## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LEADENHALL CAPITAL PARTNERS LLP
and LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,

               Plaintiffs,

    vs.

JOSH WANDER, STEVEN PASKO,
KENNETH KING, 777 PARTNERS LLC,
600 PARTNERS LLC, SPLCSS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY
SERVICES LLC, DORCHESTER
RECEIVABLES II LLC, SUTTONPARK
CAPITAL LLC, SIGNAL MEDICAL
RECEIVABLES LLC, INSURETY CAPITAL
LLC, SUTTONPARK SERVICING LLC,
SIGNAL SERVICING LLC, INSURETY
SERVICING LLC, and ADVANTAGE
CAPITAL HOLDINGS LLC,

               Defendants.

Civil Action No. _____

**COMPLAINT**

Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life

Insurance Linked Investments Fund PLC ("Leadenhall Life," and collectively, "Leadenhall"), in

their respective capacities as investment managers and/or agents, allege against Defendants Josh

Wander, Steven Pasko, Kenneth King, 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600

Partners"), SPLCSS III LLC ("SuttonPark Borrower"), Signal SML 4 LLC ("Signal Borrower"),

Insurety Agency Services LLC ("Insurety Borrower"), Dorchester Receivables II LLC

("Dorchester Borrower"), SuttonPark Capital LLC ("SuttonPark Capital"), Signal Medical

Receivables LLC ("Signal Medical"), Insurety Capital LLC ("Insurety Capital"), SuttonPark

Servicing LLC (the "SuttonPark Servicer"), Signal Servicing LLC ("Signal Servicer"), Insurety

Servicing LLC ("Insurety Servicer"), and Advantage Capital Holdings LLC ("A-CAP") as follows.

## INTRODUCTION

1.       This action concerns a years-long pattern of fraud perpetrated on the lenders of hundreds of millions of dollars of debt by a group of entities operating under the domination and control of Defendants Josh Wander, Steven Pasko, and Kenneth King.  Leadenhall is the agent with the authority to bring this action for the benefit of investors in the lenders.

2.       To induce Leadenhall to fund their operation, Wander, along with his group of alter ego entities, "pledged" over $350 million in assets as collateral to Leadenhall, knowing all along that the assets either did not exist, were not actually owned by Wander's entities, or had already been pledged to another lender.  Wander has already admitted to rampant and fundamental breaches of the parties' agreements—the only question now is whether Leadenhall will be able to recover millions of dollars in damages from a house of cards on the brink of collapse.

3.       A credit facility is an agreement that allows borrowers to borrow money over an extended period of time—here, from May 2021 through September 2024—providing borrowers flexibility to use the funds as necessary for their day-to-day operations.  In a "borrowing base" credit facility, the borrowers may draw funds from the facility up to the amount of their credit limit, which is based on the value of the collateral securing the debt, *i.e.*, the borrowers' "borrowing base."

4.       On May 7, 2021, Leadenhall entered into a credit facility agreement with a group of limited liability companies, the ultimate parent companies of which are 777 Partners and 600 Partners, as memorialized in a Loan and Security Agreement (the "LSA").  777 Partners and 600 Partners are the trade names and alter egos of Josh Wander and Steven Pasko, who are the founders and so-called "Managing Partners" of 777 Partners and 600 Partners.

5.     Under its express terms, the credit facility was a secured facility, meaning that the borrowers were required to pledge collateral to secure the debt notes and own that collateral "free and clear" of any other security interest.  The borrowers were afforded a lower interest rate because the debt was secured.  And because the value of the borrowers' assets also functioned as the borrowing base, the borrowers were required to re-affirm, on a monthly basis and each time they drew funds from the facility, that they owned any assets pledged as collateral to Leadenhall "free and clear" of any other interests.

6.     ***In other words, the cardinal rule of the entire financing arrangement was that the borrowers were required to own the assets pledged as collateral "free and clear" of any other security interests***.  If the borrowers did not actually own the assets pledged as collateral, or if the borrowers had already pledged those assets to another lender, the entire facility would effectively become an illegal and unsecured personal piggy bank that an individual like Wander could use to finance risky private equity investments in aviation, media, and sports including professional football (soccer) teams, while paying lower rates under the pretense of secured financing.  As it turned out, that is exactly what happened here.

7.     In September 2022, more than a year and a half into the credit facility and after the borrowers had represented to Leadenhall more than 40 separate times that the collateral pledged to secure the debt was "free and clear" of any other security interest, Leadenhall received an anonymous e-mail stating that Wander "either never bought" the assets that he had pledged to Leadenhall as collateral "or already pledged them to another lender."  The tipster revealed as to Wander: "***What he is doing is criminal***."

8.     After receiving the anonymous tip, Leadenhall launched an investigation and requested information from 777 Partners to determine whether this outstanding debt from the

lenders to Wander's companies—totaling well into the hundreds of millions of dollars—was in fact secured.

9.      Unfortunately for Leadenhall, the tip accusing Wander of criminal activity proved to be true.  In March 2023, a third-party lender to 777 Partners called Credigy shared with Leadenhall a list of assets that 777 Partners had ostensibly pledged for the exclusive benefit of Credigy pursuant to a separate credit arrangement with 777 Partners.

10.     By reviewing the list of assets pledged to Credigy, Leadenhall discovered that over 1,600 assets worth approximately $185 million, which 777 Partners had purportedly pledged to Leadenhall, had in fact been "double-pledged"—*i.e.*, the same collateral had been pledged to *both* Credigy and Leadenhall.

11.     During conference calls in March and April 2023, recorded with Wander's permission, Wander attempted to defuse the situation by acknowledging just the tip of the iceberg, referring to the double-pledged collateral as "embarrassing," a "mistake," and a problem that he vowed to resolve—and freely admitting that 777 Partners had breached the parties' agreements while insisting that it had done so inadvertently.  But, to conceal his broader scheme, Wander lied, assuring Leadenhall that the collateral shortfall in breach of the LSA was the result of a recording glitch that could and would be easily remedied.

12.     As a result of those conference calls, Leadenhall began to discern that Wander's misrepresentations concerning Leadenhall's collateral constituted just the opening act, and that 777 Partners does not even control its own operations and ability to perform under the LSA.  The Wizard of Oz behind the 777 Partners' curtain is in fact an insurance group holding company called Advantage Capital Holdings LLC ("A-CAP").  Wander disclosed on the calls that A-CAP had a first-priority "all asset lien" over all of the assets of 777 Partners.

13.     In an effort to "replace" the double-pledged collateral with other security interests and continue to keep Leadenhall from filing this lawsuit, in the summer of 2023, A-CAP offered Leadenhall a fourth-priority position on the assets of 777 Partners' holding company—*i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall declined the offer.

14.     Around the same time that A-CAP's unusual role in 777 Partners' affairs became privately known to Leadenhall, the entanglement between 777 Partners and A-CAP became the subject of extensive public reporting.  A-CAP, dominated and controlled by its "Chairman and CEO" Kenneth King, was reportedly the "silent partner" behind Wander's businesses who both sits on the committee that oversees 777 Partners' investments and provides the "financial firepower" to fuel 777 Partners' dealmaking—reportedly to the tune of at least $1 billion in loans, but in actuality more than double that amount, from A-CAP and affiliates to 777 Partners and affiliates.

15.     The entire scheme reached an inflection point in early 2024, when an employee of one of Wander's companies that is a party to Leadenhall's LSA disclosed to Leadenhall that, in an attempt to prevent Leadenhall from confirming that collateral had been double-pledged, Wander-affiliated borrowers had submitted forged financial statements to Leadenhall following Leadenhall's receipt of the anonymous tip. Wander's employee also disclosed that, prior to on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered internal records to try to cover up the double-pledge of collateral.  The insider also disclosed that the boundaries between A-CAP and 777 Partners did not really exist at all—specifically, A-CAP had dictated an express agreement with 777 Partners which granted A-CAP the right to control all facets of 777 Partners' operations.

16.     As a result of the agreement between 777 Partners and A-CAP, King and A-CAP must approve every material decision that 777 Partners makes, meaning that, upon information and belief, A-CAP was well aware that Wander's entities had been double-pledging assets as collateral to purportedly secure multiple lines of credit before Leadenhall discovered the double-pledging.

17.     Since Leadenhall discovered the fraudulent scheme alleged herein, public scrutiny over 777 Partners' obfuscation of its own finances and inability to pay its bills has only intensified. This scrutiny could not come at a worse time for Wander, who is currently trying to close an acquisition of the Everton Football Club, a historic football team in the prestigious English Premier League.

18.     Everton is the latest shiny object of Wander's fraudulent scheme, solvency aside. Despite the fact that 777 Partners and many of the operating businesses and professional football teams that Wander owns are deep in debt, behind on their obligations, and on thin ice with regulators, Wander's strategy has been continued expansion—using debt to acquire new assets that he can then use as collateral for more debt, which he then fails to timely pay off, in a seemingly never-ending cycle of "robbing Peter to pay Paul."

19.     Upon information and belief, Wander and Pasko are operating a giant shell game at best, and an outright Ponzi scheme at worst, that takes money in from investors and lenders and shuffles it around to various money-losing alter egos in the enterprise to disguise their true financial condition.  The enterprise is propped up and able to attract new lenders and investors only by the patronage of A-CAP, which pays off the enterprise's last-minute obligations—including 777 Partners' own payroll—in "Whac-A-Mole" fashion to keep 777 Partners' creditors at bay, if only temporarily, and to avoid the entire scheme from being laid bare in public.

20.     In March 2024, as a result of the agreement between A-CAP and 777 Partners granting A-CAP the right to control 777 Partners' operations, A-CAP prevented 777 Partners from committing to repay the obligations owed to Leadenhall pursuant to an agreed-upon amortization schedule.  During these negotiations, Wander was straightforward when questioned on whether A-CAP was the puppeteer behind the 777 Partners marionette:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

21.     Leadenhall has been forced to bring this action to hold Wander, King, Pasko, 777 Partners, A-CAP, and their affiliated entities liable for their pattern of contractual breaches and fraud, which together constitute a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

## PARTIES

**Plaintiffs**

22.     Plaintiff Leadenhall Capital is a London-based asset management company which focuses on granting institutional investors access to insurance-related risks.  Leadenhall Capital is organized as a limited liability partnership under the laws of England and maintains its principal place of business in London, England at Level 15, 70 Mark Lane, London EC3R 7NQ.  Leadenhall Capital's partners are John Wells, Luca Albertini, Lorenzo Volpi, Craig Gillespie, Tom Spreutels, Phil Kane, Chris Learmonth, Kelvin Granger, and Kunal Shah—all domiciliaries of the United Kingdom; Ben Adolph—a domiciliary of Bermuda; and Mitsui Sumitomo Insurance Company Limited—a Japanese corporation with its principal place of business in Japan.  Leadenhall Capital is the Investment Manager and Administrative Agent for the lenders under the LSA, in which

capacity it may execute a variety of functions under the LSA and associated agreements, including bringing this action on behalf of the lenders.  *See* LSA § 8.01.

23.     Plaintiff Leadenhall Life is an investment company organized as a public limited company under the laws of Ireland which maintains its principal place of business in Dublin, Ireland.  Leadenhall Life is the Collateral Agent pursuant to the LSA and, in that capacity, holds the security interests in the Collateral pledged for the benefit of the lenders under the LSA.

**Defendants**

24.     Defendant 777 Partners is a Miami-based private investment firm organized as a limited liability company under the laws of Delaware which has its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131 (the "777 Partners Address").   The company is nominally focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 777 Partners has one member, SuttonPark Acquisition LLC, which is organized under the laws of Delaware and has its principal place of business in Florida.  SuttonPark Acquisition LLC has two members, JARM Capital LLC and MTCP LLC, both of which are organized under the laws of Delaware and have their principal places of business in Florida.  The sole member of JARM Capital LLC is Josh Wander, and the sole member of MTCP LLC is Steven Pasko.

25.     Defendant 600 Partners is a Miami-based private equity firm organized as a limited liability company under the laws of Delaware which has its principal place of business at the 777 Partners Address.  Like 777 Partners, 600 Partners characterizes itself as focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 600 Partners has one member: SPA II LLC, which is organized under the laws of Delaware and

has its principal place of business in Florida; and SPA II LLC has two members, MTCP LLC and Steven Pasko.

26.     Collectively, 777 Partners and 600 Partners own 100% of the equity of each of the entities acting as Sellers and Servicers under the LSA, and the Seller entities in turn own 100% of the equity of each of the entities acting as Borrowers (defined below) under the LSA.  While Josh Wander and Steven Pasko have designed the corporate structure of their web of entities to obscure their domination over the organization, Wander and Pasko, in consultation with—and with the approval and indulgence of—King and A-CAP as discussed herein, control 777 Partners, 600 Partners, and each of their subsidiaries and affiliates, including those named as Defendants here.

27.     Defendant Josh Wander is co-founder and Managing Partner of 777 Partners and 600 Partners, and he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Upon information and belief, Wander's permanent residence is 1300 Monad Terrace, Penthouse B, Miami Beach, Florida 33139.

28.     Defendant Steven Pasko is the other co-founder and Managing Partner of 777 Partners and 600 Partners, and, upon information and belief, he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Upon information and belief, Pasko's permanent residence is 1451 Brickell Avenue, Penthouse 54, Miami Beach, Florida 33131.

29.     Defendant SPLCSS III LLC (defined above as the "SuttonPark Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Defendant SuttonPark Servicing LLC (defined above as "SuttonPark Servicer") is a limited liability company organized under the laws of Delaware and has its principal place of business at 590 Madison Avenue, 15th Floor, New York, New York 10022. Upon information and belief, the SuttonPark Borrower and SuttonPark Servicer have the same

sole member, Defendant SuttonPark Capital LLC (defined above as "SuttonPark Capital"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, SuttonPark Capital has two members, 600 Partners and SPC Partners LLC.  Upon information and belief, the members of SPC Partners LLC are all domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

30.    Defendant Dorchester Receivables II LLC (the "Dorchester Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, the Dorchester Borrower has one member, Defendant SuttonPark Capital.  As set forth above, the members of SuttonPark Capital are 600 Partners and SPC Partners LLC, which are domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

31.    Defendant Signal SML 4 LLC (defined above as the "Signal Borrower," and together with the SuttonPark and Dorchester Borrowers, the "Borrowers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, the Signal Borrower has one member, Defendant Signal Medical Receivables LLC (defined above as "Signal Medical"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address, and which is a Seller under the LSA.  Defendant Signal Servicing LLC (defined above as "Signal Servicer") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, Signal Medical and Signal Servicer each have the same sole member, Signal Financial Holdings LLC, and Signal Financial Holdings LLC is managed by Wander, who runs his businesses out of

Miami, Florida, and there is no connection between Signal Financial Holdings LLC and the United Kingdom or Bermuda.   Upon information and belief, the members of Signal Medical are all domiciled in one or more states and not in the United Kingdom, Bermuda, Ireland, or Japan.

32.    Defendant Insurety Agency Services LLC (defined above as the "Insurety Borrower," and, together with the SuttonPark, Dorchester, and Signal Borrowers, the "Borrowers") is a limited liability company organized under the laws of Florida and which has its principal place of business at the 777 Partners Address.   Defendant Insurety Servicing LLC (defined above as "Insurety Servicer," and, together with SuttonPark Servicer and Signal Servicer, the "Servicers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  The Insurety Borrower and Insurety Servicer have the same sole member, Defendant Insurety Capital LLC (defined above as "Insurety Capital"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, Insurety Capital has two members, 777 Partners and John R. Zirkelbach, a natural person domiciled in Ohio, neither of which are domiciled in the United Kingdom, Bermuda, Ireland, or Japan.

33.    Advantage Capital Holdings LLC (defined above as "A-CAP") is a limited liability company organized under the laws of Delaware and has its principal place of business at 1180 Avenue of the Americas, 21st Floor, New York, New York 10036.  A-CAP is controlled and dominated by Kenneth King, who is domiciled in New York.  Upon information and belief, the members of A-CAP are all domiciled in one or more states of the United States and not in the United Kingdom, Bermuda, Ireland, or Japan.

34.    Defendant Kenneth King is the Chairman and CEO of Advantage Capital Management LLC (defined above as "A-CAP") and owns a controlling stake in A-CAP.  Upon

information and belief, King's permanent residences are 15 Kensington Road, Unit 215, Bronxville, New York 10709 and 26 Wilton Road, Pleasantville, New York 10570.

## JURISDICTION AND VENUE

35.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted a claim arising under the RICO Act, 18 U.S.C. § 1964.  This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

36.     The Court also has diversity jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs are citizens of the United Kingdom, Ireland, Japan, and Bermuda, and, upon information and belief, Defendants are citizens of Florida, Delaware, Ohio, and New York.

37.     This Court has personal jurisdiction over Defendants 777 Partners, 600 Partners, the SuttonPark Borrower, the Dorchester Borrower, the Signal Borrower, the Insurety Borrower, SuttonPark Capital, Signal Medical, and Insurety Capital by the terms of the LSA, which provide that these Defendants have consented to the jurisdiction of courts sitting in New York. *See* LSA § 10.09; Guaranty Agreement § 15.

38.     This Court has personal jurisdiction over Defendant Josh Wander by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers.   The Court also has personal jurisdiction over Wander because—while attempting to negotiate an agreement with Leadenhall in March and April 2024 to pay back the debt that the Borrowers had borrowed in excess of contractual limitations—Wander repeatedly called Leadenhall representatives from New York City, and on at least one occasion, worked out of A-CAP's headquarters in New York City.

39.     This Court has personal jurisdiction over Defendant Steven Pasko by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers,

and the Servicers.  The Court also has personal jurisdiction over Defendant Steven Pasko by virtue of his signing the LSA on behalf of the Defendant signatories thereto, and because Pasko is so closely related to those Defendant signatories that he is bound by the LSA's forum selection clause.

40.     This Court has personal jurisdiction over Defendants A-CAP and Kenneth King because they are domiciled in New York.

41.     Venue is proper under 28 U.S.C. § 1391 because all Defendants are residents of the state of New York by domicile or the express terms of the LSA or Guaranty Agreement.  Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants, including but not limited to A-CAP, reside, are found, and/or transact their affairs in this district.

## STATEMENT OF THE CASE

### The Credit Facility

42.     Wander, through his trade name 777 Partners and its subsidiaries and affiliates, invests in, among other things, various forms of "receivables."  Relevant to this action, those receivables include future cash flows from so-called "structured settlements" and lottery winnings. A "structured settlement" allows an injured plaintiff, typically in a personal injury suit, to receive a settlement or damages award over time in periodic payments rather than as a lump-sum payment.

43.     This form of investment business runs on buying future cash flows from injured parties or lottery winners who are entitled to large amounts of money over a long period of time, but who need more money in the near term than those cash flows permit, and who are thus willing to sell their future cash flows for a lump sum that is a percentage of the present value.

44.     Wander uses the profits from this business both to purchase additional receivables and to infuse capital into other ventures, including Wander's interests in professional football clubs.  To accelerate the profits from this business, Wander increased the leverage on his

investments by borrowing against existing receivables portfolios, and using those loans to buy more receivables—rinse and repeat.

45.     In 2021, following the expiration of a prior credit facility between the parties, Wander, Pasko, 777 Partners, 600 Partners, and certain entities they control named as Defendants herein entered into a new credit facility with Leadenhall, as detailed more fully below.  The credit facility is embodied in a suite of contracts, at the center of which sits the LSA, executed May 7, 2021.  In addition to the LSA, the parties entered Sale Agreements, Servicing Agreements, Pledge Agreements, and a Guaranty Agreement (the "Agreements"), each of which is explained in turn below.  Collectively, the Agreements define the relationships between the following entities:

a.  Leadenhall Capital, which acts as Administrative Agent to the Lenders (as defined below) under the LSA, fielding borrowing requests from Borrowers, facilitating the funding of debt, and enforcing the Lenders' rights and remedies in the event of a material breach or "Event of Default";

b.  Leadenhall Life, which acts as Collateral Agent for the Lenders under the LSA, holding security interests in the receivables and related assets owned and pledged as collateral by the Borrowers, as well as 100% of the equity in the Borrowers, to secure the Lenders' debt;

c.  The Lenders, a group of nine investment funds or separate accounts for which Leadenhall Capital acts as investment manager and agent, which provided secured debt to the Borrowers pursuant to the LSA;

d.  The Borrowers, a group of four firms, all controlled by 777 Partners and 600 Partners, which borrowed secured debt from the Lenders pursuant to the LSA;

e.   The Sellers, a group of three firms, all controlled by 777 Partners and 600 Partners, which sold receivables to the Borrowers to secure debt provided under the LSA, and which also fully owned the Borrowers and pledged their equity in the Borrowers to Leadenhall Life as collateral for the LSA pursuant to the Pledge Agreements;

f.   The Servicers, a group of three firms controlled by 777 Partners and 600 Partners that agreed to service the receivables on behalf of the Borrowers and for the benefit of Leadenhall Capital as Administrative Agent; and

g.   The Guarantors, 777 Partners and 600 Partners, which guaranteed all of the Borrowers' obligations under the LSA and the other Agreements.

46.    The entities controlled by 777 Partners and 600 Partners were further organized, for purposes of their rights and obligations under the LSA, into Borrower Groups each consisting of one Borrower, the Seller that owned that Borrower, and one Servicer, and each corresponding to a particular Lender Group consisting of some or all of the nine Lender entities:

a.   The SPLCSS Borrower Group consisted of the SuttonPark Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

b.   The Dorchester Borrower Group consisted of the Dorchester Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

c.   The Insurety Borrower Group consisted of the Insurety Borrower as Borrower, Insurety Capital as Seller, and Insurety Servicer as Servicer; and

d.   The Signal Borrower Group consisted of the Signal Borrower as Borrower, Signal Medical as Seller, and Signal Servicer as Servicer.

47.    To put all of the Agreements together, in brief:

a. **the LSA** set forth the terms on which the Lenders would provide debt secured by collateral owned by the Borrowers;

b. **the Sale Agreements** set forth the terms on which the Sellers could sell or assign assets as Collateral to the Borrowers to secure that debt;

c. **the Servicing Agreements** set forth the terms under which the Servicers would service the Collateral held by the Borrowers to ensure it did not become impaired;

d. **the Pledge Agreements** provided an additional source of Collateral in the form of pledges of the 100% equity interests in the Borrowers; and

e. **the Guaranty Agreement** provided guarantees by 777 Partners and 600 Partners of all of the Borrowers' obligations under the Agreements.

48.     Reflecting his control over 777 Partners and each of the various underlying entities, Pasko executed each of the governing Agreements on behalf of the 777 Partners entities.

**Loan and Security Agreement**

49.     The LSA is structured as a secured credit facility whereby the Borrowers were permitted to borrow secured debt from the Lenders from time to time on an ongoing basis through September 30, 2024, or until the occurrence of an "Event of Default."

50.     The "Lenders" are comprised of nine investment funds or separate accounts. Leadenhall has the authority under the LSA to act on behalf of the Lenders and brings this action in its capacity as agent for the Lenders.  LSA § 8.01 ("Each Lender hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative

Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.").[1]

51.     In exchange for providing debt to the Borrowers, the Lenders were paid interest, and Leadenhall Life, as Collateral Agent, obtained first-priority security interests in all of the assets of each Borrower, including but not limited to the receivables and related assets held by the Borrowers (the "Collateral").  *See* LSA § 2.15; *id.* art. I, "Collateral."

52.     The LSA imposed the equivalent of a credit limit on each Borrower, referred to as a "Borrowing Base," based on the value of each Borrower's receivables, which was designed to ensure that each Borrower always had enough Collateral to secure its borrowings.  Each Borrowing Base was calculated using a formula specific to the Borrower—the main component of which was the value of that Borrower's receivables, with certain adjustments.  *See* LSA "Borrowing Base," LSA Schedules VIII, IX, X, and XI.  A misrepresentation as to the value of that Borrowing Base would constitute a misrepresentation as to both the owned Collateral and the Borrowing Base.

53.     In the event the principal value of the total debt of a single Borrower ever exceeded its Borrowing Base—known as a "Borrowing Base Deficiency"—and such deficiency was not cured within three business days, it would constitute a "Borrower Group Event of Default."  Upon a Borrower Group Event of Default, Leadenhall was entitled to accelerate the entire amount of that Borrowing Group's outstanding debt and pursue remedies under the LSA and the Uniform Commercial Code on behalf of the relevant Lenders against that Borrowing Group's Collateral.  LSA § 7.02(g); *id.* Art. I, "Borrowing Base Deficiency."  If the Borrowing Base Deficiency was not cured in thirty days, it would constitute a "Facility Event of Default," which would entitle

---

[1]   *See also* LSA § 8.03 ("The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a 'Lender' under this Agreement as any other Lender and may exercise the same as though it were not the Administrative Agent.").

Leadenhall to accelerate the entire amount of the outstanding debt and pursue the same remedies against all four Borrower Groups.  *Id.*, § 7.01(c).

54.    If the Borrowers wanted to borrow more, the Agreements allowed them to do so by purchasing more receivables from the Sellers pursuant to the respective Sale Agreement, thereby increasing the Borrower's Borrowing Base.   *See* LSA Article I, "Borrowing Base Limitation," "Sub-Facility Limit"; *id.* §§ 2.01(a), 3.02(c).

55.    What the Borrowers could ***not*** do under the LSA was put receivables on their books that they either did not own or that were already on the books of another of Wander and Pasko's portfolio companies—pledged to some other lender, securing some other loan.

56.    The Agreements contained additional provisions to guard proactively against such defaults, rather than waiting for them to be discovered.  For instance, each time a Borrower made a "Borrowing Request" to Leadenhall Capital, *id.* at § 2.03, the Servicer had to submit a "Compliance Report" setting forth a calculation of the Borrowing Base, a representation that the Borrowing Base Limitation had not been exceeded, an affirmation that each of the representations and warranties in the LSA remained true and correct, and a representation that no Event of Default had occurred.  *See* LSA, Annex A-1.

57.    Additionally, the LSA required each Servicer to prepare a Monthly Report for its associated Borrower concerning the receivables and other assets held by that Borrower, which could not "include any Receivable that is not an Eligible Receivable . . . in the calculation of the Borrowing Base."   LSA § 5.01(j)(i).   Each Borrower's representations and warranties were renewed as of the date of each Compliance Report and each Monthly Report.  *Id.*, § 4.01.

58.    Over the course of the credit facility, on behalf of the Servicers, Steven Pasko was the authorized signatory for Monthly Reports and Compliance Reports.

**Pledge Agreements**

59.     In addition to the security interests in the Borrowers' Collateral under the LSA, and Leadenhall Life's remedies thereunder, the Lenders' investments were meant to be protected by at least four other sets of agreements granting Leadenhall additional rights and remedies:  the Pledge Agreements, Sale Agreements, Servicing Agreements, and Guaranty Agreement, all of which were executed the same day as and in conjunction with the LSA.

60.     Leadenhall Life entered into four separate Pledge Agreements as additional protection in providing hundreds of millions of dollars of debt to the Borrowers.  In particular, Leadenhall Life entered into Pledge Agreements with each of the three Seller entities that, in turn, owned 100% of each of the four Borrowers:

> a.  SuttonPark Capital LLC (*i.e.*, "SuttonPark Capital"), which owned 100% of Dorchester Receivables II LLC (*i.e.*, the "Dorchester Borrower") and SPLCSS III LLC (*i.e.*, the "SPLCSS Borrower");
>
> b.  Insurety Capital LLC (*i.e.*, "Insurety Capital"), which owned 100% of Insurety Agency Services LLC (*i.e.*, the "Insurety Borrower"); and
>
> c.  Signal Medical Receivables LLC (*i.e.*, the "Signal Seller"), which owned 100% of Signal SML 4 LLC (*i.e.*, the "Signal Borrower").

61.     Each Borrower represented and warranted in § 4.01(l) of the LSA that it was owned 100% by the Sellers, and any change in that 100% ownership constituted an event of default pursuant to § 7.02(m).  LSA Article 1, "Change in Control."

62.     Under § 2.1 of each Pledge Agreement, each Seller pledged 100% membership interests in each Borrower, along with all present and future claims and all proceeds related thereto, to Leadenhall Life as additional security for the Borrowers' obligations.

63.     The remedies available under the Pledge Agreements were structured in a similar way to those available under the LSA.   In the event of a Borrower Group Event of Default, Leadenhall Life could exercise remedies with respect to the defaulting Borrower Group—*i.e.*, against that specific Seller's equity in a specific Borrower under the respective Pledge Agreement. *See* Pledge Agreements § 4.01.  A Facility Event of Default would trigger remedies under all four Pledge Agreements, thereby allowing Leadenhall Life to proceed against the equity of all of the Borrowers at once. *Id.*

64.     The Pledge Agreements were principally between each Seller (as Pledgor) and Leadenhall Life, but each also was acknowledged by the respective Borrower wholly owned by the signatory seller.  Section 6.11 provides that, upon an Event of Default under the LSA, the Borrower "will comply with instructions originated by the Collateral Agent with respect to the Pledged Collateral without further consent of the Pledgor."

**Sale Agreements**

65.     Each of the Borrowers also entered into a Sale Agreement with the respective Seller in its Borrower Group.  The Sale Agreements set forth the terms under which the Borrowers would purchase additional receivables from the Sellers, which receivables, once purchased, would become Collateral and would factor into the Borrowing Base, enabling the Borrowers to borrow more from the Lenders.

66.     The Sale Agreements provided that the Borrowers could purchase receivables from the Sellers even if the Borrowers did not have cash on hand to pay for them, in which case "such excess shall be deemed to be a contribution to the capital of the Purchaser by the Seller on such date and the Purchaser shall increase the Seller's aggregate investment in the Purchaser accordingly in accordance with New York law."  Sale Agreements § 2.07(b).

67. In the Sale Agreements, each Seller also acknowledged the security interests the Borrowers would grant to Leadenhall Life under the LSA, as well as that Leadenhall Life would "have the right at any time to enforce this Agreement against the Seller and to exercise directly all of the Purchaser's rights and remedies under this Agreement." *Id.* § 2.05.

68. Over the course of the credit facility, Steven Pasko was the authorized signatory on sales or "assignments" from the Sellers to the Borrowers.

**Servicing Agreements**

69. Each of the Borrowers and related Sellers in each Borrower Group also entered into a Servicing Agreement with the respective Servicer in the Borrower Group. The Servicing Agreements provide for the Servicers to service receivables held by their respective Borrowers, including by collecting payments and executing required documentation. Servicing Agreements § 3.1. In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced. Servicing Agreements § 5.1. The "Valuation Amount" of those receivables used to calculate Servicing Fees is the same as is used to calculate each Borrowers' Borrowing Base. LSA Schedules VIII, IX, X, XI.

70. The Servicers were also responsible, under the LSA and the Servicing Agreements, for delivering Monthly Reports and Compliance Reports to Leadenhall Capital as Administrative Agent, including accurately calculating their respective Borrowers' Borrowing Bases. Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

71. Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written

statement is delivered," and each Servicer agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance Report.  LSA §§ 6.06(a), 6.07(c).

72.     The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

73.     The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

**Guaranty Agreement**

74.     The final security for Leadenhall and the Lenders' investments came from a Guaranty Agreement between Leadenhall Capital on the one hand, and 777 Partners and 600 Partners on the other.  777 Partners and 600 Partners (referred to as "Guarantors" in the Guaranty Agreement) guaranteed the obligations of each of the Borrowers.  As recited in the Guaranty Agreement, each of 777 Partners and 600 Partners "is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the Loan and Security Agreement, and the other Transaction Documents."  *See* Guaranty Agreement at 1.

75.     Under the Guaranty Agreement, Leadenhall and the Lenders are defined as the "Recipients," and 777 Partners and 600 Partners each "jointly and severally absolutely,

unconditionally and irrevocably guarantee[d] to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower [and the Insurety Borrower Group and Signal Borrower Group, subject to certain Guaranty Limits], in each case, so long as a Trigger Event has occurred and is continuing . . . ." Guaranty Agreement § 2(a).

76.     The Guaranty Agreement defines a "Trigger Event" to include the occurrence of any of the following events, among others:

(i) **any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement**;

(ii) **any act of theft or misappropriation of funds by either Guarantor** under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

(iii) **any willful misrepresentation of a material nature by either Guarantor** under this Guaranty;

[…]

(ix) **any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances** (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days; … or

[…]

(xi) **any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise or enforcement of its rights and remedies against any Collateral** under the Transaction Documents or under Requirements of Law.

*Id.* at § 1, "Trigger Event."[2]

77.     The "Guaranteed Obligations" backed up by 777 Partners and 600 Partners included, the "Obligations" of the Borrowers, *id.* at § 1, "Guaranteed Obligations," which is defined under the LSA as, "with respect to each Borrower, the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA Article I, "Guaranteed Obligations."

**Central to the Credit Facility Is That All Collateral Remain "Free and Clear" of Any Other Interests.**

78.     The centerpiece of the credit facility is that the Collateral pledged for the benefit of the Lenders is pledged ***solely*** for the benefit the Lenders and remains free and clear of any "Adverse Claims."  This thread runs through all of the Agreements as stated in the provisions set forth below.

79.     *First*, under the LSA, each Borrower made the following representation upon the execution of the Loan and Security Agreement, the date on which any borrowing was made by the Borrowers (a "Borrowing Date"), and on the date of each Monthly Report and each Compliance Report: "***Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim***."  LSA § 4.01(h).

80.     An "Adverse Claim" is defined in LSA § 1.01 as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement," and it has the same meaning in the Pledge Agreements, Sale Agreements, and Guaranty Agreement.   Pledge Agreements § 1.1; Sale Agreements § 1; Guaranty Agreement § 1.

---

[2]     Any emphasis herein is added unless otherwise noted.

81.     *Second*, under the LSA, each Borrower made the following representation throughout the term of the borrowing relationship: "*[S]uch Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral*, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof." LSA § 5.01(d).

82.     *Third*, under the LSA, each Borrower makes the following representation throughout the term of the borrowing relationship: "Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) *or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person* . . . ." LSA § 5.01(k)(vi).

83.     *Fourth*, the LSA makes clear that a "Facility Event of Default" occurs whenever the security interest in the Collateral "*shall for any reason cease to be a valid and perfected first priority security interest*." LSA § 7.01(d).  Unlike other grounds for a Facility Event of Default, which apply only once a breach has continued for thirty days without being cured, any failure of any security interest "to be a valid and perfected first priority security interest" would cause *every* Borrower to be in default after only two days.  *Id.*

84.     *Fifth*, the LSA provides a right to indemnification for any losses arising out of the Borrowers' failure to vest a security interest in the Collateral free and clear of Adverse Claims: "[E]ach Borrower shall pay *on demand* to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from . . . *the failure to vest in the Collateral Agent on behalf of the Secured Parties*

*a valid and perfected security interest in the Collateral free and clear of any Adverse Claim* . . . ."
LSA § 9.01(iv).

85.     *Sixth*, under the LSA, each Servicer represented that **"[e]ach Compliance Report,
Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this
Agreement shall be true and correct in all material respects on the date such report or written
statement is delivered.**"  LSA § 6.07(c).

86.     *Seventh*, under the Sale Agreements, each Sellers agreed with their respective
Borrowers that any sale of collateral shall be "an absolute sale and transfer by the Seller (free and
clear of any Adverse Claim . . . )," and each Seller represented and warranted to its respective
Borrowers that, "[a]s of the applicable Purchase Date . . . , *the Seller is legal and beneficial owner
of the applicable Transferred Asset free and clear of any Adverse Claim*," with certain exceptions
not relevant here.  Sale Agreements §§ 2.07, 4.01(h).  Each Seller also covenants that it "*will not
sell, pledge, assign or transfer to any Person, or grant, create, incur, assume or suffer to exist
any Adverse Claim on, any Transferred Asset*, whether now existing or hereafter created, or any
interest therein."  *Id*. at § 5.01(f).

87.     *Eighth*, under the Guaranty Agreements, 777 Partners and 600 Partners guarantee
**all** of the Borrowers' obligations described above, and one of the specified "Trigger Events" is
"*any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan
and Security Agreement, in each case free and clear of all liens, security interests or
encumbrances* . . . ."  Guaranty Agreement § 1.

88.     In summary, the credit facility implemented by the Agreements depended on the
Borrowers owning sufficient Collateral to secure debt they took on from the Lenders, and the
Agreements took pains at every turn to ensure that (1) the Collateral securing the debt was free

and clear of any Adverse Claims that could interfere with the Lenders' remedies in the event of a default and, (2) if at any time there was insufficient Collateral available free and clear to secure all outstanding obligations, the Borrowers would be in default, and Leadenhall and the Lenders could proceed against all of the Collateral that the Borrowers currently owned, obtain additional receivables to recoup their investment, and otherwise proceed against 777 Partners and 600 Partners for the full values of the debt.

**Leadenhall Uncovers a Pattern of Knowing Misrepresentations Concerning Its Collateral.**

**Leadenhall receives an anonymous tip sounding the alarm on Wander's "criminal" scheme.**

89.     In May 2021, pursuant to the terms of the LSA, the Borrowers began making borrowing requests to Leadenhall, taking out debt, and delivering required Monthly Reports and Compliance Reports.

90.     The first periodic reports delivered by the SuttonPark and Dorchester Servicers reflected "Outstanding Borrowings" of approximately $300 million and $80 million, respectively, and contained a list of each Borrower's assets, a calculation of the Borrowing Base based on those assets, and a representation as to whether outstanding borrowings were in compliance with the Borrowing Base.  An excerpt from the May 2021 Monthly Report delivered by the SuttonPark Servicer—reflecting a listing of "life contingent assets," *i.e.*, assets pledged for the benefit of the Lenders with payouts contingent upon the continued survival of an insured—is set forth below:

| SPLCSS III Receivables Compliance Report<br>Borrowing Base Calculation and Compliance as of May, 2021 | | |
|---|---|---|
| **LIFE CONTINGENT RECEIVABLES** | | |
| | Swap Rate applicable to the Weighted Average Life of all Eligible Receivables that are Life Contingent Receivables | 1.97% |
| (plus) | 3.85% bps | 3.85% |
| | Life Contingent Discount Rate | 5.82% |
| | LC ASSIGNABLE ANNUITY | $- |
| | LC Assignable-No COO | $- |
| | LC HEDGED | $4,237,398.31 |
| | LC HEDGED (Premium) | $- |
| | LC Hedged (Premium) - no LE | $- |
| | LC Hedged ASSIGNABLE ANNUITY | $- |

91. Pursuant to the terms of the LSA, by the Servicers delivering these Monthly Reports and Compliance Reports to Leadenhall, the Borrowers represented upon delivery that they were "the legal and beneficial owner[s] of the applicable Collateral free and clear of any Adverse Claim." LSA § 4.01(h).

92. Over the period May 2021 through the end of 2022, the SuttonPark and Dorchester Servicers continued to deliver Monthly Reports and Compliance Reports to Leadenhall containing a list of the Borrowers' assets and a calculation of the Borrowing Base—and therefore the Borrowers represented month after month that Collateral pledged as security to Leadenhall was "free and clear" of any other security interest.

93. On September 19, 2022, Leadenhall Capital Managing Partner Craig Gillespie received an email with an anonymous tip—from sender "noreply@anonymousemail.me"—that Collateral pledged for the benefit of the Lenders either did not exist or was pledged to another third-party lender. The tip expressly accused Josh Wander of criminal activity:

**The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured. What he is doing is criminal**.

Exhibit 1 (Anonymous Tip).  The anonymous tip was a prescient warning that Leadenhall would later—despite Wander's vociferous attempts at obstruction—determine was true in all respects.

**Leadenhall visits 777 Partners' offices in Miami, during which Wander tries to assure Leadenhall that any problems with its Collateral are limited and under control.**

94.     After receiving the tip, pursuant to its audit rights under the LSA, Leadenhall began a business review of the Borrowers' receivables and assets pledged as Collateral to ensure that the hundreds of millions of dollars in debt notes provided to the Borrowers were secured and collateralized in accordance with the LSA.  *See* LSA § 5.02 (permitting Leadenhall Capital as the Administrative Agent "to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller").

95.     In the immediate aftermath of receiving the tip, Leadenhall representatives conducted a series of calls with Wander and other representatives of 777 Partners and the Borrowers, during which Leadenhall requested additional detail on assets pledged as Collateral to Leadenhall.

96.     In November 2022, Leadenhall Managing Partner Craig Gillespie, CFO and COO Chris Learmonth, and Vice President Tom Foot visited 777 Partners' offices on-site in Miami, Florida to conduct a series of in-person meetings with Wander and other individuals responsible for allocating Collateral for the benefit of the Lenders.

97.     During the on-site visit, the Leadenhall representatives met with senior management of 777 Partners and were presented with overviews of 777 Partners' businesses. Gillespie, Learmonth, and Foot also inspected the computer system used by 777 Partners and the

Borrowers—referred to as "MP Fin"—to allocate receivables and other assets to various lenders for purposes of securing the notes.  Given the number of assets that 777 Partners and the Borrowers had pledged to various lenders—which numbered in the tens of thousands—Leadenhall representatives were able to conduct only a random sample "spot check" of the assets pledged as Collateral.

98.     During the "spot check" of 777 Partners' computer systems, the Leadenhall and 777 Partners teams identified a relatively small number of assets that were improperly allocated to the Dorchester Borrower.  To reconcile the issue, the Dorchester Borrower removed the improperly allocated assets from its Borrowing Base, amounting to approximately $7 million in value that was no longer available for the Dorchester Borrower to borrow against.

99.     Removing these assets from the Dorchester Borrower's Borrowing Base resulted in a corresponding deficiency in the Dorchester Borrower's Borrowing Base compared to its Outstanding Borrowings.  This deficiency is apparent by comparing the Monthly Reports from the Dorchester Borrower issued before and after the November 2022 spot-check—with the November 2022 Report showing compliance with the Borrowing Base Limitation and the December 2022 Report showing that the Dorchester Borrower was out of compliance by approximately $7 million:

**Excerpt from November 2022 Dorchester Report:**

|  |  | Borrowing Base | $79,103,921.15 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $79,103,921.15 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **Yes** |

**Excerpt from December 2022 Dorchester Report:**

|  |  | Borrowing Base | $71,689,952.00 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $71,689,952.00 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

100.     Nevertheless, Wander and 777 Partners took pains during the November 2022 on-site meetings to ensure that Leadenhall believed that, to the extent any assets were not properly allocated to Leadenhall on MP Fin, the problem was limited to the Dorchester Borrower, contained, and under control.   Upon information and belief, Wander and 777 Partners made these misrepresentations with the full knowledge that their employees had worked to alter data and obfuscate data records in advance of the meetings.

101.     As would be revealed over the following months, however, the problem was anything but contained, as Leadenhall would discover that both the Dorchester and SuttonPark Borrowers had double-pledged hundreds of millions of dollars of collateral, and thus had covertly borrowed hundreds of millions of dollars from Leadenhall in excess of their Borrowing Bases.

102.     Following the on-site visit, Leadenhall and representatives of 777 Partners and the Borrowers continued to correspond over email and telephone to ensure that assets were properly allocated to the Borrowers.   777 Partners also agreed to add a "lender identifier" field—which was available in the MP Fin system—to the Monthly Reports to ensure that assets were properly allocated to Leadenhall.   The inclusion of this lender identifier field to the SuttonPark Borrower Monthly Reports gave no indication that Collateral was double-pledged and thus further concealed any double-pledging from Leadenhall.

**In early 2023, Wander confirms that "around $100 million" of Collateral had been double-pledged to a third-party lender called Credigy.**

103.    Through early 2023, although Leadenhall kept close watch over its lending to Wander's entities, no further issues were revealed.  For instance, the January 2023 Report for the SuttonPark Borrower represented that the Borrower was compliant with its Borrowing Base Limitation, while the Dorchester Borrower's January 2023 Report reflected approximately the same $7 million deficiency that had been identified in late 2022:

**Excerpt from January 2023 SuttonPark Report:**

| | | Borrowing Base | $361,309,249.45 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $361,309,249.45 |
| (less) | Outstanding Borrowings | | $349,997,803.32 |
| | **Compliant if difference is ≥ 0)** | | **Yes** |

**Excerpt from January 2023 Dorchester Report:**

| | | Borrowing Base | $71,831,753.87 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $71,831,753.87 |
| (less) | Outstanding Borrowings | | $79,010,000.00 |
| | **Compliant if difference is ≥ 0)** | | **No** |

104.    In March 2023, however—nearly two years into the credit facility—a separate third-party lender to 777 Partners, Credigy, visited Leadenhall's offices in London under the auspices of a "general catch-up."  Following that meeting, Credigy sent Leadenhall an inventory of assets that 777 Partners and affiliates had ostensibly pledged for the exclusive benefit of Credigy.  Credigy asked Leadenhall to confirm that 777 Partners had not also allocated the assets to Leadenhall.

105.    From Credigy's inventory of assets, Leadenhall was able to discern that 777 Partners had allocated more than 1,600 receivables—totaling approximately $185 million in value—to both Credigy and Leadenhall.  In other words, Leadenhall confirmed that Wander and Pasko had "double-pledged" Leadenhall's assets.

106.    Leadenhall would also later discover that the majority of these 1,600 double-pledged receivables had been sold or "assigned" to the SuttonPark Borrower—and therefore ostensibly pledged as Collateral to Leadenhall—via a "Form of Assignment" executed by Steven Pasko on September 30, 2022.[3]

107.    On March 24, 2023, Leadenhall sent a letter to Wander and Pasko requesting evidence that assets comprising Leadenhall's Collateral were free and clear of Adverse Claims and that the Monthly Reports and Compliance Reports were true, accurate, and complete.  *See* Exhibit 2 (Mar. 24, 2023 Letter from C. Gillespie) ("***As you are aware, it has come to our attention that certain Eligible Receivables may be subject to Adverse Claims*** . . . .  To reiterate our prior discussions, we need to receive clear and objectively determinable evidence that the Receivables constituting Collateral for our SPLCSS Loans and Dorchester Loans, respectively remain Eligible Receivables and that each of the Compliance Reports remain true, accurate and complete.").

108.    On March 28, 2023, senior executives and board members of Leadenhall held a conference call with Wander to get further detail on how assets had been double-pledged by the Borrowers and to understand whether Wander had a plan to fix the problem.  The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Phil Kane, and

---

[3] Pasko was the authorized signatory on the sale agreements or the "assignments" of assets by the Sellers to the Borrowers.  Because the Borrowers pledged to Leadenhall 100% of their assets as Collateral by function of the LSA, these assignment agreements in which the Borrowers acquired assets in the first place from the Sellers—and signed by Pasko—are foundational to the contractual violations and false statements herein.

General Counsel Peter Clark.  Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall recorded the call with Wander's permission.

109.    Wander's objective from the beginning of the call was to avoid explaining precisely how and when the double-pledging had occurred and instead impress upon the Leadenhall representatives that any deficit or hole in Leadenhall's Collateral could be shored up by, what he termed "replacement deals."

110.    Amidst a murky array of promises by Wander to Leadenhall concerning "replacement deals"—including replacing the double-pledged Collateral with cash from a potential sale of equity in 777 Partners' football assets—Wander acknowledged that there had been a "screwup" and "embarrassing" problem caused by 777 Partners' antiquated computer system concerning assets pledged to Leadenhall by the SuttonPark and Dorchester Borrowers.

111.    In particular, Wander expressly stated during the call that "the issue today is that *there are deals that are in Credigy's Borrowing Base that are allocated to you guys*."  Wander further explained concerning the double-pledged assets that there were "deals that sat on our Volans facility[4]—which is locked out basically now for five years—that were allocated to the [SuttonPark] facility.  *And those are the deals that that—you would consider double-pledged now, for they're on both facilities*."

112.    Wander claimed that the "screwup" was the result of 777 Partners and the Borrowers' failure to recognize, upon allocating certain assets to Leadenhall, that those assets had already been allocated as collateral to Credigy.  He further described the issue as a mistake in "portfolio input"—meaning that upon the initial "input" of the assets into the Leadenhall facility, they were already encumbered by other security interests.

---

[4] The "Volans facility" refers to 777 Partners' credit facility with Credigy.

113.    Near the end of the call, during an exchange between Wander and Leadenhall Chairman John Wells, Wander expressly acknowledged that the SuttonPark and Dorchester Borrowers' double-pledge of Collateral constituted a clear breach of the parties' agreements:

> Wells: **"There are so many breaches on these agreements now. We need to get all of this sorted out."**

> Wander: **"Agreed, agreed, agreed."**

114.    Wander again promised on the call that 777 Partners would individually review— or conduct a "reconciliation" of—every single asset pledged as collateral in 777 Partners' "MP Fin" system for the purpose of ensuring that assets were appropriately allocated to its lenders. Wander also promised to put a process in place to "reconcile" more frequently going forward to ensure that assets were properly allocated under 777 Partners' credit facilities.

115.    On March 29, 2023, following up on the March 28, 2023 call, Leadenhall Managing Partner Phil Kane sent an email to Wander containing a laundry list of action items under the header "**Double Pledges**," with the very first requirement for Wander listed at the top: "A reconciliation of all of our assets to the appropriate SPV for both [the SuttonPark and Dorchester Borrowers] – this should be completed as soon as possible, and by Monday 3rd of April at the latest."  Exhibit 3 (Mar. 29, 2023 Email from P. Kane).

116.    On April 3, 2023, senior executives and board members of Leadenhall held a second conference call with Wander to understand exactly how the Borrowers had double-pledged the assets.  The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Tom Spreutels, Managing Partner Phil Kane, General Counsel Peter Clark, and Vice President Tom Foot.  Again, Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall again recorded the call with Wander's permission.

117.    During the call, Wander expressly admitted to Leadenhall Chairman John Wells that the Borrowers had double-pledged "around $100 million," or over 30 percent, of the Collateral pledged to Leadenhall:

>   Wells: **"What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?"**
>   Wander: **"I think it was around 100 million I think."**
>
>   […]
>
>   Wells: **"So over 30% of our collateral has been pledged to someone else?"**
>
>   Wander: **"Yes, it appears that way."**

118.    Wander maintained that the double-pledging had been a computer system mistake and that he planned to "do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap."

119.    When pressed for details on this plan, Wander stated that the "holding company lender" was A-CAP and that, since 2020, A-CAP had extended around $200 million to $250 million in credit to 777 Partners' holding company.  Wander also disclosed that, in return for that sizeable loan, A-CAP had an "all asset lien" on the assets of 777 Partners.

120.    On April 4, 2023, following up on the April 3, 2023 call, Leadenhall Managing Partner Tom Spreutels sent an email to Wander again containing a list of action items with the very first requirement for Wander listed at the top: "***A plan to cure the identified deficiency and the associated time frame***."  Exhibit 4 (Apr. 4, 2023 Email from T. Spreutels).

121.    Following Wander's admissions, the Monthly Reports began reflecting enormous Borrowing Base deficiencies.  For instance, on April 4, 2023, the SuttonPark Servicer delivered its Monthly Report for the month of February 2023, showing for the first time that the SuttonPark Borrower had taken on ***over $170 million in debt*** above its Borrowing Base.

**Excerpt from February 2023 SuttonPark Report:**

| | | Borrowing Base | $177,547,147.46 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $177,547,147.46 |
| (less) | Outstanding Borrowings | | $349,997,803.32 |
| | **Compliant if difference is ≥ 0)** | | **No** |

122.    The February 2023 Report for the Dorchester Borrower also reflected that its Borrowing Base deficiency had also grown to approximately $10 million.

**Excerpt from February 2023 Dorchester Report:**

| | | Borrowing Base | $69,080,396.57 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $69,080,396.57 |
| (less) | Outstanding Borrowings | | $79,010,000.00 |
| | **Compliant if difference is ≥ 0)** | | **No** |

123.    In the Reports for the following month, March 2023, the Borrowing Base deficiencies remained, with the SuttonPark Borrower disclosing a deficiency of over $160 million and the Dorchester Borrower disclosing a deficiency of over $7 million.

**Excerpt from March 2023 SuttonPark Report:**

| | | Borrowing Base | $ | 187,825,142.97 |
|---|---|---|---|---|
| | **Borrowing Base Compliance** | | | |
| | Borrowing Base Amount | | $ | 187,825,142.97 |
| (less) | Outstanding Borrowings | | $ | 349,997,803.32 |
| | **Compliant if difference is ≥ 0)** | | | **No** |

**Excerpt from March 2023 Dorchester Report:**

| | Borrowing Base | $71,517,425.07 |
|---|---|---|
| | **Borrowing Base Compliance** | |
| | Borrowing Base Amount | $71,517,425.07 |
| (less) | Outstanding Borrowings | $79,010,000.00 |
| | **Compliant if difference is ≥ 0)** | **No** |

**Despite Defendants' efforts to stonewall Leadenhall's investigation, Leadenhall discovers that the Borrowers had pledged assets they never even owned, and Leadenhall formally notices the Borrowers' breaches of the Agreements.**

124.    In the ensuring months, Leadenhall continued to visit 777 Partners' offices, meet with Wander and 777 Partners' servicing teams, and conduct reviews of the assets pledged as Collateral to Leadenhall.

125.    During these meetings and telephone conferences occurring during the April through October 2023 period, Wander continued to promise that new assets and proceeds from deals just around the corner would be used to shore up the shortfall in Collateral to Leadenhall. Wander also continued to promise to conduct a so-called "reconciliation" process in his computer systems to ensure that assets pledged as Collateral to Leadenhall were actually allocated to Leadenhall in his systems.  The promised proceeds and reconciliation never materialized.

126.    With the limited information that Wander and the various entities operating under his control did provide, in October and November 2023, Leadenhall determined that the double-pledge of Collateral was just the tip of the iceberg.  In corresponding with 777 Partners personnel (with the permission of 777 Partners and Wander), reviewing receivables on MP Fin, and recognizing a pattern of 777 Partners' cash receipts being far lower than the amounts due, *Leadenhall determined that the SuttonPark and Dorchester Borrowers had borrowed against and pledged assets as Collateral to Leadenhall that they never purchased in the first place, did not own, and therefore could not even pledge as Collateral*.

127.    Leadenhall also determined that the SuttonPark and Dorchester Borrowers had sold and/or removed assets from Leadenhall's Collateral base without providing any notice to Leadenhall, further reducing their Borrowing Base relative to outstanding borrowings.

128.    Upon learning of these further material breaches of the LSA, on November 29, 2023, Leadenhall served written correspondence on 777 Partners, 600 Partners, and the SuttonPark and Dorchester Borrowers providing formal notice that the Borrowers were in material breach of the LSA and related agreements (the "Notice of Breach"):

> **Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation.**

*See* Exhibit 5 (Notice of Breach).

129.    After accounting for these breaches—that is, by subtracting double-pledged assets, assets not owned by the SuttonPark and Dorchester Borrowers, and otherwise accounting for outstanding borrowings in excess of credit limits—Leadenhall calculated in the Notice of Breach a Borrowing Base deficiency of approximately $310 million for the SuttonPark Borrower and $41 million for the Dorchester Borrower—or more than three times the amount that Wander had admitted had been double-pledged in March 2023.

130.    In December 2023, at Leadenhall's request, the SuttonPark and Dorchester Borrowers and Servicers delivered revised Compliance Reports for the preceding months making clear the extent to which the Borrowers, Pasko, and Wander had lied all along about assets

ostensibly pledged for the exclusive benefit of Leadenhall—and admitting that the original Compliance Reports were false.

131.    For example, the revised March 2023 Compliance Report delivered by the SuttonPark Servicer—which had previously reflected a Borrowing Base of approximately $187 million and outstanding borrowings of approximately $350 million—now reflected a Borrowing Base of only approximately $64 million, after subtracting the double-pledged assets and/or the assets not actually owned by the Borrowers.

**Excerpt from revised March 2023 SuttonPark Report:**

|  | | |
|---|---|---|
| **Borrowing Base** | **$** | **64,076,151.91** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 64,076,151.91 |
| Outstanding Borrowings | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | **No** |

132.    In other words, the original SuttonPark Borrower Compliance Report delivered in March 2023 had falsely represented that nearly $125 million in assets had been pledged for the exclusive benefit of the Lenders.  That $125 million of ineligible assets ***was in addition to*** the over $160 million in assets that the original March 2023 Compliance Report had already indicated were double-pledged.

133.    Similarly, the revised March 2023 Compliance Report delivered by the Dorchester Servicer, which had previously reflected a Borrowing Base of approximately $71 million and outstanding borrowings of approximately $79 million—now reflected a Borrowing Base of only $42 million after subtracting the double-pledge assets and/or the assets not actually owned by the Borrowers.

134.

**Excerpt from revised March 2023 Dorchester Report:**

| | | |
|---|---|---|
| Borrowing Base | $ | 42,455,473.97 |
| **Borrowing Base Compliance** | f | |
| Borrowing Base Amount | $ | 42,455,473.97 |
| Outstanding Borrowings | $ | 79,010,000.00 |
| Compliant if difference is ≥ 0) | | No |

135.     In other words, the original Compliance Report delivered in March 2023 had falsely represented that nearly $30 million in assets had been pledged for the exclusive benefit of the Lenders.

136.     Over the period May 2021 to November 2023, the SuttonPark and Dorchester Borrowers delivered approximately 60 Compliance Reports to Leadenhall—***therefore representing approximately 60 separate times*** that Collateral pledged for the exclusive benefit of Leadenhall was owned by the SuttonPark and Dorchester Borrowers "free and clear" of any other security interest when instead, this Collateral was pledged to other lenders or otherwise did not exist.

137.     While each Compliance Report was required to be signed on behalf of the SuttonPark Servicer and Dorchester Servicer, in practice, the Servicers often just submitted native Excel files of the reports.  Steven Pasko, however, was the signatory on behalf of the SuttonPark Servicer of the false Compliance Reports which contained signatures, including reports issued by the SuttonPark Servicer for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022.

138.     Leadenhall would not have continued to allow the Borrowers to borrow debt under the LSA had it known that hundreds of millions of dollars in security for the debt had in fact been

double-pledged to another lender and/or did not exist.  The Borrowers made each of these false representations to induce the Lenders and Leadenhall to continue allowing the Borrowers to take out debt notes under the credit facility.

**King and A-CAP Emerge as the Bankroller and Puppeteer in the Fraudulent Enterprise.**

139.    A-CAP's role in the pattern of fraud perpetrated on Leadenhall began to rear its head in April 2023, when Wander confirmed on the recorded April 3, 2023 conference call that A-CAP had an "all asset lien" on the assets of 777 Partners.

140.    Leadenhall would later find out that the story ran much deeper: A-CAP is the puppeteer to the 777 Partners' marionette, and nothing happens at 777 Partners—even execution of a last-minute restructuring agreement to repay uncontested debt and stave off this very litigation—without A-CAP's approval.  A-CAP is the financial engine behind the scenes which provides last-minute loans and investments in "Whac-A-Mole" fashion to 777 Partners in order to make the enterprise appear solvent to outside lenders and investors.  The ruse engineered by A-CAP even extends to 777 Partners' own employees—Wander and 777 Partners employees have disclosed to Leadenhall that A-CAP's relationship with 777 Partners is so intertwined that A-CAP has funded 777 Partners' payroll on repeated occasions.

141.    When Wander and Pasko's double-pledging was first revealed to Leadenhall, instead of behaving like an arm's-length first-lien leader with no reason to have knowledge of the misrepresentation, A-CAP became ***more*** involved to help 777 Partners avoid detection.  Following Leadenhall's March 2023 conference calls with Wander—in an effort to "replace" the double-pledged Collateral with other security interests—A-CAP agreed to step directly into the fray and offered Leadenhall in June and July 2023 a fourth-priority position on the assets of 777 Partners, *i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall rejected the offer.

142.    During these negotiations in June and July 2023, which involved A-CAP's Chief Operating Officer Mike Saliba, Saliba expressed not even a hint of surprise that Wander had double-pledged Leadenhall's Collateral in breach of the LSA.  Given their reaction together with the facts below, A-CAP must have been well aware and "in the know" for months that Collateral pledged to Leadenhall had been double-pledged and/or did not exist and interjected itself into negotiations in order to keep Leadenhall from making the pattern of fraud public, which in turn might bring 777 Partners—and therefore A-CAP—all the way down.[5]

143.    A-CAP's undue influence over 777 Partners continued to come to light through the latter half of 2023.  In November 2023, A-CAP interjected itself into Leadenhall and 777 Partners' discussions concerning whether 777 Partners would agree to Leadenhall's proposal for the former Chief Operating Officer of Defendant SuttonPark Capital, Paul Kosinski, to perform an "asset review" of the receivables pledged to Leadenhall as Collateral.  As stated in an email to Leadenhall from Pasko in late November 2023: "***At the request of A-CAP***, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark."

144.    Pasko purported to justify A-CAP's objections (or "concerns") to Leadenhall's proposal on grounds that the asset-by-asset review "would violate [Kosinski's] severance agreement' and that Kosinski had departed for a "direct competitor" to 777 Partners.  Upon information and belief, however, A-CAP's true concern was that Kosinski, as a former high-level

---

[5] Wander also represented to Leadenhall during the course of these March 2023 discussions that any missing Collateral was maintained within the "777 corporate system"—which, upon information and belief, Wander uses to freely transfer assets among a web of trade names without regard to corporate or legal formalities.  If this is correct, it follows that the missing Collateral owed to Leadenhall has been used to pay interest on A-CAP loan facilities with 777 Partners or reduce borrowings on assets over which A-CAP has a first lien, thereby directly improving A-CAP's position through the fraud perpetrated on Leadenhall.

officer of SuttonPark Capital, had inside knowledge of 777 Partners' operations and would expose the ongoing fraud to Leadenhall.

145.    Given King's involvement in Wander's affairs, Leadenhall began conducting a deeper dive into the relationship between King and Wander.  The core of the convoluted and enmeshed relationship between King and Wander is the relationship between A-CAP and 777 Re. 777 Re is the reinsurance subsidiary of 777 Partners.

146.    Wander has pitched 777 Re as the "anchor" of 777 Partners' entire investment strategy—meaning that it is the source of funds that Wander and his alter ego companies can raid for other ventures, including professional football teams.[6]  777 Partners is a holding company which conducts no substantial business operations itself, and its value is determined by the value of its subsidiaries.

147.    Reinsurance is a contractual arrangement by which primary insurance carriers— which write and offer insurance such as life and health insurance to policyowners—pass on or "cede" certain of their insurance liabilities to a reinsurer such as 777 Re.  777 Re indemnifies the primary insurance carriers for certain of those liabilities, while the primary insurance carriers remain in privity with and directly responsible to the policyowners.  If the reinsurer becomes unable to satisfy its obligations to the primary insurance carriers, (i) the ability of the primary insurance carriers to pay policyowners and satisfy capital requirements is in jeopardy and (ii) the

---

[6] Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/.  Upon information and belief, Wander himself is not permitted to sit as an official board member of 777 Re as a result of a cocaine trafficking conviction in 2003.  Wander still, however, actively participates in 777 Re's board meetings and acts as the de facto leader and manager of 777 Re.  Pasko sits on the 777 Re board, and until early 2024 following action from 777 Re's Bermuda regulator, 777 Partners appointed the key management team.

primary insurance carriers may not be able to pay dividends or return capital to their owners, without raising fresh capital themselves to fulfill their regulatory requirements.

148.　For example, A-CAP—through its King-controlled life insurance subsidiary Haymarket Insurance Company—may issue life insurance policies or annuities to a group of seniors.　For "reserving" purposes, A-CAP may then need to either allocate regulatory capital to back the block of business or, because reinsurance premiums are generally lower than the return on regulatory capital, pass on some of the insurance risk to a reinsurer.

149.　Thus, A-CAP purchases "reinsurance" from 777 Re, whereby, under a traditional reinsurance arrangement, A-CAP will make periodic premium payments and transfer any reserves established to support any existing insurance liabilities to 777 Re, and in return, 777 Re will be responsible for making all or part of the benefit payments required under the life insurance policies or annuities upon the death of the insureds (or other insured event).　In other words, a reinsurer like 777 Re is an "insurer for the insurer."　777 Re provides financial protection for A-CAP, which means A-CAP may hold less capital itself and 777 Re is responsible for indemnifying or paying A-CAP for the liabilities under the life insurance policies or annuities.

150.　In the typical reinsurance arrangement, the reinsurer is responsible for setting aside a certain amount of capital, including premiums payments, in reserve to ensure that it has the financial ability to indemnify or make a payment to the ceding insurance company, which will pay any benefit payment directly to the policyholders, upon a claims or insured event.

151.　However, in the case of A-CAP and 777 Re, the reinsurance arrangements are structured under a complex "modified coinsurance" or "funds withheld" basis.　Under a modified coinsurance arrangement, A-CAP (and/or the subsidiary insurance companies controlled by A-CAP) retains the reserves backing the claims payable by 777 Re in A-CAP's own custodial

accounts.  If A-CAP's reserves (including any investment earnings thereupon) exceed the amounts required to be established or held by A-CAP—*i.e.*, if the investments are profitable or if the liabilities associated with the life insurance policies or annuities decrease—A-CAP sends the profits or any excess reserves to 777 Re as premium payments or modified coinsurance account adjustment payments.[7]

152.    Under the reinsurance arrangements between A-CAP and 777 Re, the assets supporting the insurance reserves are managed by 777 Asset Management LLC, an asset manager under the 777 Partners umbrella.  The foregoing complex reinsurance structuring where the invested assets supporting the reinsurance arrangements are retained by A-CAP, and 777 Re's primary role is to invest those assets through 777 Asset Management LLC on behalf of A-CAP—for substantial management fees from A-CAP—is the start of the extreme interconnectedness of A-CAP and 777 Re.  ***Upon information and belief, through reinsurance arrangements, 777 Asset Management LLC has invested approximately $2.2 billion of A-CAP affiliated insurance assets—largely in risky 777 Partners-related ventures—which are supposed to be used to back claims to policyholders.***

153.    777 Re has used the reinsurance reserves—the source of which is premium payments from A-CAP, which come from premium payments made by A-CAP's policyholders to A-CAP—to make loans directly to 777 Partners and other subsidiaries under the 777 Partners

---

[7] A "funds withheld" arrangement is similar to a modified coinsurance arrangement except that, among other things, the insurance liabilities associated with the life insurance policies and annuities are transferred to 777 Re and reported on 777 Re's statutory statements (rather than on the King-controlled life insurance company's statutory statements, which would be the case under a modified coinsurance arrangement).

umbrella. 777 Partners has in turn used those funds to make speculative bets on payday lenders, ultra-low-cost Canadian airlines, and football clubs such as the Everton Football Club.[8]

154.   The reinsurance relationship between A-CAP and 777 Partners branched out into massive loan arrangements from A-CAP to 777 Partners and affiliates. As King acknowledged on a conference call to investors on February 27, 2024, "A-CAP is a lender to 777 for businesses outside the reinsurance relationship." It has been reported that A-CAP and affiliates, at King's direction, has loaned 777 Partners and its web of affiliates more than $1 billion.[9] *Upon information belief, however, the full amount of outstanding indebtedness at year-end 2023 by 777 Partners affiliates to A-CAP, across all of the holding companies and operating companies of both 777 Partners and A-CAP, is over $2 billion.*

155.   The loans and financing activity from A-CAP (inclusive of its affiliates) to 777 Partners take all forms and have been extended to multiple parties under the 777 Partners umbrella:

   a.   Since 2019 and through the present, A-CAP has provided a revolving line of credit of approximately $500 million directly to 777 Partners, secured by the equity value of 777 Partners' subsidiaries. Reflecting A-CAP's own lack of faith in 777 Partners' ability to repay its debt obligations, the interest rate on these direct loans is as high as 20 percent per annum.

   b.   Since December 2020, A-CAP has loaned JARM Capital LLC, the personal shareholding vehicle of Wander through which Wander owns 777 Partners,

---

[8]   Liz Hoffman, *Mystery investor 777 Partners bought sports teams with insurance customers' cash*, SEMAFOR (Nov. 15, 2023), https://www.semafor.com/article/11/15/2023/mystery-investor-777-partners-bought-european-sports-teams-with-insurance-customers-cash

[9]   Tariq Panja, *Everton Sale Stalls Amid Questions About Buyer's Financi*als, N.Y. TIMES (Oct. 18, 2023), https://www.nytimes.com/2023/10/18/world/europe/everton-sale-777-partners.html.

nearly $170 million.  This loan was originally secured by the assets of JARM Capital and other assets owned by Wander on a ***personal*** basis, reflecting the intermingling of Wander personally and his professional trade names.  This loan was provided so that Wander could purchase Pasko and other minority early-stage shareholders shares in 777 Partners.  As a result of Wander's buy-out of Pasko's shares in 777 Partners using a loan from A-CAP, Pasko has been the primary cash beneficiary of 777 Partners' business ventures over the last few years.

c.   In 2021, as represented by 777 Partners, A-CAP purchased approximately $50 million of a $250 million preferred equity share sale by 777 Partners.  Upon default or liquidation of 777 Partners, A-CAP's preferred equity will be repaid only after other senior obligations of 777 Partners are repaid.

d.   As of December 2023, A-CAP has provided approximately $700 million in loans and other forms of financing to support 777 Partners' aviation-related investments, and as security for the loans, A-CAP received additional equity in 777 Partners.

e.   As of December 2023, A-CAP has provided approximately $290 million in loans to a 777 Partners' affiliate in to support its investments in professional football teams, as further detailed in the next section.

156.   As reported in the articles, of the approximately $11.5 billion in assets held by A-CAP and its subsidiaries, $2.9 billion—or more than 25 percent of the assets—were invested in

entities related to 777 Partners.[10]  The amount of the total exposure from A-CAP to 777 Partners is so large that *The New York Times* reported late last year that 777 Partners is required to regularly update A-CAP executives about its continuing business plans.[11]

157.    King also benefits personally from bankrolling all of Wander's ventures.  Using an array of transactions between 777 Partners, A-CAP, and shell companies controlled by King to obfuscate the source of the funding, King reportedly purchased an $11 million beachfront condominium in Miami using a $9 million loan from 777 Partners.[12]  And King has good reason to obfuscate the ultimate source of the funding: ***the policyholders of the life insurance companies owned by A-CAP***—which made premium payments to the life insurance companies, which lent money to 777 Partners, which lent the money to a shell company controlled by King, which purchased the condo.

158.    King also has a personal stake in certain assets purchased by 777 Partners using 777 Re's reinsurance reserves, including a 10 percent stake in the ultra-low cost Canadian airline Flair Airlines.[13]

159.    In early 2024, however, Leadenhall learned that A-CAP's role in the enterprise transcended even just acting as ceding company which had transferred a massive portion of its

---

[10] Dan McCrum, Samuel Agini and Ian Smith, *US regulators push insurers to cut exposure to Everton bidder 777 Partners*, FINANCIAL TIMES (Apr. 1, 2024), https://www.ft.com/content/a225cb7d-ccdd-495d-b7f1-a8124129b8bf.

[11] *Id.*

[12] Hoffman, *The Silent Partner, supra* ("One loan last year from an A-CAP insurer to 777 was quickly re-lent to a Miami shell company controlled by King to buy an $11 million beachfront condo.").

[13] Moreover, employees of A-CAP and 777 Partners often move freely between the two firms. James Rothman, the former Head of Business Development at A-CAP, became the Chief Investment Officer of 777 Asset Management LLC, a 777 Partners subsidiary, as of 2023. Rothman subsequently left this role at 777 Asset Management LLC.

insurance risk to 777 Re and a massive creditor to 777 Partners which received regular updates about 777 Partners' business plans.

160.    For example, on February 21, 2024, Leadenhall reached an agreement with 777 Partners and 600 Partners, whereby 777 Partners and 600 Partners would pay off a relatively small, $25.6 million, portion of the loan extended to the SuttonPark Borrower, with payment being due on the date of execution.  777 Partners failed to make the payment to which it had agreed just days earlier, instead paying only $12.5 million on time, with the remaining $13.1 million being paid two days after the agreed date.  777 Partners personnel later told Leadenhall that, at that same time, A-CAP had infused cash into 777 Partners to allow 777 Partners to make payroll and cover operating expenses, underscoring the degree of 777 Partners' dependence on A-CAP, and explaining why 777 Partners could not come up with more of A-CAP's money to repay Leadenhall on the agreed date.

161.    Additionally, in early 2024, an employee of a 777 Partners subsidiary expressly admitted to a Leadenhall Managing Partner that *for approximately the last year, A-CAP had an express agreement with 777 Partners whereby A-CAP had the right to control 777 Partners' operations.*

162.    The insider also expressly admitted to Leadenhall that 777 Partners and the Borrowers had photoshopped financial statements submitted to Leadenhall and that, prior to the on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered receivables in the MP Fin system to try to cover up the double-pledge of Collateral.

163.    That insider tip prompted Leadenhall to re-examine the Compliance Reports and backup materials for those reports delivered around November 2022.  The examination resulted in full corroboration of the insider's admission.

164.    For the month November 2022, the SuttonPark Servicer had delivered a Compliance Report to Leadenhall showing outstanding borrowings of $349,997,803.32 and a borrowing base of $351,974,821.95.

**Excerpt from November 2022 SuttonPark Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **351,974,821.95** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 351,974,821.95 |
| Outstanding Borrowings | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | **Yes** |

165.    The November 2022 Compliance Report also showed an amount of $4,344,750.19 held in a "SPLCSS III Collection" account—which comprised part of the SuttonPark Borrowers' Borrowing Base—and an amount of $4,557,291.41 held in a "SPLCSS III Reserve" account— which comprised an amount required to be reserved on a monthly basis under the LSA as a percentage of the value of the Borrower's assets.

**Excerpt from November 2022 SuttonPark Report:**

| | | |
|---|---|---|
| SPC Assignment Amount | $ | - |
| SPLCSS III Collection | $ | 4,344,750.19 |
| SPLCSS III Reserve | $ | 4,557,291.41 |
| Total | $ | 8,902,041.60 |

166.    As backup documentation for the November 2022 Compliance Report, the SuttonPark Borrower submitted to Leadenhall "screenshots" purporting to reflect summary statements from Wells Fargo for the "Collection" and "Reserve" accounts.  The summary statements showed, as of November 30, 2022, an amount of $4,344,750.19 in the SuttonPark "Collection" account (ending in *893) and an amount of $4,557,291.41 in the "Reserve" account

(ending in *885).  *See* Exhibit 6 (Wells Fargo Summary Statement Screenshot).  In other words, the screenshot matched the November 2022 Compliance Report with respect to the "Collection" and "Reserve" amounts.

**Excerpt from Wells Fargo Screenshot Showing Balances as of November 30, 2022:**



| Account Number | Account Name | Closing Ledger Balance | Closing Collected Balance |
|---|---|---|---|
| Account Balances for  121000248  WELLS FARGO BANK, N.A. 885 | SPLCSS II Reserve | 4,557,291.41 | 4,557,291.41 |
| Account Balances for  121000248  WELLS FARGO BANK, N.A. 893 | SPLCSS II Collection | 4,344,750.19 | 4,344,750.19 |

167.    However, following the SuttonPark Borrower's submission of the Wells Fargo screenshot to Leadenhall—and at Leadenhall's request—the SuttonPark Borrower sent Leadenhall in 2023 a full monthly bank statement for the "Collection" account (ending in *893) for the month December 2022.  *See* Exhibit 7 ("Collection" Account Wells Fargo Monthly Statement).

168.    The full monthly statement showed that—contrary to the screenshot showing an amount of $4,344,750.19 in the "Collection" account (ending in *893) as of November 30, 2022— *only $300,162.82 was in the account as of November 30, 2022*.

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022**



## Account summary

### WellsOne® Account

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| 893 | $300,162.89 | $7,300,296.64 | -$7,360,710.54 | $239,748.99 |

| Daily ledger balance summary | | | | | |
|---|---|---|---|---|---|
| Date | Balance | Date | Balance | Date | Balance |
| 11/30 | 300,162.89 | 12/05 | 148,479.91 | 12/09 | 203,182.92 |
| 12/01 | 131,109.73 | 12/07 | 197,898.92 | 12/12 | 210,065.26 |

169.    Moreover, contrary to the screenshot showing an amount of $4,557,291.41 in the "Reserve" account (ending in *885) as of November 30, 2022, **$0 was in the account as of November 30, 2022.**  *See* Exhibit 8 ("Reserve" Account Wells Fargo Monthly Statement).

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022**

**Account summary**

*WellsOne® Account*

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| 885 | $0.00 | $2,165,736.79 | -$2,165,736.79 | $0.00 |

**Daily ledger balance summary**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 11/30 | 0.00 | 12/01 | 0.00 | 12/12 | 0.00 |
| **Average daily ledger balance** | | **$0.00** | | | |

170.    The insider's express admission of fraud—coupled with smoking gun evidence uncovered by Leadenhall—immediately precipitated Leadenhall's exercise of additional remedies.

171.    On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with written notice that "Events of Default" (*i.e.*, material breaches) under the LSA had occurred and were continuing.  Given the Events of Default, Leadenhall also sent, on March 12, 2024, "Trigger Notices" to Manufacturers and Traders Trust Company taking control of certain deposit accounts owned by the Borrowers (other than accounts owned by the Insurety Borrower). Funds from these accounts are being swept to other accounts as directed by Leadenhall in the Trigger Notices.  To date, Leadenhall has not exercised its control rights with respect to accounts owned by the Insurety Borrower to ensure that business may continue to operate.

172.    On March 15, 2024, Leadenhall served written notice that, in light of the Events of Default, Leadenhall was exercising its right to accelerate all outstanding debt obligations of the

Borrowers, making the outstanding balance of $609,529,966.82 immediately due and payable.  *See* Exhibit 9 (Mar. 15, 2024 Correspondence).

173.    In March 2024, in a last-ditch attempt to stave off this lawsuit, Leadenhall entered into negotiations concerning a "Forbearance Agreement" whereby Leadenhall and the Lenders would temporarily forgo exercising their default-related rights and remedies in exchange for 777 Partners' agreeing to pay back the outstanding debt pursuant to an amortization schedule.

174.    King again proved himself to be the master puppeteer.  During negotiations over the agreement, on March 29, 2024, Wander expressly represented to Leadenhall representatives in a telephone call that, if 777 Partners signed the Forbearance Agreement without A-CAP's express consent, A-CAP would accelerate A-CAP's loans to 777 Partners.  Said Wander: "**They've [A-CAP] told us they're going to default our Holdco loan if we sign the document without them agreeing to it.**

175.    Wander also represented in late March and early April 2024 to Leadenhall Managing Partner Craig Gillespie that King and Jill Gettman, Chief Legal Officer at A-CAP, were holding up execution of any agreement between Leadenhall and 777 Partners.  Wander also represented that to break through the hold-up caused by A-CAP, he would try to organize a meeting directly with Leadenhall and A-CAP so that Leadenhall and the 777 Partners' businesses could come to ground on an agreement.[14]

---

[14]  Wander called Leadenhall from New York City repeatedly over the course of these negotiations, including on March 13, 2024, April 16, 2024, and April 22, 2024.  Over and over again, Wander referenced Kenneth King's involvement and backroom control over the forbearance and amortization payment negotiations, and on at least one occasion—reflecting the intense entanglement between Wander, King, and A-CAP—Wander stated that he was working out of A-CAP's offices in New York City.

176.    As negotiations dragged over efforts to work out a restructuring arrangement, A-CAP continued to lurk in the background controlling Wander's every move.  In a conference call with Wander, 777 Partners Associate General Counsel Jon Walder, and Leadenhall representatives on April 2, 2024, Wander was straightforward when questioned on whether A-CAP had control over what 777 Partners was able to sign:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

177.    In a similar vein, Walder was unable to answer even basic questions as to why 777 Partners continued to make material edits to the Forbearance Agreement that moved the parties further away from a deal.  Said Walder on why certain changes were made to the Forbearance Agreement: "**I have no idea.  I just did what I was told [by A-CAP]**."  And when informed by Leadenhall that Leadenhall's investors were skeptical of whether 777 Partners could deliver even a $15 million payment to start to pay back the outstanding balance, Walder played it straight: "**I can't say I wouldn't have a degree of skepticism if I were in your investors' shoes.  But like I said I have no control over it [the payment]**."

178.    On April 16, 2024, Leadenhall Managing Partner Craig Gillespie spoke to Wander over the phone.  Gillespie stated to Wander that, because 777 Partners and A-CAP appeared to have no real intention of repaying Leadenhall, Leadenhall would have to commence an action unless Wander could promptly repay approximately $350 million to Leadenhall, which constituted the full amount of the collateral deficiencies.  Wander replied that paying $350 million to Leadenhall was "not possible" and he would never be able to find $350 million in two weeks.

179.    On April 17, 2024, Leadenhall Managing Partner Craig Gillespie again spoke to Wander.  Wander again indicated that A-CAP was holding up any negotiated repayment schedule and that Wander's view of A-CAP was that "they need to get fucking realistic" and allow the 777 Partners and 600 Partners entities to agree to a Forbearance Agreement.  It never happened.[15]

180.    Through these attempted restructuring negotiations, 777 Partners has admitted time and again that it does not control its own operations and ability to perform under the LSA.[16]

**The Ultimate Goal of Enterprise: Purchase Professional Football Teams**

181.    Despite King and A-CAP's efforts to keep Wander and his companies afloat and to cover up the scheme by providing loans to help 777 Partners meet last-minute deadlines, 777 Partners and the related entities have struggled to meet financial obligations outside of those just to Leadenhall.  It has been widely reported that Wander's shell companies "continue to miss routine payments to businesses, vendors and partners," including "miss[ing] payroll on at least two

---

[15] Over the course of the parties' interactions, certain materials and/or communications exchanged between the 777 Partners affiliates and Leadenhall were designated as subject to Federal Rule of Civil Procedure 408, and certain communications between A-CAP and Leadenhall were the subject of a non-disclosure agreement.  None of those documents or communications are cited or referenced in this complaint.

[16] A-CAP has used its control over 777 Partners' operations to inure to A-CAP's benefit in a variety of ways.  For example, in a separate credit agreement entered into in June 2022 between Leadenhall and 777 Partners to provide funding for 777 Re, 777 Partners failed to comply with the terms of the agreement and put this capital at significantly higher risk by using hundreds of millions of dollars of 777 Re's capital and reserves to lend to 777 subsidiaries on terms more favorable to the subsidiaries than would be customary between parties not affiliated with one another.  A-CAP, the controller of 777 Partners' operations, permitted these investments in 777 Partners' subsidiaries despite the fact that the investments violated guidelines because—as a lender to 777 Partners with a large security interest in both the value of 777 Partners' subsidiaries and the equity of 777 Partners—A-CAP benefitted from an inflated valuation of the 777 Partners' subsidiaries.

occasions" and failing to pay out bonuses.[17]  Among the many loans A-CAP has made to 777

Partners, "at least one covered payroll for 777 itself."[18]

182.    These financial problems at Wander's various alter ego companies have threatened

what appears to be Wander's ultimate pursuit: purchasing historical football clubs from around the

world, including Standard Liege in Belgium and Everton Football Club in England.  Indeed, since

2021, Wander has transformed his businesses from the relatively niche practice of investing in

structured settlements and lottery winnings into making speculative bets on professional football

teams.

183.    Similarly, while A-CAP started out as a business providing life insurance and

annuity products to ordinary people—and a staid reliance on steady insurance premium

payments—because of A-CAP's massive credit exposure to 777 Partners, its future is now tied up

as well in Wander's speculative football bets.

184.    Wander has made no secret of the fact that his goal is to flip these clubs for a quick

profit or "cross-sell" interests in the enterprises' insurance and media businesses to the clubs'

dedicated fan bases.  In October 2023, Wander told 777 Partners' employees that the firm had built

"relatively conventional but profitable finance and insurance businesses that enabled us to invest

and build positions in more exciting industries such as aviation and sports."[19]  The ultimate goal,

as Wander has stated to news outlets, "is that one day we're not selling hot dogs and beers to our

---

[17] Panja, *Everton Sale Stalls, supra*.

[18] Hoffman, *The Silent Partner, supra*.

[19] Giles Turner and David Hellier, *Everton's US Buyer Leaves Trail of Questions Over Its Finances*, BLOOMBERG (Dec. 7, 2023), https://www.bloomberg.com/news/articles/2023-12-07/everton-takeover-us-buyer-777-partners-leaves-questions-for-premier-league.

customers; [it's] that we're selling insurance or financial services or whatever."[20] Wander has even asked rhetorically (referring to himself in the third-person): "Is there anyone in the world that's been more serious about buying football clubs in history than Josh Wander?"[21]

185.   To actualize his goal of flipping storied football clubs for a profit and "cross-selling" to fans, Wander has invested, through 777 Partners and with the financial backing of King and A-CAP, in several teams from lower-tier football leagues, as well as other sports investments around the world.[22]   Several of the teams in which Wander has invested have flirted with insolvency due to 777 Partners' inability to make payments on time, and 777 Partners has failed in the past to pay the brokers involved in on some of the soccer deals.[23]

186.   Genoa CFC, one of the oldest football clubs in Italy—and one of the so-called "distressed assets" purchased by Wander with over $200 million in debt[24]—sought judicial approval of a deal with Italian tax authorities to reduce some of its tax debts on the grounds that it is "in a state of crisis or insolvency."[25]   777 Partners previously tried to avoid paying its debts timely by shifting liabilities to a shell company, but that gambit was rejected by Italian authorities.[26]

---

[20]   Andrew Edgecliffe-Johnson & James Fontanella-Khan, *Everton Suitor 777 Hails New Era of Football 'Hyper Commercialisation*, FIN. TIMES (Aug. 31, 2023), https://www.ft.com/content/8fc36dbe-23c1-4aae-a288-dc2c2f1d7c5f (hereinafter Edgecliff-Johnson, *Hyper Commercialisation*).

[21]   *Id.*

[22]   *Id.*

[23]   Panja, *Everton Sale Stalls, supra.*

[24]   Philippe Auclair & Paul Brown, *See You in Court*, JOSIMAR (Feb. 2, 2024), https://josimarfootball.com/2024/02/02/see-you-in-court/.

[25]   Philippe Auclair & Paul Brown, *On the Brink*, JOSIMAR (Nov. 22, 2023), https://josimarfootball.com/2023/11/22/on-the-brink/.

[26]   *Id.*

187.     Wander's lack of transparency about 777 Partners' finances nearly caused a Belgian regulatory body to shut down a 125-year-old club that he purchased, Standard Liege.[27]  777 Partners continued to load Standard Liege with debt in the form of loans from 777 Partners, even while it had failed to pay its players and staff on time, to the point of being sanctioned by the league.[28]

188.     Another one of Wander's football club purchases, Hertha BSC—a club that competes in the second division of German football—is in a "financial black hole" in which it does not earn enough to service its debt, and 777 Partners has had to negotiate with the league to allow it to remain operational despite its inability to invest the necessary cash in the short term.[29]

189.     There is a pattern to Wander's professional football investments.  777 Partners acquires the clubs for modest or insignificant sums—in the case of Genoa CFC, for one single euro, and for Hertha BSC, less than 15 million euro—takes on all of the club's liabilities and debt payments, and then either stiffs the clubs' creditors entirely or seeks to restructure the debt.[30]  As part of this pattern, 777 Partners reports an inflated valuation for the clubs premised on projections of growth, which in turn allows Wander to pitch new or existing lenders willing to lend money to continue expanding.[31]  Upon information and belief, Leadenhall is now caught up in this massive fraudulent enterprise.

190.     For example, the collateral 777 Partners put up to continue operating Genoa CFC was based on unrealistic projections of growth in *all* of its revenue streams and operating cost

---

[27]   *Id.*

[28]   Philippe Auclair & Paul Brown, *The Twilight Zone*, JOSIMAR (Jan. 9, 2024), https://josimarfootball.com/2024/01/09/the-twilight-zone/.

[29]   Philippe Auclair & Paul Brown, The Twilight Zone, JOSIMAR (Jan. 9, 2024), https://josimarfootball.com/2024/01/09/the-twilight-zone/.

[30]    Auclair & Brown, *On the Brink, supra.*

[31]    *Id.*

reductions, despite the fact that Genoa's major revenue stream from television rights will be shrinking soon.[32]   777 Partners predicated its financial projections for other clubs, including Standard Liege, Hertha, and Vasco de Gama, on meeting performance standards for promotion or participation in European leagues that are extremely unlikely to be met.[33]   600 Partners gave a substantial guarantee to keep Standard Liege afloat, but refused to provide audited financials to the Belgian regulators to prove that it could satisfy that guarantee.[34]

191.    In August 2023, just a few months after it came to light that he owed Leadenhall over one hundred million dollars beyond what he was permitted to borrow, Wander told the *Financial Times* that he needed to raise "a few hundred million" to cover his football investments.[35]

192.    These concerns came to a head most recently with Wander's attempt to purchase Everton Football Club, a historic club that competes in the world's preeminent and most prestigious football league, the English Premier League.[36]   Like the other clubs in Wander's portfolio, Everton is in very dire financial straits with a huge and growing debt load.[37]   The Everton investment was arranged and funded in large part by—unsurprisingly given its control over 777 Partners' operations—King and A-CAP.[38]

---

[32]   Auclair & Brown, *On the Brink, supra.*

[33]   Auclair & Brown, *See You in Court*, *supra.*

[34]   Auclair & Brown, *The Twilight Zone*, *supra.*

[35]   Edgecliff-Johnson, *Hyper Commercialisation, supra.*

[36]   James Robson, *English soccer club Everton to be bought by American investment firm 777 Partners*, AP News (Sept. 15, 2023) https://apnews.com/article/everton-sale-777-partners-03aa0b571d19c034efbaa7d10adb00ac

[37]   Paul Brown & Philippe Auclair, *Everton or Bust?*, Josimar (Feb. 16, 2024), https://josimarfootball.com/2024/02/16/everton-or-bust/.

[38]   *Id.*

193.     In September 2023, Wander announced that 777 Partners had reached an agreement to purchase Everton.  Shortly after the deal was announced, however, it was held up by concerns over 777 Partners' involvement in funding the deal.  Wander has had trouble finding investors other than King and A-CAP.  On November 26, 2023, *Forbes* ran a story titled, "777 Partners Still Reportedly Scrounging For Cash To Buy Everton FC."[39]

194.     As investigative football journal *Josimar* has revealed, an "Investment Overview" document dated August 31, 2023 concerning 777 Partners' targeted acquisition of Everton "was ***not*** put together by 777 [Partners] themselves but by A-CAP . . . ."  The "Investment Overview" prepared by A-CAP states that "the ultimate source of the first 40 million pound-loan made by 777 [Partners] to Everton was A-CAP, with the club paying an interest rate of 12.75 percent."  After the initial loan, 777 Partners' outstanding loans directly to Everton have "ballooned to almost 200 million pounds," with A-CAP "continuing to provide this money."[40]

195.     And if 777 Partners' position—and therefore A-CAP's position—vis-à-vis Everton was not precarious enough based merely on the size of the debt alone, its meager security on the loan makes it even riskier.  Reportedly, 777 Partners has taken a "last out position" in a lending facility behind a senior lender with a "charge over all of Everton's assets, including its bank accounts."  In exchange for A-CAP's ongoing funding, it would "receive a 2.5 percent warrant" in 777 Partners' referred to as "the 777 Football Group," with 777 Partners having to sell a minority interest in its Football Group to repay part of A-CAP's loan.  Meanwhile, the 777 Football Group

---

[39]   *See* Mike Ozanian, *777 Partners Still Reportedly Scrounging for Cash to Buy Everton FC*, Forbes (Nov. 26, 2023), https://www.forbes.com/sites/mikeozanian/2023/11/26/777-partners-still-reportedly-scrounging-for-cash-to-buy-everton-fc/?sh=2a2ad06a208c (hereinafter Ozanian, *Scrounging for Cash*).

[40]   Brown & Auclair, *Everton or Bust?*, *supra*.

is expected to require 240-300 million euros in working capital "to reach stabilization across all clubs," and even then, would "need to sell equity between 30-50% to cover financing needs."[41]

196.    In October last year, reporting on the targeted Everton transaction, *The New York Times* ran a story reporting that "[a] string of unpaid bills, some as recent as [late last year], raised" concerns for potential partners.[42]  This "pattern of late and delayed payments" raised "a red flag to a potentially more significant cash-flow issue," to the point that Leadenhall is not the only former business partner of Wander's to accuse him and 777 Partners of operating "a sprawling fraudulent enterprise."[43]

197.    Additionally, Wander's refusal to provide 777 Partners' audited financial statements beyond the year 2020 and subject its financials to the most basic scrutiny raised problems with an English football regulatory body, just as it did in Belgium.[44]  A former board member of a 777 Partners subsidiary is on record saying that it is "somewhat of a mystery" how 777 Partners could come up with the money to purchase Everton.[45]

198.    It has been reported that "Everton is not just the biggest sporting investment 777 have ever attempted, it is also crucial for the long-term survival of the firm itself."[46]  777 Partners needs to put Everton as an asset on its books in order to attract new investors and, invariably, new lenders in a seemingly never-ending cycle of taking on more debt.[47]

---

[41]    *Id.*

[42]    Panja, *The Mystery Company, supra*.

[43]    *Id*.

[44]    Panja, *Everton Sale Stalls*, supra.

[45]    Panja, *The Mystery Company*, supra.

[46]    Brown & Auclair, *Everton or Bust?*, *supra*.

[47]    Brown & Auclair, *Everton or Bust?*, *supra*; Auclair & Brown, *See You in Court*, *supra*.

199.    This all provided a powerful motive for Wander and Pasko, via 777 Partners, 600 Partners and their portfolio companies, at King and A-CAP's direction, to pursue short-term inflation of their Borrowing Base and take out more debt than they could secure, to cover payments coming due and fund further acquisitions, including of global football teams.

**Absent Injunctive Relief, the Enterprise Will Likely Frustrate Any Recovery by Pushing Itself to the Brink of Insolvency and Transferring Any Assets to Avoid Satisfying Creditors.**

200.    The wheels began to come off Wander, King, and Pasko's sprawling enterprise in early 2024.   In January 2024, the Bermuda Monetary Authority—which regulates 777 Re— reportedly placed 777 Re into administrative control, freezing the $2.2 billion in assets managed by 777 Asset Management LLC which have been used to fund 777 Partners various risky, money-pit business ventures.[48]

201.    By placing 777 Re into administrative control, the Bermuda Monetary Authority sent a clear signal that it has serious questions over whether the cash cow behind 777 Partners— 777 Re, as propped up by a steady flow of premium payments and loans from A-CAP—is able to meet its financial obligations.

202.    On February 16, 2024, AM Best—a credit ratings agency focused on insurers— downgraded 777 Re's credit rating from a "B" to a "C-" and assessed the strength of the firm's balance sheet as "very weak."

203.    AM Best specifically cited the firm's "exposure to affiliated assets"—meaning obligations to 777 Partners and various other companies across the enterprise through loans and investments—as the "primary driver" of the ratings downgrade.   The ratings downgrade only further confirms that lines between the various players here, whether they call themselves "777

---

[48]  Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/.

Partners," "SuttonPark," "A-CAP," "Josh Wander," "Steven Pasko," or "Kenneth King," are blurry, to the extent they exist at all.

204.    On February 23, 2024—on cue—citing A-CAP's "high reinsurance leverage and declining counterparty credit quality," AM Best downgraded the credit rating of A-CAP from "bbb+" to "bbb" and "with negative implications," signaling that AM Best may further downgrade A-CAP in the future.[49]

205.    On February 27, 2024, in response to AM Best's downgrade of 777 Re and A-CAP's credit rating, King announced on an investor call that because 777 Re "wasn't managed the way it needed to be," A-CAP was exiting its relationship with 777 Re and would "recapture" the insurance liabilities ceded to 777 Re within 45 to 60 days.   In other words, A-CAP would cease paying insurance premiums to 777 Re.

206.    King also noted on the call that he had not yet terminated the reinsurance arrangements with 777 Re because *"to shut off the flow of liquidity to our reinsurer would have paralyzed them and essentially created more risk to A-CAP."*   King's unilateral ability to dictate the future and potentially cause or contribute to the demise of 777 Re via a recapture and his prior and current involvement in the disposition of a large portion of 777 Re's investment portfolio once

---

[49] In response to AM Best's statements that it intended to downgrade the credit rating of two of A-CAP's primary insurance carriers—rather than taking action sufficient to address AM Best's concerns—A-CAP made the unusual decision to sue the ratings agency.  *See Atlantic Coast Life Insurance Company and Sentinel Security Life Insurance Company v. A.M. Best Rating Services, Inc.*, No. 24-CV-5470 (D.N.J.) (Complaint Filed April 23, 2024) ("The A-CAP Insurers bring this suit to get the benefit of their bargain.  The Court should enjoin A.M. Best from issuing a faulty rating the insurers never agreed to.  It should also require A.M. Best to redo its rating according to its published methodology.").  The complaint, coupled with a verification from controller Kenneth King and a motion for a temporary restraining order, makes plain that AM Best had threatened downgrades because of the insurers' exposure to 777 Re ("A.M. Best's threatened downgrade arises out of its fixation with financial pressures on a reinsurer called 777 Re.").

again demonstrates the scope of King's control over 777 Re and its operations.  King's announcement only further confirms that the faucet is about to turn off on 777 Partners.[50]

207.    All the while, 777 Partners has continued to pour whatever liquidity it has into Wander's football passion project.  In a LinkedIn post on April 16, 2024 by Hertha BSC, the German professional football club owned by 777 Partners, and reposted the same day by Wander, Hertha BSC announced that 777 Partners had made in early April 2024 a fresh equity investment of approximately $80 million in Hertha BSC.  According to the LinkedIn post, 777 Partners' deadline for the equity infusion was the end of May 2024, meaning that 777 Partners made the investment ahead of schedule.  The infusion was also made at a time when Wander had represented to Leadenhall over and over again in early April 2024 that he did not have even $15 million to pay down the debt to Leadenhall.

208.    As recently as April 30, 2024, news reports broke that 777 Partners had just loaned Everton another approximately $20 million, taking the amount of 777 Partners' total loans to Everton to approximately $250 million (or £200 million).  Wander and Pasko's choice to continue to dissipate millions in money-losing professional football clubs despite immediately owing Leadenhall more than $600 million in debt is reason enough to grant injunctive relief here.

---

[50] King's announced termination of A-CAP's reinsurance agreements with 777 Re has already damaged Leadenhall.  As referenced in paragraph 179 and footnote 16, *supra*, Leadenhall has provided hundreds of millions of dollars in debt notes directly to 777 Partners under a separate note purchase agreement which is secured by equity interests in 777 Re's parent company. King's recapture of reserves from 777 Re has torpedoed the value of 777 Re and wiped away any equity value in 777 Partners in the process—effectively turning Leadenhall into unsecured creditors of 777 Partners.  Moreover, assuming the termination and recapture occurs, A-CAP will directly hold the loans made by 777 Re to the subsidiaries of 777 Partners, and it is very unlikely that they would be able to find independent third-party lenders to refinance these loans on similar or commercially reasonable terms.

209.    In addition to the facts above showing that 777 Partners is on the brink of insolvency, Defendants are facing a slew of lawsuits seeking millions of dollars for failing to pay debts as they come due and fraudulently conveying assets to shield their assets from creditors.  The facts alleged in many of those lawsuits mirror the allegations here and corroborate the actual and imminent risk that 777 Partners would frustrate any judgment on the merits in this action by further spending to the point of insolvency and transferring assets out of the shell companies named as defendants.

210.    As of the date of this Complaint, ***777 Partners and its affiliates have been named in no less than sixteen lawsuits generally concerning unpaid debts and collectively demanding more than $130 million***:

a.      On January 9, 2024, an investor sued 777 Partners seeking $30 million in damages for breach of contract, alleging that 777 Partners failed to produce certain financial information to verify its financial condition and operations, thereby triggering a right for the investor to redeem its preferred equity in 777 Partners.  Rather than honoring the repurchase right, however, 777 Partners "redirected capital into new investments and management bonuses."  *Change Lending, LLC v. 777 Partners LLC.*  As revealed in public filings in the case in April 2024, in January 2024, 777 Partners did not have even ***$1 million of liquidity*** to pay back the investor.[51]

b.      On December 12, 2023, three aircraft lessors sued 777 Partners for $30 million after 777 Partners missed lease payments for four jets.  *Corvus Lights Aviation et al v. 777 Partners LLC.*

---

[51]  Paul Brown & Philippe Auclair, *A change is gonna come?*, JOSIMAR (April 8, 2024), https://josimarfootball.com/2024/04/08/a-change-is-gonna-come/ ("In one message, sent to an employee of Change Lending on 7 January, [recently departed CFO of 777 Partners Damien] Alfalla responds to an urgent request to pay 1 million dollars of money owed by the next day by admitting: 'I don't have the liquidity to pay that tomorrow.'").

c.      On July 26, 2022, an investor sued 777 Partners and one of its aviation subsidiaries, seeking damages of at least $22 million for alleged fraud in which the defendants used corporate entities to deprive the investor of its ownership interest in the subsidiary. *MALT Family Trust et al. v. 777 Partners, LLC et al.*

d.      On July 1, 2022, lenders sued 777 Partners for defaulting on a $59.7 million loan; the lenders auctioned off $41.5 million in collateral, leaving an unpaid principal of over $20 million in debt.  Subsequently, the lenders filed a related action against 777 Partners and Pasko, alleging that despite owing the lenders over $20 million, 777 Partners fraudulently transferred two subsidiaries to Pasko in order to shield those assets from creditors.  *Vida Longevity Fund, LP et al. v. Suttonpark Capital LLC et al.*; *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.*

e.      On or around December 14, 2023, a lender sued 777 Partners to recover an unpaid debt of $11.2 million.  *Balanced Management LLC v. 777 Partners LLC.*

f.      On March 14, 2024, a lender sued Wander and 777 Partners, seeking to enjoin them from transferring any assets pending an arbitration in which the lender is seeking over €9 million for unpaid debt.  *Nakula Management Ltd. v. Joshua Wander et al.*

g.      On September 8, 2023, 777 Partners' landlord sued 777 Partners under its lease for failing to pay a $5 million security deposit.  *1 Madison Office Fee LLC v. 777 Partners LLC et al.*

h.      On December 22, 2023, a creditor sued 777 Partners to recover more than $2 million on two unpaid promissory notes.  *Lasse Meilsoe v. 777 Partners LLC et al.*

i.      On January 23, 2024, 777 Partners was sued by a former principal of the firm, seeking over $2 million in unpaid compensation, in addition to unspecified management interests in 777 Partners' equity management plan.  *Peter Meyers v. 777 Partners, LLC and 777 Partners Management, LLC.*

j.      On March 3, 2023, American Express sued 777 Partners for breach of contract after 777 Partners "failed and refused to pay" an outstanding balance of $324,002.89 on a corporate credit card.  *American Express Travel Related Services Company, Inc. v. 777 Partners.*

k.      On or around June 7, 2021, Wander's former landlord sued Wander for more than $150,000 in damages to the landlord's property. *Randy S. Gelber v. Joshua Wander.*

l.      On April 21, 2023, an executive search firm dedicated to recruiting investment professionals sued 777 Partners for breach of contract, alleging that after placing three candidates with 777 Partners, 777 Partners acknowledged that it owed the firm fees but "slow-rolled" the firm, only making occasional payments before disregarding the firm entirely and without any stated justification, leaving an outstanding balance of $94,000.  *The Oxbridge Group, LTD v. 777 Partners LLC.*

m.      On September 29, 2023, an investor in one of 777 Partner's subsidiaries sued 777 Partners and the subsidiary alleging that "777 and Phoenicia are part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise[.]" *O'Neil-Dunne et al v. Phoenicia LLC et al.*

n.      777 Partners is also a co-defendant in two federal class actions alleging a predatory lending scheme in violation of RICO.  One of the complaints states that the aggregate amount in controversy exceeds $5 million, and both complaints seek treble damages for RICO violations. *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al.*; *Joseph Morgan et al. v. 777 Partners, LLC et al.*

211.    Much like many of the plaintiffs in these actions have alleged, Leadenhall has a firm basis to believe that, absent emergency injunctive relief, 777 Partners, A-CAP, and the other

Defendants will attempt to transfer their assets so as to take them out of the reach of judgment creditors, thereby causing Leadenhall irreparable harm.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of LSA Against the SuttonPark and Dorchester Borrowers)

212.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

213.    The LSA is a binding and enforceable agreement between Plaintiffs and Borrowers.

214.    Plaintiffs fulfilled their obligations under the LSA.

215.    As set forth above and in the LSA, each Borrower was required to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim."  LSA § 4.01(h); *see also id.* §§ 5.01(d), 5.01(k)(vi).  Additionally, Borrowers were prohibited from "grant[ing] an Adverse Claim on any of [their] assets to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."  *Id.* at § 5.01(k)(vi).

216.    In violation of the LSA, Borrowers failed to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim" by pledging the Collateral to multiple lenders, thereby improperly "grant[ing] an Adverse Claim" on the Collateral that was pledged to Leadenhall "to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."

217.    Specifically, Borrowers double-pledged Collateral to Plaintiffs and separate third-party lenders, pledged Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and sold and/or removed Collateral pledged to Plaintiffs without a corresponding reduction in the Principal Amount in breach of the Borrowing Base Limitation.

218.    By virtue of Borrowers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $75,000, plus interest, costs, and attorneys' fees.

## SECOND CLAIM FOR RELIEF
**(Breach of Servicing Agreement Against SuttonPark Servicer, Signal Servicer, and Insurety Servicer)**

219.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

220.    The Servicing Agreements are binding and enforceable agreements between Plaintiffs and each of the respective Servicers.

221.    Plaintiffs fulfilled their obligations under the Servicing Agreements.

222.    As set forth above and in the Servicing Agreements, each of the Servicers was responsible for, among other duties, delivering to Leadenhall Capital as Administrative Agent the Monthly and Compliance Reports required under the LSA, containing calculations of the Borrowing Base for the Borrower in their respective Borrower Groups.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

223.    Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered."  LSA § 6.07(c).

224.    The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

225.    The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure

within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

226.   As set forth above, SuttonPark Servicer delivered false and misleading Monthly Reports and Compliance Reports to Leadenhall Capital on dozens of occasions from May 2021 through the end of 2022.   Those Monthly Reports and Compliance Reports overstated the SuttonPark and Dorchester Borrowers' Borrowing Bases by tens or hundreds of millions of dollars. Each such misrepresentation under § 6.07(c) of the LSA constituted a Servicer Default as it was not cured within two business days, SuttonPark Servicer's failure to notify Leadenhall Capital of its default within thirty days constituted a separate Servicer Default.   The other Events of Default triggered by the Borrowers' conduct described above also constituted separate Service Defaults.

227.   In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced.   Servicing Agreements § 5.1.   The "Valuation Amount" of those receivables used to calculate Servicing Fees was also the most significant input into the calculation of each Borrowers' Borrowing Base.   LSA Schedules VIII, IX, X, XI.   Thus, by inflating the value of the Borrowing Bases, the Servicers also inflated the base on which their own Servicing Fees were calculated, thus diverting funds from the Borrowers to the detriment of the Borrowers' creditors, including Leadenhall and the Lenders.

228.   Each Servicer also agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance

Report.   LSA § 6.06(a).   Servicers have not indemnified Leadenhall against the losses and liabilities it has suffered arising from the false Monthly Reports and Compliance Reports.

229.   By virtue of the foregoing Servicer Defaults and Servicers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $75,000, plus interest, costs, and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Breach of Guaranty Agreement Against 777 Partners and 600 Partners)

230.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

231.   The Guaranty Agreement is a binding and enforceable agreement between Plaintiffs, 777 Partners, and 600 Partners.

232.   Plaintiffs fulfilled their obligations under the Guaranty Agreement.

233.   As set forth above and in the Guaranty Agreement, 777 Partners and 600 Partners jointly and severally guaranteed to Plaintiffs "the full and punctual payment and performance . . . of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower … so long as a Trigger Event has occurred and is continuing," Guaranty Agreement § 2(a), including but not limited to "any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days," *Id.* at § 1, "Trigger Event".

234.   Further, through the Guaranty Agreement, 777 Partners and 600 Partners guaranteed the Borrowers' "Obligations" as defined in the LSA, including "the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or

otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA, art. I, "Guaranteed Obligations."

235.    Thus, because the Borrowers have breached the LSA by, *inter alia*, failing to own Collateral "free and clear" of any other security interests, and because 777 Partners and 600 Partners have failed to guarantee the payment and/or performance of the Borrowers following that Trigger Event, 777 Partners and 600 Partners are jointly and severally liable for the Borrowers' breach of the LSA.

236.    By virtue of 777 Partners' and 600 Partners' breach of the Guaranty Agreement, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $75,000, plus interest, costs, and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**
**(Fraudulent Misrepresentation Against**
**Wander, SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower)**

237.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

238.    As alleged herein, Wander, SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower engaged in a pattern of fraudulently misrepresenting to Plaintiffs that they owned Collateral "free and clear of any Adverse Claims," when, in fact, that was false, because they had double-pledged the Collateral to Plaintiffs and separate third-party lenders, and had also pledged the Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own).

239.    In particular, Wander engaged in this pattern of fraud by virtue of his domination and control over the entities named in this claim for relief, and on information and belief, directed the SuttonPark Borrower and the Dorchester Borrower to pledge (a) Collateral to Plaintiffs that had already been pledged to other third-party lenders, and (b) Collateral that was never purchased

by the Borrowers.  After Plaintiffs became aware that the Collateral had either been double-pledged or was not owned by the Borrowers, Wander also made various misrepresentations about the Collateral in an effort to conceal the fraud.

240.    The SuttonPark Borrower and Dorchester Borrower engaged in this pattern of fraud by pledging (a) Collateral to Plaintiffs that had already been pledged to other third-party lenders, and (b) Collateral that was never purchased by the Borrowers.  On information and belief, the SuttonPark Borrower and Dorchester Borrower Directed the SuttonPark Servicer to prepare and submit reports to Plaintiffs falsely claiming that each Borrower owned the aforementioned Collateral "free and clear of any Adverse Claims."

241.    The SuttonPark Servicer engaged in this pattern of fraud by preparing and submitting reports to Plaintiffs falsely claiming that each Borrower owned the aforementioned Collateral "free and clear of any Adverse Claims."  Moreover, by engaging in this pattern of fraudulently inflating the Borrowers' Borrowing Bases, SuttonPark Servicer fraudulently inflated its servicing fees, which Plaintiffs paid but would not have done so had they known the truth.

242.    Plaintiffs would not have continued lending to the SuttonPark and Dorchester Borrowers had Plaintiffs known that their Collateral had been double-pledged or was not owned by the Borrowers at all.

243.    At the time that Wander, the SuttonPark Borrower, Dorchester Borrower, and SuttonPark Servicer made these fraudulent statements, they knew the statements to be false; indeed, they made these misrepresentations with the intent to defraud Plaintiffs and induce them to continue lending.

244.    Moreover, by concealing the fact that the Collateral pledged to Plaintiffs had been pledged to other lenders or were not even owned by the Borrowers, Wander, the SuttonPark

Borrower, Dorchester Borrower, and SuttonPark Servicer fraudulently inflated the SuttonPark and Dorchester Borrowers' Borrowing Bases, with the intent to induce Plaintiffs to lend more funds than Plaintiffs would have, had Plaintiffs known the truth.

245.    Plaintiffs reasonably relied upon Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's misrepresentations, who took affirmative steps to deceive Plaintiffs and to conceal their own fraud, including by refusing to respond to reasonable requests for information regarding the double-pledged Collateral.

246.    As a result of Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's knowingly false and fraudulent misrepresentations and Plaintiffs' reasonable reliance thereon, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

### FIFTH CLAIM FOR RELIEF
#### (Civil Conspiracy to Commit Fraud Against All Defendants)

247.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

248.    Defendants formed and operated a conspiracy.

249.    Defendants willfully, intentionally, and knowingly agreed to violate the LSA, the Servicing Agreement, and the Guaranty Agreement, to commit wire fraud, and to defraud Leadenhall, all as further described above and incorporated herein.  Defendants operated their conspiracy to accomplish these ends.

250.    Wander, the SuttonPark Borrower, the Dorchester Borrower, and the SuttonPark Servicer were willing and critical participants in the conspiracy, because they encouraged and enabled the enterprise by fraudulently inflating the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.  Wander, the SuttonPark Borrower,

Dorchester Borrower, and SuttonPark Servicer committed fraud by misrepresenting the value of their Collateral including in multiple reports sent to Plaintiffs through interstate wires. These acts had the same or similar purposes, results, participants, victims, and methods of commission, were otherwise interrelated by distinguishing characteristics, and were not isolated events. Moreover, Wander, in both his personal capacity and his capacity as founder and Managing Partner of 777 Partners and 600 Partners, misrepresented facts to Plaintiffs in an effort to conceal the fraud.

251.    Pasko, SuttonPark Capital, 777 Partners, and 600 Partners, were willing and critical participants in the scheme. These Defendants encouraged and enabled the fraud by facilitating and encouraging the SuttonPark and Dorchester Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.

252.    King and A-CAP were willing and critical participants to the racketeering scheme. These Defendants encouraged and enabled the fraud by causing the SuttonPark and Dorchester Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud. Moreover, these Defendants encouraged and enabled the fraud by funding 777 Partners and 600 Partners sufficiently to remain liquid and continue carrying out the fraud, all while knowing that the fraud was ongoing.

253.    Each of the Defendants actively participated in the above-described civil conspiracy, and therefore each Defendant is responsible for each tortious and otherwise unlawful action of any co-conspirator.

254.    As a direct and proximate result of the conspiracy, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Against
### 777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King)

255.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

256.    As alleged *supra* paragraphs 230 through 236, Wander, the SuttonPark Borrower Dorchester Borrower, and SuttonPark Servicer committed fraud against Plaintiffs.

257.    777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King substantially assisted this fraud by facilitating the pattern of making misrepresentations to Plaintiffs in order to obtain millions of dollars in debt.

258.    Additionally, every material decision by 777 Partners and its subsidiaries and affiliates must be approved by King and A-CAP in advance including, on information and belief, the decisions to commit fraud alleged herein.

259.    777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King all acted with knowledge of Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's fraud.

260.    As a result of 777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King aiding and abetting Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's fraud, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
### (Civil RICO, 18 U.S.C. § 1962(c) Against All Defendants)

261.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

262.    Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

263.    Defendants operate as an associated-in-fact enterprise within the meaning of the RICO Act and are each a person within the meaning of 18 U.S.C. § 1961(3) and are separate from and exist independently of the enterprise.

264.    Wander, the SuttonPark Borrower, the Dorchester Borrower, and the SuttonPark Servicer were willing and critical participants in the racketeering scheme, because they encouraged and enabled the enterprise by fraudulently inflating the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.  Wander, the SuttonPark Borrower, Dorchester Borrower, and SuttonPark Servicer committed mail and wire fraud from in violation of 18 U.S.C. §§ 1341, 1343, by misrepresenting the value of their Collateral including in multiple reports sent to Plaintiffs through interstate wires.  These Defendants' transfer through the interstate wires of multiple fraudulent reports constituted a predicate act within the meaning of RICO.  These acts had the same or similar purposes, results, participants, victims, and methods of commission, were otherwise interrelated by distinguishing characteristics, and were not isolated events.  Moreover, Wander, in both his personal capacity and his capacity as founder and Managing Partner of 777 Partners and 600 Partners, misrepresented facts to Plaintiffs in an effort to conceal the fraud.

265.    Pasko, SuttonPark Capital, 777 Partners, and 600 Partners, were willing and critical participants in the racketeering scheme.  These Defendants encouraged and enabled the fraud by facilitating and encouraging the SuttonPark and Dorchester Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.

266.    King and A-CAP were willing and critical participants to the racketeering scheme. These Defendants encouraged and enabled the fraud by causing the SuttonPark and Dorchester

Borrowers to fraudulently inflate the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud.  Moreover, these Defendants encouraged and enabled the fraud by funding 777 Partners and 600 Partners sufficiently to retain the appearance of solvency and continue carrying out the fraud, all while knowing that the fraud was ongoing.

267.    The racketeering acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of a common goal, including submitting reports to Plaintiffs with fraudulently inflated Collateral values; (b) used similar methods to perpetrate the frauds, including the use of similar fraudulent reports and misrepresentations regarding the reports; (c) had similar participants; and (d) had the same victims.

268.    Defendants' racketeering acts were a regular way of conducting their ongoing business with Plaintiffs and of conducting or participating in the ongoing RICO enterprise.  The racketeering acts were sufficiently continuous to form a pattern of racketeering activity.

269.    Defendants' racketeering acts pose a threat of continuing criminal activity.  For example, on information and belief, Defendants continue to borrow from third-party lenders, in addition to Plaintiffs, against collateral that has been fraudulently pledged to multiple lenders.

270.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $75,000, plus interest, costs, and attorneys' fees.

### EIGHTH CLAIM FOR RELIEF
**(Civil RICO Conspiracy, 18 U.S.C. § 1962(d) Against All Defendants)**

271.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

272.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to

conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

273.    The frauds that were perpetrated, and the continuance of the scheme, could not have occurred without the consent and knowing connivance of Defendants together.

274.    As part of and in furtherance of their conspiracy, Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity. As part of and in furtherance of their conspiracy, Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each of Defendants' actions are attributable to the other.

275.    No Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

276.    Plaintiffs have been injured in business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).

277.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, plus interest, costs, and attorneys' fees.

## TENTH CLAIM FOR RELIEF
### (Unjust Enrichment Against All Defendants)

278.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

279.    By reason of the foregoing conduct—including defrauding Plaintiffs and willfully breaching their agreements with Plaintiffs as alleged herein—Defendants have profited and enriched themselves unjustly at the expense and detriment of Plaintiffs.

280.    Defendants should not be permitted, in equity and good conscience, to retain for themselves any funds wrongfully obtained from Plaintiffs.

281.     By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at a trial but not less than $75,000, plus interest, costs, and attorneys' fees.

## **PRAYER FOR RELIEF**

282.     Plaintiffs pray for the following relief:

a)     An award of monetary damages in an amount to be determined at trial by jury;

b)     An order enjoining Defendants violating their obligations under the Agreements;

c)     An order declaring the rights and duties of the parties as indicated herein;

d)     An order declaring that Plaintiffs may exercise any rights and remedies due to them following a material breach or Event of Default under the Agreements

e)     An award of pre- and post-judgment interest;

f)     An award of all reasonable fees, costs, and expenses, including attorneys' fees; and

g)     An award of such other and further relief as the Court deems just and proper.

Dated: May 3, 2024
       New York, New York

KING AND SPALDING LLP

*/s/ Leigh M. Nathanson*

Craig Carpenito
Leigh M. Nathanson
Roger G. Schwartz
Brian Donovan
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
lnathanson@kslaw.com
rschwartz@kslaw.com
bdonovan@kslaw.com

*Attorneys for Plaintiffs Leadenhall Capital Partners
LLP and Leadenhall Life Insurance Linked
Investments Fund PLC*