**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No.  1:24-cv-03453 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR APPLICATION FOR (1) A TEMPORARY RESTRAINING ORDER, AND (2) AN ORDER TO SHOW CAUSE FOR A RECEIVER OR, ALTERNATIVELY, A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    THE PARTIES ENTER A SECURED "BORROWING-BASE" CREDIT FACILITY................................................................................... 3

    B.    THE BORROWERS' BREACHES COME TO LIGHT. ...................................... 5

    C.    DEFENDANTS' INABILITY TO MAKE REPAYMENT................................... 7

    D.    THE SOURCE OF FUNDING OF THE 777 PARTNERS ENTERPRISE COLLAPSES. .............................................................. 10

    E.    PROCEDURAL HISTORY AND REQUEST FOR PRELIMINARY RELIEF .............................................................................. 13

LEGAL STANDARD ............................................................................................. 14

ARGUMENT ...................................................................................................... 16

I.    LEADENHALL'S CLAIMS WILL SUCCEED ON THE MERITS. ........................... 16

II.    LEADENHALL FACES IRREPARABLE HARM ABSENT EMERGENCY INJUNCTIVE RELIEF. ....................................................................... 18

III.    THE BALANCE OF HARDSHIPS TIPS DECISIVELY IN LEADENHALL'S FAVOR. ........................................................................................ 22

IV.    THE PUBLIC INTEREST WEIGHS IN LEADENHALL'S FAVOR. ........................ 23

CONCLUSION.................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
  408 F. Supp. 3d 424 (S.D.N.Y. 2019) ........................................................................15

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
  740 F. Supp. 2d 465 (S.D.N.Y. 2010) .......................................................................15

*Bank of Am., N.A. v. Won Sam Yi*,
  294 F. Supp. 3d 62 (W.D.N.Y. 2018) ........................................................................22

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) ......................................................................................18

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
  2023 WL 8810142 (S.D.N.Y. Dec. 19, 2023) ..............................................14, 18, 22

*Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.*,
  2019 WL 5257995 (S.D.N.Y. Oct. 17, 2019) .............................................................22

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) ......................................................................................16

*In re Feit & Drexler, Inc.*,
  760 F.2d 406 (2d Cir. 1985) ......................................................................................18

*Nimbus Therapeutics, LLC v. Celgene Corp.*,
  570 F. Supp. 3d 100 (S.D.N.Y. 2021) .......................................................................22

*NML Cap., Ltd. v. Republic of Arg.*,
  699 F.3d 246 (2d Cir. 2012) ......................................................................................18

*Pashaian v. Eccelston Props., Ltd.*,
  691 F.3d 275 (2d Cir. 1996) ......................................................................................18

*Res. Grp. Int'l Ltd. v. Chishti*,
  91 F.4th 107 (2d Cir. 2024) ................................................................................14, 15

*U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*,
  866 F. Supp. 2d 247 (S.D.N.Y. 2012) .......................................................................14

*Wilmington Tr., N.A. v. Winta Asset Mgmt. LLC*,
  2020 WL 5802365 (S.D.N.Y. Sept. 28, 2020) ...........................................................15

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) .................................................................18

**Statutes**

CPLR § 6201.............................................................................................14, 15

**Other Authorities**

Federal Rule of Civil Procedure 64 .........................................................14

Federal Rule of Civil Procedure 65 .........................................................14

## PRELIMINARY STATEMENT

This is an extraordinary case that warrants an emergency remedy.  Defendant Josh Wander, who controls the six Defendant entities that are the subject of this application, has already admitted that his companies breached the most fundamental promise of their secured credit facility with Leadenhall by double-pledging the collateral backing their debt.[1]  That undisputed breach gave Leadenhall the right to call immediately due more than $600 million in debt owed by the borrowers under the facility and guaranteed by their parent entities, 777 Partners and 600 Partners.  Despite those entities' immediate and undisputed obligation to repay Leadenhall, Wander and his alter-ego companies continue to divert what funds they have into their other failing businesses, particularly professional football teams, in the vain hope of perpetuating their financial musical chairs a little longer.

Leadenhall seeks the Court's intervention to prevent Wander from rendering Defendants judgment-proof and irreparably harming Leadenhall's ability to ever recover what it is owed.  In the weeks preceding the filing of Leadenhall's Complaint, Wander admitted repeatedly to Leadenhall that the 777 Partners enterprise could not make even a $15 million payment as a good-faith gesture towards paying down its massive debt.  During the same period, news reports announced that 777 Partners had shoveled *a hundred million dollars* into Wander's glamor project of buying professional football clubs: on April 16, 2024, an $80 million "investment" to German professional football club Hertha BSC; on April 30, 2024, another $20 million "loan" to English professional football club Everton F.C. ("Everton").  Yet days before this action was initiated,

---

[1] "Leadenhall" refers to Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life").  Capitalized terms not defined herein have the same definitions as in Leadenhall's Complaint in this action (ECF 1).

Wander solemnly represented to Leadenhall that 777 Partners could not make any payment to Leadenhall and was in the process of running down its business and disposing of assets to repay creditors.[2]

The foundation supporting the enterprise cracked earlier this year. 777 Partners was, by its own description to investors, "anchored" by its reinsurance subsidiary 777 Re. After a dramatic credit ratings downgrade in February 2024 placed 777 Re into junk-bond territory, the five insurance companies with reinsurance exposure to 777 Re—the agreements with which comprised 99% of 777 Re's invested assets—announced they were "recapturing" or eliminating their exposure to 777 Re. That caused a domino effect. In the last month, 777 Partners has seen its Australian airline business (Bonza) collapse into voluntary administration; disposed of a substantial stake in its Canadian airline business (Flair); failed to pay players' wages at its Belgian football club (Standard Liege); missed a deadline to repay a loan related to Everton's new stadium; and seen its public relations firm (Teneo) cut ties because of unpaid bills. As of the filing of the Complaint, 777 Partners and its affiliates had already been named in at least 16 lawsuits generally concerning unpaid debts and collectively demanding more than $130 million.

Through this application, Leadenhall seeks narrowly tailored relief to preserve the status quo and prevent Wander and his companies from using insolvency as a shield against judgment on claims that are essentially undisputed. In particular, Leadenhall seeks appointment of a receiver with the power to take control of the collateral pledged to Leadenhall by the borrowers and cash (or cash equivalents) from the borrowers and their guarantors—whether presently existing or from

---

[2] On May 10, 2024—after the Complaint was filed and yet still somehow undeterred—777 Partners reportedly loaned **another $10 million** to Everton.

future transactions—sufficient to cover the accelerated loan amount.  The receiver would also prevent dissipation of assets through transactions with other Defendants and prevent other Defendants from foreclosing on the assets of the borrowers and their guarantors.  In the alternative, Leadenhall seeks a preliminary injunction that would freeze the same assets and prevent the same actions.  This relief is necessary to avoid irreparable harm to Leadenhall and its investors.

## STATEMENT OF FACTS

### A.  The Parties Enter a Secured "Borrowing-Base" Credit Facility.

In May 2021, Leadenhall entered into a secured credit facility with four borrowers, the parent entities of which are 777 Partners and 600 Partners.  Declaration of Craig Gillespie ("Gillespie Decl.") ¶ 2; Compl. ¶ 45.  Pursuant to the facility, "Lenders," represented by Leadenhall, provided secured debt to the "Borrowers" that would mature in September 2024. Gillespie Decl. ¶ 2 n.1 (defining "Maturity Date"); *id.* Ex. 1, Excerpts from Loan and Security Agreement dated May 7, 2021 (hereinafter "LSA") § 2.01; Compl. ¶¶ 3-4, 45-50.  Because this was a *secured* credit facility, each Borrower pledged to Leadenhall as Collateral first-priority security interests in 100% of its assets.[3]  Gillespie Decl. ¶ 2 n.1 (defining "Collateral"); LSA § 2.15; Compl. ¶¶ 5, 51.  To ensure the debt was secured, the Borrowers could take on debt only up to their respective credit limits—called "Borrowing Bases"—which corresponded closely to the value of their Collateral.  Gillespie Decl. ¶ 2 n.1 (defining "Borrowing Base" and "Borrowing Base Deficiency"), LSA § 2.01(a), 7.01(c), 7.02(g), scheds. VIII-XI; Compl. ¶¶ 3, 5, 52-53.

Because the Borrowers' assets corresponded one-to-one with the Collateral securing the debt, and nearly one-to-one with their Borrowing Bases, *the cardinal rule of the credit facility was that the Borrowers at all times own the assets pledged as Collateral "free and clear" of any*

---

[3] All emphasis is added unless otherwise stated.

*other claims*.  Compl. ¶¶ 5-6, 76-88.  Under the LSA, each Borrower represented that its assets were owned "free and clear" upon executing the LSA, and they reaffirmed that representation every month and every time they borrowed money from Leadenhall, by submitting Compliance Reports attesting to their Borrowing Bases and the truth of their representations.  *See* LSA §§ 4.01(h), (i) (requiring such representations upon execution of the LSA, upon any borrowing, and in each Compliance Report); Compl. ¶ 56.  If Leadenhall's security interests were impaired, or any Borrower exceeded its Borrowing Base or breached a representation and did not promptly cure, those constituted Events of Default, *i.e.*, enumerated material breaches.  LSA §§ 7.01(c), (d), 7.02(c), (d), (g).

Upon an Event of Default, Leadenhall had the right to accelerate the Borrowers' entire outstanding debt.  *Id.* §§ 7.01, 7.02 (providing that upon an Event of Default, "the Administrative Agent may in its discretion . . . declare the related Loans then outstanding to be due and payable").

The LSA contemplates two types of Events of Default—Borrower Group Events of Default and Facility Events of Default.  *Id.*  Upon a Borrower Group Event of Default, Leadenhall may exercise remedies, including acceleration, "with respect to" the affected Borrower.  *Id.* § 7.02. Borrower Group Events of Default include breached covenants and representations, and Borrowing Base Deficiencies not cured within three business days.  *Id.* § 7.02(c), (d), (g).  But upon a Facility Event of Default, Leadenhall may accelerate the debt of *all* Borrowers, even those not directly responsible for the Event of Default.  *Id.* § 7.01.  Facility Events of Default include fundamental breaches of the facility, including any impairment of Leadenhall's first-priority security interest not cured within two business days, and any Borrowing Base Deficiency not cured within 30 days.  *Id.* § 7.01(c), (d).

In addition to first-priority security interests in the Borrowers' assets and recourse against each Borrower, Leadenhall also negotiated a guarantee from 777 Partners and 600 Partners of all of the Borrowers' obligations. *See* Gillespie Decl. ¶ 4, Ex. 2, Excerpts from Guaranty Agreement (hereinafter "Guaranty"), §§ 2, 3 (providing that 777 Partners and 600 Partners "jointly and severally absolutely, unconditionally and irrevocably guarantee[d]" the Borrowers' "Guaranteed Obligations"); *id.* § 1 (defining "Guaranteed Obligations"); Gillespie Decl. ¶ 2 n.1 (defining "Obligations"). Among the "Trigger Events" granting Leadenhall recourse against 777 Partners and 600 Partners for the Borrowers' obligations is a Borrower's "failure . . . to own the Collateral pledged free and clear." *Id.* § 1 (definition of "Trigger Event" at clause (ix)).

### B.  The Borrowers' Breaches Come to Light.

On September 19, 2022, 18 months into the credit facility and after the Borrowers had borrowed hundreds of millions of dollars, Leadenhall received an anonymous e-mail stating that Wander "either never bought" assets pledged to Leadenhall as Collateral "or already pledged them to another lender." The tipster concluded, "What he is doing is criminal." Gillespie Decl. ¶ 5, Ex. 3. The e-mail prompted Leadenhall to investigate whether the debt extended to Wander's companies was secured, including by conducting a check of computer software that 777 Partners used to allocate assets to lenders. *Id.* ¶ 6.

Unfortunately, the tipster was right. In March 2023, a third-party lender called "Credigy," which had a separate credit facility with 777 Partners, sent Leadenhall a list of assets ostensibly pledged to Credigy by 777 Partners. *Id.* ¶ 7. Leadenhall identified from this inventory more than 1,600 assets, worth approximately $185 million, that the largest borrower in the LSA—the SuttonPark Borrower—had pledged to both Credigy and Leadenhall as Collateral. *Id.*

On March 28, 2023, Leadenhall held a recorded conference call with Wander. Declaration of Phil Kane ("Kane Decl.") ¶ 2. During that call, Wander admitted that the SuttonPark Borrower

had double-pledged Collateral to both Leadenhall and another lender in breach of the LSA. Wander stated:

- "The issue today is that **there are deals that are in Credigy's Borrowing Base that are allocated to you guys**."

- "[There are d]eals that sat on our Volans facility—which is locked out basically now for 5 years—that were allocated to the [SuttonPark] facility. **And those are the deals that that— you would consider double-pledged now, for they're on both facilities**."[4]

- And in response to the statement by Leadenhall Chairman John Wells that, **"There are so many breaches on these agreements now. We need to get all of this sorted out"**, Wander responded, **"Agreed, agreed, agreed."**

*Id.* ¶¶ 3-5.

Leadenhall held a second recorded conference call with Wander on April 3, 2023. *Id.* ¶ 7. Wander again admitted to fundamental breaches. *Id.* ¶¶ 8-9 (Wells: "What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?" Wander: "I think it was around 100 million I think."). Leadenhall later discovered the Dorchester Borrower had also pledged assets that were already pledged to another lender, sold or transferred to a third-party, or never purchased in the first place. Gillespie Decl. ¶ 9, Ex. 5.

On November 29, 2023, Leadenhall sent formal notice of the Borrowers' breaches. *Id.* ¶ 8, Ex. 4. Leadenhall stated it had become "aware that assets pledged as Collateral under the Agreements may have been double-pledged," calculating Borrowing Base shortfalls at approximately $310 million for the SuttonPark Borrower and $41 million for the Dorchester Borrower. *Id.*

In January 2024, at Leadenhall's request, the SuttonPark and Dorchester Borrowers submitted revised monthly Compliance Reports going back to March 2023. *Id.* ¶ 10, Exs. 6, 7.

---

[4] The "Volans facility" refers to Credigy's credit facility with 777 Partners. Kane Decl. ¶ 4.

The revised reports showed that—as a result of the double-pledging of assets—the SuttonPark and Dorchester Borrower had, going back to March 2023 (and likely much earlier), borrowed hundreds of millions of dollars in excess of contractual limitations:

**Excerpt from revised March 2023 Compliance Report for SuttonPark Borrower:**

|  | | Borrowing Base | $ | 64,076,151.91 |
|---|---|---|---|---|
| **Borrowing Base Compliance** | | | | |
| Borrowing Base Amount | | | $ | 64,076,151.91 |
| Outstanding Borrowings | | | $ | 349,997,803.32 |
| Compliant if difference is ≥ 0) | | | | No |

**Excerpt from revised March 2023 Compliance Report for Dorchester Borrower:**

|  | | Borrowing Base | $ | 42,455,473.97 |
|---|---|---|---|---|
| **Borrowing Base Compliance** | | f | | |
| Borrowing Base Amount | | | $ | 42,455,473.97 |
| Outstanding Borrowings | | | $ | 79,010,000.00 |
| Compliant if difference is ≥ 0) | | | | No |

*Id.*

In light of the material breaches, on December 19, 2023, all four Borrowers executed an amendment to the LSA (hereinafter the "Additional Interest Amendment"). *Id.* ¶ 11. Pursuant to the Additional Interest Amendment, the Borrowers agreed to pay additional interest on the "Uncollateralized Portion" of their outstanding debt to Leadenhall. *Id.* ¶ 11 & n.2.

### C. Defendants' Inability to Make Repayment.

After sending the Notice of Breach, Leadenhall negotiated for months with Wander hoping to recoup the debt extended to his companies without litigation. Instead, it became clear that Wander and his companies, including 777 Partners, 600 Partners, and the Borrowers, were in financial distress and unable to commit to repaying Leadenhall at all. Compl. ¶¶ 160, 173-211.

On February 21, 2024, Leadenhall executed a "Paydown and Partial Release Letter" with the Borrowers and Guarantors (the "Paydown Letter"). Gillespie Decl. ¶ 12, Ex. 8. In the Paydown

Letter, the Borrowers agreed immediately to repay approximately $25 million.  *Id.* Ex. 8 §§ 1-3 & Exs. A-C thereto.  The deadline for that payment was February 21, 2024, and the Borrowers immediately missed it, instead paying half that amount—approximately $12.5 million.  *Id.* ¶ 13. The next day, Leadenhall Managing Partner Craig Gillespie received an explanation why 777 Partners failed to pay Leadenhall on time—a 777 Partners employee reported that co-Defendant A-CAP had funded its payroll and operating expenses earlier that day, so 777 Partners could not pay Leadenhall $25 million in one shot.  *Id.* ¶ 14.

As it became clearer Wander's companies would not meet even modest repayment obligations, Leadenhall took additional steps to protect its rights.  On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with a Default Notice, notifying them that the events detailed in the prior Notice of Breach constituted Facility Events of Default under the LSA.  *Id.* ¶ 15, Ex. 9.  On March 15, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with an Acceleration Notice, notifying them that, in light of the Events of Default, it was exercising its contractual right, upon a Facility Event of Default, to call immediately due and payable the outstanding balance due to Leadenhall from all four Borrowers under the facility of $609,529,966.82 (the "Accelerated Amount").  *Id.* ¶ 16, Ex. 10.

Following acceleration, Leadenhall continued attempting to negotiate a restructuring of the outstanding debt.  In late March 2023, the parties exchanged draft "Forbearance Agreements," whereby Leadenhall would forbear on exercising certain remedies in exchange for payments pursuant to a repayment plan.  On March 26, 2024, Associate General Counsel of 777 Partners Jon Walder sent a markup of the Draft Forbearance Agreement back to Leadenhall, conceding in an opening recital that, "[a]s of the date hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing."  Gillespie Decl. ¶ 17, Ex. 11.

It became clear, however, that Wander and his companies could not make even one payment under any reasonable payment plan. One of the terms in the Draft Forbearance Agreement would have required a $15 million payment on March 29, 2024. *Id.* Ex. 11 § 5(d). But on that date, Wander stated that 777 Partners could not make that payment absent financing from A-CAP. Declaration of Luca Albertini ("Albertini Decl.") ¶ 2. Wander also said if 777 Partners even agreed to a repayment plan without A-CAP's approval of its terms, A-CAP would notice an event of default on A-CAP's outstanding loans to 777 Partners. *Id.*

During follow-up calls on March 31, April 1, 2, and 3, 2024, Wander repeatedly stated that 777 Partners could not make a $15 million payment—less than 2.5% of the Accelerated Amount—and A-CAP would not fund such payments to Leadenhall. Gillespie Decl. ¶¶ 18-21; Albertini Decl. ¶¶ 3-4. Using his usual tactic of promising payment was just around the corner if Leadenhall could hold out a little longer, Wander suggested 777 Partners could make a payment on April 15, 2024, using an alternative funding source not dependent on A-CAP. Gillespie Decl. ¶ 20; Albertini Decl. ¶ 4. Leadenhall never received such a payment. Gillespie Decl. ¶ 20; Albertini Decl. ¶ 5.

Leadenhall continued attempting to secure some consensual repayment for the benefit of its investors. On April 4, 2024, Wander told Leadenhall that 777 Partners did not have $30 million to repay Leadenhall and A-CAP would not allow such a payment. Albertini Decl. ¶ 6. On April 16, 2024, Wander stated he could not repay the $350 million Collateral shortfall within two weeks. Gillespie Decl. ¶ 22. And on April 29, 2024, Wander said 777 Partners did not have $400 million to repay the Borrowers' debts. *Id.* ¶ 23.

As April turned to May 2024, Wander also began confirming that 777 Partners and affiliates were in desperation mode. On May 2, 2024, the day before this lawsuit was filed, Wander stated that 777 Partners was running down its business and disposing of assets to repay creditors.

Albertini Decl. ¶ 7.  Wander also stated that A-CAP could no longer provide any funds to 777 Partners due to regulatory scrutiny and would itself foreclose on 777 Partners' assets.  Gillespie Decl. ¶ 24.

### D.  The Source of Funding of the 777 Partners Enterprise Collapses.

Adding to the exigency stemming from 777 Partners' inability to make even a modest repayment, Wander's businesses are currently in free-fall.

In early 2024, the foundation supporting Wander's businesses—777's Bermuda-based reinsurance subsidiary, 777 Re Ltd. ("777 Re")—crumbled, extinguishing 777 Partners' key funding source.  *See* Kane Decl. ¶¶ 12-15.  As a reinsurer, 777 Re accepts payments from primary insurance companies (and other reinsurers) in exchange for indemnifying their liabilities; in reinsurance parlance, 777 Re's customers "cede" liabilities to 777 Re.  The continued operation of many of 777 Partners' businesses—including in professional football, aircraft leasing, Canadian airlines, and asset management—depends heavily on 777 Re's assets.  *Id*. ¶¶ 15-16.  777 Partners has described itself to investors as "anchored" by 777 Re.[5]  At year-end 2023, approximately 99% of 777 Re's nearly $4 billion in invested assets were tied to reinsurance agreements with five insurers, three of which are owned by A-CAP.  *Id*. ¶¶ 11-12.  But in 2024—following regulatory scrutiny and a dramatic credit downgrade of 777 Re—those five firms announced they would "recapture" their exposure to 777 Re, causing a material reduction in 777 Re's value.[6]  *Id.* ¶¶ 13.

---

[5]    Compl. ¶ 146 (citing Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/).

[6]    The extent to which the net book value of 777 Re's assets is reduced depends on the extent to which 777 Re retains participation in the recaptured insurance assets.  777 Re has represented that it may retain some participation.

That caused a domino effect, and the following dominoes have fallen **in the last month alone**: Following unpaid debts by 777 Partners, an affiliate of A-CAP repossessed the entire fleet of 777 Partners' Australian budget airline, Bonza, and the airline entered voluntary court-supervised administration.[7] 777 Partners' Canadian airline, Flair, announced that 777 Partners had disposed of a substantial ownership stake.[8] 777 Partners failed to repay a nearly $200 million loan when due in connection with a new English football stadium.[9] 777 Partners failed to pay the players of its Belgian football club, Standard Liege,[10] and failed to complete the second installment

---

[7]     Andrew Curran, *Australia's Bonza goes bust as AIP Capital seizes aircraft*, CH-AVIATION (Apr. 30, 2025), https://www.ch-aviation.com/news/139721-australias-bonza-goes-bust-as-aip-capital-seizes-aircraft.

[8]     Ayesha de Kretser, *Bonza's sister airline cuts 777 Partners, restructures debt*, FINANCIAL REV. (May 2, 2024), https://www.afr.com/companies/transport/bonza-s-sister-airline-cuts-777-partners-restructures-debt-20240502-p5foes.

[9]     Jamie Nimmo and David Hellier, *Everton FC Pursued by Another US Investor as 777 Takeover Falters*, BLOOMBERG (May 8, 2024), https://www.bloomberg.com/news/articles/2024-05-08/everton-bid-explored-by-us-firm-msp-sports-capital-as-777-offer-teeters.

[10]     *From bad to worse for Standard Liege as 777 owned club have no money in their account to pay wages until the end of the season*, ONEFOOTBALL (May 8, 2024), https://onefootball.com/en/news/from-bad-to-worse-for-standard-liege-as-777-owned-club-have-no-money-in-their-account-to-pay-wages-until-the-end-of-the-season-39459085.

payment for its acquisition of the club.[11]  Even 777 Partners' public relations firm severed ties because of overdue bills.[12]

Additionally, Wander, his business partner Steven Pasko, 777 Partners, 600 Partners, and their affiliates are collectively facing at least sixteen other lawsuits collectively seeking more than $130 million.  *See* Declaration of Leigh M. Nathanson ("Nathanson Decl."), Exs. A-P.  Those lawsuits allege, among other things:

- 777 Partners "redirected capital into new investments and management bonuses," rather than honoring its obligations, *Change Lending, LLC v. 777 Partners LLC*, *id.* Ex. A ¶ 25;

- 777 Partners used affiliated corporate entities to deprive an investor of its ownership interest in an aviation subsidiary, *MALT Family Trust v. 777 Partners, LLC*, *id.* Ex. C ¶ 17;

- Wander fraudulently transferred two subsidiaries to Pasko to shield those assets from creditors, *Obra Capital Management, LLC v. 777 Partners LLC*, *id.* Ex. E ¶¶ 5, 36-38;

- 777 Partners acknowledged that it owed fees but "slow-rolled" its payment obligations (just as it has here), only making occasional payments before disregarding the firm entirely and without any stated justification, *Oxbridge Group, LTD v. 777 Partners LLC*, *id.* Ex. M ¶ 1;

- 777 Partners is "part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise," *O'Neil-Dunne v. Phoenicia LLC*, *id.* Ex. N ¶ 7.

These financial troubles came at the same time that 777 Partners and 600 Partners needed capital to close a deal to purchase Everton, the historic English football club, which would be the

---

[11]     Mauricio Alencar, *777 Partners takeover of Everton in further doubt after firm hit with legal action,* YAHOO! FINANCE (May 6, 2024), https://uk.finance.yahoo.com/news/777-partners-takeover-everton-further-174257384.html.

[12]     Bernard Lagan and Paul Joyce, *Everton takeover doubts grow as 777 Partners' airline collapses*, THE TIMES (April 30, 2024), https://www.thetimes.co.uk/sport/football/article/everton-takeover-doubts-grow-as-777-partners-airline-collapses-fmfnmc536.

most prominent of Wander's football investments.[13]   On April 30, 2024, after months of 777 Partners claiming an inability to pay down even a fraction of its debts to Leadenhall, 777 Partners reportedly loaned an additional $20 million to Everton.  Compl. ¶ 208.  This came on the heels of an announcement earlier in April by Hertha BSC, a German football club owned by 777 Partners, that 777 Partners had invested another $80 million in the club.  *Id.* ¶ 207.  When Leadenhall questioned Wander about this incongruity between his private claims of illiquidity and public actions, prior to filing the Complaint, Wander said the football loans constituted "protective advances" provided by A-CAP, and A-CAP could not provide any "protective advances" to Leadenhall.  Albertini Decl. ¶ 8.  And yet after the Complaint was filed, 777 Partners reportedly loaned Everton another $10 million.[14]

### E.  Procedural History and Request for Preliminary Relief

Leadenhall initiated this action on May 3, 2024.  By this application, Leadenhall seeks a temporary restraining order and a receivership or preliminary injunction against the Borrowers and their guarantors, 777 Partners, and 600 Partners (collectively, the "Borrowers and Guarantors").  The preliminary relief Leadenhall seeks is as narrowly tailored as possible to prevent the Borrowers and Guarantors from using insolvency as a shield against judgment while allowing legitimate business operations, if any, to continue.  In particular, Leadenhall seeks appointment of

---

[13]     For further context on Wander's football ventures, *see* Compl. ¶¶153-156, 181-199 and sources cited therein.

[14]     George Overhill, *Everton receive more cash from 777 Partners despite takeover bid on brink of collapse*, GOODISON NEWS (May 11, 2024), https://www.goodisonnews.com/2024/05/11/everton-receive-more-cash-from-777-partners-despite-takeover-bid-on-brink-of-collapse/.

a receiver to: (i) take control of the assets pledged as Collateral by the Borrowers, (ii) to the extent the value of the Collateral is less than the Accelerated Debt, take control of cash or cash equivalents owned by the Borrowers and Guarantors sufficient to cover the Accelerated Debt, (iii) to the extent the value of the Collateral plus the cash or cash equivalents of the Borrowers and Guarantors is less than the Accelerated Debt, take control of the proceeds of any sale sufficient to cover the amount of the Accelerated Debt, (iv) prevent the Borrowers and Guarantors from dissipating assets, including by transferring assets to any persons affiliated with the Defendants, and (v) notify Leadenhall if any Defendant attempts to foreclose on assets of the Borrowers and Guarantors and/or prevent any Defendant from foreclosing on assets of the Borrowers and Guarantors.  In the alternative, Leadenhall seeks a preliminary injunction to freeze the same Collateral and the same cash or cash equivalents of the Borrowers and Guarantors up to the amount of the Accelerated Debt, and otherwise enjoin or require equivalent actions.[15]

## **LEGAL STANDARD**

The forms of preliminary relief Leadenhall seeks here—either a receiver or an injunction—are subject to analogous legal standards, requiring Leadenhall to show: (1) a likelihood of success on the merits, (2) a risk of irreparable harm, and (3) a balance of the equities.  *See, e.g.*, *Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024) (discussing standard for temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65, including "that 'the balance of hardships

---

[15] Leadenhall's requested relief is designed to narrowly protect the Collateral and outstanding debt due to Leadenhall under the LSA.  Separately, Leadenhall is currently seeking the Borrowers' and Guarantors' cooperation in accordance with the terms of the LSA to protect the Collateral, and to the extent the Borrowers and Guarantors refuse to provide that contractually required cooperation, Leadenhall hereby reserves the right to seek additional injunctive relief from the Court.

tips in the plaintiff's favor'; and 'that the public interest would not be disserved by the issuance of the injunction.'"); *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2023 WL 8810142, at *2 (S.D.N.Y. Dec. 19, 2023) (discussing standard for attachment under Fed. R. Civ. P. 64 and New York law);[16] *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 250 (S.D.N.Y. 2012) (discussing standard for receivership); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("[T]he standard for an entry of a temporary restraining order is the same as for a preliminary injunction."); *see also Wilmington Tr., N.A. v. Winta Asset Mgmt. LLC*, 2020 WL 5802365, at *1 (S.D.N.Y. Sept. 28, 2020) ("A federal court has the power in equity to appoint a receiver in order to protect a party's interest in . . . property," including collateral and proceeds therefrom, and noting that "imminent danger of the diminution of the value of the property is a critical factor in the analysis").

---

[16] The Court may grant the requested relief freezing assets under Fed. R. Civ. P. 64, which incorporates the remedy of prejudgment attachment under New York law, or Fed. R. Civ. P. 65. With respect to the former, Leadenhall must also show that "one or more of the enumerated statutory grounds for attachment under N.Y. CPLR § 6201 exists." *Citibank*, 2023 WL 8810142, at *2 (internal quotation marks omitted). Applicable "enumerated statutory grounds for attachment" include that Defendants "resid[e] without the state" and that, "with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, [Defendants have] assigned, disposed of, encumbered or secreted property, or removed it from the state or [are] about to do any of these acts." N.Y. CPLR § 6201(1), (3).

**ARGUMENT**

**I.    Leadenhall's Claims Will Succeed on the Merits.**

Leadenhall asserts both contractual and non-contractual claims in its Complaint, all of which are likely to succeed on the merits.  The preliminary relief Leadenhall seeks relates specifically to its claims arising from contractual agreements with the Borrowers and Guarantors and the Accelerated Amount undisputedly due thereunder.  Therefore, for purposes of this application, Leadenhall focuses its analysis on the contract claims, which provide on their own a sufficient basis for the Court to order the relief requested.  *See, e.g.*, *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) ("Plaintiffs need not demonstrate a likelihood of success on the merits of every claim—rather, they need only show a likelihood of success on the merits of at least one of [their] claims." (internal quotation marks omitted)).

To prevail on its contract claims, Leadenhall must establish (i) an enforceable agreement, (ii) the Borrowers' and Guarantors' breach, (iii) Leadenhall's performance, and (iv) damages. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). This is the rare case where the Borrowers and Guarantors have already admitted to material breaches of enforceable agreements which caused hundreds of millions of dollars in damage.

The Borrowers pledged first-priority security interests in their assets to Leadenhall as Collateral.  Gillespie Decl. ¶ 2 n.1 (defining "Collateral"), LSA § 2.15.  They were required to maintain the Collateral "free and clear of any Adverse Claim," LSA §§ 4.01(h), 5.01(d), 5.01(k)(vi), and the SuttonPark and Dorchester Borrowers violated these provisions, including by double-pledging Collateral to both Leadenhall and separate third-party lenders.  The encumbrance of Collateral and uncured Borrowing Base deficiencies constitute Facility Events of Default, giving Leadenhall the right to accelerate *all* Borrowers' debts.  *Id.* § 7.01(c), (d).

16

Further, 777 Partners and 600 Partners jointly and severally guaranteed to Leadenhall "the full and punctual payment and performance . . . of the Guaranteed Obligations of" each of the four Borrowers to the extent "a Trigger Event has occurred and is continuing." Guaranty § 2(a). A "Trigger Event" includes "any failure of a Borrower to own the Collateral pledged by such Borrower . . . free and clear . . . as a result of the action or inaction of such Borrower or a Guarantor" that is not cured within two business days. *Id.* § 1, "Trigger Event." In other words, upon double-pledge of Collateral, the Guarantors must guarantee the obligations of the Borrowers.

Wander himself already admitted during March 28, 2023 and April 3, 2023 recorded conference calls to fundamental breaches of contract by double-pledging Collateral. *See* Kane Decl. ¶¶ 2-5, 7-9 (Wells: "There are so many breaches on these agreements now. We need to get all of this sorted out." Wander: "Agreed, agreed, agreed."). And, after Leadenhall sent formal Notice of Breach in November 2023 and requested that the SuttonPark and Dorchester Borrowers issue revised Compliance Reports accounting for the double-pledging, the revised reports disclosed that as of March 2023, the Dorchester and SuttonPark Borrowers had borrowed over $35 million and $285 million in excess of their respective Borrowing Bases. *See* Gillespie Decl. ¶¶ 10, Exs. 6-7. The revised Compliance Reports constitute proof positive of massive breaches of contract.

Written draft and final contract amendments between the parties drive home the breaches. In December 2023, the Borrowers agreed to an Additional Interest Amendment to the LSA, imposing an additional interest rate on the "Uncollateralized Portion" of their debts retroactive to March 2023, when Leadenhall discovered the double-pledging. *Id.* ¶ 11 & n.2. In March 2024, 777 Partners' in-house counsel sent Leadenhall a draft amendment conceding that "[a]s of the date

hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing." *Id.* ¶ 17, Ex. 11.

The likelihood that Leadenhall will succeed on its contract claim against the Borrowers and Guarantors for approximately $600 million in Accelerated Debt is overwhelming.[17]

## II.   Leadenhall Faces Irreparable Harm Absent Emergency Injunctive Relief.

Leadenhall faces irreparable harm if injunctive relief is not granted.  "[A] party's persistent efforts to frustrate the collection of money judgments" can "suffice to establish the inadequacy of a monetary relief." *NML Cap., Ltd. v. Republic of Arg.*, 699 F.3d 246, 262 (2d Cir. 2012).  "Thus, preliminary injunctive relief may issue" where defendants will "'frustrate any judgment on the merits by making it uncollectible.'" *Citibank*, 2023 WL 8810142, at *4 (quoting *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996)); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012) ("The 'unlikelihood that defendants would, in any event, be able to satisfy a substantial damage award' further supports a finding of irreparable harm." (cleaned up)); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985).  If Wander further dissipates the Borrowers' and Guarantors' assets, Leadenhall will lose not only its ability to recover any money judgment, but also its first-priority security interests in the Collateral and the equitable rights and remedies Leadenhall seeks to secure through its requests for injunctive and declaratory relief.  Compl. ¶ 282(b)-(d).  Emergency injunctive relief is warranted because, "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

---

[17] Leadenhall will also prevail on its fraud and civil RICO claims, but again, this application does not rest on those claims.  Nonetheless, because a civil RICO plaintiff may seek treble damages, the likelihood of personal, ten-figure liability increases Defendants' incentives to secrete assets.

In the months preceding the filing of the Complaint, Wander's sprawling enterprise started to collapse. All the while, Wander strung along Leadenhall, offering false promises to pay down existing debt while continuing to dissipate assets into money-losing football clubs and other disintegrating companies and assets.

In the first quarter of this year, 777 Re—the reinsurance subsidiary that long "anchored" 777 Partners' most valuable businesses—collapsed. In February 2024, 777 Re was placed under administrative control by its Bermuda regulator and suffered a dramatic credit rating downgrade, placing it into junk bond territory. Compl. ¶¶ 200-03. As a result, every one of the insurance companies with reinsurance agreements with 777 Re cut ties, comprising 99% of 777 Re's invested assets, "recaptured" or eliminated their exposure to 777 Re. Kane Decl. ¶¶ 11-15.

That loss of 777 Partners' piggy bank caused an implosion. In the last month, 777 Partners' Australian airline entered voluntary administration after an A-CAP affiliate repossessed its entire fleet; 777 Partners disposed of a substantial portion of its stake in a Canadian airline; 777 Partners failed to pay its Belgian football club's players and to make its second installment payment for its purchase of that club; 777 Partners failed to repay a $200 million loan when due for an English football stadium; and it even stiffed its PR firm. Wander and his companies are collectively facing 16 other lawsuits concerning unpaid debts by businesses in the 777 Partners enterprise which collectively seek over $130 million. *See supra* § D. This is an enterprise under siege.

Leadenhall has witnessed the siege first-hand. In February 2024, the parties executed the Paydown Letter, which contemplated a payment on February 21, 2024 of $25 million (about 4% of the accelerated debt). Gillespie Decl. Ex. 8. When the payment was due, 777 Partners paid only about half on time. *Id.* ¶ 13. Further substantiating 777 Partners' illiquidity, the next day, a

777 Partners employee told Leadenhall's Craig Gillespie that A-CAP had funded 777 Partners' payroll and basic operating expenses earlier that day. *Id.* ¶ 14.

In March 2024, Leadenhall accelerated the $609 million debt due under the credit facility. *Id.* ¶ 16, Ex. 10. The parties then attempted to negotiate a Forbearance Agreement, under which Leadenhall would forbear on exercising certain remedies in exchange for a payment plan. *Id.* ¶ 17. The Draft Forbearance Agreement sent by 777 Partners' counsel on March 26, 2024, contemplated an initial payment on March 29, 2024, of $15 million (less than 2.5% of the accelerated debt). *Id.* Ex. 11. Defendants did not sign the Forbearance Agreement or make that payment. Instead, on the due date, Wander told Leadenhall that 777 Partners (and its affiliates) could not make a $15 million payment absent assistance from A-CAP, and 777 Partners could not even agree to a repayment plan without A-CAP's approval of its terms. Albertini Decl. ¶ 2. Wander reaffirmed his inability to pay Leadenhall repeatedly over the coming days, while continually offering Leadenhall false hope to stave off legal action:

- On March 31, 2024, Wander told Gillespie that 777 Partners could not make a $15 million payment, and their ability to make any such payment depended entirely on A-CAP providing the money. Gillespie Decl. ¶ 18.

- On April 1, 2024, Wander told Gillespie that 777 Partners could not make a $15 million payment, and any ability to do so depended on funding from A-CAP. Wander said A-CAP could fund a $15 million payment the following day. When asked whether the inability to pay sooner was due to A-CAP's liquidity issues, Wander responded, "must be." That payment never came. *Id.* ¶ 19.

- On April 2, 2024, Wander stated 777 Partners could not make a $15 million payment until April 15, 2024, when 777 Partners anticipated receiving funding from another source. That payment never came. *Id.* at 20.

- On April 3, 2024, Wander again said he would not have $15 million to pay Leadenhall until April 15, 2024. That payment never came. *Id.* ¶ 21.

- On April 4, 2024, Wander told Luca Albertini of Leadenhall that A-CAP would not allow 777 Partners to pay Leadenhall even $30 million, but Wander again floated the possibility of a smaller payment. Even that smaller payment never came. Albertini Decl. ¶ 6.

As it became painfully clear that any payment plan would be illusory, Leadenhall shifted to asking about 777 Partners' ability to make up the $350 million Collateral shortfall, even if it could not immediately pay the entire Accelerated Amount.  On April 16, 2024, Gillespie asked whether Wander could find, in his network of companies, $350 million to repay Leadenhall in two weeks.  Wander responded that he could not.  Gillespie Decl. ¶ 22.  On April 29, Gillespie asked Wander whether 777 Partners had $400 million to repay Leadenhall.  Wander again confirmed 777 Partners did not have $400 million.  *Id.* ¶ 23.

In April 2024, while Wander could not pay even $15 million on a $600 million debt, news reports indicate 777 Partners continued to plow money it owes Leadenhall into football investments, including another $20 million loan to Everton and $80 million to Hertha BSC.  Compl. ¶¶ 207-08.  Confronted with this discrepancy, right before the Complaint was filed, Wander confirmed in the clearest terms possible that 777 Partners and A-CAP were dissipating assets they were legally bound to protect for Leadenhall.  Wander told Albertini that he was running down the 777 Partners business, and those football payments were actually made by A-CAP as "protective advances," but A-CAP was "not in a position" to make similar "protective advances" to Leadenhall.  Albertini Decl. ¶ 7.

And on May 2, 2024, the day before Leadenhall filed suit, Wander told Gillespie that 777 Partners was selling off assets to repay creditors, and A-CAP could no longer fund 777 Partners due to regulatory scrutiny.  Gillespie Decl. ¶ 24.  In a last-ditch attempt to avoid litigation, Wander claimed he could convince A-CAP to agree to share proceeds of sales of 777 Partners' assets with Leadenhall, *id.*, which rang hollow given Wander's string of broken promises supposedly caused by A-CAP's unwillingness to fund payments to Leadenhall.  When Gillespie pressed, Wander admitted that A-CAP was going to foreclose on its loans to 777 Partners and take whatever assets

it could.  *Id.*  In other words, 777 Partners is insolvent, and if left to his own devices, Wander will dissipate 777 Partners' remaining assets to pay his co-conspirator, A-CAP, and otherwise squander 777 Partners' dwindling liquidity, leaving nothing for Leadenhall.  On May 10, 2024, ***after the filing of the Complaint*** and yet still undeterred, 777 Partners dumped another $10 million into Everton.

## III.    The Balance of Hardships Tips Decisively in Leadenhall's Favor.

The balance of hardships tips decisively in Leadenhall's favor.  The $609 million debt Defendants owe Leadenhall is a significant sum for Leadenhall, the loss of which would seriously impact its business if Leadenhall cannot collect the judgment to which it will be entitled.  On the other hand, Defendants will suffer no cognizable hardship if Leadenhall's requested relief is granted, since they will lose nothing to which they have any entitlement.  They will only be required to hold, free and clear of adverse claims, enough assets to secure their debt, ***which they are all already obligated to do***.

Even if it turns out that being required to meet their existing obligations to Leadenhall creates difficulties with Defendants' ability to service their other delinquent debts, courts have recognized that kind of supposed hardship does not tip the scales in Defendants' favor.  *See, e.g.*, *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018) ("[T]he balance of hardships weighs in favor of Plaintiff.  To be sure, the order of seizure and a preliminary injunction preventing Defendants from interfering with Plaintiff's security interest in the Collateral may be the 'final nail in the coffin' for Defendants' floundering business.  However, Defendants have not submitted substantive evidence that they are making any progress towards securing alternative finance sources or reducing their debts . . . .   Meanwhile, Plaintiff's security interest in the Collateral . . . is likely eroding as a result of Defendants' [actions].").

## IV.    The Public Interest Weighs in Leadenhall's Favor.

The public interest also weighs strongly in favor of granting injunctive relief.  "[T]here is a well-recognized public interest in enforcing contracts and upholding the rule of law," especially "where, as here, the contract involves sophisticated counterparties who engaged in actual negotiation over the provisions at issue."  *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 127 (S.D.N.Y. 2021); *Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.*, 2019 WL 5257995, at *8 (S.D.N.Y. Oct. 17, 2019) (recognizing "the 'strong public interest in enforcing contracts' between sophisticated entities").

There is no public interest on Defendants' side of the balance.  Wander's companies do nothing to serve the public, so "the public interest would not be disserved" by tying up a portion of their capital temporarily or permanently.  *Citibank*, 2023 WL 8810142, at *2 n.3.  This is not a case where there are "two public interests . . . pitted against one another" that the Court must weigh.  *Bank of Am.*, 294 F. Supp. 3d at 82.  Wander's companies exist to enrich three people—Wander, Pasko, and A-CAP chair and CEO Kenneth King.  Their investment business is otherwise neutral at best, and often actively harmful, including to the football teams they run into the ground, and the many employees, contractors, brokers, and creditors whose bills and paychecks go unpaid.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Leadenhall's motion for a temporary restraining order and for appointment of a receiver or, in the alternative, a preliminary injunction in accordance with Leadenhall's proposed Order to Show Cause.

Dated:  New York, New York
        May 13, 2024

        KING AND SPALDING LLP

        */s/ Leigh M. Nathanson*
        Craig Carpenito
        Leigh M. Nathanson
        Roger G. Schwartz
        Brian Donovan
        1185 Avenue of the Americas
        New York, NY 10036
        (212) 556-2100
        ccarpenito@kslaw.com
        lnathanson@kslaw.com
        rschwartz@kslaw.com
        bdonovan@kslaw.com

        *Attorneys for Plaintiffs*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word.  Pursuant to the word count system in Microsoft Word, the total number of words in the Memorandum of Law, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6,947.  The foregoing Memorandum of Law complies with the formatting rules set forth in the § II.D of the Court's Individual Practices.

Dated: New York, New York
        May 13, 2024

KING AND SPALDING LLP

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

*Attorneys for Plaintiffs*