UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>Plaintiffs,<br><br>vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>Defendants. | Civil Action No. 1:24-cv-03453 |

## DECLARATION OF CRAIG GILLESPIE

I, Craig Gillespie, declare as follows:

1. I am a Managing Partner at Leadenhall Capital Partners LLP ("Leadenhall") and my title is Head of Life and Alternative Credit Portfolio Management. I have personal knowledge of the matters described in this declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

2. On May 7, 2021, Leadenhall entered into a secured credit facility with a group of borrowers, memorialized in a Loan and Security Agreement (the "LSA"). I executed the LSA on behalf of Leadenhall. The LSA contains definitions for certain terms relating to Leadenhall's

1

application for an Order to Show Cause.[1] A true and correct copy of excerpts of the LSA containing provisions and definitions relating to Leadenhall's application for an Order to Show Cause is attached hereto as Exhibit 1. Certain provisions of the LSA that are not contained within Exhibit 1 are commercially and competitively sensitive to Leadenhall.

3. The borrowers under the credit facility are SPLCSS III LLC (the "SuttonPark Borrower"), Dorchester Receivables II LLC (the "Dorchester Borrower"), Insurety Agency Services LLC, and Signal SML 4 LLC, all of which are affiliates of 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners").

4. On May 7, 2021, Leadenhall entered into a Guaranty Agreement with 777 Partners and 600 Partners. I executed the Guaranty Agreement on behalf of Leadenhall. A true and correct copy of excerpts of the Guaranty Agreement containing provisions relating to Leadenhall's application for an Order to Show Cause are attached hereto as Exhibit 2. Certain provisions of the Guaranty Agreement that are not contained within Exhibit 2 are commercially and competitively sensitive to Leadenhall.

5. On September 19, 2022, I received an email from sender noreply@anonymousemail.me (the "September 19, 2022 Email") stating as follows:

> The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk… your investment is unsecured. What he is doing is criminal.

A true and correct copy of the September 19, 2022 Email is attached hereto as Exhibit 3.

6. Following the September 19, 2022 Email, Leadenhall conducted a business review of assets pledged as collateral under the LSA. In November 2022, I was part of a team that visited 777 Partners' offices on-site in Miami, Florida. During the on-site visit, the Leadenhall team

inspected the "MP Fin" computer system used by 777 Partners and affiliates to manage structured settlement assets, including the allocation of assets as collateral to lenders.

7. In March 2023, a third-party lender to 777 Partners, Credigy, visited Leadenhall's offices in London. Credigy subsequently sent Leadenhall an inventory of assets that 777 Partners and affiliates had ostensibly pledged for the exclusive benefit of Credigy. From Credigy's inventory of assets, Leadenhall discerned that the SuttonPark Borrower, the largest borrower in the credit facility, had allocated more than 1,600 receivables to both Credigy and Leadenhall. The double-pledged receivables totaled more than $185 million in value.

8. On November 29, 2023, I sent a letter entitled "Notice of Breach of Parties' Agreements" (hereinafter, the "Notice of Breach") to 777 Partners, 600 Partners, the SuttonPark Borrower, and the Dorchester Borrower. I also copied members of Advantage Capital Holdings LLC ("A-CAP"), including Kenneth King, on the letter. A true and correct copy of the Notice of Breach is attached hereto as Exhibit 4.

9. Leadenhall discerned that the Dorchester Borrower had also pledged assets that had already been pledged to another lender, had been sold or transferred to third parties, or were never purchased in the first place, or were otherwise not free and clear of other security interests. In January 2024, the SuttonPark Servicer issued a Compliance Report for the Dorchester Borrower disclosing that—after subtracting the assets that were double-pledged, never purchased, or already sold or transferred to third parties, or otherwise not free and clear of other security interests—the Dorchester Borrower had borrowed in excess of its Borrowing Base limitation by approximately $46 million. A true and correct copy of an excerpt from the December 2023 Compliance Report issued for the Dorchester Borrower is attached hereto as Exhibit 5.

10. In January 2024, at Leadenhall's request, the SuttonPark Servicer issued Compliance Reports for the SuttonPark and Dorchester Borrowers going back to March 2023 which revised previously issued Compliance Reports. A true and correct copy of an excerpt from the revised Compliance Report for March 2023 for the SuttonPark Borrower is attached hereto as Exhibit 6. A true and correct copy of an excerpt from the revised Compliance Report for March 2023 for the Dorchester Borrower is attached hereto as Exhibit 7.

11. On December 19, 2023, Leadenhall and the parties to the LSA, including the borrowers, 777 Partners, and 600 Partners, entered into an amendment to the LSA (hereinafter the "Additional Interest Amendment"). Pursuant to the Additional Interest Amendment, the Borrowers agreed to the application of an additional interest rate on the "Uncollateralized Portion" of the outstanding debt to Leadenhall, retroactive to March 17, 2023.[2]

12. On February 21, 2024, Leadenhall, the borrowers under the LSA, and 777 Partners and 600 Partners entered into a letter agreement entitled the "Paydown and Partial Release Letter," providing, among other terms, a schedule on which the borrowers would pay down $25,622,621.15 in debt owed to Leadenhall as of February 21, 2024. I executed the Paydown and Partial Release Letter on behalf of Leadenhall. A true and correct copy of the Paydown Letter and Partial Release, excluding commercially sensitive exhibits, is attached hereto as Exhibit 8.

13. The borrowers failed to make the approximately $25 million payment due in full under the Paydown and Partial Release Letter by February 21, 2024. 777 Partners and affiliates wired Leadenhall a partial payment of $12.5 million on February 21, 2024.

14. On February 22, 2024, I spoke with an employee of 777 Partners who informed me that A-CAP had funded payroll and other operating expenses for 777 Partners earlier that day. I understood from the conversation that because 777 Partners was relying on A-CAP to meet day-

4

to-day operating obligations such as 777 Partners' payroll, 777 Partners did not have the ability to make the payment due to Leadenhall on February 21, 2024. On February 23, 2024, 777 Partners wired the remainder of the payment due to Leadenhall under the Paydown and Partial Release Letter.

15. On March 12, 2024, I sent on behalf of Leadenhall to 777 Partners, 600 Partners, and the borrowers a letter entitled "Notice of Events of Default and Trigger Event; Reservation of Rights" (hereinafter, the "Default Notice"). I also copied members of A-CAP, including Kenneth King, on the Default Notice. A true and correct copy of the Default Notice is attached hereto as Exhibit 9.

16. On March 15, 2024, I sent on behalf of Leadenhall to 777 Partners, 600 Partners, and the borrowers a letter entitled "Notice of Acceleration of all Loans, and Demand for Immediate Repayment" (hereinafter, the "Acceleration Notice"). I also copied members of A-CAP, including Kenneth King, on the Acceleration Notice. A true and correct copy of the Acceleration Notice is attached hereto as Exhibit 10.

17. On March 26, 2024, Jon Walder, Associate General Counsel of 777 Partners, sent a draft agreement to members of Leadenhall, including myself, entitled "FIRST FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT" (hereinafter, the "First Forbearance Agreement"). A true and correct copy of the draft First Forbearance Agreement is attached hereto as Exhibit 11.

18. On March 31, 2024, I spoke to Wander over the telephone concerning whether 777 Partners would be able to make a $15 million payment to pay down Leadenhall's debt. Wander stated that whether 777 Partners would be able to pay was dependent on whether A-CAP would provide the necessary funds to 777 Partners.

19.     On April 1, 2024, I spoke to Wander over the telephone concerning whether 777 Partners would be able to make a $15 million payment to Leadenhall.  In the middle of the call, Wander stated that Kenneth King was calling and that he would call me back.  When Wander called me back, he stated that A-CAP would not be able to fund a $15 million payment for Leadenhall on April 1, 2024 but would be able to fund the payment on April 2, 2024.  I asked whether that was due to A-CAP's liquidity issues, and Wander replied, "must be."  Leadenhall never received the $15 million payment from 777 Partners on or after April 2, 2024.

20.     On April 2, 2024, I spoke to Wander over the telephone.  Wander stated that 777 Partners would not be able to make a $15 million payment until April 15, 2024, when Wander anticipated that 777 Partners would receive funds from another funding source.  Leadenhall did not receive $15 million from 777 Partners on or after April 15, 2024.

21.     On April 3, 2024, I spoke to Wander over the telephone.  Wander indicated that he would not have $15 million to pay Leadenhall until at least April 15, 2024.  Leadenhall did not receive $15 million from 777 Partners on or after April 15, 2024.

22.     On April 16, 2024, I spoke to Wander over the telephone.  During the call, Wander stated that he would not be able to find $350 million to repay Leadenhall within two weeks.

23.     On April 29, 2024, I spoke to Wander over the telephone.  During the call, I asked whether 777 Partners had approximately $400 million to repay Leadenhall's outstanding debt, and Wander responded that 777 Partners did not have $400 million.

24.     On May 2, 2024, I spoke to Wander over the telephone.  During the call, Wander stated that 777 Partners was currently selling off assets to repay creditors, and that A-CAP could no longer provide any funds to 777 Partners because of scrutiny by regulators.  Wander also stated that the only path for Leadenhall or A-CAP to recover from 777 Partners would be for A-CAP and

Leadenhall to agree to share in the proceeds of the sale of 777 Partners' assets. Wander stated that he was confident that he could persuade A-CAP to agree to this arrangement. In response, I asked why A-CAP would not simply seek recovery by foreclosing on 777 Partners' assets, and Wander replied that A-CAP would foreclose on whatever assets that it could, but would not be able to maximize the value of those assets through foreclosure.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 13th day of May, 2024.

_____
Craig Gillespie

---

[1] "Adverse Claim" is defined in the LSA as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement."

"Borrowing Base" is defined in the LSA as "(a) with respect to the SPLCSS Borrower, the meaning specified on Schedule VIII, (b) with respect to the Signal Borrower, the meaning specified on Schedule IX, (c) with respect to the Insurety Borrower, the meaning specified on Schedule X, (d) with respect to the Dorchester Borrower, the meaning specified on Schedule XI, and (e) with respect to each Joining Borrower, the meaning specified on the Definitions Schedule attached to the Joinder Agreement for such Joining Borrower."

"Borrowing Base Deficiency" is defined in the LSA as "with respect to each Borrower, on any date of determination, an amount equal to the excess, if any of (a) the Principal Amount of all Loans made to such Borrower at such time over (b) the Borrowing Base of such Borrower at such time."

"Collateral" is defined in the LSA as "all of such Borrower's right, title and interest in, to and under all assets of such Borrower, including the following, whether now existing or hereafter arising and wherever located: (a) all Receivables, any Health Care Provider Loan Receivables, Related Security and all Collections of such Borrower, (b) all rights of such Borrower under the related Sale Agreement, the related Servicing Agreement, the related Account Control Agreements (when executed), the Related Contracts, the related Third Party Intercreditor Agreements, the related Hedge Agreements (including any Hedge Collateral), if any, together with all rights of such Borrower to receive monies due or to become due thereunder, all claims of such Borrower for damages arising out of or for breach of or default thereunder, and all rights of such Borrower to compel performance and otherwise exercise all remedies thereunder, (c) the Borrower Accounts and Lock-Boxes with respect to such Borrower, (d) all of the Borrower's membership interests in the Lottery Holding SPVs, and (e) all proceeds of the foregoing; provided that any Receivable that is purchased or repurchased by the Related Seller (or its designee) in connection with a Repurchase shall no longer be included in the Collateral and the Collateral shall not include any Excluded Insurety Receivables or any Excluded Lottery Receivables."

"Maturity Date" is defined in the LSA as "with respect to each Borrower, September 30, 2024."

"Obligations" is defined in the LSA as "with respect to each Borrower, the performance of all of the terms, covenants and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under this Agreement or any document delivered in connection with this Agreement in accordance with the terms thereof, including the punctual payment when due of all obligations and indebtedness of such Borrower hereunder or thereunder, whether for principal, interest, fees, indemnification payments, increased costs, Hedge Payments, Taxes, expenses or otherwise and whether due or to become due, matured or unmatured, liquidated or unliquidated, contingent or non-contingent and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under this Agreement or any document delivered in connection with this Agreement in accordance with the terms thereof."

[2] "Uncollateralized Portion" is defined in the Additional Interest Amendment as "as of any date of determination, (a) with respect to the Dorchester Borrower, an amount equal to the Borrowing Base Deficiency with respect to the Dorchester Borrower at such time and (b) with respect to the SPLCSS Borrower, an amount equal to the Borrowing Base Deficiency with respect to the SPLCSS Borrower at such time."