# EXHIBIT 1

EXECUTION VERSION

LOAN AND SECURITY AGREEMENT

Dated as of May 7, 2021

by and among

the Borrowers from time to time party hereto

And

the Lenders from time to time party hereto

And

LEADENHALL CAPITAL PARTNERS LLP,
as the Administrative Agent

And

LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,
as the initial Collateral Agent

And

the Servicers from time to time party hereto

And

the Sellers party hereto from time to time

(h)    reference to the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(i)    reference to "an Event of Default with respect to such Borrower" or words of similar import shall mean a Borrower Group Event of Default with respect to such Borrower or a Facility Event of Default, and references to a "Default with respect to such Borrower" or words of similar import shall mean an event that, but for notice or lapse of time or both, would constitute a Borrower Group Event of Default with respect to such Borrower or a Facility Event of Default;

(j)    reference to any agreement (including any Transaction Document), document or instrument means such agreement, document or instrument as amended, modified, waived, supplemented, restated or replaced and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of the other Transaction Documents, and reference to any promissory note includes any promissory note that is an extension or renewal thereof or a substitute or replacement therefor; and

(k)    reference to any applicable law means such applicable law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any Section or other provision of any applicable law means that provision of such applicable law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such Section or other provision.

ARTICLE II

AMOUNTS AND TERMS OF THE LOANS

Section 2.01    The Commitments.

(a)    Subject to and upon the terms and conditions set forth herein, each Lender in a Related Lender Group severally agrees, at any time and from time to time on any Business Day during the period from the Effective Date to the applicable Commitment Termination Date, to make Loans to each Borrower with respect to which such Lender is part of the Related Lender Group, which Loans (i) shall be denominated in Dollars, (ii) may be repaid at any time in accordance with the provisions hereof, (iii) shall not exceed for any such Lender at any time such Lender's then available Commitment with respect to such Borrower, and (iv) shall not exceed at any time the Borrowing Base Limitation with respect to such Borrower. Each Loan shall be subject to the conditions precedent set forth in Section 3.02.

(b)    At any time during the period from the Effective Date to the applicable Commitment Termination Date, the related Borrower may deliver a notice to the Administrative Agent requesting that the Lenders in the Related Lender Group agree to an Additional Commitment in an amount to be specified by such Borrower in such notice. The Lenders in the Related Lender Group, in their sole discretion, may agree to accept, or decline, such Borrower's request for an Additional Commitment. If such Lenders agree to provide an Additional Commitment, such Borrower shall have a period of five (5) Business Days after the delivery of a notice pursuant to this Section 2.01(b) to confirm such amount of the Additional Commitment by

delivering a Borrowing Request to such Lenders in accordance with the terms of this Agreement. Any such Additional Commitment approved by the Lenders in the Related Lender Group shall be effective upon the delivery of a new Note, if requested by any such Lender, indicating an increase in the Sub-Facility Limit (or the appropriate notation on the schedule attached to each applicable current Note). In the event that such Borrower does not deliver a Borrowing Request within five (5) Business Days of the notice required to be delivered under this Section 2.01(b), any approved Additional Commitment shall terminate and be reduced to zero; provided, that the aggregate amount of the Commitments shall automatically be reduced by such portion of the Additional Commitment increase that has not been borrowed within ten (10) calendar days following the effectiveness of such Commitment increase; provided, further, that no such increase shall be made if a Reserve Deficiency exists with respect to such Borrower.

Section 2.02    Loans and Borrowings.

(a)    Each Loan made to any Borrower shall be made by the Lenders in the Related Lender Group ratably in accordance with the amounts of their Commitments or Additional Commitments as the case may be. The failure of any Lender to make the Loan required to be made by it shall not relieve any other Lender in the Related Lender Group of its obligations hereunder; provided, that the Commitments and Additional Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make a Loan as required. With respect to each Loan made hereunder, the Lenders in the Related Lender Group may, as between themselves, alter the proportion (if any) of the Loan that each such Lender makes.

(b)    At the commencement of the initial Interest Period for any Loan, such Loan shall be in an aggregate amount that is an integral multiple of $10,000 and not less than the Minimum Borrowing with respect to the Borrower requesting such Loan, unless waived by the Administrative Agent, on behalf of the Lenders in the Related Lender Group.

Section 2.03    Requests for Borrowings. To request a Loan, the related Borrower shall notify the Administrative Agent of such request by providing a written Borrowing Request in the form of Annex E to the Administrative Agent by hand delivery or electronic transmission on a date that is not later than 1:00 p.m., New York City time, two (2) Business Days prior to the date of the proposed Borrowing. No Borrower may request more than one (1) Borrowing per week unless otherwise agreed to in writing by the Administrative Agent acting in its sole discretion, and such request shall be provided to the Administrative Agent simultaneously with the requests from each other Borrower requesting a Loan for such week; provided, that the Borrowers may request, with the consent of the Administrative Agent, not to be unreasonably withheld, one (1) additional Borrowing Request per week. Upon receipt of each Borrowing Request from a Borrower, the Administrative Agent shall notify each Lender in the Related Lender Group of each such Borrowing Request. Each such written Borrowing Request shall specify the following information in compliance with Section 2.02:

(a)    the aggregate amount of the Loan Requested;

(b)    the date of such Loan, which shall be a Business Day;

(b)    If at any time insufficient funds are received by and available to the Administrative Agent or any Lender in the Related Lender Group to pay fully all amounts of principal, Interest, fees and other Obligations then due hereunder, such funds shall be applied in the order of payment of Obligations set forth in Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable.

(c)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then (i) the Lender receiving such greater proportion shall remit to the applicable Collection Account cash in an amount equal to the amount such Lender received minus the amount representing such Lender's Ratable Share of such payment and (ii) such amount shall be shared by the other Lenders in accordance with the Ratable Share attributable to each such Lender in the order of payment of Obligations set forth in Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable, on the next Distribution Date.

(d)    If any Lender shall fail to make any payment required to be made by it hereunder, then the Administrative Agent may, in its discretion, provide an instruction that any amounts thereafter received for the account of such Lender be used to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.14    Mitigation Obligations. If any Lender requests compensation under Section 2.09, or if the Borrower with respect to which such Lender is part of the Related Lender Group is required to pay any Indemnified Taxes or any additional amount to such Lender or any Governmental Authority for the account of such Lender pursuant to Section 2.12, then such Lender (at the request of such Borrower) shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 or 2.12, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Each Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in the Related Lender Group in connection with any such designation or assignment.

Section 2.15    Security Interest. (a) To secure the performance by the Borrowers of all of the Obligations, each Borrower hereby grants to the Collateral Agent for the benefit of the Secured Parties in the Related Lender Group with respect to such Borrower, a first-priority security interest in the Collateral.

(b)    In addition, each Borrower hereby grants to the Collateral Agent for the benefit of the Subordinated Secured Parties with respect to such Borrower, a second-priority security interest in the Collateral.

(c)    In furtherance of the foregoing, each Borrower hereby authorizes the Collateral Agent or its designee to file one or more financing or continuation statements, and amendments thereto and assignments thereof from time to time, which financing statements may describe the property being secured as "all assets" or "all personal property" of such Borrower.

38

None of the Borrowers, the Servicers or the Sellers shall have any liability under this Agreement for any failure to file an amendment to any financing statement to reflect a successor Collateral Agent if notice of such successor Collateral Agent is not given in accordance with Section 8.19.

(d)    In furtherance of the foregoing, promptly after the Effective Date, each Borrower shall deliver any promissory note related to a Receivable to the Collateral Agent, accompanied by a transfer instrument executed in blank. In the event that the Loans with respect to which such Receivable is Collateral are paid in full or the Administrative Agent applies any prepayment to repay any Loan in respect of a specific Receivable or Receivables pursuant to Section 2.07(b), such promissory note shall be automatically released from the lien created by this Agreement and the Collateral Agent shall promptly deliver the original promissory note, along with the related transfer instrument that was executed in blank, to the applicable Borrower.

(e)    Any security interest granted by the Borrowers to the Collateral Agent for the benefit of the Secured Parties with respect to such Borrower shall be prior and superior to any security interest granted to the Collateral Agent for the benefit of the Subordinated Secured Parties with respect to such Borrower. Each Secured Party and each Subordinated Secured Party hereby agrees that such priority shall be applicable irrespective of the time or order of attachment or perfection of any such security interest or the time or order of filing of any financing statements or other documents, or any statutes, rules or law, or court decisions to the contrary. Furthermore, each of the Subordinated Secured Parties hereto hereby covenants and agrees that this Agreement constitutes a "subordination agreement" (within the meaning of, and subject to, Section 510(a) of the Bankruptcy Code) for purposes of the priority of security interests set forth in Article 9 of the New York UCC.

(f)    All Receivables and any Health Care Provider Loan Receivables purchased by the Borrowers shall constitute part of the Collateral; provided, that no Excluded Insurety Receivable shall constitute part of the Collateral.  To the extent any or any collections, payments or other proceeds in respect thereof are deposited into the Insurety Collection Account, the Insurety Borrower shall be entitled to withdraw and transfer such amounts to it or its designee.

(g)    Following payment in full of all Obligations with respect to a Borrower, each Secured Party and each Subordinated Secured Party, so long as no Event of Default or Borrowing Base Deficiency exists with respect to any Borrower, such Secured Parties and Subordinated Secured Parties shall release such Borrower from the lien created by this Agreement.

(h)    Each Lottery Holding SPV agrees that, upon the occurrence and during the continuance of any Event of Default with respect to the SPLCSS Borrower, it will comply with instructions originated by the Collateral Agent without the further consent of the SPLCSS Borrower.

Section 2.16    Right of Setoff. Without in any way limiting the provisions of Section 2.13(c), the Administrative Agent and each Lender and each of their respective Affiliates is hereby authorized (in addition to any other rights it may have) at any time and from time to time after the occurrence and during the continuance of an Event of Default in respect of the Borrower related thereto to set-off, appropriate and apply (without presentment, demand, protest or other notice which are hereby expressly waived) any and all deposits (general or special, time or demand,

39

Effective Date, the Borrowers shall deliver, in form and substance reasonably satisfactory to the Administrative Agent:

(i) each Account Control Agreement listed on Schedule I that has not been executed on or prior to the Closing Date;

(ii) an opinion of counsel with respect to the perfection of the Collateral Agent's security interest in each account covered by an Account Control Agreement delivered pursuant to Section 3.04(a);

(iii) a tax opinion to the effect that the Loans issued as of the Effective Date should be treated as indebtedness for U.S. federal income tax; and

(iv) a consent, duly executed by Mutual of Omaha Insurance Company, to the pledge of Medicare Commission Receivables by the Insurety Borrower; and

(b) no later than the date occurring forty-five (45) days after the Effective Date, the Borrowers shall deliver, in form and substance reasonably satisfactory to the Administrative Agent, an opinion of counsel confirming that the execution, delivery and performance by each of 777 Partners and 600 Partners LLC of the Guaranty will not conflict with the material agreements of 777 Partners LLC or 600 Partners LLC, as applicable; provided, that the Lenders shall be responsible for reasonable and documented legal fees related to the opinion of counsel delivered pursuant to this clause (b) in an amount of up to $100,000 and 777 Partners LLC shall be responsible for any amounts in excess thereof.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.01    Representations and Warranties of each Borrower. Each Borrower hereby represents and warrants, solely with respect to itself, as follows as of the Effective Date, each Borrowing Date and, with respect to Section 4.01(i), the date of each Monthly Report and the date of each Compliance Report:

(a)    Such Borrower and any Lottery Holding SPV is a limited liability company validly existing and in good standing under the laws of the State of Delaware or, with respect to the Insurety Borrower, Florida, and is duly qualified to do business, and is in good standing and has all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, in every jurisdiction where the nature of its business requires it to be so qualified, except in such jurisdictions where the failure to qualify to do business could not be reasonably expected to result in a Material Adverse Effect.

(b)    The execution, delivery and performance by such Borrower and any Lottery Holding SPV of the Transaction Documents to which it is a party and the other documents to be delivered by it hereunder, including its use of the proceeds of the Loans, (i) are within its limited liability company powers, (ii) have been duly authorized by all necessary limited liability company action, (iii) do not contravene (1) its certificate of formation and limited liability company agreement, (2) any law, rule or regulation applicable to it except where such contravention could

51

not reasonably be expected to result in a Material Adverse Effect, (3) except with respect to the Insurety Borrower, any general agent agreement, carrier agreement or similar arrangement with Mutual of Omaha Insurance Company, any contractual restriction binding on or affecting it or its property or (4) any order, writ, judgment, award, injunction or decree binding on or affecting it or its properties or assets, and (iv) do not result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties (except for the interest of the Collateral Agent for the benefit of the Secured Parties created pursuant to this Agreement). Each of the Transaction Documents to which such Borrower or any Lottery Holding SPV is a party has been duly executed and delivered by such party.

(c)     No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for the due execution, delivery and performance by such Borrower or any Lottery Holding SPV of the Transaction Documents to which it is a party or any other document to be delivered thereunder (except for the filing of UCC financing statements which are referred to herein and therein), to the extent the failure to give such notices could reasonably be expected to result in a Material Adverse Effect. Such Borrower and any Lottery Holding SPV has the power and authority to (i) enter into the Transaction Documents to which it is party, (ii) grant collateral security for the Obligations as provided for under the Transaction Documents and (iii) own and to hold all of its assets and properties, and to carry on its business as now conducted.

(d)     Each of the Transaction Documents to which such Borrower or any Lottery Holding SPV is a party constitutes the legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and general equitable principles (whether considered in a proceeding at law or in equity).

(e)     Since its date of formation, there has been no material adverse change in the business, operations, property or financial condition of such Borrower or any Lottery Holding SPV.

(f)     There is no pending or, to its knowledge, threatened action, investigation or proceeding affecting such Borrower, such Lottery Holding SPV, the Related Servicer or the Related Seller before any court, governmental agency or arbitrator which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(g)     No proceeds of any Loans made to such Borrower shall be used to acquire any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934. Neither the Related Seller nor any of its Affiliates (i) have offered or sold or will offer or sell the Receivables by any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D of the Securities Act or (ii) have engaged or will engage in any directed selling efforts within the meaning of Regulation S of the Securities Act with respect to the Receivables. Neither such Borrower nor any Lottery Holding SPV is an "Investment Company" as that term is defined under the Investment Company Act of 1940 in reliance on the exemption provided by Section 3(c)(7) thereof (although other exemptions may be available).

(h)     Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim (other than (u) the security interest of the Administrative Agent for the benefit of the Secured Parties hereunder, (v) the rights of the applicable trustee or agent bank for the benefit of the applicable Person under any Third Party Intercreditor Agreement, (w) claims relating to any Split Payment Receivables, (x) any lien for taxes not yet due or being contested in good faith, (y) with respect to any Medicare Commission Receivable, any lien that has not been perfected or offset right granted by the Insurety Borrower in favor of the related insurance company counterparty pursuant to the applicable carrier agreement in respect of compensation due to the Insurety Borrower thereunder and (z) liens related to attorney's fees, medical fees or other amounts for a Case which are subordinate to the security interest created by the Funding Agreement and Lawyers Acknowledgement Letter (if applicable) or the Loan Agreement, as applicable, which have been pledged to the Collateral Agent for the benefit of the Secured Parties hereunder). The Collateral Agent for the benefit of the Secured Parties (other than the Subordinated Secured Parties) has a valid and perfected first priority security interest in the Receivables and, if applicable, the Health Care Provider Loan Receivables and other Collateral now existing or hereafter arising and the Collateral Agent for the benefit of the Secured Parties and the Subordinated Secured Parties has a valid and perfected subordinated security interest in the Receivables and, if applicable, the Health Care Provider Loan Receivables and other Collateral now existing or hereafter arising. No effective financing statement or other instrument similar in effect covering any Collateral is on file in any recording office, except for those filed in favor of the Collateral Agent relating to this Agreement. On each Borrowing Date, each Receivable subject to the related Borrowing is an Eligible Receivable.

(i)     Each Compliance Report (if prepared by such Borrower or one of its Affiliates, or to the extent that information contained therein is supplied by such Borrower or an Affiliate), Monthly Report (if prepared by such Borrower or one of its Affiliates, or to the extent that information contained therein is supplied by such Borrower or an Affiliate), information, exhibit, financial statement, document, book, record or report furnished or to be furnished at any time by or on behalf of such Borrower to the Administrative Agent or the Lenders in the Related Lender Group in connection with and before or after the Effective Date is or will be accurate in all material respects as of its date or (except as otherwise disclosed to the Administrative Agent or the Lenders in the Related Lender Group, as the case may be, at such time) as of the date so furnished (or, if applicable, as of a date certain specified in such report), and no such document contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading.

(j)     The principal place of business and chief executive office of such Borrower and the office where such Borrower keeps its records concerning the Collateral are located at the address or addresses referred to on Schedule III.

(k)     The names and addresses of the Account Bank and all of the Account Banks, together with the post office boxes and account numbers of the Collection Account, the Lock-Boxes and the Deposit Accounts of such Borrower at such banks are as specified in Schedule I hereto, as such Schedule I may be updated from time to time pursuant to Section 5.01(g). The names and addresses of all the banks, together with the post office boxes and account numbers of the Third Party Intercreditor Accounts, if any, relating to Third Party Intercreditor Receivables,

53

are as specified in Schedule VII hereto, as such Schedule VII may be updated from time to time with the consent of the Administrative Agent. Except for any post-office boxes and bank accounts related to one or more Third Party Intercreditor Agreements, the Lock-Boxes, the Deposit Accounts and the Concentration Account are the only post office boxes and bank accounts into which Collections of Receivables are deposited or remitted (other than Collections related to Receivables arising in connection with or related to a Funding Agreement (Master Assignment), which may be deposited or remitted to the related Health Care Providers first). The Third Party Intercreditor Accounts are the only post office boxes and bank accounts into which Collections of Third Party Intercreditor Receivables are required to be deposited or remitted. Subject to the timeframe set forth in Section 3.04(a), such Borrower has delivered (or will deliver) to the Administrative Agent a fully executed and effective Account Control Agreement with respect to the Collection Account, each Deposit Account and any associated Lock-Boxes. Subject to the timeframe set forth in Section 3.04(a), all other Borrower Accounts of such Borrower are or will be the subject of a fully executed and effective Account Control Agreement. All Third Party Intercreditor Accounts related to such Borrower are subject to a fully executed and effective Third Party Intercreditor Agreement.

(l)    Neither such Borrower nor any Lottery Holding SPV is known by nor does it use any tradename or doing-business-as name. Such Borrower has no Subsidiaries other than the Lottery Holding SPVs. The Related Seller owns one hundred percent (100%) of the equity interests in such Borrower. The SPLCSS Borrower owns one hundred percent (100%) of the equity interests in the Lottery Holding SPV.

(m)    (i) The present value of the property of such Borrower is greater than the total amount of liabilities, including contingent liabilities, of such Borrower, (ii) the present fair salable value of the assets of such Borrower is not less than the amount that will be required to pay all probable liabilities of such Borrower on its debts as they become absolute and matured, (iii) such Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond such Borrower's abilities to pay such debts and liabilities as they mature and (iv) such Borrower is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Borrower's property would constitute unreasonably small capital. Neither such Borrower nor any Lottery Holding SPV is the subject of an Insolvency Event. Neither such Borrower nor any Lottery Holding SPV has any indebtedness for money borrowed from others (direct or contingent) other than (i) indebtedness owed to the Administrative Agent and the Lenders in the Related Lender Group, and (ii) obligations under any bank deposit and similar agreements required by Lenders hereunder. Neither such Borrower nor any Lottery Holding SPV has any contingent obligations or liabilities (other than any such obligations or liabilities undertaken pursuant to the Transaction Documents) that were not previously disclosed in writing (which may be provided via electronic mail) to the Administrative Agent and the Lenders in the Related Lender Group.

(n)    With respect to each Receivable and related Collateral pledged by such Borrower, such Borrower shall have received (including indirectly through such Borrower's ownership of a Lottery Holding SPV) such Receivable and related Collateral in an amount which constitutes fair consideration and reasonably equivalent value. Each such acquisition of Receivables by such Borrower or any Lottery Holding SPV under the applicable Sale Agreement

54

shall not have been made for or on account of an antecedent debt owed by the assignor thereof to such Borrower or any Lottery Holding SPV, as applicable.

(o)  Such Borrower and any Lottery Holding SPV has timely filed or caused to be filed all material United States federal, state and local tax returns and reports that are due and required to be filed by it and has paid or caused to be paid all material taxes that have become due and payable except where the payment of any such taxes is being contested in good faith by appropriate proceedings and for which such entity has set aside on its books adequate reserves.

(p)  All information heretofore furnished by, or on behalf of, such Borrower to the Administrative Agent or the Lenders in the Related Lender Group in connection with any Transaction Document or any Receivable or any Health Care Provider Loan Receivable or any transaction contemplated thereby, when taken as a whole, is true and accurate in all material respects (without omission of any information necessary to prevent such information from being materially misleading).

(q)  Such Borrower and any Lottery Holding SPV (and, in each case, each of its agents) has complied with (and shall comply with) all federal, State or local laws applicable to it or in connection with its acquisition of, or any actions taken with respect to, the Receivables and any Health Care Provider Loan Receivables. To the knowledge of the Seller, all parties which have had any interest in the Receivables and any Health Care Provider Loan Receivable, whether as originator, servicer, administrator, assignee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with all federal, State or local laws applicable to it or in connection with any actions taken with respect to, the Receivables and any Health Care Provider Loan Receivables.

(r)  Neither such Borrower nor any Lottery Holding SPV has dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with the transactions contemplated by the Transaction Documents. Such Borrower has facilitated the transfer of the Receivables and Health Care Provider Loan Receivables, if any, without any intent to hinder, delay or defraud any of its creditors.

(s)  None of such Borrower, any of its Affiliates or, to the knowledge of such Borrower, any director, officer, employee or agent of such Borrower or any of its Affiliates is a Person that is, or is owned or controlled by Persons that are:  (i) the subject of any Sanctions or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.

(t)  Such Borrower and any Lottery Holding SPV, their Affiliates and their respective directors, officers and employees and, to the knowledge of such Borrower, the agents of such Borrower and its Affiliates, are in compliance with all applicable Sanctions and with the FCPA, the Bribery Act 2010 of the United Kingdom or any applicable non-U.S. anti-bribery statute or regulation of any other jurisdiction in which it operates its business and any other applicable anti-corruption law,  in all material respects. Such Borrower and its Affiliates are subject to policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA, the Bribery Act 2010 of the United Kingdom or any applicable non-U.S. anti-bribery statute or

regulation of any other jurisdiction in which it operates its business and any other applicable anti-corruption laws.

(u)    The operations of such Borrower, such Lottery Holding SPV, the Related Servicer and the Related Seller are and have been conducted at all times in compliance with Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving such Borrower, the Related Servicer or the Related Seller with respect to Anti-Money Laundering Laws is pending or, to the knowledge of such relevant entity, threatened.

(v)    For U.S. federal income tax purposes, such Borrower is not a corporation or an association taxable as a corporation.

(w)    Neither such Borrower, such Lottery Holding SPV nor any ERISA Affiliate thereof has incurred any ERISA Event. Such Borrower and such Lottery Holding SPV are not a Benefit Plan Entity.

(x)    (i) With respect to any Borrower entering into a Hedge Agreement, such Borrower's entering into any Hedge Agreement will not cause it to be considered a "commodity pool" as defined in Section 1a(10) of the Commodity Exchange Act, or (ii) if such Borrower would be a commodity pool, with respect to such Borrower as the commodity pool, its commodity pool operator ("CPO") and commodity trading advisor ("CTA") are eligible for an exemption from such registrations and all conditions precedent to obtaining such exemptions have been satisfied.

(y)    With respect to any Borrower entering into a Hedge Agreement, each of the sole member and managers of such Borrower (other than its independent manager) has agreed in writing that, if and for so long as such Borrower is a commodity pool, its CPO and CTA will take all action necessary to ensure ongoing compliance with the applicable exemption from registration as a CPO and CTA with respect to such Borrower, and any other actions required as a CPO and CTA with respect to such Borrower.

Section 4.02    Representations and Warranties of the Servicers. Each Servicer hereby represents and warrants, solely with respect to itself, as follows as of the Effective Date and each Borrowing Date:

(a)    Such Servicer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to do business, and is in good standing and has all governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted, in every jurisdiction where the nature of its business requires it to be so qualified, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)    The execution, delivery and performance by such Servicer of this Agreement and any other documents to be delivered by it hereunder (i) are within such Servicer's limited liability company powers, (ii) have been duly authorized by all necessary limited liability company action, (iii) do not contravene (A) such Servicer's certificate of formation or limited liability company agreement, (B) any law, rule or regulation applicable to such Servicer except where such contravention could not reasonably be expected to result in a Material Adverse Effect,

56

ARTICLE V

COVENANTS

Section 5.01    Covenants of Each Borrower. Each Borrower covenants and agrees with the Administrative Agent and each Lender in the Related Lender Group, until the Commitments with respect to such Borrower have expired or been terminated and the principal of and Interest on each Loan and all other Obligations have been paid in full by such Borrower, that:

(a)    Compliance with Laws, Etc. Such Borrower shall comply (and the SPLCSS Borrower shall cause the Lottery Holding SPVs to comply) in all material respects with all applicable laws, rules, regulations and orders and preserve and maintain its limited liability company existence, rights, franchises, qualifications and privileges except to the extent that the failure so to comply with such laws, rules and regulations or the failure so to preserve and maintain such rights, franchises, qualifications and privileges could not reasonably be expected to result in a Material Adverse Effect.

(b)    Offices, Records, Name and Organization. Such Borrower shall keep (and the SPLCSS Borrower shall cause the Lottery Holding SPVs to keep) its principal place of business and chief executive office and the office where it keeps its records concerning the Collateral at the address of such party set forth on Schedule III hereto or, upon thirty (30) days' prior written notice to the Administrative Agent, at any other locations within the United States. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) change its name or its jurisdiction of organization, unless (i) such Borrower shall have provided the Administrative Agent with at least thirty (30) days' prior written notice thereof and (ii) no later than the effective date of such change, all actions reasonably requested by the Collateral Agent to protect and perfect the security interest in the Collateral of such Borrower free and clear of any Adverse Claim (other than those permitted under this Agreement) have been taken and completed. Such Borrower shall maintain and implement (or cause the Related Servicer to maintain or implement) administrative and operating procedures (including an ability to recreate records evidencing the Receivables, any Health Care Provider Loan Receivables, the Related Contracts and the Collateral owned by such Borrower in the event of the destruction of the originals thereof), and keep and maintain (or cause the Related Servicer to maintain or implement) all documents, books, records and other information reasonably necessary or advisable for the collection of all Receivables and any Health Care Provider Loan Receivables owned by such Borrower (including records adequate to permit the daily identification of each such Receivable and Health Care Provider Loan Receivables, if any, and all Collections of and adjustments to each such Receivable and any Health Care Provider Loan Receivables).

(c)    Performance and Compliance with Contracts and Credit and Collection Policy. Such Borrower shall (and shall cause the Related Servicer to), at its expense, timely and fully perform and comply with all material provisions, covenants and other promises required to be observed by it under any Related Contracts and timely and fully comply in all material respects with the Credit and Collection Policy in regard to each Receivable, the other Related Contracts and any Health Care Provider Loan Receivables and other related Collateral owned by such Borrower.

59

(d)    Sales, Liens, Etc.  Except for the security interests created hereunder in favor of the Collateral Agent for the benefit of the Secured Parties and for the benefit of the Subordinated Secured Parties and any lien for taxes not yet due or being contested in good faith and except as otherwise permitted under this Agreement and the other Transaction Documents (including in connection with any Repurchase or the transfer of an Excluded Lottery Receivable), such Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof.

(e)    Extension or Amendment of Receivables. Except in accordance with the Credit and Collection Policy or as otherwise consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed), such Borrower shall not (and shall not permit the Related Servicer, in the case of the SPLCSS Borrower, any Lottery Holding SPV, or the Related Seller, to) extend, amend or otherwise modify the terms of any Receivable or Health Care Provider Loan Receivable, or amend, modify or waive any term or condition of any Related Contracts related thereto.

(f)    Change in Business or Credit and Collection Policy. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) make any change in the character of its business or change in the Credit and Collection Policy that would impair the collectability of the Receivables or the ability of such Borrower, such Lottery Holding SPV or the Related Servicer to perform its obligations under this Agreement or the other Transaction Documents without the prior written consent of the Administrative Agent and the Required Lenders in the Related Lender Group (such consent not to be unreasonably withheld, conditioned or delayed); provided that no consent shall be required from the Administrative Agent or any Lender in such Related Lender Group in connection with any change mandated by applicable law or a Governmental Authority as evidenced by an opinion of counsel delivered to the Administrative Agent and the Lenders in the Related Lender Group in form and substance reasonably acceptable to the Administrative Agent and such Related Lender Group.

(g)    Change in Payment Instructions to Obligors. Such Borrower shall not (and the SPLCSS Borrower shall not permit the Lottery Holding SPVs to) add or terminate any bank, post office box or bank account as an Account Bank, Lock-Box or Borrower Account from those listed in Schedule I to this Agreement, or make any change in its instructions to Obligors regarding payments to be made to such Borrower or any Lottery Holding SPV, as applicable, or payments to be made to any such Account Bank, Lock-Box or Borrower Account, unless the Administrative Agent shall have received notice of such addition, termination or change and a fully executed Account Control Agreement with each new Account Bank with respect to each Lock-Box or Borrower Account and shall have been given a reasonable amount of time (not to exceed ten (10) Business Days) to review the proposed arrangements and to consult with outside counsel (which expenses shall be promptly reimbursed by such Borrower) to confirm the security arrangements in respect of the Collections relating to such proposed change.

(h)    Deposits to Lock-Boxes and Deposit Accounts. Except for Receivables that constitute Third Party Intercreditor Receivables which shall first be remitted by the Obligors thereof to the accounts set forth in the applicable Third Party Intercreditor Agreement, such

60

Borrower shall (or shall cause the Related Servicer, in the case of the SPLCSS Borrower, each Lottery Holding SPV, or the Related Seller to) instruct all Obligors to remit all payments in respect of Receivables to the Lock-Boxes or Deposit Accounts, a Collection Account or a Concentration Account. If such Borrower shall receive any Collections directly, it shall promptly (and in any event within two (2) Business Days) deposit the same to a Deposit Account or to a Collection Account. Such Borrower, the Related Seller and the Related Servicer, as applicable, shall instruct the applicable trustee or agent bank to remit all payments in respect of Third Party Intercreditor Receivables from the related Third Party Intercreditor Account to such Borrower's Collection Account or Concentration Account. Such Borrower shall not deposit or otherwise credit, or cause or permit to be so deposited or credited, to any Lock-Box or Deposit Account cash or cash proceeds other than Collections of Receivables and other similar receivables owned by the Related Seller or an Affiliate thereof, except as contemplated by the Transaction Documents. All Collections of Receivables on deposit in any Concentration Account shall be transferred to the related Collection Account within two (2) Business Days after receipt thereof. Each Lottery Holding SPV shall transfer all Collections of Lottery Receivables received by such Lottery Holding SPV in the related Deposit Account (or Lock-Box) to the Collection Account within two (2) Business Days after receipt thereof.

(i)    Further Assurances. Such Borrower agrees from time to time, at its expense, promptly to execute and deliver all further instruments and documents, and to take all further actions, that may be reasonably necessary or desirable, or that the Administrative Agent or the Collateral Agent may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under this Agreement. Such Borrower authorizes the Collateral Agent to file financing and continuation statements, and amendments thereto and assignments thereof, relating to the Collateral.

(j)    Reporting Requirements. Such Borrower shall provide to the Administrative Agent and the Lenders in the Related Lender Group (in multiple copies, if requested by the Administrative Agent) the following:

(i)    on or prior to each Calculation Date, a duly completed and certified Monthly Report containing information regarding the Receivables and any Health Care Provider Loan Receivables owned by such Borrower as of the last day of the previous calendar month; provided, that such Borrower shall not include any Receivable that is not an Eligible Receivable as of such Calculation Date in the calculation of the Borrowing Base; provided, further, that if an Event of Default has occurred and is continuing with respect to such Borrower, such Borrower shall deliver Monthly Reports on any Business Days reasonably requested by the Administrative Agent;

(ii)    on or prior to each Distribution Date, a pro forma Compliance Report giving effect to the distributions to occur on such Distribution Date under Sections 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable;

(iii)    within one hundred fifty (150) days after the end of each of the Related Seller's and such Borrower's fiscal years (in each case, beginning with the year ending December 31, 2021), an annual audited financial statement of such Borrower and the Related

61

Seller, prepared in accordance with GAAP, in form and substance reasonably acceptable to the Administrative Agent;

(iv)    within thirty (30) days after the last day of each calendar month, a consolidated unaudited income statement and balance sheet of the Related Seller (which income statement and balance sheet shall include the Related Servicer and such Borrower), in form and substance acceptable to the Administrative Agent;

(v)    as soon as possible and in any event within three (3) Business Days after the occurrence of each Event of Default or Default with respect to such Borrower, a statement of a duly authorized officer of such Borrower setting forth details of such Event of Default or Default and the action that such Borrower has taken and proposes to take with respect thereto;

(vi)    promptly after the filing or receiving thereof, copies of all reports and notices that such Borrower or any ERISA Affiliate files under ERISA with the Internal Revenue Service or the Pension Benefit Guaranty Corporation or the U.S. Department of Labor or that such Borrower or any ERISA Affiliate receives from any of the foregoing or from any Multiemployer Plan to which such Borrower or any ERISA Affiliate is or was, within the preceding five years, a contributing employer, in each case in respect of the assessment of Withdrawal Liability or an ERISA Event or other event or condition which could, in the aggregate, result in the imposition of liability on such Borrower or any such ERISA Affiliate in excess of $50,000;

(vii)    prompt notice of such Borrower or any Lottery Holding SPV becoming a Benefit Plan Entity;

(viii)    at least thirty (30) days prior to any change in the name or jurisdiction of organization of such Borrower, such Lottery Holding SPV, the Related Seller or the Related Servicer, a notice setting forth the new name or jurisdiction of organization of such Borrower, the Related Seller or the Related Servicer and the effective date thereof;

(ix)    promptly after such Borrower obtains knowledge thereof, notice of (a) any event of default, potential event of default or similar event under any Transaction Document or Related Contract and (b) any litigation, investigation or claim or any threatened litigation or claim affecting such Borrower, such Lottery Holding SPV, the Related Seller or the Related Servicer which if adversely decided could reasonably be expected to have a Material Adverse Effect;

(x)    promptly after receipt thereof, copies of all notices received by such Borrower from any Person under or with respect to any Transaction Document (unless the Administrative Agent is a named notice party therein);

(xi)    promptly after the request of the Administrative Agent, information as to the amount of funds in the applicable Borrower Accounts; and

(xii)    such other information related to the Receivables, any Health Care Provider Loan Receivables, the Obligations, the Collateral or the condition or operations, financial or otherwise, of such Borrower, the Related Servicer or the Related Seller as the Administrative

62

Agent or any Lender in the Related Lender Group may from time to time reasonably request, to the extent such disclosure is permitted under applicable law, rule or regulation.

    (k)    <u>Separateness</u>.

    (i)    Such Borrower shall not direct or participate in the management of any other Borrower or any of the Other Companies' operations or of any other Person's operations (other than as sole member of a Lottery Holding SPV).

    (ii)    Such Borrower shall have stationery and other business forms separate from that of any other Borrower, the Other Companies or any other Person.

    (iii)    Such Borrower shall at all times be adequately capitalized in light of its contemplated business.

    (iv)    Except as otherwise contemplated by the Transaction Documents, such Borrower shall at all times provide for its own operating expenses and liabilities from its own funds (and, as applicable, those of a Lottery Holding SPV).

    (v)    Such Borrower shall maintain its assets and transactions separately from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) and reflect such assets and transactions in financial statements separate and distinct from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) and evidence such assets and transactions by appropriate entries in books and records separate and distinct from those of any other Borrower, the Other Companies or any other Person (other than a Lottery Holding SPV) except as otherwise expressly permitted by the Transaction Documents, and in each case, other than for tax purposes. Such Borrower shall hold itself out to the public under such Borrower's own name as a legal entity separate and distinct from any other Borrower or the Other Companies (other than for tax purposes or with respect to a Lottery Holding SPV). Such Borrower shall not hold itself out as having agreed to pay, or as being liable, primarily or secondarily, for, any obligations of any other Borrower, the Other Companies or any other Person, except as otherwise contemplated by the Transaction Documents. Such Borrower shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person (other than a Lottery Holding SPV), and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Transaction Documents. Such Borrower shall not maintain any joint account with any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) or become liable as a guarantor or otherwise with respect to any Debt or contractual obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) except in accordance with the Transaction Documents.

    (vi)    Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person except a Lottery Holding SPV or otherwise in accordance with the Transaction Documents.

    (vii)    Such Borrower shall not make loans, advances or otherwise extend credit to any of the Other Companies or to any other Person (other than to the Lottery Holding

63

SPVs) except in connection with its ownership of any Health Care Provider Loan Receivables or as otherwise contemplated by the Transaction Documents or make any investment (other than Eligible Investments) in any Person (other than a Lottery Holding SPV) or otherwise in accordance with the Transaction documents.

(viii)    Such Borrower shall observe all (A) Delaware limited liability company formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited liability company agreement in a manner that would adversely affect the existence of such Borrower as a bankruptcy-remote special purpose entity.

(ix)    Such Borrower shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person (other than for tax purposes) and shall not identify itself as a division of any other Person (other than for tax purposes).

(x)    Without limiting in any way its ability to acquire and administer Third Party Intercreditor Receivables, if applicable, such Borrower shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

(xi)    Such Borrower shall not use its separate existence to perpetrate a fraud in violation of applicable law or act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

(xii)    Except as permitted by or pursuant to the Transaction Documents (including such Borrower's acquisition of any Receivables Notes or membership interests in a Lottery Holding SPV), such Borrower shall not acquire any securities or debt instruments of any of its Affiliates or any other Person.

(xiii)    Except as otherwise contemplated by the Transaction Documents, such Borrower shall not engage in any transaction with any of the Other Companies (other than the Lottery Holding SPVs) except for a transaction that is both (a) on arm's-length terms and (b) permitted by this Agreement, its organizational documents and the other Transaction Documents.

(xiv)    If such Borrower is the SPLCSS Borrower, the Borrower shall cause the Lottery Holding SPV to comply with each covenant in this Section 5.01(k) as if such covenant was an obligation of the Lottery Holding SPV.

(l)    <u>Nature of Business; Fiscal Year</u>. Such Borrower shall not engage in any business other than as expressly permitted by its organizational documents, this Agreement and the other Transaction Documents. Such Borrower shall not create or form any Subsidiary (other than a Lottery Holding SPV). Neither such Borrower nor any Lottery Holding SPV shall change its fiscal year or any of its fiscal quarters, without the Administrative Agent's and Lenders in the Related Lender Group's prior written consent, which consent shall not be unreasonably withheld or delayed.

(m)     Mergers, Etc. Without the prior written consent of the Administrative Agent, such Borrower shall not merge with or into or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired) to, or acquire all or substantially all of the assets or capital stock or other ownership interest of, or enter into any joint venture or partnership agreement with, any Person, other than as specifically contemplated by this Agreement and the other Transaction Documents.

(n)     Distributions, Etc. Such Borrower shall not declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of any class of equity interests of such Borrower, or return any capital to its members as such, or purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any shares of any class of equity of such Borrower or any warrants, rights or options to acquire any such shares, now or hereafter outstanding; provided that (x) such Borrower may declare and pay cash dividends to its members so long as (i) no Default or Event of Default with respect to such Borrower shall then exist or would occur as a result thereof, (ii) such dividends are in compliance with all applicable law and (iii) such dividends have been approved by all necessary and appropriate limited liability company action of such Borrower and are cash proceeds received by such Borrower in accordance with Section 2.18(a)(xi), Section 2.19(a)(xi), Section 2.20(a)(xii), Section 2.21(a)(xi) or Section 2.22, as applicable and (y) such Borrower shall be permitted to distribute the Receivables or any Health Care Provider Loan Receivables after the Obligations in respect of such Receivables or Health Care Provider Loan Receivables, if any, that are then due and payable have been prepaid.

(o)     Debt. Such Borrower shall not incur any Debt, other than any Debt permitted pursuant to this Agreement or the other Transaction Documents.

(p)     Organizational Documents. Such Borrower shall not (and will not permit any Lottery Holding SPV to), amend restate, delete or modify its certificate of formation, limited liability company agreement or resolutions in any material respect without the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed).

(q)     Use of Proceeds. Such Borrower shall use the proceeds of the Loans solely to acquire Receivables and Related Security (including indirectly by contributing to a Lottery Holding SPV) and any Health Care Provider Loan Receivables which, in each case (other than the Excluded Lottery Receivables), shall be pledged as Collateral hereunder, together with any related reasonable costs and expenses related to such acquisition (including the reimbursement of origination costs and expenses to the Seller) and to pay accrued and unpaid interest on the Loans. The SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group, shall agree for each LC Asset Group to an LTV Percentage and such LTV Percentage may only be changed by mutual agreement of the SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group; provided, that the SPLCSS Borrower and the Administrative Agent, on behalf of the Required Lenders in the SPLCSS Lender Group, may agree to amend (whether by aggregation or separation) the LTV Percentages for any LC Asset Group and the Life Contingent Receivables constituting such LC Asset Group at any time. Such Borrower agrees not to use the proceeds of any Loan to acquire or

65

carry margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

(r)     Sanctions; Anti-Money Laundering Laws, Use of Proceeds. Such Borrower shall not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Affiliate or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable Anti-Money Laundering Law or anti-corruption law, or (ii) (A) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (B) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, a Lender or otherwise).

(s)     Payment of Taxes. Such Borrower shall timely pay all taxes that become due and payable except (i) where such taxes are being contested in good faith or (ii) to the extent such failure to pay could not reasonable be expected to have a Material Adverse Effect.

(t)     Tax Treatment. For U.S. federal income tax purposes, such Borrower shall not be treated as a corporation or as an association taxable as a corporation.

(u)     Interest Rate Hedging.

(i)     With respect to each of the SPLCSS Borrower and the Dorchester Borrower, within five (5) Business Days following any Borrowing Date, and on each Calculation Date (other than the initial Calculation Date), such Borrower shall maintain in full force and effect interest rate protection mechanisms with Hedge Counterparties evidenced by Hedge Transactions as to which the aggregate notional principal amount at such time (i) is approximately equal to the aggregate principal amount of all Loans to such Borrower outstanding at such time (after giving effect to any new Loans to such Borrower or repayments by such Borrower on such date), (ii) is not more than what the Valuation Amount would be at such time if "0.0%" were substituted for, in the case of the SPLCSS Borrower, the applicable percentages set forth in clauses (i)(b), (ii)(b) and (iii)(b) of the definition of Discount Rate, and in the case of the Dorchester Borrower, 0.00% in the definition of Discount Rate and (iii) that has a DV01 that offsets the DV01 of the applicable Collateral for each of the SPLCSS Borrower or the Dorchester Borrower as illustrated in Schedule XVI and (iv) that are acceptable to the Administrative Agent.

(ii)     Such Borrower shall only enter into Hedge Transactions with a Hedge Counterparty that shall be governed by a Hedge Agreement; provided that if (x) a Hedge Agreement ceases to be of effect, (y) such Borrower fails to fulfil its obligation under clause (i), or (z) the counterparty thereto ceases to qualify as a Hedge Counterparty, such Borrower agrees to, and the Administrative Agent may cause such Borrower, within fifteen days or a request by the Administrative Agent to the related Borrower, to enter into a Hedge Agreement and Hedge Transactions with any Hedge Counterparty that the Administrative Agent selects (in its sole discretion).

(iii)    As additional security to the Administrative Agent hereunder, such Borrower has pledged to the Collateral Agent, for the benefit of the Secured Parties, all right, title and interest of such Borrower in the Hedge Collateral, if applicable. Such Borrower acknowledges that, as a result of its pledge, such Borrower may not, without the prior written consent of the Required Lenders in the Related Lender Group, exercise any rights under any Hedge Agreement or Hedge Transaction, except for such Borrower's right under any Hedge Agreement to enter into Hedge Transactions in order to meet such Borrower's obligations hereunder. Nothing herein shall have the effect of releasing such Borrower (or, if applicable, any Affiliate of such Borrower) from any of its obligations under any Hedge Agreement or any Hedge Transaction (including the payment of the Obligations in full), nor be construed as requiring the consent of any Hedge Counterparty or the Lenders in the Related Lender Group for the performance by such Borrower (or, if applicable, any Affiliate of such Borrower) of any such obligations.

(iv)    Such Borrower shall promptly deliver to the Administrative Agent and the Lenders in the Related Lender Group a copy of all documents related to any Hedge Agreement, including (a) confirmations, schedules and an aggregate notional amortization schedule prior to entering into such agreement, and (b) any notices received by such Borrower from the Hedge Counterparty following the effective date of the Hedge Agreement.

(v)    Such Borrower shall pay all reasonable and documented costs and expenses (including reasonable and documented legal fees and disbursements) incurred by the Administrative Agent, the Collateral Agent, the Lenders and each Hedge Counterparty in connection with each Hedge Transaction in accordance with Section 2.18, 2.19, 2.20, 2.21 or 2.22, as applicable to such Borrower.

(vi)    Each Hedge Agreement shall be approved by the Administrative Agent prior to the execution thereof by the applicable Borrower.

(vii)    Neither the SPLCSS Borrower nor the Dorchester Borrower shall enter into any Hedge Transaction with respect to which the Administrative Agent has previously raised an objection in writing and each of the SPLCSS Borrower and the Dorchester Borrower shall use commercially reasonable efforts to give effect to the reasonable requests of the Administrative Agent with respect to Section 5.01(u).

(v)    Eligible Receivables. All Receivables purchased by such Borrower and any Lottery Holding SPV (or Receivables securing any Health Care Provider Loan Receivables so purchased, if applicable) shall be Eligible Receivables at the time they are pledged hereunder.

(w)    Insurance. Such Borrower shall pay to any Other Company (other than the Lottery Holding SPVs) the marginal increase of (or, in the absence of such increase, the market amount of its portion of) the premium payable with respect to any insurance policy that covers the Borrower and such Other Company (other than the Lottery Holding SPVs), but the Borrower shall not, directly or indirectly, be named or enter into an agreement to be named, as a direct or contingent beneficiary or loss payee, under any such insurance policy, with respect to any amounts payable due to occurrences or events related to such Other Company (other than the other Borrowers).

(x)     Agreed Upon Actuarial Models. With respect to the Insurety Borrower, each Agreed Upon Actuarial Model, together with the related persistency rates provided by the Independent Actuary, will be updated no less frequently than once per annum or at any time that the Administrative Agent reasonably believes that the underlying persistency rates have changed (as evidenced by a written notice provided by the Administrative Agent to the Insurety Borrower) and an Agreed Upon Actuarial Model should be updated as a result of such change; provided, that the initial models applied as of the Closing Date are described on Schedule XV.

(y)     Dispute Resolution. If the Administrative Agent provides the Insurety Borrower and any Independent Actuary with written notice that it disputes the Valuation Amount of an Eligible Receivable, the Insurety Borrower shall cause such Independent Actuary to deliver a redetermined Valuation Amount within twenty (20) Business Days following receipt of such notice.

(z)     Membership Interests in Lottery Holding SPVs. The SPLCSS Borrower shall not vote to enable, or take any other action to permit, any Lottery Holding SPV to issue any additional membership interests or other equity securities of any nature or to issue any other membership interests or other ownership interests convertible into or granting the right to purchase or exchange for any membership interests or other ownership interests of any nature of any Lottery Holding SPV. Whenever any membership interest of a Lottery Holding SPV is an uncertificated security, the SPLCSS Borrower shall, or shall cause such Lottery Holding SPV to, take all steps as are reasonably necessary to give exclusive control over such membership interest to the Collateral Agent in a manner reasonably satisfactory to the Collateral Agent.

Section 5.02    Financial Records; Access to Information. Such Borrower shall maintain its books and records in accordance with GAAP. Until the Commitments have expired or been terminated and the Principal Amount of and Interest on each Loan and all other Obligations owed by such Borrower have been paid in full, such Borrower, the Related Servicer and the Related Seller shall, at their respective expense, from time to time during regular business hours as requested by the Administrative Agent, permit the Administrative Agent or its agents or representatives (including independent public accountants, which may be such Borrower's or an Affiliate's independent public accountants), with reasonable out-of-pocket costs and expenses associated therewith reimbursable to the Administrative Agent by such Borrower (subject to the limitations set forth in Section 9.02), (a) to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the Administrative Agent for initial due diligence of the Receivables), (b) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts, and (c) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (b) above, and to discuss matters relating to Receivables and the Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower, the Related Servicer or the Related Seller,

68

the account numbers of the Third Party Intercreditor Accounts, which Schedule VII may be updated from time to time with the consent of the Administrative Agent.

(b)    Payment Instructions. Except for Receivables that constitute Third Party Intercreditor Receivables, such Servicer has notified (or has caused the Related Seller to notify) the Obligor on each Receivable to make payments on such Receivable to either one of the Lock-Boxes or one of the Deposit Accounts or to the Collection Account or the Concentration Account, as applicable. Third Party Intercreditor Receivables shall be paid to the Third Party Intercreditor Accounts.

(c)    Compliance Reports and Monthly Reports. Each Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    Facility Events of Default. If any of the following events (each, a "Facility Event of Default") shall occur and be continuing:

(a)    Any Servicer (if an Affiliate of any Borrower) or any Borrower (i) shall fail to make when due any payment or deposit to be made by it under this Agreement and such failure shall remain unremedied for 30 days or (ii) shall fail to deliver any Compliance Report on or prior to any Distribution Date and such failure shall remain unremedied for two (2) Business Days; or

(b)    Any Borrower (i) shall fail to make any payment of principal of any Loan when and as the same shall become due and payable, or (ii) shall fail to pay any interest on any Loan or any fee or other amount (other than an amount referred to in the preceding clause (i)) payable under this Agreement or any other Transaction Document when and as the same shall become due and payable, and such failure shall continue unremedied for 30 days; or

(c)    A Borrowing Base Deficiency shall exist, and such Borrowing Base Deficiency shall not be remedied within 30 days after knowledge thereof by the applicable Borrower or the delivery of the related Compliance Report; provided, that a Borrowing Base Deficiency shall not constitute a Facility Event of Default until such time as the Administrative Agent declares a Facility Event of Default; and provided, further, that the election by the Administrative Agent not to declare a Facility Event of Default at any time in connection with any Borrowing Base Deficiency shall not constitute a waiver of such Facility Event of Default; or

(d)    The security interest created pursuant to Section 2.15 shall for any reason cease to be a valid and perfected first priority security interest in the Collateral, and if capable of being cured, such cessation shall remain unremedied for two (2) Business Days; or

(e)    The PBGC or the IRS shall, or shall indicate its intention to, file notice of a lien pursuant to Section 6323 of the Code or Section 4068 of ERISA with regard to the assets of

any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller; or

(f)     Should any Servicer (if such Servicer is an Affiliate of any Borrower), any Seller, any Borrower or any Lottery Holding SPV or any of their respective senior executive officers be indicted for a felony offense involving financial fraud; provided that such Facility Event of Default shall cease to exist if (i) the indictment is dismissed, (ii) such Borrower, such Servicer, such Lottery Holding SPV or such Seller or such senior executive officer of any such parties, as applicable, enters into an agreement of settlement with the authority that has commenced such indictment, which agreement is entered into without prejudice to such party or without admission of fault or wrongdoing by such party or (iii) such Borrower, such Servicer, such Lottery Holding SPV or such Seller, as applicable, removes direct responsibility for the origination, acquisition or administration of the Collateral from each such senior executive officer, if any, that is the subject of the applicable indictment; or

(g)     the aggregate Tangible Net Worth of 777 Partners LLC and 600 Partners LLC ceases to be at least equal to $75,000,000; or

(h)     without the consent of the Lenders (i) either 777 Partners LLC or 600 Partners LLC, as applicable, ceases to Control all entities that are in the respective Borrower Group or (ii) 777 Partners LLC and 600 Partners LLC cease to be Affiliates of each other; or

(i)     the failure of the Borrowers to satisfy each condition subsequent set forth in Section 3.04(a)(i) through (iii) or Section 3.04(b) when due;

then, and in any such event, any or all of the following actions may be taken by notice to the Borrowers:  (x) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in any Lender Group, declare the related Loans then outstanding to be due and payable, and thereupon the principal of the Loans, together with accrued interest thereon and all fees and other obligations of the Borrowers owing hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (y) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in each Related Lender Group, terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (z) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in each Lender Group, designate another Person to succeed each Servicer as the Related Servicer. Upon any such declaration, termination or designation or upon any such automatic acceleration, termination or cessation, the Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

Section 7.02    Events of Default. If any of the following events (each, a "Borrower Group Event of Default") shall occur and be continuing:

(a)     Any Servicer (if an Affiliate of any Borrower) or any Borrower (i) shall fail to make when due any payment or deposit to be made by it under this Agreement and such failure

76

shall remain unremedied for two (2) Business Days or (ii) shall fail to deliver any Compliance Report on or prior to any Distribution Date and such failure shall remain unremedied for two (2) Business Days; or

(b)      Any Borrower (i) shall fail to make any payment of principal of any Loan when and as the same shall become due and payable, or (ii) shall fail to pay any interest on any Loan or any fee or other amount (other than an amount referred to in the preceding clause (i)) payable under this Agreement or any other Transaction Document when and as the same shall become due and payable, and except with respect to the failure to make any payment on the applicable Maturity Date, such failure shall continue unremedied for two (2) Business Days; or

(c)      Any representation or warranty made or deemed made by any Borrower, any Seller, any Lottery Holding SPV, or, so long as such Servicer is an Affiliate of any Borrower, any Servicer (or any of their respective officers) under or in connection with this Agreement or any other Transaction Document or any information or report delivered by any Borrower, any Seller or, so long as such Servicer is an Affiliate of any Borrower, any Servicer pursuant to this Agreement or any other Transaction Document shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered, and such condition remains unremedied for a period ending two (2) Business Days after the end of immediately succeeding Interest Period after the earlier to occur of (i) the date on which written notice of such incorrectness requiring the same to be remedied shall have been given to the applicable Borrower, the applicable Seller or the applicable Servicer by the Administrative Agent or (ii) the date on which applicable Borrower, the applicable Seller or the applicable Servicer, as applicable, acquires knowledge thereof; provided, however, to the extent such false or incorrect representation relates to a Receivable or Health Care Provider Loan Receivable, it shall not constitute a Borrower Group Event of Default if such Receivable or Health Care Provider Loan Receivable does not constitute a Defective Receivable (as defined in the applicable Sale Agreement) or if the applicable Seller Repurchases such Receivable or Health Care Provider Loan Receivable in accordance with the terms of the applicable Sale Agreement; or

(d)      Any Borrower or any Seller shall fail to perform or observe any term, covenant or agreement contained in this Agreement, the applicable Servicing Agreement or the applicable Sale Agreement on its part to be performed or observed (other than as specified in subsection (a) hereof) and any such failure shall remain unremedied for a period of thirty (30) day after the earlier to occur of (i) the date on which written notice of such failure requiring the same to be remedied shall have been given to the applicable Borrowers or the applicable Seller by the Administrative Agent or (ii) the date on which the applicable Borrower or the applicable Seller, as applicable, acquires knowledge thereof; provided that the failure of any Borrower to perform or observe any covenant contained in Sections 5.01(g), 5.01(h), 5.01(m), 5.01(o), 5.01(p) or 5.01(q) shall not be entitled to the benefit of such thirty (30)-day period; or

(e)      Any Borrower, any Servicer (if an Affiliate of any Borrower) or any Seller shall fail to pay any principal of or premium or interest on any of its Debt which is outstanding in a principal amount of at least $500,000 ($25,000 in the case of a Borrower) in the aggregate when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any other event

77

shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt; or any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof; or

(f)      Any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Borrower, any Lottery Holding SPV, a Servicer or a Seller seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days in the case of a Servicer or a Seller, or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or any proceeding or petition shall be instituted or adopted for the winding up of any Borrower or any Lottery Holding SPV (whether or not in the context of a bankruptcy or insolvency proceeding); or any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower) or any Seller shall take any corporate or other action to authorize any of the actions set forth above in this subsection (g); or

(g)      A Borrowing Base Deficiency shall exist, and such Borrowing Base Deficiency shall not be remedied within three (3) Business Days after knowledge thereof by the applicable Borrower or the delivery of the related Compliance Report; provided, that a Borrowing Base Deficiency shall not constitute a Borrower Group Event of Default until such time as the Administrative Agent declares a Borrower Group Event of Default; and provided, further, that the election by the Administrative Agent not to declare a Borrower Group Event of Default at any time in connection with any Borrowing Base Deficiency shall not constitute a waiver of such Borrower Group Event of Default; or

(h)      One or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 (or $25,000 in the case of any Borrower or any Lottery Holding SPV) (except to the extent covered by insurance as to which the insurer has acknowledged such coverage in writing) shall be rendered against any Borrower, any Lottery Holding SPV, any Seller or any Servicer (if an Affiliate of any Borrower) or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be taken by a judgment creditor to attach or levy upon any assets of any Borrower, any Lottery Holding SPV, any Seller or any Servicer (if an Affiliate of any Borrower) to enforce any such judgment; or

(i)     Any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower),any Seller or any ERISA Affiliate of any of them shall fail to pay when due an amount or amounts aggregating in excess of $500,000 which it shall have become liable to pay under Section 302 or Title IV of ERISA or Section 412 of the Code with respect to any Plan or Multiemployer Plan; or notice of intent to terminate a Plan shall be filed under Title IV of ERISA by any of the foregoing, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer, any Plan; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Plan must be terminated; or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA, with respect to, one or more Multiemployer Plans which could cause any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower), any Seller or one or more ERISA Affiliates of any of them to incur a current payment obligation in excess of $500,000; or (ii) any other ERISA Event shall have occurred that, in the opinion of the Administrative Agent or the Required Lenders in the Related Lender Group, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of any Borrower, any Lottery Holding SPV, any Servicer (if an Affiliate of any Borrower), any Seller and any ERISA Affiliate of any of them in an aggregate amount exceeding $500,000; or

(j)     Any Borrower or any Lottery Holding SPV becomes a Benefit Plan Entity and fails to cease being a Benefit Plan Entity within thirty (30) days; or

(k)     So long as a Servicer is an Affiliate of any Borrower, a Servicer Default shall occur (after giving effect to any applicable notice or cure period); or

(l)     Should any material provision of this Agreement or any other Transaction Document to which any Borrower is a party cease to be in full force and effect or any Borrower shall assert in writing (which may be provided via electronic mail) that this Agreement or any other Transaction Document is no longer in full force and or effect; or

(m)     A Change of Control shall occur; or

(n)     Any Borrower ceases to be disregarded as an entity separate from any Seller, elects to be treated as a corporation, or otherwise becomes or is treated as a corporation or partnership for U.S. federal income tax purposes; or

(o)     Subject to the timeframe set forth in Section 3.04(a), any Borrower Account or Lock-Box ceases to be the subject of one or more fully executed Account Control Agreements; provided, that if any such Lock-Box is held in the name of a Lottery Holding SPV, an Account Control Agreement shall not be required with respect to such Lock-Box so long as Collections remitted to such Lock-Box are automatically transferred by the related account bank to the Collection Account related to the SPLCSS Borrower and the absence of such Account Control Agreement shall not constitute a breach of any term or condition of any Transaction Document; or

(p)     Should (i) any event of default, termination event or additional termination event in respect of any Borrower occur under any Hedge Agreement and be continuing after any

applicable grace periods, or (ii) any Borrower fail to maintain any Hedge Transactions that it is required to maintain pursuant to Section 5.01(u) hereof, and such failure shall not have been remedied within fifteen (15) days after the occurrence of such event; or

(q)    Should any event of default, termination event or additional termination event in respect of a Hedge Counterparty occur under any Hedge Agreement and be continuing after any applicable grace periods and such Borrower fails to enter into one or more replacement Hedge Agreements with one or more other Hedge Counterparties within sixty (60) days after the occurrence of such event; or

(r)    With respect to the Insurety Borrower, the failure of the Insurety Borrower to satisfy Section 3.04(a)(iv) when due;

then, and in any such event, any or all of the following actions may be taken by notice to the Borrower with respect to which such Borrower Group Event of Default has occurred:  (x) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, declare the related Loans then outstanding to be due and payable, and thereupon the principal of the Loans, together with accrued interest thereon and all fees and other obligations of the applicable Borrower owing hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (y) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, terminate the Commitments of the Lenders in the Related Lender Group, and thereupon the Commitments of the Lenders in the Related Lender Group shall terminate immediately, and (z) the Administrative Agent may in its discretion, and shall, at the direction of the Required Lenders in the Related Lender Group, designate another Person to succeed the Related Servicer as the Related Servicer; provided that, automatically upon the occurrence of any event (without any requirement for the passage of time or the giving of notice) described in paragraph (f) of this Section 7.02, the principal of the Loans (together with accrued interest thereon and all fees and other obligations of the applicable Borrower owing hereunder) shall become due and payable immediately, the Commitments of the Lenders in the Related Lender Group, if any, shall terminate immediately, and the Related Servicer shall cease to be the Related Servicer, and the successor Servicer designated by the Administrative Agent with respect to the Related Servicer shall become a Servicer. Upon any such declaration, termination or designation or upon any such automatic acceleration, termination or cessation, the Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

Section 7.03    Servicer Defaults. Each Borrower and each Servicer authorizes the Administrative Agent, and hereby irrevocably appoints the Administrative Agent (and each servicer appointed to act on its behalf) as its attorney-in-fact coupled with an interest, with full power of substitution and with full authority in place of such Borrower or such Servicer, following the occurrence and during the continuation of a Servicer Default, to take any and all steps in such Borrower's or such Servicer's name and on behalf of such Borrower or such Servicer that are necessary or desirable, in the determination of the Administrative Agent, to collect amounts due

IN WITNESS WHEREOF, the parties have caused this Loan and Security Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWERS:                    SPLCSS III LLC

                              DocuSigned by:

                              By: Steven W. Pasko
                                  DF9B492F396A415...
                              Name:  Steven W. Pasko
                              Title:    President

                              SIGNAL SML 4 LLC

                              DocuSigned by:

                              By: Steven W. Pasko
                                  DF9B492F396A415...
                              Name:  Steven W. Pasko
                              Title:    President

                              INSURETY AGENCY SERVICES LLC

                              DocuSigned by:

                              By: John Richard Zirkelbach
                                  1A0518B8DE884ED...
                              Name:  John R. Zirkelbach
                              Title:    Authorized Signatory

                              DORCHESTER RECEIVABLES II LLC

                              DocuSigned by:

                              By: Steven W. Pasko
                                  DF9B492F396A415...
                              Name:  Steven W. Pasko
                              Title:    President

[Signature Page to Loan and Security Agreement]

SERVICERS:                          SUTTONPARK SERVICING LLC


By: Steven W. Pasko
Name: Steven W. Pasko
Title:    Chief Executive Officet



SIGNAL SERVICING LLC


By: Steven W. Pasko
Name: Steven W. Pasko
Title:    Chief Executive Office

INSURETY SERVICING LLC


By: Steven W. Pasko
Name: Steven W. Pasko
Title:    Authorized Signatory


[Signature Page to Loan and Security Agreement]

SELLERS:                          SUTTONPARK CAPITAL LLC

By: _Steven W. Pasko_____

Name:   Steven W. Pasko

Title:    Chief Executive Officer

SIGNAL MEDICAL RECEIVABLES LLC

By: _Steven W. Pasko_____

Name:   Steven W. Pasko

Title:    Chief Executive Officer

INSURETY CAPITAL LLC

By: _Robert Gray_____

Name:   Robert Gray

Title:    Chief Executive Officer

[Signature Page to Loan and Security Agreement]

ADMINISTRATIVE AGENT:   LEADENHALL CAPITAL PARTNERS LLP

By: _____
Name: Craig Gillespie
Title: Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

COLLATERAL AGENT:          For and on behalf of LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS
FUND PLC by its agent Leadenhall Capital
Partners LLP


By:   _____

Name: Craig Gillespie

Title: Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

LENDERS IN SPLCSS LENDER
GROUP:

For and on behalf of LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS
FUND PLC by its agent Leadenhall Capital
Partners LLP


By: _____
Name: Craig Gillespie
Title: Head Of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL
CIMETTA INSURANCE LINKED
INVESTMENTS FUND ICAV by its agent
Leadenhall Capital Partners LLP


By: _____
Name:  Craig Gillespie
Title: Head Of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL
DIVERSIFIED INSURANCE LINKED
INVESTMENTS FUND PLC by its agent
Leadenhall Capital Partners LLP


By: _____
Name:  Craig Gillespie
Title:  Head Of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL LIFE II
DAC by its agent Leadenhall Capital Partners
LLP


By: _____
Name:   Craig Gillespie
Title:   Head Of Life & Alternative Credit Portfolio Management


[Signature Page to Loan and Security Agreement]

For and on behalf of LEADENHALL LIFE
SMA III ICAV by its agent Leadenhall Capital
Partners LLP

By: _____
Name: Craig Gillespie
Title:  Head Of Life & Alternative Credit Portfolio Management

For and on behalf of NATWEST PENSION
TRUSTEES LIMITED, as trustee for THE
NATWEST GROUP PENSION FUND by its
agent Leadenhall Capital Partners LLP

By: _____
Name:    Craig Gillespie
Title:       Head Of Life & Alternative Credit Portfolio Management

For and on behalf of SITKA ICAV by its agent
Leadenhall Capital Partners LLP

By: _____
Name:  Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

LENDERS IN SIGNAL LENDER
GROUP:

For and on behalf of LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS
FUND PLC by its agent Leadenhall Capital
Partners LLP


By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL
CIMETTA INSURANCE LINKED
INVESTMENTS FUND ICAV by its agent
Leadenhall Capital Partners LLP


By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL
DIVERSIFIED INSURANCE LINKED
INVESTMENTS FUND PLC by its agent
Leadenhall Capital Partners LLP


By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL SMA III
ICAV by its agent Leadenhall Capital Partners
LLP


By: _____
Name:   Craig Gillespie
Title:    Head Of Life & Alternative Credit Portfolio Management


[Signature Page to Loan and Security Agreement]

LENDERS IN INSURETY
LENDER GROUP:

For and on behalf of LEADENHALL LIFE
INSURANCE LINKED INVESTMENTS
FUND PLC by its agent Leadenhall Capital
Partners LLP


By: _____

Name: Craig Gillespie

Title: Head of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL LIFE II
DAC by its agent Leadenhall Capital Partners
LLP


By: _____

Name: Craig Gillespie

Title: Head of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL LIFE
SMA III ICAV by its agent Leadenhall Capital
Partners LLP


By: _____

Name: Craig Gillespie

Title: Head of Life & Alternative Credit Portfolio Management


For and on behalf of LEADENHALL
CIMETTA INSURANCE LINKED
INVESTMENTS ICAV by its agent
Leadenhall Capital Partners LLP


By: _____

Name: Craig Gillespie

Title: Head of Life & Alternative Credit Portfolio Management


[Signature Page to Loan and Security Agreement]

For and on behalf of LEADENHALL
DIVERSIFIED INSURANCE LINKED
INVESTMENTS FUND by its agent
Leadenhall Capital Partners LLP


By:_____

Name:  Craig Gillespie

Title:    Head of Life & Alternative Credit Portfolio Management


[Signature Page to Loan and Security Agreement]

LENDERS IN DORCHESTER
LENDER GROUP:

For and on behalf of NATWEST PENSION TRUSTEES LIMITED, as trustee for THE NATWEST GROUP PENSION FUND by its agent Leadenhall Capital Partners LLP

By: _____

Name:  Craig Gillespie

Title:   Head Of Life & Alternative Credit Portfolio Management

[Signature Page to Loan and Security Agreement]

Acknowledged and agreed, solely with respect to Section 2.15:

ASELLUS RECEIVABLES II LLC

By: _Steven W. Pasko_
Name: Steven W. Pasko
Title: President

ACUBENS IV LLC

By: _Steven W. Pasko_
Name: Steven W. Pasko
Title: President

[Signature Page to Loan and Security Agreement]