UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>*Plaintiffs,*<br><br>v.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>*Defendants.* | Civil Action No. 1:24-cv-03453 |

## DECLARATION OF MICHAEL SALIBA

I, Michael Saliba, declare as follows:

1.     I am the Chief Operating Officer of Defendant Advantage Capital Holdings LLC (together with its affiliates, and excluding reference to investments made in the ModCo Accounts defined below, "A-CAP"). I have personal knowledge of the matters described in this declaration, except where indicated that my knowledge is on information provided to me, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

2.     I have over 18 years of experience in the capital and financial markets, including Options, Securities, Equities, Strategic Planning, M&A, and Capital Markets.

### A-CAP's Business

3. A-CAP is an insurance holding company that is the ultimate parent of Sentinel Security Life Insurance Company, founded in 1948; Atlantic Coast Life Insurance Company, founded in 1925; Haymarket Insurance Company; Jazz Reinsurance Company; and Southern Atlantic Re Inc.

4. As an insurance holding company, A-CAP's focus is on fulfilling its fiduciary obligation to protect the investments of its policyholders. A-CAP provides comprehensive services to insurance policyholders, insurance company clients, and capital partners. A-CAP also has an asset management arm that provides insurance-driven investment strategies to its own companies and third parties. A-CAP has offices in New York, Charleston, and Salt Lake City.

### The Business of Partners

5. 777 Partners LLC, 600 Partners LLC (together, "Partners HoldCo"), and their affiliates (collectively, "Partners") comprise an investment company based in Miami, Florida. Partners reports being founded in 2015 and having more than $3 billion in assets under its management, more than 600 employees, and investments in more than 50 operating companies.

6. Partners is engaged in several lines of business, including Specialty Finance (investing in industries like aviation finance and motorcycle leasing); Litigation Finance; Sustainable (ESG) Investment; Insurance; Sports, Media, and Entertainment; and Structured Settlements.

### A-CAP's and Leadenhall's Business Relationships with Partners

7. A-CAP has loaned a substantial amount to Partners HoldCo ("the Holdco Loan"), an amount that far exceeds the amount of Leadenhall's loans to four SPVs that Leadenhall describes in its filings in this case. The Holdco Loan is secured by a first-priority, perfected senior

-3-

lien on the assets of Partners HoldCo, and also through senior, secured corporate guarantees from several subsidiary operating and intermediate holding companies across several of Partners' lines of business ("Partners OpCos").

[redacted]

10. A-CAP does not improperly "control" Partners, and A-CAP is not involved in any illicit conspiracy with Partners. A-CAP does, as a senior creditor to Partners, have several contractual rights with respect to Partners. In my experience, those contractual rights of A-CAP are customary and appropriate given Partners' significant debt to A-CAP. Those rights are necessary and appropriate to protect A-CAP's and its insurance companies' policyholders' rights and interests. A-CAP has invoked those rights in connection with requests made of and proposals made to Partners. Every such request and proposal has been made by A-CAP because A-CAP

.

believed, in its best judgment, that each would protect the rights of and be in the best interests of both A-CAP and its insurance companies' policyholders.

11. I recently reviewed assertions made by Leadenhall in its filings in this litigation. The creditor-debtor relationship between Leadenhall and Partners-related entities, as described by Leadenhall's litigation statements and the excerpted loan documents filed by Leadenhall, is much different than A-CAP's creditor-debtor relationship with Partners (as described above). Based on my reading of Leadenhall's litigation documents, I understand that Leadenhall's only investment in any affiliate of Partners is to four SPV "Borrowers"—SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC—comprising a small subset of Partners' Structured Settlements business line. Based on my recent review of those documents, I do not understand Leadenhall to assert that it has made any loan to any other business line of Partners, to any other Partners OpCo, to Partners Parent, or otherwise directly to Partners as a whole.

## Other Creditors of Partners

12. Leadenhall and A-CAP are two of what I understand to be Partners' dozens of creditors across the several industries in which Partners operates.



-5-

**Alleged "Dissipation" of Assets**

14. I understand Leadenhall to say that by making protective advances to Partners' football club investments, A-CAP, Partners, or both were "dissipating assets they were legally bound to protect for Leadenhall." (ECF 57, p. 21.) As an initial matter, I do not read Leadenhall's litigation documents to suggest that Leadenhall has any security interest of any kind in Partners' sports business, and it is unclear to me why, aside from tactical litigation reasons, Leadenhall would suggest that it could be negatively impacted by protective advances made to football clubs. It seems to me that such protective advances could only benefit Leadenhall or not affect Leadenhall one way or the other.



16. To illustrate how protective advances function and why they are a common practice among lenders, consider a lender who provides a large loan to a company that arranges, markets, and operates a concert set to be held in Yankee Stadium—a concert in connection with which the company has incurred significant expense and hopes to earn even more revenue. Say the lender

learns on the eve of the concert that the company is short on cash and will be unable to make a deposit that is due to be paid to the musician the morning of the concert. Assume that if the payment isn't made, the musician has no obligation to perform. In that scenario, it would be reasonable and prudent for the lender to advance funds to the company so that it can pay the musician and avoid the potentially disastrous consequences of the musician refusing to perform. In that scenario, as with A-CAP's protective advances, the lender seeks to preserve its collateral and increase the borrower's odds of realizing the value of its business (and the odds of success of the lender's debt investment), thus benefitting the recipient of the protective advance, the lender, and all other stakeholders. In return for such protective advances and the concomitant increased risk to the lender, it is usual, customary, and responsible lending practice for lenders to secure from borrowers additional contractual rights, security interests, or both.

17.     In other circumstances, it may be prudent for lenders (including A-CAP) and borrowers (including Partners) to agree to sell borrower assets to the lender at fair value. A sale of that type does reduce the assets of the borrower, but, importantly, it *also reduces the debt* of the borrower in an equal amount. Reducing a borrower's debt (and associated debt-service obligations) can be especially beneficial to a borrower (and thus to a secured lender's collateral) when the borrower is otherwise in financial distress. In my experience, agreed transfers of this sort are a common part of responsible and prudent private-credit lending relationships. I also note that in A-CAP's case, it is critically important to A-CAP that any such transactions are for fair value. In fact, to help ensure as much, when reasonably appropriate, A-CAP and its borrower counterparty enlist the services of banks and independent valuation experts to arrive at reasonable fair value.

## The Chief Restructuring Officer

18. In early April 2024, concerned about the risks to its investments in Partners, A-CAP requested that Joshua Wander and Steve Pasko resign their positions and that Partners appoint an independent and reputable professional in a chief restructuring officer/chief operating officer role to oversee and have complete authority in connection with the operations of and a restructuring of the business (the "CRO").

19. A-CAP hoped for a CRO that satisfied several important criteria, including that the CRO be completely independent; be cost-efficient, so as not to drain limited resources unnecessarily; have a sterling industry reputation; and have experience with large, multi-faceted, and challenging restructuring projects. Because A-CAP was unfamiliar with anyone who met all those criteria, A-CAP hired an outside firm (with which A-CAP had no previous relationship) to assist in identifying potential candidates who satisfied all the criteria.

20. That firm ultimately identified four candidates, and A-CAP proposed those four candidates to Partners for Partners' consideration. I understand, and A-CAP was advised, that all four individuals are independent, highly reputable professionals that are widely recognized as such in the restructuring industry. To my knowledge and understanding, none of them had any prior personal or professional relationship with A-CAP or its leaders.

21. I am informed that Partners interviewed at least some of the candidates, and may have interviewed other individuals as well. I am also informed that A-CAP did not participate in those interviews.

-8-

22. In early May 2024, Partners retained GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services, with Ian Ratner to serve as CRO with ultimate responsibility, and Mark Shapiro to serve as Interim COO. Mr. Ratner and Mr. Shapiro are two of the four candidates recommended to A-CAP, and which A-CAP in turn recommended to Partners.  Ratner and his team were appointed to chart a course for restructuring the business. A-CAP is not supervising or directing the work that Ratner is doing. Ratner and B. Riley are entirely independent of Partners' former leadership and independent of A-CAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 24, 2024.

Michael Saliba