# CADWALADER

Cadwalader, Wickersham & Taft LLP
200 Liberty Street, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

June 3, 2024

**VIA ECF**

The Hon. John G. Koeltl
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *Leadenhall Capital Partners LLP, et al. v. Wander, et al.*, No. 24-cv-3453 (JGK)

Dear Judge Koeltl:

      We write to outline the grounds for Advantage Capital Holdings LLC and Mr. King's (together, "A-CAP") anticipated motion to dismiss and to request a pre-motion conference.

      As to A-CAP, Leadenhall's Complaint is long on rhetoric and implausible conclusions, but short on well-pleaded facts.  Leadenhall spends dozens of paragraphs alleging fraudulently double-pledged collateral, (*see, e.g.*, ECF 1 ¶¶ 2, 7, 93–117, 120–25); never-purchased collateral, (*id.* ¶¶ 93, 126); fraudulent misrepresentations about the 777 SPVs' Borrowing Base, (*id.* ¶¶ 100, 121–38); and forged documents, (*id.* ¶¶ 100, 162–69).  But A-CAP is not alleged to have played a part in any of it.  According to Leadenhall, it was all the handiwork of "Wander," "Wander's entities," or "Wander and Pasko," (*e.g.*, *id.* ¶¶ 100, 105 ("Wander and Pasko had 'double-pledged' Leadenhall's assets."), 130 ("Borrowers, Pasko, and Wander had lied all along . . . .")), and Leadenhall sues only those 777 Defendants for alleged fraud.

      Nor can that alleged misconduct be attributed to A-CAP—Leadenhall fails to adequately plead any conspiracy involving A-CAP.  The most Leadenhall can muster is the accusation that A-CAP's current rights as a senior creditor and involvement in pre-litigation discussions with Leadenhall, (*id.* ¶ 142), must, "upon information and belief," "mean[] that," (*id.* ¶ 16), for "months" before June 2023, (*id.* ¶ 142), and maybe even "before Leadenhall discovered the [alleged] double-pledging," (*id.* ¶ 16), around March 2023, (*id.* ¶ 9), A-CAP was "well aware that Wander's entities had [allegedly] been double-pledging assets as collateral," (*id.* ¶ 16).  That accusation is not only implausible, it fails to allege the "core of a RICO civil conspiracy":  "an agreement" between alleged conspirators "to commit predicate acts."  *R.C.M. Exec. Gallery Corp. v. Rols Cap. Co.*, No. 93-cv-8571, 1997 WL 27059, at *10 (S.D.N.Y. Jan. 23, 1997) (Koeltl, J.).

      When Leadenhall turns to A-CAP, it alleges three main things.  None plausibly supports a racketeering claim; each has an "obvious alternative explanation," *Cenedella v. Metro. Museum*

CADWALADER

Hon. John G. Koeltl
Page 2

*of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (Koeltl, J.).  *See J.T. v. de Blasio*, 500 F. Supp. 3d 137, 169 (S.D.N.Y. 2020), aff'd, No. 20-4128, 2022 WL 4352040 (2d Cir. Aug. 31, 2022).

*First*, Leadenhall says that because A-CAP has had much influence over 777 Partners' decision-making since as early as 2023, (ECF 1 ¶ 161)—through A-CAP's contractual right "to default [the] Holdco loan," (*id.* ¶ 174), an alleged "all asset lien," (*id.* ¶ 12), and the "practical[] . . . power of the purse," (*id.* ¶ 20)—A-CAP must have been "in the know" about the 777 Defendants' alleged fraud, (*id.* ¶ 142).  Rhetoric aside, what Leadenhall describes is no more than the usual influence a senior secured creditor—and supplier of protective advances—has over a distressed borrower.[1]  "Suggestions by a major lender" and the "threat[ened] exercise of its legal rights if the debtor does not comply" are "commonplace and completely proper."  *Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995).  And they "often enable secured creditors to extract concessions from the borrower," including "greater restrictions and controls on [the borrower's] business."  My Chi To, *Second-Lien Financings in Bankruptcy: Expectations v. Reality*, PRACTICAL LAW (2008).  Here, Leadenhall alleges nothing to connect A-CAP's (current) rights and the alleged (years-old) Borrowing Base fraud.  There is thus a single obvious explanation:  A-CAP has used its rights to maximize the value of its collateral, as would any rational senior creditor.

*Second*, Leadenhall says that A-CAP made protective advances "to cover up the [alleged] scheme." (ECF 1 ¶ 181.)  There is again an obvious alternative explanation.  It is both rational and "common" for a lender to make "[p]rotective advances . . . when [its] collateral is in jeopardy."  *Corporative Grupo R SA de C.V. v. Marfield Ltd.*, 606 F. Supp. 3d 502, 512 (S.D. Tex. 2022); *see also, e.g.*, *Wilmington Trust, N.A. v. Winta Asset Mgmt. LLC*, 20-cv-5309, 2024 WL 1700032 (S.D.N.Y. Apr. 18, 2024) (Koeltl, J.).  Doing so "ma[kes] perfect business sense." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 371 (S.D.N.Y. 2022).

*Third*, Leadenhall says that A-CAP's participation in restructuring negotiations, (ECF 1 ¶ 13), shows that A-CAP was trying to conceal alleged fraud, (*id.* ¶ 142).  The involvement of a first-lien lender in restructuring talks cannot plausibly support such a logical leap.[2]  At any rate, Leadenhall also alleges a different reason why A-CAP became involved:  because Wander allegedly proposed to solve his dispute with Leadenhall through A-CAP lending more cash to 777 HoldCo, which in turn could loan that money to Leadenhall's SPV-counterparties. (ECF 1 ¶ 118.)  Moreover, Leadenhall alleges that the restructuring efforts aimed at "stav[ing] off this very litigation" (and the publicity that comes with it) were **nixed by A-CAP**.  (*Id.* ¶¶ 140, 175–79.)  The fiction that A-CAP became involved to cover up alleged fraud is thus "contradicted by the complaint itself," *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011), in at least two ways.

---

[1] What is more, borrowers that are in the "zone of insolvency" owe fiduciary duties to serve the interests of their creditors—and certainly first-lien creditors.

[2] "[I]nherent in any creditor-debtor relationship" is the power to "exert[] the control necessary" for a lender "to attempt a workout" of the debtor.  *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 151 (2d Cir. 2007).

**CADWALADER**

Hon. John G. Koeltl
Page 3

Because any well-pleaded allegation directed at A-CAP has an obvious, lawful, and commercially rational explanation, Leadenhall states no claim against A-CAP. Each of Leadenhall's claims also suffers from other dispositive defects. Some are outlined below.

*Civil RICO, 18 U.S.C. § 1962(c)*. Leadenhall alleges no facts, much less with the particularity Rule 9(b) demands, showing that A-CAP engaged or assisted in any predicate act. *See supra* p. 1. Neither Leadenhall's allegation of isolated Borrowing Base fraud nor anything else in the Complaint describes a distinct RICO enterprise or a pattern of racketeering activity. And Leadenhall has suffered no RICO injury. *See Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 398 (S.D.N.Y. 2000) (holding that "creditor Plaintiffs" must have their state-law claims adjudicated "before they will suffer any RICO injury"); *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, 347 F. App'x 711, 713 (2d Cir. 2009) (even when recovery on those claims is a "forlorn hope"). Leadenhall also pleads no threat of continuing criminal conduct. It alleges no fact to support any "information and belief," (ECF 1 ¶ 269), that 777 Partners' Structured Settlement business continues to originate loans, much less with double-pledged collateral. Moreover, if Leadenhall believed 777's ongoing business to be a criminal enterprise, presumably it would not have worked to "ensure" that the business "may continue to operate." (*Id.* ¶ 171.)

*Civil RICO, 18 U.S.C. § 1962(d)*. Leadenhall's RICO conspiracy claim fails because it does not allege the heart of a RICO conspiracy: an agreement to commit predicate acts. *R.C.M.*, 1997 WL 27059, at *10. Nor does it state the requisite violation of Section 1962(a), (b), or (c).

Because Leadenhall states no RICO claim, if there is no complete diversity as the 777 Defendants assert, (ECF 86, p. 14), there is no jurisdiction over Leadenhall's state-law claims.

*Civil Conspiracy*. There is "no cause of action . . . for civil conspiracy." *Dorce v. City of N.Y.*, 608 F. Supp. 3d 118, 147 (S.D.N.Y. 2022) (Koeltl, J.). At any rate, Leadenhall pleads no conspiratorial agreement.

*Aiding and Abetting Fraud*. Leadenhall pleads no *facts* alleging how A-CAP supposedly "substantially assisted," (ECF 1 ¶ 257), the alleged Borrowing Base fraud allegedly committed by others before A-CAP came into the picture, (*id.* ¶ 161). *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) (explaining that the "critical" issue is "actual knowledge" "at the time" of the alleged conduct). Indeed, it pleads no more than speculation that A-CAP must have become *aware* of the alleged Borrowing Base issues in the "months" before June 2023–when it allegedly became involved in workout talks. (ECF 1 ¶ 142.) Leadenhall thus states no claim for aiding and abetting fraud, much less with the particularity Rule 9(b) requires.

*Unjust Enrichment*. The quasi-contractual unjust enrichment claim is precluded by the contracts on the same subject matter, (*see id.* ¶ 279), which provide an adequate remedy at law. *Prickett v. N.Y. Life Ins.*, 896 F. Supp. 2d 236, 249 (S.D.N.Y. 2012). What is more, the alleged relationship between A-CAP and Leadenhall is "too attenuated" to supply the requisite reliance. *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

CADWALADER

Hon. John G. Koeltl
Page 4

Respectfully submitted,

*[signature: J.W.T.]*

Jonathan M. Watkins

JMW

cc: All Counsel of Record via ECF