**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 |

**A-CAP'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE
59(e) MOTION TO MODIFY THE PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ............................................................................................... 4

    A. Leadenhall Seeks (and Gets) an Injunction to Protect Its Ability to Collect on Its Contract Claims for the Accelerated Amount. ......................................................................................... 4

    B. Leadenhall Has a Lien on Only the Collateral Pledged by Borrowers. ...................................................................................... 5

    C. Leadenhall Seeks to Restrain All Assets of Borrowers, Guarantors, and Their Affiliates. .................................................... 6

    D. Defendants Assert That Any Injunction Must Be Limited to the Collateral. .............................................................................. 6

    E. On Reply, Leadenhall Debuts Three New Arguments With Faulty Foundations. ..................................................................... 7

    F. The Preliminary Injunction Restrains All Assets of Borrowers and Guarantors. .................................................... 10

    G. A-CAP's Interest in Modifying the Preliminary Injunction. ........... 11

ARGUMENT ................................................................................................... 13

    I. THE COURT HAS THE POWER TO RESTRAIN ONLY THOSE ASSETS IN WHICH LEADENHALL HAS A LIEN OR EQUITABLE INTEREST. ................................................................ 13

        A. Leadenhall's Lien Is Limited to the Collateral Pledged by Borrowers. ............................................................................ 14

        B. Leadenhall Has No "Equitable Interest." ...................................... 16

            1. Leadenhall brings no "claim for final equitable relief" over any particular asset. ............................................... 16

            2. The preliminary injunction is ancillary only to Leadenhall's ability to collect money damages, not any final equitable relief. ....................................................... 19

            3. Leadenhall identifies no cognizable "equitable interest." .... 20

    II. MODIFYING THE PRELIMINARY INJUNCTION UNDER RULE 59(e) IS APPROPRIATE. .................................................................. 23

CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AKF, Inc. v. AvantGarde Senior Living,*
No. 21-cv-188, 2021 WL 2662070 (N.D.N.Y. Apr. 29, 2021) ................................. 15

*Bank of Am., N.A. v. Won Sam Yi,*
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ...................................................................... 15

*Brown v. Sandimo Materials,*
250 F.3d 120 (2d Cir. 2001) .................................................................................... 17

*Dong v. Miller,*
No. 16-cv-5836 (NGG), 2018 WL 1445573
(E.D.N.Y. Mar. 23, 2018) ........................................................................................ 20

*Dorce v. City of N.Y.,*
608 F. Supp. 3d 118 (S.D.N.Y. 2022) .................................................................... 17

*Great-W. Life & Annuity Ins. v. Knudson,*
534 U.S. 204 (2002) .......................................................................................... 17, 21

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
527 U.S. 308 (1999) ........................................................................................*passim*

*Gucci Am., Inc. v. Weixing Li,*
768 F.3d 122 (2d Cir. 2014) ........................................................................ 16, 17, 21

*Guggenheim Cap., LLC v. Toumei,*
No. 10-cv-8830 (PGG), 2011 WL 13557028 (S.D.N.Y. Feb. 10, 2011) ................. 23

*III Fin. Ltd. v. Aegis Consumer Funding Grp.,*
No. 99-cv-2579 (DC), 1999 WL 461808 (S.D.N.Y. July 2, 1999) .......................... 15

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. &*
*Trade Servs., Inc.,* 295 F. Supp. 2d 366 (S.D.N.Y. 2003) ..............................*passim*

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*
*Bumi Negara,* 500 F.3d 111 (2d Cir. 2007) ............................................................ 19

*Katzman v. Victoria's Secret Catalogue,*
167 F.R.D. 649 (S.D.N.Y. 1996) ............................................................................. 12

*KCG Holdings, Inc. v. Khandekar*,
  No. 17-cv-3533 (AJN), 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) ................... 11

*Klipsch Grp. v. Big Box Store Ltd.*,
  No. 12-cv-6283 (AJN), 2012 WL 5265727 (S.D.N.Y. Oct. 24, 2012) ... 14–15, 18, 19

*LI Neurosci. Specialists v. Blue Cross Blue Shield of Fla.*,
  361 F. Supp. 3d 348 (E.D.N.Y. 2019) .................................................................... 18

*Maersk, Inc. v. Neewra, Inc.*,
  687 F. Supp. 2d 300 (S.D.N.Y. 2009) .................................................................... 17

*Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*,
  No. 06-cv-52 (JGK), 2006 WL 2337186 (S.D.N.Y. Aug. 11, 2006) ....................... 17

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
  No. 11-cv-3489 (JMF), 2013 WL 1915330 (S.D.N.Y. May 9, 2013) ............... 14, 21

*Prof'l Merch. Advance Cap., LLC v. C Care Servs., LLC*,
  No. 13-cv-6562 (RJS), 2013 WL 12109397 (S.D.N.Y. Oct. 2, 2013) ............... 15, 17

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs.
  of Va., LLC*, 144 F. Supp. 2d 241 (S.D.N.Y. 2001) ............................................... 15

*S'holder Rep. Servs. LLC v. ExlService Holdings, Inc.*,
  No. Civ. 8367–VCG, 2013 WL 4535651 (Del. Ch. Aug. 27, 2013)......................... 18

*Sheet Metal Contractors Ass'n of N. N.J. v. Sheet Metal Workers Int'l*,
  978 F. Supp. 529 (S.D.N.Y. 1997) ......................................................................... 17

**Rules**

Fed. R. Civ. P. 59(e) ............................................................................................... 3, 13, 23

**Other Authorities**

Stephen S. Gensler, 2 *Fed. R. Civ. P., R. & Comment.*, R. 65 (Feb. 2024)................. 13

Philippe Auclair and Paul Brown, *End of season sales*,
  JOSIMAR (Jul. 10, 2024) ........................................................................................ 11

F. Wait, Fraudulent Conveyances and Creditors' Bills (1884) .................................... 2

## PRELIMINARY STATEMENT

The law governing preliminary restraints on assets is both clear and controlling:  district courts have the power to preliminarily restrain only the *particular assets* in which the plaintiff has a lien or equitable interest.  Leadenhall has no lien in any asset of the Guarantors.[1]  It does have a lien on the *Borrowers'* assets, and the Court distinguished *Grupo Mexicano* based on that "secured first-priority interest."  But what matters is not merely *whether* a lender has a security interest, but *which* assets have been pledged as security (and therefore can be restrained) and which have not (and therefore cannot be restrained).  Leadenhall's lien on the *Borrowers'* assets thus cannot support a preliminary restraint on the *Guarantors'* assets.  The Court has the power to restrain only the assets in which Leadenhall claims a security interest:  the Collateral pledged by the Borrowers.

As for an "equitable interest," Leadenhall has none in *any* asset of the Borrowers or Guarantors.  The law is rigid and exacting in what it demands for creditors to have such an interest; the requirements are fixed by history, not abstract equitable ideals.  Creditors must both bring claims for final equitable relief on particular assets *and* show that the requested preliminary relief is ancillary to the requested final equitable relief.

Leadenhall is 0-for-2 on that score. It brings legal claims that seek money— $609 million of Accelerated Debt allegedly owed and past due under the LSA.  And at

---

[1] We refer to "Guarantors" as defined in the preliminary injunction.  Other capitalized terms of art are used as defined in the preliminary injunction or the parties' related submissions.

Leadenhall's request, the preliminary injunction aims to protect Leadenhall's ability to collect that money as damages—to "prevent Wander from rendering Defendants judgment-proof and irreparably harming Leadenhall's ability to ever recover what it is owed," (ECF 57 at 1).  That has nothing to do with any requested final equitable relief.  Instead, the preliminary injunction is precisely the type of relief forbidden by *Grupo Mexicano*.  Courts simply "have no authority to craft [such] a 'nuclear weapon' of the law," 527 U.S. at 332, and for good reason:

> A rule of procedure which allowed any prowling creditor . . . to impeach transfers[] or interfere with the business affairs of the alleged debtor, would manifestly be susceptible of the grossest abuse.  A more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants.

*Id.* at 330 (quoting F. Wait, Fraudulent Conveyances and Creditors' Bills § 73, pp. 110–111 (1884)).

Even so, Leadenhall appeals to abstract principles of equity, arguing that the 777 Defendants fraudulently "unsecured" its loans and thus have "unclean hands."  But that argument produces no "equitable interest."  For starters, Leadenhall did not apply for preliminary relief (or show it is likely to succeed) on its fraud claim—one, at any rate, that is a claim at law for monetary, not equitable, relief.  This alone precludes any "equitable interest" theory hinging on alleged fraud.

What's more, invoking equitable ideals cannot, in any event, satisfy the rigid requirements for an "equitable interest," much less one in particular assets of the Borrowers or Guarantors.  *Grupo Mexicano* itself forbids as much.

Because Leadenhall has no lien or equitable interest in any asset of Guarantors, the Court lacks the authority to interfere with Guarantors' property rights.  The preliminary injunction should therefore be modified to restrain only the Collateral, which comprises Borrowers' receivables, lockboxes, and other assets.

A-CAP is mindful that it moves despite the Court rejecting Leadenhall's efforts to enjoin it and that the preliminary injunction is thus "not about transactions by A-CAP not related to the Borrowers or the Guarantors," (June 7, 2024 Hr'g Tr. at 34:20–24 (Koeltl, J.)).  Yet as a practical matter, the preliminary injunction affects A-CAP all the same.  A-CAP, through its affiliate Haymarket Insurance Company, is the Guarantors' senior secured creditor.  Under the circumstances, the purchase by A-CAP and its affiliates of certain of their collateral from Guarantors—assets that Guarantors can no longer support—will forestall further deterioration and reduce Guarantors' ballooning debt.  Leadenhall, however, has seized on A-CAP's good-faith efforts to "talk" as an opportunity to create practical impediments to A-CAP's lawful, fair-value transactions with Guarantors.

A-CAP moves, under Rule 59(e), to remove those undue impediments.  Because Leadenhall, unlike A-CAP, has no lien or equitable interest in any asset of Guarantors, the law requires no less.

## BACKGROUND

A. <u>Leadenhall Seeks (and Gets) an Injunction to Protect Its Ability to Collect on Its Contract Claims for the Accelerated Amount.</u>

Leadenhall moved for preliminary relief based only on its contract claims.  (*See, e.g.*, ECF 57 at 16 ("The preliminary relief Leadenhall seeks relates specifically to its claims arising from contractual agreements with the Borrowers and Guarantors and the Accelerated Amount undisputedly due thereunder.  Therefore, for purposes of this application, Leadenhall focuses its analysis on the contract claims."); June 7, 2024 Hr'g Tr. at 52:4–5 ("Leadenhall argues that it is likely to succeed on the merits of its contract claim . . . . ).)

Those claims—like all Leadenhall's claims—are claims for money damages. (*See* ECF 1 ¶¶ 218, 229, 236, 246, 254, 260, 270, 277, 281 (seeking only money damages in the final paragraph of each claim).)  According to Leadenhall, Borrowers' "breach gave Leadenhall the right to call immediately due more than $600 million in debt owed by the borrowers under the facility guaranteed by their parent entities, 777 Partners and 600 Partners." (ECF 57 at 1.)  It alleges to have done just that, and to be owed $609 million in Accelerated Debt that is now past due.  (ECF 1 ¶ 172.)

Leadenhall applied for "an emergency remedy"  to aid in its collection of any eventual money judgment against Borrowers and Guarantors—in particular, a judgment for "the Accelerated Amount undisputedly due" under its "contractual agreements with the Borrowers and Guarantors."  (ECF 57 at 16.)  According to Leadenhall, "[d]espite those entities' immediate and undisputed obligation[s] to repay Leadenhall, Wander and his alter-ego companies continue to divert what funds they

have into their other failing businesses." (*Id.* at 1.)  Leadenhall thus sought "the Court's intervention to prevent Wander from rendering Defendants judgment-proof and irreparably harming Leadenhall's ability to ever recover what it is owed." (*Id.*) As Leadenhall concedes, that "relief" is designed to "protect" not just Leadenhall's Collateral, but also the "outstanding debt due to Leadenhall under the LSA." (*Id.* at 14 n.15.)

B. <u>Leadenhall Has a Lien on Only the Collateral Pledged by Borrowers.</u>

Leadenhall alleges a lien, but only on *some* assets—the Collateral pledged by Borrowers, which comprises "all assets of such Borrower," including Borrowers' interests in certain receivables, agreements, accounts, and lock boxes, as well as membership interests in Lottery Holding SPVs.  (ECF 58 at 8 n.1; *see* ECF 58-1 §§ 2.15(c), (f).)

To perfect that lien, "Leadenhall filed financing statements covering the Borrowers' assets," and *only* Borrowers' assets. (ECF 99 at 21 n.22.)  According to those financing statements, Leadenhall's security interests comprise the assets and membership interests of Borrowers SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC.  (*See* Saliba Decl. Exs. C–N.)

Leadenhall does not, however, claim a lien on ***any*** asset of any Guarantor.  (*Cf.* ECF 1 ¶ 51 ("[Leadenhall] obtained first-priority security interests in all of the assets of each Borrower"); *id.* ¶¶ 74–77 (describing the Guaranty Agreement and alleging no security interest in any asset of any Guarantor).)  For good reason:  while Guarantors' contractually (and conditionally) "guaranteed" Borrowers' contractual

commitments, Guarantors pledged no assets. (*See* ECF 58-2.)  With no security interest in the assets of the Guarantors, Leadenhall has filed no financing statement relating to them.[2]  Leadenhall thus has no security interest in Guarantors' assets.

C. <u>Leadenhall Seeks to Restrain All Assets of Borrowers, Guarantors, and Their Affiliates.</u>

Though assertedly "as narrowly tailored as possible," (ECF 57 at 13), the relief sought by Leadenhall would have restrained not just Borrowers' disposition of the Collateral, but Borrowers', Guarantors', and their affiliates' disposition of *all assets of Borrowers, all assets of Guarantors,* and *all assets of all their affiliates*.

As Leadenhall put it, it sought "a preliminary injunction to freeze" not just the "Collateral," but also "*cash or cash equivalents of the . . . Guarantors* [and their affiliates] up to the amount of the Accelerated Debt," and, on top of that, to "prevent the . . . Guarantors [and their affiliates] from dissipating assets"—any asset of any kind, whether Collateral or not.  (ECF 57 at 14.)

D. <u>Defendants Assert That Any Injunction Must Be Limited to the Collateral.</u>

In opposition to Leadenhall's application for preliminary relief, the 777 Entity Defendants pointed out that the Court "cannot enjoin the HoldCos [i.e., the

---

[2] *Nonparty* Leadenhall Life SMA III ICAV has filed a single, narrow financing statement over the assets of the Guarantors—a second lien on 777 Partners' equity interest in Brickell Insurance Holdings LLC.  (ECF 141-4.)  Neither that lien nor any related loan agreement is asserted here.  It is apparent, however, that when a Leadenhall entity *does* have a lien on an asset of Guarantors, it knows how to file a UCC-1 financing statement.

Guarantors] and other non-borrowers from disposing of assets pending adjudication of claims for money damages."  (ECF 86 at 14.)  For its part, A-CAP contended that, under *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), any asset-restraining preliminary relief must be limited to the Collateral. (ECF 89 at 12–13.)

    E. <u>On Reply, Leadenhall Debuts Three New Arguments With Faulty Foundations.</u>

Leadenhall replied with three new arguments.  (*See* ECF 99 at 10, 22–23.) First, it argued that it has "numerous 'equitable interest[s]' in the Guarantors' assets that it seeks to enforce through specific performance of the Guaranty."  (*Id.* at 11.)  It does not, however, seek specific performance of anything. (*See* ECF 1 ¶ 282.)  Second, it asked for "prejudgment attachment," (ECF 99 at 11), an argument that, as the Court noted, could not properly be raised for the first time in a reply brief.[3]

Third, Leadenhall premiered its theory that 777's alleged fraud, its "unclean hands," and "equitabl[e] estoppe[l]" justify extending an asset freeze beyond its Collateral.  (*Id.* at 10.)  Even were this theory able to support a preliminary injunction under *Grupo Mexicano* (as addressed below, it cannot), Leadenhall did not apply for relief based on its claims of fraud.  Defendants thus had no reason to present evidence

---

[3] The Court reminded Leadenhall that a reply brief "is not the appropriate place to make a new request for relief."  (June 7, 2024 Hr'g Tr. at 59:13–17 ("Leadenhall alleges improperly for the first time in its reply brief that . . .[it] is entitled to an attachment.") (Koeltl, J.).)

that rebuts Leadenhall's sweeping, incendiary allegations, leaving the Court with only one side of a multifaceted story.

Take, for example, Leadenhall's insistence that the entire collateral deficiency in its Borrowing Base results from 777's alleged fraud. According to Leadenhall, by pointing out that "Leadenhall's investment [i.e., its loans to Borrowers] was impaired by interest rate increases," A-CAP had made a "*factual error[]*" that "suggests that *A-CAP, or its counsel, either confused the credit facilities at issue here, or purposefully sought to mislead the Court*." (ECF 99 at 21 n.22 (emphasis added).) That accusation is unfortunate. It is also untrue in every respect.

Last October, to understand what portion of Leadenhall's alleged deficiency was caused by rates and what portion might result from something else, Mr. King requested from Leadenhall the "basic formula (e.g. components) for determining the collateral value [and] the sensitivity associated with interest rates." (Saliba Decl. Ex. A.) Unlike what it now asserts in its filings, Leadenhall's response did not inform Mr. King that his request presumed a "factual error." Just the opposite: the next day, Leadenhall Managing Partner Craig Gillespie replied with a spreadsheet meant to quantify *how much* the "collateral value" fluctuated with changes in interest rates. (*Id.* at Exs. A, B.) As Mr. Gillespie put it, he provided a "spreadsheet . . . within which **we include a DV01 measure to show interest rate sensitivity of each pool of collateral**."[4] (*Id.*)

---

[4] DV01, or "Dollar Value of 1 basis point," is a measure of interest rate risk that expresses the change in the price of a portfolio for each 1 bps change in rates.

And what that spreadsheet shows is remarkable: **for each 1 basis point (0.01%)** increase in interest rates, the value of Leadenhall's collateral—the "Borrowing Base"—on those three facilities would **drop by $310,000**. (*See id.* ¶¶ 6–7.)  Given the spike in rates of **550 basis points** between March 2022 and July 2023, (*id.* ¶ 3), there are real questions about just how much of Leadenhall's alleged deficiency is attributable to rates and what might stem from something else.[5]

In the weeks that followed, Leadenhall did identify a discrete portion of its alleged collateral deficit assertedly *not* attributable to increased rates—a deficit of about *$25 million*. (*Id.* ¶ 12.)  A-CAP helped Leadenhall solve that identified deficit. (*Id.* ¶ 13.)

For its part, National Founders asserts that no portion of any alleged deficit was caused by alleged double-pledging. (*Cf.* ECF 81 at 2 n.1.)  It refutes the allegation that its collateral and Leadenhall's were double-pledged and asserts that Leadenhall ignored its request for Leadenhall to support its allegation to the contrary. (*Id.*)

It is thus unclear, at least to A-CAP, whether and how much of any further alleged collateral deficiency remains unremedied.  At this stage, at least, Leadenhall's assertions on the topic are untested.

---

[5] At the time of Mr. Gillespie's email, Leadenhall alleged a "total aggregate" collateral deficit of "*USD 193m.*" (Saliba Decl. Ex. A (emphasis added).)  A-CAP does not know how much of Leadenhall's alleged deficit is attributable to rates.  Nor does it know what (if anything) caused any other portion of the alleged deficit.  As a matter of arithmetic: 550 bps x $310,000 lost collateral value/bps = $170.5 million lost collateral value.

F. <u>The Preliminary Injunction Restrains All Assets of Borrowers and Guarantors.</u>

The Court granted Leadenhall's application for emergency injunctive relief in part, rejecting Leadenhall's efforts to broadly enjoin all affiliates of all Defendants, and limiting the relief to conduct outside the "normal and ordinary course of business." (June 7, 2024 Hr'g Tr. at 27:19–21.)

Still, the Court determined that "Leadenhall has demonstrated the likelihood of success on the merits of its contract claims sufficient for purposes of a temporary restraining order," (*id.* at 55:20–22), and issued a TRO that restrained (outside the normal and ordinary course of business) not just the Collateral, (*see* ECF 114 (paragraph (A))), but also "cash and cash equivalents owned by the Borrowers and Guarantors sufficient to cover the full amount of the Accelerated Debt," (*id.* (paragraph (B))), and *all* "assets" of both "the Borrowers and Guarantors," (*id.* (paragraph (D) (enjoining "any action to dissipate the value of their assets")).

In so ruling, the Court distinguished *Grupo Mexicano* on the ground that, unlike the "explicitly unsecured" borrowers there, (June 7, 2024 Hr'g Tr. at 55:18–19), "Leadenhall has a secured first-priority interest in the collateral the borrowers pledged," (*id.* at 55:7–9), and "the guarantors guaranteed performance of all the

borrowers' obligations to Leadenhall," (*id.* at 55:13–15).[6]  The Court did not, however, conclude that Leadenhall has any "equitable interest" in any asset of Guarantors.

On July 8, the Court entered a preliminary injunction that is much like the TRO.  (ECF 146.)

G.  <u>A-CAP's Interest in Modifying the Preliminary Injunction.</u>

Unlike Leadenhall, A-CAP's affiliates have a perfected senior lien on substantially all of Guarantors' assets.  (*See* ECF 141 at 1–2 (citing ECF 141-1, 141-2, 141-3).)  Under the circumstances, A-CAP and its affiliates taking or purchasing certain of its collateral—always at fair value or more—*avoids* the value destruction, ballooning debt, and potential need for protective advances that would come with Guarantors' continued ownership.

Even so, the preliminary injunction has, as a practical matter, been used as a tool to impede this "lawful commercial activity," *KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at *17 (S.D.N.Y. Mar. 12, 2020).  As one recent report put it—based on unnamed "separate sources"—*it is "difficult to . . . sell any of 777's . . . assets[] without Leadenhall's approval,"* even those well beyond the outer reaches of the preliminary injunction.[7]

---

[6] The 777 Entity Defendants underscored their position at the top of their presentation at the June 7, 2024 TRO hearing.  (June 7, 2024 Hr'g Tr. at 18:21–19:9.)  Leadenhall declined to address the 777 Entity Defendants' and A-CAP's arguments on the topic.  (*See generally id.*)

[7] Philippe Auclair and Paul Brown, *End of season sales*, JOSIMAR (Jul. 10, 2024), https://josimarfootball.com/2024/07/10/end-of-season-sales/.

Regrettably, it has become apparent that Leadenhall has used Guarantors' and A-CAP's good-faith efforts to liberally "talk to" Leadenhall as an opening to impede lawful commercial activity; sow fear, uncertainty, and doubt; and aim to inflict perceived *in terrorem* pressure.

Indeed, Leadenhall's tactics fit with a strategy of coercing a bailout from those with deeper pockets and superior rights. Those tactics began with threats of sensational litigation if A-CAP did not accede to Leadenhall's demands.[8] It followed with RICO claims against A-CAP and Mr. King—despite no allegation that either had anything to do with any alleged predicate act, (*see* ECF 105 at 1)—fully aware that even "frivolous RICO allegations" come with an "almost inevitable stigmatizing effect on those named as defendants," *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996). In fact, Leadenhall asserts that it believed merely filing the complaint "might bring 777 Partners—and therefore A-CAP—all the way down." (ECF 1 ¶ 142.) Next came efforts—and repeated threats—to broadly enjoin *A-CAP*, (*see, e.g.*, ECF 89, ECF 73),[9] accusations (but not evidence) of asset

---

[8] (*See* ECF 1 ¶¶ 140 (recounting demands to "repay uncontested debt" of $350 million to "stave off this very litigation"), 141 (Leadenhall demanding more than "a fourth-priority position on the assets of 777 Partners"), 178–79 & n.15 ("A-CAP . . . 'need[s] to get fucking realistic [about] a Forbearance Agreement [on Leadenhall's terms].").)

[9] The Court denied those efforts, remarking that "it's not at all clear to me why the plaintiff would be entitled to a TRO against A-CAP," (June 7, 2024 Hr'g Tr. at 5:17–19). Yet Leadenhall's threats about "an injunction against A-CAP" continued. (*See* ECF 116 at 5.)

"stripping," (ECF 99 at 16), and threats of (irrelevant) expedited testimony from several A-CAP executives—even its Chief Legal Officer, (ECF 117 at 1).

A-CAP has little hope that Leadenhall will deviate from its course.  So that Guarantors may confidently exercise their property rights free from undue practical impediments, A-CAP moves under Rule 59(e) to modify the preliminary injunction in a way the law requires.

## ARGUMENT

## I.  THE COURT HAS THE POWER TO RESTRAIN ONLY THOSE ASSETS IN WHICH LEADENHALL HAS A LIEN OR EQUITABLE INTEREST.

As courts in this Circuit universally hold, the "Court's equitable power to issue a preliminary injunction to prevent a defendant from transferring assets does not extend to an action for money damages when plaintiff claims no lien or equitable interest in *the assets sought to be enjoined*."  *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 388 (S.D.N.Y. 2003) (Koeltl, J.) (citing *Grupo Mexicano*, 527 U.S. at 333).[10]

Leadenhall does have a lien in certain assets, and the Court has distinguished *Grupo Mexicano* on that basis.  (*See* June 7, 2024 Hr'g Tr. at 55:7–9.)  But that lien covers only *some* assets restrained by the preliminary injunction—Leadenhall's

---

[10] *Accord* Stephen S. Gensler, 2 *Fed. R. Civ. P., R. & Comment., R. 65* (Feb. 2024) (explaining that, absent an equitable interest or security interest in the particular assets, "federal courts lack power . . . to issue a preliminary injunction ordering a defendant not to dissipate assets for the purpose of preserving those assets to satisfy a future money judgment").

Collateral. And when a lien is limited to particular assets, *only those assets* can be restrained. *See infra* Part I.A.

Nor does any "equitable interest" support extending the preliminary injunction beyond the Collateral: Leadenhall has no such interest in any asset of Borrowers or Guarantors, much less all assets of both. *See infra* Part I.B.

The preliminary injunction should thus be modified to restrain only the assets in which Leadenhall has a lien or equitable interest: its Collateral.[11]

A. Leadenhall's Lien Is Limited to the Collateral Pledged by Borrowers.

When, as here, a lien or "equitable interest is limited to [particular] assets, *only those assets* may be enjoined." *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11-cv-3489 (JMF), 2013 WL 1915330, at *5 (S.D.N.Y. May 9, 2013) (emphasis added). Indeed, the Court's "*authority* to enter a preliminary injunction" extends only as far as plaintiff has a "lien or equitable interest in *the assets it seeks to restrain*." *Id.* at *4 (emphasis added) (quoting *JSC*, 295 F. Supp. 2d at 389). Thus, when "plaintiff asserts no lien or equitable interest in *the assets it seeks to restrain*, this Court lacks the power to grant the preliminary injunction it seeks." *JSC*, 295 F. Supp. 2d at 389 (emphasis added).

What matters is thus not *whether* a lender has a security interest, but *which* assets are collateral and which are not. Courts must—and routinely do—limit asset freezes to those that are. *See, e.g.*, *Klipsch Grp. v. Big Box Store Ltd.*, No. 12-cv-6283

---

[11] A-CAP does not seek to modify the relief granted in Paragraph (A) of the preliminary injunction, which restrains only the Collateral, (*see* ECF 146 at 2).

(AJN), 2012 WL 5265727, at *7 n.8 (S.D.N.Y. Oct. 24, 2012) (refusing, in a case over "the proper scope of an injunction, . . . to freeze assets beyond those in which Plaintiff claims an equitable interest" or lien); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., LLC*, 144 F. Supp. 2d 241, 242, 249–50 (S.D.N.Y. 2001) (requiring "a lien or equitable interest *in the property at issue*" and enjoining "only a portion of" "the receivables" at issue—those in which "plaintiff indeed possesses a security interest"); *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, No. 99-cv-2579 (DC), 1999 WL 461808, at *4 n.1, *8 (S.D.N.Y. July 2, 1999) (restraining only the "collateral" where plaintiffs claimed "a security interest in *the assets subject to the preliminary injunction*" (emphasis added)); *see also Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62 (W.D.N.Y. 2018) (limiting relief to "the Collateral").[12]

Here, however, the preliminary injunction does not distinguish between assets pledged as Collateral and those in which Leadenhall has no "lien or equitable interest," *e.g.*, *JSC*, 295 F. Supp. 2d at 388. By instead extending to the assets of the Guarantors, the breadth of the preliminary injunction exceeds the Court's power.

---

[12] Some rulings go further still, holding that even "[p]laintiff's security interest" in the restrained assets is not enough. *See Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*, No. 13-cv-6562 (RJS), 2013 WL 12109397, at *2 (S.D.N.Y. Oct. 2, 2013). Under those cases, only an equitable interest, "involving [the] *specific asset*" to be restrained will suffice. *Id.* (emphasis added); *see also AKF, Inc. v. AvantGarde Senior Living*, No. 1:21-cv-188, 2021 WL 2662070, at *5 (N.D.N.Y. Apr. 29, 2021).

B. <u>Leadenhall Has No "Equitable Interest."</u>

An "equitable interest" of the sort demanded here is not a malleable concept that bends to district courts' impressions of what might be fair under the circumstances. Instead, as the Supreme Court and the Second Circuit have made clear, an "equitable interest" can stem only from a claim for final "relief [that] was traditionally available" from and "accorded by courts of equity." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (citing *Grupo Mexicano*, 527 U.S. at 319).

In this context, for a creditor like Leadenhall to have an equitable interest that might give it the right to "interfere with the debtor's use of its property," *Grupo Mexicano*, 527 U.S. at 320, the creditor must "pursu[e] a claim for final equitable relief" with respect to the particular assets on which a restraint is sought ***and*** "the preliminary injunction [must be] ancillary to the final relief," *Gucci Am., Inc.*, 768 F.3d at 131 (explaining that, prejudgment, courts are powerless to restrain assets absent these conditions). Leadenhall satisfies neither requirement.

> 1. *Leadenhall brings no "claim for final equitable relief" over any particular asset.*

"[T]his is a case about" the alleged breaches of the loan agreements governing "the debts from the Borrowers and the Guarantors," (June 7, 2024 Hr'g Tr. at 34:20–21 (Koeltl, J.)), and the $609 million of Accelerated Debt allegedly due and owing as a result. The Complaint could hardly be clearer: the final paragraph of every claim for relief demands money and nothing else. (*See* ECF 1 ¶¶ 218, 229, 236, 246, 254, 260, 270, 277, 281.)

Leadenhall's lawsuit is thus "at base a classic legal action for breach of contract for which it is primarily seeking monetary relief." *Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, No. 06-cv-52 (JGK), 2006 WL 2337186, at *7 (S.D.N.Y. Aug. 11, 2006) (Koeltl, J.).[13]  And "a claim for money due and owing under a contract is 'quintessentially an action at law.'" *Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 213–14 (2002); *accord Brown v. Sandimo Materials*, 250 F.3d 120, 126 (2d Cir. 2001).

Because Leadenhall brings no equitable "claim reaching [any] particular asset of Defendants," *Prof'l Merch. Advance Capital*, 2013 WL 12109397, at *2, it has no equitable interest in *any* asset, much less all of Borrowers' and Guarantors' assets. *See, e.g.*, *Gucci Am., Inc.*, 768 F.3d at 130 (explaining that "contract claim[s]" and

---

[13] Leadenhall also brings—but has sought no preliminary relief based on—several other legal claims for which it seeks monetary relief.  *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 346–47 (S.D.N.Y. 2009) (civil RICO and fraud claims are legal claims); *Sheet Metal Contractors Ass'n of N. N.J. v. Sheet Metal Workers Int'l*, 978 F. Supp. 529, 533 (S.D.N.Y. 1997) (claims for conspiracy and fraud are legal claims); *see also Dorce v. City of N.Y.*, 608 F. Supp. 3d 118, 147 (S.D.N.Y. 2022) (in New York, "no cause of action lies for civil conspiracy"). Its claim for unjust enrichment, on which it neither moves nor seeks equitable relief, does not change what Leadenhall's case is about.  *See Nanjing Textiles*, 2006 WL 2337186, at *7 (rejecting preliminary relief despite plaintiff's "theory of unjust enrichment" and "interspersed equitable claims" because, as here, the suit was "at base a classic legal action for breach of contract").

other "legal claims for money damages" supply no equitable interest); *cf. Klipsch Grp., Inc.*, 2012 WL 5265727, at *7 ("Plaintiff has not presented any authority to persuade the Court to freeze assets in which Plaintiff claims no equitable interest simply because Plaintiff has included equitable claims in its complaint.").

Nor can Leadenhall's prayer to "enjoin[] Defendants [from] violating their obligations under the Agreements," (ECF 1 ¶ 262(b)), transform Leadenhall's contract claims into those brought in equity. *Cf. Klipsch*, 2012 WL 5265727, at *7 (holding that the mere "inclusion of [a] prayer for equitable relief does not permit the Court to freeze assets to preserve possible legal damages"). In fact, courts are particularly hostile to such a "facile trick":

> [Plaintiffs] cannot convert a claim of damages for breach of contract into an equitable claim by the facile trick of asking that the defendant be enjoined from refusing to honor its obligation to pay the plaintiff what the plaintiff is owed under the contract and appending to that request a request for payment of the amount owed.

*LI Neurosci. Specialists v. Blue Cross Blue Shield of Fla.*, 361 F. Supp. 3d 348, 356 (E.D.N.Y. 2019) ("A claim for money due and owing under a contract is quintessentially an action at law."); *accord, e.g.*, *S'holder Rep. Servs. LLC v. ExlService Holdings, Inc.*, No. Civ. 8367–VCG, 2013 WL 4535651, at *4 (Del. Ch. Aug. 27, 2013) ("Semantic *legerdemain* does not transform a legal claim into an equitable claim. . . . A plaintiff cannot convert a claim for money damages arising from a breach of commercial contract into a claim maintainable in equity by the expedient of asking that the defendant be enjoined from breaching such duty again.").

    2.   *The preliminary injunction is ancillary only to Leadenhall's ability to collect money damages, not any final equitable relief.*

At Leadenhall's request, the preliminary injunction aims to "protect" Leadenhall's ability to collect on its claims for the accelerated and "outstanding debt due to Leadenhall under the LSA." (ECF 57 at 14 n.15.; *see, e.g.*, ECF 99 at 20 (asking to enjoin transactions that might impede Borrowers' ability to "repay [the] $609 million" Accelerated Amount allegedly owed under the LSA).) *See supra* Background, Part A.[14]

But there is no equitable interest in preliminary relief "issued in aid of the collection of a money judgment," and when plaintiffs have no lien on the particular assets enjoined, that sort of injunction is "an outcome barred by *Grupo Mexicano*." *JSC,* 295 F. Supp. 2d at 389; *see Klipsch Grp., Inc.*, 2012 WL 5265727, at *8 ("[D]amages do not constitute a form of final relief for which an asset freeze is an appropriate provisional remedy."). Courts simply "have no authority to craft [such] a 'nuclear weapon' of the law . . . ." *Grupo Mexicano*, 527 U.S. at 332; *see generally id.* at 327–31; *accord Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 117 n.8 (2d Cir. 2007).

---

[14] The preliminary injunction has nothing at all to do with Leadenhall's prayer to enjoin further alleged breaches. That relief could instead only be "incidental to, and indeed contingent upon the success of" its claims for breach of contract. *JSC*, 295 F. Supp. 2d at 389 (denying requested injunctive relief despite plaintiff seeking "equitable relief . . . including," unlike here, "the setting aside of fraudulent conveyances").

### 3.  *Leadenhall identifies no cognizable "equitable interest."*

Despite not moving for injunctive relief based on its fraud claims—legal claims for money damages[15] on which it has shown no likelihood of success—Leadenhall has argued that the "preliminary injunction" should restrain assets that it alleges 777 "fraudulently rendered 'unsecured.'"  (ECF 99 at 10.)  "Equity does not permit such an absurd result," Leadenhall asserts, invoking the equitable *defenses* of "unclean hands" and "equitabl[e] estoppel."  (*Id.*)

But abstract invocations of "equity" cannot supply Leadenhall with the sort of "equitable interest" it needs.  Indeed, *Grupo Mexicano* itself forcefully rejected the dissent's appeal to "the grand aims of equity" despite allegations involving "debtors' trying to avoid paying their debts[,] . . . seeking to favor some creditors over others[,] [and] even . . . seeking to achieve these ends through "sophisticated . . . strategies." 527 U.S. at 321–22 ("This expansive view of equity must be rejected.").  As the Court explained, "[t]he law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not."  *Id.* at 322.

_____

[15] Fraud claims for money damages do not give courts the power to enjoin assets.  *See, e.g.*, *Dong v. Miller*, No. 16-cv-5836 (NGG), 2018 WL 1445573, at *1 (E.D.N.Y. Mar. 23, 2018) ("[B]ecause Plaintiff only seeks money damages in connection with his fraudulent-conveyance claims . . . those claims are properly classed as legal, not equitable, and the court may not issue a preliminary injunction to preserve assets to satisfy a judgment in Plaintiff's favor on those claims.").

Despite Leadenhall's appeal to equitable ideals, "district courts have no authority to issue a prejudgment asset freeze," *Gucci Am., Inc.*, 768 F.3d at 131, unless plaintiff has a "lien or equitable interest in *the assets it seeks to restrain*." *Paradigm BioDevices,* 2013 WL 1915330, at *4 (quoting *JSC*, 295 F. Supp. 2d at 389) (emphasis added).  There are no exceptions to that rule, and Leadenhall cites none.

Leadenhall also points to four provisions in the LSA and asserts that it has "'equitable interest[s]' in the Guarantors' assets that it seeks to enforce through specific performance of the Guaranty."  (ECF 99 at 11.)  Leadenhall is wrong.

*First*, the complaint does not seek specific performance of anything, much less "performance of the Guaranty."  (*See generally* ECF 1.)  In fact, the phrase "specific performance" appears nowhere in the complaint.[16]

*Second*, Leadenhall brings *no* claim under the four provisions of the LSA that it suggests are the source of its equitable interest, (ECF 99 at 11), much less a claim

---

[16] A prayer for specific performance would make no difference.  Leadenhall seeks not "to restore to the plaintiff *particular* funds or property in the defendant's possession."  *Great-W. Life & Annuity Ins.*, 534 U.S. at 213–14 (emphasis added), but asserts that it is "contractually entitled to *some* funds for benefits that [it] conferred," *id.* at 214, under the LSA—$609 million to satisfy the allegedly past due Accelerated Debt.  Yet "injunction[s]" are "unavailab[le] . . . to enforce a contractual obligation to pay money past due," even when a plaintiff seeks "specific performance of a past due monetary obligation."  *Id.* at 210–12.

for final equitable relief over particular assets to which the preliminary injunction is ancillary.

Nor *could* those provisions of the LSA support any claim for final equitable relief over any asset of the Guarantors.  Sections 7.01(c) and 7.02(g) impose no obligations on Borrowers; they merely describe what a "Borrowing Base Deficiency" is.  (*See* ECF 58-1.)  Section 2.07 is neither cited in the Complaint nor included in the limited excerpts from the LSA that Leadenhall chose to file, (*see* ECF 58-1), and it brings no claim based on that section.[17]    And Section 5.01(i), called "Further Assurances," is merely the provision by which "Borrower authorizes Collateral Agent to file financing and continuation statements" and agrees to "execute and deliver . . . instruments and documents" and otherwise comply with similar "reasonabl[e] request[s]."  (*Id.*)  Leadenhall does not allege that Borrowers or Guarantors have ever failed to take those promised actions, much less seek specific performance of them.  And the preliminary injunction would, in any event, have no relation to a (nonexistent) claim of the sort.

---

[17] At any rate, the provision concerns loan prepayments and supports no claim that could supply an equitable interest in Guarantors' assets. It does not, as Leadenhall asserts, require the Borrowers to "purchase substitute Collateral worth more than any Collateral they sell or repledge," (ECF 99 at 11).

## II. MODIFYING THE PRELIMINARY INJUNCTION UNDER RULE 59(e) IS APPROPRIATE.

Motions to amend preliminary injunctions are properly brought under Rule 59(e) within 28 days of entry of an interlocutory preliminary injunction. *See, e.g.*, *Guggenheim Cap., LLC v. Toumei*, No. 10-cv-8830 (PGG), 2011 WL 13557028, at *1 (S.D.N.Y. Feb. 10, 2011). Here, the preliminary injunction was entered on July 8. (ECF 146.) A-CAP's motion is thus timely and appropriate. And because the preliminary injunction goes beyond the Court's authority to restrain assets, it should be modified in the manner requested.

### CONCLUSION

Because Leadenhall has no lien or equitable interest in any asset beyond the Collateral pledged by Borrowers, the Court lacks the power to restrain Guarantors' disposition of their assets. A-CAP thus requests that the Court strike from the preliminary injunction any restraint on Guarantors' disposition of their assets, including Paragraphs (B), (C), and (D).

Dated: New York, New York
July 31, 2024

Cadwalader, Wickersham & Taft LLP

By: /s/ *Jonathan M. Watkins*
Jonathan M. Watkins
Michael E. Petrella
Matthew M. Karlan
Mark A. Singer
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Fax: (212) 504-6666
jonathan.watkins@cwt.com
michael.petrella@cwt.com
matthew.karlan@cwt.com
mark.singer@cwt.com

*Counsel for Advantage Capital Holdings LLC and Kenneth King*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, under Section II.D of Judge Koeltl's individual practices, that this memorandum contains 5,922 words, exclusive of the caption, table of contents, table of authorities, and this certification.

By: _/s/ *Jonathan M. Watkins*_
Jonathan M. Watkins