UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>            Plaintiffs,<br><br>  vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>            Defendants. | Civil Action No. 1:24-cv-03453 (JGK) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
JOSH WANDER'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. ii

Preliminary Statement ............................................................................................. 1

Statement of Relevant Facts ................................................................................... 3

Argument ................................................................................................................ 7

    I.    MR. WANDER'S ALLEGED NEW YORK CONTACTS IN MARCH AND APRIL 2024 DO NOT SUPPORT THE EXERCISE OF LONG-ARM JURISDICTION ..................................................... 7

    II.    THE COMPLAINT DOES NOT SUPPORT, AND IN FACT REFUTES, PLAINTIFFS' ALTER EGO THEORY OF PERSONAL JURISDICTION ........................................................... 11

    III.    THE COMPLAINT DOES NOT STATE ANY CLAIMS FOR RELIEF AGAINST MR. WANDER ................................................. 14

CONCLUSION ..................................................................................................... 15

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007)......................................................................................................8

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)................................................................................................................11

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)..................................................................................................................7

*Gmurzynska v. Hutton*,
   257 F. Supp. 2d 621 (S.D.N.Y. 2003)......................................................................................13

*Gordian Group, LLC v. Syringa Exploration, Inc.*,
   168 F. Supp. 3d 575 (S.D.N.Y. 2016)........................................................................................8

*Gordon v. Dino De Laurentiis Corp.*,
   141 A.D.2d 435 (1st Dep't 1988) ............................................................................................14

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*,
   No. 20-cv-00967 (LJL), 2021 WL 918556 (S.D.N.Y. Mar. 10, 2021)....................................13

*Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*,
   632 F. Supp. 3d 562 (S.D.N.Y. 2022)......................................................................................12

*Megna v. Biocomp Lab'ys, Inc.*,
   166 F. Supp. 3d 493 (S.D.N.Y. 2016)......................................................................................13

*Paterno v. Laser Spine Inst.*,
   998 N.Y.S.2d 720 (2014)...........................................................................................................8

*Shaffer v. Heitner*,
   433 U.S. 186 (1977)................................................................................................................11

*William Wrigley Jr. Co. v. Waters*,
   890 F.2d 594 (2d Cir. 1989)....................................................................................................12

**Rules**

CPLR § 302(a)(1) .........................................................................................................................2, 8

Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6) ................................................................................1

Defendant Josh Wander respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6), to dismiss the complaint of Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life") (collectively, "Leadenhall") for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim.

### Preliminary Statement

This action arises out of a secured credit facility that Leadenhall and certain company defendants entered into in May 2021. Leadenhall was the lender. The borrower defendants are a group of entities allegedly controlled by defendants 777 Partners and 600 Partners, both of which are based in Miami. Josh Wander is a Florida resident and the co-founder and co-Managing Partner of 777 Partners. Leadenhall alleges that from the inception of the facility through the end of 2023, the defendants falsely represented that the assets pledged as collateral to Leadenhall were "free and clear" of any "adverse claims" when in fact they were not because the borrowers had double-pledged those assets to other lenders and/or never owned them in the first place. As against Mr. Wander, Plaintiffs assert five claims: Fraudulent Misrepresentation and Civil Conspiracy to Commit Fraud (Counts Four and Five); Civil RICO and Civil RICO Conspiracy (Counts Seven and Eight); and Unjust Enrichment (Count Ten). Because this Court lacks personal jurisdiction over Mr. Wander, all of the claims against him should be dismissed.

There is no basis for the exercise of personal jurisdiction over Mr. Wander. Although the parties to the loan and guaranty agreements consented to jurisdiction in New York, Mr. Wander is neither a party nor a signatory to either agreement. And Plaintiffs' own allegations confirm that neither of their two purported bases for personal jurisdiction over Mr. Wander are viable.

First, Plaintiffs attempt to establish long-arm jurisdiction based on a handful of New York contacts in March and April 2024, *after* Leadenhall had declared the borrowers in default, when

the parties were trying to negotiate a forbearance agreement "in a last-ditch attempt to stave off this lawsuit." Compl. ¶ 173. To establish jurisdiction over a non-domiciliary defendant under the relevant long-arm provision, CPLR § 302(a)(1), however, a plaintiff's causes of action must arise from the defendant's New York contacts, and here they plainly do not. Indeed, Leadenhall's claims do not arise out of anything that occurred in 2024. And Mr. Wander is not alleged to have had any contact with New York prior to 2024. Accordingly, the alleged 2024 contacts cannot give rise to long-arm jurisdiction over Mr. Wander.

Presumably aware of this impediment, Plaintiffs offer an alternative theory: they claim Mr. Wander was an alter ego of the defendant entities who contractually consented to jurisdiction in New York. But beyond reciting the words "domination" and "control," Plaintiffs do not allege any facts demonstrating that Mr. Wander "dominated" or "controlled" any of those entities. In fact, they allege that he did not. According to the Complaint, defendants King and A-CAP – whom Leadenhall calls the "Wizard of Oz behind the 777 Partners' curtain" – have "control over 777 Partners' operations," and "nothing happens at 777 Partners . . . without A-CAP's approval." Compl. ¶¶ 12, 140, 192. Because courts are generally reluctant to pierce the corporate veil, Leadenhall's alter ego theory would be an uphill battle in the best circumstances. But it is a non-starter here, at least as to Mr. Wander, given Leadenhall's theory that someone other than Mr. Wander was calling the shots.

In addition, for the reasons set forth in the moving brief of the 777 Entity Defendants, the fraud, RICO and unjust enrichment claims are not adequately pled. Under New York law, breach of a contract – which at bottom is what Leadenhall alleges – does not constitute fraud, racketeering, or unjust enrichment. In any event, Leadenhall has not alleged the required elements of any of these claims. And in the absence of complete diversity, in the event the RICO claims are dismissed,

2

the Court should decline to exercise supplemental jurisdiction over the state law claims asserted against Mr. Wander.

Because Leadenhall has failed to allege a basis for the exercise of personal jurisdiction over Mr. Wander in this case and because the Complaint does not state any claims for relief against Mr. Wander, the claims asserted against him should be dismissed.

### Statement of Relevant Facts

Plaintiff Leadenhall Capital is a London-based asset management company. Plaintiff Leadenhall Life is an investment company based in Dublin, Ireland. Here, as in the Complaint, both Plaintiffs are referred to collectively as Leadenhall. Compl. ¶¶ 22-23 and p. 1.

Defendant 777 Partners is an investment firm organized as a limited liability company under Delaware law with its principal place of business in Miami. Compl. ¶ 24. Mr. Wander and defendant Steven Pasko are co-founders and Managing Partners of 777 Partners and both reside in Miami. Compl. ¶¶ 27-28. Defendant 600 Partners is a private equity firm, also organized as a limited liability company under Delaware law with its principal place of business in Miami. Compl. ¶ 25. Mr. Pasko is the co-founder and sole Managing Partner of 600 Partners. Compl. ¶ 27. All of the entity defendants that are allegedly owned (directly or indirectly) and controlled by 777 Partners and 600 Partners, except for SuttonPark Servicing, have their principal place of business in Miami. Compl. ¶¶ 29-32. Defendant SuttonPark Servicing has its principal place of business in New York. Defendant A-CAP is based in New York and defendant King, who allegedly controls A-CAP, resides in New York. Compl. ¶¶ 33-34.[1]

In 2021, Leadenhall entered into a credit facility with 777 Partners, 600 Partners, and other

---

[1] In two places, Plaintiffs mistakenly state that Mr. Wander was also a co-founder and Managing Partner of 600 Partners. Compl. ¶¶ 4, 27. He was not. As the Complaint accurately alleges in other paragraphs, 600 Partners was ultimately owned by two members: MTCP LLC, whose sole member is Mr. Pasko, and Mr. Pasko himself. Compl. ¶¶ 24, 25.

entities they allegedly control.  The terms of the credit facility are "embodied in a suite of contracts" centered around the Loan and Security Agreement (the "LSA"), which was executed in May 2021.  Compl. ¶ 45.  Mr. Wander is neither a party nor a signatory to the LSA.  None of the contracts are alleged to have been negotiated or executed in New York.

The Borrowers are defendants SPLCSS III LLC (defined as the "SuttonPark Borrower"), Dorchester Receivables II LLC (defined as the "Dorchester Borrower"), Signal SML 4 LLC (defined as the "Signal Borrower"), and Insurety Agency Services LLC (defined as the "Insurety Borrower") (collectively, the "Borrowers").  Other defendant entities served as Sellers and Servicers under the facility.  The borrower-side entities were organized into four Borrower Groups, each consisting of a Borrower, Seller and Servicer:  (i) the SPLCSS Borrower Group (consisting of the SuttonPark Borrower, SuttonPark Capital as Seller, and SuttonPark Servicing as Servicer); (ii) the Dorchester Borrower Group (consisting of the Dorchester Borrower, SuttonPark Capital as Seller, and SuttonPark Servicing as Servicer); (iii) the Insurety Borrower Group (consisting of the Insurety Borrower, Insurety Capital as Seller, and Insurety Servicing as Servicer); and (iv) the Signal Borrower Group (consisting of the Signal Borrower, Signal Medical as Seller, and Signal Servicing as Servicer).  Compl. ¶ 46.

The LSA was "structured as a secured credit facility" and Leadenhall "obtained [a] first-priority security interest in all of the assets of each Borrower."  Compl. ¶¶ 49, 51.  The contracts governing the facility required that "the Collateral securing the debt was free and clear of any Adverse Claims," and "if at any time there was insufficient Collateral available free and clear to secure all outstanding obligations, the Borrowers would be in default."  Compl. ¶ 88.  The Borrowers had to submit a Compliance Report with each funding request, as well as a Monthly Report, affirming that the representations and warranties in the LSA – including with respect to

the pledged collateral – remained true and correct as of the date of the report.  Compl. ¶¶ 56-57.

In September 2022, Leadenhall "received an anonymous tip" alleging that the "Collateral pledged for the benefit of the Lenders either did not exist or was pledged to another third-party lender."  Compl. ¶ 93.  In the wake of the anonymous tip, Leadenhall "conducted a series of calls" with Mr. Wander and others seeking "additional detail on assets pledged as Collateral to Leadenhall," and met with Mr. Wander and others at 777 Partners' offices "on-site in Miami."  Following the on-site visit, Leadenhall and the Borrowers "continued to correspond over email and telephone" concerning the pledged assets.  Compl. ¶¶ 95-102.  The Complaint does not allege that the parties met in New York, or that Mr. Wander was ever in New York, during this time period.

In March 2023, Leadenhall learned that some of the assets that were pledged to Leadenhall had also been pledged to Credigy, another third-party creditor.  Compl. ¶¶ 104-05.  In the months following that discovery, Leadenhall corresponded with Mr. Wander by letter and email, had phone calls with Mr. Wander and others, and "continued to visit 777 Partners' offices" to meet with Mr. Wander and others.  Compl. ¶¶ 107-108, 115-116, 120, 124.  The Complaint does not allege that the parties met in New York, or that Mr. Wander was ever in New York, during this time period.

In April 2023, Leadenhall learned that A-CAP "had an all asset lien" on the assets of 777 Partners."  Compl. ¶ 139.  According to the Complaint, "A-CAP is the puppeteer" of 777 Partners, and "nothing happens at 777 Partners . . . without A-CAP's approval."  Compl. ¶ 140.  Plaintiffs allege that "A-CAP had an express agreement with 777 Partners whereby A-CAP had the right to control 777 Partners' operations," and that A-CAP was "controlling Wander's every move."  Compl. ¶¶ 161, 176.  In the Summer of 2023, A-CAP "agreed to step directly into the fray and offered Leadenhall" a fourth-priority lien on the 777 Partners' assets, which Leadenhall rejected.  Compl. ¶ 141.

In October and November 2023, Leadenhall learned that the problem went beyond "the double-pledge of Collateral" and that "the SuttonPark and Dorchester Borrowers had borrowed against and pledged assets as Collateral to Leadenhall that they never purchased in the first place" and "did not own." Compl. ¶ 126. On November 29, 2023, Leadenhall served a Notice of Breach on 777 Partners, 600 Partners, and the SuttonPark and Dorchester Borrowers. Compl. ¶ 128.

Leadenhall alleges that, from the inception of the facility through November 2023, the SuttonPark and Dorchester Borrowers submitted false Compliance Reports in an effort to conceal the double-pledging problem. According to the Complaint, "[o]ver the period May 2021 to November 2023, the SuttonPark and Dorchester Borrowers delivered approximately 60 Compliance Reports to Leadenhall" that contained false representations with respect to the pledged collateral. Compl. ¶ 136. In December 2023 Leadenhall requested, and received, "revised Compliance Reports for the preceding months making clear the extent" of the prior alleged misrepresentations. Compl. ¶ 130. On March 12, 2024, Leadenhall notified the Borrowers that Events of Default "had occurred and were continuing." Compl. ¶ 171. And on March 15, 2024, Leadenhall notified the Borrowers that it "was exercising its right to accelerate all outstanding debt obligations." Compl. ¶ 172.

In March and April 2024, "in a last-ditch attempt to stave off this lawsuit, Leadenhall entered into negotiations" with the Borrowers concerning a "Forbearance Agreement," pursuant to which the Lenders "would temporarily forgo exercising their default-related rights and remedies in exchange for 777 Partners' agreeing to pay back the outstanding debt pursuant to an amortization schedule." Compl. ¶ 173. Leadenhall alleges that "over the course of these negotiations," Mr. Wander "called Leadenhall from New York City" on at least three occasions and that "on at least one occasion," Mr. Wander said "he was working out of A-CAP's offices in New York City."

6

Compl. at 54 n.14. The restructuring negotiations were ultimately unsuccessful, allegedly because A-CAP made various threats and demands and "was holding up any negotiated repayment schedule." Compl. ¶¶ 174, 176, 179.

Leadenhall commenced this action in early May 2024. The Complaint asserts ten claims for relief, five of which are directed at Mr. Wander. In Counts Four (Fraudulent Misrepresentation) and Five (Civil Conspiracy to Commit Fraud), Leadenhall alleges that Mr. Wander and others "engaged in a pattern of fraudulently misrepresenting to Plaintiffs that they owned Collateral 'free and clear of any Adverse Claims,' when, in fact, that was false, because they had double-pledged the Collateral," and that Mr. Wander "also made various misrepresentations about the Collateral in an effort to conceal the fraud." Compl. ¶¶ 238-239. In Counts Seven (Civil RICO) and Eight (Civil RICO Conspiracy), Leadenhall alleges that Mr. Wander and others committed mail and wire fraud "by misrepresenting the value of their Collateral" in the Compliance and Monthly Reports. Compl. ¶¶ 264-266. And in Count Ten (Unjust Enrichment), Leadenhall alleges that, through the conduct alleged in the other counts, the defendants "have profited and enriched themselves unjustly." Compl. ¶ 279.

## Argument

### I. MR. WANDER'S ALLEGED NEW YORK CONTACTS IN MARCH AND APRIL 2024 DO NOT SUPPORT THE EXERCISE OF LONG-ARM JURISDICTION

The claims against Mr. Wander should be dismissed because, even crediting all of Plaintiffs' allegations, Mr. Wander is not subject to personal jurisdiction in New York.

As the Complaint correctly alleges, Mr. Wander resides in Florida. Compl. ¶ 27. Plaintiffs do not claim a basis for general jurisdiction, nor can they. *See Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."). Instead, Plaintiffs attempt to establish that he is subject to specific

7

jurisdiction under New York's long-arm statute. Although they do not cite the long-arm statute or any specific subsection, they presumably are relying on section 302(a)(1), which permits the exercise of personal jurisdiction over a non-domiciliary who "transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1).

Under section 302(a)(1), specific jurisdiction exists over non-domiciliary defendants only if (i) they "transact[ed] any business" in New York, and (ii) the plaintiffs' causes of action "aris[es] from such a business transaction." *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation omitted). *See Paterno v. Laser Spine Inst.*, 998 N.Y.S.2d 720, 727 (2014) ("Our long-arm statute requires that the cause of action arise from the non-domiciliary's actions that constitute transaction of business."). Based on Plaintiffs' own pleading, the Court lacks jurisdiction over Mr. Wander in this case because the "arising from" requirement has not been and cannot be met.

Where, as here, the alleged contacts post-date the transaction or conduct on which the claim is based, those contacts generally do not support the exercise of long-arm jurisdiction. *See Paterno*, 998 N.Y.S.2d at 379 (because "plaintiff's claim is based on the June and August surgeries in Florida," defendant's "[c]ontacts after this date cannot be the basis to establish defendant's relationship with New York" for purposes of section 302(a)(1)) (citing *Harlow v. Children's Hosp.,* 432 F.3d 50, 62 (1st Cir. 2005)); *Gordian Group, LLC v. Syringa Exploration, Inc.*, 168 F. Supp. 3d 575, 587 (S.D.N.Y. 2016) (defendant's attendance at a meeting in New York after execution of the contract at issue was insufficient to create personal jurisdiction). This temporal and substantive disconnect exists here.

Mr. Wander's alleged New York contacts are set forth in a two-sentence footnote that is notably short on detail. Plaintiffs allege that in March and April 2024, when the parties were trying

8

to negotiate a forbearance agreement "in a last-ditch attempt to stave off this lawsuit," Mr. Wander "called Leadenhall from New York City" at least three times and, "on at least one occasion," he "stated that he was working out of A-CAP's offices in New York City." Compl. at 54 n.14. Even assuming these few alleged contacts constitute the transaction of business in New York – and they likely do not – they still would not support long-arm jurisdiction because the claims against Mr. Wander do not arise out of these alleged contacts. Indeed, the claims in this case do not arise out of anything that occurred in 2024. Rather, Leadenhall's claims arise out of the LSA and related "suite of contracts" that the parties entered into in May 2021. By March 2024, Leadenhall had declared the borrowers in default. Leadenhall asserts five claims against Mr. Wander. None of them arise, in any way, from the parties' 2024 post-default forbearance negotiations.

In Counts Four and Five, Plaintiffs allege that Mr. Wander and other defendants "engaged in a pattern of fraudulently misrepresenting to Plaintiffs that they owned Collateral 'free and clear of any Adverse Claims,' when, in fact, that was false," either "because they had double-pledged the Collateral" or because they never owned it at all. Compl. ¶ 238. Leadenhall claims that defendants made these false representations in meetings, calls and emails; in the LSA itself; and in the "approximately 60 Compliance Reports" that the SuttonPark and Dorchester Borrowers delivered to Leadenhall "[o]ver the period May 2021 to November 2023." Compl. ¶¶ 79, 100-102, 136. But in March and April 2023, according to the Complaint, Mr. Wander "acknowledged" and "admitted" the problem. Compl. ¶¶ 110, 117. And in December 2023, the defendants "delivered revised Compliance Reports for the preceding months" that allegedly revealed "the extent to which" Mr. Wander and others "had lied all along about assets ostensibly pledged" to Leadenhall. Compl. ¶ 130. Based on this timeline, Plaintiffs' fraudulent misrepresentation claims could not possibly arise out the forbearance negotiations that took place in 2024.

9

Plaintiffs also allege in Count Four that after they "became aware that the Collateral had either been double-pledged or was not owned by the Borrowers, Mr. Wander made various misrepresentations about the Collateral in an effort to conceal the fraud." Compl. ¶ 239. But this claim also does not arise out of Mr. Wander's alleged New York contacts. According to the Complaint, Leadenhall "became aware" of the problem initially in September 2022, when it received the anonymous tip (Compl. ¶ 93); in March 2023, when it learned that certain assets had been "double-pledged" to Credigy (*id*. ¶¶ 104-05); and in October and November 2023, when Leadenhall determined that the SuttonPark and Dorchester Borrowers never owned some of the assets in the first place (*id*. ¶ 126). By December 2023, according to the Complaint, it was known to Leadenhall that Mr. Wander and others "had lied all along" about the pledged assets. Compl. ¶ 130. Any alleged misrepresentations by Mr. Wander about the Collateral must therefore have been made prior to 2024. But Mr. Wander is not alleged to have had any contacts with New York prior to 2024, and he is not alleged to have made any such misrepresentations during the parties' forbearance discussions in 2024.

Similarly, in Counts Seven and Eight, Plaintiffs allege that Mr. Wander and others engaged in a racketeering scheme, and committed mail and wire fraud, by "fraudulently inflating the amount of their Collateral to Plaintiffs and misrepresenting facts to Plaintiffs to conceal their fraud" and by "misrepresenting the value of their Collateral including in multiple reports sent to Plaintiffs through interstate wires." Compl. ¶ 264. The RICO claims, like the fraudulent misrepresentation claims, are based on the allegedly false statements that Mr. Wander and others made to Leadenhall about the pledged collateral from May 2021 through the end of 2023, including in the Compliance Reports. Accordingly, Leadenhall's RICO claims also are not based on anything that Mr. Wander said or did in March or April of 2024.

Count Ten, for unjust enrichment, is the only other claim asserted against Mr. Wander. It is based on the same alleged conduct that underlies the fraudulent misrepresentation and RICO claims. And Plaintiffs do not claim that Mr. Wander was unjustly enriched by the unsuccessful post-default forbearance negotiations that took place in 2024. Like the others, this claim does not arise out of Mr. Wander's alleged New York contacts.

In short, because none of the claims asserted against Mr. Wander arise out of the post-default forbearance negotiations, his handful of alleged New York contacts in connection with those negotiations do not support the exercise of long-arm jurisdiction over Mr. Wander.

In addition, and for the same reason, the exercise of jurisdiction over Mr. Wander in this case would violate the Due Process Clause. To establish personal jurisdiction over a non-resident defendant, due process requires "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977). As the Supreme Court has held: "[T]his fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations and citation omitted). As discussed above, Leadenhall's claims and alleged injuries do not arise out of or relate to the parties' forbearance negotiations in the Spring of 2024.

Because Plaintiffs have not established a basis for exercising personal jurisdiction over Mr. Wander, either under New York's long-arm statute or pursuant to federal due process, the claims against him should be dismissed.

## II. THE COMPLAINT DOES NOT SUPPORT, AND IN FACT REFUTES, PLAINTIFFS' ALTER EGO THEORY OF PERSONAL JURISDICTION

Plaintiffs' alternative theory of personal jurisdiction is equally meritless. They first allege

11

that the Court has personal jurisdiction over all of the defendants who are parties to the LSA and the Guaranty because, pursuant to that agreement, those defendants consented to jurisdiction in New York. Compl. ¶ 37. Although Mr. Wander was not a party to the LSA, Plaintiffs then allege that the Court can exercise personal jurisdiction over him too, "by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers." Compl. ¶ 38. Plaintiffs' attempt to establish personal jurisdiction over Mr. Wander based on an alter ego theory should be rejected because it is not supported by, and in fact is at directly at odds with, Plaintiffs' allegations.

As a general rule, courts are hesitant to pierce the corporate veil because the law "allows individuals to incorporate for the very purpose of avoiding personal liability." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989). *See also*, *Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 570 (S.D.N.Y. 2022) ("In considering whether an individual and a corporate entity are alter egos of one another, 'it is well settled that . . . courts are reluctant to disregard the corporate entity.'") (quoting *Wrigley*). Accordingly, the bar for establishing jurisdiction over an individual based on an alter ego theory is high: "[T]he corporate veil will be pierced only when it can be demonstrated that the '[corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own.'" *Id.* (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)).

Here, the only basis for Plaintiffs' assertion that Mr. Wander exercised "domination and control" over the Borrower Defendants is Plaintiffs' repeated invocation of those two words. *See* Compl. ¶¶ 4, 19, 26, 27, 38. They allege no facts illustrating Mr. Wander's supposed "domination" or "control" of any of the entity defendants. As a matter of law, the entirely conclusory nature of

12

Plaintiffs' allegations is reason enough to reject their alter ego theory of personal jurisdiction. *See, e.g.*, *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20-cv-00967 (LJL), 2021 WL 918556 at *10 (S.D.N.Y. Mar. 10, 2021) (conclusory allegations insufficient to establish alter ego jurisdiction as to individual defendant); *Megna v. Biocomp Lab'ys, Inc.*, 166 F. Supp. 3d 493, 500 (S.D.N.Y. 2016) (conclusory allegations insufficient to establish personal jurisdiction); *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003) (same).

But there is a more significant problem with Plaintiffs' alter ego theory. Not only do Plaintiffs fail to allege any facts showing that Mr. Wander "dominated" and "controlled" the borrower defendants; they explicitly allege that he did not. Throughout the Complaint, Plaintiffs repeatedly allege that defendants A-CAP and King, not Mr. Wander, have "control over 777 Partners' operations." Compl. ¶ 140. According to the Complaint, A-CAP – whom Leadenhall calls the "Wizard of Oz behind the 777 Partners' curtain" – had an express agreement with 777 Partners "which granted A-CAP the right to control all facets of 777 Partners' operations." Compl. ¶¶ 12, 15. As a result of that agreement, according to the Complaint, "King and A-CAP must approve every material decision that 777 Partners makes," and A-CAP was "controlling Wander's every move." Compl. ¶¶ 16, 176.

The Complaint alleges that A-CAP and King's control stems from A-CAP's significant and unorthodox financial leverage over 777 Partners and its affiliates. Compl. ¶ 140. According to the Complaint, A-CAP and King exerted this control on a number of occasions, including to block the proposed restructuring agreement for 777 Partners to repay debts owed to Leadenhall. *Id.* Mr. Wander himself allegedly acknowledged that "A-CAP was the puppeteer" and that A-CAP "control[s] what we sign because they have the power of the purse right now.'" Compl. ¶ 20.

In short, the Complaint's allegations establish the *opposite* of domination and control by

13

Mr. Wander. Accordingly, the Complaint does not establish an alternative basis for personal jurisdiction over Mr. Wander under an alter ego theory.[2]

### III. THE COMPLAINT DOES NOT STATE ANY CLAIMS FOR RELIEF AGAINST MR. WANDER

As the 777 entity defendants explain in their motion to dismiss, the Complaint does not adequately allege fraud, RICO, or unjust enrichment. Mr. Wander joins in these arguments, which likewise apply to him, and incorporates by reference Points II and III in the Memorandum of law of the 777 Entity Defendants.[3]

In short, Leadenhall's Complaint is an attempt to dress up what are, at most, breach of contract claims – contracts to which Mr. Wander is not even a party – as claims of fraud, RICO and unjust enrichment. But under settled New York law, breach of a contract does not constitute fraud, let alone a RICO conspiracy. *Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435, 436 (1st Dep't 1988) ("It is well settled that a cause of action for fraud will not arise when the only fraud charged relates to a breach of contract."). Moreover, to the extent the claims against Mr. Wander rest on Leadenhall's assertion that he is the alter ego of the defendants who entered into the contracts, Leadenhall has not adequately pled alter ego liability, for the reasons discussed above.

In addition, for the reasons set forth in the 777 Entity Defendants' memorandum of law, Leadenhall also has not adequately pled any of the five claims it asserts against Mr. Wander. The fraudulent misrepresentation claim fails because the Complaint does not allege fraudulent intent

---

[2] Mr. Wander also adopts, and incorporates by reference, the arguments in Point I.A of the Memorandum of Law in Support of Defendant Steven Pasko's Motion to Dismiss the Complaint.
[3] In the event the RICO claims are dismissed, the Court should decline to exercise supplemental jurisdiction over the state law fraud and unjust enrichment claims because complete diversity is lacking. *See* 777 Defendants' Br. Point I.

14

with particularity, as Rule 9(b) requires. Indeed, as to Mr. Wander, the key allegation is pleaded "on information and belief." Compl. ¶ 239. The claim of civil conspiracy therefore fails as well, and in any event is not a cognizable claim. The RICO and derivative RICO conspiracy claims fail because the Complaint does not adequately allege predicate acts, a pattern of racketeering activity, an enterprise, or fraudulent intent. (777 Defendants' Br. Point II). And the unjust enrichment claim fails because it is duplicative of the breach of contract claims. (777 Defendants' Br. Point III).

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed in its entirety as against Mr. Wander.

Dated: August 9, 2024
       New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

     /s/ Jordan Estes
Jordan Estes
Marjorie E. Sheldon
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

# **CERTIFICATION**

JORDAN ESTES, an attorney admitted to practice in the courts of New York, affirms under the penalties of perjury that the following is true:

1. I am a member of the law firm of Kramer Levin Naftalis & Frankel LLP, attorneys for Defendant Josh Wander in this lawsuit and the individual with primary responsibility for filing the foregoing memorandum of law in support of Mr. Wander's motion to dismiss.

2. I hereby certify that the text of the foregoing memorandum of law, exclusive of caption, table of contents, table of authorities, and date and signature line, is 4,670 words, and therefore complies with the word-count limit established by Rule II.D of the Court's Individual Practices.

Dated: New York, NY
August 9, 2024

                                                          /s/ Jordan Estes
                                                          Jordan Estes