**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP and LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>Plaintiffs,<br><br>vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, SIGNAL SERVICING LLC, INSURETY SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>Defendants. | Civil Action No. 1:24-cv-03453 |

**ADVANTAGE CAPITAL HOLDINGS LLC AND KENNETH KING'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
(212) 504-6000

*Counsel for Defendants Advantage Capital*
*Holdings LLC and Kenneth King*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

TABLE OF ABBREVIATIONS ............................................................................ x

PRELIMINARY STATEMENT ........................................................................... 1

ALLEGED FACTUAL BACKGROUND ............................................................. 6

    A. A-CAP's Affiliates' First Priority, All-Assets Security Interests ................ 6

    B. Leadenhall's Security Interest in the SPV Borrowers ................................. 6

    C. SuttonPark and Dorchester Allegedly Overstate Their Borrowing
       Bases From Inception. ................................................................................ 7

    D. Dorchester and SuttonPark Immediately Draw $380 Million.................... 8

    E. Leadenhall Alleges That the Deficiencies Are Wander-Directed
       Fraud. ......................................................................................................... 9

    F. Mr. Wander Promises Fixes: "Replacement Deals," Selling
       Businesses for Cash, or Borrowing From A-CAP. ..................................... 10

    G. Leadenhall Speculates That A-CAP "Must Have" Become "Aware"
       in "Early" 2023. ....................................................................................... 11

    H. A-CAP Takes Steps to Protect the Value of Its Collateral........................ 12

    I. Leadenhall's "Upon Information and Belief" Allegations .......................... 13

LEGAL STANDARD............................................................................................ 14

ARGUMENT ........................................................................................................ 15

I. LEADENHALL'S CLAIMS ARE UNRIPE. ................................................. 15

    A. The RICO Claims Are Unripe. .................................................................. 15

    B. The State-Law Claims Are Unripe. ........................................................... 17

II. LEADENHALL STATES NO CIVIL RICO CLAIM (COUNTS VII & VIII)........ 18

    A. The Complaint Fails to Allege That A-CAP or Mr. King Committed
       a Predicate Act. ......................................................................................... 20

          1. Leadenhall Pleads No Facts Showing That A-CAP or Mr. King Had
             Anything to do With the Alleged Fraud........................................... 20

          2. Second Circuit Case Law Does Not Support Extending RICO
             Liability to Aiding and Abetting Predicate Acts............................. 24

    B. Leadenhall Suffered No Cognizable Harm Proximately Caused by
       A-CAP........................................................................................................ 26

    C. The Complaint Alleges No Domestic Injury. ............................................ 26

    D. The Complaint Alleges No Distinct Enterprise......................................... 27

E. The Complaint Alleges No Pattern of Racketeering. .................................. 29

F. Leadenhall States No RICO Conspiracy Claim............................................. 31

III. LEADENHALL'S STATE-LAW CLAIMS FAIL AS A MATTER OF LAW. ....... 33

A. "Civil Conspiracy" Is Not a Cause of Action (Count V). ............................ 33

B. Leadenhall Pleads No Claim for Aiding and Abetting Fraud (Count VI). .................................................................................................................. 33

C. Leadenhall Pleads No Unjust-Enrichment Claim (Count X). ................... 35

IV. LEADENHALL CANNOT HOLD MR. KING PERSONALLY LIABLE. ........... 37

CONCLUSION.............................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4 K & D Corp. v. Concierge Auctions, LLC,*
    2 F. Supp. 3d 525 (S.D.N.Y. 2014) ......................................................................... 24

*Alix v. McKinsey & Co.,*
    2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023)........................................................... 25

*Almeciga v. Ctr. for Investigative Reporting, Inc.,*
    121 F. Supp. 3d 379 (S.D.N.Y. 2015) ..................................................................... 36

*Am. Home Mortg. Corp. v. UM Sec. Corp.,*
    2007 WL 1074837 (S.D.N.Y. Apr. 9, 2007) ........................................................... 16

*AmBase Corp. v. 111 W. 57th Sponsor LLC,*
    785 F.App'x. 886 (2d Cir. 2019)............................................................................. 30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................. 14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 14, 15, 21

*Berdeaux v. OneCoin Ltd.,*
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ................................................. 22, 33, 34, 35

*Berman v. Morgan Keegan & Co.,*
    2011 WL 1002683 (S.D.N.Y. Mar. 11, 2011) ........................................................ 33

*In re Brainard,*
    2021 WL 850290 (D. Conn. Bankr. Mar. 3, 2021).................................................. 6

*Cenedella v. Metro. Museum of Art,*
    348 F. Supp. 3d 346 (S.D.N.Y. 2018) ............................................................. 14, 32

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,*
    516 N.E.2d 190 (N.Y. 1987).................................................................................... 35

*Cont'l Fin. Co. v. Ledwith,*
    2009 WL 1748875 (S.D.N.Y. June 22, 2009) ....................................................... 27

*Coppola v. Bear Stearns & Co.,*
    499 F.3d 144 (2d Cir. 2007).................................................................................... 23

*Corporativo Grupo R SA de C.V. v. Marfield Ltd.*,
   606 F. Supp. 3d 502 (S.D. Tex. 2022)..................................................... 23

*Crawford v. Franklin Credit Mgmt. Corp.*,
   758 F.3d 473 (2d Cir. 2014)........................................................ 18, 31

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
   587 F.App'x 663 (2d Cir. 2014).......................................................... 29

*D.N.C. v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019) ............................................... 29, 30

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001)............................................................. 19

*Doe v. Trump Corp.*,
   385 F. Supp. 3d 265 (S.D.N.Y. 2019) ................................................... 26

*Donelli v. Cnty. of Sullivan*,
   2009 WL 2365551 (S.D.N.Y. July 31, 2009) ............................................ 14

*Dorce v. City of N.Y.*,
   608 F. Supp. 3d 118 (S.D.N.Y. 2022) ................................................... 33

*Edmonson & Gallagher v. Alban Towers Tenants Ass'n*,
   48 F.3d 1260 (D.C. Cir. 1995) ......................................................... 31

*Eliahu v. Jewish Agency for Israel*,
   919 F.3d 709 (2d Cir. 2019)............................................................ 25

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018)............................................................ 26

*Equitable Life Ins. Soc'y of U.S. v. Alexander Grant & Co.*,
   627 F. Supp. 1023 (S.D.N.Y. 1985) .................................................... 35

*Est. of Gottdiener v. Sater*,
   35 F. Supp. 3d 386 (S.D.N.Y. 2014) ................................................... 25

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004).......................................................*passim*

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994).........................................................*passim*

*Foster v. 2001 Real Estate*,
   2015 WL 7587360 (S.D.N.Y. Nov. 24, 2015)........................................... 27

*Georgia Malone & Co. v. Rieder,*
  973 N.E.2d 743 (N.Y. 2012)................................................................ 36

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.,*
  67 F.3d 463 (2d Cir. 1995)............................................................. 30, 31

*Glidden Co. v. Jandernoa,*
  5 F. Supp. 2d 541 (W.D. Mich. 1998) .................................................. 34

*Goldfine v. Sichenzia,*
  118 F. Supp. 2d 392 (S.D.N.Y. 2000) .............................................. 15, 16

*Goldman v. Metro. Life Ins. Co.,*
  841 N.E.2d 742 (N.Y. 2005)................................................................ 35

*Gross v. Waywell,*
  628 F. Supp. 2d 475 (S.D.N.Y. 2009) .................................................. 18

*Gutman v. Equidyne Extractive Indus. 1980 Petro/Coal Program I,*
  1990 WL 113193 (S.D.N.Y. July 27, 1990) ........................................ 18

*Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap.
  Markets, LLC,*
  347 F.App'x 711 (2d Cir. 2009)............................................................ 16

*Heinrich v. Dean,*
  655 F. Supp. 3d 184 (S.D.N.Y. 2023) ............................................. 27, 28

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.,*
  2013 WL 3943267 (S.D.N.Y. July 31, 2013) ....................................... 19

*Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp.,*
  2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012)........................................ 16

*Kaplan, Inc. v. Yun,*
  16 F. Supp. 3d 341 (S.D.N.Y. 2014) .................................................... 36

*Katzman v. Victoria's Secret Catalogue,*
  167 F.R.D. 649 (S.D.N.Y. 1996) .......................................................... 19

*Kerik v. Tacopina,*
  64 F. Supp. 3d 542 (S.D.N.Y. 2014) ........................................ 15, 16, 18

*Khan Funds Mgmt. Am., Inc. v. Nations Techs. Inc.,*
  2023 WL 6124801 (S.D.N.Y. Sept. 19, 2023)....................................... 20

*Knoll v. Schectman,*
    275 F.App'x 50 (2d Cir. 2008) .............................................................. 31

*L-7 Designs v. Old Navy, LLC,*
    647 F.3d 419 (2d Cir. 2011).................................................................. 23

*Law Debenture v. Maverick Tube Corp.,*
    2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008)......................................... 36

*Limestone Dev. Corp. v. Vill. of Lemont,*
    520 F.3d 797 (7th Cir. 2008) ......................................................... 3, 19

*Lundy v. Catholic Health Sys. of Long Island Inc.,*
    711 F.3d 106 (2d Cir. 2013).................................................................. 18

*Motorola Credit Corp. v. Uzan,*
    322 F.3d 130 (2d Cir. 2003).................................................................. 16

*Nat'l Westminster Bank USA v. Century Healthcare Corp.,*
    885 F. Supp. 601 (S.D.N.Y. 1995) ...................................................... 22

*Nezry v. Haven Ave. Owner LLC,*
    2010 WL 3338545 (N.Y. Sup. Ct. 2010).............................................. 37

*OSRecovery, Inc. v. One Groupe Int'l, Inc.,*
    2004 WL 238035 (S.D.N.Y. Feb. 9, 2004) .......................................... 14

*Paul Hobbs Imports Inc. v. Verity Wines LLC,*
    2023 WL 374120 (S.D.N.Y. Jan. 24, 2023) ......................................... 28

*Penn. Ass'n of Edwards Heirs v. Rightenour,*
    235 F.3d 839 (3d Cir. 2000)................................................................. 25

*Perry v. NYSARC, Inc.,*
    424 F.App'x 23 (2d Cir. 2011) ...................................................... 14, 24

*Prickett v. N.Y. Life Ins. Co.,*
    896 F. Supp. 2d 236 (S.D.N.Y. 2012) .................................................. 35

*Quebecor World (USA), Inc. v. Harsha Assocs., L.L.C.,*
    455 F. Supp. 2d 236 (W.D.N.Y. 2006)................................................. 37

*R.C.M. Exec. Gallery Corp. v. Rols Cap. Co.,*
    1997 WL 27059 (S.D.N.Y. Jan. 23, 1997) ...................................... 31, 32

*In re Refco Inc. Sec. Litig.,*
    2011 WL 13168450 (S.D.N.Y. Dec. 8, 2011) ...................................... 34

*Rio Tinto PLC v. Vale,*
  2015 WL 7769534, at *10 (S.D.N.Y. Nov. 20, 2015)........................................ 30, 31

*RJR Nabisco v. European Cmty.,*
  579 U.S. 325 (2016) .................................................................. 26

*Rolo v. City Investing Co. Liquidating Tr.,*
  155 F.3d 644 (3d Cir. 1998 .............................................................. 25

*Rosner v. Bank of China,*
  349 F.App'x 637 (2d Cir. 2009).......................................................... 34

*Saleh Holdings Grp., Inc. v. Chernov,*
  30 Misc. 3d 1220(A), (Sup. Ct. Jan. 31, 2011) .......................................... 17

*U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.,*
  152 F. Supp. 2d 443 (S.D.N.Y. 2001) ......................................... 15, 30, 34

*United States v. Persico,*
  832 F.2d 705 (2d Cir. 1987).............................................................. 18

*United States v. Pizzonia,*
  577 F.3d 455 (2d Cir. 2009)............................................................... 30

*United States v. Turkette,*
  452 U.S. 576 (1981) ...................................................................... 29

*Wild Edibles Inc. v. Indus. Workers of World Local 460/640,*
  2008 WL 4548392 (S.D.N.Y. Oct. 9, 2008)............................................... 27

*Williams v. Affinion Grp., LLC,*
  889 F.3d 116 (2d Cir. 2018).............................................................. 18

*Wilson v. Dantas,*
  2013 WL 92999 (S.D.N.Y. Jan. 7, 2013),
  *aff'd*, 746 F.3d 530 (2d Cir. 2014) .................................................... 36

*Yegiazaryan v. Smagin,*
  599 U.S. 533 (2023) .............................................................. 26, 27

*Zarintash v. Boffa,*
  1999 WL 155991 (S.D.N.Y. Mar. 19, 1999) ............................................ 17

**Statutes**

6 Del. Code § 18-303 ...................................................................... 37

18 U.S.C. § 1961(1) ............................................................................ 20

28 U.S.C. § 1367(c)(3) ....................................................................... 32

N.Y. Ltd. Liab. Co. § 609 .................................................................. 37

N.Y. U.C.C. § 9-322 ........................................................................... 17

## Other Authorities

My Chi To, Second-Lien Financings in Bankruptcy: Expectations v.
    Reality, PRAC. LAW (2008) ........................................................ 23

## TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| "777 Entity Defendants" | 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, Dorchester Receivables II LLC, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLC, SuttonPark Servicing LLC, Signal Servicing LLC, and Insurety Servicing LLC |
| "777 Defendants" | 777 Entity Defendants, Josh Wander, and Steven Pasko |
| "777" | 777 Partners LLC, 600 Partners LLC, and all of their affiliates, generally |
| "777 Partners" | 777 Partners LLC |
| "A-CAP" | Advantage Capital Holdings LLC |
| "Borrowing Base," "Borrowing Base Deficiency," and other terms from the LSA | As defined in the LSA (ECF 58-1, p. 23 of 40) and used in the Complaint |
| "Dorchester" or "Dorchester Borrower" | Dorchester Receivables II LLC |
| "Leadenhall" | Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC |
| "Partners HoldCos" | 777 Partners LLC and 600 Partners LLC |
| "Servicers" | SuttonPark Servicing LLC, Signal Servicing LLC, and Insurety Servicing LLC |
| "SPV Borrowers" | SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC |
| "SuttonPark" or "SuttonPark Borrower" | SPLCSS III LLC |

## PRELIMINARY STATEMENT

The Complaint teems with sweeping, conclusory accusations and headline-grabbing rhetoric. Yet when stripped of chaff, all that remains about A-CAP is this: speculation that it became *aware* in 2023 of Mr. Wander's alleged misconduct from 2021 or before. Nothing resembles a claim against A-CAP or Mr. King.

At bottom, Leadenhall alleges that two SPV Borrowers—SuttonPark and Dorchester—breached a loan agreement. They allegedly did so by drawing from the loan facility—in 2021 or before—hundreds of millions of dollars beyond the present value of their receivables, and thus beyond the contractual "Borrowing Bases" securing the facility. Leadenhall allowed those years-old draws because SuttonPark and Dorchester had, in their Reports to Leadenhall, allegedly overstated their receivables to include future cash flows "that they either did not own or that were already on the books of another of Wander and Pasko's portfolio companies—pledged to some other lender, securing some other loan."[1]

Leadenhall alleges that Mr. Wander admitted the resulting Borrowing Base Deficiencies—embarrassing mistakes caused by antiquated computer systems, he said. Whatever *caused* the deficiencies, their *existence* allegedly gave Leadenhall the contractual right to accelerate the debt owed by all four SPV Borrowers. Leadenhall

---

[1] (Compl. ¶ 55; *see, e.g., id.* ¶¶ 101, 126.)

exercised that right and sues the 777 Entity Defendants for $609 million in allegedly past due Accelerated Debt.[2] That is the crux of this case.

Leadenhall also alleges fraud; that Mr. Wander directed the intentional inflation of SuttonPark's and Dorchester's Borrowing Bases. The alleged object of the fraud: *"[t]o induce Leadenhall to fund" draws* up to the amounts reflected in the overstated Borrowing Bases.[3] If Leadenhall is right, then *the object of the fraud was achieved by mid-2021*—all $80 million of Dorchester's draws had been funded by May 2021, and all or virtually all of SuttonPark's $350 million in draws were funded by about then too.[4]

Leadenhall spends dozens of paragraphs outlining how it believes the alleged fraud was carried out—the alleged handiwork of "Wander," "Wander's entities," or "Wander and Pasko." A-CAP, however, is not alleged to have played ***any*** part in the alleged misconduct. In fact, A-CAP is not alleged to have even ***learned*** of the alleged Borrowing Base Deficiency until 2023—years after the allegedly fraudulent inflation of the Borrowing Bases and the last of the allegedly fraudulent draws.

The Complaint reveals why A-CAP and Mr. King are nevertheless here: Leadenhall believes "the only question now is whether Leadenhall will be able to

---

[2] A-CAP and Mr. King take no position on the merits of Leadenhall's claims against the 777 Defendants.

[3] (*Id.* ¶ 2 (emphasis added); *see id.* ¶ 138.)

[4] *See infra* Background Part D. Presumably those draws were funded under the "prior facility," not the LSA. *Id.*

recover millions of dollars in damages" from Mr. "Wander [and] his group of alter ego entities," a "house of cards on the brink of collapse."[5] That "question" stems from more than just Leadenhall's allusion to 777's limited liquidity. Any judgment for Leadenhall against its borrowers would likely be academic—Leadenhall already has (purportedly perfected) security interests in all their borrowers' assets. And any judgment against Partners HoldCos (the guarantors of the LSA) would be junior to a mountain of secured debt—debt owed to A-CAP and its affiliated insurance companies, which have perfected first liens on Partners HoldCos' assets.

With recovery from 777 facing long odds, Leadenhall refocused its aim on deeper pockets: A-CAP's. *Why* Leadenhall might wish to ensnare A-CAP (and its combined reported assets of $11.5 billion) in its dispute with 777 is apparent. *How* it might do so was not so simple. Leadenhall has no contractual relationship with A-CAP. A-CAP did not induce Leadenhall to lend money to 777. And A-CAP had no role in pledging, purchasing, or servicing Leadenhall's Collateral. Leadenhall's solution: reaching for "the litigation equivalent of a thermonuclear device," no doubt hoping for A-CAP and Mr. King to share its view that the lawsuit "might bring 777 Partners—and therefore A-CAP—all the way down."[6] Such a fear could be a recipe for even "groundless claim[s]" to deliver the "in terrorem . . . settlement value"[7] that Leadenhall is after.

---

[5] (*Id.* ¶ 2.)

[6] (*Id.* ¶ 142.)

[7] *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

RICO claims cannot, however, be pleaded with fear, bombast, or rhetoric. What matters are well-pleaded facts. Yet Leadenhall cannot (and has not) pleaded facts connecting A-CAP to any alleged fraud. Leadenhall instead points to A-CAP's (i) rights and influence as a senior creditor (since 2023); (ii) protective advances (in late 2023 and 2024); and (iii) alleged involvement in pre-litigation workout talks (in 2023 and 2024). Leadenhall strains, however, even to rationalize how those allegations could be *consistent* with its claims. None of its allegations *supports* its claims.

Because Leadenhall fails to plausibly allege that A-CAP or Mr. King engaged in any misconduct, the claims against them should be dismissed.

*First*, because Leadenhall has not exhausted its bargained-for contractual remedies, it has no ripe claims against A-CAP or Mr. King. *See infra* Part I. Under controlling Second Circuit authority, Leadenhall must secure a judgment on its contract claims before bringing RICO or fraud claims.

*Second*, Leadenhall's civil RICO claims (Counts VII and VIII) are meritless for several reasons. For starters, Leadenhall does not allege (much less with particularity) that A-CAP or Mr. King committed a single predicate act—the *sine qua non* of a RICO claim. All that Leadenhall can muster is speculation about when A-CAP "must have" *learned* of Mr. Wander's alleged misdeeds. But knowledge is not enough, speculation does not suffice, and at any rate, Leadenhall's "belief" is that A-CAP learned of Mr. Wander's alleged misconduct after the fact—in 2023. *See infra* Part II.A.

The RICO claims fail on other threshold issues too. Leadenhall does not demonstrate that it suffered cognizable harm proximately caused by A-CAP. *See infra* Part II.B. Nor does Leadenhall show that it, an English entity, suffered the required "domestic injury." *See infra* Part II.C. It pleads no "enterprise" distinct from the underlying alleged conduct. *See infra* Part II.D. It does not plausibly allege the "hallmark of racketeering"—a threat of continuing criminal activity. *See infra* Part II.E. And with no underlying RICO claim or alleged agreement to commit predicate acts, the RICO conspiracy claim fails as well. *See infra* Part II.F.

*Third*, Leadenhall's state-law claims against A-CAP and Mr. King also fail on pleading basics. New York has no standalone claim for civil conspiracy (Count V). *See infra* Part III.A. Leadenhall states no aiding-and-abetting-fraud claim (Count VI) for the same reason it pleads no predicate act—the Complaint does not allege that A-CAP provided substantial assistance to any fraud. *See infra* Part III.B. And Leadenhall has no claim for unjust enrichment (Count X) because this case is based on contract claims. *See infra* Part III.C.

*Fourth*, Leadenhall cannot make out any claims against Mr. King because—on top of all the foregoing defects—the Complaint alleges no facts showing that Mr. King engaged individually in any tortious or conspiratorial conduct. *See infra* Part IV.

## ALLEGED FACTUAL BACKGROUND

A. <u>A-CAP's Affiliates' First Priority, All-Assets Security Interests</u>

As Leadenhall's Complaint acknowledges, A-CAP, through affiliates including Haymarket Insurance Company,[8] has a perfected, "first-priority" security interest in substantially all assets of the Partners HoldCos. (Compl. ¶¶ 12–13.) Under the HoldCo Loan Agreement referenced in the Complaint, (*id.* ¶ 174), Haymarket, (*see id.* ¶ 148), has loaned hundreds of millions of dollars to Partners HoldCos, and Haymarket has perfected its security interests by filing financing statements, (*see* ECF 141-1–141-3.)[9]

B. <u>Leadenhall's Security Interest in the SPV Borrowers</u>

In May 2021, "following the expiration of a prior credit facility between the parties," certain 777 Defendants "entered into a new credit facility with Leadenhall," the LSA, which governs Leadenhall's loans to four SPV Borrowers in 777's structured settlement business. (Compl. ¶ 45.) Leadenhall's only security interest[10] is the equity and assets of those SPV Borrowers, which mainly comprise receivables—cash flows

---

[8] A-CAP's five insurance company affiliates offer life insurance and annuity products and make investments to create returns for policyholders. (Compl. ¶ 183.)

[9] Courts may take judicial notice of filed financing statements. *See In re Brainard*, 2021 WL 850290, at *3 (D. Conn. Bankr. Mar. 3, 2021).

[10] The alleged facts do not show that Leadenhall's security interest in the assets of the SPV Borrowers was rendered "unsecured." Instead, the Monthly Reports allegedly overstated the value of SuttonPark's and Dorchester's assets.

from structured settlements and lottery winnings. (*See id.* ¶¶ 42, 51 (citing LSA § 2.15; ECF 153, Exs. C–N (financing statements).) Leadenhall alleges no security interest in any asset of Partners HoldCos. (*Id.*; *see also* ECF 58-2 (Guaranty Agreement).)

Leadenhall's lending relationship with 777 is broad: on top of the "prior credit facility," Leadenhall has made other loans to 777 Partners (not at issue here) through a "credit agreement entered into in June 2022 between Leadenhall and 777 Partners to provide funding for 777 Re." (Compl. ¶ 180 n.16.)

## C. SuttonPark and Dorchester Allegedly Overstate Their Borrowing Bases From Inception.

Leadenhall alleges that, from inception (and perhaps before), SuttonPark and Dorchester overstated the present value of their receivables—and thus their Borrowing Bases under the LSA—in the Monthly Reports they provided to Leadenhall. (*Id.* ¶¶ 52, 55, 90, 121–23, 130–33.) Those Monthly Reports allegedly included not only the present value of those entities' receivables, but also the value of certain receivables owned by Credigy's Volans facility—Credigy's collateral—and, allegedly, the value of other "assets" that do not exist.[11] (*Id.* ¶ 111; *see id.* ¶ 55.)

---

[11] Servicers, Leadenhall alleges, were responsible for the accuracy of the Monthly Reports and represented their accuracy in the Compliance Reports they provided each time SuttonPark or Dorchester drew funds from the credit facility. (*Id.* ¶¶ 56, 70–71.)

D. <u>Dorchester and SuttonPark Immediately Draw $380 Million.</u>

By May 2021, those Borrowers had allegedly drawn amounts that were close to the allegedly inflated Borrowing Bases, but well over their true Borrowing Bases—Dorchester had already drawn all "approximately . . . $80 million" from the facility (or its predecessor), and SuttonPark had drawn about "approximately $300 million, (*id.* ¶ 90). And Leadenhall permitted those draws—even with its robust audit and inspection rights, (*id.* ¶ 94 (citing LSA § 5.02)), it was unaware that its Borrowers had allegedly materially overstated the value of their receivables.

Dorchester's "Outstanding Borrowings" reflect that it has made no additional draws since May 2021—each of the "Dorchester Reports" in the Complaint (spanning November 2022 through March 2023) show that Dorchester has borrowed a total of $79.01 million, (*id.* ¶¶ 99, 103, 122–23, 134). Every SuttonPark Report in the Complaint, spanning November 2022 through March 2023, reflects "Outstanding Borrowings" of $349.998 million, (*id.* ¶¶ 103, 121, 123, 131, 164)—about $50 million more than the $300 million in borrowings as of May 2021, (*id.* ¶ 90). SuttonPark thus drew about $50 million from the facility at some point between June 2021 and October 2022.

Mr. Wander allegedly admitted that SuttonPark's and Dorchester's draws exceeded their true Borrowing Bases, but said they were embarrassing mistakes attributable to antiquated computer systems. (*Id.* ¶¶ 11, 110.)

Leadenhall alleges that because the draws exceeded the applicable Borrowing Base, (*id.* ¶¶ 38, 121–22), "Borrowing Base Deficienc[ies]," "Borrower Group Event[s] of Default," and "Facilit[y] Events of Default," were triggered, allegedly "entitl[ing]

Leadenhall to accelerate the entire amount of the outstanding debt and pursue the same remedies against all four Borrower Groups." (*Id.* ¶ 53.)

E.  Leadenhall Alleges That the Deficiencies Are Wander-Directed Fraud.

Leadenhall alleges that SuttonPark's and Dorchester's Borrowing Base deficits result from fraud: Mr. Wander, it alleges, directed those entities to fraudulently misrepresent their Borrowing Bases "[t]o induce Leadenhall to fund" more draws. (*Id.* ¶ 2; *id.* ¶ 138 (The Borrower's made each of these false representations to induce the Lenders and Leadenhall to continue allowing the Borrowers to take out debt notes under the credit facility.").)

Leadenhall alleges that the fraud allegedly started with its first Compliance Report in May 2021. (*See id.* ¶ 136 (alleging "60 [false] Compliance Reports" beginning in "May 2021").) And as described above, SuttonPark and Dorchester had drawn about $300 million and $80 million, respectively, by May 2021. *See supra* Part D.

By the time Leadenhall was tipped off on September 19, 2022—a tip that Leadenhall alleges "was true in all respects"—Mr. Wander had already allegedly consummated "criminal activity" involving the reported Borrowing Base of the SuttonPark Borrower: "**The assets you are lending against at SuttonPark do not exist. Josh Wander *either never bought them* or *already pledged them to another lender.* . . . What he is doing is criminal.**" (Compl. ¶ 93.)

Eleven days after receiving the tip, Mr. Wander (now with the help of Mr. Pasko) allegedly caused a document to be executed that purported to sell receivables from Credigy's Volans facility (the assets of which were Credigy's collateral) to

SuttonPark and Dorchester. (*Id.* ¶¶ 105–106 (alleging that this alleged "'double-pledg[ing]'" was effected by a "'Form of Assignment' executed by Steven Pasko on September 30, 2022");[12] *cf. id.* ¶ 111 (Wander allegedly later admitting "there are deals that are in Credigy's Borrowing Base that are allocated to you guys").)

In November 2022, Leadenhall's on-site "'spot check' of 777 Partners' computer systems" revealed $7 million "of assets that [had been] improperly allocated to the Dorchester Borrower." (*Id.* ¶¶ 96–98.) It turns out, Leadenhall alleges, that "prior to the on-site meetings . . . in November 2022," the 777 Defendants "had photoshopped financial statements submitted to Leadenhall" and "altered receivables in the MP Fin System to try to cover up" the fraud. (*See id.* ¶ 162.)

Leadenhall alleges that, in all, "both the Dorchester and SuttonPark Borrowers had double-pledged hundreds of millions of dollars of collateral, and *thus had covertly borrowed hundreds of millions of dollars from Leadenhall in excess of their Borrowing Bases*." (*Id.* ¶ 101 (emphasis added).)

    F.   <u>Mr. Wander Promises Fixes: "Replacement Deals," Selling Businesses for Cash, or Borrowing From A-CAP.</u>

By March 2023, Mr. Wander allegedly acknowledged a bigger "'screwup,'" (*id.* ¶ 110), yet continued to obfuscate, "avoid[ing] explaining precisely how and when the [alleged "]double-pledging["] had occurred," (*id.* ¶ 109).

Mr. Wander allegedly promised to do two things to make things right. First, he would direct "reconciliation[s]" of all assets pledged as collateral to confirm the

---

[12] No effect from this transfer is apparent in the Reports reproduced in the Complaint.

scope of the issue and prevent its recurrence. (*Id.* ¶ 114.) Second, Mr. Wander (and Mr. Wander "alone," (*id.* ¶ 108)), committed to somehow fix Leadenhall's deficit. Mr. Wander said that "any deficit or hole in Leadenhall's Collateral could be shored up by[] what he termed 'replacement deals.'" (*Id.* ¶ 109.) He promised "to 'do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap." (*Id.* ¶ 118 (alteration in Complaint).)

Leadenhall alleges that "[w]hen pressed for details on this plan"—one to "'cure the identified deficiency and the associated time frame,'" (*id.* ¶ 120 (citing Ex. 4))— Mr. "Wander stated that the 'holding company lender' was A-CAP," Partner HoldCos' senior lienholder, (*id.* ¶ 119).

G. Leadenhall Speculates That A-CAP "Must Have" Become "Aware" in "Early" 2023.

Leadenhall alleges that A-CAP first entered the fray in the months that followed. A-CAP allegedly took part in workout negotiations with Leadenhall, allegedly aimed at avoiding "this lawsuit," offering in the summer of 2023 to "'replace' the double-pledged collateral with other security interests." (*Id.* ¶ 13.)

Leadenhall does not, however, allege that A-CAP had anything to do with the alleged Borrowing Base fraud. Indeed, Leadenhall does not plead facts plausibly showing that A-CAP so much as *knew* about the alleged fraud until Leadenhall clued A-CAP in. Leadenhall instead speculates that "A-CAP must have been well aware and 'in the know' for months" before "June and July 2023"—*i.e.*, well after the alleged fraud had been committed—"that Collateral pledged to Leadenhall had been [']double-pledged['] and/or did not exist . . . ." (*Id.* ¶ 142.) The basis for that

speculation is (i) A-CAP COO Mike Saliba's alleged lack of "surprise" (as allegedly perceived by Leadenhall) when informed by Leadenhall of the alleged "double-pledging," (*id.*), and, (ii) "upon information and belief," "[a]s a result of" a purported "agreement between 777 Partners and A-CAP," (*id.* ¶ 16), giving A-CAP "the right to control 777 Partners' operations," (*id.* ¶ 161). According to Leadenhall, based on an alleged statement by an unnamed employee of an unnamed Partners HoldCo subsidiary, that unidentified agreement was entered in early 2023.[13] (*Id.*)

Leadenhall pleads no facts suggesting that 777 Partners allegedly giving A-CAP the contractual right to control operations in early 2023 means that 777 must have confessed its earlier alleged federal crimes to A-CAP.

H. <u>A-CAP Takes Steps to Protect the Value of Its Collateral.</u>

The Complaint describes steps taken by A-CAP, after discovery of the alleged collateral deficiency, to protect its right to repayment from 777 on behalf of its policyholders: A-CAP allegedly made loans to 777 so that it could cover expenses, (*id.* ¶¶ 19, 181), including one that "allow[ed] 777 Partners to make payroll and cover operating expenses" in February 2024, (*id.* ¶ 160). So-called "protective advances" of the sort are common and lawful. *See infra* Part II.A.1.[14]

---

[13] "[I]n early 2024," Leadenhall alleges, it was told by an unnamed 777 employee that the agreement had been in place "for approximately the last year." (*Id.* ¶ 161.)

[14] Leadenhall also asserts that because A-CAP is a major lender that "provides the 'financial firepower' to fuel 777 Partners' dealmaking," (Compl. ¶ 14), 777 could not have engaged in its scheme without A-CAP. But loaning money to an entity later alleged to have operated a

I. <u>Leadenhall's "Upon Information and Belief" Allegations</u>

Despite the law's demand for specificity, the allegations that Leadenhall cobbles together about A-CAP comprise almost entirely allegations made "upon information and belief." That includes Leadenhall's assertion about when A-CAP learned of the alleged Borrowing Base Deficiency. *See supra* Part G (citing Compl. ¶ 16). It even includes Leadenhall's ultimate (threadbare) conclusion that A-CAP aided and abetted 777's alleged fraud: Leadenhall asserts only "on information and belief" that A-CAP "approved" of 777's "decisions to commit fraud alleged [in the Complaint]." (Compl. ¶ 258.)

Allegations on "information and belief" also include, for instance, the allegation that Mr. Wander used 777's corporate system to freely transfer assets among a web of trade names. (*Id.* ¶ 142 n.5.) From that belief, Leadenhall surmises that "[i]f this is correct," then a "fraud [was] perpetrated on Leadenhall," the result of which was to improve A-CAP's position. (*Id.*) Yet even this information-and-belief allegation describes no action taken by—much less misconduct by—A-CAP and does not contend that A-CAP had any knowledge of the purported double-pledging scheme.

Leadenhall also alleges that A-CAP objected to Leadenhall's proposal to have a former employee of a Partners HoldCo subsidiary perform an asset-by-asset review of receivables pledged to Leadenhall as collateral. (*Id.* ¶¶ 143–44.) Leadenhall then alleges upon information and belief that A-CAP's objection can be explained only by

---

criminal enterprise makes A-CAP no more liable than it does Leadenhall. If Leadenhall's allegations are true, then A-CAP, like Leadenhall, is a *victim* of 777's alleged crimes.

its purportedly "true" concern that the proposal "would expose the ongoing fraud to Leadenhall." (*Id.* ¶ 144.) The Complaint does not explain why that is a plausible inference, or why A-CAP's alleged objections are not more plausibly explained by, for example, the reason allegedly given: that the asset-by-asset review "'would violate'" the severance agreement of a former employee who had departed for a "'direct competitor'" to 777 Partners. (*Id.*)

As for Mr. King, Leadenhall makes only sporadic and extraneous allegations. (*See, e.g.*, *id.* ¶¶ 157–58.) It fails to allege that Mr. King personally had any role in 777's allegedly fraudulent conduct.

## LEGAL STANDARD

To survive a motion to dismiss, Leadenhall must allege "enough facts to state a claim to relief that is plausible on its face," not merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts do not accept as true legal conclusions, *see id.*, "threadbare recitals" of the elements, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or assertions "contradicted by the complaint itself," *Perry v. NYSARC, Inc.*, 424 F.App'x 23, 25 (2d Cir. 2011). Nor do Courts accept allegations of conspiratorial conduct with "obvious alternative explanation[s]." *Twombly*, 550 U.S. at 567; *see Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358–59 (S.D.N.Y. 2018) (dismissing conspiracy claim over obvious alternative explanation).

When causes of action incorporate fraud claims by reference and thus also sound in fraud, they must be pled with particularity under Rule 9(b). *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 2004 WL 238035, at *1 (S.D.N.Y. Feb. 9, 2004) (applying Rule 9(b) to RICO and aiding-and-abetting claims); *see also Donelli v. Cnty. of*

*Sullivan*, 2009 WL 2365551, at *2 (S.D.N.Y. July 31, 2009) (RICO claims "based on predicate acts of fraud" are subject to Rule 9(b)). Fraud allegations cannot be pled "upon information and belief," unless the alleged fraud is "particularly within the opposing party's knowledge." *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 455 (S.D.N.Y. 2001). Even then, for such allegations to be credited, they "must be accompanied by statements of facts upon which such belief is *reasonably* founded." *Id.* (emphasis added).

## ARGUMENT

### I.  LEADENHALL'S CLAIMS ARE UNRIPE.

#### A.  <u>The RICO Claims Are Unripe.</u>

Leadenhall has no RICO claim for a threshold reason: "creditor Plaintiffs" like Leadenhall "must pursue" their state-law claims, including those based on "their admitted contractual rights," before they can "allege 'clear and definite' damages" of the sort needed to state a RICO claim. *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 398–99 (S.D.N.Y. 2000); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 562 (S.D.N.Y. 2014) ("[A] 'cause of action does not accrue under RICO until the amount of damages becomes clear and definite.'" (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)). Lenders can thus pursue RICO claims "only after the lender has exhausted the bargained-for remedies available to it . . , and then only to the extent of the deficiency." *First Nationwide*, 27 F.3d at 768; *see also Am. Home Mortg. Corp. v. UM Sec. Corp.*, 2007 WL 1074837, at *4 (S.D.N.Y. Apr. 9, 2007) (holding that plaintiff alleging that unforeclosed loans had been unsecured by racketeering lacked RICO standing). Those state-law remedies must be exhausted

even when collecting on them is a "'forlorn hope.'" *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, 347 F.App'x 711, 713 (2d Cir. 2009) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 137 (2d Cir. 2003)); *see also Goldfine*, 118 F. Supp. at 398 (holding that "adjudication of the State law claims" was "a necessary predicate to ripeness and standing" under RICO).

The Second Circuit's decision in *First Nationwide* is on point. There, defendants allegedly misrepresented the value of pledged collateral to obtain loans. *First Nationwide*, 27 F.3d at 765–77 (outlining "Excess Loan Loss" theory based on "the true value of the collateral"). The plaintiff argued its RICO claim was ripe even though it had not foreclosed on those loans because, it contended, "it suffered immediate quantifiable injury when the loans were made because the loans were undersecured, [plaintiff] assumed additional risk of loss, and for all practical purposes, the additional funds were lost the moment the loans were made." *Id.* at 768 (internal quotations and alterations omitted). The Second Circuit rejected the plaintiff's "novel theory" that it had standing under RICO "simply by being undersecured" on "loans not yet foreclosed" and dismissed the claim. *Id.*; *see also Kerik*, 64 F. Supp. 3d at 562 ("[A] lender's claim against a debtor for recovery of a secured loan is not ripe until the lender has sought foreclosure.").

So too here. Leadenhall claims harm from allegedly fraudulently "double-pledged" and nonexistent "collateral." (Compl. ¶¶ 2, 7, 93–117, 120–26.) Yet it has not sought to foreclose on its loans, and its state-law claims remain pending. *See Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp.*, 2012 WL 3542196, at *14

(S.D.N.Y. Aug. 15, 2012) (holding RICO claim unripe because "numerous other claims . . . in this litigation" made RICO damages "not yet clear and definite"). Indeed, at this stage, Leadenhall's damages remain speculative. It remains to be seen whether its Collateral—comprising "first-priority security interests in all of the assets of each Borrower," (Compl. ¶ 51), will prove inadequate upon foreclosure, and if so, *by how much*.[15] And if Leadenhall believes its Collateral was "double-pledged," the U.C.C. has a mechanism for resolving disputes among creditors, *see* N.Y. U.C.C. § 9-322 ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection"), and Leadenhall must exhaust those available remedies before pursuing the claims it brings here.

B. <u>The State-Law Claims Are Unripe.</u>

Leadenhall's state-law claims for aiding and abetting fraud are also unripe— *First Nationwide* and its progeny apply with equal force to state-law claims sounding in fraud. Lenders must thus exhaust "bargained-for remedies available" before "assert[ing] that it was damaged by the fraud, and then only to the extent of the deficiency." *Saleh Holdings Grp., Inc. v. Chernov*, 30 Misc. 3d 1220(A), at *4 (Sup. Ct. Jan. 31, 2011) (dismissing state-law fraud claim as unripe); *see also Zarintash v.*

---

[15] Leadenhall does **not** allege that SuttonPark or Dorchester stopped remitting monthly inflows of cash to Leadenhall or that they would have been unable to eventually repay their debt. It alleges a present value of future cash flows of about $106 million between SuttonPark and Dorchester. (See *id.* ¶¶ 131, 134.) And it is silent about the assets of the other two SPV Borrowers, where there is no alleged deficiency.

*Boffa*, 1999 WL 155991, at *2 (S.D.N.Y. Mar. 19, 1999) (dismissing state-law fraud claim for failure to exhaust claims under promissory note).

## II. LEADENHALL STATES NO CIVIL RICO CLAIM (COUNTS VII & VIII).

To state a civil RICO claim, plaintiffs must allege harm by "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering conduct," *Kerik*, 64 F. Supp. 3d at 553. That is a high bar—especially when, as here, the asserted claim hinges on alleged mail or wire fraud.[16] Claims like those are "particularly scrutinized." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014).

Because "[a]ll of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions," *Gutman v. Equidyne Extractive Indus. 1980 Petro/Coal Program I*, 1990 WL 113193, at *7 (S.D.N.Y. July 27, 1990), plaintiffs must identify the time, place, content of, and parties to all allegedly fraudulent communications. *See, e.g.*, *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124–26 (2d Cir. 2018); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013).

And "lumping the defendants into collective allegations," as Leadenhall does here, "results in a failure to demonstrate the elements of § 1962(c)." *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009); *see United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the

---

[16] Leadenhall alleges that only the 777 Defendants, not A-CAP and Mr. King, committed mail and wire fraud. (*See* Compl. ¶ 264.)

members of the enterprise . . . ."). Instead, every element must be pled "as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) ("[W]e evaluate the RICO allegations with respect to each defendant individually.").

Courts apply these standards well aware of RICO's power, the potential for abuse, and the "inevitable stigmatizing effect" on those named as defendants. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996); *see Limestone Dev. Corp.*, 520 F.3d at 803 (affirming dismissal of RICO claim and warning against "largely groundless claim[s] simply tak[ing] up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence") (alteration in original omitted). Courts are thus vigilant to "flush out" defective RICO claims "at an early stage of the litigation." *Id.*; *see also Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 2013 WL 3943267, at *5 (S.D.N.Y. July 31, 2013).

On top of being unripe, Leadenhall's RICO claims against A-CAP and Mr. King should be "flush[ed] out" for five main reasons. Leadenhall makes no well-pleaded allegations that: (1) A-CAP committed predicate acts; (2) Leadenhall suffered cognizable damages proximately caused by such acts; (3) it suffered any injury in the United States; (4) the asserted RICO enterprise is distinct from any alleged pattern of racketeering; or (5) there is any threat of continuing criminal conduct. Given these failures and others, the RICO conspiracy claim necessarily fails too.

A. <u>The Complaint Fails to Allege That A-CAP or Mr. King Committed a Predicate Act.</u>

To state a RICO claim, Leadenhall must, at a minimum, plead with particularity that A-CAP and Mr. King each "personally committed two or more predicate acts," *Khan Funds Mgmt. Am., Inc. v. Nations Techs. Inc.*, 2023 WL 6124801, at *12 (S.D.N.Y. Sept. 19, 2023) (quotations omitted).[17] What Leadenhall offers, however, is instead no more than the threadbare legal conclusion that they, in some unspecified way, "encouraged and enabled" the alleged fraud of others. (Compl. ¶ 266.)

For two reasons—one on the alleged facts and the other on the law—that cannot sustain a RICO claim. First, Leadenhall pleads no facts to support an aiding-and-abetting claim—only those that preclude one. *See infra* Part II.A.1. Second, aiding and abetting a predicate act should not itself qualify as a predicate act. *See infra* Part II.A.2.

1. *Leadenhall Pleads No Facts Showing That A-CAP or Mr. King Had Anything to do With the Alleged Fraud.*

Leadenhall pleads no fact to support its charge that A-CAP and Mr. King aided and abetted the 777 Defendants' alleged fraud. Just the opposite: Leadenhall speculates that A-CAP did not so much as become *aware* of the misconduct until 2023, *see supra* Background Part G, (citing, *inter alia*, Compl. ¶ 142). Yet Mr. Wander's

---

[17] A "predicate act" is any crime defined as "racketeering activity" in 18 U.S.C. § 1961(1).

alleged fraud was complete—and at least $380 million drawn—by mid-2021. *See supra* Background Part D.[18]

When Leadenhall turns to A-CAP, it makes no plausible allegation that A-CAP played any role in that years-old fraud. It alleges three other types of conduct instead. None plausibly supports a finding that A-CAP engaged in any predicate act that was part of a racketeering scheme, and each has an "obvious alternative explanation," *Twombly*, 550 U.S. at 567.

**A-CAP's alleged influence.** Leadenhall says that because A-CAP has had influence over 777's decision-making since 2023, (Compl. ¶ 161)—through A-CAP's contractual right "to default [the] Holdco loan," (*id.* ¶ 174), an "all asset lien," (*id.* ¶ 12), and the "'practical[] . . . power of the purse,'" (*id.* ¶ 20)—A-CAP must have been "in the know" about 777's alleged fraud, (*id.* ¶ 142). But for three reasons, that has nothing to do with aiding and abetting alleged fraud.

---

[18] Leadenhall spends dozens of paragraphs alleging *how* the fraud was alleged perpetrated, covering fraudulently "double-pledged" "collateral," (*e.g.*, Compl. ¶¶ 2, 7, 93–117, 120–25); never-purchased "collateral," (*id.* ¶¶ 93, 126); fraudulent misrepresentations about the SPV Borrower's Borrowing Base in Monthly and Compliance Reports, (*id.* ¶¶ 100, 121–38); and altered data and forged documents, (*id.* ¶¶ 100, 162–69). Yet according to Leadenhall, it was all the handiwork of "Wander," "Wander's entities," or "Wander and Pasko," (*e.g.*, *id.* ¶¶ 16, 100, 105 ("Wander and Pasko had 'double-pledged' Leadenhall's assets."), (*id.* ¶ 130 ("Borrowers, Pasko, and Wander had lied all along . . . .")).

*First*, A-CAP's contractual rights as a senior creditor hardly imply its knowledge of—much less participation in—an alleged scheme that came to fruition years before A-CAP allegedly secured those rights.

Nor do rights and influence in 2023 and 2024 suggest that Mr. Wander confessed years-old alleged crimes to A-CAP—ever, much less contemporaneously.[19] To the contrary, A-CAP's alleged rights (and power of the purse) suggest that A-CAP is the *last* entity to which Mr. Wander would want to divulge alleged fraud, lest A-CAP exercise those rights or cease its protective advances.

*Second*, after a windup with sweeping rhetoric, Leadenhall's "payoff" is no more than speculation about *knowledge* in 2023. But knowledge alone is never enough to state a claim for aiding and abetting, *see Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 411 (S.D.N.Y. 2021)—much less knowledge that allegedly comes two years late.

*Third*, rhetoric aside, what Leadenhall describes is no more than the usual influence that a senior creditor has over a borrower through standard contractual rights. "Suggestions by a major lender" and the "threat[ened] exercise of its legal rights if the debtor does not comply" are "commonplace and completely proper." *Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y.

---

[19] Nor is it plausible to suggest, as Leadenhall does, (*see* Compl. ¶ 256), that because A-CAP had the right to approve decisions, Mr. Wander went to A-CAP to approve federal crimes (lest he "breach" a contract).

1995). Doing so "often enable[s] secured creditors to extract concessions from the borrower," including "greater restrictions and controls on [the borrower's] business." My Chi To, *Second-Lien Financings in Bankruptcy: Expectations v. Reality*, PRAC. LAW (2008).

There is thus a single, obvious, and innocent explanation for A-CAP's purported "influence": it has rights common among senior creditors and the influence that may come with them. *Cf. L-7 Designs v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (plaintiff's inferences are implausible if there "exist[] alternative explanations so obvious that they render plaintiff's inferences unreasonable").

**Protective advances.** Leadenhall says that A-CAP made protective advances "to cover up the [alleged] scheme." (Compl. ¶ 181.) There is again an obvious alternative explanation. It is both rational and "common" for a lender to make "[p]rotective advances . . . when [its] collateral is in jeopardy." *Corporativo Grupo R SA de C.V. v. Marfield Ltd.*, 606 F. Supp. 3d 502, 512 (S.D. Tex. 2022).

**Pre-litigation workout discussions.** Leadenhall also speculates that the reason A-CAP participated in pre-litigation workout discussions was "to keep Leadenhall from making the pattern of fraud public." (*Id.* ¶ 142.) The involvement of a first-lien lender in workout talks cannot plausibly support such a logical leap. *See Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 151 (2d Cir. 2007) (explaining that "inherent in any creditor-debtor relationship" is the power to "exert[] the control necessary" for a lender "to attempt a workout" of the debtor). Plainly, it is in A-CAP's interests as a senior creditor to engage in alleged talks that might avoid

(aggressively) threatened litigation, the mere existence of which could (as Leadenhall acknowledges, (*id.* ¶ 142)), affect A-CAP's collateral.[20]

At any rate, Leadenhall also alleges an innocent commercial reason why A-CAP became involved: because Mr. Wander allegedly proposed to solve his dispute with Leadenhall through A-CAP lending more cash to 777, which in turn could loan that money to Leadenhall's SPV-Borrower counterparties. *See supra* Background Part F (citing, *inter alia*, Compl. ¶ 118). Moreover, Leadenhall alleges that the restructuring efforts aimed at "stav[ing] off this very litigation" (and the publicity that comes with it) were ***nixed by A-CAP***, (*id.* ¶¶ 140, 175–80), much to Mr. Wander's dismay, (*id.* at ¶ 179)—hardly the actions of a lender intent on covering up fraud at all costs. The notion that A-CAP became involved to conceal alleged fraud is thus "contradicted by the complaint itself." *Perry*, 424 F.App'x at 25.

Because Leadenhall fails to plausibly allege the commission of any predicate act by A-CAP, it states no RICO claim against A-CAP. *See, e.g.*, *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 540 (S.D.N.Y. 2014) (dismissing RICO claim for lack of "any specific act" of fraud).

### 2. Second Circuit Case Law Does Not Support Extending RICO Liability to Aiding and Abetting Predicate Acts.

Though there is a divide among courts in this Circuit, the better view is that aiding and abetting mail and wire fraud are not RICO predicate acts. While mail and

---

[20] HoldCo's assets are A-CAP's collateral. And Leadenhall itself alleges that the claims themselves could bring 777 "all the way down." (Compl. ¶ 142.)

wire fraud themselves are predicate acts, "nothing in the language of" the statute "suggests that aiding and abetting a predicate act itself constitutes a predicate act." *Est. of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 395–96 (S.D.N.Y. 2014); *see also Penn. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 841 (3d Cir. 2000) (rejecting RICO liability for "aid[ing] and abet[ing] RICO predicate acts of mail and wire fraud") (cited approvingly by *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019)); *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 657 (3d Cir. 1998) ("[T]he text of § 1962 itself contains no indication that Congress intended to impose private civil aiding and abetting liability under RICO.").[21] And whether civil RICO liability should be expanded to include aiding and abetting the proscribed acts is a decision for Congress, not the courts.

What is more, reading the statute to include aiding and abetting another act to itself be a predicate act would clash with the Second Circuit's holding in *Eliahu* that there is "no private cause of action . . . for aiding and abetting a civil RICO violation," 919 F.3d at 713 (citing *Rightenour*, 235 F.3d at 843–44).

---

[21] In *Alix v. McKinsey & Co.*, 2023 WL 5344892, at \*12 (S.D.N.Y. Aug. 18, 2023), Judge Furman denied a motion to dismiss a civil RICO claim premised on aiding and abetting in part because *Satinwood*, 385 F.3d at 178, suggested "in *dicta*" that an aider and abettor of predicate acts could face RICO liability. The Second Circuit has yet to directly address whether that *dicta* survives *Eliahu*.

B. Leadenhall Suffered No Cognizable Harm Proximately Caused by A-CAP.

Leadenhall cannot meet RICO's "rigorous" proximate-causation requirement, which "requires dismissal when substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276–77 (S.D.N.Y. 2019). Leadenhall fails to allege any direct relation between A-CAP's alleged actions and Leadenhall's alleged injury.

In fact, that alleged injury—the Borrowing Base Deficiency—is not a RICO injury at all. Leadenhall cannot plausibly allege, for example, to what extent any shortfall in the present value of its collateral resulted from alleged racketeering, rather than external factors such as interest-rate fluctuations. (*Cf.* ECF 155 at pp. 12–13.) This failure independently warrants dismissal. *See, e.g.*, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 143 (2d Cir. 2018) (where liquor distributors' lost sales did not necessarily follow from the alleged predicate act of liquor smuggling, affirming dismissal of complaint because of the attenuated causal chain).

C. The Complaint Alleges No Domestic Injury.

Although Leadenhall "must allege and prove a *domestic* injury to its business or property," *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 346 (2016) (emphasis in original), Leadenhall merely alleges that it is a foreign entity,[22] (Compl. ¶ 22), that

---

[22] It is not impossible for foreign entities to show facts capable of supporting a domestic injury. *See Yegiazaryan v. Smagin*, 599 U.S. 533 (2023). Still, under both that case and *RJR Nabisco*, all plaintiffs must allege facts that show that an alleged injury was suffered domestically.

does business with American entities. The entity that it has characterized as the "foundation" of the alleged scheme, (ECF 57 at 14), is Bermudan, and the alleged "ultimate goal" of the alleged racketeering is to buy European football clubs, (Compl. ¶ 191). And unlike in *Yegiazaryan*, Leadenhall does not allege having suffered any injury to any domestic property or interest. 599 U.S. at 549 (finding domestic injury based on, among other things, harm caused by racketeering activity that stymied plaintiff's enforcement of a California judgment in California). It thus fails RICO's domestic injury requirement.

D. <u>The Complaint Alleges No Distinct Enterprise.</u>

A RICO enterprise must (1) "be distinct from the person conducting the affairs of the enterprise" and (2) "exist separate and apart from the pattern of activity in which it engages." *Heinrich v. Dean*, 655 F. Supp. 3d 184, 190 (S.D.N.Y. 2023) (quotations omitted). These two requirements "work in tandem to weed out claims dressed up as RICO violations but which are not in fact." *Cont'l Fin. Co. v. Ledwith*, 2009 WL 1748875, at *5 (S.D.N.Y. June 22, 2009). The "conclusory naming of a string of entities" does not suffice to allege an enterprise; a plaintiff must plausibly allege "solid information regarding the hierarchy, organization, and activities of the alleged enterprise." *Wild Edibles Inc. v. Indus. Workers of World Local 460/640*, 2008 WL 4548392, at *1 (S.D.N.Y. Oct. 9, 2008). Failure to do so "dooms a RICO claim." *Foster v. 2001 Real Estate*, 2015 WL 7587360, at *4 (S.D.N.Y. Nov. 24, 2015).

The Complaint falls far short of making this required showing. Leadenhall makes the conclusory assertion that all Defendants operate as an associated-in-fact enterprise, (Compl. ¶ 263), each a "critical participant[]," (*id.* ¶¶ 264–66), without

even trying to allege any "solid information" about the hierarchy, organization, and activities of the enterprise distinct from the alleged pattern of racketeering activity. Inflammatory and conclusory rhetoric that A-CAP is the "Wizard of Oz," "bankroller," and "master puppeteer," (*id.* ¶¶ 12, 139, 174) is insufficient. *See, e.g., Paul Hobbs Imports Inc. v. Verity Wines LLC*, 2023 WL 374120, at *9 (S.D.N.Y. Jan. 24, 2023) (allegation that defendants were "masterminds" behind a RICO scheme was "too conclusory to plausibly allege the existence of an association-in-fact enterprise") (internal quotations omitted). It is also contradicted by the Complaint itself, which repeatedly says that *Mr. Wander and Mr. Pasko*, not A-CAP, hold "domination and control" over nearly all members of the alleged enterprise, (*id.* ¶¶ 38, 39, 239).

Nor does the Complaint allege an enterprise distinct from the alleged Borrowing Base fraud, which is "the very 'pattern' of activity underlying Plaintiff's RICO claim." *Heinrich*, 655 F. Supp. 3d at 192 (internal quotations omitted). Leadenhall alleges that the enterprise "defraud[ed] one particular" entity only, *id.*: Leadenhall. (*See, e.g.*, Compl. ¶ 251 ("Defendants . . . fraudulently inflate[d] the amount of their Collateral *to Plaintiffs* and misrepresent[ed] facts *to Plaintiffs* to conceal their fraud.") (emphases added).) The alleged acts of fraud aimed at Leadenhall allegedly constitute the enterprise. (*See, e.g., id.* ¶¶ 263–68 (failing to distinguish the enterprise from the allegedly fraudulent activity aimed at one victim); *id.* ¶ 268 (alleging only that "Defendants' racketeering acts were a regular way of conducting their ongoing business ***with Plaintiffs***") (emphasis added).) That is insufficient to allege an enterprise, which must exist "separate and apart from the

pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see Satinwood*, 385 F.3d at 176 (affirming dismissal of RICO complaint that failed to "detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves—a requirement in this Circuit").

Moreover, Leadenhall must show that the alleged enterprise participants "acted on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests." *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F.App'x 663, 668 (2d Cir. 2014). The Complaint fails there too because it does not—and cannot—explain how A-CAP's purpose was anything but advancing its own self-interest rather than some shared purpose of the enterprise. *See id.* (dismissing RICO claim for failure to plead the existence of an association-in-fact enterprise where defendants allegedly "worked together in some respects . . . , but the complaints create no plausible inference that they did so to advance the political agenda of their purported 'enterprise' or for any shared purpose"). At best, the Complaint implausibly claims that the "ultimate goal of the enterprise" is to "purchase professional football teams." (Compl. ¶ 181.) But even if that were true, buying sports teams is lawful, and Leadenhall cannot allege the existence of a "separate enterprise . . . by alleging that illegal means were used to obtain a lawful objective." *D.N.C. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019).

E.  <u>The Complaint Alleges No Pattern of Racketeering.</u>

To plead a "pattern" of racketeering activity, plaintiffs must plead facts showing that each "defendant's criminal participation in an enterprise is not merely

isolated or sporadic, but indicative of the sort of continuity of criminal activity—or the threat of continuity—that is the hallmark of racketeering." *United States v. Pizzonia*, 577 F.3d 455, 465 (2d Cir. 2009). For three reasons, Leadenhall fails to do so.

*First*, Leadenhall's open-ended theory of continuity is unsupported by the required plausible allegations of "a future threat of repetition" of the criminal activity alleged. *D.N.C.*, 392 F. Supp. 3d at 445. Leadenhall instead resorts to a threadbare and conclusory recital of the element: there is a "threat of continuing criminal activity," it says, because, "on information and belief, Defendants continue to borrow from third-party lenders, in addition to Plaintiffs, against collateral that has been fraudulently pledged to multiple lenders." (Compl. ¶ 269.) That sort of "conclusory[]," *AmBase Corp. v. 111 W. 57th Sponsor LLC*, 785 F.App'x. 886, 889 (2d Cir. 2019), and "speculative," *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995), purported threat of continuity cannot support the required "pattern." What's more, because Leadenhall assertion of its "information and belief" is not "accompanied by statements of facts upon which such belief is reasonably founded," *Phipps.*, 152 F. Supp. 2d at 455, Leadenhall's unsupported "belief," (Compl. ¶ 269) cannot be credited.

*Second*, the alleged RICO scheme fails the open-ended continuity test because it was "not only inherently terminable, but, in fact was terminated," *Rio Tinto PLC v. Vale*, 2015 WL 7769534, at *10 (S.D.N.Y. Nov. 20, 2015) (quotations omitted), within a matter of months in and around mid-2021. That is, 777 made all the

allegedly fraudulent draws around the time of the LSA's inception and made no further draws thereafter. *See supra* Background Part D. Leadenhall thus concedes that the fraudulent scheme was accomplished long ago, demonstrating that "the requisite threat of continuity," *GICC Cap. Corp.*, 67 F.3d at 466, is lacking. Any alleged subsequent enjoyment of the proceeds or concealment does not extend the continuity period. *Rio Tinto*, 2015 WL 7769534, at *10.

*Third*, Leadenhall's pattern allegations fail because multiple acts of fraud "in furtherance of a single episode of fraud involving one victim"—Leadenhall—"and relating to one basic transaction"—the LSA—"cannot constitute the necessary pattern." *Crawford*, 758 F.3d at 489 (quotations omitted); *accord Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (suggesting that it is "virtually impossible" for allegations of a single scheme, single injury, and *few* victims to meet RICO's pattern requirement).

F.  Leadenhall States No RICO Conspiracy Claim.

Leadenhall's civil RICO conspiracy claim fails for three reasons. *First*, when, as here, the "RICO conspiracy claim[] [is] entirely dependent on the[] substantive RICO claim[]," the failure of the latter requires dismissal of the former. *Satinwood*, 385 F.3d at 164*; see also Knoll v. Schectman*, 275 F.App'x 50, 51 (2d Cir. 2008) (RICO conspiracy claims "necessarily must fail" if the substantive RICO claims are deficient).

*Second*, Leadenhall has not plausibly alleged against A-CAP the "core of a RICO civil conspiracy," that it agreed "to commit predicate acts," *R.C.M. Exec. Gallery Corp. v. Rols Cap. Co.*, 1997 WL 27059, at *10 (S.D.N.Y. Jan. 23, 1997). Conclusory

allegations of participation in a conspiracy are insufficient. *Id.* The only agreement that Leadenhall alleges as to A-CAP is conclusory and not even alleged to have been entered into for the purpose of committing predicate acts: "A-CAP had dictated an express agreement with 777 Partners which granted A-CAP the right to control all facets of 777 Partners' operations." (Compl. ¶ 15.) But, as described *supra* in Background Part G, the basis for the allegation that such an agreement exists is dubious. At any rate, an agreement to control operations is not an agreement to commit predicate acts.

*Third*, dismissal is also warranted because "there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants." *Cenedella*, 348 F. Supp. 3d at 358; *see supra* Part II.A.1 (describing obvious alternative, commercially reasonable explanations for the acts allegedly taken by A-CAP—*i.e.*, that A-CAP monitored and protected collateral backing its loans, as would any responsible senior creditor).[23]

---

[23] If the Court dismisses the RICO counts, as it should, then the only remaining claims will be state-law claims. Given 777 Partners' representation that one of its members is a foreign entity, diversity jurisdiction appears to be lacking. (ECF 86-1 ¶ 3.) Accordingly, the Court should decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c)(3); *Satinwood*, 385 F.3d at 183 (affirming dismissal of state-law claims following dismissal of RICO claims).

### III.  LEADENHALL'S STATE-LAW CLAIMS FAIL AS A MATTER OF LAW.

A.  "Civil Conspiracy" Is Not a Cause of Action (Count V).

Leadenhall's civil conspiracy claim fails because "no cause of action lies for civil conspiracy." *Dorce v. City of N.Y.*, 608 F. Supp. 3d 118, 147 (S.D.N.Y. 2022). In any case, Leadenhall fails to plausibly allege a conspiratorial agreement. *See supra* Part II.

B.  Leadenhall Pleads No Claim for Aiding and Abetting Fraud (Count VI).

As with Leadenhall's RICO claim premised on aiding and abetting, *see supra* Part II.A, Leadenhall's aiding-and-abetting-fraud claim should be dismissed for failure to plausibly allege how A-CAP supposedly "substantially assisted," (Compl. ¶ 257), the fraud allegedly committed by others years before A-CAP came into the picture, (*see id.* ¶ 161 (alleging the existence of an early 2023 agreement by which A-CAP "had the right to control" 777 Partners)).

"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Berdeaux*, 561 F. Supp. 3d at 411 (citation omitted). Aiding and abetting claims premised on fraud are subject to Rule 9(b). *Berman v. Morgan Keegan & Co.*, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 11, 2011).

Leadenhall offers only self-serving speculation: that given an A-CAP employee's allegedly perceived lack of surprise about 777's double-pledging, A-CAP must have discovered the alleged borrowing-base issues "months" before June 2023 when it became involved in workout talks. (Compl. ¶ 142.) Leadenhall thus fails to

plead that A-CAP had actual, contemporaneous knowledge of the fraud that allegedly began in May 2021, (*see id.* ¶ 136). But it is "critical" to plausibly allege that, in providing substantial assistance, the defendant had "actual knowledge" "at the time" of the alleged conduct—failure to do so is "fatal." *Berdeaux*, 561 F. Supp. 3d at 414–15; *see also Rosner v. Bank of China*, 349 F.App'x 637, 639 (2d Cir. 2009) (holding that allegations merely suggesting that a defendant "should have known" of the fraud at the time are insufficient).

Rather than plead that A-CAP substantially assisted Mr. Wander's alleged fraud, Leadenhall tries to hold A-CAP liable for aiding and abetting because it (like Leadenhall and others) loaned money to an alleged fraudster. The case law does not support such a result. *See In re Refco Inc. Sec. Litig.*, 2011 WL 13168450, at *11 (S.D.N.Y. Dec. 8, 2011) ("Plaintiffs' reliance on [lender's] providing credit avails them nothing as applied to their aiding and abetting claim."); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 557 (W.D. Mich. 1998) (applying New York aiding-and-abetting law, and holding that a lender "cannot be held liable for aiding and abetting fraud . . . merely on the basis that it knew that the party it was lending to was not being forthright in its dealings with others").

Leadenhall also fails to plead substantial assistance. Leadenhall alleges that "on information and belief," 777's "decisions to commit fraud" must have been "approved by [Mr.] King and A-CAP in advance." (Compl. ¶ 258.) Leadenhall does not plead facts showing the source of, or basis for, that self-serving information and belief. Its key aiding-and-abetting-fraud allegation thus cannot be credited, *see Phipps*, 152

F. Supp. 2d at 455, and the claim does not satisfy Rule 9(b).[24] Moreover, even Leadenhall's unsupported, conclusory allegations fail to allege that A-CAP's actions "proximately caused the harm on which the primary liability is predicated." *Berdeaux*, 561 F. Supp. 3d at 416 ("'But-for' causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct."). The Complaint alleges no fact revealing any causal connection between anything A-CAP did and the alleged Borrowing Base Deficiency underlying Leadenhall's claims.

 C.  <u>Leadenhall Pleads No Unjust-Enrichment Claim (Count X).</u>

 Leadenhall's unjust enrichment claim (Count X) should be dismissed for two independent reasons.

 *First*, unjust enrichment is a "quasi-contract claim . . . the law creates *in the absence of any agreement*." *Goldman v. Metro. Life Ins. Co.,* 841 N.E.2d 742, 746 (N.Y. 2005). Thus, a "contract governing a particular subject matter ordinarily precludes" an unjust enrichment claim, *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987), even "where one party to the lawsuit is not a party to the contract." *Prickett v. N.Y. Life Ins. Co.,* 896 F. Supp. 2d 236, 249 (S.D.N.Y. 2012).

---

[24] The insufficiency of the information-and-belief allegations applies equally to the RICO counts given that both are allegedly based on predicate acts of fraud. *See Equitable Life Ins. Soc'y of U.S. v. Alexander Grant & Co.*, 627 F. Supp. 1023, 1029 (S.D.N.Y. 1985) (explaining that it is "entirely inappropriate" to plead a fraud-based RICO claim on "information and belief").

Here, Leadenhall's claim hinges on its "agreements" with 777, (Compl. ¶ 279)—including the LSA and the Guaranty, (*id.* ¶ 45)—the existence and validity of which are undisputed. "[T]he existence of [these] valid and binding contract[s] governing the subject matter at issue . . . preclude[s] a claim for unjust enrichment even against a third party non-signatory to the agreement" like A-CAP. *Law Debenture v. Maverick Tube Corp.*, 2008 WL 4615896, at *12 (S.D.N.Y. Oct. 15, 2008).

*Second*, unjust enrichment claims require allegations "showing a sufficient relationship between the parties that could have caused reliance or inducement." *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 121 F. Supp. 3d 379, 386 (S.D.N.Y. 2015). A relationship is "too attenuated" if the parties "had no dealings with each other." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012). Here, A-CAP is not alleged to have had any relationship with Leadenhall until June 2023, when it allegedly became involved in workout talks, (Compl. ¶ 141), long after 777 received any benefit from Leadenhall through the May 2021 LSA, *see supra* Background Part D. There is no allegation that A-CAP had taken any Leadenhall-facing action at the time of the "enrichment"—much less that A-CAP induced Leadenhall's reliance. Moreover, any benefit bestowed by Leadenhall was not "at the behest" of A-CAP, *Wilson v. Dantas*, 2013 WL 92999, at *8 (S.D.N.Y. Jan. 7, 2013), *aff'd*, 746 F.3d 530 (2d Cir. 2014), nor did A-CAP receive any "direct benefit," *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 353 (S.D.N.Y. 2014), so A-CAP was not unjustly enriched.

## IV.  LEADENHALL CANNOT HOLD MR. KING PERSONALLY LIABLE.

Leadenhall states no claim against Mr. King for all the above reasons and more. It alleges that Mr. King did only two things: announced A-CAP's recapture of insurance liabilities ceded to 777 Re, (Compl. ¶¶ 205–06), and objected to a forbearance agreement—on terms demanded by Leadenhall—that might have avoided this litigation, (*id.* ¶¶ 173–75). Such garden-variety actions by a CEO support no claim by Leadenhall of any sort, much less the "inevitabl[y] stigmatizing" RICO claim it launched.

Nor does Leadenhall show that even those benign actions were taken by Mr. King in his *personal* capacity. Yet Leadenhall cannot hold Mr. King liable for any action taken in his capacity as A-CAP's CEO. *See* N.Y. LTD. LIAB. CO. § 609 (Members, managers, and agents of LLCs are not personally liable for "liabilities of the limited liability company . . . arising in tort . . . by reason of *being* such member, manager or agent or *acting* (or omitting to act) in such capacities . . . .") (emphases added);[25] *Quebecor World (USA), Inc. v. Harsha Assocs., L.L.C.*, 455 F. Supp. 2d 236, 244 (W.D.N.Y. 2006) ("[O]ne of the beneficial purposes for forming an LLC . . . is[] to shield its individual members from personal liability for the acts of the LLC."); *Nezry v. Haven Ave. Owner LLC*, 2010 WL 3338545, at *11 (N.Y. Sup. Ct. 2010) (dismissing claims against LLC's members for failure to allege members' tortious conduct).

### CONCLUSION

Accordingly, A-CAP's and Mr. King's motion to dismiss should be granted.

---

[25] The rule in Delaware, where A-CAP is organized, is the same. *See* 6 Del. Code § 18-303.

Dated: New York, New York
       August 9, 2024

CADWALADER, WICKERSHAM & TAFT LLP

By: /s/ *Jonathan Watkins*
Jonathan M. Watkins
Michael E. Petrella
Matthew M. Karlan
Mark A. Singer
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Fax: (212) 504-6666
jonathan.watkins@cwt.com
michael.petrella@cwt.com
matthew.karlan@cwt.com
mark.singer@cwt.com

*Counsel for Advantage Capital Holdings
LLC and Kenneth King*

<u>**CERTIFICATION OF COMPLIANCE**</u>

I hereby certify under Section II.D of Judge Koeltl's individual practices that this memorandum contains 9,810 words, exclusive of the cover page, table of contents, table of authorities, and this certification. This complies with the Court's Order (ECF 159) permitting each defendant to file briefs with up to 10,000 words.

By:  /s/ *Jonathan Watkins*
Jonathan M. Watkins