## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP AND LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453 <br><br> **<u>AMENDED COMPLAINT</u>** |

## Table of Contents

INTRODUCTION ................................................................................................... 4

PARTIES .............................................................................................................. 10

    A.    Plaintiffs ............................................................................................ 10

    B.    Defendants ......................................................................................... 11

JURISDICTION AND VENUE ............................................................................ 16

STATEMENT OF THE CASE .............................................................................. 19

I.     Leadenhall Enters into a Credit Facility with 777 Partners Secured by Collateral. ........................................................................................................ 19

    A.    The Credit Facility ........................................................................... 19

    B.    The Loan and Security Agreement ................................................... 22

    C.    The Pledge Agreements .................................................................... 27

    D.    The Sale Agreements ........................................................................ 28

    E.    The Servicing Agreements ............................................................... 29

    F.    The Guaranty Agreement .................................................................. 31

    G.    Central to the Credit Facility Is That All Collateral Remain "Free and Clear" of Any Other Interests. ................................................... 32

II.    Leadenhall Uncovers a Pattern of Knowing Misrepresentations Concerning Its Collateral. ........................................................................... 36

    A.    Leadenhall Receives an Anonymous Tip Sounding the Alarm on Wander's "Criminal" Scheme. ......................................................... 36

    B.    Leadenhall Visits 777 Partners' Offices in Miami, During Which Wander Tries to Assure Leadenhall That Any problems with Its Collateral Are Limited and Under Control. ......................................... 38

    C.    In Early 2023, Wander Confirms That "Around $100 Million" of Collateral Had Been Double-Pledged to a Third-Party Lender Called Credigy. .............................................................................. 42

    D.    Despite Defendants' Efforts to Stonewall Leadenhall's Investigation, Leadenhall Discovers That the Borrowers Had Pledged Assets They Never Even Owned, and Leadenhall Formally Notices the Borrowers' Breaches of the Agreements ..................................................................... 48

    E.    Leadenhall Learns That 777 Partners and the Borrowers Forged and Altered Financial Records to Conceal the Fraud. ................................ 55

    F.    Leadenhall Exercises Remedies under the LSA, and 777 Partners Admits It Lacks Authority to Agree to a Repayment Plan without A-CAP. ......................... 59

III.    The Collateral Scam Furthered a Broader Fraudulent Enterprise Between 777, A-CAP, and Their Principals ..................................................................... 65

A.    King and A-CAP Controlled 777 Partners' Operations During the Fraudulent Scheme Against Leadenhall.................................................................. 69

B.    A-CAP Was Well Aware of and Participated in 777's Fraud on Leadenhall. ........................................................................................................ 72

C.    A-CAP Exercised and Continues to Exercise Its Control Over 777 Partners to Advantage Itself Over Other Creditors, Including Leadenhall. ......................................................................................................... 76

D.    The Tangled Web of A-CAP and 777 Partners........................................... 79

E.    Wander, Pasko, and the 777 Entities Operate as Alter Egos. ................. 90

F.    As Creditors and Counterparties Learn the Truth, the A-CAP/777 Scheme Begins to Crumble.......................................................................... 95

IV.    Absent Injunctive Relief, the Enterprise Would Frustrate Any Recovery by Pushing Itself to the Brink of Insolvency and Transferring Assets to A-CAP to Avoid Satisfying Creditors. ............................................................................. 101

CLAIMS FOR RELIEF .................................................................................................... 118

FIRST CLAIM FOR RELIEF (Breach of LSA)........................................................... 118

SECOND CLAIM FOR RELIEF (Breach of Sale Agreement).................................. 121

THIRD CLAIM FOR RELIEF (Breach of Servicing Agreement and LSA)

FOURTH CLAIM FOR RELIEF (Breach of Guaranty Agreement)........................... 127

FIFTH CLAIM FOR RELIEF (Civil RICO, 18 U.S.C. § 1962(c)).............................. 132

SIXTH CLAIM FOR RELIEF (Civil RICO Conspiracy, 18 U.S.C. § 1962(d))........ 143

SEVENTH CLAIM FOR RELIEF (Fraudulent Misrepresentation) ........................... 146

EIGHTH CLAIM FOR RELIEF (Civil Conspiracy to Commit Fraud)...................... 147

NINTH CLAIM FOR RELIEF (Aiding and Abetting Fraud))................................... 148

TENTH CLAIM FOR RELIEF (Unjust Enrichment) ................................................. 152

ELEVENTH CLAIM FOR RELIEF (Actual Fraudulent Transfer) ........................... 152

TWELFTH CLAIM FOR RELIEF (Constructive Fraudulent Transfer).................... 154

PRAYER FOR RELIEF .................................................................................................... 155

Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life," and collectively, "Leadenhall"), in their respective capacities as investment managers and/or agents, allege against Defendants Josh Wander, Steven Pasko, Kenneth King, 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners"), SPLCSS III LLC ("SuttonPark Borrower"), Signal SML 4 LLC ("Signal Borrower"), Insurety Agency Services LLC ("Insurety Borrower"), Dorchester Receivables II LLC ("Dorchester Borrower"), SuttonPark Capital LLC ("SuttonPark Capital"), Signal Medical Receivables LLC ("Signal Medical"), Insurety Capital LLC ("Insurety Capital"), SuttonPark Servicing LLC (the "SuttonPark Servicer"), and Advantage Capital Holdings LLC ("A-CAP") as follows.

## INTRODUCTION

1.    This action concerns a years-long pattern of fraud perpetrated on the lenders of hundreds of millions of dollars of debt by a group of entities operating under the domination and control of Defendants Josh Wander, Steven Pasko, and Kenneth King.  Leadenhall is the agent with the authority to bring this action for the benefit of investors in the lenders.

2.    To induce Leadenhall to fund their operation, Wander, along with his group of alter ego entities, "pledged" over $350 million in assets as collateral to Leadenhall, knowing all along that the assets either did not exist, were not actually owned by Wander's entities, or had already been pledged to another lender.  Wander has already admitted to rampant and fundamental breaches of the parties' agreements—the only question now is whether Leadenhall will be able to recover millions of dollars in damages from a house of cards on the brink of collapse.

3.    The scheme would not have been possible—and would not have been able to operate undetected for so long—without A-CAP.  While claiming to be nothing more than a "senior" lender to Wander, Pasko, and their constellation of businesses, A-CAP has not acted like

one.  If it ever was an arm's-length lender, it knowingly and willingly crossed the line to become a co-conspirator and participant in Wander and Pasko's enterprise by perpetuating the lie to Leadenhall.  Regardless of exactly when A-CAP became aware of the scheme—which, as set forth below, occurred by spring 2023 *at the latest*—A-CAP has actively leveraged, and continues to leverage, its knowledge of the fraud to its own financial advantage by, among other things, (a) strategically injecting capital into the 777 businesses to create the illusion of value and financial stability where there is none, for the purpose of inducing Leadenhall to continue lending money, and (b) perpetuating and concealing 777's lies to Leadenhall about fictitious or inflated collateral to avoid the discovery and collapse of the fraudulent enterprise.  In exchange for A-CAP's participation in and enabling of the scheme, Wander and Pasko, in willful abandonment of their fiduciary and other duties and obligations, gave A-CAP first dibs on every asset in the 777 empire—whether A-CAP is legally entitled to claim those assets or not.

4.    A credit facility is an agreement that allows borrowers to borrow money over an extended period of time—here, from May 2021 through September 2024—providing borrowers flexibility to use the funds as necessary for their day-to-day operations.  In a "borrowing base" credit facility, the borrowers may draw funds from the facility up to the amount of their credit limit, which is based on the value of the collateral securing the debt, *i.e.*, the borrowers' "borrowing base."

5.    On May 7, 2021, Leadenhall entered into a credit facility agreement with a group of limited liability companies, the ultimate parent companies of which are 777 Partners and 600 Partners, as memorialized in a Loan and Security Agreement (the "LSA").  777 Partners and 600 Partners are the trade names and alter egos of Josh Wander and Steven Pasko, who are the founders and so-called "Managing Partners" of 777 Partners and 600 Partners.

6.      Under its express terms, the credit facility was a secured facility, meaning that the borrowers were required to pledge collateral to secure the debt notes and own that collateral "free and clear" of any other security interest.  The borrowers were afforded a lower interest rate because the debt was secured.  And because the value of the borrowers' assets also functioned as the borrowing base, the borrowers were required to re-affirm, on a monthly basis and each time they drew funds from the facility, that they owned any assets pledged as collateral to Leadenhall "free and clear" of any other interests.

7.      In other words, the cardinal rule of the entire financing arrangement was that the borrowers were required to own the assets pledged as collateral "free and clear" of any other security interests.  If the borrowers did not actually own the assets pledged as collateral, or if the borrowers had already pledged those assets to another lender, the entire facility would effectively become an illegal and unsecured personal piggy bank that an individual like Wander could use to finance risky private equity investments in aviation, media, and sports including professional football (soccer) teams, while paying lower rates under the pretense of secured financing.  As it turned out, that is exactly what happened here.

8.      In September 2022, more than a year and a half into the credit facility and after the borrowers had represented to Leadenhall more than 40 separate times that the collateral pledged to secure the debt was "free and clear" of any other security interest, Leadenhall received an anonymous e-mail stating that Wander "either never bought" the assets that he had pledged to Leadenhall as collateral "or already pledged them to another lender."  The tipster revealed as to Wander: "***What he is doing is criminal***."

9.      After receiving the anonymous tip, Leadenhall launched an investigation and requested information from 777 Partners to determine whether this outstanding debt from the

lenders to Wander's companies—totaling well into the hundreds of millions of dollars—was in fact secured.

10.    Unfortunately for Leadenhall, the tip accusing Wander of criminal activity proved to be true. In March 2023, a third-party lender to 777 Partners called Credigy shared with Leadenhall a list of assets that 777 Partners had ostensibly pledged for the exclusive benefit of Credigy pursuant to a separate credit arrangement with 777 Partners.

11.    By reviewing the list of assets pledged to Credigy, Leadenhall discovered that over 1,600 assets worth approximately $185 million, which 777 Partners had purportedly pledged to Leadenhall, had in fact been "double-pledged"—*i.e.*, the same collateral had been pledged to *both* Credigy and Leadenhall.

12.    During conference calls in March and April 2023, recorded with Wander's permission, Wander attempted to defuse the situation by acknowledging just the tip of the iceberg, referring to the double-pledged collateral as "embarrassing," a "mistake," and a problem that he vowed to resolve—and freely admitting that 777 Partners had breached the parties' agreements while insisting that it had done so inadvertently. But, to conceal his broader scheme, Wander lied, assuring Leadenhall that the collateral shortfall in breach of the LSA was the result of a recording glitch that could and would be easily remedied.

13.    As a result of those conference calls, Leadenhall began to discern that Wander's misrepresentations concerning Leadenhall's collateral constituted just the opening act, and that 777 Partners does not even control its own operations and ability to perform under the LSA. The Wizard of Oz behind the 777 Partners curtain is in fact an insurance group holding company called A-CAP. Wander disclosed on the calls that A-CAP had a first-priority "all asset lien" over all of the assets of 777 Partners. Leadenhall later learned that A-CAP was behind the scenes—literally—

for these discussions, having physically moved into 777's Miami offices to oversee Wander and Pasko's operations around the same time the Leadenhall double-pledge came to light.

14.    In an effort to "replace" the double-pledged collateral with other security interests and continue to keep Leadenhall from filing this lawsuit, in the summer of 2023, A-CAP offered Leadenhall a fourth-priority position on the assets of 777 Partners' holding company—*i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall declined the offer.

15.    Around the same time that A-CAP's unusual role in 777 Partners' affairs became privately known to Leadenhall, the entanglement between 777 Partners and A-CAP became the subject of extensive public reporting.  A-CAP, dominated and controlled by its "Chairman and CEO" Kenneth King, was reportedly the "silent partner" behind Wander's businesses who both sits on the committee that oversees 777 Partners' investments and provides the "financial firepower" to fuel 777 Partners' dealmaking—reportedly to the tune of at least $1 billion in loans, but in actuality more than double that amount, from A-CAP and affiliates to 777 Partners and affiliates.

16.    The entire scheme reached an inflection point in early 2024, when an employee of one of Wander's companies that is a party to Leadenhall's LSA disclosed to Leadenhall that, in an attempt to prevent Leadenhall from confirming that collateral had been double-pledged, Wander-affiliated borrowers had submitted forged financial statements to Leadenhall following Leadenhall's receipt of the anonymous tip. Wander's employee also disclosed that, prior to on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered internal records to try to cover up the double-pledge of collateral.  The insider also disclosed that the boundaries between A-CAP and 777 Partners did not really exist at all—specifically, A-

CAP had dictated an express agreement with 777 Partners granting A-CAP the right to control all facets of 777 Partners' operations.

17.    As a result of the agreement between 777 Partners and A-CAP, King and A-CAP must approve every material decision that 777 Partners makes, meaning that, upon information and belief, A-CAP was well aware that Wander's entities had been double-pledging assets as collateral to purportedly secure multiple lines of credit before Leadenhall discovered the double-pledging.

18.    Since Leadenhall discovered the fraudulent scheme alleged herein, public scrutiny over 777 Partners' obfuscation of its own finances and inability to pay its bills has only intensified. This scrutiny could not come at a worse time for Wander, who had been trying to close an acquisition of the Everton Football Club, a historic football team in the prestigious English Premier League.

19.    Everton was the latest shiny object of Wander's fraudulent scheme, solvency aside. Despite the fact that 777 Partners and many of the operating businesses and professional football teams that Wander owns are deep in debt, behind on their obligations, and on thin ice with regulators, Wander's strategy has been continued expansion—using debt to acquire new assets that he can then use as collateral for more debt, which he then fails to timely pay off, in a seemingly never-ending cycle of "robbing Peter to pay Paul."

20.    Upon information and belief, Wander and Pasko are operating an enterprise that is structured and organized as a giant shell game at best, and an outright Ponzi scheme at worst, that takes money in from investors and lenders and shuffles it around to various money-losing alter-ego, though legally distinct, entities to disguise their true financial condition. The enterprise is propped up, in order to attract and deceive new lenders and investors, only by the patronage of A-

CAP, which pays off the enterprise's last-minute obligations—including 777 Partners' own payroll—in "Whac-A-Mole" fashion to keep 777 Partners' creditors at bay, if only temporarily, and to avoid the entire scheme from being laid bare in public.  A-CAP has called these payments "protective advances"—and they have been successful in protecting and concealing the scheme.

21.    In March 2024, exercising its control and dominion over the 777 Partners enterprise, A-CAP prevented 777 Partners from committing to repay the obligations owed to Leadenhall pursuant to an agreed-upon amortization schedule.  During these negotiations, Wander was straightforward when questioned on whether A-CAP was the puppeteer behind the 777 Partners marionette:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

22.    Leadenhall has been forced to bring this action to hold Wander, King, Pasko, 777 Partners, A-CAP, and their affiliated entities liable for their pattern of contractual breaches and fraud, which together constitute a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

## PARTIES

### A. Plaintiffs

23.    Plaintiff Leadenhall Capital is a London-based asset management company focused on granting institutional investors access to insurance-related risks.  Leadenhall Capital is organized as a limited liability partnership under the laws of England and maintains its principal place of business in London, England at Level 15, 70 Mark Lane, London EC3R 7NQ.  Leadenhall Capital's partners are John Wells, Luca Albertini, Lorenzo Volpi, Craig Gillespie, Tom Spreutels, Phil Kane, Chris Learmonth, Kelvin Granger, and Kunal Shah—all domiciliaries of the United

Kingdom; Ben Adolph—a domiciliary of Bermuda; and Mitsui Sumitomo Insurance Company Limited—a Japanese corporation with its principal place of business in Japan.  Leadenhall Capital is the Investment Manager and Administrative Agent for the lenders under the LSA, in which capacity it may execute a variety of functions under the LSA and associated agreements, including bringing this action on behalf of the lenders.  *See* LSA § 8.01.

24.    Plaintiff Leadenhall Life is an investment company organized as a public limited company under the laws of Ireland which maintains its principal place of business in Dublin, Ireland.  Leadenhall Life is the Collateral Agent pursuant to the LSA and, in that capacity, holds the security interests in the Collateral pledged for the benefit of the lenders under the LSA.

## B. Defendants

25.    Defendant 777 Partners is a Miami-based private investment firm organized as a limited liability company under the laws of Delaware which has its principal place of business at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131 (the "777 Partners Address").  The company is nominally focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 777 Partners has one member, SuttonPark Acquisition LLC, which is organized under the laws of Delaware and has its principal place of business in Florida.  SuttonPark Acquisition LLC has two members, JARM Capital LLC and MTCP LLC, both of which are organized under the laws of Delaware and have their principal places of business in Florida.  The sole member of JARM Capital LLC is Josh Wander, and the sole member of MTCP LLC is Steven Pasko.  Reflecting the blurring of personal and professional lines, Josh Wander's wife previously operated her ice cream business, Vitali Natural LLC, out of the 777 Partners Address before the business shut down.

26.    Defendant 600 Partners is a Miami-based private equity firm organized as a limited liability company under the laws of Delaware which has its principal place of business at the 777

Partners Address.  Like 777 Partners, 600 Partners characterizes itself as focused on a range of investments in the insurance, aviation, sports, and media sectors.  Upon information and belief, 600 Partners has one member: SPA II LLC, which is organized under the laws of Delaware and has its principal place of business in Florida; and SPA II LLC has two members, MTCP LLC and Steven Pasko.

27.    On April 19, 2023, 777 Partners' assistant general counsel, Jonathan Walder, certified in writing to Leadenhall that the governing documents for the entities listed above attached to that certification—including the Fourth Amended and Restated Limited Liability Company Agreement of 777 Partners LLC, dated September 10, 2021; the First Amended and Restated Limited Liability Company Agreement of SuttonPark Acquisition LLC, dated September 10, 2015; the Amended and Restated Limited Liability Company Agreement of MTCP LLC, dated May 2, 2019; and the Limited Liability Company Agreement of JARM Capital LLC, dated August 25, 2015—were "true and correct copies of the operating agreements governing each entity as of today's date."  Those documents confirm that the sole member of 777 Partners is SuttonPark Acquisition LLC, the sole members of SuttonPark Acquisition LLC are MTCP LLC and JARM Capital LLC, and the sole members of those entities are Pasko and Wander, respectively—as of both September 10, 2021, and April 19, 2023.

28.    Further, in approximately June 2022, a 777 Partners representative sent Leadenhall an updated organizational chart listing all of the holders of membership interests in 600 Partners, which were the same members 600 Partners identified in connection with the initial execution of the secured credit facility in May 2021.  Each member was a U.S.-based entity, and none has any apparent connection to the UK, Bermuda, Ireland, or Japan.  Then, on September 23, 2022, a 777 Partners representative (writing from a 777 Partners email address) represented to Leadenhall that

three of the four owners had exited 600 Partners, leaving SPA II LLC (wholly owned by Pasko and by Pasko's wholly-owned personal shareholding vehicle) as the "sole member of 600 Partners."

29.     As of May 24, 2024, a 777 Partners spokesperson reconfirmed, in a statement to the Financial Times, that Wander and Pasko were 100% owners of 777 Partners.[1]

30.     Collectively, 777 Partners and 600 Partners own 100% of the equity of each of the entities acting as Sellers and Servicers under the LSA, and the Seller entities in turn own 100% of the equity of each of the entities acting as Borrowers (defined below) under the LSA.  While Josh Wander and Steven Pasko have designed and organized their web of separate legal entities to obscure their domination over the entire structure, Wander and Pasko, in consultation with—and with the approval and indulgence of—King and A-CAP as discussed herein, control 777 Partners, 600 Partners, and each of their subsidiaries and affiliates, including those named as Defendants here.

31.     Defendant Josh Wander is co-founder and Managing Partner of 777 Partners and 600 Partners, and he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Wander's permanent residence is 1300 Monad Terrace, Penthouse B, Miami Beach, Florida 33139.  Reflecting the blurring of personal and professional lines, in purchasing the beachfront property in March 2021, Wander was represented in the purchase by 777 Partners.

32.     Defendant Steven Pasko is the other co-founder and Managing Partner of 777 Partners and 600 Partners, and, upon information and belief, he controls and manages the entities acting as Sellers, Servicers, and Borrowers under the LSA.  Pasko's permanent residence is 1451

---

[1] Samuel Agini, et al., *How a Bet on Everton Engulfed a Football Investor and Its Financial Backers*, FIN. TIMES (May 24, 2024), https://www.ft.com/content/d0b2eae1-0369-40a3-b6f8-73df5a1bc2a9.

Brickell Avenue, Penthouse 54, Miami Beach, Florida 33131. Until May 2023, Pasko also owned a residence at 47 Annfield Ct., Staten Island, NY, 10304.

33.    Defendant SPLCSS III LLC (defined above as the "SuttonPark Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Defendant SuttonPark Servicing LLC (defined above as "SuttonPark Servicer") is a limited liability company organized under the laws of Delaware, which represented to Leadenhall that its principal place of business was at 590 Madison Avenue, 15th Floor, New York, New York 10022 as of May 2021, but which has operations in Florida and may have moved its principal office to the 777 Partners Address. Upon information and belief, the SuttonPark Borrower and SuttonPark Servicer have the same sole member, Defendant SuttonPark Capital LLC (defined above as "SuttonPark Capital"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, SuttonPark Capital has two members, 600 Partners and SPC Partners LLC. Upon information and belief, the members of SPC Partners LLC are all domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

34.    Defendant Dorchester Receivables II LLC (the "Dorchester Borrower") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address. Upon information and belief, the Dorchester Borrower has one member, Defendant SuttonPark Capital. As set forth above, the members of SuttonPark Capital are 600 Partners and SPC Partners LLC, which are domiciled in one or more states of the United States and not the United Kingdom, Bermuda, Ireland, or Japan.

35.     Defendant Signal SML 4 LLC (defined above as the "Signal Borrower," and together with the SuttonPark and Dorchester Borrowers, the "Borrowers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, the Signal Borrower has one member, Defendant Signal Medical Receivables LLC (defined above as "Signal Medical"), which is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address, and which is a Seller under the LSA.  Signal Servicing LLC (the "Signal Servicer") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, Signal Medical and Signal Servicer each have the same sole member, Signal Financial Holdings LLC, and Signal Financial Holdings LLC is managed by Wander, who runs his businesses out of Miami, Florida, and there is no connection between Signal Financial Holdings LLC and the United Kingdom or Bermuda.  Upon information and belief, the members of Signal Medical are all domiciled in one or more states and not in the United Kingdom, Bermuda, Ireland, or Japan.

36.     Defendant Insurety Agency Services LLC (defined above as the "Insurety Borrower," and, together with the SuttonPark, Dorchester, and Signal Borrowers, the "Borrowers") is a limited liability company organized under the laws of Florida and which has its principal place of business at the 777 Partners Address.  Insurety Servicing LLC (the "Insurety Servicer," and, together with SuttonPark Servicer and Signal Servicer, the "Servicers") is a limited liability company organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  The Insurety Borrower and Insurety Servicer have the same sole member, Defendant Insurety Capital LLC (defined above as "Insurety Capital," and, together with SuttonPark Capital and Signal Medical, the "Sellers"), which is a limited liability company

organized under the laws of Delaware and has its principal place of business at the 777 Partners Address.  Upon information and belief, Insurety Capital has two members, 777 Partners and John R. Zirkelbach, a natural person domiciled in Ohio, neither of which are domiciled in the United Kingdom, Bermuda, Ireland, or Japan.  The Borrowers, Sellers, Servicers, and Guarantors are hereinafter referred to collectively as the "777 Entity Defendants."  The 777 Entity Defendants along with Wander and Pasko are referred to collectively as the "777 Defendants."

37.     Advantage Capital Holdings LLC (defined above as "A-CAP") is a limited liability company organized under the laws of Delaware and has its principal place of business at 1180 Avenue of the Americas, 21st Floor, New York, New York 10036.  A-CAP is controlled and dominated by Kenneth King, who is domiciled in New York.  Upon information and belief, the members of A-CAP are all domiciled in one or more states of the United States and not in the United Kingdom, Bermuda, Ireland, or Japan.

38.     Defendant Kenneth King is the Chairman and CEO of Advantage Capital Management LLC (defined above as "A-CAP") and owns a controlling stake in A-CAP.  Upon information and belief, King's permanent residences are 15 Kensington Road, Unit 215, Bronxville, New York 10709 and 26 Wilton Road, Pleasantville, New York 10570.  King and A-CAP are hereinafter referred to collectively as the "A-CAP Defendants."

## JURISDICTION AND VENUE

39.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted a claim arising under the RICO Act, 18 U.S.C. § 1964.  This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

40.     The Court also has diversity jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs are citizens of

the United Kingdom, Ireland, Japan, and Bermuda, and, upon information and belief, Defendants are citizens of Florida, Delaware, Ohio, and New York.

41.     This Court has personal jurisdiction over Defendants 777 Partners, 600 Partners, the SuttonPark Borrower, the Dorchester Borrower, the Signal Borrower, the Insurety Borrower, SuttonPark Capital, Signal Medical, and Insurety Capital by the terms of the LSA, which provide that these Defendants have consented to the jurisdiction of courts sitting in New York.  *See* LSA § 10.09; Guaranty Agreement § 15.

42.     This Court has personal jurisdiction over Defendant Josh Wander by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers.  The Court also has personal jurisdiction over Wander because—while attempting to negotiate an agreement with Leadenhall in March and April 2024 to pay back the debt that the Borrowers had borrowed in excess of contractual limitations—Wander repeatedly called Leadenhall representatives from New York City and, on at least one occasion, worked out of A-CAP's headquarters in New York City.  Furthermore, during the relevant period, 777 Partners maintained offices at 140 Grand Street, 9th Floor, White Plains, NY 10601 and 114 West 47th Street, New York, NY 10036.  Upon information and belief, Wander conducted the business of 777 Partners at least in part from its New York office.  The Court also has personal jurisdiction over Wander because he is so closely related to the Defendant signatories of the LSA that he is bound by the LSA's forum selection clause.

43.     This Court has personal jurisdiction over Defendant Steven Pasko by virtue of his domination and control over Defendants 777 Partners, 600 Partners, the Borrowers, the Sellers, and the Servicers.  The Court also has personal jurisdiction over Pasko by virtue of his signing the LSA on behalf of the Defendant signatories thereto, and because Pasko is so closely related to

those Defendant signatories that it was foreseeable that he would be, and is, bound by the LSA's forum selection clause. Pasko took an active role in the transactions that went beyond simply signing the original LSA, including signing numerous monthly Compliance Reports, as well as all of the Borrowers' Borrowing Requests, and the Sellers' assignments of Collateral to the Borrowers, all of which, as discussed below, were critical components of the 777 Defendants' fraud. The Court also has personal jurisdiction over Pasko because, in his capacity as authorized signatory of the Compliance Reports on behalf of the SuttonPark Borrower and Dorchester Borrower, Pasko represented the SuttonPark Servicer, which as alleged above, has or had during the relevant period its principal place of business in New York. The Court also has personal jurisdiction over Pasko because, until at least 2023, Pasko owned a home in Staten Island, New York. The address of that home was also listed as the business address of MTCP LLC, Pasko's personal shareholding vehicle through which he owned, among other things, his stakes in 777 Partners and 600 Partners. Upon information and belief, Pasko resided and carried out the business of 777 Partners and 600 Partners at least in part from his New York home, and from 777 Partners' offices located in New York.

44.     This Court has personal jurisdiction over Defendants A-CAP and Kenneth King because they are domiciled in New York.

45.     Venue is proper under 28 U.S.C. § 1391 because all Defendants are residents of the state of New York by domicile or the express terms of the LSA or Guaranty Agreement. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendants, including but not limited to A-CAP, reside, are found, and/or transact their affairs in this district.

**STATEMENT OF THE CASE**

I.    **Leadenhall Enters into a Credit Facility with 777 Partners Secured by Collateral.**

   A.  **The Credit Facility**

46.    Wander, through his trade name 777 Partners and its subsidiaries and affiliates, invests in, among other things, various forms of "receivables."  Relevant to this action, those receivables include future cash flows from so-called "structured settlements" and lottery winnings. A "structured settlement" allows an injured plaintiff, typically in a personal injury suit, to receive a settlement or damages award over time in periodic payments rather than as a lump-sum payment.

47.    This form of investment business runs on buying future cash flows from injured parties or lottery winners who are entitled to large amounts of money over a long period of time, but who need more money in the near term than those cash flows permit, and who are thus willing to sell their future cash flows for a lump sum that is a percentage of the present value.

48.    Wander uses the profits from this business both to purchase additional receivables and to infuse capital into other ventures, including Wander's interests in professional football clubs.  To accelerate the profits from this business, Wander increased the leverage on his investments by borrowing against existing receivables portfolios and using those loans to buy more receivables—rinse and repeat.

49.    In 2021, following the expiration of a prior credit facility between the parties, Wander, Pasko, 777 Partners, 600 Partners, and certain entities they control named as Defendants herein entered into a new credit facility with Leadenhall, as detailed more fully below.  The credit facility is embodied in a suite of contracts, at the center of which sits the LSA, executed May 7, 2021.  In addition to the LSA, the parties entered into Sale Agreements, Servicing Agreements, Pledge Agreements, and a Guaranty Agreement (the "Agreements"), each of which is explained in turn below.  Collectively, the Agreements define the relationships between the following entities:

a. Leadenhall Capital, which acts as Administrative Agent to the Lenders (as defined below) under the LSA, fielding borrowing requests from Borrowers, facilitating the funding of debt, and enforcing the Lenders' rights and remedies in the event of a material breach or "Event of Default";

b. Leadenhall Life, which acts as Collateral Agent for the Lenders under the LSA, holding security interests in the receivables and related assets owned and pledged as collateral by the Borrowers, as well as 100% of the equity in the Borrowers, to secure the Lenders' debt;

c. The Lenders, a group of nine investment funds or separate accounts for which Leadenhall Capital acts as investment manager and agent, which provided secured debt to the Borrowers pursuant to the LSA;

d. The Borrowers, a group of four firms, all controlled by 777 Partners and 600 Partners, which borrowed secured debt from the Lenders pursuant to the LSA;

e. The Sellers, a group of three firms, all controlled by 777 Partners and 600 Partners, which sold receivables to the Borrowers to secure debt provided under the LSA, and which also fully owned the Borrowers and pledged their equity in the Borrowers to Leadenhall Life as collateral for the LSA pursuant to the Pledge Agreements;

f. The Servicers, a group of three firms controlled by 777 Partners and 600 Partners that agreed to service the receivables on behalf of the Borrowers and for the benefit of Leadenhall Capital as Administrative Agent; and

g. The Guarantors, 777 Partners and 600 Partners, which guaranteed all of the Borrowers' obligations under the LSA and the other Agreements.

50.     The entities controlled by 777 Partners and 600 Partners were further organized, for purposes of their rights and obligations under the LSA, into Borrower Groups each consisting of one Borrower, the Seller that owned that Borrower, and one Servicer, and each corresponding to a particular Lender Group consisting of some or all of the nine Lender entities:

    a.  The SPLCSS Borrower Group consisted of the SuttonPark Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

    b.  The Dorchester Borrower Group consisted of the Dorchester Borrower as Borrower, SuttonPark Capital as Seller, and SuttonPark Servicer as Servicer;

    c.  The Insurety Borrower Group consisted of the Insurety Borrower as Borrower, Insurety Capital as Seller, and Insurety Servicer as Servicer; and

    d.  The Signal Borrower Group consisted of the Signal Borrower as Borrower, Signal Medical as Seller, and Signal Servicer as Servicer.

51.     To put all of the Agreements together, in brief:

    a.  **the LSA** set forth the terms on which the Lenders would provide debt secured by collateral owned by the Borrowers;

    b.  **the Sale Agreements** set forth the terms on which the Sellers could sell or assign assets as Collateral to the Borrowers to secure that debt;

    c.  **the Servicing Agreements** set forth the terms under which the Servicers would service the Collateral held by the Borrowers to ensure it did not become impaired;

    d.  **the Pledge Agreements** provided an additional source of Collateral in the form of pledges of the 100% equity interests in the Borrowers; and

e. **the Guaranty Agreement** provided guarantees by 777 Partners and 600 Partners of all of the Borrowers' obligations under the Agreements.

52.    Reflecting his control over 777 Partners and each of the various underlying entities, Pasko executed each of the governing Agreements on behalf of the 777 Partners entities.

**B.  The Loan and Security Agreement**

53.    The LSA is structured as a secured credit facility whereby the Borrowers were permitted to borrow secured debt from the Lenders from time to time on an ongoing basis through September 30, 2024, or until the occurrence of an "Event of Default."

54.    The "Lenders" are comprised of nine investment funds or separate accounts. Leadenhall has the authority under the LSA to act on behalf of the Lenders and brings this action in its capacity as agent for the Lenders.  LSA § 8.01 ("Each Lender hereby appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Transaction Documents as are delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.").[2]

55.    Under the LSA, in order to borrow additional debt from the credit facility, a Borrower would submit a Borrowing Request to the Lenders in their its corresponding Lender Group.  That Borrowing Request was required to include, among other things, "a pro forma Compliance Report" demonstrating that the requested debt would be adequately secured under the terms of the LSA discussed below.  LSA § 2.03; *id.* art. I, "Borrowing Request."  The Dorchester Borrower submitted Borrowing Requests and accompanying pro forma Compliance Reports

---

[2] *See also* LSA § 8.03 ("The Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a 'Lender' under this Agreement as any other Lender and may exercise the same as though it were not the Administrative Agent.").

purporting to show compliance with Borrowing Base requirements including but not necessarily limited to those dated May 12, 2021 ($69.98 million), May 19, 2021 ($10 million), January 31, 2022 ($10 million), March 18, 2022 ($16 million), and March 30, 2022 ($10 million).  The SuttonPark Borrower also submitted Borrowing Requests and accompanying pro forma Compliance Reports purporting to show compliance with Borrowing Base requirements including, after it drew the initial $300 million in debt in May 2021, another request on June 30, 2021 ($50 million).  Pasko signed each Borrowing Request submitted by the Borrowers to Leadenhall.  Each Borrowing Request was funded shortly after it was received.

56.    In exchange for providing debt to the Borrowers, the Lenders were paid interest, and Leadenhall Life, as Collateral Agent, obtained first-priority security interests in all of the assets of each Borrower, including but not limited to the receivables and related assets held by the Borrowers (the "Collateral").  *See* LSA § 2.15; *id.* art. I, "Collateral."

57.    The LSA imposed the equivalent of a credit limit on each Borrower, referred to as a "Borrowing Base," based on the value of each Borrower's receivables, which was designed to ensure that each Borrower always had enough Collateral to secure its borrowings.  Each Borrowing Base was calculated using a formula specific to the Borrower—the main component of which was the value of that Borrower's receivables, with certain adjustments.  *See* LSA "Borrowing Base," LSA Schedules VIII, IX, X, and XI.  A misrepresentation as to the value of that Borrowing Base would constitute a misrepresentation as to both the owned Collateral and the Borrowing Base.

58.    In the event the principal value of the total debt of a single Borrower ever exceeded its Borrowing Base—known as a "Borrowing Base Deficiency"—and such deficiency was not cured within three business days, it would constitute a "Borrower Group Event of Default."  Upon a Borrower Group Event of Default, Leadenhall was entitled to accelerate the entire amount of that

Borrowing Group's outstanding debt and pursue remedies under the LSA and the Uniform Commercial Code on behalf of the relevant Lenders against that Borrowing Group's Collateral. LSA § 7.02(g); *id.* Art. I, "Borrowing Base Deficiency." If the Borrowing Base Deficiency was not cured in thirty days, it would constitute a "Facility Event of Default," which would entitle Leadenhall to accelerate the entire amount of the outstanding debt and pursue the same remedies against all four Borrower Groups. *Id.*, § 7.01(c).

59.     If the Borrowers wanted to borrow more, the Agreements allowed them to do so by purchasing more receivables from the Sellers pursuant to the respective Sale Agreement, thereby increasing the Borrower's Borrowing Base. *See* LSA Article I, "Borrowing Base Limitation," "Sub-Facility Limit"; *id.* §§ 2.01(a), 3.02(c).

60.     What the Borrowers could ***not*** do under the LSA was put receivables on their books that they either did not own or that were already on the books of another of Wander and Pasko's portfolio companies—pledged to some other lender, securing some other loan.

61.     And if the Borrowers wanted to decrease their overall obligation to Leadenhall, they could prepay their debt under certain defined circumstances, but they were not permitted to sell or repledge Collateral unless they replaced it with "Substitute Collateral" of equal or greater value. LSA § 2.07(y)(ii)(B) (permitting prepayment of debt based on "a Repurchase of [certain receivables] if such Borrower . . . receives one or more substitute Eligible Receivables having a Valuation Amount that is greater than or equal . . . to that of the substituted [receivable]" and "use[s] selection procedures to substitute Eligible Receivables for Guaranteed Receivables or Lottery Receivables in a manner that is not intended to be adverse to the interests of Lenders").

62.     The Agreements contained additional provisions to guard proactively against such defaults, rather than waiting for them to be discovered. For instance, each time a Borrower made

a "Borrowing Request" to Leadenhall Capital, *id.* at § 2.03, the Servicer had to submit a "Compliance Report" setting forth a calculation of the Borrowing Base, a representation that the Borrowing Base Limitation had not been exceeded, an affirmation that each of the representations and warranties in the LSA remained true and correct, and a representation that no Event of Default had occurred.  *See* LSA, Annex A-1.

63.    Additionally, the LSA required each Servicer to prepare a Monthly Report for its associated Borrower concerning the receivables and other assets held by that Borrower, which could not "include any Receivable that is not an Eligible Receivable . . . in the calculation of the Borrowing Base."  LSA § 5.01(j)(i).  Each Borrower's representations and warranties were renewed as of the date of each Compliance Report and each Monthly Report.  *Id.*, § 4.01.

64.    Over the course of the credit facility, on behalf of the Servicers, Steven Pasko was the authorized signatory for Monthly Reports and Compliance Reports.

65.    The LSA also contained provisions to guard proactively against the risk of interest rate fluctuations affecting the value of receivables, shifting that risk to the Borrowers and Guarantors by requiring the Borrowers to "maintain in full force and effect interest rate protection mechanisms with Hedge Counterparties evidenced by Hedge Transactions" meeting defined requirements.  LSA § 5.01(u).

66.    And under the LSA, each Borrower "agree[d] . . . to take all further actions, that may be reasonably necessary or desirable, or that [Leadenhall] may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under" the LSA.  LSA § 5.01(i).

67.    The LSA provided Leadenhall with remedies in case of default by the 777 Entity Defendants.  Among other things, upon either a Borrower Group Event of default or a Facility

Event of Default, Leadenhall had the right to declare either the relevant Borrower Group's outstanding debt or the *entire* outstanding debt, respectively, "due and payable immediately, without presentment, demand, protest or other notice of any kind, all which are hereby waived by the Borrowers" including "the principal . . . together with accrued interest thereon and all fees and other obligations of the Borrowers owing hereunder." LSA §§ 7.01, 7.02. This remedy is known as "acceleration." The LSA also expressly provided that Leadenhall's right to accelerate the Borrowers' outstanding debt is *in addition to* and *cumulative of* its rights to foreclose or exercise any other remedies with respect to the Collateral:

> Upon any such declaration [that outstanding debt is immediately due and payable] . . . [Leadenhall], shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative.

LSA §§ 7.01, 7.02.

68.     The LSA also required the Borrowers to indemnify Leadenhall and the Lenders "against any and all claims, losses and liabilities (including reasonable attorneys' fees) . . . arising out of or resulting from [the LSA] or the other Transaction Documents, or the use of the proceeds of the Loans or the security interest granted hereunder or in respect of any Collateral," with exceptions not relevant here. LSA § 9.01. The LSA provided that "[t]he Borrowers also agree to pay, upon demand, all reasonable and documented costs and expenses of [Leadenhall], including reasonable attorneys' fees actually incurred in connection with amendments, consents, waivers, and terminations made or requested in connection with [the LSA], the other Transaction Documents and the Indebtedness (including any security interests granted thereby)," and incurred "in the collection of the Obligations, in connection with the enforcement, protection, defense and collection of this Agreement, the other Transaction Documents and the Obligations," including reasonable and documented attorneys' fees and legal expenses of [Leadenhall] Agent actually

incurred, whether or not there is a lawsuit," and "any court costs, in addition to all other sums provided by law."  LSA § 9.02.

### C. The Pledge Agreements

69.    In addition to the security interests in the Borrowers' Collateral under the LSA, and Leadenhall Life's remedies thereunder, the Lenders' investments were meant to be protected by at least four other sets of agreements granting Leadenhall additional rights and remedies:  the Pledge Agreements, Sale Agreements, Servicing Agreements, and Guaranty Agreement, all of which were executed the same day as and in conjunction with the LSA.

70.    Leadenhall Life entered into four separate Pledge Agreements as additional protection in providing hundreds of millions of dollars of debt to the Borrowers.  In particular, Leadenhall Life entered into Pledge Agreements with each of the three Seller entities that, in turn, owned 100% of each of the four Borrowers:

> a.    SuttonPark Capital LLC (*i.e.*, "SuttonPark Capital"), which owned 100% of Dorchester Receivables II LLC (*i.e.*, the "Dorchester Borrower") and SPLCSS III LLC (*i.e.*, the "SPLCSS Borrower");
>
> b.    Insurety Capital LLC (*i.e.*, "Insurety Capital"), which owned 100% of Insurety Agency Services LLC (*i.e.*, the "Insurety Borrower"); and
>
> c.    Signal Medical Receivables LLC (*i.e.*, the "Signal Seller"), which owned 100% of Signal SML 4 LLC (*i.e.*, the "Signal Borrower").

71.    Each Borrower represented and warranted in § 4.01(l) of the LSA that it was owned 100% by the Sellers, and any change in that 100% ownership constituted an event of default pursuant to § 7.02(m).  LSA Article 1, "Change in Control."

72.    Under § 2.1 of each Pledge Agreement, each Seller pledged 100% membership interests in each Borrower, along with all present and future claims and all proceeds related thereto, to Leadenhall Life as additional security for the Borrowers' obligations.

73.    The remedies available under the Pledge Agreements were structured in a similar way to those available under the LSA.  In the event of a Borrower Group Event of Default, Leadenhall Life could exercise remedies with respect to the defaulting Borrower Group—*i.e.*, against that specific Seller's equity in a specific Borrower under the respective Pledge Agreement. *See* Pledge Agreements § 4.01.  A Facility Event of Default would trigger remedies under all four Pledge Agreements, thereby allowing Leadenhall Life to proceed against the equity of all of the Borrowers at once. *Id.*

74.    The Pledge Agreements were principally between each Seller (as Pledgor) and Leadenhall Life, but each also was acknowledged by the respective Borrower wholly owned by the signatory seller.  Section 6.11 provides that, upon an Event of Default under the LSA, the Borrower "will comply with instructions originated by the Collateral Agent with respect to the Pledged Collateral without further consent of the Pledgor."

**D.  The Sale Agreements**

75.    Each of the Borrowers also entered into a Sale Agreement with the respective Seller in its Borrower Group.  The Sale Agreements set forth the terms under which the Borrowers would purchase additional receivables from the Sellers, which receivables, once purchased, would become Collateral and would factor into the Borrowing Base, enabling the Borrowers to borrow more from the Lenders.

76.    Each time a Borrower purchased additional receivables from a Seller to serve as Collateral for debt, the Seller was obligated to deliver an executed assignment to the Borrower. Sale Agreements § 2.02(c).  Those assignments were then delivered to Leadenhall and purported

to substantiate that receivables had, in fact, been transferred to the Borrower in question and could form part of the Borrower's Collateral and increase its Borrowing Base. These assignments were often made when the 777 Entity Defendants were reallocating assets among different borrower vehicles and when pledging additional assets to ensure continued compliance with Borrowing Base requirements. Pasko was the authorized signatory on sales or "assignments" from the Sellers to the Borrowers and signed each assignment in connection with each purported transfer of receivables from a Seller to a Borrower.

77.     The Sale Agreements provided that the Borrowers could purchase receivables from the Sellers even if the Borrowers did not have cash on hand to pay for them, in which case "such excess shall be deemed to be a contribution to the capital of the Purchaser by the Seller on such date and the Purchaser shall increase the Seller's aggregate investment in the Purchaser accordingly in accordance with New York law." Sale Agreements § 2.07(b).

78.     In the Sale Agreements, each Seller also acknowledged the security interests the Borrowers would grant to Leadenhall Life under the LSA, as well as that Leadenhall Life would "have the right at any time to enforce this Agreement against the Seller and to exercise directly all of the Purchaser's rights and remedies under this Agreement." *Id.* § 2.05.

### E.  The Servicing Agreements

79.     Each of the Borrowers and related Sellers in each Borrower Group also entered into a Servicing Agreement with the respective Servicer in the Borrower Group. The Servicing Agreements provide for the Servicers to service receivables held by their respective Borrowers, including by collecting payments and executing required documentation. Servicing Agreements § 3.1. In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced. Servicing Agreements § 5.1. The "Valuation Amount" of those

receivables used to calculate Servicing Fees is the same as is used to calculate each Borrowers' Borrowing Base.  LSA Schedules VIII, IX, X, XI.

80.    The Servicers were also responsible, under the LSA and the Servicing Agreements, for delivering Monthly Reports and Compliance Reports to Leadenhall Capital as Administrative Agent, including accurately calculating their respective Borrowers' Borrowing Bases.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

81.    Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered," and each Servicer agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance Report.  LSA §§ 6.06(a), 6.07(c).

82.    The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

83.    The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

### F.  The Guaranty Agreement

84.    The final source of security for Leadenhall and the Lenders' investments came from a Guaranty Agreement between Leadenhall Capital on the one hand, and 777 Partners and 600 Partners on the other.  777 Partners and 600 Partners (referred to as "Guarantors" in the Guaranty Agreement) guaranteed the obligations of each of the Borrowers.  As recited in the Guaranty Agreement, each of 777 Partners and 600 Partners "is an Affiliate of the Borrowers and receives substantial direct and indirect benefits from the transactions contemplated by the Loan and Security Agreement, and the other Transaction Documents."  *See* Guaranty Agreement at 1.

85.    Under the Guaranty Agreement, Leadenhall and the Lenders are defined as the "Recipients," and 777 Partners and 600 Partners each "jointly and severally absolutely, unconditionally and irrevocably guarantee[d] to the Recipient, for its benefit and the benefit of the other Recipients, the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower [and the Insurety Borrower Group and Signal Borrower Group, subject to certain Guaranty Limits], in each case, so long as a Trigger Event has occurred and is continuing . . . ."  Guaranty Agreement § 2(a).

86.    The Guaranty Agreement defines a "Trigger Event" to include the occurrence of any of the following events, among others:

(i) any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement;

(ii) any act of theft or misappropriation of funds by either Guarantor under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

(iii) any willful misrepresentation of a material nature by either Guarantor under this Guaranty;

[…]

(ix) any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days; … or

[…]

(xi) any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise or enforcement of its rights and remedies against any Collateral under the Transaction Documents or under Requirements of Law.

*Id.* at § 1, "Trigger Event."

87.    The "Guaranteed Obligations" backed up by 777 Partners and 600 Partners included the "Obligations" of the Borrowers, *id.* at § 1, "Guaranteed Obligations," which is defined under the LSA as, "with respect to each Borrower, the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA Article I, "Guaranteed Obligations." The Guaranteed Obligations—and particularly those enumerated above concerning the allocation of adequate Collateral "free and clear" of Adverse Interests—confer to Leadenhall an equitable interest in the Guarantors' assets, since the Guarantors are required to back the Obligations of the Borrowers and provide adequate Collateral if the Borrowers are unable to.

## G.  Central to the Credit Facility Is That All Collateral Remain "Free and Clear" of Any Other Interests.

88.    The centerpiece of the credit facility is that the Collateral pledged for the benefit of the Lenders is pledged ***solely*** for the benefit the Lenders and remains free and clear of any "Adverse Claims." This thread runs through all of the Agreements as stated in the provisions set forth below.

89.    *First*, under the LSA, each Borrower made the following representation upon the execution of the Loan and Security Agreement, the date on which any borrowing was made by the Borrowers (a "Borrowing Date"), and on the date of each Monthly Report and each Compliance Report: "***Such Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim***."  LSA § 4.01(h).[3]

90.    An "Adverse Claim" is defined in LSA § 1.01 as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement," and it has the same meaning in the Pledge Agreements, Sale Agreements, and Guaranty Agreement.   Pledge Agreements § 1.1; Sale Agreements § 1; Guaranty Agreement § 1.

91.    Second, under the LSA, each Borrower made the following representation throughout the term of the borrowing relationship: "[S]uch Borrower shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Adverse Claim upon or with respect to any Collateral, or upon or with respect to any account to which any Collections of any Receivable are sent, or assign any right to receive income in respect thereof." LSA § 5.01(d).

92.    *Third*, under the LSA, each Borrower makes the following representation throughout the term of the borrowing relationship: "Such Borrower shall not make any payment or distribution of assets with respect to any obligation of any other Borrower, any Other Company or any other Person (other than a Lottery Holding SPV) ***or grant an Adverse Claim on any of its assets to secure any obligation of any other Borrower, any Other Company or any other Person*** . . . ." LSA § 5.01(k)(vi).

---

[3] Any emphasis herein is added unless otherwise noted.

93.     *Fourth*, the LSA makes clear that a "Facility Event of Default" occurs whenever the security interest in the Collateral "***shall for any reason cease to be a valid and perfected first priority security interest***."  LSA § 7.01(d).  Unlike other grounds for a Facility Event of Default, which apply only once a breach has continued for thirty days without being cured, any failure of any security interest "to be a valid and perfected first priority security interest" would cause *every* Borrower to be in default after only two days.  *Id.*

94.     *Fifth*, the LSA provides a right to indemnification for any losses arising out of the Borrowers' failure to vest a security interest in the Collateral free and clear of Adverse Claims: "[E]ach Borrower shall pay ***on demand*** to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from . . . ***the failure to vest in the Collateral Agent on behalf of the Secured Parties a valid and perfected security interest in the Collateral free and clear of any Adverse Claim*** . . . ." LSA § 9.01(iv).

95.     Sixth, under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered."  LSA § 6.07(c).

96.     *Seventh*, under the Sale Agreements, each Sellers agreed with their respective Borrowers that any sale of collateral shall be "an absolute sale and transfer by the Seller (free and clear of any Adverse Claim . . . )," and each Seller represented and warranted to its respective Borrowers that, "[a]s of the applicable Purchase Date . . . , ***the Seller is legal and beneficial owner of the applicable Transferred Asset free and clear of any Adverse Claim***," with certain exceptions not relevant here.  Sale Agreements §§ 2.07, 4.01(h).  Each Seller also covenants that it "***will not***

**sell, pledge, assign or transfer to any Person, or grant, create, incur, assume or suffer to exist any Adverse Claim on, any Transferred Asset**, whether now existing or hereafter created, or any interest therein." *Id*. at § 5.01(f).

97.    *Eighth*, under the Guaranty Agreements, 777 Partners and 600 Partners guarantee **all** of the Borrowers' obligations described above, and one of the specified "Trigger Events" is "**any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances** . . .." Guaranty Agreement § 1. That Trigger Event, among many others, would trigger the Guarantors' obligations to back up *all* of the Borrowers' obligations, including not only their payment obligations, but their obligations to pledge sufficient Collateral "free and clear" and ensure Leadenhall maintains perfected, first-priority security interests in all such Collateral, giving Leadenhall direct recourse to and an equitable interest in the Guarantors' assets to secure the debt.

98.    In summary, the credit facility implemented by the Agreements depended on the Borrowers owning sufficient Collateral to secure debt they took on from the Lenders, and the Agreements took pains at every turn to ensure that (1) the Collateral securing the debt was free and clear of any Adverse Claims that could interfere with the Lenders' remedies in the event of a default and, (2) if at any time there was insufficient Collateral available free and clear to secure all outstanding obligations, the Borrowers would be in default, and Leadenhall and the Lenders could proceed against all of the Collateral that the Borrowers currently owned, obtain additional receivables to recoup their investment, and otherwise proceed against 777 Partners and 600 Partners for the full values of the debt.

II. **Leadenhall Uncovers a Pattern of Knowing Misrepresentations Concerning Its Collateral.**

A. **Leadenhall Receives an Anonymous Tip Sounding the Alarm on Wander's "Criminal" Scheme.**

99.    In May 2021, pursuant to the terms of the LSA, the Borrowers began making borrowing requests to Leadenhall, taking out debt, and delivering required monthly Compliance Reports to Leadenhall identifying and valuing each asset pledged by the Borrowers.

100.    The 777 Partners employees responsible for preparing and sending the Compliance Reports to Leadenhall, typically by uploading the reports to a file sharing program, were Nicholas Bennett, Senior Manager in 777 Partners' Capital Markets group, and Alexander Adnani, Financial Analyst in 777 Partners' Capital Markets group.  Bennett and Adnani were also both employees of SuttonPark Capital during the relevant period, and Adnani continued to use a SuttonPark Capital email address in 2024—again, the distinction between SuttonPark Capital and 777 Partners was often disregarded, to the extent it existed at all.

101.    While Bennett and Adnani formally reported to then-Chief Financial Officer of 777 Partners Damien Alfalla as part of 777 Partners' finance function, at least for purposes of allocating assets to serve as Collateral for debt from Leadenhall and preparing and sending Compliance Reports, they reported directly to Josh Wander—typically in person or via videoconference (over the FaceTime application on the individuals' mobile phones) to ensure that Wander knew exactly who was in the room with Bennett and Adnani when they were communicating and that there was no paper trail of any communications.

102.    The first periodic reports delivered by the SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers covering May 2021 reflected that the SuttonPark and Dorchester Borrowers had already taken "Outstanding Borrowings" of approximately $300 million and $80 million, respectively, in the first month the credit facility was effective, and

contained a list of each Borrower's assets, a calculation of the Borrowing Base based on those assets, and a representation as to whether outstanding borrowings were in compliance with the Borrowing Base. An excerpt from the May 2021 monthly compliance Report delivered by the SuttonPark Servicer on behalf of the SuttonPark Borrower—reflecting a listing of "life contingent assets," *i.e.*, assets pledged for the benefit of the Lenders with payouts contingent upon the continued survival of an insured—is set forth below:

| SPLCSS III Receivables Compliance Report | | |
|---|---|---|
| Borrowing Base Calculation and Compliance as of May, 2021 | | |
| **LIFE CONTINGENT RECEIVABLES** | | |
| | Swap Rate applicable to the Weighted Average Life of all Eligible Receivables that are Life Contingent Receivables | 1.97% |
| (plus) | 3.85% bps | 3.85% |
| | Life Contingent Discount Rate | 5.82% |
| | LC ASSIGNABLE ANNUITY | $- |
| | LC Assignable-No COO | $- |
| | LC HEDGED | $4,237,398.31 |
| | LC HEDGED (Premium) | $- |
| | LC Hedged (Premium) - no LE | $- |
| | LC Hedged ASSIGNABLE ANNUITY | $- |

103.     Pursuant to the terms of the LSA, by the Servicers delivering these monthly Compliance Reports to Leadenhall, the Borrowers represented upon delivery that they were "the legal and beneficial owner[s] of the applicable Collateral free and clear of any Adverse Claim." LSA § 4.01(h).

104.     Over the period May 2021 through the end of 2022, Bennett and Adnani on behalf of the SuttonPark Servicer continued to deliver monthly Compliance Reports to Leadenhall

containing a list of the Borrowers' assets and a calculation of the Borrowing Base—and therefore the Borrowers represented month after month that Collateral pledged as security to Leadenhall was "free and clear" of any other security interest.

105.    On September 19, 2022, Leadenhall Capital Managing Partner Craig Gillespie received an email with an anonymous tip—from sender "noreply@anonymousemail.me"—that Collateral pledged for the benefit of the Lenders either did not exist or was pledged to another third-party lender.  The tip expressly accused Josh Wander of criminal activity:

> **The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured. What he is doing is criminal.**

Exhibit 1 (Anonymous Tip).  The anonymous tip was a prescient warning that Leadenhall would later—despite Wander's vociferous attempts at obstruction—determine was true in all respects.

**B.    Leadenhall Visits 777 Partners' Offices in Miami, During Which Wander Tries to Assure Leadenhall That Any problems with Its Collateral Are Limited and Under Control.**

106.    After receiving the tip, pursuant to its audit rights under the LSA, Leadenhall began a business review of the Borrowers' receivables and assets pledged as Collateral to ensure that the hundreds of millions of dollars in debt notes provided to the Borrowers were secured and collateralized in accordance with the LSA.  *See* LSA § 5.02 (permitting Leadenhall Capital as the Administrative Agent "to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller").

107.    In the immediate aftermath of receiving the tip, Leadenhall representatives conducted a series of calls with Wander and other representatives of 777 Partners and the Borrowers, during which Leadenhall requested additional detail on assets pledged as Collateral to Leadenhall.

108.    In November 2022, Leadenhall Managing Partner Craig Gillespie, Chief Financial Officer and Chief Operating Officer Chris Learmonth, and Vice President Tom Foot visited 777 Partners' offices on-site in Miami, Florida to conduct a series of in-person meetings with Wander and other individuals responsible for allocating Collateral for the benefit of the Lenders.

109.    During the on-site visit, the Leadenhall representatives met with senior management of 777 Partners, as well as Bennett and Adnani, and were presented with overviews of 777 Partners' businesses. Gillespie, Learmonth, and Foot also inspected the computer system used by 777 Partners and the Borrowers—referred to as "MP Fin"—to allocate receivables and other assets to various lenders for purposes of securing the notes. Bennett and Adnani in the 777 Partners Capital Markets group were responsible for allocating assets to lenders in the MP Fin system, which they did at the direction of Josh Wander.

110.    The MP Fin system contains a unique identifier for each asset and the Borrower to which the asset had been allocated. The excerpt from MP Fin below reflects that asset number "64371" was allocated by 777 Partners to "SPLCSS II LC," *i.e.*, the SuttonPark Borrower,[4] which in turn pledged 100% of its assets—including asset number 64371—to Leadenhall:

**Excerpt from MP Fin Showing "Portfolio Name" Allocation for Asset No. 64371:**

| File # | File Name | Portfolio Name | Annuity Issuer | Transfer State | Seller ID | Contract # | Annuity Owner |
|--------|-----------|----------------|----------------|----------------|-----------|------------|---------------|
| 64371 | ███ | SPLCSS II LC | Monarch Life Insurance Company in Liquidation | Texas | 20997 | ML0493472 | United States Fire Insurance Company |

---

[4] For clarity, the Borrower that executed the LSA and related agreements at issue here is SPLCSS III LLC, but a different 777 Partners' borrower vehicle named "SPLCSS II" had borrowed from Leadenhall under a prior credit facility. When the prior credit facility ended and the facility at issue here began, 777 Partners simply did not bother to update the nomenclature in its system, so "SPLCSS II" denotes assets owned by SPLCSS III LLC as of the relevant period.

112.    Given the number of assets that 777 Partners and the Borrowers had pledged to various lenders—which numbered in the tens of thousands—Leadenhall representatives were able to conduct only a random sample "spot check" of the assets pledged as Collateral.

113.    During the "spot check" of 777 Partners' computer systems, the Leadenhall and 777 Partners teams identified a relatively small number of assets that were improperly allocated to the Dorchester Borrower.  To reconcile the issue, Bennett and Adnani, at the direction of Josh Wander, removed the improperly allocated assets from its Borrowing Base, amounting to approximately $7 million in value that was no longer available for the Dorchester Borrower to borrow against.

114.    Removing these assets from the Dorchester Borrower's Borrowing Base resulted in a corresponding deficiency in the Dorchester Borrower's Borrowing Base compared to its Outstanding Borrowings.  This deficiency is apparent by comparing the monthly Compliance Reports from the Dorchester Borrower issued before and after the November 2022 spot-check—with the November 2022 Report showing compliance with the Borrowing Base Limitation and the December 2022 Report showing that the Dorchester Borrower was out of compliance by approximately $7 million:

**Excerpt from November 2022 Dorchester Borrower Compliance Report:**

|  |  | Borrowing Base | $79,103,921.15 |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $79,103,921.15 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **Yes** |

**Excerpt from December 2022 Dorchester Borrower Compliance Report:**

| | | Borrowing Base | $71,689,952.00 |
|---|---|---|---|
| | **Borrowing Base Compliance** | | |
| | Borrowing Base Amount | | $71,689,952.00 |
| (less) | Outstanding Borrowings | | $79,010,000.00 |
| | Compliant if difference is ≥ 0) | | No |

115.     Nevertheless, Wander and 777 Partners took pains during the November 2022 on-site meetings to ensure that Leadenhall believed that, to the extent any assets were not properly allocated to Leadenhall on MP Fin, the problem was limited to the Dorchester Borrower, contained, and under control.  Upon information and belief, Wander and 777 Partners made these misrepresentations with the full knowledge that their employees had worked to alter data and obfuscate data records in advance of the meetings.

116.     As would be revealed over the following months, however, the problem was anything but contained, as Leadenhall would discover that both the Dorchester and SuttonPark Borrowers had double-pledged hundreds of millions of dollars of collateral, and thus had covertly borrowed hundreds of millions of dollars from Leadenhall in excess of their Borrowing Bases.

117.     Following the on-site visit, Leadenhall and representatives of 777 Partners and the Borrowers continued to correspond over email and telephone to ensure that assets were properly allocated to the Borrowers.  777 Partners also agreed to add a "portfolio name" field—which was available in the MP Fin system—to the monthly Compliance Reports to ensure that assets were properly allocated to Leadenhall.  The inclusion of this portfolio name field to the SuttonPark Borrower monthly Compliance Reports gave no indication that Collateral was double-pledged and thus further concealed any double-pledging from Leadenhall.

**C. In Early 2023, Wander Confirms That "Around $100 Million" of Collateral Had Been Double-Pledged to a Third-Party Lender Called Credigy.**

118.    Through early 2023, although Leadenhall kept close watch over its lending to Wander's entities, no further issues were revealed, so Leadenhall reasonably relied on the Compliance Reports it received during this period.  For instance, the January 2023 Report for the SuttonPark Borrower represented that the Borrower was compliant with its Borrowing Base Limitation, while the Dorchester Borrower's January 2023 Report reflected approximately the same $7 million deficiency that had been identified in late 2022:

**Excerpt from January 2023 SuttonPark Borrower Compliance Report:**

|       |                                    | Borrowing Base | $361,309,249.45 |
|-------|------------------------------------|----------------|-----------------|
|       | **Borrowing Base Compliance**      |                |                 |
|       | Borrowing Base Amount              |                | $361,309,249.45 |
| (less)| Outstanding Borrowings             |                | $349,997,803.32 |
|       | **Compliant if difference is ≥ 0)**|                | **Yes**         |

**Excerpt from January 2023 Dorchester Borrower Compliance Report:**

|       |                                    | Borrowing Base | $71,831,753.87 |
|-------|------------------------------------|----------------|----------------|
|       | **Borrowing Base Compliance**      |                |                |
|       | Borrowing Base Amount              |                | $71,831,753.87 |
| (less)| Outstanding Borrowings             |                | $79,010,000.00 |
|       | **Compliant if difference is ≥ 0)**|                | **No**         |

119.    In March 2023, however—nearly two years into the credit facility—a separate third-party lender to 777 Partners, Credigy, visited Leadenhall's offices in London under the auspices of a "general catch-up."  Following that meeting, Credigy sent Leadenhall an inventory of assets that 777 Partners and affiliates had ostensibly pledged for the exclusive benefit of

Credigy.  Credigy asked Leadenhall to confirm that 777 Partners had not also allocated the assets to Leadenhall.

120.    From Credigy's inventory of assets, Leadenhall was able to discern that 777 Partners had allocated more than 1,600 receivables—totaling approximately $185 million in value—to both Credigy and Leadenhall.  In other words, Leadenhall confirmed that Wander and Pasko had "double-pledged" Leadenhall's assets.

121.    Leadenhall would also later discover that the majority of these 1,600 double-pledged receivables had been sold or "assigned" to the SuttonPark Borrower—and therefore ostensibly pledged as Collateral to Leadenhall—via a "Form of Assignment" executed by Steven Pasko on September 30, 2022.[5]

122.    On March 24, 2023, Leadenhall sent a letter to Wander and Pasko requesting evidence that assets comprising Leadenhall's Collateral were free and clear of Adverse Claims and that the monthly Compliance Reports were true, accurate, and complete.  *See* Exhibit 2 (Mar. 24, 2023 Letter from C. Gillespie) ("***As you are aware, it has come to our attention that certain Eligible Receivables may be subject to Adverse Claims*** . . . .  To reiterate our prior discussions, we need to receive clear and objectively determinable evidence that the Receivables constituting Collateral for our SPLCSS Loans and Dorchester Loans, respectively remain Eligible Receivables and that each of the Compliance Reports remain true, accurate and complete.").

123.    On March 28, 2023, senior executives and board members of Leadenhall held a conference call with Wander to get further detail on how assets had been double-pledged by the

---

[5] Pasko was the authorized signatory on the sale agreements or the "assignments" of assets by the Sellers to the Borrowers.  Because the Borrowers pledged to Leadenhall 100% of their assets as Collateral by function of the LSA, these assignment agreements in which the Borrowers acquired assets in the first place from the Sellers—and signed by Pasko—are foundational to the contractual violations and false statements herein.

Borrowers and to understand whether Wander had a plan to fix the problem. The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Phil Kane, and General Counsel Peter Clark. Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall recorded the call with Wander's permission.

124.    Wander's objective from the beginning of the call was to avoid explaining precisely how and when the double-pledging had occurred and instead impress upon the Leadenhall representatives that any deficit or hole in Leadenhall's Collateral could be shored up by, what he termed "replacement deals."

125.    Amidst a murky array of promises by Wander to Leadenhall concerning "replacement deals"—including replacing the double-pledged Collateral with cash from a potential sale of equity in 777 Partners' football assets—Wander acknowledged that there had been a "screwup" and "embarrassing" problem caused by 777 Partners' antiquated computer system concerning assets pledged to Leadenhall by the SuttonPark and Dorchester Borrowers.

126.    In particular, Wander expressly stated during the call that "the issue today is that *there are deals that are in Credigy's Borrowing Base that are allocated to you guys*." Wander further explained concerning the double-pledged assets that there were "deals that sat on our Volans facility[6]—which is locked out basically now for five years—that were allocated to the [SuttonPark] facility. *And those are the deals that that—you would consider double-pledged now, for they're on both facilities*."

127.    Wander claimed that the "screwup" was the result of 777 Partners and the Borrowers' failure to recognize, upon allocating certain assets to Leadenhall, that those assets had already been allocated as collateral to Credigy. He further described the issue as a mistake in

---

[6] The "Volans facility" refers to 777 Partners' credit facility with Credigy.

"portfolio input"—meaning that upon the initial "input" of the assets into the Leadenhall facility, they were already encumbered by other security interests.

128.    Near the end of the call, during an exchange between Wander and Leadenhall Chairman John Wells, Wander expressly acknowledged that the SuttonPark and Dorchester Borrowers' double-pledge of Collateral constituted a clear breach of the parties' agreements:

> Wells: **"There are so many breaches on these agreements now.  We need to get all of this sorted out."**
>
> Wander: **"Agreed, agreed, agreed."**

129.    Wander again promised on the call that 777 Partners would individually review— or conduct a "reconciliation" of—every single asset pledged as collateral in 777 Partners' "MP Fin" system for the purpose of ensuring that assets were appropriately allocated to its lenders. Wander also promised to put a process in place to "reconcile" more frequently going forward to ensure that assets were properly allocated under 777 Partners' credit facilities.

130.    On March 29, 2023, following up on the March 28, 2023 call, Leadenhall Managing Partner Phil Kane sent an email to Wander containing a laundry list of action items under the header "**Double Pledges**," with the very first requirement for Wander listed at the top: "A reconciliation of all of our assets to the appropriate SPV for both [the SuttonPark and Dorchester Borrowers] – this should be completed as soon as possible, and by Monday 3rd of April at the latest."  Exhibit 3 (Mar. 29, 2023 Email from P. Kane).

131.    On April 3, 2023, senior executives and board members of Leadenhall held a second conference call with Wander to understand exactly how the Borrowers had double-pledged the assets.  The call was attended by Leadenhall Chairman John Wells, CEO Luca Albertini, Managing Partner Tom Spreutels, Managing Partner Phil Kane, General Counsel Peter Clark, and Vice

President Tom Foot.  Again, Wander alone attended on behalf of 777 Partners and the Borrowers. Leadenhall again recorded the call with Wander's permission.

132.    During the call, Wander expressly admitted to Leadenhall Chairman John Wells that the Borrowers had double-pledged "around $100 million," or over 30 percent, of the Collateral pledged to Leadenhall:

> Wells: **"What is the shortfall that has been pledged to someone else and not to us, and therefore what is our gross shortfall at the moment?"**
>
> Wander: **"I think it was around 100 million I think."**
>
> […]
>
> Wells: **"So over 30% of our collateral has been pledged to someone else?"**
>
> Wander: **"Yes, it appears that way."**

133.    Wander maintained that the double-pledging had been a computer system mistake and that he planned to "do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap."

134.    When pressed for details on this plan, Wander stated that the "holding company lender" was A-CAP and that, since 2020, A-CAP had extended around $200 million to $250 million in credit to 777 Partners' holding company.  Wander also disclosed that, in return for that sizeable loan, A-CAP had an "all asset lien" on the assets of 777 Partners.  A-CAP extended the loan to 777 Partners through its affiliate Haymarket Insurance Company ("Haymarket"), the collateral agent for which is an A-CAP shell entity called ACM Delegate LLC.

135.    On April 4, 2023, following up on the April 3, 2023 call, Leadenhall Managing Partner Tom Spreutels sent an email to Wander again containing a list of action items with the very first requirement for Wander listed at the top: "*A plan to cure the identified deficiency and the associated time frame*."  Exhibit 4 (Apr. 4, 2023 Email from T. Spreutels).

136.    Following Wander's admissions, the monthly Compliance Reports began reflecting enormous Borrowing Base deficiencies.  For instance, on April 4, 2023, the SuttonPark Servicer delivered its monthly Compliance Report on behalf of the SuttonPark Borrower for the month of February 2023, showing for the first time that the SuttonPark Borrower had taken on ***over $170 million in debt*** above its Borrowing Base.

**Excerpt from February 2023 SuttonPark Borrower Compliance Report:**

|  |  | **Borrowing Base** | **$177,547,147.46** |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $177,547,147.46 |
| (less) | Outstanding Borrowings |  | $349,997,803.32 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

137.    The February 2023 Report for the Dorchester Borrower also reflected that its Borrowing Base deficiency had also grown to approximately $10 million.

**Excerpt from February 2023 Dorchester Borrower Compliance Report:**

|  |  | **Borrowing Base** | **$69,080,396.57** |
|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |
|  | Borrowing Base Amount |  | $69,080,396.57 |
| (less) | Outstanding Borrowings |  | $79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  | **No** |

138.    In the Reports for the following month, March 2023, the Borrowing Base deficiencies remained, with the SuttonPark Borrower disclosing a deficiency of over $160 million and the Dorchester Borrower disclosing a deficiency of over $7 million.

**Excerpt from March 2023 SuttonPark Borrower Compliance Report:**

|  |  | Borrowing Base | $ | 187,825,142.97 |
|---|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |  |
|  | Borrowing Base Amount |  | $ | **187,825,142.97** |
| (less) | Outstanding Borrowings |  | $ | 349,997,803.32 |
|  | **Compliant if difference is ≥ 0)** |  |  | **No** |

**Excerpt from March 2023 Dorchester Compliance Report:**

|  |  | Borrowing Base | $ | 71,517,425.07 |
|---|---|---|---|---|
|  | **Borrowing Base Compliance** |  |  |  |
|  | Borrowing Base Amount |  | $ | 71,517,425.07 |
| (less) | Outstanding Borrowings |  | $ | 79,010,000.00 |
|  | **Compliant if difference is ≥ 0)** |  |  | **No** |

**D. Despite Defendants' Efforts to Stonewall Leadenhall's Investigation, Leadenhall Discovers That the Borrowers Had Pledged Assets They Never Even Owned, and Leadenhall Formally Notices the Borrowers' Breaches of the Agreements.**

139.    In the ensuing months, Leadenhall continued to visit 777 Partners' offices, meet with Wander and 777 Partners' servicing teams, and conduct reviews of the assets pledged as Collateral to Leadenhall.

140.    During these meetings and telephone conferences occurring during the April through October 2023 period, Wander continued to promise that new assets and proceeds from deals just around the corner would be used to shore up the shortfall in Collateral to Leadenhall. Wander also continued to promise to conduct a so-called "reconciliation" process in his computer systems to ensure that assets pledged as Collateral to Leadenhall were actually allocated to Leadenhall in his systems.  The promised proceeds and reconciliation never materialized.

141.    With the limited information that Wander and the various entities operating under his control did provide, in October and November 2023, Leadenhall determined that the double-pledge of Collateral was just the tip of the iceberg.  In corresponding with 777 Partners personnel

(with the permission of 777 Partners and Wander), reviewing receivables on MP Fin, and recognizing a pattern of 777 Partners' cash receipts being far lower than the amounts due, **Leadenhall determined that the SuttonPark and Dorchester Borrowers had borrowed against and pledged assets as Collateral to Leadenhall that they never purchased in the first place, did not own, and therefore could not even pledge as Collateral**.

142.    Leadenhall also determined that the SuttonPark and Dorchester Borrowers had sold and/or removed assets from Leadenhall's Collateral base without providing any notice to Leadenhall, further reducing their Borrowing Base relative to outstanding borrowings.

143.    Upon learning of these further material breaches of the LSA, on November 29, 2023, Leadenhall served written correspondence on 777 Partners, 600 Partners, and the SuttonPark and Dorchester Borrowers providing formal notice that the Borrowers were in material breach of the LSA and related agreements (the "Notice of Breach"):

> **Based on our current investigation, the Borrowers have materially breached the Agreements by double-pledging Collateral to both the Lenders and to a separate third-party lender, pledging Collateral to the Lenders which was never purchased by the Borrowers (and therefore which the Borrowers did not own), and selling and/or removing Collateral pledged to the Lenders without a corresponding reduction in the Principal Amount of all Loans in breach of the Borrowing Base Limitation.**

*See* Exhibit 5 (Notice of Breach).

144.    After accounting for these breaches—that is, by subtracting double-pledged assets, assets not owned by the SuttonPark and Dorchester Borrowers, and otherwise accounting for outstanding borrowings in excess of credit limits—Leadenhall calculated in the Notice of Breach a Borrowing Base deficiency of approximately $310 million for the SuttonPark Borrower and $41 million for the Dorchester Borrower—or more than three times the amount that Wander had admitted had been double-pledged in March 2023.

145.    In January 2024, at Leadenhall's request, the SuttonPark and Dorchester Borrowers, via the SuttonPark Servicer, delivered revised Compliance Reports for the preceding months making clear the extent to which the Borrowers, Pasko, and Wander had lied all along about assets ostensibly pledged for the exclusive benefit of Leadenhall—and admitting that the original Compliance Reports were false.

146.    For example, the revised March 2023 Compliance Report delivered by the SuttonPark Servicer on behalf of the SuttonPark Borrower—which had previously reflected a Borrowing Base of approximately $187 million and outstanding borrowings of approximately $350 million—now reflected a Borrowing Base of only approximately $64 million, after subtracting the double-pledged assets and/or the assets not actually owned by the Borrowers.

**Excerpt from revised March 2023 SuttonPark Borrower Compliance Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **64,076,151.91** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 64,076,151.91 |
| Outstanding Borrowings | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | **No** |

147.    In other words, the original SuttonPark Borrower Compliance Report delivered in March 2023 had falsely represented that nearly $125 million in assets had been pledged for the exclusive benefit of the Lenders.  That $125 million of ineligible assets *was in addition to* the over $160 million in assets that the original March 2023 Compliance Report had already indicated were double-pledged.

148.    Similarly, the revised March 2023 Compliance Report delivered by the SuttonPark Servicer on behalf of the Dorchester Borrower, which had previously reflected a Borrowing Base of approximately $71 million and outstanding borrowings of approximately $79 million—now

reflected a Borrowing Base of only $42 million after subtracting the double-pledge assets and/or the assets not actually owned by the Borrowers.

**Excerpt from revised March 2023 Dorchester Borrower Compliance Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **42,455,473.97** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 42,455,473.97 |
| Outstanding Borrowings | $ | 79,010,000.00 |
| **Compliant if difference is ≥ 0)** | | **No** |

149.     In other words, the original Dorchester Borrower Compliance Report delivered in March 2023 had falsely represented that nearly $30 million in assets had been pledged for the exclusive benefit of the Lenders.

150.     In December 2023, all four Borrowers, as well as the Sellers and Servicers, agreed with Leadenhall to execute an amendment to the LSA (the "Additional Interest Amendment"). Under the Additional Interest Amendment, the Borrowers agreed to pay additional interest on the "Uncollateralized Portion" of the Borrowers' outstanding debts to Leadenhall, retroactive to March 17, 2023, when Leadenhall first discovered the double-pledging. The "Uncollateralized Portion" was defined as each Borrower's Borrowing Base Deficiency, which the Borrowers represented were reflected in the amended Compliance Reports delivered around the same time.

151.     Leadenhall also learned more about the causes of the double-pledge and failure to own Collateral. Beginning in 2021, Wander and 777 Partners considered purchasing a portfolio of assets valued at approximately $250 million from JG Wentworth, a financial services company well known for purchasing structured settlements and lottery annuity payments in exchange for lump-sum cash settlements (and renowned for the tagline, "It's my money, and I need it now!").

152.    SuttonPark Capital conducted due diligence of the JG Wentworth portfolio and specifically insisted on receiving a "data tape" from JG Wentworth that listed the portfolio's structured settlement and lottery annuity receivables by unique identifier and calculated the net present value of each asset by their discounted cash flow.

153.    But before SuttonPark Capital acquired the JG Wentworth portfolio of assets, Wander directed Bennett, Adnani, and the Capital Markets group to use the JG Wentworth data tape *to list JG Wentworth's assets as collateral for 777's lenders*, including Leadenhall and Trinity Life (which later executed an agreement with 777 Partners by which 777 Partners would acquire Trinity Life, though the transaction was never consummated).

154.    Of course, because the assets had not been properly acquired by SuttonPark Capital, SuttonPark Capital did not own the "Collections" from those assets to pass onto Leadenhall. Servicing Agreements § 3.1 (requiring Servicers to deposit "Collections" into Leadenhall's accounts, defined to include "(all cash payments (including Settlement Payments and Scheduled Net Lottery Payments, if any) or proceeds of such Receivable, whether in the form of cash, checks, wire transfers, electronic transfers or any other form of cash payment.").   To conceal that SuttonPark Capital did not actually own the assets it had pledged, the Capital Markets group "topped up" Leadenhall's collection account with other funds to make it appear as though the cash flows were incoming.

155.    That process became a pattern and practice for the Capital Markets group, whereby the group created shell records on the MP Fin system for assets that 777 Partners did not actually own and covered up that fact by "topping up" lenders' collection accounts such as Leadenhall, to give the illusion that cash in-flows were being received from the fictitious assets.

156.    Moreover, the servicing notes associated with the assets pledged to Leadenhall, created and entered into the MP Fin database by the SuttonPark Capital servicing and operational teams, confirm that the Borrowers' rampant double-pledging and failure to own the Collateral was, as of March 2023, neither a new problem nor a problem that Wander had only just discovered. The MP Fin notes reflect that, going back to 2021, 777 Partners staff were expressly aware that certain receivables pledged to Leadenhall were never acquired, had already been sold, or were determined to be ineligible to be used as collateral. The servicing team documented those issues contemporaneously in the servicing notes, some of which were elevated directly to Bennett and Adnani on the Capital Markets team, and all of which Bennett and Adnani had the access, ability, and responsiveness to review as part of their roles in submitting Compliance Reports truthfully attesting to the value of Collateral actually owned by the Borrowers.

157.    777 Partners, as well as SuttonPark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers, thus had actual and constructive knowledge of those non-existent, double-pledged, or otherwise defective receivables and made the conscious decision to leave those assets as allocated to Leadenhall in the MP Fin system and falsely represent to Leadenhall that they existed and were "free and clear" of other interests.

158.    This practice created a problem whereby the assets listed as collateral in the MP Fin computer system were not actually on the Sutton Park Capital balance sheet maintained by Sutton Park Capital accounting department. To solve the issue, Wander caused Bennett and Adnani to lie to SuttonPark Capital's own accounting department, falsely representing that SuttonPark Capital owned the assets that had been added into the MP Fin system. The accounting team of SuttonPark Capital was tasked with ensuring that Sutton Park Capital's books and records were accurate. In the course of 2023 and 2024, the team members departed one by one until the last

Accounting Controller resigned from SuttonPark Capital in July 2024, shortly after this Complaint was originally filed in May 2024.

159.    Leadenhall also discovered that, after Leadenhall entered into the LSA, 777 Partners changed the programming of the MP Fin system to allow employees to retroactively alter the names of the lenders to which assets had been allocated in the past.  For instance, by 2024, a user could alter the record for an asset to make it look like it had been pledged to Credigy for the period January 2023 to December 2023, even though the same asset had previously been shown as pledged to Leadenhall for the same period.  When Leadenhall entered into the LSA with the Borrowers in May 2021, the MP Fin system did not allow for assets to be edited nor "re-allocated" after the fact.

160.    Over the period May 2021 to November 2023, the SuttonPark and Dorchester Borrowers delivered approximately 60 Compliance Reports to Leadenhall—***therefore representing approximately 60 separate times*** that Collateral pledged for the exclusive benefit of Leadenhall was owned by the SuttonPark and Dorchester Borrowers "free and clear" of any other security interest when instead, this Collateral was pledged to other lenders or otherwise did not exist.  Exhibit 6 is a table identifying the sender or uploader, transmission medium, upload date, and confirmatory email date, if any, for each monthly Compliance Report.

161.    While each Compliance Report was required to be signed on behalf of the SuttonPark Servicer, in practice, the Servicers often just submitted native Excel files of the reports. Steven Pasko, however, was the signatory on behalf of the SuttonPark Servicer of the false Compliance Reports which contained signatures, including reports issued by the SuttonPark Servicer for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022.

162.    Leadenhall relied on the Compliance Reports to confirm throughout the term of the LSA that the funds provided to Borrowers were secured as contractually required.  Leadenhall would not have continued to allow the Borrowers to borrow debt under the LSA had it known that hundreds of millions of dollars in security for the debt had in fact been double-pledged to another lender and/or did not exist.  The Borrowers made each of these false representations to induce the Lenders and Leadenhall to continue allowing the Borrowers to take out debt notes under the credit facility.

### E.  Leadenhall Learns That 777 Partners and the Borrowers Forged and Altered Financial Records to Conceal the Fraud.

163.    In early 2024, a 777 insider told Leadenhall that 777 Partners and the Borrowers had photoshopped financial statements submitted to Leadenhall and that, prior to the on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners had altered receivables in the MP Fin system to try to cover up the double-pledge of Collateral.

164.    That insider tip prompted Leadenhall to re-examine the Compliance Reports and backup materials for those reports delivered around November 2022.  The examination resulted in full corroboration of the insider's admission.

165.    For the month November 2022, the SuttonPark Servicer had delivered a Compliance Report on behalf of the SuttonPark Borrower to Leadenhall showing outstanding borrowings of $349,997,803.32 and a borrowing base of $351,974,821.95.

**Excerpt from November 2022 SuttonPark Borrower Compliance Report:**

| | | |
|---|---|---|
| **Borrowing Base** | **$** | **351,974,821.95** |
| **Borrowing Base Compliance** | | |
| Borrowing Base Amount | $ | 351,974,821.95 |
| Outstanding Borrowings | $ | 349,997,803.32 |
| **Compliant if difference is ≥ 0)** | | **Yes** |

166.    The November 2022 Compliance Report also showed an amount of $4,344,750.19 held in a "SPLCSS III Collection" account—which comprised part of the SuttonPark Borrowers' Borrowing Base—and an amount of $4,557,291.41 held in a "SPLCSS III Reserve" account—which comprised an amount required to be reserved on a monthly basis under the LSA as a percentage of the value of the Borrower's assets.

**Excerpt from November 2022 SuttonPark Borrower Compliance Report:**

| | | |
|---|---|---|
| SPC Assignment Amount | $ | - |
| SPLCSS III Collection | $ | 4,344,750.19 |
| SPLCSS III Reserve | $ | 4,557,291.41 |
| Total | $ | 8,902,041.60 |

167.    As backup documentation for the November 2022 Compliance Report, the SuttonPark Borrower submitted to Leadenhall "screenshots" purporting to reflect summary statements from Wells Fargo for the "Collection" and "Reserve" accounts. The summary statements showed, as of November 30, 2022, an amount of $4,344,750.19 in the SuttonPark "Collection" account (ending in *893) and an amount of $4,557,291.41 in the "Reserve" account (ending in *885). *See* Exhibit 7 (Wells Fargo Summary Statement Screenshot). In other words, the screenshot matched the November 2022 Compliance Report with respect to the "Collection" and "Reserve" amounts.

**Excerpt from Wells Fargo Screenshot Showing Balances as of November 30, 2022:**

| Account Number | Account Name | Closing Ledger Balance | Closing Collected Balance |
|---|---|---|---|
| Account Balances for  121000248  WELLS FARGO BANK, N.A. 885 | SPLCSS II Reserve | 4,557,291.41 | 4,557,291.41 |
| Account Balances for  121000248  WELLS FARGO BANK, N.A. 893 | SPLCSS II Collection | 4,344,750.19 | 4,344,750.19 |

168.    However, following the SuttonPark Borrower's submission of the Wells Fargo screenshot to Leadenhall—and at Leadenhall's request—the SuttonPark Borrower sent Leadenhall in 2023 a full monthly bank statement for the "Collection" account (ending in *893) for the month December 2022.  *See* Exhibit 8 ("Collection" Account Wells Fargo Monthly Statement).

169.    The full monthly statement showed that—contrary to the screenshot showing an amount of $4,344,750.19 in the "Collection" account (ending in *893) as of November 30, 2022— *only $300,162.82 was in the account as of November 30, 2022*.

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022:**



170.    Moreover, contrary to the screenshot showing an amount of $4,557,291.41 in the "Reserve" account (ending in *885) as of November 30, 2022, *$0 was in the account as of November 30, 2022.*  *See* Exhibit 9 ("Reserve" Account Wells Fargo Monthly Statement).

**Excerpt from Wells Fargo Monthly Statement Showing Balance as of November 30, 2022:**

171.    Leadenhall also discovered that 777 Partners had—using the programming change to MP Fin in the course of 2022 or 2023 allowing users to retroactively alter the lenders to which assets had been allocated—altered receivables pledged to Leadenhall.

172.    The excerpt from the MP Fin system below for asset number "69039" reflects a suspicious "Change of Portfolio" history between Leadenhall and Credigy.  "SPLCSS II" is the SuttonPark Borrower and "Volans 2018-2-18" is the special purpose borrowing vehicle set up by 777 Partners for Credigy.  A 777 Partners member of staff, likely a Capital Markets Group employee, altered the portfolio history for asset number 69039 such that it was pledged to Leadenhall as of May 1, 2021 (*i.e.*, right before the LSA was executed), remained pledged to Leadenhall through September 16, 2021, and—then unbeknownst to Leadenhall—was re-allocated to Credigy on September 17, 2021.  The history appears to reflect that the asset remains pledged to Credigy through the present.

**Excerpt from MP Fin Showing "Change of Portfolio" History for Asset No. 69039:**



173.    In the monthly Compliance Report issued to Leadenhall as of September 30, 2021, however, and thereafter, asset 69039 continued to show as being pledged by the SuttonPark Borrower exclusively to Leadenhall:

**Excerpt from September 2021 SuttonPark Borrower Compliance Report:**

| File No | File Name | Portfolio Name | Case Type | Discount Rate | PV |
|---------|-----------|----------------|-----------|---------------|-----|
| 69039 | 109068 | SPLCSS II | STRUCTURED SETTLEMENTS | 3.83% | $   45,143.79 |

174.    That 777 Partners deliberately altered financial records to conceal the true state of Leadenhall's collateral is proof that the deficiency was not a "mistake" but a series of recurring, carefully orchestrated acts of fraud.

**F. Leadenhall Exercises Remedies under the LSA, and 777 Partners Admits It Lacks Authority to Agree to a Repayment Plan without A-CAP.**

175.    This admission of fraud—coupled with smoking gun evidence uncovered by Leadenhall—immediately precipitated Leadenhall's exercise of additional remedies.

176.    On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with written notice that "Events of Default" (*i.e.*, material breaches) under the LSA had occurred and were continuing.  Given the Events of Default, Leadenhall also sent, on March 12, 2024, "Trigger Notices" to Manufacturers and Traders Trust Company taking control of certain deposit accounts owned by the Borrowers (other than accounts owned by the Insurety Borrower).  Funds from these accounts are being swept to other accounts as directed by Leadenhall in the Trigger Notices.  To date, Leadenhall has not exercised its control rights with respect to accounts owned by the Insurety Borrower to ensure that business may continue to operate.

177.    On March 15, 2024, Leadenhall served written notice that, in light of the Events of Default, Leadenhall was exercising its right to accelerate all outstanding debt obligations of the Borrowers, making the outstanding balance of $609,529,966.82 immediately due and payable.  *See*

Exhibit 10 (Mar. 15, 2024 Correspondence). Exhibit 11 provides a breakdown of this outstanding accelerated balance into principal and interest components.[7]

178.    In March 2024, in a last-ditch attempt to stave off this lawsuit, Leadenhall entered into negotiations concerning a "Forbearance Agreement" whereby Leadenhall and the Lenders would temporarily forgo exercising their default-related rights and remedies in exchange for 777 Partners' agreeing to pay back the outstanding debt pursuant to an amortization schedule.

179.    On March 26, 2024, Walder sent a markup of a draft Forbearance Agreement to Leadenhall which contained the following concession: "As of the date hereof, the Events of Default identified on Exhibit A hereto have occurred and are continuing (collectively, the 'Specified Defaults')." Exhibit 12 (777 Partners' Draft Forbearance Agreement). Exhibit A to the draft Forbearance Agreement was the Notice of Breach setting forth details of 777 Partners' double-pledge and failure to own Collateral.

180.    During negotiations over the agreement, on March 29, 2024, Wander expressly represented to Leadenhall representatives in a telephone call that, if 777 Partners signed the Forbearance Agreement without A-CAP's express consent, A-CAP would accelerate A-CAP's loans to 777 Partners. Said Wander: "**They've [A-CAP] told us they're going to default our Holdco loan if we sign the document without them agreeing to it.**"

181.    Wander also represented in late March and early April 2024 to Leadenhall Managing Partner Craig Gillespie that King and Jill Gettman, Chief Legal Officer at A-CAP, were holding up execution of any agreement between Leadenhall and 777 Partners. Wander also represented that to break through the hold-up caused by A-CAP, he would try to organize a meeting

---

[7] Exhibit 11 reflects the accelerated amount due as of March 15, 2024, the date Leadenhall served written notice of acceleration of all outstanding debt obligations.

directly with Leadenhall and A-CAP so that Leadenhall and 777 Partners' businesses could come to ground on an agreement.[8]

182.    As negotiations dragged over efforts to work out a restructuring arrangement, A-CAP continued to lurk in the background controlling Wander's every move.  In a conference call with Wander, 777 Partners Associate General Counsel Jon Walder, and Leadenhall representatives on April 2, 2024, Wander was straightforward when questioned on whether A-CAP had control over what 777 Partners was able to sign:

> **Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now, and we have to keep the organization going and operating so we can solve all of our problems and deal with all of our obligations.  And they are the ones that are doing that.**

183.    In a similar vein, Walder was unable to answer even basic questions as to why 777 Partners continued to make material edits to the Forbearance Agreement that moved the parties further away from a deal.  Said Walder on why certain changes were made to the Forbearance Agreement: "**I have no idea.  I just did what I was told [by A-CAP]**."  And when informed by Leadenhall that Leadenhall's investors were skeptical of whether 777 Partners could deliver even a $15 million payment to start to pay back the outstanding balance, Walder played it straight: "**I can't say I wouldn't have a degree of skepticism if I were in your investors' shoes.  But like I said I have no control over it [the payment]**."

184.    Leadenhall personnel had phone calls with Wander about the potential for the 777 Entity Defendants to repay even small amounts of their $609 million debt—on the order of $15 or

---

[8] Wander called Leadenhall from New York City repeatedly over the course of these negotiations, including on March 13, 2024, April 16, 2024, and April 22, 2024.  Over and over again, Wander referenced Kenneth King's involvement and backroom control over the forbearance and amortization payment negotiations, and on at least one occasion—reflecting the intense entanglement between Wander, King, and A-CAP—Wander stated that he was working out of A-CAP's offices in New York City.

$30 million—and each time, Wander failed to make good on even the modest promise of repayment, and each time he made clear that A-CAP controlled his ability to make even a relatively tiny good-faith gesture.

185.    On March 31, 2024, Managing Partner Craig Gillespie of Leadenhall spoke to Wander on the telephone concerning whether 777 Partners could make a $15 million payment to pay down its debt to Leadenhall, or less than 2.5% of the outstanding debt.  Wander stated that whether 777 Partners could make a payment depended on whether A-CAP would provide the necessary funds.

186.    On April 1, 2024, Gillespie spoke with Wander again concerning whether 777 Partners could make a $15 million payment to pay down its debt to Leadenhall.  In the middle of the call, Wander said that Kenneth King was calling him, and that Wander would call Gillespie back.  When Wander called back, he stated that A-CAP would not be able to fund a $15 million payment for Leadenhall on April 1, 2024 but would be able to fund the payment on April 2, 2024.  Gillespie asked whether that was due to A-CAP's liquidity issues, and Wander replied, "must be."  Leadenhall never received the $15 million payment from 777 Partners on or after April 2, 2024.

187.    On April 2, 2024, Leadenhall Managing Partners Luca Albertini and Phil Kane spoke to Wander, and Gillespie separately spoke to Wander again, about whether 777 Partners could make a $15 million payment to pay down its debt to Leadenhall.  Wander told Leadenhall that 777 Partners would not be able to pay the $15 million previously promised without funding from A-CAP, but could potentially pay $15 million on April 15, 2024, when Wander anticipated that 777 Partners would obtain funding from another source.  Wander also told Leadenhall on April 2, 2024 that A-CAP controlled whether 777 Partners could even sign an agreement committing to a repayment schedule.  On April 3, 2024, Gillespie spoke to Wander again, and Wander again

stated that he would not have $15 million to pay Leadenhall until April 15, 2024.  Leadenhall never received that payment.

188.    On April 4, 2024, Albertini spoke to Wander again, and Wander stated that A-CAP would not allow 777 Partners to pay $30 million to reduce the debt owed to Leadenhall.  Wander hinted that he might be able to make an offer to pay $17.5 million.  Leadenhall never received a $17.5 million payment.

189.    On April 16, 2024, Leadenhall Managing Partner Craig Gillespie spoke to Wander over the phone.  Gillespie stated to Wander that, because 777 Partners and A-CAP appeared to have no real intention of repaying Leadenhall, Leadenhall would have to commence an action unless Wander could promptly repay approximately $350 million to Leadenhall, which constituted the full amount of the Collateral deficiencies.  Wander replied that paying $350 million to Leadenhall was "not possible" and he would never be able to find $350 million in two weeks.

190.    On April 17, 2024, Leadenhall Managing Partner Craig Gillespie again spoke to Wander.  Wander again indicated that A-CAP was holding up any negotiated repayment schedule and that Wander's view of A-CAP was that "they need to get fucking realistic" and allow the 777 Partners and 600 Partners entities to agree to a Forbearance Agreement.  It never happened.[9]

191.    The restructuring negotiations confirmed not only that 777 Partners had no ability whatsoever to pay back Leadenhall, but that Kenneth King operated as a near-omniscient force in Wander's head and in controlling the enterprise's every move.  Wander referenced or was

---

[9] Over the course of the parties' interactions, certain materials and/or communications exchanged between the 777 Partners affiliates and Leadenhall were designated as subject to Federal Rule of Civil Procedure 408, and certain communications between A-CAP and Leadenhall were the subject of a non-disclosure agreement.  None of those documents or communications are cited or referenced in this complaint.

interrupted by King during nearly every single phone call that Wander had with Leadenhall over the course of these discussions, as catalogued below:

    a. On March 1, 2024, Wander stated in a phone call that he had just spoken to King and that King had directed Wander to speak to A-CAP's in-house counsel concerning a term sheet on a potential restructuring agreement;

    b. On March 4, 2024, Wander stated in text messages concerning the term sheet that "Kenny was working on it all weekend"—and further confirmed the same in a subsequent short phone call;

    c. On March 5, 2024, Wander stated in a short phone call that he had heard from King that Leadenhall had received a draft of the restructuring term sheet;

    d. On March 12, 2024, Wander stated in a short phone call that he was working on getting a deal done and that he was flying to New York City to see King the next day;

    e. On March 13, 2024, Wander stated on a short phone call that he was working out of A-CAP's offices in New York City, that he was going out for lunch that day with King, and that A-CAP was working on the Forbearance Agreement;

    f. On March 28, 2024, Wander stated in a short phone call that if Wander executed any agreement without Leadenhall's consent, King would default his "all-asset lien" loan to 777 Partners and foreclose on 777 Partners' assets;

    g. On April 1, 2024, Wander stated that 777 Partners would not be able to make any payment to Leadenhall that day but that he had to go because King was calling him;

h.  On April 2, 2024, Wander stated in a short phone call that he thought King needed to find a way to make a payment to Leadenhall, at which point he hung up the call to speak to King, called Leadenhall back, and then stated that he would talk to King again that night;

i.  On April 3, 2024, Wander stated in a short phone call that he needed to promptly call King to try to get a restructuring deal across the finish line;

j.  On April 17, 2024, Wander, while in New York City, stated in a short phone call that he had spoken to King five or six times over the last day concerning a potential forbearance agreement;

k.  On April 22, 2024, Wander stated in a phone call that he was in New York City waiting to meet with King, who was concerned about a downgrade of A-CAP's insurers by a ratings agency, and that Wander was still working to get a deal done with Leadenhall;

l.  On April 29, 2024, Wander told Gillespie on the phone that 777 Partners did not have $400 million, but he had to go because King was calling him.

192.  Through these attempted restructuring negotiations, 777 Partners has admitted time and again that it does not control its own operations and ability to perform under the LSA—it is part of a broader enterprise controlled by A-CAP and King.

## III.  The Collateral Scam Furthered a Broader Fraudulent Enterprise Between 777, A-CAP, and Their Principals.

193.  Wander, Pasko, and 777 falsified the collateral underlying Leadenhall's credit facility because they wanted money they did not have and, based on the true condition of their business, would not have been permitted to borrow.  Their use of false collateral to induce lenders to make loans, and their use of those loans to purchase more receivables to tout as collateral for

other loans, enabled them to keep their sprawling enterprise going when it should have folded—facilitating both personal enrichment on a grand scale and money-losing passion projects like the acquisition of professional sports teams.

194.    The 777 Defendants' partner and co-conspirator in this enterprise is A-CAP, under the control of King, who has financed Wander, Pasko, and the 777 Entity Defendants since at least February 2020.  While King and A-CAP publicly portray A-CAP as an arm's-length "senior" lender to the 777 Entity Defendants, it is anything but.  The terms of A-CAP's financing stand in stark contrast to an arm's-length commercial lending arrangement:  Through a series of insider transactions, A-CAP funds Wander and Pasko's businesses at wildly above-market interest rates in conjunction with essentially unlimited rights with respect to those entities' assets and total control and dominion over its enterprise.  As alleged in further detail below, King and A-CAP have exerted their undue and self-interested influence over the 777 Defendants by, *inter alia*:

   a.  Assuming by express agreement day-to-day control of the 777 entities;

   b.  Assuming direct dealings and operational decision-making with respect to certain of 777 Partners' portfolio companies;

   c.  Installing A-CAP and its employees on site at 777 Partners to ensure compliance with, and execution upon, A-CAP and King's directives as to the operations of the 777 Entity Defendants and their daily decision-making;

   d.  Directing the 777 Entity Defendants' ownership and management as to what decisions to make and how to implement them;

   e.  Directing how the 777 Defendants' liquidity should be used and invested, including by conditioning "protective advances" on approval by A-CAP of every expenditure;

f.  Deciding which of the 777 Defendants' creditors to pay or not to pay;

g.  Deciding which of the 777 Defendants' portfolio companies should be funded or not;

h.  Assuming responsibility for and/or controlling and dictating the 777 Defendants' negotiations with creditors, stakeholders, and contractual counterparties;

i.  Holding itself out publicly as the ultimate decision-maker with respect to all of the 777 Defendants';

j.  Manipulating the lack of independent and disinterested governance at 777 Partners to force through transactions to improve A-CAP's creditor position within the 777 Defendants' enterprise without adequate consideration, or otherwise for the benefit of A-CAP, to the detriment of other creditors;

k.  Dictating corporate governance changes at the 777 Defendants' entities, including "recommend[ing] that Joshua Wander and Steven Pasko resign," recommending that 777 Partners appoint a chief restructuring officer ("CRO"), and recommending candidates for that role, including the ultimate selection, B. Riley, all of which were immediately accepted by 777 Partners;

l.  Converting or attempting to convert A-CAP's loan positions to ownership stakes in the 777 Defendants' portfolio companies without adequate consideration and on non-market terms;

m.  Engaging investment banks to market the 777 Defendants' assets for the benefit of A-CAP; and

n.  Obscuring, misrepresenting, and avoiding disclosures with respect to its exposure to 777 Partners, its continued funding of 777 Partners, and the terms and conditions under which it has exercised remedies against 777 Partners' assets, including in direct discussions with Leadenhall and in connection with this litigation.

195.    Further, while A-CAP has a tendency to portray itself as if it were a "senior" or "first-lien" lender to the entire 777 Partners enterprise as a result of the "all asset lien" it holds as to 777 Partners, the reality is more nuanced.  The lien simply means that A-CAP has a security interest in the equity of 777 Partners, *i.e.*, the extent to which its assets outweigh liabilities, and the equity of 777 Partners' various operating companies.  777 Partners and its operating companies carry so much debt that it is unclear what, if anything, that equity is even worth.  In any event, ACAP's "senior" rights are more akin to structurally subordinated, mezzanine, or equity interests, which would be paid out only after virtually *all* of the operating companies' other creditors.  This is clear upon reviewing the credit agreement between 777 Partners and Haymarket—the A-CAP affiliate that holds so much of 777 Partners' debt—which charges interest between roughly 14% and 19% per annum depending on the time period, well in excess of industry standards for senior debt that is actually secured by a first lien.

196.    A-CAP, with King at the helm, has nonetheless proceeded to exercise power over the enterprise far beyond those rights to equity, operating as an all-powerful, almighty force of nature over 777 Partners and its principals to seize, foreclose, and/or liquidate many of 777 Partners' and 600 Partners' operating companies' assets.

197.    In short, King and A-CAP have conspired with Wander, Pasko, and the 777 entities to enrich A-CAP and King at the expense of all other 777 creditors, including Leadenhall.  Wander,

Pasko, and 777 have agreed to this symbiotic arrangement because the continued survival of their otherwise insolvent business depends on it. A-CAP's status as a "senior" lender does not immunize it from liability for the acts 777 carried out under its control, with its knowledge, and for its benefit. Together, A-CAP and 777's use of fraud and other illegal means to induce Leadenhall to help float their continued self-enrichment scheme constitutes a RICO enterprise.

### A. King and A-CAP Controlled 777 Partners' Operations During the Fraudulent Scheme Against Leadenhall.

198.    A-CAP's role in the pattern of fraud perpetrated on Leadenhall—but not the full extent of it—began to rear its head in April 2023, when Wander confirmed on the recorded April 3, 2023 conference call that A-CAP had a purported "all asset lien" on the assets of 777 Partners.

199.    Leadenhall would later find out that the story ran much deeper: A-CAP is the puppeteer to 777 Partners' marionette, and nothing happens at 777 Partners—even execution of a last-minute restructuring agreement to repay uncontested debt and stave off this very litigation—without A-CAP's approval. A-CAP is the financial engine behind the scenes which provides last-minute loans and investments in "Whac-A-Mole" fashion to 777 Partners in order to make the enterprise appear solvent to outside lenders and investors. The ruse engineered by A-CAP even extends to 777 Partners' own employees—Wander and 777 Partners employees have disclosed to Leadenhall that A-CAP's relationship with 777 Partners is so intertwined that A-CAP has funded 777 Partners' payroll on multiple occasions.

200.    When Wander and Pasko's double-pledging was first revealed to Leadenhall, instead of behaving like an arm's-length first-lien leader with no prior knowledge of the misrepresentation, A-CAP became *more* involved to help 777 Partners avoid detection and take damage control into its own hands.

201.    At precisely the time Leadenhall confronted Wander—around March 2023—A-CAP formally memorialized its control of 777 Partners' operations in a memo circulated within 777 Partners via letter or e-mail correspondence.  The memo dictated a number of operational changes at 777 Partners, including the establishment of a "Steering Committee" for 777 Partners, with King at the head, to ensure that every single 777 Partners investment into a portfolio company was approved by King.  The memo also provided that certain 777 Partners employees would report directly to A-CAP executives.

202.    King also took action to ensure he had boots on the ground at 777 Partners' headquarters.  Around March 2023, King moved A-CAP Portfolio Manager Carson McGuffin and several others into the shared office of Nicholas Bennett and Alexander Adnani, the individuals in 777 Partners' Capital Markets group responsible for carrying out Wander's wishes in allocating assets to lenders in the MP Fin system and preparing Compliance Reports for Leadenhall.

203.    Bennett and Adnani were unceremoniously kicked out of the shared office and began reporting directly to A-CAP Chief Operating Officer Mike Saliba, who was installed in his own office in the opposite, executive wing of the 777 Partners office, near Wander and Pasko.

204.    Bennett ultimately attempted to leave 777 Partners for a competing firm in the summer of 2023.  However, due to high turnover within Chief Financial Officer Damien Alfalla's finance function, 777 Partners had in recent periods installed an incentive-heavy compensation retention structure including prohibitive non-compete terms and conditions.  Wander, wary of losing control over Bennett, who had been his foot soldier in committing many of the constituent acts of this fraud against Leadenhall, intervened directly by telling the competitor firm that Bennett could not join on the basis of the non-compete agreement, while telling Bennett he was simply not

allowed to leave 777 Partners. Bennett accepted his fate and returned to 777 Partners, but only after negotiating a "promotion" from the finance function to 777 Partners' investment team.

205.    Leadenhall also learned that A-CAP and King controlled 777 Partners' payroll. At least two former Managing Directors of 777 Partners, Jorge Beruff (777 Partners' former Head of Insurance), and Juan Arciniegas (777 Partners' former Head of Sports, Media, and Entertainment) initiated arbitration proceedings in May 2024 against 777 Partners, A-CAP, and King, alleging that the parties refused to pay millions of dollars in deferred compensation. A-CAP, in turn, made the demands public by bringing declaratory judgment actions in federal court. *See Advantage Capital Holdings and Kenneth King v. Beruff*, 24-cv-22620 (S.D. Fla., filed July 10, 2024); *Advantage Capital Holdings and Kenneth King v. Arciniegas*, 24-cv-22621 (S.D. Fla., filed July 10, 2024).

206.    Both former Managing Directors alleged that A-CAP assumed control over the 777 Partners enterprise in mid-2023, and therefore is liable under their compensation plans with 777 Partners, and that A-CAP and King refused to allow 777 Partners to make requisite payments under the plans. *See Beruff*, 24-cv-22620, ECF No. 1-1 at ¶¶ 53-54 ("Claimant spoke with Respondent Wander and asked why the Award payment was not being made. Respondent Wander responded that Respondent A-CAP, through Respondent King, refused to allow the Company to make the Award payments, but that Mr. Wander would speak with Respondent ACAP, through Respondent King, and try to get authority to pay Claimant his May 2024 Award payment in another form (*e.g.*, a consulting arrangement). On May 15, 2024, Respondent Wander and Claimant spoke again and ***Respondent Wander reiterated that Respondent A-CAP, and not Respondent 777, made the decision to suspend the Plan and Cash Agreement payments***." (emphasis added)); *Arciniegas*, 24-cv-22621, ECF No. 1-1 at ¶¶ 53-55 ("In and around May 2023, Claimant demanded the payment of his benefits due and in response Respondent Pasko and Respondent Wander each told

Claimant on separate communications that the payments had not been approved by Respondent A-CAP and its chairman and CEO Respondent King, which had apparently taken over the ultimate decision making from Respondent 777's managing partners. . . . On June 13, 2023, **_Respondent Pasko called Claimant and stated that Respondent A-CAP would not allow Respondent 777 to write any big checks for any purpose, even for amounts they contractually owed and were past due_**." (emphasis added)).

207.    Further reflecting the enmeshment among the various Defendants here, both of these former Managing Directors characterize 777 Partners on their LinkedIn Pages as a "Family Office," presumably for Wander, Pasko, and King.  Exhibit 13 (Jorge Beruff LinkedIn Profile, available at https://www.linkedin.com/in/jorgeberuff/); Exhibit 14 (Juan Arciniegas LinkedIn Profile, available at https://www.linkedin.com/in/juan-arciniegas-40a61616/).  Other Principals and Managing Directors, such as Aaron Levy and Lenz Balan, also refer to the enterprise as a "Family Office."  Exhibit 15 (Aaron Levy LinkedIn Profile, available at https://www.linkedin.com/in/aaron-levy-41833421/); Exhibit 16 (Lenz Balan LinkedIn Profile, available at https://www.linkedin.com/in/lenz-balan-10507b3/).

**B.  A-CAP Was Well Aware of and Participated in 777's Fraud on Leadenhall.**

**1.  The False Compliance Reports**

208.    The 777 Defendants continued to send false Compliance Reports to Leadenhall through January 2024, when they issued restated Compliance Reports disclosing the full extent of the Collateral deficiency to Leadenhall from early 2023.  Until February 2023, right before King moved his lieutenants into the offices of the 777 Partners Capital Markets group, Adnani sent confirmation emails with each upload of the monthly Compliance Reports, with Bennett copied on each email.  By April 2023, after King moved A-CAP executives into the offices of the 777 Partners Capital Markets group, the monthly Compliance Reports uploads no longer came with

confirmation emails, and the name attached to these reports was simply "SuttonPark Capital"—not Adnani, Bennett, or any other SuttonPark or 777 Partners employee.

209.    With 777 employees reporting to King and his deputies, and Adnani and Bennett no longer sending Compliance Reports to Leadenhall consistent with their prior course of dealings, A-CAP was well aware of, if not directly responsible for, the transmission of these false Compliance Reports to Leadenhall.

210.    King also took more drastic measures to ensure that Wander and his lieutenants kept a lid on the enterprise's activities.  A-CAP management—and King in particular—regularly sat in unannounced on Wander's phone calls starting around April 2023 to ensure that Wander did not say too much to outside parties, including Leadenhall.

### 2.    The Sham "Restructuring" Negotiations

211.    A-CAP overtly inserted itself into the discussions with Leadenhall around the issues with its collateral beginning in June and July 2023.  In an effort to "help" 777 "replace" Leadenhall's double-pledged Collateral with other security interests—A-CAP stepped directly into the fray and offered Leadenhall a fourth-priority position on the assets of 777 Partners, *i.e.*, multiple spots behind A-CAP's first-priority position.  Leadenhall rejected the offer.

212.    During these negotiations in June and July 2023, which involved A-CAP's Chief Operating Officer Mike Saliba, Leadenhall explained to Saliba that Wander had double-pledged Leadenhall's Collateral in breach of the LSA, and impressed upon him the seriousness of the problem they had identified.  Saliba did not express even a hint of surprise or concern, inquire about how it happened, or suggest that A-CAP would take immediate steps to investigate or address the cause of the double-pledging.  Given Saliba's reaction, together with the facts below, the Leadenhall representatives who participated in those meetings inferred that A-CAP must have been

well aware and "in the know" for months that Collateral pledged to Leadenhall had been double-pledged and/or did not exist and interjected itself into negotiations in order to keep Leadenhall from making the pattern of fraud public, which in turn might bring 777 Partners—and therefore A-CAP—all the way down.[10]

213.    A-CAP again tried to prevent Leadenhall from pursuing legal avenues for recovery by injecting itself into negotiations—both on its own behalf and on behalf of 777 Partners—of a potential forbearance agreement in late 2023 up until the filing of this lawsuit, as described *supra* Section II.F.  After attempting to demand a release for *A-CAP* as a condition of negotiating, A-CAP allowed, if not directed, 777 Partners and Wander to string Leadenhall along for months with promises of a repayment plan that it knew it would not permit 777 to perform.

214.    Indeed, A-CAP and King have overtly directed 777 Partners not to repay Leadenhall and to divert funds elsewhere.  On February 21, 2024, 777 Partners and 600 Partners agreed to pay off a relatively small $25.6 million portion of the loan extended to the SuttonPark Borrower, with payment to come due on the date of execution.  777 Partners failed to make the payment to which it had agreed just days earlier, instead paying only $12.5 million on time, with the remaining $13.1 million being paid two days after the agreed date.  777 Partners personnel later told Leadenhall that, at that same time, A-CAP had infused cash into 777 Partners to allow 777 Partners to make payroll and cover operating expenses, underscoring the degree of 777

---

[10] Wander also represented to Leadenhall during the course of these March 2023 discussions that any missing Collateral was maintained within the "777 corporate system"—which, upon information and belief, Wander uses to freely transfer assets among a web of trade names without regard to corporate or legal formalities.  If this is correct, it follows that the missing Collateral owed to Leadenhall has been used to pay principal, fees, and interest on A-CAP loan facilities with 777 Partners or reduce borrowings on assets in which A-CAP has an interest, thereby directly improving A-CAP's position through the fraud perpetrated on Leadenhall.

Partners' dependence on A-CAP, and explaining why 777 Partners could not come up with more of A-CAP's money to repay Leadenhall on the agreed date.

215. 777 Partners' acquiescence to A-CAP's direction is consistent with the admission of an employee of a 777 Partners subsidiary to a Leadenhall Managing Partner, in early 2024, that since at least early 2023, A-CAP has had an express agreement with 777 Partners whereby A-CAP has the right to control 777 Partners' operations, apparently referring to the communication setting up the Steering Committee structure discussed *supra*.

### 3. A-CAP's Attempts to Prevent Leadenhall from Auditing Its Collateral

216. In November 2023, A-CAP interjected itself further into Leadenhall and 777 Partners' discussions concerning whether 777 Partners would agree to Leadenhall's proposal for the former Chief Operating Officer of Defendant SuttonPark Capital, Paul Kosinski, to perform an "asset review" of the receivables pledged to Leadenhall as Collateral. As stated in an email to Leadenhall from Pasko in late November 2023: "***At the request of A-CAP***, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark."

217. Pasko purported to justify A-CAP's objections (or "concerns") to Leadenhall's proposal on grounds that the asset-by-asset review "would violate [Kosinski's] severance agreement" and that Kosinski had departed for a "direct competitor" to 777 Partners. Upon information and belief, however, A-CAP's true concern was that Kosinski, as a former high-level officer of SuttonPark Capital, had inside knowledge of 777 Partners' operations and would expose the ongoing fraud to Leadenhall.

218. When confronted with Leadenhall's clear right under the LSA to designate any representative to perform an asset review, and the fact that Kosinski did not, in fact, work for a

competitor of 777 Partners, 777 Partners acknowledged that it had no basis to prevent Kosinski from performing the review.  But in August 2024, as Kosinski and his team dug deeper into the records of what little collateral is left, 777 Partners—with A-CAP-appointed B. Riley at the helm—abruptly revoked Kosinski's access to its systems, including Leadenhall's Collateral portfolio, under the guise of what its counsel called "technological issues."  777 Partners later admitted that there were no "technological issues"; they instead cited the same baseless "competition" concerns invoked by A-CAP, falsely claimed, with no explanation or proof, that the asset review team had exceeded the scope of its authorization, and demanded that Leadenhall designate a different representative.  Even today, Defendants continue to frustrate Leadenhall's ability—and contractual right—to determine the extent and condition of the remaining collateral securing the investment with which they have absconded.

### C.  A-CAP Exercised and Continues to Exercise Its Control Over 777 Partners to Advantage Itself Over Other Creditors, Including Leadenhall.

219.    As discussed above, A-CAP's supposed rights, liens, and claims with respect to 777 Partners' and its affiliates' assets arose from a series of insider transactions that gave Wander and Pasko funding for their vanity projects and personal pursuits and gave A-CAP control of a family of companies without the regulatory restrictions and oversight that come with running insurance companies.

220.    A-CAP has repeatedly exercised these "rights"—coupled with 777 Partners' lack of corporate formalities—to deploy 777 Partners' assets and businesses to serve the interests of A-CAP while prejudicing the rights of arm's-length creditors like Leadenhall.

221.    This includes moving or "reallocating" liens up or down 777 Partners' organizational structure without apparent adequate consideration.  In December 2020, A-CAP, through its affiliate Haymarket, extended a secured loan to JARM Capital LLC ("JARM")—the

*personal* shareholding vehicle of Wander, through which Wander owns his majority shareholding of 777 Partners—for nearly $170 million.  The loan was originally secured by JARM's (*i.e.*, Wander's) own assets.

222.    Haymarket provided the loan so that Wander could purchase Pasko's and other minority early-stage shareholders' shares in 777 Partners.  As a result of that buyout, Pasko has received a very significant pecuniary benefit from 777 Partners and its relationship with A-CAP.

223.    In March 2021, Haymarket and JARM amended the loan documents to add a pledge by JARM of its membership interests in SuttonPark Acquisition LLC, the direct parent company of 777 Partners, and in SPA II LLC, the direct parent company of 600 Partners.  On the same day that Haymarket and JARM entered into the amendment, again reflecting a mixing of personal and professional interests, Wander and Pasko entered into personal guarantees with Haymarket whereby they personally guaranteed all of JARM's obligations under the amended agreement.

224.    Despite Wander's and Pasko's personal guarantees, this shareholder loan was still risky for A-CAP.  Haymarket's security interest in JARM's equity interest in 777 Partners would again give Haymarket only subordinated equity rights in the assets of 777 Partners—an even more tenuous position than that Haymarket formally held through its separate lien on the assets of 777 Partners, which translated into subordinated rights in the assets of the operating companies (though as a practical matter, A-CAP's iron grip on 777 Partners gave it power to extract assets from the operating companies far greater than the rights of a typical secured creditor).  In other words, Haymarket's rights to JARM's interests in 777 Partners would have value only in the extremely unlikely event that 777 Partners repaid virtually all of its creditors.

225.    On March 4, 2024, apparently no longer satisfied with the JARM collateral for which he had negotiated, King notified Leadenhall that as "a result [of] (among other things)

pressures from the rating agencies and regulators," the security interests collateralizing the loan to JARM would be "consolidated into the HoldCo facility"—*i.e.*, King caused Wander to agree that *777 Partners*—not Wander's personal vehicle—would take on the JARM loan obligation and back that obligation with a purported first-priority position on the assets of 777 Partners. In short, A-CAP induced 777 Partners to turn King's worthless equity pledge into a $170 million obligation at the HoldCo level ***for no apparent consideration*** and then used that obligation as a pretext for a senior lien on 777 Partners'—not Wander's—assets.

226.    This "up-tiering" transaction directly impaired the value of Leadenhall's Guaranty from 777 Partners (and 600 Partners). When the JARM loan was "consolidated into the HoldCo facility"—with its many preexisting obligations to Leadenhall and other creditors—A-CAP ensured that its $170 million loan would be senior to 777 Partners' obligations to non-affiliated secured creditors like Leadenhall—virtually extinguishing those creditors' ability to be repaid from 777 Partners.

227.    JARM repaid approximately $120 million of the loan to Haymarket on January 1, 2024, and based on the fact that the entire 777 Partners ecosystem has essentially no cash of its own, that liquidity was likely an advance from A-CAP. Haymarket's financial filings reflect that it is not unusual for the various companies, including JARM, Haymarket, and other A-CAP affiliates, to shuffle massive amounts of money between and among one another on the very same day.

228.    It is also not unusual for A-CAP to move its liens from the assets of 777 Partners itself to the assets of 777 Partners' operating companies, a practice which A-CAP leadership has referred to in the past as the "hardening" or firming up of its liens.

229.    Further, while A-CAP portrays its practice of making enormous "protective advances" to 777 Partners and operating companies as part of the ordinary course of business for a "senior" lender, the real benefit to A-CAP is simply keeping 777 Partners out of bankruptcy for as long as possible.  A-CAP is well aware that if 777 Partners submits to the jurisdiction and oversight of a bankruptcy court, and 777 Partners is forced to treat its creditors equitably rather than rolling over to A-CAP's every demand, A-CAP's insider transactions will be subject to challenge, and the transactions described above (among likely many others) will be voidable as fraudulent transfers.

### D.  The Tangled Web of A-CAP and 777 Partners

230.    Given King's involvement in Wander's affairs, Leadenhall began conducting a deeper dive into the relationship between King and Wander.  The core of the convoluted and enmeshed relationship between King and Wander is the relationship between A-CAP and 777 Re.  777 Re is the reinsurance subsidiary of 777 Partners.

231.    Wander has pitched 777 Re as the "anchor" of 777 Partners' entire investment strategy—meaning that it is the source of funds that Wander and his alter ego companies can raid for other ventures, including professional football teams.[11]  777 Partners is a holding company which conducts no substantial business operations itself, and its value is determined by the value of its subsidiaries.

---

[11] Paul Brown & Philippe Auclair, *Endgame*, JOSIMAR (Jan. 15, 2024), https://josimarfootball.com/2024/01/15/endgame/.  Upon information and belief, Wander himself is not permitted to sit as an official board member of 777 Re because he was convicted of cocaine trafficking in 2003.  Wander still, however, actively participates in 777 Re's board meetings and acts as the de facto leader and manager of 777 Re.  Pasko sits on the 777 Re board, and until early 2024, following action from 777 Re's Bermuda regulator, 777 Partners appointed 777 Re's key management team.

232.    Reinsurance is a contractual arrangement by which primary insurance carriers—which write and offer insurance such as life and health insurance to policyowners—pass on or "cede" certain of their insurance liabilities to a reinsurer such as 777 Re.  777 Re indemnifies the primary insurance carriers for certain of those liabilities, while the primary insurance carriers remain in privity with and directly responsible to the policyowners.  If the reinsurer becomes unable to satisfy its obligations to the primary insurance carriers, (i) the ability of the primary insurance carriers to pay policyowners and satisfy capital requirements is in jeopardy and (ii) the primary insurance carriers may not be able to pay dividends or return capital to their owners without raising fresh capital themselves to fulfill their regulatory requirements.

233.    For example, A-CAP—through its King-controlled life insurance subsidiary Haymarket—may issue life insurance policies to a population of senior citizens.  For "reserving" purposes, A-CAP may then need to either allocate regulatory capital to ensure it can pay those liabilities as they come due, or, because reinsurance premiums are generally lower than the return on regulatory capital, pass on some of the insurance risk to a reinsurer.

234.    Thus, A-CAP purchases "reinsurance" from 777 Re whereby, under a traditional reinsurance arrangement, A-CAP will make periodic premium payments and transfer any reserves established to support any existing insurance liabilities to 777 Re, and in return, 777 Re will be responsible for making all or part of the benefit payments required under the life insurance policies upon the death of the insureds (or other insured event).  In other words, a reinsurer like 777 Re is an "insurer for the insurer."  777 Re provides financial protection for A-CAP, which means A-CAP may hold less capital itself and 777 Re is responsible for indemnifying or paying A-CAP for the liabilities under the life insurance policies or annuities.

235.    In the typical reinsurance arrangement, the reinsurer is responsible for setting aside a certain amount of capital, including premiums payments, in reserve to ensure that it has the financial ability to indemnify or make a payment to the ceding insurance company, which will pay any benefit payment directly to the policyholders, upon a claims or insured event.

236.    However, in the case of A-CAP and 777 Re, the reinsurance arrangements are structured under a complex "modified coinsurance" or "funds withheld" basis.  Under a modified coinsurance arrangement, A-CAP (and/or the subsidiary insurance companies controlled by A-CAP) retains the reserves backing the claims payable by 777 Re in A-CAP's own custodial accounts.  If A-CAP's reserves (including any investment earnings thereupon) exceed the amounts required to be established or held by A-CAP—*i.e.*, if the investments are profitable or if the liabilities associated with the life insurance policies or annuities decrease—A-CAP sends the profits or any excess reserves to 777 Re as premium payments or modified coinsurance account adjustment payments.[12]

237.    Under the reinsurance arrangements between A-CAP and 777 Re, the assets supporting the insurance reserves are managed by 777 Asset Management LLC, an asset manager under the 777 Partners umbrella.  The foregoing complex reinsurance structuring where the invested assets supporting the reinsurance arrangements are retained by A-CAP, and 777 Re's primary role is to invest those assets through 777 Asset Management LLC on behalf of A-CAP— for substantial management fees from A-CAP—is just the start of the extreme interconnectedness of A-CAP and 777 Re.  ***Upon information and belief, through reinsurance arrangements, 777***

---

[12] A "funds withheld" arrangement is similar to a modified coinsurance arrangement except that, among other things, the insurance liabilities associated with the life insurance policies and annuities are transferred to 777 Re and reported on 777 Re's statutory statements (rather than on the King-controlled life insurance company's statutory statements, which would be the case under a modified coinsurance arrangement).

***Asset Management LLC has invested approximately $2.2 billion of A-CAP affiliated insurance assets—largely in risky 777 Partners-related ventures—which are supposed to be used to back claims to policyholders.***

238.    777 Re has used the reinsurance reserves—the sources of which are premium payments from A-CAP, which come from premium payments made by A-CAP's policyholders to A-CAP—to make loans directly to 777 Partners and other subsidiaries under the 777 Partners umbrella.  777 Partners has, in turn, used those funds to make speculative bets on payday lenders, ultra-low-cost airlines, and football clubs such as the Everton Football Club.[13]

239.    The reinsurance relationship between A-CAP and 777 Partners branched out into massive loan arrangements from A-CAP to 777 Partners and affiliates.  As King acknowledged on a conference call to investors on February 27, 2024, "A-CAP is a lender to 777 for businesses outside the reinsurance relationship."

240.    As reported in the press, of the approximately $11.5 billion in assets held by A-CAP and its subsidiaries, $2.9 billion—or more than 25 percent of the assets—were invested in entities related to 777 Partners.[14]  The amount of total exposure from A-CAP to 777 Partners is so large that *The New York Times* reported late last year that 777 Partners is required to regularly update A-CAP executives about its continuing business plans[15]—an arrangement formalized by the memorandum and the Steering Committee discussed *supra*.

---

[13]  Liz Hoffman, *Mystery Investor 777 Partners Bought Sports Teams with Insurance Customers' Cash*, SEMAFOR (Nov. 15, 2023), https://www.semafor.com/article/11/15/2023/mystery-investor-777-partners-bought-european-sports-teams-with-insurance-customers-cash.

[14] Dan McCrum, Samuel Agini and Ian Smith, *US Regulators Push Insurers to Cut Exposure to Everton Bidder 777 Partners*, FIN. TIMES (Apr. 1, 2024), https://www.ft.com/content/a225cb7d-ccdd-495d-b7f1-a8124129b8bf.

[15] Tariq Panja, *Everton Sale Stalls Amid Questions About Buyer's Financials*, N.Y. TIMES (Oct. 18, 2023), https://www.nytimes.com/2023/10/18/world/europe/everton-sale-777-partners.html.

241.    It has also been reported that A-CAP and its affiliates, at King's direction, have loaned 777 Partners and its web of affiliates more than $1 billion.[16]  ***Upon information belief, however, the full amount of outstanding indebtedness at year-end 2023 by 777 Partners' affiliates to A-CAP, across all of the holding companies and operating companies of both 777 Partners and A-CAP, is over $2 billion.***

242.    The loans and financing activity from A-CAP (inclusive of its affiliates) to 777 Partners take multiple forms and have been extended to multiple parties under the 777 Partners umbrella:

a.    Since 2019 and through the present, A-CAP has provided a revolving line of credit of approximately $500 million directly to 777 Partners, secured by the equity value of 777 Partners' subsidiaries.  Reflecting A-CAP's own lack of faith in 777 Partners' ability to repay its debt obligations, the interest rate on these direct loans is as high as 20 percent per annum.

b.    In 2021, as represented by 777 Partners, A-CAP purchased approximately $50 million of a $250 million preferred equity share sale by 777 Partners.  Upon default or liquidation of 777 Partners, A-CAP's preferred equity will be repaid only after other senior obligations of 777 Partners are repaid.

c.    As of December 2023, A-CAP has provided approximately $700 million in loans and other forms of financing to support 777 Partners' aviation-related investments, and as security for the loans, A-CAP received additional equity in 777 Partners.

---

[16] *Id.*

    d. As of December 2023, A-CAP has provided approximately $290 million in loans to a 777 Partners affiliate to support its investments in professional football teams, as further detailed in the next section.

243. Public records confirm that through the massive amount of credit extended to the 777 Partners enterprise, A-CAP, through its affiliate ACM Delegate LLC, has an ***all-asset lien*** not only on 777 Partners but also the following entities:

    a. 600 Partners, a Defendant co-conspirator in this action operating out of the 777 Partners Address which acted as Guarantor to the Borrowers;

    b. SuttonPark Acquisition LLC, a 777 Partners entity operating out of the 777 Partners Address which is the direct owner of 777 Partners;

    c. JARM, a 777 Partners entity operating out of Josh Wander's Miami penthouse which is his personal shareholding vehicle through which he has a majority ownership stake in 777 Partners;

    d. SPA II LLC, a 777 Partners entity operating out of the 777 Partners Address which is the direct owner of 600 Partners;

    e. MTCP LLC, a 777 Partners entity operating out of Steven Pasko's Miami penthouse which is a 99% owner of SPA II and which is Pasko's personal shareholding vehicle through which he has a minority ownership stake in 777 Partners and a majority ownership stake in 600 Partners;

    f. Nutmeg Acquisition LLC, a 777 Partners entity operating out of the 777 Partners Address which invests in professional football teams;

    g. 777 Partners UK Limited, a 777 Partners entity operating out of the UK;

h.   777 Asset Management LLC, a 777 Partners entity operating out of the 777 Partners Address responsible for (prior to A-CAP's "recapture" of its reinsurance business from 777 Re) managing and investing the assets of A-CAP's insurance premiums and reserves;

i.   777 Asset Management Ltd, a 777 Partners entity operating out of the 777 Partners Address responsible for (prior to A-CAP's "recapture" of its reinsurance business from 777 Re) managing and investing the assets of A-CAP's insurance premiums and reserves;

j.   Trans Atlantic Lifetime Mortgages Limited, a 777 Partners entity operating out of the 777 Partners Address which originates home equity release mortgages;

k.   Triplet Global LLC, a 777 Partners entity operating out of the 777 Partners Address, which owns a Bombardier Global 6000 aircraft that Wander and Pasko use to fly around the world;

l.   FFI Holdings LLC, a 777 Partners portfolio company operating out of California, of which Josh Wander and Steven Pasko are Directors, and which is a provider of production, financing, evaluation, and monitoring services to the entertainment industry. Lumiere Acquisitions Company, another 777 entity, acquired a 30.1% stake of this company in 2019;

m.   Film FI Holdings LLC, a 777 Partners portfolio company operating out of California which is a holding company for a provider of production and financing services to the entertainment industry;

n.  Triple 7 Operations Limited, a 777 Partners entity operating out of Dublin, Ireland, of which Steven Pasko serves as the sole Director, whose business purpose is listed in its public filings as a "[r]ange of activities";

o.  Signal Medical Receivables LLC, a Defendant "Seller" under the LSA operating out of the 777 Partners Address which purchases medical lien receivables;

p.  Signal Servicing LLC, a "Servicer" under the LSA operating out of the 777 Partners Address which services medial debt purchased by Signal Medical Receivables LLC;

q.  Signal SML 1 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

r.  Signal SML 2 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

s.  Signal MLH Medical Receivables HoldCo LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

t.  Signal Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC and which finances personal-injury litigations;

u.  Signal Financial Holdings LLC, a 777 Partners entity operating out of the 777 Partners Address which is the sole member of Signal Medical Receivables LLC and Signal Servicing LLC;

   v.  Signal LF Portfolio HoldCo LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC;

   w.  Signal AHF Medical Receivables HoldCo LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC and which facilitates funding arrangements for medical healthcare services;

   x.  SKC 1 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC;

   y.  SKC RX LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Financial Holdings LLC;

   z.  SLF 2 LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Medical Receivables LLC;

  aa.  Speed Leasing Company LLC, a 777 Partners portfolio company which provides consumer leases for used motorcycles;

  bb.  777 Real Estate LLC, a 777 Partners entity operating out of the 777 Partners Address which acquired Keypad, a company that paid cash and provided real estate services to homeowners in exchange for the right to be the listing agent on a sale of the home;

  cc.  777 Software LLC, a 777 Partners entity operating out of the 777 Partners Address, which is a computer software company;

  dd.  777 Stream LLC, a 777 Partners entity operating out of the 777 Partners Address;

ee. Lex Capital Holdings LLC, a 777 Partners entity operating out of the 777 Partners Address, which is a holding company for Scout Law Group LLC and which was a defendant in a 2024 Arizona lawsuit alongside 600 Partners and 777 Partners;

ff. Lumiere Acquisitions Company LLC, a 777 Partners entity operating out of the 777 Partners Address, which acquired a large stake in FFI Holdings PLC for € 11.9 million in 2019;

gg. Lumiere Financing LLC, a 777 Partners entity operating out of the 777 Partners Address, which received a $50 million COVID stimulus loan in July 2020 from the Federal Reserve;

hh. Medset Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a direct subsidiary of 777 Partners;

ii. Nimble Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of Signal Funding LLC and which connects individuals with investors willing to finance their legal claims in exchange for a portion of the proceeds from those claims;

jj. Sustainable Supplies LLC, a 777 Partners entity operating out of the 777 Partners Address;

kk. Triple7 Sports Management LLC, a 777 Partners entity operating out of the 777 Partners Address;

ll. F3EA Holdings LLC, a 777 Partners entity which is a consumer lending and finance company operating out of the address of Sky Financial Group, a personal loan company;

mm.    F3EA Funding LLC, a 777 Partners entity operating out of the 777 Partners Address which is a subsidiary of F3EA Holdings LLC and which is a consumer finance company;

244.    Of course, King also benefits personally from bankrolling all of Wander's ventures. Using an array of transactions between 777 Partners, A-CAP, and a shell company controlled by King to obfuscate the source of the funding, King purchased an $11 million beachfront condominium in Miami using funds that appeared to originate from A-CAP.[17]    Specifically, an A-CAP affiliate loaned 777 Partners $9 million in November 2022, 777 Partners loaned a shell company named none other than "A-Miami LLC" $10 million the next day, and A-Miami LLC promptly purchased the $11 million condo.  The mailing address for A-Miami LLC is A-CAP's mailing address, 415 Bedford Road, Pleasantville, NY.  According to publicly available filings, Kenneth King remains a debtor to 777 Partners, and 777 Partners has security interest in all of King's "right, title and membership interests in A-Miami LLC."    In other words, King's relationship with Wander and 777 Partners offered a path of very little resistance for King to appropriate his own company's assets for personal use, without regard to A-CAP's corporate form.

245.    King has good reason to obfuscate the ultimate source of the funding: ***it is the policyholders of the life insurance companies owned by A-CAP***, who made premium payments to the life insurance companies, which lent money to 777 Partners, which lent the money to a shell company controlled by King, which purchased the condo.

---

[17] Liz Hoffman, *The Silent Partner Behind 777's Buying Spree*, SEMAFOR (Nov. 22, 2023), https://www.semafor.com/article/11/22/2023/the-silent-partner-behind-777s-buying-spree ("One loan last year from an A-CAP insurer to 777 was quickly re-lent to a Miami shell company controlled by King to buy an $11 million beachfront condo.").  .

246.    King also has a personal stake in certain assets purchased by 777 Partners using 777 Re's reinsurance reserves, including a 10-percent stake in Flair Airlines, an ultra-low cost Canadian airline.[18]

**E.  Wander, Pasko, and the 777 Entities Operate as Alter Egos.**

247.    Wander and Pasko have repeatedly shown that they treat the 777 Partners companies as instrumentalities of their own interests and pursuits, disregarding the legal separateness of the many affiliated entities.

248.    The following examples demonstrate the lack of boundaries between and among the Wander, Pasko, and 777 Entity Defendants; the lack of corporate formalities observed; and the use by Wander and Pasko of the 777 Entity Defendants' assets for personal purposes:

a.    In a June 21, 2023 memorandum from Pasko and Wander to the Board of 777 Re, Pasko and Wander admitted that SuttonPark Capital "lacks an active Board of Managers."

b.    In late 2023, Wander and Pasko decided to reorganize their various businesses, and one such move involved Sutton National Insurance Company ("Sutton National")—formerly a wholly owned insurance subsidiary of 777 Partners— which Wander and Pasko nominally separated from 777 Partners and made

---

[18] Moreover, employees of A-CAP and 777 Partners often move freely between the two firms. James Rothman, the former Head of Business Development at A-CAP, became the Chief Investment Officer of 777 Asset Management LLC, a 777 Partners subsidiary, as of 2023. Rothman subsequently left this role at 777 Asset Management LLC.

Pasko the sole owner.[19]  But in August 2024, it was reported that 777 Partners (not Pasko) had listed Sutton National for sale.[20]

c.   On or about December 31, 2022, 777 Partners placed airplanes as financial assets on 777 Re's balance sheet—for no consideration—in order to assist 777 Re in meeting certain regulatory capital maintenance requirements for 2022, and then took the planes off of 777 Re's balance sheet in January 2023, once they had served their purpose of concealing regulatory deficiencies.

d.   Upon information and belief, Wander created the 600 Partners entity to conceal his personal control over his companies' assets.  SuttonPark Capital was previously wholly owned by 777 Partners until Wells Fargo—which was providing customer accounts for SuttonPark Capital at the time—discovered Wander's prior drug convictions in a Know Your Customer/Anti-Money Laundering review.  Wells Fargo required Wander to step down from a managerial position with SuttonPark Capital as a condition of keeping its accounts open.  Wander "stepped down" on paper only, and he and Pasko created a new entity to be beneficially owned by Pasko alone—600 Partners— that would wholly own SuttonPark Capital going forward, even as Wander and Pasko continued jointly operating the 777 Partners enterprise as a whole.

---

[19] *See AM Best Places Credit Ratings of Sutton National Group's Members Under Review With Negative Implications*, (Nov. 16, 2023),
https://news.ambest.com/newscontent.aspx?refnum=254055&altsrc=23.
[20] *See* Farhin Lilywala, et al., *777 Partners-Backed Sutton National Pulls Sale Process*, INSURANCE INSIDER US (August 21, 2024),
https://www.insuranceinsiderus.com/article/2dnqq5ss12jgiihdt88w0/specialty-lines/777-partners-backed-sutton-national-pulls-sale-process.

249.     According to a June 21, 2023 memorandum from Pasko and Wander to the Board of 777 Re, 777 Partners had raided the assets of several of its other subsidiaries that borrowed under other credit facilities.

     a.   In one instance, an entity called Heron Finance LLC ("Heron") had issued debt to buy an airplane, but when it sold the airplane, 777 Partners appropriated the cash from the sale rather than allowing Heron to pay off the debt.  Wander and Pasko explained they had understood "based on conversations with [A-CAP] that the cash could be used for short period of time while [A-CAP] increased the size of their holding company loan to the parent," but then "[t]hat increase did not take place for reasons outside of [Wander and Pasko's] control and the deficiency remained," leaving the credit facility undercollateralized, much like Leadenhall's facility.

     b.   In another instance, 777 Partners rendered a credit facility called "Medset" undercollateralized because "the cash was used by the Parent Company, 777 Partners LLC, in error as [Wander and Pasko] had thought a waiver was in place to use said proceeds to invest temporarily in non-medical lien assets."

     c.   In yet another instance, 777 Partners caused an "interest reserve shortfall" on a facility called SPSS Fund 6 because Wander and Pasko "were under the impression at closing that the cash reserve was approved to be released as part of an amendment based on discussions with internal management as the cash flow from the asset was sufficient to cover the cost of funds."

250.     In each case, Wander and Pasko claimed a mistake, but their history of "mistakes" that happen to result in 777 Partners misappropriating cash from their subsidiary borrowers

acquired through credit facilities, leaving secured lenders without adequate collateral, constitutes an unmistakable pattern. This pattern indicates, at a minimum, that the separateness among and between Wander, Pasko, 777 Partners, and its various affiliates is paper thin, if it exists at all, and the utter lack of controls allows Wander and Pasko to do virtually whatever they want. Indeed, Wander and Pasko reported to 777 Re that SuttonPark Capital not only "lacks an active Board of Managers," but also "lacks a loan or asset accounting system able to track and report on assets" (due to numerous deficiencies with MP Fin), "lacks written processes to manage the operations when turnover occurs," and "lacks sufficiently trained staffing to manage operations," and that several of their other subsidiaries' controls are similarly deficient.

251.    Wander and Pasko's conduct since this action was filed underscores the point. Shortly after the original Complaint was filed, 777 Partners purported to appoint representatives of B. Riley Advisory Services to serve as independent fiduciaries to facilitate a restructuring.

252.    In a letter dated May 16, 2024, which the 777 Entity Defendants filed with the Court the following day, 777 Partners' counsel represented: "On May 6, 2024, after consultation with B. Riley, Mr. Pasko and Mr. Wander each resigned as managers of 777 Partners LLC and Mr. Pasko and Mollie Wander each resigned as managers of 600 Partners LLC. That same day, the respective members of those entities accepted the resignations and appointed Ian Ratner and Ronald Glass of B. Riley as managers of both entities. At this point, B. Riley professionals have independent and unilateral control of the 777 Entities and the companies are operating under their direction and supervision."

253.    A week later, on May 24, 2024, 777 Partners doubled down on this claim, filing affidavits in support of its opposition to Leadenhall's TRO application, attesting to B. Riley's supposed independence and total control over 777 Partners' and its affiliates' operations.

254.    That same day, however, the *Financial Times* reported that when "[a]sked about their resignations, a 777 spokeswoman told the FT Wander and Pasko, as 100 per cent owners of 777, remained 'unreservedly committed' to its successful future. Both men, she said, 'continue to lead on strategic direction across every facet of the business, overseeing all progressive changes directed at strengthening the company's long term value.'"[21]

255.    And one week after that, on May 31, 2024, the football journal *Josimar* reported that it had seen an internal email sent by Wander to 777 Partners staff, in which "[h]e claimed that [B. Riley representatives] will only 'support the leadership team,'" "[t]hat [Wander and Pasko] 'maintain our active roles across the business, including various board positions,'" and "that B. Riley had in fact been brought in 'to collaborate with [Wander], [Pasko,] and the leadership team." *Josimar* also reported that, even though Wander and Pasko were formally removed from the boards of 777 Partners, its football division, and several of the individual football teams, Wander told a board meeting of the British Basketball League that he was "still in charge" and that despite having "hired a new COO from B. Riley," "neither he nor Steve had been removed or had their executive duties reduced from the football business and that they remained the 100% owners."[22]

256.    Even after the Court entered the preliminary injunction in this case, 777 Partners affiliate Employee Funding of America LLC entered Chapter 7 bankruptcy in August 2024, apparently without having been directed or authorized to do so by the purportedly independent fiduciaries that nominally control 777 Partners (B. Riley) or their counsel, further underscoring that B. Riley is not in control, and 777 Partners continues to bleed assets despite court intervention.

---

[21] Agini, et al., *A Bet on Everton*, *supra* note 1.
[22] Philippe Auclair & Paul Brown, *Black Friday*, Josimar (May 31, 2024), https://josimarfootball.com/2024/05/31/black-friday/.

**F.  As Creditors and Counterparties Learn the Truth, the A-CAP/777 Scheme Begins to Crumble.**

257.    Despite King and A-CAP's efforts to keep Wander and his alter-ego companies afloat while squeezing as much financial benefit for themselves as possible, 777 Partners and the related entities have struggled to meet financial obligations besides those just to Leadenhall.  It has been widely reported that Wander's shell companies "continue to miss routine payments to businesses, vendors and partners," including "miss[ing] payroll on at least two occasions" and failing to pay out bonuses.[23]  Among the many loans A-CAP has made to 777 Partners, "at least one covered payroll for 777 itself."[24]

258.    These financial problems at Wander's various alter ego companies have threatened what appears to be Wander's ultimate pursuit: purchasing historical football clubs from around the world, including Standard Liege in Belgium and Everton Football Club in England.  Indeed, since 2021, Wander has transformed his businesses from the relatively niche practice of investing in structured settlements and lottery winnings into making speculative bets on professional football teams.

259.    Similarly, while A-CAP started out as a business providing life insurance and annuity products to ordinary people—and relying on steady insurance premium payments— because of A-CAP's massive credit exposure to 777 Partners, its future is now tied up in Wander's speculative football bets.

260.    Wander has made no secret of the fact that his goal is to flip these clubs for a quick profit or "cross-sell" interests in the enterprises' insurance and media businesses to the clubs' dedicated fan bases.  In October 2023, Wander told 777 Partners' employees that the firm had built

---

[23] Panja, *Everton Sale Stalls*, *supra* note 15.
[24] Hoffman, *Silent Partner*, *supra* note 17.

"relatively conventional but profitable finance and insurance businesses that enabled us to invest and build positions in more exciting industries such as aviation and sports."[25]  The ultimate goal, as Wander has stated to news outlets, "is that one day we're not selling hot dogs and beers to our customers; [it's] that we're selling insurance or financial services or whatever."[26]  Wander has even asked rhetorically (referring to himself in the third-person): "Is there anyone in the world that's been more serious about buying football clubs in history than Josh Wander?"[27]

261.    To actualize his goal of flipping storied football clubs for a profit and "cross-selling" to fans, Wander has invested, through 777 Partners and with the financial backing of King and A-CAP, in several teams from lower-tier football leagues, as well as other sports investments around the world.[28]  Several of the teams in which Wander has invested have flirted with insolvency due to 777 Partners' inability to make payments on time and failure to pay the brokers involved on some of the soccer deals.[29]

262.    Genoa CFC, one of the oldest football clubs in Italy—and one of the so-called "distressed assets" purchased by Wander with over $200 million in debt[30]—sought judicial approval of a deal with Italian tax authorities to reduce some of its tax debts on the grounds that it

---

[25]  Giles Turner and David Hellier, *Everton's US Buyer Leaves Trail of Questions Over Its Finances*, BLOOMBERG (Dec. 7, 2023), https://www.bloomberg.com/news/articles/2023-12-07/everton-takeover-us-buyer-777-partners-leaves-questions-for-premier-league.

[26] Andrew Edgecliffe-Johnson & James Fontanella-Khan, *Everton Suitor 777 Hails New Era of Football 'Hyper Commercialisation*, FIN. TIMES (Aug. 31, 2023), https://www.ft.com/content/8fc36dbe-23c1-4aae-a288-dc2c2f1d7c5f.

[27] *Id*.

[28] *Id*.

[29] Panja, *Everton Sale Stalls*, *supra* note 15.

[30] Philippe Auclair & Paul Brown, *See You in Court*, JOSIMAR (Feb. 2, 2024), https://josimarfootball.com/2024/02/02/see-you-in-court/.

is "in a state of crisis or insolvency."[31]  777 Partners previously tried to avoid timely paying its debts by shifting liabilities to a shell company, but that gambit was rejected by Italian authorities.[32]

263.    Wander's lack of transparency about 777 Partners' finances nearly caused the collapse of a 125-year-old club, Standard Liege, after facing serious legal implications from a Belgian regulatory body.[33]  777 Partners continued to load Standard Liege with debt in the form of loans from 777 Partners, even while it had failed to pay its players and staff on time, to the point of being sanctioned by the league.[34]  It has been reported that Belgian authorities have now imposed (and then lifted) three different transfer bans in a single year on Standard Liege for failure to honor financial commitments, only issued a license for the 2024-2025 season after imposing the strictest monitoring measures available to the regulator, and threatened the club with more severe sanctions.[35]  As a result, both Wander and Pasko were also removed from the club's board, and on May 16, 2024, a Belgian court reportedly ordered the seizure of 777 Partners' assets in Belgium.[36]

264.    Another one of Wander's football club purchases, Hertha BSC—a club that competes in the second division of German football—is in a "financial black hole" in which it does not earn enough to service its debt, and 777 Partners has had to negotiate with the league to allow it to remain operational despite its inability to invest the necessary cash in the short term.[37]

---

[31] Philippe Auclair & Paul Brown, *On the Brink*, JOSIMAR (Nov. 22, 2023), https://josimarfootball.com/2023/11/22/on-the-brink/.

[32] *Id.*

[33] *Id.*

[34] Philippe Auclair & Paul Brown, *The Twilight Zone*, JOSIMAR (Jan. 9, 2024), https://josimarfootball.com/2024/01/09/the-twilight-zone/.

[35] Philippe Auclair & Paul Brown, *End of Season Sales*, JOSIMAR (July 10, 2024), https://josimarfootball.com/2024/07/10/end-of-season-sales/; Auclair & Brown, *Black Friday*, *supra* note 22.

[36] *Id.*

[37] Auclair & Brown, *Twilight Zone*, *supra* note 34.

265.     There is a pattern to Wander's professional football investments.  777 Partners acquires the clubs for modest or insignificant sums—in the case of Genoa CFC, for one single euro, and for Hertha BSC, less than 15 million euro—takes on all of the club's liabilities and debt payments, and then either stiffs the clubs' creditors entirely or seeks to restructure the debt.[38]  As part of this pattern, 777 Partners reports an inflated valuation for the clubs premised on projections of growth, which in turn allows Wander to pitch new or existing lenders willing to lend money to continue expanding.[39]  Upon information and belief, Leadenhall is yet another lender caught in this massive web of fraudulent enterprise.

266.     For example, the collateral 777 Partners put up to continue operating Genoa CFC was based on unrealistic projections of growth in *all* of its revenue streams and operating cost reductions, despite the fact that Genoa's major revenue stream from television rights will be shrinking soon.[40]  Genoa's debt load continued to balloon due to continued, aggressive spending, though it bought itself some time by convincing Italian tax authorities that it was "in a state of crisis," and negotiating a significant reduction in its unpaid tax liability.[41]

267.     777 Partners predicated its financial projections for other clubs, including Standard Liege, Hertha, and Vasco de Gama, on meeting performance standards for promotion or participation in European leagues that are extremely unlikely to be met.[42]  600 Partners gave a substantial guarantee to keep Standard Liege afloat, but refused to provide audited financials to the Belgian regulators to prove that it could satisfy that guarantee.[43]  And like Standard Liege, 777

---

[38] Auclair & Brown, *On the Brink*, *supra* note 31.
[39] *Id.*
[40] *Id.*
[41] Auclair & Brown, *Black Friday*, *supra* note 22; *see* Auclair & Brown, *End of Season Sales*, *supra* note 35.
[42] Auclair & Brown, *See You in Court*, *supra* note 30.
[43] Auclair & Brown, *The Twilight Zone*, *supra* note 34.

Partners' interest in Vasco de Gama was seized pursuant to an order of a Brazilian court, and Wander and Pasko were removed from that club's board as well.[44]

268.    In August 2023, just a few months after it came to light that he owed Leadenhall over one hundred million dollars beyond what he was permitted to borrow, Wander told the *Financial Times* that he needed to raise "a few hundred million" to cover his football investments.[45]

269.    These concerns came to a head most recently with Wander's attempt to purchase Everton Football Club, a historic club that competes in the world's preeminent and most prestigious football league, the English Premier League.[46]  In accordance with Wander's patterned portfolio, Everton is in very dire financial straits with a huge and growing debt load.[47]  The Everton investment was arranged and funded in large part by—unsurprisingly given its control over 777 Partners' operations—King and A-CAP.[48]

270.    In September 2023, Wander announced that 777 Partners had reached an agreement to purchase Everton.  Shortly after the deal was announced, however, it was held up by concerns over 777 Partners' involvement in funding the deal.  Wander had trouble finding investors other than King and A-CAP.  On November 26, 2023, *Forbes* ran a story titled, "777 Partners Still Reportedly Scrounging For Cash To Buy Everton FC."[49]

---

[44] Auclair & Brown, *Black Friday*, *supra* note 22.

[45] Edgecliff-Johnson, *Hyper Commercialisation*, *supra* note 26.

[46] James Robson, *English Soccer Club Everton to Be Bought by American Investment Firm 777 Partners*, AP NEWS (Sept. 15, 2023) https://apnews.com/article/everton-sale-777-partners-03aa0b571d19c034efbaa7d10adb00ac.

[47] Paul Brown & Philippe Auclair, *Everton or Bust?*, JOSIMAR (Feb. 16, 2024), https://josimarfootball.com/2024/02/16/everton-or-bust/.

[48] *Id.*

[49] *See* Mike Ozanian, *777 Partners Still Reportedly Scrounging for Cash to Buy Everton FC*, FORBES (Nov. 26, 2023), https://www.forbes.com/sites/mikeozanian/2023/11/26/777-partners-still-reportedly-scrounging-for-cash-to-buy-everton-fc/?sh=2a2ad06a208c.

271.    As investigative football journal *Josimar* revealed, an "Investment Overview" document dated August 31, 2023 concerning 777 Partners' targeted acquisition of Everton "was ***not*** put together by 777 [Partners] themselves but by A-CAP . . . ." The "Investment Overview" prepared by A-CAP stated that "the ultimate source of the first 40 million pound-loan made by 777 [Partners] to Everton was A-CAP, with the club paying an interest rate of 12.75 percent." After the initial loan, 777 Partners' outstanding loans directly to Everton "ballooned to almost 200 million pounds," with A-CAP "continuing to provide this money."[50]

272.    And if 777 Partners' position—and therefore A-CAP's position—vis-à-vis Everton was not precarious enough based merely on the size of the debt alone, its meager security on the loan made it even riskier. Reportedly, 777 Partners took a "last out position" in a lending facility behind a senior lender with a "charge over all of Everton's assets, including its bank accounts." In exchange for A-CAP's ongoing funding, it would "receive a 2.5 percent warrant" in "the 777 Football Group," with 777 Partners having to sell a minority interest in its Football Group to repay part of A-CAP's loan. Meanwhile, the 777 Football Group was expected to require 240-300 million euros in working capital "to reach stabilization across all clubs," and even then, would "need to sell equity between 30-50% to cover financing needs."[51]

273.    In October last year, reporting on the targeted Everton transaction, *The New York Times* ran a story reporting that "[a] string of unpaid bills, some as recent as [late last year], raised" concerns for potential partners.[52] This "pattern of late and delayed payments" raised "a red flag to a potentially more significant cash-flow issue," to the point that Leadenhall is not the only former

---

[50] Brown & Auclair, *Everton or Bust?*, *supra* note 47.

[51] *Id.*

[52] Tariq Panja, *The Mystery Company With One Foot in the Premier League*, THE NEW YORK TIMES (Oct. 10, 2023), https://www.nytimes.com/2023/10/10/world/europe/everton-777-premier-league.html

business partner of Wander's to accuse him and 777 Partners of operating "a sprawling fraudulent enterprise."[53]

274.    Additionally, Wander's refusal to provide 777 Partners' audited financial statements beyond the year 2020 and subject its financials to the most basic scrutiny raised problems with an English football regulatory body, just as it did in Belgium.[54]  A former board member of a 777 Partners subsidiary is on record saying that it is "somewhat of a mystery" how 777 Partners could have ever come up with the money to purchase Everton.[55]

275.    It has been reported that "Everton is not just the biggest sporting investment 777 have ever attempted, it is also crucial for the long-term survival of the firm itself."[56]  777 Partners needed Everton as an asset on its books in order to attract new investors and, invariably, new lenders in a seemingly never-ending cycle of taking on more debt.[57]

276.    This all provided a powerful motive for Wander and Pasko, via 777 Partners, 600 Partners and their portfolio companies, at King and A-CAP's direction, to pursue short-term inflation of their Borrowing Base and take out more debt than they could secure, to cover payments coming due and fund further acquisitions, including of global football teams.

## IV.    Absent Injunctive Relief, the Enterprise Would Frustrate Any Recovery by Pushing Itself to the Brink of Insolvency and Transferring Assets to A-CAP to Avoid Satisfying Creditors.

277.    The wheels began to come off Wander, King, and Pasko's sprawling enterprise in early 2024.  In January 2024, the Bermuda Monetary Authority—which regulates 777 Re—reportedly placed 777 Re into administrative control, freezing the $2.2 billion in assets managed

---

[53] *Id.*
[54] Panja, *Everton Sale Stalls*, *supra* note 15.
[55] Panja, *The Mystery Company*, *supra* note 52.
[56] Brown & Auclair, *Everton or Bust?*, *supra* note 47.
[57] Brown & Auclair, *Everton or Bust?*, *supra* note 47; Auclair & Brown, *See You in Court*, *supra* note 30.

by 777 Asset Management LLC which have been used to fund 777 Partners' various risky, money-pit business ventures.[58]

278.    By placing 777 Re into administrative control, the Bermuda Monetary Authority sent a clear signal that it has serious questions over whether the cash cow behind 777 Partners—777 Re, as propped up by a steady flow of premium payments and loans from A-CAP—is able to meet its financial obligations.

279.    On February 16, 2024, AM Best—a credit ratings agency focused on insurers—downgraded 777 Re's credit rating from a "B" to a "C-" and assessed the strength of the firm's balance sheet as "very weak."

280.    AM Best specifically cited the firm's "exposure to affiliated assets"—meaning obligations to 777 Partners and various other companies across the enterprise through loans and investments—as the "primary driver" of the ratings downgrade.  The ratings downgrade only further confirms that lines between the various players here, whether they call themselves "777 Partners," "SuttonPark," "A-CAP," "Josh Wander," "Steven Pasko," or "Kenneth King," are blurry, to the extent they exist at all.

281.    On February 23, 2024—on cue—citing A-CAP's "high reinsurance leverage and declining counterparty credit quality," AM Best downgraded the credit rating of A-CAP from "bbb+" to "bbb" and "with negative implications," signaling that AM Best may further downgrade A-CAP in the future.[59]

---

[58] Brown & Auclair, *Endgame*, *supra* note 11.

[59] In response to AM Best's statements that it intended to downgrade the credit rating of two of A-CAP's primary insurance carriers—rather than taking action sufficient to address AM Best's concerns—A-CAP made the unusual decision to sue the ratings agency.  *See Atlantic Coast Life Insurance Company and Sentinel Security Life Insurance Company v. A.M. Best Rating Services, Inc.*, No. 24-CV-5470 (D.N.J.) (Complaint Filed April 23, 2024) ("The A-CAP Insurers bring this

282.    On February 27, 2024, in response to AM Best's downgrade of 777 Re and A-CAP's credit rating, King announced on an investor call that because 777 Re "wasn't managed the way it needed to be," A-CAP was exiting its relationship with 777 Re and would "recapture" the insurance liabilities ceded to 777 Re within 45 to 60 days.  In other words, A-CAP would cease paying insurance premiums to 777 Re.

283.    King also noted on the call that he had not yet terminated the reinsurance arrangements with 777 Re because ***"to shut off the flow of liquidity to our reinsurer would have paralyzed them and essentially created more risk to A-CAP."*** King's unilateral ability to dictate the future and potentially cause or contribute to the demise of 777 Re via a recapture and his prior and current involvement in the disposition of a large portion of 777 Re's investment portfolio once again demonstrates the scope of King's control over 777 Re and its operations.   King's announcement only further confirms that the faucet has been turned off on 777 Partners.[60]

284.    In total, as of year-end 2023, approximately 99% of 777 Re's reported GAAP book value of invested assets at year-end 2023 was based on 777 Re's reinsurance agreements—and the

---

suit to get the benefit of their bargain.  The Court should enjoin A.M. Best from issuing a faulty rating the insurers never agreed to.  It should also require A.M. Best to redo its rating according to its published methodology.").  The complaint, coupled with a verification from controller Kenneth King and a motion for a temporary restraining order, makes plain that AM Best had threatened downgrades because of the insurers' exposure to 777 Re ("A.M. Best's threatened downgrade arises out of its fixation with financial pressures on a reinsurer called 777 Re.").  In June 2024, A-CAP and AM Best notified the court that they had reached a settlement in principle.

[60] King's announced termination of A-CAP's reinsurance agreements with 777 Re has already damaged Leadenhall.  Leadenhall has provided hundreds of millions of dollars in debt notes directly to 777 Partners under a separate note purchase agreement which is secured by equity interests in 777 Re's parent company.  King's recapture of reserves from 777 Re has torpedoed the value of 777 Re and wiped away any equity value in 777 Partners in the process—effectively turning Leadenhall into unsecured creditors of 777 Partners.  Moreover, assuming the termination and recapture occurs, A-CAP will directly hold the loans made by 777 Re to the subsidiaries of 777 Partners, and it is very unlikely that they would be able to find independent third-party lenders to refinance these loans on similar or commercially reasonable terms.

payments receivable from those reinsurance agreements—with SILAC Insurance Company and Singapore Life Limited, as well as A-CAP affiliates Haymarket, Jazz Reinsurance Company, and Southern Atlantic Re Inc. In addition to A-CAP's recapture discussed above, the two non-A-CAP insurers, SILAC and Singapore life, recaptured their insurance risks ceded to 777 Re in February and March 2024. These recaptures caused a material reduction in the net book value of 777 Re, which had financially propped up various of 777 Partners' businesses, including in professional football, aircraft leasing, budget airlines, and asset management in addition to reinsurance.

285.    All the while, 777 Partners has continued to pour whatever liquidity it has into Wander's football passion project. In a LinkedIn post on April 16, 2024 by Hertha BSC, the German professional football club owned by 777 Partners, and reposted the same day by Wander, Hertha BSC announced that 777 Partners had made a fresh equity investment of approximately $80 million in Hertha BSC in early April 2024. According to the LinkedIn post, 777 Partners' deadline for the equity infusion was the end of May 2024, meaning that 777 Partners made the investment ahead of schedule. The infusion was also made at a time when Wander had represented to Leadenhall over and over again in early April 2024 that he did not have even $15 million to pay down the debt to Leadenhall.

286.    On April 30, 2024, news reports broke that 777 Partners had just loaned Everton another approximately $20 million, taking the amount of 777 Partners' total loans to Everton to approximately $250 million (or £200 million). Wander and Pasko's choice to continue to dissipate millions in money-losing professional football clubs despite immediately owing Leadenhall more than $600 million in debt justifies injunctive relief here.

287.    On May 2, 2024, a Leadenhall representative spoke with Wander on the phone and confronted him about 777 Partners continuing to waste money on Wander's failing vanity projects.

Wander admitted that 777 Partners was then in the process of running down its business and selling off assets to repay creditors. However, rather than sell the football assets to generate cash to pay back creditors, Wander confirmed that 777 Partners had been making "protective advances," through its patron A-CAP, and that A-CAP would not make any further "protective advances" to pay amounts due to Leadenhall.

288.    That same day, another Leadenhall representative spoke with Wander, who confirmed 777 Partners' impending fire sale. Wander admitted that A-CAP was going to stop funding 777 Partners' operations due to regulatory scrutiny and would instead seek to foreclose on whatever assets it could get its hands on. In a last-ditch attempt to stave off litigation, Wander claimed he was confident he could convince A-CAP to share the proceeds of its planned fire sale with Leadenhall. A-CAP did not act as Wander predicted.

289.    Subsequent reporting confirmed that A-CAP had seized control all of 777 Partners football assets, among other assets around the world, through an array of undisclosed maneuvers.

290.    In May 2024, A-CAP allowed the CEO of 777 Partners' football operations' contract to expire, keeping him on only as a consultant to A-CAP, and hand-picked the investment bank Moelis & Company to put *all* of 777 Partners' football clubs on the auction block.

291.    Simultaneously, A-CAP took over 777 Partners' obligations to fund the operations of teams. On May 10, 2024, even after the original complaint was filed in this action as it became increasingly clear that no sale would be consummated, 777 Partners (or more likely, A-CAP acting through 777 Partners as conduit) dumped yet another $10 million investment into Everton.

292.    Later in May 2024, A-CAP started paying 777 Partners' long-delinquent bills for its Belgian club, Standard Liege, and has ensured that Standard has just enough funding to survive

in recent months, but no more than that,[61] to the point that Standard Liege has only escaped bankruptcy and liquidation so far because of regular loans made by A-CAP, who, each time, provided just enough money to keep a growing company of wolves at the door.[62]

293.    In early June 2024, as it became clear 777 Partners lacked the financial wherewithal to close the Everton deal, the Wizard of Oz stepped out from behind the curtain, and A-CAP itself made a bid to acquire the club, presumably in the hope of recovering some of the debt that it had recklessly heaped onto Everton in the last year through its conduit, 777 Partners.[63]  Around that time, it was reported that Wander had been pitching Everton as the solution to his cash problems and effectively a vehicle to raise funds for other ventures, and that A-CAP had *also* viewed Everton as the saving grace that could prop up 777 Partners' entire crumbling football enterprise at least a while longer:  "[T]he hope was that the club's premium valuation and a new stadium . . . would, by association, 'materially increase' the value of 777's entire football portfolio."[64]

294.    Later in June 2024, the Italian press reported that A-CAP was prepared to abandon all pretense of separateness between the companies, would no longer use 777 Partners as an investment vehicle, and would instead operate directly on 777 Partners' Italian club, Genoa FC,

---

[61] Manuel Gonzalez, *Is de Miserie Compleet in Luik? '777 Partners Heeft al Maanden Niéts Meer te Zeggen en . . . Twee Schuldeisers Moeten mee Beslissen over lot van Standard'*, VOETBALKRANT (Jul. 10, 2024), https://www.voetbalkrant.com/nieuws/2024-07-10/is-de-miserie-compleet-in-luik-777-partners-heeft-al-maanden-niets-meer-te-zeggen-en-twee-schuldeisers-moeten-mee-beslissen-over-lot-van-standard.

[62] Auclair &  Brown, *End of Season Sales*, *supra* note 35.

[63] Paul Quinn, *The Absurdity of a Potential Bid for Everton by A-Cap*, THE ESK (Jun. 13, 2024), https://theesk.org/2024/06/13/the-absurdity-of-a-potential-bid-for-everton-by-a-cap; Tom Morgan, *U.S. Financial Firm Emerges as Serious Everton Takeover Contender Despite 777 Links*, TELEGRAPH (June 12, 2024), https://www.msn.com/en-gb/money/other/everton-takeover-contender-under-pressure-from-us-authorities-to-cut-ties-with-777/ar-BB1o6x0D; David Hellier and Jill Shah, *Everton Gets Funding Offer From Firm Behind Previous Bidder 777*, BLOOMBERG (Jun. 6, 2024), https://www.bloomberg.com/news/articles/2024-06-06/everton-gets-funding-offer-from-firm-behind-previous-bidder-777.

[64] Agini, *A Bet on Everton*, *supra* note 1.

without intermediaries. One advantage of this plan was reportedly that it would not require the club to undergo a significant corporate reorganization—by substituting A-CAP for 777 Partners, nothing would actually change.[65]

295. And in July, the president of Vasco de Gama, the Brazilian club that 777 Partners owned (but has since lost control over) confirmed that A-CAP was working to find new investors in Vasco de Gama to take 777 Partners' place.[66]

296. As of July 26, 2024, A-CAP was informing 777-affiliated football clubs that all football assets of 777 Partners are now exclusively controlled by A-CAP.[67]

297. At this point, across much of 777 Partners' global enterprise, 777 Partners and A-CAP have ceased to be independent businesses and have become virtually indistinguishable substitutes for one another.

298. The interconnectedness of 777 Partners and A-CAP is further evidenced by A-CAP's recent motion to modify the preliminary injunction issued in this matter on the spurious notion that it has been "misunderstood in the press" and is thus having a "general chilling effect on commercial activity," despite the fact that A-CAP can point to no proposed transactions that have in fact been "chilled."[68]

---

[65] Gessi Adamoli, *Genoa, i 777 Pensano all'Addio: i Finanziatori di A-Cap Pronti a Ccendere in Campo*, LA REPUBBLICA (June 25, 2024), https://genova.repubblica.it/sport/2024/06/25/news/genoa_777_verso_laddio_i_finanziatori_di_a-cap_pronti_a_scendere_in_campo-423280827/.

[66] Fabio Marseille, *Genoa, la Stretta Finale per Roman Arriverà dopo l'ok di A-Cap*, CALCIO GENOA (July 16, 2024), https://www.calciogenoa.it/2024/07/16/genoa-roman-a-cap/; Gonzalez, *supra* note 61.

[67] *VP jurídico Felipe Carregal diz que A-Cap quer ressarcir os prejuízos que a 777 Partners causou*, https://www.netvasco.com.br/n/342721/vp-juridico-felipe-carregal-diz-que-a-cap-quer-ressarcir-os-prejuizos-que-a-777-partners-causo.

[68] Aug. 1, 2024 Hearing Tr. 5:8-15.

299.    As the Court noted during a telephone conference on August 1, 2024, "One has to wonder if, in fact, the accurate preliminary injunction is not so detrimental to any parties to the preliminary injunction, how it comes about that A-CAP, which is not a party to the injunction, feels so chilled by misreporting what the actual injunction did so that the injunction should be modified." Aug 1, 2024 Conf. Tr. at 9.  The answer, of course, is that A-CAP considers 777 Partners to be an extension of itself and 777 Partners' assets as its own.

300.    A-CAP's vigorous opposition to a preliminary injunction that does not even enjoin A-CAP, and its motion for reconsideration of that injunction, are further examples of A-CAP's strong aversion to waiting for its turn in line with the rest of 777 Partners' creditors, in keeping with A-CAP's desperate bids to keep 777 Partners out of bankruptcy by funding payroll and many other obligations.

301.    777 Partners' low-budget airline ventures have suffered a similar fate to its football operations, and commentators have noted in these circumstances, too, that the relationship between 777 Partners and A-CAP "is murky at best."[69]  In March 2023, bailiffs seized four Boeing 737 MAX jets from Flair Airlines, a low-budget Canadian airline backed by 777 Partners, after months of non-payment on leases for the jets; by December, the lessors of the jets sued 777 Partners for the missed payments.[70] By January, it was revealed that Canadian tax authorities had begun seizing assets from Flair due to Flair failing to pay over $67 million CAD in taxes.[71]  As such, industry experts have described Flair as being "on the verge of collapse" and "in a death spiral."[72]  Flair's

---

[69] Sarah Milner, *Flair Airlines: Is Canada's Low-Cost Carrier in Trouble?*, TRAVELMARKET REPORT (May 30, 2024), https://www.travelmarketreport.com/articles/%20%20%20/air/articles/flair-airlines-is-canadas-low-cost-carrier-in-trouble.
[70] *Id.*
[71] *Id.*
[72] *Id.*

CEO stepped down in June 2024.[73]  However, on August 27, 2024, Bloomberg reported that Flair was attempting to raise funds to recapitalize itself and restructure its balance sheet, having reduced 777 Partners' stake in the company from 25 percent to 10 percent, and thanks to unspecified "support" from A-CAP.[74]

302.     777 Partners' Australian low-budget airline, Bonza, has also collapsed, with court-appointed administrators faulting 777 Partners for undercapitalizing the company and engaging in conflicted transactions with the company.[75]  Pasko was one of Bonza's founders, and he and another 777 Partners representative, Adam Weiss, sat on the company's board, while 777 Partners held a majority stake in the company through a subsidiary.  Bonza's aircrafts were all leased from entities named with some variation of "JWARP," at least three of which the administrators have confirmed were directed by Wander.  In late April 2024, the airlines' entire fleet was seized and the company was sent into receivership, and reports have revealed that more than a month earlier, representatives of 777 Partners, A-CAP (including King), and an aircraft leasing company known as AIP Capital (which was partly owned by 777 Partners until the ownership was restructured and A-CAP took part ownership) were plotting via email to "get the planes out" and "wind [Bonza] up."[76]  Reportedly, 777 Partners and A-CAP "were so entwined in their dealings that it made it

---

[73] *See* Christopher Reynolds, *Flair Airlines CEO to step down from low-cost carrier this summer*, CAN. PRESS (June 4, 2024), https://www.cp24.com/news/flair-airlines-ceo-to-step-down-from-low-cost-carrier-this-summer-1.6913297.

[74] Thomas Seal, *Canada's Flair Airlines Discusses Balance Sheet Restructure*, BLOOMBERG (Aug. 27, 2024), https://www.bloomberg.com/news/articles/2024-08-27/canada-s-struggling-flair-in-talks-to-restructure-balance-sheet.

[75] *See generally*, Bonza Aviation Pty Ltd – Voluntary Administrators' Report to Creditors (June 25, 2024), https://www.hallchadwick.com.au/wp-content/uploads/2024/06/BONZAV-Report-to-Creditors-25.06.24.pdf.

[76] Alysha de Kretser, *Bonza's Backers Plotted to 'Get the Planes Out' and 'Wind this Up'*, FIN. REV. (May 7, 2024), https://www.afr.com/companies/transport/bonza-s-backers-plotted-to-get-the-planes-out-and-wind-this-up-20240506-p5fp87.

impossible for other lenders to reach an agreement with the company over its debts."  Ultimately, approximately 300 employees were fired, after going without wages for months due to 777 Partners' inability to pay.[77]

303.    According to a report issued by Bonza's court-appointed administrators, "the Company was unable to reach forecasted levels of sales, it was heavily reliant on funding from 777 Partners to continue its operations, which funding was sporadic and delayed."[78]  And although 777 Partners loaned $77 million to Bonza, "there is no document pertaining to the loan provided / funds advanced by 777 Partners."[79]  The administrators also noted that "the leasing entities for the aircraft were related parties of 777 Partners.  This added layer of complexity and the relationship between the entities, and their ultimate intentions appear to have also impacted the availability of the aircraft."[80]  The administrators noted the "substantial connection between the business of 777 Partners, [A-CAP], the JWARP companies, and AIP Capital," and stated that the "dual duties" that Pasko and Weiss owed to 777 Partners and Bonza "created a situation of conflict … where the interest of the Company was to continue to be in possession of the Aircraft … whereas for 777 Partners, it appeared to be to terminate the funding of the Company and the lease agreements."[81]

---

[77] Amelia McGuire, *Bonza Hopes Dashed, Hundreds Sacked After No Rescue Bid Emerges*, SYDNEY MORNING HERALD (June 11, 2024), https://www.smh.com.au/business/companies/bonza-hopes-dashed-hundreds-sacked-after-no-rescue-bid-emerges-20240611-p5jkvu.html; Ayesha de Kretser, *Bonza's Administrators Concede Sale Hopes Dead, Staff to Go*, FIN. REV. (June 6, 2024), https://www.afr.com/companies/transport/bonza-s-administrators-concede-sale-hopes-dead-staff-to-go-20240606-p5jjst.
[78] Bonza Aviation Pty Ltd – Voluntary Administrators' Report to Creditors at 14 (June 25, 2024), https://www.hallchadwick.com.au/wp-content/uploads/2024/06/BONZAV-Report-to-Creditors-25.06.24.pdf.
[79] *Id.* at 16.
[80] *Id.* at 22.
[81] *Id.* at 33-34.

Moreover, the administrators stated that none of the 777 Partners representatives involved in Bonza had cooperated with their investigation, in violation of applicable Australian law.[82]

304.    On May 31, 2024, Josimar Football reported that 777 Partners had represented to Italian tax authorities that it was worth $3 billion as of October 31, 2023, while it was concurrently representing to other parties in pitch decks that it was worth $10 billion.[83]  Josimar noted that it is a crime under Italian law to give incorrect financial information to Italian tax authorities.  Further, Josimar emphasized that 777 Partners' statement of worth was made *before* 777 Re (its primary source of funds) was placed under administrative control and downgraded by AM Best.  This raises serious questions as to how much lower than $3 billion 777 Partners' self-valuation would be in a filing made today.

305.    777 Partners is not alone in obscuring its finances to trick outsiders into thinking it is adequately capitalized when it is, in reality, anything but.  The financial information posted on A-CAP's own website is hopelessly out of date.  There, A-CAP advertises its "credit mix" with a chart dated "as of Q1 2022."  It announces that "as of 12/31/21, [A-CAP] manages $4.9B of assets."  There is no mention of A-CAP's financials over the past two and a half years.

306.    And 777 Re—777 Partners' piggy bank—similarly hides its financial status from the outside world.  Not only does 777 Re not publish financial information on any publicly available platform, but it also obfuscates the finances it prepares internally.  On October 13, 2023, James Rothman—then the head of 777 Asset Management—wrote a letter "To Whom It May Concern" regarding 777 Re's engagement of 777 Asset Management "to provide a monthly estimation of fair value across the 777 Re portfolio of assets that it manages."  Mr. Rothman noted

---

[82] *Id.* at 41.
[83] Auclair & Brown, *Black Friday*, *supra* note 22.

in his letter that, in performing this estimation, "777 AM did not analyze the financial condition of its corporate parent 777 Partners LLC and its affiliates and related entities . . . in 777 Partners' role (directly or indirectly) as debtor, guarantor or counterparty of certain transactions, other than to assume, without analysis, that 777 Partners will pay in full obligations as and when due[.]" Rothman also noted that 777 Asset Management did not adjust its valuation for various potential collateral issues.  Rothman left his position as head of 777 Asset Management shortly after publishing this letter.

307.    Several 777 Partners subsidiaries are well-known for the opacity of their finances. On August 13, 2024, Belgian outlet RTBF published a story noting that 777 SDL, the Belgian subsidiary of 777 Partners that owns the Belgian soccer team Standard Liege, had violated Belgian law by failing to publish its annual financial accounts on time.  As of the date of publication of that story, 777 SDL was three months late in disclosing its finances, which puts it in the bottom 3% of Belgian entities.  The article noted that "This situation is not exceptional in the 777 galaxy. Almost all of the American group's subsidiaries are late for publication, which reinforces the opacity around it."  It goes on to note that "777 Partners is a master in the art of accounting opacity, but also in the creation of complex structures.  At 777, holding companies have holding companies that, in turn, have holding companies that hold companies, including football clubs."[84]

308.    In addition to the facts above showing that 777 Partners is on the brink of insolvency, Defendants are facing a slew of lawsuits seeking millions of dollars for failing to pay debts as they come due and fraudulently conveying assets to shield their assets from creditors.  The facts alleged in many of those lawsuits mirror the allegations here and corroborate the actual and

---

[84] Par B. Verpoorten, *Mais Où Sont Donc Passés les Comptes de 777 SDL, Propriétaire du Standard?*, RTBF, https://rtbf.be/article/mais-ou-sont-donc-passes-les-comptes-de-777-sdl-proprietaire-du-standard-11418254.

imminent risk that 777 Partners would frustrate any judgment on the merits in this action by further spending to the point of insolvency and transferring assets out of the shell companies named as defendants.

309.    As of the date of this Complaint, 777 Partners and its affiliates have been named in no fewer than seventeen lawsuits generally concerning unpaid debts and collectively demanding more than $130 million:

a.    On January 9, 2024, an investor sued 777 Partners seeking $30 million in damages for breach of contract, alleging that 777 Partners failed to produce certain financial information to verify its financial condition and operations, thereby triggering a right for the investor to redeem its preferred equity in 777 Partners.  Rather than honoring the repurchase right, however, 777 Partners "redirected capital into new investments and management bonuses."  *Change Lending, LLC v. 777 Partners LLC.*  777 Partners' and 600 Partners' inadequate capitalization and financial distress are corroborated by documents introduced into the record in the *Change Lending* case.  For example, the plaintiff in that case filed an affidavit attaching a copy of a September 30, 2022 "Consolidated and Combined Balance Sheet" provided by 777 Partners and 600 Partners.  According to that document, as of that date, 777 Partners and 600 Partners had fewer assets than liabilities, including members' equity of negative $196,342,961.00; net revenue of negative $29,825,48.00 an a total comprehensive loss of $589,753,127.00 over the nine months prior.

Furthermore, as revealed in public filings in the case in April 2024, in January 2024, 777 Partners did not have even ***$1 million of liquidity*** to pay back.[85]

b. On December 12, 2023, three aircraft lessors sued 777 Partners for $30 million after 777 Partners missed lease payments on four jets. *Corvus Lights Aviation et al v. 777 Partners LLC*.

c. On July 26, 2022, an investor sued 777 Partners and one of its aviation subsidiaries, seeking damages of at least $22 million for alleged fraud in which the defendants used corporate entities to deprive the investor of its ownership interest in the subsidiary. *MALT Family Trust et al. v. 777 Partners, LLC et al.*

d. On July 1, 2022, lenders sued 777 Partners for defaulting on a $59.7 million loan; the lenders auctioned off $41.5 million in collateral, leaving an unpaid principal of over $20 million in debt. Subsequently, the lenders filed a related action against 777 Partners and Pasko, alleging that despite owing the lenders over $20 million, 777 Partners fraudulently transferred two subsidiaries to Pasko in order to shield those assets from creditors. Accordingly, upon information and belief based on these allegations, Pasko was willing to take personal ownership of cash-rich subsidiaries of 777 Partners in order to shield those subsidiaries from creditors (like Leadenhall). Pasko was thus an active participant in Defendants' scheme. *Vida Longevity Fund, LP et al. v. Suttonpark*

---

[85] Paul Brown & Philippe Auclair, *A Change Is Gonna Come?*, Josimar (April 8, 2024), https://josimarfootball.com/2024/04/08/a-change-is-gonna-come/ ("In one message, sent to an employee of Change Lending on 7 January, [recently departed CFO of 777 Partners Damien] Alfalla responds to an urgent request to pay 1 million dollars of money owed by the next day by admitting: 'I don't have the liquidity to pay that tomorrow.'").

*Capital LLC et al.*; *Obra Capital Management, LLC et al. v. 777 Partners LLC et al.*

e.   On or around December 14, 2023, a lender sued 777 Partners to recover an unpaid debt of $11.2 million.  *Balanced Management LLC v. 777 Partners LLC.*

f.   On March 14, 2024, a lender sued Wander and 777 Partners, seeking to enjoin them from transferring any assets pending an arbitration in which the lender is seeking over €9 million for unpaid debt.  *Nakula Management Ltd. v. Joshua Wander et al.*

g.   On September 8, 2023, 777 Partners' landlord sued 777 Partners under its lease for failing to pay a $5 million security deposit.  *1 Madison Office Fee LLC v. 777 Partners LLC et al.*

h.   On December 22, 2023, a creditor sued 777 Partners to recover more than $2 million on two unpaid promissory notes.  *Lasse Meilsoe v. 777 Partners LLC et al.*

i.   On January 23, 2024, 777 Partners was sued by a former principal of the firm, seeking over $2 million in unpaid compensation, in addition to unspecified management interests in 777 Partners' equity management plan.  *Peter Meyers v. 777 Partners, LLC and 777 Partners Management, LLC.*

j.   On March 3, 2023, American Express sued 777 Partners for breach of contract after 777 Partners "failed and refused to pay" an outstanding balance of $324,002.89 on a corporate credit card.  *American Express Travel Related Services Company, Inc. v. 777 Partners.*

k.  On or around June 7, 2021, Wander's former landlord sued Wander for more than $150,000 in damages to the landlord's property. *Randy S. Gelber v. Joshua Wander.*

l.  On April 21, 2023, an executive search firm dedicated to recruiting investment professionals sued 777 Partners for breach of contract, alleging that after placing three candidates with 777 Partners, 777 Partners acknowledged that it owed the firm fees but "slow-rolled" the firm, only making occasional payments before disregarding the firm entirely and without any stated justification, leaving an outstanding balance of $94,000. *The Oxbridge Group, LTD v. 777 Partners LLC.*

m.  On September 29, 2023, an investor in one of 777 Partners' subsidiaries sued 777 Partners and the subsidiary alleging that "777 and Phoenicia are part of a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise[.]" *O'Neil-Dunne et al v. Phoenicia LLC et al.*

n.  On July 26, 2024, the landlord of 777 Partners' office space in downtown Miami sued to evict 777 Partners for nonpayment of rent. According to the complaint in that action, 777 Partners failed to pay rent on June 1, 2024, at which time the landlord demanded $144,443 in unpaid rent pursuant to the terms of the parties' lease. 777 Partners allegedly did not respond to its landlord's demand. *Brickell Holdings, LLC v. 777 Partners LLC.* 777 Partners' website reflects a new office location in Miami.

o. On August 9, 2024, the landlord of 777 Partners' office space in Orange County, California also sued to evict 777 Partners and to collect $97,764.36 in past-due rent. *The Irvine Company LLC v. 777 Partners LLC.*

p. 777 Partners is also a co-defendant in two federal class actions alleging a predatory lending scheme in violation of RICO. One of the complaints states that the aggregate amount in controversy exceeds $5 million, and both complaints seek treble damages for RICO violations. *Eido Hussam Al-Nahhas v. 777 Partners, LLC et al.*; *Joseph Morgan et al. v. 777 Partners, LLC et al.*

310. Much like many of the plaintiffs in these actions have alleged, Leadenhall has a firm basis to believe that, absent emergency injunctive relief, 777 Partners, A-CAP, and the other Defendants would have attempted to transfer their assets so as to take them out of the reach of judgment creditors, thereby causing Leadenhall irreparable harm.

311. During the course of this litigation, 777 Partners has repeatedly confirmed that it cannot make Leadenhall whole. For example, in an affidavit filed with the 777 Entity Defendants' opposition to a temporary restraining order, Ian Ratner of B. Riley was not even sure whether there was *any* equity remaining in the system. ECF 86-3 ¶ 12. At the TRO hearing, the 777 Entity Defendants' counsel confirmed, "it's not like there's $609 million of cash sitting in the bank" and "there's not sufficient liquid assets to pay $609 million." June 7 Hr'g Tr. 24:8-9, 24-25. And again, even after the TRO and preliminary injunction were entered, 777 Partners continued to relinquish assets, including in Employee Funding of America LLC's Chapter 7 bankruptcy.

312. Although Leadenhall, the public, and 777 Partners' own advisors appear to lack transparency into where, if anywhere, value exists within the 777 system, A-CAP knows—and it

has repeatedly proven that it will take all possible steps to recapture that value for itself if given the opportunity.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Breach of LSA Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Servicing, Signal Medical, Insurety Capital, SuttonPark Borrower, Dorchester Borrower, Signal Borrower, Insurety Borrower)

313.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

314.    The LSA is a binding and enforceable agreement between Plaintiffs and Borrowers, as well as Sellers, and Servicers.

315.    Plaintiffs fulfilled their obligations under the LSA.

316.    As set forth above and in the LSA, each Borrower was required to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim."  LSA § 4.01(h); *see also id.* §§ 5.01(d), 5.01(k)(vi).  Additionally, Borrowers were prohibited from "grant[ing] an Adverse Claim on any of [their] assets to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."  *Id.* at § 5.01(k)(vi).

317.    In violation of the LSA, the SuttonPark Borrower and the Dorchester Borrower failed to, *inter alia*, maintain the Collateral "free and clear of any Adverse Claim" by pledging the Collateral to multiple lenders, thereby improperly "grant[ing] an Adverse Claim" on the Collateral that was pledged to Leadenhall "to secure any obligation of any other Borrower, any Other Company or any other Person . . . ."

318.    Specifically, the SuttonPark Borrower and the Dorchester Borrower double-pledged Collateral to Plaintiffs and separate third-party lenders, pledged Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own),

and sold and/or removed Collateral pledged to Plaintiffs without a corresponding reduction in the Principal Amount in breach of the Borrowing Base Limitation.

319.    The SuttonPark and Dorchester Borrowers' foregoing breaches of the LSA constituted Facility Events of Default, which entitle Leadenhall to declare all outstanding debt of all Borrowers immediately due and payable, i.e., to "accelerate" all outstanding debt of all Borrowers. *See, e.g.*, LSA § 7.01(c), (d).  Leadenhall exercised its rights to call Facility Events of Default on March 12, 2024, and to accelerate all of the Borrowers' debt on March 15, 2024, in the amount of $609,529,966.82.  None of the four Borrowers have paid their debt, in violation of the LSA and Leadenhall's right to accelerate.

320.    Further, each Borrower "agree[d] to jointly and severally indemnify" Leadenhall "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees) . . . arising out of or resulting from [the LSA] or the other Transaction Documents," including but not limited to misstatements in Compliance Reports, "failure to vest a valid and perfected security interest in the Collateral free and clear of any Adverse Claim."  LSA § 9.01; *id.* § 9.01(i), (iv). None of the four Borrowers have indemnified Leadenhall for the loss of the accelerated amount.

321.    By virtue of each Borrowers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

322.    Further, Wander, Pasko, King, A-CAP, the Guarantors, and the Sellers, are liable for the Borrowers' breaches because the Borrowers are mere alter egos of their owners—the Sellers—who in turn are mere alter egos of *their* owners—the Guarantors, 777 Partners and 600 Partners—and the Guarantors are mere alter egos of *their* owners—Wander and Pasko.  Wander and Pasko dominate and control the Guarantors, and the wholly owned subsidiaries of the

Guarantors, by virtue of their 100% ownership of the Guarantors through personal shareholding vehicles. The Guarantors, Sellers, and Borrowers are mere alter egos of their shareholders, including because they do not observe corporate formalities; they are grossly undercapitalized; their shareholders use their funds and assets freely for non-corporate purposes; they have virtually complete overlap in ownership, officers, directors, and personnel; they share office space; they exercise no business discretion beyond following the dictates of their shareholders; they engage in transactions that are not at arm's length both with their shareholders (*e.g.*, the JARM loan, condominium purchases, etc.), and with one another (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko); they are not independent profit centers but exist in service of providing cash for the investment activities of their shareholders; and the companies and their shareholders use the companies' and other companies' property as if it were their own. A-CAP and King are liable for the breaches of the Borrowers, Sellers, and Guarantors because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

323.    By virtue of the SuttonPark and Dorchester Borrowers' breaches of the LSA, Plaintiffs' secured debt is largely uncollateralized in violation of the LSA, as Wander has admitted repeatedly and as the 777 Entity Defendants admitted in signing the Additional Interest Amendment and during negotiations over the draft Forbearance Agreement. Therefore, Plaintiffs seek injunctive relief compelling the SuttonPark and Dorchester Borrowers to comply with the LSA by acquiring and/or pledging adequate Collateral to secure Plaintiffs' debt, including complying with LSA §§ 2.07, 2.15, 5.01(i), 7.01(c), and 7.02(g), and by exercising their rights, if necessary, pursuant to the Sale Agreements to acquire additional receivables from SuttonPark

Capital, which the SuttonPark and Dorchester Borrowers can do whether or not they have the cash on hand to pay for such receivables, *see* Sale Agreements § 2.07(b).

### SECOND CLAIM FOR RELIEF
### (Breach of Sale Agreement Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, Signal Medical, Signal Borrower, Insurety Borrower, Insurety Capital)

324.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

325.    The Sale Agreements are binding and enforceable agreements between each of the Borrowers and their respective Sellers, and Leadenhall is an intended third-party beneficiary of each of the Sale Agreements.

326.    In the Sale Agreements, each Seller acknowledges that, pursuant to the LSA, each Borrower will grant to Leadenhall a security interest in all of the Borrower's rights under its respective Sale Agreement, including but not limited to "claims . . . for damages arising out of or for breach or default hereunder," and each "Seller acknowledges and agrees that [Leadenhall] shall have the right at any time to enforce this Agreement against the Seller and to exercise directly all of the [respective Borrower's] rights and remedies under this Agreement." Sale Agreement § 2.05.

327.    In the Sale Agreements, each Seller represents and warrants, among other things, that as of the date on which it transfers ownership of any receivables to its respective Borrower, the Seller "is legal and beneficial owner of the [receivable] free and clear of any Adverse Claim." Sale Agreement § 4.01(h).  Each Seller also covenanted that it would "not sell, pledge, assign or transfer to any Person, or grant, create, incur, assume or suffer to exist any Adverse Claim on" any receivable so transferred to a Borrower, nor would it "take action inconsistent with the [Borrower's] ownership of the" receivables.  *Id.* § 5.01(f).

328.     In addition to those direct obligations owed to the Borrowers and thus to Leadenhall, each Seller also agreed to indemnify its respective Borrower and Leadenhall "from and against any and all damages, losses, claims, liabilities and related costs and expenses," arising from, among other things, any breach of the representations and warranties in § 4.01(h), any failure by the Seller or any of its Affiliates—including any of the other Sellers, the Borrowers, the Servicers, and the Guarantors—to comply with "any term, provision or covenant in" any of the Transaction Documents (including the LSA, Sale Agreements, Servicing Agreements, Pledge Agreements, Compliance Reports, Guaranty, and more), and "the Seller's gross negligence, fraud, bad faith or willful misconduct in conducting the activities contemplated by the" Sale Agreement. Sale Agreement § 7.03.

329.     SuttonPark Capital, Signal Medical, and Insurety Capital have all breached their obligations to indemnify their respective Borrowers and Leadenhall for Leadenhall's claims above arising out of breaches of the LSA.

330.     In the alternative, to the extent the SuttonPark Borrower or the Dorchester Borrower owned any of the receivables that later turned out to be double-pledged, and such receivables were double-pledged because the Sellers had either already sold those receivables to another entity prior to selling them to the Borrower or the Seller later suffered to exist an adverse claim on those receivables after selling them to the Borrower, then SuttonPark Capital breached the foregoing provisions of the Sale Agreements.

331.     By virtue of Sellers' breaches of the Sale Agreements, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

332.    Further, Wander, Pasko, King, A-CAP, the Guarantors, and the Sellers, are liable for the Borrowers' breaches because the Borrowers are mere alter egos of their owners—the Sellers—who in turn are mere alter egos of *their* owners—the Guarantors, 777 Partners and 600 Partners—and the Guarantors are mere alter egos of *their* owners—Wander and Pasko.  Wander and Pasko dominate and control the Guarantors, and the wholly owned subsidiaries of the Guarantors, by virtue of their 100% ownership of the Guarantors through personal shareholding vehicles.  The Guarantors, Sellers, and Borrowers are mere alter egos of their shareholders, including because they do not observe corporate formalities; they are grossly undercapitalized; their shareholders use their funds and assets freely for non-corporate purposes; they have virtually complete overlap in ownership, officers, directors, and personnel; they share office space; they exercise no business discretion beyond following the dictates of their shareholders; they engage in transactions that are not at arm's length both with their shareholders (*e.g.*, the JARM loan, condominium purchases, etc.), and with one another (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko); they are not independent profit centers but exist in service of providing cash for the investment activities of their shareholders; and the companies and their shareholders use the companies' and other companies' property as if it were their own.  A-CAP and King are liable for the breaches of the Borrowers, Sellers, and Guarantors because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

## **THIRD CLAIM FOR RELIEF**
### **(Breach of Servicing Agreement and LSA Against Wander, Pasko, King, A-CAP, 600 Partners, SuttonPark Capital, SuttonPark Servicer)**

333.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

334.    The LSA and the Servicing Agreements are binding and enforceable agreements between Plaintiffs and each of the respective Servicers, Borrowers, and Sellers in each Borrowing Group.

335.    Plaintiffs fulfilled their obligations under the Servicing Agreements.

336.    As set forth above and in the Servicing Agreements, each of the Servicers was responsible for, among other duties, delivering to Leadenhall Capital as Administrative Agent the Monthly and Compliance Reports required under the LSA, containing calculations of the Borrowing Base for the Borrower in their respective Borrower Groups.  Servicing Agreements § 4.1; *see* LSA Article I; *id.* §§ 3.02(e), 5.01(j), 6.02(f); Annex A-1; Annex A-2.

337.    Under the LSA, each Servicer represented that "[e]ach Compliance Report, Monthly Report or other pro forma written statement delivered by such Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered."  LSA § 6.07(c).

338.    The Servicers also were obligated to notify Leadenhall as Administrative Agent "of the occurrence of any Servicer Default or any event which, with the giving of notice or lapse of time or both, would constitute a Servicer Default," which notice must include "the measures being taken by the Servicer to cure such Servicer Default."  Servicing Agreements § 4.3.

339.    The Servicing Agreements provide that a "Servicer Default" occurs whenever a Servicer fails to comply with any of their duties under the Servicing Agreements and fails to cure within thirty days, *id.* § 7.2(a), whenever any representation of the Servicer under any of the credit facility agreements is false or misleading when made and not corrected within two business days, *id.* § 7.2(c), and whenever *any* Event of Default occurs as defined in the LSA, *id.* § 7.2(e).

340.    As set forth above, SuttonPark Servicer delivered false and misleading Monthly Reports and Compliance Reports to Leadenhall Capital on dozens of occasions from May 2021 through the end of 2022.  Those Monthly Reports and Compliance Reports overstated the SuttonPark and Dorchester Borrowers' Borrowing Bases by tens or hundreds of millions of dollars. Each such misrepresentation under § 6.07(c) of the LSA constituted a Servicer Default as it was not cured within two business days, SuttonPark Servicer's failure to notify Leadenhall Capital of its default within thirty days constituted a separate Servicer Default.  The other Events of Default triggered by the Borrowers' conduct described above also constituted separate Servicer Defaults.

341.    In exchange for its services, the Servicers were each paid Servicing Fees by their respective Borrowers, which were calculated according to a set rate "multiplied by the Valuation Amount" of each of the receivables serviced.  Servicing Agreements § 5.1.  The "Valuation Amount" of those receivables used to calculate Servicing Fees was also the most significant input into the calculation of each Borrowers' Borrowing Base.  LSA Schedules VIII, IX, X, XI.  Thus, by inflating the value of the Borrowing Bases, the SuttonPark Servicer also inflated the base on which its own Servicing Fees were calculated, thus diverting funds from the Borrowers to the detriment of the Borrowers' creditors, including Leadenhall and the Lenders.

342.    Each Servicer also agreed to indemnify Leadenhall and the Lenders "from and against any and all claims, losses and liabilities (including reasonable attorneys' fees but excluding Taxes) arising out of or resulting from" any misrepresentation under the LSA or in any Compliance Report, LSA § 6.06(a), which as discussed above includes each Borrower's obligation "to jointly and severally indemnify" Leadenhall for all such losses.

343.    The SuttonPark Servicer has not indemnified Leadenhall against the losses and liabilities it has suffered arising from the false Monthly Reports and Compliance Reports.

344.    By virtue of the foregoing Servicer Defaults and Servicers' breach of the LSA, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

345.    Further, Wander, Pasko, King, A-CAP, the Guarantors, and the Sellers, are liable for the Borrowers' breaches because the Borrowers are mere alter egos of their owners—the Sellers—who in turn are mere alter egos of *their* owners—the Guarantors, 777 Partners and 600 Partners—and the Guarantors are mere alter egos of *their* owners—Wander and Pasko. Wander and Pasko dominate and control the Guarantors, and the wholly owned subsidiaries of the Guarantors, by virtue of their 100% ownership of the Guarantors through personal shareholding vehicles. The Guarantors, Sellers, and Borrowers are mere alter egos of their shareholders, including because they do not observe corporate formalities; they are grossly undercapitalized; their shareholders use their funds and assets freely for non-corporate purposes; they have virtually complete overlap in ownership, officers, directors, and personnel; they share office space; they exercise no business discretion beyond following the dictates of their shareholders; they engage in transactions that are not at arm's length both with their shareholders (*e.g.*, the JARM loan, condominium purchases, etc.), and with one another (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko); they are not independent profit centers but exist in service of providing cash for the investment activities of their shareholders; and the companies and their shareholders use the companies' and other companies' property as if it were their own. A-CAP and King are liable for the breaches of the Servicers because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Guaranty Agreement Against Wander, Pasko, 777 Partners, 600 Partners)**

346.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

347.    The Guaranty Agreement is a binding and enforceable agreement between Plaintiffs, 777 Partners, and 600 Partners.

348.    Plaintiffs fulfilled their obligations under the Guaranty Agreement.

349.    As set forth above and in the Guaranty Agreement, 777 Partners and 600 Partners jointly and severally guaranteed to Plaintiffs "the full and punctual payment and performance . . . of the Guaranteed Obligations of the [SuttonPark] Borrower Group and the Dorchester Borrower … so long as a Trigger Event has occurred and is continuing," Guaranty Agreement § 2(a), including but not limited to:

(i) any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement;

(ii) any act of theft or misappropriation of funds by either Guarantor under this Guaranty or any entity included in a Borrower Group under the Loan and Security Agreement;

(iii) any willful misrepresentation of a material nature by either Guarantor under this Guaranty;

[…]

(ix) any failure of a Borrower to own the Collateral pledged by such Borrower pursuant to the Loan and Security Agreement, in each case free and clear of all liens, security interests or encumbrances (other than Adverse Claims specified in Section 4.01(b) of the Loan and Security Agreement) solely as a result of the action or inaction of such Borrower or a Guarantor and such failure continues for two (2) Business Days;  … or

[…]

(xi) any Subsidiary or Affiliate of a Guarantor takes any action in bad faith with the intent to directly or indirectly delay, oppose, avoid, contest, impede, obstruct, hinder, enjoin or otherwise interfere in any manner with the Administrative Agent's or any Lender's exercise

or enforcement of its rights and remedies against any Collateral under the Transaction Documents or under Requirements of Law.

*Id.* at § 1, "Trigger Event".

350.    Further, through the Guaranty Agreement, 777 Partners and 600 Partners guaranteed the Borrowers' "Obligations" as defined in the LSA, including "the performance of all of the terms, covenants, and agreements on the part of such Borrower (whether as Borrower or otherwise) to be performed under" the LSA, "or any other document delivered in connection with this Agreement in accordance with the terms thereof," LSA, art. I, "Guaranteed Obligations."

351.    Numerous Trigger Events have occurred:

a.   The SuttonPark and Dorchester Borrowers have breached the LSA by, *inter alia*, failing to own Collateral "free and clear" of any other security interests;

b.   The SuttonPark and Dorchester Borrowers committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by double-pledging assets and then falsifying records including in the MP Fin system to cover their tracks, and misrepresenting the cause of the double-pledging and their ability to cure the problem to Leadenhall;

c.   In the alternative, SuttonPark Capital committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by double-pledging assets and then falsifying records including in the MP Fin system to cover their tracks, and misrepresenting the cause of the double-pledging and their ability to cure the problem to Leadenhall;

d.   In the alternative, the Guarantors committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by double-pledging assets and then falsifying records including in the MP Fin

system to cover their tracks, and misrepresenting the cause of the double-pledging and their ability to cure the problem to Leadenhall;

e.  SuttonPark Servicing committed acts of fraud or willful misconduct and took actions in bad faith to interfere with Leadenhall's exercise of remedies by submitting false and fraudulent Compliance Reports and falsified supporting documents;

f.  The SuttonPark and Dorchester Borrowers have misappropriated funds by failing to use borrowed funds to maintain their Borrowing Bases and avoid Borrowing Base Deficiencies and instead using funds borrowed from Leadenhall for other purposes while defaulting on their debt to Leadenhall;

g.  In the alternative, SuttonPark Capital has misappropriated funds by failing to use borrowed funds to maintain the SuttonPark and Dorchester Borrowers' Borrowing Bases and avoid Borrowing Base Deficiencies and instead using funds borrowed from Leadenhall for other purposes while defaulting on their debt to Leadenhall;

h.  In the alternative, the Guarantors have misappropriated funds by failing to use borrowed funds to maintain the SuttonPark and Dorchester Borrowers' Borrowing Bases and avoid Borrowing Base Deficiencies and instead using funds borrowed from Leadenhall for other purposes while defaulting on their debt to Leadenhall;

i.  The SuttonPark Servicer has misappropriated funds by fraudulently increasing the basis on which its servicing fees were calculated, to the detriment of the SuttonPark and Dorchester Borrowers and their creditors including Leadenhall;

j. The Guarantors have made material misrepresentations, including by Wander on recorded phone calls with Leadenhall misrepresenting the cause of the double-pledging and their ability to cure the deficiency caused by the double-pledging.

352. Thus, because 777 Partners and 600 Partners have failed to guarantee the payment obligations of the Borrowers or performance of the SuttonPark and Dorchester Borrowers' obligations to pledge sufficient Collateral to secure Leadenhall's debt following that Trigger Event, 777 Partners and 600 Partners are jointly and severally liable for the Borrowers' breach of the LSA.

353. By virtue of 777 Partners' and 600 Partners' breach of the Guaranty Agreement, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

354. Further, Wander and Pasko are liable for the Guarantors' liability because the Guarantors are merely their alter egos. Wander and Pasko dominate and control the Guarantors that they wholly own, which are mere alter egos of their shareholders, including because they do not observe corporate formalities, they are grossly undercapitalized, their shareholders use their funds and assets freely for non-corporate purposes, they have virtually complete overlap in ownership, officers, directors, and personnel, they share office space, they exercise no business discretion beyond following the dictates of their shareholders, they engage in transactions that are not at arm's length both which their shareholders (e.g., the JARM loan, condominium purchases, etc.), and with each other (e.g., the reorganization of 600 Partners to be wholly owned solely by Pasko), they are not independent profit centers but all exist in service of providing cash for the investment activities of their shareholders, and the companies and their shareholders use the companies' and other companies' property as if it was their own. A-CAP and King are liable for

the breaches of the Guarantors because they exercise excessive and improper control over the Guarantors by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors.

355.    Further, by virtue of the Guarantors' breaches of the Guaranty Agreement, Plaintiffs' secured debt is largely uncollateralized in violation of the LSA, as Wander has admitted repeatedly and as the 777 Entity Defendants admitted in signing the Additional Interest Amendment and during negotiations over the draft Forbearance Agreement.  Therefore, Plaintiffs seek injunctive relief compelling the Guarantors to perform the Borrowers' obligations under the LSA by acquiring and/or pledging adequate Collateral to secure Plaintiffs' debt, including complying with LSA §§ 2.07, 2.15, 5.01(i), 7.01(c), and 7.02(g), and by exercising the Borrowers' rights, if necessary, pursuant to the Sale Agreements to acquire additional receivables from SuttonPark Capital, which the SuttonPark and Dorchester Borrowers can do whether or not they have the cash on hand to pay for such receivables, *see* Sale Agreements § 2.07(b), and including by directly performing the Borrowers' obligations to "remedy XX", LSA §§ 7.01(c), 7.02(g), to provide "substitute Eligible Receivables having a Valuation Amount that is greater than or equal . . . to that of the substituted" receivables, *id.* § 2.07(a)(y)(ii)(B), and "to take all further actions, that may be reasonably necessary or desirable, or that [Leadenhall] may reasonably request, to perfect or protect the security interest granted under this Agreement, or to enable the Secured Parties to exercise and enforce their respective rights and remedies under this Agreement," *id.* § 5.01(i), in particular by acquiring and then transferring to the SuttonPark and Dorchester Borrower and pledging to Leadenhall adequate collateral to secure the outstanding debt.

**FIFTH CLAIM FOR RELIEF**
**(Civil RICO, 18 U.S.C. § 1962(c), Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, Dorchester Borrower)**

356.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

357.    Defendants Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrower (the "RICO Defendants") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

358.    The RICO Defendants, together with the other Defendants, as well as the wholly-owned shareholding vehicles through which Wander and Pasko wholly own and control 777 Partners and 600 Partners (JARM Capital LLC, MTCP LLC, SuttonPark Acquisition LLC, and SPA II LLC), operate as an association-in-fact enterprise within the meaning of the RICO Act, and each RICO Defendant is a person within the meaning of 18 U.S.C. § 1961(3) and is separate from and exists independently of the enterprise.

359.    The enterprise shared a common purpose of enriching its principals by fraud and otherwise, particularly Wander, Pasko, and King, and obtaining capital for the principals to pursue new business opportunities, also for their personal enrichment.

360.    The structure of the enterprise begins with King's control of A-CAP and Wander and Pasko's control of 777 Entity Defendants via their personal shareholding vehicles. While the 777 Entity Defendants are each alter egos of their shareholders due to their lack of corporate formalities, undercapitalization, and other factors discussed above, the 777 Entity Defendants are distinct from King and A-CAP (and vice versa), and together all Defendants and the shareholding

vehicles form a RICO enterprise alleged here distinct from any Defendant or group of affiliated Defendants. Further, each person and entity in the enterprise plays a distinct role in the hierarchy:

a. King controls A-CAP, which in turn generates cash flows through its insurance subsidiaries (and specifically policyholder premiums) and other business activities.

b. A-CAP funds the operations of 777 Partners and 600 Partners through loans and otherwise.

c. Wander and Pasko control 777 Partners and 600 Partners through their personal shareholding vehicles, in part because Wander's prior felony conviction precluded him from personally controlling both entities (and their subsidiaries, including SuttonPark Capital).

d. 777 Partners and 600 Partners use their web of subsidiaries, including Sellers, Borrowers, and Servicers, to acquire receivables, service receivables, and pledge receivables as collateral to induce lenders to provide (purportedly) secured funding, while attempting to use the intricate corporate structuring to limit liability up the chain to 777 Partners and 600 Partners, including in the event of a potential bankruptcy.

e. Each Borrower then borrows (purportedly) secured debt from a lender such as Leadenhall, using the actual (and potential) assets of the Seller to provide the appearance of collateral, and the Servicer to provide fraudulent compliance reports, while returning cash up the corporate ladder to 777 Partners and 600 Partners and, in turn, to Wander, Pasko, and King (via A-CAP).

361.    The enterprise described above has existed in some form since at least 2020, when A-CAP began (as far as Leadenhall is aware) funding the operations of 777 Partners and 600 Partners through massive loans, and it has existed in its current form with the membership identified above since at least 2021, when Defendants became parties to the LSA with Leadenhall. The enterprise exists independent from its acts of racketeering activity because the 777 Entity Defendants exist as a family of corporate entities managed by Wander and Pasko, most of which predate the signing of the LSA here and that, at least in theory, carry on a legitimate business in addition to acts of racketeering, and A-CAP and King's role as the funders and effective controllers predates and transcends the acts of racketeering at issue here.

362.    Each RICO Defendant committed multiple predicate acts of racketeering activity, namely mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343, by making knowingly and intentionally false and fraudulent statements through the use of interstate wires, by misrepresenting the existence, encumbrance, or value of Collateral; the availability of substitute Collateral; and the nature and scope of the RICO Defendants' misconduct with respect to that Collateral, with intent to induce Leadenhall to rely on those statements in either extending debt or maintaining existing debt levels without demanding immediate repayment or exercising remedies under the LSA.  The RICO Defendants' false and fraudulent statements were critical to perpetuating the enterprise's broader fraudulent scheme and pattern of racketeering activity because (as has been made clear since Leadenhall discovered the fraud, demanded repayment, and ultimately filed this lawsuit), Leadenhall's exposure of the scheme and demand to be repaid would cripple the enterprise's ability to fraudulently obtain and use cash from Leadenhall to borrow more money and fund other business ventures, including in professional football teams, budget airlines, reinsurance, and more. These acts had the same or similar purposes, results, participants, victims, and methods of

commission, were otherwise interrelated by distinguishing characteristics, and were not isolated events.

363.    The RICO Defendants' specific predicate acts include, without limitation, the following:

a.    The SuttonPark Servicer transmitted to Leadenhall, on behalf of the SuttonPark Borrower and Dorchester Borrower, false and fraudulent Compliance Reports on dozens of occasions, including without limitation those enumerated with particularity in Exhibit 6.    Servicing notes in MP Fin indicate that the SuttonPark Servicer knew, beginning in 2021 and throughout 2022 and 2023 that certain receivables purportedly pledged to Leadenhall were double-pledged, did not exist, had been sold, or otherwise were defective or ineligible to serve as Collateral, and nonetheless kept them allocated to Leadenhall in the 777 Partners computer system.    The purpose of the Compliance Reports under the LSA was to confirm to Leadenhall that its debt was secured in accordance with the terms of the LSA, which security was material to Leadenhall's decision to lend to the 777 Entity Defendants at the interest rates it did, so that Leadenhall would either extend new debt or would maintain the existing level of debt and would not call an Event of Default, demand repayment of some or all of the outstanding debt, and/or exercise other remedies available to it under the LSA. Leadenhall conducted industry-standard due diligence and reasonably relied upon statements in the Compliance Reports, as contemplated by the LSA.

b.    The SuttonPark Borrower and the Dorchester Borrower participated in and directed the transmission of the respective false and fraudulent Compliance

Reports described above, which were submitted by the SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers, and the SuttonPark Borrower and SuttonPark Servicer also transmitted or participated in and directed the transmission of false and fraudulent pro forma Compliance Reports in connection with Borrowing Requests and assignments of receivables.

c.   SuttonPark Capital participated in and directed the transmission of the false and fraudulent Compliance Reports described above, including because SuttonPark Capital owned (or was supposed to own) all of the receivables that were allocated to the SuttonPark Borrower and Dorchester Borrower, SuttonPark Capital employees including Bennett and Adnani directly received information from the SuttonPark Servicer stating that certain receivables were not eligible to be pledged as Collateral (either because they were double-pledged, never purchased, previously sold, or otherwise) and had the ability and responsibility to access and review the rest of those servicing notes in MP Fin, and SuttonPark Capital employees Bennett and Adnani uploaded the Compliance Reports to Leadenhall and communicated with Leadenhall about them, at least until A-CAP took over in March or April 2023.  Further, the SuttonPark Servicer and SuttonPark and Dorchester Borrowers were alter egos of SuttonPark Capital during the relevant period as alleged above.

d.   777 Partners and 600 Partners participated in and directed the transmission of the false and fraudulent Compliance Reports described above, including because Bennett and Adnani acted in part in their capacity as employees of 777 Partners' and 600 Partners' Capital Markets group in taking the actions above,

while they were also employees of SuttonPark Capital, and Bennett and Adnani did not act without being personally directed to do so by Wander, who jointly controlled 777 Partners and 600 Partners with Pasko. Further, Suttonpark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers were alter egos of 777 Partners and 600 Partners during the relevant period as alleged above.

e. Wander participated in and directed the transmission of the false and fraudulent Compliance Reports described above for the reasons above, including because 777 Partners, 600 Partners, Suttonpark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers were alter egos of Wander during the relevant period as alleged above. Further, Wander personally made numerous intentional, material misrepresentations to Leadenhall in telephonic, e-mail, and text message communications with representatives of Leadenhall with the intent that Leadenhall would rely on those statements in extending or maintaining debt, forbearing from exercising their rights to demand repayment and/or compliance with other requirements of the LSA and other transaction documents, including to pledge adequate Collateral "free and clear," and forbearing from filing suit and publicly exposing the fraudulent scheme. Those misrepresentations included, but were not limited to, claims that the double-pledging resulted from a computer glitch or "mistake" rather than knowing and intentional fraudulent activity and promises to reconcile receivables, promises to find substitute deals to compensate for Collateral shortfalls, and/or promises to repay some or all of his companies' debts to Leadenhall, which were

knowingly false and fraudulent at the time because Wander had no intention or ability to perform those promises at the time they were made.

f.   Pasko participated in and directed the transmission of the false and fraudulent Compliance Reports described above for the reasons above, including because 777 Partners, 600 Partners, SuttonPark Capital, the SuttonPark Servicer, and the SuttonPark and Dorchester Borrowers were alter egos of Pasko during the relevant period as alleged above.   Further, Pasko personally signed the Compliance Reports issued by SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers that contained actual signatures, including those listed on Exhibit 6 for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022, as well as the pro forma compliance reports that were transmitted with the Borrowing Requests and assignments of receivables discussed above.

g.   A-CAP participated in and directed the transmission of the false and fraudulent Compliance Reports described above and enumerated with particularity in Exhibit 6, beginning in March or April 2023 at the latest, when A-CAP removed the 777 Partners and SuttonPark Capital employees who were responsible for reviewing detail on purported Collateral and MP Fin and submitting Compliance Reports to Leadenhall—Bennett and Adnani—from their offices, and agreed with 777 Partners that the Capital Markets group, including Bennett and Adnani, would report to A-CAP Chief Operating Officer Mike Saliba, after which 777 Partners, under the direct supervision of A-CAP, continued submitting false and fraudulent Compliance Reports from April 2023 through

November 2023.   Further, A-CAP represented to Leadenhall during restructuring negotiations that 777 Partners had sources of liquidity other than A-CAP that 777 Partners could and/or would use to repay its obligations to Leadenhall, which A-CAP knew was false at the time and said with the intent that Leadenhall would rely on those statements in forbearing from exercising rights under the LSA and other transaction documents and in forbearing from filing suit and publicly exposing the fraudulent scheme.   Further, A-CAP exercised excessive and improper control over 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrower during that period and is responsible for their actions.   Additionally, and separate from A-CAP's direct participation in the transmission of false and fraudulent Compliance Reports, A-CAP aided and abetted the predicate acts of mail and wire fraud committed directly by Wander, Pasko, and the 777 Entity Defendants that are RICO Defendants, by strategically injecting capital into the 777 Entity Defendants' operations to retain the appearance of solvency and continue carrying out the fraud, all while knowing that the fraud was ongoing.

h.   King participated in and directed the transmission of the false and fraudulent Compliance Reports described immediately above, for the reasons above, because King personally was responsible for directing that Saliba and A-CAP employee Carson McGuffin, among others, physically move into 777 Partners' offices in March 2023, for entering into the agreement with 777 Partners providing that the Capital Markets Group, including Bennett and Adnani, would report to Saliba and A-CAP going forward, as they continued to submit false

and fraudulent compliance reports, and for directing A-CAP to make false representations to Leadenhall during restructuring negotiations to perpetuate the scheme and prevent or delay its exposure. Further, King exercised excessive and improper control over 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrower during that period and is responsible for their actions

364.    The racketeering acts identified above were related to one another and formed a pattern of racketeering activity in that they (a) were in furtherance of a common purpose, including enriching the principals Wander, Pasko, and King; by inducing Leadenhall and the various Lender Groups that Leadenhall represents to extend debt they would not have extended (at interest rates they would not have offered) in the absence of such fraud; and inducing Leadenhall and the Lenders to forbear from exercising their rights under the LSA and other transaction documents and/or from filing suit and publicly exposing the scheme; so that the RICO Defendants could continue to use the ill-gotten funds from Leadenhall to prop up other business ventures, and pay other debt obligations, and perpetuate the fraudulent scheme, while the principals of the enterprise, including King and A-CAP, continued to strip assets from the enterprise to enrich themselves. Further, the racketeering acts identified above used similar methods to perpetrate the frauds, including the use of false and fraudulent Compliance Reports, misrepresentations regarding the reports, and other misrepresentations about the extent of and reasons for inaccuracies in the Compliance Reports and the possibility of curing those issues.

365.    The acts of racketeering above had similar participants and similar victims, including Leadenhall and the Lender Groups for the SuttonPark and Dorchester Borrowers. The acts of racketeering activity above form a pattern in that they were, by definition, perpetrated on

additional groups of victims beyond Leadenhall and those represented by Leadenhall, because when Collateral is double-pledged, *none* of the creditors—not Leadenhall, nor Credigy, nor any of the other lenders on SuttonPark Capital's credit facilities—have security interests free and clear of adverse claims.

366.    Defendants' racketeering acts were a regular way of conducting their ongoing business with Plaintiffs and of conducting or participating in the ongoing RICO enterprise, and pose a threat of continuing criminal activity, and they are sufficiently continuous to form a pattern of racketeering activity.  The foregoing acts of racketeering would have continued indefinitely had Leadenhall not received the anonymous tip, investigated further, and ultimately exercised the remedies it has exercised.  Indeed, even after Leadenhall began inquiring about double-pledging following the anonymous tip, Defendants continued to perpetuate the RICO enterprise and commit fraudulent acts, including A-CAP's installation of its own employees at 777 Partners to direct the 777 Partners Capital Markets team to continue submitting fraudulent Compliance Reports. Similarly, during that time period, even after discovery of the double-pledging and other problems with the Collateral, Wander continued to lie to Leadenhall about the extent and cause of those problems in an effort to forestall the exercise of any remedies as long as possible and allow the enterprise to continue operating.  Further, many of the dozens of other operating companies owned by 777 Partners and 600 Partners continue to have their own credit facilities with other third-party lenders, and there is no reason to think that the fraudulent practices with respect to collateral pledging alleged above are confined only to the Leadenhall facility.

367.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered damages in the amount of the debt accelerated without dispute on March 15, 2024—$609,529,966.82—plus interest accruing from the date of acceleration, which Plaintiffs will be entitled to treble.  As alleged

above, Plaintiffs reasonably relied upon the misrepresentations contained in the false and fraudulent Compliance Reports in extending the debt that has now been accelerated, and in forbearing from or delaying demanding repayment or exercising remedies, including declining to do so at such a time when 777 Partners and 600 Partners might have had assets sufficient to repay their debts, so that Wander, Pasko, King, and A-CAP could continue using their ill-gotten gains to fund other business ventures and pay other debt obligations and keep their enterprise afloat.  Now, as Wander, the 777 Entity Defendants, and their counsel have represented repeatedly, 777 Partners and 600 Partners are unable to make even modest payments representing fractions of the outstanding debt, leaving Plaintiffs bearing $609,529,966.82 in losses plus interest.

368.    The circumstances surrounding Leadenhall's injuries establish that the RICO enterprise and Leadenhall's injuries arose in the United States, including because all of the racketeering activity alleged above was committed by U.S.-based persons and entities operating in the United States, and Defendants' racketeering activity impaired Leadenhall's rights to collect on its debt in the United States, as well as rights to assets (*i.e.*, receivables) in the United States, as required by the LSA.  *See* LSA scheds. VIII, XI (defining eligibility requirements for receivables to count towards the SuttonPark and Dorchester Borrowers' Borrowing Bases that are inherently or explicitly limited to the United States).

369.    As a result of the RICO Defendants' racketeering scheme, Plaintiffs have suffered further damages in the form of collection costs already expended prior to filing suit.  Specifically, Plaintiffs incurred substantial expenses as well as attorneys' fees in connection with investigating Defendants' fraud, tracing Defendants' assets, and attempting to negotiate a restructuring of Defendants' debt in order to collect it.

370.     Separately, as a result of the RICO Defendants' racketeering scheme, Plaintiffs seek to recover their costs and attorneys' fees incurred in prosecuting this lawsuit.

371.     To put a stop to the RICO Defendants' racketeering scheme and ensure that the RICO Defendants cannot profit therefrom, Plaintiffs also seek injunctive relief enjoining any further breaches of the LSA and Guaranty Agreement, including requiring the Guarantors (and Wander and Pasko as the controllers of the Guarantors, and A-CAP and King as controllers of the Enterprise) to honor the Guarantors' obligations to guarantee the Borrowers' performance of the Guaranteed Obligations, including both the obligations to repay Leadenhall and to acquire and pledge sufficient Collateral to secure Leadenhall's debt.

## SIXTH CLAIM FOR RELIEF
### (Civil RICO Conspiracy, 18 U.S.C. § 1962(d), Against All Defendants)

372.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

373.     In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that they knowingly agreed and conspired together and with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.

374.     Defendants willfully, intentionally, and knowingly agreed to further a shared plan, which agreement was consummated no later than March 2023, when it was memorialized in a letter or email correspondence dictating a number of operational changes at 777 Partners, including the establishment of a "Steering Committee" for 777 Partners, with King at the head, to ensure that every single 777 Partners investment into a portfolio company was approved by King. The memo also provided that certain 777 Partners employees, including members of the Capital Markets

group who were responsible for sending false and fraudulent Compliance Reports to Leadenhall would report directly to A-CAP executives.

375.    The agreement between King, A-CAP, Wander, Pasko, and the 777 Entity Defendants encompassed an agreement to commit the predicate acts of racketeering described above on the part of each of the RICO Defendants, including continuing to defraud Leadenhall through the use of false and fraudulent Compliance Reports and other fraudulent misrepresentations about the financial condition of the 777 Entity Defendants and Leadenhall's prospect for repayment or recollateralization.  This agreement is evidenced by, among other things, the fact that 777 Partners Capital Markets employees Bennett and Adnani had been sending false and fraudulent Compliance Reports to Leadenhall for many months prior to A-CAP seizing control of 777 Partners; Bennett and Adnani had actual knowledge of some and constructive knowledge of other instances of double-pledged, non-existent, already-sold, or otherwise ineligible or defective receivables being pledged to Leadenhall; Bennett and Adnani then came to report directly to A-CAP Chief Operating Officer Mike Saliba after being displaced from their office by A-CAP personnel, at the direction of Kenneth King; and 777 Partners and its subsidiaries (SuttonPark Capital, SuttonPark Servicing, SuttonPark Borrower, and Dorchester Borrower) continued sending false and fraudulent reports for the rest of 2023.  The other 777 Entity Defendants, including the Insurety Borrower, Signal Borrower, Insurety Capital, and Signal Medical were also parties to the agreement that constitutes this conspiracy, because all of those entities were controlled and represented by Wander and Pasko, and their participation in the conspiracy (including refusing to repay Leadenhall what it is owed) was necessary to the success of the underlying fraud, the goal of which was to retain as much of the ill-gotten funds from Leadenhall as possible so that Wander,

Pasko, King, A-CAP, 777 Partners, and 600 Partners could continue funding other business ventures and pay other debt obligations, and keep the enterprise afloat.

376.    The frauds that were perpetrated, and the continuance of the scheme, could not have occurred without the consent and knowing connivance of Defendants together.

377.    As part of and in furtherance of their conspiracy, Defendants conspired in the commission of the many predicate acts described above, with the knowledge that they furthered that pattern of racketeering activity. As part of and in furtherance of their conspiracy, Defendants agreed to and did commit at least two predicate acts of racketeering.  Further, each of Defendants' actions are attributable to the other.

378.    No Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

379.    Plaintiffs have been injured in their business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).

380.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered damages in the amount of the accelerated amount of $609,529,966.82, plus interest accruing from the date of acceleration, which Plaintiffs will be entitled to treble.

381.    As a result of Defendants' racketeering scheme, Plaintiffs have suffered further damages in the form of collection costs already expended prior to filing suit.  Specifically, Plaintiffs incurred substantial expenses as well as attorneys' fees in connection with investigating Defendants' fraud, tracing Defendants' assets, and attempting to negotiate a restructuring of Defendants' debt in order to collect it.

382.    Separately, as a result of Defendants' racketeering scheme, Plaintiffs seek to recover their costs and attorneys' fees incurred in prosecuting this lawsuit.

383.    To put a stop to the RICO Defendants' racketeering scheme and Defendants' broader conspiracy, and ensure that A-CAP, King, Wander, and Pasko cannot profit therefrom, Plaintiffs also seek injunctive relief enjoining any further breaches of the LSA and Guaranty Agreement, including requiring the Guarantors (and A-CAP, King, Wander, and Pasko as the controllers of the Guarantors) to honor the Guarantors' obligations to guarantee the Borrowers' performance of the Guaranteed Obligations, including both the obligations to repay Leadenhall and to acquire and pledge sufficient Collateral to secure Leadenhall's debt.

## SEVENTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentation Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, Dorchester Borrower)

384.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

385.    Wander, Pasko, King, A-CAP, SuttonPark Capital, SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower engaged in the pattern described above of fraudulently misrepresenting to Plaintiffs the value of Collateral they owned "free and clear of any Adverse Claims," which statements were false and fraudulent because SuttonPark Capital, the SuttonPark Borrower, and the Dorchester Borrower had double-pledged the Collateral to Plaintiffs and separate third-party lenders, and had also pledged the Collateral to Plaintiffs which was never purchased by the Borrowers (and therefore which the Borrowers did not own).

386.    The fraudulent statements described above, contained in the Compliance Reports and elsewhere, were knowingly false statements of material fact, made with intent to induce Leadenhall to rely upon them.  Leadenhall reasonably relied on those statements for the reasons set forth above.

387.    By concealing the fact that the Collateral pledged to Plaintiffs had been pledged to other lenders or was not even owned by the Borrowers, Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, the SuttonPark Borrower, Dorchester Borrower, and SuttonPark Servicer fraudulently inflated the SuttonPark and Dorchester Borrowers' Borrowing Bases, with the intent to induce Plaintiffs to lend more funds than Plaintiffs would have, had Plaintiffs known the truth.  The SuttonPark Servicer also fraudulently inflated its own servicing fees, which Plaintiffs paid but would not have paid had they known the truth.  Further, the above Defendants induced Leadenhall to continue lending and to forbear from demanding repayment or exercising other remedies, including from doing so at such time when Defendants might have been able to repay Leadenhall, permitting Defendants to continue spending the ill-gotten funds from Leadenhall on other business ventures and other debt obligations, keeping their enterprise afloat, causing Leadenhall to bear losses.

388.    As a result of Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, and Dorchester Borrowers' knowingly false and fraudulent misrepresentations and Plaintiffs' reasonable reliance thereon, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

## EIGHTH CLAIM FOR RELIEF
### (Civil Conspiracy to Commit Fraud Against All Defendants)

389.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

390.    Defendants willfully, intentionally, and knowingly agreed to further a shared plan, which agreement was consummated no later than March 2023, when it was memorialized in a

letter or email correspondence, and which shared plan included committing fraud against Leadenhall, as described above.

391.    In furtherance of that agreement, Defendants committed the acts enumerated above including committing wire fraud, defrauding Leadenhall, and violating the LSA, the Servicing Agreement, the Sale Agreement, and the Guaranty Agreement, all as further described above.

392.    Each of the Defendants actively participated in the above-described civil conspiracy as described above, and therefore each Defendant is responsible for each tortious and otherwise unlawful action of any co-conspirator.

393.    As a direct and proximate result of the conspiracy, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

### NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital)

394.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

395.    In the alternative, Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital aided and abetted the principal fraud committed by the SuttonPark and Dorchester Borrowers and the SuttonPark Servicer.

396.    In particular, each of Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital had actual knowledge of the fraud for the reasons above, and because each of the 777 Entity Defendants was controlled by Wander and Pasko, as well as King and A-CAP, and pursuant to the aforementioned March 2023 agreement, every material decision by 777 Partners and its subsidiaries and affiliates must be approved by King and A-CAP in advance including, on information and belief, the decisions to commit fraud alleged herein.  King and A-CAP knew of

the fraud by virtue of the close relationship between A-CAP and 777 Partners and ACAP's assistance in the affairs of 777 Partners.

397.    Each of Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital substantially assisted the fraud in the following ways:

a.   SuttonPark Capital owned (or was supposed to own) all of the receivables that were allocated to the SuttonPark Borrower and Dorchester Borrower, SuttonPark Capital employees including Bennett and Adnani directly received information from the SuttonPark Servicer stating that certain receivables were not eligible to be pledged as Collateral (either because they were double-pledged, never purchased, previously sold, or otherwise) and had the ability and responsibility to access and review the rest of those servicing notes in MP Fin, and SuttonPark Capital employees Bennett and Adnani uploaded the Compliance Reports to Leadenhall and communicated with Leadenhall about them, at least until A-CAP took over in March or April 2023.

b.   777 Partners and 600 Partners provided substantial assistance because Bennett and Adnani acted in part in their capacity as employees of 777 Partners' and 600 Partners' Capital Markets group in taking the actions above, while they were also employees of SuttonPark Capital, and Bennett and Adnani did not act without being personally directed to do so by Wander, who jointly controlled 777 Partners and 600 Partners with Pasko.

c.   Wander personally made numerous intentional, material misrepresentations to Leadenhall in telephonic, e-mail, and text message communications with representatives of Leadenhall with the intent that Leadenhall would rely on

those statements in extending or maintaining debt, forbearing from exercising their rights to demand repayment and/or compliance with other requirements of the LSA and other transaction documents, including to pledge adequate Collateral "free and clear," and forbearing from filing suit and publicly exposing the fraudulent scheme. Those misrepresentations included, but were not limited to, claims that the double-pledging resulted from a computer glitch or "mistake" rather than knowing and intentional fraudulent activity and promises to reconcile receivables, promises to find substitute deals to compensate for Collateral shortfalls, and/or promises to repay some or all of his companies' debts to Leadenhall, which were knowingly false and fraudulent at the time because Wander had no intention or ability to perform those promises at the time they were made.

d. Pasko personally signed the Compliance Reports issued by SuttonPark Servicer on behalf of the SuttonPark and Dorchester Borrowers that contained actual signatures, including those listed on Exhibit 6 for the months November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022, as well as the pro forma compliance reports that were transmitted with the Borrowing Requests and assignments of receivables discussed above.

e. A-CAP removed the 777 Partners and SuttonPark Capital employees who were responsible for reviewing detail on purported Collateral and MP Fin and submitting Compliance Reports to Leadenhall—Bennett and Adnani—from their offices, and agreed with 777 Partners that the Capital Markets group,

including Bennett and Adnani, would report to A-CAP Chief Operating Officer Mike Saliba, after which 777 Partners, under the direct supervision of A-CAP, continued submitting false and fraudulent Compliance Reports from April 2023 through November 2023. Further, A-CAP represented to Leadenhall during restructuring negotiations that 777 Partners had sources of liquidity other than A-CAP that 777 Partners could and/or would use to repay its obligations to Leadenhall, which A-CAP knew was false at the time and said with the intent that Leadenhall would rely on those statements in forbearing from exercising rights under the LSA and other transaction documents and in forbearing from filing suit and publicly exposing the fraudulent scheme. Additionally, and separate from A-CAP's direct participation in the transmission of false and fraudulent Compliance Reports, A-CAP aided and abetted the predicate acts of mail and wire fraud committed directly by Wander, Pasko, and the 777 Entity Defendants that are RICO Defendants, by strategically injecting capital into the 777 Entity Defendants' operations to retain the appearance of solvency and continue carrying out the fraud, all while knowing that the fraud was ongoing.

f.  King personally was responsible for directing that Saliba and A-CAP employee Carson McGuffin, among others, physically move into 777 Partners' offices in March 2023, for entering into the agreement with 777 Partners providing that the Capital Markets Group, including Bennett and Adnani, would report to Saliba and A-CAP going forward, as they continued to submit false and fraudulent compliance reports, and for directing A-CAP to make false

representations to Leadenhall during restructuring negotiations to perpetuate the scheme and prevent or delay its exposure.

398.    As a result of 777 Partners, 600 Partners, SuttonPark Capital, Pasko, A-CAP, and King aiding and abetting Wander's, the SuttonPark Borrower's, Dorchester Borrower's, and SuttonPark Servicer's fraud, Plaintiffs have suffered damages in an amount to be determined at trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

**TENTH CLAIM FOR RELIEF**
**(Unjust Enrichment Against All Defendants)**

399.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

400.    By reason of the foregoing conduct—including defrauding Plaintiffs and willfully breaching their agreements with Plaintiffs as alleged herein—Defendants have profited and enriched themselves unjustly at the expense and detriment of Plaintiffs.

401.    Defendants should not be permitted, in equity and good conscience, to retain for themselves any funds wrongfully obtained from Plaintiffs.

402.    By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at a trial but not less than $609,529,966.82, plus interest, costs, and attorneys' fees.

**ELEVENTH CLAIM FOR RELIEF**
**(Actual Fraudulent Transfer Under N.Y. Debtor and Creditor Law § 273(a)(1)**
**Against 777 Partners, Wander, Pasko, A-CAP)**

403.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

404.    By virtue of the Guaranty Agreement, Leadenhall is, and was during all relevant periods, a creditor of 777 Partners.

152

405.    Since December 2020, A-CAP has loaned nearly $170 million to Wander's personal stockholding vehicle, JARM, so that Wander could, *inter alia*, effect the purchase of all of Pasko's shares in 777 Partners.

406.    Although the JARM loan initially an obligation of JARM secured by a lien on JARM's assets, 777 Partners, Wander, Pasko, and A-CAP subsequently agreed to modify the terms of the JARM loan such that it would become an obligation of 777 Partners secured by 777 Partners' assets, without adequate consideration.  In short, the loan was "moved" from Wander's personal vehicle to 777 Partners, which it encumbered by a grant of a lien in the assets of that entity.

407.    In undertaking this arrangement, 777 Partners, Wander, Pasko, and A-CAP acted with actual intent to defraud 777 Partners' other creditors, as evidenced by the following factors enumerated in N.Y. Debtor and Creditor Law § 273(b):

   a.  The restructuring of Haymarket's JARM loan to become an obligation of 777 Partners secured by a purported first lien on the assets of 777 Partners, rather than the assets of JARM including its junior equity interests in the assets of 777 Partners, involved insiders of 777 Partners, including Wander, Pasko, and A-CAP/King;

   b.  Before the transaction took place, 777 Partners had been sued or threatened with suit by creditors including Leadenhall;

   c.  777 Partners received no or inadequate consideration for incurring the debt or the obligation, to provide security to A-CAP, in the form of a lien on its assets, and thus the value of consideration received by 777 Partners was not reasonably equivalent to the amount of the obligation incurred;

    d.   777 Partners was insolvent or became insolvent shortly after the obligation was incurred;

    e.   These transactions in early 2024 occurred both shortly before and shortly after substantial debts were incurred by 777 Partners, including their mounting debt to A-CAP that reached the billions of dollars as of 2023, and their continuing series of loans to Everton to keep the potential acquisition alive through April and into May 2024.

408.   By reason of the foregoing, 777 Partners' payment obligation to A-CAP in connection with the JARM loan and its grant of a lien on its assets as security for the JARM loan should be avoided, and any payments made by 777 Partners to A-CAP on the JARM loan rescinded, pursuant to N.Y. Debtor & Creditor Law § 276(a)(1), to the extent necessary to satisfy Leadenhall's claims against 777 Partners.

**TWELFTH CLAIM FOR RELIEF**
**(Constructive Fraudulent Transfer Under N.Y. Debtor and Creditor Law §§ 273(a)(2), 274**
**Against 777 Partners, Wander, Pasko, A-CAP )**

409.   Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

410.   By virtue of the Guaranty Agreement, Leadenhall is, and was during all relevant periods, a creditor of 777 Partners.

411.   In incurring debt to A-CAP and granting A-CAP a lien on its assets to secure a loan made to and for the benefit of JARM, 777 Partners incurred an obligation without receiving a reasonably equivalent value in exchange for the obligation; indeed, 777 Partners received no consideration for the lien.

412.    When 777 Partners incurred the obligations of the JARM loan, 777 Partners was engaged in a business for which its remaining assets were unreasonably small in relation to its business.

413.    Additionally, when 777 Partners incurred the obligations of the JARM loan, 777 Partners intended to incur, or believed or reasonably should have believed, that it would incur debts beyond 777 Partners' ability to pay as they became due.

414.    Additionally, when 777 Partners incurred the obligations of the JARM loan, 777 Partners was insolvent and/or became insolvent as a result of the transfer or obligation.

415.    In the alternative, when 777 Partners incurred the obligations of the JARM loan, even if 777 Partners received reasonably equivalent value, 777 Partners made the transfer to an insider, A-CAP, for an antecedent debt—A-CAP's existing massive loans to 777 Partners that effectively gave A-CAP unlimited leverage to impose its will on 777 Partners, which it knew to be insolvent.

416.    By reason of the foregoing, 777 Partners' payment obligation to A-CAP in connection with the JARM loan and its grant of a lien on its assets as security for the JARM loan should be avoided, and any payments made by 777 Partners to A-CAP on the JARM loan rescinded, pursuant to N.Y. Debtor & Creditor Law § 276(a)(1), to the extent necessary to satisfy Leadenhall's claims against 777 Partners.

## **PRAYER FOR RELIEF**

417.    Plaintiffs pray for the following relief:

a)    An award of monetary damages on Plaintiffs' RICO claims in the accelerated amount of $609,529,966.82 plus interest;

b)    An award of monetary damages on Plaintiffs' RICO claims in the amount of fees and costs incurred by Plaintiffs in attempting to collect the accelerated amount;

c)  An award of monetary damages on Plaintiffs' other claims in an amount to be determined at trial by jury;

d)  An order enjoining Defendants violating their obligations under the Agreements;

e)  An order declaring the rights and duties of the parties as indicated herein;

f)  An order voiding fraudulent transfers and rescinding payments related thereto;

g)  An award of pre- and post-judgment interest;

h)  An award of all reasonable fees, costs, and expenses, including attorneys' fees and

i)  An award of such other and further relief as the Court deems just and proper.

Dated: August 30, 2024
New York, New York

KING AND SPALDING LLP
*/s/ Leigh Nathanson*
Craig Carpenito
Leigh M. Nathanson
Brian Donovan
Michael Taintor
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
lnathanson@kslaw.com
bdonovan@kslaw.com
mtaintor@kslaw.com

*Attorneys for Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC*