**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LEADENHALL CAPITAL PARTNERS LLP
and LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,

                    Plaintiffs,

   vs.

JOSH WANDER, STEVEN PASKO,
KENNETH KING, 777 PARTNERS LLC, 600
PARTNERS LLC, SPLCSS III LLC, SIGNAL
SML 4 LLC, INSURETY AGENCY
SERVICES LLC, DORCHESTER
RECEIVABLES II LLC, SUTTONPARK
CAPITAL LLC, SIGNAL MEDICAL
RECEIVABLES LLC, INSURETY CAPITAL
LLC, SUTTONPARK SERVICING LLC,
SIGNAL SERVICING LLC, INSURETY
SERVICING LLC, and ADVANTAGE
CAPITAL HOLDINGS LLC,

                    Defendants.

Civil Action No. 1:24-cv-03453 (JGK)

 

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**JOSH WANDER'S MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

Table of Authorities.................................................................................................. ii

Preliminary Statement.............................................................................................1

Statement of Relevant Facts...................................................................................3

Argument..................................................................................................................8

    I.     THE AMENDED COMPLAINT DOES NOT ALLEGE A BASIS FOR LONG-ARM JURISDICTION OVER MR. WANDER ..............8

    II.    THE COMPLAINT DOES NOT SUPPORT, AND IN FACT REFUTES, PLAINTIFFS' OTHER THEORIES OF PERSONAL JURISDICTION ................................................................................13

    III.   ALL OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR LACK OF SUBJECT JURISDICTION AND FAILURE TO STATE A CLAIM ...............................................................................17

CONCLUSION .......................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
    356 F. Supp. 3d 379 (S.D.N.Y. 2019)................................................................................16, 17

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)........................................................................................................9

*Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc.*,
    No. 09 Civ. 130 (LTS) (JCF), 2010 WL 2835543 (S.D.N.Y. July 1, 2010)............................11

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)..................................................................................................................13

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)....................................................................................................................8

*Gilbert v. Indeed, Inc.*,
    513 F. Supp. 3d 374 (S.D.N.Y. 2021)........................................................................................10

*Giuliano v. Barch*,
    No. 16 CV 0859 (NSR), 2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) .................................14

*Gordian Group, LLC v. Syringa Exploration, Inc.*,
    168 F. Supp. 3d 575 (S.D.N.Y. 2016)..........................................................................................9

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*,
    No. 20-CV-00967 (LJL), 2021 WL 918556 (S.D.N.Y. Mar. 10, 2021)................11, 14, 16, 17

*Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*,
    632 F. Supp. 3d 562 (S.D.N.Y. 2022)..................................................................................13, 14

*Paterno v. Laser Spine Inst.*,
    998 N.Y.S.2d 720 (2014)............................................................................................................9

*Shaffer v. Heitner*,
    433 U.S. 186 (1977)..................................................................................................................13

*William Wrigley Jr. Co. v. Waters*,
    890 F.2d 594 (2d Cir. 1989)......................................................................................................13

*Zanotti v. Invention Submission Corp.*,
    No. 18 Civ. 5893 (NSR), 2020 WL 2857304 (S.D.N.Y. June 2, 2020) .................................10

## TABLE OF AUTHORITIES—Continued

**Page**

**Statutes & Rules**

CPLR § 302(a)(1) ............................................................................................................2, 9

Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6) ................................................................1

Defendant Josh Wander respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6), to dismiss the Amended Complaint ("Complaint" or "AC") of Plaintiffs Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life") (collectively, "Leadenhall") for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim.

### Preliminary Statement

This action arises out of a secured credit facility that Leadenhall and certain company defendants entered into in May 2021. Leadenhall was the lender. The borrower defendants are a group of entities allegedly controlled by defendants 777 Partners and 600 Partners, both of which are based in Miami. Josh Wander is a Florida resident and the co-founder and former co-Managing Partner of 777 Partners. Leadenhall alleges that from the inception of the facility through January 2024, the defendants falsely represented that the assets pledged as collateral to Leadenhall were "free and clear" of any "adverse claims" when in fact they were not because the borrowers had double-pledged those assets to other lenders and/or never owned them in the first place. After two attempts, Plaintiffs have failed to plead any basis for the exercise of personal jurisdiction over Mr. Wander as to any of their claims. On this ground alone – although there are others – the Complaint should be dismissed in its entirety as against Mr. Wander.

Although the parties to the loan and guaranty agreements consented to jurisdiction in New York, Mr. Wander is neither a party nor a signatory to either agreement. The original complaint alleged two purported bases for personal jurisdiction over Mr. Wander, and those bases are re-alleged in the Amended Complaint. However, both are defeated by Plaintiffs' own allegations. First, Plaintiffs attempt to establish long-arm jurisdiction based on a handful of New York contacts in March and April 2024, *after* Leadenhall had declared the borrowers in default, when the parties

were trying to negotiate a forbearance agreement "in a last-ditch attempt to stave off this lawsuit." AC ¶ 178. To establish jurisdiction over a non-domiciliary defendant under the relevant long-arm provision, CPLR § 302(a)(1), however, a plaintiff's causes of action must arise from the defendant's New York contacts, and here they do not.

Presumably aware of this impediment, Plaintiffs offer an alternative theory: they claim Mr. Wander was an alter ego of the defendant entities who contractually consented to jurisdiction in New York. Plaintiffs' breach of contract claims against Mr. Wander rely on their alter ego theory as well. But Plaintiffs do not allege any facts demonstrating that Mr. Wander "dominated" or "controlled" any of those entities. In fact, they allege that he did not. According to the Complaint, defendants A-CAP and King – whom Leadenhall calls the "Wizard of Oz behind the 777 Partners' curtain" – have "total control and dominion over" the 777 Entity Defendants." AC ¶¶ 13, 194. Because courts are generally reluctant to pierce the corporate veil, Leadenhall's alter ego theory would be an uphill battle in the best circumstances. But it is a non-starter here, at least as to Mr. Wander, given Leadenhall's theory that someone other than Mr. Wander was calling the shots.

After Mr. Wander moved to dismiss for lack of personal jurisdiction, Leadenhall filed an amended complaint that repeats the original flawed theories and alleges two new ones. But Plaintiffs' new allegations do not fix the problem. They now allege that, during the relevant period, 777 Partners had offices in New York and they allege, on "information and belief," that Mr. Wander "conducted the business of 777 Partners in least in part from its New York office." AC ¶ 42. But personal jurisdiction cannot be established on information and belief. And even if it could, Plaintiffs do not allege that their claims arise from work that Mr. Wander did in the New York offices. Indeed, they do not allege that Mr. Wander – or any of the other defendants, for that matter – did any work in 777 Partners' New York offices that related to the Leadenhall credit facility.

The Complaint also alleges that Mr. Wander "is so closely related" to the entities that signed the LSA "that he is bound by the LSA's forum selection clause." AC ¶ 42. But the "closely related" theory has repeatedly been rejected by courts in this jurisdiction as a basis for binding a non-signatory to a forum selection clause. In any event, this theory, like the "domination and control" theory, requires an alter ego relationship between the signatories and the non-party, which Leadenhall does not and cannot allege.

Because Leadenhall has failed to allege a basis for the exercise of personal jurisdiction over Mr. Wander in this case, the Complaint should be dismissed in its entirety as against Mr. Wander. In addition, for the reasons set forth in the moving brief of the 777 Entity Defendants, the Complaint should be dismissed in its entirety for lack of subject jurisdiction and failure to state any claims for relief.

## Statement of Relevant Facts

Plaintiff Leadenhall Capital is a London-based asset management company. Plaintiff Leadenhall Life is an investment company based in Dublin, Ireland. Here, as in the Complaint, both Plaintiffs are referred to collectively as Leadenhall. AC ¶¶ 23-24 and p. 1.

Defendant 777 Partners is an investment firm organized as a limited liability company under Delaware law with its principal place of business in Miami. AC ¶ 25. Mr. Wander and defendant Steven Pasko are co-founders and former Managing Partners of 777 Partners and both reside in Miami. AC ¶¶ 31-32. Defendant 600 Partners is a private equity firm, also organized as a limited liability company under Delaware law with its principal place of business in Miami. AC ¶ 26. Mr. Pasko is the co-founder and sole Managing Partner of 600 Partners. AC ¶ 32. All of the entity defendants that are allegedly owned (directly or indirectly) and controlled by 777 Partners and 600 Partners, except for SuttonPark Servicing, have their principal place of business in Miami. AC ¶¶ 33-36. Defendant SuttonPark Servicing has its principal place of business in New York.

Defendant A-CAP is based in New York and defendant King, who allegedly controls A-CAP, resides in New York. AC ¶¶ 37-38.[1]

In 2021, Leadenhall entered into a credit facility with 777 Partners, 600 Partners, and other entities they allegedly control. The terms of the credit facility are "embodied in a suite of contracts" centered around the Loan and Security Agreement (the "LSA"), which was executed in May 2021. AC ¶ 49. Mr. Wander is neither a party nor a signatory to the LSA or any of the related contracts. None of the contracts are alleged to have been negotiated or executed in New York.

The Borrowers are defendants SPLCSS III LLC (defined as the "SuttonPark Borrower"), Dorchester Receivables II LLC (defined as the "Dorchester Borrower"), Signal SML 4 LLC (defined as the "Signal Borrower"), and Insurety Agency Services LLC (defined as the "Insurety Borrower") (collectively, the "Borrowers"). Other defendant entities served as Sellers and Servicers under the facility. The borrower-side entities were organized into four Borrower Groups, each consisting of a Borrower, Seller and Servicer: (i) the SPLCSS Borrower Group (consisting of the SuttonPark Borrower, SuttonPark Capital as Seller, and SuttonPark Servicing as Servicer); (ii) the Dorchester Borrower Group (consisting of the Dorchester Borrower, SuttonPark Capital as Seller, and SuttonPark Servicing as Servicer); (iii) the Insurety Borrower Group (consisting of the Insurety Borrower, Insurety Capital as Seller, and Insurety Servicing as Servicer); and (iv) the Signal Borrower Group (consisting of the Signal Borrower, Signal Medical as Seller, and Signal

---

[1] In two places, Plaintiffs mistakenly state that Mr. Wander was also a co-founder and Managing Partner of 600 Partners. AC ¶¶ 5, 31. He was not. As the Complaint accurately alleges in other paragraphs, 600 Partners was ultimately owned by two members: MTCP LLC, whose sole member is Mr. Pasko, and Mr. Pasko himself. AC ¶¶ 25, 26, 28.

Servicing as Servicer).  AC ¶ 50.

The LSA was "structured as a secured credit facility" and Leadenhall "obtained [a] first-priority security interest in all of the assets of each Borrower."  AC ¶¶ 53, 56.  The contracts governing the facility required that "the Collateral securing the debt was free and clear of any Adverse Claims," and "if at any time there was insufficient Collateral available free and clear to secure all outstanding obligations, the Borrowers would be in default."  AC ¶ 98.  The Borrowers had to submit a Compliance Report with each funding request, as well as a Monthly Report, affirming that the representations and warranties in the LSA – including with respect to the pledged collateral – remained true and correct as of the date of the report.  AC ¶¶ 62-63.

In September 2022, Leadenhall "received an anonymous tip" alleging that the "Collateral pledged for the benefit of the Lenders either did not exist or was pledged to another third-party lender."  AC ¶ 105.  In the wake of the anonymous tip, Leadenhall "conducted a series of calls" with Mr. Wander and others seeking "additional detail on assets pledged as Collateral to Leadenhall," and met with Mr. Wander and others at 777 Partners' offices "on-site in Miami." Following the on-site visit, Leadenhall and the Borrowers "continued to correspond over email and telephone" concerning the pledged assets.  AC ¶¶ 107-117.  The Complaint does not allege that the parties met in New York, or that Mr. Wander was ever in New York, during this time period.

In March 2023, Leadenhall learned that some of the assets that were pledged to Leadenhall had also been pledged to another third-party creditor.  AC ¶¶ 119-120.  In the months following that discovery, Leadenhall corresponded with Mr. Wander by letter and email, had phone calls with Mr. Wander and others, and "continued to visit 777 Partners' offices" to meet with Mr. Wander and others.  AC ¶¶ 122-123, 130-131, 135, 139.  The Complaint does not allege that the parties met in New York, or that Mr. Wander was ever in New York, during this time period.

In April 2023, Leadenhall learned that A-CAP "had an all asset lien" on the assets of 777 Partners." AC ¶ 198. According to the Complaint, A-CAP was more than just a lender; it exercised "total control and dominion over" the 777 Entity Defendants, AC ¶ 194, including during the alleged fraudulent scheme against Leadenhall, AC ¶¶ 198-207. The Complaint further alleges that A-CAP was "controlling Wander's every move," AC ¶¶ 161, 182, and that 777 Partners did "not control its own operations and ability to perform under the LSA" but, rather, was "controlled by A-CAP and King." AC ¶ 192.

The Complaint contains numerous examples of A-CAP's alleged "control and dominion" over the 777 Entity Defendants. For example, according to the Complaint, A-CAP and King have "day-to-day control of the 777 entities" pursuant to an "express agreement"; A-CAP installed its employees, including its CEO, on site at 777 Partners; A-CAP "direct[s] the 777 Entity Defendants' ownership and management as to what decisions to make and how to implement them"; A-CAP "decide[s] which of the 777 Defendants' portfolio companies should be funded or not" and "which of the 777 Defendants' creditors to pay or not to pay"; and A-CAP has converted its loan positions to ownership stakes in the 777 Defendants' portfolio companies without adequate consideration. AC ¶ 194. Leadenhall describes A-CAP as the puppeteer" of 777 Partners" and alleges that "nothing happens at 777 Partners . . . without A-CAP's approval." AC ¶ 199. In the summer of 2023, A-CAP "stepped directly into the fray and offered Leadenhall" a fourth-priority lien on the 777 Partners' assets, which Leadenhall rejected. AC ¶ 211.

On November 29, 2023, after purportedly learning that the problem went beyond the double-pledging of collateral, Leadenhall served a Notice of Breach on 777 Partners, 600 Partners, and the SuttonPark and Dorchester Borrowers. AC ¶¶ 141, 143.

Leadenhall alleges that, from the inception of the facility through November 2023, the

6

SuttonPark and Dorchester Borrowers submitted false Compliance Reports in an effort to conceal the double-pledging problem. The Complaint alleges that "[t]he 777 Defendants continued to send false Compliance Reports to Leadenhall through January 2024," at which point "they issued restated Compliance Reports disclosing the full extent of the Collateral Deficiency." AC ¶¶ 145, 208. On March 12, 2024, Leadenhall notified the Borrowers that Events of Default "had occurred and were continuing." AC ¶ 176. And on March 15, 2024, Leadenhall notified the Borrowers that it "was exercising its right to accelerate all outstanding debt obligations." AC ¶ 177.

In March and April 2024, "in a last-ditch attempt to stave off this lawsuit, Leadenhall entered into negotiations" with the Borrowers concerning a "Forbearance Agreement," pursuant to which the Lenders "would temporarily forgo exercising their default-related rights and remedies in exchange for 777 Partners' agreeing to pay back the outstanding debt pursuant to an amortization schedule." AC ¶ 178. Leadenhall alleges that "over the course of these negotiations," Mr. Wander "called Leadenhall from New York City" on at least three occasions and that, "on at least one occasion," Mr. Wander said "he was working out of A-CAP's offices in New York City." AC at 61 n.8 and ¶ 191. The restructuring negotiations were ultimately unsuccessful, allegedly because A-CAP made various threats and demands and "was holding up any negotiated repayment schedule." AC ¶¶ 180, 182, 190.

Leadenhall commenced this action in early May 2024, asserting nine claims for relief, only four of which were directed at Mr. Wander. In September 2024, after Defendants moved to dismiss, Leadenhall filed an amended complaint asserting twelve claims for relief:

- In Counts One through Four (Breach of Contract) Leadenhall alleges that Defendants breached the LSA and related agreements.

- In Counts Five and Six (Civil RICO and RICO Conspiracy), Plaintiffs allege that Defendants engaged in a racketeering scheme, and committed mail and wire fraud, by "making knowingly and intentionally false and fraudulent statements through the use

of interstate wires, by misrepresenting the existence, encumbrance, or value of Collateral." AC ¶ 362.

- In Counts Seven (Fraudulent Misrepresentation), Eight (Civil Conspiracy to Commit Fraud), and Nine (Aiding and Abetting Fraud), Leadenhall alleges that Defendants "engaged in the pattern . . . of fraudulently misrepresenting to Plaintiffs the value of Collateral they owned 'free and clear of any Adverse Claims,' which statements were false and fraudulent," either because they "had double-pledged the Collateral" or because they never owned it at all.  AC ¶ 385.

- In Count Ten (Unjust Enrichment), Leadenhall alleges that, through the conduct alleged in the other counts, the defendants "have profited and enriched themselves unjustly." AC ¶ 400.

- In Counts Eleven and Twelve (Actual and Constructive Fraudulent Transfer), Plaintiffs allege that A-CAP exercised its control rights over 777 Partners to advantage itself over other creditors by "reallocating" or "uptiering" a $170 million loan that was originally secured by Mr. Wander's personal assets to a first-priority lien on 777 Partners' assets, with the intent to defraud Leadenhall and other creditors.  AC ¶¶ 225, 406.

As against Mr. Wander, the Amended Complaint alleges two new purported grounds for personal jurisdiction: (i) the fact that 777 Partners maintained offices in New York "during the relevant period"; and (ii) Mr. Wander's alleged close relationship with the defendants who entered into the LSA.  AC ¶ 42.  Unlike in the original complaint, Leadenhall named Mr. Wander on all of its claims, including its claims for breach of contracts to which Mr. Wander admittedly was neither a party nor a signatory.

## **Argument**

**I.   THE AMENDED COMPLAINT DOES NOT ALLEGE A BASIS FOR LONG-ARM JURISDICTION OVER MR. WANDER**

The claims against Mr. Wander should be dismissed because, even crediting all of Plaintiffs' allegations, Mr. Wander is not subject to personal jurisdiction in New York.

As the Complaint correctly alleges, Mr. Wander resides in Florida.  AC ¶ 31.  Plaintiffs do not claim a basis for general jurisdiction, nor can they.  *See Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the

8

individual's domicile.").  Instead, Plaintiffs attempt to establish that he is subject to specific jurisdiction under New York's long-arm statute.  Although they do not cite the long-arm statute or any specific subsection, they presumably rely on section 302(a)(1), which permits the exercise of personal jurisdiction over a non-domiciliary who "transacts any business within the state."  N.Y. C.P.L.R. § 302(a)(1).

Under section 302(a)(1), specific jurisdiction exists over non-domiciliary defendants only if (i) they "transact[ed] any business" in New York, and (ii) the plaintiffs' cause of action "aris[es] from such a business transaction."  *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation omitted).  *See Paterno v. Laser Spine Inst.*, 998 N.Y.S.2d 720, 727 (2014) ("Our long-arm statute requires that the cause of action arise from the non-domiciliary's actions that constitute transaction of business.").  Based on Plaintiffs' pleading, the Court lacks jurisdiction over Mr. Wander in this case because the "arising from" requirement has not been and cannot be met.

Where the alleged contacts post-date the transaction or conduct on which the claim is based, those contacts generally do not support the exercise of long-arm jurisdiction.  *See Paterno*, 998 N.Y.S.2d at 379 (because "plaintiff's claim is based on the June and August surgeries in Florida," defendant's "[c]ontacts after this date cannot be the basis to establish defendant's relationship with New York" for purposes of section 302(a)(1)) (citing *Harlow v. Children's Hosp.,* 432 F.3d 50, 62 (1st Cir. 2005)); *Gordian Group, LLC v. Syringa Exploration, Inc.*, 168 F. Supp. 3d 575, 587 (S.D.N.Y. 2016) (defendant's attendance at a meeting in New York after execution of the contract at issue was insufficient to create personal jurisdiction).  This temporal and substantive disconnect exists here.

Mr. Wander's only alleged New York contacts involving Leadenhall occurred in March and

April 2024, when the parties were trying to negotiate a forbearance agreement "in a last-ditch attempt to stave off this lawsuit." AC ¶ 178. Plaintiffs allege that, in the course of those negotiations, Mr. Wander "called Leadenhall from New York City" at least three times and, "on at least one occasion," he "stated that he was working out of A-CAP's offices in New York City." AC at 61 n.8 and AC ¶ 191. Even assuming these few alleged contacts constitute the transaction of business in New York – and they likely do not – they still would not support long-arm jurisdiction because none of Leadenhall's claims arise out of the forbearance negotiations that took place in the spring of 2024. Rather, Leadenhall's claims arise out of the LSA and related "suite of contracts" that the parties entered into in May 2021. By March 2024, Leadenhall had already declared the borrowers in default.

Leadenhall also alleges that "during the relevant period, 777 Partners maintained offices" in New York and further alleges – solely "[u]pon information and belief" – that Mr. Wander "conducted the business of 777 Partners at least in part from its New York office." AC ¶ 42. But allegations based on information and belief cannot establish a basis for personal jurisdiction. *See, e.g.*, *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 415 n.21 (S.D.N.Y. 2021) ("Plaintiff's 'belief as to Schwartz's visit to New York in February 2016 [was] also insufficient to meet her burden of establishing jurisdiction."); *Zanotti v. Invention Submission Corp.*, No. 18 Civ. 5893 (NSR), 2020 WL 2857304, at *16 (S.D.N.Y. June 2, 2020) ("Conclusory allegations showing the presence of jurisdiction, particularly those stated only upon information and belief, are insufficient to establish that the court has personal jurisdiction over the defendant.") (dismissing amended complaint for lack of personal jurisdiction).

Even if that were not the case, this new allegation would not establish long-arm jurisdiction under CPLR § 302(a)(1) because Plaintiffs do not allege that their claims arise out of any business

that Mr. Wander transacted out of the New York offices.  Indeed, they do not allege that Mr. Wander – or anyone else, for that matter – did any work relating to Leadenhall in 777 Partners' New York offices.  Absent that nexus, this allegation does not fix Leadenhall's jurisdictional problem.  *Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc.*, No. 09 Civ. 130 (LTS) (JCF), 2010 WL 2835543, at *4 (S.D.N.Y. July 1, 2010) (dismissing for lack of personal jurisdiction when the "New York activity relied upon by Plaintiff . . . [was] unrelated to the claims asserted or injuries alleged in the Complaint.").

Indeed, Leadenhall has not alleged a basis for long-arm jurisdiction for any of its twelve claims, because none arises from Mr. Wander's handful of alleged New York contacts in March and April of 2024.  *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20-CV-00967 (LJL), 2021 WL 918556 at *11 (S.D.N.Y. Mar. 10, 2021) ("Plaintiff must separately allege personal jurisdiction for each of the sixteen causes of action brought against" the defendants.).

In Counts One through Four, Leadenhall alleges that Defendants breached the LSA and related loan agreements because they "failed … to maintain the Collateral 'free and clear of any Adverse Claim.'" AC ¶¶ 317, 319.  But the forbearance negotiations occurred after Leadenhall served its Notice of Default on March 12, 2024.  AC ¶¶ 176-78, 319.

In Counts Five and Six, Leadenhall alleges that Mr. Wander and others engaged in a racketeering scheme, and committed mail and wire fraud, by "making knowingly and intentionally false and fraudulent statements through the use of interstate wires, by misrepresenting the existence, encumbrance, or value of Collateral." AC ¶ 362.  But the RICO claims are based on the allegedly false and fraudulent Compliance Reports that were sent to Leadenhall "beginning in 2021 and throughout 2022 and 2023."  AC ¶ 363.  In January 2024, the defendants "delivered revised Compliance Reports for the preceding months" that allegedly revealed "the extent to

11

which" Mr. Wander and others "had lied all along about assets ostensibly pledged" to Leadenhall. AC ¶ 145.  Plaintiffs' RICO claims therefore do not arise out of the spring 2024 forbearance negotiations.

Similarly, in Count Seven and Eight, Plaintiffs allege that Mr. Wander and other defendants "engaged in the pattern . . . of fraudulently misrepresenting to Plaintiffs the value of Collateral they owned 'free and clear of any Adverse Claims,' which statements were false and fraudulent," either because they "had double-pledged the Collateral" or because they never owned it at all.  AC ¶ 385.  The fraudulent misrepresentation claims, like the RICO claims, are based on the allegedly false statements in the Compliance Reports.

Counts Nine, for Aiding and Abetting Fraud, and Ten, for unjust enrichment, are based on the same alleged conduct that underlies the fraudulent misrepresentation and RICO claims.

Counts Eleven and Twelve, for Actual and Constructive Fraudulent Transfer, concern a specific "uptiering" transaction in which King allegedly "caused" Wander to prioritize one of A-CAP's liens ahead of the liens of other creditors.  These claims are directed primarily against A-CAP and King, who purportedly exercised their control over 777 Partners to achieve this result. To the extent these claims concern Mr. Wander, the Complaint does not allege any New York contacts relating to the transaction at issue.  AC ¶¶ 219-229.

In short, because Mr. Wander's alleged New York contacts relate only to the spring 2024 forbearance negotiations, and because none of Leadenhall's claims arises out of the parties' forbearance negotiations, Mr. Wander's handful of alleged New York contacts do not support the exercise of long-arm jurisdiction.

In addition, and for the same reason, the exercise of jurisdiction over Mr. Wander in this case would violate the Due Process Clause.  To establish personal jurisdiction over a non-resident

12

defendant, due process requires "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977). As the Supreme Court has held: "[T]his fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations and citation omitted). As discussed above, Leadenhall's claims and alleged injuries do not arise out of or relate to the parties' forbearance negotiations in the spring of 2024, or Mr. Wander's alleged presence in the New York office.

Because Plaintiffs have not established a basis for exercising personal jurisdiction over Mr. Wander, either under New York's long-arm statute or pursuant to federal due process, the claims against him should be dismissed.

## II. THE COMPLAINT DOES NOT SUPPORT, AND IN FACT REFUTES, PLAINTIFFS' OTHER THEORIES OF PERSONAL JURISDICTION

Plaintiffs also attempt to establish personal jurisdiction over Mr. Wander based on the forum selection clause in the LSA, even though he is neither a party nor a signatory to that agreement. Leadenhall alleges that Mr. Wander should be bound by the forum selection clause both "by virtue of his domination and control over," and "because he is so closely related to," the Defendant entities who are parties to the LSA. AC ¶ 42. Both theories would require Plaintiffs to allege that Mr. Wander was an alter ego of the entity defendants. But the Amended Complaint, even more so than the original complaint, belies any such allegation.

As a general rule, courts are hesitant to pierce the corporate veil because the law "allows individuals to incorporate for the very purpose of avoiding personal liability." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989). *See also*, *Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 570 (S.D.N.Y. 2022) ("In considering whether an

13

individual and a corporate entity are alter egos of one another, '[i]t is well settled that . . . courts are reluctant to disregard the corporate entity.'") (quoting *Wrigley*). Accordingly, the bar for establishing jurisdiction over an individual based on an alter ego theory is high: "[T]he corporate veil will be pierced only when it can be demonstrated that the '[corporate] form has been used to achieve fraud, or when the corporation has been so dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own.'" *Id.* (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)).

Leadenhall alleges no facts demonstrating that Mr. Wander was the alter ego of any of the 777 Entity Defendants. In a footnote, Plaintiffs allege "upon information and belief" that Mr. Wander "freely transfer[s] assets among a web of trade names without regard to corporate or legal formalities." AC at 74 n.10. But no supporting facts are alleged. The conclusory nature of this allegation is reason enough to reject Plaintiffs' alter ego theory of personal jurisdiction. *See, e.g.*, *HSM,* 2021 WL 918556 at *10 (conclusory allegations insufficient to establish alter ego jurisdiction as to individual defendant); *Giuliano v. Barch*, No. 16 CV 0859 (NSR), 2017 WL 1234042, at *12 (S.D.N.Y. Mar. 31, 2017) (granting motion to dismiss for lack of personal jurisdiction because plaintiff's allegations that defendants "exercised complete domination and control" were "conclusory or made on information and belief.").

In *Liberty Highrise*, the Court held that Plaintiffs' allegations did not support alter ego status as to the individual defendant because plaintiffs did not allege facts showing a commingling of personal and corporate assets. As the Court in that case explained: "Evidence of financial commingling is particularly important in determining whether an individual is an alter ego of a corporation. Indeed, the Second Circuit has found clear error where district courts have held an individual principal to be an alter ego absent such evidence of financial comingling.") *Liberty*

*Highrise*, 632 F. Supp. 3d at 569-72 (collecting cases).  Here, as in *Liberty Highrise*, Plaintiffs allege no facts showing that Mr. Wander intermingled his personal assets with the assets of any of the 777 Entity Defendants.

But there is a more fundamental problem with Plaintiffs' alter ego theory.  Not only do Plaintiffs fail to allege any facts showing that Mr. Wander "dominated" and "controlled" the borrower defendants; they explicitly allege that he did not.  According to the Complaint, A-CAP and King had "total control and dominion over" the 777 Entity Defendants, AC ¶ 194, including during the alleged fraudulent scheme against Leadenhall.  AC ¶¶ 198-207.

Indeed, one of the most significant changes in the Amended Complaint is an even greater emphasis on the degree to which 777 Partners is "controlled by A-CAP and King."  AC ¶ 192.  For example, the Amended Complaint alleges – among other things – that A-CAP, pursuant to an "express agreement," has "day-to-day control of the 777 entities"; that A-CAP directs "the 777 Entity Defendants' ownership and management as to what decisions to make and how to implement them"; that A-CAP directs "how the 777 Defendants' liquidity should be used and invested"; that A-CAP installed its employees, including its CEO, on-site at 777 Partners; and that A-CAP decides "which of the 777 Defendants' creditors to pay or not to pay."  AC ¶ 194. Leadenhall calls A-CAP "the puppeteer to 777 Partners' marionette" and asserts that "nothing happens at 777 Partners . . . without A-CAP's approval."  AC ¶ 199.  In other words, Plaintiffs' conclusory assertion that Mr. Wander and Mr. Pasko "could do virtually whatever they want" with the assets of 777 Partners and its affiliates is refuted by their contradictory allegation that A-CAP

15

was running the show.  *See* AC ¶ 250.[2]

Plaintiffs' allegation that Mr. Wander "is bound by the LSA's forum selection clause" because "he is so closely related" to its signatories fares no better.  AC ¶ 42.  In recent years, courts in this jurisdiction have repeatedly rejected the "closely related to" theory as a means of exercising personal jurisdiction over non-parties to a contract based on a forum selection clause in the contract.  *See e.g.*, *HSM,* 2021 WL 918556 at *8-9; *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 394-95 (S.D.N.Y. 2019).  To the extent this theory is still viable, Leadenhall has not made the showing required to invoke it here.

Under basic principles of contract law, which apply with equal force to contractual forum selection clauses, "[a] contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the alter ego of the party."  *Arcadia*, 356 F. Supp. 3d at 390.  *See also HSM*, 2021 WL 918556 at *9 (in determining whether to bind a non-signatory to a forum selection clause, the court will "analyze whether the non-party is otherwise bound to the agreement, as for example under the ordinary law of successor liability and alter ego applicable to all other contractual provisions.").  Mr. Wander did not sign the LSA in any capacity, and he is not alleged to be (nor is he) a successor in interest to the parties that did sign in.  And as demonstrated above, alter ego liability, which is the only other justification for applying this theory, is belied by Leadenhall's allegations.

---

[2] Because the contract claims against Mr. Wander depend on Plaintiffs' allegation that he is an alter ego of the entity defendants who entered into the contracts (*see* ¶¶ AC 322, 332, 345, 354), Plaintiffs' failure to allege an alter ego relationship also warrants dismissal of Counts One through Four as against Mr. Wander.

In short, Leadenhall's attempt to establish personal jurisdiction over Mr. Wander based on the LSA's forum selection clause would require a showing of alter ego liability that cannot be squared with Leadenhall's allegations that A-CAP and King – not Mr. Wander – dominated and controlled 777 Partners. Accordingly, on the facts alleged here, exercising personal jurisdiction over Mr. Wander in this case would not comply with the CPLR or with the requirements of Due Process. *See HSM*, 2021 WL 918556 at \*13-15; *Arcadia*, 356 F. Supp. 3d at 394-95.[3]

## III. ALL OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR LACK OF SUBJECT JURISDICTION AND FAILURE TO STATE A CLAIM

Mr. Wander joins in the arguments made by the 777 Entity Defendants in support of their motion to dismiss the Complaint. For the reasons set forth in the 777 Entity Defendants' moving brief, the Complaint should be dismissed in its entirety for lack of subject matter jurisdiction and for failure to state any claims for relief.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed in its entirety as against Mr. Wander.

Dated: New York, NY
October 10, 2024

KRAMER LEVIN NAFTALIS & FRANKEL LLP

    /s/  Jordan Estes
Jordan Estes
Marjorie E. Sheldon
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

---

[3] Mr. Wander also adopts, and incorporates by reference, the arguments in Point I of the Memorandum of Law in Support of Defendant Steven Pasko's Motion to Dismiss the Complaint.

## **CERTIFICATION**

JORDAN ESTES, an attorney admitted to practice in the courts of New York, affirms under the penalties of perjury that the following is true:

1.      I am a member of the law firm of Kramer Levin Naftalis & Frankel LLP, attorneys for Defendant Josh Wander in this lawsuit and the individual with primary responsibility for filing the foregoing memorandum of law in support of Mr. Wander's motion to dismiss.

2.      I hereby certify that the text of the foregoing memorandum of law, exclusive of caption, table of contents, table of authorities, and date and signature line, is 5,422 words, and therefore complies with the word-count limit established by Rule II.D of the Court's Individual Practices.

Dated:  New York, NY
        October 10, 2024


                                        /s/  Jordan Estes
                                        Jordan Estes

18