## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LEADENHALL CAPITAL PARTNERS LLP
and LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,

        Plaintiffs,

   vs.

JOSH WANDER, STEVEN PASKO,
KENNETH KING, 777 PARTNERS LLC,
600 PARTNERS LLC, SPLCSS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY
SERVICES LLC, DORCHESTER
RECEIVABLES II LLC, SUTTONPARK
CAPITAL LLC, SIGNAL MEDICAL
RECEIVABLES LLC, INSURETY
CAPITAL LLC, SUTTONPARK
SERVICING LLC, and ADVANTAGE
CAPITAL HOLDINGS LLC,

        Defendants.

Civil Action No. 1:24-cv-03453

## ADVANTAGE CAPITAL HOLDINGS LLC AND KENNETH KING'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
(212) 504-6000

*Counsel for Defendants Advantage Capital Holdings LLC and Kenneth King*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

TABLE OF ABBREVIATIONS ........................................................................... viii

PRELIMINARY STATEMENT .............................................................................. 1

ALLEGED FACTUAL BACKGROUND ................................................................ 5

    A.    A-CAP's Affiliates' First-Priority, All-Assets Security Interests ........... 5

    B.    Leadenhall's Security Interest in the SPV Borrowers........................... 6

    C.    SuttonPark and Dorchester Allegedly Overstate Their Borrowing Bases From Inception. .................................................. 6

    D.    Dorchester and SuttonPark Immediately Draw All $430 Million. ........ 7

    E.    Between September 2022 and March 2023, Leadenhall Learns That the Deficiencies Are Allegedly Wander-Directed Fraud............... 7

    F.    Mr. Wander Promises Fixes: "Replacement Deals," Selling Businesses, or Borrowing From A-CAP........................................ 9

    G.    Leadenhall Speculates That A-CAP "Must Have" Become "Aware" in "Spring 2023." ....................................................... 10

    H.    A-CAP Takes Steps to Protect the Value of Its Collateral. .................. 12

    I.    Restructuring the JARM Loan .............................................................. 12

LEGAL STANDARD............................................................................................. 13

ARGUMENT ......................................................................................................... 14

I.    LEADENHALL'S FRAUD-BASED CLAIMS ARE UNRIPE. ........................ 14

II.    LEADENHALL STATES NO RICO CLAIM (COUNTS VII & VIII)............. 17

    A.    Leadenhall Fails to Allege That A-CAP or Mr. King Committed Predicate Acts............................................................... 17

        1.    A-CAP Learned of the Alleged Fraud Long After It Was Complete. ..................................................................... 18

        2.    "Transmission" of Compliance Reports....................................... 19

        3.    Statements about 777 Partners' Liquidity ................................. 20

        4.    "Excessive and Improper Control" ............................................. 22

        5.    Protective Advances .................................................................... 23

    B.    Leadenhall Suffered No Cognizable Harm Proximately Caused by A-CAP. ................................................................... 25

    C.    The Amended Complaint Alleges No Domestic Injury. ....................... 26

D.     The Amended Complaint Alleges No Distinct Enterprise................... 27

E.     The Amended Complaint Alleges No Pattern of Racketeering. ........... 28

F.     Leadenhall States No RICO Conspiracy Claim. ................................... 30

III.     LEADENHALL'S STATE-LAW CLAIMS FAIL AS A MATTER OF LAW.... 31

A.     "Civil Conspiracy" Is Not a Cause of Action (Count V)......................... 31

B.     Leadenhall Pleads No Aiding-and-Abetting Claim (Count VI). ........... 31

C.     Leadenhall Pleads No Unjust-Enrichment Claim (Count X). .............. 33

D.     Leadenhall's Fraudulent Conveyance Claims Fail. .............................. 34

1.     Leadenhall States No Constructive Fraudulent Transfer Claim. .......................................................................................... 34

2.     Leadenhall States No Actual Fraudulent Transfer Claim. ....... 35

IV.     A-CAP AND MR. KING ARE NOT LIABLE FOR THE 777 ENTITY DEFENDANTS' DEBTS. ................................................................................. 36

V.     LEADENHALL CANNOT HOLD MR. KING PERSONALLY LIABLE. ....... 37

CONCLUSION................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4 K & D Corp. v. Concierge Auctions, LLC*,
    2 F. Supp. 3d 525 (S.D.N.Y. 2014) ........................................................................ 17

*Am. Home Mortg. Corp. v. UM Sec. Corp.*,
    2007 WL 1074837 (S.D.N.Y. Apr. 9, 2007) ........................................................ 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 13

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ............................................................. 32, 33

*Berman v. Morgan Keegan & Co.*,
    2011 WL 1002683 (S.D.N.Y. Mar. 11, 2011) ...................................................... 31

*Cenedella v. Metro. Museum of Art*,
    348 F. Supp. 3d 346 (S.D.N.Y. 2018) ............................................................. 13, 31

*Corporativo Grupo R SA de C.V. v. Marfield Ltd.*,
    606 F. Supp. 3d 502 (S.D. Tex. 2022).................................................................. 25

*Crawford v. Franklin Credit Mgmt. Corp.*,
    758 F.3d 473 (2d Cir. 2014).................................................................................. 17

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
    587 F.App'x 663 (2d Cir. 2014)............................................................................ 28

*D.N.C. v. Russian Fed'n*,
    392 F. Supp. 3d 410 (S.D.N.Y. 2019) .................................................................. 28

*Dorce v. City of N.Y.*,
    608 F. Supp. 3d 118 (S.D.N.Y. 2022) .................................................................. 31

*Eliahu v. Jewish Agency for Israel*,
    919 F.3d 709 (2d Cir. 2019).................................................................................. 25

*Est. of Gottdiener v. Sater*,
    35 F. Supp. 3d 386 (S.D.N.Y. 2014) .................................................................... 25

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ............................................................ 28, 30

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994) ................................................ 5, 14, 15, 16

*Georgia Malone & Co. v. Rieder*,
   973 N.E.2d 743 (N.Y. 2012) ................................................................ 33

*Goldfine v. Sichenzia*,
   118 F. Supp. 2d 392 (S.D.N.Y. 2000) ............................................ 14, 15

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009) ................................................. 17

*Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap.
   Markets, LLC*,
   347 F.App'x 711 (2d Cir. 2009) ........................................................... 15

*Heinrich v. Dean*,
   655 F. Supp. 3d 184 (S.D.N.Y. 2023) ................................................. 27

*Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp.*,
   2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) ..................................... 15

*Kaplan, Inc. v. Yun*,
   16 F. Supp. 3d 341 (S.D.N.Y. 2014) ................................................... 34

*Kerik v. Tacopina*,
   64 F. Supp. 3d 542 (S.D.N.Y. 2014) ....................................... 14, 15, 17

*Khan Funds Mgmt. Am., Inc. v. Nations Techs. Inc.*,
   2023 WL 6124801 (S.D.N.Y. Sept. 19, 2023) ..................................... 17

*L-7 Designs v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011) ................................................................. 23

*Law Debenture v. Maverick Tube Corp.*,
   2008 WL 4615896 (S.D.N.Y. Oct. 15, 2008) ...................................... 33

*Limestone Dev. Corp. v. Vill. of Lemont*,
   520 F.3d 797 (7th Cir. 2008) ................................................................ 3

*Motorola Credit Corp. v. Uzan*,
   322 F.3d 130 (2d Cir. 2003) ................................................................ 15

*Nezry v. Haven Ave. Owner LLC,*
    2010 WL 3338545 (N.Y. Sup. Ct. 2010) ................................................................. 38

*OSRecovery, Inc. v. One Groupe Int'l, Inc.,*
    2004 WL 238035 (S.D.N.Y. Feb. 9, 2004) ........................................................... 13

*Paul Hobbs Imports Inc. v. Verity Wines LLC,*
    2023 WL 374120 (S.D.N.Y. Jan. 24, 2023) ......................................................... 27

*Penn. Ass'n of Edwards Heirs v. Rightenour,*
    235 F.3d 839 (3d Cir. 2000)................................................................................. 25

*Perry v. NYSARC, Inc.,*
    424 F.App'x 23 (2d Cir. 2011) ............................................................................ 13

*U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.,*
    152 F. Supp. 2d 443 (S.D.N.Y. 2001) ................................................................. 14

*Quebecor World (USA), Inc. v. Harsha Assocs., L.L.C.,*
    455 F. Supp. 2d 236 (W.D.N.Y. 2006)................................................................. 37

*R.C.M. Exec. Gallery Corp. v. Rols Cap. Co.,*
    1997 WL 27059 (S.D.N.Y. Jan. 23, 1997) .......................................................... 30

*RJR Nabisco v. European Community,*
    579 U.S. 325 (2016) ............................................................................................. 26

*Rosner v. Bank of China,*
    349 F.App'x 637 (2d Cir. 2009)........................................................................... 32

*Saleh Holdings Grp., Inc. v. Chernov,*
    30 Misc. 3d 1220(A), (Sup. Ct. Jan. 31, 2011) .................................................. 16

*United States v. Pizzonia,*
    577 F.3d 455 (2d Cir. 2009)................................................................................. 28

*United States v. Turkette,*
    452 U.S. 576 (1981) ............................................................................................. 28

*Wild Edibles Inc. v. Indus. Workers of World Local 460/640,*
    2008 WL 4548392 (S.D.N.Y. Oct. 9, 2008)........................................................ 27

*Wilson v. Dantas,*
    2013 WL 92999 (S.D.N.Y. Jan. 7, 2013), *aff'd*, 746 F.3d 530 (2d Cir.
    2014)..................................................................................................................... 33

*Yegiazaryan v. Smagin,*
   599 U.S. 533 (2023) ............................................................................ 26

*Zarintash v. Boffa,*
   1999 WL 155991 (S.D.N.Y. Mar. 19, 1999) ........................................ 16

**Statutes**

Del. Code § 18-303 ................................................................................ 37

N.Y. U.C.C. § 9-322 .............................................................................. 16

18 U.S.C. § 1962 ............................................................................ *passim*

**Other Authorities**

N.Y. Lᴛᴅ. Lɪᴀʙ. Cᴏ. § 609 ..................................................................... 37

Rule 9(b) ......................................................................................... 13, 31

**TABLE OF ABBREVIATIONS**

| Abbreviation | Definition |
|---|---|
| "777 Entity Defendants" | 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, Dorchester Receivables II LLC, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLC, SuttonPark Servicing LLC, Signal Servicing LLC, and Insurety Servicing LLC |
| "777 Defendants" | 777 Entity Defendants, Josh Wander, and Steven Pasko |
| "777" | 777 Partners LLC, 600 Partners LLC, and all of their affiliates, generally |
| "777 Partners" | 777 Partners LLC |
| "AC" | Amended Complaint |
| "A-CAP" | Advantage Capital Holdings LLC |
| "Borrowing Base," "Borrowing Base Deficiency," and other terms from the LSA | As defined in the LSA (ECF 58-1, p. 23 of 40) and used in the Complaint |
| "Dorchester" or "Dorchester Borrower" | Dorchester Receivables II LLC |
| "Leadenhall" | Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC |
| "Partners HoldCos" | 777 Partners LLC and 600 Partners LLC |
| "Servicers" | SuttonPark Servicing LLC, Signal Servicing LLC, and Insurety Servicing LLC |
| "SPV Borrowers" | SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC |
| "SuttonPark" or "SuttonPark Borrower" | SPLCSS III LLC |
| "U.S." | United States |

## PRELIMINARY STATEMENT

Leadenhall now admits what A-CAP has said all along:  A-CAP had absolutely nothing to do with 777's alleged misconduct. As Leadenhall asserts, A-CAP did not even ***learn*** of the allegations until well after the major lenders to 777's structured settlement business—Leadenhall and Crediqy—were acutely aware. And here, timing is everything.

Leadenhall alleges that the SPV Borrowers (SuttonPark and Dorchester) overstated their "Borrowing Bases" from the start, beginning with the first Reports in May 2021. Leadenhall alleges the overstatements were intentional—fraudulent misrepresentations, it alleges, directed by Mr. Wander. The alleged object of the fraud was "[t]o induce Leadenhall to fund" draws on its loan facility in excess of the true Borrowing Bases—and thus in excess of the value of Leadenhall's Collateral. If Leadenhall is right, then ***the object of the fraud was achieved by mid-2021***—all $80 million of Dorchester's draws had been funded by May 2021, and all of SuttonPark's $350 million in draws were funded by June 2021.

In its original Complaint, Leadenhall spent dozens of paragraphs outlining how it believes the alleged fraud was carried out—all allegedly at the ultimate direction of "Wander" or "Wander and Pasko." In the Amended Complaint, Leadenhall adds more, describing how (and when) Mr. Wander and two of his "foot soldier[s]" "liste[d] JG Wentworth's assets as collateral for . . . Leadenhall" (in "2021"); "created shell records" ("going back to 2021"); "changed the programming of the MPFin system" ("after Leadenhall entered into the LSA"); and more.

A-CAP, however, is still not alleged to have played **any** part in any of the alleged misconduct. Rather, this is Leadenhall's theory:  A-CAP "crossed the line" from arm's-length lender to co-conspirator by (i) "strategically injecting capital into the 777 businesses" to "induc[e] Leadenhall to continue lending money," and (ii) "perpetuating and concealing 777's lies" to "avoid the discovery and collapse of the fraudulent enterprise."

The alleged *facts*, however, lay waste to that theory. Leadenhall alleges that A-CAP only so much as "***became aware*** of the scheme" in "***spring 2023***"—years after the alleged fraud reached fruition, its object achieved with ***the last of the allegedly fraudulent draws in June 2021***. By the time A-CAP became aware, the alleged fraud had been uncovered and the damage long since done.

Leadenhall pleads nothing to support its conclusion that A-CAP induced Leadenhall to lend (years earlier) or concealed 777's alleged misconduct.  Nor, given what Leadenhall allegedly knew by spring 2023, would such an allegation be plausible.  By then, Leadenhall had been tipped off (in September 2022); launched its on-site investigation (in November 2022); was supplied (by Credigy) details about the alleged fraud (in March 2023); uncovered all the alleged double-pledging (by March 2023); and formally confronted Messrs. Wander and Pasko.  A-CAP, it seems, was the last to know.

Leadenhall nevertheless reaches for "the litigation equivalent of a thermonuclear device," and takes aim at A-CAP with the hope that it shares Leadenhall's view that the lawsuit "might bring 777 Partners—and therefore A-

CAP—all the way down." After all, even "groundless claim[s]" can deliver the "in terrorem" "settlement value"[1] that Leadenhall is after.

Leadenhall's claims cannot, however, be pleaded with fear, bombast, or rhetoric. What matters are well-pleaded facts. Yet Leadenhall points only to A-CAP's (i) rights and influence as a senior creditor (since 2023); (ii) protective advances (in late 2023 and 2024); (iii) supposed oversight of certain 777 Partners employees (in 2023); and (iv) alleged involvement in pre-litigation workout talks (in 2023 and 2024). And the Amended Complaint's big reveal about A-CAP has nothing to do with wire fraud or any other predicate act. It is this: in March 2023, A-CAP, as senior secured lender to 777 Partners, allegedly established a "Steering Committee" to provide oversight of 777 Partners' investment portfolio. This allegedly entailed having a few A-CAP employees on site—just as Leadenhall itself did.

While Leadenhall devotes much attention to arguing that those allegations are *not inconsistent* with its claims, it does not (and cannot) plausibly allege that A-CAP or Mr. King engaged in any misconduct. For that reason, the claims against both should be dismissed.

*First*, as a threshold matter of law, because Leadenhall has not exhausted its bargained-for contractual remedies, it has no ripe RICO or fraud claims against A-CAP or Mr. King. *See infra* Part I. Leadenhall must secure a judgment on its contract claims before bringing RICO or fraud claims.

---

[1] *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

*Second*, Leadenhall's civil RICO claims (Counts V and VI) are meritless for several reasons. In its Amended Complaint, Leadenhall does not allege (much less with particularity) that A-CAP or Mr. King committed a single act of mail or wire fraud—the only predicate act alleged by Leadenhall. All Leadenhall can muster is speculation about when A-CAP "must have" learned of Mr. Wander's alleged misdeeds. But knowledge is not enough, speculation does not suffice, and at any rate, Leadenhall's "belief" is that A-CAP learned of Mr. Wander's alleged misconduct, long after the object of the fraud was allegedly accomplished. *See infra* Part II.A.

The RICO claims also fail for several other reasons. Leadenhall does not demonstrate that it suffered cognizable harm proximately caused by A-CAP or the required "domestic injury." *See infra* Parts II.B, II.C. It pleads no "enterprise" distinct from the underlying alleged conduct. *See infra* Part II.D. Nor does it plausibly allege the "hallmark of racketeering"—a threat of continuing criminal activity. *See infra* Part II.E. And with no underlying RICO claim or alleged agreement to commit predicate acts, the RICO conspiracy claim also fails. *See infra* Part II.F.

*Third*, Leadenhall's state-law claims against A-CAP and Mr. King fail on pleading basics. New York has no standalone claim for civil conspiracy (Count VIII). *See infra* Part III.A. Leadenhall states no aiding-and-abetting-fraud claim (Count IX) for the same reason it pleads no predicate act—the Complaint does not allege that A-CAP provided substantial assistance to any fraud. *See infra* Part III.B. Leadenhall has no claim for unjust enrichment (Count X) because this case is based on contract claims. *See infra* Part III.C. And Leadenhall's fraudulent conveyance claims (Counts

XI and XII)—over the alleged consolidation of a shareholder loan in March 2024—fail because New York's Debtor and Creditor Law does not even apply when, as here, the debtor (777), has its principal place of business in Florida. In any case, Leadenhall's conclusory allegations fail to allege any actual or constructive intent to defraud creditors. *See infra* Part III.D.

*Fourth*, Leadenhall's effort to hold A-CAP and Mr. King liable for the breaches and debts of 777 is baseless. Leadenhall alleges that 777 Entity Defendants and A-CAP are "distinct," not alter egos of one another. *See infra* Part IV.

*Fifth*, Leadenhall cannot make out any claims against Mr. King because—on top of everything else—the Amended Complaint alleges no facts showing that Mr. King engaged individually in any tortious or conspiratorial conduct. *See infra* Part V.

## ALLEGED FACTUAL BACKGROUND

A. <u>A-CAP's Affiliates' First-Priority, All-Assets Security Interests</u>

As Leadenhall acknowledges, A-CAP, through affiliates including Haymarket Insurance Company ("Haymarket"), has a perfected, "first-priority" security interest in substantially all assets of the Partners HoldCos. (AC ¶¶ 13–14.) Under the HoldCo Loan Agreement, (*see id.* ¶ 180), Haymarket has loaned hundreds of millions of dollars to Partners HoldCos and has perfected its security interests by filing financing statements, (ECF 141-1–141-3).

B.  Leadenhall's Security Interest in the SPV Borrowers

In May 2021, "following the expiration of a prior credit facility between the parties,"[2] certain 777 Defendants "entered into a new credit facility with Leadenhall," the LSA, which governs Leadenhall's loans to four SPV Borrowers in 777's structured settlement business. (AC ¶ 49.) Leadenhall's only security interest is the equity and assets of those SPV Borrowers, which mainly comprise receivables—cash flows from structured settlements and lottery winnings. (*See id.* ¶¶ 46, 56; ECF 153.) Leadenhall alleges no security interest in any asset of Partners HoldCos. (*Id.*)

Leadenhall's lending relationship with 777 is broad: on top of the "prior credit facility," Leadenhall has made other loans to 777 Partners (not at issue here) "under a separate note purchase agreement," "secured by equity interests" in 777 Partners. (AC ¶ 283 n.60.)

C.  SuttonPark and Dorchester Allegedly Overstate Their Borrowing Bases From Inception.

Leadenhall alleges that, *from inception* in May 2021 (and perhaps before), SuttonPark and Dorchester overstated the present value of their receivables—and thus their Borrowing Bases under the LSA—in the Reports they provided to Leadenhall. (*Id.* ¶ 160.) Those Reports allegedly included not only the present value of those entities' receivables, but also the value of certain receivables owned by

---

[2] Given the prior facility, Leadenhall was likely lending to 777 long before 2020, when A-CAP is alleged to have begun doing so, (*id.* ¶ 194).

Credigy's Volans facility—Credigy's collateral—and the value of other "assets" that do not exist. (*Id.* ¶ 126; *see id.* ¶ 60.)

### D. Dorchester and SuttonPark Immediately Draw All $430 Million.

By May 2021, "the first month [in which] the credit facility was effective," those Borrowers had allegedly drawn amounts that were close to the allegedly inflated Borrowing Bases, but well over their true Borrowing Bases. Dorchester had already drawn all "approximately" "$80 million" from the facility (or its predecessor), and SuttonPark had drawn "approximately $300 million," (*id.* ¶ 102). The next month, SuttonPark drew the remaining $50 million—**all $430 million was thus drawn by June 2021**. (*Id.* ¶ 55.) Leadenhall permitted those draws—even with its robust audit and inspection rights, (*id.* ¶ 106), it was unaware that Borrowers had materially overstated the value of their receivables.

Dorchester's "Outstanding Borrowings" reflect no additional draws since May 2021. (*Id.* ¶¶ 102, 114, 118, 137–38, 148.) SuttonPark has not made additional draws since June 2021. (*Id.* ¶¶ 55, 118, 136, 138, 146, 165.)[3]

### E. Between September 2022 and March 2023, Leadenhall Learns That the Deficiencies Are Allegedly Wander-Directed Fraud.

Leadenhall alleges that SuttonPark's and Dorchester's Borrowing Base deficits result from fraud: Mr. Wander, it alleges, directed those entities to fraudulently

---

[3] Leadenhall suggests that Dorchester made relatively modest borrowing requests in January and March 2022, (*id.* ¶ 55), but does not assert that they were funded. In any case, its total borrowings remained about the same from May 2021 on. (*Compare* AC ¶ 102 *with id.* ¶¶ 114, 118, 137–38, 148.)

misrepresent their Borrowing Bases "[t]o induce Leadenhall to fund" more draws. (*Id.* ¶ 2.)

Leadenhall alleges that the fraud started with its first Compliance Report in "May 2021." (*Id.* ¶ 160.) By the time Leadenhall was tipped off in ***September 2022***—a tip that Leadenhall alleges "was true in all respects"—Mr. Wander had already allegedly consummated "criminal activity" involving the reported Borrowing Base of the SuttonPark Borrower: "The assets you are lending against at SuttonPark do not exist. Josh Wander *either never bought them* or *already pledged them to another lender*. . . . What he is doing is criminal." (*Id.* ¶ 105)

Eleven days after receiving the tip, Mr. Wander (now with help from Mr. Pasko) allegedly caused a document to be executed that purported to sell receivables from Credigy's Volans facility (the assets of which were Credigy's collateral) to SuttonPark and Dorchester. (*Id.* ¶¶ 120–121 (alleging "'double-pledg[ing]'" was effected by a "'Form of Assignment' executed by Mr. Pasko on September 30, 2022").)

In November 2022, Leadenhall's on-site "'spot check' of 777 Partners' computer systems" revealed $7 million "of assets that [had been] improperly allocated to the Dorchester Borrower." (*Id.* ¶¶ 108, 112–13.) It turns out, Leadenhall alleges, that "prior to the on-site meetings" "in November 2022," the 777 Defendants "had photoshopped financial statements submitted to Leadenhall" and "altered receivables in the MP Fin system to try to cover up" the fraud. (*Id.* ¶ 163.)

Leadenhall alleges that, in all, "both the Dorchester and SuttonPark Borrowers had double-pledged hundreds of millions of dollars of collateral, and thus

had covertly borrowed hundreds of millions of dollars from Leadenhall in excess of their Borrowing Bases." (*Id.* ¶ 116.)

The specificity of the allegations about A-CAP and the specificity of those against the 777 Defendants are night and day. Of the fraud pertaining to the 777 Defendants' failure to own Collateral, for example, Leadenhall alleges the *who* (Bennett and Adnani, at the instruction of Wander (AC ¶ 153)), the *when* ("[b]eginning in 2021," (*id.* ¶ 151)), the *why* ("they wanted money they did not have, and, based on the true condition of their business, would not have been permitted to borrow," (*id.* ¶ 193)), and the *how*: 777 Partners had considered buying a portfolio of assets from JG Wentworth, received a "data tape" of the portfolio's receivables in diligence, and used that tape "*to list JG Wentworth's assets as collateral for 777's lenders*" before the assets had been acquired, (*id.* ¶¶ 151-154 (italics in original)). By contrast, Leadenhall alleges no facts suggesting that A-CAP or Mr. King had any role in the alleged fraud.

F. <u>Mr. Wander Promises Fixes: "Replacement Deals," Selling Businesses, or Borrowing From A-CAP.</u>

By March 2023, Mr. Wander allegedly acknowledged that the alleged "double-pledging had occurred," (*id.* ¶ 124), and promised "to 'do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap,'" (*id.* ¶ 133). Leadenhall alleges that "[w]hen pressed for details on this plan," (*id.* ¶ 135), Mr. "Wander stated that the 'holding company lender' was A-CAP," its senior lienholder, (*id.* ¶ 134).

G. <u>Leadenhall Speculates That A-CAP "Must Have" Become "Aware" in "Spring 2023."</u>

Leadenhall alleges that A-CAP first entered the fray in the months that followed. A-CAP allegedly took part in workout negotiations with Leadenhall, allegedly aimed at avoiding "this lawsuit," offering in the summer of 2023 to "'replace' the double-pledged collateral with other security interests." (*Id.* ¶ 14.)

Leadenhall does not, however, allege that A-CAP had anything to do with the alleged Borrowing Base fraud. Indeed, Leadenhall concedes that A-CAP did not so much as *learn* about the alleged fraud until spring 2023. Leadenhall instead speculates that "A-CAP must have been well aware and 'in the know' for months" before "June and July 2023"—*i.e.*, well after the alleged fraud had been committed by 2021—"that Collateral pledged to Leadenhall had been [']double-pledged['] and/or did not exist." (*Id.* ¶ 212.) Leadenhall then speculates that "[b]y April 2023" A-CAP "was well **aware of**, if not directly responsible for, the transmission of [] false Compliance Reports to Leadenhall." (*Id.* ¶¶ 208-209.)

The basis for Leadenhall's speculation is (i) "upon information and belief," a purported "agreement between 777 Partners and A-CAP," (*id.* ¶ 17), allegedly consummated by March 2023, (*id.* ¶ 374), giving A-CAP "the right to control 777 Partners' operations," (*id.* ¶ 215), through the alleged establishment of a "Steering Committee,"[4] (ii) that A-CAP allegedly had certain of its employees working out of

---

[4] According to Leadenhall, based on an alleged statement made "in early 2024" by an unnamed employee of an unnamed Partners HoldCo subsidiary, the alleged agreement had

777 Partners' office "[a]round March 2023," (*id.* ¶ 202), (iii) a change in April 2023 to the way Compliance Reports were signed and confirmed, (*id.* ¶ 208), and (iv) A-CAP COO Mike Saliba's alleged lack of "surprise or concern" (as allegedly perceived by Leadenhall) when informed by Leadenhall in June or July 2023 of the alleged "double-pledging," (*id.* ¶ 212).

Leadenhall pleads no facts suggesting that 777 Partners allegedly giving A-CAP the contractual right to control certain aspects of operations in early 2023 means that 777 must have confessed its earlier alleged federal crimes to A-CAP. Nor does it plead facts showing that A-CAP sending a handful of employees to 777 Partners' offices in 2023—as Leadenhall themselves did in late 2022, (*id.* ¶ 108)—means it was privy to or participated in a years-old fraud perpetrated upon one of 777's many creditors. Indeed, the assets "777 Partners and the Borrowers [] pledged to various lenders" "numbered in the tens of thousands," (*id.* ¶ 112), such that even Leadenhall, which was exclusively focused on its own Collateral, was only able to scratch the surface of the alleged scheme during its visit, (*id.* ¶ 113).

Despite receiving three separate tips about the alleged Borrowing Base fraud in September 2022, March 2023, and early 2024, (AC ¶¶ 8, 119–120, 163), conducting a "business review" of the Collateral, (*id.* ¶ 106), many calls with Josh Wander and other representatives of the 777 Entity Defendants, (*id.* ¶ 107), visiting the offices of

---

been in place "since at least early 2023" and established a "Steering Committee" designed to "ensure that every single 777 Partners investment into a portfolio company was approved by [Mr.] King." (*Id.* ¶¶ 201, 215.)

777 Partners in November 2022 and inspecting their computer system, (*id.* ¶¶ 108–113), it took Leadenhall until November 2023 to uncover the full extent of the fraud, and until March 2024 to serve the borrowers with written notice of default, (*id.* ¶¶ 175–76). Yet, Leadenhall alleges that A-CAP, within a month (*id.* ¶¶ 208–09), *must have* discovered not just that Compliance Reports were being sent to Leadenhall, but that the information contained in those reports was false.

   H. <u>A-CAP Takes Steps to Protect the Value of Its Collateral.</u>

   The Amended Complaint alleges that A-CAP has billions of dollars of exposure to 777 Partners, (*id.* ¶ 240) and an all-asset lien in 777 Partners and certain of its affiliates, (*id.* ¶ 243). In order to protect its sizable investment, A-CAP allegedly established a "Steering Committee" in March 2023 requiring 777 Partners to "regularly update A-CAP executives about its continuing business plans," (*id.* ¶ 201, 240). In connection with this effort, certain A-CAP executives allegedly worked out of 777 Partners' offices and oversaw certain 777 Partners employees. (*Id.* ¶ 201–202.)

   The Amended Complaint also describes steps taken by A-CAP, after discovery of the alleged collateral deficiency, to protect its right to repayment from 777 on behalf of its policyholders: A-CAP allegedly made loans to 777 so that it could cover expenses, (*id.* ¶¶ 20, 257), including one that "allow[ed] 777 Partners to make payroll and cover operating expenses" in February 2024, (*id.* ¶ 214). So-called "protective advances" of the sort are common and lawful. *See infra* Part II.A.4.

   I. <u>Restructuring the JARM Loan</u>

   The Amended Complaint also alleges, for the first time, a transaction that Leadenhall admits it has known about since at least March 2024, when it received

notice from A-CAP. (AC ¶ 225.) In December 2020, A-CAP affiliate Haymarket loaned almost $170 million to 777 Partners affiliate JARM Capital LLC ("JARM"), an entity which "owns [the] majority shareholding of 777 Partners," secured by JARM's assets. (*Id.* ¶ 221). JARM repaid $120 million in early 2024, but Haymarket is still owed $50 million of principal on the loan. (*Id.* ¶ 227.) In March 2024, as A-CAP, through Haymarket, continued to make protective advances to 777 Partners, the rest of the loan was consolidated into the Holdco Loan. (*Id.* ¶¶ 225, 229, 242(a).) Leadenhall does not allege any connection between the JARM transactions and the alleged borrowing base deficiency. Nor, as discussed below, does it adequately allege that the transaction gives rise to any other claim.

## LEGAL STANDARD

To survive a motion to dismiss, Leadenhall must allege "enough facts to state a claim to relief that is plausible on its face," not merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts do not accept as true legal conclusions, *see id.*, "threadbare recitals" of the elements, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or assertions "contradicted by the complaint itself," *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011). Nor do Courts accept allegations of conspiratorial conduct with "obvious alternative explanation[s]." *Twombly*, 550 U.S. at 567; *see Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358–59 (S.D.N.Y. 2018) (dismissing conspiracy claim over obvious alternative explanation).

When claims sound in fraud, they must be pled with particularity under Rule 9(b). *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 2004 WL 238035, at *1 (S.D.N.Y. Feb. 9, 2004) (applying Rule 9(b) to RICO and aiding-and-abetting claims). Fraud

allegations cannot be pled "upon information and belief," unless the alleged fraud is "particularly within the opposing party's knowledge." *U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 455 (S.D.N.Y. 2001). Even then, for such allegations to be credited, they "must be accompanied by statements of facts upon which such belief is *reasonably* founded." *Id.*

## ARGUMENT

## I.    LEADENHALL'S FRAUD-BASED CLAIMS ARE UNRIPE.

Under Second Circuit law, Leadenhall's RICO claims (Counts VII & VIII) fail for a threshold reason: "creditor Plaintiffs" like Leadenhall "must pursue" their state-law claims, including those based on "their admitted contractual rights," before they can "allege 'clear and definite' damages" of the sort needed to state a RICO claim. *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 398–99 (S.D.N.Y. 2000); *see Kerik v. Tacopina*, 64 F. Supp. 3d 542, 562 (S.D.N.Y. 2014) ("[A] 'cause of action does not accrue under RICO until the amount of damages becomes clear and definite.'" (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)).[5] Lenders can thus pursue RICO claims "only after the lender has exhausted the bargained-for remedies available to it"—"and then only to the extent of the deficiency." *First Nationwide*, 27 F.3d at 768; *see also Am. Home Mortg. Corp. v. UM Sec. Corp.*, 2007 WL 1074837, at *4 (S.D.N.Y. Apr. 9, 2007) (holding that plaintiff alleging that unforeclosed loans had been unsecured by racketeering lacked RICO

---

[5] Unless otherwise indicated, emphasis is supplied and quotation marks, internal citations, and brackets have been omitted.

standing). Those state-law remedies must be exhausted even when collecting on them is a "'forlorn hope.'" *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Markets, LLC*, 347 F.App'x 711, 713 (2d Cir. 2009) (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 137 (2d Cir. 2003)); *see also Goldfine*, 118 F. Supp. at 398 (holding that "adjudication of the State law claims" was "a necessary predicate to ripeness and standing" under RICO).

The Second Circuit's decision in *First Nationwide* is on point. There, defendants allegedly misrepresented the value of pledged collateral to obtain loans. *First Nationwide*, 27 F.3d at 765–77 (outlining "Excess Loan Loss" theory based on "the true value of the collateral"). Plaintiff argued its RICO claim was ripe even though it had not foreclosed on those loans because, it contended, "it suffered immediate quantifiable injury when the loans were made because the loans were undersecured, [plaintiff] assumed additional risk of loss, and for all practical purposes, the additional funds were lost the moment the loans were made." *Id.* at 768. The Second Circuit rejected plaintiff's "novel theory" that it had standing under RICO "simply by being undersecured" on "loans not yet foreclosed" and dismissed the claim. *Id.*; *see also Kerik*, 64 F. Supp. 3d at 562 ("[A] lender's claim against a debtor for recovery of a secured loan is not ripe until the lender has sought foreclosure.").

So too here. Leadenhall claims harm from allegedly fraudulently "double-pledged" and nonexistent "collateral." (AC ¶¶ 2, 8, 105–32, 135–41.) Yet it has not sought to foreclose on its loans, and its state-law claims remain pending. *See Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp.*, 2012 WL 3542196, at *14

(S.D.N.Y. Aug. 15, 2012) (holding RICO claim unripe because "numerous other claims . . . in this litigation" made RICO damages "not yet clear and definite"). Indeed, at this stage, Leadenhall's damages remain speculative. It remains to be seen whether its Collateral—comprising "first-priority security interests in all of the assets of each Borrower," (AC ¶ 56)—will prove inadequate upon foreclosure, and if so, *by how much*.[6] And if Leadenhall believes its Collateral was "double-pledged," the U.C.C. has a mechanism for resolving disputes among creditors, *see* N.Y. U.C.C. § 9-322 ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection"), which Leadenhall must exhaust before pursuing RICO claims.

Leadenhall's state-law claims for aiding and abetting fraud (Count IX) are also unripe—*First Nationwide* and its progeny apply with equal force to state-law claims sounding in fraud. Leadenhall must exhaust "bargained-for remedies available" before "assert[ing] that it was damaged by the fraud, and then only to the extent of the deficiency." *Saleh Holdings Grp., Inc. v. Chernov*, 30 Misc. 3d 1220(A), at *4 (Sup. Ct. Jan. 31, 2011) (dismissing state-law fraud claim as unripe); *see also Zarintash v. Boffa*, 1999 WL 155991, at *2 (S.D.N.Y. Mar. 19, 1999) (dismissing state-law fraud claim for failure to exhaust claims under promissory note).

---

[6] Leadenhall does **not** allege that SuttonPark or Dorchester stopped remitting monthly inflows of cash to Leadenhall or that they would have been unable to eventually repay their debt. (*Id.* ¶¶ 146, 148.)

## II.    LEADENHALL STATES NO RICO CLAIM (COUNTS VII & VIII).

To state a civil RICO claim, plaintiffs must allege, as to each defendant "individually," *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004), harm proximately caused by "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering conduct," *Kerik*, 64 F. Supp. 3d at 553. "[L]umping the defendants into collective allegations," as Leadenhall does here, "results in a failure to demonstrate the elements of § 1962(c)." *Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009).

Leadenhall's RICO claims against A-CAP and Mr. King fail for several reasons.

### A.    Leadenhall Fails to Allege That A-CAP or Mr. King Committed Predicate Acts.

Under RICO, Leadenhall must plead with particularity that A-CAP and Mr. King each "personally committed two or more predicate acts," *Khan Funds Mgmt. Am., Inc. v. Nations Techs. Inc.*, 2023 WL 6124801, at *12 (S.D.N.Y. Sept. 19, 2023); *see 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 540 (S.D.N.Y. 2014) (dismissing RICO claim for lack of "any specific act" of fraud). Yet none of the purported "predicate acts of racketeering activity" identified by Leadenhall amount to "mail and/or wire fraud"—the only predicate acts Leadenhall purports to identify (AC ¶ 362), and ones that are "particularly scrutinized" by courts. *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014).[7]

---

[7] A "predicate act" is any crime defined as "racketeering activity" in 18 U.S.C. § 1961(1).

1.    *A-CAP Learned of the Alleged Fraud Long After It Was Complete.*

All of Leadenhall's mail/wire fraud allegations against A-CAP suffer from the same threshold defect: A-CAP is not alleged to have even learned of the fraud until March 2023, years after its alleged object (draws from Leadenhall's loan facility up to inflated Borrowing Bases) had been achieved—the final draws under the LSA were made in June 2021. *See supra* Facts Part, D.  A mail or wire "cannot," however, "be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition." *United States v. Altman*, 48 F.3d 96, 103 (2d Cir. 1995).

That threshold defect manifests in several ways.  Mail and wire fraud requires, for instance, that "money or property [be] the object of the scheme," *Smulley v. Fed. Hous. Fin. Agency*, 754 Fed. Appx. 18, 22 (2d Cir. 2018), and such money or property "must be . . . in the hands of the victim[,]" *Cleveland v. United States*, 531 U.S. 12, 15 (2000). But A-CAP allegedly learned of the alleged scheme long after the last alleged withdrawal request, months after Leadenhall was tipped off, and in the same month Leadenhall allegedly got to the bottom of all $185 million worth of double-pledging, (*id.* ¶ 119–138). By that point, no attempts to induce Leadenhall to lend were, or reasonably could have been, made. Wander's discussions with Leadenhall were focused, by then, on "a murky array" of ways for Wander to fix the problem, not on Leadenhall funding future draws. (*Id.* ¶ 125.) And all the funds that were loaned under the LSA had long since left Leadenhall's "hands." *See supra* Facts,  Part D.

Because Leadenhall cannot plausibly allege that A-CAP intended to induce Leadenhall to fund more loans after March 2023, Leadenhall also fails to plead facts to support the sort of "fraudulent intent" that the mail and wire fraud statutes

"demand[]." *United States v. Greenberg*, 835 F.3d 295, 305–06 (2d Cir. 2016). Under those statutes, there must be "proof . . . that the defendant had a conscious knowing intent to defraud" and to have "contemplated or intended some harm to the property rights of the victim." *U.S. v. Autuori*, 212 F.3d 105, 116 (2d Cir. 2000).

### 2.    *"Transmission" of Compliance Reports*

Leadenhall must plead at least two predicate acts with particularity—indeed, "[a]ll of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions." *Gutman v. Equidyne Extractive Indus. 1980 Petro/Coal Program I*, 1990 WL 113193, at *7 (S.D.N.Y. July 27, 1990). And when, as here, the predicate act is based on fraudulent misrepresentations (here, in Compliance Reports), the "complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. Affinion Grp.*, 889 F.3d 116, 124–26 (2d Cir. 2018). All Leadenhall offers, however, is alleged physical proximity and unsupported conclusions.

Leadenhall alleges that, in March 2023, certain A-CAP employees worked out of the offices of 777 Partners, (*id.* ¶ 202), and two 777 Partners employees, whose responsibilities included preparation of the Compliance Reports, began reporting to A-CAP's Chief Operating Officer, Mr. Saliba, (*id.* ¶ 202–03). The two employees, Adnani and Bennett, then stopped sending confirmation emails with the reports—as Adnani had prior—and the name attached to the reports was now simply "SuttonPark Capital." (*Id.*, Ex. 6.) From this, Leadenhall offers the *conclusion* that A-CAP and Mr.

King "participated in and directed" the *transmission* of unsigned false Compliance Reports from SuttonPark Servicing to Leadenhall. (AC ¶ 363(g), (h).)

But when it comes to alleged *facts*, Leadenhall can only allege that A-CAP was "aware of" the "transmission" of the Reports. (*Id.* ¶ 209.) None of Leadenhall's allegations ties Mr. Saliba or any other A-CAP employee to the Compliance Reports. It alleges instead only that the Reports were "Uploaded to Leadenhall's DropBox" by "SuttonPark Capital." (*Id.*, Ex. 6.)

What is more, the first Reports issued after A-CAP's alleged "aware[ness]" (on "April 4, 2023") allegedly reflected for the first time that, as a result of the just-uncovered double-pledging, "SuttonPark Borrower had taken on ***over \$170 million in debt*** above its Borrowing Base." (*Id.* ¶ 136.) The Amended Complaint supplies zero basis to conclude that A-CAP somehow knew that the April Report and those that followed nevertheless remained inaccurate as a result of *other* alleged misdeeds.

Leadenhall does, however, detail how, years before, that alleged misconduct had been well concealed. (*Id.* ¶¶ 151-159, 163-174.) And it allegedly took Leadenhall over a year to uncover the full extent of the alleged fraud. *See supra* Facts Part G. Leadenhall, however, supplies no basis to conclude that A-CAP must have uncovered the same within a month. (*Id.* ¶¶ 208–09.)

### 3. *Statements about 777 Partners' Liquidity*

Leadenhall alleges that, during pre-litigation workout discussions in June and July 2023 (AC ¶ 212), A-CAP represented that 777 Partners had "sources of liquidity other than A-CAP," (*id.* ¶ 363 (g), (h)). This allegation cannot constitute a predicate act of "mail and/or wire fraud," (*id.* ¶ 362), for four reasons.

*First*, "[t]o be guilty of mail or wire fraud, defendants must have used the mail or wires" in their fraud, *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 511 (S.D.N.Y. 1990), yet Leadenhall makes no mention. (*See id.* ¶ 363(g), (h).)

*Second*, Leadenhall must "allege specifically" "the content of any alleged misrepresentation, and the date, place and identity of the persons making the misrepresentations." *Atl. Gypsum Co.*, 753 F. Supp. at 512. But it fails to allege when, where, or how the purported misrepresentations were made; only that they occurred sometime during restructuring negotiations that spanned several months, (AC ¶ 212). Leadenhall also fails to plead the content of the misrepresentations with specificity; it does not "elaborat[e] on what representations [about those sources of liquidity] were made or why those representations were false." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (finding allegation that defendants "made oral and written misrepresentations of their net worth and their ability to make [a] partnership business successful" were "conclusory and unsupported by assertions of facts").

*Third*, Leadenhall's allegations about A-CAP and Mr. King's intent—that the alleged misrepresentations were made so that Leadenhall would "forbear[e] from filing suit" and to "prevent or delay" exposure (*id.* ¶ 363(g), (h))—are contradicted by the Amended Complaint's allegations. Leadenhall alleges that the restructuring efforts aimed at "stav[ing] off this very litigation" were **nixed by A-CAP**, (*id.* ¶¶ 199, 181–192), much to Mr. Wander's dismay, (*id.* ¶ 190)—hardly the actions of a lender intent on covering up fraud. Leadenhall's allegation about A-CAP and Mr. King's intent is thus "contradicted by the complaint itself." *Perry*, 424 F. App'x at 25.

-21-

*Fourth*, the involvement of a first-lien lender in workout talks cannot plausibly support an inference of fraud. *See Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 151 (2d Cir. 2007) (explaining that "inherent in any creditor-debtor relationship" is the power to "exert[] the control necessary" for a lender "to attempt a workout" of the debtor). Plainly, it is in A-CAP's interests as a senior creditor to engage in alleged talks that might avoid threatened litigation, the mere existence of which could (as Leadenhall acknowledges, (AC ¶ 142)), affect A-CAP's collateral. At any rate, Leadenhall also alleges an innocent commercial reason why A-CAP became involved: because Mr. Wander allegedly proposed to solve his dispute with Leadenhall through A-CAP lending more cash to 777, which in turn could loan that money to Leadenhall's SPV-Borrower counterparties. *See supra* Facts Part F.

### 4. *"Excessive and Improper Control"*

Leadenhall accuses A-CAP and Mr. King of exercising "excessive and improper control" over the 777 Entity Defendants, in the form of A-CAP's all asset liens, (AC ¶ 243), and the Steering Committee (*id.* ¶ 201), and thus claims that A-CAP and Mr. King are liable for those Defendants' actions. (*id.* ¶ 363(g), (h).) But such alleged control is not itself mail or wire fraud, and Leadenhall is careful not to allege that A-CAP and 777 are alter egos of one another or should otherwise be treated as a single entity.

In any case, what Leadenhall describes is no more than the usual influence that a senior creditor has over a borrower through standard contractual rights—

nothing that resembles any predicate act.[8] A-CAP's contractual rights as a senior creditor do not imply its knowledge of—much less participation in—an alleged scheme that came to fruition years before A-CAP allegedly secured those rights.

There is thus an obvious, innocent explanation for A-CAP's purported "influence": it has rights common among senior creditors. *Cf. L-7 Designs v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (plaintiff's inferences are implausible if there "exist[] alternative explanations so obvious that they render plaintiff's inferences unreasonable"). In fact, several of the allegations Leadenhall proffers as evidence of A-CAP and Mr. King's involvement in fraud are things Leadenhall itself engaged in as a lender: *e.g.*, visiting 777 Partners' offices, (AC ¶¶ 108, 139); issuing directions to 777 Partners' agents, (*id.* ¶ 130); and wielding the ability to accelerate debt, (*id.* ¶ 177).

### 5. *Protective Advances*

Finally, Leadenhall says that A-CAP aided and abetted the predicate acts of others by "strategically injecting capital into the 777 Entity Defendants' operations to retain the appearance of solvency and continue carrying out the fraud." (AC

---

[8] "Suggestions by a major lender" and the "threat[ened] exercise of its legal rights if the debtor does not comply" are "commonplace and completely proper." *Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995). Doing so "often enable[s] secured creditors to extract concessions from the borrower," including "greater restrictions and controls on [the borrower's] business." My Chi To, Second-Lien Financings in Bankruptcy: Expectations v. Reality, Prac. Law (2008).

¶ 363(g).) And without that capital, which allegedly "provides the 'financial firepower' to fuel 777 Partners' dealmaking," (AC ¶ 15), 777 could not have engaged in its scheme. But loaning money to an entity later alleged to have operated a criminal enterprise makes A-CAP no more liable than it does Leadenhall. The "mere act of extending financing does not form the basis for an implication of the 'substantial assistance' required for aiding and abetting liability." *Nat'l Union Fire Ins. of Pittsburgh, Pa. v. Eaton*, 701 F. Supp. 1031, 1039 (S.D.N.Y. 1988); *In re Refco Inc. Sec. Litig.*, 2011 WL 13168450, at *11 (S.D.N.Y. Dec. 8, 2011) ("Plaintiffs' reliance on [lender's] providing credit avails them nothing as applied to their aiding and abetting claim."); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 557 (W.D. Mich. 1998) (applying New York law, and holding that a lender "cannot be held liable for aiding and abetting fraud" "merely on the basis that it knew that the party it was lending to was not being forthright in its dealings with others"); *First City Nat. Bank & Tr. Co. v. Fed. Deposit Ins.,* 730 F. Supp. 501, 509 (E.D.N.Y. 1990) (dismissing RICO claim against accounting firm that allegedly aided and abetted predicate acts, even though the firm allegedly "had knowledge of the [] scheme."); *see also Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 411 (S.D.N.Y. 2021).

Even when the lender is fully aware of the borrower's fraud, lending is simply not a predicate act of mail or wire fraud. *Berry v. Deutsche Bank Tr. Co. Americas*, 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008), *aff'd*, 378 Fed. Appx. 110 (2d Cir. 2010) ("Lending money to an enterprise does not establish [liability under RICO] even with knowledge of the fraud."). And there is again an obvious alternative explanation:

it is both rational and "common" for a lender to make "[p]rotective advances" "when [its] collateral is in jeopardy." *Corporativo Grupo R SA de C.V. v. Marfield Ltd.*, 606 F. Supp. 3d 502, 512 (S.D. Tex. 2022).

Moreover, though there is a divide among courts in this Circuit, the better view is that "aiding and abetting a predicate act" does not "itself constitute[] a predicate act." *Est. of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 395–96 (S.D.N.Y. 2014) *see Penn. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 841 (3d Cir. 2000) (rejecting liability for "aid[ing] and abet[ing] RICO predicate acts") (cited approvingly by *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019) (there is "no private cause of action" for "aiding and abetting a civil RICO violation").

B. <u>Leadenhall Suffered No Cognizable Harm Proximately Caused by A-CAP</u>.

Leadenhall cannot meet RICO's "rigorous" proximate-causation requirement, which "requires dismissal when substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury." *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 276–77 (S.D.N.Y. 2019). Leadenhall fails to allege any direct relation between A-CAP's actions and Leadenhall's injury from years before. A-CAP's acts were not "an indispensable part of the" Borrowing Base fraud, and "[a]cts that merely furthered, facilitated, permitted, or concealed an injury which happened or could have happened independently of the act do not directly cause that [RICO] injury, and thus do not proximately cause it." *City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272, 286 (S.D.N.Y. 2016) (granting motion to dismiss RICO claims involving "after-the-fact money laundering in the United States"). Indeed, Leadenhall speculates that A-CAP did not so much as become *aware* of the

misconduct until years after Mr. Wander's alleged fraud was complete. *See supra* Facts, Part D.

Moreover, Leadenhall's alleged injury—the Borrowing Base Deficiency—is not a RICO injury at all. Leadenhall cannot plausibly allege, for example, how much of any shortfall in the present value of its collateral resulted from alleged racketeering, rather than external factors such as interest-rate fluctuations. (*See, e.g.*, ECF 58-5, 58-6, 58-7 (Reports showing an unmet "Hedging Requirement" and Borrowing Bases that fluctuate as the "Discount Rate" changed).) This failure independently warrants dismissal. *See Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 143 (2d Cir. 2018) (affirming dismissal where distributors' lost sales did not necessarily flow from predicate act of smuggling).

C. <u>The Amended Complaint Alleges No Domestic Injury.</u>

Leadenhall "must allege and prove a *domestic* injury to its business or property." *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 346 (2016) (emphasis in original). Leadenhall merely alleges that it is a foreign entity, (AC ¶ 23), that does business with American entities and has been unable to collect a debt owed to it (*id.* ¶ 368). The entity that it has characterized as the "foundation" of the alleged scheme, 777 Partners' reinsurance subsidiary 777 Re Ltd. ("777 Re"), (ECF 57 at 14), is Bermudan. While Leadenhall alleges that it has rights to certain U.S.-based assets under the LSA, (AC ¶ 368), it does not allege any attempt to exercise those rights by foreclosing. Thus, unlike in *Yegiazaryan v. Smagin*, which found a domestic injury where the racketeering activity—the "injurious effects of [which] largely manifested in California"—had "the 'central purpose of'" frustrating a California judgment, the

rights to which "exist[ed] only in California," 599 U.S. 533, 546 (2023), Leadenhall does not allege domestic injury.

###### D. The Amended Complaint Alleges No Distinct Enterprise.

A RICO enterprise must (1) "be distinct from the person conducting the affairs of the enterprise" and (2) "exist separate and apart from the pattern of activity in which it engages." *Heinrich v. Dean*, 655 F. Supp. 3d 184, 190 (S.D.N.Y. 2023).

Leadenhall claims that all Defendants operate as an association-in-fact enterprise, (AC ¶ 358), without alleging "solid information regarding the hierarchy, organization, and activities of the alleged enterprise." *Wild Edibles Inc. v. Indus. Workers of World Loc. 460/640*, 2008 WL 4548392, at *1 (S.D.N.Y. Oct. 9, 2008). Rhetoric that A-CAP is the "Wizard of Oz" and "puppeteer," (*id.* ¶¶ 13, 199), is insufficient. *See Paul Hobbs Imports Inc. v. Verity Wines LLC*, 2023 WL 374120, at *9 (S.D.N.Y. Jan. 24, 2023) (allegation that defendants were "masterminds" was "too conclusory"). Indeed, Leadenhall says *Mr. Wander and Mr. Pasko*, not A-CAP, hold "domination and control" over most alleged enterprise members, (*id.* ¶¶ 42–43).

Nor is Leadenhall's allegation that A-CAP "funds the operations of 777 Partners and 600 Partners through loans and otherwise," (*id.* ¶¶ 360(a), (b)), sufficient. Leadenhall too "fund[ed] the operations of 777 Partners and 600 Partners." (*Id.* ¶¶ 49, 283 n.60.)

Moreover, the alleged acts of fraud aimed at Leadenhall allegedly constitute the enterprise itself. (*See, e.g.*, *id.* ¶ 268 (alleging only that "Defendants' racketeering acts were a regular way of conducting their ongoing business *with Plaintiffs*").) And A-CAP's alleged role in the enterprise, funding 777, allegedly amounts to aiding and

abetting the fraud. (AC ¶ 363(g).) That is insufficient to allege an enterprise, which must exist "separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see Satinwood*, 385 F.3d at 176.

Leadenhall must also show that defendants "acted on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests." *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014). Leadenhall does not explain how A-CAP's purpose was anything but advancing its own self-interest. *See id.* (dismissing RICO claim where defendants "worked together in some respects" but "the complaints create no plausible inference that they did so . . . for any shared purpose"). Leadenhall now claims that the "common purpose" of the enterprise is to "enrich[] its principals." (AC ¶ 359.)[9] But Leadenhall cannot show an enterprise "by alleging that illegal means were used to obtain a lawful objective." *D.N.C. v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019).

E.    <u>The Amended Complaint Alleges No Pattern of Racketeering.</u>

A racketeering "pattern" requires that each "defendant's criminal participation in an enterprise is not merely isolated or sporadic, but indicative of the sort of continuity of criminal activity—or the threat of continuity—that is the hallmark of racketeering." *United States v. Pizzonia*, 577 F.3d 455, 465 (2d Cir. 2009).

---

[9] In its initial Complaint, Leadenhall claimed the enterprise's "ultimate goal" was to "purchase professional football teams." (Compl. ¶ 181.)

Leadenhall's open-ended continuity theory fails because the alleged RICO scheme was "not only inherently terminable, but, in fact was terminated." *Rio Tinto PLC v. Vale*, 2015 WL 7769534, at \*10 (S.D.N.Y. Nov. 20, 2015). 777 made all the allegedly fraudulent draws around the time of the LSA's inception and made no further draws after March 2022 at the latest. *See supra* Facts, Part D. Moreover, multiple acts of fraud "in furtherance of a single episode of fraud involving one victim"—Leadenhall—"and relating to one basic transaction"—the LSA—"cannot constitute" a pattern. *Crawford*, 758 F.3d at 489. Nor does the alleged "subsequent enjoyment of the proceeds" constitute "ongoing criminal activity"; otherwise "every finite scheme [could be turned] into an enterprise[.]" *Rio Tinto*, 2015 WL 7769534, at \*10. Similarly, any alleged "efforts by a defendant to cover up the underlying conduct are inadequate to satisfy the continuity requirement of the RICO statute." *Id.*

Leadenhall argues that "double-pledging" would deprive other creditors of "free and clear" security interests. (AC ¶ 365.) But even if other creditors—whom, beyond Credigy, Leadenhall does not identify—suffered an injury, that would not show a pattern. *See Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) ("[T]he combination of these factors (single scheme, single injury, and few victims) makes it virtually impossible for plaintiffs to state a RICO claim.").

Leadenhall claims that companies owned by the Partners HoldCos "continue to have their own credit facilities with other third-party lenders, and there is no reason to think that the fraudulent practices with respect to collateral pledging

alleged above are confined only to the Leadenhall facility." (AC ¶ 366.) That sort of "conclusory[]," *AmBase Corp. v. 111 W. 57th Sponsor LLC*, 785 F.App'x. 886, 889 (2d Cir. 2019), and "speculative," *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995), purported threat of continuity cannot show a "pattern." Indeed, Leadenhall does not even claim that the "fraudulent practices" extend to two of the four SPV Borrowers.

F.  Leadenhall States No RICO Conspiracy Claim.

When, as here, the "RICO conspiracy claims are entirely dependent on the[] substantive RICO claims," *Satinwood*, 385 F.3d at 164, the conspiracy claims "necessarily must fail" if the substantive RICO claims are deficient, *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008).

Moreover, Leadenhall has not plausibly alleged against A-CAP the "core of a RICO civil conspiracy," that it agreed "to commit predicate acts," *R.C.M. Exec. Gallery Corp. v. Rols Cap. Co.*, 1997 WL 27059, at *10 (S.D.N.Y. Jan. 23, 1997). Leadenhall alleges that a March 2023 Steering Committee amounted to an agreement to commit the predicate acts of racketeering." (*Id.* ¶ 375.) But its own Amended Complaint admits that the alleged agreement merely "ensure[d] that every single 777 Partners investment into a portfolio company was approved by King." (*Id.* ¶ 374.)

Agreement to make operational changes is not an agreement to commit predicate acts. Indeed, the alleged Borrowing Base fraud has nothing to do with "investment[s] into [] portfolio compan[ies]." (*Id.* ¶ 374.)

Dismissal is also warranted because "there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants,"

*Cenedella*, 348 F. Supp. 3d at 358—A-CAP monitored and protected collateral backing its loans, as would any responsible senior creditor. *See supra* Part II.A.1.[10]

## III.   LEADENHALL'S STATE-LAW CLAIMS FAIL AS A MATTER OF LAW.

### A.   "Civil Conspiracy" Is Not a Cause of Action (Count V).

Leadenhall's civil conspiracy claim fails because "no cause of action lies for civil conspiracy." *Dorce v. City of N.Y.*, 608 F. Supp. 3d 118, 147 (S.D.N.Y. 2022). Moreover, Leadenhall fails to plausibly allege a conspiratorial agreement. *See supra* Part II.

### B.   Leadenhall Pleads No Aiding-and-Abetting Claim (Count VI).

As with Leadenhall's RICO claim, Leadenhall's aiding-and-abetting-fraud claim should be dismissed for failure to plausibly allege how A-CAP and Mr. King supposedly "substantially assisted," (AC ¶ 397), the fraud allegedly committed by others years before A-CAP came into the picture. *See supra* Part II.A.

"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 411 (S.D.N.Y. 2021). Aiding-and-abetting claims premised on fraud are subject to Rule 9(b). *Berman v. Morgan Keegan & Co.*, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 11, 2011).

---

[10] Given 777 Partners' representation that one of its members is a foreign entity, there appears to be no diversity jurisdiction. (ECF 86-1 ¶ 3.) If the Court dismisses the federal counts, it should decline to exercise supplemental jurisdiction over the remaining state-law claims.

A state law fraud claim requires "justifiable reliance by the plaintiff." *Negrete v. Citibank*, 759 Fed. Appx. 42, 47 (2d Cir. 2019). Leadenhall alleges summarily that it reasonably relied on the Compliance Reports it received in early 2023, (AC ¶ 118), but Leadenhall does not (and cannot plausibly) claim to have reasonably relied on (or been deceived by) the unsigned Compliance Reports transmitted after March 2023—the point at which A-CAP allegedly learned of the alleged fraud, (*id.* ¶ 202–209). By March 2023, Leadenhall had received two tips about the 777 Defendants' alleged fraud: one anonymous tip in September 2022, after which Leadenhall commenced an investigation, (*id.* ¶ 8–9), and one from Crediqy in March 2023, (*id.* ¶ 10). Through Crediqy, Leadenhall learned about all the alleged "double-pledging"—which implicated  assets totaling $185 million. (*Id.* ¶ 119–122.) Then, on March 24, 2023, Leadenhall sent a letter to Messrs. Wander and Pasko, demanding evidence (by March 27) of the Compliance Reports' accuracy. Thus, by the time A-CAP is alleged to have learned of the fraud, Leadenhall could not have plausibly relied on the accuracy of any Compliance Reports.

Leadenhall also fails to allege A-CAP's knowledge or substantial assistance. As to knowledge, Leadenhall offers only self-serving speculation that A-CAP *must have* discovered the alleged borrowing-base fraud by spring 2023. (AC ¶ 212, 208–209.) It is "critical," however, to plausibly allege that, in providing substantial assistance, defendant had "actual knowledge" "***at the time***" of the alleged conduct. *Berdeaux*, 561 F. Supp. 3d at 414–15; *see also Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) (holding allegations merely suggesting that a defendant

"should have known" of the fraud are insufficient). But Leadenhall fails to plead that A-CAP had actual, contemporaneous knowledge of fraud that allegedly began in May 2021 and achieved its object by June 2021, (*id.* ¶ 55).

Leadenhall must also allege, to show substantial assistance, that A-CAP's conduct "proximately caused the harm on which the primary liability is predicated." *Berdeaux*, 561 F. Supp. 3d at 416. Yet the Amended Complaint alleges no causal connection between anything A-CAP did and the alleged Borrowing Base Deficiency underlying Leadenhall's claims. *See supra* Part II.B. Indeed, Leadenhall reiterates the same conduct it characterizes as RICO predicate acts. (AC ¶ 398 (e), (f).) But apart from making loans, all these alleged acts occurred years after the fraudulent scheme was complete. *See supra* Part II.A. And with respect to funding, Leadenhall seeks to hold A-CAP liable for aiding and abetting because it (like Leadenhall and others) loaned money to an alleged fraudster, but the law does not support that result. *See supra* Part II.A.4.

C.  <u>Leadenhall Pleads No Unjust-Enrichment Claim (Count X).</u>

Leadenhall's "agreements" with 777, (AC ¶ 400)—including the LSA and the Guaranty (*id.* ¶ 49)—preclude an unjust enrichment claim "even against a third party non-signatory to the agreement" like A-CAP. *Law Debenture v. Maverick Tube Corp.*, 2008 WL 4615896, at *12 (S.D.N.Y. Oct. 15, 2008). Moreover, the relationship between A-CAP and Leadenhall is "too attenuated": they "had no dealings," *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012), until June 2023, (AC ¶¶ 200, 211), long after 777 received any benefit from Leadenhall. Any benefit bestowed by Leadenhall was not "at the behest" of A-CAP, *Wilson v. Dantas*, 2013 WL 92999, at

*8 (S.D.N.Y. Jan. 7, 2013), *aff'd*, 746 F.3d 530 (2d Cir. 2014), nor did A-CAP receive

any "direct benefit," *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 353 (S.D.N.Y. 2014), so

A-CAP was not unjustly enriched.

    D. Leadenhall's Fraudulent Conveyance Claims Fail.

    Leadenhall asserts claims under New York's Debtor and Creditor Law ("DCL").

A claim "under th[at] article is governed by the local law of the jurisdiction in which

the debtor is located" at the time—here, Florida. *See* DCL § 279(a)(2), (3), 279(b); (AC

¶ 25.) Even if the statute applied, however, Leadenhall's claims fail. Leadenhall

pleads no payments by 777 Partners on the JARM loan, only by *JARM*. (AC ¶¶ 227,

416.) And as explained below, the alleged creation of a payment obligation and grant

of a lien on 777 Partners' assets also does not state a claim.

    *1.    Leadenhall States No Constructive Fraudulent Transfer Claim.*

    Under DCL §§ 273(a)(2) and 274(a), Leadenhall asserts that 777 Partners

received "no apparent consideration." (AC ¶¶ 225, 411.) But "conclusory allegations"

that the transferor "received nothing of reasonably equivalent value" "do not suffice."

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 466 (S.D.N.Y. 2018);

*see In re Molina*, 657 B.R. 172, 187 (Bankr. E.D.N.Y 2023) (allegations of "no

consideration" were too "conclusory"). These assertions also contradict Leadenhall's

pleading, which recognizes that 777 received value: "through [to] the present, A-CAP

has provided a revolving line of credit" and "continued funding of 777 Partners"

rather than foreclosing. (AC ¶¶ 21, 191(f), 194(n), 197, 242(a), 288.) *See In re Wade

Park Land Holdings, LLC*, 2024 WL 3024648 (2d Cir. 2024) ("[F]orbearance of

foreclosure on a defaulted loan can constitute 'reasonably equivalent value' by

itself.").

Leadenhall's claim under § 274(b) also fails because A-CAP is not an "insider" of 777 Partners. The only potentially applicable part of the definition is "a person in control of the debtor." DCL § 270(h)(2). But again, the Amended Complaint asserts that it is Wander and Pasko, not A-CAP, that "dominate and control" 777 Partners. (*E.g.*, AC ¶¶ 322, 332.)

Finally, all of Leadenhall's constructive fraudulent conveyance claims fail because, beyond a recitation of the elements, (AC ¶¶ 412–14), Leadenhall does not allege any facts showing that at the time of the alleged transfer—on March 4, 2024— 777 Partners was or would become insolvent. *See Patterson Belknap Webb & Tyler LLP v. Marcus & Cinelli LLP*, 227 A.d.3d 505, 507 (1st Dep't 2024).

### 2. *Leadenhall States No Actual Fraudulent Transfer Claim.*

To state a claim, Leadenhall must plead with particularity "that a defendant has transferred property with actual intent to hinder, delay, or defraud its creditors." *Red Rock Sourcing LLL v. JGX LLC*, 2024 WL 1243325, at *40 (S.D.N.Y. 2024), including "the factual basis" for "a 'strong inference' of fraudulent intent." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991).

Leadenhall alleges that the JARM consolidation was made pursuant to *A-CAP's desire* to "firm[] up" its liens, (AC ¶¶ 225, 228), not any intent by 777 Partners to "hinder, delay or defraud" creditors. But Leadenhall "must plead the fraudulent intent of the *transferor, not the transferee.*" *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 365–66 (Bankr. S.D.N.Y. 2024). And the statutory factors cited by Leadenhall fail to support fraudulent intent. (AC ¶ 407); DCL § 273(b). As noted above, the allegations

that: (i) 777 Partners was insolvent; (ii) that it failed to receive adequate consideration; and (iii) that A-CAP was an "insider" are conclusory and insufficient.

The remaining factors Leadenhall cites are unavailing. Leadenhall alleges that the March 2024 transfer occurred "shortly before and shortly after substantial debts were incurred by 777 Partners[.]" (AC ¶ 407(e).) But the only specific debts Leadenhall cites are its debts to A-CAP, which began in 2020, four years earlier. Leadenhall also alleges that "[b]efore the transaction" "777 Partners had been sued or threatened with suit by creditors including Leadenhall." (AC ¶ 407(b).) But Leadenhall did not threaten to sue 777 until mid-April 2024, more than a month after the transfer, and did not sue until May 2024. (AC ¶¶ 158, 176, 189.)

## IV.    A-CAP AND MR. KING ARE NOT LIABLE FOR THE 777 ENTITY DEFENDANTS' DEBTS.

Leadenhall's effort to hold A-CAP and Mr. King "liable for the [contractual] breaches" of 777 (AC ¶ 322) violates "hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action." *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991). Leadenhall disclaims alter-ego liability, affirmatively alleging that 777 Partners, 600 Partners, and A-CAP are "legally distinct entities," *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005): "***the 777 Entity Defendants are distinct from King***

***and A-CAP (and vice versa)***." (AC ¶ 360). Indeed, Leadenhall *must* allege they are distinct in pursuit of its (defective) RICO claims.[11]

## V.    LEADENHALL CANNOT HOLD MR. KING PERSONALLY LIABLE.

Leadenhall states no claim against Mr. King for all the above reasons and more. It alleges that Mr. King did the following: announced A-CAP's recapture of insurance liabilities ceded to 777 Re, (AC ¶¶ 282–83), communicated with Wander regarding workout negotiations and sat in on phone calls, (*id.* ¶¶ 186, 191, 210), objected to a forbearance agreement on terms demanded by Leadenhall, (*id.* ¶¶ 178, 180), headed a March 2023 "Steering Committee" that approved of 777 Partners' investments, and sent A-CAP employees to visit 777 Partners' offices, (*id.* ¶¶ 201– 202). Such lawful actions by the CEO of a senior lender support no claim by Leadenhall, much less the "inevitabl[y] stigmatizing" RICO claim it launched. *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996).

Nor does Leadenhall show that even those benign actions were taken by Mr. King in his *personal* capacity. Yet Leadenhall cannot hold Mr. King liable for any action taken in his capacity as A-CAP's CEO. *See* N.Y. LTD. LIAB. CO. § 609 (Members, managers, and agents are not personally liable for "liabilities of the limited liability company . . . arising in tort . . . by reason of *being* such member, manager or agent or *acting* (or omitting to act) in such capacities[.]");[12] *Quebecor World (USA), Inc. v.*

---

[11] *See Friedlander v. Rhoades*, 962 F. Supp. 428, 432 (S.D.N.Y. 1997) (dismissing RICO claim where plaintiff alleged defendants were alter egos, "a defect fatal to [plaintiff's] RICO claim").

[12] The rule in Delaware, where A-CAP is organized, is the same. 6 Del. Code § 18-303.

*Harsha Assocs., LLC*, 455 F. Supp. 2d 236, 244 (W.D.N.Y. 2006) ("[O]ne of the beneficial purposes for forming an LLC" is "to shield its individual members from personal liability for the acts of the LLC."); *Nezry v. Haven Ave. Owner LLC*, 2010 WL 3338545, at *11 (N.Y. Sup. Ct. 2010) (dismissing claims against LLC's members for failure to allege members' tortious conduct).

## CONCLUSION

A-CAP and Mr. King's motion to dismiss should be granted.

Dated: New York, New York
October 10, 2024

CADWALADER, WICKERSHAM & TAFT LLP

By: /s/ Jonathan Watkins
Jonathan M. Watkins
Michael E. Petrella
Matthew M. Karlan
Mark A. Singer
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Fax: (212) 504-6666
jonathan.watkins@cwt.com
michael.petrella@cwt.com
matthew.karlan@cwt.com
mark.singer@cwt.com

*Counsel for Advantage Capital Holdings
LLC and Kenneth King*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby certify under Section II.D of Judge Koeltl's individual practices that this memorandum contains 9,974 words, exclusive of the cover page, table of contents, table of authorities, and this certification. This complies with the Court's Order (ECF 159) permitting each defendant to file briefs with up to 10,000 words.


By:  /s/ *Jonathan Watkins*
Jonathan M. Watkins