# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,

Plaintiffs,

vs.

JOSH WANDER, STEVEN PASKO,
KENNETH KING, 777 PARTNERS LLC,
600 PARTNERS LLC, SPLCSS III LLC,
SIGNAL SML 4 LLC, INSURETY AGENCY
SERVICES LLC, DORCHESTER
RECEIVABLES II LLC, SUTTONPARK
CAPITAL LLC, SIGNAL MEDICAL
RECEIVABLES LLC, INSURETY CAPITAL
LLC, SUTTONPARK SERVICING LLC,
ADVANTAGE CAPITAL HOLDINGS LLC,

Defendants.

Civil Action No. 1:24-cv-03453-JGK

# LEADENHALL'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 6

    A.   The Parties Enter into a Secured "Borrowing Base" Credit Facility. .......................... 6

    B.   Wander Admits to Double-Pledging Collateral. .......................................... 7

    C.   A-CAP and King Emerge as Controllers of 777. ........................................ 9

    D.   777 and A-CAP Pursue High-Profile Football and Aviation Projects. ...................... 10

    E.   Leadenhall Uncovers Forged Bank Statements and Other Evidence of Fraud. ........ 11

    F.   Leadenhall Accelerates the $609 Million in Outstanding Debt and Restructuring Negotiations Fail. .............................................................................. 13

    G.   A-CAP and King Emerge from Behind the Curtain. ..................................... 14

    H.   Leadenhall Initiates this Action and Obtains a Preliminary Injunction ................... 15

LEGAL STANDARD ......................................................................................... 16

ARGUMENT ................................................................................................... 17

  I.   The Court Has Both Federal Question and Diversity Subject Matter Jurisdiction. .......... 17

  II.  Leadenhall Pleads a Prototypical RICO Claim. ............................................. 20

    A.   Leadenhall Has Sufficiently Pled a RICO "Enterprise" Whereby Defendants Used the 777 Organization to Defraud Investors to Fund Passion Projects They Otherwise Lacked the Money to Pursue. ..................................................................... 21

        1.   Leadenhall Alleges Each Required Element of the RICO Enterprise's Structure. ................................................................................... 21

            a.   The Enterprise's Common Purpose: Fraudulently Inducing Lenders to Bail Out a Sinking Ship and Keeping the Profits for Themselves and Their Vanity Projects .............................................................. 22

            b.   Employment, Contractual, and Control/Agency Relationships Among Members of the Enterprise .......................................................... 26

            c.   The Enterprise Engaged in a Clear, Regular, and Longstanding Pattern of Racketeering Activity. .............................................................. 27

        2.   Each RICO Defendant Is Distinct from the RICO Enterprise. ...................... 30

B.  Leadenhall Has Sufficiently Pled Predicate Acts of "Racketeering Activity," Including but Not Limited to 60+ Fraudulent Communications Lying About Leadenhall's Collateral. ............................................................................ 34

C.  Leadenhall Has Sufficiently Pled Each Defendant's "Conduct or Participation" in the Enterprise. ............................................................................ 37

D.  Defendants' Falsification of Collateral, False Compliance Reports, and Fraudulent Acts of Concealment Constitute an Unmistakable Pattern of Racketeering Activity with Both Open-Ended and Closed-Ended Continuity. ............................................. 45

E.  Leadenhall's RICO Claims Seeking Treble the Accelerated Debt Are Ripe. ............ 48

F.  Both the 777 Defendants and A-CAP and King Proximately Caused Leadenhall's Damages. ............................................................................................................ 51

  1.  Leadenhall Reasonably Relied on the 777 Defendants' Fraudulent Statements, as Defendants Intended. .................................................................................. 52

  2.  A-CAP and King Directly Caused Leadenhall's RICO Injuries. ..................... 55

G.  Leadenhall Has Sufficiently Pled Domestic Injury. .................................................. 56

III.  Leadenhall Sufficiently alleges a RICO Conspiracy Claim ............................................... 59

IV.  Leadenhall's Contract and Quasi-Contract Claims Remain Virtually Undisputed. .......... 63

A.  Defendants Do Not Dispute Nine of Ten "Trigger Events" Constituting Breaches of the Guaranty Agreement (Claim 4) and Waive Any Challenge Thereto. ................. 63

B.  Defendants Do Not Dispute Breaches of the LSA, Sale Agreements, and Servicing Agreements (Claims 1-3) Except to Feign Confusion as to Which Provisions Were Breached by Which Defendants. .............................................................................. 65

C.  The 777 Entity Defendants Do Not Dispute That They Operate as Alter Egos of One Another, and Wander's and Pasko's Challenges to Alter-Ego Liability Are Factual Disputes. ............................................................................................................ 66

  1.  Both Wander and Pasko Dominated and Controlled the 777 Entity Defendants, and There Is No Dispute that 777 Partners and 600 Partners Dominated and Controlled Their Subsidiaries. .......................................................................... 68

  2.  The Complaint Demonstrates That Defendants Used Their Domination and Control to Commit a Fraud or Other Wrong. ................................................... 74

D.  A-CAP and King Have Waived Any Challenge to Lender Liability. ........................ 77

E.  Leadenhall Has Sufficiently Pled Unjust Enrichment. ............................................. 80

V.    Leadenhall Alleges Its Fraud Claims with Ample Particularity.......................................... 82

    A.    The 777 Defendants' Sole Challenge to Leadenhall's Common-Law Fraud Claim
Fails. ....................................................................................................................... 82

    B.    Leadenhall's Detailed Allegations State a Claim for Aiding and Abetting Common-
Law Fraud............................................................................................................... 84

    C.    Leadenhall Has Sufficiently Pled Civil Conspiracy to Commit Common-Law
Fraud....................................................................................................................... 88

    D.    Forcing 777 Partners to Assume and Secure a $170 Million Loan to Prevent, Hinder,
and/or Delay Leadenhall from Recovering on Its Claims Constitutes a Fraudulent
Transfer.................................................................................................................. 89

        1.    The Transaction Was an Actual Fraudulent Transfer Because It Was Made with
Intent to Hinder Leadenhall's Recovery. ........................................................... 91

        2.    The Transaction Was a Constructive Fraudulent Transfer Because 777 Partners
Received No Value for the $170 Million of Debt It Incurred............................ 94

VI.    The Court Has Personal Jurisdiction over Wander and Pasko........................................... 95

    A.    Wander and Pasko Consented to Personal Jurisdiction in the LSA, Guaranty
Agreement, Sale Agreements, Servicing Agreements, and Pledge Agreements. ....... 96

    B.    Wander and Pasko's Numerous Suit-Related Contacts with New York Subject Them
to Long-Arm Jurisdiction. ...................................................................................... 100

    C.    The Court Has Jurisdiction Over Wander and Pasko Based on the New York-Based
Actions of their Agents and Co-Conspirators......................................................... 102

CONCLUSION.................................................................................................................... 105

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4 K & D Corp. v. Concierge Auctions, LLC*,
    2 F. Supp. 3d 525 (S.D.N.Y. 2014)..................................................................33, 45

*Ajinomoto Co. v. CJ CheilJedang Corp.*,
    2021 WL 4430200 (S.D.N.Y. Sept. 27, 2021)...................................................33, 80

*Alix v. McKinsey & Co., Inc.*,
    2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023).........................................................44

*Allen ex rel. Allen v. Devine*,
    726 F. Supp. 2d 240 (E.D.N.Y. 2010) .......................................................21, 25, 32

*AM Cosms., Inc. v. Solomon*,
    67 F. Supp. 2d 312 (S.D.N.Y. 1999)......................................................................88

*Am. Home Mortg. Corp. v. UM Sec. Corp.*,
    2007 WL 1074837 (S.D.N.Y. Apr. 9, 2007)...........................................................49

*Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC*,
    402 F. App'x 623 (2d Cir. 2010) ...........................................................................73

*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
    268 F.3d 103 (2d Cir. 2001)...................................................................................20

*Automated Teller Mach. Advantage LC v. Moore*,
    2009 WL 2431513 (S.D.N.Y. Aug. 6, 2009)..........................................................30

*Bank of China, N.Y. Branch v. NBM LLC*,
    359 F.3d 171 (2d Cir. 2004)...................................................................................54

*Bankers Tr. Co. v. Rhoades*,
    859 F.2d 1096 (2d Cir. 1988).................................................................................50

*Bansal v. TD Ameritrade, Inc.*,
    2024 WL 3009423 (S.D. Fla. June 7, 2024) ..........................................................91

*Bolivar v. FIT Int'l Grp. Corp.*,
    2017 WL 11473766 (S.D.N.Y. Mar. 16, 2017)..................................................46, 47

*Boyle v. United States*,
    556 U.S. 938 (2009)...................................................................................... **passim**

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008)................................................................................51, 54, 55

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985).........................................................................................99

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*,
  2012 WL 12932049 (S.D.N.Y. July 17, 2012) ................................................73

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
  90 F. Supp. 2d 401 (S.D.N.Y. 2000).................................................................77

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
  316 F. Supp. 3d 635 (S.D.N.Y. 2018).........................................................73, 75

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001).........................................................................................33

*CesFin Ventures LLC v. Al Ghaith Holding Co. PJSC*,
  2022 WL 18859076 (S.D.N.Y. Dec. 10, 2022) ................................................96

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018).............................................................................103

*Chevron Corp. v. Donziger*,
  833 F.3d 74 (2d Cir. 2016)...............................................................................51

*Chevron Corp. v. Donziger*,
  974 F. Supp. 2d 362 (S.D.N.Y. 2014).........................................................20, 45

*Childers v. N.Y. & Presbyterian Hosp.*,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014).................................................................82

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
  714 F. Supp. 3d 416 (S.D.N.Y. 2024).........................................................69, 77

*City of N.Y. v. Gordon*,
  155 F. Supp. 3d 411 (S.D.N.Y. 2015).............................................................45

*Cleveland v. United States*,
  531 U.S. 12 (2000)...........................................................................................34

*Contant v. Bank of Am. Corp.*,
  385 F. Supp. 3d 284 (S.D.N.Y. 2019).....................................................103, 104

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
  587 F. App'x 663 (2d Cir. 2014) ......................................................................25

*D'Addario v. D'Addario*,
  901 F.3d 80 (2d Cir. 2018)................................................................................50, 51

*De Sole v. Knoedler Gallery, LLC*,
  974 F. Supp. 2d 274 (S.D.N.Y. 2013)........................................................21, 29, 37

*DeFalco v. Bernas*,
  244 F.3d 286 (2d Cir. 2001)................................................................................45

*Democratic Nat'l Comm. v. Russian Federation*,
  392 F. Supp. 3d 410 (S.D.N.Y. 2019)..................................................................25

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
  2024 WL 4008120 (S.D.N.Y. Aug. 30, 2024)................................................56, 57

*Discon, Inc. v. NYNEX Corp.*,
  93 F.3d 1055 (2d Cir. 1996)................................................................................31

*In re E. End Dev., LLC*,
  2017 WL 1277443 (Bankr. E.D.N.Y. Apr. 4, 2017)..............................................78

*eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*,
  2022 WL 1320405 (S.D. Fla. May 2, 2022) .........................................................95

*Edmar Fin. Co., LLC v. Currenex, Inc.*,
  2023 WL 3570017 (S.D.N.Y. May 18, 2023) ......................................24, 25, 27, 36

*Eliahu v. Jewish Agency for Israel*,
  919 F.3d 709 (2d Cir. 2019)................................................................................44

*Equinox Gallery Ltd. v. Dorfman*,
  306 F. Supp. 3d 560 (S.D.N.Y. 2018)..................................................................34

*In re Fairfield Sentry Ltd.*,
  660 B.R. 568 (Bankr. S.D.N.Y. 2024)................................................................103

*Fasano v. Li*,
  47 F.4th 91 (2d Cir. 2022) ..................................................................................97

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004)....................................................................29, 59, 62

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d. Cir. 1994)............................................................................48, 49

*Fountain v. United States*,
  357 F.3d 250 (2d Cir. 2004)................................................................................34

*Freeport-McMoRan, Inc. v. K N Energy, Inc.*,
    498 U.S. 426 (1991)...................................................................................................19

*Friedlander v. Rhoades*,
    962 F. Supp. 428 (S.D.N.Y. 1997).........................................................................31

*Friedman v. Hartmann*,
    1994 WL 376058 (S.D.N.Y. July 15, 1994) ...........................................................47

*Frydman v. Verschleiser*,
    172 F. Supp. 3d 653 (S.D.N.Y. 2016)....................................................................59

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    640 F. Supp. 2d 300 (S.D.N.Y. 2009)...............................................................30, 33

*Fuld v. Palestine Liberation Org.*,
    82 F.4th 74 (2d Cir. 2023) ......................................................................................99

*Gen. Trading v. Yale Materials Handling Corp.*,
    119 F.3d 1485 (11th Cir. 1997) ..............................................................................94

*Goldfine v. Sichienza*,
    118 F. Supp. 2d 392 ...............................................................................................49

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)..................................................................................100

*Gucci Am., Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015).......................................................................95

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)................................................................................................45

*Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Mkts., LLC*,
    347 F. App'x 711 (2d Cir. 2009) ............................................................................50

*Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
    2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012).........................................................49

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)................................................................................................52

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*,
    2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ..........................................................97

*Idle Media, Inc. v. Create Music Grp., Inc.*,
    2024 WL 2946248 (S.D.N.Y. June 11, 2024) .........................................................97

*Javier v. Beck*,
    2014 WL 3058456 (S.D.N.Y. July 3, 2014) ........................................................ 67

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005) ...........................................................85, 88

*JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*,
    2007 WL 1159637 (S.D.N.Y. Apr. 18, 2007) ..................................................29

*Kaplan v. Lebanese Can. Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) .........................................................................16, 74

*In re KDI Holdings, Inc.*,
    277 B.R. 493 (Bankr. S.D.N.Y. 1999) ........................................................78, 79

*Keawsri v. Ramen-Ya Inc.*,
    2023 WL 5950685 (S.D.N.Y. Sept. 13, 2023) .............................................67, 74

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018) ...............................................................................20

*Lateral Recovery LLC v. Funderz.net, LLC*,
    2024 WL 216533 (S.D.N.Y. Jan. 19, 2024) .....................................................29

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) .............................................................................37

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ...........................................................................100

*Long Side Ventures LLC v. Hempacco Co.*,
    2023 WL 6386888 (S.D.N.Y. Sept. 29, 2023) .............................................97, 98

*Long v. Zhuang*,
    2024 WL 4250308 (E.D.N.Y. Aug. 8, 2024) ....................................................33

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) .........................................................................34, 82

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ...............................................................................16

*Mandarin Trading Ltd. v. Wildenstein*,
    944 N.E.2d 1104 (N.Y. 2011) ..........................................................................80

*Marathon CRE 2018-FL1 Issuer, Ltd. v. 257-263 W 34th St. LLC*,
    2023 WL 1815195 (S.D.N.Y. Feb. 7, 2023) ....................................................19

*Mayfield v. Asta Funding, Inc.*,
 95 F. Supp. 3d 685 (S.D.N.Y. 2015)......................................................................24

*Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*,
 531 F. Supp. 3d 673 (S.D.N.Y. 2021).....................................................................62

*Motorola Credit Corp. v. Uzan*,
 322 F.3d 130 (2d Cir. 2003)...............................................................................49, 50

*Moy v. Terranova*,
 1999 WL 118773 (E.D.N.Y. Mar. 2, 1999)............................................................31

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
 766 F.3d 212 (2d Cir. 2014)......................................................................... *passim*

*Nathel v. Siegal*,
 592 F. Supp. 2d 452 (S.D.N.Y. 2008).....................................................................85

*Newman Cap. LLC v. Private Cap. Grp., Inc.*,
 2024 WL 2115311 (S.D.N.Y. May 10, 2024) ........................................................74

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)....................................................................................37

*NYKCool A.B. v. Pac. Int'l Servs., Inc.*,
 2013 WL 1274561 (S.D.N.Y. Mar. 29, 2013) ........................................................75

*In re Orion HealthCorp, Inc.*,
 95 F.4th 98 (2d Cir. 2024) .........................................................................................1

*Oster v. Kirschner*,
 77 A.D.3d 51 (1st Dep't 2010) ...............................................................................85

*Pampillonia v. RJR Nabisco, Inc.*,
 138 F.3d 459 (2d Cir. 1998)....................................................................................19

*Pasternack v. Klein*,
 2019 WL 330593 (M.D. Fla. Jan. 25, 2019)...........................................................94

*In re Pearlman*,
 460 B.R. 306 (Bankr. M.D. Fla. 2011) ...................................................................92

*In re Pearlman*,
 515 B.R. 887 (Bankr. M.D. Fla. 2014) ...................................................................95

*Physicians. Mut. Inc. Co. v. Greystone Servicing Corp., Inc.*,
 2009 WL 855648 (S.D.N.Y. Mar. 25, 2009) ..........................................................31

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ................................................................104

*Protex Indus. (H.K.) Ltd. v. Vince Holding Corp.*,
2024 WL 4149188 (S.D.N.Y. Sept. 11, 2024)..............................................80, 81

*Related Cos., L.P. v. Ruthling*,
2017 WL 6507759 (S.D.N.Y. Dec. 18, 2017) ...............................................54

*Related Cos., L.P. v. Ruthling*,
2019 WL 10947100 (S.D.N.Y. July 23, 2019) .............................................59, 61

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)........................................................................37

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
30 F.3d 339 (2d Cir. 1994)................................................................31

*Roberts v. C.R. England, Inc.*,
318 F.R.D. 457 (D. Utah 2019) ............................................................31

*Saidnia v. Nimbus Mining LLC*,
2023 WL 7005037 (S.D.N.Y. Oct. 24, 2023)..........................................96, 97, 98

*Salinas v. United States*,
522 U.S. 52 (1997)......................................................................59, 63

*Schmuck v. United States*,
489 U.S. 705 (1989)........................................................................34

*Schwartz v. Sensei, LLC*,
2020 WL 5817010 (S.D.N.Y. Sept. 30, 2020)...............................................75

*SD Prot., Inc. v. Del Rio*,
498 F. Supp. 2d 576 (E.D.N.Y. 2007) ....................................................19

*Secure Source Claims Co., LLC v. Miller*,
2024 WL 1342804 (S.D.N.Y. Mar. 29, 2024) ............................................26, 28

*Shanghai Join Buy Co. v. PSTEX Grp., Inc.*,
2006 WL 2322648 (S.D.N.Y. Aug. 10, 2006) ..............................................75

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018)......................................................85

*Sluka v. Estate of Herink*,
1996 WL 612462 (E.D.N.Y. Aug. 13, 1996)...............................................31, 32

*Stochastic Decisions, Inc. v. DiDomenico*,
  995 F.2d 1158 (2d Cir. 1993) ................................................................50

*Suazo v. Ocean Network Express (N. Am.), Inc.*,
  2024 WL 68428 (S.D.N.Y. 2024) ...........................................................64

*SUEZ Water N.Y. Inc. v. E.I. Due Pont de Nemours & Co.*,
  578 F. Supp. 3d 511 (S.D.N.Y. Jan. 4, 2022) ...............................101, 102

*TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*,
  945 F. Supp. 2d 1331 (M.D. Fla. 2013) ................................................90

*Transient Path, LLC v. Stones S. Bay Corp.*,
  2024 WL 3730113 (S.D.N.Y. Aug. 8, 2024) .................................97, 100

*U1it4less, Inc. v. Fedex Corp.*,
  871 F.3d 199 (2d Cir. 2017) .......................................................30, 31, 32

*U1iT4less, Inc. v. Fedex Corp.*,
  896 F. Supp. 2d 275, 288 (S.D.N.Y. 2012) ...........................................45

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
  Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ................................................................25

*United States v. Allen*,
  155 F.3d 35 (2d Cir. 1998) ...................................................................37

*United States v. Arrington*,
  941 F.3d 24 (2d Cir. 2019) ...........................................................21, 29

*United States v. Gershman*,
  31 F.4th 80 (2d Cir. 2022) ......................................................22, 27, 29

*United States v. Moses*,
  109 F.4th 107 (2d Cir. 2024) ...............................................................34

*United States v. Pierce*,
  785 F.3d 832 (2d Cir. 2015) ........................................................27, 28, 29

*United States v. Silvestri*,
  409 F.3d 1311 (11th Cir. 2005) ............................................................92

*United States v. Turkette*,
  452 U.S. 576 (1981) ........................................................................28, 29

*United States v. Vernace*,
  811 F.3d 609 (2d Cir. 2016) ................................................................26

*United States v. Weaver*,
    860 F.3d 90 (2d Cir. 2017)...........................................................................34

*United States v. Zemlyansky*,
    908 F.3d 1 (2d Cir. 2018) ......................................................................59, 63

*Vengalatorre v. Cornell Univ.*,
    36 F.4th 87 (2d Cir. 2022) .........................................................................17

*Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co. LLC*,
    2023 WL 2989068 (S.D.N.Y. Apr. 18, 2023)...........................................90

*Weyant v. Phia Grp. LLP*,
    2021 WL 5998400 (S.D.N.Y. Dec. 20, 2021) .........................................81

*Wiand v. Waxenberg*,
    611 F. Supp. 2d 1299 (M.D. Fl. 2009).....................................................95

*Williams v. Equitable Acceptance Corp.*,
    443 F. Supp. 3d 480 (S.D.N.Y. 2020).......................................................46

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
    933 F.2d 131 (2d Cir. 1991).....................................................67, 73, 74, 76

*Yaralli v. Am. Reprographics Co., LLC*,
    165 So. 3d 785 (Fla. 4th DCA 2015) ........................................................91

*Yegiazaryan v. Smagin*,
    599 U.S. 533 (2023)...........................................................................56, 57

**Statutes**

18 U.S.C. § 1343 ..........................................................................................34

18 U.S.C. § 1961 ..............................................................................30, 34, 44

18 U.S.C. § 1962 ......................................................................20, 32, 37, 59

18 U.S.C. § 1964 ..........................................................................................48

28 U.S.C. § 1331 ..........................................................................................17

28 U.S.C. § 1332 ..........................................................................................17

28 U.S.C. § 1367 ..........................................................................................17

N.Y. Debtor & Creditor Law § 270 ............................................................91

N.Y. Debtor & Creditor Law § 279 ............................................................91

Fla. Stat. § 726.105 ..................................................................................................90, 91, 93

**Other Authorities**

CPLR § 302.........................................................................................................................100

Fed. R. Civ. P. 8 ............................................................................................................30, 33

Fed. R. Civ. P. 9 ............................................................................................................34, 82

Fed. R. Civ. P. 10 .................................................................................................................2

Fed. R. Civ. P. 15 .................................................................................................................1

**TABLE OF ABBREVIATIONS**

| Abbreviation | Definition |
|---|---|
| "Complaint" or "Compl." | Corrected Amended Complaint (ECF 187) |
| "777 Entity Defendants" | 777 Partners, 600 Partners, SuttonPark Borrower, Dorchester Borrower, Insurety Borrower, Signal Borrower, SuttonPark Capital, Signal Medical, Insurety Capital, SuttonPark Servicer |
| "777 Defendants" | 777 Entity Defendants, Josh Wander, and Steven Pasko |
| "RICO Defendants" | Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, SuttonPark Servicer, SuttonPark Borrower, Dorchester Borrower |
| "777" | 777 Partners LLC, 600 Partners LLC, and their affiliates, generally |
| "777 Partners" | 777 Partners LLC |
| "600 Partners" | 600 Partners LLC |
| "Sellers" | SuttonPark Capital, Insurety Capital, and Signal Medical |
| "A-CAP" | Advantage Capital Holdings LLC |
| "Dorchester Borrower" | Dorchester Receivables II LLC |
| "Leadenhall" | Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC |
| "LSA" | Loan and Security Agreement, dated May 7, 2021 |
| "Guarantors" | 777 Partners and 600 Partners |
| "Servicers" | SuttonPark Servicer, Signal Servicing LLC, Insurety Servicing LLC |
| "Borrowers" | SuttonPark Borrower, Dorchester Borrower, Insurety Borrower, Signal Borrower |
| "SuttonPark Borrower" | SPLCSS III LLC |
| "Insurety Borrower" | Insurety Agency Services LLC |
| "Signal Borrower" | Signal SML 4 LLC |
| "SuttonPark Capital" | SuttonPark Capital LLC |
| "Signal Medical" | Signal Medical Receivables LLC |
| "Insurety Capital" | Insurety Capital LLC |
| "SuttonPark Servicer" | SuttonPark Servicing LLC |
| "U.S." | United States |

Plaintiff Leadenhall submits this consolidated memorandum in opposition to the motions to dismiss the Complaint filed by (1) the 777 Entity Defendants,[1] (2) Steven Pasko, (3) Josh Wander, and (4) A-CAP and Kenneth King.

## PRELIMINARY STATEMENT

Lying month after month in reports and communications for more than two years, Defendants intentionally misled Leadenhall into believing that approximately $600 million it provided to Defendants was secured by collateral "free and clear" of any other claims and that Defendants were running a legitimate, solvent business. The assets were not "free and clear," and the Defendants were in fact running a shell game, fueled by billions of dollars provided by A-CAP—and traceable to ordinary Americans' insurance premiums—whereby 777 Partners and its affiliates took money from investors and lenders and shuffled it among various money-losing entities to disguise their true financial condition.

As Leadenhall's Complaint reveals, two corporate families, 777 and A-CAP, comprise a dangerously leveraged enterprise that spends more than it makes and funnels any cash back to its principals and their risky vanity investments. For 777 principals Wander and Pasko, this criminal partnership gave 777 a source of cash—A-CAP's reserves—enabling an otherwise insolvent business to stay afloat so they could stay rich and make headlines buying sports teams and airlines.

---

[1] Leadenhall did not name in its Amended Complaint two 777 affiliates named as Defendants in the original pleading, Insurety Servicing LLC and Signal Servicing LLC. The Amended Complaint was filed with the Court's leave under Rule 15(a)(2). The remaining 777 Entity Defendants' unsupported suggestion that this was somehow improper is baseless. *See In re Orion HealthCorp, Inc.*, 95 F.4th 98, 102 (2d Cir. 2024).

For A-CAP Chairman King, the relationship provided a vehicle—777—for making risky investments with policyholder premiums that regulators would prevent his own insurance companies from making themselves. As in any Ponzi scheme, the victim was the outside investor—Leadenhall—providing what was supposed to be fully secured, low-risk financing that was, in reality, backed only by a carefully constructed façade of assets.

In the face of particularized facts showing a clear pattern of fraud and conscious misconduct—including many core facts to which Defendants have already admitted—Defendants move to dismiss based on technicalities and generalizations that conspicuously avoid engaging with the allegations. Betraying the weakness of their motions, Defendants feign ignorance of the factual allegations comprising the Complaint's "Statement of the Case," instead attacking the "Claims for Relief" section in a vacuum.[2] For example, Defendants argue Leadenhall has not substantiated its allegation that A-CAP controlled the 777 Entity Defendants—ignoring the allegations that A-CAP established a Steering Committee, moved into 777's offices to take over operations, and controlled virtually every payment they made. They claim Leadenhall has not alleged "clear and definite" damages—even though Leadenhall has crystallized its losses down to the cent ($609,529,966.82). They argue Leadenhall has not alleged fraud with particularity—but Leadenhall has identified the sender/speaker, date, and transmission method (among other details) of more than 60 false statements and forged documents sent to Leadenhall. Leadenhall's claims should be sustained for the reasons set forth below.

---

[2] Defendants do this despite the fact that each Claim for Relief expressly incorporates the facts alleged in the Statement of the Case. *See* Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.").

*First*, Leadenhall alleges a prototypical RICO case, comprised of dozens of separately actionable acts of fraud, whereby individual Defendants Wander, Pasko, and King—through false statements and reports, forged bank statements, and other predicate acts—took control of 777 and, propped up by billions of A-CAP dollars, attracted lenders, investors, employees, and even landlords now asserting claims for a litany of fraud and unpaid debt.  Pursuant to a May 2021 credit facility, Leadenhall provided more than $600 million to 777's borrower affiliates, all of which was supposed to be secured.  By March 2024, Leadenhall discovered not only that Defendants had double-pledged or fictitiously pledged approximately $350 million in collateral—rendering false more than 60 monthly "Compliance Reports" identifying assets purportedly pledged exclusively to Leadenhall—but that they had forged bank statements, altered computer programs and historical records to re-pledge assets to different lenders, prevented Leadenhall from auditing its collateral, and even engaged in sham restructuring negotiations with Leadenhall to stall this litigation while dissipating what assets remained into professional football clubs.

Leadenhall also discovered that A-CAP, through King, led the enterprise, making it appear solvent with billions of dollars in loans in exchange for an "all asset lien" giving him *de facto*—and eventually formal—control over approximately 40 different 777 affiliates to invest, move, and withdraw funds as he pleased.  While the fraud on Leadenhall was ongoing, King created a "Steering Committee" to oversee every transaction and decision made by the 777 Entity Defendants, including funding payroll (or not), and moving into 777's Miami offices to take over the affiliate sending false Compliance Reports to Leadenhall.  The chain of command was clear, and the objective has been plainly alleged: to defraud Leadenhall into continuing to provide debt so that King, Wander, and Pasko could purchase beachfront condos, airlines, and football teams.

Defendants have no answer to Leadenhall's RICO and fraud allegations.  Other than plaintive protestations that the claims are "conclusory," which fail in light of the details alleged, Defendants quibble around the edges—pointing the finger at one another and arguing, for example, that the selfishness of their respective interests defeat a "common purpose"; that they cannot have formed an "enterprise" because some Defendants are alter egos of one another; or that Leadenhall should not have credited Defendants' explanations and efforts to conceal the fraud.  Defendants put forth no basis for dismissal of Leadenhall's RICO or fraud claims.

*Second*, the 777 Entity Defendants *do not dispute* their fundamental breaches of contract, to which they have already admitted through recorded phone calls (Leadenhall: "There are so many breaches on these agreements now.  We need to get all of this sorted out."  Wander: "Agreed, agreed, agreed."); a binding contract to address the "Uncollateralized Portion" of Leadenhall's debt; a document wherein 777's General Counsel acknowledged that "Events of Default" had occurred; and restated Compliance Reports removing the double- or fictitiously-pledged assets from previously issued reports.  The 777 Entity Defendants themselves *do not dispute* that they, Wander, and Pasko are one another's alter egos and are therefore liable for one another's contractual breaches.  A-CAP and King's argument that they cannot be liable for breaches of contracts as non-parties entirely ignores—and therefore waives any challenge to—Leadenhall's allegation of lender liability, which imputes a borrower's liability to a lender that exercises excessive control over the borrower's business to the detriment of a third party, as A-CAP has done here.

*Third*, A-CAP and King mount no legitimate challenge to Leadenhall's fraudulent transfer claims.  Since the specter of this litigation arose, A-CAP has made crystal clear that it claims the right as self-proclaimed "senior secured creditor" of 777 to strip assets from the 777 Defendants

at will, before Leadenhall can obtain a judgment.  King's unilateral mandate, against the threat of

this lawsuit, that 777 Partners incur and secure an additional $170 million of Wander's personal

debt to A-CAP for no consideration is an invalid insider transaction, whether it was specifically

intended to prevent Leadenhall's' repayment (as Leadenhall alleges) or whether that result was a

fortuitous byproduct.

*Fourth*, Wander and Pasko cannot escape liability for the fraudulent scheme on personal

jurisdiction grounds, because Leadenhall alleges multiple, independent bases for jurisdiction.

Neither Wander nor Pasko meaningfully disputes that they controlled the 777 Entity Defendants

as alter egos, and both are independently bound by the forum-selection clause of the Leadenhall

credit facility agreement, through which all parties consented to personal jurisdiction in New York.

The law is clear that a forum-selection clause may establish personal jurisdiction over a defendant

that is not party to the contract where that defendant is "closely aligned" with a contractual party

or "closely related" to the contract dispute.  Here, in addition to the fact that Pasko *signed* the

contract, Leadenhall alleges that Wander and Pasko controlled the 777 Entity Defendants and

expressly directed both their execution of the contract and the acts that breached it and caused this

dispute—including by double-pledging or fabricating collateral, falsifying Compliance Reports,

forging bank statements, lying on recorded phone calls, prohibiting Leadenhall from auditing its

collateral, and, in Pasko's case, cashing out.  Leadenhall has also alleged direct presence and suit-

related conduct in New York: Wander engaged in extensive sham restructuring negotiations from

New York, including while working out of A-CAP's offices; Pasko owned a residence in Staten

Island; and at least one 777 Entity Defendant that the principals controlled had its principal place

of business in New York.  Moreover, the individual Defendants subjected themselves to personal

jurisdiction by participating in a conspiracy in which co-conspirators undisputedly purposefully availed themselves of the forum, including because A-CAP and King are domiciled in New York.

Because Defendants either (1) do not dispute the sufficiency of Leadenhall's claims or (2) raise challenges that ignore or are refuted by the well-pled allegations in the Complaint, Defendants' motions to dismiss should be denied in their entirety.

## STATEMENT OF FACTS

### A. The Parties Enter into a Secured "Borrowing Base" Credit Facility.

In May 2021, Leadenhall entered into a secured credit facility with four borrowers, the parent entities of which are 777 Partners and 600 Partners. Compl. ¶¶ 49-87. The lenders to the facility, represented by Leadenhall, provided secured debt to the "Borrowers," which purchased assets such as structured settlements and lottery winnings from the "Sellers," affiliates of the Borrowers. *Id.* ¶¶ 33-36, 53, 75-78. Each Borrower pledged to Leadenhall as Collateral first-priority security interests in 100% of its assets, *i.e.*, the structured settlements and lottery winnings. *Id.* ¶¶ 53-68. To ensure the debt was secured, the Borrowers could borrow debt only up to their credit limits—called "Borrowing Bases"—which corresponded to the value of their Collateral. *Id.* ¶¶ 55-57.

Because the Borrowers' assets corresponded one-to-one with the Collateral securing the debt, and nearly one-to-one with their Borrowing Bases, the cardinal rule of the credit facility was that the Borrowers own all Collateral "free and clear" of any other claims. *Id.* ¶¶ 88-98. Upon executing the LSA, each Borrower represented that its assets were owned "free and clear" and reaffirmed that representation every time it borrowed money from Leadenhall and in monthly Compliance Reports issued to Leadenhall by the "Servicers"—777 affiliates responsible for

servicing the receivables pledged by the Borrowers—identifying and valuing each asset pledged as Collateral for purposes of calculating the Borrowing Base. *Id*. ¶¶ 79-83, 88-98.

In addition to first-priority security interests in the Borrowers' assets, Leadenhall also negotiated a guarantee from 777 Partners and 600 Partners of *all* of the Borrowers' obligations. *Id.* ¶¶ 84-87 (777 Partners and 600 Partners "jointly and severally absolutely, unconditionally and irrevocably guarantee[d]" each Borrower's "performance of all of the terms, covenants, and agreements"). Among the ten different "Trigger Events" granting Leadenhall recourse against 777 Partners and 600 Partners for the Borrowers' obligations are: (i) "any act of fraud or willful misconduct committed by either Guarantor under this Guaranty or by any entity included in a Borrower Group under the Loan and Security Agreement;" (ii) any willful misrepresentation of a material nature by either Guarantor under this Guaranty;" and (iii) "any failure of a Borrower to own the Collateral pledged free and clear of all liens, security interests, or encumbrances.'" *Id.* ¶ 86.

### B. Wander Admits to Double-Pledging Collateral.

On September 19, 2022, 18 months into the credit facility and after the Borrowers had borrowed hundreds of millions of dollars, Leadenhall received an anonymous email stating that Wander "either never bought" assets pledged to Leadenhall as Collateral "or already pledged them to another lender." *Id.* ¶¶ 99-105. The tipster concluded, "What he is doing is criminal." *Id.* ¶ 105.

Leadenhall immediately launched an investigation. In November 2022, Leadenhall management visited 777's offices in Miami, Florida to review the "MP Fin" computer system used by 777 to allocate assets to lenders and conduct in-person meetings with Wander and individuals in 777 Partners' Capital Markets Group responsible for preparing monthly Compliance Reports—

including Nicholas Bennett and Alexander Adnani. *Id.* ¶¶ 100, 107-13. Leadenhall discovered during this investigation that one of the Borrowers, the Dorchester Borrower, had borrowed in excess of credit limits by approximately $7 million, but Wander and his associates reassured Leadenhall that "the problem was limited to the Dorchester Borrower, contained, and under control." *Id.* ¶¶ 114-15.

That was false. In March 2023, Leadenhall was approached by "Credigy," another lender that had a separate credit facility with 777 Partners, who sent Leadenhall a list of assets ostensibly pledged exclusively to Credigy by 777 Partners. *Id.* ¶ 119. From this list, Leadenhall identified more than 1,600 assets, worth approximately $185 million, that the largest of the Borrowers, the SuttonPark Borrower, had pledged to both Credigy and Leadenhall. *Id.* ¶¶ 119-21. From a "Form of Assignment" executed by Pasko, Leadenhall discerned that those 1,600 assets were "assigned" or sold by SuttonPark Capital on September 30, 2022 to the SuttonPark Borrower. *Id.* ¶ 121.

Leadenhall promptly wrote 777 requesting confirmation that assets were owned "free and clear," and on March 28, 2023, confronted Josh Wander on a recorded conference call. *Id.* ¶¶ 122-24. During that call, Wander admitted that the SuttonPark Borrower had double-pledged assets to Leadenhall and another lender in breach of the LSA. *Id.* ¶¶ 124-29 (Wander: "The issue today is that there are deals that are in Credigy's Borrowing Base that are allocated to you guys."). On a second conference call on April 3, 2023, Wander again admitted to fundamental breaches and claimed "around 100 million" of assets had been double-pledged. *Id.* ¶ 131. Wander maintained, however, that the double-pledging was a mistake, attributable to the antiquated MP Fin system, and that he planned to "do everything in our power to sell businesses, come up with cash, [and] borrow cash from our holding company lender to solve the gap." *Id.* ¶ 133.

### C.  A-CAP and King Emerge as Controllers of 777.

The "holding company lender" was A-CAP, an insurance holding company controlled by Chairman and CEO Kenneth King.  *Id.* ¶¶ 37, 134, 198.  While Wander disclosed in April 2023 that A-CAP had an "all-asset lien" on 777 Partners, the story ran much deeper.  *Id.* ¶ 134.  Since February 2020, A-CAP had loaned 777 Partners and affiliates over $2 billion, including $500 million directly to 777 Partners and approximately $1 billion to 777's various professional football teams and airlines.  *Id.* ¶¶ 241-42.  Separately, through a 777 reinsurance affiliate called 777 Re Ltd. ("777 Re")—referred to in 777's marketing materials as the "anchor" of 777's investment strategy—A-CAP fueled 777 with approximately $2.2 billion in "reinsurance reserves," *i.e.*, capital designed to be held in reserve to back claims by policyholders of A-CAP's insurance companies.  *Id.* ¶¶ 231-38.  Through those billions of dollars in financing, A-CAP obtained for itself not just an "all-asset lien" on 777 Partners, but an all-asset lien on 600 Partners and approximately 40 affiliates of 777 Partners and 600 Partners, including the majority owner of 777 Partners, JARM Capital LLC ("JARM"), and the shell entities set up to invest in football teams and aviation companies.  *Id.* ¶ 243.  Mixing the personal with the professional, King obtained a personal stake in 777 portfolio company assets, including a 10% stake in a Canadian airline called "Flair" and, using a $10 million loan from 777 Partners, an $11 million beachfront condo in Miami. *Id.* ¶ 246.

Leadenhall later discovered that, just when Wander's admissions on recorded phone calls threatened to expose the scam, A-CAP tightened its grip on 777.  *Id.* ¶¶ 198-210.  Around March 2023, "A-CAP formally memorialized its control of 777 Partners' operations in a memo circulated within 777 Partners via letter or e-mail correspondence," established a "Steering Committee" to ensure every single 777 investment decision was approved by King, and A-CAP management

moved into 777's offices in Miami, Florida. *Id.* A-CAP COO Michael Saliba moved next to Wander and Pasko's offices in 777's "executive wing," and A-CAP Portfolio Manager Carson McGuffin moved into the shared office of Nicholas Bennett and Alexander Adnani, who had been responsible for preparing and transmitting Compliance Reports to Leadenhall. *Id.* While Adnani had historically transmitted the monthly Compliance Reports to Leadenhall, once A-CAP moved into 777's offices in March 2023, the entity (and co-Defendant) "SuttonPark Capital" began to upload the Compliance Reports to Leadenhall rather than Adnani. *Id.* ¶ 208; ECF 187-6. King also became a regular presence in 777's Miami offices and began sitting in unannounced on Wander's calls to ensure that Wander "did not say too much to outside parties, including Leadenhall." Compl. ¶ 210. A-CAP and King even took over 777 Partners' payroll obligations. *Id.* ¶¶ 205-06, 257.

Around this time, in June and July 2023, A-CAP and King inserted themselves into the 777 Defendants' discussions with Leadenhall concerning the double-pledge of Collateral. *Id.* ¶¶ 211-12. In an effort to "replace" Leadenhall's double-pledged Collateral with other security interests, A-CAP offered Leadenhall a fourth-priority position on the assets of 777 Partners, *i.e.*, multiple spots behind A-CAP's first-priority "all asset" position. *Id.* Leadenhall rejected the offer. *Id.*

### D.  777 and A-CAP Pursue High-Profile Football and Aviation Projects.

Wander never made any secret that the ultimate pursuit of 777 was to transition away from "relatively conventional" businesses like structured settlements and lottery winnings to higher-profile, "exciting industries such as aviation and sports." *Id.* ¶¶ 260-61. In addition to buying a private jet, *id.* ¶ 243(k), 777 purchased airlines, including Flair and an Australian airline called "Bonza." *Id.* ¶¶ 301-02. And in September 2023, despite Wander's admission that the 777 Entity

Defendants had borrowed in excess of credit limits under the LSA by "around 100 million," 777 Partners announced an agreement to purchase Everton Football Club, one of the most storied clubs in the English Premier League. *Id.* ¶¶ 269-70. 777 Partners' agreement to purchase Everton followed a string of other high-profile acquisitions over the LSA's term, including Hertha BSC in Germany, Genoa CFC in Italy, Standard Liege in Belgium, and Vasco da Gama in Brazil. *Id.* ¶¶ 257-76. 777 Partners' pattern was to purchase football clubs for modest sums (in the case of Genoa CFC, for one euro) take on all of the club's debts and liabilities, stiff the creditors, and use inflated valuations of the clubs as collateral to acquire more debt—"rinse and repeat." *Id.* ¶¶ 48, 265.

A-CAP bankrolled 777's aviation investments and the Everton purchase. *Id.* ¶¶ 242, 270-72 ("The 'Investment Overview' prepared by A-CAP stated that 'the ultimate source of the first 40 million pound-loan made by 777 [Partners] to Everton was A-CAP….'"). By late 2023, Everton became not merely an investment but a lifeline, as A-CAP and 777 Partners needed Everton "as an asset on its books in order to attract new investors and, invariably, new lenders in a seemingly never-ending cycle of taking on more debt." *Id.* ¶ 275. At this time, in discussions with Leadenhall, Wander "continued to promise that new assets and proceeds from deals just around the corner would be used to shore up the shortfall in Collateral to Leadenhall." *Id.* ¶ 140.

### E. Leadenhall Uncovers Forged Bank Statements and Other Evidence of Fraud.

Over the summer and fall of 2023, Leadenhall continued to meet with 777 personnel. *Id.* Around this time, A-CAP and Steven Pasko prohibited Leadenhall from engaging a former employee of SuttonPark Capital to perform an "asset review" of receivables pledged to Leadenhall as Collateral. *Id.* ¶¶ 216-18. Despite the enterprise's attempts to conceal their actions, in November 2023 Leadenhall discovered that two of the Borrowers, the SuttonPark Borrower and

Dorchester Borrower, had borrowed against assets that they never purchased in the first place, and consequently could not even pledge as Collateral. *Id.* ¶¶ 140-41.

Leadenhall issued a formal notice of material breach in November 2023, *id.* ¶ 143; negotiated and executed an amendment to the LSA in December 2023 whereby the Borrowers agreed to pay additional interest on the "Uncollateralized Portion" of the Borrowers' outstanding debt to Leadenhall, retroactive to March 2023, *id.* ¶ 150; and directed the SuttonPark Servicer in January 2024 to issue revised Compliance Reports for the SuttonPark and Dorchester Borrowers subtracting any double-pledged or fictitiously pledged assets from their Borrowing Bases. *Id.* ¶¶ 144-45. The SuttonPark Servicer issued revised Compliance Reports going back to March 2023 disclosing that the SuttonPark and Dorchester Borrowers had double-pledged or fictitiously pledged to Leadenhall well over $350 million in assets. *Id.* ¶¶ 145-49.

The plot continued to thicken. In early 2024, a 777 insider disclosed to Leadenhall that 777 Partners and the Borrowers photoshopped financial statements submitted to Leadenhall and that, prior to on-site meetings between Leadenhall and 777 Partners' personnel in November 2022, 777 Partners altered receivables in the MP Fin system to cover up the double-pledge of Collateral. *Id.* ¶ 163. The tip prompted Leadenhall to re-examine Compliance Reports and backup materials delivered around November 2022, and to discover that the SuttonPark Borrower forged Wells Fargo bank statements such that millions of dollars appeared to be in accounts when they were empty or near empty. *Id.* ¶¶ 163-64. Leadenhall also discovered that in 2022 or 2023, 777 Partners altered the programming of the MP Fin system to allow employees to retroactively alter the lenders to which assets had been allocated. *Id.* ¶ 159. Using the programming change, 777 Partners employees altered receivables to make them falsely appear as though they were and always had been pledged only to Leadenhall. *Id.* ¶¶ 171-74. The SuttonPark servicing team also recorded

notes in the MP Fin system expressly acknowledging, going back to 2021, that assets had been double-pledged or fictitiously pledged. *Id.* ¶ 156.

Leadenhall learned more about the cause of fictitiously pledged assets. Beginning in 2021, Wander and 777 Partners considered purchasing a portfolio of assets from JG Wentworth, a financial services company known for purchasing structured settlements. *Id.* ¶ 151. SuttonPark Capital conducted due diligence of the JG Wentworth portfolio and received a "data tape" from JG Wentworth that listed the portfolio's structured settlement and lottery annuity receivables by unique identifier and calculated the net present value of each asset by their discounted cash flow. *Id.* ¶ 152. But before SuttonPark Capital acquired the JG Wentworth portfolio, Wander directed Bennett, Adnani, and 777 Partners' Capital Markets Group to use data from the tape to allocate the JG Wentworth assets as collateral to lenders. *Id.* ¶ 153. To conceal that SuttonPark Capital did not own the receivables it pledged, the Capital Markets Group "topped up" Leadenhall's collection account with other funds to give the appearance of cash flows on phony receivables—and even lied to its own accounting department about assets that were not on its books. *Id.* ¶¶ 154-58.

### F. Leadenhall Accelerates the $609 Million in Outstanding Debt and Restructuring Negotiations Fail.

After uncovering evidence of conscious misconduct, Leadenhall exercised its contractual remedies under the LSA. On March 12, 2024, Leadenhall served the Borrowers, 777 Partners, and 600 Partners with written notice that "Events of Default" had occurred, and on March 15, 2024, Leadenhall exercised its right to accelerate all outstanding debt obligations of the Borrowers, making the outstanding balance of $609,529,966.82 immediately due and payable. *Id.* ¶¶ 175-77.

Leadenhall and the 777 Defendants also attempted restructuring negotiations. *Id.* ¶¶ 178-92. Because A-CAP and King were controlling the enterprise from behind the scenes in New York City, Wander flew back and forth to New York City to purportedly strike a deal, even working out

of A-CAP's offices.  *Id.* ¶¶ 181, 191.  The problem was that A-CAP, which had poured billions of dollars of insurance reserves and loans into, and effectively controlled, 777, refused to permit any agreement to start paying down the $600+ million debt.  *Id.* ¶ 182 (Wander: "Practically speaking you're right—they [A-CAP] control what we sign because they have the power of the purse right now ….").  From March to April 2024, Leadenhall tried to determine whether 777 could pay off even $15 million, approximately 2.5% of the outstanding debt, as a good-faith gesture, but King made clear, through Wander, the answer was "no."  *Id.* ¶¶ 178-92.  Wander conceded repeatedly that 777 itself had no ability to pay Leadenhall anything.  *Id.*  ¶ 191.

### G.  A-CAP and King Emerge from Behind the Curtain.

By this time, the wheels had begun to come off at 777.  In February 2024, AM Best, a credit ratings agency focused on insurers, downgraded the credit rating of 777 Re—the "anchor" of 777—and assessed its balance sheet as "very weak."  *Id.* ¶¶ 277-80.  Approximately a week later, because of its massive exposure to 777, the same agency downgraded the credit rating of A-CAP. *Id.* ¶¶ 277-81.  King, his entire insurance business in jeopardy because of the downgrade, began trying to unwind the 777 Re relationship, though recognizing on a February 2024 investor call that doing so immediately would "shut off the flow of liquidity to" 777 Re and "would have paralyzed them and essentially created more risk to A-CAP."  *Id.* ¶ 283.

A-CAP began transferring debt obligations to 777 Partners and, to use A-CAP's own term, "hardening" its existing liens against 777's assets.  *Id.* ¶¶ 225-28.  Since December 2020, A-CAP had extended a $170 million loan to JARM—the personal shareholding vehicle of Wander, through which Wander owns his majority stake in 777 Partners—so that Wander could buy out half of Pasko's shares in 777 Partners.  *Id.* ¶¶ 221-22.  The loan was secured by JARM's equity interest in 777 Partners and personally guaranteed by Wander and Pasko.  *Id.* ¶ 223.  In March 2024, King

14

notified Leadenhall that he had, for no apparent consideration, "consolidated into the HoldCo facility" A-CAP's loan to JARM, *i.e.*, transferred the $170 million debt obligation from JARM to 777 Partners. *Id.* ¶ 225. In other words, to the detriment of other creditors to 777 Partners, including Leadenhall, King and A-CAP encumbered 777 Partners with a $170 debt obligation, secured by A-CAP's purported preexisting first-priority security right on all of 777 Partners' assets. *Id.* ¶ 226.

King and A-CAP also began stripping 777's assets. A few weeks later, in April 2024, King, through an A-CAP affiliate, seized an entire fleet of Australian airplanes right before the portfolio company owning the planes went into receivership. *Id.* ¶ 302. Reports following the receivership filing indicated that 777 and A-CAP "were so entwined in their dealings that it made it impossible for other lenders to reach an agreement with the company over its debts." *Id.* ¶¶ 302-03. In May 2024, A-CAP seized control of all of 777's football team assets and put them up for sale. *Id.* ¶¶ 289-90. A-CAP and King had stepped out from behind the thinly veiled curtain.

### H. Leadenhall Initiates this Action and Obtains a Preliminary Injunction

As Wander continued to tell Leadenhall in March and April 2024 that 777 could not come up with even $15 million, the 777 Entity Defendants continued to pour any remaining liquidity into professional football teams. *Id.* ¶¶ 285-87. In early April 2024, 777 Partners invested an additional $80 million into Hertha BSC, and in late April 2024, 777 Partners loaned Everton an additional $20 million. *Id.* Wander characterized these funds as "protective advances" by A-CAP, which continued to pour funds into the 777 corporate family. *Id.* ¶ 287.

Leadenhall initiated this action on May 3, 2024, asserting RICO, fraud, and contract claims against the 777 Entity Defendants, A-CAP, Josh Wander, Steven Pasko, and Kenneth King. ECF 1. At the time of that filing, 777 had been named in 17 different lawsuits concerning fraud and

unpaid debts—and collectively demanding more than $130 million. Compl. ¶ 309. Right after the Complaint was filed, now openly in control, A-CAP forced Wander and Pasko to resign as "managers" of 777 Partners and 600 Partners and appointed B. Riley Advisory Services ("B. Riley"), bankruptcy and restructuring professionals, to take purported "independent and unilateral control of the 777 Entities." *Id.* ¶¶ 194, 252. 777 and Wander, meanwhile, continued to tell the public after the appointment that Wander and Pasko were "100 per cent owners of 777" and "continue[d] to lead on strategic direction across every facet of the business." *Id.* ¶¶ 254-55. True to form, on May 10, 2024, 777 Partners invested another $10 million in Everton. *Id.* ¶ 291.

On May 13, 2024, Leadenhall applied for a temporary restraining order ("TRO") to restrain the Borrowers and Guarantors from dissipating any remaining assets. ECF 57. Counsel for the 777 Entity Defendants admitted at the TRO hearing on June 7, 2024 that his clients had virtually nothing in the bank, and on July 8, 2024, the TRO was converted into a preliminary injunction. *Id.* ¶ 311. In June 2024, A-CAP—now abandoning any pretense of arm's length dealing with 777—made its own bid to acquire Everton, the one-time crown jewel of 777 Partners. *Id.* ¶¶ 293-97. Leadenhall filed an Amended Complaint, and the present motions to dismiss followed.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim must be denied where a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." *Kaplan v. Lebanese Can. Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). "The proper question is whether there is a permissible relevant inference from '*all* of the facts alleged, taken collectively,' not whether an

16

inference is permissible based on any individual allegation, scrutinized in isolation." *Vengalatorre v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (citations and quotations omitted).

## ARGUMENT

### I.  THE COURT HAS BOTH FEDERAL QUESTION AND DIVERSITY SUBJECT MATTER JURISDICTION.

The Court has multiple bases for subject matter jurisdiction.  First, Leadenhall's RICO claims give rise to federal question jurisdiction, 28 U.S.C. § 1331, and no Defendant disputes that the Court has supplemental jurisdiction over Leadenhall's state law claims, which "form part of the same case or controversy under Article III," 28 U.S.C. § 1367.  Defendants argue only that the Court should decline to exercise supplemental jurisdiction *if* the Court dismisses the RICO claims. *See* ECF 205 at 8; ECF 210 at 17; ECF 212 at 22 n.6; ECF 215 at 31 n.10.[3]  As set forth in Parts II and III, Leadenhall's RICO claims are adequately pled.

Second, diversity jurisdiction exists over Leadenhall's state law claims.  Plaintiffs are only "citizens or subjects of a foreign state," and Defendants are all only "citizens of a state."  28 U.S.C. § 1332(a)(2).  Leadenhall Capital Partners is a citizen of the United Kingdom and Japan by virtue of its members' citizenship.  Compl. ¶ 23.  Leadenhall Life is a citizen of Ireland, where it is incorporated and has its principal place of business.  *Id.* ¶ 24.  Wander and Pasko are citizens of Florida, and King is a citizen of New York*. Id.* ¶¶ 31-32, 38.  777 Partners and 600 Partners are

---

[3] Wander incorporates all of the 777 Entity Defendants' arguments and Pasko's personal jurisdiction arguments, ECF 210 at 17, and Pasko incorporates all of the 777 Entity Defendants' arguments *except* for Section I.A, on diversity jurisdiction.  ECF 212 at 21-23 & n.6.  Throughout this brief, except where otherwise noted, references to arguments by the 777 Entity Defendants refer to arguments also joined by Wander and Pasko (collectively, the "777 Defendants").

citizens of Florida because they are LLCs that trace 100% of their membership (including the membership of their member LLCs) to Wander and Pasko. *Id.* ¶¶ 25-29. The other 777 Entity Defendants and A-CAP are all LLCs which trace their membership only to citizens of one or more states, not of foreign states. *Id.* ¶¶ 30, 33-37.

Defendants do not dispute these allegations, except that the 777 Entity Defendants (joined by Wander, King, and A-CAP) claim that "[o]n September 20, 2021, 777 Re," purportedly a citizen of Bermuda, "purchased preferred units of 700 Partners [*sic*] and 600 Partners" via a "Subscription Agreement." ECF 205 at 7; ECF 215 at 31 n.10. On that basis, the 777 Entity Defendants claim to be citizens of foreign states because they trace membership interests to 777 Re. *Id.* As Leadenhall alleges, however, 777 Partners and 600 Partners confirmed to Leadenhall in 2022 and 2023—*after* the purported share purchase by 777 Re in 2021—that the membership of 777 Partners and 600 Partners remained as alleged: 777 Partners' only member was SuttonPark Acquisition LLC, the members of which were MTCP LLC and JARM Capital LLC, the wholly-owned personal shareholding vehicles whose sole members are Pasko and Wander, respectively; and 600 Partners' sole member was SPA II LLC, wholly owned by Pasko and MTCP LLC (*i.e.*, 100% by Pasko). Compl. ¶¶ 25-29 & n.1; *see* Decl. of Tom Spreutels, Ex. A-C; *see also* Compl. ¶ 29 & n.1 (detailing 777 Partners' press statements that Wander and Pasko were 100% owners).

The 777 Entity Defendants and Wander's about-face means that either the 777 Entity Defendants' 2022 and 2023 representations to Leadenhall regarding their ownership were false, or their representations to the Court now are false. If 777 Re bought membership interests in 777 Partners and 600 Partners in 2021 but relinquished those interests before the 777 Entity Defendants represented to Leadenhall in 2022 and 2023, and later to the public, that 777 Partners and 600 Partners were wholly owned by Wander and Pasko, complete diversity would still exist because

jurisdiction is evaluated at the time an action is filed.  *See Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991).

More plausible in light of the sworn declaration from 777 Partners and 600 Partners General Counsel Christopher O'Reilly that "777 Re Ltd. still possesses those membership interests" that it purchased in 2021, ECF 204 ¶ 3 ("O'Reilly Decl."), is that those "membership interests" were never transferred, either because the Subscription Agreement was akin to an option—memorializing 777 Re's *commitment* to purchase preferred shares but not effectuating such a purchase, ECF 204-1—or because the transaction was never fully closed as required in Section 6 thereof.  Neither the Subscription Agreement nor the amendments to the operating agreements of 777 Partners and 600 Partners (ECF 204-1, 204-2, 204-3) list 777 Re as a member of the 777 Partners and 600 Partners LLCs.  And it is telling that Pasko, the person who signed the "Subscription Agreement," *see* ECF 204-1 at 12, is the only 777 Defendant who did not join this argument.  *See* ECF 212 at 21-23 & n.6 (joining sections I.B, II, and III of 777 Entity Defendants' memorandum of law but not section 1.A).

At best, the 777 Entity Defendants' incomplete diversity argument presents a factual dispute that cannot be resolved on a motion to dismiss and thus counsels in favor of denial.  *See SD Prot., Inc. v. Del Rio*, 498 F. Supp. 2d 576, 582 (E.D.N.Y. 2007) (denying motion to dismiss for incomplete diversity where there was "uncertainty as to relationship among the various … entities").  And at worst, their attempt to defeat diversity by artfully asserting that their affiliate's foreign citizenship "is attributable to"—rather than stating that the foreign affiliate is *a member of*—two LLCs they have repeatedly represented are wholly owned by Wander and Pasko suggests "outright fraud" in Defendants' pleading of jurisdictional facts that should be disregarded.  *See Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998); *cf. Marathon CRE 2018-FL1*

*Issuer, Ltd. v. 257-263 W 34th St. LLC*, 2023 WL 1815195, at *8 (S.D.N.Y. Feb. 7, 2023) (party's misrepresentation about location of office did not "rise to the level of a 'fraudulent' statement regarding citizenship" because, unlike here, party did not allege citizenship based on misrepresented fact). If the Court needs to reach the diversity analysis at all in light of Leadenhall's well-pled RICO claims and is not inclined to discredit the 777 Defendants' diversity challenge outright, Leadenhall should be permitted limited jurisdictional discovery into this disputed issue.

## II.    LEADENHALL PLEADS A PROTOTYPICAL RICO CLAIM.

The civil RICO statute, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To plead a substantive RICO claim, "a plaintiff must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).

"Congress drafted RICO broadly to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 567 (S.D.N.Y. 2014) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248-49 (1989)). The Supreme Court has "made clear that it would not interpret civil RICO narrowly," *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 139 n.6 (2d Cir. 2001) (citing *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985)), and "that RICO applies 'not just to mobsters' but to '*any person*' who violates its provisions." *Chevron*, 974 F. Supp. 2d at 567 (emphasis in original) (quoting *Sedima*, 473 U.S. at 495)); *id.* at 568 ("The RICO question in this and all other such cases is whether all of

the statutory requirements are satisfied with respect to each defendant, not whether the defendant fits a particular popular stereotype.").

This is not an edge case. The fact pattern alleged falls within the statute's heartland. Leadenhall alleges the RICO Defendants conduct and each participate in the affairs of an association-in-fact enterprise, comprised of two superficially legitimate firms who abuse the appearance of legitimacy and corporate separateness to engage in a pattern of wire fraud more widespread than any could alone. *See Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 251 (E.D.N.Y. 2010) ("The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over." (quoting *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997))).

### A. Leadenhall Has Sufficiently Pled a RICO "Enterprise" Whereby Defendants Used the 777 Organization to Defraud Investors to Fund Passion Projects They Otherwise Lacked the Money to Pursue.

#### 1. Leadenhall Alleges Each Required Element of the RICO Enterprise's Structure.

"Any principled analysis of a RICO claim must begin from an understanding of what enterprise is alleged." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 300 (S.D.N.Y. 2013) (internal quotations and ellipses omitted). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" and this "enumeration of included enterprises is obviously broad" and "has a wide reach." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. §1961(4)). "An association-fact-enterprise is simply a continuing unit that functions with a common purpose." *United States v. Arrington*, 941 F.3d 24, 37 (2d Cir. 2019) (internal

quotations and brackets omitted) (quoting *Boyle*, 556 U.S. at 948). The Complaint pleads each of the required "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *United States v. Gershman*, 31 F.4th 80, 96 (2d Cir. 2022) (quoting *Boyle*, 556 U.S. at 946), *cert. denied*, 143 S. Ct. 816 (2023). The Supreme Court and Second Circuit have rejected attempts, like Defendants', to manufacture additional requirements for pleading an enterprise. *See Boyle*, 556 U.S. at 948 (rejecting argument that "an enterprise must have at least some additional structural attributes, such as a structural 'hierarchy,' 'role differentiation,' a 'unique *modus operandi*,' a 'chain of command,'" or "uncharged or additional crimes aside from predicate acts," among others); *Gershman*, 31 F.4th at 96 ("Because of the expansive nature of an association-in-fact enterprise, it may help to think of the concept by what qualities are unnecessary.").

> ### a. The Enterprise's Common Purpose: Fraudulently Inducing Lenders to Bail Out a Sinking Ship and Keeping the Profits for Themselves and Their Vanity Projects

First, the Complaint alleges that Defendants shared a "common purpose," which was "to generate money for its members" by defrauding lenders, lying about the security backing their debt, and using ill-gotten financing to make risky vanity investments, including those they could not make lawfully or honestly convince lenders to fund. *Gershman*, 31 F.4th at 97-98 (citations and quotations omitted); Compl. ¶¶ 99-162 (alleging a pattern of false Compliance Reports), ¶¶ 163-74 (alleging forged bank statements and changes to assets in MP Fin system), ¶¶ 244, 247-309 (showing objective was to use the illicitly obtained proceeds to enrich themselves and purchase luxury condos, airlines, and professional football teams); *see id.* ¶¶ 230-42 (alleging purpose to leverage A-CAP's control over 777 to funnel policyholder funds into risky, affiliated investments and circumvent regulation). Legitimate businesses build up capital and credit to make

investments.  Knowing they would be unable to pursue high-risk investments like football clubs and airlines based on their own creditworthiness—or, for A-CAP and King, because of regulatory restrictions limiting investment risk—Defendants faked it.  They engaged in fraud, including falsifying collateral and forging bank statements, to feign financial security and induce creditors like Leadenhall to provide funding, which they then funneled through a series of shell companies to enable their pursuits.  Compl. ¶¶ 99-162, 165-74, 193, 219, 232, 244, 247-309.

The members of the enterprise worked together toward a common goal, pursuant to the structure formalized in the memorandum creating the "Steering Committee" to govern the 777 Defendants' affairs, with King at the head.  *Id.* ¶ 201.  King and A-CAP kept the enterprise afloat so it could continue to serve its members' common purpose, including by covering 777 Partners' payroll and operating expenses and making so-called "protective advances" to keep creditors at bay.  *Id.* ¶¶ 20, 205-06, 214, 257, 287.  King and A-CAP even installed their deputies in 777's offices—in the same room that housed the employees responsible for sending Leadenhall false Compliance Reports—so King and A-CAP could literally oversee the scheme.  *Id.* ¶¶ 100-01, 202-04, 208-10.  And when Leadenhall discovered the fraud, King and A-CAP emerged and laid bare their "common purpose" with the 777 Defendants by taking over restructuring negotiations while continuing to dissipate assets into professional football teams.  *Id.* ¶¶ 175-92, 211-15, 257-309.  King and A-CAP, along with Pasko, deployed obstructionist tactics to block a Collateral audit, made false promises of repayment before blocking the 777 Defendants from following through, and used Wander as a decoy to distract Leadenhall while A-CAP and King stripped the 777 Defendants' assets behind the scenes.  *Id.* ¶¶ 211-29, 289-300.

An examination of the entanglements between A-CAP and King, on one hand, and the 777 Defendants, on the other, underscores the common purpose animating them to perpetuate the

enterprise to defraud Leadenhall and others. A-CAP and King loaned the 777 Defendants more than $2 billion, vastly more than any arm's-length lender would, in exchange for "wildly above-market interest rates" and "essentially unlimited rights with respect to those entities' assets." *Id.* ¶¶ 194, 230-46. This benefited the enterprise as a whole: the 777 Defendants had far more liquidity than they otherwise would, allowing them to keep afloat failing passion projects—including 777 Partners' and A-CAP's joint pursuit of Everton—while A-CAP and King had free rein to use the 777 Defendants' assets as their own, enabling investments for which insurance company assets could not be used directly and self-dealing loans to purchase, for example, luxury condos. *See, e.g.*, *id.* ¶¶ 193, 197, 244-45. A-CAP also fueled 777 Partners' offshore subsidiary 777 Re, the "anchor" of 777 Partners' investment strategy, with more than $2.2 billion so Wander, Pasko, and King could make riskier bets with policyholder money than A-CAP's insurance companies, regulated in the U.S., could make on their own. *Id.* ¶¶ 230-38. This symbiotic relationship, in which each enterprise member plays a distinct role in a pattern of fraud, is more than enough to satisfy the common purpose element of a RICO claim. *See, e.g.*, *Edmar Fin. Co., LLC v. Currenex, Inc.*, 2023 WL 3570017, at *15 (S.D.N.Y. May 18, 2023) (plaintiff alleged trading platform gave certain trading entities secret privileges to "rig" auctions, which benefited "Trading Defendants" with "illicit trading profits" and benefited platform with "a more-successful Platform and thus higher fees"); *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 700-01 (S.D.N.Y. 2015) (plaintiff alleged enterprise members each "played specifically-alleged roles in a fraudulent scheme").

A-CAP and King argue they did not share a "common purpose" because they acted out of self-interest, but the law recognizes no such distinction. ECF 215 at 28. Presumably, every criminal who participates in a criminal enterprise thinks it is in his self-interest, often because he can use the enterprise's "resources, contacts, facilities, and appearance of legitimacy to perpetrate

more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over." *Devine*, 726 F. Supp. 2d at 251 (quoting *Fitzgerald.*, 116 F.3d at 227). The question in evaluating a RICO enterprise is not whether the members committed crimes out of self-interest, but whether their self-interest led them to commit isolated, independent crimes or, as here, to join with others to commit crimes with a common purpose on an ongoing basis. *See, e.g.*, *Edmar*, 2023 WL 3570017, at *15 (describing benefits different RICO enterprise members reaped at victims' expense).

A-CAP and King cite no case suggesting that self-interest is inconsistent with RICO liability. Rather, in the cases they cite, plaintiffs failed to allege *any* relationship between enterprise members and asked courts to *infer* a connection solely from their commission of isolated or seemingly independent crimes. *See Democratic Nat'l Comm. v. Russian Federation*, 392 F. Supp. 3d 410, 439-40 (S.D.N.Y. 2019) (plaintiff did not allege "any apparent connection" between enterprise members, where purported "members are alleged to have been pursuing various goals independent of one another"); *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (rejecting fallback theory, first raised on reply, of a two-man RICO enterprise based solely on joint commission of one crime with no relationship to the enterprise's alleged purpose). There is no need for such an inference here, where Leadenhall alleges how "officials from [both] compan[ies] involved themselves in the affairs of the other," and how King, A-CAP, and the 777 Defendants worked cooperatively in constant, formalized communication, to pursue shared criminal ends. *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (cited in *D. Penguin Bros.*, 587 F. App'x at 668).

There is only one reasonable inference to be drawn from Leadenhall's allegations, which is that A-CAP, King, and the 777 Defendants worked together to defraud Leadenhall using false

Compliance Reports and an array of other predicate acts to make 777 appear solvent when it was not and use the proceeds to purchase luxury condos, airlines and football teams.  Compl. ¶¶ 99-174, 193-97, 244, 247-309.  Even if A-CAP or King could posit an alternative inference, that factual issue would be for the jury, not for the pleading stage.  *See United States v. Vernace*, 811 F.3d 609, 616 (2d Cir. 2016) (finding crimes "lie[] within the heartland of what RICO targets" where "jury could … reasonably conclude[] that Vernace participated in the Shamrock Murders to further his *own* reputation, thereby enabling him to more effectively carry out the activities of the" enterprise).  *See generally Secure Source Claims Co., LLC v. Miller*, 2024 WL 1342804, at *2 (S.D.N.Y. Mar. 29, 2024) (noting that court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'" (quoting *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008))).

### b.    Employment, Contractual, and Control/Agency Relationships Among Members of the Enterprise

Second, the Complaint alleges relationships among the enterprise's members.  The relationships between A-CAP and King, among the 777 Entity Defendants, and between those Defendants and Wander and Pasko, are self-evident, and no party disputes them.  A-CAP and King argue Leadenhall has not alleged their relationships to other enterprise members, but they do so by picking random paragraphs of the Complaint and declaring each insufficient on its own.  ECF 215 at 27.  Their arguments ignore the allegations in the body of the Complaint, including that:

- Wander and Pasko controlled the 777 Entity Defendants, and King controlled A-CAP, by virtue of their respective ownership and executive roles.  Compl. ¶¶ 31, 32, 38.

- A-CAP and/or King loaned the 777 Entity Defendants $2 billion since February 2020, took control of their operations, and developed a symbiotic relationship with 777 Partners and affiliates (including 777 Re).  Compl. ¶¶ 193-97, 230-46.

- King and A-CAP moved their deputies into 777's offices so they could directly assume key duties in the scheme to defraud Leadenhall. *Id.* ¶¶ 202-09.

- King and A-CAP held the 777 Defendants' purse strings, exercising total control over when the 777 Defendants could make debt payments, make payroll, enter into contracts, and use A-CAP's money to make "protective advances." *Id.* ¶¶ 182, 199, 205-06, 210-29.

- Although members of a RICO enterprise "need not have fixed roles" or form a "legal entity," *Gershman*, 31 F.4th at 96 (quoting *Boyle*, 556 U.S. at 948), here these relationships were formalized in a memorandum, and certain 777 employees formally reported to A-CAP executives. *Id.* ¶ 201.

That is more than sufficient. *See, e.g.*, *Edmar*, 2023 WL 3570017, at *15 (finding this element satisfied based on allegations of "secretly agreeing" to engage in racketeering activity).

A-CAP and King's contention that Leadenhall has failed to allege "solid information regarding the hierarchy, organization, and activities of the alleged enterprise" ignores both the detailed allegations in the Complaint and binding law. ECF 215 at 27. The cases A-CAP cites are irrelevant and stale, superseded by the Supreme Court's subsequent holding that a RICO enterprise may be "loosely and informally organized" and need not have had "a leader or a hierarchy" or "any long-term master plan." *Boyle*, 556 U.S. at 941. Leadenhall goes far beyond what the law requires, alleging an archetypal RICO enterprise that would meet any conceivable standard.

### c.    The Enterprise Engaged in a Clear, Regular, and Longstanding Pattern of Racketeering Activity.

Third, the enterprise had "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Gershman*, 31 F.4th at 96 (quoting *Boyle*, 556 U.S. at 946). "[T]here is no hard-and-fast time period for satisfaction of the longevity prong," *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015), and RICO requires only "that the enterprise had 'affairs' of sufficient

duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'" *Boyle*, 556 U.S. at 946 (quoting 18 U.S.C. § 1962(c)).  This enterprise has existed since at least 2020, when A-CAP began financing and taking control of 777, which is more than enough time to pursue its purpose.  Compl. ¶¶ 194, 221, 243, 361.  Further, the longevity prong is satisfied if the underlying pattern of racketeering activity meets the requirements of either open-ended or closed-ended continuity, which are addressed *infra* at Part II.D.  *See Pierce*, 785 F.3d at 838 (noting, in discussing longevity, that "[c]ontinuity is both a closed- and open-ended concept" (quoting *H.J. Inc.*, 492 U.S. at 241 (1989))); *accord Secure Source*, 2024 WL 1342804, at *6.

In attempting to rebut the longevity prong, Defendants try to have it both ways.  After they argue Leadenhall has not alleged that racketeering was Defendants' regular way of doing business, they turn around and argue Leadenhall has not alleged an enterprise that existed distinct from its pervasive racketeering activity.  Defendants' conflicting arguments fall flat.

First, the 777 Defendants argue Leadenhall has not alleged that the enterprise "is engaged in any legitimate business ventures separate from the alleged fraudulent scheme."  ECF 205 at 17.  Setting aside the perverse policy implications of Defendants' contention that they are not liable because they conduct an *exclusively* criminal enterprise with no redeeming qualities, this argument is irrelevant because the Supreme Court has held that "a wholly criminal enterprise comes within the ambit of the [RICO] statute."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Second, Defendants argue Leadenhall has not alleged an enterprise distinct from the alleged pattern of racketeering activity, again grossly mischaracterizing binding law.  ECF 215 at 27-28.  Defendants argue Leadenhall has not alleged that Defendants committed other crimes against other people, which ignores both Leadenhall's allegations to the contrary (*e.g.*, Compl. ¶ 407), and authority holding that a RICO enterprise may be "formed solely for the purpose of

carrying out a pattern of racketeering acts," and "proof of a pattern of racketeering activity may be sufficient … to permit a jury to infer the existence of an association-in-fact enterprise." *Boyle*, 556 U.S. at 942, 947, 951; *Gershman*, 31 F.4th at 96 ("The breadth of what encapsulates [an association-in-fact] enterprise means that its existence 'is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.") (citations omitted). Defendants cite the Second Circuit's dicta in *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) and misleadingly cite *Turkette*—making the *exact* argument this Court previously rejected, finding that it overreads *Satinwood* and *Turkette*, misunderstands the elements of RICO, and conflicts with other binding precedent (which is even more true today). *JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, 2007 WL 1159637, at *9-10 (S.D.N.Y. Apr. 18, 2007).

"[T]he enterprise and pattern of racketeering activity are separate elements," and therefore Leadenhall alleges the required structural elements of a RICO enterprise enumerated above, which existed independent of the pattern of racketeering perpetrated against Leadenhall, as well as a widespread pattern of similar conduct by the enterprise with respect to other victims. *Id.* That is more than the law requires. *See Lateral Recovery LLC v. Funderz.net, LLC*, 2024 WL 216533, at *14 (S.D.N.Y. Jan. 19, 2024) ("As the Second Circuit has explained, even if the Amended Complaint alleges that the Enterprise was 'formed for the sole purpose of carrying out a pattern of racketeering,' it can still constitute a RICO enterprise, 'so long as it is in fact an enterprise as defined in the statute.'"). Indeed, it is common for courts to find RICO enterprises adequately pled where their *sole* purpose is to engage in one course of racketeering activity, or even just to defraud one victim. *See, e.g.*, *Arrington*, 941 F.3d at 37 (finding an enterprise defined by its "'common purpose' of selling drugs in and around their neighborhood"); *Pierce*, 785 F.3d at 838-39 (finding an enterprise defined by a "common purpose: the illicit sale of narcotics in and around the Melrose-

Jackson houses"); *Automated Teller Mach. Advantage LC v. Moore*, 2009 WL 2431513, at *6 (S.D.N.Y. Aug. 6, 2009) (finding "common purpose to defraud Plaintiff by 'induc[ing] Plaintiff … to enter into agreements to purchase Placed ATMs which [did] not exist in exchange for the receipt of millions of dollars'"); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 314 (S.D.N.Y. 2009) ("The Complaint further alleges that the association-in-fact was united by a common purpose, namely that of defrauding Fuji. Accordingly, Fuji has sufficiently pled a RICO enterprise under Rule 8(a)."). The enterprise alleged here meets every requirement of the RICO statute, as it exhibits the structural requirements above, and is not simply a disparate collection of unrelated actors who just happen to commit crimes together. Compl. ¶¶ 99-174, 194-207.

### 2. Each RICO Defendant Is Distinct from the RICO Enterprise.

The 777 Defendants (but not A-CAP and King) challenge Leadenhall's allegations of "distinctness," but the Complaint demonstrates that each RICO Defendant is distinct from the RICO enterprise. ECF 205 at 12-13. The RICO enterprise is an association-in-fact comprised of three individuals—King, Wander, and Pasko—and two distinct, albeit associated, corporate families they control—in King's case, A-CAP, and in Wander's and Pasko's cases, 777 Partners and affiliates. Compl. ¶ 358. The RICO Defendants include each of the three individuals and those specific corporate entities that participated in or conducted the enterprise's affairs within the meaning of 18 U.S.C. § 1961(3), each of which is distinct from the broader enterprise. *Id.* ¶ 357-58. Therefore, the rule that a "corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be *both* the RICO person and the enterprise" is inapposite here. *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (citations omitted).

The enterprise here is not the same as any corporate entity named as a RICO "person," nor is it composed solely of the corporate parents, subsidiaries, employees, or agents of any Defendant.

*Cf. id.* at 205-06.  Those are the only circumstances under which courts in this Circuit find a lack of distinctness.[4]  To the contrary, Leadenhall alleges the prototypical RICO enterprise that the Second Circuit has expressly held *does* satisfy "distinctness," *i.e.*, where "natural person[s] control[] two active corporations that operate independently in different lines of business, receive

---

[4] *See U1it4less*, 871 F.3d at 206 (holding that a parent company and one subsidiary were not distinct RICO defendants from an enterprise consisting of another subsidiary of the same parent); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063-64 (2d Cir. 1996) (parent company and two subsidiaries not distinct RICO defendants from an enterprise consisting of all three companies), *vacated on other grounds*, 525 U.S. 128 (1998); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[T]he employees in association with the corporation do not form an enterprise distinct from the corporation."); *Physicians Mut. Inc. Co. v. Greystone Servicing Corp., Inc.*, 2009 WL 855648, at *7 (S.D.N.Y. Mar. 25, 2009) (corporation not a distinct RICO defendant from enterprise comprised of corporation, a close affiliate, and its officers); *Friedlander v. Rhoades*, 962 F. Supp. 428, 432 (S.D.N.Y. 1997) (two lawyers and their alter ego law firm not distinct RICO defendants from an enterprise consisting of all three); *Moy v. Terranova*, 1999 WL 118773, at *3-4 (E.D.N.Y. Mar. 2, 1999) (no distinctness where plaintiff "explicitly state[d] that [the defendant] and [the enterprise] [were] one and the same"); *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 489 (D. Utah 2019) (two alter-ego companies not distinct RICO defendants from an enterprise consisting of the two of them); *Sluka v. Estate of Herink*, 1996 WL 612462, at *6 (E.D.N.Y. Aug. 13, 1996) (corporations that were alter egos of each other were not distinct RICO defendants from an enterprise consisting of the alter-ego corporations and their officers, agents, and employees).

independent benefits from the illegal acts of the enterprise, and affirmatively use their separate corporate status to further the illegal goals of the enterprise, we will regard each of the three entities as distinct from their coordinated enterprise under Section 1962(c)." *U1it4less*, 871 F.3d at 207. King, Wander, and Pasko control two distinct corporate families that operate independently in distinct industries: A-CAP owns insurance companies, while 777 and its sprawling subsidiaries run businesses including football, airlines, investment management, life insurance receivables, reinsurance, and more.  Compl. ¶¶ 25-26, 236-38, 301-07.  The RICO Defendants—the natural persons as well as the two distinct corporate families—all benefit from the purported corporate separateness between A-CAP and 777 to further the illegal goals of the enterprise.  *Id.* ¶¶ 230-46.

The 777 Entity Defendants have seized on Leadenhall's allegations that the 777 Entity Defendants are alter egos of Wander and Pasko, but that is irrelevant to the distinctness of this RICO enterprise.  ECF 205 at 13-16.  Even if "alter ego" status were relevant to distinctness (and the Second Circuit has never suggested it is), this would not warrant dismissal because the RICO enterprise here consists of the 777 Defendants *and* A-CAP and King, which A-CAP expressly acknowledges are alleged to be "distinct" from the other RICO Defendants.  *See, e.g.*, ECF 215 at 22 ("Leadenhall is careful not to allege that A-CAP and 777 are alter egos of one another or should otherwise be treated as a single entity."); *id.* at 5, 36.  The Second Circuit has stated that the distinctness principle "does not foreclose the possibility of a corporate entity being held liable" "where it associates with others to form an enterprise that is sufficiently distinct from itself." *U1it4less,* 871 F.3d at 206 (citation omitted).  Thus, the single decades-old, non-binding case that the 777 Defendants cite for this argument is distinguishable.  *Cf. Sluka*, 1996 WL 612462, at *6. Nor does "control" of one RICO defendant by another defeat distinctness.  Indeed, the "prototypical RICO case" involves a defendant who "has taken over" an enterprise. *Devine*, 726

F. Supp. 2d at 251 (quoting *Fitzgerald*, 116 F.3d at 227); *Fuji Photo Film*, 640 F. Supp. 2d at 314 ("The alleged association-in-fact has a clear structure.  McNulty was the heart of the enterprise and at all relevant times exercised authority and control over the CPD.").  The existence of multiple paths to liability is not a basis for dismissal because Leadenhall is permitted to plead alternative theories of recovery at this stage.  *See Ajinomoto Co. v. CJ CheilJedang Corp.*, 2021 WL 4430200, at *2-3 (S.D.N.Y. Sept. 27, 2021) (rejecting argument that "contradictory pleadings with respect to the relationship/separate corporate existence of the defendants it groups together preclude Plaintiffs' own arguments" because Rule 8(d)(2) permits pleading in the alternative).

Although Wander and Pasko join the 777 Entity Defendants' distinctness argument, they are differently situated and provide no basis for *their* dismissal on "distinctness" grounds.  The Supreme Court has held that an "employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner," so even if the RICO enterprise here solely consisted of the 777 Defendants' corporate family, Wander and Pasko (and King) remain distinct RICO Defendants.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001); *see also Long v. Zhuang*, 2024 WL 4250308, at *10-11 (E.D.N.Y. Aug. 8, 2024) ("[U]nder *Kushner* and Second Circuit precedent, in cases where both natural persons and corporate entities are named RICO defendants, … a natural person named as the defendant "person" is inherently distinct from a corporate entity 'enterprise' for which he acts as an agent; in such a case, the distinctness requirement is met." (quoting *Palatkevich v. Choupak*, 2014 WL 1509236, at *15 (S.D.N.Y. Jan. 24, 2014))); *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 536-37 (S.D.N.Y. 2014).

**B. Leadenhall Has Sufficiently Pled Predicate Acts of "Racketeering Activity," Including but Not Limited to 60+ Fraudulent Communications Lying About Leadenhall's Collateral.**

"Racketeering activity" under the RICO statute includes wire fraud.  18 U.S.C. §§ 1961(1), 1343.  Wire fraud has three elements: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the [] wires to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (quotations and alterations omitted).  "The statutes 'do not define scheme to defraud, but it has been described as a plan to deprive a person of something of value by trick, deceit, chicane or overreaching.'" *United States v. Moses*, 109 F.4th 107, 117 (2d Cir. 2024); *see United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (requiring scienter and materiality for a scheme to defraud).  The second element requires that the object of the scheme is to obtain "property in the hands of the victim." *Cleveland v. United States*, 531 U.S. 12, 15 (2000).  Finally, any wire that "is part of the execution of the scheme [to defraud] as conceived by the perpetrator at the time" satisfies the third element. *Schmuck v. United States,* 489 U.S. 705, 715 (1989).  Rule 9(b) requires that fraud allegations "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 572 (S.D.N.Y. 2018) (citations omitted).  Scienter "may be alleged generally," and Rule 9(b) "does not require factual pleadings that demonstrate the *probability* of wrongdoing." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (citing Fed. R. Civ. P. 9(b)).

Here, Leadenhall alleges the RICO Defendants engaged in a concrete, years-long, pattern of fraudulent schemes to steal, combined, more than $600 million from Leadenhall by falsely representing, month after month, that Collateral free and clear of other interests secured Leadenhall's loans.  Compl. ¶¶ 99-162, 311.  The scheme was "a giant shell game at best, and an

34

outright Ponzi scheme at worst" whereby the RICO Defendants misrepresented asset values to fraudulently acquired low-cost "secured" debt, which they used to acquire assets they overvalued and used to acquire more debt—rinse and repeat—with A-CAP and King extending billions of dollars in loans and even funding payroll to make the enterprise appear legitimate and conceal the fraud. *Id.* ¶¶ 19-20, 48, 205-06, 230-56. Money was undisputedly the object of the scheme, *id.* ¶¶ 193-97, which the RICO Defendants then poured into money-losing, high-profile investments that their creditors would never knowingly underwrite, like professional football teams, *id.* ¶¶ 257-76, 285-311, private airplanes and airlines, *id.* ¶¶ 249, 301-02, and beachfront condos, *id.* ¶ 244.

The primary means by which the RICO Defendants carried out their scheme was issuing approximately 60 Compliance Reports from May 2021 through November 2023 falsely stating that assets were pledged exclusively to Leadenhall when they were in fact "pledged to other lenders or otherwise did not exist." Compl. ¶¶ 99-162. The Complaint describes in detail the false Compliance Reports which "identif[ied] and valu[ed] each asset pledged by the Borrowers," *id.* ¶¶ 99, 102; the individuals responsible for transmitting the Compliance Reports to Leadenhall— Nicholas Bennett and Alexander Adnani, at Wander's direction, *id.* ¶¶ 100-01—and the changes after A-CAP management moved into Bennett and Adnani's offices, *id.* ¶¶ 198-210; the transmission of Compliance Reports over the "wires" via email and DropBox from 777's Miami offices, *id.* ¶¶ 100-01, 208-10; the manner in which assets were added up to falsely substantiate the "Borrowing Bases" against outstanding borrowings, *id.* ¶¶ 114, 118, 136-38, 146-48; detail around how the RICO Defendants pledged assets they never purchased, *id.* ¶¶ 151-58; and the SuttonPark Servicer's disclosure that the Compliance Reports were false all along when they restated Compliance Reports in January 2024, *id* ¶¶ 145-49. For each false Compliance Report, Leadenhall alleges the month to which each applies (from May 2021 to November 2023); the date

of each confirmation email, if any (from June 2021 to February 2023); the date each was transmitted to Leadenhall (from June 2021 to January 2024); the individual or entity responsible for transmitting each (Alexander Adnani or "SuttonPark Capital"); the transmission medium (a shared DropBox folder); and the date on which any restated Compliance Report was sent to Leadenhall. *Id.* ¶ 160; ECF 187-6. In other words, Leadenhall alleges with particularity dozens of "specific misrepresentations and omissions of material fact … disseminated using the mails and wires and were made in furtherance of the RICO enterprise['s] scheme to defraud plaintiffs." *Edmar*, 2023 WL 3570017, at *16.

Leadenhall alleges a litany of other racketeering activity in the form of false statements and other acts intended to conceal the falsity of the Compliance Reports, which underscore the RICO Defendants' fraudulent intent and knowledge of their falsity. These other acts include forged bank statements transmitted to Leadenhall showing millions of dollars in bank accounts that were not there, Compl. ¶¶ 163-70; false statements by Wander in meetings and recorded calls with Leadenhall in November 2022, March 2023, and April 2023 about the extent of the fraud, *id.* ¶¶ 123-34; a change to the "MP Fin" computer system allowing for retroactive alteration of the "lender" fields for individual assets, *id.* ¶ 171; excerpts from MP Fin showing assets pledged alternately between Leadenhall and Credigy, *id.* ¶¶ 172-74; servicing notes reflecting awareness of double-pledging and fake cash flows to avoid detection, *id.* ¶¶ 152-57, and deliberate attempts to stop Leadenhall from auditing its Collateral and discovering the full scope of the fraud, *id.* ¶ 216. All the while—and from 777's own offices starting from March 2023, *id.* ¶¶ 203-10—A-CAP and King controlled the enterprise through an express agreement and made it appear legitimate and solvent through billions in loans, reinsurance reserves from insurance policyholders, and even funding payroll. *Id.* ¶¶ 193-99, 201-06, 235-45.

**C. Leadenhall Has Sufficiently Pled Each Defendant's "Conduct or Participation" in the Enterprise.**

A RICO plaintiff must allege that each defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c); *De Sole*, 974 F. Supp. 2d at 301. The word "participate" makes clear that RICO liability "is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "[T]hose who 'operate' or 'direct' a RICO enterprise sufficiently to 'conduct' its affairs within the meaning of RICO need not be 'upper management,' but might also be 'lower rung participants in the enterprise who are under the direction of upper management.'" *United States v. Allen,* 155 F.3d 35, 41 (2d Cir. 1998) (citations omitted).

Here, Leadenhall alleges each RICO Defendant's role in the fraudulent schemes, including for each a "strong inference" of fraudulent intent by alleging "defendants had both motive and opportunity to commit fraud," or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006). In the Second Circuit, that inference arises in at least four circumstances: where each defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (citations omitted).

**SuttonPark Servicer.** The SuttonPark Servicer issued to Leadenhall, on behalf of the SuttonPark Borrower and Dorchester Borrower, over 60 Compliance Reports from May 2021 to November 2023. Compl. ¶¶ 63-64, 102, 118, 136, 145-46, 161. With each false Compliance

37

Report, the SuttonPark Servicer represented that the Compliance Report was "true and correct in all material respects." *Id.* ¶¶ 63, 79-81, 95. These Compliance Reports were false in all material respects, including by falsely identifying assets as pledged to Leadenhall when they were not and falsely calculating Borrowing Bases based on double-pledged or fictitiously pledged assets. *Id.* ¶¶ 102, 114, 118-19, 136-38, 145-49, 160-61. The SuttonPark Servicer also serviced the double-pledged Collateral, meaning collecting cash flows from receivables and representing that those receivables were pledged exclusively to Leadenhall. *Id.* ¶¶ 46-49, 79-81. Leadenhall has further alleged that the SuttonPark Servicer was uniquely situated to know that its representations about Collateral were false and which cash flows were faked by 777 Partners and SuttonPark Capital because it could not collect cash flows from receivables that were never owned. *Id.* ¶¶ 152-57.

**SuttonPark and Dorchester Borrowers.** The SuttonPark and Dorchester Borrowers received more than $400 million in loans from Leadenhall—all supposedly fully secured—and, upon issuance of each Compliance Report, falsely represented that "[s]uch Borrower is the legal and beneficial owner of the applicable Collateral free and clear of any Adverse Claim." Compl. ¶¶ 55, 63, 89. The Borrowers made the same representations with each "borrowing request" to draw funds from the facility. *Id.* ¶¶ 89, 99, 118. The SuttonPark and Dorchester Borrowers were responsible for owning Collateral "free and clear" and are alleged to have double-pledged or fictitiously pledged approximately $350 million of Collateral. *Id.* ¶¶ 116, 128-33, 156. The Dorchester Borrower was the first entity to disclose—though only in part, thus perpetuating the fraud—that it had double-pledged receivables. *Id.* ¶¶ 113-14. And the SuttonPark Borrower submitted forged screenshots of bank statements to Leadenhall falsifying amounts in bank accounts adding up to its Borrowing Base. *Id.* ¶¶ 167-70.

**SuttonPark Capital.**  SuttonPark Capital was the "seller" entity responsible for selling assets to the SuttonPark and Dorchester Borrowers, which those Borrowers pledged to Leadenhall. *Id.* ¶¶ 50-51, 56.  On September 30, 2022, SuttonPark Capital sold or "assigned" 1,600 receivables to the SuttonPark Borrower, totaling approximately $185 million, which Leadenhall later discovered were already pledged to Credigy.  *Id.* ¶¶ 76-78, 120-21.  SuttonPark Capital conducted due diligence on the "JG Wentworth portfolio" and, before acquiring any assets, fictitiously allocated them to Leadenhall.  *Id.* ¶¶ 151-58.  SuttonPark Capital, through Adnani and Bennett, and later in its own name after A-CAP evicted Adnani and Bennett from their offices around March 2023, transmitted false Compliance Reports to Leadenhall monthly through November 2023.  *Id.* ¶¶ 100-01, 198-210; *see also* ECF 187-6.  SuttonPark Capital also created fake records in MP Fin, "topped up" accounts to give the appearance of cash flows, and recorded notes in MP Fin showing they were aware that receivables pledged to Leadenhall "were never acquired, had already been sold, or were determined to be ineligible to be used as collateral."  *Id.* ¶ 154-56.

**777 Partners and 600 Partners**.  777 Partners and 600 Partners are the parent entities which controlled the 777 Entity Defendants and guaranteed the Borrowers' obligations under the LSA.  *Id.* ¶¶ 49, 85, 97.  These entities, through their principals, concocted and ran the fraudulent schemes; guaranteed obligations that they knew the Borrower entities had no intention or ability to perform because they lacked adequate Collateral; induced Leadenhall to enter into the credit facility; created the Borrower, Seller, and Servicer entities to hold Collateral and serve as contractual counterparties to Leadenhall; and directed the 777 Entity Defendants and their employees in managing Collateral acquired for and ostensibly pledged to Leadenhall.  *Id.* ¶¶ 30-36, 120, 141, 162, 193, 197.  In short, 777 Partners and 600 Partners are the businesses that promised they would be a good—and secured—investment for Leadenhall.

Leadenhall also alleges that Wander and Pasko used the 777 Partners and 600 Partners entities as "trade names," *id.* ¶¶ 5, 46, 212 n.10—characterized as "Family Office[s]" by employees and principals, *id.* ¶¶ 205-07—to intake money from lenders and investors, acquire new assets they could use as collateral for more debt, and pour that money into glamor projects such as professional football teams. *Id.* ¶¶ 257-76. While the lines between SuttonPark Capital and 777 Partners are blurred—to the point where even employees appear confused about the distinction—employees of 777 Partners' Capital Markets Group prepared and submitted the fraudulent monthly Compliance Reports to Leadenhall at Wander's direction. *Id*. ¶¶ 100-01. The Complaint is replete with other predicate acts and conscious misbehavior by 777 Partners specifically, including that it "changed the programming of the 'MP Fin' asset allocation system" to allow retroactive reallocations, *id.* ¶ 159; it altered receivables to show different lenders different allocations, *id.* ¶¶ 172-73; its employees "created shell records" for assets it never owned "and covered up that fact by 'topping up' lenders' collection accounts such as Leadenhall, to give the illusion that cash in-flows were being received," *id.* ¶¶ 154-55; and its employees reviewed notes in MP Fin expressly stating that assets were double-pledged or fictitiously pledged, *id.* ¶ 156. 777 Partners also "raided the assets of several of its subsidiaries that had borrowed under other credit facilities," *id.* ¶ 249, demonstrating that all funds eventually flowed to 777 Partners, and held itself out as the lender and investor in professional football teams to which assets were dissipated, *id.* ¶¶ 261-96.

600 Partners is nothing but a shell entity, the independence of which not even the self-described "777 Entity Defendants" respect, which was created by Wander and Pasko to conceal that Wander is managing certain 777 Partners subsidiaries that he cannot manage due to his prior felony drug conviction. *Id.* ¶ 248. 777 Partners and 600 Partners were not just managers of the fraudulent schemes, directing issuance of false Compliance Reports and raiding subsidiaries for

funds to pour into football teams.  They were direct participants responsible for transmitting false Compliance Reports and altering assets to make it appear as though unsecured debt was secured.

**Wander.**  Wander is the principal individual fraudster behind these schemes.  After receiving a tip in September 2022 accusing Wander of "criminal" activity, *id.* ¶ 105, Leadenhall uncovered that Wander instructed his direct reports (over FaceTime to ensure privacy and avoid a paper trail) to falsely allocate assets as Collateral and issue Leadenhall false Compliance Reports, *id.* ¶¶ 100-01, 113, 152-58, 202; lied to Leadenhall on recorded phone calls on March 28 and April 3, 2023 about the cause of the double-pledge, *id.* ¶¶ 123-40; directed his underlings to pledge assets the 777 Entity Defendants did not own, *id.* ¶¶ 151-58; engaged in sham restructuring negotiations with Leadenhall in March and April 2024 to prevent Leadenhall from bringing the fraud to light, *id.* ¶¶ 175-91; and used the ill-gotten gains to enrich himself and fulfill personal vanity projects such as purchasing football teams, *id.* ¶¶ 48, 193, 257-76 (Wander: "Is there anyone in the world that's been more serious about buying football clubs in history than Josh Wander?").  Before Wander was removed as manager of 777 Partners at A-CAP's direction in May 2024, *id.* ¶ 252, he managed the schemes with the motive and opportunity to defraud Leadenhall by accessing, through his web of 777 Partners-related trade names, more than $600 million in low-interest debt and dissipating of the ill-gotten funds on risky, attention-grabbing assets that he never could have accessed legally.

**Pasko**.  Pasko, the other Managing Partner of 777 Partners and 600 Partners, is the primary cash beneficiary of the fraudulent schemes and was responsible for executing the month-to-month Compliance Reports on which Leadenhall relied.  Pasko "was the signatory on behalf of the SuttonPark Servicer of the false Compliance Reports" for November 2021, December 2021, June 2021, January 2022, February 2022, September 2022, and December 2022, *id.* ¶¶ 61-64, 161-62;

signed the September 2022 assignment by SuttonPark Capital to the SuttonPark Borrower of 1,600 receivables, valued at approximately $185 million, which were already pledged to Credigy, *id.* ¶¶ 120-21; signed borrowing requests in which the SuttonPark and Dorchester Borrowers borrowed hundreds of millions from Leadenhall, falsely representing that all Collateral was "free and clear" of any other security interests, *id.* ¶¶ 55, 89; and in November 2023, at A-CAP's direction, blocked Leadenhall from reviewing pledged receivables, to avoid exposing the fraud, *id.* ¶¶ 216-17. Wander bought out much of Pasko's stake in 777 Partners using approximately $170 million in loans from A-CAP. *Id.* ¶ 218-27, 405. Pasko is the elder statesman who lent the enterprise's schemes a patina of legitimacy and, through his buyout, their primary cash beneficiary.

**A-CAP.** Nothing happens at 777 without A-CAP's approval. *Id.* ¶ 182. The relationship between 777 and A-CAP began because, through 777's Bermudan reinsurance affiliate 777 Re, A-CAP wanted to invest approximately $2.2 billion traceable to insurance policyholders in high-risk assets—*e.g.*, professional football teams—that it could not invest in directly through U.S.-regulated insurance companies. *Id.* ¶¶ 230-39. Separately, A-CAP loaned 777 $2 billion to make it appear solvent, *id.* ¶¶ 235-42, and, in return, obtained "all-asset liens" over not only 777 Partners and 600 Partners, but approximately 40 affiliates. *Id.* ¶¶ 240-43. A-CAP fraudulently moved liens up and down the 777 organizational structure at will, to the detriment of other creditors, in a practice A-CAP referred to as "hardening" its liens by attaching them to higher quality assets. Compl. ¶ 228, *see supra* Statement of Facts § G; *infra* Part V.D.

A-CAP's mantra has been that Leadenhall alleges "no more than the usual influence that a senior creditor has," ECF 215 at 22, but it struggles to explain why it did the *opposite* of what an arm's-length creditor would do upon discovering its borrower had committed fraud—doubling down on its control of 777 and *concealing* rather than distancing itself from the schemes. A-CAP's

actions raising a strong inference of fraud include: publicly taking unilateral control of whether the 777 Entity Defendants paid—or didn't pay—its principals, employees, and creditors, Compl. ¶¶ 205-15; around March 2023, formally memorializing its control over 777 in a memo specifying that certain 777 employees would report directly to A-CAP executives, setting up a "Steering Committee" to ensure it controlled every 777 investment, and moving into 777's offices, including that of the employees responsible for transmitting fraudulent Compliance Reports to Leadenhall, *id.* ¶¶ 198-210; exercising formal control over its new direct reports who continued transmitting false Compliance Reports to Leadenhall under the name "SuttonPark Capital" through November 2023, *id.* ¶¶ 160-62, 202-10; and assuming control and direction of restructuring negotiations with 777 creditors, *id.* ¶¶ 178-92.  A-CAP also prohibited Leadenhall from conducting an "asset review" of its Collateral that would have uncovered the fraud sooner, *id.* ¶¶ 216-17.  These allegations, taken together, rise far above strong circumstantial evidence of conscious misbehavior by A-CAP, the controller of the scheme.

A-CAP's principal argument to the contrary rests on the premise that the scheme somehow reached "fruition" before Defendants stopped issuing false Compliance Reports in November 2023.  ECF 215 at 18 (citing *United States v. Altman*, 48 F.3d 96, 103-4 (2d Cir. 1995) (observing after trial that mailings could not constitute predicate acts where the "looting had already taken place" and the subsequent mailings were not "incident to any essential part of his scheme to defraud").  Here, the RICO Defendants' perpetuation of the lie that the Collateral deficiency was a "mistake" starting in March 2023—including through A-CAP's continued oversight of false Compliance Reports through November 2023—allowed the enterprise to dissipate Leadenhall's ill-gotten funds for *more than another year* before the scheme was laid bare and Leadenhall accelerated the debt in March 2024 and then, following months of additional obfuscation at the

direction of A-CAP, filed this lawsuit in May 2024. Compl. ¶¶ 122-49, 175-92, 202, 208. A-CAP also directed the dissipation of assets and concealed the fraud through its control over whether and to whom 777 could make "protective advances," funded by A-CAP, favoring the football investments that were, in fact, joint pursuits by 777 and A-CAP. *Id.* ¶¶ 285-88, 293. Even assuming A-CAP (and King) merely aided and abetted wire fraud, ECF 215 at 25, that is an "act which is indictable under" the wire fraud statute, and thus a predicate act. 18 U.S.C. § 1961(1); *see Alix v. McKinsey & Co., Inc.*, 2023 WL 5344892, at *12 (S.D.N.Y. Aug. 18, 2023) (distinguishing, e.g., *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019)).

**King.**  King controlled A-CAP's every move and thus 777's every move. In addition to preventing the 777 Defendants from entering a restructuring agreement and controlling Wander's moves during negotiations, Compl. ¶¶ 191-92, King directed A-CAP management to move into 777's offices and take over operations around March 2023—and he began personally sitting in unannounced on Wander's phone calls, *id.* ¶¶ 202-10; directed payment of 777 Partners' payroll and refusing to pay certain employees, *id.* ¶¶ 205-15; and directed billions of dollars in loans and reinsurance reserves to 777, *id.* ¶¶ 237-42, which were used to pursue King's and Wander's money-losing passion projects, *id.* ¶¶ 269-72. In March 2024, King directed the fraudulent transfer of an approximately $170 million debt obligation from the parent of 777 Partners, JARM, to 777 Partners, *id.* ¶ 225, impairing 777 Partners' guarantee of Leadenhall's debt after Leadenhall issued notice of breach, *id.* ¶ 143, 226. King benefitted personally from these schemes, including by causing 777 Partners to loan King $11 million in funds to purchase a beachfront condo in Miami, *id.* ¶¶ 244-45, and personally purchasing a stake in certain of 777's flashy investments, including a Canadian airline, *id.* ¶ 246. King had motive and opportunity to use 777 as a front to make investments with policyholder funds that he could not have made through A-CAP, and to take in

hundreds of millions of dollars from lenders like Leadenhall in pursuit of those investments, massively enriching himself. King's actions in commandeering the cover-up operation—rather than stepping aside and taking action *against* 777 as an arm's-length lender would—only underscores his role in the scheme and what he stood to lose when it started to unravel.

> ### D. Defendants' Falsification of Collateral, False Compliance Reports, and Fraudulent Acts of Concealment Constitute an Unmistakable Pattern of Racketeering Activity with Both Open-Ended and Closed-Ended Continuity.

A pattern of racketeering activity requires "at least two predicate acts of racketeering within ten years of one another." *U1iT4less, Inc. v. FedEx Corp.*, 896 F. Supp. 2d 275, 288 (S.D.N.Y. 2012). A plaintiff must allege that the predicate acts are "related, *and* that they amount to or pose a threat of continued criminal activity." *H.J., Inc.*, 492 U.S. at 239. Predicate acts are "related" when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *4 K & D Corp.*, 2 F. Supp. 3d at 535 (citations omitted). Continuity may be "closed-ended," if the acts span at least two years, or "open-ended," if they span a shorter period but threaten "continuing criminal activity beyond th[at] period." *Chevron*, 974 F. Supp. 2d at 599; *DeFalco*, 244 F.3d at 321-23; *City of N.Y. v. Gordon*, 155 F. Supp. 3d 411, 424 (S.D.N.Y. 2015).

Here, the RICO Defendants issued or caused to be issued more than 60 false Compliance Reports from May 2021 through November 2023, along with other fraudulent cover-up statements. Compl. ¶ 160. Not only are the Compliance Reports "related," but they take the *same form*, *i.e.*, Excel files uploaded to a DropBox folder containing lists of pledged assets and "Borrowing Base" calculations based on the valuation of those assets, *id.* ¶¶ 100-04, 114-18, 136-38, 146-49, 161; have the *same function*, which was to itemize the assets purportedly securing Leadenhall's debt to feign compliance with Borrowing Base limitations, *id.* ¶¶ 55, 99; were transmitted by the *same*

*sender*—Adnani and then, after King and A-CAP displaced him from his office in early 2023, his employer SuttonPark Capital—and signed, where applicable, by the *same authorized signatory*, Pasko, *id.* ¶¶ 64, 100, 161, 203-10; as their key *distinguishing characteristic*, were delivered at monthly intervals for the month previously ended, ECF 187-6; and have the *same victims*, Leadenhall, which relied on the Compliance Reports to confirm that its funds were secured, Compl. ¶ 162 and, while themselves constitute a pattern of wire fraud, are part of a *larger practice* whereby 777 double-pledged or fictitiously pledged assets as collateral to lenders, including third-party intervenor Credigy, to which the double-pledged assets were also pledged, and third-party intervenor ING Capital LLC, which has brought a separate suit against 777 Partners for fictitiously pledging assets, *id.* ¶¶ 162. 309; *ING Capital LLC vs. 777 Partners, LLC, et al.*, No. 24-cv-7913 (S.D.N.Y.), ECF No. 1 ¶¶ 57-64 (alleging $28 million fraud by fictitiously pledging collateral).

Because the Compliance Reports were issued over more than two years, no Defendant disputes that Leadenhall alleges a "closed-ended" pattern of wire fraud.  ECF 205 at 17-21; ECF 215 at 28-30.  And Leadenhall has also alleged an open-ended pattern of wire fraud.  Open-ended continuity exists even where the activity is short in duration if it reflects that "the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful" or at least where the predicate acts "were the regular way of operating that business." *Bolivar v. FIT Int'l Grp. Corp.*, 2017 WL 11473766, at *18 (S.D.N.Y. Mar. 16, 2017); *Williams v. Equitable Acceptance Corp.*, 443 F. Supp. 3d 480, 493 (S.D.N.Y. 2020) ("Open-ended continuity may still exist even when the enterprise's business is legitimate 'if the predicate acts were the regular way of operating that business.'" (citations omitted)).

Here, Leadenhall alleges that the RICO Defendants defrauded Leadenhall out of more than $600 million and have dissipated most or all of it.  Compl. ¶¶ 257-76, 311.  The schemes here,

whereby the 777 Defendants double-pledged Leadenhall's Collateral and "borrow[ed] against existing receivables portfolios and us[ed] those loans to buy more receivables—rinse and repeat," *id.* ¶¶ 48, 118-74, inherently involve fraud against multiple lenders, some of whom have intervened here, and others of whom have brought the 17-and-counting other lawsuits pending against 777, *id.* ¶ 309.  These facts demonstrate that double-pledging and pledging non-existent securities was the enterprise's regular way of doing business.  *See Bolivar*, 2017 WL 11473766, at *19 (finding open-ended continuity where Plaintiffs "alleged that the predicate acts of mail and wire fraud were 'the regular way' that Defendants operated their purported business"); *Friedman v. Hartmann*, 1994 WL 376058 at *1 (S.D.N.Y. July 15, 1994) ("The mere fact that RICO defendants terminate their conduct does not prevent the Court from finding open-ended continuity.").

The show goes on today.  Even after this lawsuit prompted A-CAP to oust Wander and Pasko as managers and install a purportedly "independent" third-party restructuring firm in their stead, Wander claimed he was "still in charge" and, despite having "a new COO from B. Riley," "neither he nor Steve had been removed or had their executive duties reduced from the football business and that they remained the 100% owners."  Compl. ¶¶ 253-55.  A-CAP continues to fund B. Riley to keep 777 out of bankruptcy and A-CAP's insider transactions hidden from judicial oversight.  *Id.* ¶ 229.  A-CAP even continues to fight *any* restraint on its ability to strip assets from 777, challenging, moving to modify, and then seeking an expedited appeal of the Court's asset-preserving preliminary injunction.  *Id.* ¶¶ 298-300, ECF 200.  The RICO Defendants' conduct evinces more than a "threat" of continued criminal activity, as their schemes continue undeterred, and easily satisfy the standard for both open- and closed-ended continuity.

### E.  Leadenhall's RICO Claims Seeking Treble the Accelerated Debt Are Ripe.

Leadenhall alleges damages that are "clear and definite" as required under RICO: exactly $609,529,966.82, immediately due and payable, plus fees and interest, trebled pursuant to 18 U.S.C. § 1964(c).  Plaintiffs do not cite a single case in which a court confronted the situation presented here—where, upon default, the creditor exercised the remedy of accelerating (*i.e.*, demanding immediate payment of) the full amount owed, a sum certain of which the creditor has been deprived by violations of RICO—and found those damages were not "clear and definite."

In arguing that Leadenhall cannot pursue RICO claims for lack of "clear and definite" damages, Defendants rely primarily upon the Second Circuit's decision in *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d. Cir. 1994), which betrays the weakness of this challenge. *First Nationwide* bears a superficial similarity to this case in that the defendant allegedly "misrepresented the value of … collateral to secure … loans, and thereby fraudulently induced [plaintiff] to make loans it otherwise would not have made."  *Id.* at 765.  But the similarities end there.  The plaintiff there argued "its claims with respect to all fraudulent loans were 'ripe' for suit *the moment the loans were made*, regardless of whether the borrowers presently were in default," even though "several of the loans in the amended complaint ha[d] not been sold, foreclosed, or restructured."  *Id.* at 767 (emphasis added).  In other words, the plaintiff in that case had not exercised any contractual remedies to reduce its losses to a sum certain to ripen the claim—unlike Leadenhall.  *Id.* at 768.  The plaintiff in *First Nationwide* argued that, "because the loans were undersecured, [plaintiff] assumed additional risk of loss, and '[f]or all practical purposes, the[] additional funds were lost the moment the loans were made.'"  *Id.*  Here, Leadenhall does not seek damages for an inchoate, speculative *risk* of loss, but an *actual* loss of $609,529,966.82 that the 777 Entity Defendants admit they owe and cannot repay.  Leadenhall does not argue those funds

48

were lost when the loans were made; but they were certainly lost when the RICO Defendants absconded with them instead of repaying Leadenhall upon acceleration.

Defendants attempt to manufacture a rule that a RICO plaintiff who is a secured creditor must always exercise a *foreclosure* remedy, as opposed to other remedies, before bringing a fraud-based claim. ECF 205 at 11; ECF 215 at 15-16. That is not the law. Although the *First Nationwide* court referenced potential foreclosure as *one* way the plaintiff could reduce its damages to a "clear and definite" sum, it acknowledged that fraud losses could become "clear and definite" in other ways, including if fraudulently induced loans had been "sold" or "restructured." 27 F.3d at 767-68. In another case Defendants cite, the court acknowledged that "lost opportunities to sell the unforeclosed loans on the secondary market" could "constitute an ascertainable loss" if the plaintiff alleged "facts that would allow the Court to assess such losses," which Leadenhall has done by specifying the accelerated amount. *Am. Home Mortg. Corp. v. UM Sec. Corp.*, 2007 WL 1074837, at *4 (S.D.N.Y. Apr. 9, 2007). Unlike here, the plaintiffs in *First Nationwide* and the other cases Defendants cite either sat on their hands and exercised *no* remedies, or were still in the process of exercising remedies, like a contractual right to arbitrate, that had yet to reduce damages to a sum certain. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 136 (2d Cir. 2003) ("Plaintiffs have not foreclosed on the loans at issue here, and … arbitrations are pending in Switzerland that concern the same underlying transactions."); *Goldfine v. Sichienza*, 118 F. Supp. 2d 392, 398 ("[N]owhere do Plaintiffs allege that they made any effort whatsoever to recover their alleged losses, or even any part of such losses, by seeking to enforce any of their admitted contractual rights. Plaintiffs cannot claim that their loans are uncollectible *before* making any effort to collect them…."); *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *14 (S.D.N.Y. Aug. 15, 2012) ("Hildene has not alleged it has suffered a clear and definite RICO

49

injury for two reasons.  First, … Hildene has not alleged that there has been a payment default or a shortfall of funds … such that Hildene has not received funds to which it is entitled.  …  Second, Hildene's RICO claim is premature because Hildene has not been frustrated in pursuing its other remedies that might reduce or eliminate the alleged injury, a prerequisite to asserting a RICO claim.").  The LSA gave Leadenhall the right, in lieu of foreclosure, to accelerate the debt, and there is no dispute Leadenhall has been frustrated in pursuing its contractual remedy.  Compl. ¶ 67.

Defendants also suggest Leadenhall may not bring contract and RICO claims in the same action, but that also is not the law, and for good reason.  Every time the Second Circuit has found RICO claims unripe based on the pendency of other claims to recover the same funds, those claims were being pursued in preexisting "parallel proceedings to collect the amount owed … ongoing in another forum."  *D'Addario v. D'Addario*, 901 F.3d 80, 93 (2d Cir. 2018); *see Uzan*, 322 F.3d at 136; *Harbinger Cap. Partners Master Fund I, Ltd. v. Wachovia Cap. Mkts., LLC*, 347 F. App'x 711, 713 (2d Cir. 2009) ("Appellants acknowledge the possibility of some recovery through the bankruptcy proceedings…."); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165-66 (2d Cir. 1993) (holding RICO claims unripe because plaintiff had won another judgment "after the initiation of the present action" that was "likely to be fully satisfied"); *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1107 (2d Cir. 1988) (holding RICO claims unripe because of "ongoing bankruptcy proceedings").  Defendants therefore posit no basis to argue that Leadenhall is somehow not entitled—today—to the full $609,529,966.82 accelerated amount underlying its RICO claims.

Even if Defendants could purport to be able to defray some portion of the accelerated debt through partial repayment—contrary to their prior representations set forth in the Complaint, in sworn declarations, and in open court—Leadenhall's RICO claims are also predicated on the clear and definite fees and costs it incurred in attempting to collect the accelerated amount.  Compl. ¶¶

369, 381, 417(b).  The Second Circuit has repeatedly held such damages are clear and definite, even if other amounts sought may be unripe, and even if collection costs will continue to increase as the plaintiff continues its attempts to collect.  *See D'Addario*, 901 F.3d at 96 ("We have long recognized that a plaintiff may recover legal fees, including expenses incurred in one or more attempts to combat a defendant's RICO violations through the legal system, as damages in a civil RICO action." (citing *Bankers Tr.*, 859 F.2d at 1105-06)); *see also Stochastic Decisions*, 995 F.2d at 1167.  Leadenhall also seeks final injunctive relief, expanding on the preliminary injunction, to restrain any further RICO violations, Compl. ¶¶ 371, 383, 417(c), and the Second Circuit has held clear and definite damages are not required for injunctive claims.  *See Chevron Corp. v. Donziger*, 833 F.3d 74, 139-40 (2d Cir. 2016).  Defendants' ripeness challenge, if credited, would at most narrow the categories of money damages sought for these claims and would not warrant dismissal.

This argument is also meritless as applied to Leadenhall's common-law fraud claims, if it applies at all, which is unsupported by the two dated, non-binding cases cited.  ECF 215 at 16.

### F. Both the 777 Defendants and A-CAP and King Proximately Caused Leadenhall's Damages.

Leadenhall adequately alleges the RICO Defendants' pattern of wire fraud proximately caused Leadenhall's injury.  Proximate cause for a civil RICO claim requires "some direct relation between the injury asserted and the injurious conduct alleged." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008).  Proximate causation "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case'" but refers "generically" to "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* (citations omitted).  The RICO Defendants proximately caused Leadenhall's injury since "there are no independent factors that account for [that] injury, there is no risk of duplicative recoveries

51

by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." *Id.* at 658; *see Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

### 1. Leadenhall Reasonably Relied on the 777 Defendants' Fraudulent Statements, as Defendants Intended.

The Complaint alleges Leadenhall reasonably relied on the 777 Defendants' fraudulent statements, before and after being tipped off about their fraud. Starting with the 777 Defendants' first borrowing requests under the facility, "Leadenhall relied on the Compliance Reports to confirm throughout the term of the LSA that the funds provided to Borrowers were secured as contractually required." Compl. ¶ 162. Indeed, the purpose of the Compliance Reports was to offer contractual representations, on which Leadenhall would rely, that the Borrowers' debt was secured—when the debt was drawn, and throughout its term until maturity—backed by certifications and detailed calculations. *See id.* ¶¶ 55, 62-64, 80-81, 89, 95, 99.

Leadenhall's scrutiny increased after it received the anonymous tip in September 2022—and so did Defendants' efforts to conceal their fraud. "Through early 2023, although Leadenhall kept close watch over its lending to Wander's entities, no further issues were revealed, so Leadenhall reasonably relied on the Compliance Reports it received during this period." *Id.* ¶¶ 105, 118. Leadenhall monitored the 777 Defendants by, among other things, sending employees to 777's offices to spot-check their asset-allocation computer software. *Id.* ¶¶ 106-17.

Leadenhall stepped up scrutiny *again* when, in March 2023, Leadenhall learned from Credigy, another lender, that the deficiency was greater than originally thought. *Id.* ¶ 119. Leadenhall reviewed information provided by Credigy and promptly demanded more information from the 777 Defendants, including holding multiple conference calls, serving written correspondence requesting information, and repeatedly demanding asset reconciliations (which Wander repeatedly promised). *Id.* ¶¶ 120-35. During those calls, Wander admitted that there was

a $100-million collateral shortfall, and shortly thereafter, the 777 Defendants began submitting Compliance Reports conceding somewhat larger deficits of around $170 million. *Id.* ¶¶ 132, 136-38. Leadenhall again had reason to rely upon the 777 Defendants' "corrected" representations as Defendants purported to admit their "mistake" and swore they would rectify the issue.

Leadenhall's heightened scrutiny continued from April through October 2023, with more in-person meetings and conference calls, and more promises by Wander of new deals around the corner and asset reconciliations. *Id.* ¶¶ 139-40. Then, in October and November 2023, Leadenhall learned that the problem was much larger—and more nefarious—than the $170 million "mistake" to which Wander admitted. Leadenhall learned for the first time that the 777 Defendants had not just double-pledged assets but pledged assets they never owned. *Id.* ¶¶ 141-43, 151-59. When Leadenhall peeled back yet another layer of the schemes, it uncovered a shortfall of over $350 million, more than double what the 777 Defendants previously admitted, and triple what Wander originally claimed. *Id.* ¶¶ 144-49. Leadenhall demanded access to conduct a full audit of the Collateral, but the Defendants, directed by A-CAP and King, resisted. *Id.* ¶¶ 216-18.

The 777 Defendants do not seriously dispute that Leadenhall did, in fact, rely on the Compliance Reports, which was their entire *raison d'être*. The 777 Defendants' arguments that reliance was not "reasonable" or "justifiable" are frivolous.

*First*, the 777 Defendants grossly mischaracterize the Complaint when they claim that, after Leadenhall received the anonymous tip about the fraud, "the Complaint tells a story of the 777 Entity Defendants collaborating with [Leadenhall] during its audits and immediately correcting records when they were inaccurate, not concealing," and the SuttonPark Servicer "began correcting its records and reporting same without [Leadenhall's] intervention." ECF 205 at 22. That is false. In the paragraphs cited by the 777 Defendants, Leadenhall alleges Defendants'

selective "admissions" were part of the scheme, calculated to avoid further scrutiny and create a false sense of trust: Wander lied about the cause and extent of the collateral "screwup"; the SuttonPark Servicer started issuing Compliance Reports showing Borrowing Base Deficiencies in April 2023 only *after* Leadenhall conducted numerous site visits and essentially forced it to do so; and those mid-2023 Compliance Reports *still* understated the extent of the fraud by more than $100 million to continue inflating the Borrowing Base as much as possible. Compl. ¶¶ 127, 132-49. And while the 777 Defendants finally opened up their books, including the MP Fin system, the 777 Defendants neglect to mention that they *falsified* the records they begrudgingly showed to Leadenhall and continue to this day to frustrate Leadenhall's ability to audit its collateral. *Id.* ¶¶ 155, 163-74, 216-18. Leadenhall went far beyond ordinary diligence in relying on anything the 777 Defendants said, while the 777 Defendants tried to deceive Leadenhall at every turn.

*Second*, while Leadenhall amply alleges that its reliance was reasonable, the Court need not even reach that question, because the 777 Defendants cite no case requiring *reasonable* reliance to allege proximate causation for a civil RICO claim. Instead, the 777 Defendants cite a common-law fraud case, but "the predicate act here is not common-law fraud, but [wire] fraud." *Bridge*, 553 U.S. at 655. While the Second Circuit previously held reasonable reliance was required, *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004), that holding was superseded by *Bridge*'s holding that, since reasonable reliance is not an element of mail fraud, there is "no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim." 553 U.S. at 655. After *Bridge*, in lieu of reasonable reliance, "the central question is whether the alleged violation led directly to the plaintiff's injuries," which can be the case whether reliance was reasonable or not. *Related Cos., L.P. v. Ruthling*, 2017 WL 6507759, at *19 (S.D.N.Y. Dec.

18, 2017) (citing *Bridge*, 553 U.S. at 654). To be clear, Leadenhall's allegations suffice under any standard, since Leadenhall undisputedly pleads actual reliance and "detail[s] the steps which defendants took to deceive them." *Id.* But the Court may also sustain Leadenhall's claims on this point without analyzing whether reliance was reasonable.

### 2. A-CAP and King Directly Caused Leadenhall's RICO Injuries.

Leadenhall alleges A-CAP's and King's actions directly caused Leadenhall's RICO injuries, including the loss of $609,529,966.82. Leadenhall alleges the fraud began in 2021 when the 777 Defendants first made fraudulent Compliance Reports and borrowing requests. But Leadenhall's injury from the ultimate loss of those funds—the 777 Defendants' failure and inability to repay the accelerated amount—was directly caused by A-CAP and King as well, who caused the 777 Defendants to divert the borrowed funds (mostly to benefit A-CAP) until the funds and assets were gone. A-CAP's and King's actions causing Leadenhall's injury include: perpetuating the fraud by taking over preparation and submission of fraudulent Compliance Reports, Compl. ¶¶ 200-04, 208-210; covering 777 Partners' payroll to avoid alerting creditors like Leadenhall to the 777 Defendants' crumbling financial position, *id.* ¶¶ 205-06, 214; blocking Leadenhall's attempts to exercise its contractual rights to audit the Collateral, *id.* ¶¶ 216-18; stripping assets from 777 and wasting the 777 Defendants' money on "protective advances" to cover up the fraud, *id.* ¶¶ 219-29, 287-96; and using threats to prevent the 777 Defendants from making debt payments, *id.* ¶¶ 180-92, 214. A-CAP and King fraudulently concealed the fraud for years, lent the RICO enterprise a patina of solvency, and fraudulently promised repayment to Leadenhall to stave off litigation, so A-CAP could reap its reward by stripping ill-gotten assets, leaving nothing for Leadenhall to collect. The 777 Defendants' role in causing Leadenhall's injury

was not "independent" of A-CAP's and King's, *Bridge*, 553 U.S. at 658; to the contrary, the RICO

Defendants worked in concert to bring to fruition the very pattern of fraud that caused the injury.

A-CAP and King's counterargument mischaracterizes Leadenhall's claims. They claim

"Leadenhall's alleged injury—the Borrowing Base Deficiency—is not a RICO injury at all," and

that A-CAP and King's actions did not proximately cause Borrowing Base Deficiencies, which

already existed by the time A-CAP and King got involved. ECF 215 at 25-26. But the Borrowing

Base Deficiencies themselves are not Leadenhall's "RICO injury"—they are one of many ways

the 777 Defendants breached the credit facility. The 777 Defendants' actions, in concert with A-

CAP's and King's, caused RICO injury, including loss of $609,529,966.82 because the RICO

Defendants absconded with the fruits of their fraud. *See supra* Part II.E.

### G.  Leadenhall Has Sufficiently Pled Domestic Injury.

In an argument no other Defendants join, A-CAP and King posit that Leadenhall has not

suffered a "domestic injury," attempting to resurrect the "bright-line rule" expressly rejected by

the Supreme Court that foreign entities cannot assert RICO claims. ECF 215 at 26 ("Leadenhall

merely alleges that it is a foreign entity, that does business with American entities and has been

unable to collect a debt owed to it.") (citations omitted). The *only* foreign touchpoint A-CAP can

muster among Leadenhall's allegations of a wholly domestic RICO enterprise is the tangential role

played by 777 Re—777's Bermudian reinsurance subsidiary that A-CAP used to offshore billions

in policyholder funds to evade U.S. regulation. Compl. ¶¶ 230-40; ECF 215 at 26-27.

The domestic injury requirement is not a "bright-line rule" and "does not mean that foreign

plaintiffs may not sue under RICO." *Yegiazaryan v. Smagin*, 599 U.S. 533, 544-45, (2023)

(quoting *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 353 n.12 (2016)); *Digilytic Int'l FZE v. Alchemy*

*Fin., Inc.*, 2024 WL 4008120, at *16 (S.D.N.Y. Aug. 30, 2024). "[D]etermining whether a plaintiff

has alleged a domestic injury for purposes of RICO is a context-specific inquiry that turns largely on the particular facts alleged in a complaint," including "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Yegiazaryan*, 599 U.S. at 543-44 (citations, quotations, and alterations omitted).

In *Yegiazaryan*, a resident of Russia asserted a RICO claim against a California resident. *Id.* at 537-39.  The plaintiff alleged that the defendant committed racketeering acts in the United States to avoid an arbitral award issued in London, confirmed in a California court.  *Id.* at 539. Rejecting the argument that the Russia-based plaintiff "felt his economic injury in Russia" such that his injury was not "domestic," the Supreme Court determined that "[m]uch of the alleged racketeering activity that caused the injury occurred in the United States[,]" including "allegedly creating U.S. shell companies to hide his U.S. assets, submitting a forged doctor's note to a California District Court, and intimidating a U.S.-based witness[,]" and that the defendant acted with "the aim and effect of subverting [Plaintiff's] rights to execute on that judgment in California."  *Id.* at 545-46.  Therefore, the foreign plaintiff alleged a domestic RICO injury.  *Id.* at 546.  A recent decision in this District held that a RICO claim asserted by a foreign resident against New York residents was domestic because, "[l]ike in *Yegiazaryan*, Plaintiffs allege that most of [Defendants'] racketeering activities occurred in the United States."  *Digilytic*, 2024 WL 4008120, at *16.  The court found the defendants' activity in New York and "fraudulent statements from the United States," including transmission of false white papers, purchase agreements, emails, and telephone calls, "indicate[d] the injury arose in the United States."  *Id.* at *2, *16.

Here, the LSA and related contracts through which Defendants carried out their scheme are New York law-governed contracts with New York forum selection clauses.  Compl. ¶¶ 39-45.  The only assets eligible to support Borrowing Bases that Defendants fraudulently inflated were U.S.-

based.  *Id.* ¶ 368.  The 777 Defendants resided in Florida and/or New York over the relevant period and drew funds from Leadenhall's credit facility for use by businesses based in Florida.  *Id.* ¶¶ 25, 31-34, 102.  A-CAP and King controlled and oversaw the enterprise from New York.  *Id.* ¶¶ 37-38, 193-97.  The 777 Entity Defendants—and the SuttonPark Servicer and employees of SuttonPark Capital in particular—transmitted to Leadenhall from Florida approximately 60 false Compliance Reports over a two-and-a-half-year period.  *Id.* ¶¶ 160-61.  In March 2023, A-CAP management moved into 777's offices in Florida, and "SuttonPark Capital" continued to transmit false Compliance Reports from Florida through November 2023.  *Id.* ¶¶ 160, 202-10.

Further, to corroborate the false Compliance Reports, the SuttonPark Borrower, from Florida, transmitted forged bank statements (from U.S. bank Wells Fargo) to Leadenhall, *id.* ¶¶ 163-70; Florida employees of SuttonPark Capital and 777 Partners' Capital Markets Group altered receivables in the computer system to retroactively show they had been pledged to different lenders, *id.* ¶¶ 108, 171-73; the computer system was operated in Florida, which is why Leadenhall had to visit 777's offices in Florida in November 2022, *id.* ¶ 108; Wander, in Florida, lied on recorded phone calls about the cause and extent of the double-pledge, *id.* ¶¶ 31, 123-33; the assets pledged to Leadenhall (including the fictitiously pledged JG Wentworth assets) were in the U.S., *id.* ¶¶ 151-55, 368; and Wander conducted sham restructuring negotiations over the phone from New York, with King dictating those negotiations to avoid litigation, *id.* ¶¶ 175-92.

Ultimately, this is a case about more than $600 million taken in Florida, by impairing the value of U.S.-based collateral, in schemes run out of Florida and New York to subvert Leadenhall's right to either get its money back from Florida or enforce a judgment issued by a New York court. That Leadenhall is London-based is entirely incidental in these U.S.-based wire frauds.

### III.    LEADENHALL SUFFICIENTLY ALLEGES A RICO CONSPIRACY CLAIM.

In addition to its substantive RICO claim, Leadenhall asserts a RICO conspiracy claim under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate" any of the substantive provisions of RICO.  A person "may be liable for [a RICO] conspiracy even though he was incapable of committing the substantive offense."  *Salinas v. United States*, 522 U.S. 52, 64 (1997); *Satinwood*, 385 F.3d at 178 (observing that the standard for a RICO conspiracy claim is "more relaxed" and "less demanding" because it requires only that a conspirator "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense").

A RICO conspiracy claim requires allegations: "(a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering."  *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018); *accord Related Cos., L.P. v. Ruthling*, 2019 WL 10947100, at *6 (S.D.N.Y. July 23, 2019).  Unlike a "basic" common-law conspiracy claim, which requires each defendant's "knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed," a RICO conspiracy claim "does not require proof that a defendant knowingly agreed to facilitate a specific crime (*e.g.*, mail fraud)."  *Zemlyansky*, 908 F.3d at 10-11.  "So long as the defendant knowingly agreed to facilitate 'the general criminal objective of a jointly undertaken racketeering scheme,' the [plaintiff] need not prove that he or she knowingly agreed to facilitate any specific predicate act."  *Id.* at 11 (citations omitted); *accord Ruthling,* 2019 WL 10947100, at *6 ("plaintiff need not show that the defendant herself either committed, or agreed to commit two predicate acts" (quotations omitted)); *Frydman v.*

*Verschleiser*, 172 F. Supp. 3d 653, 671 (S.D.N.Y. 2016) (citing *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008)).

On the first element, Leadenhall alleges A-CAP and King formed an implicit agreement with the 777 Defendants as early as 2020 by providing 777 more than $2 billion in loans and an additional $2.2 billion in reinsurance reserves, Compl. ¶¶ 194, 230-42, in exchange for an "all asset lien" and de facto control across much of the global 777 organization, *id.* ¶¶ 134, 243. Leadenhall also alleges that around March 2023, "A-CAP formally memorialized its control of 777 Partners' operations in a memo circulated within 777 Partners," *id.* ¶ 201; established a "Steering Committee" with "King at the head, to ensure that every 777 Partners investment into a portfolio company was approved by King," *id.*; moved into 777's Miami headquarters and took over for the individuals responsible for sending false Compliance Reports to Leadenhall, *id.* ¶¶ 202-09; had King surreptitiously listen in on Wander's phone calls, *id.* ¶ 210; funded the 777 Entity Defendants' payroll and operating costs to create the appearance of solvency and conceal the fraud, knowing that there was no intention to repay Leadenhall, *id.* ¶¶ 205-06, 257, 363(g); and controlled the 777 Entity Defendants' ability to enter into contracts, including with Leadenhall, *id.* ¶ 182. Leadenhall alleges an express agreement among the RICO Defendants giving A-CAP and King control over the enterprise's every move. *Id.* ¶ 194.

On the second element, Leadenhall alleges the RICO Defendants engaged in the scheme to fraudulently obtain money from lenders like Leadenhall, to acquire new collateral that could be fraudulently used to obtain more debt—"rinse and repeat." *Id.* ¶¶ 48, 193-97, 257-76. With these funds, Defendants acquired, *inter alia*, high-profile professional football teams, such as Everton Football Club and Genoa CFC, and various airlines, that they lacked the financial wherewithal to acquire lawfully. *Id.* ¶¶ 257-303. In addition to enabling these vanity investments, the schemes

directly enriched the individual Defendants, allowing them to purchase luxury real estate and individual stakes in the enterprise's passion projects, as reflected by King's purchase of an $11 million beachfront condo in Miami using a loan from 777 Partners, and a 10% stake in an airline owned by 777 Partners. *Id.* ¶¶ 244-46. Further demonstrating A-CAP's and King's orchestration of the scheme to enrich themselves is A-CAP's history of exercising the remedies it created for itself against 777 assets when non-insider creditors threaten to disrupt the flow of funds to A-CAP. When the 777 Entity Defendants' gross financial mismanagement began threatening the enterprise's goals, A-CAP stepped out from behind the curtain and seized 777's fleet of Australian airplanes and football assets. *Id.* ¶ 293-303. In other words, A-CAP and King knowingly conducted the enterprise "with the intent that its overall goals be effectuated," and then carried out those goals when the 777 Defendants proved unable to do so. Such allegations of "receipt of diverted or stolen funds … may support an inference that the defendant knowingly participated in a claimed RICO conspiracy." *Ruthling*, 2019 WL 10947100, at *7.

Finally, on the third element, Leadenhall alleges specific predicate acts of wire fraud over two-and-a-half-years—including false Compliance Reports*, id.* ¶¶ 99-162; forged bank statements and lies about the cause and extent of the issue to conceal the fraud, *id.* ¶¶ 123-34, 163-70; reprogramming of 777's computer system to allow retroactive alteration of collateral records, *id.* ¶¶ 171-74; and deliberate attempts to thwart Leadenhall's Collateral audit, *id.* ¶¶ 216-18.

The facts above, in addition to the utter lack of surprise by Michael Saliba, A-CAP's COO and King's deputy, when Leadenhall informed him of the 777 Defendants' fraud, *id.* ¶ 212, is more than enough to infer their role in a conspiracy. *See Ruthling*, 2019 WL 10947100, at *7 ("[K]nowing and willing participation in a conspiracy may be inferred from, for example … presence at critical stages of the conspiracy that could not be explained by happenstance … a lack

of surprise when discussing the conspiracy with others … participat[ion] in conversations directly related to the substance of the conspiracy; … or receiv[ing] or expect[ing] to receive a share of the profits from the conspiracy." (quoting *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002))); *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 726-28 (S.D.N.Y. 2021) (holding defendants who learned about ongoing fraud during due diligence and proceeded with business relationship, "knew about and agreed to facilitate [the alleged] racketeering scheme").

Defendants only cursorily challenge the RICO conspiracy claim by claiming Leadenhall engages in "improper group pleading" and that the underlying substantive RICO is inadequately pled.  ECF 205 at 23-24; ECF 215 at 30-31.  In arguing that Leadenhall has engaged in "group pleading," the 777 Entity Defendants attack only the Complaint's "Claims for Relief" section and ignore the factual allegations underpinning, and expressly incorporated by reference into, each cause of action.  ECF 205 at 23-24.  As discussed *supra* at Part II.B, C, Leadenhall makes specific and distinct allegations demonstrating each Defendant's individual role in the pattern of wire fraud.

Defendants also misunderstand or misapply the case law they cite for the proposition that "where a plaintiff fails to plead a substantive RICO violation, he cannot maintain a RICO conspiracy claim."  ECF 205 at 23; ECF 215 at 30-31.  That authority simply states that where a plaintiff has failed entirely to plead that an enterprise engaged in a racketeering pattern against any defendant, the plaintiff cannot state a RICO *or* RICO conspiracy claim.  *See, e.g.*, *Satinwood*, 385 F.3d at 182 (finding that because the plaintiff had, among other things, failed to plead a pattern of fraud that continued for long enough to satisfy the continuity requirement, the plaintiff could not plead a RICO conspiracy claim based on that same deficient pattern).  Here, Leadenhall alleges a detailed pattern of wire fraud, which even A-CAP and King appear to acknowledge on the very

first page of their brief, in trying to save themselves at the expense of Wander, Pasko, and the 777 Entity Defendants.  ECF 215 at 1 (describing the detailed fraud allegations against the 777 Defendants); *id.* at 9.  Because Leadenhall has sufficiently alleged that pattern of fraud, the question for a RICO conspiracy claim is whether each RICO Defendant engaged in the scheme with intent that its goal be effectuated.  The answer is yes, including as to A-CAP and King.

A-CAP and King's other arguments rely on case law that predates the Supreme Court and Second Circuit decisions providing the operative legal standard for a RICO conspiracy claim, *Salinas*, 522 U.S. 52 and *Zemlyansky*, 908 F.3d 1, and, like the 777 Defendants, address only the "Claims for Relief" section.  ECF 215 at 30-31 (citing Compl. ¶¶ 374-75).  To plead a RICO conspiracy claim against A-CAP and King, Leadenhall must allege the "broad goals of the racketeering scheme be realized, along with evidence that some (or any) members of the conspiracy intended that specific criminal acts be accomplished."  *Zemlyansky*, 908 F.3d at 11.  Here, the RICO Defendants' goal was to obtain low-cost debt under fraudulent pretenses that they could invest in high-risk personal passion projects that they could not pursue lawfully, such as professional football teams and airplanes, Compl. ¶¶ 48; 193-97; 257-303, and when the 777 Entity Defendants ran out of money, A-CAP and King emerged to ensure the conspiracy's goals were achieved, *id.* ¶¶ 277-303.  Leadenhall has satisfied all the elements of a RICO conspiracy claim.

## IV.    LEADENHALL'S CONTRACT AND QUASI-CONTRACT CLAIMS REMAIN VIRTUALLY UNDISPUTED.

### A. Defendants Do Not Dispute Nine of Ten "Trigger Events" Constituting Breaches of the Guaranty Agreement (Claim 4) and Waive Any Challenge Thereto.

The 777 Defendants argue that Leadenhall failed to allege the occurrence of a "Trigger Event" causing a default of the Guaranty Agreement, which they characterize as a "condition

precedent." ECF 205 at 27-28. Even assuming the 777 Defendants' characterization of the legal significance of a "Trigger Event" is correct, this argument ignores the allegations of the Complaint.

First, the 777 Defendants dispute the occurrence of only one of the *ten* Trigger Events alleged in the Complaint. *Compare* ECF 205 at 27-28 (disputing only whether the Borrowers' failure to own Collateral "free and clear" was "solely as a result of the action or inaction of such Borrower or a Guarantor," under subparagraph (ix) of the definition of "Trigger Event"), *with* Compl. ¶ 351 (alleging ten distinct Trigger Events, only one of which arises under subparagraph (ix)); *see also id.* ¶¶ 84-174. Because each Trigger Event independently triggers the Guarantors' obligations, and the 777 Defendants do not dispute that nine occurred, they have waived any argument for dismissal of the Breach of Guaranty Agreement claim and may not raise one belatedly on reply. *Suazo v. Ocean Network Express (N. Am.), Inc.*, 2024 WL 68428, at *4 (S.D.N.Y. 2024) (citing *Knipe v. Skinner*, 999 F.2d 708, 711 (2d. Cir. 1993)).

Second, the 777 Defendants are wrong about the one Trigger Event they do dispute. The 777 Defendants argue that failure to own collateral "free and clear" is a Trigger Event only if it is "solely as a result of the action or inaction of such Borrower or a Guarantor" and claim that "the Complaint does not allege such exclusive action or inaction of a Borrower or Guarantor and is therefore deficient." ECF 205 at 27. But the 777 Defendants do not cite any allegation of the Complaint suggesting anyone *other* than a Borrower or Guarantor caused the Borrowers' failure to own Collateral free and clear—because none exists. *See generally id.* at 27-28. Even if the 777 Defendants could concoct a speculative alternate theory of causation (which they do not attempt), that would only raise a factual dispute inappropriate for resolution at this stage.

**B. Defendants Do Not Dispute Breaches of the LSA, Sale Agreements, and Servicing Agreements (Claims 1-3) Except to Feign Confusion as to Which Provisions Were Breached by Which Defendants.**

As to Leadenhall's claims for breaches of the other contracts—the LSA, the Sale Agreements, and the Servicing Agreements—the 777 Defendants argue Leadenhall has failed to allege which terms of various contracts were breached, or that Leadenhall named the wrong Defendants. *Id.* at 28-29. These arguments are demonstrably wrong, as the Complaint pleads precisely which Defendants breached which provisions of each contract and which Defendants are subject to alter-ego or lender liability for other Defendants' breaches.

In sum, the Borrowers breached the LSA in these ways: breaching their representation and warranty that they would hold Collateral "free and clear" of any Adverse Claim, § 4.01(h); breaching their covenants that they would not create or suffer to exist any Adverse Claim over such Collateral, §§ 5.01(d), 5.01(k)(vi); breaching their obligations to pay Leadenhall the accelerated amount when due under § 7.01(c), (d), and to indemnify Leadenhall for losses caused by the foregoing breaches; and submitting fraudulent Compliance Reports. Compl. ¶¶ 316-20; *see id.* ¶¶ 53-68, 88-174. By failing to hold Collateral "free and clear" of any Adverse Claim, and thus failing to grant Leadenhall a first-priority security interest that it can enforce, the Borrowers (and their alter egos) also breached their obligations under LSA §§ 2.07, 2.15, 5.01(i), 7.01(c), and 7.02(g). Compl. ¶ 323. While the Sellers are parties to the LSA, Leadenhall does not presently allege the Sellers breached their direct duties under the LSA, but Leadenhall does allege that SuttonPark Capital and the Guarantors, as well as Wander and Pasko, are liable for the Borrowers' breaches because the Borrowers are their alter egos, as discussed below. *Id.* ¶ 322. And, as also discussed below, Leadenhall alleges A-CAP and King are subject to lender liability for the Borrowers' breaches. *Id.* The 777 Defendants' contention that "absent are any allegations about

the Servicer at all," ECF 205 at 28, misses Leadenhall's claim against the SuttonPark Servicer for breach of the LSA (and Servicing Agreement).  Compl. ¶¶ 336-43; *see id.* ¶¶ 79-83, 88-174.

As to the Sale Agreements, SuttonPark Capital breached its representation and warranty that it owned any receivables it sold to the Borrowers "free and clear of any Adverse Claim" and its covenants not to create or suffer to exist any Adverse Claim or take any action inconsistent with the Borrowers' ownership of those receivables, §§ 4.01(h), 5.01(f).  Compl. ¶¶ 327, 330; *see id.* ¶¶ 75-78, 88-174.  All Sellers breached their obligations to indemnify the Borrowers for losses or damages arising from those breaches under § 7.03.  *Id.* ¶¶ 328-29.  As alleged, Leadenhall has the right to enforce those obligations under § 2.05.  *Id.* ¶ 326.  Leadenhall alleges the Guarantors, Wander, and Pasko are liable for the Sellers' breaches because the Sellers are their alter egos, and A-CAP and King are subject to lender liability.  *Id.* § 332.

The SuttonPark Servicer breached its obligations under the LSA to prepare and deliver Compliance Reports that were "true and correct in all material respects," LSA § 6.07(c); committed Servicer Defaults and breached its obligation to notify Leadenhall of such Servicer Defaults, including false Compliance Reports, and Events of Default, §§ 7.2(a), (c), (e), Servicing Agreements § 4.3; and its duty to indemnify Leadenhall for its Servicer Defaults, LSA § 6.06(a). Compl. ¶¶ 336-43; *see id.* ¶¶ 79-83, 88-174.  Leadenhall alleges the Guarantors, SuttonPark Capital, Wander, and Pasko are liable for SuttonPark Servicer's breaches because the SuttonPark Servicer is their alter ego, and A-CAP and King are subject to lender liability.  *Id.* ¶ 345.

### C. The 777 Entity Defendants Do Not Dispute That They Operate as Alter Egos of One Another, and Wander's and Pasko's Challenges to Alter-Ego Liability Are Factual Disputes.

Leadenhall alleges the 777 Defendants function as a single entity, in which each entity is an alter ego of its owners, all ultimately owned, dominated, and controlled by Wander and Pasko,

such that liability for the acts of one are properly imputed to the others. *Id.* ¶ 247-56. Courts will pierce the corporate veil where, as here, "(1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff." *Keawsri v. Ramen-Ya Inc.*, 2023 WL 5950685, at *6 (S.D.N.Y. Sept. 13, 2023) (citations and quotations omitted). For contract claims, "New York law permits a plaintiff to 'pierce the corporate veil' and sue a non-signatory for breach of contract when the non-signatory is an alter ego of one or more signatories." *Javier v. Beck*, 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014); *see Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) ("[A] controlling shareholder may be held liable for the corporation's commercial dealings as well as for its negligent acts."). Veil-piercing is appropriate here because, as alleged, the 777 Entity Defendants are mere trade names for Wander and Pasko, vessels into and out of which they move assets when it suits their purposes, exhibiting none of the formalities that signify a legitimate business.

Defendants raise no *legal* challenge to the sufficiency of Leadenhall's alter-ego allegations. Although the 777 Entity Defendants argue (wrongly) that their status as alter egos of one another is incompatible with Leadenhall's RICO claims, they *do not dispute* that Leadenhall alleges facts sufficient to establish alter-ego liability except for two sentences stating, with no explanation or supporting authority, that "Plaintiffs' allegations of alter ego liability are merely conclusory," ECF 205 at 28, and "Plaintiffs' allegations [of alter ego liability as to 600 Partners] are incognizable,"

*id.* at 29.[5]  A-CAP and King likewise *do not challenge* that the 777 Defendants, Wander, and Pasko are alter egos.  ECF 215.  Wander *does not dispute* the sufficiency of Leadenhall's allegations that he and Pasko operated the 777 Defendants with disregard for corporate formalities and exercised control and dominion over the businesses.  ECF 210.  Rather, Wander argues only that Leadenhall's alter-ego theory is a "non-starter" because *someone else*—King—was controlling *him*.  *Id.* at 2 ("But it is a non-starter here, at least as to Mr. Wander, given Leadenhall's theory that someone other than Mr. Wander was calling the shots.").  And Pasko raises a factual dispute inappropriate for disposition on a motion to dismiss, arguing based on facts outside the Complaint that he personally was not an alter ego of his companies and asking the Court to draw inferences against Leadenhall and in favor of Pasko that certain events either did not happen as alleged or were "benign."  ECF 212 at 14-18.  None of these arguments supports dismissal of any alter-ego claim.

### 1. Both Wander and Pasko Dominated and Controlled the 777 Entity Defendants, and There Is No Dispute that 777 Partners and 600 Partners Dominated and Controlled Their Subsidiaries.

Courts consider an array of factors "to determine the degree of domination," including: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like;

---

[5] In one example of a frequent tactic employed by Defendants, Wander attacks one summary allegation that he uses the 777 corporate family to "freely transfer assets among a web of trade names without regard to corporate or legal formalities" as "conclusory."  ECF 210 at 14 (quoting Compl. ¶ 212 n.10).  Indeed, that paragraph *is* the plausible (if not only) conclusion to be drawn from the detailed factual allegations surrounding and supporting it, which, taken together and assumed to be true, state a claim.

(2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the amount of business discretion displayed by the allegedly dominated corporation; (7) whether the related corporations deal with the dominated corporation at arms length; (8) whether the corporations are treated as independent profit centers; (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (quoting *Passalacqua*, 933 F.2d at 139 (brackets omitted)); *accord Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 714 F. Supp. 3d 416, 439 (S.D.N.Y. 2024). These factors are not exhaustive, nor is any particular factor or combination of factors dispositive, but in this intensely fact-specific inquiry, "a court may properly disregard the corporate form 'whenever necessary to prevent fraud or to achieve equity.'" *Aralpa*, 714 F. Supp. 3d at 439, 440-41 (citations omitted). On the facts alleged here, most, if not all, of those factors are present, and it would be deeply inequitable to allow Wander and Pasko to continue using the corporate form as a shield.

First, the 777 Entity Defendants function as a single unit, with complete "overlap in ownership, officers, directors, and personnel," "common office space, address and telephone numbers," and no "business discretion" of their own. *FirstEnergy*, 766 F.3d at 224 (factors 4, 5, 6). The 777 Entity Defendants all ultimately trace their ownership and control to Wander and Pasko, work out of the same offices, and have a single group of employees. *See, e.g.*, Compl. ¶¶ 30-36; 100-01 (Bennett and Adnani, employees of 777 Partners and SuttonPark Capital, also

carried out functions of the SuttonPark Servicer, including sending Compliance Reports to Leadenhall, under strict control by Wander).

Second, the 777 Entity Defendants pervasively lack corporate formalities. *FirstEnergy*, 766 F.3d at 224 (factor 1). The companies under the 777 umbrella, including the 777 Entity Defendants, all ultimately answer to Wander and Pasko, and the Borrowers are simply special-purpose shells that exist solely to hold collateral (in theory) and assume debt. Compl. ¶¶ 247-49. Even the companies that seem more substantial on paper lack any of the hallmarks of legitimate businesses, as evidenced by a 2023 memorandum from Wander and Pasko to the Board of 777 Re, in which they were forced to admit that SuttonPark Capital "lacks an active Board of Managers." *Id.* ¶ 248(a). The very existence of 600 Partners is a sham to conceal from creditors and business partners Wander's control over subsidiaries in the 777 corporate family—including SuttonPark Capital. *Id.* ¶ 248(d). And that is not the only time Wander and Pasko have nominally shifted an asset from the balance sheet of 777 Partners to 600 Partners, only to ignore that paper barrier when it suited their interests. *Id.* ¶ 248(b). The one action 777 Partners and 600 Partners took at the apparent direction of anyone *but* Wander or Pasko—causing Wander and Pasko to step down as managers and make way for "independent" fiduciaries from B. Riley—was revealed immediately as a sham, with Wander's admission that B. Riley is not really in charge. *Id.* ¶¶ 251-56. The 777 Entity Defendants also lack reliable "corporate records," as they manipulate their MP Fin asset allocation to deceive their creditors and have admitted in writing that SuttonPark Capital "lacks a loan or asset accounting system able to track and report on assets," "lacks written processes to manage the operations when turnover occurs," and "lacks sufficiently trained staffing to manage operations" and that their other subsidiaries' controls are similarly deficient. *Id.* ¶¶ 152-59, 171-74, 250.

Third, Leadenhall alleges that the 777 entities, again including the 777 Entity Defendants, do not transact "at arms length" and are not "independent profit centers." *FirstEnergy*, 766 F.3d at 224 (factors 7 and 8). This is true even in their transaction with Leadenhall, wherein each Borrower has the right to purchase assets from its respective Seller even if the Borrower cannot pay for them, in which case "such excess shall be deemed to be a contribution to the capital of the Purchaser by the Seller on such date and the Purchaser shall increase the Seller's aggregate investment in the Purchaser accordingly…." Compl. ¶ 77 (quoting Sale Agreements § 2.07(b)). And it is manifest in other deals, including when 777 Partners placed airplanes on 777 Re's balance sheet for no consideration to help 777 Re meet year-end regulatory requirements before taking them back, and when 777 Partners agreed to up-tier the loan A-CAP had previously made to Wander's personal shareholding vehicle that owns 777 Partners' equity, JARM. *Id.* ¶¶ 248(c), 221-27. Wander's and Pasko's intermingling their companies' assets are reflected in the downgrade of 777 Re's credit rating to a "C-" because of the firm's "exposure to affiliated assets"—meaning its obligations to 777 Partners and other 777 entities. *Id.* ¶¶ 279-80.

Fourth, Leadenhall alleges the 777 entities, including the 777 Entity Defendants, are chronically undercapitalized, while Wander and Pasko use them as personal piggybanks to fund their and their families' money-losing passion projects. *FirstEnergy*, 766 F.3d at 224 (factors 2 and 3). This Court recognized that the 777 Entity Defendants are at (if not over) the precipice of insolvency, in granting a temporary restraining order and then preliminary injunction. *See* Compl. ¶¶ 257-311. And while they were undercapitalized, Wander and Pasko have used those companies' assets for their own purposes. Wander used the JARM loan, the debt obligation for which was subsequently transferred to 777 Partners, to buy out Pasko's stake in 777 Partners, enriching both men. *Id.* ¶ 221-27. 777 Partners allowed Wander's wife to operate an ice cream business out of

the 777 Partners' office and represented Wander in the purchase of his Miami Beach penthouse. *Id.* ¶¶ 25, 31. Wander used one of his now-defunct budget airlines to lease airplanes from what appear to be his personal entities, named some version of "JWARP." *Id.* ¶ 302. And Wander's and Pasko's own employees understand there is no boundary between Wander's and Pasko's assets and those of their companies, routinely referring to 777 Partners as a "family office." *Id.* ¶ 207. Nor is this problem limited only to the 777 Entity Defendants. Wander and Pasko have admitted numerous "mistakes" in which they liquidated assets their companies were required to hold as collateral or reserves, presumably to fund their lifestyles or other ventures. *Id.* ¶¶ 249-50.

Fifth, Leadenhall alleges "the payment or guarantee of debts of the dominated corporation by other corporations in the group." *FirstEnergy*, 766 F.3d at 224 (factor 9). As discussed in *supra* at Part IV.B, there is an intricate web of guarantees and indemnities among the 777 Entity Defendants, with 777 Partners and 600 Partners guaranteeing not only the debts but the performance of *all* obligations of the Borrowers, the Sellers indemnifying both the Borrowers and Leadenhall for all 777 Entity Defendants' obligations, and the Borrowers indemnifying Leadenhall for all losses arising out of *any* of the Transaction Documents (including the Sale Agreements, Servicing Agreements, and Guaranty Agreement). Compl. ¶¶ 320, 328, 350; LSA § 9.01; Sale Agreements § 7.03; Guaranty Agreement. Wander and Pasko personally guaranteed A-CAP's loan to Wander's personal shareholding vehicle (JARM) that was used to buy Pasko out, which loan was later uptiered to 777 Partners. Compl. ¶ 223. And other lawsuits filed against Defendants demonstrate that individual Defendants personally guarantee other 777 debt obligations. *See, e.g.*, *Dacian Master Fund LP v. Josh Wander*, No. 24-cv-2549 (S.D. Ind.) (ECF No. 1-2 ¶¶ 19-23 (showing Wander personally guaranteed a $25 million loan to a 777 Partners affiliate).

Sixth, Leadenhall alleges that "the corporation in question had property that was used by other of the corporations as if it were its own." *FirstEnergy*, 766 F.3d at 224 (factor 10). Just as in the aforementioned transactions where Wander and Pasko commingled and misappropriated corporate assets for their own purposes, including borrowing against corporate assets for personal gain, Compl. ¶¶ 221-27, 249-50, this is a central feature of the fraud perpetrated on Leadenhall: the 777 Entity Defendants pledged receivables as Collateral to Leadenhall, meaning on paper those assets were owned by the Borrowers. *See id.* ¶ 56 (Collateral is defined to mean all assets of the Borrowers (citing LSA § 1.01)). But Wander and Pasko, through the Guarantors and Sellers that own and control the Borrowers, treated many such assets as their own and liquidated them for cash or double-pledged them to other creditors to fraudulently obtain more financing. *Id.* ¶¶ 119-62.

In other words, the 777 Entity Defendants are a mere "'shell' being used by" Wander and Pasko "to advance their own 'purely personal rather than corporate ends,'" which they dominate by "shuttling their own funds in and out without regard to the corporation's form." *Passalacqua*, 933 F.2d at 138. This level of "pronounced and intimate commingling of identities of the corporation and its principal or principals" justifies piercing the corporate veil. *Atateks Foreign Trade, Ltd. v. Priv. Label Sourcing, LLC*, 402 F. App'x 623, 626 (2d Cir. 2010) (summary order); *see CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 646-49 (S.D.N.Y. 2018) (walking through similar allegations, focused on failure to deal at arm's length, overlap in ownership and control, undercapitalization, same address, and lack of corporate formalities).

Wander's and Pasko's attempts to refute domination are meritless. Wander claims that he cannot have dominated and controlled his companies because A-CAP and King (and Pasko) did as well. ECF 210 at 15. But it is well-established that "[i]t is possible for a corporation to be an alter ego for more than one individual." *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 2012 WL

12932049, at *18 n.14 (S.D.N.Y. July 17, 2012), *R & R adopted*, 896 F. Supp. 2d 320 (S.D.N.Y. 2012); *see, e.g.*, *Newman Cap. LLC v. Private Cap. Grp., Inc.*, 2024 WL 2115311, at *7 (S.D.N.Y. May 10, 2024). And Pasko's claim that "Plaintiffs have not alleged that Mr. Pasko failed to observe corporate formalities with respect to any 777 Entity Defendant, intermingled his personal funds with corporate assets, engaged in conduct to render any 777 Entity Defendant undercapitalized, or otherwise used any 777 Entity Defendant to further his personal interests rather than corporate ends," ECF 212 at 4-5, is simply untrue in the face of the allegations described above, including the facts that Pasko alone owned and, with Wander, controlled 600 Partners (because Wander, with his felony conviction, could not be nominally associated with that entity), Compl. ¶¶ 26, 28, 32, 248(d), and leveraged his ownership into a buyout netting him $170 million in borrowed cash and saddling 777 Partners and its creditors with the associated debt by commingling personal and corporate obligations. *Id.* ¶¶ 405-07. The "benign" hypotheticals Pasko posits to explain away these allegations, ECF 212 at 14-18, are irrelevant at this stage, where allegations are taken as true and reasonable inferences are drawn in Leadenhall's favor. *Kaplan*, 999 F.3d at 854.

### 2. The Complaint Demonstrates That Defendants Used Their Domination and Control to Commit a Fraud or Other Wrong.

With alter ego status established, the remaining prongs of the veil-piercing analysis are satisfied based on the allegations discussed above: Wander and Pasko, and the parent 777 Entity Defendants, used their domination and control of other 777 Entity Defendants to perpetrate a "fraud or 'other wrong'" that injured Leadenhall. *Keawsri*, 2023 WL 5950685, at *6; *see Passalacqua*, 933 F.2d at 138 ("[T]he control must be used to commit a fraud or other wrong that causes plaintiff's loss."). What Leadenhall alleges Wander and Pasko have done here is *the* archetypal "abuse[] [of] the privilege of doing business in the corporate form to perpetrate a wrong or injustice," in that they "drain[ed]" the 777 Entity Defendants "of [their] corporate assets so that

[they] could not satisfy [their] contractual obligation to" Leadenhall.  *Shanghai Join Buy Co. v. PSTEX Grp., Inc.*, 2006 WL 2322648, at *5 (S.D.N.Y. Aug. 10, 2006); *see CBF Industria*, 316 F. Supp. 3d at 649 ("[A] jury could find that Defendants … sought to make [a subsidiary] judgment proof as a means of evading its obligations under the Contracts.");  *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, 2013 WL 1274561, at *11 (S.D.N.Y. Mar. 29, 2013), *aff'd sub nom. NYKCool A.B. v. Ecuadorian Line, Inc.*, 562 F. App'x 45 (2d Cir. 2014) ("[I]t 'is clear that proof of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would constitute a fraud or wrong justifying piercing of the corporate veil.'").

Wander's and Pasko's attempts to avoid alter ego liability involve shifting the blame to other Defendants and are insufficient.  Pasko cites one case in which a court found one individual defendant liable as an alter ego and let the other one off the hook, but that case is distinguishable because the plaintiff had "not alleged *any* facts that demonstrate [the individual's] complete domination," and indeed he was not even an "owner or majority shareholder."  *Schwartz v. Sensei, LLC*, 2020 WL 5817010, at *9 (S.D.N.Y. Sept. 30, 2020) (emphasis added).  Pasko simply ignores Leadenhall's allegations about how he personally benefited from his domination of the 777 Entity Defendants.  Pasko tries to pin the blame on Wander, but to the extent Pasko suggests Wander *solely* dominates and controls all 777 Entity Defendants—even those that were nominally shifted to Pasko due to Wander's prior criminal conviction—that would be a striking admission that Pasko participated in deceptive conduct and ignored corporate formalities distinguishing the entities.  Compl. ¶ 248(d).  And Wander tries to pin the blame on A-CAP.  ECF 210 at 15-16.  To be clear, A-CAP did exercise improper control as a creditor, as discussed below, but in doing so, A-CAP exploited Wander's and Pasko's total domination of the 777 Entity Defendants, which allowed them to abuse the corporate form to benefit A-CAP at Leadenhall's expense.  *See, e.g.*, Compl.

¶¶ 221-27 (transferring $170 million debt obligation to A-CAP from JARM to 777 Partners); *id.* ¶ 244 (round-tripping loan through 777 so King could use policyholder funds to buy a luxury condo). There is nothing inconsistent about the distinct, dominant roles played by A-CAP, Wander, and Pasko.

Pasko otherwise resorts to picking out single allegations and declaring each insufficient *on its own* to establish alter-ego status, ECF 212 at 8-9, 14-19, but allegations in a Complaint are not analyzed in isolation. Defendants' tactic of declaring Leadenhall's *conclusions* "conclusory" while ignoring the factual allegations supporting those conclusions should also be ignored. *See, e.g.*, ECF 205 at 28; ECF 210 at 14; ECF 212 at 8. Leadenhall alleges a basis for piercing the corporate veil as to both Wander and Pasko, and for imposing each 777 Entity Defendant's contract liability on the other 777 Defendants that were part of "one whole entity." *Passalacqua*, 933 F.2d at 139.

Because they operate as alter egos, the 777 Defendants are either directly or indirectly liable to Leadenhall for contractual breaches as follows:

- The SuttonPark Borrower, Dorchester Borrower, Signal Borrower, and Insurety Borrower are each directly liable to Leadenhall under the LSA, including, in the SuttonPark and Dorchester Borrowers' cases for their individual breaches, and in each case for their failures to pay the Accelerated Amount following a Facility Event of Default. Compl. ¶¶ 313-21.

- The SuttonPark Servicer is directly liable to Leadenhall for its own breaches of both the LSA and the Servicing Agreement. *Id.* ¶¶ 333-44.

- The Sellers—SuttonPark Capital, Insurety Capital, and Signal Medical—are (1) directly liable to Leadenhall under the Sale Agreements, including (a) in SuttonPark Capital's case, for individual breaches of its Sale Agreement, and (b) in all cases, for breaches of their obligations to indemnify Leadenhall for losses caused by the other Sellers', Borrowers', and

Servicers' breaches above; and (2) liable for their alter egos' breaches, including those of the Borrowers and Servicers they wholly own, *id.* ¶¶ 322, 332.

- 777 Partners and 600 Partners (the "Guarantors") are each (1) directly liable to Leadenhall for their breaches of the Guaranty Agreement, *id.* ¶¶ 346-53, and (2) liable for the breaches of their alter egos, including those of the Sellers they wholly own, and the Borrowers and Servicers the Sellers wholly own, *id.* ¶¶ 322, 332, 345.

- Wander and Pasko are liable for all of the breaches of their alter egos above. *Id.* ¶¶ 322, 332, 345, 355.

- The subsidiaries are also liable for breaches by their parents, under an identical theory of reverse veil-piercing. *Id.* ¶¶ 322, 332, 345, 355; *see Aralpa*, 714 F. Supp. 3d at 439-46.

**D. A-CAP and King Have Waived Any Challenge to Lender Liability.**

A-CAP and King do not address in their motion—and therefore have waived their ability to challenge—Leadenhall's claim that "A-CAP and King are liable for the breaches of the Borrowers, Sellers, and Guarantors because they exercise excessive and improper control over the Guarantors and, in turn, the Sellers, Servicers, and Borrowers, by virtue of A-CAP's all-asset liens and other undisclosed rights granted by the Guarantors." Compl. ¶ 332. Although A-CAP and King argue that "Leadenhall disclaims alter-ego liability [by] affirmatively alleging that 777 Partners, 600 Partners, and A-CAP are 'legally distinct entities,'" ECF 215 at 36, Leadenhall's basis for imputing contract liability to A-CAP and King is *not* that they are the 777 Defendants' alter egos. Rather, as the claim for relief makes clear, Leadenhall asserts contract claims against A-CAP and King under a lender liability theory based on their excessive control of the 777 Defendants' business. Compl. ¶¶ 322, 332, 345, 355, 360; *see Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 418 (S.D.N.Y. 2000) ("Lender liability … refers to the imposition

of traditional contract or tort liability on a bank or other financial institution.").  A-CAP and King

do not refute this theory or the sufficiency of Leadenhall's allegations supporting it.

There are several theories under which lender liability may be imposed, but Leadenhall's

allegations focus on an "instrumentality" theory.  *See In re E. End Dev., LLC*, 2017 WL 1277443,

at *4 & n.5 (Bankr. E.D.N.Y. Apr. 4, 2017).  While an "alter ego" theory is predicated on *ownership*

and control coupled with disregard of the corporate form, instrumentality liability focuses on the

*improper role* a lender assumes in a particular transaction.  The instrumentality doctrine requires

(1) "complete domination, not only of finances, but of policy and business practice in respect to

the transaction attacked so that the corporate entity *as to this transaction* had *at the time* no separate

mind, will or existence of its own; and (2) [s]uch control must have been used by the defendant to

commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a

dishonest and unjust act in contravention of plaintiff's legal rights; and (3) [t]he aforesaid control

and breach of duty must proximately cause the injury or unjust loss complained of."  *In re KDI*

*Holdings, Inc.*, 277 B.R. 493, 515-16 (Bankr. S.D.N.Y. 1999) (emphasis added) (citing *Fisser v.*

*Int'l Bank*, 282 F.2d 231, 238 (2d Cir. 1960)).  Leadenhall alleges each of these elements.

First, Leadenhall alleges that A-CAP and King exercised "[a]ctual, participatory and total

control over the debtor."  *Id.*; *see In re E. End*, 2017 WL 1277443, at *5.  They achieved that level

of control by March 2023 *at the latest*, when they established, and formalized in a memo, a Steering

Committee led by King to govern all the affairs of the 777 Entity Defendants, moved their deputies

into 777's offices, and forced 777 Partners' employees to report to A-CAP's COO.  Compl. ¶¶ 201-

02, 215.  As alleged, A-CAP and King did not merely have *input* into 777's operational decisions;

nothing could happen at 777 without A-CAP and King's sign-off, including making payroll,

funding portfolio companies, making so-called "protective advances" to creditors, and sending

fraudulent Compliance Reports to Leadenhall. *Id.* ¶¶ 205-09, 277-302. When the 777 Defendants engaged Leadenhall in sham restructuring negotiations, A-CAP and King micromanaged Wander's every move to stave off this lawsuit while they stripped assets from the 777 Entity Defendants. *Id.* ¶¶ 175-92, 211-29. "This is not a case in which [A-CAP and King] simply monitored the [777 Defendants'] situation or suggested a course of action the [777 Defendants'] ought to follow to improve their financial situation." *In re KDI Holdings*, 277 B.R. at 516. Nor did A-CAP and King merely "threaten[] to exercise [their] legal rights should [the 777 Defendants] fail to acquiesce to [A-CAP's] suggestions." *Id.* Instead, Leadenhall alleges A-CAP and King "took over the day-to-day management of [the 777 Defendants] and "directed the payment of certain debts" in their own interest and to the detriment of Leadenhall. *Id.*

Second, Leadenhall alleges A-CAP and King used their control to force the 777 Entity Defendants to breach their contracts with Leadenhall, which "proximately caused [] the aforesaid control and breach of [contractual] duty." *Id.*at 517. Leadenhall alleges A-CAP was well aware of and participated in the 777 Defendants' fraud on Leadenhall, including by (1) transmitting fraudulent Compliance Reports to Leadenhall, which *partially* admitted the breaches but concealed the extent of the fraud to frustrate Leadenhall's efforts to protect its rights, (2) continuing to frustrate those efforts by blocking Leadenhall's Collateral audit, and then (3) stage-managing every aspect of sham restructuring negotiations to stall while A-CAP and King stripped 777's assets. Compl. ¶¶ 175-92, 205-29, 277-302. By stepping far over the line of how an arm's-length lender would act, and abusing their control over the 777 Defendants to divert assets from Leadenhall, A-CAP and King exposed themselves to liability for the 777 Defendants' breaches and directly

caused Leadenhall's loss of the $609,529,966.82 accelerated amount. Under a RICO theory or lender liability or both,[6] A-CAP and King must be held accountable.

### E. Leadenhall Has Sufficiently Pled Unjust Enrichment.

Leadenhall pleads a viable unjust enrichment claim. Each Defendant was enriched at Leadenhall's expense, whether directly through the debt Leadenhall extended, by siphoning funds acquired from Leadenhall or assets funded with that debt for their own use, or through inflated servicing fees, in the case of the SuttonPark Servicer. *See, e.g.*, *id.* ¶ 341. For the reasons discussed above, "it is against equity and good conscience to permit the defendant[s] to retain what is sought to be recovered," giving rise to a claim of unjust enrichment. *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011).

The 777 Defendants argue the unjust enrichment claims against them are duplicative of the contract claims, but in doing so, they "appear to be playing a bit fast and loose." *Protex Indus. (H.K.) Ltd. v. Vince Holding Corp.*, 2024 WL 4149188, at *13 (S.D.N.Y. Sept. 11, 2024). The 777 Entity Defendants' brief concedes the relevant contracts here constitute "valid, enforceable contractual obligations." ECF 205 at 25. That is helpful in narrowing the disputed issues going forward, but it is not clear whether A-CAP and King have made the same concession. If *any* Defendant plans to challenge the enforceability of the contracts, the unjust enrichment claims are

---

[6] As discussed above, Leadenhall's lender liability allegations are not inconsistent with its RICO allegations of an enterprise distinct from the RICO defendants. In any event, Leadenhall is entitled to plead in the alternative and proceed on different legal theories at this juncture, even if they are inconsistent as to whether the Defendants constitute "a unitary entity" or whether one "induced another entity" to violate Leadenhall's rights. *See Ajinomoto Co.*, 2021 WL 4430200, at *3-4.

not duplicative.  *Protex*, 2024 WL 4149188, at *13.  And even if the 777 Defendants stand by their concessions that the contracts here are enforceable against *some* of them, Leadenhall alleges cross-liability against non-signatory 777 Defendants under an alter-ego theory, and liability against A-CAP and King as lenders.  If any Defendant disputes that any of the contracts are enforceable *against it specifically*, Leadenhall's unjust enrichment claim is not duplicative insofar as it is asserted against that Defendant.  *Id.*  A-CAP, King, and Pasko argue a valid, enforceable contract bars claims even against third parties.  ECF 215 at 33 (quoting *Law Debenture v. Maverick Tube Corp.*, 2008 WL 4615896, at *12 (S.D.N.Y. Oct. 15, 2008), *aff'd*, 595 F.3d 458 (2d Cir. 2010)); ECF 212 at 23.  That is unpersuasive in light of more recent, contrary precedent that limits the line of cases on which Defendants rely to situations, not present here, where a party would "circumvent the contractual limitations to which he agreed."  *Weyant v. Phia Grp. LLP*, 2021 WL 5998400, at *3 (S.D.N.Y. Dec. 20, 2021).  Where, as here, a party seeks to recoup moneys obtained as a result of contractual breaches, from parties whom (Defendants may argue) cannot be sued for breach of contract, unjust enrichment is one appropriate vehicle.  *Id.*

A-CAP and King argue their relationship to Leadenhall is "too attenuated" to support an unjust enrichment claim, because A-CAP allegedly came on the scene "after 777 received any benefit from Leadenhall."  ECF 215 at 33.  That is irrelevant because Leadenhall's unjust enrichment claim against A-CAP and King is about the benefit received *by A-CAP and King*, not by the 777 Defendants.  A-CAP and King obtained benefits from the funding Leadenhall provided to Leadenhall's detriment, including by inducing Leadenhall to forebear for months from exercising remedies against the fraudulent enterprise while A-CAP and King stripped remaining assets from 777.  Compl. ¶¶ 175-92, 211-29.  That direct benefit, conferred by Leadenhall on A-

CAP, King, and the 777 Defendants jointly, at A-CAP and King's behest, is not attenuated in the least and is exactly the kind of conduct for which the unjust enrichment cause of action exists.

## V. LEADENHALL ALLEGES ITS FRAUD CLAIMS WITH AMPLE PARTICULARITY.

### A. The 777 Defendants' Sole Challenge to Leadenhall's Common-Law Fraud Claim Fails.

In seeking dismissal of Leadenhall's fraud claim, the 777 Entity Defendants (joined by Wander and Pasko) simply refer back in a single sentence to their arguments for dismissal of the RICO claims. ECF 205 at 24; 210 at 17; 215 at 31-36. Pasko briefly argues that he lacked scienter when he (at least recklessly) signed numerous fraudulent representations. ECF 212 at 22. But while A-CAP and King challenge the aiding and abetting claims against them, they do not dispute claims involving "the fraud allegedly committed by others." ECF 215 at 31. For those Defendants who do seek dismissal, their arguments are unavailing. The RICO predicate acts described with particularity *supra* at Part II.B, C meet the pleading standard for Leadenhall's fraud claims.

Under New York law, the elements of a claim for fraud are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 309 (S.D.N.Y. 2014). While fraud claims require the plaintiff to allege the fraudulent misrepresentation with specificity under Fed. R. Civ. P. 9(b), "[a]t the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley Fin.*, 797 F.3d at 174 (emphasis in original) (internal quotation and citation omitted)). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The primary material misrepresentations are approximately 60 false Compliance Reports issued to Leadenhall from May 2021 to November 2023. Compl. ¶¶ 99-174. For each such report, Leadenhall alleged the month which the Compliance Report reflected; the date any confirmation email was sent; the date of transmission to Leadenhall, sender, and transmission medium; and even the date Defendants sent a "revised" report after admitting that assets had been double-pledged or fictitiously pledged. ECF 187-6. Leadenhall also alleged that the "cardinal rule of the entire financing arrangement" was that the Borrowers own the Collateral "free and clear" of any other security interests, Compl. ¶¶ 7, 88-98, and that the monthly Compliance Reports identified and valued each asset purportedly pledged exclusively to Leadenhall for purposes of calculating each Borrower's "Borrowing Base," *i.e.*, their credit limit. *Id.* ¶¶ 57, 99, 102, 144.

On knowledge and intent to defraud, direct and circumstantial facts create a strong inference that Defendants knew the Compliance Reports were false and acted with fraudulent intent. For one, the sheer magnitude of the double-pledged or fictitiously pledged assets—in revised Compliance Reports, the SuttonPark Servicer disclosed that approximately $350 million in assets pledged to Leadenhall had been double-pledged or fictitiously pledged—suggests that the discrepancy was no mistake*, id.* ¶¶ 118-49, and direct evidence confirms it. *Id.* ¶ 156 (notes in MP Fin system reflected that "going back to 2021, 777 Partners staff were expressly aware that certain receivables pledged to Leadenhall were never acquired, had already been sold, or were determined to be ineligible"). Additional direct evidence of knowledge of falsity and fraudulent intent includes these allegations: the SuttonPark and Dorchester Borrowers' submitted forged bank statements to Leadenhall purporting to show fictitious amounts in bank accounts, *id.* ¶¶ 163-70; SuttonPark Capital employees, acting at Wander's direction, pledged assets to Leadenhall before they were ever purchased while lying to their own accounting department about which assets had been

purchased, *id.* ¶¶ 151-58; SuttonPark Capital and Pasko assigned 1,600 receivables to the SuttonPark Borrower, worth approximately $185 million, which had already been pledged to Credigy, *id.* ¶¶ 76, 119-21; and 777 Partners, acting at Wander's direction, altered the programming of the MP Fin system—and then altered receivables in that system to make it look like they were pledged to different lenders and fake the appearance of cash flow, *id.* ¶¶ 154-56, 171-73. Much of this conduct, including the false Compliance Reports issued between March and November 2023, happened after Leadenhall confronted Wander and after A-CAP and King took formal control of 777, *id.* ¶¶ 198-210, at which point no Defendant could credibly disclaim actual knowledge of falsity. Rather, each took active steps to perpetuate and conceal the fraud.

On reliance, "Leadenhall relied on the Compliance Reports to confirm throughout the term of the LSA that the funds provided to Borrowers were secured as contractually required." *Id.* ¶ 162. Indeed, that was the entire point of the Compliance Reports. *See id.* ¶¶ 55, 62-64, 80-81, 89, 95, 99. Leadenhall reasonably and justifiably relied on those Reports both before and after being tipped off, repeatedly escalating its scrutiny of the 777 Defendants' representations as Defendants escalated their efforts to conceal their wrongdoing. *See supra* Part II.F.1.

On damages, Defendants do not dispute that the fraud caused Leadenhall's loss of more than $600 million in loans that were supposed to be fully secured but for Defendants' deception. *Id.* ¶¶ 177, 311, 393. Leadenhall alleges all the elements of fraud.

## B. Leadenhall's Detailed Allegations State a Claim for Aiding and Abetting Common-Law Fraud.

Leadenhall alleges, in the alternative, that Wander, Pasko, 777 Partners, 600 Partners, SuttonPark Capital LLC, King, and A-CAP aided and abetted the SuttonPark and Dorchester Borrowers' and SuttonPark Servicer's primary acts of fraud. Wander does not dispute that Leadenhall has adequately alleged he aided and abetted fraud—he only "incorporates" the 777

Entity Defendants' brief, which makes no argument on his behalf—so any challenge to that claim is waived.  ECF 210 at 12.  A-CAP and King challenge this claim on the bases that (a) they became involved in the fraud midstream after it had "achieved its object"—*i.e.*, after Leadenhall had transferred money to the Borrowers, ECF 215 at 32-33, and (b) "Leadenhall could not have plausibly relied on the accuracy of any Compliance Reports" submitted under A-CAP and King's direction from March through November 2023 because it "learned about all the alleged "'double-pledging,'" *id.* at 32—despite Defendants' vociferous efforts to mischaracterize the issue as a "mistake" and to conceal the *other* $100+ million in bad collateral, while A-CAP secretly ran the business.  The 777 Entity Defendants and Pasko briefly argue that *their* specific conduct or scienter is not sufficiently pled, ECF 205 at 25; ECF 212 at 22, ignoring Leadenhall's specific allegations against each entity and individual, including as to fraudulent intent.  *See supra* Part II.C.

The elements of aiding and abetting fraud are "(1) an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance to the fraud." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 482 (S.D.N.Y. 2018).  An "allegation of actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud." *Nathel v. Siegal*, 592 F. Supp. 2d 452, 468 (S.D.N.Y. 2008).  Instead, "circumstantial evidence can be sufficient to support a finding of actual knowledge." *Silvercreek*, 346 F. Supp. 3d at 487; *see also Oster v. Kirschner*, 77 A.D.3d 51, 55-56 (1st Dep't 2010) ("Participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud …. [A]n intent to commit fraud is to be divined from surrounding circumstances.").  Under New York law, "[a] defendant provides substantial assistance only if she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *JP Morgan*

*Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (citations and quotations omitted).

Leadenhall alleges an underlying fraud. *See supra* Part V.A. Each aiding and abetting Defendant (omitting Wander, the principal orchestrator of the fraud, who does not challenge the aiding and abetting claim) had actual knowledge and substantially assisted, as follows.

**Pasko**. Pasko provided the imprimatur of legitimacy to the fraudulent scheme and helped carry it out. At A-CAP's request, Pasko prohibited Leadenhall from auditing the receivables pledged as Collateral, demonstrating knowledge the Compliance Reports were false. Compl. ¶¶ 216-17. Pasko personally signed (i) multiple false Compliance Reports, *id.* ¶¶ 60-64, 161; (ii) the September 2022 assignment form by which SuttonPark Capital purported to transfer to the SuttonPark Borrower 1,600 receivables already pledged to Credigy, *id.* ¶¶ 120-21; and (iii) the Borrowing Requests by which the SuttonPark and Dorchester Borrowers borrowed hundreds of millions of dollars from Leadenhall without having collateral, *id.* ¶ 55. Pasko was also the primary cash beneficiary of the scheme (a cash buyout of ~$170 million), *id.* ¶¶ 219-27.

**SuttonPark Capital.** SuttonPark Capital sold assets to the SuttonPark and Dorchester Borrowers to be pledged to Leadenhall, including the 1,600 assets which Leadenhall discovered had been pledged to Credigy. *Id.* ¶¶ 50, 56, 76-78, 120-21. SuttonPark Capital used due diligence from a potential purchase of a "JG Wentworth portfolio" of assets to falsely allocate to Leadenhall that SuttonPark Capital had not actually acquired, showing both knowledge of the fraud and acts in furtherance. *Id.* ¶¶ 151-58. SuttonPark Capital also transmitted false Compliance Reports to Leadenhall. *Id.* ¶¶ 99-102, 198-210; ECF 187-6.

**777 Partners and 600 Partners**. 777 Partners and 600 Partners are the parent entities and guarantors of the 777 Entity Defendants, which committed countless acts in furtherance of the

scheme. 777 Partners changed the programming of the asset allocation system to allow retroactive alterations of lenders' asset allocations—and then altered receivables, Compl. ¶¶ 159, 171-74; created shell records in the asset allocation system for assets 777 Partners did not own, *id.* ¶ 155; and prepared and submitted at Wander's direction the false Compliance Reports to Leadenhall, *id.* ¶¶ 99-101. 600 Partners is merely a shell entity created because Wander is unable to operate as a manager of certain 777 Partners' subsidiaries due to his prior felony drug conviction. *Id.* ¶ 248. 777 Partners and 600 Partners were not just managers of the fraudulent scheme—they executed it together, creating the false impression that Leadenhall was a fully secured lender.

**A-CAP.** A-CAP, with King at the helm, controlled the scheme from the shadows. A-CAP knew of the scheme because it controlled 777's operations and approved every transaction by a portfolio company, via an arrangement formalized around March 2023 but effectively in place earlier. *Id.* ¶¶ 198-210. Demonstrating substantial assistance (and further corroborating A-CAP's knowledge), SuttonPark Capital transmitted false Compliance Reports to Leadenhall from the office the A-CAP managers took over. *Id.* ¶¶ 160-62, 202-10. To conceal the extent of the fraud, A-CAP also prohibited Leadenhall from conducting an "asset review" of the receivables pledged as collateral. *Id.* ¶¶ 216-17. A-CAP also substantially assisted the enterprise by making it appear legitimate, including by providing 777 more than $2 billion in loans and $2.2 billion in reinsurance reserves to conceal their financial condition from lenders like Leadenhall. *Id.* ¶¶ 230-42.

**King.** In addition to directing A-CAP's actions, King sat in on Wander's phone calls, *id.* ¶ 210; controlled 777 Partners' payroll, *id.* ¶¶ 205, 214-15; and directed billions of dollars in loans and reinsurance reserves to 777 to pursue passion projects, *id.* ¶¶ 235-42, 268-72. In March 2024, King also directed the fraudulent transfer of a $170 million debt obligation from Wander's personal shareholding vehicle, JARM, to 777 Partners. *Id.* ¶ 225.

Defendants have virtually no response to these allegations. The 777 Entity Defendants and Pasko again attack only the summary of Leadenhall's claims rather than the fact allegations in the body of the Complaint. ECF 205 at 24; ECF 212 at 22-23. A-CAP and King ask the Court to draw an inference in *their* favor based on the false and uncited statement that "Leadenhall concedes that A-CAP did not so much as learn about the alleged fraud until spring 2023." ECF 215 at 10; *see also id.* at 2, 32. To the contrary, A-CAP controlled the 777 enterprise by virtue of its lending stranglehold on Wander and Pasko's organization, a financing relationship dating back to at least February 2020. *E.g.,* Compl. ¶ 194. The correct, well-supported, and permissible inference is that A-CAP and King knew about the fraud *well before* they took the drastic step of moving into 777's offices and fully taking over.

### C.  Leadenhall Has Sufficiently Pled Civil Conspiracy to Commit Common-Law Fraud.

Defendants argue briefly that no action for "civil conspiracy" lies under New York law and that Leadenhall failed to plausibly allege an agreement sufficient to form a conspiracy. ECF 205 at 25; 215 at 31. The former argument is irrelevant because Leadenhall alleges a conspiracy to commit fraud. Compl. ¶¶ 389-93; *AM Cosms., Inc. v. Solomon*, 67 F. Supp. 2d 312, 322 (S.D.N.Y. 1999) (a plaintiff "may plead the existence of a conspiracy in order to connect the actions of the individual Defendants with an actionable, underlying tort, and establish that those actions were a part of a common scheme"). The latter argument ignores Leadenhall's conspiracy allegations which are recited here and *supra* at Part III. To establish a claim of civil conspiracy to commit fraud, a plaintiff must allege the underlying fraud and "(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective, and (4) knowledge." *Winnick*, 406 F. Supp. 2d at 259.

Leadenhall alleges A-CAP and King formed an agreement with the 777 Entity Defendants by providing 777 more than $2 billion in loans and $2.2 billion in reinsurance reserves starting in 2020, Compl. ¶¶ 230-42, obtaining both the right to control the enterprise and an "all asset lien" over much of 777's global organization, *id.* ¶¶ 134, 193-97, 243.  The agreement which began with billions of dollars in financing was expressly memorialized around March 2023, which coincides with A-CAP's move into 777's offices and its establishment of a "Steering Committee" to ensure that it had the final say on every 777 investment.  *Id.* ¶¶ 201, 215, 240.

The scheme's common objective was to fraudulently obtain low-cost debt financing that could be cyclically used to acquire new collateral to attract more financing.  *Id.* ¶¶ 48; 193-97; 257-76.  The collateral and investments were football teams, airlines, film production companies, motorcycles, and real estate.  *Id.* ¶¶ 243, 257-308.  In addition to pursuing passion projects, the objective was to enrich the individual Defendants, allowing them to purchase luxury real estate and individual stakes in the investments, including King's purchase of an $11 million beachfront condo in Miami and a 10% individual stake in 777 Partners' airline.  *Id.* ¶¶ 244-46.

The third and fourth elements of this claim, acts in furtherance and knowledge, are similar to the corresponding elements of an aiding and abetting fraud claim.  *Winnick*, 406 F. Supp. 2d at 259 ("[T]he facts which sufficed to allege substantial assistance and actual knowledge of the fraud in support of the Banks' aiding and abetting claims suffice here to show acts in furtherance and knowledge of the conspiracy.").  These elements are satisfied as set forth *supra* at Part V.B.

### D. Forcing 777 Partners to Assume and Secure a $170 Million Loan to Prevent, Hinder, and/or Delay Leadenhall from Recovering on Its Claims Constitutes a Fraudulent Transfer.

Leadenhall asserts claims for actual and constructive fraudulent transfer under the New York Debtor and Creditor Law ("DCL") against A-CAP, 777 Partners, Wander, and Pasko.  Compl.

¶¶ 403-16.  Under both the Uniform Voidable Transactions Act (adopted in New York) and the Uniform Fraudulent Transfer Act (adopted in Florida), fraudulent transfers—*i.e.*, transfers of assets made or obligations incurred by a debtor with intent to hinder, delay, or defraud creditors—are invalid.  *Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co. LLC*, 2023 WL 2989068, at *6 (S.D.N.Y. Apr. 18, 2023) (citing DCL § 273(a)); *TempPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F. Supp. 2d 1331, 1347 (M.D. Fla. 2013) (citing Fla. Stat. § 726.105).

Leadenhall alleges that A-CAP and King caused—and 777 Partners, Wander, and Pasko effectuated—the transfer of $170 million in debt owed to A-CAP from Wander's personal shareholding vehicle, JARM, to 777 Partners for no consideration.  Compl. ¶¶ 221-29.  In moving to dismiss, A-CAP and the 777 Entity Defendants quote out-of-context snippets from inapposite cases, with A-CAP arguing that its own fraudulent intent is irrelevant because it is the "transferee" in the transaction and 777 Partners arguing that it is not liable for money damages on the claim because it is the "transferor."  ECF 215 at 35-36; ECF 205 at 25-26.  To be clear, this is a rescission claim in which Leadenhall seeks to avoid the transfer of a *debt obligation*, not an *asset*, from JARM to 777 Partners.  Compl. ¶¶ 408, 416.  A-CAP, 777 Partners, Wander, and Pasko were beneficiaries and active participants in the fraudulent transfer: A-CAP caused the transfer to increase the likelihood of *A-CAP's* being repaid by 777 Partners despite this litigation, *id.* ¶¶ 225, 28, and 777 Partners, Wander, and Pasko together accepted the debt obligation for no consideration, with this lawsuit looming, to place a $170-million obstacle ahead of *Leadenhall's* ability to be repaid, *id.* ¶¶ 184, 225-26.  Cases involving an innocent transferee's receipt of an *asset* as a mere conduit to a scheme, ECF 215 at 35, or a money damages claim against a debtor/transferor that was *not* a beneficiary of the fraudulent transfer, ECF 205 at 26, have no application here and confuse the issues.

90

A-CAP also makes a passing reference to the applicable state law.  ECF 215 at 34.  The DCL provides that a fraudulent transfer claim "is governed by the local law of the jurisdiction in which the debtor [*i.e.*, 'a person that is liable on a claim'] is located when the transfer is made or the obligation is incurred." DCL § 279(b); *see also id.* § 270 (defining "claim" broadly to mean "a right to payment," whether "liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed," etc.).  Here, 777 Partners is the entity liable on a "claim"—*i.e.*, the debtor against which Leadenhall asserts a claim for accelerated debt of more than $600 million.  Compl. ¶¶ 212-29.  777 Partners is located "at its chief executive office," DCL § 279(a)(3), in Florida. Compl. ¶ 25.  Thus, while Leadenhall's fraudulent conveyance claim is brought under the DCL, the substantive law of Florida governs.  To the extent A-CAP argues that the DCL does not apply here, ECF 215 at 34, the distinction is meaningless because the New York statute calls for the application of Florida substantive law.

### 1.   The Transaction Was an Actual Fraudulent Transfer Because It Was Made with Intent to Hinder Leadenhall's Recovery.

Under Florida's actual fraudulent transfer provision, a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation (a) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor…." Fla. Stat. § 726.105(1)(a).  A "transfer" includes "every mode, direct or indirect … of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." *Bansal v. TD Ameritrade, Inc.*, 2024 WL 3009423, at *10 (S.D. Fla. June 7, 2024) (citing Fla. Stat. § 726.102(14)).  "Because the determination of actual fraudulent intent can be difficult, courts look to certain 'badges of fraud.'" *Yaralli v. Am. Reprographics Co., LLC*, 165 So. 3d 785, 788 (Fla. 4th DCA 2015) (citations and quotations

omitted).  Badges of fraud include: (i) "[t]he transfer or obligation was to an insider"; (ii) "[t]he debtor retained possession or control of the property after the transfer"; (iii) "[b]efore the transfer was made the debtor had been sued or threatened with suit"; and (iv) "[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred."  Fla. Stat. § 726.105(a)(2).

In cases involving a Ponzi scheme, courts infer fraudulent intent because "[a] Ponzi scheme is by definition fraudulent."  *In re Pearlman*, 460 B.R. 306, 318 (Bankr. M.D. Fla. 2011); *see United States v. Silvestri,* 409 F.3d 1311, 1317 n. 6 (11th Cir. 2005) ("[I]n a Ponzi scheme, additional money invested by investors is used to pay returns to investors with the goal of attracting more investors.").  The Ponzi scheme presumption applies here.  Defendants operated "a giant shell game at best, and an outright Ponzi scheme at worst, that takes money in from investors and lenders and shuffles it around to various money-losing alter ego though legally distinct, entities to disguise their true financial condition."  Compl. ¶ 20.  Specifically, A-CAP and affiliates fueled 777 with more than $2 billion in loans and $2.2 billion in reinsurance reserves to give it the appearance of a legitimate, cash-flow producing business.  *Id.* ¶¶ 202-06, 230-46.  In return, A-CAP extracted all-asset liens from not only 777 Partners but also approximately 40 other affiliates. *Id.* ¶ 243.  Propped up by A-CAP's loans, 777 attracted creditors like Leadenhall and Credigy— and an array of other creditors such as intervenor ING Capital LLC suing the enterprise for unpaid debt, *id.* ¶ 309—and took hundreds of millions of dollars while falsely representing that exclusively-pledged collateral was backing those amounts.  *Id.* ¶¶ 99-162, 309 (17 lawsuits pending at time of case initiation seeking $130 million in damages, including ING Capital's).  777 Partners regularly raided its affiliates' assets, *id.* ¶¶ 231-49, and used that debt to acquire more collateral it could use to acquire more debt—"rinse and repeat."  *Id.* ¶¶ 19, 48, 265.  The only

investors paid off in the sham arrangement were those associated with A-CAP and Wander's passion projects: football clubs and airlines. *Id.* ¶¶ 257-88. That is a Ponzi scheme.

Even without the Ponzi scheme presumption, Leadenhall alleges the transfer of a debt obligation with actual intent to defraud on the part of both A-CAP and King *and* 777 Partners, Wander, and Pasko. In December 2020, A-CAP, through its affiliate Haymarket, loaned approximately $170 million to JARM, Wander's personal shareholding vehicle through which he owns 777 Partners. *Id.* ¶ 221. The loan was originally secured by JARM's assets—primarily equity in 777 Partners. *Id.* ¶ 224. Wander used the loan to buy some of Pasko's shares in 777 Partners, enriching Pasko and giving Wander majority ownership of 777 Partners (while Pasko held 600 Partners). *Id*. ¶ 222. In March 2024, as 777 Partners hurtled towards insolvency and on the brink of this lawsuit, King and A-CAP decided that the security interest was essentially worthless and JARM had no ability to repay the loan. *Id.* ¶¶ 224-25. Thus, on March 4, 2024, King notified Leadenhall that as "a result [of] (among other things) pressures from the rating agencies and regulators," the JARM loan obligation would be "consolidated into the HoldCo facility"—*i.e.*, King and A-CAP unilaterally transferred the debt and security obligations on the loan from JARM to 777 Partners. *Id.* ¶ 225.

That transfer of a debt obligation to 777 Partners, a Guarantor liable to Leadenhall for the approximately $600 million in accelerated debt, encumbered 777 Partners with an additional $170 million in purportedly "senior" debt, directly "hinder[ing]" and delay[ing]" Leadenhall's ability ever to recover the debt from 777 Partners. *See* Fla. Stat. § 726.105. Multiple "badges of fraud" surround the transfer. *First,* it was an insider transaction between 777 Partners and A-CAP, which had assumed formal control of 777 Partners by March 2024. *Id*. ¶¶ 220-25. *Second*, A-CAP maintained possession of its "all-asset lien" over *both* JARM and 777 Partners despite the

purported transfer of the debt obligation away from JARM. *Id.* ¶¶ 191, 243. *Third,* as A-CAP well knew, 777 Partners was on the brink of insolvency by its own admission in March 2024 that it could not come up with even $15 million to pay down its debt to Leadenhall, *id.* ¶¶ 175-92, as this Court recognized when it entered an asset-preserving TRO in June 2024. ECF 114. *Fourth,* Leadenhall alleges that at the time of the transfer, numerous 777 creditors and lenders had sued 777 Partners and affiliates on allegations of unpaid debt, and Defendants were scrambling to prevent Leadenhall from suing. Compl. ¶ 309. It is no coincidence that A-CAP opted to "harden[]" or "firm[] up" its lien against this backdrop, *id.* ¶ 228—deliberately preferring itself over Leadenhall and other creditors when Leadenhall publicly revealed what A-CAP already knew— that there would not be nearly enough assets to go around.

Defendants ignore these badges of fraud. And A-CAP's accusation that Leadenhall's claim is "conclusory" again addresses only the "Claims for Relief" and ignores the rest of the Complaint. *Id.* (citing Compl. ¶ 407).

### 2. The Transaction Was a Constructive Fraudulent Transfer Because 777 Partners Received No Value for the $170 Million of Debt It Incurred.

A transfer is constructively fraudulent under Florida law where "(1) the creditor's claim arose before the transfer; (2) the debtor was insolvent at the time of the transfer or became insolvent because of the transfer; and (3) the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer." *Pasternack v. Klein*, 2019 WL 330593, at *8 (M.D. Fla. Jan. 25, 2019) (citing Fla. Stat. § 726.106(1)). Unlike actual fraud, claims for constructive fraud do not require proof of fraudulent intent. *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1499 (11th Cir. 1997).

All of these elements are satisfied. *First*, at the time of A-CAP's transfer of the lien on March 4, 2024, Leadenhall was a "present creditor" with a "claim" against 777 Partners that arose

before the transfer.  Compl. ¶¶ 139-44.  *Second*, 777 Partners was admittedly insolvent at the time of the transfer.  Compl. ¶¶ 175-92; *see In re Pearlman*, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014) ("[A] company run as a Ponzi scheme is insolvent as a matter of law.").

Third, Leadenhall alleges that 777 Partners received "***no apparent consideration***" (let alone "reasonably equivalent value") for taking on and securing a $170 million loan.  *Id.* ¶ 225 (emphasis in original).  In assessing reasonably equivalent value, courts examine the totality of the circumstances, including "the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee," *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1320-21 (M.D. Fl. 2009), noting that "value should be scrutinized more closely when dealing with a transfer to an insider."  *eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 2022 WL 1320405, at *7 (S.D. Fla. May 2, 2022).  A-CAP had assumed control of 777 Partners by the time transfer was made, making it an insider transaction.  *Id.* ¶¶ 193-97, 220-25.  The "fair market value" of the debt obligation was not even assessed, and Leadenhall alleges *bad faith* on the part of the transferee—King simply forced the lien on 777 Partners, citing "pressure[] from the rating agencies and regulators," *id.* ¶ 225.

## VI.    THE COURT HAS PERSONAL JURISDICTION OVER WANDER AND PASKO.

Three requirements must be met for this Court to exercise personal jurisdiction over Defendants: (1) the party must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process. *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015). The 777 Entity Defendants undisputedly consented to jurisdiction in the forum-selection clauses of the contracts at issue here.  Compl. ¶ 41; LSA § 10.09.  A-CAP and King undisputedly are subject to general personal jurisdiction in New York because they are domiciled in New York.

Compl. ¶ 44.  Only Wander and Pasko dispute personal jurisdiction, and they do not dispute that they were properly served.  *See generally* ECF 210 at 8-17; ECF 212 at 5-21.  The only disputed issues are this Court's statutory basis for exercising jurisdiction over Wander and Pasko, and whether that exercise is consistent with due process.  The answer to both questions is yes.

### A. Wander and Pasko Consented to Personal Jurisdiction in the LSA, Guaranty Agreement, Sale Agreements, Servicing Agreements, and Pledge Agreements.

Wander and Pasko consented to jurisdiction via the forum-selection clauses in the LSA and each of the related contracts.

*First*, Wander and Pasko are alter egos of the 777 Entity Defendants, which in turn are parties to the LSA and related contracts, each of which contains a forum-selection clause consenting to the personal jurisdiction of this Court.  *See supra* Part IV.C.  Neither Wander nor Pasko disputes that if they are alter egos, they are bound by those clauses and subject to personal jurisdiction.  *See CesFin Ventures LLC v. Al Ghaith Holding Co. PJSC*, 2022 WL 18859076, at *3 (S.D.N.Y. Dec. 10, 2022) ("Under New York law, if a court has personal jurisdiction over a defendant, it may also exercise personal jurisdiction over an alter ego defendant" and "not offend due process." (quotations and citations omitted)).  Although Leadenhall's allegations suffice to plead alter ego liability under any standard, the "exercise of personal jurisdiction over an alleged alter ego requires application of a 'less onerous standard' than that necessary for equity to pierce the corporate veil for liability purposes."  *Id.* (citation omitted).

*Second*, Wander and Pasko are bound by the forum-selection clauses because "a party to a contract with a forum-selection clause 'may invoke that clause to establish personal jurisdiction over a defendant that is not party to the contract but that is closely aligned with a party,' or closely related to the contract dispute itself."  *Saidnia v. Nimbus Mining LLC*, 2023 WL 7005037, at *6 (S.D.N.Y. Oct. 24, 2023) (citation omitted).  Non-signatories may be "bound by … forum selection

clauses where, under the circumstances, the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Fasano v. Li*, 47 F.4th 91, 103 (2d Cir. 2022). While *Fasano* concerned a *forum non conveniens* motion, many cases both before and since have found forum-selection clauses establish consent to jurisdiction as to parties who were not deemed alter egos. *See, e.g.*, *Idle Media, Inc. v. Create Music Grp., Inc.*, 2024 WL 2946248, at *1 (S.D.N.Y. June 11, 2024) (subjecting to personal jurisdiction signatory's vice president, "who worked extensively on the project for Idle that is the subject of the underlying dispute, while knowing about the exclusive jurisdiction clauses"); *Transient Path, LLC v. Stones S. Bay Corp.*, 2024 WL 3730113, at *8 (S.D.N.Y. Aug. 8, 2024) (defendant subject to personal jurisdiction because "Elevation played an active role in managing Seven Mile and Stones Gambling and actively participated in the performance of the licensing agreements"); *Saidnia*, 2023 WL 7005037, at *6-7 (individual defendants subject to personal jurisdiction because, "[a]s the CEO and co-founders of Nimbus who had an active role in the management and operation of the company, the Individual Defendants are all closely aligned with Defendant Nimbus" and because they engaged in "a scheme … to deprive Plaintiff of her contractual rights" and "engaged in months of direct communications with Plaintiff related to the dispute"); *Long Side Ventures LLC v. Hempacco Co.*, 2023 WL 6386888, at *6 (S.D.N.Y. Sept. 29, 2023) (similar, noting defendant's "position as a controlling officer of Vidbox Mexico").[7]

---

[7] Even before any of the cases cited above, in *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *13 (S.D.N.Y. Mar. 10, 2021), cited by Defendants, the court acknowledged the "almost uniform" case law in this Circuit supporting Leadenhall on this point.

Wander and Pasko have unusually close relationships to the 777 Entity Defendants, and to this dispute, even for co-founders who wholly own and control their companies. *See* Compl. ¶¶ 31-32; 243, 248-56, 302-03. Their cozy relationships are detailed *supra* at Part IV.C and include using the companies to purchase a home and to house an unrelated family business (in Wander's case), *id.* ¶ 31, and using a home address for an affiliated company (in Pasko's case), *id.* ¶ 43. Employees even refer to Wander's and Pasko's companies as a "family office." *Id.* ¶ 207.

Wander was the tip of the spear in the 777 Defendants' scheme to defraud Leadenhall and "engaged in months of direct communications with [Leadenhall] related to the dispute." *Saidnia*, 2023 WL 7005037, at *7; *see supra* Part II.C. Wander personally participated in numerous calls and meetings on behalf of the 777 Defendants, in which he repeatedly admitted massive contractual breaches and lied about the extent, and fraudulent nature, of the misconduct. Compl. ¶¶ 107, 122-34, 139-40, 180-91. Even before Leadenhall uncovered the scheme, Wander managed every detail of the fraudulent enterprise, keeping close tabs on his deputies who transmitted fraudulent statements to Leadenhall, and convincing one to return to 777 Partners when he tried to leave. *Id.* ¶¶ 100-01, 113, 115, 150-53, 156, 158, 204. Wander borrowed money from A-CAP against his personal shareholdings to buy out part of Pasko's share in 777 Partners. *Id.* ¶¶ 219-26. Wander also manipulated the affairs of 777 Re, a key nexus between his companies and A-CAP, even though he is formally barred from sitting on its board. *Id.* ¶ 230-38. And Wander's personal desire for fame through glamorous investments appears to be the driving force behind 777 Partners' use of other people's money to buy football clubs. *Id.* ¶¶ 257-76, 285-88, 293.

Contrary to Pasko's suggestion, Leadenhall does not allege only that Pasko signed the contracts, though that is certainly a relevant factor. *See Long Side Ventures*, 2023 WL 6386888, at *6. Pasko signed every fraudulent Compliance Report (that was transmitted with a signature), as

well as "borrowing requests" through which the Borrowers borrowed from the credit facility, and the Sellers' purported assignments of Collateral to the Borrowers that were used to portray the debt as secured—all critical elements of the fraud. Compl. ¶ 43. Pasko was active in obstructing Leadenhall's exercise of its contractual Collateral-audit rights, to conceal the fraud. *Id.* ¶¶ 216-17. Additionally, Pasko was the direct beneficiary of A-CAP's $170 million loan to JARM and personally took ownership of cash-rich subsidiaries of 777 Partners to shield those assets from creditors. *Id.* ¶¶ 222-24, 248(d), 309(d).

Wander and Pasko argue that the "closely related" doctrine has been "rejected" by recent cases, ECF 210 at 16; ECF 212 at 12-13, but that contention is belied by the recent precedent above. They also argue that even a defendant who is "closely related" under that doctrine cannot be bound by a forum selection clause unless the exercise of personal jurisdiction *separately* satisfies the "minimum contacts" test for "specific jurisdiction" under the Due Process Clause. ECF 210 at 8-12; ECF 212 at 6-7. It is black-letter law that "[t]he Supreme Court has recognized three distinct bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process: general jurisdiction, specific jurisdiction, *and consent.*" *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 86 (2d Cir. 2023) (emphasis added). It is equally well-established that consent to personal jurisdiction in a valid and enforceable forum-selection clause "does not offend due process." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). "Thus, when a defendant has validly consented to personal jurisdiction, a court may exercise authority over that defendant in conformity with the Due Process Clause, even in the absence of general or specific jurisdiction." *Fuld*, 82 F.4th at 88. Consent may be "express or implied," and "a variety of legal arrangements may represent consent." *Id.* (internal citation omitted). Viewed through that lens, the "closely related" rulings, including the sampling above,

reflect considered judgments about when a non-signatory has "consented to the jurisdiction of th[e] Court" by involving himself to such a degree in a transaction governed by a forum-selection clause that it was "foreseeable" he would be bound by it. *Transient Path*, 2024 WL 3730113, at *8. The case Wander and Pasko cited, *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, did not find earlier cases were wrong about consent, but simply asserted that due process always requires a plaintiff to satisfy *International Shoe*'s specific jurisdiction test. 356 F. Supp. 3d 379, 394-95 (S.D.N.Y. 2019). That approach cannot be squared with binding precedent and is therefore unpersuasive.

### B. Wander and Pasko's Numerous Suit-Related Contacts with New York Subject Them to Long-Arm Jurisdiction.

In any event, Wander and Pasko are subject to specific jurisdiction by straightforward operation of New York's long-arm statute, consistent with the constitutional "minimum contacts" standard. New York's long-arm statute, CPLR § 302(a)(1), provides that a court may exercise personal jurisdiction over anyone who "transacts any business within the state" if the plaintiff's claim arises from that transaction. "A nondomiciliary 'transacts business' under CPLR § 302(a)(1) when he *purposefully avails* himself of the privilege of conducting activities within New York." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) (emphasis in original, internal marks omitted). That standard, while not precisely coextensive with due process, is very close, and the Second Circuit has observed that "[i]t would be unusual, indeed," for a defendant to be subject to long-arm jurisdiction while lacking constitutional "minimum contacts." *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (citations omitted). This is a "fact-intensive inquiry," *id.* at 168; "[n]o single event or contact connecting defendant to the forum state need be demonstrated," as courts must evaluate "the totality of all defendant's contacts." *Pryor*, 425 F.3d at 166. Further, "whether a claim arises from a defendant's transaction of business in New York … is a 'relatively permissive' inquiry," which is satisfied "[i]f a claim is

arguably connected' to the business transaction that forms the basis for jurisdiction," "even if only one element arises from the New York contacts." *SUEZ Water N.Y. Inc. v. E.I. Due Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 531 (S.D.N.Y. Jan. 4, 2022).

Leadenhall's claims arise out of Wander and Pasko's transaction of business in New York. Wander did so during the restructuring negotiations among Leadenhall and Defendants, including traveling here repeatedly to meet with King and work from A-CAP's New York headquarters on a forbearance agreement that would have restructured the 777 Defendants' debt to Leadenhall. Of course, Wander and King were actually working to string Leadenhall along to stave off litigation and allow King and A-CAP to strip and secrete assets. Specifically:

- On March 12, 2024, Wander stated that he was working to get a deal done and was flying to New York to see King the next day. Compl. ¶ 191(d).

- On March 13, 2024, Wander stated that he was working out of A-CAP's offices in New York, meeting with King, and working with A-CAP on the forbearance agreement. *Id.* ¶ 191(e).

- On April 16, 2024, Wander called Leadenhall from New York concerning the restructuring negotiations. *Id.* ¶ 181 n.8.

- On April 17, 2024, Wander, while in New York, stated that he had spoken to King five or six times over the last day concerning a potential forbearance agreement. *Id.* ¶ 191(j).

- On April 22, 2024, Wander stated that he was in New York to meet with King and that Wander was still working to get a deal done with Leadenhall. *Id.* ¶ 191(k).

Wander argues these extensive New York contacts, for the purpose of transacting business, somehow do not suffice because they came toward the end of the fraudulent scheme. ECF 210 9-10. But that argument is baseless. These contacts do not "post-date the transaction or conduct on

which the claim is based;" they are part of the conduct on which Leadenhall's claims are based. *Cf. id.* at 9.  While a causal connection is unnecessary, Defendants' delay tactics directly caused Leadenhall's losses by giving A-CAP more time to strip assets from 777.  *SUEZ Water*, 578 F. Supp. 3d at 531 ("[T]here does not need to be … 'a causal link between the defendant's New York business activity and a plaintiff's injury.'" (citation omitted)).  Wander strains credulity in arguing that the restructuring negotiations, which were key to revealing the 777 Defendants' financial distress and prolonging the scheme to facilitate fraudulent transfers to A-CAP, are "completely unmoored" from Leadenhall's claims.  *Id.* (citation omitted).

Leadenhall alleges that Pasko lived in New York, creating the inference that he sometimes worked in-state, and that Pasko's New York home address was the business address of MTCP LLC, the vehicle through which Pasko owned stakes in 777 Partners and 600 Partners.  Compl. ¶ 42. Pasko also signed numerous false monthly Compliance Reports on behalf of the SuttonPark Servicer, which has or had its principal place of business in New York.  *Id.*

Lastly, and significantly, 777 Partners maintained an office in New York during the relevant period.  *Id*. ¶¶ 42-43.  Wander and Pasko criticize Leadenhall for alleging "upon information and belief" that Wander and Pasko conducted business from their office (and from Pasko's home), but those allegations are not "conclusory."  Leadenhall alleges the relevant facts, that is, Wander and Pasko worked and lived in New York, and asks the Court to draw the reasonable inference that they worked on matters related to this action in New York.

### C.  The Court Has Jurisdiction Over Wander and Pasko Based on the New York-Based Actions of their Agents and Co-Conspirators.

Wander and Pasko are also subject to personal jurisdiction in New York because the minimum contacts of their agents and co-conspirators are attributed to them.

*First,* under New York's long-arm statute and the due process clause, "there is jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (citations omitted). However, a showing of an agency relationship is not necessary. *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292 & n.2 (S.D.N.Y. 2019). "[A]n out-of-state defendant can be subject to personal jurisdiction in New York [through conspiracy jurisdiction] … when that defendant 'has knowledge of the New York acts of his co-conspirators.'" *Id.* at n.2 (citations omitted). Wander's and Pasko's agents' actions in New York subject them to jurisdiction in New York.

Wander and Pasko wholly owned and exclusively controlled 777 Partners, 600 Partners, and their subsidiaries, including the SuttonPark Servicer, and 777 Partners and the SuttonPark Servicer maintained New York offices. Compl. ¶¶ 28-30, 33, 42-43. Even if Wander and Pasko did not personally conduct business relevant to this case in New York (a factual dispute that need not be resolved at this stage), their employees in New York plainly "acted in [New York] for the benefit of, with the knowledge and consent of, and under *some* control by" Wander and Pasko. *In re Fairfield Sentry Ltd.*, 660 B.R. 568, 588 (Bankr. S.D.N.Y. 2024) (emphasis added) (citations and quotations omitted). The precise contours of the agency relationships with these entities are not dispositive, because "the Court may impute an agent's conduct within or aimed at the forum to the principal based on 'the realities of the relationship in question rather than the formalities of agency law.'" *Id*. (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).

*Second*, even absent an agency relationship, "'one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator,' even when the co-conspirator lacks such contacts

itself." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 270 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) (citations omitted).  Each of the "three requirements for imputing the minimum contacts of one co-conspirator to another" is met here: "(1) a conspiracy existed; (2) [Wander and Pasko] participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* (quoting *Charles Schwab Corp.*, 883 F.3d at 87).  The requirement to plead in-state acts in furtherance of the conspiracy is "not a difficult requirement to meet," as "an overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *Id.* at 271 (citations and quotations omitted).

Leadenhall alleges Wander and Pasko participated in a conspiracy with A-CAP and King, as well as the 777 Entity Defendants, to defraud Leadenhall and commit a pattern of racketeering activity. *See supra* Part III.  Those co-conspirators committed acts in furtherance of the conspiracy in New York, including the 777 Entity Defendants discussed above, and A-CAP and King, who are both domiciled in the state, primarily conducted their businesses in the state, and from New York collaborated with Wander and Pasko on, *inter alia*, obstructing Leadenhall's collateral audit and stringing Leadenhall along with sham restructuring negotiations.  Compl. ¶¶ 37-38; *see supra* Part IV.D.  Wander and Pasko may argue they did not control A-CAP and King's actions in furtherance of the conspiracy in New York, but that is irrelevant, since conspiracy jurisdiction, unlike agency, does not require control.  *In re Platinum*, 61 F.4th at 272.  It is enough that Wander and Pasko knew of their co-conspirators' acts, *Contant*, 385 F. Supp. 3d at 292 & n.2, which they did because Wander and King were in frequent contact about their conspiracy during the relevant period, *see supra* Parts IV.D, VI.B, and Pasko and King collaborated to obstruct Leadenhall's collateral audit.  Compl. ¶¶ 216-18.  Accordingly, Wander and Pasko are subject to personal

jurisdiction on both agency and conspiracy jurisdiction theories, due to their own contacts with New York, and through their consent.

<u>**CONCLUSION**</u>

The Court should deny Defendants' motions to dismiss in their entirety.

Dated: New York, New York
November 21, 2024

KING AND SPALDING LLP

<u>*/s/ Leigh M. Nathanson*</u>
Craig Carpenito
Leigh M. Nathanson
Brian Donovan
Michael S. Taintor
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
lnathanson@kslaw.com
bdonovan@kslaw.com
mtaintor@kslaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Section II.D. of the Individual Practices of Judge John G. Koeltl that this memorandum contains 33,955 words according to Microsoft Word, exclusive of cover page, table of authorities, table of contents, table of abbreviations, and this certification. This complies with the Court's Orders (ECF 193, ECF 241) permitting Leadenhall to file a single omnibus opposition brief of up to 34,000 words. This memorandum otherwise complies with the requirements of Section II.D.

Dated: New York, New York
November 21, 2024

KING AND SPALDING LLP

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
lnathanson@kslaw.com

*Attorneys for Plaintiffs*