## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LEADENHALL CAPITAL PARTNERS LLP and
LEADENHALL LIFE INSURANCE LINKED
INVESTMENTS FUND PLC,

           Plaintiffs,

      vs.

JOSH WANDER, STEVEN PASKO, KENNETH
KING, 777 PARTNERS LLC, 600 PARTNERS
LLC, SPLCSS III LLC, SIGNAL SSML 4 LLC,
INSURETY AGENCY SERVICES LLC,
DORCHESTER RECEIVABLES II LLC,
SUTTONPARK CAPITAL LLC, SIGNAL
MEDICAL RECEIVABLES LLC, INSURETY
CAPITAL LLC, SUTTONPARK SERVICING
LLC, and ADVANTAGE CAPITAL HOLDINGS
LLC,

           Defendants.

Case No. 1:24-cv-03453-JGK

## ADVANTAGE CAPITAL HOLDINGS LLC AND KENNETH KING'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
+1 (212) 504-6000

*Counsel for Defendants Advantage Capital
Holdings LLC and Kenneth King*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

I.    LEADENHALL PLEADS NEITHER A RICO PREDICATE NOR
PROXIMATE RICO INJURY. ................................................................... 3

    A.   "Aware[ness]" of "Transmission" of Compliance Reports from March–
November 2023 Is Neither a Predicate Act Nor a Proximate Cause. ........... 4

    B.   "Blocking" a Collateral Audit Is Not a Predicate Act and Caused No
Caused RICO Injury. ................................................................................... 6

    C.   Leadenhall Pleads No Clear and Definite RICO Injury Proximately
Caused by Delay. ........................................................................................ 7

    D.   Leadenhall Pleads No Claim, Predicate Act, or Alleged Harm Based on
"Dissipation." .............................................................................................. 7

II.   LEADENHALL LACKS RICO STANDING. ............................................. 8

III.  THE RICO CLAIMS SUFFER OTHER FATAL DEFECTS. .......................... 10

    A.   No Pattern of Racketeering ......................................................................... 10

    B.   No RICO Conspiracy .................................................................................. 12

    C.   No Domestic Injury .................................................................................... 13

    D.   No Distinct Enterprise ................................................................................ 13

IV.  LEADENHALL'S STATE-LAW CLAIMS FAIL. ....................................... 14

    A.   Fraudulent Conveyance Fails. ..................................................................... 14

    B.   The Other State-Law Claims Fail ................................................................ 14

V.   A-CAP AND KING ARE NOT LIABLE ON THE CONTRACT CLAIMS. ..... 15

VI.  LEADENHALL CANNOT HOLD KING PERSONALLY LIABLE. ............... 16

CONCLUSION ....................................................................................................... 17

CERTIFICATION OF COMPLIANCE ...................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005) ........................................................................ 14

*Chevron Corp. v. Donziger*,
    833 F.3d 74 (2d Cir. 2016) .......................................................................... 10

*Crabtree v. Tristar Auto. Grp., Inc.*,
    776 F. Supp. 155 (S.D.N.Y. 1991) .............................................................. 16

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018) ...................................................................... 8, 10

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ........................................................................ 12

*First Nat. Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ........................................................ 4, 9, 10, 15

*Goldfine v. Sichenzia*,
    118 F. Supp. 2d 392 (S.D.N.Y. 2000) .......................................................... 9

*Hecht v. Com. Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990) .......................................................................... 12

*Mandarin Trading Ltd. v. Wildenstein*,
    944 N.E.2d 1104 (N.Y. 2011) ...................................................................... 15

*In re McDonald*,
    265 B.R. 632 (Bankr. M.D. Fla. 2001) ...................................................... 14

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004) ........................................................ 13

*MPM Silicones, LLC v. Union Carbide Corp.*,
    931 F. Supp. 2d 387 (N.D.N.Y. 2013) ........................................................ 13

*In re Northlake Foods, Inc.*,
    715 F.3d 1251 (11th Cir. 2013) .................................................................. 14

*Premium Merchant Funding 18, LLC v. Honan*,
    2024 WL 4931940 (S.D.N.Y. Dec. 2, 2024) ................................... 8, 10, 11

*Rio Tinto PLC v. Vale*,
   2015 WL 7769534 (S.D.N.Y. Nov. 20, 2015)........................................................ 11

*In re TransCare Corp.*,
   602 B.R. 234 (Bankr. S.D.N.Y. 2019).................................................................... 15

*U.S. v. Maze*,
   414 U.S. 395 (1974) ............................................................................................... 5

*U.S. v. Zemlyansky*,
   908 F.3d 1 (2d Cir. 2018)...................................................................................... 12

*In re Wade Park Land Holdings, LLC*,
   2024 WL 3024648 (2d Cir. June 17, 2024) .......................................................... 14

## Statutes and Rules

18 U.S.C. § 1862, *et seq.*.................................................................................*passim*

Fed. R. Civ. P. 9(b) ............................................................................................... 16

## PRELIMINARY STATEMENT

Leadenhall has long repeated its fantastic accusation that A-CAP and Mr. King committed federal crimes. Yet nowhere in its opposition's reams of rhetoric does Leadenhall dispute that the Borrowing Base fraud it alleges was conceived, carried out, and consummated years before A-CAP so much as "became aware." And despite its meandering *accusations*, Leadenhall confirms, in its opposition, the fraud it *alleges* is simple.

In May 2021, Wander allegedly set out on a "goal" of "obtain[ing] low-cost debt under fraudulent pretenses." (Opp. 63.) "Money was undisputedly the object of the scheme." (*Id.* 5.) The "primary means" of realizing that object: Wander allegedly directed deputies to overstate two SPVs' Borrowing Bases in monthly Reports. (Opp. 35.) And he allegedly made quick work of his scheme—within a month of entering the LSA, the SPVs' Borrowing Bases were inflated by a combined $351 million. And Leadenhall does not dispute that the last of the allegedly fraudulent draws—all $351 million—was made in June 2021.

A-CAP is not alleged to have had anything to do with those draws—it allegedly did not even *learn* of the alleged misconduct until March or April 2023. (AC ¶¶3, 208–209, 212.) A-CAP thus played no part in causing the resulting harm: $351 million of Leadenhall's loans being uncollateralized.

For good reason, Leadenhall's opposition narrows the case against A-CAP and Mr. King. The only predicate acts it alleges are supposed efforts to "stop Leadenhall from discovering the full scope of the fraud." (Opp. 63.) It alleges that A-CAP was "aware" of the "transmission" of Reports by "SuttonPark Capital" from April through

November 2023, and that those reports were only "partially corrected." (Opp. 35–36, 42–44; AC ¶¶208–209.) And it asserts that, in November 2023, A-CAP expressed "concerns" about the individual chosen to conduct the next phase of Leadenhall's Collateral audit. (*Id.* ¶216.) Yet neither is wire fraud (much less a continuous pattern of wire fraud), and neither caused Leadenhall harm.

In fact, for A-CAP, Leadenhall's the only remaining theory of harm is that A-CAP allegedly delayed Leadenhall's filing of this lawsuit. But Leadenhall's litigation tactics are not a directly caused RICO injury. In any case, Leadenhall does not and cannot allege to what "clear and definite" degree it would have fared better had it sued sooner.

Without facts to support a claim against A-CAP or Mr. King, Leadenhall shoots the moon. It argues that, since March 2023, A-CAP has "complete[ly] dominat[ed]" 777, which assertedly has "no separate mind, will or existence of its own." (Opp. 78.) For that reason, it says, A-CAP "is responsible" for everything—even alleged misconduct from years before. (AC ¶363(h).) But neither the facts nor the law supports such a theory. In fact, it clashes with any conception of a RICO enterprise.

## ARGUMENT[1]

## I. LEADENHALL PLEADS NEITHER A RICO PREDICATE NOR PROXIMATE RICO INJURY.

The "primary" predicate acts, and the heart of Leadenhall's RICO claims, are the alleged Wander-directed overstatements of the SPVs' Borrowing Bases in May and June 2021—the alleged fraudulent misrepresentations that induced Leadenhall to lend $351 million beyond the true value of its Collateral. (Opp. 35.) Leadenhall does not dispute that A-CAP played no part in that alleged fraud.

Leadenhall points to only one other type of alleged RICO predicate: conduct "intended to conceal the falsity of the Compliance Reports" that induced it to lend in mid-2021. (*Id.* at 36.) The allegations against A-CAP are thin; they stem only from (i) Reports from March through November *2023*; and (ii) "concerns" expressed in November *2023* about who would lead a Collateral audit.

Leadenhall acknowledges that acts undertaken after a scheme's "fruition" cannot be RICO predicates. (*Id.* at 43.) Still, it claims that concealing the fraud "perpetuat[ed]" it, and that A-CAP's alleged acts caused RICO harm by delaying its decision to sue. (*Id.* 43–44 (citing AC ¶¶122–149, 175–192, 202, 208 (none of which alleges dissipation)).) That, Leadenhall argues, is what directly caused it to suffer $609 million of RICO injury. (*Id.* at 55.)

Leadenhall's allegations fail to plead a RICO predicate, and they fail to plead proximately caused RICO injury.

---

[1] Unless noted, emphasis is supplied and internal citations are omitted.

A.    <u>"Aware[ness]" of "Transmission" of Compliance Reports from March–November 2023 Is Neither a Predicate Act Nor a Proximate Cause.</u>

For five main reasons, A-CAP's alleged involvement with Compliance Reports from March–November 2023 are not predicate acts that harmed Leadenhall.

*First*, because Leadenhall pleads no specific facts showing that A-CAP *knew* the Reports to be inaccurate, there can be no wire fraud.  Leadenhall alleges that the Reports uploaded from March–November 2023 "*partially* admitted the breaches," (Opp. 79)—they conceded "deficits of around **$170 million**" (*id.* 53) stemming from *all alleged double pledging*, but no deficit attributable to never-purchased J.G. Wentworth receivables.  Yet Leadenhall pleads no fact showing that A-CAP had any clue that the SPVs' Borrowing Bases had long been inflated with never-purchased receivables—and thus no knowledge that the Reports remained inaccurate.  While Leadenhall asserts that, by the nature of its work, "*SuttonPark Servicer* was uniquely situated to know that its representations about Collateral were false," (Opp. 38 (citing AC ¶¶152–177)), it does not (and could not) allege the same for A-CAP.  Nor does Leadenhall claim that the perpetrators broadcast their misdeeds—or even that Leadenhall shared what it had known since September 2022 about non-existent collateral.  Leadenhall thus fails to plead, much less with specificity, that A-CAP knew the Reports to be false.

*Second*, Leadenhall pleads no facts showing that A-CAP was responsible for the contents or transmission of the Reports.  While Leadenhall resorts to imagining, in its opposition, that A-CAP and King "took over **preparation** and **submission** of fraudulent Compliance Reports,"  (Opp. 55 (citing AC ¶¶200–204, 208–209)), it *alleges*

no such thing.  Rather, it alleges only that A-CAP's Carson McGuffin "displaced" Adnani "from his office" (Opp. 46) and Adnani allegedly began "report[ing] to Saliba," (AC ¶363(h)).  (AC ¶¶202–203.)  On that basis, it concludes merely that "[b]y April 2023," A-CAP and King were "**aware of**, if not directly responsible for, **the transmission**" of the Reports,  (AC ¶¶208–209).  *Cf. U.S. v. Maze*, 414 U.S. 395, 399 (1974) (requiring "knowingly caus[ing]" materials "to be delivered by mail").

*Third*, wire fraud requires "a plan to deprive a person of something of value" and the "object" of "obtain[ing] '**property in the hands of the victim**.'"  (Opp. 34.) But Leadenhall does not allege that the March–November 2023 Reports aimed to coax Leadenhall to permit more draws under the LSA.[2]  And even Leadenhall's "delay and dissipate" theory has nothing to do with depriving Leadenhall of property in its hands.

*Fourth*, because Leadenhall has not alleged that it justifiably *relied* on those Reports, it cannot show cause in fact.  Indeed, Leadenhall alleges to the contrary: that it "relied" only  "on the Compliance Reports it received" "**[t]hrough early 2023**." (AC ¶118.)

Nor would any allegation of reliance be plausible, given all that Leadenhall knew by March; the demanded and promised—yet undelivered—reconciliations; and

---

[2] With all double-pledging laid bare by March, "Leadenhall would not" have "allow[ed] the Borrowers to borrow debt under the LSA."  (AC ¶162.)

now-unsigned Reports to which no individual would attach their name.  (AC ¶¶129–130 & Ex. 3.)

*Fifth*, Leadenhall argues (but does not allege) that by understating the extent of the Deficiencies (Opp. 43–44)—disclosing 'only' a $*170* million deficit (AC ¶136)—those Reports delayed Leadenhall's decision to sue.  But that is no theory of proximate cause.  Whether and when to sue was always up to Leadenhall; its decision to delay is an intervening and superseding cause of its own making.

### B.    "Blocking" a Collateral Audit Is Not a Predicate Act and Caused No Caused RICO Injury.

Leadenhall *argues* that, in November 2023, A-CAP "blocked Leadenhall from reviewing the pledged receivables, to avoid exposing the fraud."  (Opp. 42 (citing AC ¶¶216–217).)  But it again *alleges* something far different:  in "***late November 2023***," A-CAP expressed "*concerns* regarding [Leadenhall's] request to use *Paul Kosinski* to perform an asset review of SuttonPark."  (AC ¶216.)[3]  That is not fraud, wire or otherwise.

In any case, by "late November," there was nothing to conceal:  Leadenhall alleges that it uncovered the *full scope* of the alleged fraud "in ***October and November 2023***."  (AC ¶¶141, 144 & Ex. 5; Opp 53.)  A-CAP's (apparently well-founded) concerns thus delayed nothing and caused no harm.

_____

[3] Ultimately, A-CAP did not "block" anything:  Kosinski conducted the review, leading to the burglary of SuttonPark's offices and litigation in Florida.  (ECF 197, 197-1.)

C.    Leadenhall Pleads No Clear and Definite RICO Injury Proximately Caused by Delay.

Leadenhall fails to plead that *any* delay, whatever the reason, caused it the required "clear and definite" injury.  Because it has not exhausted its state-law remedies, how much Leadenhall will collect is unknowable.  *See infra* Part II.  And Leadenhall does not plead whether or to what clear-and-definite degree the outcome would have been different had it sued (or foreclosed) sooner.

D.    Leadenhall Pleads No Claim, Predicate Act, or Alleged Harm Based on "Dissipation."

Leadenhall brings *no* claims over what the SPVs did with the *proceeds* of its loans from Leadenhall.  The (unalleged) fate of those funds thus cannot give rise to any **RICO** injury.

In any case, Leadenhall does not allege—much less plead specific facts showing—that **A-CAP** had anything to do with what happened to the SPVs' borrowed funds.  In fact, by March 2023, much or all of the loan proceeds had likely **already** been put to other uses by 777; the Amended Complaint, however, is silent on the issue.  And even in its Opposition, Leadenhall cites no particular instance of A-CAP allegedly "diverting" or "absconding with" money.  Just the opposite:  it cites allegations about A-CAP **supplying** money **to** Borrowers' affiliates.  (*See* Opp. 44 (describing "'protective advances[]' funded by A-CAP," including for "payroll").)  And it alleges that **A-CAP**, not Leadenhall, "*directed billions of dollars in loans and reinsurance reserves to 777, which were used to pursue King's and Wander's passion projects.*" (*Id.* (citing AC ¶¶269–72 ("with A-CAP 'continuing to provide this money'"; "A-CAP's ongoing funding")).)

## II.    LEADENHALL LACKS RICO STANDING.

Leadenhall says that because it *seeks* damages to the penny—$609,529,966.82 in Accelerated Debt under the LSA—it must have *suffered* "clear and definite" RICO injury.    But as in *Premium Merch. Funding 18, LLC v. Scott Crandall Honan*, Leadenhall's alleged "injury is the same injury Plaintiffs have suffered" under governing contract because Defendants "are [allegedly] in breach of their obligation to repay the amounts due."  2024 WL 4931940, at *2 (S.D.N.Y. Dec. 2, 2024).  And as Judge McMahon reiterated in that case, "***[b]efore*** a RICO plaintiff can assert a claim, he must exhaust any state law remedies that might redress his injury."  *Id.* Until Leadenhall has "obtained whatever relief [it] can" on its state-law claims, it "lack[s] standing to pursue a RICO claim."  *Id.*

Leadenhall, however, says that it may proceed because it assuredly will recover nothing on its state-law claims.  Not so.  Plaintiffs must Leadenhall's prediction that it will recover nothing on its state-law claims fails because a RICO plaintiff must "'demonstrate that the orthodox methods of recovery ***have*** failed them' ***before*** they can allege that acts of racketeering caused them loss,'" *id.*; insisting that they *will* fail them is not enough.  (Mot. 15–16); *see also D'Addario v. D'Addario*, 901 F.3d 80, 95 (2d Cir. 2018) ("RICO plaintiff[s] [cannot], through predictions . . . , artificially ripen a claim that is unripe . . . .").)  Indeed, "[s]tate-law remedies must be pursued and exhausted even if collecting on them is a 'forlorn hope.'"  *Premium Merch*, 2024 WL 4931940, at *2.

Nor, as Leadenhall contends, may state-law and RICO claims be pursued simultaneously.  (Opp. 49–50); *see also Premium Merch.*, 2024 WL 4931940, at *2.

RICO damages are limited to "out-of-pocket losses caused by the fraud," calculated "***after*** [Leadenhall's] contractual rights to payment have been frustrated." *First Nat. Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994). The resolution of those contract rights "must be reached by a court of competent jurisdiction ***before*** [Leadenhall] will suffer any RICO injury." *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 398 (S.D.N.Y. 2000).

Leadenhall also misleads on its prospects of recovery. The present value of those receivables allegedly amounts to about ***$230 million***[4]—assets on which Leadenhall holds first liens and on which it can seek to foreclose (ECF 178-1 §2.15(a)). Leadenhall can also pursue U.C.C. remedies to resolve intercreditor disputes over double-pledged collateral. (*Cf.* AC ¶365.) A variable, however, is how much (if any) of the Deficiency was caused not by fraud, but Borrowers' unhedged rate exposure. (*See, e.g.*, ECF 176 at 11; ECF 178–1 §5.01(u).)

Leadenhall tries to skirt all this by invoking its prayer for "fees and costs it incurred in attempting *to collect the accelerated amount*." (Opp. 50-51.) But that claim for fees under the LSA (ECF 178-1 §§9.01, 9.02) must be exhausted before asserting RICO injury, otherwise no RICO claimant would never lack standing. In any case, Leadenhall alleges no "clear" and "definite" amount. The circumstances are

---

[4] Leadenhall alleges true Borrowing Bases of $64 million at SuttonPark; $42 million at Dorchester; and $124 million at Insurety and Signal Borrowers, which are not accused are fraud. (AC ¶¶146, 148 & Ex. 10 p. 23.)

thus unlike those in *D'Addario*, where fees were incurred "combat[ing] a defendant's RICO violations," not pursuing contract remedies; were recoverable *only* under RICO; and were sought in the "clear," "definite," and "neither 'speculative' nor unprovable'" amount of $200,000.  901 F.3d at 96.

Finally, Leadenhall misreads *Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016).  The Second Circuit did not reject Appellant's challenge to injunctive relief because, as Leadenhall says, "clear and definite" injury is "not required for injunctive claims," (Opp. 51).  To the contrary, the court rejected the challenge because plaintiff **had, in fact, shown** the required clear and definite injury—plaintiff, the court held, was injured by its "liability on an $8.64 billion judgment obtained through a pattern of racketeering," and "**that injury**, affecting its net worth, **is clear and definite**." *Chevron*, 833 F.3d at 140.[5]

## III.   THE RICO CLAIMS SUFFER OTHER FATAL DEFECTS.

### A.    No Pattern of Racketeering

It took two months (May and June 2021) for the alleged enterprise to secure low-cost "secured" debt on false pretenses—the alleged object of the enterprise.  (*See* Mot. 7; Opp. 35, 63, 89.)  Thus, as in *Premium Merchant Funding*, the "allegedly

---

[5] The other fraud-based claims are also unripe for these reasons.  (Mot. 16.)  While Leadenhall contends A-CAP relies on "dated, non-binding" cases on the point (Opp. 51), it cites no contrary authority.  Moreover, *First National Bank* relied on common-law fraud cases in enunciating the RICO ripeness requirement.  27 F.3d at 768.

fraudulent conduct that induced Plaintiffs" to lend "occurred in the receding past, over a brief period of . . . weeks, and has not recurred."  2024 WL 4931940, at *3.[6] That forecloses both forms of continuity.

While that is enough, there are more reasons Leadenhall fails to allege continuity in any form.

### 1.  No open-ended continuity

There can be no open-ended racketeering scheme when, as here, the scheme was "not only inherently terminable, but, in fact was terminated."  *Rio Tinto PLC v. Vale*, 2015 WL 7769534, at *10 (S.D.N.Y. Nov. 20, 2015).  And here, termination could hardly be more clear:  777 has allegedly long been "in the process of running down its business and selling off assets to repay creditors."  (AC ¶287; *cf. id.* ¶¶278–288.)

The narrow scope of the alleged enterprise also forecloses continuity.  (*See* Mot. 28–30.)  Beyond Leadenhall, the only alleged victim is Credigy—and only because double-pledging necessarily affects two lenders.  (AC ¶365).[7]  Try as it might to broaden the scope, Leadenhall musters only speculation: "there is no reason to think

---

[6] Both "subsequent enjoyment of the proceeds" and "efforts by a defendant to cover up the underlying conduct are inadequate to satisfy the continuity requirement of the RICO statute."  *Rio Tinto*, 2015 WL 7769534, at *10.

[7] In its Opposition, Leadenhall also invokes a suit by ING—an entity not mentioned in the Amended Complaint—alleging discrete misconduct by 777.  (Opp. 46.)  But neither A-CAP nor the alleged enterprise is allegedly responsible for ING's harm.

that the fraudulent practices with respect to collateral pledging alleged above are confined only to the Leadenhall facility." (*Id.* ¶366.)

### 2. *No closed-ended continuity*

The Amended Complaint alleges only open-ended continuity. (*Id.*) Leadenhall's opposition nonetheless debuts a closed-ended continuity theory, which it unabashedly claims no Defendant disputes. (Opp. 46.) A-CAP and King dispute it.

A closed-ended pattern of RICO activity must "span at least two years," (Opp. 45), and continuity is assessed for each defendant, *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004). Here, the alleged fraud spanned two *months*. And A-CAP is not alleged to have even known of any fraud for the past two years. (AC ¶¶3, 201–202, 208–209, 212, 374.)

### B. No RICO Conspiracy

The "core of a RICO civil conspiracy" is agreeing "to commit predicate acts[.]" *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *see also U.S. v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018) ("RICO conspiracy requires proof . . . of an agreement to join" a scheme that "involved, or . . . was intended to involve, two or more predicate acts of racketeering.").

The only "agreement" Leadenhall alleges is one made in "March 2023" to create a "Steering Committee" (of an undisclosed size) headed by King. (AC ¶374.) But that is not an agreement to commit predicate acts. Nor does the act of lending money equate to an (unpleaded) "implicit agreement," (Opp. 60), to violate RICO.

C.    No Domestic Injury

In *Yegiazaryan v. Smagin*, a foreign plaintiff was injured in his ability to enforce a California judgment against a California resident through racketeering acts "targeted at California." 599 U.S. 533, 544, 549 (2023). Here, by contrast, allegedly fraudulently overstated Reports were sent to London; targeted at inducing London decisionmakers to approve allegedly fraudulent draws; and with the (allegedly achieved) object of causing Leadenhall to wire funds from a London financial institution. And the injurious "effects" of that loan were suffered in London and Dublin. Because the "circumstances surrounding the injury" hardly make "clear [that] the injury arose domestically," *id.* at 545, Leadenhall alleges no domestic injury.

D.    No Distinct Enterprise

Because Leadenhall can identify no misconduct by A-CAP or Mr. King, it resorts to asserting that each is legally indistinct from 777 and therefore "responsible for [777's] actions." (AC ¶¶363(g), (h); *see also* Opp. 32; *id.* 31 n.4; *id.* 77–78; AC ¶¶201–203.) But if Defendants are one and the same—or even part of the same corporate family—there can be no association-in-fact enterprise. *See, e.g., Moses v. Martin*, 360 F. Supp. 2d 533, 546–47 (S.D.N.Y. 2004).

Recognizing the roadblock, Leadenhall argues that its "excessive control" allegations are pleaded "in the alternative." (Opp. 80 n.6.) But to plead in the alternative, the complaint must **say** it is pled in the alternative. *MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387, 396 n.11 (N.D.N.Y. 2013). It does not. It makes factual allegations fatally inconsistent with its RICO claims.

## IV.    LEADENHALL'S STATE-LAW CLAIMS FAIL.

### A.    Fraudulent Conveyance Fails.

#### 1.    *No Constructive Fraudulent Transfer*

Leadenhall fails to show lack of consideration because "forbearance of foreclosure on a defaulted loan"—as A-CAP did here (*e.g.*, AC ¶225)—"can constitute 'reasonably equivalent value' by itself."  *In re Wade Park Land Holdings, LLC*, 2024 WL 3024648, at *6 (2d Cir. June 17, 2024); *see also In re McDonald*, 265 B.R. 632, 637 (Bankr. M.D. Fla. 2001).  And plaintiffs have the burden to allege in "the complaint" why such benefits "do ***not*** constitute a reasonably equivalent exchange." *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1257 (11th Cir. 2013).

#### 2.    *No Actual Fraudulent Transfer*

Actual fraudulent transfer requires that the transferors intended to "hinder, delay, or defraud" the creditor.  (Mot. 35.).  But Leadenhall does not allege any fraudulent intent of the transferors—JARM and 777.  (AC ¶¶221–29.)  Instead, Leadenhall maligns A-CAP's alleged intent, and contends that it was the ultimate transferor.  (Opp. 93.)  But because JARM and 777 are at issue, A-CAP is irrelevant (as is Leadenhall's "Ponzi scheme" discourse).

### B.    The Other State-Law Claims Fail.

Little more need be said about the other state-law claims.  Leadenhall's civil conspiracy workaround falls flat—it cannot "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 591 (2d Cir. 2005).

On aiding-and-abetting, Leadenhall does not dispute that lending to an alleged fraudster is not "substantial assistance." (Opp. 87.)  It also states no claim for the reasons it fails on wire fraud.  *See supra* Part I.A.

On unjust enrichment, Leadenhall now argues (but does not allege) that, by waiting to sue, it enriched A-CAP.  In any case, there is no alleged "relationship between the parties that could have caused reliance or inducement."  *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

Leadenhall's reliance on *Weyant v. Phia Grp. LLP* is misplaced.  The limited exception invoked there only applies when, unlike here, the defendant possesses particular funds or assets that, by contract, belong to the plaintiff.  *See* 2021 WL 5998400, at *3 (S.D.N.Y. Dec. 20, 2021).

## V.    A-CAP AND KING ARE NOT LIABLE ON THE CONTRACT CLAIMS.

Leadenhall new "lender liability" theory fails.

*First*, there is no support for holding one lender (A-CAP) liable to another (Leadenhall) for the debts of a mutual borrower (777).  To the extent viable at all, "lender liability" is instead a moniker for certain claims a ***debtor*** asserts against its lender.  (Opp. 77–78 (citing cases).)

*Second*, even then, lender liability demands "[a]ctual, participatory and total control" "*as to the transaction attacked*."  *In re TransCare Corp.*, 602 B.R. 234, 247 (Bankr. S.D.N.Y. 2019).  Yet A-CAP and King are not alleged to have controlled 777 entering the LSA or breaching it (in May and June 2021).  Nor is A-CAP alleged ever to have misused alleged control to cause Leadenhall redressable harm.  By March

2023, the LSA had long since been breached and, in any case, A-CAP's alleged conduct aligns with a senior creditor interacting with a distressed debtor.  (Mot. 23 n.8.)

*Third*, Leadenhall contradicts itself, claiming on the one hand that A-CAP and King were distinct from (and not alter egos of) the 777 Defendants (AC ¶360), and on the other hand, that the 777 Defendants were "instrumentalities" of A-CAP and King (Opp. 77–78).    Leadenhall's   own   authorities   state   that   "[a]lter   ego"   and "instrumentality" liability is "a distinction without a difference," as "[e]ach theory requires a certain level of control by the lender over the borrower."  *East End*, 2017 WL 1277443, at *4 n.5.

*Fourth*, Leadenhall's assertion that A-CAP somehow "waived" opposition to Leadenhall's lender-liability theory is frivolous.  A-CAP and King correctly argued that as "non-signator[ies] to" the LSA, they are not liable.  *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991). (*See* Mot. 36–37.)

## VI.    LEADENHALL CANNOT HOLD KING PERSONALLY LIABLE.

As to Mr. King, Leadenhall's theory of liability amounts to this:  from the time A-CAP first lent 777 a dime, there is *nothing* across the sprawling 777 universe he did not control.  All knowledge and misconduct of anyone at any time should therefore be imputed to him.  But neither the law nor Rule 9(b) permit any theory of the sort.

For that reason; for the reasons the claims against A-CAP fail; and because Leadenhall does not contest that King cannot be held *personally* liable for actions undertaken in his capacity as A-CAP's CEO (Mot. 37–38), the feckless claims against King should be dismissed.

## CONCLUSION

The Court should dismiss the Amended Complaint.


Dated:  December 19, 2024                  Respectfully submitted,
        New York, New York

                                           CADWALADER, WICKERSHAM & TAFT LLP
                                           By:        */s/ Jonathan M. Watkins*
                                           Jonathan M. Watkins
                                           Michael E. Petrella
                                           Matthew M. Karlan
                                           Mark A. Singer
                                           200 Liberty Street
                                           New York, NY 10281
                                           Telephone: (212) 504-6000
                                           Fax: (212) 504-6666
                                           jonathan.watkins@cwt.com
                                           michael.petrella@cwt.com
                                           matthew.karlan@cwt.com
                                           mark.singer@cwt.com

                                           *Counsel for Advantage Capital Holdings*
                                           *LLC and Kenneth King*

## CERTIFICATION OF COMPLIANCE

I hereby certify, under Section II.D of Judge Koeltl's individual practices, that this memorandum contains 3,984 words, exclusive of the caption, table of contents, table of authorities, and this certification. This complies with the Court's Order (ECF 193) permitting A-CAP to file a reply brief of 4,000 words or fewer. This memorandum otherwise complies with the requirements of Section II.D.

*/s/ Jonathan M. Watkins*
Jonathan M. Watkins