# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, ADVANTAGE CAPITAL HOLDINGS LLC, <br><br> Defendants. | Civil Action No. 1:24-cv-03453-JGK |

# MEMORANDUM OF LAW IN SUPPORT OF LEADENHALL'S
## MOTION FOR CONTEMPT AGAINST THE GUARANTORS, A-CAP, AND KENNETH KING

**TABLE OF REFERENCES**

| Abbreviation | Definition |
|---|---|
| "600 Partners" | 600 Partners LLC |
| "777 Entity Defendants" | 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Signal SML 4 LLC, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLC, SuttonPark Servicing LLC |
| "777 Partners" | 777 Partners LLC |
| "A-CAP" | Advantage Capital Holdings LLC, inclusive of affiliates Haymarket and ACM Delegate |
| "ACM Delegate" | ACM Delegate LLC |
| "Atlantic Coast" | Atlantic Coast Life Insurance Company |
| "B. Riley" | B. Riley Advisory Services |
| "Borrowers" | SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Signal SML 4 LLC |
| "Everton" | Everton Football Club |
| "Friedkin" | The Friedkin Group |
| "Guarantors" | 777 Partners LLC and 600 Partners LLC |
| "Haymarket" | Haymarket Insurance Company |
| "Jazz Re" | Jazz Reinsurance Company |
| "Leadenhall" | Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC |
| "Nutmeg" | Nutmeg Acquisition LLC |
| "Sentinel Life" | Sentinel Security Life Insurance Company |
| "Southern Re" | Southern Atlantic Re, Inc. |
| "SuttonPark" | SuttonPark Capital LLC |
| "TAMI" | Trans Atlantic Lifetime Mortgages Limited |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 3

FACTUAL BACKGROUND ................................................................................................... 5

    A.   The Court Issues a Preliminary Injunction. .................................................. 5

    B.   A-CAP Seeks Reconsideration of and Appeals the Preliminary Injunction. ............... 7

    C.   The Guarantors Transfer TAMI to A-CAP and Do Not Receive Payment. ................ 7

    D.   Guarantor 600 Partners Permits the Everton Transaction to Diminish the Equity Value of Its Asset, Nutmeg, Without Calculating the Impact. ................................... 10

    E.   A-CAP Has Incentive to Strip Assets. ........................................................ 12

ARGUMENT ...................................................................................................................... 13

   I.   The Preliminary Injunction Is Clear and Unambiguous. .................................. 14

   II.   Proof of the Guarantors' Violations of the Preliminary Injunction Is Clear and Convincing. ...................................................................................................... 16

   III.   The Guarantors and A-CAP Have Not Attempted to Comply with the Preliminary Injunction in a Reasonable Manner. ........................................................................ 21

CONCLUSION .................................................................................................................. 23

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
    2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002) ..................................................................15

*Ally Bank v. Reimer*,
    2010 WL 446025 (E.D.N.Y. Jan. 29, 2010) ...................................................................15

*Casale v. Kelly*,
    710 F. Supp. 2d 347 (S.D.N.Y. 2010) ...........................................................................14

*Fed. Deposit Ins. Corp. v. Antonio*,
    649 F. Supp. 1352 (D. Colo. 1986) ...............................................................................15

*Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*,
    289 F. Supp. 2d 373 (S.D.N.Y. 2003) ...........................................................................14

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
    369 F.3d 645 (2d Cir. 2004) ..........................................................................................15

*Pro. Sports Servs. FI OY v. Grossman*,
    753 F. Supp. 3d 84 (D. Mass. 2024)..............................................................................15

**Other Authorities**

Federal Rule of Civil Prodecure 65(d)(2) ............................................................................19

Federal Rule of Evidence 408................................................................................................9

Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall") submit this memorandum of law in support of their motion for a finding of contempt against the Guarantors, A-CAP, and Kenneth King.

## PRELIMINARY STATEMENT

The Preliminary Injunction ("PI") in this case prohibits the Borrowers and Guarantors, Defendant entities who took more than $600 million in debt from Leadenhall, from dissipating their remaining assets. Despite that prohibition, the Guarantors, in concert with their "senior lender" A-CAP, transferred two assets worth hundreds of millions of dollars to A-CAP and received virtually nothing in return—or have declined to even assess the assets' value. A-CAP has made clear since inception of the case that it believes it has "superior" contractual rights to strip assets from the Guarantors and that it does not want to wait for an adjudication of that issue to do so. ECF No. 128 at 32:21-23 (A-CAP Counsel: "Strip is certainly a pejorative word. Commonly understood generally. A-CAP has rights as a creditor with respect to assets of the holdco level."). Having failed to defeat or modify the PI, and facing the insolvency of its own businesses, A-CAP forged ahead in violation of the PI, papering up two dissipations of Guarantor assets masquerading as transactions for value. Contempt is warranted for the following reasons:

*First*, the PI is clear and unambiguous. The operative provisions "prohibit[] the Borrowers and Guarantors from taking any action to dissipate the value of their assets" and "prohibit[] the expenditure or dissipation by the Borrowers and Guarantors of any cash or cash equivalents received from any sale or transaction." The proscription is clear: Outside the normal and ordinary course of business, do not spend cash or cash equivalents or transfer assets for less than fair value. Both provisions were heavily litigated, and Defendants have demonstrated they understood them in briefing and in open court.

*Second*, Leadenhall has clear evidence of PI violations, including admissions at deposition from the restructuring firm, B. Riley Advisory Services ("B. Riley"), installed by A-CAP to manage the Guarantors.  In separate litigation filed by 777 Partners against Leadenhall in Florida—in which Defendants racked up approximately $1.5 million in legal fees and then walked away from the case after discovery showed their claims against Leadenhall to be baseless—testimony from B. Riley's COO confirmed that: (i) on the day the PI was entered, July 8, 2024, the Guarantors transferred a $250- to $300-million company called "TAMI" to A-CAP but have yet to even calculate a purchase price, let alone receive fair consideration ("Q. So what consideration has 777 Partners received to date for payment?  […]  A: Well, the ultimate purchase price has not been determined yet."); and (ii) in December 2024, A-CAP monetized *for itself* a loan that a Guarantor subsidiary called "Nutmeg" had made to Everton Football Club, and though A-CAP subsequently wrote down debt owed to A-CAP by Nutmeg to create the appearance of consideration, the Guarantors have no idea whether the debt write-down constituted fair consideration for the receivable from which A-CAP profited ("Q: Would you agree with me that the equity value of Nutmeg would be affected by a debt write-down concerning a $200 million loan? A. Yes.  […]  Q: Do you know the extent to which the equity value of Nutmeg was affected by A-CAP writing down approximately $250 million in debt … to Nutmeg?  […]  A: No.").  The result is the same for both transactions: A-CAP took an asset from the Guarantors, and the Guarantors failed to determine, as required to comply with the PI, whether the consideration was fair or even insist on payment.

*Third*, there has been no reasonable attempt to comply with the PI.  To the contrary, A-CAP has grown more desperate, and its actions more brazen, since its issuance.  In August 2024, just one month after the PI was issued, A-CAP told regulators that its "Action Plan" to lift its struggling insurers out of insolvency was to "Liquidate 777 Assets," promising: "$1 billion of 777 related

assets to be sold by September 30, 2024."  In November 2024, A-CAP again tried to assuage regulators by trumpeting that "A-CAP can fully exercise rights to liquidate assets" of the Guarantors.  In December 2024, insurance regulators ordered all of A-CAP's insurance companies to cease writing new business on grounds that they posed a hazardous financial condition to policyholders.  And in March 2025, the Utah Insurance Commissioner filed a petition for a "Rehabilitation Order"—the equivalent of a bankruptcy filing—on grounds that the Utah insurers are "insolvent, impaired, . . . [and] in flagrant violation" of state insurance code.  As regulators raised concerns over the solvency of A-CAP's businesses, A-CAP appropriated TAMI and monetized for itself Nutmeg's loan.  In December 2024, A-CAP exercised irrevocable proxy rights "to make resolutions" on behalf of the Guarantors, taking formal control of those entities and thereby making itself an enjoined party under the PI.  These are not the actions of a party attempting to comply with the PI.  These are the premeditated actions of a party motivated, in concert with the Guarantors, to run roughshod over the PI.

Absent a finding of contempt, A-CAP will continue exercising whatever contractual rights it wants to as to the Guarantors' assets, and B. Riley will continue to look the other way while A-CAP loots the vault.  A-CAP and the Guarantors should be sanctioned for each day that elapses while the Guarantors fail to receive fair payment for TAMI and fail to calculate the equity value of Nutmeg.

## **FACTUAL BACKGROUND**

### **A.  The Court Issues a Preliminary Injunction.**

Leadenhall initiated this action on May 3, 2024.  ECF No. 1.  Leadenhall alleged that, in breach of a secured credit agreement, the Borrowers double-pledged the collateral securing the debt or pledged collateral which they did not own.  ECF No. 187 ¶¶ 88-162.  Leadenhall also alleged that the 777 Entity Defendants, inclusive of the Borrowers and the Guarantors, were part

of an insolvent enterprise controlled by an insurance holding company, A-CAP, which propped the enterprise up with billions of dollars in loans sourced from insurance policyholders. *Id.* ¶¶ 193-245. Leadenhall asserted breach of contract, fraud, and RICO claims against the 777 Entity Defendants, Josh Wander and Steven Pasko (principals of 777 Partners), A-CAP, and Kenneth King (A-CAP's Chairman and CEO). *Id.* ¶¶ 313-416. Right after the Complaint was filed, A-CAP forced Wander and Pasko to resign as managers of the Guarantors and installed B. Riley in their stead. *Id.* ¶ 194; ECF Nos. 86-11 ¶ 6; 87 ¶ 18.

Leadenhall moved for a temporary restraining order ("TRO") on May 13, 2024, asserting that the Borrowers and Guarantors breached the credit agreement and were dissipating their remaining assets while claiming to be unable to pay back even a fraction of the approximately $609 million owed to Leadenhall (the "Accelerated Debt"). ECF No. 57. Defendants opposed the TRO and argued that the presence of B. Riley obviated the need for preliminary relief. ECF No. 86 at 7, 11-12. The Court issued a TRO on June 7, 2024 and converted it into the PI on July 8, 2024. ECF Nos. 128, 146.

As relevant here, the PI "prohibits the expenditure or dissipation by the Borrowers and Guarantors of any cash or cash equivalents received from any sale or transaction up to the full amount of the Accelerated Debt," to the extent the value of the collateral plus any cash or cash equivalents are less than the Accelerated Debt. ECF No. 146 (provision C). It further "prohibits the Borrowers and Guarantors from taking any action to dissipate the value of their assets, including by transferring assets to any Defendant." *Id.* (provision D).

The Court entered the PI over the Borrowers' and Guarantors' objections, including their plea the day before issuance for a modified injunction that would allow them to dissipate assets so long as the Guarantors "fairly and reasonably determined" that they could do so. ECF No. 138-1

at 3-4; ECF No. 138-2 at 3-4; ECF No. 148 at 18:03-19:04 (The Court: "So the suggestion that …

we're going to rely on the decision by the transferring borrowers and guarantors, that's a loophole

wide enough to drive the proverbial truck through."). A-CAP, intervening through its affiliates

Haymarket and ACM Delegate, ECF No. 139, objected on grounds that the Court did not have the

power to restrain dissipations by the Guarantors. ECF No. 140 at 9.

To balance the parties' competing interests, the Court specified that the Borrowers' and

Guarantors' affiliates were not enjoined by the PI and carved out transactions in the "normal and

ordinary course of business," observing: "If the parties are contemplating a transaction that they

think might violate the TRO, it would behoove them to simply talk to the plaintiffs about it." ECF

No. 128 at 64:02-04.

### B. A-CAP Seeks Reconsideration of and Appeals the Preliminary Injunction.

A-CAP, while not itself enjoined by the PI, moved for "modification" of the PI. ECF Nos.

152-155. A-CAP moved to excise provisions (B) through (D) from the PI, which would permit

the Guarantors to transfer cash or cash equivalents without restraint and dissipate assets to A-CAP.

ECF 154-1. The Court denied A-CAP's motion, ECF No. 199, and in October 2024, A-CAP

appealed the PI to the Second Circuit. ECF No. 200. A-CAP, joined by the 777 Entity Defendants

on appeal, continues to argue that the PI cannot restrain asset transfers by the Guarantors. *See*

*Leadenhall Capital Partners et al. v. Advantage Capital Holdings LLC et. al*, Case No. 24-2647

(2d Cir.) ("2d Cir. Appeal"), ECF Nos. 23 at 14-19; 36.1.

### C. The Guarantors Transfer TAMI to A-CAP and Do Not Receive Payment.

On June 28, 2024, the Borrowers and Guarantors notified Leadenhall of the potential sale

of a 777 Partners asset, Trans Atlantic Lifetime Mortgages Limited ("TAMI"), to Haymarket (via

Haymarket's designee, ACM Delegate). ███████████ ███████████████████████████

███████████████████████████ █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

Leadenhall objected to the transaction as an asset dissipation with illusory consideration: A-CAP was neither paying for TAMI in cash nor extinguishing any debt owed to A-CAP. *Id.* at 4. The only party benefitting from the transaction was Haymarket, which would both receive one of the Guarantors' most valuable assets and retain as an asset on its balance sheet a loan equivalent to the value of TAMI—effectively double-counting TAMI for accounting purposes while also obtaining another path to repayment of the loan through TAMI's future cash flows. *Id.* B. Riley asserted the transaction was "heavily negotiated" and therefore fair. *Id.* at 2. On July 10, 2024— two days after the Court converted the TRO into the PI—TAMI filed notices pursuant to UK law stating that King was a person with "significant control" over the company, *i.e.*, owned 75% or more of TAMI's shares. Ex. B; *see also* Exs. C, D.

The full picture emerged in late 2024 and early 2025. In regulatory filings, A-CAP's subsidiaries began listing "TAMI" as an asset. Exs. E, F, X. Upon questioning from Leadenhall

---

[1] "Ex." citations are citations to the Declaration of Leigh M. Nathanson.

[2] The Guarantors designated the emailed notice to Leadenhall as protected by Federal Rule of Evidence 408. The notice was not an offer to "compromise[e] any claim," *see* Fed. R. Evid. 408, nor is Leadenhall using the notice to prove or disprove the validity or amount of any claim.

in early 2025, the Guarantors later confirmed that TAMI had been transferred to A-CAP "last summer" and that the Guarantors had not yet come up with a purchase price. Ex. G at 1. The Guarantors also confirmed that they "have been operating under the assumption that the value of Leadenhall's collateral plus the value of their cash and cash equivalents do not exceed the alleged amount of the Accelerated Debt." *Id.* at 2.

In March 2025, Leadenhall deposed B. Riley professionals in litigation brought by 777 Partners against Leadenhall in the Southern District of Florida (the "Florida Action").[3] ECF No. 74-1; *see also* ECF Nos. 87 ¶ 18; 89 at 7. B. Riley's COO confirmed the following facts:

- The Guarantors transferred TAMI to A-CAP in the summer of 2024. Ex. H. 141:18-142:3.

- The Guarantors estimated the value of TAMI to be "between [$]250 and $300 million" at the time of transfer. *Id.* 142:24-143:2.

- The purchase price of TAMI has not been determined, and A-CAP has not paid that purchase price yet. The only consideration that the Guarantors have received to date is $2 to $3 million as an "advance." *Id.* 142:12-19 ("Q. So what consideration has 777 Partners received to date for payment? […] A: Well, the ultimate purchase price has not been determined yet.").

- Although A-CAP and the Guarantors engaged independent accounting firms to conduct a valuation of TAMI, *id.* 143:2-5, they have no timeframe for valuations nor a deadline by which A-CAP must pay for TAMI, *see id.* 150:1-16 ("Q: [W]hen is A-CAP going to pay for this? […] A: As soon as we can agree on the valuation…. Q: Well, it has been since August 2024, right? A: It has been delayed and it shouldn't have taken this long. That is fair.").

- The Guarantors immediately spent the $2 to $3 million cash "advance" they received from A-CAP on "operating" expenses. *Id.* 188:2-11.

---

[3] 777 Partners sought to hold Leadenhall liable for intrusions into its computer systems and office building by a former 777 employee disgruntled over not receiving his bonus. *See 777 Partners LLC and SuttonPark Capital LLC vs. Leadenhall Capital Partners et al.*, Case No. 24-cv-81143, ECF No. 1, Complaint (S.D. Fla. Sept. 17, 2024). 777 Partners spent approximately $1.5 million pursuing the action, Ex. H 131:24-132:2, for which they asserted approximately $6,000 in actual damages, *id.*131:1-22, before voluntarily dismissing the case with prejudice after discovery showed no involvement by Leadenhall. Ex. I. Leadenhall reserves the right to move for contempt on grounds that the fees incurred constituted another dissipation of assets. *Id.*

The upshot is that the Guarantors transferred a $250- to $300-million asset to A-CAP in July 2024 and received approximately 1% of its value in return, plus an "IOU" pending calculation of a purchase price that may never come.

### D. Guarantor 600 Partners Permits the Everton Transaction to Diminish the Equity Value of Its Asset, Nutmeg, Without Calculating the Impact.

On October 18, 2024, A-CAP filed a letter seeking the Court's "guidance" on a contemplated transaction involving Everton, a professional football team.  ECF No. 219.  █████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████  This Court declined to give an advisory opinion on whether A-CAP's monetization of the loan violated the PI.  ECF No. 233 at 10:1-6.

Friedkin completed its purchase of Everton in December 2024.  A-CAP, seven of its affiliates, and Nutmeg executed an "Acknowledgement and Agreement" whereby Haymarket wrote down approximately $201 million in debt, plus interest, owed by Nutmeg to Haymarket.  Ex. J.  The Chief Legal Officer of A-CAP signed on behalf of *all eight parties*.  *Id.*

The full picture again emerged in early 2025.  The Guarantors confirmed in February 2025 that they had no insight into the "particulars" of the debt write-down because A-CAP had seized control of Nutmeg (by exercising a proxy right to install ACM Delegate as Nutmeg's sole manager) prior to entry of the TRO—a fact undisclosed to Leadenhall or the Court during the PI proceedings. Ex. G at 1-2.  The Guarantors also disclosed that in December 2024, A-CAP, via ACM Delegate, exercised *another* proxy right to grant itself the irrevocable right "to make resolutions" on behalf of *the Guarantors*.  Ex. G at 3-4.  Since then, A-CAP and affiliates, rather than the Guarantors, have provided notice under provision (E) of the PI when they foreclose on the Guarantors' assets. Ex. K, L.[4]

In March 2025, B. Riley's COO confirmed the following:

- Since June 2024, A-CAP has fully controlled Nutmeg following the exercise of proxy rights.  Nutmeg, however, remains an asset of 600 Partners. Ex. H 194:7-20.

- The Guarantors do not know how the dollar amount of the debt reduction provided by A-CAP to Nutmeg in December 2024 was calculated because Nutmeg has been controlled by A-CAP since June 2024. *Id.* 193:21-194:7.

- The Guarantors have not seen the transaction document whereby A-CAP reduced debt owed by Nutmeg. *Id.* 193:5-20, 195:7-196:2.

- The equity value of Nutmeg was necessarily affected by A-CAP's reduction of debt owed by Nutmeg. *Id.* 194:25-195:3 ("Q: Would you agree with me that the equity value of Nutmeg would be affected by a debt write-down concerning a $200 million loan? A. Yes.").

- The Guarantors have not calculated how the equity value of Nutmeg was affected or reduced by the debt reduction provided by A-CAP. *Id.* 195:7-15 ("Q: Do you know the extent to which the equity value of Nutmeg was affected by A-CAP writing down approximately $250 million in debt … to Nutmeg?  […]  A: No.").

- The Guarantors have not calculated their own equity value. *Id.* 196:3-19 ("Q: So is it

---

[4] In the latest such notice, on April 18, 2025, A-CAP noticed foreclosure on two other Guarantor portfolio companies.  Leadenhall reserves the right to move for contempt based on these foreclosures pending Defendants' response to Leadenhall's request for information about the assets.

fair to say that the company does not know the value of 777 Partners? […] A: That is fair. Q: Is it fair to say that the company does not know the value of 600 Partners? […] A: That is fair.").

The upshot is that 600 Partners consummated a transaction with A-CAP that it concedes impacted the equity value of Nutmeg but has declined to calculate how much the value was reduced. 600 Partners' decision not to "determine[] whether it needs to adjust the amount reflected on its balance sheet for its investment in Nutmeg," Ex. G at 2—in other words, whether it needs to book a loss on that asset as a result of the Everton transaction—does not mean that a loss did not occur.[5]

### E. A-CAP Has Incentive to Strip Assets.

A-CAP is fighting for its own financial life. ECF No. 187 ¶¶ 277-300; *see also* ECF No. 99 at 18-19. A-CAP's five insurance companies are domiciled in Utah (Haymarket, Sentinel Life, and Jazz Re) and South Carolina (Atlantic Coast and Southern Re). Ex. M at 1-2; Ex. N at 1-2. On December 2, 2024, the Utah Department of Insurance issued an Emergency Order prohibiting the Utah-based insurers from writing new business based on a determination they had "negative capital and surplus"—*i.e.*, were balance sheet insolvent, and posed a hazardous condition to the public. Ex. M at 4-7. On December 18, 2024, the South Carolina Department of Insurance ordered A-CAP's South Carolina-based insurers to stop writing new business on a similar basis. Ex. N at 1-2. These emergency orders cover all A-CAP's operating businesses.

On March 24, 2025, Utah filed a petition for a "Rehabilitation Order"—akin to a bankruptcy filing—on grounds that the Utah insurers "pose an immediate danger to their policyholders, creditors, and the public at large." Ex. O ¶ 2. Utah determined that an "affiliation

---

[5] Furthermore, because B. Riley has not analyzed the validity of A-CAP's liens and claims as to the Guarantors—*i.e.*, the transactions giving rise to the debt A-CAP wrote down—they have no basis to represent that the consideration provided by A-CAP constituted fair value.

relationship," *i.e.*, a control relationship, existed between A-CAP and 777 Partners whereby A-CAP has "the authority to influence key financial and operational decisions within 777 Partners." Ex. P.  Utah requested that an independent third party be appointed to manage the Utah insurers. Ex. O ¶ 116-17.  The action remains pending.

A-CAP has repeatedly told regulators that it intends to lift its insurers out of insolvency by appropriating the assets of the Guarantors.  An August 2024 "Action Plan" deck prepared for the Utah regulator contains a slide entitled "Liquidate 777 Assets & FMV Calculations," which states: "**A-CAP continues to liquidate and sell assets to realize profits and has made progress in several key asset verticals**."  Ex. Q at 5.  Among 777 Partners' assets, A-CAP identifies both the Everton loan and TAMI as ripe to realize profits, describing TAMI as "purchased by A-CAP" and estimated to deliver to A-CAP "$100 million plus in estimated profit."  *Id.*  In the same Action Plan, A-CAP summarized its rescue plan: **"$1 billion of 777 related assets to be sold by September 30, 2024**."  *Id.* at 7.

In a November 2024 "Corrective Action Plan Update," A-CAP again was candid about "steps taken" to assuage regulatory concerns about the solvency of insurers:

> 3) Severed the 777 relationship
> - Exercised lender rights and Inserted independent third-party manager (B. Riley) to control operations
> - B. Riley terminated Josh Wander and Steve Pasko
> - A-CAP can fully exercise rights to liquidate assets

Ex. R at 4.

Nowhere in these plans does A-CAP reference the PI.

## ARGUMENT

A court may hold a party in contempt to enforce compliance with court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Casale v. Kelly*, 710 F. Supp. 2d 347, 359 (S.D.N.Y. 2010). "Sanctions for contempt are meant to coerce compliance or compensate loss." *Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 378 (S.D.N.Y. 2003). A court has "broad discretion to design a remedy that will bring about compliance" and should consider "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about [compliance], and the contemnor's ability to pay." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657-58 (2d Cir. 2004) (citation and internal marks omitted). While a party's objectionable conduct need not be willful for the party to be found in contempt, where contempt is willful, the court "would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs for the victim of contempt." *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 2002 WL 2012618, at *11 (S.D.N.Y. Sept. 3, 2002) (citation omitted).

## I.    THE PRELIMINARY INJUNCTION IS CLEAR AND UNAMBIGUOUS.

PI provision (C) "prohibits the expenditure or dissipation by the Borrowers and Guarantors of any cash or cash equivalents received from any sale or transaction up to the full amount of the Accelerated Debt," and provision (D) "prohibits the Borrowers and Guarantors from taking any action to dissipate the value of their assets, including by transferring assets to any Defendant." ECF No. 146. Injunctions restraining asset "dissipations" are common when a party has attempted to frustrate a judgment. *Ally Bank v. Reimer*, 2010 WL 446025, at *5-8 (E.D.N.Y. Jan. 29, 2010) (prohibiting "dissipating" property); *Fed. Deposit Ins. Corp. v. Antonio*, 649 F. Supp. 1352, 1355 (D. Colo. 1986), *aff'd*, 843 F.2d 1311 (10th Cir. 1988) (noting that "considerable authority exists for enjoining dissipation of assets" and collecting cases); *Pro. Sports Servs. FI OY v. Grossman*,

753 F. Supp. 3d 84, 88 (D. Mass. 2024) (prohibiting "dissipating … assets without leave of the Court").

Before and after issuance of the PI, Defendants have confirmed their understanding of its plain and unambiguous meaning. The Borrowers and Guarantors proposed a modified injunction with a loophole in provision (D) that would have allowed them to dissipate assets to A-CAP so long as the Guarantors "fairly and reasonably determined" they could do so, demonstrating their understanding (and dislike) of the PI as entered. ECF No. 138-1 at 3-4; ECF No. 138-2 at 3-4; ECF No. 148 at 18:3-19:4. Defendants also indicated in court that the as-issued PI was crystal clear. ECF No. 128 at 64:5-10 (777 Entity Defendants' Counsel: "You know, the way I look at it, your Honor, is if you have a sale for fair market value, the fair value of the asset, there is no dissipation of assets because you're trading one asset for another, and I don't think that would violate the TRO as your Honor has just described it."). A-CAP moved to excise provisions (B), (C), and (D) precisely *because* those provisions restrained the Guarantors from making asset transfers for less than fair value. ECF No. 155 at 3. Defendants argue on appeal that the Court should not have restrained the Guarantors' assets, again making clear their understanding (and dislike) of those restraints. 2d Cir. Appeal, ECF No. 23 at 14-19. Finally, in raising transactions to Leadenhall and this Court's attention, the Guarantors and A-CAP have reaffirmed their understanding of the PI's meaning. Ex. A at 2 ("[T]he sale of TAMI is not dissipating the value of 777. The TAMI business is being sold for Fair Market Value to be determined in a valuation process[.]"); ECF No. 230 at 2 ("Nutmeg received consideration in the form of … the promised debt reduction under the Haymarket-Nutmeg Facility upon closing of the Transaction and retirement of the RMF Facility.").

The first element for a finding of contempt is satisfied here.

## II.    PROOF OF THE GUARANTORS' VIOLATIONS OF THE PRELIMINARY INJUNCTION IS CLEAR AND CONVINCING.

Leadenhall's proof that the Guarantors and A-CAP have violated the PI includes express admissions from the Guarantors and A-CAP in court filings, written correspondence from counsel, and sworn deposition testimony.  Those admissions are straightforward: In concert with A-CAP, the Guarantors transferred TAMI away without insisting on payment and wasted Nutmeg away without calculating the extent of the waste.

On the TAMI transaction, Leadenhall has proof of the following: (i) after entry of the TRO, TAMI was an asset of the Guarantors, Ex. A at 5; (ii) in July 2024, the Guarantors transferred TAMI to King and/or an affiliate of A-CAP, Ex. B; (iii) before or around the time of the transfer, the Guarantors estimated TAMI's value to be approximately $250 to $300 million, Ex. H 142:24-143:2; (iv) A-CAP told regulators in August 2024 that TAMI is estimated to deliver to A-CAP "$100 million plus in estimated profit"—to say nothing of the asset's overall value, Ex. Q at 5; (v) to date, the Guarantors have received nothing from A-CAP for TAMI other than a $2 to $3 million cash "advance"—and the parties have yet to even calculate a purchase price for TAMI, Ex. H 142:12-19; (vi) the Guarantors promptly spent that "advance" on operating expenses, *id.* 188:2-11.

On the Everton transaction, Leadenhall has proof of the following: (i) Nutmeg is an asset of a Guarantor, Ex. H 194:7-20; (ii) Nutmeg's equity value was affected or reduced when A-CAP, in December 2024, monetized for itself a loan made by Nutmeg to Everton and purported to pay for the loan by writing down approximately $201 million plus interest of debt owed by Nutmeg to A-CAP, *id.* 194:25-195:3; (iii) the Guarantors did not attempt to determine whether the consideration provided by A-CAP to Nutmeg was fair or otherwise equivalent to the consideration received by A-CAP from Friedkin, Ex. G at 2; (iv) the documentation memorializing the debt

reduction was signed on all sides by a single representative of A-CAP, Jill Gettman, Ex. J; and (v) the Guarantors did not calculate the extent to which the equity value of Nutmeg was affected by the transaction—and Guarantors do not even know their own value. Ex. G at 2; Ex. H 195:7-15, 196:3-19.

Both transactions are asset dissipations violating provision (D) of the PI. The Guarantors admitted that (i) they valued TAMI at $250 to $300 million yet have received only $2 to $3 million for it to date; and (ii) the equity value of Nutmeg was affected by A-CAP's writing down approximately $201 million in debt owed by Nutmeg in exchange for the various consideration received solely for A-CAP's benefit, yet the Guarantors have no idea by how much that equity value was affected. The goal here appears to be feigned compliance with the PI, either by papering up asset transfers to A-CAP but then not requiring payment or calculating the value of assets. The result is the same either way: the Guarantors transferred assets without receiving fair value in return or permitted assets to waste while deliberately remaining ignorant as to whether they have wasted away. The evidence is not circumstantial evidence requiring any inferences or even subjective valuation materials showing a dissipation of assets; rather, it is direct acknowledgments by the Guarantors.

Neither the transfer of TAMI to A-CAP nor the write-down of the Everton loan falls within the PI's "normal and ordinary course of business" carve-out. TAMI was "one of the most valuable assets owned by 777." Ex. A at 1. Nutmeg's attempts to purchase Everton and the approximately $201 million in loans it made to Everton in connection with that purchase were reportedly not only "the biggest sporting investment 777 have ever attempted, [but] also crucial for the long-term

survival of the firm itself."[6]  That A-CAP chose TAMI and the Everton loans for appropriation

from the Guarantors' portfolio itself suggests that they were some of the Guarantors' most valuable

assets.  And that is how A-CAP has presented the transactions to regulators, listing TAMI and the

Everton loans on its August 2024 master "Action Plan" to "Liquidate 777 Assets & FMV

Calculations" and use the profits to lift itself out of insolvency.  Ex. Q at 5.  No party has ever tried

to intimate that the transfer of TAMI to A-CAP or write-down of the Everton loan was part of the

normal and ordinary course of business.

The TAMI transaction separately violates provision (C) of the PI, which provides that if

the value of the collateral *plus* any cash or cash equivalents is below the Accelerated Debt, the

Borrowers and Guarantors are restrained from spending cash or cash received from future

transactions up to the amount of the Accelerated Debt.  The Borrowers and Guarantors confirmed

in February 2025 that this was the case at the time of the TAMI transaction.  Ex. G at 2.

Nonetheless, even the inadequate consideration the Guarantors received for this non-ordinary

course transaction—approximately $2 to $3 million in an "advance" from A-CAP—was promptly

spent on "operating" expenses.  Ex. H 142:12-19, 188:2-11.  Provision (C) prohibits the Guarantors

from spending *any* cash proceeds from the TAMI sale, and the fact that the Guarantors insisted on

only $2 to $3 million rather than the full purchase price does not somehow transform the

expenditure into an ordinary course transaction.

A-CAP, acting in concert with the Guarantors, violated the PI just as the Guarantors did.

*See* Fed. R. Civ. P. 65(d)(2) (binding "other persons who are in active concert or participation with"

enjoined parties).  In December 2024, A-CAP, via its affiliate ACM Delegate, exercised contractual

---

[6] Paul Brown & Philippe Auclair, *Everton or Bust?*, JOSIMAR (Feb. 16, 2024),
https://josimarfootball.com/2024/02/16/everton-or-bust/.

rights to revoke Wander's and Pasko's rights to act on behalf of the Guarantors, continue the term of B. Riley, and otherwise exercise corporate authority over the Guarantors. Ex. G at 3-4. In doing so, A-CAP stepped into the shoes of the Guarantors and, in that capacity, made itself an enjoined party under the PI, and has even assumed notice obligations of the Guarantors under provision (E). Ex. K, L.

Even before A-CAP's formal exercise of control over the Guarantors, it exercised actual control. In the Complaint, Leadenhall set forth detailed allegations that A-CAP is part of a criminal racketeering enterprise with the 777 Entity Defendants, ECF No. 187 ¶¶ 198-300, and discovery in the Florida Action has corroborated these allegations.[7]  State regulators have found an "affiliation relationship" whereby A-CAP has "the authority to influence key financial and operational decisions within 777 Partners." Ex. P.

The notices provided for the TAMI and Everton transactions also demonstrate that A-CAP and the Guarantors are in active concert. The only beneficiary of the TAMI transaction was A-CAP, which not only took TAMI from the Guarantors but also listed as an asset on its balance sheet a loan equivalent to the equity value of TAMI—essentially double-counting the same asset. In response to Leadenhall's concerns that the consideration was "illusory," the Guarantors claimed only that the transaction was "heavily negotiated"—*i.e.*, the Guarantors and A-CAP had gone to great lengths to paper up the transaction. Ex. A at 2, 4. King then simply seized control of TAMI. Exs. E, F, X.

---

[7] Ex. S 113:23-114:2 ("Q: Is there any doubt in your mind that Steven Pasko and Josh Wander stole at least $350 million from Leadenhall? […] There's no doubt in my mind."); Ex. H 187:1-7 ("Q: Was Leadenhall's money used to try to buy football Teams? A: Possibly. Q: Was it used to try to buy airlines? A: Possibly. Q: Was it used to try to buy apartments?  A: Possibly."); Ex. T 66:16-22) ("                                                    ); Ex. U 137:21-138:1.

The Everton transaction is more of the same. In April 2024, in a short "Deed of Assignment" executed not by lawyers but by Wander and A-CAP COO Michael Saliba, Nutmeg transferred the Everton loan to A-CAP for no consideration. ECF No. 220-2. In June 2024, without disclosure to Leadenhall or the Court, A-CAP seized control of Nutmeg while avoiding transferring its equity (which would have been an obvious PI violation) and, in December 2024, executed an "Acknowledgement and Agreement" on behalf of *all parties*—including Nutmeg as the borrower and all A-CAP affiliates as lenders—whereby A-CAP wrote down debt owed by Nutmeg. Ex. J. Standing by while A-CAP controlled the show, the Guarantors, under the purportedly independent oversight of B. Riley,[8] did not bother to assess the "particulars" of the transaction or whether the write-down was fair consideration for the loan monetized by A-CAP, let alone the extent to which the equity value of Nutmeg was affected. Ex. G at 1-2. Again, the Guarantors and A-CAP worked hand-in-hand—A-CAP looted the vault while the Guarantors looked the other way—to transfer an asset to A-CAP and either paper up a cashless transaction or avoid doing the work that might show a dissipation.

Defendants' clear admissions show that, acting in concert, the Guarantors dissipated TAMI to A-CAP for limited or no consideration and wasted away the equity value of Nutmeg without ever calculating that value.

---

[8] After B. Riley's appointment, Leadenhall asked them to confirm they would authorize an independent review of (i) the transactions that created A-CAP's alleged "superior" contractual rights; (ii) any defenses the Guarantors and their subsidiaries may have to A-CAP's purported claims or secured creditor status; and (iii) any claims the Guarantors and their subsidiaries may possess against A-CAP and its affiliates. For nearly ten months B. Riley refused. B. Riley's COO admitted at his deposition that no one had reviewed or investigated the above items, or whether the Guarantors—or their creditors to whom B. Riley also has a fiduciary duty—have a basis to challenge A-CAP's exercises of remedies. Ex. Y 64:16-19 ("Q: [H]as you or your team investigated any claims […] 777 Partners may have against A-CAP? A: Not at this time."); Ex. Z 99:7-101:7.

### III.     THE GUARANTORS AND A-CAP HAVE NOT ATTEMPTED TO COMPLY WITH THE PRELIMINARY INJUNCTION IN A REASONABLE MANNER.

The third factor required for a finding of contempt is also satisfied.  The Guarantors and A-CAP have doggedly fought the PI.  The Borrowers and Guarantors submitted a proposed modified injunction on the eve of issuance that would have allowed asset dissipations to A-CAP, ECF No. 138; A-CAP intervened in the proceedings via its affiliates Haymarket and ACM Delegate to argue that the Court lacked power to restrain asset transfers by the Guarantors, ECF Nos. 139, 140; A-CAP moved for reconsideration of the PI to argue that the Court lacked power to restrain asset transfers by the Guarantors, ECF No. 155 at 13-22; and A-CAP and the 777 Entity Defendants even filed an interlocutory appeal to argue that the Court lacked power to restrain asset transfers by the Guarantors, 2d Cir. Appeal, ECF No. 23 at 14-19.  Throughout these proceedings, A-CAP has done little other than quibble over semantics to assuage concerns that it is trying to strip the Guarantors' assets.  ECF No. 128 at 32:21-23 (A-CAP Counsel: "Strip is certainly a pejorative word.  Commonly understood generally. A-CAP has rights as a creditor with respect to assets of the holdco level.").

Leadenhall's concerns proved well-founded.  State regulatory proceedings make clear that A-CAP is caught between the so-called rock of insolvency and the hard place of violating a court order.  It chose the latter.  A month after the PI was issued, A-CAP told regulators that the centerpiece of its plan to lift its operating businesses out of insolvency was to "Liquidate 777 Assets," summarizing the entire rescue plan as follows: "$1 billion of 777 related assets to be sold by September 30, 2024."  Ex. Q at 5, 7.  In the same August 2024 plan, A-CAP brazenly characterized TAMI as "purchased by A-CAP," estimating that it would deliver "$100 million plus in estimated *profit*."  *Id.* at 5 (emphasis added).  Later in 2024, in a follow-up statement to regulators, A-CAP asserted that "A-CAP can fully exercise rights to liquidate assets" owned by

the Guarantors. Ex. R at 4. Neither the TRO nor the PI is referenced in A-CAP's plans to the regulators. The Guarantors' and A-CAP's violations are no accident: A-CAP stated time and again that it believes it may exercise whatever rights it wants with respect to the Guarantor's assets, ECF No. 155 at 3, and then did exactly that—and touted it to regulators.

The correspondence surrounding the TAMI and Everton transactions are not attempts to comply with the PI; rather, they are concerted efforts to evade the PI. On TAMI, the Guarantors and A-CAP papered up a transaction allowing A-CAP to show regulators as assets on its books both TAMI itself *and* a loan equal to the equity value of TAMI. When Leadenhall raised concerns that the consideration flowing to the Guarantors was "illusory," the line of communication went dead and King took the asset.

With respect to Everton, A-CAP's monetization for itself of Nutmeg's loans to Everton started when A-CAP ███████████████████████████████████. After the PI was issued, A-CAP purported to try to pay for the loans while still capturing the upside of the Friedkin sale by writing down debt owed by Nutmeg—in a textbook insider transaction executed via a document *signed on all sides by a representative of A-CAP*. Ex. J. 600 Partners waved away any obligation to assess whether the write-down was fair on the basis that A-CAP had already appropriated Nutmeg and dismissed any obligation to assess how the value of Nutmeg, an asset of 600 Partners, was affected by the write-down. Ex. G at 2 ("We do not see any reason to undertake such an endeavor at this time."). These are not the steps taken by parties trying to comply with a court order. They are the steps taken to paper up or cover up sham transactions that always end with the same result: A-CAP has an asset previously owned by the Guarantors (or its affiliates), and the Guarantors have not insisted on payment or even calculated whether the consideration was fair. A-CAP wins. The Guarantors and their other creditors, including Leadenhall, lose.

Absent a finding of contempt and sanction, A-CAP and the Guarantors have given every reason to believe they will continue these willful PI violations going forward.

## CONCLUSION

The Court should find the Guarantors, A-CAP, and King in contempt for violating the PI and impose the following sanctions, with monies payable jointly and severally to Leadenhall:

(a) A fine of $25,000 per day, beginning from the date on which the Guarantors transferred TAMI to King (July 8, 2024), and until the Guarantors receive full payment for TAMI;

(b) A fine of $25,000 per day, beginning from the date on which A-CAP wrote down approximately $201 million in debt plus interest owed by Nutmeg to Haymarket (December 18, 2024), and until the Guarantors assess the extent to which the equity value of Nutmeg changed as a result of A-CAP's taking, monetizing, and writing down Everton debt;

(c) Disclosure to Leadenhall of the valuation of TAMI and change in the equity value of Nutmeg, as referenced in the preceding two provisions;

(d) A determination that A-CAP, through its affiliate ACM Delegate, is an enjoined party under the PI to the extent it controls and/or acts on behalf of the Guarantors or any other enjoined party;

(e) An award of Leadenhall's reasonable attorneys' fees and costs that it incurred in bringing this motion.

Dated:  New York, New York
        May 1, 2025

                                           KING AND SPALDING LLP

                                           */s/ Leigh M. Nathanson*
                                           Craig Carpenito
                                           Leigh M. Nathanson
                                           Brian Donovan
                                           1185 Avenue of the Americas
                                           New York, NY 10036
                                           (212) 556-2100
                                           ccarpenito@kslaw.com
                                           lnathanson@kslaw.com
                                           bdonovan@kslaw.com

                                           *Attorneys for Plaintiffs*

24

## CERTIFICATE OF COMPLIANCE

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word.  Pursuant to the word count system in Microsoft Word, the total number of words in the Memorandum of Law, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6,988.  The foregoing Memorandum of Law complies with the formatting rules set forth in the § III.D of the Court's Individual Practices.

Dated:  New York, New York
        May 1, 2025

                        KING AND SPALDING LLP

                        */s/ Leigh M. Nathanson*          

                        *Attorney for Plaintiffs*