# Exhibit O

Scott M. Lilja (4231)
David P. Billings (11510)
Sarah C. Vaughn (14615)

**FABIAN VANCOTT**

95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801)-531-8900
Fax: (801)-596-2814
slilja@fabianvancott.com
dbillings@fabianvancott.com
svaughn@fabianvancott.com

*Attorneys for Utah Insurance*
*Commissioner Jonathan T. Pike*

---

### IN THE THIRD JUDICIAL DISTRICT COURT-SALT LAKE DEPARTMENT

### IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| IN RE:<br><br>SENTINEL SECURITY LIFE INSURANCE COMPANY; HAYMARKET INSURANCE COMPANY; and JAZZ REINSURANCE COMPANY | **VERIFIED PETITION FOR REHABILITATION ORDER AND REQUEST FOR TEMPORARY INJUNCTIVE RELIEF**<br><br>Civil No.:<br><br>Judge: |

Pursuant to the Utah Insurer Receivership Act, §§ 31A-27a-101 *et seq.* and specifically §§ 31A-27a-202, 207, and 301-305, the Utah Insurance Commissioner, Jonathan T. Pike ("**Commissioner**"), petitions the Court to issue a Rehabilitation Order with respect to Sentinel Security Life Insurance Company ("**Sentinel**"), Haymarket Insurance Company ("**Haymarket**"), and Jazz Reinsurance Company ("**Jazz Re**") (Sentinel, Haymarket, and Jazz Re are collectively referred to as the "**Utah Insurers**"): (1) appointing Jonathan T. Pike, Utah Insurance

1

Commissioner, and successors in office, and appointed special deputies, as Rehabilitator, (2) directing the Rehabilitator to take possession, control, and title to all assets of Sentinel, Haymarket, and Jazz Re, and to administer those assets pursuant to the laws of the State of Utah, as directed by the Court, (3) staying all actions and proceedings relating to the Utah Insurers, in Utah and elsewhere, pursuant to Utah Code § 31A-27a-108(4)(b); and (4) and issuing temporary injunctive relief until entry of the Rehabilitation Order requiring the Utah Insurers' full compliance with the Supervision Order and orders of the Supervisor pursuant to that order.

In support of this petition, the Commissioner alleges the following:

## INTRODUCTION

1.      Insurance is a regulated industry. In Utah, it is regulated by the Utah Insurance Department ("**Department**") under the direction of the Commissioner and pursuant to the Utah Insurance Code, Utah Code §§ 31A-1-101 *et seq.* The purpose of such regulation is to "ensure the solidity of insurers doing business in Utah." Utah Code § 31A-1-102.

2.      Since May 2023, each of the Utah Insurers have been subject to examination by the Department pursuant to Utah Code §§ 31A-2-203 - 205. On April 10, 2024, the Utah Insurers were each placed under an Order of Supervision ("**Supervision Order**"), pursuant to Utah Code § 31A-27-503(2). Through the examination and supervision, the Department has determined that the Utah Insurers are insolvent, impaired, in a financially hazardous condition, in flagrant violation of multiple provisions of the Utah Insurance Code, failing and refusing to comply with the orders of the Commissioner, and pose an immediate danger to their policyholders, creditors, and the public at large.

### A-CAP, 777 Partners, and The Utah Insurers

3.      This Petition results from a years-long history of self-dealing, conflicts of interest,

and obfuscation by the ultimate controlling party of the Utah Insurers, Kenneth King ("**King**"). King, through various related corporate entities, including Advantage Capital Group ("**A-CAP**"), owns and controls the Utah Insurers and owns and controls many other A-CAP related entities that serve to "manage" the money generated by the Utah Insurers. ACAP Group Organizational Charts, attached hereto as <u>Exhibit A</u>.

4.    In the A-CAP family of companies, the Utah Insurers serve the role of providing capital, through policy premiums, to other A-CAP related entities focused on investing that money for the benefit of A-CAP and its principals. Through management of the investments made possible by the Utah Insurers' capital, A-CAP related companies are paid investment management fees which increase based upon increased expected rate of return from the investment. Thus, integral to maximizing A-CAP's returns from the Utah Insurers was investment of their capital in high-return, high-risk investments.

5.    A-CAP's requirements for the Utah Insurers was twofold: first, to continue generating cash through selling policies and, second, to invest that cash in high-return, high-risk investments that would make cash available to A-CAP from the insurers.

6.    To accomplish those requirements, in or around 2020, A-CAP made an agreements and loans with 777 Partners LLC ("**777 Partners**"). First, 777 Partners agreed the Utah Insurers would be able to reinsure their liability through 777 Re Ltd. ("**777 Re**"), which allowed the insurers to continue writing insurance without the need to increase their capital reserves. Second, A-CAP agreed that the Utah Insurers would invest their capital in high-return investments in the form of short-term loans to entities controlled by 777 Partners and that 777 Partners would act as an asset management sub-advisor to the Utah Insurers. ACAP-777 Partners Diagram attached hereto as <u>Exhibit B</u>.

7.      Beginning in at least 2020 and continuing over time A-CAP, through Advantage Capital Management, LLC ("**A-CAP Management**"), as asset manager for the Utah Insurers, invested over $2.1 billion (approximately 26%) of the Utah Insurers' admitted assets in various 777 Partners investments. As discussed below, these investments have been non-performing and have been increased, rather than liquidated, to avoid recognizing losses. There has been virtually no return on the investments. A-CAP, through these investments, became the largest investor by far in 777 Partners, such that that King took control of 777 Partners.[1]

8.      The investments themselves, which are short-term high interest loans to entities controlled by 777 Partners, have been non-performing and, instead of realizing any return on the investments, the Utah Insurers have been required to provide additional funds on the investments to avoid defaults that would disclose their worthless investments and force them to recognize losses, to continue to fund 777 Partners, and avoid the collapse of the entire enterprise. Although ordered by the Department to divest these investments in the Supervision Order in April 2024, the Utah Insurer's contributions to the 777 Partners investments have instead increased by $400 million in 2024. Examples of the investments are in Appendix A, the allegations of which are incorporated herein.

9.      The 777 Holdco Loan, made by the Utah Insurers to 777 Partners in February 2022, is one such example. In 2022 that loan was for approximately $46 million and had a maturity date of less than one year. But since its origination, the 777 Holdco Loan has been amended more than 100 times and the outstanding balance has grown to over $500 million[2] as of December 31, 2023,

---

[1] *See* Liz Hoffman, *The silent partner behind 777's buying spree*, Semator (Nov. 23, 2023), https://finance.yahoo.com/news/silent-partner-behind-777-buying-141311037.html, last accessed March 6, 2025.

[2] This figure includes accrued interest and amounts held by A-CAP Holdings-controlled special purpose vehicles AAV2024 LLC and HCAV2023 LLC, of which Utah Insurers hold $189 million and $208 million of debt, respectively.

of which $270 million relates directly to the Utah Insurers. As 777 Partners is insolvent, there is no value in the loan.

10.    A-CAP is in breach of the terms of its asset management agreement. A-CAP Management has been paid millions of dollars under that agreement, including over $30 million in fees by the Utah Insurers in 2023 alone.

11.    The investment of the Utah Insurers' capital by A-CAP has resulted in the insolvency of each of the Utah Insurers and their inability to meet a sufficient level of capital to continue as insurers under the Utah Insurance Code.

12.    These deficiencies, which far exceed the level for mandatory supervision multiple times over, arise primarily from:

      a.   investments made in violation of the Single Issuer Limitation, Utah Code § 31A-18-106(2)(a)(i);

      b.   failure to properly value impaired and affiliated investments under the Statements of Standard Accounting Practice ("**SSAP**") resulting in grossly overstated capital values;

      c.   the recapture of the non-performing investments associated with the 777 Re agreement; and,

      d.   use of the Utah Insurers' capital by A-CAP to obtain benefits for A-CAP and its principals through high-risk investments in affiliates of A-CAP.

13.    The result of this pattern is that each of the Utah Insurers' is insolvent based on their recalculated Risk Based Capital ("**RBC**"), which is a statutory level of capital, calculated based the insurer's risk, to be held by the insurers as the minimum level of capital the insurer must maintain to have sufficient capital to cover potential losses for the protection of its policyholders

and the public. The RBC of each of the Utah Insurers is multiple times less than required under the Utah Insurance Code for the risk they have insured.

### The Department's Examination

14.    Pursuant to the Utah Insurance Code, the Department routinely examines insurers licensed in Utah and is conducting such an examination of the Utah Insurers directly and through an appointed Examiner.

15.    Early in the examination, it was determined that the Utah Insurers' investments were heavily concentrated in a single legal entity, 777 Partners and its affiliates, in violation of the single issuer limitation in the Utah Insurance Code. Table #1 outlines the Department's single issuer findings, ($s in thousands).

**TABLE # 1**

| As of 12/31/2023 | Sentinel | Haymarket | Jazz RE |
|---|---|---|---|
| **Admitted Assets** | 1,214,616 | 3,602,341 | 3,125,876 |
| **Single Issuer Limit** | 215,659 | 377,947 | 343,297 |
| **777 Partners Investments** | 268,632 | 1,323,866 | 510,226 |
| **Single Issuer (Over) Under** | (52,973) | (945,919) | (166,929) |
| **RBC** | -17615% | -3175% | -5931% |

16.    The Commissioner therefore found the Utah Insurers were in hazardous financial condition, each evidencing a negative capital and surplus and each evidencing negative RBC, entered an Order of Supervision, and appointed a supervisor (the "**Supervisor**") to oversee the Utah Insurers' operations.

17.    The Commissioner's April 10, 2024, Supervision Order required the Utah Insurers

to, among other things:

      a.  liquidate the investments that contributed to the breach of the single issuer limitation; and

      b.  engage an independent service provider to provide independent fair valuations for these investments.

18.     The Utah Insurers challenged certain of these findings but in so doing, admitted that Haymarket was insolvent due to the single issuer limitation. See Exhibit C.

19.     During the examination, the Examiner reviewed the Utah Insurers' statutory filings and identified additional significant risks pertaining to the Utah Insurers' invested assets.

20.     The Examiner requested over forty level 3 internally prepared fair valuations from the Utah Insurers, yet only five of these required valuations were received. The Examiner concluded that those internal valuations provided were not prepared in accordance with applicable standards. As a result, the Examiner engaged a valuation specialist to provide independent fair valuations of the investments.

21.     After receiving the initial independent fair valuation reports, the Examiner issued his significant examination findings ("**SEF**") and an amended RBC analysis. To date, the significant examination findings include:

      a.  Violations of the single issuer limitation (i.e., investment limitations);

      b.  Material misstatements in reporting short-term investments;

      c.  Material misstatements in fair value measurements of financial instruments;

      d.  Failure to recognize, record, and report material impairments of financial instruments;

      e.  Material misstatements of fair value disclosures;

      f.  Material misstatements of reporting for subsidiary, controlled, and affiliated

entities;

g.    Material misstatements in reporting of related party transactions; and

h.    Material misstatement of affiliation and related party disclosures.

The SEFs were provided to the Utah Insurers for their responses.

22.    After considering the Utah Insurers' responses, the Examiner found that the Utah Insurers' level of restated RBC, which restatement was required by the SEF findings, placed them in hazardous financial condition.

23.    On December 2, 2024, to protect the public, policyholders and creditors, the Commissioner issued an emergency order prohibiting the Utah Insurers from writing new policies. The Commissioner has stayed this Order.

24.    On February 6, 2025, the Examiner issued an updated amended RBC analysis showing the Utah Insurers' RBC to be significantly negative rather than substantially positive as required by the Utah Insurance Code.  See Table #2 below.

### Table # 2

| December 31, 2023 (in thousands) | Utah Insurers | | | South Carolina Insurers | |
|---|---|---|---|---|---|
| | Sentinel | Haymarket | Jazz Re | ACL | SAR |
| Recorded Capital and Surplus | 130,478 | 63,471 | 3,083 | 111,126 | 1,813 |
| Adjustment to Investments | (107,807) | (613,942) | (170,590) | (129,997) | (89,541) |
| Investment in Subs | (3,083) | | | (1,813) | |
| Surplus Notes | | (22,791) | | | |
| Holdco Loans | | (33,339) | | | |
| Total Adjustments | (110,890) | (670,072) | (170,590) | (131,810) | (89,541) |
| AVR Benefit | 10,178 | 39,200 | 24,552 | 8,022 | 7,717 |
| Loss of Reinsurance Credits | (461,510) | 0 | 0 | (318,297) | 0 |
| Adjusted Capital and Surplus | (431,744) | (567,401) | (142,955) | (330,959) | (80,011) |
| Adjusted RBC | -1511% | -1924% | -5937% | -1589% | -7802% |

25.    The Utah Insurers challenged the emergency order, the SEFs, and have attempted to belatedly challenge various provisions of the Supervision Order.  Those challenges were consolidated in an ongoing administrative proceeding before an administrative law judge

appointed by the Commissioner.

26.     The Utah Insurers have stopped providing documentation to the Examiner and the Supervisor.   As a result, the Examiner does not have access to the documentation needed to continue its fair valuation analyses of the remaining level 3 investments selected for review.  In addition to the violations already discussed, the Utah Insurers' failure to provide this necessary documentation violates Utah Code § 31A-2-308 (i.e., failing to comply with an order of the Commissioner).

27.     The Utah Insurers are insolvent at least in the Adjusted Capital and Surplus amounts set forth in Table #2 above. Even so, the Utah Insurers continue to take actions that benefit management and their non-insurer affiliates, to the detriment of policyholders.  The Utah Code requires that the Utah Insurers be placed into rehabilitation to protect policyholders in Utah, policyholders in other states, and the public at large.

## JURISDICTION

28.     This Court has jurisdiction over the subject matter and is the proper venue for this proceeding under Utah Code §§ 31A-27a-105, 31A-27a-207 and 78B-3a-101 et seq.

29.     The Commissioner was duly appointed and, under the Utah Insurance Code, has powers, duties and responsibilities for company licensing, delinquency and receivership matters.  He is specifically authorized by Utah Code § 31A-27a-105 to file a petition for rehabilitation.

## THE PARTIES

30.     Sentinel is a Utah domiciled life insurance company selling polices to the public, National Association of Insurance Commissioners ("NAIC") company code number 68802, authorized to do business as a life insurance company by a certificate of authority issued by the Commissioner on September 1, 1948.

31.    Haymarket is a Utah domiciled reinsurance company, NAIC company code number 15828, authorized to do business as a life insurance company by a certificate of authority issued September 30, 2015, by the State of Nebraska and redomiciled to Utah by approval of the Commissioner on April 26, 2023.

32.    Jazz Re is a Utah domiciled captive reinsurance company, NAIC company code number 16156, authorized to do business as a captive insurance company by a certificate of authority issued by the Commissioner on April 13, 2017. Jazz Re is owned by Sentinel.

33.    Sentinel, Haymarket, and Jazz Re are subject to the Utah Insurer Receivership Act pursuant to Utah Code § 31A-27a-104(1)(e)(viii).

34.    Advantage Capital Holdings, LLC ("A-CAP Holdings"), owned by A-CAP, is NAIC Code 4864, a group of five insurance companies that includes the Utah Insurers and two South Carolina Insurers, Atlantic Coast Life Insurance Company and Southern Atlantic RE Inc. A-CAP provides common ownership and common executive management of the five insurers. The A-CAP Group Organizational Charts are attached Exhibit A.

35.    A-CAP Holdings owns 100% of A-CAP Management which is an SEC-registered investment advisor and, by contract, the investment manager for the Utah Insurers.

36.    A-CAP Holdings, through an entity named Advantage West, LLC, owns 100% of Sentinel. Advantage West, LLC is paid service fees by Sentinel.

37.    A-CAP Holdings, through an entity named Haymarket Holding I, LLC, owns 100% of Haymarket.

38.    Kenneth King, via A-CAP, is the ultimate owner and controlling party of the Utah Insurers. King, through holding companies, owns approximately 76% of the Utah Insurers. ACAP Group Organizational Charts, attached Exhibit A.

10

## STATEMENT OF FACTS

39.     The Commissioner is tasked with, among other things, (1) ensuring the solidity of insurers doing business in Utah, (2) ensuring that Utah has an adequate and healthy insurance market, and (3) encouraging loss prevention as part of the insurance industry. The Commissioner achieves these goals through the administration and enforcement of Utah's insurance laws and rules.

40.     On May 9, 2023, pursuant to Utah Code §§ 31A-2-203 and -204, the Commissioner ordered a full scope financial examination of the Utah Insurers for the period from January 1, 2020, through December 31, 2022, which was extended to December 31, 2023.

41.     The Commissioner retained an independent examiner and independent investment specialist and technical expert for the examination.

42.     The examination showed the Utah Insurers' investment portfolios included a disproportionately large number of high-risk investments which have a significant likelihood of default or an unstable credit profile.  High-risk investments include level 3 financial instruments which are difficult to value as they are not tied to any market to find comparable values. These investments are particularly susceptible to price volatility, interest rate fluctuations, and liquidity constraints. In addition to the above, there are substantial risks when a portfolio is overly concentrated in a single issuer.

43.     In response to those risks, substantive testing was performed to ensure that the Utah Insurers adhered to statutory accounting principles and legal requirements in valuing those investments.  An independent valuation specialist was engaged to value the Utah Insurers' investments in accordance with applicable accounting principles and valuation standards.

44.    Over forty (40) of the Utah Insurers' assets/investments were selected as part of the examination, including PAC Wagon, Flair, and JARM. A-CAP has refused to provide information for assessment of the over 30 investments.

45.    The Examiner has issued several SEFs to date and the examination remains ongoing.

46.    The impairments and other evidence demonstrate that the Utah Insurers were and are in a hazardous financial condition as described in Utah Admin. Code R590-265-4.

### 777 Re Examination

47.    On November 29, 2023, while the Department's examination was ongoing, King, on behalf of A-CAP, provided to the Department a "snapshot overview" of 777 Re investments and the 777 Re capital position. King asserted the following, among other things:

   a.    A-CAP had full transparency, and u/w [underwriting] review on all assets held by 777 Re;

   b.    Approximately 90% of the assets ceded to 777 Re by the Utah Insures were rated investment grade or better;

   c.    All 777 Re assets had been independently valued;

   d.    777 Re has approximately $430 million in capital and $25 million in comfort trust dedicated to the Utah Insurers' exposure;

   e.    777 Partners had a net valuation of approximately $1.5 billion; and

   f.    777 Re had audited financial statements.

48.    Concurrent with King's email to the Department, the Bermuda Monetary Authority ("**BMA**") was conducting an examination of 777 Re.  As a result of its examination findings, in November 2023, the BMA implemented various regulatory requirements against 777 Re arising

from significant concerns with 777 Re's corporate governance, its risk management and decision-making functions, and its inability to secure adequate capital and liquidity support from its ultimate parent, 777 Partners.

49.     Further, due to the materiality and seriousness of the issues identified by the BMA, and to ensure that policyholders were being protected and to assess 777 Re's management and shareholders' conduct, on November 20, 2023, the BMA issued a notice to 777 Re advising it of the appointment of a competent person to investigate 777 Re and report their findings to the BMA.

50.     As of December 31, 2023, the Utah Insurers had ceded over $1.7 billion in reserves to 777 Re.

51.     As early as January 2024, A-CAP executives, including King, Jill Gettman and Michael Saliba, were interviewed by representatives of the BMA as part of its ongoing 777 Re investigation.

52.     Effective September 6, 2024, the BMA cancelled the insurance registration of 777 Re.  It determined that 777 Re "was acting contrary to the prudent person principal with respect to investments in affiliated assets; breached of minimum criteria for registration such as inadequate corporate governance; imprudent business conduct; and failure to meet enhanced capital requirements arising from the failure of its parent company [777 Partners] to provide relevant contractual capital contributions, all of which were considered by the Authority [BMA] to not be in the best interests of…policyholders." Cancellation Attached hereto as Exhibit D.

## Utah Examination and Significant Examination Findings

53.     On April 10, 2024, the Commissioner issued a Hazardous Financial Condition Memorandum to each of the Utah Insurers stating that each is in "hazardous financial condition." The Memoranda are attached as Exhibits E, F, and G, and are incorporated herein.

54. On August 12, 2024, the Examiner issued a significant examination finding titled Analysis of Short-Term Investment Reporting Under SSAP 2R and NAIC Annual Statement Instructions ("**SEF 2**"). SEF 2 is attached as <u>Exhibit H</u> and incorporated herein.

55. On September 27, 2024, the Examiner issued a significant examination finding titled Significant Examination finding for Haymarket Insurance Company 'Haymarket,' Jazz Reinsurance Company 'Jazz,' Southern Atlantic Reinsurance Company 'Southern Atlantic,' Sentinel Security Life Insurance Company 'Sentinel,' and Atlantic Life Insurance Company 'Atlantic Coast,' together referred as 'A-CAP Insurers' ("**SEF 3**") including adjustments to reported capital and surplus related to Harvest's fair value assessments of the Flair, PAC Wagon and JARM investments. SEF 3 is attached as <u>Exhibit I</u> and incorporated herein.

56. The adjustments in SEF 3 included the following restatement to the Utah Insurers' capital and surplus as of December 31, 2023:

      a. Sentinel's capital and surplus fell from $130,478,003 (as reported) to ($143,106,666) (as adjusted);

      b. Haymarket's capital and surplus fell from $63,471,407 (as reported) to ($239,660,592) (as adjusted); and

      c. Jazz Re's capital and surplus fell from $3,083,242 (as reported) to ($138,740,748) (as adjusted).

57. Additional findings include: SEF 3a, which included Harvest's updated fair value assessments of the Flair, PAC Wagon, and JARM investments, SEF 4, SEF 5, and SEF 6. Copies of these findings are attached, respectively, as <u>Exhibits J, K, L, and M</u>, and are incorporated herein.

58. The Examiner issued additional significant examination findings on December 26, 2024. These findings are SEF 7, which included Harvest's fair Value Assessments of the Century,

Ensurem, and Phipps Investments, and SEF 8.  Copies of these findings are attached, respectively, as <u>Exhibits N and O</u>, and are incorporated herein.

59.    On December 27, 2024, the Examiner again adjusted the reported financial condition of the Utah Insurers resulting from previously issued SEFs.  A copy of this adjustment tracker is attached as <u>Exhibit P</u> and incorporated herein.

60.    The Examiner issued additional significant examination findings on February 6, 2025.  First, he issued Examination Finding #9-Affiliation relationship exists between Advantage Capital Holdings (A-CAP) and 777 Partners, Inc. ("**SEF 9**").  SEF 9 is attached as <u>Exhibit Q</u> and incorporated herein.

61.    Second, he issued Examination Finding #10- Full Impairment and Write-Off of 777 Partners Holding Company Note ("**SEF 10**").  SEF 10 is attached as <u>Exhibit R</u> and incorporated herein.

62.    These adjustments further adversely impacted the Utah Insurers' capital and surplus as of December 31, 2023:

     a.    Sentinel's capital and surplus fell from $130,478,000 (as reported) to ($431,744,000) (as adjusted);

     b.    Haymarket's capital and surplus fell from $63,471,000 (as reported) to ($567,401,000) (as adjusted); and

     c.    Jazz Re's capital and surplus fell from $3,083,000 (as reported) to ($142,955,000) (as adjusted).

63.    As a result, the Utah Insurers' capital is less than the mandatory RBC requirements found in Utah Code § 31A-17-601, causing the Utah Insurers to be at a mandatory control level.

## **Supervision**

64.    On April 10, 2024, the Commissioner issued a Notice of Agency Action and Order placing the Utah Insurers under supervision ("**Supervision Order**").  A copy of the Supervision Order is attached as <u>Exhibit S</u> and incorporated herein.

65.    In the Supervision Order, in accordance with Utah Code § 31A-27-503(3)(b)(i) through (vii), the Commissioner ordered the Utah Insurers to not, without prior approval from the Commissioner or the Supervisor:

   a.    transfer any of their assets or their business in force;

   b.    withdraw funds from any of their bank accounts;

   c.    end any of their funds;

   d.    invest any of their funds;

   e.    transfer any of their property;

   f.    incur any debt, obligation or liability other than in the ordinary and usual course of business; or

   g.    enter into any new reinsurance contract or treaty.

And ordered the Utah Insurers to:

   h.    recapture their reinsurance arrangements with 777 Re;

   i.    liquidate, to the fullest extent possible, specific investments as determined by the Department to have contributed to the breach of the single issuer limitation and hazardous financial condition determination;

   j.    on a monthly basis, (1) identify investments for which valuation inputs are not directly observable, including all level 3 investments as well as some level 2 investments; (2) engage an independent service provider for these investments to

16

provide independent fair market valuations, and (3) record and report the resulting

fair market values in accordance with statutory accounting principles;

k.    sever their relationships with 777 Re and 777 Partners;

l.    provide daily production reports and monthly deposit reconciliations; and

m.    be subject to such other measures as the Commissioner or supervisor

reasonably determines are necessary to adequately abate the conditions giving rise

to the supervision.

66.    The Utah Insurers had a statutory right to challenge the Supervision Order and the

reasons for the order under Utah Code § 31A-27-503. The Utah Insurers did not timely challenge

the Supervision Order.

67.    After consultation with, and approval by King, the Commissioner appointed Mike

FitzGibbons, FitzGibbons & Company, as supervisor ("**Supervisor**") to oversee the Utah Insurers'

compliance with the Supervision Order. As of the date of this filing the supervision is ongoing,

with certain issues pending before an administrative law judge appointed by the Commissioner as

Docket No. 2024-4609.[3]

68.    On October 21, 2024, the Supervisor directed the Utah Insurers to promptly cease

writing new business. Following a meeting between the Utah Insurers and the Department, on

November 14, 2024, the Supervisor amended his order to cease writing new premiums by

December 31, 2024.

**Emergency Order**

---

[3] Pursuant to Utah Code § 31A-27a-108(3), the filing of this Petition stays this administrative proceeding.

17

69.    On December 2, 2024, the Commissioner issued an emergency order pursuant to Utah Code §§ 31A-2-201(4)(a) and 63G-4-502 and Utah Admin. Code R.590-265-5(2) ("**Emergency Order**") on the basis that the Utah Insurers were and are in a hazardous financial condition. A copy of the Emergency Order is attached as <u>Exhibit T</u> and incorporated herein. The Emergency Order directed, among other things, that the Utah Insurers cease writing new business after December 31, 2024. The Commissioner has stayed this order.

### Financial Condition of Utah Insurers

70.    The deteriorating financial condition of the Utah Insurers is attributable to the following:

    a.    violation of the single issuer limitation through investments in 777 Partners and A-CAP;

    b.    overvalued impaired and/or affiliated investments valued at cost rather than fair value;

    c.    the recapture of the non-performing investments associated with the 777 Re agreement; and,

    d.    use of the Utah Insurers' capital by A-CAP to obtain benefits for A-CAP and its principals through high risk investments in affiliates of A-CAP.

### Single Issuer Limitation

71.    As of December 31, 2023, the Utah Insurers investments in the 777 Partners' portfolio companies greatly exceeds the 10% limitation imposed by Utah Code § 31A-18-106(2)(a)(i) as shown below, requiring adjustment of their investments and by reduction of their RBC as follows ($s in thousands):

| As of 12/31/2023 | Sentinel | Haymarket | Jazz RE |
|---|---|---|---|
| Admitted Assets | 1,214,616 | 3,602,341 | 3,125,876 |

| Single Issuer Limit | 215,659 | 377,947 | 343,297 |
|---|---|---|---|
| 777 Partners Investments | 268,632 | 1,323,866 | 510,226 |
| Single Issuer (Over) Under | (52,973) | (945,919) | (166,929) |
| RBC | -17615% | -3175% | -5931% |

72.     Insurance regulation, particularly solvency oversight, seeks to "limit" concentration of investments in a particular legal entity and a legal entity's' affiliates.  This is referred to as the "**Single Issuer Limitation**."  Under the Single Issuer Limitation, Utah Code § 31A-18-106(2)(a)(i), an insurer may not invest more than 10% of its asserts in a single entity, its affiliates, and subsidiaries.

73.     777 Re's failure brought attention to the insurer's concentration of investments in private credit of the 777 Partners' portfolio companies.

74.     On April 10, 2024, the Commissioner determined the Utah Insurers were in violation of the Single Issuer Limitation and issued a Financial Examination Exception Memorandum titled Single Issuer Limitation to the Utah Insurers regarding violations of the Single Issuer Limitations ("**SEF 1**"). SEF 1 is attached as Exhibit U and incorporated herein.

75.     On April 10, 2024, the Commissioner issued a Hazardous Financial Condition Memorandum to each of the Utah Insurers.  Each of these notifications states that the subject is in a "hazardous financial condition" and orders the Utah Insurers to liquidate 777 Partners-related investments to abate the Single Issuer Limitation problem. See Exhibits E, F, and G.

76.     The Utah Insurers' 777 Partners-related investments of $2.1 billion as of December 31, 2023, are not marketable at the value recorded by the Utah Insurers in the financial statements they filed with the Department. Despite the order to divest of these investments, and the Utah Insurers many submitted corrective action plans to do so, these same investments increased to $2.6 billion as of December 31, 2024.

77.    In lieu of liquidating these investments, A-CAP repackaged several 777 Partners' investments, attempting to distance the Utah Insurers from the legal entity entanglements within 777 Partners.  However, to do so, many of the former 777 Partners' investments are now considered A-CAP subsidiary, controlled, or affiliated investments, causing a concentration in both A-CAP related party investments and 777 Partners' investments as shown below.

| December 31, 2024 ($s in thousands) | Utah Insurers | | | South Carolina Insurers | |
|---|---|---|---|---|---|
| | Sentinel | Haymarket | Jazz Re | SAR | ACL |
| Admitted Assets | 1,912,571 | 3,013,309 | 4,118,053 | 2,941,631 | 1,636,780 |
| ACAP affiliates | 577,943 | 1,291,543 | 342,909 | 356,008 | 499,052 |
| 777 Partners and affiliates | 238,774 | 422,635 | 312,300 | 359,873 | 195,226 |
| Total ACAP and 777 Partners | 816,717 | 1,714,178 | 655,209 | 715,881 | 694,278 |
| % of Admitted Assets | | | | | |
| ACAP | 30.2% | 42.9% | 8.3% | 12.1% | 30.5% |
| Total ACAP and 777 Partners | 42.7% | 56.9% | 15.9% | 24.3% | 42.4% |

78.    Sentinel and Haymarket both exceeded the single issuer limitation as to A-CAP affiliates as of December 31, 2024.  If all 777 Partner affiliated investments are included (777 Partners and A-CAP considered affiliates), all three Utah Insurers violate the Single Issuer Limitation.

## Fair Value

79.    As part of the ongoing examination of the Utah Insurers, a valuation specialist reviewed certain 777 Partners' investments and determined their "fair values" in accordance with statutory accounting principles proffered by SSAP 100R.  Those accounting standards require investments that are impaired and, also, affiliated investments to be valued at fair value. The adjustments to investments from other than temporary impairments, and deviations from

statutory accounting standards SSAP 25 and SSAP 97 are as follows:

(in thousands)

| | 12/31/2023 | | | | |
| Investment | Utah Insurers | | | South Carolina Insurers | |
| | Sentinel | Haymarket | Jazz Re | ACL | SAR |
| Flair | 0 | (27,850) | (47,021) | 0 | (39,138) |
| PAC Wagon | (12,550) | (203,940) | (118,760) | 0 | (49,570) |
| JARM | 0 | (96,293) | 0 | 0 | 0 |
| Century | (2,219) | (11,356) | (821) | (1,846) | (833) |
| Sertroff/OMB/Sera | (12,559) | (30,887) | 0 | (11,326) | 0 |
| Phipps | 0 | (38,360) | 0 | 0 | 0 |
| Ensurem | (2,456) | (17,065) | 0 | (2,456) | 0 |
| **Total** | **(29,784)** | **(425,751)** | **(166,602)** | **(15,628)** | **(89,541)** |

80.    The impact of these fair valuations and the other adjustments on the capital and surplus of the Utah Insurers as of December 31, 2023, is as follows:

| December 31, 2023 (in thousands) | Utah Insurers | | | South Carolina Insurers | |
| --- | --- | --- | --- | --- | --- |
| | Sentinel | Haymarket | Jazz Re | ACL | SAR |
| **Recorded Capital and Surplus** | **130,478** | **63,471** | **3,083** | **111,126** | **1,813** |
| Adjustment to Investments | (107,807) | (613,942) | (170,590) | (129,997) | (89,541) |
| Investment in Subs | (3,083) | | | (1,813) | |
| Surplus Notes | | (22,791) | | | |
| A-CAP Holdco Loans | | (33,339) | | | |
| **Total Adjustments** | **(110,890)** | **(670,072)** | **(170,590)** | **(131,810)** | **(89,541)** |
| AVR Benefit | 10,178 | 39,200 | 24,552 | 8,022 | 7,717 |
| Loss of Reinsurance Credits | (461,510) | 0 | 0 | (318,297) | 0 |
| **Adjusted Capital and Surplus** | **(431,744)** | **(567,401)** | **(142,955)** | **(330,959)** | **(80,011)** |
| Adjusted RBC | -1511% | -1924% | -5937% | -1589% | -7802% |

81.    Utah Code § 31A-17-606 requires the Commissioner to take mandatory control of an insurer if its RBC falls below 70% of the statutorily required level of 300%.

82.    The examination has targeted an additional 30 plus suspect investments for fair valuation determination for which the Utah Insurers have failed to provide information.

83.    With negative capital and surplus in the hundreds of millions of dollars, the Utah

Insurers' admitted assets are far less than their liabilities.

84.     Based on the conditions of the Utah Insurers, the Utah Insurers are impaired, as defined in Utah Code § 31A-27a-102(21) and are insolvent as of December 31, 2023, as defined in Utah Code § 31A-27a-102(22).

85.     Because the Utah Insurers are impaired, if they write business at any point in the future, a consumer who buys a policy may not obtain the financial protection that the policy would be expected to provide. Being impaired, the Utah Insurers pose a risk of irreparable harm to themselves and their policyholders, creditors, and the public.

### Reinsurance Failures

86.     Reinsurance describes a contractual arrangement by which a primary insurance carrier, like Sentinel, writes and offers insurance policies or annuities to the public and then passes on or "cedes" certain of its insurance liabilities to a reinsurer such as Haymarket or Jazz Re. Those reinsurers in turn may then retrocede, *i.e.* reinsure by a reinsurer, their insurance liabilities by passing or ceding those liabilities to yet another reinsurer, like 777 Re. Here, 777 Re agreed to cover certain liabilities of Haymarket and Jazz Re, Haymarket and Jazz Re agreed to cover certain liability of Sentinel, and Sentinel remained in privity with and directly responsible to its policyowners.

87.     To avoid the need to increase its capital to continue writing new policies, Sentinel entered into reinsurance agreements with Haymarket and Jazz Re through which it reinsured over $5 billion of the liabilities it had undertaken.

88.     Haymarket and Jazz Re, in turn, reinsured $1.7 billion of their risk through agreements with 777 Re.

89.     As discussed above, the BMA cancelled the insurance registration of 777 Re effective September 6, 2024.

90.     The cascading effect of the demise of 777 Re has required Haymarket and Jazz Re to recognize the recapture of $1.7 billion in non-performing investments previously the responsibility of 777 Re. The loss of this reinsurance and the exposure to the related 777 Partners' investments that secured 777 Re reinsurance agreements has increased the capital requirements of the Utah Insurers and, as no additional capital has been acquired, their capital is insufficient under the Utah Insurance Code.

### Risk Based Capital

91.     Risk-based capital or RBC is a statutorily required regulatory tool measuring, through an assessment of various risks, including underwriting risk, investment risk, and other operational risk, the minimum level of capital an insurer must maintain to have sufficient capital to cover potential losses.  RBC focuses on insurers' risks compared to their capital and surplus levels and requires a level of capital for an insurer to continue to operate. Failure of an insurer to maintain the minimum levels of RBC requires regulatory action by the Commissioner under Utah Code §§ 31A-17-601 et seq.

92.     Due to the realized investment impairments, loss of reinsurance credits and recalculations of capital and surplus, the restated RBC for the Utah Insurers is, at best, - 1511% for Sentinel, - 1924% for Haymarket, and – 5937% for Jazz Re compared to the statutorily required positive percentage RBC placing these insurers at a mandatory level. Utah Code § 31A-17-606.

### Investment of Utah Insurer's Capital to Benefit A-CAP

93.     While the high-risk investment of the Utah Insurers' capital rendered them insolvent and left their capital severely impaired, A-CAP, its officers and affiliates have directly

23

and improperly benefitted from those investments.

94.    Those transactions include: investment management fees paid to A-CAP Management for high return, high risk investments in 777 Partners; investments made by A-CAP Management in violation of its investment management contracts with the Utah Insurers (Firmament Group, Flair Airlines, Nutmeg, Trans Atlantic Mortgage, Century, Caprice Capital, SPP Opportunities Fund, Ensurem LLC, HalseyPoint Asset Management, and Limited Film Finances); investments in 777 Partners companies in exchange for compensation paid directly to A-CAP (Nutmeg); an investment through the 777 Holdco Loan of $10 million to 777 Partners for which 777 Partners made a $9 million balloon payment loan to a limited liability company owned by King with which a condominium was purchased in Miami (A Miami LLC); and mortgage loans to officers of A-CAP in the amount of over $7 million with repayment tied to A-CAP bonuses (Mortgages to A-CAP Officers). These transactions are described in Appendix B, the allegations of which are incorporated herein.

## Violation of the Supervision Order

95.    At the inception of the Supervision Order the Supervisor, in the spirit of operating efficiency and cooperation, informed A-CAP it was not necessary to seek preapproval of ordinary course operating expenses.  However, A-CAP was to seek approval, in advance, for non-ordinary course or non-recurring expenses and costs.  Moreover, all investments required preapproval.

96.    The Utah Insurers violated the Supervision Order.

97.    On multiple occasions, the Utah Insurers made investments in Flair via PAC Wagon without approval of the Supervisor as detailed below:

| | Utah Insurers | | South Carolina Insurers | |
|---|---|---|---|---|
| Date | Haymarket | Jazz Re | SAR | Total |
| 4/26/2024 | - | - | 10,000,000 | 10,000,000 |
| 5/3/2024 | - | - | 5,000,000 | 5,000,000 |
| 5/7/2024 | - | 5,000,000 | - | 5,000,000 |
| 5/10/2024 | - | 3,000,000 | 4,500,000 | 7,500,000 |
| 5/17/2024 | 5,000,000 | - | - | 5,000,000 |
| 5/21/2024 | 6,250,000 | - | 6,250,000 | 12,500,000 |
| **Total** | **11,250,000** | **8,000,000** | **25,750,000** | **45,000,000** |

98.    On multiple occasions, the Utah Insurers made investments in Nutmeg without approval of the Supervisor:

| | Utah Insurers | South Carolina Insurers | |
|---|---|---|---|
| Date | Jazz | SAR | Total |
| 5/9/2024 | 1,500,000 | 3,500,000 | 5,000,000 |
| 5/10/2024 | 3,500,000 | 6,500,000 | 10,000,000 |
| **Total** | **5,000,000** | **10,000,000** | **15,000,000** |

99.    The Utah Insurers also made new investments without the approval of the Supervisor:

| Investment | Date | Utah Insurers | | | South Carolina Insurers | | Total |
|---|---|---|---|---|---|---|---|
| | | Sentinel | Haymarket | Jazz Re | ACL | SAR | |
| EETC Term B Loan | 8/8/2024 | - | - | - | - | 8,544,889 | 8,544,889 |
| Factoring Facility | 12/12/2024 | 20,000,000 | - | - | - | - | 20,000,000 |
| PAC Engine Short Term | 11/26/2024 | - | 8,805,080 | - | - | - | 8,805,080 |
| PAC Engine Short Term | 12/12/2024 | 15,000,000 | - | - | - | - | 15,000,000 |
| PAC Short Term Loan | 9/4/2024 | - | - | 4,000,000 | - | 11,400,000 | 15,400,000 |
| PAC Short Term Loan | 12/6/2024 | - | 6,500,000 | - | 35,241,692 | - | 41,741,692 |
| ZEPHYRUS | 10/1/2024 | - | - | 3,400,000 | 28,200,000 | - | 31,600,000 |
| | **Total** | **35,000,000** | **15,305,080** | **7,400,000** | **63,441,692** | **19,944,889** | **141,091,661** |

100.    On December 23, 2024, a Form D filing was submitted to the Utah Insurance Department requesting approval for a transaction whereby the South Carolina affiliate Atlantic Coast would recapture certain business ceded to Haymarket. After review and consultation of the Form D request between the Supervisor and the Department the Form D was denied on December 30, 2024. Haymarket completely disregarded this denial and recognized the recapture by Atlantic Coast on its

25

December 31, 2024 annual financial statements filed with the Department on March 10, 2025. The amount of this transaction was $373.6 million.

101.     Further, the Utah Insurers funded aviation costs and legal fees that were deemed not in the ordinary course and were not approved by the Supervisor as follows:

|  | Date | Utah Insurers | | South Carolina Insurers | Total |
|---|---|---|---|---|---|
|  |  | Sentinel | Haymarket | ACL |  |
| Aviation | 3Q24 | 414,113 | 414,113 | 414,113 | 1,242,339 |
| Legal fees | 3Q24 | 851,323 | 152,412 | 386,626 | 1,390,361 |
| **Totals** |  | **1,265,436** | **566,525** | **800,739** | **2,632,700** |

102.     The Utah Insurers funded aviation costs related to Phoenix Aviation Capital LLC ("PAC") airplane costs, including Bonza (a failed Australian airline owned by 777) repossession costs.  These costs should have been funded by PAC, a wholly owned subsidiary of A-CAP Holdings.  These expenses were not in ordinary course and were not submitted to the Supervisor, and accordingly, the payments were made without approval.  These expenses would not have been approved by the Supervisor.

103.     The Utah Insurers stated these unapproved expenses would be repaid by December 31, 2024, but failed to do so.  The Utah Insurers have now asserted that payment will occur by March 1, 2025. The Utah Insurers have not provided evidence that the unapproved expenses have been repaid.

104.     As for the unapproved legal fees, the Utah Insurers provided redacted legal invoices to the Supervisor with the descriptions "Project Big Ben, TAMI, Asset Restructure, Flair Airlines, Bridge Loan, Structured Settlement, Nutmeg, Everton Financing, and Sale of Red Star."  Due to redactions, the Supervisor could not confirm if these were in fact ordinary expenses of the Utah Insurers.  The Utah Insurers have yet to provide unredacted legal invoices nor will they provide engagement letters in the name of the Utah Insurers supporting these legal fees.  As such, the

Supervisor has deemed that these legal fees were not in the ordinary course and has not approved them.

105.    The Supervisor has requested a full accounting of such legal fees back to the date of the Supervision Order. The Utah Insurers have failed to provide this information.

106.    On November 20, 2024, the Supervisor directed the Utah Insurers to make no further "incentive payments" related to Investment Management Agreements without Supervisor approval. On December 16, 2024, the Supervisor directed the Utah Insurers that all expenses in excess of $25,000, even those in the "ordinary course," must be approved by the Supervisor. The Utah Insurers were again reminded on December 30, 2024. To date, no expenses have been presented for approval, demonstrating that the Utah Insurers do not intend to comply with the Supervisor's orders or requests.

107.    The Utah Insurers have stopped providing the needed documents to permit the completion of the examination, including documentation to complete the fair valuation of the remaining 30 plus level 3 investments. If completed, these examinations are expected to further deepen the insolvency of each of the Utah Insurers.

108.    The Utah Insurers have willfully violated the Supervision Order.

## Violation of Regulatory Requirements

109.    Beyond failing to comply with the Supervision Order, the Utah Insurers have recently flouted mandatory regulatory requirements applicable to all insurance companies licensed to sell insurance in Utah. Specifically:

   a.    Utah Admin. Code R590-70-18 requires insurers to give notice to the Department of certain proposed transactions. On October 4, 2022, in correspondence with Sentinel, the Department informed Sentinel that "any bonuses or changes in

salary for Mr. King shall require a prior notice of the proposed transaction as outlined in Utah Admin. Code R590-70-18." On March 10, 2025, the Utah Insurers submitted December 31, 2024 annual financial statements to the Department. Those statements disclosed that in 2024, King was paid a $3 million bonus. Sentinel failed to seek approval for the transaction from the Department in violation of Utah Admin. Code R590-70-18. Moreover, the 2024 bonus to King was paid in a year where Sentinel experienced a 54% decrease in net income, while King realized a 79% net increase in total compensation. This bonus never would have been approved by the Department had it been filed as required.

b.  Utah Code § 31A-16-106(b)(i) requires that transactions between affiliated entities which exceed 3% of the insurer's admitted assets "may not be entered into unless the insurer has notified the commissioner in writing of its intention to enter into the transaction at least 30 days" beforehand. The March 10, 2025 disclosure of the Utah Insurers annual financial statements revealed that on December 31, 2024, Haymarket recorded a $476.6 million recapture of reinsurance by Sentinel. In violation of Utah Code § 31A-16-106(b)(i), neither Haymarket nor Sentinel provided the required notice.

**Grounds for Rehabilitation**

110.    The Utah Insurer Receivership Act, Utah Code § 31A-27a-207, sets forth the grounds under which an order for rehabilitation may be sought.

111.    The Commissioner has reasonable cause to believe that the Utah Insurers:

a.  Are impaired in violation of Utah Code §§ 31A-27a-102(21), and 31A-27a-207(1)(a);

b.  Are insolvent within the meaning of Utah Code § 31A-27a-102(22) and in violation of Utah Code § 31A-27a-207(1)(b);

c.  Have violated Single Issuer limitations in violation of Utah Code §§ 31A-18-106(2)(a) and 31A-27a-207(1)(p)(3);

d.  Neglected or refused to comply with an order of the commissioner to make good within the time prescribed by law any deficiency; or if a stock company, if its capital and minimum required surplus is impaired in violation of Utah Code § 31A-27a-207(1)(d);

e.  Within the previous five years have willfully and continuously violated an insurance law of this state; or a valid order of the commissioner in violation of Utah Code § 31A-27a-207(1)(p).

f.  are at an RBC mandatory control level in violation of Utah Code §§ 31A-17-606 and 31A-27a-207(1)(v);

g.  are in such a condition that the further transaction of business would be hazardous financially, according to § 31A-17-609(3), or otherwise, to its policyholders, creditors, or the public in violation of Utah Code § 31A-27a-207(1)(i);

h.  its parent companies (A-CAP), its subsidiaries, or its affiliates have converted, wasted, and/or concealed property of the Utah Insurers in violation of Utah Code § 31A-27a-207(1)(e);

i.  at any time after the issuance of an order under § 31A-2-201(4), or at the time of instituting a proceeding under this chapter, it appears to the commissioner that upon good cause shown, it is not in the best interest of the policyholders,

29

creditors, or the public to proceed with the conduct of the business of the insurer in violation of Utah Code § 31A-27a-207(1)(h);

j.   there is reasonable cause to believe that there has been forgery or fraud affecting the Utah Insurers, or other illegal conduct in, by, or with respect to the Utah Insurers; and the act would endanger assets in an amount threatening the solvency of the Utah Insurers in violation of Utah Code § 31A-27a-207(1)(j)(i) and (ii);

k.   its parent company, its subsidiary, or its affiliate have concealed, removed, altered, destroyed, and/or failed to establish and maintain records and other pertinent material adequate for the determination of the financial condition of the Utah Insurers by examination under Utah Code § 31A-2-203 in violation of Utah Code § 31A-27a-207(1)(g)(i);

l.   after demand by the commissioner under § 31A-2-203 or under this chapter, have failed to promptly make available for examination any of its own property, accounts, or records; or so far as it pertains to the insurer, property, accounts or records of a subsidiary or related company within the control of the insurer; or a person having executive authority in the insurer in violation of Utah Code § 31A-27a-207(1)(m); and

m.   within the previous five years have willfully and continuously violated an insurance law of this state; or a valid order of the commissioner in violation of Utah Code § 31A-27a-207(1)(p).

### Necessity for Rehabilitation Order

112.   The continued operation of the Utah Insurers in their current financial condition

could substantially increase the risk of loss to policyholders and creditors of the Utah Insurers, and the public. The rehabilitation of the Utah Insurers would therefore be in the best interests of policyholders and creditors of the Utah Insurers, and the public.

113.    The information, property, assets, business records, and other materials of the Utah Insurers are subject to removal, destruction, dissipation, diminution, depletion, alteration by the Utah Insurers' and A-CAP's officers, directors, trustees, agents, employees, affiliates, agents, sub-agents, and persons participating with them, or acting in concert with them, if they are not enjoined from doing so, and if the above-referenced property, information, and materials are not placed in the possession and control of the Rehabilitator, and are not protected.

114.    It is necessary that the Rehabilitator take possession of the property, assets, books, accounts, documents, and other records of the Utah Insurers, to prevent further prejudice to the interests of policyholders and creditors of the Utah Insurers, and the public.

115.    With the statutory powers set forth by the Rehabilitation, the Commissioner, as rehabilitator, will be able to assess the condition of the Utah Insurers, and determine if the Utah Insurers should be returned to their current owners, or sold, or placed into liquidation, and to make such a recommendation to the Court.

116.    In view of the foregoing, it is in the best interests of policyholders and creditors of the Utah Insurers, and the public, for the Court:

    a.    To issue a rehabilitation order, and to appoint the Commissioner, and his successors in office, as Rehabilitator of the Utah Insurers;

    b.    To find and declare that sufficient grounds exist under Utah Code § 31A-27a-207 to place the Utah Insurers in rehabilitation;

    c.    To enjoin, in conjunction with the issuance of the rehabilitation order, the

Utah Insurers and its current directors, officers, managers, affiliates, trustees, agents, sub-agents, employees, and all persons participating with them or acting in concert with them, from removing the assets of the Utah Insurers from their current depositories, or otherwise converting, changing or modifying title to the assets, withdrawing or removing the assets; and

d.   To enjoin, in conjunction with the issuance of the rehabilitation order, the Utah Insurers and their current directors, officers, managers, affiliates, trustees, agents, sub-agents, employees, and all persons participating with them or acting in concert with them, from removing, destroying or altering the books and records or other information of the Utah Insurers.

117.   The Rehabilitator will need assistance in rehabilitating the Utah Insurers and desires to appoint and recommends that the Court approve the appointment of Michael FitzGibbons, FitzGibbons & Company, Inc., as a special deputy rehabilitator, including assistant deputy rehabilitator Joshua Andersen, pursuant to Utah Code § 31A-27a-209(3).

### TEMPORARY INJUNCTIVE RELIEF

118.   Utah Code § 31-27a-108(1) provides: "The receivership court may issue an order, process, or judgment including stays, injunctions, or other orders necessary or appropriate to carry out this chapter[.]"

119.   Utah Code § 31 A-27a-202(3) provides that a petition that seeks injunctive relief must be verified by the Commissioner, and "is not required to plead or prove irreparable harm or inadequate remedy at law. "

120.   If a temporary restraining order is requested in a verified petition, "the receivership court may issue an initial order containing the relief requested." Utah Code § 31A-27a-202.

121.    Here, the purpose of the temporary injunctive relief is to preserve the status quo by requiring the Utah Insurers to comply with the Supervision Order, and to protect Utah citizens by reinstatement of the Emergency Order, until the Rehabilitation Order can be issued.

122.    The Commissioner has a strong likelihood of success on its Petition for Rehabilitation. To date, the examination has detailed multiple significant examination findings, which include:

      a.   Violations of the single issuer limitation (i.e., investment limitations);

      b.   Material misstatements in reporting short-term investments;

      c.   Material misstatements in fair value measurements of financial instruments;

      d.   Failure to recognize, record, and report material impairments of financial instruments;

      e.   Material misstatements of fair value disclosures;

      f.   Material misstatements of reporting for subsidiary, controlled, and affiliated entities;

      g.   Material misstatements in reporting of related party transactions; and

      h.   Material misstatement of affiliation and related party disclosures.

123.    Pursuant to Utah Code § 31A-27a-204(4), the facts contained within the SEFs are presumed true.

124.    Further, the potential for harm exists should the temporary injunctive relief not be issued. As detailed above, the Commissioner is aware of several instances where the Utah Insurers have failed to comply with the Supervision Order and even disregarded standard regulatory requirements of all insurance companies licensed to sell insurance in Utah. The Utah Insurers' disregard for the Supervision Order and the Insurance Code as a whole raises serious concerns

should the TRO not be issued.

125.    Finally, the issuance of the requested injunctive relief, if issued, would not be adverse to the public interest. In fact, the requested injunctive relief preserves the public interest by protecting the information, property, assets, business records, and other material of the Utah Insurers so the rehabilitation of the Utah Insurers may be accomplished.

126.    Thus, the Commissioner requests temporary injunctive relief until entry of the Rehabilitation Order requiring the Utah Insurers' full compliance with the Supervision Order, and all orders of the Supervisor under that order, and recognizing the stay of all actions relating to the Utah Insurers under Utah Code § 31A-27a-108(3), including the pending administrative hearing, Docket No. 2024-4609.

127.    Pursuant to Utah Code § 31A-27a-202, a proposed order granting the requested temporary injunctive relief has been filed contemporaneously herewith.

**WHEREFORE,** the Commissioner prays that the Court issue an order declaring that:

1.    Sufficient grounds exist under Utah Code § 31A-27a-207 to place the Utah Insurers in rehabilitation;

2.    The Commissioner and his successors in office are appointed as Rehabilitator of the Utah Insurers ("**Rehabilitator**") under Utah Code § 31A-27a-301, with all powers provided by the Utah Insurance Code.

3.    The Rehabilitator shall take possession of the property of the Utah Insurers and administer the property in accordance with Utah Code § 31A-27a-301(1)(a)(ii).

4.    The Rehabilitator, pursuant to Utah Code § 31A-27a-301(1)(a)(ii), is vested by operation of law with the title to all of the assets, property, contracts, all rights of action, and all records of the Utah Insurers, wherever located, as of the date of the Rehabilitation Order, and the

Rehabilitator is directed to take possession of all assets, property, contracts, rights of action, and records of the Utah Insurers, and to administer them pursuant to the provisions of Utah Code § 31A-27a-101 et seq., and pursuant to any further orders of the Court.

5.      The Rehabilitator has authority to do all acts necessary or appropriate to accomplish the rehabilitation of the Utah Insurers pursuant to Utah Code § 31A-27a-301.

6.      The Rehabilitator has the powers specifically set forth in Utah Code § 31A-27a-302.

7.      The Rehabilitator may pursue all appropriate legal remedies on behalf of the Utah Insurers; and the Rehabilitator is directed to assert all defenses available to the Utah Insurers as against a third party.

8.      All actions and all proceedings are stayed as against the Utah Insurers in Utah, and elsewhere, pursuant to Utah Code § 31A-27a-108, subject to the limitations of Utah Code § 31A-27a-108(4)(b), including the administrative proceedings presently pending with regard to the Utah Insurers, including Docket No, 2024-4699 and 2024-4609.

9.      The Rehabilitator shall exercise any and all rights of the Utah Insurers in connection with any collateral or other assets being held for the benefit of the Utah Insurers by any person or entity, including any and all trustee accounts and other accounts.

10.     Pursuant to Utah Code § 31A-27a-209(3)(a), the Rehabilitator is authorized to appoint one or more special deputy Rehabilitators: (1) with all powers and responsibilities of the Rehabilitator granted under Utah Code § 31A-27a-209, unless specifically limited by the Rehabilitator; and (2) who serves at the pleasure of the Rehabilitator. The Rehabilitator may employ or contract with additional persons, as provided by Utah Code § 31A-27a-209(3)(c), with the Court retaining jurisdiction over compensation fixed by the Rehabilitator.    Compensation of the

aforementioned persons and cost of administering the rehabilitation are not claims, shall be paid from the Utah Insurers' funds or assets, and shall be paid at the Rehabilitator's discretion.

11.    The Rehabilitator's appointment of Michael FitzGibbons, FitzGibbons & Company, Inc. as a special deputy rehabilitator, including assistant deputy rehabilitator Joshua Andersen, pursuant to Utah Code § 31A-27a-209(3).

12.    All persons and entities are enjoined, subject to Utah Code § 31A-27a-108, including but not limited to, the Utah Insurers' directors, officers, trustees, manager, agents, subagents, employees, affiliates, policyholders, attorneys, and any person participating with them or acting in concert with them, other than as directed by the Rehabilitator, from:

   a. The commencement or continuation of a judicial, administrative, arbitration proceeding, or other action or proceeding against the Utah Insurers that was or could have been commenced before the rehabilitation proceeding, or to recover a claim against the Utah Insurers that arises before the commencement of the rehabilitation proceeding;

   b. The enforcement against the Utah Insurers or against property of the Utah Insurers of a judgment obtained before rehabilitation;

   c. An act to transfer, waster, dissipate, obtain or retain any bank accounts, property, assets or records of the Utah Insurers or an act that interferes with the Rehabilitator's possession, custody or control of same;

   d. An act to maintain, create, perfect, or enforce a lien, preference, judgment, attachment or garnishment against property of the Utah Insurers or to obtain possession or repossession of such property;

   e. An act to collect, assess or recover a claim against the Utah Insurers that arises before the commencement of rehabilitation;

f.  The commencement or continuation of an action or proceeding against a reinsurer of the Utah Insurers by the holder of a claim against the Utah Insurers and seeking a reinsurance recovery that is contractually due to the Utah Insurers;

g.  The commencement or continuation of an action or proceeding to terminate or revoke an insurance license;

h.  Removing, destroying or altering the books and records or other information of the Utah Insurers;

i.  Removing the assets of the Utah Insurers from their current depositories, or otherwise converting, changing or modifying title to the assets, withdrawing or removing the assets; and

j.  An action, described in Utah Code § 31A-27a-108(3)(h)(ii), with respect to a contract, agreement, or lease including (i) a policy; (ii) an insurance or reinsurance contract; (iii) a surety bond; or (iv) a surety undertaking, whether or not the Utah Insurers is a party to the contract, agreement, lease, policy, bond, or undertaking; and, if the sole basis for the action is that the Utah Insurers is the subject of a delinquency proceeding or that one or more of the Utah Insurers' licenses have been suspended or revoked because the insurer is the subject of a delinquency proceeding.

13.  All secured creditors or parties, pledgees, lien holders, collateral holders or other persons claiming a secured, priority, or preferred interest in any property or assets of the Utah Insurers are enjoined from taking any steps whatsoever to transfer, sell, encumber, attach, dispose of or exercise purported rights in or against any property or assets of the Utah Insurers without the prior approval of the Rehabilitator.

14.    The Rehabilitator and special deputy are entitled to immunity and indemnification as set forth in Utah Code § 31A-27a-114.

15.    All rights and liabilities of the Utah Insurers and its creditors, policyholders, members and all other persons are fixed as of the date of entry of this order.

16.    The Rehabilitator shall file a report with the Court on the status of the Utah Insurers within 180 days after the date of this Order and every calendar quarter thereafter unless the Court orders otherwise.  The status report shall be filed within 45 days after the end of each quarter unless the Court orders otherwise.

17.    No suit, action, proceeding or claim at law or in equity or any kind shall be brought, maintained, or further prosecuted or present on behalf of or in the name of the Utah Insurers without proper authorization of the Rehabilitator.

18.    The Rehabilitator may enter into contracts necessary to carry out the rehabilitation and may accept or reject contracts to which the Utah Insurers is a party.

19.    The Rehabilitator is authorized to dispose of records not necessary for the rehabilitation without further Court order.

20.    Providing that, upon petition by the Rehabilitator stating that further efforts to rehabilitate Respondent would substantially increase the risk of loss to creditors, policyholders, or the public or would be futile, this Court will consider entry of an Order of Liquidation of Respondent in accordance with Utah Code § 31A-27a-304(1)(a).

21.    Providing that the rehabilitation may be otherwise terminated as provided in Utah Code § 31A-27a-304(3).

22.    Providing that this Court shall retain jurisdiction of this cause for the purpose of granting such other and further relief as from time to time may be necessary and appropriate.

23.    Such other relief as the Court may deem necessary to carry out the rehabilitation shall be ordered.

DATED this 21st day of March, 2025.

FABIAN VANCOTT

*Scott M. Lilja*
Scott M. Lilja
David P. Billings
Sarah C. Vaughn
*Attorneys for Utah Insurance*
*Commissioner Jonathan T. Pike*

## VERIFICATION

I declare under penalty of perjury that the foregoing Verified Petition for Rehabilitation Order and for Temporary Injunctive Relief and the following Appendices A and B are true and correct to the best of my knowledge.

DATED this 21st day of March, 2025.

*/s/ Jonathan T. Pike*
Jonathan T. Pike, Utah Insurance Commissioner
Signed electronically by Scott M. Lilja
with permission of Plaintiffs

39

# APPENDIX A

### The Holdco Loan

1.      Beginning in February 2022, the Utah Insurers provided a loan to 777 Partners in the form of a credit facility known as the 777 Holdco loan (the "**777 Holdco Loan**"). The initial 777 Holdco Loan balance approximated $46 million with a maturity date of less than one year.

2.      Since its origination, the 777 Holdco Loan has been amended on more than 100 occasions and the outstanding balance has grown to over $500 million[4] as of December 31, 2023, of which $270 million relates directly to the Utah Insurers. The loan proceeds were used for, among other things, 777 Partners' payroll, office rent, payments to subordinate creditors, litigation expenses, failed portfolio companies, and other expenditures that fail to provide the Utah Insurers with tangible collateral. The underlying collateral for the Holdco loan is 'all assets.'

3.      According to 777 Partners' unaudited financial statements, 777 Partners has had net losses of $598.5 million and $500.4 million for the year ending December 31, 2022, and the nine months ending December 2023, respectively. As of September 30, 2023, 777 Partners has negative equity of approximately $767.9 million. 777 Partners is insolvent. The full impairment impact to Utah Insurers is $270 million.

### The JARM Loan

4.      Beginning on or around December 2020, the Utah Insurers provided a loan to JARM Capital LLC ("**JARM**") in the form of a credit facility known as the JARM loan (the "**JARM Loan**"). The initial JARM Loan balance approximated $45 million with a maturity date of less than one year.

5.      JARM does not have any ordinary business operations but is simply a shell company for 777 Partners' co-CEO Joshua Wander.

---

[4] This figure includes accrued interest and amounts held by A-CAP Holdings-controlled special purpose vehicles AAV2024 LLC and HCAV2023 LLC, of which Utah Insurers hold $189 million and $208 million of debt, respectively.

6.      Since its origination, the JARM Loan has been amended on more than eight occasions and the outstanding balance has grown to over $190 million[5] at December 31, 2023, of which $116 million relates directly to the Utah Insurers.  The underlying collateral for the JARM loan was Wander's ownership interests in 777 Partners.

7.      Wander is a defendant in numerous civil complaints related to his role as an officer of 777 Partners.  Wander resigned from 777 Partners and certain affiliates in or around May 2024.

8.      A-CAP has not provided their own independent fair valuation of JARM as required by the examiner.

9.      The Supervisor, with the assistance of the Examiner, noted transactions that were suspect both in terms of economic benefits accruing to A-CAP Holdings and A-CAP Management in violation of certain investment management agreements and questionable management practices.  As a result, certain transactions were selected for examination.

### The Flair Airlines Loan

10.      In or around May 2021, the Utah Insurers began extending loans to Flair Airlines (the "**Flair Loans**") with a contractual maturity date of May 13, 2024.  Since origination, the Flair Loans have been amended on at least twenty occasions; including additional advances, capitalization of unpaid interest and maturity extensions.  The Utah Insurer loans to Flair Airlines ("**Flair**") at inception amounted to $20 million.  A-CAP loans now exceed $245 million as of December 31, 2024, of which $200 million relates directly to Utah Insurers.

### The Phipps Loan

11.      The Phipps loan was issued in 2019 by 777 Partners affiliate Employee Funding of America as a high- interest, prime plus 18% increasing to prime plus 24.5%, $75 million delayed

---

[5] This figure includes accrued interest and amounts held by A-CAP Holdings-controlled special purpose vehicle HCAV2023 LLC, of which Utah Insurers hold $208 million of debt.

draw loan. The loan was restructured in February 2023 and the loan balance, having been inflated by unpaid interest, had reached $125.9 million. Haymarket assumed the loan for steep discount of $48 million.  No principal or interest payments have ever been made on the loan and the loan is impaired.

# APPENDIX B

## 1. Investment Management Incentive Fees

12.     A-CAP Management, an affiliate of the Utah Insurers, is a Securities and Exchange Commission ("**SEC**") registered investment adviser. Under the Investment Advisers Act of 1940 ("**Advisers Ac**t"), A-CAP Management is considered a fiduciary. The fiduciary duty an investment adviser owes its client under the Advisers Act includes a duty of loyalty. The duty of loyalty requires that an adviser serve the best interest of its clients; subrogate its own interests to that of its clients; and fully disclose and eliminate or mitigate conflicts of interest.

13.     A-CAP Management is engaged by the Utah Insurers as their investment manager. The investment management agreements ("**Investment Management Agreements**") between A-CAP Management and each insurer provide for base compensation and performance-based fees payable to A-CAP Management. The performance-based compensation structure is earned and calculated based on "cash flows" attributable to capital gains / losses, interest proceeds, principal proceeds and impairment charges.

14.     The ongoing examination evidenced substantial performance-based compensation payments being made on 777 Partners and A-CAP affiliated loans that were non-performing, in default, and failed to generate contractual cash flows, if any at all.

15.     For example, for the year-end 2023, these performance-based fees related to the following non-performing loans exceeded more than $15 million, almost entirely related to Utah Insurers:

- 777 HoldCo (777 Partners affiliate)
- Century Debt Settlement (A-CAP Holdings affiliate)
- Hertha Term Loan (Nutmeg Acquisition / 777 Partners-related)
- JARM Loan (777 Partners affiliate)
- Noble Financial Solutions (collateral: 777 Partners preferred stock)
- Phipps Litigation Senior (777 Partners-related)
- Triple 7 Finance Loan (777 Partners affiliate)

45

16.    Additionally, the Investment Management Agreements limit A-CAP Management's compensation, related to transactions involving the insurer portfolios. These agreements specify that A-CAP Management's compensation is restricted to the base and performance-based fee components only and explicitly state that A-CAP Management shall not receive any additional financial benefits from any transaction in the account.

17.    The ongoing examination has evidenced that A-CAP Management and its parent company, A-CAP Holdings have systematically extracted excessive fees, equity, stock options and warrants, as well as other economic benefits through transactions in direct violation of the Investment Management Agreements. These violations occurred while the Utah Insurers committed billions in purchase transactions to undisclosed related parties and agreed to debt restructuring transactions for non-performing loans.

## 2. Firmament Group

18.    Firmament Group ("**Firmament**") is a private investment firm based in New York. In or around March 2023, an A-CAP Holdings affiliate, PACA FRMT II LLC ("**PACA FRMT II**") entered into a series of complex transactions with Firmament designed, in part, to provide financial benefits to A-CAP Holdings and King in violation of Investment Management Agreements with the Utah Insurers.

19.    First, Firmament Cap Credit LLC ("**Cap Credit**") was formed. The Utah Insurers' relationship with Cap Credit was to provide funding for the Cap Credit fund for which the Insurers would receive a 6% annual return on the invested funds.

20.    Second, Firmament Cap Advisors LLC ("**Cap Advisors**") was simultaneously formed as another A-CAP Holdings affiliate. Cap Advisors is the manager of Cap Credit. In its capacity as manager, Cap Advisors receives an annual management fee equal to 1.00% of the

amounts invested by Cap Credit. Cap Advisors is also entitled to structuring fees for each investment. A-CAP Holdings' affiliate, PACA FRMT II received a 50% ownership interest in Cap Advisors.

21.    A-CAP Holdings, on behalf of the Utah Insurers, made a binding capital commitment of $1 billion to Cap Credit and an additional $1 billion commitment to new Firmament investment vehicles. In consideration of the $2 billion commitment, PACA FRMNT II (an affiliate of A-CAP Holdings) received a 50% interest in Cap Advisors. Utah Insurers invested directly and indirectly in loans to Cap Credit and Firmament investment vehicles and portfolio companies.

22.    The potential scale of the economic benefits diverted to A-CAP Holdings are significant. For example, should the Utah Insurers meet their commitment to provide $2 billion in funding to Cap Credit, the management fee payable to Cap Advisors would approximate $20 million per year; of which PACA FRMT II would be entitled to $10 million. Further, A-CAP Holdings, through its ownership of Cap Advisors, would also receive additional, substantial compensation in the form of carried interest (i.e., a portion of the appreciation of the Cap Credit investments).

23.    Certain A-CAP Holdings executives play an active management role in the Firmament fund. Notably, King and Edward Zhu, head of private credit, hold two of the three seats on Cap Advisors' investment committee. In this capacity, King and Zhu have effective control of the investment decisions on behalf of Cap Credit.

24.    Cap Advisors filed its most recent Form ADV with the SEC on March 24, 2024. To further demonstrate A-CAP Holdings' influence and control over the Cap Credit fund, in this filing, PACA FRMT is listed as a "control person:"

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| SMITH, CHRISTOPHER, DENNIS | I | FOUNDING PARTNER | 11/2022 | NA | Y | N | 2784478 |
| Palacios Hardy, Marie Isabelle | I | CHIEF COMPLIANCE OFFICER / GENERAL COUNSEL | 01/2023 | NA | Y | N | 7689430 |
| FIRMAMENT CAP MANAGERS, LP | DE | MANGER / MEMBER | 03/2023 | D | Y | N | |
| PACA FRMT II LLC | DE | MEMBER | 03/2023 | D | Y | N | |
| Boyd, Parris | I | PARTNER | 11/2022 | NA | Y | N | 7710883 |
| SARDELLI, ROWENA, NMN | I | CHIEF FINANCIAL OFFICER | 09/2023 | NA | Y | N | 4853567 |

25.     Also included in the SEC filing is a disclosure that PACA FRMT, A-CAP Holdings, Advantage Capital Partners LLC and King are indirect owners of the Firmament entity:

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| FIRMAMENT CAP GP, LLC | DE | FIRMAMENT CAP MANAGERS, LP | GENERAL PARTNER | 02/2023 | F | Y | N | |
| SMITH, CHRISTOPHER, DENNIS | I | FIRMAMENT CAP GP, LLC | MEMBER | 02/2023 | E | Y | N | 2784478 |
| PACA FRMT, LLC | DE | PACA FRMT II LLC | MEMBER | 03/2023 | E | Y | N | |
| ADVANTAGE CAPITAL HOLDINGS LLC | DE | PACA FRMT, LLC | MEMBER | 10/2021 | E | Y | N | |
| ADVANTAGE CAPITAL PARTNERS LLC | DE | ADVANTAGE CAPITAL HOLDINGS LLC | MEMBER | 07/2012 | E | Y | N | |
| KING, KENNETH, NMN | I | ADVANTAGE CAPITAL PARTNERS LLC | MEMBER | 07/2012 | E | Y | N | 2812188 |

26.     This self-dealing is a violation of the Investment Management Agreements. Equity grants, structuring fees and other financial benefits should have accrued to the benefit of the Utah Insurers as consideration for their funding commitment.

### 3. Nutmeg Acquisition

27.     In 2022, the Utah Insurers funded a $23 million loan to 777 Partners affiliate, Nutmeg. The purpose of the loan was to support 777 Partners' investments in certain European football clubs. Since the loan originated, A-CAP has amended the loan more than 12 times including extending the maturity dates, deferring/capitalizing interest, and increasing the outstanding balance which now exceeds $350 million as of December 31, 2024, of which $219 million relates directly to Utah Insurers.

28.     Following 777 Partners' insolvency, King exercised certain of the Utah Insurers'

rights to restructure the Nutmeg loans. Upon restructuring, A-CAP Holdings, not the Utah Insurers, received financial benefits from 777 Partners and Nutmeg. For example, on November 17, 2023, A-CAP Holdings was granted a penny warrant to purchase 35% of Nutmeg. According to the Amended and Restated Warrant for the Purchase of Membership Interests of Nutmeg Acquisition LLC:

> "In order to induce A-CAP to make certain additional financial accommodations to the Company [Nutmeg], the Company has agreed to amend and restate the Warrant dated November 10, 2023, and issue this Warrant to A-CAP [Holdings] in accordance herewith."

29. Notably, A-CAP Holdings informed the examination and supervision teams that it valued the Nutmeg penny warrant at approximately $54 million, not for the Utah Insurers' benefit, but for A-CAP Holdings.

30. On April 29, 2024, after the Supervision Order was issued, Nutmeg granted to A-CAP Holdings, not the Utah Insurers, an option to acquire an additional 20% of Nutmeg as consideration for the Utah Insurers agreeing to "the partial satisfaction and cancellation of a portion of the obligations due under the 777 Holdco loan...in an amount equal to $120 million." A-CAP Holdings, not the Utah Insurers, now had the right to own 55% of Nutmeg. King-controlled A-CAP Management was the investment manager for the Utah Insurers and was now, by way of A-CAP Holdings, the majority owner of Nutmeg were he to exercise the warrants and options. With Nutmeg burning cash, King, to protect the value of his options and warrants, subordinated the Utah Insurers' collateral and raised third party debt senior to the Utah Insurers' loans. A-CAP Holdings' in house counsel, Jill Gettman, executed the loan amendments on behalf of the Utah Insurers as lenders and Nutmeg as borrower.

31. These Nutmeg transactions are violations of the Investment Management

Agreements.

### 3. Flair Airlines

32.     In or around May 2021, the Utah Insurers began extending loans to Flair Airlines (the "**Flair Loans**") with a contractual maturity date of May 13, 2024.  Since origination, the Flair Loans have been amended on at least twenty occasions; including additional advances, capitalization of unpaid interest and maturity extensions.  The Utah Insurer loans to Flair Airlines ("**Flair**") at inception amounted to $20 million.  A-CAP loans now exceed $245 million at December 31, 2024, of which $200 million relates directly to Utah Insurers.

33.     On April 26, 2024, without the required approval of the Supervisor, A-CAP Holdings, on behalf of A-CAP, entered into a Flair Share Purchase Agreement ("**Flair Purchase Agreement**") and a Side Letter Agreement ("**Flair Side Letter**").  As part of the Flair Purchase Agreement and the Flair Side Letter, A-CAP provided a funding commitment in the amount of $30 million Canadian Dollars to Flair ("**April 2024 Flair Funding**").  As consideration for the April 2024 Flair Funding, A-CAP Holdings acquired 60% of 777 Partners' ownership of Flair.

34.     A-CAP Holdings' ownership of Flair equity should have accrued to the Utah Insurers as consideration for loan concessions and the additional funding commitment partially provided by the Utah Insurers.  The Utah Insurers provided the funding for Flair, yet the equity was assigned to A-CAP Holdings.  This is a violation of the Investment Management Agreements.

### 4. Trans Atlantic Mortgage Limited

35.     One of the early lenders to Trans Atlantic Mortgage Limited ("**TAMI**") was Leadenhall Capital ("**Leadenhall**"); now a plaintiff against 777 Partners, King, and A-CAP alleging widespread fraud.[6]  The Utah Insurers provided loans to TAMI with the proceeds used to

---

[6] *Leadenhall Capital Partners LLP et al v. Wander et al*, 1:24-cv-03453-JGK (SDNY).

satisfy the obligations due to Leadenhall. As of December 31, 2024, A-CAP's exposure to TAMI was more than $130 million, of which $33 million relates directly to Utah Insurers.

36.     On or about August 29, 2023, the Utah Insurers extended a $20 million loan to TAMI. On the same day, A-CAP Holdings, not the Utah Insurers that provided the funding, received a penny warrant from TAMI to acquire 41.3 million shares of TAMI, representing approximately 20% of TAMI on a fully diluted basis.

37.     A document dated May 17, 2024, and provided to the examination and supervision teams, entitled "777 Bridge Loan Valuation," asserted that the net equity value of TAMI was approximately $232 million. Based on this assertion, the warrant received by A-CAP Holdings would be valued at approximately $46.4 million.

38.     In or around July 2024, TAMI filed a document with UK Companies House stating that King has "significant control" of TAMI. A July 8, 2024, Share Sale and Purchase Agreement between 600 Partners LLC ("**600 Partners**") (a 777 Partners affiliate and majority shareholder of TAMI) and Senior Capital Holdings LLC ("**Senior Capital**") (an affiliate of A-CAP Holdings) indicates that 600 Partners sold all its shares in TAMI to Senior Capital. Consideration for sale of the TAMI shares to Senior Capital was the release of 600 Partners from certain debt owed to the Utah Insurers. According to the Share Sale and Purchase Agreement, the amount of the debt to be forgiven "will be determined at a later date."

39.     The equity and all other rights in TAMI should have accrued to the Utah Insurers as the lenders, not to A-CAP Holdings.

### 5. Century

40.     In or around 2021, the Utah Insurers began lending to Century. The initial A-CAP loan amounted to $21 million, of which $16 million relates to Utah Insurers. The loan was

amended at least 10 times including increases to the loan balance and maturity extensions. As of June 30, 2024, A-CAP's exposure to Century was approximately $41 million, of which $26 million relates to Utah Insurers.

41.     Century's audited financial statements for the year ending December 31, 2023, evidence A-CAP Holdings received penny warrants in Century "for consideration to provide additional funding under the working capital lending facility."

42.     This is a violation of the A-CAP Management Agreements and further evidence of A-CAP's self-dealing to the detriment of the lenders, the Utah Insurers and their policyholders.

### 6. A Miami LLC

43.     On October 25, 2022, A Miami LLC, a Delaware company ("**A Miami**"), an entity controlled by King, was formed. Less than a month later, on November 17, 2022, 777 Partners borrowed $10 million from the Utah Insurers via the 777 Holdco Loan.

44.     On November 18, 2022, 777 Partners loaned $9 million to A Miami in the form of a mortgage ("**A Miami Mortgage**") secured by a condominium located at 100 South Pointe Drive, Unit 3707, in Miami, Florida ("**South Pointe Condo**"). King executed the mortgage on behalf of A Miami as the sole member of the LLC. According to documents filed with the Miami-Dade County Clerk, A Miami became the owner of the South Pointe Condo on or around November 22, 2022.

45.     Less than a month later, 777 Partners assigned the A Miami Mortgage to Newport Funding LLC, an affiliate of Hudson Cove Capital ("**Hudson Cove**"). According to documents filed with the Miami-Dade County Clerk, the assignment satisfied existing obligations of 777 Partners due to Hudson Cove. At the time of the assignment, according to documents prepared by Hudson Cove and filed with the Miami-Dade County Clerk, the value of the A Miami Mortgage,

including future contractual interest, approximated $11.23 million. The same documents indicated that 777 Partners' liabilities due to Hudson Cove, that were satisfied by the assignment, approximated $6.07 million; resulting in a financial benefit for Hudson Cove of more than $5.1 million. Hudson Cove has been, and may still be, a shareholder of and lender to 777 Partners.

46.    The A-Miami transaction resulted in policyholder assets funding a personal condominium of King. Further, 777 Partners' assignment of the mortgage to Hudson Cove effectively separates the collateral from the Utah Insurers since any repayment of the mortgage will flow to Hudson Cove, an entity against which the Utah Insurers do not have recourse, thereby leaving the Utah Insurers saddled with 777 Partners' security which is nil.

### 7. Mortgages Provided to A-CAP Executives

47.    The Utah Insurers were caused to make residential mortgages to certain A-CAP executives, Jill Gettman and Michael Saliba. These mortgages total more than $7.0 million. As of December 31, 2024, A-CAP's exposure to these mortgages was approximately $5.8 million, of which $4.7 million relates to the Utah Insurers. These loans have not been disclosed as loans made to A-CAP officers as is required in the NAIC filing instructions.

48.    Repayment language in the mortgage documents is also inconsistent with standard mortgage lending practices, suggesting that these were not arm's length transactions. For example, certain of the mortgages, for $2.1 million and $2.5 million to A-CAP's in-house counsel Gettman and for $2.5 million to A-CAP Chief Operating Officer Michael Saliba are to be repaid through bonus payments for A-CAP.

### 8. SPP Opportunities Fund

49.    SPP Opportunities Fund ("**SPP**"), formerly known as A-CAP Investments Rated LLC, provides senior, subordinate, mezzanine, and equity capital to middle market companies.

A-CAP Management is the investment manager of SPP. In addition, a Delaware limited liability company, 2021 SPP JV OpCO I LLC ("**SPP Advisor**"), is an advisor to SPP.

50.    The Utah Insurers are lenders to SPP.

51.    SPP filed its most recent Form ADV with the SEC on March 29, 2024. To further demonstrate A-CAP Holdings' influence and control over the SPP, in this filing, both SPP Advisor and Edward Zhu, A-CAP Holdings' head of private credit, are listed as "control persons:"

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| BUSCH, ROBIN, ELLIS | I | MANAGER REPRESENTATIVE | 03/2021 | NA | Y | N | 2082719 |
| LAZARUS, AMY, SUE | I | CHIEF COMPLIANCE OFFICER | 03/2021 | NA | Y | N | 1498788 |
| ZHU, EDWARD, JUN | I | MANAGER | 03/2021 | NA | Y | N | 5915590 |
| SPP JV HOLDCO, LLC | DE | MEMBER | 03/2021 | E | Y | N | |

52.    Also included in the SEC filing is a disclosure that A-CAP Holdings, King, and A-CAP Holdings' affiliate, PACA-SPP LLC, are indirect owners of the SPP entity:

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| KING, KENNETH, NMN | I | ADVANTAGE CAPITAL HOLDINGS, LLC | MEMBER | 03/2021 | E | Y | N | 2812188 |
| PACA-SPP LLC | DE | SPP JV HOLDCO, LLC | MEMBER | 03/2021 | C | Y | N | |
| ADVANTAGE CAPITAL HOLDINGS, LLC | DE | PACA-SPP LLC | MEMBER | 03/2021 | E | Y | N | |

53.    In A-CAP Holdings' March 27, 2024, Form ADV filed with the SEC, SPP Credit Advisors II LLC is disclosed as a related person:

1.  Legal Name of *Related Person*:
    SPP CREDIT ADVISORS II LLC

2.  Primary Business Name of *Related Person*:
    SPP CREDIT ADVISORS II LLC

3.  *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
    801 - 126971
    or
    Other

54.     According to SPP's audited financial statements, A-CAP Management, as the investment manager, is entitled to receive a portion of SPP's profits.  Further, A-CAP Management entered into Investment Management Agreements with each investor under which it charges management fees to each investor.

55.     SPP Advisor, controlled by A-CAP Management, receives various fees from SPP including a base management fee, structuring fees and an incentive fee.

56.     These fees and other financial benefits are in violation of the Investment Management Agreements.

### 9. Ensurem LLC

57.     Beginning in or before May 2018, the Utah Insurers began lending to Ensurem LLC ("**Ensurem**").  A-CAP Holdings owned approximately 70% of Ensurem while the Utah Insurers provided the credit facility.

58.      In or around March 2021, A-CAP Holdings sold Ensurem to 777 Partners.

59.     Proceeds from the sale were distributed to A-CAP Holdings while the Utah Insurers' debt increased.

60.     From 2021 through 2023, Ensurem incurred significant operating losses.

61.     The Utah Insurers' debt has subsequently been subordinated to a third-party lender; weakening the Utah Insurers' collateral rights.

62.     The sale of Ensurem to 777 Partners and the related distribution of proceeds to A-CAP Holdings instead of satisfying the debts due to the Utah Insurers, is a violation of the Investment Management Agreements and A-CAP Management's fiduciary duties.

### 10. Caprice Capital

63.     A-CAP Holdings, through its subsidiaries PACA – WCR LLC and WCR Holdings

LLC owned at least 50% of Caprice Capital ("**Caprice**").

64.     Caprice is a private investment firm focused on providing debt and minority equity investments in small and lower-middle market companies base in the United States.

65.     The Utah Insurers are lenders to Caprice and certain of its portfolio companies.

66.     In A-CAP Holdings' March 27, 2024, Form ADV filed with the SEC, Caprice is disclosed as a related person:

1. Legal Name of *Related Person*:
   CAPRICE CAPITAL PARTNERS, LLC

2. Primary Business Name of *Related Person*:
   CAPRICE CAPITAL PARTNERS, LLC

67.     A-CAP Holdings maintained a financial interest in, and earned fees from, Caprice and its portfolio companies while simultaneously approving investments in Caprice portfolio companies as A-CAP Management in its capacity as investment manager.  Further, the Utah Insurers' investments in Caprice portfolio companies were not disclosed as related party transactions in the Utah Insurers' statutory filings.

68.     These fees and other financial benefits derived from Caprice are in violation of the Investment Management Agreements.

<u>11. HalseyPoint Asset Management</u>

69.     HalseyPoint Asset Management ("**HalseyPoint**") is an institutional fixed income asset manager specializing in leveraged loans and high yield bonds.

70.     Since at least 2019, A-CAP Holdings has held a 50% ownership interest in HalseyPoint.

71.     In A-CAP Holdings' March 27, 2024, Form ADV filed with the SEC, HalseyPoint is disclosed as a related person:

1.  Legal Name of *Related Person*:
    HALSEY POINT ASSET MANAGEMENT, LLC

2.  Primary Business Name of *Related Person*:
    HALSEY POINT ASSET MANAGEMENT, LLC

72.     The Utah Insurers are lenders to HalseyPoint and certain HalseyPoint-issued collateralized loan obligations ("**CLOs**").

73.     Certain of the loans made by the Utah Insurers include collateral that is the least creditworthy, unrated tranches ("**Equity Tranches**") of the HalseyPoint CLOs.

74.     To complete the sale of the CLOs to third party investors, HalseyPoint was required to fund the Equity Tranches as means to provide security to investors.  Despite the Equity Tranches carrying greater risk and no contractual interest rate yield, A-CAP Management approved these investments on behalf of the Utah Insurers.

75.     As a result of funding the Equity Tranches, HalseyPoint was able to complete the issuance of the CLOs and generate substantial fees.  A-CAP Holdings was a beneficiary of these fees, not the Utah Insurers.

76.     These fees and other financial benefits derived from HalseyPoint are in violation of the Investment Management Agreements.

## 12. Film Finances

77.     In or around July 2019, the Utah Insurers began lending to 777 Partners' affiliate Film Finances ("**FFI**").  The initial A-CAP loan approximated $30 million, of which $27 million related to the Utah Insurers.  As of June 30, 2024, A-CAP's exposure to FFI was approximately $32 million, of which $6 million relates to the Utah Insurers.

78.     While the Utah Insurers were creditors to FFI, one of FFI's more profitable business units was a subsidiary known as Reel Media.

79.     On or about August 31, 2022, FFI sold Reel Media to a third party (the "**Reel Media**

**Transaction**") and realized proceeds from the sale of approximately $99.5 million.

80.     Simultaneously with the Reel Media Transaction, FFI distributed $93.0 million of the proceeds to 777 Partners instead of satisfying its obligations to creditors, including the Utah Insurers; and FFI distributed $2.0 million to A-CAP Holdings, not the Utah Insurers, as an "origination fee".

81.     On the same day as the Reel Media Transaction, the Utah Insurers provided additional loans to FFI approximating $22.2 million despite the divestiture of one of FFI's best performing business units and the distribution of the sale proceeds to 777 Partners.

82.     On or about November 4, 2024, FFI and its affiliates filed bankruptcy in Delaware Bankruptcy Court. The Utah Insurers were listed as creditors.

83.     This is a clear violation of the A-CAP Investment Management Agreements and further evidence of A-CAP's self-dealing for its benefit and to the detriment of the lenders, the Utah Insurers and their policyholders.