# Exhibit S

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE ∣ REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

**CONDENSED**

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF FLORIDA

3    WEST PALM BEACH DIVISION

4    CASE NO. CASE NO. 9:24-CV-81143-DMM

5

6    777 PARTNERS LLC AND

7    SUTTONPARK CAPITAL LLC,

8    Plaintiffs,

9

10   V.

11

12   LEADENHALL CAPITAL PARTNERS

13   LLP, LEADENHALL LIFE

14   INSURANCE LINKED INVESTMENT

15   FUND PLC, NOAH DAVIS, SAIPH

16   CONSULTING LLC AND PAUL

17   KOSINSKI,

18   Defendants.

19

20   DEPONENT:  KAREN GORDE

21   DATE:      MARCH 17, 2025

22   REPORTER:  KATELYN TATTOLI MCFARLAND

23

24

25

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

## Page 2

1              APPEARANCES
2  ON BEHALF OF THE: PLAINTIFFS, 777 PARTNERS LLC AND
   SUTTONPARK CAPITAL LLC:
3    James J. Boland, Esquire
     Smith Gambrell & Russell
4    311 South Wacker Drive
     Suite 3000
5    Chicago, Illinois 60606
     Telephone No.: (312) 360-6548
6    E-mail: jboland@sgrlaw.com
     (Appeared via videoconference)
7
   ON BEHALF OF THE DEFENDANTS, SAIPH CONSULTING LLC & PAUL
8  KOSINSKI:
     Harold E. Morlan III, Esquire
9    Noah Rust, Esquire
     Shutts & Bowen, LLP
10   300 South Orange Avenue
     Suite 1600
11   Orlando, Florida 32801
     Telephone No.: (407) 423-3200
12   E-mail: hmorlan@shutts.com
     (Appeared via videoconference)
13
   ON BEHALF OF THE DEFENDANTS, LEDENHALL CAPITAL PARTNERS
14 LLP, LEADENHALL LIFE INSURANCE LINKE INVESTMENT FUND
   PLC:
15   Brian Donovan, Esquire
     Leigh Nathanson, Esquire
16   King & Spalding, LLP
     1185 Avenue of the Americas
17   34th Floor
     New York, New York 10036
18   Telephone No.: (212) 556-2100
     E-mail: bdonovan@kslaw.com
19   (Appeared via videoconference)
20 ON BEHALF OF THE DEFENDANT, NOAH DAVIS:
     Leonard Feuer, Esquire
21 The Feuer Law Firm
     500 South Australian Avenue
22   Suite 500
     West Palm Beach, Florida 33401
23   Telephone No.: (561) 659- 1360
     E-mail: lfeuer@feuerlawfirm.com
24   (Appeared via videoconference)
25  Also Present: Paul Kosinski, Defendant

## Page 4

1              STIPULATION

2

3  The deposition of KAREN GORDE was taken at
   MILESTONE

4  REPORTING, 315 EAST ROBINSON STREET, SUITE 510,
   ORLANDO,

5  FLORIDA 32801, via videoconference in which all

6  participants attended remotely, on MONDAY the 17th  day

7  of MARCH 2025 at 9:04 A.M. (ET); said deposition was

8  taken pursuant to the FLORIDA Rules of Civil Procedure.

9

10 It is agreed that KATELYN TATTOLI MCFARLAND, being
   a

11 Notary Public and Court Reporter for the State of

12 FLORIDA, may swear the witness and that the reading and

13 signing of the completed transcript by the witness is

14 not waived.

15

16

17

18

19

20

21

22

23

## Page 3

1              INDEX
2                           Page
3  PROCEEDINGS                   5
4  DIRECT EXAMINATION BY MR. MORLAN          7
5  EXAMINATION BY MR. DONOVAN         108
6  EXAMINATION BY MR. FEUER        156
7  CROSS-EXAMINATION BY MR. BOLAND        158
8  REDIRECT EXAMINATION BY MR. MORLAN      162
9  RECROSS-EXAMINATION BY MR. BOLAND        172
10
11            EXHIBITS
12 Exhibit                  Page
13   1    Letter about Data Access        21
14   2    Saiph 5.30.24          31
15   3    Saiph 6.5.24         32
16   4    Saiph 2.10.23 E-mail Bellissimo     36
17        to N. Bennett, K Gorde
18   5    Saiph 6.20.24          68
19   6    Saiph E-mail Ref top off       73
20   7    E-mail Re Interest Payment      82
21   8    Saiph Top off Collection       90
22   9    Structured Settlement Matrix     27
23   10   Matrices           62
24   11   E-mail Re Dorchester Facility     97
25

## Page 5

1             PROCEEDINGS
2       THE REPORTER:  Okay, everyone.  My name's Kate
3  McFarland, I'm the online video technician as well
4  as the court reporter today.  Excuse me.  We
5  represent Milestone Reporting Company, located at
6  315 East Robinson Street, Suite 510, Orlando,
7  Florida 32801.  Today's the 17th day of March 2025.
8  The time now is 9:04 a.m., Eastern.
9       We are convened by video conference to take the
10  deposition of Ms. Karen Gorde in the matter of 777
11  Partners, LLC, and SuttonPark Capital, LLC, v.
12  Leadenhall Capital Partners LLP, Leadenhall Life
13  Insurance Linked Investment Fund PLC, Noah Davis,
14  Saiph Consulting, LLC, and Paul Kosinski pending in
15  the United States District Court Southern District
16  of Florida West Palm Beach Division, case number
17  9:24-CV-81143-DMM.
18       Will everyone, except the witness, please state
19  your appearance, how you are attending, and the
20  location that you're attending from, starting with
21  the plaintiff's counsel, please?
22       MR. BOLAND:  Oh, Jim Boland, Smith, Gambrell &
23  Russell, on behalf of the plaintiffs.  I'm attending
24  from Chicago.
25       THE REPORTER:  Thank you.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE  **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

---

**6**

1      MR. MORLAN: Harold E. Morlan III with Shutts &
2 Bowen on behalf of Defendants, Saiph Consulting,
3 LLC, and Paul Kosinski. I'm attending from Orlando.
4      THE REPORTER: Thank you.
5      MR. DONOVAN: Brian Donovan from King &
6 Spalding on behalf of the Leadenhall defendants. I
7 am attending from New York.
8      THE REPORTER: Thank you. Ms. Gorde, will you
9 please state and spell your last name for the
10 record?
11      THE WITNESS: My name is Karen. Last name is
12 Gorde, G-O-R-D-E.
13      THE REPORTER: Thank you. Let the record
14 reflect that I did have Ms. Gorde show us her
15 driver's license off the video record. Counselors,
16 can we all stipulate on the record that we are in
17 agreement she is who she says she is based on that
18 driver's license provided?
19      MR. BOLAND: Yes.
20      MR. MORLAN: So stipulated.
21      MR. DONOVAN: Yep. Confirmed.
22      THE REPORTER: Thank you. All right, Ms.
23 Gorde, will you please raise your right hand? Do
24 you solemnly swear or affirm that the testimony
25 you're about to give will be the truth, the whole

---

**7**

1 truth, and nothing but the truth so help you God?
2      THE WITNESS: Yes, I do.
3      THE REPORTER: Thank you. Counsel, you may
4 begin.
5      MR. MORLAN: Thank you.
6      DIRECT EXAMINATION
7      BY MR. MORLAN:
8      Q. Good morning, Ms. Gorde. Thank you for being
9 here. I know it's not always the first choice of folks
10 to have to testify in something that they're not a party
11 to, but we sure appreciate you taking this time and --
12 out of your busy schedule to accommodate us.
13      And we're going to do our best -- continue to
14 try to do our best to accommodate you and make this
15 deposition go as smoothly and as quickly as possible. To
16 that end, I want to go over just a few things that'll,
17 kind of, help us do that. Have you ever had your
18 deposition taken before?
19      A. No, I have not.
20      Q. Okay. So this is a little bit, you know,
21 different than a typical one because we're doing this
22 remotely, but we still have a court reporter, and part
23 of what we're trying to do today is get a clear record
24 so that we can use it for other purposes. Does that
25 make sense?

---

**8**

1      A. Yes, it does.
2      Q. Okay. And in order to do that, we need you to
3 answer -- provide your answers audibly. Speak.
4 Sometimes there's a tendency to, you know, shake your
5 head or nod your head, but it will help the court
6 reporter if you could make sure that your answers are
7 audible. Sound good?
8      A. Sounds good.
9      Q. Okay. And we need to also make sure that we
10 don't talk over each other, and I'll try to do my best
11 to let you finish. And if you'll try to do your best to
12 let me finish. That way, there won't be two of us
13 talking at once, and she'll be able to get a clear
14 record. Does that sound good?
15      A. Sounds great.
16      Q. Great. Also, you are in charge here in a --
17 several different ways. You're the master of your own
18 testimony, and we're here also to accommodate you. So
19 anytime you want to take a break, just let us know, and
20 we'll take a break.
21      The only thing that I ask is if we're in the
22 middle of a question or a short line of questions that
23 we just finish that before we take a break, and then we
24 can take a break whenever you need. Does that sound
25 fair enough?

---

**9**

1      A. It sounds fair.
2      Q. Great. Also, if any -- I'm going to try my
3 best to make my questions clear, but if anything is
4 unclear, you're welcome to ask me to rephrase it or
5 break it down further so that you make sure that it's
6 clear that you understand what I'm asking, all right?
7      A. Okay. Sounds great.
8      Q. But if you do answer, then -- if you're able
9 to answer, then we will all assume that you understood
10 the question. Does that make sense?
11      A. That does make sense.
12      Q. Okay. Is there any reason that you can think
13 of that you wouldn't be able to provide true and
14 accurate testimony today?
15      A. Nope.
16      Q. Okay. Where do you presently work, Ms. Gorde?
17      A. I presently work at a company called Fine Art
18 Handcrafted Lighting.
19      Q. And how long have you worked there?
20      A. About -- probably about eight months now.
21      Q. And prior to that, who was your employer?
22      A. It was SuttonPark slash -- SuttonPark
23 Capital/777 Partners.
24      Q. Okay. And for our purposes today, I'm going
25 to refer to the plaintiffs as 777 or Triple 7. And

---



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

10

1  that's going to mean SuttonPark or 777 Partners, kind
2  of, collectively.  Does that make sense?
3      A.  Yes.
4      Q.  Okay.  But if there is a particular question
5  where there's some sort of difference that you think is
6  significant between SuttonPark and 777 Partners with
7  respect to the particular question, if you could just
8  let us know or keep clarify for us.  I'm not sure there
9  will be, but if you could do that to the extent you can,
10  that would be helpful.  Sound good?
11      A.  Sounds good.
12      Q.  Great.  And how long did you work for 777?
13      A.  I worked there -- well, okay.  Let's --
14  originally, it was SuttonPark that I was hired for back
15  in 2019.
16      Q.  Okay.
17      A.  And then 777 took over SuttonPark and I left
18  last year in 2024.
19      Q.  What year did 777 take over SuttonPark?
20      A.  That I am not exactly sure on the exact year.
21      Q.  Okay.
22      A.  Probably more -- I would say more like 2020
23  during COVID, maybe.  It could have been a little
24  earlier.
25      Q.  And when you say takeover, what do you mean?

11

1      A.  Well, what I mean by that is 777 Partners was
2  the parent company, and SuttonPark was the subsidiary of
3  -- of 777.
4      Q.  Okay.  So when you say that 777 took over, do
5  you mean that they stepped in to -- sorry, I was getting
6  a little feedback there.  Do you mean that they stepped
7  in to take over management of day-to-day operations or
8  something else?
9      A.  I -- to tell you the truth, I'm not exactly
10  sure exactly what their role was.  All I know is that
11  SuttonPark was a subsidiary of 777 Partners.  They
12  probably had a majority stake in the company.  But other
13  than that, I -- they didn't -- at that time when they
14  started taking over, they didn't do the everyday
15  management operations.  That was later on.
16      Q.  And when you say that was later on, when are
17  you -- what approximate date are you referring to?
18      A.  I would say probably more like 2023.
19      Q.  Okay.  Do you remember was that around the
20  summertime?  Later in the year?  Do you recall when in
21  2023 it was?
22      A.  I don't recall.
23      Q.  Okay.  When you started at SuttonPark in 2019,
24  what was your position?
25      A.  I was the assistant controller.

12

1      Q.  And is that the position that you had
2  throughout your tenure at -- this position even as it --
3  there were some changes of management and control that
4  we just talked about?
5      A.  I was the assistant controller up until
6  October of 2024.
7      Q.  And October of 2024, was that was when you
8  were no longer employed by 777 as of October 2024?
9      A.  No.  October 2024 is when they moved me up to
10  the controller position because the controller at that
11  time left the company.
12      Q.  Okay.  And who was that controller?
13      A.  That was Josh Klein.
14      Q.  And how long had Mr. Klein been the
15  controller?
16      A.  He was probably the controller for about two
17  years.
18      Q.  And when was your last day of employment with
19  777?
20      A.  July 12, 2024.
21      Q.  Okay.  So just to clarify, I think earlier you
22  might have said 2024 when you were talking about when
23  you moved from assistant controller to a controller.  Did
24  you mean October of 2023?
25      A.  Yes, sorry.  It was October of 2023.

13

1      Q.  That's okay.  And did you do anything to
2  prepare for this deposition today?
3      A.  No, I did not.
4      Q.  Okay.  And have you spoken with anyone about
5  this case other than to schedule your deposition at all?
6      A.  No, I did not.
7      Q.  Okay.  And what, if anything, do you know
8  about the particular case that we're here on today?
9      A.  Well, I --
10      Q.  Just generally speaking.
11      A.  If you can refer about exactly this case with
12  Paul Kosinski and Saiph --
13      Q.  Okay.
14      A.  -- or the entire case in general?
15      Q.  So there is -- by the way, just so that we're
16  clear, you may have heard before I represent Paul
17  Kosinski and Saiph Consulting in this matter.  Saiph and
18  Kosinski are defendants, two Leadenhall entities are
19  also defendants, and then the plaintiffs are SuttonPark
20  and 777 in this particular case.  It sounds like from
21  what you were saying earlier that you might be familiar
22  with some litigation between Leadenhall, the plaintiffs
23  and a whole bunch of other folks up in New York.  Is
24  that fair to say?
25      A.  That is fair to say.


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

---

14

1    Q.   Okay.  So Saiph and Kosinski are not part of
2  that New York case.  We're on a -- this is a separate
3  case.  We're -- it -- it's in the Southern District of
4  Florida, and it concerns -- the primary sort of subject
5  matter of this case concerns a collateral audit that Mr.
6  Kosinski and Saiph performed for Leadenhall.  When I say
7  collateral audit, are you familiar with what I'm talking
8  about?
9    A.   Yes.  I am familiar with what you're talking
10  about.
11    Q.   Okay.  And are you familiar with the specific
12  collateral audit that I'm talking about with respect to
13  Saiph and Mr. Kosinski on behalf of Leadenhall?
14    A.   The only thing I know about that is that
15  Leadenhall had hired Paul Kosinski and Saiph Consulting
16  to do some audits of their records with SuttonPark/77
17  Partners.
18    Q.   Okay.  And in connection with that, did
19  management designate or assign you any particular role
20  with respect to that collateral audit?
21    A.   No, they did not.
22    Q.   Did they designate you as someone that would
23  -- that -- provide information and answer Mr. Kosinski's
24  questions as part of the collateral audit?
25    A.   The only thing they said was they sent a

---

15

1  general e-mail that they were doing an audit of their
2  files.  That was it.
3    Q.   Okay.  When you say a general e-mail, they
4  sent it to everybody, or they sent it to some --
5    A.   Yes, everybody.  I'm sorry.
6    Q.   Okay.
7    A.   Yes, everybody.
8    Q.   Okay.  So was it your understanding that part
9  of the purpose of that e-mail was to let everybody know
10  that the audit was occurring?
11    A.   I -- I'm -- I don't understand what you mean
12  by that.
13    Q.   Fair enough.  Was it your understanding that
14  if Mr. Kosinski had questions or needed information with
15  respect to the audit, that -- to the extent that you had
16  that information, management was directing you to
17  provide that to Mr. Kosinski?
18    A.   Was my understanding.
19    Q.   Okay.  And how long -- do you know Paul
20  Kosinski?
21    A.   I do.
22    Q.   Okay.  And how long have you known Mr.
23  Kosinski?
24    A.   Since I started working at SuttonPark.
25    Q.   And while you were at SuttonPark, did you have

---

16

1  occasion to have much interaction with Mr. Kosinski?
2    A.   Yes, every day.
3    Q.   And do you recall when Mr. Kosinski left his
4  employment with 777?
5    A.   I do.
6    Q.   Do you recall when that was?
7    A.   I am pretty sure it was in December of 2020,
8  because I know it was during COVID, and we were all at
9  home.
10    Q.   Okay.  And shifting focus back to the audit,
11  did you and Mr. Kosinski communicate at all about the
12  audit?
13    A.   The only thing is -- is I met him at the
14  SuttonPark office on a day that I was also doing other
15  work for B. Riley, who is also there at the SuttonPark
16  offices.  And that's the only one I communicated any,
17  you know, work or documents that he -- he might've --
18  was questioning.
19    Q.   And when you say SuttonPark's offices, were
20  those the offices in Boca?
21    A.   Yes.  Those were the offices in Boca.
22    Q.   And was that where you were normally located
23  or did you come up --
24    A.   I was actually -- oh, sorry.  I was actually,
25  normally, working from home.  I had not really been set

---

17

1  foot in SuttonPark offices for over four years.
2    Q.   Okay.  And that -- did that kind of start with
3  COVID?
4    A.   Yes, it did.
5    Q.   And so was one of the specific purposes you
6  came into the office was to help facilitate Mr. Kosinski
7  and Saiph's audit?
8    A.   It was -- it was a combination of Mr. Kosinski
9  audit plus also with -- at the time B. Riley was there,
10  too.
11    Q.   And what did B. Riley ask you to do?
12    A.   Did some questions about the -- the accounting
13  books in general of, you know, SuttonPark.  They wanted
14  to look at -- at the records in total.  Showed them how
15  to have -- show them exactly where those records were,
16  where they could find it.  They had access to that.
17    Q.   What type of records are you referring to?
18    A.   Accounting records, Excel spreadsheets, maybe
19  PF documentation, our -- you know, our accounting
20  software.
21    Q.   And would these be -- I'm getting a little
22  feedback here, so I apologize.  Let me start over.  Would
23  those records that you just referred to, would that
24  include anything that would be in MpFin or are those
25  separate from what you're talking about?

---



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         **www.MILESTONEREPORTING.com**         **Toll Free 855-MYDEPOS**

36-08 Gorde Karen 03-11-2025 Page 18

18

1    A.  Yeah, those were separate -- separate from
2  what I was talking to -- about.  MpFin was a totally
3  different software system, which housed all the client
4  information, customer and client information in there.
5    Q.  Can you sort of give us a brief sort of
6  overview of the difference between the -- it -- to the
7  extent there is one, between the MpFin records and the
8  accounting records and those types of records that you
9  were just talking about?
10    A.  So -- so the accounting records are mainly
11  like, you know, your cash accounts, your balance, you
12  know, your bank accounts on there, your receivables in -
13  - in total.  Where MpFin housed all the documentations,
14  all the checks, all the backup for all the insurance
15  annuities that we would get in and then have to send
16  out.
17    Q.  Okay.  And from time to time, were there
18  differences or inconsistencies between the MpFin system
19  and the accounting records?
20    A.  I cannot be -- can't tell you on that.  I was
21  never in MpFin.  I never dealt with MpFin.
22    Q.  Okay.  Did you assist with reconciling certain
23  accounting records and documentation that you had with
24  records from other systems or records used for other?
25    A.  I did reconcile with a spreadsheet to a report

19

1  that we would send over to our investors.
2    Q.  Okay.  And which records would you be
3  reconciling with the accounting records?
4    A.  So we would -- I didn't have access to MpFin,
5  but we would get what we called work deals, which were
6  stuff that we would buy, you know, insurance annuities
7  and stuff that we would buy.  We would get that.  I
8  would have a record of those.  I would put it on a -- a
9  spreadsheet.  And then once a month, our -- another
10  apartment would repair a report, and we would -- I would
11  match what I was given and what -- what we sold and
12  purchased to what they were stating -- stating.
13    Q.  Okay.  I'm going to go ahead and rather than
14  just do these bit by bit, I'm going to upload some
15  additional exhibits to kind of make sure that you are
16  able to open all of those and just ask you to just spend
17  a few minutes taking a look at them.  We will talk about
18  them more, but I want to give you a chance to just
19  familiarize yourself with them if you haven't seen them
20  before or haven't seen them recently, is more like it.
21  Most of them, I believe, have your -- or communications
22  that you were involved in.  But I'm going to go ahead
23  and do that.  And while we're getting that squared away
24  and giving you some time to kind of go through those,
25  however long you need, there's not that many.  We will

20

1  go off the record.  Does that sound workable?
2    A.  Yes.
3    Q.  Okay.  So I'm going to go ahead and just start
4  uploading these.  And if you need any help accessing it,
5  the court reporter may be able to help, and I'll do
6  anything I can to assist as well.
7    A.  Okay.
8    MR. MORLAN:  So I'm going to start doing that
9  right now and we will go off the record.  Also,
10  Counsel, let me know if you have any problems
11  accessing this.  I don't mind sending an e-mail with
12  this stuff.  I think most of it is probably small
13  enough that will work.  So with that, we'll go off
14  the record.
15    THE REPORTER:  The time now is 9:28, Eastern.
16  We are going off the record.
17    (A recess was taken.)
18    THE REPORTER:  Time now is 9:48 a.m., Eastern.
19  We are back on the record.
20    BY MR. MORLAN:
21    Q.  Okay.  Ms. Gorde, I understand you were able
22  to download the exhibits that I shared to the chat.
23    A.  Yes.  All eight of them.
24    Q.  Great.  Don't worry.  I'm not necessarily
25  going to ask you tons and tons of questions in detail

21

1  about each one.  Some of these are going to be just to
2  see if you're familiar with or if you can identify them
3  for us. Let's start with, if you would, please take a
4  look at what we've marked for purposes of this
5  deposition as Exhibit 1.
6    (Exhibit 1 was marked for identification.)
7    A.  Okay.  I have it open.
8    BY MR. MORLAN:
9    Q.  Okay.  And is the right bottom corner, do you
10  see a number in the right bottom corner of that
11  Exhibit 1?
12    A.  Yeah.  On the first page?
13    Q.  First page.  Yes.
14    A.  Yes.
15    Q.  Can you tell me what that number is?
16    A.  I have -- it says 77(PL-FL_3 -- 00008909).
17    Q.  Okay.  And we're going to refer to that as a
18  Bates label, and we will call this one Bates 8909, for
19  example, just for clarification and to keep the record
20  straight, but we'll also refer to it by its Exhibit
21  number.
22    Okay.
23    Q.  Do you recognize this document here?
24    A.  I do not because I don't think I've ever seen
25  it.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

36/08  Gorder  Karen  2014  2025                    Page  22

22

1    Q.  Okay.  Have you had a chance to look at it
2  briefly?
3    A.  Yes.  I was able to look at it briefly.
4    Q.  Okay.  And do you see that the -- according to
5  the subject line and in looking at this, do you
6  understand that this letter to be discussing access to
7  data and information for purposes of the audit that
8  we're talking about?
9    A.  Yes.
10    Q.  Okay.  And do you see that the letter is
11  directed to B. Riley, attention: Jim Howard?
12    A.  Yes.
13    Q.  Do you know who Jim Howard is?
14    A.  I do.  I know he worked for B. Riley, and I
15  know he was, I guess, the lead on anything relating to
16  the 777 Partners and looking at records.
17    Q.  Okay.  And did you have much interaction with
18  Jim Howard while he was at 777 SuttonPark?
19    A.  Not much.  I mainly had interactions with
20  Teresa, and I don't know her last name.  With Teresa --
21    Q.  Do you think it was Teresa Licamara?
22    A.  It might have been.  All I -- all I know is
23  she worked with him on 777 Partners, and I was dealing
24  mainly with her.  Occasionally I would get an e-mail
25  from Jim, but Jim usually did not respond to me.  It

23

1  went always through Teresa.
2    Q.  And did you and Jim Howard or you and Teresa
3  have any discussions at all about the collateral audit?
4    A.  Nope.  Just -- just -- the only thing we had
5  in -- in communications was just to meet up with Paul
6  Kosinski.  That was it.
7    Q.  And when you say communications
8  regarding meetup with Paul Kosinski, was that Mr. Howard
9  or Teresa directing you to meet up with Paul Kosinski
10  for purposes of the audit?
11    A.  Yes.
12    Q.  Okay.  And did you in fact meet up with Mr.
13  Kosinski for purposes of the audit?
14    A.  Yes, I did.
15    Q.  Okay.  And I just want to direct your
16  attention to the last page of this Exhibit 1.  Do you
17  see in the third to last paragraph where it lists some
18  names of some folks that are being requested to have --
19  to be able to have permission to speak with Paul
20  Kosinski directly?
21    A.  Yes.
22    Q.  Okay.  And do you know who the signatory,
23  Roger Schwartz, is on this letter?
24    A.  No, I do not.
25    Q.  Okay.  And do you know who the law firm of

24

1  King and Spalding is?
2    A.  No, I do not.
3    Q.  Okay.  But do you understand from this letter
4  overall that King and Spalding and Mr. Schwartz were
5  stating that they represented Leadenhall in connection
6  with the audit at issue?
7    A.  That's the way it appears to be, yes.
8    Q.  And so with respect to that, just to clarify,
9  because I think my question before was a little awkward.
10  So did you -- do you understand based on what happened
11  with the audit, your conversations with the B. Riley
12  folks and in this letter that this letter was requesting
13  permission for Mr. Kosinski to have direct conversations
14  with you and some other 777 folks in the context of the
15  collateral audit?
16    A.  Yes.
17    Q.  Okay.  Can you tell me -- if you would just
18  take a look at this list real quick.  Can you tell me
19  who Sue Melchiori is?
20    A.  She was a legal counsel.  She wasn't like, you
21  know, top legal, but she was -- she worked under Fred
22  Love.
23    Q.  And did you have any communications with Sue
24  about the collateral audit?
25    A.  No, I did not.

25

1    Q.  Okay.  Did you have any communications with
2  anyone besides Jim Howard and -- yeah.  Strike that.  Let
3  me start over.  As far as other 777 employees, or B.
4  Riley acting on behalf of 777, was there anybody that
5  you had any communications with about the collateral
6  audit besides Jim Howard and Teresa?
7    A.  Nope.
8    Q.  Okay.  All right.  Percy Ford.  Can you tell
9  me -- do you know who Percy Ford is?
10    A.  I do.
11    Q.  And who is Percy Ford?
12    A.  Percy Ford is the servicing manager.  So he
13  would deal with MpFin.  He also dealt with a lot of the
14  money coming in with the insurance companies and money
15  going directly out.
16    Q.  And did you ever have occasion to need to
17  access any of the documentation in MpFin?
18    A.  If I did -- if I did, it would be, you know --
19  I would ask Percy Ford to get documentation for me
20  because I didn't have access to it.
21    Q.  But were some of the documents that you might
22  have looked at in the context of reconciliations, were
23  some of those reports that you were referring to -- were
24  those reports that would be based on information in
25  MpFin or something else?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

336758 Gordon Karen 04-17-2025          Page   26

**26**

1    A.  They would be based on information from MpFin,
2 but Percy -- Percy Ford would have the information in
3 there.  But somebody else would access that information
4 to do the report and then give it to me.
5    Q.  Okay.  Do you know who that person would be,
6 who would access the information other than Percy Ford?
7    A.  Well -- oh, well, and not in SuttonPark area,
8 it was Alex Adnani [sic].  I think that's how
9 he says his last name.
10   Q.  Okay.  And who is Alex Adnani?
11   A.  He worked at 777.  He would do all the
12 reporting and monthly requirements, monthly compliance
13 for all investors.  He would compile all the data and
14 send the reports out to the investors.
15   Q.  And as part of Mr. Adnani's compilation --
16 compiling of the data, as you said, would he need to
17 consult with you sometimes?
18   A.  Sometimes he would.  He would, you know -- so
19 I can compare to what I have on -- what we call as a
20 matrix, which is an Excel documentation that lists all
21 the deals between the different investors.  And we would
22 compare it saying, why -- you know, what he has on his
23 report and what I have on mine.
24   Q.  Okay.  And I want to come back to the -- these
25 matrixes a little bit more.  And I may show some of them

**27**

1 to you.  But I want to ask, can you explain a little bit
2 more what the matrixes are that you're talking about?
3    A.  The matrixes is is -- it's a very large document.
4 It had several -- it had about four or five different
5 tabs on it.  It would list a summary listing of all
6 deals that we have, that we have on our record, and then
7 what the interest and principal and payments would be
8 for those each deals that would be sent over to either,
9 you know, the different investors.
10   Q.  Okay.  I'm actually -- since it just came up,
11 I'm going to show you something.  And we will call this
12 -- let me know when you are able to open the document I
13 just shared.
14       THE REPORTER:  And what did you want to call
15 this one?
16       MR. MORLAN:  We'll call that one Exhibit 9.
17       (Exhibit 9 was marked for identification.)
18       THE REPORTER:  Okay.  Great.
19       THE WITNESS:  It -- it's going.  I know it's a
20 very large document.  Okay.  I have it open.
21       BY MR. MORLAN:
22   Q.  Oh, you weren't kidding.  Okay.  I'm going to
23 definitely --
24   A.  Yes.
25   Q.  -- try not to - problems with all these

**28**

1 exhibits.
2    Q.  Would this Exhibit 9 that you're looking at
3 right now, would that be an example of one of the
4 matrices you just described?
5    A.  Yes.  This is the matrice [sic].
6    Q.  Okay.  And hang on.  It's taking a minute to
7 open up on my screen as well.
8    A.  Yeah.  It's a large document.  I could have
9 told you that right away.
10   Q.  Okay.  And so did Mr. Kosinski request access
11 or request copies of settlement matrices like this one
12 for purposes of the audit?
13   A.  Yes.  Yes, he did.
14   Q.  Okay.  And did that seem to you to be an odd
15 or inappropriate request?
16   A.  No, I did not.
17   Q.  Why would this document be useful to someone
18 who was trying to perform a collateral audit?
19   A.  This document would be useful because it lists
20 all the deals that we have on record on when they were
21 purchased, what investor they belong to and -- and that.
22 So that's what I would see very -- very helpful.
23   Q.  Okay.  And what is the significance of the --
24 for the title of this document?  The beginning part is a
25 Bates label identification number.  But it's got

**29**

1 appended there, too.  It's something that says,
2 Structured Settlement Matrix 1-31-21 XLSX.  Do you see
3 that?
4    A.  Yes.
5    Q.  And is that how -- disregarding the beginning
6 part, identifying it, but starting with Structured
7 Settlement Matrix, is that how the files were typically
8 named?
9    A.  Yes, because we kept it up to date for every
10 month.  This would also help me reconcile my records on
11 a monthly basis, because we did have deals that we would
12 buy and sell throughout the month.  And at the end of
13 the month, we would have these listing of deals --
14   Q.  Okay.
15   A.  -- that were technically, you know, settled on
16 the different investors.
17   Q.  Okay.  So this particular one that we're
18 looking at, am I correct that it was dated January 31,
19 2021?  Is that what that means in the name -- file name?
20   A.  Correct.  Correct.
21   Q.  Okay.  And so that was the information that
22 was current as to the particular deals, as you described
23 it, as of January 31, 2021?
24   A.  Correct.
25   Q.  Okay.  And so that date doesn't necessarily



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

30

1 refer to when the deals were acquired. It just refers
2 to the status of the deals as of that particular date;
3 is that right?
4    A. That is correct.
5    Q. Okay. All right. We'll come back to this. I
6 think what I'm going to do is show you a spreadsheet
7 with a list of names of some other settlement matrixes.
8 So we don't necessarily have to upload them all because
9 you're right. They're quite large.
10   A. Yes.
11   Q. Do you recall approximately how many
12 Structured Settlement Matrices Mr. Kosinski requested
13 and that you provided?
14   A. I -- I am not exactly sure the amount -- the
15 number of them. I think it was maybe at least one --
16 couple of them, like, one every month because we did
17 this every month. I would save it every month. So I'm
18 pretty sure he has every month for a year maybe. I am
19 not exactly sure exactly the amount.
20   Q. Okay. And these files are pretty large. How
21 were you able to transfer these to Mr. Kosinski?
22   A. I had -- he -- I had a -- what we call -- I
23 call as a jump drive, a portable, you know, little flash
24 drive. Be able to put it on there to give to him.
25   Q. Okay. And was that because of the files were

31

1 too large to e-mail?
2    A. Correct.
3    Q. Okay. And were there any other files that you
4 provided to Mr. Kosinski on the -- what you described as
5 a jump drive besides Structured Settlement Matrices?
6    A. Nope. It was just the Structured Settlement
7 Matrices.
8    Q. Okay. All right. Let's take a look now at
9 Exhibit 2, if you would, please.
10   (Exhibit 2 was marked for identification.)
11   A. Okay. Got it open.
12   BY MR. MORLAN:
13   Q. Okay. And I don't see your name in the e-
14 mails on this. The e-mail addresses. Have you ever
15 seen this document before?
16   A. This document, I don't recall. I did -- might
17 have been on another e-mail maybe with this, requesting
18 me to be able to meet with Paul from Jim.
19   Q. Okay. And if you look at the top of this e-
20 mail, it CCs someone named Teresa Licamara. Do you
21 think that was the Teresa from -- we were talking about
22 earlier?
23   A. Yes. That was the Teresa we were talking
24 about earlier.
25   Q. Okay. And looking at this e-mail and

32

1 recognizing that you received a similar e-mail, as you
2 said, does it appear that this involves a request by
3 Paul Kosinski to Jim to meet with you for purposes of
4 the audit?
5    A. Yes.
6    Q. All right. And if you would, please take a
7 look at Exhibit 3.
8    (Exhibit 3 was marked for identification.)
9    A. Okay. I have Exhibit 3 open.
10   BY MR. MORLAN:
11   Q. Okay. Now, is this an e-mail you've ever seen
12 before?
13   A. Yes, this is.
14   Q. Okay. And is this the e-mail that you may
15 have been referring to earlier when you said that you
16 thought you received some additional communication about
17 meeting with Paul?
18   A. Yes.
19   Q. Okay. And does this appear to be a true and
20 accurate copy of an e-mail exchange between you and
21 Paul, Teresa Licamara, and Jim Howard?
22   A. Yes. It appears to be correct.
23   Q. Okay. And is this the type of e-mail document
24 that you would routinely rely on during the course and
25 scope of your -- of performing your duties for 777?

33

1    A. Yes.
2    Q. Okay. And were these types of e-mails saved
3 and preserved and relied upon overall in the ordinary
4 course of business of 777 Partners?
5    A. Yes. On my triple -- on my SuttonPark e-mail
6 address.
7    Q. Okay. And when you were doing work for 777
8 and SuttonPark, did you use any other e-mail addresses
9 besides the one on here, kgorde@suttonpark.com?
10   A. Nope, I did not.
11   Q. Okay. Didn't have, like, a 777 Partner's
12 e-mail address or anything like that?
13   A. I think they might have set me up with one,
14 but I never used it. Never got e-mails from that. I --
15 mine was always SuttonPark.
16   Q. Okay.
17   MR. BOLAND: Mr. Morlan?
18   BY MR. MORLAN:
19   Q. And --
20   MR. BOLAND: Mr. Morlan, can I just ask you a
21 question?
22   MR. MORLAN: Yes, sir.
23   MR. BOLAND: I noticed that the document that
24 you showed didn't have a Bates number on it. It
25 doesn't look like it has one on the stamp.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

34

1      MR. MORLAN:  I'm going to fix that or either
2  substitute that or just give you the Bates number.
3  That should only be a couple of these, but these are
4  documents that were produced, and they do have a
5  Bates number that we just got some wires crossed.
6  And some of them right now are -- they may be
7  referred to by a control number.  But we will
8  clarify that for you, but I wanted to get something
9  for everybody to be able to see.
10      MR. BOLAND:  That -- that's fine.  Is it fair
11  then that in the title of the document, it says,
12  Exhibit 3, and that it's got a Saiph number.  That
13  this is going to be a Saiph-produced document?
14      MR. MORLAN:  Yes.
15      MR. BOLAND:  Okay.  That's what I wanted to
16  know.  Thank you.
17      MR. MORLAN:  I think so.  Okay.  And again, we
18  will -- actually, I may have that now.  Let me
19  check.  Yes, we will get that ironed out.  But yes,
20  all of these with the control numbers where -- if it
21  says safe, it's just a control number.  If it says
22  safe PROD, that should be the production ones, and
23  we will fix that after the depo.  Or at least make
24  clear with the -- which Bates number these
25  correspond to.

35

1      BY MR. MORLAN:
2   Q.  Okay.  And this e-mail that we're looking at,
3  Exhibit 3, the most recent date on that at the top is
4  Wednesday, June 5, 2024; is that right?
5   A.  Yes.
6   Q.  Okay.  And do you know -- do you recall when
7  you actually met with Mr. Kosinski?
8   A.  It -- it was the Thursday the day after.
9  Thursday, June 6, 2024.
10   Q.  Okay.  And if you would please take a look at
11  Composite Exhibit 4.
12      (Exhibit 4 was marked for identification.)
13   A.  Okay.
14      BY MR. MORLAN:
15   Q.  And are you able to open the bookmark tab?
16  Are you able to see that?
17   A.  The bookmark tab?  Not exactly sure.
18   Q.  Actually, will you share your -- will you
19  share your screen with us real quick and let me just see
20  if --
21   A.  You need me to share my screen?
22   Q.  Yes.
23   A.  Okay.  Sorry.
24   Q.  I just want to see what you're looking at to
25  make sure you're looking at the right thing and see if I

36

1  can -- okay.
2   A.  Can you see my screen?
3   Q.  I can.  If you would go to the far left corner
4  and go to the bottom ribbon.  Up a little bit.  Next to
5  the highlighter.  That little tab.  Yes.
6   A.  Yeah.  This one?
7   Q.  If you would click on -- yes.  There you go.
8   A.  Okay.  And then click on these.
9   Q.  Okay.  Correct.  So I'm showing you what's
10  been marked as Composite Exhibit 4.
11      Do you recognize --
12   A.  Okay.  Okay.
13   Q.  -- this document?
14   A.  This one?  Yes.
15   Q.  Okay.  And do you see on Page 1 of Composite
16  Exhibit 4, the Bates number is Safe Prod 443611?
17   A.  Yes.
18   Q.  Okay.  And then Composite Exhibit 4 has four
19  parts that I'm going to ask you about just briefly, 4A,
20  4B, 4C, 4D.  And --
21   A.  Okay.
22   Q.  Do you see that?
23   A.  Yeah.  Do you want me to go to 4A?
24   Q.  Well, let's start with four for just a second.
25  And I believe you said you do recognize this document,

37

1  Page 1 of this Composite Exhibit 4?
2   A.  Yes.
3   Q.  Okay.  And does this appear to be a true and
4  accurate copy of an e-mail that you sent to Mr. Kosinski
5  on June 7, 2024?
6   A.  Yes.
7   Q.  Okay.  And was that the day that -- or around
8  the time that you met with Mr. Kosinski, as we just
9  discussed?
10   A.  Yes.
11   Q.  Okay.  And was this e-mail that you sent that
12  we're looking at right now, was this provided to Mr.
13  Kosinski for purposes of the audit?
14   A.  Yes.
15   Q.  Okay.  And does this e-mail reference four
16  different attachments?
17   A.  Yes.
18   Q.  Okay.  And we're going to go through them
19  briefly, but does it appear that Attachments 4A, 4B, 4C,
20  and 4D -- or Composite Exhibit 4A, 4B, 4C, and 4D, that
21  those correspond to the attachments to this e-mail
22  that are listed on Page 1?
23   A.  I'm not exactly sure.
24   Q.  Okay.  All right.  Well, we can go through
25  those.  What did you mean when you said, "See attached



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

---

**38**

1 backup for the different matrices"?
2    A.  Off the top of my head, the only thing I can
3 think of is regarding some deals that were supposed to
4 be on the books that we were going to purchase.  Then we
5 had to take them off, I think.  Because they weren't
6 purchased.  That's the only thing I can think of with
7 this.
8    Q.  Okay.  I -- I'm a little --
9    MR. MORLAN:  Did somebody say something?  Must
10 be the feedback again.
11    BY MR. MORLAN:
12    Q.  So I -- I'm a little confused.  So you said
13 these deals were on the books and then off the books.
14 Can you help us understand what that means a little
15 more?
16    A.  Well, they were deals that we were going to be
17 purchasing at one point in time.  And then it turned out
18 some of those deals we did not -- we did not purchase.
19 So we had to take them off the matrices.
20    Q.  And so was it typical for there to be deals
21 included on the matrix that had not been purchased?
22    MR. BOLAND:  Object to the form.
23    THE WITNESS:  Not -- not typically.  Sometimes
24 because they were in the process of getting all the
25 information together, they knew which deals they

---

**39**

1    were. Most of the time we would put them on because
2 we knew we were going to buy them in the next week,
3 or two, or three weeks.  But typically this was not
4 typical of them putting them on and then taking them
5 off.
6    MR. MORLAN:  Mr. Boland, what was your
7 objection to form so that I can fix it and make sure
8 we get this clear for Ms. Gorde?
9    MR. BOLAND:  Well, I think she answered it, but
10 it was the use of the word typical.  I thought it
11 was vague.  But she answered it.
12    MR. MORLAN:  Okay.  Okay.  So is your objection
13 withdrawn?
14    MR. BOLAND:  No.  I put the objection in.  She's
15 answered the question.  And we're there.
16    MR. MORLAN:  Okay.
17    BY MR. MORLAN:
18    Q.  Ms. Gorde, I'm going to ask the question
19 slightly differently, because -- in order to keep a nice
20 clear record on this.  How often was it the situation
21 that deals would go on and off the books as you
22 described with respect to the settlement matrices?
23    A.  Not often at all.
24    Q.  And so let's look at Composite Exhibit 4A.  If
25 you would just take a moment to review that and let me

---

**40**

1 know when you've had a chance to look at that.  It's two
2 pages long.
3    A.  I'm assuming it's the one with Richard
4 Bellissimo --
5    Q.  Yes.
6    A.  -- and Damien -- okay.
7    Q.  And there's a Bates number at the bottom,
8 443612?
9    A.  Yes.
10    Q.  Okay.  And is the subject line for this WMS
11 and JGW deals?
12    A.  Yes, it is.
13    Q.  Okay.  And is this one of the attachments that
14 you sent in the previous e-mail that we just looked at
15 that's also part of this composite exhibit?
16    A.  I can't say that it is.
17    Q.  Okay.  Well, let -- let's go up to Page 1.  Do
18 you see where it says attachments?
19    A.  Here?
20    Q.  Yes.
21    A.  Yes.
22    Q.  And you see where it says WMS and JGW deals?
23    A.  Yes.
24    Q.  Okay.  Now let's go down to -- back down to
25 the next page.  Does the subject line of this Composite

---

**41**

1 Exhibit 4A on Page 2, does that match the name of the
2 first attachment that we just looked at on Page 1?
3    A.  It looks like it.  It appears to -- to be.
4    Q.  Okay.  And does Composite Exhibit 4A that
5 we're looking at right now on Page 2, does this appear
6 to be a document that you attached to the e-mail that we
7 just looked at --
8    A.  I can't verify that --
9    Q.  -- on Page 1?
10    A.  -- that was the attachment that -- in that e-
11 mail.
12    Q.  Okay.  Well, are you familiar with this
13 document that we've marked as -- it doesn't --
14    A.  I'm familiar with this e-mail.  I'm -- I am
15 familiar with this e-mail.
16    Q.  Okay.  And do you believe that -- do you have
17 any reason to believe that you did not send this e-mail
18 to Mr. Kosinski?
19    A.  I can't tell you what exactly those
20 attachments were.
21    Q.  Okay.  And can you tell me what the
22 significance of this e-mail that we're looking at is?
23    A.  The only thing I can say -- say on this was
24 that these were the deals that they were going to put on
25 the books and then they took them off.

---



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

42

1    Q.   And if you go down to the highlighted portion
2 of Page 2 of Composite Exhibit 4, do you see the bold
3 and underlined part that says, "Do not put those
4 contracts on the books and records"?
5    A.   Correct.  Yes, I do see it.
6    Q.   Okay.  Had something like that ever happened
7 before?  Were those routine instructions?
8    A.   Those were not routine instructions because we
9 would always only put deals that we purchased on the
10 books.
11    Q.   And who is Damien Alfalla?
12    A.   He was the CFO of 777 Partners.
13    Q.   So would this -- would -- was this e-mail part
14 of the backup for certain versions of the settlement
15 matrices that we described -- that you described
16 earlier?
17    A.   Yes.
18    Q.   Okay.  And when you say that it's backup for
19 that, is this a document that was retained to confirm
20 and memorialize changes to the settlement matrices based
21 on instructions from Damien Alfalla?
22    A.   I can say it probably was because it was
23 actually directed toward the controller at the time,
24 Josh Klein.
25    Q.   And did you report to Mr. Klein?

43

1    A.   I did.
2    Q.   And do you remember anything about this
3 particular issue in terms of whether or not to put these
4 contracts on the books and records as of the approximate
5 time of this e-mail in February 2023?
6    A.   You mean to put them on, or take them off?
7    Q.   Well, whatever you would have used this as
8 backup for.  If this was to take them off, then -- let
9 me start over.  Was this -- the purpose of this e-mail,
10 was it to provide backup for taking certain deals, as
11 you described it, off of the settlement matrices?
12    A.   Yes.
13    Q.   Okay.  And were those deals in fact taken off
14 the settlement matrices?
15    A.   They were.
16    Q.   Okay.  And when Mr. Alfalla is saying, "Do not
17 put those contracts on the books and records" would that
18 refer to the settlement matrices?  More than that?
19 Something else?  Do you know?
20    A.   It would be the settlement matrices, as well
21 as the accounting records.  Because our matrices would
22 be tying into our accounting records.  We couldn't have
23 a matrices with deals on the books that didn't match to
24 our accounting records.
25    Q.   And when you say your accounting records, were

44

1 those contained within a particular system?
2    A.   Yes, that would be SAP.
3    Q.   So did the settlement matrices, did they start
4 out as a report or an output from SAP?
5    A.   No.  Those matrices were just a manual
6 documentation that we kept for anything that would come
7 through as an e-mail say -- stating that we're buying
8 these deals.  Here's the deal, here's the -- the
9 information, and we would manually put it on an Excel
10 spreadsheet, and then we would enter it into SAP as a --
11 you know, as an entry.
12    Q.   Okay.  So first, the deals would be put within
13 the settlement matrices, and then the settlement
14 matrices would be used to have the deals input into SAP?
15    A.   Yes, they would.
16    Q.   Okay.
17    A.   It would be almost simultaneously.  It would
18 be on the matrix and in SAP at the same time.
19    Q.   At the point that Mr. Alfalla sent this e-
20 mail, the deals that are being referenced were those
21 already part of a settlement matrice as you understand
22 it?
23    A.   Yes.
24    Q.   Okay.  Were these deals already in SAP?
25    A.   Yes.  At that point in time, yes, they were.

45

1    Q.   Okay.  So given that the deals were already in
2 SAP and Mr. Alfalla's instructions, what were the next
3 steps that needed to be taken?
4    A.   We would take them off the matrices and then
5 take them -- like, write them off on SAP.  What we call
6 as a write-off.
7    Q.   And what -- can you give me a little bit more
8 information about what a write-off in SAP is?
9    A.   It's just taking the actual deal off the books
10 that was put on.  So pretty much just reversing what we
11 originally booked.
12    Q.   And with respect to the deals described in
13 this e-mail, do you have any idea how long these
14 particular deals were in SAP before they were written
15 off?
16    A.   I wouldn't -- I'm actually not exactly sure if
17 it was on for a year or two years.
18    Q.   Okay.  But are you fairly sure that it was
19 sometime within the one-to-two-year time frame that
20 these deals were in SAP before they were written off?
21    A.   Yes.
22    Q.   Okay.  And was this something that had ever
23 happened before like this?  Had you needed to do
24 something like this before?
25    A.   No.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

46

1    Q.   Okay.  And the last sentence of Mr. Alfalla's
2  e-mail, you see where it says, "This will be a trade
3  break until we generate the cash to complete the
4  transaction"?
5    A.   Yes.
6    Q.   What does the trade break refer to?  Do you
7  know what that means?
8    A.   No, I do not.
9    Q.   Okay.  And can you tell me anything else about
10  the rest of the sentence in terms of generating the cash
11  to complete the transaction?
12    A.   That I do not know either.
13    Q.   Okay.  Who is Richard Bellissimo?
14    A.   He was the controller for 77 Partners [sic].
15    Q.   And the person in the CC, Josh Klein, that I
16  think you said is the -- he was the controller for
17  SuttonPark?
18    A.   Correct.
19    Q.   Okay.  And did you report to Mr. Bellissimo as
20  well as Mr. Klein?
21    A.   Yes, I -- I would report to both of them.
22    Q.   And would there be anything odd to you about
23  this particular document that we're looking at, Page 2
24  and Page 3 of Composite Exhibit 4?  Do you believe that
25  the --

47

1    A.   No, I --
2    Q.   Go ahead.
3    A.   I was going to say, no, I don't believe
4  anything to be odd about it.
5    Q.   I -- strike that question.  I -- my question
6  -- what I meant to ask was there anything odd about this
7  document being requested by or provided to Ms. Kosinski
8  in the context of the collateral audit?
9    A.   Not that I'm aware of.
10    Q.   As you understood it, this would've been one
11  of the -- a document that you would have been authorized
12  to provide to Mr. Kosinski for the collateral audit; is
13  that right?
14    A.   That is right.  The thing with this document
15  could -- the only reason why, if it was sent to him, was
16  because of the different matrices and the different
17  timelines.
18    Q.   Okay.  And if you would, let's go to Composite
19  Exhibit 4B starting on Page 4.
20    A.   Okay.
21    Q.   Have you ever seen -- starting on Page 4 of
22  Composite Exhibit 4, is -- does this appear to be an e-
23  mail dated September 7, 2022?
24    A.   Yes.
25    Q.   Okay.  And do you know -- have you ever seen

48

1  this e-mail before?
2    A.   Yes.
3    Q.   Okay.  And I see that from the header that it
4  appears that this e-mail was directed to you; is that
5  right?
6    A.   It was to me and Anthony.
7    Q.   And is this another e-mail that would've
8  provided backup for changes or revisions to the
9  settlement matrices that we were discussing earlier?
10    A.   Yes.
11    Q.   Okay.  And was the purpose of providing --
12  strike that.  And did you provide Mr. Kosinski with
13  settlement matrices that were current as of different
14  dates that showed sort of the progression of the -- and
15  changes to the settlement matrices over time?
16    A.   Yes.
17    Q.   Do you recall what the WMS portfolio refers
18  to?
19    A.   It's -- I recall that the WMS portfolio was a
20  listing of deals that we were going to purchase from
21  WMS.
22    Q.   And what is WMS?
23    A.   That I do not know.
24    Q.   But does this Composite Exhibit 4B, Page 4, 5,
25  and 6, does that appear to be one of the attachments

49

1  referenced on the first page of Composite Exhibit 4?
2    A.   Yes, it appears.
3    Q.   Okay.  And does this appear to be a true and
4  correct copy of an e-mail that you received and also
5  sent to Mr. Kosinski?
6    A.   It appears to be an e-mail I received and
7  appears to be maybe something that I did send to Paul
8  Kosinski.  I can't verify that from the first -- first
9  e-mail with the attachments.
10    Q.   Okay.  But you would agree that the subject
11  line of Composite Exhibit 4B where it says WMS portfolio
12  6-30-2021, is that something that's also listed in the
13  attachments on Page 1 of Composite Exhibit 4?
14    A.   I can't -- it looks like it might be one of
15  the attachments, but I can't verify that.
16    Q.   Okay.  But do you have any reason to believe
17  that this is not one of the attachments that was sent
18  along with and referenced on Page 1 of Composite
19  Exhibit 4?
20    A.   All I -- I -- it looks like it is, but I can't
21  verify that.
22    Q.   And was there anything unusual about this
23  particular e-mail exchange on Page 4 through 6 of
24  Composite Exhibit 4?
25    A.   I do not see anything strange about it.


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

50

1  Q.  All right.  If you would take a look at Page
2  5.  Do you see an e-mail on Page 5 from Abascheck
3  Lasaria?
4    A.  Yes.
5    Q.  Okay.  And was it common to receive -- or can
6  you tell me what these first two sentences, what you
7  understood them to mean when you receive this e-mail?
8  The two sentences after "Hi, Karen"?
9    A.  "That these files will be removed from the WMS
10  portfolio"?  And the one --
11    Q.  Yes.
12    A.  -- underneath it?
13    Q.  Yes.
14    A.  It -- to mean that these deals were not being
15  purchased from the -- on the WMS portfolio.
16    Q.  Okay.
17    A.  They originally were on the WMS portfolio, but
18  then they said they won't be -- we won't be funding
19  these, or they won't be funding those.
20    Q.  Okay.  And was that something that had
21  happened before?
22    A.  It has.  Sometimes with these portfolios, they
23  would give a list of deals as they're trying to work
24  them all out, saying we're going to give you a list of
25  these deals.  Turned out these deals weren't right, and

51

1  they would substitute these deals for something else.
2    Q.  Okay.  And what does the statement "they're
3  not pledged anywhere" mean?
4    A.  What it means is that according -- at this
5  time and on this time that these deals for this WMS
6  portfolio was not pledged to any investor, meaning that
7  we did not borrow against any of our investors for these
8  deals.
9    Q.  And did you know or were you asked to verify
10  whether or not these deals were pledged or not?
11    A.  The only way I was able to verify if these
12  deals were not if they were on my matrices and if they
13  were put on as that they were pledged to a -- a
14  different investor or if they were just put on bought
15  through -- and put on just SuttonPark's listing of
16  deals.
17    Q.  Were you the only person who input data into
18  the settlement matrices?
19    A.  I would put it in there.  We would have -- I
20  -- I took care of it mostly myself.  If I wasn't around,
21  Josh Klein would do it.  If he wasn't available, we used
22  to have another guy called Reuben Mitchell would work on
23  these.  Another person, Mary Thomas, would work on
24  these.  These matrices, you know, for -- these matrices
25  were mostly mine.  But if I was out on a vacation or

52

1  something, some -- we would have a backup.
2    Q.  Okay.  And where would you get the information
3  from in order to put the deal information into the
4  settlement matrice?
5    A.  That would come through e-mails from our
6  funding department.  They would say, okay, we're funding
7  this deal.  Here's the information on the deal.  And
8  Alex Adnani and Nick -- Nick's last name I don't
9  remember off the top of my head -- would actually say,
10  okay, we're going to, what we call, pledge these deals
11  to whatever investor that we can.
12    Q.  So if a deal made it onto your settlement
13  matrice, does that mean that it had already been pledged
14  to an investor?
15    A.  Not necessarily.  It would first go on the
16  matrice, maybe as just a -- a deal we purchased, and
17  until we could see where we could pledge it to.  So
18  maybe on, you know, I'm just using an example, January
19  9th, we would put it on because that's when we're paying
20  -- you know, we're buying the deal.  And then maybe
21  February 1st is when we would pledge it to a facility
22  because we have the capacity to pledge it to a certain
23  facility -- you know, investor.
24    Q.  What would need to happen from your
25  perspective and from an accounting perspective from the

53

1  time that the deal was purchased or supposed to have
2  been purchased to the time that it was pledged to an
3  investor?
4    A.  As far as I know, all I would deal with was
5  purchases of the deals.  Whether they were pledged to an
6  investor, that would've been with Alex or Nick.  They
7  would be the ones that would contact the investors and
8  send them a list of deals.  Hey, we have these deals.  We
9  would like to put them on this facility -- on this
10  facility with you guys.
11    Q.  So are you saying (audio cuts out) -- would
12  provide the investors with different information about
13  the deals that you (audio cuts out) --
14    THE REPORTER:  I'm sorry.  Mr. Morlan, I'm
15  having audio issues for you.  Can you try to restate
16  that question for me?
17    MR. MORLAN:  Sure.
18    THE REPORTER:  You're still coming through
19  garbled even with the "sure".  I'm so sorry.
20    MR. MORLAN:  How do I sound?  Still garbled?
21    THE REPORTER:  You're cutting in and out.  I'm
22  going to pull us off record.  One moment.  The time
23  now is 10:41 a.m., Eastern.  We're going off the
24  record.
25    (A recess was taken.)



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

54

1       THE REPORTER:  Time now is 10:49 a.m., Eastern,
2   and we are back on the record.
3       BY MR. MORLAN:
4       Q.   Okay.  Ms. Gorde, when we went off the record,
5   we were still looking at Composite Exhibit 4.  I'd like
6   to direct your attention to Page 7 of Composite Exhibit
7   4, what we're referring to as Composite Exhibit 4C.  If
8   you would, please take a look at that document?
9       A.   Yes, I have it up.
10      Q.   Okay.  And is this WMS portfolio 6-30-2021?
11  Is that the subject line of the e-mail that you're
12  looking at right now?
13      A.   Yes.
14      Q.   Okay.  And does that appear to match the --
15  one of the references to the attachments on Page 1 of
16  Composite Exhibit 4?
17      A.   It appears to be, yes.
18      Q.   Okay.  And have you ever seen this e-mail
19  starting at Page 7 of Composite Exhibit 4?
20      A.   Yes.
21      Q.   Okay.  And is the -- at the very top, is this
22  is an e-mail from you to Anthony Lockwa (phonetic) and
23  Josh Klein; is that right?
24      A.   Correct.
25      Q.   Okay.  And if we go down to the e-mail

55

1   directly below that, is that a copy of the e-mail that
2   we just looked at a couple pages up from Abascheck
3   (phonetic) Lasaria (phonetic)?
4       A.   Yes, it is.
5       Q.   Okay.  And can you just sort of tell me in
6   layman's terms what the purpose of your e-mail to
7   Anthony and Josh is?
8       A.   This is just to inform Anthony, who is on 777
9   Partners side, to -- that -- you know, he deals with the
10  777 accounting, that these are the deals that are being
11  taken off for the WMS deals that we were not purchasing.
12      Q.   Okay.  And what is Anthony Lockwa's title at
13  this time?  Do you know?
14      A.   I -- I want to say his title maybe was an
15  assistant controller over at 777 Partners.
16      Q.   And -- oh, I did want to clarify something
17  earlier.  When you were describing two employees who
18  communicated with the investors, I believe one of them
19  was Alex Adani, correct?
20      A.   Correct.
21      Q.   And the other one that you said his first name
22  was Nick, but you couldn't remember his last name; is
23  that right?
24      A.   His -- his last name was, I think, Nick
25  Bennett.

56

1       Q.   Okay.  That was my understanding as well.  I
2   was just going to confirm that.  And when you say
3   investors, what do you mean?
4       A.   What I mean by investors?  It's the -- and
5   well, investors are the people that we would, you know,
6   borrow the money to buy these deals.
7       Q.   Okay.  And so would Leadenhall be considered
8   an investor, as you're using the term here?
9       A.   Yes.
10      Q.   Okay.  And besides Leadenhall, who are some of
11  the other investors that would loan money to purchase
12  these deals?
13      A.   Credigy, ING -- ING Capital.  Those are the
14  ones I am aware of, and Leadenhall.  Those are the three
15  main ones that I'm aware of off the top of my head.
16      Q.   Was Northwestern Mutual Life an investor?
17      A.   It was, but that was years and years prior to
18  -- that was when I first started out at SuttonPark
19  Capital.
20      Q.   And were you involved at all in any audits for
21  Northwestern Mutual Life's collateral?
22      A.   I was not.  I know a lot of the -- the audits
23  came with Percy Ford.  Percy Ford did a lot of that part
24  of the audits.
25      Q.   Okay.  Were you involved in any audits for

57

1   Credigy?
2       A.   I was not.  Mary Thomas was the one that was
3   dealing with Credigy.
4       Q.   And were you involved in any audits for ING
5   Capital?
6       A.   I couldn't say that I was.  The main audits
7   that I dealt with was mainly the overall audit with our
8   auditors doing our financial statements.
9       Q.   And when you say the overall audit, was that
10  like a regular annual audit?
11      A.   That -- yes, that was a regular annual audit.
12      Q.   And who were your auditors for the regular
13  annual audits?
14      A.   We had -- who did we have?  Off the top of my
15  head, I don't remember who they were at this point --
16  moment in time.
17      Q.   Okay.  But you were also involved with those
18  audits as well?
19      A.   Correct.
20      Q.   What was your role with respect to those
21  overall audits as you described them?
22      A.   Anything they would -- you know, I would be
23  the ones to give them, like, the trial balances.  And
24  when they questioned and they want to see backup was it
25  given the backup to the auditors, you know, and answered

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

58

1 any questions that they might have had, like any changes
2 in the company and stuff like that.
3    Q.   Okay.  And at the time of -- this e-mail that
4 we're looking at is dated September 6, 2022; is that
5 right?
6    A.   Yes.
7    Q.   Okay.  And when would you typically be
8 communicating?  Like, what months, what time frame of
9 the year would you typically be communicating with the
10 auditors for the overall audit?
11    A.   I would say anywhere from, like, April to
12 June.
13    Q.   And what fiscal year did 777 and SuttonPark
14 use
15    A.   What -- okay.  It -- it's always a December
16 31st year-end.
17    Q.   Okay.  And so these audits, the -- these
18 overall audit that you would assist with, those would be
19 for a calendar year?
20    A.   Correct.
21    Q.   So if I said calendar year 2022, that would
22 end on December 31, 2022?
23    A.   That is correct.
24    Q.   And do you recall whether there was anything
25 abnormal with respect to the 2022 audit overall?

59

1    A.   The only thing I can think of is -- has to do
2 with these -- the portfolio deals.
3    Q.   And when you say the portfolio deals, are you
4 talking about the ones specifically that we've been
5 discussing and that are discussed in these e-mails we're
6 looking at?
7    A.   Yes, the WMS deals and the JGW deals.
8    Q.   And what was abnormal about those particular
9 deals?
10    A.   The only thing I can think of abnormally is
11 that they were either not on the books or they were on
12 the books.
13    Q.   And by that, do you mean that they were on the
14 books for a time and then needed to be taken off the
15 books?
16    A.   Correct.
17    Q.   All right.  And if you would, please scroll
18 down to Page 9.  What I'm -- as part of Composite
19 Exhibit 4, Page 9 starts Composite Exhibit 4D.
20    A.   Okay.
21    Q.   Do you recognize this document on Page 9 and
22 Page 10?
23    A.   Yes, I do.
24    Q.   Okay.  And is this an e-mail exchange that
25 you're a part of?

60

1    A.   Yes, I am.
2    Q.   Okay.  And the other folks on there, I believe
3 we identified all of them.  Anthony, Josh, and Richard;
4 is that right?
5    A.   Yes.  Yes.
6    Q.   Okay.  And those are other accounting folks,
7 correct?
8    A.   Correct.
9    Q.   Okay.  And is this additional backup with
10 respect to why the JGW and WMS deals were taken off the
11 books?
12    A.   Correct.
13    Q.   Okay.  And scrolling down to the bottom, do
14 you see an e-mail at the bottom of Page 10 of Composite
15 Exhibit 4 from Anthony Lockwa to Josh Richard and you,
16 dated January 3rd at 12:10 p.m.?
17    A.   Yes.
18    Q.   Okay.  Can you tell me -- can you explain to
19 me what this e-mail is asking about and describing?
20    A.   This e-mail, that it looks like is that they
21 were actually taking the WMS and the J.G. deals off the
22 books and that the entry is through -- with SuttonPark
23 and 777 Partners.
24    Q.   Okay.  And does this appear to be, on Page 9
25 and 10, a true and accurate copy of an e-mail exchange

61

1 that you were a participant in on about the date stated?
2    A.   Yes.
3       MR. MORLAN:  All right.  I'm going to add
4 another exhibit that will hopefully allow us to not
5 have to upload all of those other matrices that we
6 talked about.  Let me just put that in the chat
7 here.  That's interesting.  I logged in and logged
8 out and the sound got better, but now it's not
9 letting me drop anything into the chat.
10       THE REPORTER:  Do you want to --
11       MR. MORLAN:  Why don't you put your e-mail
12 address in the chat, if you don't mind, and I'll e-
13 mail it to you, Madam Court Reporter Kate.  And if
14 you would then put it in the chat so everybody can
15 see it.
16       THE REPORTER:  Do you want to go off record for
17 this?
18       MR. MORLAN:  Sure.
19       THE REPORTER:  Okay.  One moment.  Time now is
20 11:02 a.m., Eastern.  We're going off the record.
21       (A recess was taken.)
22       THE REPORTER:  Time now is 11:11 a.m., Eastern.
23 We are back on the record.
24       BY MR. MORLAN:
25    Q.   Okay.  Ms. Gorde, if you would please open up



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

62

1  what's been marked for purposes of this deposition as
2  Exhibit 10. It should be shared in the chat.
3       (Exhibit 10 was marked for identification.)
4    A. Yes, I have it open.
5       BY MR. MORLAN:
6    Q. Okay. And I'm going to represent to you that
7  this is a list of the settlement matrices that we were
8  describing earlier that I think were provided, but
9  rather than go through each one, if we can avoid it,
10  given their size, I thought this might be a shortcut. So
11  I'm going to ask you a few questions about this Exhibit
12  10, okay?
13    A. Okay.
14    Q. Okay. Do you see the first line of Exhibit
15  10, under "unified title"? Does that appear to be a
16  file name?
17    A. Yes, it appears to be a file name.
18    Q. Okay. And does that describe -- is that a
19  file name for one of the structured settlement matrices
20  that we were discussing?
21    A. Yes.
22    Q. And does the very first one, dated 1.31.21, is
23  that in fact the specific Settlement Matrice that we
24  looked at previously?
25    A. Yes.

63

1    Q. Okay. And looking at this list, do you see
2  that there's some additional settlement matrice file
3  names on here?
4    A. Yes.
5    Q. Okay. Does -- do you recognize these
6  particular file names?
7    A. Yes.
8    Q. Okay. Does this appear to be a list of the
9  settlement matrices that you provided to Mr. Kosinski
10  that we talked about earlier?
11    A. Yes.
12    Q. And with respect to the settlement matrices,
13  the last few items on the bottom, what does it -- what
14  do the dates mean? These are the only ones that I --
15  I've seen that have a date and then they say they're
16  updated. Can you explain what that means?
17    A. Well, that -- those are the ones that -- the
18  original December 31, 2021 matrices, the dates after
19  that are the dates that they were updated for whatever
20  reason, either a deal was taken off or a deal was put
21  on. And those were the back-and-forths of all those
22  different timeframes and -- at the, you know -- on
23  updating all that stuff.
24    Q. Okay. And are these updates -- were those --
25  what were the reasons for these updates; do you recall?

64

1    A. Those updates could have been for the WMS and
2  JGW deals that were either taken on or put off. There
3  were different back-and-forths of what -- these deals
4  were either going to be bought, not bought, and those
5  were the dates that I had to update those -- the
6  December matrices for whatever change that was
7  communicated to me.
8    Q. Okay. And just to clarify in case I didn't
9  say this before when we were talking about this lawsuit,
10  to my knowledge, nobody in this lawsuit is claiming that
11  you did anything wrong. We're just asking you to help
12  us authenticate some documents and kind of describe what
13  was happening. My clients certainly aren't claiming
14  that you did anything wrong, but I just wanted to let
15  you know that if I didn't make that clear earlier,
16  because I know that, you know, depositions, if you
17  haven't done them before, can be not the most pleasant
18  experiences, but I thought that might help.
19    A. Yes, it does.
20    Q. Okay. So going up to the very first one that
21  says "updated." At 12 -- if you look to the left, it
22  says "Saiph Prod 331514". That's just a Bates reference
23  label like we talked about earlier. That doesn't really
24  have anything to do with you, but I'm asking about the
25  file name.

65

1       Would that have -- if I understand correctly
2  from your testimony, that would reflect that the
3  original Structured Settlement Matrice dated December
4  31, 2021, was updated as of December 19, 2022; is that
5  right?
6    A. Correct.
7    Q. Okay. And what does the "-JP" mean?
8    A. The one -- the "-JP," I'm not exactly sure
9  what that one represents.
10    Q. Okay. And was it typical to need to update a
11  structured settlement matrice, it looks like, almost a
12  year later.
13    A. Usually, no. This -- normally, we would just
14  -- it would be the 12-31 would be done on 12-31 with all
15  updates and everything else, not make changes a year
16  later.
17    Q. Okay. And am I looking at this correctly that
18  these last few entries reflect that there were updates
19  to the December 31, 2021? That was updated several
20  times; is that right?
21    A. Correct.
22    Q. Okay. And it looks like, in addition to
23  December 19th of 2022 that we just discussed, there was
24  also an update on -- a prior update on February 3, 2022?
25    A. Correct.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

66

1    Q.   Okay.  And another one on September 7, 2022?
2    A.   Correct.
3    Q.   Okay.  And the update for September 7th also
4  has that JP suffix at the end; is that right?
5    A.   Yes.
6    Q.   Okay.  And as to any of these other updates,
7  do you recall the purpose or the reason for the update?
8    A.   The updates were -- on all of these were
9  either dealing with the -- like I said, the JG and WMS
10  deals. One -- at one point, they were told to put on the
11  matrix, then they were told to put off the matrix, then
12  they were told to put on the matrix, then they were told
13  to put off.  That's why you have all these back-and-
14  forth.  Originally, if they were changed, I wanted to
15  make sure I had a record of what I changed from what to
16  what time frame.
17    Q.   Okay.  And the very last one on this list, the
18  12.31.21-1, does that mean that that was the initial
19  Settlement Matrice for December 31st of '21?
20    A.   I'm not sure if that was the initial one.  It
21  could be -- it could be the initial one and that the
22  original one maybe had some file errors when opening it
23  up because these are big files, and that when we tried
24  to save it, it wouldn't let me save, so we had to put a
25  -1 on there.

67

1    Q.   Okay.  And all of these documents listed on
2  Composite Exhibit -- or sorry.  Just Exhibit 10, these
3  were documents that you provided to Mr. Kosinski for
4  purposes of the collateral audit; is that right?
5    A.   That is correct.
6    Q.   Okay.  And did you -- could -- would you
7  consider, based on your experience at SuttonPark and
8  your accounting experience, to be records that would be
9  germane to the collateral audit?
10    A.   Yes.
11    MR. MORLAN:  And Madam Court Reporter, did we
12  already mark -- I apologize.  I'm going to have to
13  ask a little bit about where we're at just to
14  clarify in some of these exhibits because my chat
15  window got erased.
16    THE REPORTER:  That's okay.
17    MR. MORLAN:  Did you already mark Exhibit 3?
18    THE REPORTER:  Yes.
19    MR. MORLAN:  Okay.
20    THE REPORTER:  And Composite 4 and Exhibit 10.
21  That was the --
22    MR. MORLAN:  Okay.  And we also did one and --
23  one, two, three, four, and --
24    THE REPORTER:  I did one, nine, two, three,
25  four, and then ten.

68

1    BY MR. MORLAN:
2    Q.   So if you would, please, Ms. Gorde, take a
3  look at Exhibit 5.
4    (Exhibit 5 was marked for identification.)
5    A.   Okay.  I have it open.
6    BY MR. MORLAN:
7    Q.   Okay.  And does this appear to be an e-mail
8  exchange between you and Mr. Kosinski in the context of
9  the collateral audit?
10    A.   Yes.
11    Q.   Okay.  And have you seen this e-mail exchange
12  before, do you believe?
13    A.   Yes.
14    Q.   Okay.  And the subject line is "M&T Bank."  Do
15  you see that?
16    A.   Yes, I do.
17    Q.   Do you recall, just generally speaking, what
18  the subject matter of this e-mail exchange in Exhibit 5
19  is?
20    A.   In this exhibit, it's just trying to get a
21  contact at M&T Bank due to our Wells Fargo account.  We
22  had a couple lockboxes at M&T, and we had a couple
23  accounts at Wells, and this was just to try to get a
24  contact person from M&T so that we could move some of
25  our lockboxes that were at Wells over to M&T.

69

1    Q.   And why did you need to move the lockboxes
2  from Wells to M&T?
3    A.   Wells Fargo was threatening to close our
4  accounts.
5    Q.   And do you know why Wells Fargo was
6  threatening to close the accounts?
7    A.   Due to some of our accounts having -- going in
8  a negative balance.
9    Q.   And these were lockbox accounts that were
10  going into a negative balance?
11    A.   Not the lockboxes, some of our main operating
12  accounts.
13    Q.   And was that an issue that was occurring as of
14  the date of these e-mails?
15    A.   Yes.
16    Q.   And do you know approximately when Wells Fargo
17  first started threatening to close 777's accounts?
18    A.   I want to say probably in -- starting in May
19  of 2024.
20    Q.   And was there anything that happened in May of
21  2024 that's significant or would otherwise relate to why
22  Wells Fargo might be threatening to shut down accounts
23  for 777?
24    A.   Not that I was aware of.
25    Q.   Okay.  Earlier, we briefly discussed a lawsuit



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

70

1  between Leadenhall and 777, SuttonPark, and some other
2  folks that's pending in New York, and I believe you said
3  that you had heard of that before; is that right?
4       A.  That is correct.
5       Q.  Okay.  As of -- and I'll represent to you that
6  that lawsuit was filed in May of 2024.  At the time of
7  these e-mails in June of 2024, do you think you were
8  aware of the existence of that lawsuit?
9       A.  Yes, I was.
10      Q.  Okay.  And is that something that most people
11  at 777 and SuttonPark knew about and talked about
12  shortly after it was filed?
13      A.  I can't say that everybody knew.  I can't say
14  most people knew.  I do know it was talked about.  I
15  think pretty much the most people that were still at
16  SuttonPark knew about it, and I don't know who at 777
17  knew about it or didn't know.
18      Q.  Okay.  And why was Paul Kosinski involved in
19  this lockbox account issue with Wells and M&T?  Do you
20  know?
21      A.  I do not.  I mean, his name -- because we used
22  to -- the M&T account we had at M&T, Paul Kosinski was
23  on that account way back when he used to work for
24  SuttonPark.  It's a SuttonPark account, and that is, I
25  think, where it came from.

71

1       Q.  Okay.  So was this e-mail exchange -- would
2  you say that this was part of the audit or was this
3  something ancillary that Mr. Kosinski was assisting
4  with?
5       A.  This was ancillary to Paul Kosinski was
6  helping with because, since his name was still on the
7  account, you know, we were trying to get a contact
8  person over at M&T to be able to move those Wells
9  accounts over.
10      Q.  Okay.  So was it your understanding that 777
11  and SuttonPark were requesting Mr. Kosinski to help
12  address this lockbox account issue?
13      A.  It was my understanding, yes.
14      Q.  Okay.  And was that based in part on these e-
15  mails?
16      A.  Yes.
17      Q.  Okay.  And did you ever have any conversations
18  with Jim Howard and Teresa Licamara about this issue?
19      A.  We were told about I have talked to those two
20  about Wells Fargo being closed, and I got no response.
21      Q.  Meaning that you sent Jim Howard and Teresa
22  Licamara some e-mails with questions about that?
23      A.  Correct.  I asked them what's going -- what
24  were they planning on doing to help with the Wells Fargo
25  closing, helping them to not close the account, because

72

1  we did get letters from Wells Fargo stating that we had
2  60 days before they would close the accounts.
3       Q.  And what would happen if they closed these
4  accounts?
5       A.  Some of those funds, I -- my understanding
6  would've been locked, and it would be hard to get a lot
7  of our insurance companies that send our checks over to
8  our lockboxes for the individual deals to try to get
9  them to send it over to another lockbox.
10      Q.  Okay.  Can you just give us sort of a nutshell
11  version of what a lockbox account is?
12      A.  It -- a lockbox account is mainly a bank
13  account that, you know, you can send -- it's like a PO
14  box to send checks to, and the bank will process those
15  checks instead of sending them directly to SuttonPark's
16  office and having us go to a bank to deposit that.
17      Q.  Okay.  And was it your understanding,
18  particularly in light of them being copied on this e-
19  mail, that Jim Howard and Teresa Licamara were aware of
20  and requested Mr. Kosinski's assistance with respect to
21  the lockbox issue?
22      A.  As far as I know, it looks -- appears to be
23  that.
24      Q.  Okay.  Other than this e-mail, did you have
25  any other understanding about Mr. Kosinski's involvement

73

1  in the -- in this particular issue?
2       A.  No.
3       Q.  But I think you said you were aware that Mr.
4  Kosinski was a person who was on existing M&T Bank
5  accounts; is that right?
6       A.  Yes.
7       Q.  Okay.  And you must have known that
8  independent of this particular e-mail string at Exhibit
9  5; is that right?
10      A.  It would -- it would've been -- if I would've
11  known, I think we -- Kevin Burgos, who's a 777 Partner
12  treasury analyst, had a listing of all -- who was on
13  everybody's bank accounts within the entire company.
14      Q.  Okay.
15      A.  And I think he was the one that was -- told me
16  that's Paul is still on there.
17      Q.  Okay.  All right.  I'd like to now direct your
18  attention, please -- oh, and let me just ask before we
19  go.  Does -- this Exhibit 5, does this appear to be a
20  true and accurate copy of an e-mail exchange that you
21  participated in on or about the date specified?
22      A.  Yes.
23      Q.  Okay.  And now, if you would please take a
24  look at composite -- I'm sorry, just Exhibit 6.
25            (Exhibit 6 was marked for identification.)



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

74

1    A.  Okay.  I have it open.
2       BY MR. MORLAN:
3    Q.  Okay.  Now, there are a fair number of e-mails
4  that are kind of similar to some of the exhibits that
5  I'm going to show you.  What I'm going to try to do is
6  just sort of get a -- an overview of the significance of
7  these particular e-mails as kind of examples and see if
8  we can get enough information from the examples so that
9  I don't have to -- we don't have to go through every one
10  of them.  So I'm going to kind of ask you maybe some
11  specific questions and maybe some more, you know,
12  general questions to try to streamline things.  So with
13  that, do you recognize this document, Exhibit 6, this e-
14  mail exchange?
15    A.  Yes, I do.
16    Q.  Okay.  And can you generally sort of describe
17  the subject matter and purpose of this e-mail exchange?
18    A.  Well, this -- this purpose of this e-mail is
19  between Alex and, like, myself and Josh regarding one of
20  our investor facilities, Dorchester.  This is a monthly
21  report that we usually send out, and this was him
22  telling us how -- how much we need to top off the
23  facility to be -- so that we could be in compliant with
24  the report.
25    Q.  Thank you for that succinct summary.  Just I

75

1  -- I'm going to ask you to break that down a little more
2  and kind of ask you what Dorchester facility top off and
3  compliant in which report, but we'll take that kind of
4  one by one.  First of all, what is Dorchester?
5    A.  Dorchester is a -- I guess a facility.  It's
6  through Leadenhall.  We set up a whole separate company
7  called Dorchester so that we could just segregate all
8  the -- those deals relating to that facility.  And, you
9  know, we would -- we would have borrowing on them to
10  purchase deals, and the deals will be pledged to the
11  facility.
12    Q.  And when you say the word "facility" here,
13  what does that mean?  That doesn't mean, like, a
14  physical building like some people would use it in other
15  contexts, right?
16    A.  Correct.  It's more of a, I guess you can say,
17  electronic facility, a digital facility.
18    Q.  Okay.  But the Dorchester facility that
19  related specifically to Leadenhall; is that right?
20    A.  Correct.
21    Q.  Okay.  And when you -- what is -- what does
22  the term "top off" mean here?
23    A.  Meaning based on the value of the deals that
24  are on the facility and the report that they generated,
25  it was below the required calculation.  So because of

76

1  our -- maybe our deals were worth a little bit less than
2  originally thought, we would have to put additional
3  funds back into the facility to top it off to make it in
4  compliance.
5    Q.  And when you say in compliance, do you mean to
6  make it comply with the terms of the agreement between
7  777 and Leadenhall with respect to the facility?
8    A.  Correct.
9    Q.  And so I see in the bottom e-mail that started
10  this chain, that's an e-mail from Mr. Adnani, who I
11  believe you described previously; is that correct?
12    A.  Yes.
13    Q.  Okay.  And it looks like he's pointing out a
14  -- both a borrowing base deficiency and an interest
15  payment deficiency; is that right?
16    A.  Correct.
17    Q.  Okay.  What's a borrowing base deficiency?
18    A.  Meaning to based on how, you know, our receive
19  -- the money that we owe we're not -- we haven't
20  received that money yet from the insurance companies.  So
21  let's just say we had $100,000 worth of deals that we
22  were supposed to get in from the insurance company.  We
23  only got 50.  So we were short that 50 that we owed
24  Dorchester to -- for those deals.
25    Q.  Okay.  So when it says borrowing base

77

1  deficiency, $720,964 and change, that's what you were
2  referring to as being short in terms of what you
3  would've -- should have received?
4    A.  Correct.
5    Q.  Okay.  And what is the parenthetical there,
6  "not associated with defaulted open receivables"?  What's
7  the significance of that?
8    A.  That, I am not exactly sure.
9    Q.  Okay.  And then "interest payment deficiency,"
10  what does that mean?
11    A.  That is based on if we borrowed a certain
12  amount of money on -- on the deals, we owe a certain
13  amount of interest.  The interest on there, we were
14  short probably prior month or something like that, so we
15  owed 120,000 for -- for shorting an interest payment.
16    Q.  So that would be an interest payment due to
17  Leadenhall based on the amount of 777 borrowing under
18  the terms of the facility.
19    A.  Correct.
20    Q.  Thank you.  And what was the purpose of Mr.
21  Adnani sending this e-mail to you and Mr. Klein as you
22  understood it?
23    A.  Was that he was letting us aware that we had
24  to pay these back to Dorchester on this report.  And we
25  were going to do another borrowing on another facility,



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

78

1 and we were including this amount so that we could pay
2 Dorchester the amount of money that was owed for
3 Leadenhall.
4    Q.   Okay.  So are you saying that these -- the
5 additional money that was going to be added to
6 Dorchester, was that $841,104 and change?
7    A.   Correct.
8    Q.   Okay.  And that's the sum of the borrowing
9 base deficiency and the interest payment deficiency; is
10 that right?
11    A.   Correct.
12    Q.   Okay.  And I believe I understood you to say
13 that we're -- and I don't mean you, Karen, but 777 was
14 going to need to borrow that $841,104 from another
15 facility in order to make these payments to Leadenhall?
16    A.   Correct.
17    Q.   Okay.  And with respect to the borrowing base
18 deficiency, would -- was that a payment that would be
19 paid to Leadenhall and retained by Leadenhall or was
20 that something that would just be allocated to the
21 facility?
22    A.   My understanding it would be allocated to the
23 facility.  I'm -- because I'm not the one that do -- did
24 those reports.  That was Alex.
25    Q.   Okay.

79

1    A.   I just made the payments into the correct --
2 where there -- where they were supposed to go.
3    Q.   Okay.  So essentially, the purpose of this is
4 Alex is sending information about directing what
5 payments need to be made to accounting, so that
6 accounting can make the payments and book them within
7 the accounting record; is that right?
8    A.   Correct.  Correct.
9    Q.   Okay.  And then with respect to the interest
10 payment deficiency component, is that something that
11 Leadenhall would retain?  I mean, is that, like, normal
12 interest payment on a loan that the bank or the lender
13 would keep?
14    A.   Yes.
15    Q.   Okay.  But the borrowing base deficiency,
16 that's just money that's allocated to the particular
17 facility in order to keep it in compliance with the loan
18 terms of the facility?
19    A.   That is my understanding; that is correct.
20    Q.   Okay.  And is this type of top off e-mail
21 communication from Mr. Adnani, is that something -- is
22 this the only one or is this something that would happen
23 fairly regularly?
24    A.   I mean, different communications based on, you
25 know, the different reports and how they come out.  But

80

1 he would always be sending us, oh, we need to make this
2 payment or stuff like that every month after the report
3 is been run.
4    Q.   Okay.  And after, for example, in this one
5 that borrowing base deficiency was allocated to the
6 Dorchester facility, would that amount be subject to
7 being reallocated to a different facility later?
8    A.   Not that I was aware of, no.
9    Q.   Okay.  Is that something that you would've
10 been involved in if it -- if it -- if it did happen?
11    A.   If it did?  Yes, for the accounting records.
12 The only thing I know what they would do on -- on --
13 between the different facilities, different investors is
14 they would, you know, sell some of the deals off
15 Dorchester and put them on -- and, you know, put them on
16 Volins.  And that's the things -- the only things that I
17 know that would happen.
18    Q.   And is Volins the name of a different
19 facility?
20    A.   It is.
21    Q.   Okay.  And who is the investor for Volins?
22    A.   Credigy.
23    Q.   And when you say that they would sell off a
24 deal from a facility, what does that mean?
25    A.   They would -- say, for example, whatever the

81

1 reason being, they would take off -- they would sell --
2 you know, take off the deals on Dorchester.  Obviously,
3 pay the money for those deals being taken off so that
4 they can clear off the borrowing -- the -- the
5 outstanding loan for that part.  And then they would put
6 it on to a different facility.  Sell off one, put it on
7 another.
8    Q.   Okay.  So when you say sell off, do you mean
9 that they would replace the particular receivable within
10 the facility with cash representing the value of that
11 receivable?
12    A.   Yes.
13    Q.   And then once that cash payment was made, that
14 -- your understanding was then that the deal could be
15 reallocated or repledged to a different facility?
16    A.   Correct.
17    Q.   And scrolling up to the very top of this e-
18 mail, it looks like within about three minutes or so of
19 you receiving this, you forwarded this e-mail to Reuben
20 Mitchell; is that right?
21    A.   That is correct.
22    Q.   Okay.  Do you recall why you did that?
23    A.   I did that because he was the one that would
24 keep track of what cash needs we -- we needed for, you
25 know, or maybe the week, the day, the month.  And so he



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

82

1 just needed to put on his cash flow of, hey, I needed
2 this amount of money to go here.
3     Q.  Okay.  If you would please take a look at
4 Exhibit 7.
5         (Exhibit 7 was marked for identification.)
6     A.  Okay.  I got it open.
7     BY MR. MORLAN:
8     Q.  Okay.  Actually, let me go back to Exhibit 6
9 real quick, just in case I didn't ask this.  Does this
10 appear to be a true and accurate copy of an e-mail
11 exchange in which you were a participant?
12     A.  Yes, it does.
13     Q.  Okay.  All right.  And now, if you'll take a
14 look at Exhibit 7.
15     A.  Got it open.
16     Q.  Okay.  Have you had a chance to look at this
17 exhibit?
18     A.  Yes, I have.
19     Q.  Okay.  Does this appear to be a true and
20 accurate copy of an e-mail exchange that you were a part
21 of with Mr. Adnani, and Mr. Bennett, and others?
22     A.  Yes, it does.  Yes.
23     Q.  Okay.  All right.  And this is -- it appears
24 to be a little bit longer and more complicated e-mail
25 exchange than the last one; is that right?

84

1 "Dorchester," is this Dorchester 1?
2     A.  Yes.
3     Q.  Okay.  And SPLCSS -- was there a SPLCSS 1, or
4 otherwise, an original SPLCSS that proceeded 2 and 3?
5     A.  There might have been an SPLCSS, I think it
6 was 2016.  And then they amended it to SPLCSS 2, and
7 then they amended again to SPLCSS 3.
8     Q.  Okay.  So those weren't necessarily completely
9 different facilities, they were just an amended
10 facility?
11     A.  Correct.  They would close one facility and
12 reopen it up as a new facility with new agreements on
13 it.
14     Q.  Okay.  But the new facilities, would they have
15 some of the same assets as part of them, as the old
16 facility?
17     A.  Correct.  They would just move them over from
18 one to another.
19     Q.  Okay.  And is there a typical range of how
20 long the particular assets would stay on the books of a
21 particular facility?
22     A.  I wouldn't know, exactly, the range.  I mean,
23 they could be years, or they could be months, and it --
24 there is no particular range.
25     Q.  Okay.  It would be specific to the specific

83

1     A.  Correct.
2     Q.  Okay.  And I believe the last one we looked at
3 related to a Dorchester monthly report from November of
4 2021, Exhibit 6; is that right?
5     A.  Correct.
6     Q.  Okay.  And then this one, Exhibit 7, that
7 we're looking at, appears to relate to a Dorchester
8 monthly report dated 9-30-21?
9     A.  Correct.
10     Q.  Okay.  And that monthly report that's
11 referenced in the subject line, were those the monthly
12 reports that you were referring to previously when you
13 said Mr. Adnani and Mr. Bennett would be responsible for
14 sending those to the investors?
15     A.  Yes.
16     Q.  Okay.  And were those reports typically done
17 by facility?
18     A.  Yes.  It would be done by facility.
19     Q.  Okay.  And besides Dorchester, are you
20 familiar with, or do you recall any other Leadenhall-
21 specific facilities?
22     A.  SPLCSS 2, SPLCSS 3.  It was those two.  And
23 then -- they -- they had a Dorchester 1 and
24 Dorchester 2.
25     Q.  So I'm guessing that since this just says,

85

1 asset?
2     A.  Yes.
3     Q.  Depending on its -- the length of the payment
4 stream left, and whether or not it was bought, or sold,
5 or reallocated to different facilities; is that correct?
6     A.  Correct.  That's correct.
7     Q.  Okay.  So if you just, to kind of
8 streamline this, can you give me sort of an overview of
9 the purpose of this particular e-mail exchange that
10 we've marked as Exhibit 7 for purposes of this
11 deposition?
12     A.  Well, the below e-mails were relating to Alex
13 and Leadenhall, submitting the report as a draft, have
14 them review it, have them make any comments on it.  And
15 the last e-mail from Alex to me and Nick was that the
16 report was approved by Leadenhall, and that we should
17 process the interest payment at that time.
18     Q.  Okay.  But you and accounting weren't involved
19 in getting these reports approved by the investor; is
20 that right?
21     A.  No.  We were not in involved in that.
22     Q.  Okay.  So that would be something that Mr.
23 Adnani or Mr. Bennett took care of, and then informed
24 you about so you could make the necessary accounting
25 adjustments?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

86

1    A.   Correct.
2    Q.   And are you familiar with the particular
3  issues that are discussed in this e-mail in terms of
4  what needed to be modified, with respect to the report?
5    A.   I am not, no.
6    Q.   But this is -- this sort of exchange of
7  information regarding monthly reports being sent to an
8  investor, and then there being comments, and ultimately
9  approved, is that something that you would normally be
10  involved in in the capacity that we just spoke about?
11    A.   Yes.
12    Q.   So just going down to -- if you look on Page 3
13  of this exhibit, did you see an e-mail from
14  tomfoot@leadenhall to Alex Adnani?
15    A.   Yes.
16    Q.   Okay.  And do you know what Mr. Foot is
17  referring to in his first comment that starts with the
18  reconciliation?
19    A.   The only thing is -- is based on the report,
20  is that he was seeing that every payment was -- that we
21  had not received every -- any payment, is pretty much
22  what he's asking about.
23    Q.   Okay.  Do you know why you wouldn't have
24  received any payments?
25    A.   I don't know why that was the case on this

87

1  one, no.
2    Q.   Is that something that you were used to seeing
3  that there would be a report, and every payment would be
4  past due, or do you know?
5    A.   No.  That doesn't seem -- to me, it doesn't
6  seem that appears to be right at all.
7    Q.   When you say it doesn't appear to be right,
8  you mean -- do you mean that Tom's evaluation is
9  incorrect, or that it's, you know, abnormal for a report
10  to have all the payments being past due, or something
11  else?
12    A.   It's abnormal for a report to have all
13  payments past due.  There always are going to be some
14  payments that are past due, but not all of them.
15    Q.   Okay.  And it also refers to, if I'm correct,
16  something about whether or not the borrowing base was
17  reduced for defaulted receivables.  What does that mean?
18    A.   That, I guess there -- the -- my understanding
19  would be -- is that due to the fact that we had -- we
20  had a borrowing base, which means we could borrow up to
21  a certain amount.  Since we were defaulted, we couldn't
22  borrow as much on the facility because of those
23  defaulted deals.
24    Q.   Okay.  And is a defaulted receivable just one
25  that an interest payment wasn't received on, or did it

88

1  have to be more than that to be considered a defaulted
2  receivable?
3    A.   A defaulted receivable would be that we didn't
4  receive, yeah, the interest, or any payments on that --
5  that asset.
6    Q.   Okay.  So where Tom says, "Every payment is
7  showing being past due," just being past due, wouldn't
8  necessarily be enough to render something a defaulted
9  receivable, would it?
10    A.   Well, it's past -- it would be in default
11  because we were supposed to expect the payment on, let's
12  say, January 1st, and we haven't received it as -- at
13  the end of January 31st, as an example.  And it's in
14  default, meaning we haven't paid on that -- that deal.
15    Q.   Okay.  I'm a little confused, but I think we
16  saw this earlier.  Can you just go back to Exhibit 6 for
17  a second?
18    A.   Yes.
19    Q.   And if you look at the e-mail from Mr. Adnani,
20  where he's describing the borrowing base deficiency, do
21  you see that, the parenthetical not associated with
22  defaulted open receivables?
23    A.   Yes.
24    Q.   Okay.  So what does that mean?  Is he
25  describing what the deficiency is, but that number

89

1  doesn't include the -- any deficiency created by a
2  defaulted open receivable?
3    A.   That I can't answer.
4    Q.   Okay.  And is one of the reasons that you
5  can't answer that because you didn't often see
6  situations where there were borrowing base deficiencies
7  not associated with defaulted open receivables?
8    A.   It's just that I don't know what he meant in
9  this particular e-mail.  All I -- all this particular e-
10  mail tells me is that we owe Dorchester $841,000.  And
11  that's really what we did on this that's based on his
12  report.
13    Q.   Okay.  Anything else of significance, going
14  back to Exhibit 7, from your perspective, and in terms
15  of what you and the accounting department needed to know
16  from the exchange -- the e-mail exchange at Exhibit 7?
17    A.   Nope.  Other than the fact that the report was
18  approved and that we can go ahead and make the payment
19  that we -- the interest payment that we owed on the
20  facility.
21    Q.   And does this appear to be a document that
22  would be germane to Leadenhall's collateral audit?
23    A.   Yes.
24    Q.   Okay.  And does this appear to be a document
25  that you would've provided to Mr. Kosinski, in



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE  **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

90

1   connection with the Leadenhall collateral audit?
2       A.  I am not exactly sure.
3       Q.  Do you have any reason to believe that this is
4   not an e-mail that you provided to Mr. Kosinski?
5       A.  On -- from your exhibit that you gave me on
6   Exhibit 4, based on the attachments, that's the -- one
7   of them is not in there.  So I do not know if this was
8   an e-mail that I provided to Paul Kosinski.
9       Q.  Okay.  Were there e-mails included on that
10  thumb drive with the settlement matrices?
11      A.  The settlement matrices, the only thing I put
12  on there were the matrices.
13      Q.  Okay.  All right.  Let's take a look at
14  Exhibit
15  8.
16          (Exhibit 8 was marked for identification.)
17      A.  Okay.  I have it open.
18      BY MR. MORLAN:
19      Q.  All right.  And does this appear to be a true
20  and accurate copy of an e-mail -- appear to be a true
21  and accurate copy of an e-mail exchange that you were
22  on, with the date of December 29, 2021 at the very top?
23      A.  Yes, it appears.
24      Q.  Okay.  And the subject line is Dorchester
25  collection top off, right?

91

1       A.  Correct.
2       Q.  Okay.  And is that top off, as it's being used
3   here, it's being used in the same way that we discussed
4   earlier when you were describing what topping off the
5   accounts meant?
6       A.  Yes.
7       Q.  Okay.  And what is the particular significance
8   of this particular e-mail exchange from your
9   perspective?
10      A.  From my perspective, this e-mail exchange was
11  to top off the collection account to remain in compliant
12  with the facility.  And that's just us getting the
13  approvals to top it off.
14      Q.  So accounting would be seeking the approvals
15  to make the top off payments; is that right?
16      A.  Correct.  From management.
17      Q.  Okay.  And typically, who would need to
18  approve these types of top offs?
19      A.  Damien Alfalla, Steve Pasko, Fred Love.  So we
20  would need all three of them to approve it.
21      Q.  Would all three of those people, Damien
22  Alfalla, Steve Pasko, and Fred Love need to approve all
23  top offs, or is this a special one or does it have to do
24  with the amount or something?
25      A.  Nope.  All of them.

92

1       Q.  And does the first e-mail in the string from
2   Damien Alfalla, 12-29-2021, is it your understanding
3   that -- did this e-mail mean to you that Mr. Alfalla
4   approved the top off?
5       A.  Yes.
6       Q.  Okay.  And in the e-mail below that, is your
7   understanding of that e-mail that Mr. Pasko was
8   approving the top off?
9       A.  Yes.
10      Q.  And I don't see an e-mail from Mr. Love, but
11  would he also need to approve this top off payment?
12      A.  Yes.
13      Q.  And if we look starting at the bottom -- well,
14  let me ask you about this bottom e-mail.  Does this
15  appear to be an e-mail from Mr. Adnani to Clarence Err?
16      A.  It appears to be.
17      Q.  Okay.  And Mr. Err, along with Mr. Foot, and
18  Mr. Mason, and Mr. Gillespie, those are representatives
19  of Leadenhall?
20      A.  Yes, they are.
21      Q.  Okay.  And is this one of those communications
22  that you were describing earlier where Mr. Adnani and/or
23  Mr. Bennett would be communicating about monthly status
24  and compliance reports with the investors with respect
25  to particular facilities?

93

1       A.  Yeah, that is correct.
2       Q.  Okay.  And this particular e-mail exchange
3   that we're looking at, Exhibit 8, that deals with the
4   Leadenhall Dorchester facility that we've been
5   discussing, correct?
6       A.  Correct.
7       Q.  Okay.  And do you know what the significance
8   is of the black text versus the red text in the very
9   first e-mail?  In other words, who is -- I think is --
10  does the red text reflect somebody's comment or do you
11  know?
12      A.  I do not know.
13      Q.  Okay.  How about with respect to the next e-
14  mail?  Do you understand what they're talking about
15  there when they say -- when they're talking about the
16  shortfall there, is that the shortfall that we talked
17  about before, about -- as to the borrowing base?
18      A.  It appears to be.
19      Q.  And what would Clarence be referring to, if
20  you know, when he's asking Alex, would you be able to
21  update the report to cure the shortfall, please, do you
22  know what that means?
23      A.  No, I do not.
24      Q.  All right.  Well, let -- let's scroll up to
25  the e-mail from Mr. Adnani to you, Josh Klein, and



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

94

1 Reuben Mitchell. Do you see that?
2    A. Yes, I do.
3    Q. Okay. And in this, does this reflect that Mr.
4 Adnani is essentially seeking -- I guess, asking
5 accounting to make a payment of $64,000 into the
6 Dorchester facility?
7    A. Correct.
8    Q. Okay. And so he would direct accounting to
9 make the payment and then before accounting made that
10 payment, they would make sure that Mr. Pasko, Mr. Love,
11 and Mr. Alfalla approved of the payment; is that right?
12    A. Correct.
13    Q. Okay. And do you know what Mr. Adnani is
14 referring to when he says, "This is a small ask given
15 they're waiving the 11 million in defaulted receivables
16 as of 11-30"?
17    A. No, I do not.
18    Q. And do you know whether the $64,000 payment
19 was ultimately approved by Fred Love or not?
20    A. I do not know if it was. He could have done
21 it a different e-mail.
22    Q. Okay. And who is Fred Love?
23    A. Fred Love was -- let's see. He was legal
24 counsel and then he was overseeing SuttonPark after I --
25 Paul Kosinski left.

95

1    Q. When you say Paul Kosinski left, do you know
2 anything besides the approximate time frame regarding
3 Paul Kosinski's departure from SuttonPark?
4    A. No. I wasn't really involved in that.
5    Q. Okay.
6    A. I just know he left, and I know, you know,
7 that he went on his own.
8    Q. Okay. Was that something that was discussed
9 at all around the office?
10    A. That I do not know. I wasn't in the office.
11 I work from home.
12    Q. Okay. Were you privy to any, you know, office
13 gossip or grapevine at all, even though you were working
14 from home?
15    A. Nope.
16    Q. Did you like it better that way?
17    A. Sometimes, yeah.
18    Q. Have you ever heard any disparaging remarks
19 about Paul Kosinski made by anyone affiliated with
20 SuttonPark, B. Riley, or 777?
21    A. No, I'm not. I'm not aware of any.
22    Q. Okay. And in -- I believe you said you worked
23 with Mr. Kosinski quite a bit --
24    A. Yes.
25    Q. -- during the time you overlapped?

96

1    A. Yes.
2    Q. Okay. And did you ever know Mr. Kosinski to
3 do anything unethical or questionable during that time?
4    A. No, not at all.
5    Q. And would you consider Mr. Kosinski someone
6 who was knowledgeable regarding the accounting and
7 reporting issues with respect to these structured
8 settlement loan facilities like Dorchester?
9    A. Yes. He was very knowledgeable when he worked
10 there.
11    Q. Okay. And in your view, based on your
12 interaction with him with respect to the audit, as well
13 as your experience in working with him, do you believe
14 that he was somebody who would be particularly qualified
15 to perform a collateral audit on behalf of Leadenhall?
16    A. Oh yes, definitely.
17    Q. As you sit here today, are you aware of
18 anybody who would be more qualified than Mr. Kosinski to
19 perform a audit of structured settlement collateral
20 facilities than Paul Kosinski?
21    A. No.
22    MR. MORLAN: All right. I am going to now
23 direct you to -- did I -- was I able to share
24 Exhibit 9 yet? I don't believe so.
25    THE REPORTER: You did. That was the second

97

1 one that you shared.
2    MR. MORLAN: Oh, that's right. Okay. So --
3    MR. BOLAND: Sorry, I don't see Exhibit 9 in
4 the chat. Am I missing it?
5    THE REPORTER: It's not marked as nine. It's
6 the Saiph --
7    MR. DONOVAN: The Excel. Is it the Excel?
8    MR. BOLAND: Oh, it's the Excel. Yeah, I get
9 it.
10    MR. DONOVAN: I think it's the Excel.
11    MR. MORLAN: Okay. And we did Exhibit 10. All
12 right. I'm going to -- still can't share it to the
13 chat. I'm going to send Exhibit 11 to the court
14 reporter. I apologize everybody for the delay on
15 this. I don't know how that happened that I can't --
16 that I could share in the beginning and now I can't
17 but doing the exact same thing. So I'm going to
18 share that and ask Kate to put that in the chat so
19 that everyone will be able to see it.
20    THE REPORTER: All right. It's now in the
21 chat.
22    MR. MORLAN: Okay. Does everybody have access
23 to that?
24    MR. BOLAND: Yes. Thank you.
25    THE WITNESS: Yes.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

98

1      MR. BOLAND: Give me one second. Thanks. Yeah.
2      BY MR. MORLAN:
3      Q.   So Ms. Gorde, when these top off payments were
4  approved and made, would that then result in the monthly
5  reports to the investor as of that time not showing any
6  borrowing-based deficiencies?
7      A.   Correct.
8      Q.   And that was the purpose of the top-off?
9      A.   Yes.
10     Q.   Okay. And do you have what we've marked as
11  Exhibit 11?
12         (Exhibit 11 was marked for identification.)
13     A.   Yes, I have it open here.
14     BY MR. MORLAN:
15     Q.   Okay. And does Exhibit 11 appear to be a true
16  and accurate exchange between you, Fred Love, and others
17  regarding the Dorchester facility that we've been
18  discussing?
19     A.   Yes. Yes.
20     Q.   And do you see where the subject line says,
21  the Dorchester July distribution due today?
22     A.   Correct.
23     Q.   What is the -- what is a distribution as it's
24  used here in this e-mail?
25     A.   It is payments made regarding all the

99

1  collections based on the reports.
2      Q.   Okay. So in addition to making interest
3  payments on the facility, there would need to be
4  payments made based on the receivable payments that came
5  into the lockbox?
6      A.   Correct.
7      Q.   Okay. And those -- so those -- that
8  shortfall, that's a different -- is that a different
9  shortfall than we were talking about before in terms of
10  the -- I think we talked about the -- there being
11  interest payments due and we talked about the borrowing-
12  based deficiency, but this particular e-mail is talking
13  about a distribution deficiency?
14     A.   Yes.
15     Q.   Okay. And with respect to the distribution
16  deficiency, is that deficiency -- does that represent
17  the difference between the payments that were received
18  by 777 and the payments that were made to Leadenhall?
19     A.   Yes. It's the difference between the payments
20  that were collected into the account versus what is
21  actually due.
22     Q.   Okay. And this particular e-mail is talking
23  about $270,000 -- a shortfall of $270,000 in the
24  distribution amount that was due to Leadenhall as of the
25  -- as of August 25, 2021; is that right?

100

1      A.   Based on the July distribution report --
2  report. So July distribution report, they -- it goes
3  out in August, obviously when July closes, and it was
4  due on August 25th for the July amount.
5      Q.   And so was the July amount that was in the
6  report, was that based on actual collections or
7  predicted collections?
8      A.   On the report I would say it's -- well, it's a
9  combination, I think, of both. It's predicted
10  distribute -- it's predicted collections, but it also
11  compares it to what actually was collected.
12     Q.   Okay. So does this mean that $270,000 was not
13  collected or just that there was a shortfall in the
14  amount of the lockbox for whatever reason of $270,000?
15     A.   Well, that 270,000 hadn't been collected from
16  the insurance companies.
17     Q.   Okay. And the first e-mail in the string at
18  the bottom, August 25, 2021, at 11:40 a.m., this is you
19  seeking approval again, from Damien Alfalla, Steve
20  Pasko, and Fred Love to make the July distribution?
21     A.   Correct.
22     Q.   Okay. And so if the July distribution was
23  supposed to be a particular amount, but the funds didn't
24  come in, was the typical practice to add funds so that
25  that payment could be made to the lender as of the date

101

1  that it was due?
2      A.   Correct.
3      Q.   Is that something that -- how often were there
4  shortfalls like that?
5      A.   I do not know off the top of my head.
6      Q.   Okay. I mean, does this look like something
7  that was typical, abnormal? Do you have any feel for
8  the frequency of this?
9      A.   No, I do not.
10     Q.   Okay. How about the magnitude? A $270,000
11  shortfall in the collection account. Is that -- does
12  that get your attention or is that within, you know, a
13  range that you recall typically seeing?
14     A.   That I don't remember. No.
15     Q.   And do you know the -- what would be some of
16  the reasons for shortfalls in the collection account?
17     A.   It would be the fact that we didn't get the
18  funds from the insurance companies because they didn't
19  send the checks for whatever reason. Maybe they, you
20  know, got it late and then they sent it to us late.
21  Could have been that. Mainly would be the reason why.
22     Q.   Can you think of any other reason?
23     A.   Not that I can think of. No.
24     Q.   But you wouldn't necessarily be in a position
25  to know all of those reasons, because that wasn't within



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

102

1  your area necessarily, was it?
2      A.  Correct.
3      Q.  All right.  All right.  I'm just going to take
4  a two-minute break, check my notes and then I think I am
5  done.  So if we'll just go off the record here real
6  quick and I will be right back.
7          THE REPORTER:  Sure.  The time now is 12:19
8  p.m., Eastern.  We're going off the record.
9          (A recess was taken.)
10         THE REPORTER:  Time now is 12:29 p.m., and we
11  are back on the record.
12         BY MR. MORLAN:
13     Q.  Ms. Gorde, do you know who Noah Davis is?
14     A.  Yes, I do.
15     Q.  Okay.  And how long have you known Mr. Davis?
16     A.  Since I started at SuttonPark.
17     Q.  Okay.  And did you have much interaction with
18  Mr. Davis while you were at SuttonPark?
19     A.  IT-related issues.
20     Q.  What types of IT-related issues?
21     A.  If -- if I couldn't get into a drive, you
22  know, he would fix it.  If, you know, we used to have an
23  old QuickBooks file, we use.  If I couldn't get in
24  there, he would be able to get me -- fix it to be able
25  to get me into it, where he would have to shut down the

103

1  server and put it back up, but just little things like
2  that.
3      Q.  Okay.  How well would you say you think, you
4  know, Mr. Davis?
5      A.  Just I guess I know him well, but not too
6  well. I mean, we were, you know, just, you know,
7  employee -- you know, colleagues.
8      Q.  Okay.  Were you aware of any allegations
9  against Mr. Davis with respect to hacking into or
10  otherwise accessing 777 SuttonPark's computer systems
11  without authorization following his employment?
12     A.  The only thing I've heard was what was ever --
13  was in the news.
14     Q.  Okay.  And what was it that you heard from the
15  news and what was the news source, if you recall?
16     A.  I don't recall the exact news source, but it
17  was just that supposedly he -- he had broke into
18  SuttonPark and took some -- some IT equipment or some
19  data.  And I don't know if that's the case or not.
20     Q.  Okay.  So you -- you're talking about an
21  actual physical break in; is that right?
22     A.  Yes.
23     Q.  Okay.  Have you seen any news reports about
24  any allegations made by SuttonPark or 777 against Paul
25  Kosinski or Saiph?

104

1      A.  Not that I was aware of, no.
2      Q.  Okay.  Are you -- have you seen any
3  allegations in news reports regarding Leadenhall or --
4  yeah.  Well, yes.  Just regarding Leadenhall with
5  respect to any unauthorized intrusions by Mr. Davis?
6      A.  Nope, I have not.
7      Q.  Would it surprise you to learn that SuttonPark
8  and 777 are alleging in this lawsuit that Paul Kosinski
9  and Saiph encouraged or otherwise caused Mr. Davis to
10  illegally make unauthorized intrusions to SuttonPark's
11  offices and computer systems?
12     A.  I couldn't see Paul having him do that.  No.
13     Q.  So based on having worked with Paul and known
14  Paul for a considerable period of time, are you saying
15  that those allegations don't ring true to you?
16     A.  I don't see them ringing true at all.  Only
17  just by his, you know, knowing him, knowing that he
18  wouldn't send out anybody to go steal something.  That's
19  just how I only know him.
20     Q.  Okay.  And I know earlier you said you were
21  somewhat out of the loop, but have you -- did you hear
22  anybody say anything negative about Paul leading into
23  the time of the audit or during the collateral audit?
24     A.  Nope.
25     Q.  And prior to that, did you hear anybody say

105

1  anything negative about Paul?
2      A.  Nope.
3      Q.  And just going back to, sort of, look at the
4  big picture, we, kind of, got into the detail, but on a
5  more big picture view, trying to understand the process
6  by which reports go to the investors and then the
7  reports are compared with certain accounting records and
8  there's some reconciliation.  That's that whole process
9  that we've been discussing here?
10     A.  Yes.
11     Q.  Okay.  And ideally, would there be -- would
12  there be as many discrepancies as were apparent between
13  those records over time?
14     A.  I'm -- I'm not exactly sure I understand the
15  question.
16     Q.  Okay.  That's fair.  Did you understand there
17  to be frequent discrepancies requiring reconciliation
18  between the accounting records and other records or
19  reports or systems regarding information about the
20  credit facilities?
21     A.  No.  I mean, we would always reconcile the
22  reports to what I have on the Matrices to the accounting
23  records.  It was always a reconciliation.
24     Q.  Okay.  In terms of some of the allegations
25  that were made in the New York litigation regarding



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

106

1 inaccuracies and reports and collateral being double
2 pledged, things like that, are you familiar with --
3 well, first of all, do you know what I mean when I say
4 that collateral was double pledged?
5    A.  Yes, I do.
6    Q.  Okay.  Understanding that it wouldn't
7 necessarily be in your direct area to decide what was
8 and was not pledged, are you familiar with any instances
9 of any receivables or assets being double pledged to
10 different creditors or different facilities?
11   A.  I have been aware of some of them, yes.
12   Q.  Okay.  And was management of 777 and
13 SuttonPark also aware of those?
14   A.  As far as I know, yes, they were.
15   Q.  Okay.  And to the extent that you discovered
16 irregularities like that or performed reconciliations,
17 you would bring that type of information to the
18 attention of management, correct?
19   A.  Correct.
20   Q.  Okay.  And would that include Mr. Pasko?
21   A.  Yes.
22   Q.  Okay.  And would that include Mr. Alfalla?
23   A.  Yes, that would.
24   Q.  Okay.  And would that include Fred Love?
25   A.  Yes.

107

1    Q.  Would that include Josh Wander?
2    A.  Josh Wander, I didn't -- I mean, he was
3 included on it, yes, because I would send it to
4 everyone.  I didn't deal too much with Josh Wander.  I
5 did mainly with, you know, Steve Pasko and Fred Love and
6 Damien.
7    Q.  Okay.  Other than the double pledging
8 discrepancies that we talked about, were there other
9 types of suspicious or other potentially problematic or
10 fraudulent discrepancies that you're aware of besides
11 the double pledging?
12      MR. BOLAND:  Objection.  Form.
13      THE WITNESS:  No.
14      BY MR. MORLAN:
15   Q.  And while you were at -- what -- when was your
16 -- when did you leave 777 and SuttonPark?
17   A.  July -- was it July 15th or July 12th?  I
18 think it was July 12th of 2024.
19   Q.  2024.  Okay.  And do you recall ever hearing
20 anything about any problems with the MpFin system?
21   A.  I know it was an outdated system.  It was very
22 not friendly to use.  Other than that, not -- not much
23 on that.
24   Q.  Okay.  Were you aware of any allegations of
25 any records being improperly altered within the MpFin

108

1 system?
2    A.  No, I was not.
3    Q.  Okay.  But you were aware of usability types
4 of issues with respect to MpFin?
5    A.  It -- I have seen it, that it wasn't very
6 friendly.  I would actually, you know, have somebody do
7 it for me and it always wasn't easy to find certain
8 things in there.  It's what my, you know, recollection
9 of it was, but I never really used it.  So --
10   Q.  Okay.  But in terms of the system being down
11 or things like that, or other people who routinely used
12 it not being able to -- or you not being able to get the
13 data that you wanted, any issues like that of which you
14 were aware?
15   A.  No.
16      MR. MORLAN:  Okay.  All right.  I will tender
17 this witness to whoever's next.
18      MR. DONOVAN:  All right.  I think that's me,
19 right?  Okay.  Thanks, Hal.
20      EXAMINATION
21      BY MR. DONOVAN:
22   Q.  Hi, Ms. Gorde.
23   A.  Hi.
24   Q.  My name is -- my name is Brian Donovan.  I'm
25 Counsel for the Leadenhall defendants.  I know this is

109

1 not, probably, your favorite thing to do.  I want to get
2 you out of here on time.  We really appreciate your time
3 today.  Mr. Morlan said before that no one is saying you
4 did anything wrong.  I want to reiterate that both for
5 purposes of this Florida litigation and also the New
6 York litigation.  Have you read the complaint in this
7 litigation, the Florida litigation?
8    A.  In this -- the Florida litigation, no, I have
9 not.  The New York one, I have
10   Q.  All right.  What are your reactions to the
11 allegations in the New York litigation?
12      MR. BOLAND:  Object to the form.
13      THE WITNESS:  I prefer not to answer.  Yeah, I
14 have my own opinions on it.  That's all I got to
15 say.
16      BY MR. DONOVAN:
17   Q.  Sure.  Can I get those opinions, if you don't
18 mind?
19   A.  I prefer not to do it because I do know for a
20 fact that it is true.  They stole the money.
21   Q.  Can you explain what you mean by that?
22   A.  I saw the money come into our bank accounts
23 from Leadenhall.  And in turn, 777 asked for a
24 distribution from SuttonPark, directing all that money
25 to them, not paying for deals.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

110

1    Q.  How much money did SuttonPark and 777 Partners
2  steal from Leadenhall?
3       MR. BOLAND:  Object to the form.
4       THE WITNESS:  The one I know of is the 350
5  million.
6       BY MR. DONOVAN:
7    Q.  Okay.  So do you know -- strike that.  How did
8  777 Partners and SuttonPark steal at least $350 million
9  from Leadenhall?
10       MR. BOLAND:  Object to the form.
11       THE WITNESS:  From my knowledge, they went and
12  borrowed the money from Leadenhall to purchase the
13  JGW deals and the WMS deals.  In turn, that money
14  never went to those portfolios to purchase.  It went
15  straight from SuttonPark to 777.
16       BY MR. DONOVAN:
17    Q.  All right.  It went straight to SuttonPark and
18  777.  What did 777 and SuttonPark do with the money it
19  stole from Leadenhall?
20       MR. BOLAND:  Object to the form.
21       THE WITNESS:  That I do not know.  I can't tell
22  you what -- when it left SuttonPark's bank accounts
23  and it went to 777 Partners' bank accounts, what 777
24  Partner did with that money.  All I do know that
25  those deals that they said that it was going to be

111

1  for, it did not.
2       BY MR. DONOVAN:
3    Q.  Okay.  So you understand that SuttonPark was
4  supposed to be using debt from Leadenhall to purchase
5  receivables, right?
6    A.  Correct.
7    Q.  And you're saying that instead of using at
8  least 350 million from Leadenhall to purchase
9  receivables, SuttonPark instead transferred those funds
10  to 777 Partners, right?
11    A.  Correct.
12    Q.  Do you know what bank account SuttonPark
13  transferred $350 million to?
14    A.  Not on the -- it was a 777 bank account.  I
15  want to say maybe it was Bank of America, but I'm not
16  100 percent sure.
17    Q.  Who gave the direction at 777 Partners to
18  steal $350 million from Leadenhall at least?
19       MR. BOLAND:  Object to the form.
20       THE WITNESS:  I --
21       MR. BOLAND:  You can answer.
22       THE WITNESS:  -- I -- I would -- go ahead.
23       MR. BOLAND:  No, you can answer.  I just made
24  the objection.  You can answer.
25       THE WITNESS:  Okay.  No problem.  I would say

112

1  -- I mean, it came from -- I would say probably
2  Steve and Josh went to Damien and had Damien then
3  send it to -- down to myself and/or Josh Klein, who
4  Josh Klein was, at the time, the controller.
5       BY MR. DONOVAN:
6    Q.  All right.  So I just want to make sure I
7  understand your testimony.  Your testimony is that Josh
8  Wander and Steven Pasko directed Damien Alfalla to steal
9  money from Leadenhall, right?
10       MR. BOLAND:  Object to the form.
11       THE WITNESS:  I wouldn't say necessarily steal,
12  but transfer money from SuttonPark to them for their
13  operations, as far as I know.
14       BY MR. DONOVAN:
15    Q.  Okay.
16       THE WITNESS:  What they did with that money?  I
17  do not know.
18       BY MR. DONOVAN:
19    Q.  Okay.  So is it your testimony that Josh
20  Wander and Steven Pasko directed Damien Alfalla to
21  transfer at least $350 million of Leadenhall's money
22  from SuttonPark to 777 Partners?
23    A.  That is my understanding, yes.
24    Q.  And you testified that you don't know what 777
25  Partners then did with that money, right?

113

1    A.  Correct, because I was not on 777's bank
2  accounts.  I was not on 777's accounting records.  I was
3  only on SuttonPark's accounting records.
4    Q.  Did you ever hear from anyone what 777
5  Partners might have done with that money?
6    A.  I do not know.
7    Q.  Do you know what I mean by the word knowingly
8  or intentionally?
9    A.  Yes.
10    Q.  Is there any doubt in your mind that Josh
11  Wander and Steven Pasko knowingly stole money from
12  Leadenhall?
13       MR. BOLAND:  Object to the form.
14       THE WITNESS:  Yes.
15       BY MR. DONOVAN:
16    Q.  Sorry.  There is doubt in your mind or is
17  there is not doubt?
18    A.  No, there's no -- there's -- that they
19  knowingly did it?  Yes.
20    Q.  All right.  So I just want to make sure the
21  record is clear.
22    A.  Yes.
23    Q.  Is there any doubt in your mind that Steven
24  Pasko and Josh Wander stole at least $350 million from
25  Leadenhall?



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

Steven Gold - March 03, 2025    Page 114

114

1    MR. BOLAND: Objection to the form.
2    THE WITNESS: There's no doubt in my mind.
3    BY MR. DONOVAN:
4    Q.   And is it your testimony that Josh Wander and
5    Steven Pasko knowingly stole hundreds of million dollar
6    -- hundreds of millions of dollars from Leadenhall?
7    MR. BOLAND: Object to the form.
8    THE WITNESS: Yeah. From the -- at least 350,
9    yes.
10   BY MR. DONOVAN:
11   Q.   Who else at 777 Partners or SuttonPark do you
12   think knows that Josh Wander and Steven Pasko stole
13   hundreds of millions of dollars from Leadenhall?
14   MR. BOLAND: Objection to the form.
15   THE WITNESS: I would say Josh Klein, who was
16   the controller at the time. I know Rich Bellissimo
17   might have known about it. Not that he did
18   anything, or Josh Klein. We were just doing what we
19   were told, you know, where to send that money.
20   Other than that, I'm not exactly sure who else might
21   know. I don't know if Alex or anybody else that
22   we've been talking about on this call knows anything
23   about that. But the other people I've mentioned,
24   they might have some -- some -- some knowledge on
25   it. They had -- they would have more knowledge than

115

1    I would.
2    BY MR. DONOVAN:
3    Q.   All right. Did you raise concerns directly
4    with Steven Pasko or Josh Wander that they were stealing
5    money from Leadenhall?
6    A.   I did not. I -- because at the time, like I
7    said, I -- we were supposedly going to buy these deals.
8    I -- I brought it up to Damien saying that we shouldn't
9    put anything on the books if we're not buying these
10   deals. But other than that -- other than those
11   conversations, nothing else.
12   Q.   All right. When you refer to these deals,
13   you're referring to the J.G. Wentworth and WMS deals,
14   right?
15   A.   Correct.
16   Q.   All right. In or around -- sorry, strike
17   that. In 2021, did SuttonPark Capital consider
18   purchasing a portfolio of assets valued at approximately
19   $250 million --
20   A.   Yeah. Yes, it was -- my understanding, it was
21   the WMS and the J.G. Wentworth deals.
22   Q.   Did SuttonPark pledge assets from that deal
23   before they were purchased?
24   A.   I do not know.
25   Q.   All right. So why don't you just explain to

116

1    me what the problem was with the J.G. Wentworth deal
2    vis-a- vis pledging assets to Leadenhall?
3    A.   They -- well, my -- my problem was, is that
4    they borrowed the money. They hadn't purchased the
5    deals yet. They borrowed the money to purchase those
6    deals. Then they were in the process of working with
7    the JGW and -- J.G. Wentworth -- J.G. and WMS to
8    purchase the portfolio of deals. But they were going
9    through to figure out if these deals are correct or if
10   they still have those deals, they didn't purchase --
11   they didn't sell them to somebody else and stuff like
12   that. When in turn, they didn't end up buying that many
13   deals at all. Maybe $1 million worth of them.
14   Q.   Okay. So is it fair to say that SuttonPark
15   pledged assets to Leadenhall as collateral that it never
16   purchased in the first place?
17   MR. BOLAND: Object to the form.
18   THE WITNESS: I would say yes.
19   BY MR. DONOVAN:
20   Q.   And what is the dollar amount of assets,
21   approximately, that SuttonPark pledged to Leadenhall
22   that it never purchased in the first place?
23   A.   Probably be about 300 million.
24   Q.   Did Josh Wander knowingly pledge assets to
25   Leadenhall as collateral that SuttonPark never purchased

117

1    in the first place?
2    MR. BOLAND: Object to the form.
3    THE WITNESS: Personally, with Josh Wander, I'm
4    not exactly sure if Josh Wander directly did it
5    himself.
6    BY MR. DONOVAN:
7    Q.   Fair enough. So leaving aside whether he
8    directly did it himself, is it your view that Josh
9    Wander knowingly pledged assets to Leadenhall that
10   SuttonPark had never purchased in the first place?
11   MR. BOLAND: Object to the form.
12   THE WITNESS: Yes.
13   BY MR. DONOVAN:
14   Q.   Did Steven Pasko pledge or direct the pledging
15   of assets to Leadenhall that SuttonPark never purchased
16   in the first place?
17   MR. BOLAND: Object to the form.
18   THE WITNESS: I would say yes.
19   BY MR. DONOVAN:
20   Q.   And the dollar amount of assets that
21   SuttonPark pledged to Leadenhall, which it never
22   purchased in the first place, was around $350 million,
23   right?
24   A.   Correct.
25   Q.   We talked before about the term, "double



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

575194 Golan Kheart 684-1 2025                      Page  118

118

1  pledge," do you remember that?
2      A.  Yes.
3      Q.  How would you define the term, "double
4  pledge"?
5      A.  Double pledging, meaning pledging it to
6          Leadenhall and then pledging it also to ING:
7  same deal, same amount, both -- two different
8  facilities.
9      Q.  Did SuttonPark double pledge assets to
10  Leadenhall?
11      MR. BOLAND:  Object to the form.
12      THE WITNESS:  That, I'm not exactly sure if
13  they double pledged all -- any assets to Leadenhall.
14  I'm aware that some of them were, and when they did,
15  they -- you know, when we found them out, we -- I
16  mentioned it and we took them off the books.  That's
17  all the ones I know.
18      BY MR. DONOVAN:
19      Q.  Got it.  That's helpful.  Do you know the
20  approximate dollar amount of assets that were pledged as
21  collateral to Leadenhall that were also pledged to
22  another lender?
23      A.  Not -- not exactly, no
24      Q.  Leaving aside exactly, do you know generally
25  how much, in terms of dollars, SuttonPark pledged in

119

1  assets to Leadenhall that it also pledged to another
2  lender?
3      A.  Maybe 5 million.
4      Q.  And was that 5 million associated with the
5  Dorchester borrowing base, or the SPLCSS 3 borrowing
6  base?
7      A.  That, I don't know.  I do not remember.
8      Q.  Can you explain to me the concerns that the
9  accounting department raised to management as to assets
10  being pledged to Leadenhall that were not actually
11  purchased?
12      MR. BOLAND:  Object to the form.
13      THE WITNESS:  All -- all I know is that they
14  were, you know, just brought in concern saying we
15  shouldn't put these deals on the books until we
16  purchase them.  That's -- we brought it up to -- I
17  know I've brought it up to both Rich, who also --
18  Richard Bellissimo, who also brought it up to Damien
19  Alfalla.
20      From there, I don't know where it went off on
21  the books.  Eventually, I know they were, I think,
22  taken off the matrices.
23      BY MR. DONOVAN:
24      Q.  Do you know whether 777 Partners or SuttonPark
25  Capital ever forged or photoshopped bank statements to

120

1  make it appear as though money was in accounts when it
2  was not in those accounts?
3      A.  I am not aware that they did anything like
4  that.
5      Q.  Did those allegations surprise you when you
6  read them in the Leadenhall, New York, complaint?
7      A.  No, not really.
8      Q.  Why didn't they surprise you?
9      A.  They didn't surprise me because the fact they
10  were trying to hide that they stole the 350 million.
11      Q.  Can you explain for me all of the ways in
12  which Josh Wander, Steven Pasko, or others at 777
13  Partners tried to conceal the fact that they stole $350
14  million from Leadenhall?
15      MR. BOLAND:  Object to the form.
16      THE WITNESS:  The only thing I can say is --
17  from what I know, is that they made the reports look
18  like they bought them and then eventually took them
19  off, saying they didn't.
20      BY MR. DONOVAN:
21      Q.  When you're referring to reports, you're
22  referring to the monthly compliance reports issued to
23  Leadenhall, right?
24      A.  Correct.
25      Q.  And is it your understanding that those

121

1  compliance reports listed assets which were purportedly
2  pledged exclusively to Leadenhall?
3      A.  Correct.
4      Q.  Is it your understanding that the compliance
5  reports then added up those receivable values to come up
6  with a borrowing base?
7      A.  Correct.
8      Q.  And you understand the borrowing base to be a
9  credit limit?
10      A.  Correct.
11      Q.  Do you know approximately how many compliance
12  reports 777 Partners issued to Leadenhall over the
13  course of Leadenhall's credit facility?
14      A.  Oh, I don't remember.  I mean, it's one every
15  month for -- you know, since at least 2016 so, I mean,
16  you're talking about, you know, maybe hundreds.  I -- I
17  don't know how many.
18      Q.  Would you agree with me that those monthly
19  compliance reports issued by 777 Partners to Leadenhall
20  contained false statements?
21      MR. BOLAND:  Object to the form.
22      THE WITNESS:  Yes.
23      BY MR. DONOVAN:
24      Q.  What were those false statements?
25      A.  The fact that some of them had -- some of



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

122

1  those monthly compliance reports had those deals that
2  were never purchased.
3      Q.   Right.  In other words, the way in which the
4  compliance reports were false was that they listed
5  approximately $350 million in assets that were never
6  actually purchased by 777 Partners, right?
7      A.   Correct.
8      Q.   In your view, did Josh Wander knowingly issue,
9  or direct to be issued, compliance reports, which
10 contain false statements, to Leadenhall?
11      MR. BOLAND:  Object to the form.
12      THE WITNESS:  Yes.
13      BY MR. DONOVAN:
14     Q.   In your view, did Steven Pasko knowingly issue
15 compliance reports to Leadenhall which contained false
16 statements?
17      MR. BOLAND:  Same objection.
18      THE WITNESS:  Yes.
19      MR. BOLAND:  Yeah.
20      BY MR. DONOVAN:
21     Q.   Who are all of the people at 777 Partners who
22 knowingly issued false compliance reports to Leadenhall?
23      MR. BOLAND:  Object to the form.
24      THE WITNESS:  It would be Alex Adnani and Nick
25 Bennett who actually prepared the reports.  I do

123

1    know they had questionable concerns about those
2    reports, but they followed their direction of what
3    they were told to issue those reports.
4      BY MR. DONOVAN:
5      Q.   What were the concerns that Nick Bennett and
6  Alex Adnani had about the compliance reports containing
7  false statements?
8      MR. BOLAND:  Object to the form.
9      THE WITNESS:  The fact that the deals that --
10    that were on their statements on the compliance
11    reports were not deals we actually purchased.
12      BY MR. DONOVAN:
13     Q.   Did Alex Adnani know that the monthly
14 compliance reports issued to Leadenhall contained false
15 statements?
16      MR. BOLAND:  Object to the form.
17      THE WITNESS:  Yes.
18      BY MR. DONOVAN:
19     Q.   Did Nick Bennett know that the monthly
20 compliance reports issued to Leadenhall contain false
21 statements?
22      MR. BOLAND:  Object to the form.
23      THE WITNESS:  Yes.
24      BY MR. DONOVAN:
25     Q.   Is there anyone other than Josh Wander, Steven

124

1  Pasko, Nick Bennett, and Alex Adnani who, in your view,
2  knew that 777 Partners was knowingly issuing false
3  compliance reports to Leadenhall?
4      MR. BOLAND:  Object to the form.
5      THE WITNESS:  I would say Damien Alfalla.
6      BY MR. DONOVAN:
7      Q.   Would you agree with me that Josh Wander,
8  Steven Pasko, Damien Alfalla, Nick Bennett, and Alex
9  Adnani knowingly stole hundreds of millions of dollars
10 from Leadenhall?
11      MR. BOLAND:  Object to the form.
12      THE WITNESS:  I don't know if they specifically
13    stole, but following the reports that they filed,
14    yes.
15      BY MR. DONOVAN:
16     Q.   Sorry, can you explain what you mean by that?
17      A.   So I -- they knowingly didn't do it themselves
18 by -- but they did know those reports were false by
19 adding those deals on those reports.
20     Q.   Right.  So when I use the term "knowingly,"
21 what I mean by that is they knew that an asset was not
22 actually purchased, but it was being listed on the
23 compliance reports to Leadenhall anyway.  Does that make
24 sense?
25      A.   Yes.  Yes.  That makes sense, and that is

125

1  correct.
2      Q.   Okay.  So let me just make -- ask my question
3  one more time.  Did Josh Wander, Steven Pasko, Damien
4  Alfalla, Nick Bennett, and Alex Adnani issue compliance
5  reports to Leadenhall that they knew were false?
6      MR. BOLAND:  Object to the form.
7      THE WITNESS:  Correct.  Yes.
8      BY MR. DONOVAN:
9      Q.   Do you believe a fraud was perpetrated on
10 Leadenhall?
11      MR. BOLAND:  Object to the form.
12      THE WITNESS:  I do.
13      BY MR. DONOVAN:
14     Q.   Can you explain to me why you think that?
15      A.   Why I think that?  Because they borrowed money
16 that they didn't use the intended purpose on.
17     Q.   Do you think Josh Wander is trustworthy?
18      MR. BOLAND:  Object to the form.
19      THE WITNESS:  That, I don't know because I do
20    not know him that well.
21      BY MR. DONOVAN:
22     Q.   Do you think Steven Pasko is trustworthy?
23      MR. BOLAND:  Same objection.
24      THE WITNESS:  I thought I did.
25      BY MR. DONOVAN:



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

126

1    Q.   You thought you did?  What do you mean by
2  that?
3    A.   Because I thought he was trustworthy in the
4  beginning, you know, when I -- since I've been at
5  SuttonPark, and then with all the -- the stealing of
6  these deals, I do not.
7    Q.   Can you explain to me what you mean by
8  "stealing of these deals"?
9    A.   By stealing the money from Leadenhall and
10  falsifying, saying they're purchasing deals that they
11  never did.
12    Q.   So outside of the monthly compliance reports,
13  did 777 Partners falsify any other records that were
14  issued to Leadenhall?
15      MR. BOLAND:  Object to the form.
16      THE WITNESS:  As far as I know, no, but I do
17  not know.
18      BY MR. DONOVAN:
19    Q.   Do you know that in the New York complaint,
20  Leadenhall -- we allege -- Leadenhall alleges that it
21  received an anonymous tip in September 2022, concerning
22  assets that had been double pledged or fictitiously
23  pledged?
24    A.   I didn't know that they received that, no.
25    Q.   Do you have any understanding of who may have

127

1  sent Leadenhall a tip, in September 2022, that assets it
2  was lending against were double pledged or fictitiously
3  pledged?
4    A.   I do not know who would've told Paul that.
5    Q.   Sorry, did you say Paul, or did you say
6  Leadenhall?
7      MR. FEUER:  I think --
8      THE WITNESS:  No, I didn't --
9      MR. FEUER:  -- you got cut off.
10      MR. BOLAND:  Yeah.  Sorry.  You may want to ask
11  the question again.
12      MR. DONOVAN:  Sorry.  Ms. Gorde, I -- can I --
13      THE WITNESS:  Yeah, go --
14      MR. DONOVAN:  Let me just ask it again because
15  I don't think I --
16      THE WITNESS:  Sure.
17      BY MR. DONOVAN:
18    Q.   So do you know who may have sent Leadenhall an
19  anonymous tip, in September 2022, that assets had been
20  double pledged or fictitiously pledged?
21    A.   No.  I do not.
22    Q.   Before you testified about topping up or
23  topping off of accounts, right?
24    A.   Correct.
25    Q.   Can you explain to me exactly what that means?

128

1    A.   From my perspective, that means that --
2  topping off the account would be, for example, our
3  collection account.  We topped it off because we did not
4  expect the -- we did not receive the interest -- the
5  insurance payments for the deals in a -- in a timely
6  manner, so to make a payment on the -- the distribution
7  for those deals, we had to top it off to make the full
8  distribution based on the report.
9    Q.   Got it.  So you testified that one of the
10  reasons for topping off a deal or a receivable is that
11  the money wasn't coming in from the insurance company,
12  right?
13    A.   Correct.
14    Q.   Is another reason why 777 Partners or
15  SuttonPark might top off a deal or receivable that the
16  receivable was never purchased in the first place?
17    A.   That -- that probably was toward the end, yes.
18    Q.   And so in part, was the purpose of topping off
19  or topping up receivables to conceal the fact from
20  Leadenhall that it had been pledged receivables which
21  were never purchased in the first place?
22    A.   Back in 2001, I would say yes.
23    Q.   Sorry, did you say 2001 there?
24    A.   I'm sorry, 2021.
25    Q.   Okay.  So let me just try my question again.

129

1    A.   Okay.
2    Q.   Is one of the reasons why 777 Partners or
3  SuttonPark topped up accounts because it had pledged
4  assets to lenders that it never purchased in the first
5  place?
6    A.   Yes, in 2021.
7    Q.   And was the purpose of that, quote, "topping
8  up of accounts," to conceal the fact from lenders that
9  lenders had been pledged assets which 777 Partners had
10  never purchased in the first place?
11    A.   I would say yes.
12      THE REPORTER:  Sorry, Mr. Donovan.  I have a --
13  I had somebody in the waiting room.  It was Leigh
14  something.
15      MR. DONOVAN:  Leigh Nathanson?  She can come
16  in.
17      THE REPORTER:  Okay.  It looks like she dropped
18  off, but if she adds again, I will admit her.  Thank
19  you.
20      BY MR. DONOVAN:
21    Q.   Do you know -- what do you know about the
22  MpFin system?
23    A.   I don't know much about the MpFin system.  I
24  never dealt with that system.
25    Q.   Do you know anything about 777 Partners



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

130

1 offering programming in the MpFin system to make it
2 appear as though assets were pledged to different
3 lenders historically?
4      A.  No.  I was never aware of that.
5      Q.  Do you think Nick Bennett is trustworthy?
6      A.  I do.
7      Q.  Do you think Alex Adnani is trustworthy?
8      A.  I do.
9      Q.  So why then do you think they participated in
10 defrauding Leadenhall out of hundreds of millions of
11 dollars?
12     A.  The only thing I'm -- I know I think they did
13 it was to do what their bosses told them to do.  Nothing
14 other than that.
15     Q.  Got it.  Their bosses being Josh Wander and
16 Steven Pasko?
17     A.  Yes.
18     Q.  Anyone else?
19     A.  And I think Damien Alfalla might have told him
20 also to do it, but I think he was also being directed by
21 Josh Wander and Steven.
22     Q.  Do you know what ACAP is?
23     A.  ACAP?  Yes.
24     Q.  And do you know who Kenneth King is?
25     A.  I've heard of him, but I do not know who he

131

1 was.
2      Q.  Can you describe for me your understanding of
3 the 777 Partners and ACAP relationship?
4      A.  My -- from my understanding of it, it was
5 another business partner with them that they borrowed
6 money from to do their operations.
7      Q.  Do you know whether in April or May 2023, ACAP
8 employees moved into 777 Partner's offices in Miami?
9      A.  I have no recollection.  No knowledge of that
10 at all.
11     Q.  Do you know whether ACAP controlled 777
12 Partners' ability to make payments such as payroll?
13     A.  I would say yes, they did.
14     Q.  Can you tell me more about that?
15     A.  As far as I know, they would borrow money from
16 ACAP and then use it to pay their payroll.
17     Q.  What other expenses did 777 Partners borrow
18 money from?
19     A.  I would say probably rent because I do know,
20 you know, SuttonParks rent in Boca.  They were having
21 problems paying it.  And I think they also used it for
22 some of the other subsidiaries.
23     Q.  Do you know whether ACAP knew that 777
24 Partners was issuing false compliance reports to
25 Leadenhall?

132

1      MR. BOLAND:  Object to the form.
2      THE WITNESS:  I do not know.
3      BY MR. DONOVAN:
4      Q.  So, just so I'm clear, and this will cut off
5 some other questions, you don't have any understanding
6 of what ACAP knew about compliance reports issued to
7 Leadenhall, right?
8      A.  Correct.
9      Q.  Okay.  Would you were the -- can you remind me
10 what your job title was when you left SuttonPark?
11     A.  My job title when I left SuttonPark was
12 controller.
13     Q.  And you testified that 777 Partners took over
14 SuttonPark in 2023; is that right?
15     MR. BOLAND:  Object to the form.
16     THE WITNESS:  I would say so.  Yes.
17     BY MR. DONOVAN:
18     Q.  Are 777 Partners and SuttonPark Capital now
19 the same thing?
20     MR. BOLAND:  Object to the form.
21     THE WITNESS:  I would -- I could say yes.
22     Q.  All right.  Let me try it again.  Are 777
23 Partners and SuttonPark Capital, as far as you know, the
24 same entity right now?

133

1      MR. BOLAND:  Object to the form.
2      THE WITNESS:  As far as I know, yes, but I'm
3 not exactly sure.  I mean, when I left, they were
4 just a subsidiary of -- of 777 Partner, but to tell
5 you the truth, SuttonPark only had a handful of
6 employees left when I left.
7      BY MR. DONOVAN:
8      Q.  And you left in what month of 2024?
9      A.  July.
10     Q.  Why did you leave?
11     A.  I've been trying to leave because of all this
12 -- the mess that we -- we saw, the not making -- you
13 know, not having the funds to pay anything.  You know,
14 the stealing of the 350 million and not doing with the
15 deals.  I didn't want to be a part of that.
16     Q.  Why did you feel uncomfortable about that?
17     A.  Because it was wrong.  I mean, the fact that
18 you're stealing money to not purchase deals, and not
19 even make -- try to make payroll, and not do anything on
20 that, it's -- to me, it was just wrong.
21     Q.  Like it was morally wrong, you mean?
22     MR. BOLAND:  Object to the form.
23     THE WITNESS:  Morally and ethically wrong.
24     BY MR. DONOVAN:
25     Q.  Did others at 777 Partners have similar



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

134

1  concerns about 777 Partners and SuttonPark Capital
2  stealing approximately $350 million from Leadenhall?
3      MR. BOLAND: Object to the form.
4      THE WITNESS: I can say Rich Bellissimo, Josh
5  Klein, they both left because of all of it. I don't
6  know about anybody else.
7      BY MR. DONOVAN:
8      Q.  Well, how many people in the accounting
9  department resigned or left as a result of concerns over
10 Josh Wander and Steven Pasko stealing $350 million from
11 Leadenhall?
12     MR. BOLAND: Object to the form.
13     THE WITNESS: I do not know off the top of my
14 head. I mean, we originally had a department of
15 eight people, and it was down to me when I left in
16 July.
17     BY MR. DONOVAN:
18     Q.  So do you know -- do you know that Leadenhall
19 filed this complaint in New York around the time,
20 May 2024?
21     A.  I did hear that they -- something that they
22 filed some -- some complaint about it.
23     Q.  Can you describe for me -- strike that. You
24 testified that you weren't surprised by the complaint,
25 right?

135

1      A.  No, I was not.
2      Q.  And can you remind me why you weren't
3  surprised about the complaint?
4      A.  Because the fact of the matter is we saw that
5  what -- what they did back in 2021 and 2022.
6      Q.  And what was it that they did?
7      A.  That they took the money and did not purchase
8  the deals that they say they were going to purchase.
9  What they did with that money, I do not know.
10     Q.  Right. In other words, they issued false
11 compliance reports to Leadenhall, causing Leadenhall to
12 provide them with $350 million, right?
13     MR. BOLAND: Object to the form.
14     THE WITNESS: Correct.
15     BY MR. DONOVAN:
16     Q.  And 777 Partners then did not use that $350
17 million to purchase receivables, right?
18     A.  Correct.
19     Q.  And Josh Wander and Steven Pasko knowingly
20 issued false compliance reports to Leadenhall, right?
21     MR. BOLAND: Object to the form.
22     THE WITNESS: Correct.
23     BY MR. DONOVAN:
24     Q.  Do you know approximately when 777 Partners
25 started issuing false compliance reports to Leadenhall?

136

1      MR. BOLAND: Object to the form.
2      THE WITNESS: No, I do not.
3      BY MR. DONOVAN:
4      Q.  Do you know generally when 777 Partners and
5  SuttonPark Capital started issuing false compliance
6  reports to Leadenhall?
7      MR. BOLAND: Same objection.
8      THE WITNESS: No, I do not. Because my
9  understanding of those compliance reports that they
10 were issuing for December of 2021 and forward, that
11 they were intending to purchase these assets.
12     BY MR. DONOVAN:
13     Q.  Right. However, your testimony is that while
14 Josh Wander and Steven Pasko may have intended to
15 purchase EG&G, Wentworth, and WMS portfolio of assets,
16 they did not ultimately purchase that portfolio of
17 assets, right?
18     A.  Correct.
19     Q.  And yet, despite not purchasing those
20 portfolios of assets, 777 Partners pledge those assets
21 to Leadenhall, right?
22     MR. BOLAND: Object to the form.
23     THE WITNESS: Correct.
24     BY MR. DONOVAN:
25     Q.  And those assets were used as collateral to

137

1  convince Leadenhall to provide 777 Partners with at
2  least $350 million in funding, right?
3      MR. BOLAND: Object to the form.
4      THE WITNESS: Correct.
5      BY MR. DONOVAN:
6      Q.  How would you define -- sorry. You have an
7  accounting background, right?
8      A.  Correct. I do.
9      Q.  All right. And how long have you been an
10 accountant or in the accounting world?
11     A.  Oh, I've been in there since let's see, 20 --
12 20 -- 2025. No, not 2025. Sorry. Sorry. 2005.
13     Q.  All right. Do you have an -- do you have a --
14 an accounting degree?
15     A.  I do. I have a -- a bachelor's of accounting
16 and a master's also.
17     Q.  How would you define the word insolvent?
18     A.  That you can't -- when you're insolvent, that
19 you don't have the money to, you know, to purchase
20 anything, pay for expenses, anything like that, that you
21 are -- you just don't have anything.
22     Q.  Would you characterize 777 Partners and
23 SuttonPark Capital as insolvent at any point in time
24 while you worked there?
25     MR. BOLAND: Object to the form.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   **www.MILESTONEREPORTING.com**   **Toll Free 855-MYDEPOS**

138

1        THE WITNESS:  Probably I would say -- well at
2   -- at least with SuttonPark, because we did not have
3   very much funds at all from 777 because that's where
4   we got all our funding from.  Probably I would say
5   in 2024.
6        BY MR. DONOVAN:
7        Q.  So when you say SuttonPark got all of its
8   funding from 777 Partners, what do you mean by that?
9        A.  Well, because we weren't able to borrow on
10  facilities because we weren't buying deals and stuff
11  like that.  So to pay our operating expenses, we
12  actually had to reach out to 777 Partners, who then
13  reached out to whomever, to borrow funds to so that we
14  could pay our -- just our operating expenses of keeping
15  our -- our -- the lights on in our offices.
16       Q.  Is your understanding -- is your understanding
17  that 777 Partners was borrowing hundreds of millions or
18  billions of dollars from ACAP to stay afloat?
19       MR. BOLAND:  Objection.
20       THE WITNESS:  Toward the -- toward the end,
21  yes.  I did note -- I did hear that they were
22  borrowing, you know, millions of dollars to stay
23  afloat.
24       BY MR. DONOVAN:
25       Q.  And how did the transactions work between 777

139

1   Partners and SuttonPark Capital whereby 777 Partners was
2   providing SuttonPark Capital with funds?
3        MR. BOLAND:  Object to the form.
4        THE WITNESS:  We would tell -- we would, like,
5   let them know, hey, we need, you know, $100,000 for
6   payroll.  They would then borrow it and then say,
7   okay, well I have $100,000 for you to use.  We'll --
8   they'll move the money from their bank account to
9   ours.
10       BY MR. DONOVAN:
11       Q.  Okay.  And would that transaction be
12  memorialized in a contract?
13       A.  It was -- I think it's based on an agreement
14  between 777 Partners and SuttonPark.  But I have never
15  seen that agreement, so I don't know exactly what it
16  says.
17       Q.  All right.  Another way to ask my question is,
18  were 777 Partners and SuttonPark Capital just drawing
19  funds from the same bank account?
20       MR. BOLAND:  Object to the form.
21       THE WITNESS:  Not that I'm aware of.  No.
22       BY MR. DONOVAN:
23       Q.  Do you know whether Josh Wander and Steven
24  Pasko ever used corporate funds for personal use?
25       A.  I do not know that.

140

1        Q.  So you don't know whether they ever used 777
2   Partners or SuttonPark Capital's funds to, like, buy
3   apartments or go on vacations, right?
4        A.  I do not -- I do not know, because if any --
5   if they did, it would all come through 777, and I was
6   never part of 777's accounting department.
7        Q.  Would you say that Josh Wander and Steven
8   Pasko exercise complete control over 777 Partners?
9        MR. BOLAND:  Object to the form.
10       THE WITNESS:  I would say yes.
11       BY MR. DONOVAN:
12       Q.  How would you define a Ponzi scheme?
13       A.  How would I define a Ponzi scheme, saying you
14  pretty much you would have a -- an item or an
15  investment, let's just -- just say investment, that, you
16  know, John Smith would say, hey, I have this investment.
17  Invest in me.  Instead of using it to buy that
18  investment, they used it to purchase whatever personal
19  stuff they wanted to and never put the monies in the
20  funds that they -- the investments that they borrowed,
21  you know, from an individual.
22       Q.  Do you think that Josh Wander and Steven Pasko
23  were, in part, running a Ponzi scheme or a shell game?
24       MR. BOLAND:  Object to the form.
25       THE WITNESS:  That I don't know.

141

1        BY MR. DONOVAN:
2        Q.  Who do you think knows the most about this
3   fraud?
4        MR. BOLAND:  Object to the form.
5        THE WITNESS:  Who do I think knows the most
6   about this fraud?  I would have to say the
7   accounting department that was in -- at 777.
8        BY MR. DONOVAN:
9        Q.  And can you remind me who you're referring to
10  when you refer to the accounting department?
11       A.  And like I said -- like I would say, Rich
12  Bellissimo.  I would even say Kevin Burgos might know
13  something about it.  Damien Alfalla.  Other than those
14  few people, that's the only one I would know who -- who
15  might know the most.
16       Q.  Do you think that Josh Wander and Steven Pasko
17  tried to get the accounting department to cook the books
18  so to speak?
19       MR. BOLAND:  Object to the form.
20       THE WITNESS:  On -- on 777's side, I'm not
21  sure.  I don't know.
22       BY MR. DONOVAN:
23       Q.  What about on SuttonPark Capital side?
24       A.  I would say no.
25       Q.  So is it -- I'm just trying to understand your



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

142

1  -- how you think of it.  Is it --
2      A.   Yep.
3      Q.   Well, let me start here.  Are Nick Bennett and
4  Alex Adnani in the Capital Markets Group?
5      A.   Yes, they are.
6      Q.   Is it your view that the Capital Markets Group
7  perpetrated a fraud on Leadenhall that the accounting
8  department tried to raise concerns over?
9          MR. BOLAND:  Object to the form.
10         THE WITNESS:  I would say yes.
11         BY MR. DONOVAN:
12     Q.   Can you explain to me why you say yes to that
13  question?
14     A.   Well, by doing those reports, those monthly
15  compliance reports, I mean, they knew exactly those
16  deals weren't on the books.  But they were only doing
17  what they were told to do and then turning it over to
18  the accounting, where we actually had to book the -- the
19  information on our -- on the SuttonPark books.
20     Q.   All right.  So I think when you're referring
21  to "they" in that sentence, you're referring to Nick
22  Bennett and Alex Adnani, right?
23     A.   Yes, I am.
24     Q.   And what you're saying is, while Nick Bennett
25  and Alex Adnani knowingly issued false compliance

143

1  reports to Leadenhall, you don't hold them responsible
2  because they were just following orders, right?
3          MR. BOLAND:  Object to the form.
4          THE WITNESS:  Correct.
5          BY MR. DONOVAN:
6      Q.   And those orders were from Josh Wander and
7  Steven Pasko, right?
8          MR. BOLAND:  Object to the form.
9          THE WITNESS:  Correct.
10         BY MR. DONOVAN:
11     Q.   So I checked out your LinkedIn before this,
12  and I'm not going to introduce it as an exhibit.  I just
13  have a question on what one of the lines means, if you
14  don't mind.  You referenced preparing monthly financial
15  statements for over 20 subsidiaries with respect to
16  SuttonPark Capital.
17     A.   Correct.
18     Q.   Can you tell me what financial statements
19  you're referring to there?
20     A.   So under SuttonPark, there's multiple
21  subsidiary companies that we had set up -- that were set
22  up.  ING for the ING, you know, borrowing, Dorchester
23  for the Dorchester borrowing, SPLCSS2 for their
24  borrowing, you know, and on those.  And each one of
25  those had a set of books that we -- I would properly do

144

1  and prepare 20 plus financial statements for on a
2  monthly basis.
3      Q.   All right.  And so when you -- when you're
4  referring to financial statements, are you referring to
5  like balance sheets and cash flow statements?
6      A.   Yes.  Balance sheets and cash flow statements.
7  I would only do those for the major accounts.  Like ING
8  Dorchester, SPLCSS, some -- some of our smaller ones
9  just rolled up into SuttonPark's main account.
10     Q.   Okay.  So you're not -- when you refer to
11  monthly financial statements, you're not referring to
12  the compliance reports issued to Leadenhall, right?
13     A.   No.  No.
14     Q.   Got it.  Do you know those reports were
15  generated from MpFin?
16     A.   My understanding is that MP -- they ran
17  reports -- my understanding is that they ran reports
18  from MpFin on the deals that were associated when they
19  were entered into MpFin.  And they used MpFin as the
20  listing of all deals on the compliance report.
21     Q.   So was it your understanding that the
22  compliance reports were generated from the MpFin system?
23     A.   On a portion.  Just for the listing of deals
24  that applied to that.  The actual entire report was not.
25     Q.   I see.  So the portion of the compliance

145

1  reports that lists receivables is generated from MpFin,
2  right?
3      A.   Correct.
4      Q.   So then understanding that -- strike that.
5  You didn't prepare these monthly compliance reports to
6  Leadenhall, right?
7      A.   Correct.
8      Q.   Is it fair to say that if assets were listed
9  on compliance reports issued to Leadenhall, that 777
10  Partners had never actually purchased, MpFin showed
11  those assets as being purchased?
12         MR. BOLAND:  Object to the form.
13         THE WITNESS:  As far as I am aware, yes.  I --
14  but I don't know.  Like I said, I don't know MpFin,
15  so I don't know what records were on there.
16         BY MR. DONOVAN:
17     Q.   I guess what I'm asking is, do you know how
18  Nick Bennett or Alex Adnani were listing assets on
19  compliance reports issued to Leadenhall that 777
20  Partners had never purchased in the first place?
21     A.   I do not.  No, I do not.
22     Q.   Who would know the answer to that?  Other than
23  Nick Bennett and Alex Adnani.
24         MR. BOLAND:  Object to form.
25         THE WITNESS:  That's as far as I know, would be



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

146

1  those two.
2        BY MR. DONOVAN:
3     Q.  Do you think Josh Wander and Steven Pasko know
4  how the compliance reports are prepared?
5        MR. BOLAND:  Object to the form.
6        THE WITNESS:  I do not know.
7        BY MR. DONOVAN:
8     Q.  But you do believe that Josh Wander and Steven
9  Pasko directed Alex Adnani and Nick Bennett to list
10  assets on compliance reports issued to Leadenhall that
11  had not actually been purchased by 777 Partners, right?
12        MR. BOLAND:  Object to the form.
13        THE WITNESS:  Do believe, yes.
14        BY MR. DONOVAN:
15     Q.  And the value of those assets that were listed
16  on Leadenhall's compliance reports that were never
17  purchased in the first place was approximately $350
18  million, right?
19     A.  That is my understanding, yes.
20     Q.  Can you explain to me the basis for your
21  understanding?
22     A.  The basis of my understanding was because I
23  knew the -- you know, I knew they borrowed $350 million.
24  I saw the money because I had to book the -- the ins and
25  outs of those funds coming in.  But -- and then I knew

147

1  there was supposedly a list of deals that they were
2  supposedly going to purchase.
3     Q.  All right.  So is the basis not the, using
4  your terms, reconciliations that you were conducting?
5  Or do you is your basis for knowing -- for this
6  knowledge, something other than the reconciliations?
7     A.  The basis of my knowledge on this was from the
8  -- actually the compliance reports because I would do my
9  reconciliation of what was on my books, what was on the
10  compliance report.  And I would compare them and say,
11  hey, these aren't -- deals aren't here.  Where'd you get
12  them from?
13     Q.  Okay.  That clears it up.  So I just want to
14  make sure I understand how 777 Partners and you use the
15  term reconciliation.  Is it accurate to say that a
16  reconciliation is comparing accounting statements with
17  compliance reports issued to lenders?
18        MR. BOLAND:  Object to the form.
19        THE WITNESS:  Yes.
20        BY MR. DONOVAN:
21     Q.  And is the purpose of the reconciliation to
22  determine whether assets that exist on the compliance
23  reports also exist in the accounting department's books
24  and records?
25     A.  Correct.

148

1     Q.  And did you make the determination that there
2  were hundreds of millions of dollars in assets which
3  existed on Leadenhall's compliance reports, which were
4  not in the accounting department's books and records?
5     A.  Yes, I did.  And I also brought it up to -- I
6  brought it into Alex because she -- he's the one that
7  was doing these reports.  Like, where did you get these
8  deals?
9     Q.  And what did he say in response to that
10  concern that you raised?
11     A.  His concern is that these are deals we were in
12  the process of purchasing and that was about it.
13     Q.  Do you know when you raised that concern to
14  Alex Adnani?
15     A.  Probably in January of 2022, when we were
16  doing the December of 2021s accounting.
17     Q.  Did you -- did -- strike that.  Do you
18  remember saying to Alex Adnani something along the lines
19  of, hey, we shouldn't be pledging these assets given
20  that --
21     A.  I have.
22     Q.  -- we never purchased them in the first place.
23     A.  Correct.  I have
24     Q.  And his response was just, we are in the
25  process of purchasing these deals and so it's fine?

149

1     A.  His -- his response was we're in the process
2  of purchasing these deals.  He told me that Josh wants
3  them on their -- on the report.  That was what I was
4  told.
5     Q.  Is your understanding that Josh wanted assets
6  that 777 Partners had never actually purchased on
7  Leadenhall's compliance reports because that would allow
8  SuttonPark to borrow even more money from Leadenhall?
9        MR. BOLAND:  Object to the form.
10        THE WITNESS:  Not that I'm aware of.  No.
11        BY MR. DONOVAN:
12     Q.  Well -- so what's the purpose of pledging
13  assets to Leadenhall that 777 Partners would (audio cuts
14  out) --
15        MR. BOLAND:  Object to the form.
16        THE WITNESS:  Well, if 777 Partners purchased
17  assets that they never actually purchased and they
18  borrowed that money that be brings down their
19  borrowing base, which means they couldn't borrow
20  anymore because they have all these deals unless
21  they sold them.
22        BY MR. DONOVAN:
23     Q.  Right.  And so the purpose of pledging assets
24  to Leadenhall that SuttonPark had never actually
25  purchased in the first place, is that it allowed Josh



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

150

1  Wander and Steven Pasko to take out even more money from
2  Leadenhall than they otherwise be able to do, right?
3        MR. BOLAND: Object to the form.
4        THE WITNESS: Correct.
5        BY MR. DONOVAN:
6     Q.  I know you have childcare and kid
7  responsibilities.
8     A.  Yes.
9     Q.  I'm almost done here.  So you had testified
10  before that topping up of receivable accounts was a way
11  to conceal from lenders that assets they were lending
12  against were not actually purchased, right?
13        MR. BOLAND: Object to the form.
14        THE WITNESS: Yes.
15        BY MR. DONOVAN:
16     Q.  Are you aware of any other ways, whether
17  through forging documents or otherwise, that 777
18  Partners concealed from lenders, such as Leadenhall,
19  that the lenders were lending against assets that were
20  double pledged or did not exist?
21     A.  No.
22     Q.  Where do you think evidence would exist that
23  777 Partners pledged assets to Leadenhall that it never
24  purchased in the first place?
25     A.  The only thing I can see is I know from the

151

1  different matrices that I had, that can be -- that's the
2  only thing I have.  I know they have had documents
3  stating that they were going to purchase $350 million of
4  assets, which I've seen those agreements.  But other
5  than them not purchasing it, I don't have any record
6  other than my matrices showing them coming on and going
7  off.
8     Q.  All right.  So you're saying that in the 2021
9  period, there would be documents showing that SuttonPark
10  was considering purchasing a J.G. Wentworth and WMS
11  portfolio of assets, right?
12     A.  Yes.
13     Q.  And where would those documents be?  Like,
14  would they be in someone's inbox?
15        MR. BOLAND: Object to the form.
16        THE WITNESS: I don't know if there would be in
17  somebody's inbox.  I do know I've seen a copy of it,
18  and I've seen it sitting on our -- the network
19  there.  The, you know, SuttonPark Network.
20        BY MR. DONOVAN:
21     Q.  And when you say the SuttonPark Network, what
22  do you mean?
23     A.  The shared drive that everybody could have
24  access to.
25     Q.  Does that have a name?

152

1     A.  I don't know what the name of it is.
2     Q.  Is it -- well, can you just describe to me
3  what the shared drive is like?  Is it like a folder that
4  everyone at 777 Partners can save documents in and then
5  access?
6     A.  This drive would -- I don't know what people
7  have access to and what people don't.  So the drive I'm
8  talking about has mainly SuttonPark's information in it,
9  different folders of different accounting reports, like
10  the different monthly compliance reports that I would
11  save myself to make sure here is what my information
12  that came from and has also a folder of different
13  agreements that are in there.  But I do not know who has
14  access to those at SuttonPark side.  And I do not know
15  if they had one, a folder like that on the 777 side,
16  since I did not have access to 777's records.
17        THE REPORTER: Excuse me, Mister (audio cuts
18  out) -- we have a Noah Rust joining?
19        MR. DONOVAN: Sorry.  Say it again.
20        THE REPORTER: Noah Rust.
21        MR. BOLAND: That -- that's fine.  He's -- he
22  is an attorney with Shutts --
23        MR. DONOVAN: Oh.
24        THE REPORTER: Okay.  Thank you.
25        MR. BOLAND: -- working on the case.

153

1        BY MR. DONOVAN:
2     Q.  If you were trying to find documents showing
3  that Josh Wander and Steven Pasko knowingly stole
4  approximately $350 million from Leadenhall, where would
5  you look?
6     A.  I would try those drives, but also I think
7  there might be some e-mail communication could also be
8  the case, too.
9     Q.  Is that how e-mail communication -- sorry,
10  strike that.  Are you referring to e-mail communication
11  with, and to and from Josh Wander and Steven Pasko?
12     A.  Those, I don't know.  I don't know if there is
13  any e-mail communication between them.  I know there was
14  e-mail communication between, you know, the accounting
15  department saying these -- these numbers don't -- aren't
16  -- shouldn't be on the books.  Should we take them off?
17  Should we keep them on?  That's the only thing I know of
18  on that e-mail communication.  But with -- between Josh
19  Wander and Steven, I don't know.
20     Q.  Were you ever directed to delete documents or
21  not leave a paper trail of your concerns?
22     A.  No.
23     Q.  To your knowledge, would the e-mails you're
24  referring to where you raised concerns to management
25  concerning the pledging of assets that were not actually



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

154

1  purchased still live in your SuttonPark e-mail inbox?
2      A.  I don't know if it does or doesn't.  I don't
3  know what -- since I haven't worked there, I don't know
4  what they've done.
5      Q.  Do you have any like texts or personal e-mails
6  which would reflect the pledging of assets which were
7  not actually purchased or the double pledging of assets?
8      A.  No, I do not.
9      Q.  Outside of individuals in the accounting
10  department, who do you think knows the most about the
11  fraud perpetrated on Leadenhall?
12      A.  Outside the accounting department?  I know
13  Percy Ford is pretty much aware of it.
14      MR. DONOVAN:  Why don't we go off the record
15  for three minutes and then I think that I'll review
16  my materials and that might be it.
17      THE REPORTER:  All right.  The time --
18      MR. DONOVAN:  Thank you, Ms. Gorde.  I really
19  appreciate your time.
20      THE WITNESS:  No problem.
21      THE REPORTER:  The (audio cuts out) -- p.m.,
22  Eastern.  We're going off the record.
23      (A recess was taken.)
24      THE REPORTER:  Time now is 1:46 p.m., Eastern,
25  and we are back on the record.

155

1      BY MR. DONOVAN:
2      Q.  Okay.  Ms. Gorde, did anyone at 777 Partners
3  ever try to prevent you from disclosing what you knew
4  about the fraud perpetrated on Leadenhall?
5      A.  No, no one prevented me.
6      Q.  Well, I'm asking, did anyone ever try to
7  prevent you from disclosing what you saw at SuttonPark?
8      A.  No.
9      Q.  In 777 Partners?
10      A.  No.
11      Q.  Did 777 Partners or SuttonPark Capital ever
12  offer you severance?
13      A.  No.
14      Q.  All right.  You said before that when you
15  reviewed the complaint filed by Leadenhall in the New
16  York action, you weren't surprised at all, right?
17      A.  Correct.
18      Q.  Is there anything that I haven't asked you
19  today that would be helpful for us to know or that you
20  think we should know?
21      MR. BOLAND:  Object to the form.
22      THE WITNESS:  Nope, I've -- I think you've
23  pretty much asked everything.
24      BY MR. DONOVAN:
25      Q.  Okay.  So there's nothing that -- there's no

156

1  other reaction to the complaint filed by Leadenhall or
2  the allegations in Leadenhall's complaint against 777
3  Partners that we haven't covered today?
4      A.  No.
5      MR. DONOVAN:  That's all the questions I have.
6  I really appreciate it, Ms. Gorde.
7      THE WITNESS:  No problem.
8      EXAMINATION
9      BY MR. FEUER:
10      Q.  Good afternoon, Ms. Gorde.  How are you?
11      A.  Good.  How are you?
12      Q.  Good.  This is Leonard Feuer.  I represent
13  Noah Davis.  I've just got a few questions for you,
14  okay?
15      A.  Sure.
16      Q.  Had -- did anyone at 777 Partners ever try to
17  get you to sign a non-disclosure agreement?
18      A.  Nope.  Nope.
19      Q.  You think they were aware that you knew or
20  know what you -- you've testified to as far as the $350
21  million version?
22      A.  I don't know if they know that I testified for
23  it, but they knew I knew.
24      Q.  Did you ever have a conversation with any of
25  the upper echelon at 777 Partners about that?

157

1      A.  No.
2      Q.  Were there false compliance reports issued
3  after the diversion of the $315 million?
4      A.  It -- I think they were after -- after it, but
5  I think it was finally rectified like a year later.
6      Q.  When you say rectified?
7      A.  Meaning they -- as far as I know, my
8  understanding was that they were taken off the
9  compliance reports.
10      Q.  I see.  Do you know what the catalyst for that
11  was?
12      A.  No, I don't.
13      Q.  Okay.  Are you aware of any attempts to
14  disguise the transfer of the $350 million besides false
15  compliance reports?
16      A.  Nope.
17      Q.  Had you been -- have you received any
18  subpoenas for a federal grand jury?
19      A.  Nope.
20      Q.  When was the last time you spoke or had any
21  contact with Noah Davis?
22      A.  I didn't even know he had left 777, if that is
23  any kind of indication of that, you know, so it's been
24  few years.
25      Q.  Did you have any bad interactions with him?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

158

1    A.  No.
2    Q.  When he was still employed there?
3    A.  No.
4    Q.  Okay.  And you had no interaction or contact
5  with him after he left the employment of 777 Partners;
6  is that right?
7    A.  No, I haven't had any contact with him.
8    MR. FEUER:  Okay.  I've got no further
9  questions.  Thank you, ma'am.
10    THE WITNESS:  You're welcome.
11    CROSS-EXAMINATION
12    BY MR. BOLAND:
13    Q.  I do have a few if just not very many, Ms.
14  Gorde.
15    A.  Okay.
16    Q.  Nice to see you.  My name is Jim Boland.  I
17  represent the plaintiffs in the case.  I just want to
18  make sure I had some facts clear in my mind.
19    A.  Sure.
20    Q.  Did you testify earlier that Mr. Kosinski left
21  in 12 -- in December of 2020?
22    A.  That's my -- yes.  That's my understanding,
23  yes.
24    Q.  And again -- and then he -- you were contacted
25  again by him in roughly June of 2024 in connection with

159

1  the collateral audit; is that accurate?
2    A.  That is accurate, yes.
3    Q.  Had you had communications or contact with him
4  from the time he left until the time he came back?
5    A.  No.
6    Q.  So it'd been several years before you had
7  experience with him -- since the last time you had spent
8  some time working with him as a colleague; is that
9  accurate?
10    MR. MORLAN:  Object to form.
11    THE WITNESS:  That is accurate, yes.
12    BY MR. BOLAND:
13    Q.  Okay.  You testified --
14    THE REPORTER:  I'm sorry.  Who is that
15  objection from?
16    MR. MORLAN:  Oh, that was from me.
17    THE REPORTER:  Thank you.  Sorry, Mr. Boland.
18    BY MR. BOLAND:
19    Q.  You testified that you had read something
20  about Mr. Davis.  And I don't want to -- I don't want to
21  put words in your mouth, having an issue --
22    A.  Sure.
23    Q.  -- with having possibly been alleged to have
24  breaking -- broken into SuttonPark offices?
25    A.  Correct.

160

1    Q.  Did that surprise you?
2    A.  It did actually.  I didn't think Noah Davis
3  would actually do anything like that.
4    Q.  Yeah.  The only reason I said that is because
5  you testified earlier that you didn't think Mr. Kosinski
6  would direct anything to be taken from like SuttonPark
7  systems as well.  You remember testifying to that?
8    A.  Yes, I do.  And I don't think he would direct
9  anybody to take anything from that -- from that office.
10    Q.  And you didn't think Mr. Davis would've broken
11  into SuttonPark's offices either, right?
12    A.  No, I don't.
13    Q.  Okay.  I did not look at your LinkedIn
14  portfolio.  I apologize.  I should have.  You have an
15  accounting degree?
16    A.  Yes, I do.
17    Q.  Yeah.  And a master's.  Are you a CPA?
18    A.  No, I'm not.
19    Q.  Okay.  I think you testified earlier, and I
20  don't want to use the term you used, that there was sort
21  of an overall audit of 777 Partners that was done.  Do
22  you remember using that word?
23    A.  Overall audit?  Yes, I do remember using that.
24    Q.  Do you mean like an audit of the companies by
25  an independent outside accounting firm?

161

1    A.  Yes.
2    Q.  And I --
3    A.  Yes.
4    Q.  Do you recall who the independent outside
5  accounting firm was?
6    A.  No, I do not recall.
7    Q.  Did you interact with any of those outside
8  accountants at all during the course of any of their
9  audits from 2021, 2022, and 2023?
10    A.  The only thing, I think it was for 2021, just,
11  you know, them asking, you know, for documentation when
12  they were doing the 2020 audit.  But 2022 and 2023, as
13  far as I know, they hadn't even done any audits.
14    Q.  You know there were no audits being done?
15    A.  As far as I'm -- I was aware of that they told
16  me.
17    Q.  And when you testified a little bit before
18  about the assets that were never purchased, but money
19  was --
20    A.  Correct.
21    Q.  -- promised, I just -- I'm just getting you
22  back to the subject.
23    A.  No, that's fine.
24    Q.  2021, 2022 time period is what we were talking
25  about, right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

162

1    A.   Yes.
2    Q.   And you were aware of these events
3 contemporaneously, were you not?
4    A.   Yes.
5    Q.   To whom, other than internally, did you report
6 those facts?
7    A.   Just internally.
8    Q.   You didn't report them to Leadenhall, did you?
9    A.   No, I did not.
10    Q.   You did not report them to any of the outside
11 auditors, did you?
12    A.   No, I did not.
13    Q.   You didn't report them to any state or federal
14 authority, did you?
15    A.   No, I did not.
16        MR. BOLAND:  Okay.  I have nothing further.
17 Thank you.
18        THE WITNESS:  You're welcome.
19        THE REPORTER:  Okay.
20            REDIRECT EXAMINATION
21        BY MR. MORLAN:
22    Q.   I just have a couple quick follow-ups.
23    A.   Okay.
24    Q.   With respect to the overall audits that we
25 talked about, did you play any role with respect to the

163

1 2021 audit?
2    A.   Just by giving documentation that they
3 requested, you know, their -- their standard audit list
4 that -- that I was able to give.  I know Josh Klein was
5 the main contact person and I would funnel everything
6 from -- from him -- to him after he funneled it down
7 from them.
8    Q.   Okay.  So you weren't a direct point of
9 contact in the overall audit for 2021; is that correct?
10    A.   Correct.
11    Q.   Okay.  And did anyone seek any information
12 from you in the context of the 2021 audit regarding any
13 of the double pledging or other irregularities that
14 we've discussed today?
15    A.   No.
16    Q.   Okay.  And I believe you said you were not
17 aware of any overall audit that was conducted as to
18 2022, 2023?
19    A.   Correct.
20    Q.   And I guess you -- okay.  And so it's safe to
21 say that nobody contacted you for purposes of getting
22 information about an audit for the 2022 or 2023 books of
23 SuttonPark or 777; is that correct?
24    A.   That is correct.
25    Q.   And when you did report this information

164

1 regarding the fraud, did you -- who did -- to whom did
2 you report that information to?
3    A.   Well, I told, you know, Josh Klein, who was
4 the controller at the time, Rich Bellissimo.  I know I
5 -- Fred Love was in -- was told about it.  And I know,
6 you know, my documentation was told to them.  What they
7 did with it, I don't know.
8    Q.   And was that documentation provided to them
9 via e-mail?
10    A.   Some of it, I think, was e-mail and then also
11 some was maybe on Teams.
12    Q.   Okay.  So if we wanted to look for
13 communications regarding those issues that we just
14 talked about, a good place to start then would be the e-
15 mails and Teams messages of Josh Klein, Rich Bellissimo,
16 and Fred Love?
17    A.   I would say yes.
18    Q.   Okay.  And would those e-mails be with you?
19    A.   I -- it -- I would assume they would be.  I
20 don't know if there's any other between other people
21 between them.
22    Q.   Okay.  If you were trying to figure out
23 whether there were other communications by and amongst
24 Josh Klein, Rich Bellissimo, and Fred Love regarding the
25 issues that you reported to them, is there anyone else

165

1 who you -- whose e-mail you suspect -- who might have
2 some of those e-mails?
3    A.   I don't know.
4    Q.   And when you said earlier that eventually your
5 understanding was that the -- from a reporting and
6 compliance standpoint, the $350 million fraud was
7 ultimately taken off the compliance reports; is that
8 right?
9    A.   That's my understanding.
10    Q.   Okay.
11    A.   Yes.
12    Q.   Okay.  And approximately when was that when
13 you say a year later?  Would you say that was around
14 mid-2023 or when was that?
15    A.   I -- I am not exactly sure, to tell you the
16 truth.
17    Q.   Okay.  Do you remember whether there -- any
18 particular salient event or catalyst that may have led
19 to that being rectified?
20    A.   No, I -- I don't know.
21    Q.   Okay.  How did you learn that that was
22 rectified?
23    A.   Only by looking at my matrix and the deals and
24 the compliance reports that I do, the -- the
25 reconciliation.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

166

1    Q.  Okay.  So if we were to look at the settlement
2  matrices over a period of time and revisions there too,
3  would that give us a pretty good indication as to
4  whether and when those issues were rectified?
5        MR. BOLAND:  Object to the form.
6        THE WITNESS:  Yes, I would say so.
7        BY MR. MORLAN:
8    Q.  Okay.  And who else were those settlement
9  matrices shared with?
10   A.  What do you -- I -- you know, anyone had
11 access to it who -- in the accounting department who had
12 the drive.
13   Q.  And with respect to the -- some of the
14 representations contained in compliance reports that you
15 described about assets that had not yet been purchased,
16 were there specific people who directed you or the
17 accounting department, that it was okay for those assets
18 to remain on the compliance reports?
19       MR. BOLAND:  Object to the form.
20       THE WITNESS:  No one -- no one directed -- no
21 one told me anything on that about the compliance
22 reports.
23       BY MR. MORLAN:
24   Q.  Okay.  Did anyone say anything to you with
25 respect to -- strike that.  Was there anyone that told

167

1  you that the irregularities that you were noticing or
2  the concerns that you raised were not a problem?
3    A.  No.
4    Q.  And was there anyone else with whom -- or was
5  there anyone with whom you had any spoken or oral
6  communications with about the issues that we're -- we've
7  been discussing with respect to the double pledging and
8  the non-existent assets?
9    A.  No, no one else other than the people that
10 I've mentioned.
11   Q.  Okay.  And that would be the folks in the
12 accounting department that you mentioned?
13   A.  Yes, correct.
14   Q.  Any -- anyone else beyond those accounting
15 folks?
16   A.  Nope.
17   Q.  Okay.  All right, anyone else in management
18 outside the accounting department who approved of these
19 things or directed that they weren't concerns?
20       MR. BOLAND:  Object to the form.
21       THE WITNESS:  Nope.
22       MR. MORLAN:  All right, I have nothing further
23 at this time.
24       THE REPORTER:  All right, this --
25       MR. MORLAN:  Oh, wait, I did have one more

168

1  question actually.
2        BY MR. MORLAN:
3    Q.  You were asked some questions about your
4  thoughts as to whether or not you expected Mr. Davis --
5  whether you were surprised by some of the allegations
6  against him; is that right?
7    A.  Yes.
8    Q.  Okay.  How much interaction and time did you
9  spend with Mr. Davis compared to the amount of time that
10 you spent with Mr. Kosinski while both you and Mr.
11 Kosinski were at SuttonPark?
12   A.  I had more interactions with Mr. Kosinski than
13 with Mr. Davis, because only -- Mr. Davis was only
14 anything with IT related.  So if I had an IT issue, I
15 only -- I went to him.  The accounting stuff, I would
16 always go to -- you know, obviously deal with Paul
17 Kosinski.
18   Q.  And just relatively speaking, is there any way
19 you could quantify the amount of communication or
20 interaction that you had with Mr. Kosinski compared to
21 the amount of communication, interaction you had with
22 Mr. Davis?
23   A.  I would say I probably spent about -- you
24 know, probably 30 to 40 percent with, you know, Davis,
25 and then, like, more 80, 90 percent with Mr. Kosinski.

169

1    Q.  Okay, you mean, like, 30 to 40 percent of the
2  days you were in the office you spoke with them, with
3  Davis?  Or I guess I don't quite understand what you
4  mean by the percentages.
5    A.  Well, I mean, I interacted with Davis, you
6  know, said hello and stuff like that, but mainly I would
7  deal with him when I had an IT issue.
8    Q.  Okay.
9    A.  If an IT issue was -- you know, if you had one
10 every day, maybe it was 10 percent.  You know, 10
11 percent of the day I was in the office, maybe I dealt
12 with him.  I did -- you know, did speak with him, say,
13 hi.  You know, other than that -- but not much after
14 that.  With Mr. Kosinski, I would spend a lot more
15 interaction with him because of the accounting and our
16 roles together.
17   Q.  Okay.  So you're not saying that on average,
18 you spent 10 percent of your day dealing with Mr. Davis,
19 right?
20   A.  Correct.
21   Q.  Okay.  So your interactions with Mr. Davis
22 were episodic and they just dealt with IT problems that
23 you were having; is that right?
24   A.  Correct.
25   Q.  Okay.  And when you say IT problems, do you



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

170

1  mean things like your e-mail wasn't working, something
2  like that?
3      A.  Yes.
4      Q.  Okay.  And would these interactions typically
5  take place over e-mail, in person, on the phone?
6      A.  All different, depends.  You know, it was in
7  person when we -- when -- when I was in the office, but
8  when we had COVID it was through e-mails and Teams
9  messages.
10     Q.  And other than what I said in terms of
11 problems with e-mails, do any other particular kinds of
12 IT issues that you had come to mind, like a broken
13 mouse, a problematic monitor, something like that?
14     A.  Nothing that I could think of.  No.
15     Q.  Okay.  And in order to resolve those types of
16 issues, typically the total sort of interaction time
17 that you would spend, whether it was on Teams, or
18 sending e-mails, or on the phone with Mr. Davis, would
19 that typically be under ten minutes total?
20     A.  It would -- I mean, it depends on what the
21 problem was.  If there was a major issue, maybe 30
22 minutes, maybe, you know, ten minutes, it all depends.
23     Q.  Okay.  On average, how many of those types of
24 interactions would you have with Mr. Davis in a given
25 month?

171

1      MR. BOLAND:  Object to the form.
2      THE WITNESS:  Oh, then I don't know.  Probably,
3  if anything, maybe once a month, if that.
4      BY MR. MORLAN:
5      Q.  So is it your testimony that you would have IT
6  issues that required contact with Mr. Davis
7  approximately once a month or less?
8      A.  Yes.
9      Q.  Okay.  And approximately how many times per
10 month would you interact with Mr. Kosinski?
11     A.  Oh, I would be, you know, interacting with
12 him, like, almost on a daily basis, because of the
13 accounting -- the accounting things that we would do.
14     Q.  So would it be safe to say that you know Mr.
15 Kosinski much better than you know Mr. Davis?
16     MR. BOLAND:  Objection to the form.
17     THE WITNESS:  That is correct, yes.
18     BY MR. MORLAN:
19     Q.  Okay.  And would it be safe to say that you're
20 much more familiar based on your observations and
21 interactions of Mr. Kosinski, that you're much more
22 familiar with Mr. Kosinski's character than you are Mr.
23 Davis'?
24     MR. BOLAND:  Object to the form.
25     THE WITNESS:  I would say yes, yes.

172

1      MR. MORLAN:  Okay.  I have nothing further at
2  this time.
3          RECROSS-EXAMINATION
4      BY MR. BOLAND:
5      Q.  I just have one quick follow up, if I could.
6  Ms. Gorde, you started in 2019; is that accurate?
7      A.  In my -- I -- it could be -- I think it might
8  have been 2016, I'm not exactly sure on the date.  I
9  would have to go back into my records.
10     Q.  Oh, you -- no, when you started working?
11     A.  When I started --
12     Q.  Yeah.
13     A.  -- working for SuttonPark?
14     Q.  Yeah.
15     A.  It could have been I think maybe -- I thought
16 it was 2019, but I was looking up something and I think
17 it's 2016.
18     Q.  Oh, you think it's 2016?
19     A.  Yes.
20     Q.  Okay, got it.  And in 2020, you were working
21 -- from the time COVID hit, you were working from home?
22     A.  Correct.
23     Q.  So you were not in the office
24 (audio cuts out) --
25     A.  Nope.

173

1      Q.  Okay.  And Mr. Kosinski left in December of
2  that year?
3      A.  Yes.
4      Q.  And Mr. Davis continued on through April
5  of 2024?
6      A.  I don't know when he left, I couldn't tell you
7  that when he left, because I wasn't even informed that
8  he left.
9      Q.  Okay.  But in terms of IT issues and whatnot,
10 you still continued to work with him until the time he
11 left; is that fair?
12     A.  Yes, yes.
13     Q.  That's all I had, thank you.
14     A.  You're welcome.
15     THE REPORTER:  All right, can someone explain
16 read or waive to Ms. Gorde?
17     MR. BOLAND:  Oh, are we allowed to do that?
18     MR. MORLAN:  Sorry, what was the question?
19     THE REPORTER:  It's, can we explain read or
20 waive?  Yeah, because she doesn't have --
21     MR. MORLAN:  Sorry, I still can't hear what you
22 said.
23     THE REPORTER:  Read or waive for Ms. Gorde, can
24 someone elaborate on that for her?
25     MR. BOLAND:  Yeah.  Ms. Gorde, you have the


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

174

1  ability to read your transcript and then sign it and
2  make any corrections that you think need to be made,
3  the court reporter can send them to you.  Or you
4  could waive your right to do that and just stand on
5  it as it is right now, it's totally up to you.
6      THE WITNESS:  Okay, so I would give you guys --
7  let you know if I wanted to read it to make sure it
8  seems accurate from my words, and then -- or I would
9  just say, it is what it is.
10     THE REPORTER:  So I can e-mail what's called an
11  errata sheet to you, you can't change anything, but
12  you can make notes --
13     THE WITNESS:  Okay.
14     THE REPORTER:  -- like for example, your 2019
15  start date versus your 2016 start date.  You can
16  make a note of it, but you can't actually change it
17  per se.
18     THE WITNESS:  Got you.
19     THE REPORTER:  So if you --
20     THE WITNESS:  So could -- I would like you to
21  send that to me, please.
22     THE REPORTER:  What's your e-mail address?
23     THE WITNESS:  T as in Tom, A as in apple, Z as
24  in zebra, F as in Frank, E as in Edward, R as in
25  Robert, at MSN.com.

176

1  and I'll have somebody get in touch with you about
2  the order, that's above my pay grade.
3      THE REPORTER:  Okay, understood.  And Mr.
4  Morlan?
5      MR. MORLAN:  I'll follow up with you if we need
6  it, I got to run to another deposition we have
7  scheduled for right now.
8      THE REPORTER:  All right, one moment.  The time
9  now is 2:11 p.m., Eastern, and this concludes the
10  deposition of Karen --
11      (Deposition concluded at 2:11 p.m. ET)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

175

1      THE REPORTER:  Okay, thank you.  And any orders
2  today, gentlemen?
3      MR. DONOVAN:  Orders of the transcript you
4  asked?
5      THE REPORTER:  Yes.
6      MR. DONOVAN:  Yeah.  Could we get the rough
7  whenever you've got it available, and maybe an
8  expedited --
9      THE REPORTER:  How soon?
10     MR. DONOVAN:  -- final, if you can.
11     THE REPORTER:  What's the date that you need it
12  in your hands by?
13     MR. DONOVAN:  It's kind of just as soon as you
14  can, like, can you do the rough maybe today or
15  tomorrow? And then the final in, like, three days?
16  I don't know. What is reasonable for you?
17     THE REPORTER:  Yeah.  I mean, we can do same
18  day.  Of course, there are fees that apply to any
19  kind of rush day, our standard is seven business
20  day.  But I can definitely have production reach out
21  to you to let you know exactly how much --
22     MR. DONOVAN:  Okay, that'd be good.
23     THE REPORTER:  Okay.
24     MR. DONOVAN:  Thank you.
25     MR. BOLAND:  We will definitely take the rough,

177

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF ORANGE
5
6      I, the undersigned, certify that the witness in the
7  foregoing transcript personally appeared before me and
8  was duly sworn.
9
10  Identification:  Produced Identification
11
12
13
14
15      _____
16      KATE MCFARLAND
17      Court Reporter, Notary Public
18      State of Florida
19      Commission Expires: 02/06/2028
20      Commission Number:  HH 489646
21
22
23
24
25



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

178

1                C E R T I F I C A T E
2
3  STATE OF FLORIDA)
4  COUNTY OF ORANGE)
5
6     I, KATE MCFARLAND, Court Reporter and Notary Public
7  for the State of Florida at Large, do hereby certify
8  that I was authorized to and did report the foregoing
9  proceeding, and that said transcript is a true record of
10  the said proceeding.
11
12     I FURTHER CERTIFY that I am not of counsel for,
13  related to, or employed by any of the parties or
14  attorneys involved herein, nor am I financially
15  interested in said action.
16
17  Submitted on: March 19, 2025.
18
19
20
21
22     _____
23         KATE MCFARLAND
24         Court Reporter, Notary Public
25

180

1
2
3
4
5              Read and Sign Letter
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

179

1                ERRATA
2
3  PAGE     LINE              CHANGE     REASON
4
5
6
7
8
9
10
11
12
13
14
15
16  I have read the entire transcript of my deposition taken
17  in the captioned matter or the same has been read to
18  me.I request that the following changes be entered upon
19  the record for the reasons indicated. I have signed my
20  name to the Errata Sheet and authorize you to attach the
21  changes to the original transcript.
22
23
24  _____     _____
25  Date              NAME



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

**$**

**$1** 116:13

**$100,000** 76:21
  139:5,7

**$250** 115:19

**$270,000** 99:23
  100:12,14
  101:10

**$315** 157:3

**$350** 110:8
  111:13,18
  112:21 113:24
  117:22 120:13
  122:5 134:2,10
  135:12,16
  137:2
  146:17,23
  151:3 153:4
  156:20 157:14
  165:6

**$64,000** 94:5,18

**$720,964** 77:1

**$841,000** 89:10

**$841,104**
  78:6,14

**0**

**00008909** 21:16

**02/06/2028**
  177:19

**1**

**1** 3:13
  21:5,6,11
  23:16 36:15
  37:1,22 40:17
  41:2,9

  49:13,18 54:15
  66:25 83:23
  84:1,3

**1.31.21** 62:22

**1:46** 154:24

**10** 3:23 59:22
  60:14,25
  62:2,3,12,15
  67:2,20 97:11
  169:10,18

**10:41** 53:23

**10:49** 54:1

**100** 111:16

**10036** 2:17

**108** 3:5

**11** 3:24 94:15
  98:11,12

**11:02** 61:20

**11:11** 61:22

**11:40** 100:18

**11-30** 94:16

**1185** 2:16

**12** 12:20 64:21
  158:21

**12.31.21-1**
  66:18

**12:10** 60:16

**12:19** 102:7

**12:29** 102:10

**120,000** 77:15

**12-29-2021** 92:2

**12-31** 65:14

**12th** 107:17,18

**1-31-21** 29:2

**1360** 2:23

**156** 3:6

**158** 3:7

**15th** 107:17

**1600** 2:10

**162** 3:8

**17** 1:21

**172** 3:9

**17th** 4:6 5:7

**19** 65:4 178:17

**19th** 65:23

**1st** 52:21 88:12

**2**

**2** 3:14 31:9,10
  41:1,5 42:2
  46:23 83:22,24
  84:4,6

**2.10.23** 3:16

**2:11** 176:9,11

**20** 137:11,12
  143:15 144:1

**2001** 128:22,23

**2005** 137:12

**2016** 84:6
  121:15
  172:8,17,18
  174:15

**2019** 10:15
  11:23 172:6,16
  174:14

**2020** 10:22 16:7
  158:21 161:12

  172:20

**2021** 29:19,23
  63:18 65:4,19
  83:4 90:22
  99:25 100:18
  115:17 128:24
  129:6 135:5
  136:10 151:8
  161:9,10,24
  163:1,9,12

**2021s** 148:16

**2022** 47:23
  58:4,21,22,25
  65:4,23,24
  66:1 126:21
  127:1,19 135:5
  148:15
  161:9,12,24
  163:18,22

**2023** 11:18,21
  12:24,25 43:5
  131:7 132:14
  161:9,12
  163:18,22

**2024** 10:18
  12:6,7,8,9,20,
  22 35:4,9 37:5
  69:19,21
  70:6,7
  107:18,19
  133:8 134:20
  138:5 158:25
  173:5

**2025** 1:21 4:7
  5:7 137:12
  178:17

**21** 3:13 66:19

**212** 2:18



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**25** 99:25 100:18

**25th** 100:4

**27** 3:22

**270,000** 100:15

**29** 90:22

---
3
---

**3** 3:15 32:7,8
34:12 35:3
46:24 65:24
67:17 83:22
84:4,7 86:12
119:5

**30** 168:24 169:1
170:21

**300** 2:10 116:23

**3000** 2:4

**31** 3:14
29:18,23 58:22
63:18 65:4,19

**311** 2:4

**312** 2:5

**315** 4:4 5:6

**31st** 58:16
66:19 88:13

**32** 3:15

**32801** 2:11 4:5
5:7

**331514** 64:22

**33401** 2:22

**34th** 2:17

**350** 110:4 111:8
114:8 120:10
133:14

**36** 3:16

**360-6548** 2:5

**3rd** 60:16

---
4
---

**4** 3:16 35:11,12
36:10,16 37:1
42:2 46:24
47:19,21,22
48:24
49:1,13,19,23,
24
54:5,7,16,19
59:19 67:20
90:6

**40** 168:24 169:1

**407** 2:11

**423-3200** 2:11

**443611** 36:16

**443612** 40:8

**489646** 177:20

**4A** 36:19,23
37:19,20 39:24
41:1,4

**4B** 36:20
37:19,20 47:19
48:24 49:11

**4C** 36:20
37:19,20 54:7

**4D** 36:20 37:20
59:19

---
5
---

**5** 3:3,18 35:4
48:24 50:2
68:3,4 73:9,19

119:3,4

**5.30.24** 3:14

**50** 76:23

**500** 2:21,22

**510** 4:4 5:6

**556-2100** 2:18

**561** 2:23

---
6
---

**6** 3:19 35:9
48:25 49:23
58:4 73:24,25
74:13 83:4

**6.20.24** 3:18

**6.5.24** 3:15

**60** 72:2

**60606** 2:5

**62** 3:23

**6-30-2021** 49:12
54:10

**659** 2:23

**68** 3:18

---
7
---

**7** 3:4,20 9:25
37:5 47:23
54:6,19 66:1
82:4,5,14 83:6
89:14,16

**73** 3:19

**77** 46:14

**77(PL-FL_3**
21:16

**777** 1:6 2:2
5:10 9:25

**10**:1,6,12,17,1
9 **11**:1,3,4,11
**12**:8,19 **13**:20
**16**:4
**22**:16,18,23
**24**:14 **25**:3,4
**26**:11 **32**:25
**33**:4,7,11
**42**:12
**55**:8,10,15
**58**:13 **60**:23
**69**:23
**70**:1,11,16
**71**:10 **73**:11
**76**:7 **77**:17
**78**:13 **95**:20
**99**:18
**103**:10,24
**104**:8 **106**:12
**107**:16 **109**:23
**110**:1,8,15,18,
23
**111**:10,14,17
**112**:22,24
**113**:4 **114**:11
**119**:24 **120**:12
**121**:12,19
**122**:6,21 **124**:2
**126**:13 **128**:14
**129**:2,9,25
**131**:3,8,11,17,
23
**132**:13,18,23
**133**:4,25 **134**:1
**135**:16,24
**136**:4,20
**137**:1,22
**138**:3,8,12,17,
25 **139**:1,14,18
**140**:1,5,8
**141**:7 **145**:9,19



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

146:11 147:14
149:6,13,16
150:17,23
152:4,15
155:2,9,11
156:2,16,25
157:22 158:5
160:21 163:23

**777's** 69:17
113:1,2 140:6
141:20 152:16

**7th** 66:3

---
8
---

**8** 3:21 90:15,16
93:3

**80** 168:25

**82** 3:20

**8909** 21:18

---
9
---

**9** 3:22 27:16,17
59:18,19,21
60:24

**9:04** 4:7 5:8

**9:24-CV-81143-
DMM** 1:4 5:17

**9:28** 20:15

**9:48** 20:18

**90** 3:21 168:25

**9-30-21** 83:8

**97** 3:24

**9th** 52:19

---
A
---

**a.m** 4:7 5:8

20:18 53:23
54:1 61:20,22
100:18

**Abascheck** 50:2
55:2

**ability** 131:12
174:1

**able** 8:13
9:8,13 19:16
20:5,21 22:3
23:19 27:12
30:21,24 31:18
34:9 35:15,16
51:11 71:8
93:20 96:23
97:19 102:24
108:12 138:9
150:2 163:4

**abnormal** 58:25
59:8 87:9,12
101:7

**abnormally**
59:10

**ACAP** 130:22,23
131:3,7,11,16,
23 132:6
138:18

**access** 3:13
17:16 19:4
22:6 25:17,20
26:3,6 28:10
97:22 151:24
152:5,7,14,16
166:11

**accessing**
20:4,11 103:10

**accommodate**
7:12,14 8:18

**according** 22:4
51:4

**account** 68:21
70:19,22,23,24
71:7,12,25
72:11,12,13
91:11 99:20
101:11,16
111:12,14
128:2,3
139:8,19 144:9

**accountant**
137:10

**accountants**
161:8

**accounting**
17:12,18,19
18:8,10,19,23
19:3
43:21,22,24,25
52:25 55:10
60:6 67:8
79:5,6,7 80:11
85:18,24 89:15
91:14 94:5,8,9
96:6
105:7,18,22
113:2,3 119:9
134:8
137:7,10,14,15
140:6
141:7,10,17
142:7,18
147:16,23
148:4,16 152:9
153:14
154:9,12
160:15,25
161:5

166:11,17
167:12,14,18
168:15 169:15
171:13

**accounts**
18:11,12 68:23
69:4,6,7,9,12,
17,22 71:9
72:2,4 73:5,13
91:5 109:22
110:22,23
113:2 120:1,2
127:23 129:3,8
144:7 150:10

**accurate** 9:14
32:20 37:4
60:25 73:20
82:10,20
90:20,21 98:16
147:15
159:1,2,9,11
172:6 174:8

**acquired** 30:1

**acting** 25:4

**action** 155:16
178:15

**actual** 45:9
100:6 103:21
144:24

**actually** 16:24
27:10 34:18
35:7,18 42:23
45:16 52:9
60:21 82:8
99:21 100:11
108:6 119:10
122:6,25
123:11 124:22
138:12 142:18



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

145:10 146:11
147:8
149:6,17,24
150:12 153:25
154:7 160:2,3
168:1 174:16

**Adani** 26:8
55:19

**add** 61:3 100:24

**added** 78:5
121:5

**adding** 124:19

**addition** 65:22
99:2

**additional**
19:15 32:16
60:9 63:2 76:2
78:5

**address** 33:6,12
61:12 71:12
174:22

**addresses** 31:14
33:8

**adds** 129:18

**adjustments**
85:25

**admit** 129:18

**Adnani** 26:8,10
52:8 76:10
77:21 79:21
82:21 83:13
85:23 86:14
88:19 92:15,22
93:25 94:4,13
122:24
123:6,13
124:1,9 125:4

130:7
142:4,22,25
145:18,23
146:9
148:14,18

**Adnani's** 26:15

**affiliated**
95:19

**affirm** 6:24

**afloat**
138:18,23

**afternoon**
156:10

**against** 51:7
103:9,24 127:2
150:12,19
156:2 168:6

**agreed** 4:10

**agreement** 6:17
76:6 139:13,15
156:17

**agreements**
84:12 151:4
152:13

**ahead** 19:13,22
20:3 47:2
89:18 111:22

**Alex** 26:8,10
52:8 53:6
55:19 74:19
78:24 79:4
85:12,15 86:14
93:20 114:21
122:24
123:6,13
124:1,8 125:4
130:7

142:4,22,25
145:18,23
146:9
148:6,14,18

**Alfalla**
42:11,21 43:16
44:19 91:19,22
92:2,3 94:11
100:19 106:22
112:8,20
119:19 124:5,8
125:4 130:19
141:13

**Alfalla's** 45:2
46:1

**allegations**
103:8,24
104:3,15
105:24 107:24
109:11 120:5
156:2 168:5

**allege** 126:20

**alleged** 159:23

**alleges** 126:20

**alleging** 104:8

**allocated**
78:20,22 79:16
80:5

**allow** 61:4
149:7

**allowed** 149:25
173:17

**already**
44:21,24 45:1
52:13 67:12,17

**altered** 107:25

**am** 6:7 10:20

142:4,22,25
145:18,23
146:9
148:6,14,18

**Alfalla**
42:11,21 43:16
44:19 91:19,22
92:2,3 94:11
100:19 106:22
112:8,20
119:19 124:5,8
125:4 130:19
141:13

**Alfalla's** 45:2
46:1

**allegations**
103:8,24
104:3,15
105:24 107:24
109:11 120:5
156:2 168:5

14:9 16:7
29:18 30:14,18
41:14 56:14
60:1 65:17
77:8 86:5 90:2
96:22 97:4
102:4 120:3
142:23 145:13
165:15
178:12,14

**amended**
84:6,7,9

**America** 111:15

**Americas** 2:16

**amongst** 164:23

**amount** 30:14,19
77:12,13,17
78:1,2 80:6
82:2 87:21
91:24 99:24
100:4,5,14,23
116:20 117:20
118:7,20
168:9,19,21

**analyst** 73:12

**ancillary**
71:3,5

**and/or** 92:22
112:3

**annual**
57:10,11,13

**annuities** 18:15
19:6

**anonymous**
126:21 127:19

**answer** 8:3
9:8,9 14:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

89:3,5 109:13
111:21,23,24
145:22

**answered**
39:9,11,15
57:25

**answers** 8:3,6

**Anthony** 48:6
54:22
55:7,8,12
60:3,15

**anybody** 25:4
96:18
104:18,22,25
114:21 134:6
160:9

**anymore** 149:20

**anyone** 13:4
25:2 95:19
113:4 123:25
130:18 155:2,6
156:16 163:11
164:25
166:10,24,25
167:4,5,14,17

**anything** 9:3
13:1,7 17:24
20:6 22:15
33:12 43:2
44:6 46:9,22
47:4,6
49:22,25 57:22
58:24 61:9
64:11,14,24
69:20 89:13
95:2 96:3
104:22 105:1
107:20 109:4
114:18,22

115:9 120:3
129:25
133:13,19
137:20,21
155:18
160:3,6,9
166:21,24
168:14 171:3
174:11

**anytime** 8:19

**anyway** 124:23

**anywhere** 51:3
58:11

**apartment** 19:10

**apartments**
140:3

**apologize** 17:22
67:12 97:14
160:14

**apparent** 105:12

**appear** 32:2,19
37:3,19 41:5
47:22 48:25
49:3 54:14
60:24 62:15
63:8 68:7
73:19 82:10,19
87:7 89:21,24
90:19,20 92:15
98:15 120:1
130:2

**appearance** 5:19

**APPEARANCES** 2:1

**appeared**
2:6,12,19,24
177:7

**appears** 24:7

32:22 41:3
48:4 49:2,6,7
54:17 62:17
72:22 82:23
83:7 87:6
90:23 92:16
93:18

**appended** 29:1

**apple** 174:23

**applied** 144:24

**apply** 175:18

**appreciate** 7:11
109:2 154:19
156:6

**approval** 100:19

**approvals**
91:13,14

**approve**
91:18,20,22
92:11

**approved**
85:16,19 86:9
89:18 92:4
94:11,19 98:4
167:18

**approving** 92:8

**approximate**
11:17 43:4
95:2 118:20

**approximately**
30:11 69:16
115:18 116:21
121:11 122:5
134:2 135:24
146:17 153:4
165:12 171:7,9

**April** 58:11

131:7 173:4

**area** 26:7 102:1
106:7

**aren't** 64:13
147:11 153:15

**Art** 9:17

**aside** 117:7
118:24

**asset** 85:1 88:5
124:21

**assets** 84:15,20
106:9
115:18,22
116:2,15,20,24
117:9,15,20
118:9,13,20
119:1,9 121:1
122:5 126:22
127:1,19
129:4,9 130:2
136:11,15,17,2
0,25
145:8,11,18
146:10,15
147:22
148:2,19
149:5,13,17,23
150:11,19,23
151:4,11
153:25 154:6,7
161:18
166:15,17
167:8

**assign** 14:19

**assist** 18:22
20:6 58:18

**assistance**
72:20



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

assistant 11:25
  12:5,23 55:15

assisting 71:3

associated 77:6
  88:21 89:7
  119:4 144:18

assume 9:9
  164:19

assuming 40:3

attach 179:20

attached 37:25
  41:6

attachment
  41:2,10

attachments
  37:16,19,21
  40:13,18 41:20
  48:25
  49:9,13,15,17
  54:15 90:6

attempts 157:13

attended 4:6

attending
  5:19,20,23
  6:3,7

attention 22:11
  23:16 54:6
  73:18 101:12
  106:18

attorney 152:22

attorneys
  178:14

audible 8:7

audibly 8:3

audio

53:11,13,15
  149:13 152:17
  154:21 172:24

audit
  14:5,7,12,20,2
  4 15:1,10,15
  16:10,12
  17:7,9 22:7
  23:3,10,13
  24:6,11,15,24
  25:6 28:12,18
  32:4 37:13
  47:8,12
  57:7,9,10,11
  58:10,18,25
  67:4,9 68:9
  71:2 89:22
  90:1
  96:12,15,19
  104:23 159:1
  160:21,23,24
  161:12
  163:1,3,9,12,1
  7,22

auditors
  57:8,12,25
  58:10 162:11

audits 14:16
  56:20,22,24,25
  57:4,6,13,18,2
  1 58:17
  161:9,13,14
  162:24

August 99:25
  100:3,4,18

Australian 2:21

authenticate
  64:12

authority

162:14

authorization
  103:11

authorize
  179:20

authorized
  47:11 178:8

available 51:21
  175:7

Avenue
  2:10,16,21

average 169:17
  170:23

avoid 62:9

aware 47:9
  56:14,15 69:24
  70:8 72:19
  73:3 77:23
  80:8 95:21
  96:17 103:8
  104:1
  106:11,13
  107:10,24
  108:3,14
  118:14 120:3
  130:4 139:21
  145:13 149:10
  150:16 154:13
  156:19 157:13
  161:15 162:2
  163:17

away 19:23 28:9

awkward 24:9

———————————
              B
———————————
bachelor's
  137:15

back-and 66:13

back-and-forths
  63:21 64:3

background
  137:7

backup 18:14
  38:1 42:14,18
  43:8,10 48:8
  52:1 57:24,25
  60:9

bad 157:25

balance 18:11
  69:8,10
  144:5,6

balances 57:23

bank 18:12
  68:14,21
  72:12,14,16
  73:4,13 79:12
  109:22
  110:22,23
  111:12,14,15
  113:1 119:25
  139:8,19

base
  76:14,17,25
  78:9,17 79:15
  80:5 87:16,20
  88:20 89:6
  93:17 119:5,6
  121:6,8 149:19

based 6:17
  24:10 25:24
  26:1 42:20
  67:7 71:14
  75:23 76:18
  77:11,17 79:24
  86:19 89:11



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

90:6 96:11
99:1,4,12
100:1,6 104:13
128:8 139:13
171:20

**basis** 29:11
144:2
146:20,22
147:3,5,7
171:12

**Bates** 21:18
28:25 33:24
34:2,5,24
36:16 40:7
64:22

**bdonovan@kslaw.
com** 2:18

**Beach** 1:3 2:22
5:16

**begin** 7:4

**beginning** 28:24
29:5 97:16
126:4

**behalf**
2:2,7,13,20
5:23 6:2,6
14:13 25:4
96:15

**believe** 19:21
36:25 41:16,17
46:24 47:3
49:16 55:18
60:2 68:12
70:2 76:11
78:12 83:2
90:3 95:22
96:13,24 125:9
146:8,13

163:16

**Bellissimo** 3:16
40:4 46:13,19
114:16 119:18
134:4 141:12
164:4,15,24

**belong** 28:21

**Bennett** 3:17
55:25 82:21
83:13 85:23
92:23 122:25
123:5,19
124:1,8 125:4
130:5
142:3,22,24
145:18,23
146:9

**besides** 25:2,6
31:5 33:9
56:10 83:19
95:2 107:10
157:14

**best** 7:13,14
8:10,11 9:3

**better** 61:8
95:16 171:15

**beyond** 167:14

**billions** 138:18

**bit** 7:20 19:14
26:25 27:1
36:4 45:7
67:13 76:1
82:24 95:23
161:17

**black** 93:8

**Boca** 16:20,21
131:20

**Boland** 2:3
3:7,9 5:22
6:19
33:17,20,23
34:10,15 38:22
39:6,9,14
97:3,8,24 98:1
107:12 109:12
110:3,10,20
111:19,21,23
112:10 113:13
114:1,7,14
116:17
117:2,11,17
118:11 119:12
120:15 121:21
122:11,17,19,2
3 123:8,16,22
124:4,11
125:6,11,18,23
126:15 127:10
132:1,15,20
133:1,22
134:3,12
135:13,21
136:1,7,22
137:3,25
138:19
139:3,20
140:9,24
141:4,19 142:9
143:3,8
145:12,24
146:5,12
147:18
149:9,15
150:3,13
151:15
152:21,25
155:21
158:12,16

159:12,17,18
162:16
166:5,19
167:20
171:1,16,24
172:4
173:17,25
175:25

**bold** 42:2

**book** 79:6
142:18 146:24

**booked** 45:11

**bookmark**
35:15,17

**books** 17:13
38:4,13 39:21
41:15 42:4,10
43:4,17,23
45:9
59:11,12,14,15
60:11,22 84:20
115:9 118:16
119:15,21
141:17
142:16,19
143:25
147:9,23 148:4
153:16 163:22

**borrow** 51:7
56:6 78:14
87:20,22
131:15,17
138:9,13 139:6
149:8,19

**borrowed** 77:11
110:12 116:4,5
125:15 131:5
140:20 146:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

149:18

**borrowing** 75:9
76:14,17,25
77:17,25
78:8,17 79:15
80:5 81:4
87:16,20 88:20
89:6 93:17
99:11 119:5
121:6,8
138:17,22
143:22,23,24
149:19

**borrowing-based**
98:6

**bosses**
130:13,15

**bottom** 21:9,10
36:4 40:7
60:13,14 63:13
76:9 92:13,14
100:18

**bought** 51:14
64:4 85:4
120:18

**Bowen** 2:9 6:2

**box** 72:14

**break**
8:19,20,23,24
9:5 46:3,6
75:1 102:4
103:21

**breaking** 159:24

**Brian** 2:15 6:5
108:24

**brief** 18:5

**briefly** 22:2,3

36:19 37:19
69:25

**bring** 106:17

**brings** 149:18

**broke** 103:17

**broken** 159:24
160:10 170:12

**brought** 115:8
119:14,16,17,1
8 148:5,6

**building** 75:14

**bunch** 13:23

**Burgos** 73:11
141:12

**business** 33:4
131:5 175:19

**busy** 7:12

**buy** 19:6,7
29:12 39:2
56:6 115:7
140:2,17

**buying** 44:7
52:20 115:9
116:12 138:10

--------

C

**calculation**
75:25

**calendar**
58:19,21

**capacity** 52:22
86:10

**Capital** 1:7,12
2:2,13 5:11,12
56:13,19 57:5
115:17 119:25

132:18,24
134:1 136:5
137:23
139:1,2,18
141:23 142:4,6
143:16 155:11

**Capital/777**
9:23

**Capital's** 140:2

**captioned**
179:17

**care** 51:20
85:23

**case** 1:4 5:16
13:5,8,11,14,2
0 14:2,3,5
64:8 82:9
86:25 103:19
152:25 153:8
158:17

**cash** 18:11
46:3,10
81:10,13,24
82:1 144:5,6

**catalyst** 157:10
165:18

**caused** 104:9

**causing** 135:11

**CC** 46:15

**CCs** 31:20

**certain** 18:22
42:14 43:10
52:22 77:11,12
87:21 105:7
108:7

**certainly** 64:13

**CERTIFICATE**
177:1

**certify** 177:6
178:7,12

**CFO** 42:12

**chain** 76:10

**chance** 19:18
22:1 40:1
82:16

**change** 64:6
77:1 78:6
174:11,16
179:3

**changed**
66:14,15

**changes** 12:3
42:20 48:8,15
58:1 65:15
179:18,21

**character**
171:22

**characterize**
137:22

**charge** 8:16

**chat** 20:22
61:6,9,12,14
62:2 67:14
97:4,13,18,21

**check** 34:19
102:4

**checked** 143:11

**checks** 18:14
72:7,14,15
101:19

**Chicago** 2:5
5:24



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

childcare 150:6

choice 7:9

Civil 4:8

claiming
64:10,13

Clarence 92:15
93:19

clarification
21:19

clarify 10:8
12:21 24:8
34:8 55:16
64:8 67:14

clear 7:23 8:13
9:3,6 13:16
34:24 39:8,20
64:15 81:4
113:21 132:4
158:18

clears 147:13

click 36:7,8

client 18:3,4

clients 64:13

close 69:3,6,17
71:25 72:2
84:11

closed 71:20
72:3

closes 100:3

closing 71:25

collateral
14:5,7,12,20,2
4 23:3
24:15,24 25:5
28:18 47:8,12
56:21 67:4,9

68:9 89:22
90:1 96:15,19
104:23 106:1,4
116:15,25
118:21 136:25
159:1

colleague 159:8

colleagues
103:7

collected 99:20
100:11,13,15

collection 3:21
90:25 91:11
101:11,16
128:3

collections
99:1
100:6,7,10

collectively
10:2

combination
17:8 100:9

coming 25:14
53:18 128:11
146:25 151:6

comment 86:17
93:10

comments 85:14
86:8

Commission
177:19,20

common 50:5

communicate
16:11

communicated
16:16 55:18

64:7

communicating
58:8,9 92:23

communication
32:16 79:21
153:7,9,10,13,
14,18
168:19,21

communications
19:21 23:5,7
24:23 25:1,5
79:24 92:21
159:3
164:13,23
167:6

companies 25:14
72:7 76:20
100:16 101:18
143:21 160:24

company 5:5
9:17 11:2,12
12:11 58:2
73:13 75:6
76:22 128:11

compare
26:19,22
147:10

compared 105:7
168:9,20

compares 100:11

comparing
147:16

compilation
26:15

compile 26:13

compiling 26:16

complaint 109:6

120:6 126:19
134:19,22,24
135:3 155:15
156:1,2

complete
46:3,11 140:8

completed 4:13

completely 84:8

compliance
26:12 76:4,5
79:17 92:24
120:22
121:1,4,11,19
122:1,4,9,15,2
2
123:6,10,14,20
124:3,23 125:4
126:12 131:24
132:6
135:11,20,25
136:5,9
142:15,25
144:12,20,22,2
5 145:5,9,19
146:4,10,16
147:8,10,17,22
148:3 149:7
152:10
157:2,9,15
165:6,7,24
166:14,18,21

compliant 74:23
75:3 91:11

complicated
82:24

comply 76:6

component 79:10

composite 35:11



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

36:10,15,18
37:1,20 39:24
40:15,25 41:4
42:2 46:24
47:18,22 48:24
49:1,11,13,18,
24
54:5,6,7,16,19
59:18,19 60:14
67:2,20 73:24
**computer** 103:10
104:11
**conceal** 120:13
128:19 129:8
150:11
**concealed**
150:18
**concern** 119:14
148:10,11,13
**concerning**
126:21 153:25
**concerns** 14:4,5
115:3 119:8
123:1,5
134:1,9 142:8
153:21,24
167:2,19
**concluded**
176:11
**concludes** 176:9
**conducted**
163:17
**conducting**
147:4
**conference** 5:9
**confirm** 42:19
56:2

**Confirmed** 6:21
**confused** 38:12
88:15
**connection**
14:18 24:5
90:1 158:25
**consider** 67:7
96:5 115:17
**considerable**
104:14
**considered** 56:7
88:1
**considering**
151:10
**consult** 26:17
**Consulting** 1:16
2:7 5:14 6:2
13:17 14:15
**contact** 53:7
68:21,24 71:7
157:21 158:4,7
159:3 163:5,9
171:6
**contacted**
158:24 163:21
**contain** 122:10
123:20
**contained** 44:1
121:20 122:15
123:14 166:14
**containing**
123:6
**contemporaneous
ly** 162:3
**context** 24:14
25:22 47:8

68:8 163:12
**contexts** 75:15
**continue** 7:13
**continued**
173:4,10
**contract** 139:12
**contracts** 42:4
43:4,17
**control** 12:3
34:7,20,21
140:8
**controlled**
131:11
**controller**
11:25
12:5,10,12,15,
16,23 42:23
46:14,16 55:15
112:4 114:16
132:12 164:4
**convened** 5:9
**conversation**
156:24
**conversations**
24:11,13 71:17
115:11
**convince** 137:1
**cook** 141:17
**copied** 72:18
**copies** 28:11
**copy** 32:20 37:4
49:4 55:1
60:25 73:20
82:10,20
90:20,21

151:17
**corner** 21:9,10
36:3
**corporate**
139:24
**correct**
29:18,20,24
30:4 31:2
32:22 36:9
42:5 46:18
49:4 54:24
55:19,20 57:19
58:20,23 59:16
60:7,8,12
65:6,21,25
66:2 67:5 70:4
71:23 75:16,20
76:8,11,16
77:4,19
78:7,11,16
79:1,8,19
81:16,21
83:1,5,9
84:11,17
85:5,6 86:1
87:15 91:1,16
93:1,5,6
94:7,12
98:7,22 99:6
100:21 101:2
102:2
106:18,19
111:6,11 113:1
115:15 116:9
117:24 120:24
121:3,7,10
122:7 125:1,7
127:24 128:13
132:8
135:14,18,22



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

136:18,23
137:4,8
143:4,9,17
145:3,7 147:25
148:23 150:4
155:17 159:25
161:20
163:9,10,19,23
,24 167:13
169:20,24
171:17 172:22

**corrections**
174:2

**correctly**
65:1,17

**correspond**
34:25 37:21

**counsel** 5:21
7:3 20:10
24:20 94:24
108:25 178:12

**Counselors** 6:15

**COUNTY** 177:4
178:4

**couple** 30:16
34:3 55:2
68:22 162:22

**course** 32:24
33:4 121:13
161:8 175:18

**court** 1:1 4:11
5:4,15 7:22
8:5 20:5 61:13
67:11 97:13
174:3 177:17
178:6,24

**covered** 156:3

**COVID** 10:23
16:8 17:3
170:8 172:21

**CPA** 160:17

**created** 89:1

**Crediegy** 56:13
57:1,3 80:22

**credit** 105:20
121:9,13

**creditors**
106:10

**crossed** 34:5

**CROSS-
EXAMINATION**
3:7 158:11

**cure** 93:21

**current** 29:22
48:13

**customer** 18:4

**cut** 127:9 132:4

**cuts** 53:11,13
149:13 152:17
154:21 172:24

**cutting** 53:21

---

D

**daily** 171:12

**Damien** 40:6
42:11,21
91:19,21 92:2
100:19 107:6
112:2,8,20
115:8 119:18
124:5,8 125:3
130:19 141:13

**data** 3:13 22:7

26:13,16 51:17
103:19 108:13

**date** 1:21 11:17
29:9,25 30:2
35:3 61:1
63:15 69:14
73:21 90:22
100:25 172:8
174:15 175:11
179:25

**dated** 29:18
47:23 58:4
60:16 62:22
65:3 83:8

**dates** 48:14
63:14,18,19
64:5

**Davis** 1:15 2:20
5:13
102:13,15,18
103:4,9
104:5,9 156:13
157:21 159:20
160:2,10
168:4,9,13,22,
24
169:3,5,18,21
170:18,24
171:6,15,23
173:4

**day** 4:6 5:7
12:18 16:2,14
35:8 37:7
81:25
169:10,11,18
175:18,19,20

**days** 72:2 169:2
175:15

**day-to-day** 11:7

**deal** 25:13 44:8
45:9
52:3,7,12,16,2
0 53:1,4 63:20
80:24 81:14
88:14 107:4
115:22 116:1
118:7
128:10,15
168:16 169:7

**dealing** 22:23
57:3 66:9
169:18

**deals** 19:5
26:21 27:6,8
28:20
29:11,13,22
30:1,2
38:3,13,16,18,
20,25 39:21
40:11,22 41:24
42:9
43:10,13,23
44:8,12,14,20,
24
45:1,12,14,20
48:20
50:14,23,25
51:1,5,8,10,12
,16 52:10
53:5,8,13
55:9,10,11
56:6,12
59:2,3,7,9
60:10,21
64:2,3 66:10
72:8
75:8,10,23
76:1,21,24



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

77:12 80:14
81:2,3 87:23
93:3 109:25
110:13,25
115:7,10,12,13
,21
116:5,6,8,9,10
,13 119:15
122:1 123:9,11
124:19
126:6,8,10
128:5,7
133:15,18
135:8 138:10
142:16
144:18,20,23
147:1,11
148:8,11,25
149:2,20
165:23

**dealt** 18:21
25:13 57:7
129:24
169:11,22

**debt** 111:4

**December** 16:7
58:15,22 63:18
64:6
65:3,4,19,23
66:19 90:22
136:10 148:16
158:21 173:1

**decide** 106:7

**default**
88:10,14

**defaulted** 77:6
87:17,21,23,24
88:1,3,8,22
89:2,7 94:15

**Defendant**
2:20,25

**defendants** 1:18
2:7,13 6:2,6
13:18,19
108:25

**deficiencies**
89:6 98:6

**deficiency**
76:14,15,17
77:1,9 78:9,18
79:10,15 80:5
88:20,25 89:1
99:12,13,16

**define** 118:3
137:6,17
140:12,13

**definitely**
27:23 96:16
175:20,25

**defrauding**
130:10

**degree** 137:14
160:15

**delay** 97:14

**delete** 153:20

**department** 52:6
89:15 119:9
134:9,14 140:6
141:7,10,17
142:8 153:15
154:10,12
166:11,17
167:12,18

**department's**
147:23 148:4

**departure** 95:3

**Depending** 85:3

**depends**
170:6,20,22

**depo** 34:23

**DEPONENT** 1:20

**deposit** 72:16

**deposition**
4:3,7 5:10
7:15,18 13:2,5
21:5 62:1
85:11
176:6,10,11
179:16

**depositions**
64:16

**describe** 62:18
64:12 74:16
131:2 134:23
152:2

**described** 28:4
29:22 31:4
39:22 42:15
43:11 45:12
57:21 76:11
166:15

**describing**
55:17 60:19
62:8 88:20,25
91:4 92:22

**designate**
14:19,22

**despite** 136:19

**detail** 20:25
105:4

**determination**
148:1

**determine**
147:22

**difference** 10:5
18:6 99:17,19

**differences**
18:18

**different** 7:21
8:17 18:3
26:21 27:4,9
29:16 37:16
38:1 47:16
48:13 51:14
53:12 63:22
64:3 79:24,25
80:7,13,18
81:6,15 84:9
85:5 94:21
99:8 106:10
118:7 130:2
151:1
152:9,10,12
170:6

**differently**
39:19

**digital** 75:17

**direct** 3:4 7:6
23:15 24:13
54:6 73:17
94:8 96:23
106:7 117:14
122:9 160:6,8
163:8

**directed** 22:11
42:23 48:4
112:8,20
130:20 146:9
153:20
166:16,20
167:19



MILESTONE **|** REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

**directing** 15:16
23:9 79:4
109:24

**direction**
111:17 123:2

**directly** 23:20
25:15 55:1
72:15 115:3
117:4,8

**disclosing**
155:3,7

**discovered**
106:15

**discrepancies**
105:12,17
107:8,10

**discussed** 37:9
59:5 65:23
69:25 86:3
91:3 95:8
163:14

**discussing** 22:6
48:9 59:5
62:20 93:5
98:18 105:9
167:7

**discussions**
23:3

**disguise** 157:14

**disparaging**
95:18

**disregarding**
29:5

**distribute**
100:10

**distribution**

98:21,23
99:13,15,24
100:1,2,20,22
109:24 128:6,8

**District** 1:1,2
5:15 14:3

**diversion** 157:3

**Division** 1:3
5:16

**document** 21:23
27:3,12,20
28:8,17,19,24
31:15,16 32:23
33:23 34:11,13
36:13,25
41:6,13 42:19
46:23
47:7,11,14
54:8 59:21
74:13 89:21,24

**documentation**
17:19 18:23
25:17,19 26:20
44:6 161:11
163:2 164:6,8

**documentations**
18:13

**documents** 16:17
25:21 34:4
64:12 67:1,3
150:17
151:2,9,13
152:4 153:2,20

**dollar** 114:5
116:20 117:20
118:20

**dollars**
114:6,13

118:25 124:9
130:11
138:18,22
148:2

**done** 64:17
65:14 83:16,18
94:20 102:5
113:5 150:9
154:4 160:21
161:13,14

**Donovan** 2:15
3:5 6:5,21
97:7,10
108:18,21,24
109:16
110:6,16 111:2
112:5,14,18
113:15
114:3,10 115:2
116:19
117:6,13,19
118:18 119:23
120:20 121:23
122:13,20
123:4,12,18,24
124:6,15
125:8,13,21,25
126:18
127:12,14,17
129:12,15,20
132:3,17,22
133:7,24
134:7,17
135:15,23
136:3,12,24
137:5 138:6,24
139:10,22
140:11
141:1,8,22
142:11

143:5,10
145:16
146:2,7,14
147:20
149:11,22
150:5,15
151:20
152:19,23
153:1
154:14,18
155:1,24 156:5
175:3,6,10,13,
22,24

**Dorchester** 3:24
74:20
75:2,4,5,7,18
76:24 77:24
78:2,6 80:6,15
81:2
83:3,7,19,23,2
4 84:1 89:10
90:24 93:4
94:6 96:8
98:17,21 119:5
143:22,23
144:8

**double**
106:1,4,9
107:7,11
117:25
118:3,5,9,13
126:22
127:2,20
150:20 154:7
163:13 167:7

**doubt**
113:10,16,17,2
3 114:2

**download** 20:22



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

draft 85:13

drawing 139:18

drive 2:4
30:23,24 31:5
90:10 102:21
151:23
152:3,6,7
166:12

driver's
6:15,18

drives 153:6

drop 61:9

dropped 129:17

due 68:21 69:7
77:16
87:4,10,13,14,
19 88:7 98:21
99:11,21,24
100:4 101:1

duly 177:8

during 10:23
16:8 32:24
95:25 96:3
104:23 161:8

duties 32:25

_____
E
_____

earlier 10:24
12:21 13:21
31:22,24 32:15
42:16 48:9
55:17 62:8
63:10 64:15,23
69:25 88:16
91:4 92:22
104:20 158:20
160:5,19 165:4

East 4:4 5:6

Eastern 5:8
20:15,18 53:23
54:1 61:20,22
102:8
154:22,24
176:9

easy 108:7

echelon 156:25

Edward 174:24

EG&G 136:15

eight 9:20
20:23 134:15

either 27:8
34:1 46:12
59:11 63:20
64:2,4 66:9
160:11

elaborate
173:24

electronic
75:17

else 11:8 25:25
26:3 43:19
46:9 51:1
65:15 87:11
89:13
114:11,20,21
115:11 116:11
130:18 134:6
164:25 166:8
167:4,9,14,17

e-mail
2:6,12,18,23
3:16,19,20,24
15:1,3,9 20:11
22:24

31:1,14,17,25
32:1,11,14,20,
23 33:5,8,12
35:2
37:4,11,15,21
40:14
41:6,14,15,17,
22 42:13
43:5,9 44:7
45:13 46:2
48:1,4,7
49:4,6,9,23
50:2,7
54:11,18,22,25
55:1,6 58:3
59:24
60:14,19,20,25
61:11
68:7,11,18
71:1 72:24
73:8,20
74:17,18
76:9,10 77:21
79:20 81:19
82:10,20,24
85:9,15
86:3,13 88:19
89:9,16
90:4,8,20,21
91:8,10
92:1,3,6,7,10,
14,15
93:2,9,25
94:21 98:24
99:12,22
100:17
153:7,9,10,13,
14,18 154:1
164:9,10 165:1
170:1,5

174:10,22

e-mails 33:2,14
52:5 59:5
69:14 70:7
71:22 74:3,7
85:12 90:9
153:23 154:5
164:18 165:2
170:8,11,18

employed 12:8
158:2 178:13

employee 103:7

employees 25:3
55:17 131:8
133:6

employer 9:21

employment
12:18 16:4
103:11 158:5

encouraged
104:9

enter 44:10

entered 144:19
179:18

entire 13:14
73:13 144:24
179:16

entities 13:18

entity 132:25

entries 65:18

entry 44:11
60:22

episodic 169:22

equipment
103:18



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

erased 67:15

Err 92:15,17

errata 174:11
179:1,20

errors 66:22

Esquire
2:3,8,9,15,20

essentially
79:3 94:4

ET 4:7 176:11

ethically
133:23

evaluation 87:8

event 165:18

events 162:2

eventually
119:21 120:18
165:4

everybody
15:4,5,7,9
34:9 61:14
70:13 97:14,22
151:23

everybody's
73:13

everyday 11:14

everyone 5:2,18
97:19 107:4
152:4

everything
65:15 155:23
163:5

evidence 150:22

exact 10:20
97:17 103:16

exactly 10:20
11:9,10 13:11
17:15 30:14,19
35:17 37:23
41:19 45:16
65:8 77:8
84:22 90:2
105:14 114:20
117:4
118:12,23,24
127:25 133:3
139:15 142:15
165:15 172:8
175:21

EXAMINATION
3:4,5,6,8 7:6
108:20 156:8
162:20

example 21:19
28:3 52:18
80:4,25 88:13
128:2 174:14

examples 74:7,8

Excel 17:18
26:20 44:9
97:7,8,10

except 5:18

exchange 32:20
49:23 59:24
60:25
68:8,11,18
71:1 73:20
74:14,17
82:11,20,25
85:9 86:6
89:16 90:21
91:8,10 93:2
98:16

exclusively

121:2

Excuse 5:4
152:17

exercise 140:8

exhibit 3:12
21:5,6,11,20
23:16 27:16,17
31:9,10 32:7,8
34:12
35:3,11,12
36:10,16
37:1,20 39:24
40:15 41:1,4
42:2 46:24
47:19,22 48:24
49:1,11,13,19,
24
54:5,6,7,16,19
59:19 61:4
62:2,3,11,14
67:2,17,20
68:3,4,20
73:8,19,24,25
74:13
82:4,5,14,17
83:4,6 86:13
89:14,16
90:5,6,14,16
93:3 97:11
98:11,12
143:12

Exhibit 11
97:13 98:15

Exhibit 3 32:9

Exhibit 4 36:18
60:15

Exhibit 5 68:18

Exhibit 6 82:8

88:16

Exhibit 7 85:10

Exhibit 9 28:2
96:24 97:3

exhibits 3:11
19:15 20:22
28:1 67:14
74:4

exist 147:22,23
150:20,22

existed 148:3

existence 70:8

existing 73:4

expect 88:11
128:4

expected 168:4

expedited 175:8

expenses 131:17
137:20
138:11,14

experience
67:7,8 96:13
159:7

experiences
64:18

Expires 177:19

explain 27:1
60:18 63:16
109:21 115:25
119:8 120:11
124:16 125:14
126:7 127:25
142:12 146:20
173:15,19

extent 10:9
15:15 18:7



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

106:15

---

### F

**facilitate** 17:6

**facilities**
74:20 80:13
83:21 84:9,14
85:5 92:25
96:8,20 105:20
106:10 118:8
138:10

**facility** 3:24
52:21,23
53:9,10 74:23
75:2,5,8,11,12
,17,18,24
76:3,7
77:18,25
78:15,21,23
79:17,18
80:6,7,19,24
81:6,10,15
83:17,18
84:10,11,12,16
,21 87:22
89:20 91:12
93:4 94:6
98:17 99:3
121:13

**fact** 23:12
43:13 62:23
87:19 89:17
101:17 109:20
120:9,13
121:25 123:9
128:19 129:8
133:17 135:4

**facts** 158:18
162:6

**fair** 8:25 9:1
13:24,25 15:13
34:10 74:3
105:16 116:14
117:7 145:8
173:11

**fairly** 45:18
79:23

**false** 121:20,24
122:4,10,15,22
123:7,14,20
124:2,18 125:5
131:24
135:10,20,25
136:5 142:25
157:2,14

**falsify** 126:13

**falsifying**
126:10

**familiar** 13:21
14:7,9,11 21:2
41:12,14,15
83:20 86:2
106:2,8
171:20,22

**familiarize**
19:19

**Fargo** 68:21
69:3,5,16,22
71:20,24 72:1

**favorite** 109:1

**February** 43:5
52:21 65:24

**federal** 157:18
162:13

**feedback** 11:6
17:22 38:10

**feel** 101:7
133:16

**fees** 175:18

**Feuer** 2:20,21
3:6 127:7,9
156:9,12 158:8

**fictitiously**
126:22
127:2,20

**figure** 116:9
164:22

**file** 29:19
62:16,17,19
63:2,6 64:25
66:22 102:23

**filed** 70:6,12
124:13
134:19,22
155:15 156:1

**files** 15:2 29:7
30:20,25 31:3
50:9 66:23

**final** 175:10,15

**finally** 157:5

**financial** 57:8
143:14,18
144:1,4,11

**financially**
178:14

**fine** 9:17 34:10
148:25 152:21
161:23

**finish**
8:11,12,23

**firm** 2:21 23:25
160:25 161:5

**first** 7:9
21:12,13 41:2
44:12 49:1,8
50:6 52:15
55:21 56:18
62:14,22 64:20
69:17 75:4
86:17 92:1
93:9 100:17
106:3
116:16,22
117:1,10,16,22
128:16,21
129:4,10
145:20 146:17
148:22 149:25
150:24

**fiscal** 58:13

**five** 27:4

**fix** 34:1,23
39:7 102:22,24

**flash** 30:23

**Floor** 2:17

**Florida** 1:2
2:11,22
4:5,8,12
5:7,16 14:4
109:5,7,8
177:3,18
178:3,7

**flow** 82:1
144:5,6

**focus** 16:10

**folder**
152:3,12,15

**folders** 152:9

**folks** 7:9 13:23

---



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS**

23:18 24:12,14
60:2,6 70:2
167:11,15

**follow-ups**
162:22

**foot** 17:1 86:16
92:17

**Ford**
25:8,9,11,12,1
9 26:2,6 56:23
154:13

**foregoing** 177:7
178:8

**forged** 119:25

**forging** 150:17

**form** 38:22 39:7
107:12 109:12
110:3,10,20
111:19 112:10
113:13
114:1,7,14
116:17
117:2,11,17
118:11 119:12
120:15 121:21
122:11,23
123:8,16,22
124:4,11
125:6,11,18
126:15
132:1,15,20
133:1,22
134:3,12
135:13,21
136:1,22
137:3,25
139:3,20
140:9,24
141:4,19 142:9

143:3,8
145:12,24
146:5,12
147:18
149:9,15
150:3,13
151:15 155:21
159:10
166:5,19
167:20
171:1,16,24

**forth** 66:14

**forward** 136:10

**forwarded** 81:19

**frame** 45:19
58:8 66:16
95:2

**Frank** 174:24

**fraud** 125:9
141:3,6 142:7
154:11 155:4
164:1 165:6

**fraudulent**
107:10

**Fred** 24:21
91:19,22
94:19,22,23
98:16 100:20
106:24 107:5
164:5,16,24

**frequency** 101:8

**frequent** 105:17

**friendly** 107:22
108:6

**full** 128:7

**Fund** 1:15 2:14

5:13

**funding**
50:18,19 52:6
137:2 138:4,8

**funds** 72:5 76:3
100:23,24
101:18 111:9
133:13
138:3,13
139:2,19,24
140:2,20
146:25

**funnel** 163:5

**funneled** 163:6

---

G

**Gambrell** 2:3
5:22

**game** 140:23

**garbled**
53:19,20

**general** 13:14
15:1,3 17:13
74:12

**generally** 13:10
68:17 74:16
118:24 136:4

**generate** 46:3

**generated** 75:24
144:15,22
145:1

**generating**
46:10

**gentlemen** 175:2

**germane** 67:9
89:22

**getting** 11:5
17:21 19:23
38:24 85:19
91:12 161:21
163:21

**Gillespie** 92:18

**given** 19:11
45:1 57:25
62:10 94:14
148:19 170:24

**giving** 19:24
163:2

**God** 7:1

**Gorde** 1:20 3:17
4:3 5:10
6:8,12,14,23
7:8 9:16 20:21
39:8,18 54:4
61:25 68:2
98:3 102:13
108:22 127:12
154:18 155:2
156:6,10
158:14 172:6
173:16,23,25

**G-O-R-D-E** 6:12

**gossip** 95:13

**grade** 176:2

**grand** 157:18

**grapevine** 95:13

**great** 8:15,16
9:2,7 10:12
20:24 27:18

**Group** 142:4,6

**guess** 22:15
75:5,16 87:18
94:4 103:5



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

145:17 163:20
169:3

**guessing** 83:25

**guy** 51:22

**guys** 53:10
174:6

---
H
---

**hacking** 103:9

**Hal** 108:19

**hand** 6:23

**Handcrafted**
9:18

**handful** 133:5

**hands** 175:12

**hang** 28:6

**happen** 52:24
72:3 79:22
80:10,17

**happened** 24:10
42:6 45:23
50:21 69:20
97:15

**hard** 72:6

**Harold** 2:8 6:1

**haven't**
19:19,20 64:17
76:19 88:12,14
154:3 155:18
156:3 158:7

**having** 53:15
69:7 72:16
104:12,13
131:20 133:13
159:21,23
169:23

**head** 8:5 38:2
52:9 56:15
57:15 101:5
134:14

**header** 48:3

**hear** 104:21,25
113:4 134:21
138:21 173:21

**heard** 13:16
70:3 95:18
103:12,14
130:25

**hearing** 107:19

**hello** 169:6

**help** 7:1,17 8:5
10:8 17:6
20:4,5 29:10
38:14 64:11,18
71:11,24

**helpful** 10:10
28:22 118:19
155:19

**helping** 71:6,25

**hereby** 178:7

**herein** 178:14

**here's** 44:8
52:7

**he's** 76:13
86:22 88:20
93:20 148:6
152:21

**hey** 53:8 82:1
139:5 140:16
147:11 148:19

**HH** 177:20

**hi** 50:8

108:22,23
169:13

**hide** 120:10

**highlighted**
42:1

**highlighter**
36:5

**hired** 10:14
14:15

**historically**
130:3

**hit** 172:21

**hmorlan@shutts.
com** 2:12

**hold** 143:1

**home** 16:9,25
95:11,14
172:21

**hopefully** 61:4

**housed** 18:3,13

**Howard**
22:11,13,18
23:2,8 25:2,6
32:21 71:18,21
72:19

**hundreds**
114:5,6,13
121:16 124:9
130:10 138:17
148:2

---
I
---

**I'd** 54:5 73:17

**idea** 45:13

**ideally** 105:11

**identification**

21:6 27:17
28:25 31:10
32:8 35:12
62:3 68:4
73:25 82:5
90:16 98:12
177:10

**identified** 60:3

**identify** 21:2

**identifying**
29:6

**III** 2:8 6:1

**I'll** 8:10 20:5
61:12 70:5
154:15 176:1,5

**illegally**
104:10

**Illinois** 2:5

**I'm** 5:3,23 6:3
9:2,6,24 10:8
11:9 14:7,12
15:5,11 17:21
19:13,14,22
20:3,8,24
27:10,11,22
30:6,17 34:1
36:9,19 37:23
38:8,12 39:18
40:3 41:14
45:16 47:9
52:18
53:14,19,21
56:15 59:18
61:3 62:6,11
64:24 65:8
66:20 67:12
73:24 74:5,10
75:1 78:23



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

83:25 87:15
88:15 95:21
97:12,13,17
102:3 105:14
108:24 111:15
114:20 117:3
118:12,14
128:24 130:12
132:4 133:2
139:21
141:20,25
143:12 145:17
149:10 150:9
152:7 155:6
159:14 160:18
161:15,21
172:8

**improperly**
107:25

**inaccuracies**
106:1

**inappropriate**
28:15

**inbox** 151:14,17
154:1

**include** 17:24
89:1
106:20,22,24
107:1

**included** 38:21
90:9 107:3

**including** 78:1

**inconsistencies**
18:18

**incorrect** 87:9

**independent**
73:8 160:25

161:4

**INDEX** 3:1

**indicated**
179:19

**indication**
157:23 166:3

**individual** 72:8
140:21

**individuals**
154:9

**inform** 55:8

**information**
14:23 15:14,16
18:4 22:7
25:24
26:1,2,3,6
29:21 38:25
44:9 45:8
52:2,3,7 53:12
74:8 79:4 86:7
105:19 106:17
142:19
152:8,11
163:11,22,25
164:2

**informed** 85:23
173:7

**ING** 56:13 57:4
118:6 143:22
144:7

**initial**
66:18,20,21

**input** 44:14
51:17

**ins** 146:24

**insolvent**

137:17,18,23

**instances** 106:8

**instead** 72:15
111:7,9 140:17

**instructions**
42:7,8,21 45:2

**insurance** 1:14
2:14 5:13
18:14 19:6
25:14 72:7
76:20,22
100:16 101:18
128:5,11

**intended** 125:16
136:14

**intending**
136:11

**intentionally**
113:8

**interact** 161:7
171:10

**interacted**
169:5

**interacting**
171:11

**interaction**
16:1 22:17
96:12 102:17
158:4
168:8,20,21
169:15 170:16

**interactions**
22:19 157:25
168:12 169:21
170:4,24
171:21

**interest** 3:20

27:7 76:14
77:9,13,15,16
78:9 79:9,12
85:17 87:25
88:4 89:19
99:2,11 128:4

**interested**
178:15

**interesting**
61:7

**internally**
162:5,7

**introduce**
143:12

**intrusions**
104:5,10

**Invest** 140:17

**investment** 1:14
2:14 5:13
140:15,16,18

**investments**
140:20

**investor** 28:21
51:6,14
52:11,14,23
53:3,6 56:8,16
74:20 80:21
85:19 86:8
98:5

**investors** 19:1
26:13,14,21
27:9 29:16
51:7 53:7,12
55:18
56:3,4,5,11
80:13 83:14
92:24 105:6



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

involved 19:22
  56:20,25
  57:4,17 70:18
  80:10 85:18,21
  86:10 95:4
  178:14

involvement
  72:25

involves 32:2

ironed 34:19

irregularities
  106:16 163:13
  167:1

issue 24:6 43:3
  69:13 70:19
  71:12,18 72:21
  73:1 122:8,14
  123:3 125:4
  159:21 168:14
  169:7,9 170:21

issued 120:22
  121:12,19
  122:9,22
  123:14,20
  126:14 132:6
  135:10,20
  142:25 144:12
  145:9,19
  146:10 147:17
  157:2

issues 53:15
  86:3 96:7
  102:19,20
  108:4,13
  164:13,25
  166:4 167:6
  170:12,16
  171:6 173:9

issuing 124:2
  131:24 135:25
  136:5,10

it'd 159:6

item 140:14

items 63:13

IT-related
  102:19,20

I've 21:24
  63:15 103:12
  114:23 119:17
  126:4 130:25
  133:11 137:11
  151:4,17,18
  155:22 156:13
  158:8 167:10

---
                    J
---
J.G 60:21
  115:13,21
  116:1,7 151:10

James 2:3

January
  29:18,23 52:18
  60:16 88:12,13
  148:15

jboland@sgrlaw.
  com 2:6

JG 66:9

JGW 40:11,22
  59:7 60:10
  64:2 110:13
  116:7

Jim 5:22
  22:11,13,18,25
  23:2 25:2,6
  31:18 32:3,21

71:18,21 72:19
  158:16

job 132:10,11

John 140:16

joining 152:18

Josh 12:13
  42:24 46:15
  51:21 54:23
  55:7 60:3,15
  74:19 93:25
  107:1,2,4
  112:2,3,4,7,19
  113:10,24
  114:4,12,15,18
  115:4 116:24
  117:3,4,8
  120:12 122:8
  123:25 124:7
  125:3,17
  130:15,21
  134:4,10
  135:19 136:14
  139:23
  140:7,22
  141:16 143:6
  146:3,8
  149:2,5,25
  153:3,11,18
  163:4
  164:3,15,24

JP 65:7,8 66:4

July 12:20
  98:21
  100:1,2,3,4,5,
  20,22
  107:17,18
  133:9 134:16

jump 30:23 31:5

June 35:4,9
  37:5 58:12
  70:7 158:25

jury 157:18

---
                    K
---
Karen 1:20 4:3
  5:10 6:11 50:8
  78:13 176:10

Kate 5:2 61:13
  97:18 177:16
  178:6,23

KATELYN 1:22
  4:10

Kenneth 130:24

Kevin 73:11
  141:12

kgorde@suttonpa
  rk.com 33:9

kid 150:6

kidding 27:22

kinds 170:11

King 2:16 6:5
  24:1,4 130:24

Klein 12:13,14
  42:24,25
  46:15,20 51:21
  54:23 77:21
  93:25 112:3,4
  114:15,18
  134:5 163:4
  164:3,15,24

knew 38:25 39:2
  70:11,13,14,16
  ,17 124:2,21
  125:5 131:23
  132:6 142:15



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

146:23,25
155:3
156:19,23

**knowingly**
113:7,11,19
114:5 116:24
117:9
122:8,14,22
124:2,9,17,20
135:19 142:25
153:3

**knowledge** 64:10
110:11
114:24,25
131:9 147:6,7
153:23

**knowledgeable**
96:6,9

**known** 15:22
73:7,11 102:15
104:13 114:17

**Kosinski** 1:17
2:8,25 5:14
6:3
13:12,17,18
14:1,6,13,15
15:14,17,20,23
16:1,3,11
17:6,8
23:6,8,9,13,20
24:13 28:10
30:12,21 31:4
32:3 35:7
37:4,8,13
41:18 47:7,12
48:12 49:5,8
63:9 67:3 68:8
70:18,22
71:3,5,11 73:4

89:25 90:4,8
94:25
95:1,19,23
96:2,5,18,20
103:25 104:8
158:20 160:5
168:10,11,12,1
7,20,25 169:14
171:10,15,21
173:1

**Kosinski's**
14:23 72:20,25
95:3 171:22

---

**L**

**label** 21:18
28:25 64:23

**large** 27:3,20
28:8 30:9,20
31:1 178:7

**Lasaria** 50:3
55:3

**last** 6:9,11
10:18 12:18
22:20 23:16,17
26:9 46:1 52:8
55:22,24 63:13
65:18 66:17
82:25 83:2
85:15 157:20
159:7

**late** 101:20

**later**
11:15,16,20
65:12,16 80:7
157:5 165:13

**law** 2:21 23:25

**lawsuit** 64:9,10

69:25 70:6,8
104:8

**layman's** 55:6

**lead** 22:15

**Leadenhall**
1:12,13 2:14
5:12 6:6
13:18,22
14:6,13,15
24:5
56:7,10,14
70:1 75:6,19
76:7 77:17
78:3,15,19
79:11 83:20
85:13,16 90:1
92:19 93:4
96:15 99:18,24
104:3,4 108:25
109:23
110:2,9,12,19
111:4,8,18
112:9
113:12,25
114:6,13 115:5
116:2,15,21,25
117:9,15,21
118:6,10,13,21
119:1,10
120:6,14,23
121:2,12,19
122:10,15,22
123:14,20
124:3,10,23
125:5,10
126:9,14,20
127:1,6,18
128:20 130:10
131:25 132:7
134:2,11,18

135:11,20,25
136:6,21 137:1
142:7 143:1
144:12
145:6,9,19
146:10
149:8,13,24
150:2,18,23
153:4 154:11
155:4,15 156:1
162:8

**Leadenhall's**
89:22 112:21
121:13 146:16
148:3 149:7
156:2

**leading** 104:22

**learn** 104:7
165:21

**least** 30:15
34:23 110:8
111:8,18
112:21 113:24
114:8 121:15
137:2 138:2

**leave** 107:16
133:10,11
153:21

**leaving** 117:7
118:24

**led** 165:18

**LEDENHALL** 2:13

**legal** 24:20,21
94:23

**Leigh** 2:15
129:13,15

**lender** 79:12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

100:25 118:22
119:2

**lenders**
129:4,8,9
130:3 147:17
150:11,18,19

**lending** 127:2
150:11,19

**length** 85:3

**Leonard** 2:20
156:12

**less** 76:1 171:7

**let's** 10:13
21:3 31:8
36:24 39:24
40:17,24 47:18
76:21 88:11
90:13 93:24
94:23 137:11
140:15

**letter** 3:13
22:6,10 23:23
24:3,12 180:5

**letters** 72:1

**letting** 61:9
77:23

**lfeuer@feuerlaw
firm.com** 2:23

**Licamara** 22:21
31:20 32:21
71:18,22 72:19

**license** 6:15,18

**Life** 1:13 2:14
5:12 56:16

**Life's** 56:21

**light** 72:18

**Lighting** 9:18

**lights** 138:15

**limit** 121:9

**line** 8:22 22:5
40:10,25 49:11
54:11 62:14
68:14 83:11
90:24 98:20
179:3

**lines** 143:13
148:18

**LINKE** 2:14

**Linked** 1:14
5:13

**LinkedIn** 143:11
160:13

**list** 24:18 27:5
30:7 50:23,24
53:8 62:7
63:1,8 66:17
146:9 147:1
163:3

**listed** 37:22
49:12 67:1
121:1 122:4
124:22 145:8
146:15

**listing** 27:5
29:13 48:20
51:15 73:12
144:20,23
145:18

**lists** 23:17
26:20 28:19
145:1

**litigation**
13:22 105:25

109:5,6,7,8,11

**little** 7:20
10:23 11:6
17:21 24:9
26:25 27:1
30:23 36:4,5
38:8,12,14
45:7 67:13
75:1 76:1
82:24 88:15
103:1 161:17

**live** 154:1

**LLC** 1:6,7,16
2:2,7 5:11,14
6:3

**LLP** 1:13
2:9,14,16 5:12

**loan** 56:11
79:12,17 81:5
96:8

**located** 5:5
16:22

**location** 5:20

**lockbox** 69:9
70:19 71:12
72:9,11,12,21
99:5 100:14

**lockboxes**
68:22,25
69:1,11 72:8

**locked** 72:6

**Lockwa** 54:22
60:15

**Lockwa's** 55:12

**logged** 61:7

**long** 9:19 10:12

12:14 15:19,22
19:25 40:2
45:13 84:20
102:15 137:9

**longer** 12:8
82:24

**loop** 104:21

**lot** 25:13
56:22,23 72:6
169:14

**Love** 24:22
91:19,22 92:10
94:10,19,22,23
98:16 100:20
106:24 107:5
164:5,16,24

---
M
---
**M&T**
68:14,21,22,24
,25 69:2
70:19,22 71:8
73:4

**ma'am** 158:9

**Madam** 61:13
67:11

**magnitude**
101:10

**mail** 31:20
41:11 44:20
47:23 61:13
72:19 74:14
81:18 89:10
93:14

**mails** 31:14
71:15 164:15

**main** 56:15 57:6



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

69:11 144:9
163:5

**mainly** 18:10
22:19,24 57:7
72:12 101:21
107:5 152:8
169:6

**major** 144:7
170:21

**majority** 11:12

**management**
11:7,15 12:3
14:19 15:16
91:16
106:12,18
119:9 153:24
167:17

**manager** 25:12

**manner** 128:6

**manual** 44:5

**manually** 44:9

**March** 1:21 4:7
5:7 178:17

**mark** 67:12,17

**marked** 21:4,6
27:17 31:10
32:8 35:12
36:10 41:13
62:1,3 68:4
73:25 82:5
85:10 90:16
97:5 98:10,12

**Markets** 142:4,6

**Mary** 51:23 57:2

**Mason** 92:18

**master** 8:17

**master's** 137:16
160:17

**match** 19:11
41:1 43:23
54:14

**materials**
154:16

**matrice** 28:5
44:21
52:4,13,16
62:23 63:2
65:3,11 66:19

**matrices** 3:23
28:4,11 30:12
31:5,7 38:1,19
39:22 42:15,20
43:11,14,18,20
,21,23
44:3,5,13,14
45:4 47:16
48:9,13,15
51:12,18,24
61:5 62:7,19
63:9,12,18
64:6
90:10,11,12
105:22 119:22
151:1,6
166:2,9

**matrix** 3:22
26:20 29:2,7
38:21 44:18
66:11,12
165:23

**matrixes** 26:25
27:2,3 30:7

**matter** 5:10
13:17 14:5
68:18 74:17

135:4 179:17

**may** 4:12 7:3
13:16 20:5
26:25 32:14
34:6,18
69:18,20 70:6
126:25
127:10,18
131:7 134:20
136:14 165:18

**maybe** 10:23
17:18 30:15,18
31:17 49:7
52:16,18,20
55:14 66:22
74:10,11 76:1
81:25 101:19
111:15 116:13
119:3 121:16
164:11
169:10,11
170:21,22
171:3 172:15
175:7,14

**McFarland** 1:22
4:10 5:3
177:16
178:6,23

**me.I** 179:18

**mean** 10:1,25
11:1,5,6 12:24
15:11 37:25
43:6 50:7,14
51:3 52:13
56:3,4 59:13
63:14 65:7
66:18 70:21
75:13,22 76:5
77:10 78:13

79:11,24 80:24
81:8 84:22
87:8,17 88:24
92:3 100:12
101:6 103:6
105:21 106:3
107:2 109:21
112:1 113:7
121:14,15
124:16,21
126:1,7
133:3,17,21
134:14 138:8
142:15 151:22
160:24
169:1,4,5
170:1,20
175:17

**meaning** 51:6
71:21 75:23
76:18 88:14
118:5 157:7

**means** 29:19
38:14 46:7
51:4 63:16
87:20 93:22
127:25 128:1
143:13 149:19

**meant** 47:6 89:8
91:5

**meet** 23:5,9,12
31:18 32:3

**meeting** 32:17

**meetup** 23:8

**Melchiori** 24:19

**memorialize**
42:20

**memorialized**



MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

139:12

**mentioned**
114:23 118:16
167:10,12

**mess** 133:12

**messages** 164:15
170:9

**met** 16:13 35:7
37:8

**Miami** 131:8

**mid-2023** 165:14

**middle** 8:22

**might've** 16:17

**Milestone** 4:3
5:5

**million** 94:15
110:5,8
111:8,13,18
112:21 113:24
114:5 115:19
116:13,23
117:22 119:3,4
120:10,14
122:5 133:14
134:2,10
135:12,17
137:2
146:18,23
151:3 153:4
156:21
157:3,14 165:6

**millions**
114:6,13 124:9
130:10
138:17,22
148:2

**mind** 20:11

61:12 109:18
113:10,16,23
114:2 143:14
158:18 170:12

**mine** 26:23
33:15 51:25

**minute** 28:6

**minutes** 19:17
81:18 154:15
170:19,22

**missing** 97:4

**Mister** 152:17

**Mitchell** 51:22
81:20 94:1

**modified** 86:4

**moment** 39:25
53:22 57:16
61:19 176:8

**MONDAY** 4:6

**money** 25:14
56:6,11
76:19,20 77:12
78:2,5 79:16
81:3 82:2
109:20,22,24
110:1,12,13,18
,24
112:9,12,16,21
,25 113:5,11
114:19 115:5
116:4,5 120:1
125:15 126:9
128:11
131:6,15,18
133:18 135:7,9
137:19 139:8
146:24
149:8,18 150:1

161:18

**monies** 140:19

**monitor** 170:13

**month** 19:9
29:10,12,13
30:16,17,18
77:14 80:2
81:25 121:15
133:8 170:25
171:3,7,10

**monthly** 26:12
29:11 74:20
83:3,8,10,11
86:7 92:23
98:4 120:22
121:18 122:1
123:13,19
126:12 142:14
143:14
144:2,11 145:5
152:10

**months** 9:20
58:8 84:23

**morally**
133:21,23

**Morlan** 2:8
3:4,8 6:1,20
7:5,7 20:8,20
21:8 27:16,21
31:12 32:10
33:17,18,20,22
34:1,14,17
35:1,14
38:9,11
39:6,12,16,17
53:14,17,20
54:3
61:3,11,18,24
62:5

67:11,17,19,22
68:1,6 74:2
82:7 90:18
96:22
97:2,11,22
98:2,14 102:12
107:14 108:16
109:3
159:10,16
162:21
166:7,23
167:22,25
168:2 171:4,18
172:1
173:18,21
176:4,5

**morning** 7:8

**mostly** 51:20,25

**mouse** 170:13

**mouth** 159:21

**move** 68:24 69:1
71:8 84:17
139:8

**moved** 12:9,23
131:8

**MP** 144:16

**MpFin** 17:24
18:2,7,13,18,2
1 19:4
25:13,17,25
26:1 107:20,25
108:4
129:22,23
130:1
144:15,18,19,2
2 145:1,10,14

**MSN.com** 174:25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    **Toll Free 855-MYDEPOS**

**multiple** 143:20

**Mutual** 56:16,21

**myself** 51:20
74:19 112:3
152:11

---
N
---

**name's** 5:2

**Nathanson** 2:15
129:15

**necessarily**
20:24 29:25
30:8 52:15
84:8 88:8
101:24 102:1
106:7 112:11

**necessary** 85:24

**negative**
69:8,10 104:22
105:1

**network**
151:18,19,21

**news**
103:13,15,16,2
3 104:3

**nice** 39:19
158:16

**Nick** 52:8 53:6
55:22,24 85:15
122:24
123:5,19
124:1,8 125:4
130:5
142:3,21,24
145:18,23
146:9

**Nick's** 52:8

**nine** 67:24 97:5

**Noah** 1:15
2:9,20 5:13
102:13
152:18,20
156:13 157:21
160:2

**nobody** 64:10
163:21

**nod** 8:5

**non-disclosure**
156:17

**non-existent**
167:8

**Nope** 9:15 23:4
25:7 31:6
33:10 89:17
91:25 95:15
104:6,24 105:2
155:22 156:18
157:16,19
167:16,21
172:25

**nor** 178:14

**normal** 79:11

**normally**
16:22,25 65:13
86:9

**Northwestern**
56:16,21

**Notary** 4:11
177:17
178:6,24

**note** 138:21
174:16

**notes** 102:4

174:12

**nothing** 7:1
115:11 130:13
155:25 162:16
167:22 170:14
172:1

**noticed** 33:23

**noticing** 167:1

**November** 83:3

**nutshell** 72:10

---
O
---

**OATH** 177:1

**Object** 38:22
109:12
110:3,10,20
111:19 112:10
113:13 114:7
116:17
117:2,11,17
118:11 119:12
120:15 121:21
122:11,23
123:8,16,22
124:4,11
125:6,11,18
126:15
132:1,15,20
133:1,22
134:3,12
135:13,21
136:1,22
137:3,25
139:3,20
140:9,24
141:4,19 142:9
143:3,8
145:12,24
146:5,12

147:18
149:9,15
150:3,13
151:15 155:21
159:10
166:5,19
167:20
171:1,24

**objection**
39:7,12,14
107:12 111:24
114:1,14
122:17 125:23
136:7 138:19
159:15 171:16

**observations**
171:20

**obviously** 81:2
100:3 168:16

**occasion** 16:1
25:16

**Occasionally**
22:24

**occurring** 15:10
69:13

**October**
12:6,7,8,9,24,
25

**odd** 28:14 46:22
47:4,6

**offer** 155:12

**offering** 130:1

**office** 16:14
17:6 72:16
95:9,10,12
160:9 169:2,11
170:7 172:23



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

**offices**
  16:16,19,20,21
  17:1 104:11
  131:8 138:15
  159:24 160:11

**offs** 91:18,23

**oh** 5:22 16:24
  26:7 27:22
  55:16 73:18
  80:1 96:16
  97:2,8 121:14
  137:11 152:23
  159:16 167:25
  171:2,11
  172:10,18
  173:17

**okay** 5:2 7:20
  8:2,9
  9:7,12,16,24
  10:4,13,16,21
  11:4,19,23
  12:12,21
  13:1,4,7,13
  14:1,11,18
  15:3,6,8,19,22
  16:10 17:2
  18:17,22
  19:2,13
  20:3,7,21
  21:7,9,17,22
  22:1,4,10,17
  23:7,12,15,22,
  25 24:3,17
  25:1,8
  26:5,10,24
  27:10,18,20,22
  28:6,10,14,23
  29:14,17,21,25
  30:5,20,25
  31:3,8,11,13,1

9,25
  32:9,11,14,19,
  23
  33:2,7,11,16
  34:15,17
  35:2,6,10,13,2
  3
  36:1,8,9,12,15
  ,18,21
  37:3,7,11,15,1
  8,24 38:8
  39:12,16
  40:6,10,13,17,
  24
  41:4,12,16,21
  42:6,18
  43:13,16
  44:12,16,24
  45:1,18,22
  46:1,9,13,19
  47:18,20,25
  48:3,11
  49:3,10,16
  50:5,16,20
  51:2 52:2,6,10
  54:4,10,14,18,
  21,25 55:5,12
  56:1,7,10,25
  57:17
  58:3,7,15,17
  59:20,24
  60:2,6,9,13,18
  ,24 61:19,25
  62:6,12,13,14,
  18 63:1,5,8,24
  64:8,20
  65:7,10,17,22
  66:1,3,6,17
  67:1,6,16,19,2
  2 68:5,7,11,14
  69:25

70:5,10,18
  71:1,10,14,17
  72:10,17,24
  73:7,14,17,23
  74:1,3,16
  75:18,21
  76:13,17,25
  77:5,9
  78:4,8,12,17,2
  5 79:3,9,15,20
  80:4,9,21
  81:8,22
  82:3,6,8,13,16
  ,19,23
  83:2,6,10,16,1
  9
  84:3,8,14,19,2
  5 85:7,18,22
  86:16,23
  87:15,24
  88:6,15,24
  89:4,13,24
  90:9,13,17,24
  91:2,7,17
  92:6,17,21
  93:2,7,13
  94:3,8,13,22
  95:5,8,12,22
  96:2,11
  97:2,11,22
  98:10,15
  99:2,7,15,22
  100:12,17,22
  101:6,10
  102:15,17
  103:3,8,14,20,
  23 104:2,20
  105:11,16,24
  106:6,12,15,20
  ,22,24
  107:7,19,24

108:3,10,16,19
  110:7 111:3,25
  112:15,19
  116:14 125:2
  128:25
  129:1,17 132:9
  139:7,11
  144:10 147:13
  152:24
  155:2,25
  156:14 157:13
  158:4,8,15
  159:13
  160:13,19
  162:16,19,23
  163:8,11,16,20
  164:12,18,22
  165:10,12,17,2
  1
  166:1,8,17,24
  167:11,17
  168:8
  169:1,8,17,21,
  25 170:4,15,23
  171:9,19
  172:1,20
  173:1,9
  174:6,13
  175:1,22,23
  176:3

**old** 84:15
  102:23

**ones** 34:22 53:7
  56:14,15 57:23
  59:4 63:14,17
  118:17 144:8

**one-to-two-year**
  45:19

**online** 5:3


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   www.**MILESTONEREPORTING.com**   Toll Free 855-MYDEPOS

onto 52:12

open 19:16 21:7
  27:12,20 28:7
  31:11 32:9
  35:15 61:25
  62:4 68:5 74:1
  77:6 82:6,15
  88:22 89:2,7
  90:17 98:13

opening 66:22

operating 69:11
  138:11,14

operations
  11:7,15 112:13
  131:6

opinions
  109:14,17

oral 167:5

Orange 2:10
  177:4 178:4

order 8:2 39:19
  52:3 78:15
  79:17 170:15
  176:2

orders 143:2,6
  175:1,3

ordinary 33:3

original 63:18
  65:3 66:22
  84:4 179:21

originally
  10:14 45:11
  50:17 66:14
  76:2 134:14

Orlando 2:11
  4:4 5:6 6:3

others 82:21
  98:16 120:12
  133:25

otherwise 69:21
  84:4 103:10
  104:9 150:2,17

ours 139:9

outdated 107:21

output 44:4

outs 146:25

outside 126:12
  154:9,12
  160:25 161:4,7
  162:10 167:18

outstanding
  81:5

overall 24:4
  33:3 57:7,9,21
  58:10,18,25
  160:21,23
  162:24
  163:9,17

overlapped
  95:25

overseeing
  94:24

overview 18:6
  74:6 85:8

owe 76:19 77:12
  89:10

owed 76:23
  77:15 78:2
  89:19

---
P
---

p.m 60:16

102:8,10
  154:21,24
  176:9,11

page 3:2,12
  21:12,13 23:16
  36:15 37:1,22
  40:17,25
  41:1,2,5,9
  42:2 46:23,24
  47:19,21 48:24
  49:1,13,18,23
  50:1,2
  54:6,15,19
  59:18,19,21,22
  60:14,24 86:12
  179:3

pages 40:2 55:2

paid 78:19
  88:14

Palm 1:3 2:22
  5:16

paper 153:21

paragraph 23:17

parent 11:2

parenthetical
  77:5 88:21

participant
  61:1 82:11

participants
  4:6

participated
  73:21 130:9

particular
  10:4,7 13:8,20
  14:19 29:17,22
  30:2 43:3 44:1
  45:14 46:23

49:23 59:8
  63:6 73:1,8
  74:7 79:16
  81:9
  84:20,21,24
  85:9 86:2 89:9
  91:7,8 92:25
  93:2 99:12,22
  100:23 165:18
  170:11

particularly
  72:18 96:14

parties 178:13

partner 73:11
  110:24 131:5
  133:4

Partners
  5:11,12 9:23
  10:1,6 11:1,11
  14:17 22:16,23
  33:4 42:12
  46:14 55:9,15
  60:23
  110:1,8,23
  111:10,17
  112:22,25
  113:5 114:11
  119:24 120:13
  121:12,19
  122:6,21 124:2
  126:13 128:14
  129:2,9,25
  131:3,12,17,24
  132:13,18,24
  133:25 134:1
  135:16,24
  136:4,20
  137:1,22
  138:8,12,17



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

139:1,14,18
140:2,8
145:10,20
146:11 147:14
149:6,13,16
150:18,23
152:4
155:2,9,11
156:3,16,25
158:5 160:21

**Partner's** 33:11
131:8

**PARTNERS** 1:6,12
2:2,13

**party** 7:10

**Pasko** 91:19,22
92:7 94:10
100:20 106:20
107:5 112:8,20
113:11,24
114:5,12 115:4
117:14 120:12
122:14 124:1,8
125:3,22
130:16 134:10
135:19 136:14
139:24
140:8,22
141:16 143:7
146:3,9 150:1
153:3,11

**past**
87:4,10,13,14
88:7,10

**Paul** 1:16
2:7,25 5:14
6:3 13:12,16
14:15 15:19
23:5,8,9,19

31:18
32:3,17,21
49:7 70:18,22
71:5 73:16
90:8 94:25
95:1,3,19
96:20 103:24
104:8,12,13,14
,22 105:1
127:4,5 168:16

**pay** 77:24 78:1
81:3 131:16
133:13 137:20
138:11,14
176:2

**paying** 52:19
109:25 131:21

**payment** 3:20
76:15
77:9,15,16
78:9,18
79:10,12 80:2
81:13 85:3,17
86:20,21
87:3,25
88:6,11
89:18,19 92:11
94:5,9,10,11,1
8 100:25 128:6

**payments** 27:7
78:15 79:1,5,6
86:24
87:10,13,14
88:4 91:15
98:3,25
99:3,4,11,17,1
8,19 128:5
131:12

**payroll**

131:12,16
133:19 139:6

**pending** 5:14
70:2

**people** 56:5
70:10,14,15
75:14 91:21
108:11 114:23
122:21
134:8,15
141:14 152:6,7
164:20 166:16
167:9

**per** 171:9
174:17

**percent** 111:16
168:24,25
169:1,10,11,18

**percentages**
169:4

**Percy**
25:8,9,11,12,1
9 26:2,6 56:23
154:13

**perform** 28:18
96:15,19

**performed** 14:6
106:16

**performing**
32:25

**period** 104:14
151:9 161:24
166:2

**permission**
23:19 24:13

**perpetrated**
125:9 142:7

154:11 155:4

**person** 26:5
46:15 51:17,23
68:24 71:8
73:4 163:5
170:5,7

**personal** 139:24
140:18 154:5

**personally**
117:3 177:7

**perspective**
52:25 89:14
91:9,10 128:1

**PF** 17:19

**phone** 170:5,18

**phonetic** 54:22
55:3

**photoshopped**
119:25

**physical** 75:14
103:21

**picture** 105:4,5

**plaintiffs** 5:23
9:25 13:19,22
158:17

**plaintiff's**
5:21

**Plaintiffs** 1:8
2:2

**planning** 71:24

**play** 162:25

**PLC** 1:15 2:14
5:13

**pleasant** 64:17

**please** 5:18,21



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

6:9,23 21:3
31:9 32:6
35:10 54:8
59:17 61:25
68:2 73:18,23
82:3 93:21
174:21

**pledge**
52:10,17,21,22
115:22 116:24
117:14
118:1,4,9
136:20

**pledged**
51:3,6,10,13
52:13 53:2,5
75:10
106:2,4,8,9
116:15,21
117:9,21
118:13,20,21,2
5 119:1,10
121:2
126:22,23
127:2,3,20
128:20 129:3,9
130:2
150:20,23

**pledging**
107:7,11 116:2
117:14 118:5,6
148:19
149:12,23
153:25 154:6,7
163:13 167:7

**plus** 17:9 144:1

**PO** 72:13

**point** 38:17
44:19,25 57:15

66:10 137:23
163:8

**pointing** 76:13

**Ponzi**
140:12,13,23

**portable** 30:23

**portfolio**
48:17,19 49:11
50:10,15,17
51:6 54:10
59:2,3 115:18
116:8
136:15,16
151:11 160:14

**portfolios**
50:22 110:14
136:20

**portion** 42:1
144:23,25

**position** 11:24
12:1,2,10
101:24

**possible** 7:15

**possibly** 159:23

**potentially**
107:9

**practice** 100:24

**predicted**
100:7,9,10

**prefer**
109:13,19

**prepare** 13:2
144:1 145:5

**prepared** 122:25
146:4

**preparing**

143:14

**Present** 2:25

**presently**
9:16,17

**preserved** 33:3

**pretty** 16:7
30:18,20 45:10
70:15 86:21
140:14 154:13
155:23 166:3

**prevent** 155:3,7

**prevented** 155:5

**previous** 40:14

**previously**
62:24 76:11
83:12

**primary** 14:4

**principal** 27:7

**prior** 9:21
56:17 65:24
77:14 104:25

**privy** 95:12

**probably** 9:20
10:22 11:12,18
12:16 20:12
42:22 69:18
77:14 109:1
112:1 116:23
128:17 131:19
138:1,4 148:15
168:23,24
171:2

**problem** 111:25
116:1,3 154:20
156:7 167:2
170:21

**problematic**
107:9 170:13

**problems** 20:10
27:25 107:20
131:21
169:22,25
170:11

**Procedure** 4:8

**proceeded** 84:4

**proceeding**
178:9,10

**PROCEEDINGS** 3:3
5:1

**process** 38:24
72:14 85:17
105:5,8 116:6
148:12,25
149:1

**Prod** 34:22
36:16 64:22

**produced** 34:4
177:10

**production**
34:22 175:20

**programming**
130:1

**progression**
48:14

**promised** 161:21

**properly** 143:25

**provide** 8:3
9:13 14:23
15:17 43:10
47:12 48:12
53:12 135:12
137:1



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

provided 6:18
    30:13 31:4
    37:12 47:7
    48:8 62:8 63:9
    67:3 89:25
    90:4,8 164:8
providing 48:11
    139:2
Public 4:11
    177:17
    178:6,24
pull 53:22
purchase
    38:4,18 48:20
    56:11 75:10
    110:12,14
    111:4,8
    116:5,8,10
    119:16 133:18
    135:7,8,17
    136:11,15,16
    137:19 140:18
    147:2 151:3
purchased 19:12
    28:21 38:6,21
    42:9 50:15
    52:16 53:1,2
    115:23
    116:4,16,22,25
    117:10,15,22
    119:11 122:2,6
    123:11 124:22
    128:16,21
    129:4,10
    145:10,11,20
    146:11,17
    148:22
    149:6,16,17,25
    150:12,24

154:1,7 161:18
    166:15
purchases 53:5
purchasing
    38:17 55:11
    115:18 126:10
    136:19
    148:12,25
    149:2 151:5,10
purportedly
    121:1
purpose 15:9
    43:9 48:11
    55:6 66:7
    74:17,18 77:20
    79:3 85:9 98:8
    125:16 128:18
    129:7 147:21
    149:12,23
purposes 7:24
    9:24 17:5 21:4
    22:7 23:10,13
    28:12 32:3
    37:13 62:1
    67:4 85:10
    109:5 163:21
pursuant 4:8
putting 39:4

_____
    Q
qualified
    96:14,18
quantify 168:19
question 8:22
    9:10 10:4,7
    24:9 33:21
    39:15,18 47:5
    53:16 105:15

125:2 127:11
    128:25 139:17
    142:13 143:13
    168:1 173:18
questionable
    96:3 123:1
questioned
    57:24
questioning
    16:18
questions 8:22
    9:3 14:24
    15:14 17:12
    20:25 58:1
    62:11 71:22
    74:11,12 132:5
    156:5,13 158:9
    168:3
quick 24:18
    35:19 82:9
    102:6 162:22
    172:5
QuickBooks
    102:23
quickly 7:15
quite 30:9
    95:23 169:3
quote 129:7

_____
    R
raise 6:23
    115:3 142:8
raised 119:9
    148:10,13
    153:24 167:2
ran 144:16,17
range

84:19,22,24
    101:13
rather 19:13
    62:9
Re 3:20,24
reach 138:12
    175:20
reached 138:13
reaction 156:1
reactions
    109:10
reading 4:12
real 24:18
    35:19 82:9
    102:5
reallocated
    80:7 81:15
    85:5
really 16:25
    64:23 89:11
    95:4 108:9
    109:2 120:7
    154:18 156:6
reason 9:12
    41:17 47:15
    49:16 63:20
    66:7 81:1 90:3
    100:14
    101:19,21,22
    128:14 160:4
    179:3
reasonable
    175:16
reasons 63:25
    89:4 101:16,25
    128:10 129:2



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

179:19

**recall** 11:20,22
  16:3,6 30:11
  31:16 35:6
  48:17,19 58:24
  63:25 66:7
  68:17 81:22
  83:20 101:13
  103:15,16
  107:19 161:4,6

**receivable**
  81:9,11 87:24
  88:2,3,9 89:2
  99:4 121:5
  128:10,15,16
  150:10

**receivables**
  18:12 77:6
  87:17 88:22
  89:7 94:15
  106:9 111:5,9
  128:19,20
  135:17 145:1

**receive** 50:5,7
  76:18 88:4
  128:4

**received**
  32:1,16 49:4,6
  76:20 77:3
  86:21,24 87:25
  88:12 99:17
  126:21,24
  157:17

**receiving** 81:19

**recent** 35:3

**recently** 19:20

**recess** 20:17
  53:25 61:21

102:9 154:23

**recognize** 21:23
  36:11,25 59:21
  63:5 74:13

**recognizing**
  32:1

**recollection**
  108:8 131:9

**reconcile** 18:25
  29:10 105:21

**reconciliation**
  86:18
  105:8,17,23
  147:9,15,16,21
  165:25

**reconciliations**
  25:22 106:16
  147:4,6

**reconciling**
  18:22 19:3

**record**
  6:10,13,15,16
  7:23 8:14 19:8
  20:1,9,14,16,1
  9 21:19 27:6
  28:20 39:20
  53:22,24
  54:2,4
  61:16,20,23
  66:15 79:7
  102:5,8,11
  113:21 151:5
  154:14,22,25
  178:9 179:19

**records** 14:16
  17:14,15,17,18
  ,23
  18:7,8,10,19,2

3,24 19:2,3
  22:16 29:10
  42:4
  43:4,17,21,22,
  24,25 67:8
  80:11
  105:7,13,18,23
  107:25 113:2,3
  126:13 145:15
  147:24 148:4
  152:16 172:9

**RECROSS-
EXAMINATION**
  3:9 172:3

**rectified**
  157:5,6
  165:19,22
  166:4

**red** 93:8,10

**REDIRECT** 3:8
  162:20

**reduced** 87:17

**Ref** 3:19

**refer** 9:25
  13:11 21:17,20
  30:1 43:18
  46:6 115:12
  141:10 144:10

**reference** 37:15
  64:22

**referenced**
  44:20 49:1,18
  83:11 143:14

**references**
  54:15

**referred** 17:23
  34:7

**referring** 11:17
  17:17 25:23
  32:15 54:7
  77:2 83:12
  86:17 93:19
  94:14 115:13
  120:21,22
  141:9
  142:20,21
  143:19
  144:4,11
  153:10,24

**refers** 30:1
  48:17 87:15

**reflect** 6:14
  65:2,18 93:10
  94:3 154:6

**regarding** 23:8
  38:3 74:19
  86:7 95:2 96:6
  98:17,25
  104:3,4
  105:19,25
  163:12
  164:1,13,24

**regular**
  57:10,11,12

**regularly** 79:23

**reiterate** 109:4

**relate** 69:21
  83:7

**related** 75:19
  83:3 168:14
  178:13

**relating** 22:15
  75:8 85:12

**relationship**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

131:3

**relatively**
168:18

**relied** 33:3

**rely** 32:24

**remain** 91:11
166:18

**remarks** 95:18

**remember** 11:19
43:2 52:9
55:22 57:15
101:14 118:1
119:7 121:14
148:18
160:7,22,23
165:17

**remind** 132:9
135:2 141:9

**remotely** 4:6
7:22

**removed** 50:9

**render** 88:8

**rent** 131:19,20

**reopen** 84:12

**repair** 19:10

**rephrase** 9:4

**replace** 81:9

**repledged** 81:15

**report** 18:25
19:10 26:4,23
42:25 44:4
46:19,21
74:21,24
75:3,24 77:24
80:2 83:3,8,10

85:13,16
86:4,19
87:3,9,12
89:12,17 93:21
100:1,2,6,8
128:8
144:20,24
147:10 149:3
162:5,8,10,13
163:25 164:2
178:8

**reported** 164:25

**reporter** 1:22
4:11 5:2,4,25
6:4,8,13,22
7:3,22 8:6
20:5,15,18
27:14,18
53:14,18,21
54:1
61:10,13,16,19
,22
67:11,16,18,20
,24 96:25
97:5,14,20
102:7,10
129:12,17
152:17,20,24
154:17,21,24
159:14,17
162:19 167:24
173:15,19,23
174:3,10,14,19
,22
175:1,5,9,11,1
7,23 176:3,8
177:17
178:6,24

**reporting** 4:4
5:5 26:12 96:7

165:5

**reports**
25:23,24 26:14
78:24 79:25
83:12,16 85:19
86:7 92:24
98:5 99:1
103:23 104:3
105:6,7,19,22
106:1
120:17,21,22
121:1,5,12,19
122:1,4,9,15,2
2,25
123:2,3,6,11,1
4,20
124:3,13,18,19
,23 125:5
126:12 131:24
132:6
135:11,20,25
136:6,9
142:14,15
143:1
144:12,14,17,2
2 145:1,5,9,19
146:4,10,16
147:8,17,23
148:3,7 149:7
152:9,10
157:2,9,15
165:7,24
166:14,18,22

**represent** 5:5
13:16 62:6
70:5 99:16
156:12 158:17

**representations**
166:14

**representatives**
92:18

**represented**
24:5

**representing**
81:10

**represents** 65:9

**request**
28:10,11,15
32:2 179:18

**requested** 23:18
30:12 47:7
72:20 163:3

**requesting**
24:12 31:17
71:11

**required** 75:25
171:6

**requirements**
26:12

**requiring**
105:17

**resigned** 134:9

**resolve** 170:15

**respect** 10:7
14:12,20 15:15
24:8 39:22
45:12 57:20
58:25 60:10
63:12 72:20
76:7 78:17
79:9 86:4
92:24 93:13
96:7,12 99:15
103:9 104:5
108:4 143:15
162:24,25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

166:13,25
167:7

**respond** 22:25

**response** 71:20
148:9,24 149:1

**responsibilitie
s** 150:7

**responsible**
83:13 143:1

**rest** 46:10

**restate** 53:15

**result** 98:4
134:9

**retain** 79:11

**retained** 42:19
78:19

**Reuben** 51:22
81:19 94:1

**reversing** 45:10

**review** 39:25
85:14 154:15

**reviewed** 155:15

**revisions** 48:8
166:2

**ribbon** 36:4

**Rich** 114:16
119:17 134:4
141:11
164:4,15,24

**Richard** 40:3
46:13 60:3,15
119:18

**Riley** 16:15
17:9,11
22:11,14 24:11

25:4 95:20

**ring** 104:15

**ringing** 104:16

**Robert** 174:25

**Robinson** 4:4
5:6

**Roger** 23:23

**role** 11:10
14:19 57:20
162:25

**roles** 169:16

**rolled** 144:9

**room** 129:13

**rough**
175:6,14,25

**roughly** 158:25

**routine** 42:7,8

**routinely** 32:24
108:11

**Rules** 4:8

**run** 80:3 176:6

**running** 140:23

**rush** 175:19

**Russell** 2:3
5:23

**Rust** 2:9
152:18,20

———————
S
———————
**safe** 34:21,22
36:16 163:20
171:14,19

**Saiph** 1:15 2:7
3:14,15,16,18,

19,21 5:14 6:2
13:12,17
14:1,6,13,15
34:12 64:22
97:6 103:25
104:9

**Saiph-produced**
34:13

**Saiph's** 17:7

**salient** 165:18

**SAP**
44:2,4,10,14,1
8,24
45:2,5,8,14,20

**save** 30:17
66:24 152:4,11

**saved** 33:2

**saw** 88:16
109:22 133:12
135:4 146:24
155:7

**schedule** 7:12
13:5

**scheduled** 176:7

**scheme**
140:12,13,23

**Schwartz** 23:23
24:4

**scope** 32:25

**screen** 28:7
35:19,21 36:2

**scroll** 59:17
93:24

**scrolling** 60:13
81:17

**se** 174:17

**second** 36:24
88:17 96:25
98:1

**seeing** 86:20
87:2 101:13

**seek** 163:11

**seeking** 91:14
94:4 100:19

**seem** 28:14
87:5,6

**seems** 174:8

**seen** 19:19,20
21:24 31:15
32:11 47:21,25
54:18 63:15
68:11 103:23
104:2 108:5
139:15
151:4,17,18

**segregate** 75:7

**sell** 29:12
80:14,23
81:1,6,8
116:11

**send** 18:15 19:1
26:14 41:17
49:7 53:8
72:7,9,13,14
74:21 97:13
101:19 104:18
107:3 112:3
114:19
174:3,21

**sending** 20:11
72:15 77:21
79:4 80:1



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

83:14 170:18

**sense** 7:25
9:10,11 10:2
124:24,25

**sent** 14:25 15:4
27:8 37:4,11
40:14 44:19
47:15 49:5,17
71:21 86:7
101:20
127:1,18

**sentence**
46:1,10 142:21

**sentences**
50:6,8

**separate** 14:2
17:25 18:1
75:6

**September** 47:23
58:4 66:1,3
126:21
127:1,19

**server** 103:1

**servicing** 25:12

**settled** 29:15

**settlement** 3:22
28:11 29:2,7
30:7,12 31:5,6
39:22 42:14,20
43:11,14,18,20
44:3,13,21
48:9,13,15
51:18 52:4,12
62:7,19,23
63:2,9,12
65:3,11 66:19
90:10,11
96:8,19

166:1,8

**seven** 175:19

**several** 8:17
27:4 65:19
159:6

**severance**
155:12

**shake** 8:4

**share**
35:18,19,21
96:23
97:12,16,18

**shared** 20:22
27:13 62:2
97:1 151:23
152:3 166:9

**sheet** 174:11
179:20

**sheets** 144:5,6

**shell** 140:23

**she'll** 8:13

**She's** 39:14

**shifting** 16:10

**short** 8:22
76:23 77:2,14

**shortcut** 62:10

**shortfall**
93:16,21
99:8,9,23
100:13 101:11

**shortfalls**
101:4,16

**shorting** 77:15

**shortly** 70:12

**showed** 17:14

33:24 48:14
145:10

**showing** 36:9
88:7 98:5
151:6,9 153:2

**shut** 69:22
102:25

**Shutts** 2:9 6:1
152:22

**sic** 26:8 28:5
46:14

**sign** 156:17
174:1 180:5

**signatory** 23:22

**signed** 179:19

**significance**
28:23 41:22
74:6 77:7
89:13 91:7
93:7

**significant**
10:6 69:21

**signing** 4:13

**similar** 32:1
74:4 133:25

**simultaneously**
44:17

**sir** 33:22

**sit** 96:17

**sitting** 151:18

**situation** 39:20

**situations** 89:6

**size** 62:10

**slash** 9:22

**slightly** 39:19

**small** 20:12
94:14

**smaller** 144:8

**Smith** 2:3 5:22
140:16

**smoothly** 7:15

**software** 17:20
18:3

**sold** 19:11 85:4
149:21

**solemnly** 6:24

**somebody** 26:3
38:9 96:14
108:6 116:11
129:13 176:1

**somebody's**
93:10 151:17

**someone** 14:22
28:17 31:20
96:5 173:15,24

**someone's**
151:14

**sometime** 45:19

**somewhat** 104:21

**sorry** 11:5
12:25 15:5
16:24 35:23
53:14,19 67:2
73:24 97:3
113:16 115:16
124:16
127:5,10,12
128:23,24
129:12
137:6,12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

**152:**19 **153:**9 **159:**14,17 **173:**18,21

**sort** 10:5 14:4 18:5 48:14 55:5 72:10 74:6,16 85:8 86:6 105:3 160:20 170:16

**sound** 8:7,14,24 10:10 20:1 53:20 61:8

**sounds** 8:8,15 9:1,7 10:11 13:20

**source** 103:15,16

**South** 2:4,10,21

**Southern** 1:2 5:15 14:3

**Spalding** 2:16 6:6 24:1,4

**speak** 8:3 23:19 141:18 169:12

**speaking** 13:10 68:17 168:18

**special** 91:23

**specific** 14:11 17:5 62:23 74:11 83:21 84:25 166:16

**specifically** 59:4 75:19 124:12

**specified** 73:21

**spell** 6:9

**spend** 19:16 168:9 169:14 170:17

**spent** 159:7 168:10,23 169:18

**SPLCSS** 83:22 84:3,4,5,6,7 119:5 144:8

**SPLCSS2** 143:23

**spoke** 86:10 157:20 169:2

**spoken** 13:4 167:5

**spreadsheet** 18:25 19:9 30:6 44:10

**spreadsheets** 17:18

**squared** 19:23

**stake** 11:12

**stamp** 33:25

**stand** 174:4

**standard** 163:3 175:19

**standpoint** 165:6

**start** 17:2,22 20:3,8 21:3 25:3 36:24 43:9 44:3 142:3 164:14 174:15

**started** 11:14,23 15:24 56:18 69:17

76:9 102:16 135:25 136:5 172:6,10,11

**starting** 5:20 29:6 47:19,21 54:19 69:18 92:13

**starts** 59:19 86:17

**state** 4:11 5:18 6:9 162:13 177:3,18 178:3,7

**stated** 61:1

**statement** 51:2

**statements** 57:8 119:25 121:20,24 122:10,16 123:7,10,15,21 143:15,18 144:1,4,5,6,11 147:16

**States** 1:1 5:15

**stating** 19:12 24:5 44:7 72:1 151:3

**status** 30:2 92:23

**stay** 84:20 138:18,22

**steal** 104:18 110:2,8 111:18 112:8,11

**stealing** 115:4 126:5,8,9 133:14,18

134:2,10

**stepped** 11:5,6

**steps** 45:3

**Steve** 91:19,22 100:19 107:5 112:2

**Steven** 112:8,20 113:11,23 114:5,12 115:4 117:14 120:12 122:14 123:25 124:8 125:3,22 130:16,21 134:10 135:19 136:14 139:23 140:7,22 141:16 143:7 146:3,8 150:1 153:3,11,19

**stipulate** 6:16

**stipulated** 6:20

**STIPULATION** 4:1

**stole** 109:20 110:19 113:11,24 114:5,12 120:10,13 124:9,13 153:3

**straight** 21:20 110:15,17

**strange** 49:25

**stream** 85:4

**streamline** 74:12 85:8

**Street** 4:4 5:6

**strike** 25:2



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        **Toll Free 855-MYDEPOS**

47:5 48:12
110:7 115:16
134:23 145:4
148:17 153:10
166:25

**string** 73:8
92:1 100:17

**structured** 3:22
29:2,6 30:12
31:5,6 62:19
65:3,11
96:7,19

**stuff** 19:6,7
20:12 58:2
63:23 80:2
116:11 138:10
140:19 168:15
169:6

**subject** 14:4
22:5 40:10,25
49:10 54:11
68:14,18 74:17
80:6 83:11
90:24 98:20
161:22

**Submitted**
178:17

**submitting**
85:13

**subpoenas**
157:18

**subsidiaries**
131:22 143:15

**subsidiary**
11:2,11 133:4
143:21

**substitute** 34:2

51:1

**succinct** 74:25

**Sue** 24:19,23

**suffix** 66:4

**Suite** 2:4,10,22
4:4 5:6

**sum** 78:8

**summary** 27:5
74:25

**summertime**
11:20

**supposed** 38:3
53:1 76:22
79:2 88:11
100:23 111:4

**supposedly**
103:17 115:7
147:1,2

**sure** 7:11 8:6,9
9:5 10:8,20
11:10 16:7
19:15
30:14,18,19
35:17,25 37:23
39:7 45:16,18
53:17,19 61:18
65:8 66:15,20
77:8 90:2
94:10 102:7
105:14 109:17
111:16 112:6
113:20 114:20
117:4 118:12
127:16 133:3
141:21 147:14
152:11 156:15
158:18,19
159:22 165:15

172:8 174:7

**surprise** 104:7
120:5,8,9
160:1

**surprised**
134:24 135:3
155:16 168:5

**suspect** 165:1

**suspicious**
107:9

**SuttonPark** 1:7
2:2 5:11 9:22
10:1,6,14,17,1
9 11:2,11,23
13:19 15:24,25
16:14,15
17:1,13 22:18
26:7 33:5,8,15
46:17 56:18
58:13 60:22
67:7
70:1,11,16,24
71:11 94:24
95:3,20
102:16,18
103:18,24
104:7 106:13
107:16 109:24
110:1,8,15,17,
18 111:3,9,12
112:12,22
114:11
115:17,22
116:14,21,25
117:10,15,21
118:9,25
119:24 126:5
128:15 129:3
132:10,11,14,1

8,24 133:5
134:1 136:5
137:23 138:2,7
139:1,2,14,18
140:2 141:23
142:19
143:16,20
149:8,24
151:9,19,21
152:14 154:21
155:7,11
159:24 160:6
163:23 168:11
172:13

**SuttonPark/77**
14:16

**SuttonParks**
131:20

**SuttonPark's**
16:19 51:15
72:15 103:10
104:10 110:22
113:3 144:9
152:8 160:11

**swear** 4:12 6:24

**sworn** 177:8

**system** 18:3,18
44:1 107:20,21
108:1,10
129:22,23,24
130:1 144:22

**systems** 18:24
103:10 104:11
105:19 160:7

———————————
T
———————————
**tab** 35:15,17
36:5



MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

tabs 27:5

takeover 10:25

taking 7:11
  11:14 19:17
  28:6 39:4
  43:10 45:9
  60:21

talk 8:10 19:17

talked 12:4
  61:6 63:10
  64:23 70:11,14
  71:19 93:16
  99:10,11 107:8
  117:25 162:25
  164:14

talking 8:13
  12:22
  14:7,9,12
  17:25 18:2,9
  22:8 27:2
  31:21,23 59:4
  64:9 93:14,15
  99:9,12,22
  103:20 114:22
  121:16 152:8
  161:24

TATTOLI 1:22
  4:10

Teams 164:11,15
  170:8,17

technically
  29:15

technician 5:3

Telephone
  2:5,11,18,23

ten 67:25
  170:19,22

tendency 8:4

tender 108:16

tenure 12:2

Teresa 22:20,21
  23:1,2,9 25:6
  31:20,21,23
  32:21 71:18,21
  72:19

term 56:8 75:22
  117:25 118:3
  124:20 147:15
  160:20

terms 43:3
  46:10 55:6
  76:6 77:2,18
  79:18 86:3
  89:14 99:9
  105:24 108:10
  118:25 147:4
  170:10 173:9

testified
  112:24 127:22
  128:9 132:13
  134:24 150:9
  156:20,22
  159:13,19
  160:5,19
  161:17

testify 7:10
  158:20

testifying
  160:7

testimony 6:24
  8:18 9:14 65:2
  112:7,19 114:4
  136:13 171:5

text 93:8,10

texts 154:5

thank 5:25
  6:4,8,13,22
  7:3,5,8 34:16
  74:25 77:20
  97:24 129:18
  152:24 154:18
  158:9 159:17
  162:17 173:13
  175:1,24

Thanks 98:1
  108:19

that'd 175:22

that'll 7:16

themselves
  124:17

there's 8:4
  10:5 19:25
  40:7 63:2
  105:8 113:18
  114:2 143:20
  155:25 164:20

they'll 139:8

they're 7:10
  30:9 50:23
  51:2 63:15
  93:14,15 94:15
  126:10

they've 154:4

third 23:17

Thomas 51:23
  57:2

thoughts 168:4

threatening
  69:3,6,17,22

throughout 12:2

29:12

thumb 90:10

Thursday 35:8,9

timeframes
  63:22

timelines 47:17

timely 128:5

tip 126:21
  127:1,19

title 28:24
  34:11 55:12,14
  62:15
  132:10,11

today 5:4 7:23
  9:14,24 13:2,8
  96:17 98:21
  109:3 155:19
  156:3 163:14
  175:2,14

Today's 5:7

Tom 88:6 174:23

tomfoot@leadenh
  all 86:14

tomorrow 175:15

Tom's 87:8

tons 20:25

top 3:19,21
  24:21 31:19
  35:3 38:2 52:9
  54:21 56:15
  57:14 74:22
  75:2,22 76:3
  79:20 81:17
  90:22,25
  91:2,11,13,15,
  18,23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS



92:4,8,11 98:3
101:5 128:7,15
134:13
**top-off** 98:8
**topped** 128:3
129:3
**topping** 91:4
127:22,23
128:2,10,18,19
129:7 150:10
**total** 17:14
18:13
170:16,19
**totally** 18:2
174:5
**touch** 176:1
**toward** 42:23
128:17 138:20
**track** 81:24
**trade** 46:2,6
**trail** 153:21
**transaction**
46:4,11 139:11
**transactions**
138:25
**transcript** 4:13
174:1 175:3
177:7 178:9
179:16,21
**transfer** 30:21
112:12,21
157:14
**transferred**
111:9,13
**treasury** 73:12

**trial** 57:23
**tried** 66:23
120:13 141:17
142:8
**triple** 9:25
33:5
**true** 9:13 32:19
37:3 49:3
60:25 73:20
82:10,19
90:19,20 98:15
104:15,16
109:20 178:9
**trustworthy**
125:17,22
126:3 130:5,7
**truth** 6:25 7:1
11:9 133:5
165:16
**try** 7:14
8:10,11 9:2
27:25 53:15
68:23 72:8
74:5,12 128:25
132:23 133:19
153:6 155:3,6
156:16
**trying** 7:23
28:18 50:23
68:20 71:7
105:5 120:10
133:11 141:25
153:2 164:22
**turn** 109:23
110:13 116:12
**turned** 38:17
50:25

**turning** 142:17
**two-minute**
102:4
**tying** 43:22
**type** 17:17
32:23 79:20
106:17
**types** 18:8 33:2
91:18 102:20
107:9 108:3
170:15,23
**typical** 7:21
38:20 39:4,10
65:10 84:19
100:24 101:7
**typically** 29:7
38:23 39:3
58:7,9 83:16
91:17 101:13
170:4,16,19

---
U
---

**ultimately** 86:8
94:19 136:16
165:7
**unauthorized**
104:5,10
**unclear** 9:4
**uncomfortable**
133:16
**underlined** 42:3
**underneath**
50:12
**undersigned**
177:6
**understand** 9:6

15:11 20:21
22:6 24:3,10
38:14 44:21
65:1 93:14
105:5,14,16
111:3 112:7
121:8 141:25
147:14 169:3
**understanding**
15:8,13,18
56:1 71:10,13
72:5,17,25
78:22 79:19
81:14 87:18
92:2,7 106:6
112:23 115:20
120:25 121:4
126:25 131:2,4
132:5 136:9
138:16
144:16,17,21
145:4
146:19,21,22
149:5 157:8
158:22 165:5,9
**understood** 9:9
47:10 50:7
77:22 78:12
176:3
**unethical** 96:3
**unified** 62:15
**United** 1:1 5:15
**unless** 149:20
**unusual** 49:22
**update** 64:5
65:10,24
66:3,7 93:21
**updated**



MILESTONE **|** REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

63:16,19 64:21
65:4,19

**updates**
63:24,25 64:1
65:15,18
66:6,8

**updating** 63:23

**upload** 19:14
30:8 61:5

**uploading** 20:4

**upon** 33:3
179:18

**upper** 156:25

**usability** 108:3

**useful** 28:17,19

**usually** 22:25
65:13 74:21

---
V
---

**vacation** 51:25

**vacations** 140:3

**vague** 39:11

**value** 75:23
81:10 146:15

**valued** 115:18

**values** 121:5

**verify** 41:8
49:8,15,21
51:9,11

**version** 72:11
156:21

**versions** 42:14

**versus** 93:8
99:20 174:15

**via**

2:6,12,19,24
4:5 164:9

**video** 5:3,9
6:15

**videoconference**
2:6,12,19,24
4:5

**view** 96:11
105:5 117:8
122:8,14 124:1
142:6

**vis** 116:2

**vis-a** 116:2

**Volins**
80:16,18,21

---
W
---

**Wacker** 2:4

**wait** 167:25

**waiting** 129:13

**waive**
173:16,20,23
174:4

**waived** 4:14

**waiving** 94:15

**Wander**
107:1,2,4
112:8,20
113:11,24
114:4,12 115:4
116:24
117:3,4,9
120:12 122:8
123:25 124:7
125:3,17
130:15,21
134:10 135:19

136:14 139:23
140:7,22
141:16 143:6
146:3,8 150:1
153:3,11,19

**wasn't** 24:20
51:20,21 87:25
95:4,10 101:25
108:5,7 128:11
170:1 173:7

**ways** 8:17
120:11 150:16

**Wednesday** 35:4

**week** 39:2 81:25

**weeks** 39:3

**welcome** 9:4
158:10 162:18
173:14

**we'll** 8:20
20:13 21:20
27:16 30:5
75:3 102:5
139:7

**Wells**
68:21,23,25
69:2,3,5,16,22
70:19
71:8,20,24
72:1

**Wentworth**
115:13,21
116:1,7 136:15
151:10

**we're**
7:13,21,23
8:18,21
13:8,15 14:2,3
19:23 21:17

22:8 29:17
35:2 37:12,18
39:15 41:5,22
44:7 46:23
50:24
52:6,10,19,20
53:23 54:7
58:4 59:5
61:20 64:11
67:13 76:19
78:13 83:7
93:3 102:8
115:9 149:1
154:22 167:6

**West** 1:3 2:22
5:16

**we've** 21:4
41:13 59:4
85:10 93:4
98:10,17 105:9
114:22 163:14
167:6

**whatever** 43:7
52:11 63:19
64:6 80:25
100:14 101:19
140:18

**whatnot** 173:9

**whenever** 8:24
175:7

**whereby** 139:1

**Where'd** 147:11

**whether** 43:3
51:10 53:5
58:24 85:4
87:16 94:18
117:7 119:24
131:7,11,23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

139:23 140:1
147:22 150:16
164:23 165:17
166:4 168:4,5
170:17

**whoever's**
108:17

**whole** 6:25
13:23 75:6
105:8

**whom** 162:5
164:1 167:4,5

**whomever** 138:13

**who's** 73:11

**whose** 165:1

**window** 67:15

**wires** 34:5

**withdrawn** 39:13

**witness** 4:12,13
5:18 6:11 7:2
27:19 38:23
97:25 107:13
108:17 109:13
110:4,11,21
111:20,22,25
112:11,16
113:14
114:2,8,15
116:18
117:3,12,18
118:12 119:13
120:16 121:22
122:12,18,24
123:9,17,23
124:5,12
125:7,12,19,24
126:16
127:8,13,16

132:2,16,21
133:2,23
134:4,13
135:14,22
136:2,8,23
137:4 138:1,20
139:4,21
140:10,25
141:5,20
142:10 143:4,9
145:13,25
146:6,13
147:19
149:10,16
150:4,14
151:16 154:20
155:22 156:7
158:10 159:11
162:18
166:6,20
167:21
171:2,17,25
174:6,13,18,20
,23 177:6

**WMS** 40:10,22
48:17,19,21,22
49:11
50:9,15,17
51:5 54:10
55:11 59:7
60:10,21 64:1
66:9 110:13
115:13,21
116:7 136:15
151:10

**work** 9:16,17
10:12 16:15,17
19:5 20:13
33:7 50:23
51:22,23 70:23

95:11 138:25
173:10

**workable** 20:1

**worked** 9:19
10:13 22:14,23
24:21 26:11
95:22 96:9
104:13 137:24
154:3

**working** 15:24
16:25 95:13
96:13 116:6
152:25 159:8
170:1
172:10,13,20,2
1

**world** 137:10

**worry** 20:24

**worth** 76:1,21
116:13

**would've** 47:10
48:7 53:6 72:6
73:10 77:3
80:9 89:25
127:4 160:10

**write** 45:5

**write-off**
45:6,8

**written**
45:14,20

**wrong** 64:11,14
109:4
133:17,20,21,2
3

---

X

**XLSX** 29:2

---

Y

**year-end** 58:16

**Yep** 6:21 142:2

**yet** 76:20 96:24
116:5 136:19
166:15

**York** 2:17 6:7
13:23 14:2
70:2 105:25
109:6,9,11
120:6 126:19
134:19 155:16

**you'll** 8:11
82:13

**yourself** 19:19

**you've** 32:11
40:1 155:22
156:20 175:7

---

Z

**zebra** 174:24



**MILESTONE** | **REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS