# Exhibit V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 24-81143-CIV-DMM


777 PARTNERS LLC and SUTTONPARK
CAPITAL LLC,

     Plaintiff,

vs.


LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE LINKED
INVESTMENTS FUND PLC, NOAH DAVIS,
SAIPH CONSULTING LLC, and PAUL KOSINSKI,

     Defendant.
_____/




VIDEOTAPED DEPOSITION OF ALEXANDER ADNANI

TAKEN ON BEHALF OF THE DEFENDANT

MARCH 24, 2025
9:00 A.M. TO 12:30 P.M.

KING & SPALDING LLP
200 SOUTH BISCAYNE BOULEVARD, SUITE 4700
MIAMI, FLORIDA 33131




REPORTED BY:
MICHELLE VILLALOBOS, COURT REPORTER, CER, CDR
NOTARY PUBLIC, STATE OF FLORIDA



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

## Page 2

```
01                   APPEARANCES OF COUNSEL
02  ON BEHALF OF THE PLAINTIFF:
03      JAMES "JIM" BOLAND, ESQUIRE
        SMITH GAMBRELL RUSSELL
04      300 SOUTH WACKER DRIVE
        CHICAGO, ILLINOIS 60606
05      312-360-6548
        JBOLAND@SGRLAW.COM
06
    ON BEHALF OF THE DEFENDANT, LEADENHALL CAPITAL PARTNERS
07  LLP AND LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND
    PLC :
08
        BRIAN DONOVAN, ESQUIRE (PRO HAC VICE)
09      KINGS & SPALDING, LLP
        1185 AVENUE OF THE AMERICAS
10      NEW YORK, NEW YORK 10036
        212-556-2100
11      BDONOVAN@KSLAW.COM
12  OB BEHALF OF THE DEFENDANT, NOAH DAVIS:
13      LEONARD S. FEUER, ESQUIRE
        LEONARD S. FEUER, P.A.
14      500 AUSTRALIAN AVENUE, SUITE 500
        WEST PALM BEACH, FLORIDA 33401
15      561-659-1360
        LFEUER@FEUERLAWFIRM.COM
16
    ON BEHALF OF THE DEFENDANT, SAIPH CONCULTING LLC AND PAUL
17  KOSINSKI:
18      HAROLD E. MORLAN, III, ESQUIRE
        SHUTTS & BOWEN, LLP
19      300 SOUTH ORANGE AVENUE, SUITE 1600
        ORLANDO, FLORIDA 32801
20      407-835-6950
        HMORLAN@SHUTTS.COM
21
22
23
24
25
```

## Page 4

```
01                   INDEX OF EXAMINATION
02  WITNESS:  ALEXANDER ADNANI

                                                  PAGE
03  DIRECT EXAMINATION
         BY BRIAN DONOVAN, ESQUIRE                  7
04
    DIRECT EXAMINATION
05       BY HAROLD E. MORLAN, III, ESQUIRE         65
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
01                   APPEARANCES OF COUNSEL
02  ON BEHALF OF THE DEFENDANT:
03      FRANCIS D. MURRAY, ESQUIRE
        STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC
04      2 SOUTH BISCAYNE BOULEVARD SUITE 1600
        MIAMI, FLORIDA 33131-1824
05      305-614-1400
        FMURRAY@SKNLAW.COM
06
    ALSO PRESENT:
07
        ASHLEY TAYLOR, VIDEOGRAPHER
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
01                   INDEX OF EXHIBITS
02  EXHIBIT              DESCRIPTION              PAGE
03
04  NO EXHIBITS MARKED
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01    VIDEOTAPED DEPOSITION OF ALEXANDER ADNANI
02                    MARCH 24, 2025
03          THE COURT REPORTER:  We're now on the video
04    record.  Today's date is Monday, March 24th, 2025,
05    and the time is 09:16 A.M.
06          This is the video deposition of Alexander
07    Adnani, taken in the matter of 777 Partners, LLC
08    and SuttonPark Capital LLC vs. Leadenhall Capital
09    Partners, LLP et al.  This deposition is being
10    conducted at 200 South Biscayne Boulevard, Miami,
11    Florida.
12          The Court Reporter is Michelle Villalobos and
13    the Videographer is Ashley Taylor.
14          Would Counsel, please announce their
15    appearances for the record?
16          MR. DONOVAN:  Sure.  Brian Donovan from King
17    and Spalding on behalf of the Leadenhall,
18    Defendants.
19          MR. BOLAND:  Jim Boland from Smith Gambrell
20    Russell on behalf of the Plaintiffs.
21          MR. FEUER:  Good Morning, Leonard Feuer,
22    Leonard Feuer, P.A. on behalf of Noah Davis.
23          MR. MORLAN:  Harold E. Morlan III on behalf of
24    Shutts and Bowen, I mean with Shutts and Bowen on
25    behalf of Paul Kosinski and Saiph Consulting, LLC.

01          MR. MURRAY:  Francis Murray from Stumphauzer
02    Kolaya Nadler and Sloman on behalf of Mr. Adnani.
03    Thereupon:
04                    ALEXANDER ADNANI,
05    was called as a witness, and after having
06    been first duly  sworn, testified as follows:
07                    DIRECT EXAMINATION
08    BY MR. DONOVAN:
09          Q.    Okay.  Mr. Adnani, how's it going today?
10          A.    Good, how are you?
11          Q.    Good.  Can you state your full name for the
12    record?
13          A.    Alexander Adnani.
14          Q.    Can you give me your, your home address?
15          A.    Yes.  488 Northeast 18th Street, Miami,
16    Florida 33132.
17          Q.    Can you give me your work address?
18          A.    Currently I am remote at this point.
19          Q.    Have you ever been deposed before?
20          A.    No.
21          Q.    Have you ever given any type of testimony
22    before either oral or written?
23          A.    Yes.
24          Q.    What type of testimony are you referring to?
25          A.    Under the advice of Counsel in invoking my

01    Fifth Amendment right to against self-incrimination and
02    respectfully decline to answer your question.
03          Q.    Sure.  And so, for any Fifth Amendment --
04          A.    Yeah.
05          Q.    Indications if you want to, you can say
06    anything so long as it references five, you can say the
07    whole thing if you want to, but if you just say Fifth
08    Amendment or take five or something like that, that's
09    fine.  If you're amenable to that --
10          A.    Whatever --
11          Q.    I invoke the fifth --
12          A.    Invoke.
13          Q.    I take the fifth, whatever you want to say, if
14    it says --
15          A.    Okay.
16          Q.    If it uses the word five or fifth.  How did
17    you prepare for this deposition?
18          A.    Can you repeat the question?
19          Q.    Sure.  How did you prepare for this
20    deposition?
21          A.    Just having conversations with my Counsel.
22          Q.    How many conversations with Counsel did you
23    have?
24          A.    I think just one.
25          Q.    And which Counsel are you referring to?

01          A.    The Counsel that's here today, Francis Murray.
02          Q.    All right.  Did you have any conversations
03    with Counsel for -- strike that.  Do you know who the
04    Plaintiff's are in this case?
05          A.    Yes.
06          Q.    All right.  I'll represent to you that they're
07    777 Partners and SuttonPark Capital.  Is that fair?
08          A.    Yes.
09          Q.    Did you have any conversations to prepare for
10    today's deposition with Counsel for the Plaintiff's?
11          A.    No.
12          Q.    Did you have any conversations to prepare for
13    today's deposition with any Counsel other than Counsel
14    who's in the room with you right now?
15          A.    No.
16          Q.    Did you review any documents to prepare for
17    today's deposition?
18          A.    No, I don't believe so.
19          Q.    What's your job title currently?
20          A.    Going to in invoke fifth.
21          Q.    Are you employed by 777 Partners currently?
22          A.    Yes.
23          Q.    Are you employed by SuttonPark Capital
24    currently?
25          A.    My employer is 777.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 10

01    Q.   Is there any difference between 777 Partners
02 and SuttonPark Capital?
03         MR. BOLAND:  Object to the form.
04    A.   What did you say, sir?
05 BY MR. DONOVAN:
06    Q.   Sorry.  He said, so he objected to the form.
07         And so, I'll do it.  He objected to the form,
08 which is going to happen sometimes.
09    A.   Okay.
10    Q.   So, I'll ask the question, your Counsel or
11 Counsel on the Zoom may object to form and then you --
12 you'd still have to answer the question unless you're
13 instructed not to by your Counsel, basically --
14    A.   Understood.
15    Q.   So, I'll ask my question again.  Give me a
16 second because I think Counsel on the Zoom or -- Counsel
17 on the Zoom is going to object to form?
18    A.   Okay.
19    Q.   Are 777 Partners in SuttonPark Capital the
20 same thing?
21         MR. BOLAND:  Object to the form.
22    A.   I invoke the fifth.
23 BY MR. DONOVAN:
24    Q.   Let me try it again.  Are 777 Partners in
25 SuttonPark Capital the same entity?

Page 11

01         MR. BOLAND:  Same objection.
02    A.   I invoke the fifth.
03 BY MR. DONOVAN:
04    Q.   Can you describe for me your job
05 responsibilities currently?
06    A.   I invoke the fifth.
07    Q.   Do you understand that there are lawsuits in
08 both New York and Florida between 777 Partners on the
09 one hand and Leadenhall on the other hand?
10    A.   Have you rephrase that?  I apologize --
11    Q.   Sure.  Do you -- I'm just asking you yes or no
12 really.  Do you understand that there are lawsuits
13 pending in both New York and Florida between 777
14 Partners and affiliates on the one hand and Leadenhall
15 on the other hand?
16    A.   Yes.
17    Q.   What's your understanding of the New York
18 lawsuit between 777 Partners and affiliates and
19 Leadenhall?
20         MR. MURRAY:  Mr. Adnani, if you have an
21         independent understanding of that outside of
22         conversations with Counsel, you should go ahead and
23         answer it.  If you do not, you should not answer.
24    A.   Okay.  I'm invoking the fifth.
25         MR. DONOVAN:  Sorry, was that a -- was that a

Page 12

01 privilege instruction?
02         MR. MURRAY:  That was a privilege instruction,
03         yeah.
04 BY MR. DONOVAN:
05    Q.   All right.  Let me just ask it again to make
06 sure that the objection, I understand the objection from
07 your Counsel and your answer.
08         Outside of any communications you've had with
09 Counsel concerning any of the lawsuits involving
10 Leadenhall and 777 Partners.
11         What's your understanding of the New York
12 lawsuit between 777 Partners in Leadenhall?
13    A.   I invoke the fifth.
14    Q.   Do you understand that you're here testifying
15 about the Florida lawsuit between Leadenhall on the one
16 hand and other Defendant's on and on the other hand 777
17 Partners in SuttonPark?
18    A.   Yes.
19    Q.   What's your understanding of this Florida
20 lawsuit?
21         MR. MURRAY:  Same instruction as before
22         regarding privilege.  If you have an independent
23         understanding of the lawsuit, you can go ahead and
24         answer it, but if you do not then or invoking
25         privilege or instruction not to answer.

Page 13

01    A.   Okay.  I don't believe that I have an -- a
02 complete understanding of the lawsuit between or that
03 we're discussing today.
04 BY MR. DONOVAN:
05    Q.   Understood that you don't have a complete
06 understanding of the Florida lawsuit between 777
07 Partners on the one hand and Leadenhall and other
08 Defendant's on the other hand.
09         Do you have any understanding of the lawsuit
10 that you're here testifying about today?
11    A.   To be honest not entirely.
12    Q.   Sure.  I'm just, I understand that you don't
13 have a complete understanding or an entire
14 understanding.  I'm just asking do you know anything
15 about why you're here testifying today?
16    A.   Yes.
17    Q.   What's your understanding of what this case is
18 about?
19    A.   Noah Davis and Saiph Consulting, is it, and
20 777.
21    Q.   Can you say more there?
22    A.   I don't know that I really have more
23 information than that.
24    Q.   Well, what's your understanding of what Noah
25 Davis and Saiph allegedly did that gave rise to this


UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 14

01 lawsuit?

02      MR. MURRAY: Same instructions as before. If
03 you have an independent basis outside of our
04 conversations, you can go ahead and answer on that
05 basis, otherwise I'm instructing you not to answer
06 based on privilege.

07      A. Okay. What I heard is some equipment was
08 stolen from an office of SuttonPark, but I don't have
09 any other understanding.

10 BY MR. DONOVAN:

11      Q. Who did you hear stole equipment from an
12 office of SuttonPark?

13      A. Noah, I believe.

14      Q. Noah Davis --

15      A. This is --

16      Q. -- Sorry, go ahead?

17      A. -- strictly, I believe an article that I saw,
18 so I don't have any further information regarding the
19 issue.

20      Q. I see. So, is it fair to say that your basis
21 for understanding that this lawsuit is about Noah Davis
22 taking equipment allegedly from a SuttonPark office
23 building is news articles?

24      A. Could you re-say that?

25      Q. Sure. So, let me ask you like this. What's

Page 15

01 your basis for your understanding that this lawsuit is
02 about Noah Davis taking equipment allegedly from
03 SuttonPark Capital's offices?

04      A. I read a news article.

05      Q. All right. Did -- is that your only basis?

06      A. Yes.

07      Q. Okay. What is Saiph?

08      A. I believe it's consulting company started by
09 Paul Kosinski.

10      Q. And who is Paul Kosinski?

11      A. He was formerly working for SuttonPark Capital
12 as CEO.

13      Q. Do you know what type of consulting services
14 Saiph provides?

15      A. No. Financial Service.

16      Q. Your testimony is that Saiph provides
17 financial consulting services?

18      A. I don't know the extent of the services.

19      Q. Do you know -- well, I'm just trying to ask a
20 general question about what your understanding is, if
21 any of what Saiph does?

22      A. I believe that they provide financial
23 specialty services would be my best interpretation.

24      Q. Did you say that your understanding was that
25 Paul Kosinski was formerly CEO of SuttonPark Capital?

Page 16

01      A. Yes.

02      Q. Do you know until when approximately?

03      A. I don't recall an exact date.

04      Q. How much interaction did you have with Paul
05 Kosinski while he was SuttonPark Capital's CEO?

06      A. I'm going to invoke the fifth.

07      Q. Did he have any interactions with Paul
08 Kosinski while he worked at SuttonPark Capital?

09      A. I'm going to invoke the fifth.

10      Q. Do you know who Noah Davis is?

11      A. He was CTO of 777.

12      Q. Okay. So, Noah -- is your testimony that Noah
13 Davis was formerly Chief Technology Officer of 777
14 Partners?

15      A. To the best of my knowledge.

16      MR. BOLAND: Objection.

17      THE COURT REPORTER: I didn't hear.

18      MR. DONOVAN: Mr. Boland, you might have to
19 speak up a little bit so we can, sorry, Mr. Boland,
20 you might have to talk, speak up a little bit so
21 that we can hear you when you object.

22      MR. BOLAND: I will, I'm conscious of not
23 trying to interrupt, so I'll try to speak up a
24 little bit more.

25      THE COURT REPORTER: Was that an objection he

Page 17

01 used?

02      MR. DONOVAN: He -- I think he objected to
03 form. I don't remember the question. Do you mind
04 reading the question back?

05      THE COURT REPORTER: One second.

06      MR. DONOVAN: I think, actually I think I
07 remember the question. Why don't we -- why don't I
08 try it again and then just if you don't mind giving
09 Counsel a chance to object and then answer.

10      THE COURT REPORTER: I can play it.

11      MR. DONOVAN: I got -- no, I got it.

12 BY MR. DONOVAN:

13      Q. Is it your testimony that Noah Davis was
14 previously Chief Technology Officer of 777 Partners

15      MR. BOLAND: And I objected to the form.

16      A. That was my understanding.

17 BY MR. DONOVAN:

18      Q. Do you know what his responsibilities were as
19 Chief Technology Officer of 777 Partners?

20      A. I don't believe I would be able to answer that
21 question without having more information.

22      Q. All right. Well, what's your understanding of
23 the responsibilities of a Chief Technology Officer at a
24 company like 777 Partners?

25      MR. BOLAND: Object to the form.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 18

```
01      A.   I don't know that I would have all the
02  information to answer that question.
03  BY MR. DONOVAN:
04      Q.   All right.  Fair.  Did you interact with Noah
05  Davis at all while he was Chief Technology Officer at
06  777 Partners?
07      A.   Friendly interaction.
08      Q.   Can you describe Noah Davis' personality?
09      A.   He seemed very nice.
10      Q.   Did he seem happy at his job?
11          MR. BOLAND:  Object to the form.
12      A.   I'm not sure I can answer that question.
13  BY MR. DONOVAN:
14      Q.   I'm just asking based on your understanding or
15  what you saw, did Noah Davis seem happy on a day-to- day
16  basis?
17          MR. BOLAND:  Object to the form.
18      A.   I can't speak to his emotions.
19  BY MR. DONOVAN:
20      Q.   Do you know when he -- do you know when he
21  resigned -- strike that.  Do you know whether Noah Davis
22  resigned his position as Chief Technology Officer of 777
23  Partners?
24      A.   I don't know.
25      Q.   So, do you know whether Noah Davis is still
```

Page 19

```
01  employed by 777 Partners?
02          MR. BOLAND:  Object to the form.
03      A.   I don't believe he is.
04  BY MR. DONOVAN:
05      Q.   So, do you know when Noah Davis stopped being
06  employed by 777 Partners approximately?
07      A.   That is unclear to me.
08      Q.   Fair.  Do you have any understanding
09  whatsoever, as to when Noah Davis left 777 Partners?
10      A.   I don't think I would be able to answer it.
11      Q.   Are you not able to answer because you don't
12  know or because you would prefer not to answer?
13      A.   Because I don't know.
14      Q.   Okay.  Do you know why Noah Davis left his
15  position as Chief Technology Officer of 777 Partners?
16      A.   No.
17      Q.   Do you know whether Noah Davis ever worked as
18  an independent contractor for Saiph?
19      A.   I don't know.
20      Q.   What's your understanding of the term
21  collateral?
22      A.   I'll invoke fifth there.
23      Q.   All right.  So, when I use the term
24  collateral, I'm referring to assets securing a loan.
25          Do you have any understanding of a collateral
```

Page 20

```
01  audit performed by Saiph on behalf of Leadenhall
02  beginning around late 2023?
03      A.   I'll invoke the fifth.
04      Q.   Do you know who Craig Gillespi is?
05      A.   He -- I don't know his official title, but he
06  worked at Leadenhall.
07      Q.   Is he the individual you interacted with at
08  Leadenhall the most concerning the credit facility
09  between 777 Partners in Leadenhall?
10          MR. BOLAND:  Object to the form.
11      A.   I'm invoking the fifth.
12  BY MR. DONOVAN:
13      Q.   Do you know why Leadenhall wanted to conduct
14  an audit of or review its collateral starting around
15  2022?
16          MR. BOLAND:  Object to the form.
17      A.   I'm invoking the fifth.
18  BY MR. DONOVAN:
19      Q.   Do you know whether Leadenhall engaged Saiph
20  to conduct an audit of its collateral?
21      A.   I'm invoking the fifth.
22      Q.   Can you tell me anything about collateral
23  audit conducted by Saiph on behalf of Leadenhall?
24          MR. BOLAND:  Object to the form.
25      A.   I'm invoking the fifth.
```

Page 21

```
01  BY MR. DONOVAN:
02      Q.   Do you know whether 777 Partners objected to
03  Leadenhall performing an audit of its collateral?
04          MR. BOLAND:  Object to the form.
05      A.   I'm invoking fifth.
06  BY MR. DONOVAN:
07      Q.   When I use the term A-CAP, I'm referring to an
08  insurance holding company called Advantage Capital
09  Holdings LLC.  Do you understand that?
10      A.   Yes.
11      Q.   What is A-CAP?
12      A.   I'm sorry, what is A-CAP?
13      Q.   Yeah, let me try it again.  Is A-CAP a lender
14  to 777 Partners?
15      A.   I am invoking fifth.
16      Q.   Did A-CAP object to Leadenhall using Saiph to
17  conduct an audit of Leadenhall's collateral in late
18  2023?
19      A.   I'm invoking the fifth.
20          MR. BOLAND:  Let me just insert an objection
21      to the form of that one after the fact, sorry about
22      that.
23  BY MR. DONOVAN:
24      Q.   Did A-CAP object to Leadenhall performing an
25  audit of its collateral in 2023 because A-CAP knew that
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01 collateral had been fictitiously pledged and double
02 pledged?
03          MR. BOLAND: Object to the form.
04     A.   I'm invoking the fifth.
05 BY MR. DONOVAN:
06     Q.   Did 777 Partners in A-CAP initially object to
07 Leadenhall performing an audit of Leadenhall's
08 collateral because they were concerned that Leadenhall
09 would find out that assets had been fictitiously pledged
10 or double pledged?
11          MR. BOLAND: Object to the form.
12     A.   I'm invoking the fifth.
13 BY MR. DONOVAN:
14     Q.   Do you know what the MP Fin computer system
15 is?
16     A.   I'm invoking the fifth.
17     Q.   Is the MP Fin Computer System, the system in
18 which the 777 Partners Capital Markets Group allocates
19 assets to lenders?
20     A.   I'm invoking the fifth.
21     Q.   Did you play any role in allocating assets to
22 lenders in MP Fin?
23          MR. BOLAND: Object to the form.
24     A.   I'm invoking the fifth.
25 BY MR. DONOVAN:

01     Q.   Did you play any role in issuing compliance
02 reports to Leadenhall?
03     A.   I'm invoking the fifth.
04     Q.   Do you know who made the decision to file this
05 Florida lawsuit against Leadenhall based on Noah Davis'
06 alleged intrusions?
07          MR. BOLAND: Object to the form.
08     A.   Could you repeat the --
09 BY MR. DONOVAN:
10     Q.   Sure.
11     A.   -- the beginning of that?
12     Q.   Sure.  Do you know who at 777 Partners or A-
13 CAP made the decision to file this lawsuit against
14 Leadenhall based on alleged intrusions by Noah Davis?
15          MR. BOLAND: Object to the form.
16     A.   No.
17 BY MR. DONOVAN:
18     Q.   All right.  Fair to say you have no
19 understanding of who made the decision to file this
20 lawsuit?
21     A.   That's unclear to me.
22     Q.   Sorry, is my question unclear to you?  Is that
23 what you mean?
24     A.   It's unclear, I don't know.
25     Q.   Okay.  Let me just ask my question again so

01 that we have a clear record.
02          Is it fair to say that you don't have any
03 understanding of who made the decision to file this
04 lawsuit against Leadenhall, Saiph, Paul Kosinski and
05 Noah Davis?
06     A.   No.
07     Q.   Sorry, is it not fair to say that I'm asking
08 -- let me ask it one more time.  Is it fair to say that
09 you don't have any understanding of who made the
10 decision to file this lawsuit against Leadenhall, Saiph,
11 Paul Kosinski and Noah Davis?
12     A.   I don't have a clear understanding.
13     Q.   Do you have any understanding of who made the
14 decision to file this lawsuit against Leadenhall, Saiph,
15 Paul Kosinski and Noah Davis?
16     A.   No.
17     Q.   Do you know whether this lawsuit was filed
18 against Leadenhall for the purpose of retaliating
19 against Leadenhall for filing the New York litigation?
20          MR. BOLAND: Object to the form.
21     A.   I'm invoking the fifth.
22 BY MR. DONOVAN:
23     Q.   Did you play any role in the decision to file
24 this lawsuit?
25     A.   How do you mean?

01     Q.   Let me ask it this way.  Prior to the lawsuit
02 being filed in Florida, were you in favor of initiating
03 a lawsuit against Leadenhall based on intrusions by Noah
04 Davis?
05     A.   I don't know that I understand the question.
06     Q.   All right.  What's your understanding of why
07 -- strike that.
08          What's your understanding of why Noah Davis
09 allegedly entered into SuttonPark Capital's office
10 buildings?
11     A.   I don't have an understanding why.
12     Q.   You testified before that your understanding
13 of this lawsuit is that Noah Davis conducted
14 unauthorized physical entries into SuttonPark Capital's
15 office's -- office buildings, right?
16     A.   Well, no, I said that I read an article that
17 mentions, but I don't have any details or understanding
18 of why or how or any other information regarding the
19 incident.
20     Q.   That's fair.  So, I'm just asking apart from
21 what you read about Noah Davis conducting unauthorized
22 physical entries into an office building, do you have
23 any understanding of whether Noah Davis conducted
24 unauthorized intrusions into 777 Partners computer
25 systems?



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01    A.   The only understanding is what I've read in
02  the news article, which may or may not be true.  I don't
03  have any information regarding the incident.
04    Q.   So, is your understanding of this lawsuit that
05  Noah Davis on one single occasion entered into 777
06  Partners or SuttonPark Capital's office buildings?
07         MR. BOLAND:  Object to the form.
08    A.   I don't have enough information to answer
09  that.  As I said, I've read the news article and that's
10  the extent of my knowledge.
11  BY MR. DONOVAN:
12    Q.   That's fair.  So, I understand what you were
13  saying.  I'm trying to ask my question correctly here.
14         Do you have any understanding of whether,
15  aside from any physical -- sorry, withdrawn.
16         Do you have any understanding of whether Noah
17  Davis conducted unauthorized intrusions into 777
18  Partners computer systems aside from any physical entry
19  into an office building?
20    A.   Do I have an understanding of that?
21    Q.   Sure.
22    A.   I don't believe that I do.  I -- as I said,
23  read an article and I can't recall the details of the
24  article, but as I said, I had heard that he had stolen
25  equipment, but I have no basis of that other than the

01  article.
02    Q.   Got it.  So, is it fair to say that you don't
03  know one way or the other whether outside of Noah Davis
04  allegedly stealing equipment, he also conducted
05  unauthorized intrusions into the 777 Partners computer
06  systems?
07    A.   I don't know.
08    Q.   Do you have any evidence or factual basis to
09  believe that Leadenhall directed Noah Davis to steal
10  computer equipment?
11         MR. BOLAND:  Object to form.
12    A.   I'm invoking the fifth.
13  BY MR. DONOVAN:
14    Q.   Do you have any evidence or factual basis to
15  believe that Leadenhall directed Noah Davis to conduct
16  an unauthorized entry into 777 Partners office
17  buildings?
18         MR. BOLAND:  Object to form.
19    A.   I'm sorry, could you repeat that?
20  BY MR. DONOVAN:
21    Q.   Sure.  Do you have any evidence or factual
22  basis to believe that Leadenhall directed Noah Davis to
23  break into 777 Partners or SuttonPark Capital's office
24  buildings?
25         MR. BOLAND:  Object to form.

01    A.   I have no information about the incident or,
02  I'm unsure how to answer that.  I don't have any
03  information regarding your question.
04  BY MR. DONOVAN:
05    Q.   Okay.  That's fair.  Do you have any evidence
06  or factual basis to believe that Leadenhall directed
07  Noah Davis to conduct unauthorized intrusions into 777
08  Partners computer systems?
09         MR. BOLAND:  Object to the form.
10    A.   I have no information regarding that question.
11  BY MR. DONOVAN:
12    Q.   Do you have any evidence or factual basis to
13  believe that Leadenhall benefited in any way from any
14  information taken by Noah Davis?
15         MR. BOLAND:  Object to form.
16    A.   I'm going to invoke the fifth.
17  BY MR. DONOVAN:
18    Q.   Do you have any evidence or factual basis to
19  believe that Leadenhall ever received any information
20  taken by Noah Davis via unauthorized intrusions?
21         MR. BOLAND:  Object to the form.
22    A.   I'll invoke the fifth.
23  BY MR. DONOVAN:
24    Q.   Would you agree with me that you have no
25  factual basis or evidence to believe that Leadenhall

01  directed Noah Davis to conduct unauthorized intrusions
02  in 777 Partners or SuttonPark Capital's computer
03  systems?
04         MR. BOLAND:  Object to form.
05    A.   I'm invoking the fifth.
06         MR. DONOVAN:  Do you mind if we take a 5-
07  minute break?
08         THE WITNESS:  Of course, yeah.
09         MR. DONOVAN:  All right, thanks.  We can go
10  off the record.
11         (Thereupon, a short discussion was held off
12  record.)
13         (Deposition resumed.)
14         THE COURT REPORTER:  We're back on the record.
15  The time is 10:06 A.M.
16  BY MR. DONOVAN:
17    Q.   Okay.  Mr. Adnani, you ready?
18    A.   Yes.
19    Q.   Okay.  I'm going to refer to the borrowers as
20  the following entities, SPLCSS III, Dorchester
21  receivables II LLC, Insurety Agency Services LLC and
22  Signal SML 4 LLC.
23         I'm going to refer to the guarantors as the
24  following entities, 777 Partners LLC and 600 Partners
25  LLC.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 30

01      I'm going to refer to the servicer as
02  SuttonPark Servicing LLC and I'm going to refer to the
03  sellers as SuttonPark Capital LLC, Signal Medical
04  Receivables, LLC and Insurety Capital LLC.
05      All of those entities together I'm going to
06  refer to as the 777 entity Defendant's, which is how
07  those entities are defined in the New York litigation
08  between Leadenhall on the one hand and the 777 entity
09  Defendant's among other Defendant's on the other hand
10  and I'm going to refer to Advantage Capital Holdings,
11  LLC as A-CAP.
12      All right.  Did the 777 entity Defendant's
13  pledge collateral to Leadenhall that was not free and
14  clear of other claims?
15          MR. BOLAND:  Object to form.
16      A.  I'm invoking the fifth.
17  BY MR. DONOVAN:
18      Q.  Did the 777 entity Defendant's pledge
19  collateral to Leadenhall that the 777 entity Defendant's
20  had already pledged to other lenders?
21          MR. BOLAND:  Object to form.
22      A.  I'm invoking the fifth.
23  BY MR. DONOVAN:
24      Q.  Did the 777 entity Defendant's pledge
25  collateral to Leadenhall that the 777 entity Defendant's

Page 31

01  had not yet purchased?
02          MR. BOLAND:  Object to the form.
03      A.  I'm invoking the fifth.
04  BY MR. DONOVAN:
05      Q.  Do you know what JG Wentworth is?
06      A.  Yes.
07      Q.  What is JG Wentworth
08      A.  A wholesale seller of structured settlements,
09  I believe, servicer.
10      Q.  What is a structured settlement?
11      A.  I am invoking the fifth.
12      Q.  In 2021, did SuttonPark Capital consider
13  purchasing a portfolio of structured settlements from JG
14  Wentworth?
15      A.  I'm invoking the fifth.
16      Q.  In 2021, did SuttonPark Capital consider
17  purchasing a portfolio of structured settlements from JG
18  Wentworth worth approximately $250 million?
19      A.  I'm invoking the fifth.
20      Q.  Before SuttonPark Capital ever purchased those
21  assets from JG Wentworth, did Josh wander direct you to
22  allocate those assets to Leadenhall in the MP Fin
23  system?
24          MR. BOLAND:  Object to the form.
25      A.  I'm invoking the fifth.

Page 32

01  BY MR. DONOVAN:
02      Q.  Before SuttonPark Capital ever purchased the
03  portfolio of assets from JG Wentworth in 2021, did Josh
04  Wander and Steven Pasko direct you to issue compliance
05  reports to Leadenhall false -- falsely stating that
06  assets were pledged to Leadenhall when they were not?
07          MR. BOLAND:  Object to the form.
08      A.  I'm invoking the fifth.
09  BY MR. DONOVAN:
10      Q.  Let me ask that question again.  Before
11  SuttonPark Capital ever purchased the portfolio of
12  assets from JG Wentworth in 2021, did Josh Wander and
13  Steven Pasko direct you to issue compliance reports to
14  Leadenhall, stating that assets had been pledged to
15  Leadenhall despite the fact that they had never been
16  purchased in the first place?
17          MR. BOLAND:  Object to the form.
18      A.  I'm invoking the fifth.
19  BY MR. DONOVAN:
20      Q.  Can you confirm that over the May 2021 to
21  November 2023 period, you knew that compliance reports
22  issued to Leadenhall contain false statements?
23          MR. BOLAND:  Object to form.
24      A.  I'm invoking the fifth.
25  BY MR. DONOVAN:

Page 33

01      Q.  Isn't it true that of the $250 million
02  portfolio that SuttonPark Capital considered purchasing
03  from JG Wentworth SuttonPark Capital only ultimately
04  purchased approximately $1 million of the portfolio?
05          MR. BOLAND:  Object to the form.
06      A.  I'm invoking the fifth.
07  BY MR. DONOVAN:
08      Q.  Do you know that members of the SuttonPark
09  accounting department have been deposed in this action?
10      A.  I'm invoking the fifth.
11      Q.  Do you have any understanding of who the
12  accounting department says they expressly raised
13  concerns to about assets being pledged to Leadenhall
14  that were never actually purchased?
15          MR. BOLAND:  Object to the form.
16      A.  I'm invoking the fifth.
17  BY MR. DONOVAN:
18      Q.  Would it surprise you to find out that the
19  accounting department at SuttonPark Capital has
20  testified under oath that they expressly raised concerns
21  to you that assets were pledged to Leadenhall, which
22  were never actually purchased?
23          MR. BOLAND:  Object to the form.
24      A.  I'm invoking the fifth.
25  BY MR. DONOVAN:



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 34

01    Q.    Do you remember taking any of those concerns
02  raised by the accounting department to Josh Wander?
03           MR. BOLAND:  Object to the form.
04    A.    I'm invoking the fifth.
05  BY MR. DONOVAN:
06    Q.    Did Josh Wander ever tell you or the
07  accounting department not to worry about the fact that
08  assets had been pledged to Leadenhall despite the fact
09  that they had never been purchased?
10           MR. BOLAND:  Object to the form.
11    A.    Invoking the fifth.
12  BY MR. DONOVAN:
13    Q.    Do you think Josh Wander is trustworthy?
14           MR. BOLAND:  Object to the form.
15    A.    Invoking the fifth.
16  BY MR. DONOVAN:
17    Q.    Do you think Josh Wander is a conman?
18           MR. BOLAND:  Object to the form.
19    A.    Invoking the fifth.
20  BY MR. DONOVAN:
21    Q.    Do you think Steven Pasko is a conman?
22           MR. BOLAND:  Object to the form.
23    A.    Invoking the fifth.
24  BY MR. DONOVAN:
25    Q.    Did Josh Wander or Steven Pasko ever instruct

Page 35

01  you to top up or top off receivables accounts to conceal
02  the fact that 777 Partners had never purchased assets
03  that were pledge to Leadenhall?
04           MR. BOLAND:  Object to the form.
05    A.    I'm invoking the fifth.
06  BY MR. DONOVAN:
07    Q.    Did the 777 entity Defendants pledge
08  fictitious assets to Leadenhall?
09           MR. BOLAND:  Object to the form.
10    A.    I'm invoking the fifth.
11  BY MR. DONOVAN:
12    Q.    Did the 777 entity Defendants double pledge
13  assets to Leadenhall?
14           MR. BOLAND:  Objection.
15    A.    Invoking the fifth.
16  BY MR. DONOVAN:
17    Q.    Were assets double pledged or fictitiously
18  pledged to Leadenhall solely because of the actions of
19  the borrowers or guarantors?
20           MR. BOLAND:  Object to the form.
21    A.    Invoking the fifth.
22  BY MR. DONOVAN:
23    Q.    Were the 7 -- strike that.  Were the 777
24  entity Defendants A-CAP, Kenneth King, Josh Wander, and
25  Steven Pasko part of a criminal enterprise?

Page 36

01           MR. BOLAND:  Object to the form.
02    A.    Invoking the fifth.
03  BY MR. DONOVAN:
04    Q.    Were the 777 entity Defendants A-CAP, Kenneth
05  King, Josh Wander, and Steven Pasko part of an
06  association in fact?
07    A.    Invoking the fifth.
08  BY MR. DONOVAN:
09    Q.    How would you describe a Ponzi scheme?
10    A.    Invoking the fifth.
11    Q.    Did the 777 entity Defendants A-CAP, Kenneth
12  King, Josh Wander and Steven Pasko operate a Ponzi
13  scheme?
14           MR. BOLAND:  Object to the form.
15    A.    Invoking fifth.
16  BY MR. DONOVAN:
17    Q.    Did A-CAP and Kenneth King make the 777 entity
18  Defendants appear to be a legitimate enterprise when it
19  was not by loaning billions of dollars to it and making
20  protective advances?
21           MR. BOLAND:  Object to the form.
22    A.    Invoking fifth.
23  BY MR. DONOVAN:
24    Q.    Was the common purpose of the association
25  between the 777 entity Defendants Kenneth King, Josh

Page 37

01  Wander and Steven Pasko to generate money for its
02  members by lying about the security backing lender's
03  debt.
04           MR. BOLAND:  Object to the form.
05    A.    Invoking the fifth.
06  BY MR. DONOVAN:
07    Q.    Did A-CAP and Mr. King, control decision
08  making of the enterprise with the 777 entity Defendants
09  Josh Wander and Steven Pasko?
10           MR. BOLAND:  Object to the form.
11    A.    Invoking the fifth.
12  BY MR. DONOVAN:
13    Q.    Was the structure of the criminal enterprise
14  between 777, the 777 entity Defendants, Kenneth King,
15  Josh Wander and Steven Pasko memorialized in a steering
16  committee, memorandum issued around April 2023?
17           MR. BOLAND:  Object to the form.
18    A.    Invoking the fifth.
19  BY MR. DONOVAN:
20    Q.    When did you stop working in the physical
21  office space of 777 Partners?
22    A.    Invoking the fifth.
23    Q.    What was the address of 777 Partners former
24  office building?
25    A.    600 Brickell Ave.



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  Q.  What floor of 600 Brickell Ave did you work
02  on?
03      A.  The 19th.
04      Q.  Did you sit in a shared office with Nick
05  Bennett?
06      A.  Invoking the fifth.
07      Q.  Did shared offices exist on sorry -- strike
08  that.  You said in 19th floor?
09      A.  Yes.
10      Q.  Did shared offices exist on the 19th floor of
11  600 Brickell Avenue?
12      A.  Invoking.
13      Q.  Were you part of 777 Partners Capital Markets
14  Group?
15      A.  Invoking the fifth.
16      Q.  Did the 777 Partners Capital Markets Group
17  work in the same office from the period May 2021 to
18  April 2023, approximately?
19      A.  Invoking the fifth.
20      Q.  Did you and Nick Bennett share an office at
21  777 Partners offices from approximately May 2021 to
22  April 2023?
23      A.  Invoking the fifth.
24      Q.  Around April 2023, did A-CAP employees Carson
25  McGuffin and Mike Saliab move into your and Nick

01  Bennett's offices at 777 Partners offices?
02          MR. BOLAND:  Object to the form.
03      A.  Invoking the fifth.
04  BY MR. DONOVAN:
05      Q.  Would you agree with me that Kenneth King and
06  A-CAP exercised total control over the 777 entity
07  Defendants?
08          MR. BOLAND:  Object to the form.
09      A.  Invoking the fifth.
10  BY MR. DONOVAN:
11      Q.  Would you agree with me that A-CAP and Kenneth
12  King determined whether the 777 entity Defendants could
13  make payroll and enter into contracts?
14          MR. BOLAND:  Object to the form.
15      A.  Invoking the fifth.
16  BY MR. DONOVAN:
17      Q.  Did Kenneth King and A-CAP sit at the top of
18  the hierarchy in the criminal enterprise with the 777
19  entity Defendants Josh Wander and Steven Pasko?
20          MR. BOLAND:  Object to the form.
21      A.  Invoking fifth.
22  BY MR. DONOVAN:
23      Q.  Did Kenneth King control two different
24  organizations that exist the defraud lenders Number one,
25  A-CAP and Number two the 777 entity Defendants?

01          MR. BOLAND:  Object to the form.
02          Invoking the fifth.
03  BY MR. DONOVAN:
04      Q.  Do you know whether the 777 entity Defendant's
05  A-CAP, Wander, Pasko and King approximately $600
06  million in debt provided by Leadenhall to purchase
07  professional football teams?
08          MR. BOLAND:  Object to the form.
09      A.  Invoking fifth.
10  BY MR. DONOVAN:
11      Q.  Did the 777 entity Defendants A-CAP, Wander,
12  Pasko and King use $100 million in debt provided by
13  Leadenhall to purchase or try to purchase football teams
14  and airlines?
15          MR. BOLAND:  Object to the form.
16      A.  Invoking fifth.
17  BY MR. DONOVAN:
18      Q.  Did you play any role in 777 Partners attempt
19  to purchase Everton?
20      A.  Invoking the fifth.
21      Q.  Did the 777 entity Defendants issue false
22  compliance reports to Leadenhall over the May 2021 to
23  November 2023 period.
24          MR. BOLAND:  Object to the form.
25      A.  Invoking the fifth.

01  BY MR. DONOVAN:
02      Q.  What's your understanding of a compliance
03  report?
04      A.  Invoking the fifth.
05      Q.  Do you understand that a compliance report
06  contains list of assets, purportedly pledged exclusively
07  to a lender?
08          MR. BOLAND:  Object to the form.
09      A.  Invoking the fifth.
10  BY MR. DONOVAN:
11      Q.  Did the 777 entity Defendants issue
12  approximately 60 false monthly compliance reports to
13  Leadenhall?
14          MR. BOLAND:  Objection.
15      A.  Invoking fifth.
16  BY MR. DONOVAN:
17      Q.  Were the compliance reports false because they
18  contained lists of assets extensively pledged
19  exclusively to Leadenhall, which were either double
20  pledged or which were never purchased in the first
21  place?
22          MR. BOLAND:  Object to the form.
23      A.  Invoking the fifth.
24  BY MR. DONOVAN:
25      Q.  Did the 777 entity Defendants A-CAP, Kenneth


UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01  King, Josh Wander and Steven Pasko participate in the
02  scheme to issue compliance reports to Leadenhall from
03  May 2021 to November 2023 falsely stating that assets
04  were pledged exclusively to Leadenhall and they were
05  not?
06         MR. BOLAND:  Object to the form.
07      A.   Invoking fifth.
08  BY MR. DONOVAN:
09      Q.   Did that criminal enterprise work together to
10  issue false compliance reports to Leadenhall over the
11  May 2021 to November 2023?
12         MR. BOLAND:  Object to the form.
13      A.   Invoking the fifth.
14  BY MR. DONOVAN:
15      Q.   Do you remember, preparing restated compliance
16  reports for Leadenhall around the January 2024 period?
17      A.   Invoking the fifth.
18      Q.   And did those restated compliance reports
19  issued in January 2024 show that going back to March
20  2023, the 777 entity Defendants had double pledged or
21  fictitiously pledged approximately $350 million in
22  collateral to Leadenhall?
23         MR. BOLAND:  Object to the form.
24      A.   Invoking the fifth.
25  BY MR. DONOVAN:

01      Q.   When I use the term knowingly, I mean
02  intentionally and deliberately and not by mistake.  Did
03  the 777 entity Defendants knowingly issue false
04  compliance reports to Leadenhall from May 2021 to
05  November 2023?
06         MR. BOLAND:  Object to the form.
07      A.   Invoking fifth.
08  BY MR. DONOVAN:
09      Q.   Did Josh Wander knowingly issue false
10  compliance reports to Leadenhall from May 2021 to
11  November 2023?
12         MR. BOLAND:  Object to the form.
13      A.   Invoking the fifth.
14  BY MR. DONOVAN:
15      Q.   Did Steven Pasko knowingly issue false
16  compliance reports to Leadenhall from May 2021 to
17  November 2023?
18         MR. BOLAND:  Object to the form.
19      A.   Invoking fifth.
20  BY MR. DONOVAN:
21      Q.   Did A-CAP knowingly issue false compliance
22  reports to Leadenhall from May 2021, November 2023?
23         MR. BOLAND:  Object to the form.
24      A.   Invoking fifth.
25  BY MR. DONOVAN:

01      Q.   Did Kenneth King knowingly issue false
02  compliance reports to Leadenhall from May 2021 to
03  November 2023?
04         MR. BOLAND:  Object to the form.
05      A.   Invoking the fifth.
06  BY MR. DONOVAN:
07      Q.   Did the enterprise between the 777 entity
08  Defendants in A-CAP issue forged or photo-shopped bank
09  statements to Leadenhall to show that money was in bank
10  accounts when it was not in those accounts?
11         MR. BOLAND:  Object to the form.
12      A.   Invoking the fifth.
13  BY MR. DONOVAN:
14      Q.   Did the 777 entity Defendants alter
15  receivables in the 777 Partners computer system called
16  MP FIN to make it appear as though assets had been
17  pledged exclusively to Leadenhall when they had not?
18         MR. BOLAND:  Object to the form.
19      A.   Invoking the fifth.
20  BY MR. DONOVAN:
21      Q.   Do you know whether A-CAP and the 777 entity
22  Defendants engaged in sham or restructuring negotiations
23  with Leadenhall in 2024 to avoid bringing defraud to
24  light?
25         MR. BOLAND:  Object to the form.

01      A.   Invoking the fifth.
02  BY MR. DONOVAN:
03      Q.   Do you know whether the 777 entity Defendants
04  recorded in servicing notes in 777 Partners computer
05  system that assets had been double pledged to
06  Leadenhall?
07         MR. BOLAND:  Object to the form.
08      A.   Invoking the fifth.
09  BY MR. DONOVAN:
10      Q.   Did the 777 entity Defendants knowingly double
11  pledge assets to Leadenhall?
12         MR. BOLAND:  Object to the form.
13      A.   Invoking the fifth.
14  BY MR. DONOVAN:
15      Q.   Did the 777 entity Defendants knowingly pledge
16  assets to Leadenhall that had never been purchased in
17  the first place?
18         MR. BOLAND:  Object to the form.
19      A.   Invoking the fifth.
20  BY MR. DONOVAN:
21      Q.   Did A-CAP and Kenneth King knowingly double
22  pledge assets to Leadenhall?
23         MR. BOLAND:  Object to the form.
24      A.   Invoking fifth.
25  BY MR. DONOVAN:



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 46

01    Q.    Did A-CAP and Kenneth King knowingly pledge
02    assets to Leadenhall that had never been purchased in
03    the first place?
04            MR. BOLAND:  Object to the form.
05        A.    Invoking the fifth.
06    BY MR. DONOVAN:
07        Q.    Did the 777 entity Defendants operating at the
08    direction of Kenneth King, Josh Wander, Steven Pasko and
09    A-CAP create fake records in 777 Partners computer
10    system -- systems to give the appearance that assets had
11    been pledged to Leadenhall?
12            MR. BOLAND:  Object to the form.
13        A.    Invoking the fifth.
14    BY MR. DONOVAN:
15        Q.    Did the 777 entity Defendants A-CAP, Kenneth
16    King, Josh Wander, and Steven Pasko attempt to stop
17    Leadenhall from conducting an audit of its collateral
18    because it knew that an audit would show that assets had
19    been double pledged or fictitiously pledged?
20            MR. BOLAND:  Object to the form.
21        A.    Invoking the fifth.
22    BY MR. DONOVAN:
23        Q.    Around March 2023, did A-CAP employees move
24    into your and Nick Bennett's offices?
25        A.    Invoking the fifth.

Page 47

01    Q.    Around March 2023, did you and Nick Bennett
02    begin reporting directly to A-CAP employees Mike Saliab
03    and Carson McGuffin?
04        A.    Invoking fifth.
05    Q.    Did A-CAP employees Carson McGuffin and Mike
06    Saliab direct you to continue to issue false compliance
07    reports to Leadenhall from the March 2023 to November
08    2023 period?
09            MR. BOLAND:  Object to the form.
10        A.    Invoking the fifth.
11    BY MR. DONOVAN:
12    Q.    Prior to moving into 777 Partners offices in
13    March 2023, did A-CAP know that the 777 entity
14    Defendants were issuing false compliance reports to
15    Leadenhall?
16            MR. BOLAND:  Object to the form.
17        A.    Invoking the fifth.
18    BY MR. DONOVAN:
19    Q.    Who at 777 Partners would know the most about
20    compliance reports issued to Leadenhall?
21        A.    Invoking the fifth.
22    Q.    Would it surprise you to find out that other
23    employees have testified that you and Nick Bennett would
24    know the most about compliance reports issued to
25    Leadenhall?

Page 48

01            MR. BOLAND:  Object to the form.
02        A.    Invoking fifth.
03    BY MR. DONOVAN:
04    Q.    Do you remember Josh Wander and Steven Pasko
05    resigning as managers of 777 Partners and 600 Partners
06    in May 2024?
07        A.    Invoking.
08    Q.    Sorry, invoking the fifth, right?
09        A.    Invoking.
10    Q.    Yeah.
11        A.    Sorry.
12    Q.    Do you want a drink of water or no?
13        A.    I got.
14    Q.    Okay.
15        A.    Thank you.
16    Q.    Do -- withdrawn.  Did 777 Partners and 600
17    Partners operate as one single entity over the May 2021
18    to May 2024 period?
19            MR. BOLAND:  Object to the form.
20        A.    Invoking fifth.
21    BY MR. DONOVAN:
22    Q.    Is it fair to say there's no distinction
23    whatsoever between 777 Partners and 600 Partners prior
24    to May 2024?
25            MR. BOLAND:  Object to the form.

Page 49

01        A.    Invoking fifth.
02    BY MR. DONOVAN:
03    Q.    Prior to May 2024, did Josh Wander and Steven
04    Pasko exercise complete dominion in control over 777
05    Partners and 600 Partners?
06            MR. BOLAND:  Object to the form.
07        A.    Invoking the fifth.
08    BY MR. DONOVAN:
09    Q.    Prior to May 2024, were 777 Partners and 600
10    Partners mere instrumentalities of Josh Wander, Steven
11    Pasko and Kenneth King?
12            MR. BOLAND:  Object to the form.
13        A.    Invoking the fifth.
14    BY MR. DONOVAN:
15    Q.    Did Josh Wander, Steven Pasko and Kenneth King
16    use 777 Partners and 600 Partners as instrumentalities
17    to defraud Leadenhall?
18            MR. BOLAND:  Object to the form.
19        A.    Invoking the fifth.
20    BY MR. DONOVAN:
21    Q.    Did the fraud perpetrated by Wander and Pasko
22    through 777 Partners and 600 Partners result in a loss
23    to Leadenhall?
24            MR. BOLAND:  Object to the form.
25        A.    Invoking fifth.



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 50

01  BY MR. DONOVAN:
02      Q.  What's your understanding of the word
03  insolvent?
04      A.  Going to invoke the fifth.
05      Q.  So, when I use the term insolvents, what I
06  mean is that the 777 entity Defendants could not meet
07  their debts and financial obligations as they became
08  due.
09          So, did there come a time when the 777 entity
10  Defendants became insolvent?
11          MR. BOLAND:  Object to the form.
12      A.  I'm invoking fifth.
13  BY MR. DONOVAN:
14      Q.  Is it fair to say that but for loans and
15  protective advances provided by A-CAP, the 777 entity
16  Defendants were insolvent over the May 2021 to May 2024
17  period?
18          MR. BOLAND:  Object to the form.
19      A.  Invoking the fifth.
20  BY MR. DONOVAN:
21      Q.  Did Josh Wander and Steven Pasko use the
22  corporate funds of 777 Partners and 600 Partners for
23  personal use?
24          MR. BOLAND:  Object to the form.
25      A.  Invoking fifth.

Page 51

01  BY MR. DONOVAN:
02      Q.  Did Josh Wander and Steven Pasko use a
03  corporate jet of 777 Partners and 600 Partners for
04  personal use?
05          MR. BOLAND:  Object to the form.
06      A.  Invoking fifth.
07  BY MR. DONOVAN:
08      Q.  Can you confirm that there was an overlap in
09  ownership officers, directors and personnel between 777
10  Partners and 600 Partners?
11          MR. BOLAND:  Object to the form.
12      A.  Invoking fifth.
13  BY MR. DONOVAN:
14      Q.  Can you confirm that 777 Partners and 600
15  Partners, had common office space addresses e-mail
16  addresses and telephone numbers?
17          MR. BOLAND:  Object to the form.
18      A.  Invoking fifth.
19  BY MR. DONOVAN:
20      Q.  Can you confirm that 777 Partners, 600
21  Partners and other entities within the 777 system did
22  not transact with each other at arm's length?
23          MR. BOLAND:  Object to the form.
24      A.  Invoking fifth.
25  BY MR. DONOVAN:

Page 52

01      Q.  Did 777 Partners, 600 Partners, Josh Wander
02  and Steven Pasko, co-mingle corporate and professional
03  -- sorry, withdrawn.  Let me start again.
04          Did 777 Partners, 600 Partners, Josh Wander
05  and Steven Pasko, co-mingle corporate and personal
06  funds?
07          MR. BOLAND:  Object to the form.
08      A.  Invoking fifth.
09  BY MR. DONOVAN:
10      Q.  Were 777 Partners and 600 Partners operating
11  as one single profit center?
12          MR. BOLAND:  Object to the form.
13      A.  Invoking fifth.
14  BY MR. DONOVAN:
15      Q.  Did 777 Partners and 600 Partners hold regular
16  board meetings?
17          MR. BOLAND:  Objection.
18      A.  Invoking fifth.
19  BY MR. DONOVAN:
20      Q.  Isn't it true that 777 Partners and 600
21  Partners stopped holding regular board meetings around
22  the latter half of 2022?
23          MR. BOLAND:  Object to the form.
24      A.  Invoking the fifth.
25  BY MR. DONOVAN:

Page 53

01      Q.  Did 777 Partners and 600 Partners cease
02  holding regular board meetings because A-CAP had
03  exercised further control over the enterprise around the
04  period late 2022 to early 2023?
05          MR. BOLAND:  Object to the form.
06      A.  Invoking fifth.
07  BY MR. DONOVAN:
08      Q.  Did 777 Partners and 600 Partners exercise any
09  corporate formalities?
10          MR. BOLAND:  Object to the form.
11      A.  How do you mean?  Can you repeat that?
12  BY MR. DONOVAN:
13      Q.  Sure.  Did 777 Partners and 600 Partners
14  exercise any corporate formalities?
15          MR. BOLAND:  Object to the form.
16      A.  Invoking fifth.
17  BY MR. DONOVAN:
18      Q.  Do you understand, what I mean by corporate
19  formalities?
20      A.  I believe I have an idea.
21      Q.  What's your idea?
22      A.  Well, I think it would be beneficial for you
23  to elaborate.
24      Q.  Sure.  So, when I use the term corporate
25  formalities, I mean things like regular board meetings,



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01 minutes taken at board meetings, specifically delineated
02 roles between officers and managers formal annualized or
03 regular reporting things like that.
04 Fair?
05     A.    Understood.
06     Q.    Okay.  Did 777 Partners and 600 Partners
07 exercise corporate formalities?
08         MR. BOLAND:  Object to the form.
09     A.    I'm going to exercise the fifth.
10 BY MR. DONOVAN:
11     Q.    Did the 777 entity Defendants routinely
12 guarantee the debt or debt obligations of other
13 affiliates within the 777 corporate system?
14         MR. BOLAND:  Object to the form.
15     A.    I'm going to invoke the fifth.
16 BY MR. DONOVAN:
17     Q.    Did Josh Wander and Steven Pasko routinely
18 guarantee on a personal basis of other entities
19 within the 777 Partners corporate system?
20         MR. BOLAND:  Object to the form.
21     A.    Invoking fifth.
22 BY MR. DONOVAN:
23     Q.    Is 600 Partners a shell corporate entity which
24 exists solely to funnel money up to Steven Pasko?
25         MR. BOLAND:  Object to the form.

01     A.    Invoking fifth.
02 BY MR. DONOVAN:
03     Q.    Do you know whether the 777 entity Defendants
04 maintain any corporate records?
05         MR. BOLAND:  Object to the form.
06     A.    Invoking fifth.
07 BY MR. DONOVAN:
08     Q.    Does triple -- sorry, withdrawn.  Did 777
09 Partners have a shared drive or a network folder where
10 documents were saved?
11     A.    I believe so.
12     Q.    You remember what was -- sorry.  Do you
13 remember what it was called?
14     A.    For what specifically, I believe, there were
15 several.
16     Q.    Sure.  So, you testified that 777 Partners has
17 a shared folder or a network drive where team members
18 can share and access documents, right?
19     A.    Yes.
20     Q.    Does that shared folder or network drive go by
21 a name by 777 Partners employees?
22         MR. BOLAND:  Object to the form.
23     A.    I am going to invoke the fifth.
24 BY MR. DONOVAN:
25     Q.    Well, I'm just asking if you have to save a

01 document to a shared drive and you tell one of your
02 colleagues "Hey, I'm going to save this document to the
03 shared drive," what do you call that shared drive or
04 network folder?
05         MR. BOLAND:  Object to the form.
06     A.    It would depend on the company.
07 BY MR. DONOVAN:
08     Q.    When you refer to the company, are you
09 referring to companies within the 777 system or lenders?
10         MR. BOLAND:  Object to the form.
11     A.    Within the 777 system.
12 BY MR. DONOVAN:
13     Q.    Fair.  So, for 777 Partners specifically, is
14 there a shared drive where employees can save and access
15 documents collectively?
16     A.    Yes.  Yes.
17     Q.    What do employees call that, shared drive or
18 network folder?
19         MR. BOLAND:  Object to the form.
20     A.    Again, there were several, so you would have
21 to be more specific.
22 BY MR. DONOVAN:
23     Q.    Can you name for me, the several that you
24 remember?
25     A.    I believe SharePoint or Dropbox were among the

01 few that I recall.
02     Q.    Do they have specific names or do you just
03 call them SharePoint or Dropbox?
04     A.    In regard to what?
05     Q.    So, I'll give you an example.  I work at a law
06 firm and when we have to save documents, we say things
07 like, can you save it to the Z Drive or can you save it
08 to the 777 Partners system within the Z Drive or
09 something like that.
10         Do employees refer to specific folders where
11 they saved documents in that manner or no?
12         MR. BOLAND:  Object to the form.
13     A.    For me personally or other?
14 BY MR. DONOVAN:
15     Q.    Oh yeah, sure.  Let's start with you
16 personally.  Like if you were going to save a document
17 so that others could access the document within a shared
18 folder or network drive.
19         How would you describe the name of the
20 SharePoint or the Dropbox or the share folder in which
21 you are saving the document?
22     A.    You would say the name of -- well, I would
23 assume you would say the name of which you saved it to.
24     Q.    I see.  So, would you say like, I'm going to
25 save this to the 777 Partner SharePoint?


UNIVERSAL COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 58

01    A.    I am not sure specifically; I would assume
02  several different ways of articulating the location of
03  any sort of file depending on the company.
04    Q.    Sure.  So, I'm just asking for 777 Partners
05  specifically.  What are the folder or network drive
06  names for employee saved documents?
07    A.    Again, there's quite a few portfolio
08  companies, so it's difficult to answer that question
09  specifically.
10    Q.    I see.  So, is it fair to say that folders on
11  the SharePoint or Dropbox are organized by Portfolio
12  Company?
13        MR. BOLAND:  Object to the form.
14    A.    I'm not sure, how to answer that.
15  BY MR. DONOVAN:
16    Q.    Well, so triple -- were you going to -- sorry,
17  I didn't mean to cut you off there.
18    A.    No, no go ahead.
19    Q.    777 Partners LLC is not a portfolio company,
20  right?
21    A.    No.
22    Q.    Would you describe it, as a holding company?
23        MR. BOLAND:  Object to the form.
24    A.    I would.
25  BY MR. DONOVAN:

Page 59

01    Q.    So, I'm asking for documents concerning the
02  777 Partners holding company.
03        What is the name of the shared folder or
04  network drive in which you saved documents apart from
05  the portfolio companies?
06        MR. BOLAND:  Object to the form.
07    A.    Again, it's difficult to answer that I'm not
08  sure, there were several and it would depend on the
09  instance.
10  BY MR. DONOVAN:
11    Q.    Well, so if I were looking for documents on
12  the shared drive which concerned Leadenhall, where would
13  I look?
14    A.    I'm going to invoke the fifth.
15    Q.    Is there a folder on the 777 Partners shared
16  network or shared folder named or otherwise referring to
17  Leadenhall?
18        MR. BOLAND:  Object to the form.
19    A.    I'm going to invoke the fifth.
20  BY MR. DONOVAN:
21    Q.    Do you know how often the MP FIN system --
22  sorry, strike that.
23        Have you ever received a document preservation
24  notice concerning the Leadenhall lawsuits?
25        MR. BOLAND:  Object to the form.

Page 60

01    A.    I'm going to invoke the fifth.
02  BY MR. DONOVAN:
03    Q.    Has anyone ever instructed you to delete
04  documents?
05    A.    I'm going to invoke the fifth.
06    Q.    Let me try it again.  Has anyone during your
07  employment at 777 Partners instructed you to delete
08  documents?
09        MR. BOLAND:  Object to the form.
10    A.    I'm going to invoke the fifth.
11  BY MR. DONOVAN:
12    Q.    Has anyone at 777 Partners instructed you to
13  delete documents concerning Leadenhall?
14        MR. BOLAND:  Object to the form.
15    A.    I'm going to invoke the fifth.
16  BY MR. DONOVAN:
17    Q.    Has anyone at 777 Partners instructed you to
18  not leave a paper trail for communications involving
19  Leadenhall?
20        MR. BOLAND:  Object to the form.
21    A.    I'm going to invoke the fifth.
22  BY MR. DONOVAN:
23    Q.    Do you know, whether Josh Wander communicated
24  with you and Nick Bennett over FaceTime because he was
25  concerned about leaving a paper trail of fraud?

Page 61

01        MR. BOLAND:  Object to the form.
02    A.    I'm going to invoke the fifth.
03  BY MR. DONOVAN:
04    Q.    Around the period March 2023, did A-CAP
05  representatives, Kenneth King, Mike Saliab and Carson
06  McGuffin start listening in on your phone calls?
07        MR. BOLAND:  Object to the form.
08    A.    I'm going to invoke the fifth.
09  BY MR. DONOVAN:
10    Q.    Did Josh Wander and Steven Pasko use 777
11  Partners and 600 Partners as trade names to take in
12  money from lenders under false pretenses and shuffle it
13  around to various money losing entities?
14        MR. BOLAND:  Object to the form.
15    A.    Invoking fifth.
16  BY MR. DONOVAN:
17    Q.    Did A-CAP and King control the guarantors
18  every move in inducing Leadenhall to provide over $600
19  million in debt funding to the 777 entity Defendants?
20    A.    Invoking fifth.
21    Q.    Did A-CAP, the 777 entity Defendants Wander,
22  Pasko and King defraud Leadenhall out of approximately
23  $600 million and shuffle it around to various money
24  losing shell entities?
25        MR. BOLAND:  Object to the form.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 62

01      A.   Invoking fifth.
02  BY MR. DONOVAN:
03      Q.   Did A-CAP, the 777 entity Defendants Wander,
04  Pasko and King use money drawn from Leadenhall to make
05  risky bets on professional football teams, airlines and
06  luxury condos?
07          MR. BOLAND:  Object to the form.
08      A.   Invoking fifth.
09          MR. DONOVAN:  Can we take a 5-minute break?
10          THE WITNESS:  Sure.
11          THE COURT REPORTER:  We're going off record.
12  The time is 10:58 A.M.
13          (Thereupon, a short discussion was held off
14  record.)
15          (Deposition resumed.)
16          THE COURT REPORTER:  We are back on the
17  record.  The time is 11:15 A.M.
18  BY MR. DONOVAN:
19      Q.   All right.  Mr. Adnani, you ready?
20      A.   Yes.
21      Q.   Okay.  Did the Plaintiffs in this Florida
22  action, file the action solely to retaliate against
23  Leadenhall for bringing the New York Action?
24          MR. BOLAND:  Object to form.
25      A.   Invoking fifth.

Page 63

01  BY MR. DONOVAN:
02      Q.   Did the Plaintiffs in this Florida action file
03  the action solely to get even with Leadenhall because
04  Leadenhall filed a New York action?
05          MR. BOLAND:  Object to the form.
06      A.   Invoking fifth.
07          THE COURT REPORTER:  Mr. Boland, can you speak
08  a little bit louder?  I apologize.  It's very
09  feeble.
10          MR. BOLAND:  Yeah, it was object to the form.
11  I try not to interrupt the question if I can.
12          THE COURT REPORTER:  Thank you.
13          THE WITNESS:  You can hear me?
14          THE COURT REPORTER:  Yes, I can hear you.
15          THE WITNESS:  Okay.
16  BY MR. DONOVAN:
17      Q.   Did Plaintiffs file the Florida action in bad
18  faith for the sole purpose of trying to injure
19  Leadenhall?
20          MR. BOLAND:  Object to the form.
21      A.   Invoking fifth.
22  BY MR. DONOVAN:
23      Q.   Do you know that 777 Partners is currently the
24  subject of an investigation by the Department of
25  Justice?

Page 64

01      A.   Invoking the fifth.
02      Q.   Have you testified before a grand Jury?
03      A.   Invoking the fifth.
04      Q.   Have you provided information to the
05  Department of Justice concerning 777 Partners?
06      A.   Invoking the fifth.
07      Q.   Do you know, whether Noah Davis has been asked
08  to testify before a grand Jury?
09          MR. BOLAND:  Object to the form.
10      A.   Invoking fifth.
11  BY MR. DONOVAN:
12      Q.   Do you know that right before Noah Davis
13  conducted his first intrusion into 777 Partners computer
14  systems, he had received a grand Jury subpoena asking
15  for information to that?
16          MR. BOLAND:  Object to the form.
17      A.   Invoking the fifth.
18  BY MR. DONOVAN:
19      Q.   Do you have any evidence or factual basis
20  whatsoever to believe that Leadenhall played any role in
21  Noah Davis conducting unauthorized intrusions in the 777
22  Partners computer systems or office buildings?
23          MR. BOLAND:  Object to the form.
24      A.   Invoking fifth.
25          MR. DONOVAN:  All right.  I'm going to pass

Page 65

01  the witness, Mr. Morlan.  Thank you.
02          THE WITNESS:  Thank you.
03              DIRECT EXAMINATION
04  BY MR. MORLAN III:
05      Q.   Good morning, Mr. Adnani.  My name is Harold
06  Morlan.  I represent Paul Kosinski and Saiph Consulting
07  LLC in this action.
08          Have you ever heard of Saiph Consulting LLC
09  before?
10      A.   I have heard of them.
11      Q.   And have you ever heard of Paul Kosinski
12  before?
13      A.   Yes.
14      Q.   And how did you first become familiar with
15  Saiph Consulting LLC?
16      A.   I don't recall specifically.
17      Q.   What do you know about Saiph Consulting LLC?
18          MR. BOLAND:  Object to the form.
19      A.   They provide a consulting service for
20  different financial needs I believe, but I'm not 100%
21  certain exactly the extent of their business.
22  BY MR. MORLAN III:
23      Q.   And when I say the collateral audit that's at
24  issue in this litigation, do you know what I'm referring
25  to?



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 66

01    A.    I'm invoking fifth.
02    Q.    Is it your understanding that Leadenhall
03  retained a Saiph Consulting LLC, to perform an audit of
04  the collateral that was pledged or to be pledged to
05  Leadenhall in the connection -- in connection with
06  certain credit facilities?
07    A.    I'm going to invoke the fifth.
08    Q.    How long have you worked for 777 Partners?
09    A.    Roughly seven years, I believe.
10    MR. BOLAND:  Object to the form.
11  BY MR. MORLAN III:
12    Q.    And what was your title when you started
13  working there?
14    A.    I'm going to invoke the fifth.
15    Q.    And can you walk me through the history of
16  your, the various positions you've held at 777 Partners,
17  since you began working there approximately seven years
18  ago?
19    A.    I am going to invoke the fifth.
20    Q.    Did you know Paul Kosinski when he worked for
21  SuttonPark Capital?
22    A.    Yes.
23    Q.    Did you have occasion to work with,
24  Mr. Kosinski back then?
25    A.    Yes.

Page 67

01    Q.    And did you work with Mr. Kosinski enough such
02  that you would have insight into his character?
03    MR. BOLAND:  Objection.
04    A.    In what regard?
05  BY MR. MORLAN, III:
06    Q.    What -- Were you familiar with the --
07  Mr. Kosinski's job role prior to him leaving SuttonPark
08  Capital in late 2020?
09    A.    Yes.
10    Q.    Okay.  In what capacities, did you have -- if
11  any, did you have professional interaction with
12  Mr. Kosinski prior to his leaving SuttonPark Capital?
13    MR. BOLAND:  Object to form.
14    A.    He was the CEO.
15  BY MR. MORLAN, III:
16    Q.    As you sit here today, are you sure whether he
17  was the CEO or the CFO?
18    A.    I believe he was the CEO.
19    Q.    And did you work on any specific projects with
20  Mr. Kosinski prior to his departure?
21    A.    Going to invoke the fifth.
22    Q.    Did you report to Mr. Kosinski at any time
23  during your tenure at SuttonPark?
24    A.    Yes.
25    Q.    And did you and Mr. Kosinski ever have any

Page 68

01  disagreements that you can recall, prior to his
02  departure from SuttonPark Capital?
03    A.    Going to invoke the fifth.
04    Q.    Have you ever heard anybody make any
05  disparaging remarks about Mr. Kosinski?
06    A.    Going to invoke the fifth.
07    Q.    Do you feel like you've spent enough time
08  working with Mr. Kosinski prior to his departure in late
09  2020 to have insights into his professional reputation?
10    MR. BOLAND:  Object to form.
11    A.    Going to invoke the fifth.
12  BY MR. MORLAN, III:
13    Q.    Do you feel like you worked with Mr. Kosinski
14  prior to his departure in 2020 enough to have insights
15  into his character as would pertain to his business
16  activities?
17    MR. BOLAND:  Object to form.
18    A.    I'm going to invoke the fifth.
19  BY MR. MORLAN, III:
20    Q.    Are you aware of any allegations of
21  impropriety against Paul Kosinski?
22    A.    I'm going to invoke the fifth.
23    Q.    Are you aware of the allegations against
24  Mr. Kosinski and Saiph Consulting in the lawsuit for
25  which your deposition is being taken today?

Page 69

01    A.    Could you repeat that?  I apologize.
02    Q.    Sure.  Are you aware of the allegations
03  against Mr. Kosinski and Saiph Consulting in this
04  lawsuit that we're here on today?
05    A.    Not entirely, but I'm --
06    Q.    What is your understanding of the main issues
07  in the lawsuit that you're being deposed about today?
08    MR. BOLAND:  Object to form.
09    A.    As I had stated earlier, I had seen an article
10  and it described a break-in to the SuttonPark office
11  related with Noah Davis.  But I don't have much other
12  understanding of the issues.
13  BY MR. MORLAN, III:
14    Q.    Are you aware of any evidence that in any way
15  links Paul Kosinski to the allegations against Mr. Davis
16  pertaining to the physical break-in of at SuttonPark's
17  office that you just referenced?
18    MR. BOLAND:  Object to form.
19    A.    I'm going to invoke the fifth.
20  BY MR. MORLAN, III:
21    Q.    Are you aware of any evidence that links Saiph
22  Consulting to the physical break-in at SuttonPark,
23  that's been alleged against Mr. Davis in this action?
24    MR. BOLAND:  Object to form.
25    A.    Can you repeat that?  I'm sorry.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

01 BY MR. MORLAN, III:

02    Q.   Sure.  Are you aware of any evidence that
03 links SuttonPark, I'm sorry that links at -- Let me
04 strike that.

05         Are you aware of any evidence linking Saiph
06 Consulting, LLC to the break-in alleged against Noah
07 Davis in this lawsuit?

08         MR. BOLAND:  Object to form.

09    A.   I'm going to invoke the fifth.

10 BY MR. MORLAN, III:

11    Q.   Okay.  And to be clear, when I say the break-
12 in alleged, I mean, the allegations that Mr. Davis
13 unlawfully entered SuttonPark's premises on or about,
14 September 5, 2024, just to make that clear, do you
15 understand that?  When I say break-in, that's what I'm
16 referring to?

17    A.   What was the question there?

18    Q.   I just want to make sure that we're on the
19 same page.  You mentioned allegations of a break-in
20 earlier.  I want to make sure that we're talking about
21 the same thing.

22         So, when you were referring to allegations of
23 a break-in, are you referring to allegations in the
24 complaint in this action that Noah Davis entered
25 SuttonPark's offices without authorization on September

01 5th, 2024, or near that time?

02         MR. BOLAND:  Object to form.

03    A.   I was strictly speaking to the news article,
04 which again, I can't recall the details or which outlet
05 it was from, but that was all I was referring to.  I
06 don't have any other information.

07 BY MR. MORLAN, III:

08    Q.   Okay.  Are you familiar at all with the
09 allegations of a computer or cyber intrusion that
10 Mr. Davis is alleged to have made with respect to
11 SuttonPark Capital and 777 Partners' computer systems?

12    A.   I don't have any information regarding the
13 issue.

14    Q.   Are you aware of any evidence linking
15 Mr. Kosinski and any alleged cyber intrusions -- alleged
16 to have been committed by Mr. Davis?

17    A.   I don't have any information regarding that.

18    Q.   Are you aware of any evidence linking Saiph
19 Consulting, LLC to any of the cyber intrusions alleged
20 against Mr. Davis in this action?

21         MR. BOLAND:  Object to form.

22    A.   Again, I'm unfamiliar with the issue at hand,
23 so I don't have any information to provide.

24 BY MR. MORLAN, III:

25    Q.   Okay.  So, you don't have any information

01 about any of the cyber intrusions alleged against
02 Mr. Davis in this action?

03    A.   No.  Again, I heard about the issue or the
04 break-in through a news article.  So, that was the
05 extent of any knowledge I would have on the matter.

06    Q.   Okay.  And when you say the break-in the news
07 article, is that just -- did that article just refer to
08 the -- to a physical break-in or also to a computer or
09 cyber intrusion?

10    A.   I can't recall exactly what the extent the
11 article particularly, but it could have.  I honestly
12 don't recall.

13    Q.   Okay.  But you don't have any knowledge
14 regarding any cyber intrusions that may have occurred at
15 777 Partners or SuttonPark during May, June, July,
16 August, or September of last year?

17    A.   I have no knowledge really of the case itself
18 other than, as I said, from a news article.  So, it's
19 hard to give you more information on that.

20    Q.   Okay.  Are you familiar with the MP FIN
21 system?

22    A.   I'm going to invoke the fifth.

23    Q.   Is the MP FIN system something that you used
24 in your day-to-day responsibilities in your role at 777
25 Partners?

01    A.   I'm going to invoke the fifth.

02    Q.   Do you know what's the term top off means in
03 the context of an e-mail asking whether or not certain
04 accounts should be topped off in advance of reports to
05 Leadenhall.  Does that term ring any bell?

06         MR. BOLAND:  Object to form.

07    A.   I'm going to invoke the fifth.

08 BY MR. MORLAN, III:

09    Q.   Do you know what the term top off means in
10 general?

11    A.   Going to invoke the fifth.

12    Q.   Do you know what a protective advance is?

13    A.   Going to invoke the fifth.

14    Q.   During the course of your time at 777
15 Partners, have you ever heard anyone else say anything
16 negative about Paul Kosinski?

17    A.   I'm going to invoke the fifth.

18    Q.   During your time at 777 Partners, have you
19 ever said anything negative about Mr. Kosinski?

20    A.   Going to invoke the fifth.

21    Q.   What, if any, information do you have
22 regarding Mr. Kosinski's departure from his former role
23 at SuttonPark Capital?

24    A.   I can't recall specifically.

25    Q.   What is your current title for -- at 777


UNIVERSAL COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 74

01 Partners?
02     A.    Going to invoke the fifth.
03     Q.    Are you presently employed by 777 Partners?
04     A.    Yes.
05     Q.    Does 777 Partners have a policy or program
06 under which they provide Counsel to their employees or
07 former employees related to incidents arising out of
08 their job duties?
09           MR. BOLAND:  Object to form.
10     A.    I'm invoking the fifth.
11 BY MR. MORLAN, III:
12     Q.    Has 777 Partners paid for your Counsel to
13 represent you in this deposition?
14     A.    I'm invoking the fifth.
15     Q.    Has 777 Partners paid for Counsel to represent
16 you, in connection with any other matter?
17     A.    I'm invoking the fifth.
18     Q.    Are you aware of whether or not there is a
19 justice department investigation pending as to certain
20 activities and allegations against 777 Partners in
21 SuttonPark Capital?
22     A.    Invoking the fifth.
23     Q.    Do you know whether you're a target of any
24 federal investigation that relates in any way to your
25 role at 777 Partners?

Page 75

01     A.    I'm invoking the fifth.
02     Q.    Do you know who Karen Gorde is?
03     A.    Yes.
04     Q.    Who is Karen Gorde?
05     A.    Employee of, I believe, SuttonPark.
06     Q.    And what was Karen Gorde's role at SuttonPark?
07     A.    She was an accountant.
08     Q.    Do you have any information or evidence that
09 would indicate that Ms. Gorde is not trustworthy?
10           MR. BOLAND:  Object to form.
11     A.    I'm going to invoke the fifth.
12 BY MR. MORLAN, III:
13     Q.    Were you asked to make any modifications to
14 the MP FIN system relating to the pledging of collateral
15 by anyone at 777?
16           MR. BOLAND:  Object to form.
17     A.    I'm invoking the fifth.
18 BY MR. MORLAN, III:
19     Q.    Were you ever asked by anyone at 777 or on
20 behalf of 777 to assist in any way with the collateral
21 audit that Saiph Consulting was performing on behalf of
22 Leadenhall?
23     A.    I'm invoking the fifth.
24     Q.    Do you know whether there's currently any
25 problems with the MP FIN system in terms of its

Page 76

01 usability or reliability like that currently?
02     A.    I'm invoking the fifth.
03     Q.    Do you use the MP FIN system on a day-to-day
04 basis as part of your roles and duties at 777?
05     A.    I'm invoking the fifth.
06     Q.    When was the last time you accessed the MP FIN
07 system?
08     A.    I'm invoking the fifth.
09     Q.    Have you ever been asked to modify any
10 information within the MP FIN system?
11     A.    I'm invoking the fifth.
12           THE VIDEOGRAPHER:  This is the Videographer.
13     Can I go off for a media change?
14           MR. MORLAN, III:  Sure.
15           THE VIDEOGRAPHER:  This ends Media 1, we're
16     going off record.  The time is 11:41 A.M.
17           (Thereupon, a short discussion was held off
18     record.)
19           (Deposition resumed.)
20           THE VIDEOGRAPHER:  Okay.  Standby.  This
21     begins Media 2.  We're back on the record.  The
22     time is 11:41 A.M.
23 BY MR. MORLAN, III:
24     Q.    Do you know what I mean when I say the MP FIN
25 system?

Page 77

01     A.    I'm invoking the fifth.
02     Q.    Do you know whether Noah Davis was ever
03 contacted as part of a grand jury investigation into 777
04 Partners?
05     A.    I have no knowledge.
06     Q.    And for purposes of this deposition, when I
07 say 777 Partners or SuttonPark, I'm using those terms
08 interchangeably because they're both Plaintiffs in the
09 lawsuit.  So, I just want to make sure that that that's
10 clear.
11           And, if I say one or the other, and it would
12 change your answer to the question if it was only, you
13 know, specifically as to one or the other, would you let
14 me know?
15     A.    Okay.
16     Q.    And insofar as I've -- the questions I've
17 previously asked you, would it matter -- would it change
18 your answers, if I was talking about only one or the
19 other?
20           MR. BOLAND:  Object to form.
21     A.    I'm not sure how to answer that.  What do you
22 mean, can you repeat that?
23 BY MR. MORLAN, III:
24     Q.    I just mean, do I need to go back and re-ask
25 the questions specifically and separately as to



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

01 SuttonPark Capital versus 777 Partners, in order to be
02 clear?
03         Like, is there a material difference, in other
04 words, between those two entities that would affect your
05 answers to the questions that I've asked?
06         MR. BOLAND:  Objection.
07    A.  I believe I answered the questions to the best
08 of my ability.
09 BY MR. MORLAN, III:
10    Q.  Okay.  And would your answers be different, if
11 there was a distinction made between 777 Partners and
12 SuttonPark Capital, LLC?
13         MR. BOLAND:  Object to form.
14    A.  I'm not sure how to answer that.  I don't
15 think I understand the question.
16 BY MR. MORLAN, III:
17    Q.  Well, the reason I'm asking is that, both 777
18 Partners and SuttonPark are Plaintiffs in this
19 particular lawsuit.  And I'm trying to streamline my
20 questions here given that you've already answered some
21 and that for purposes of this lawsuit, the -- both are
22 Plaintiffs, both are making the same allegations and I
23 just wanted to make sure that in treating both of them
24 essentially as alter egos, I'm not missing something or,
25 you know, creating any uncertainty in the way that I'm

01 asking you the questions.  Does that make sense?
02         MR. BOLAND:  Object to form.
03    A.  I believe so.  Again, I think I answered the
04 questions to the best of my ability so far.
05 BY MR. MORLAN, III:
06    Q.  Okay.  And when you say to the best of your
07 ability, what I'm saying is do I need to re-ask the
08 questions to specifically isolate 777 Partners and
09 SuttonPark Capital, because that would change your
10 answers, or would your answers be the same regardless of
11 whether I'm talking about only one or the other or both?
12         MR. BOLAND:  Object to form.
13    A.  You've asked me a lot of questions.  It would
14 probably depend on the question, and I -- honestly, I
15 think that I answered them correctly, so.
16 BY MR. MORLAN, III:
17    Q.  Okay.  Have you ever worked directly for
18 SuttonPark Capital, LLC?
19    A.  Yes.
20    Q.  Okay.  Have you ever worked directly for 777
21 Partners, LLC?
22    A.  Yes.
23    Q.  Have you worked for both of them at the same
24 time?
25    A.  How do you mean, having two jobs?

01    Q.  Correct.  Who did you understand your employer
02 to be when you first became involved, when you said you
03 started your position with 777 Partners seven years ago?
04    A.  777.
05    Q.  Okay.  And did you consider 777 to be your
06 employer since you started to the present or did it, at
07 some point, change to SuttonPark Capital?
08    A.  Are you saying, did it change from 777 to
09 SuttonPark Capital?
10    Q.  Correct.
11    A.  No.  I was hired as a part time job for
12 SuttonPark and transferred to 777 at some point.
13    Q.  Approximately when did you transfer to 777?
14    A.  I believe when I started the seven-year tenure
15 with 777 back in 2018.
16    Q.  When was the last time you spoke with Noah
17 Davis?
18    A.  I honestly can't recall in passing, in the
19 office at some point.
20    Q.  Was this current lawsuit brought for purposes,
21 at least in part of retaliating against Saiph Consulting
22 for his role in the collateral audit?
23         MR. BOLAND:  Object to form.
24    A.  I'm invoking the fifth.
25 BY MR. MORLAN, III:

01    Q.  And do you know whether this lawsuit was
02 brought for purposes of retaliating against Mr. Kosinski
03 for his role in the collateral audit?
04         MR. BOLAND:  Object to form.
05    A.  I'm invoking the fifth.
06 BY MR. MORLAN, III:
07    Q.  And do you know whether this lawsuit was
08 brought for the purposes of disincentivizing other
09 financial professionals from performing work on behalf
10 of other creditors to 777 Partners or SuttonPark
11 Capital?
12         MR. BOLAND:  Object to form.
13    A.  I'm invoking the fifth.
14 BY MR. MORLAN, III:
15    Q.  And are you aware that there are allegations
16 in the complaint that Noah Davis modified information in
17 the MP FIN system?
18         MR. BOLAND:  Object to form.
19    A.  I'm invoking the fifth.
20 BY MR. MORLAN, III:
21    Q.  And are the allegations in the complaint with
22 respect to modifications of the MP FIN system intended
23 to provide cover for other modifications of the MP FIN
24 system, that were made in order to conceal the double
25 pledging of collateral?



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 82

01          MR. BOLAND:  Object to form.
02      A.  I'm invoking the fifth.
03  BY MR. MORLAN, III:
04      Q.  Are you aware of any modifications to the MP
05  FIN system that were made in order to conceal
06  information from 777 or SuttonPark Capital's creditors?
07      A.  I'm invoking the fifth.
08      Q.  Are you aware that Leadenhall communicated
09  with 777 or its agents to request access to their
10  systems for purposes of performing a collateral audit?
11      A.  I'm invoking the fifth.
12      Q.  And are you aware that the first
13  communications with respect to Leadenhall asking 777 for
14  access to its systems in order to perform a collateral
15  audit occurred during or about July of 2023?
16          MR. BOLAND:  Object to form.
17      A.  I'm invoking the fifth.
18  BY MR. MORLAN, III:
19      Q.  And are you aware that 777 Partners did not
20  permit access to its systems for purposes of the
21  collateral audit until some time in May of 2024?
22          MR. BOLAND:  Object to form.
23      A.  I'm going to invoke the fifth.
24  BY MR. MORLAN, III:
25      Q.  So, for purposes of my next question, I'm

Page 83

01  going to refer to the time period between July of 2023
02  and May of 2024, when access was ultimately granted to
03  Leadenhall's agents for the collateral as the delay
04  period.
05          Is that sufficiently clear just for purposes
06  of my question?
07      A.  Yes.
08      Q.  Okay.  So, was one of the purposes of the
09  delay period to stall the collateral audit in order to
10  conceal evidence of the double pledging of collateral?
11          MR. BOLAND:  Object to form.
12      A.  I'm invoking the fifth.
13  BY MR. MORLAN, III:
14      Q.  And was the purpose of the delay period to
15  allow time to conceal evidence of potential wrongdoing
16  by 777 Partners?
17          MR. BOLAND:  Object to form.
18      A.  I'm invoking the fifth.
19  BY MR. MORLAN, III:
20      Q.  Was the purpose of the delay period to make
21  certain changes within the MP FIN system in an effort to
22  conceal evidence of wrongdoing by 777 Partners or
23  SuttonPark Capital?
24          MR. BOLAND:  Object to form.
25      A.  I'm invoking the fifth.

Page 84

01  BY MR. MORLAN, III:
02      Q.  In our allegations related to problems with
03  the integrity, usability, and reliability of the MP FIN
04  system in this lawsuit, intended to provide cover or
05  modifications made to the MP FIN system in order to
06  conceal wrongful conduct by 777 Partners?
07      A.  I'm invoking the fifth.
08      Q.  Would your answer be different if I ask the
09  same question, but with respect to SuttonPark Capital,
10  LLC?
11      A.  I'm invoking the fifth.
12      Q.  Do you know whether anyone at 777 or
13  SuttonPark encourage Mr. Davis to physically enter
14  SuttonPark's offices in September of 2024?
15          MR. BOLAND:  Object to form.
16      A.  Sorry.  What was the question?
17  BY MR. MORLAN, III:
18      Q.  Do you know whether anyone affiliated with 777
19  Partners and/or SuttonPark Capital encouraged Mr. Davis
20  to physically enter the premises of SuttonPark's offices
21  in early September of 2024?
22          MR. BOLAND:  Object to form.
23      A.  No, I don't have any knowledge.
24  BY MR. MORLAN, III:
25      Q.  Do you know whether Paul Kosinski or Saiph

Page 85

01  Consulting encouraged Mr. Davis to physically enter
02  SuttonPark's offices on or about September of 2024?
03      A.  Again, I heard about this through a news
04  article, so I really don't have any information
05  regarding the instances surrounding.
06      Q.  Okay.  And to be clear, you don't -- your
07  testimony is that you don't have any information
08  regarding any alleged computer intrusions that are
09  related to the matter, that we're here on today.
10  Correct?
11          MR. BOLAND:  Object to form.
12      A.  The only information that I have is as I
13  stated previously.
14  BY MR. MORLAN, III:
15      Q.  And that would be from the news article?
16      A.  Correct.
17      Q.  Who do you currently report to at the 777
18  Partners?
19      A.  I'm going to invoke the fifth.
20      Q.  What role is B. Riley currently playing at 777
21  Partners?
22          MR. BOLAND:  Object to form.
23      A.  I'm going to invoke the fifth.
24  BY MR. MORLAN, III:
25      Q.  Do you know who Mark Shapiro is?



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 86

01    A.    Yes.
02    Q.    Have you ever spoken with Mark Shapiro about
03 this case?
04    A.    No.
05    Q.    Did you say, no?
06    A.    No.
07    Q.    Have you ever discussed with Mark Shapiro,
08 your role in providing reports to Leadenhall?
09    A.    Going to invoke the fifth.
10    Q.    Has Mark Shapiro ever directed you to do
11 anything with respect to your role in 777 Partners?
12         MR. BOLAND:  Object to form.
13    A.    I'm going to invoke the fifth.
14 BY MR. MORLAN, III:
15    Q.    Has Mark Shapiro ever asked you about any
16 actions that you've taken as an employee of 777
17 Partners?
18         MR. BOLAND:  Object to form.
19    A.    I'm going to invoke the fifth.
20 BY MR. MORLAN, III:
21    Q.    Has anyone from B. Riley ever asked you about
22 any actions you've taken during your tenure as an
23 employee of 777 Partners?
24         MR. BOLAND:  Object to form.
25    A.    Going to invoke the fifth.

Page 87

01 BY MR. MORLAN, III:
02    Q.    Has anyone from B. Riley ever asked you
03 anything about your role with respect to the preparation
04 of compliance reports for Leadenhall?
05    A.    Going to invoke the fifth.
06    Q.    And was one of the purposes of filing this
07 lawsuit to discourage other 777 employees from
08 participating in the grand jury investigation with
09 respect to 777 Partners?
10         MR. BOLAND:  Object to form.
11    A.    I'm invoking the fifth.
12 BY MR. MORLAN, III:
13    Q.    And do you know what I mean when I say the New
14 York litigation that's related to this case?
15    A.    I'm invoking the fifth.
16    Q.    But you are aware that there was a complaint
17 filed by Leadenhall and the Southern District Of New
18 York against 777 Partners and others.  Is that correct?
19    A.    I'm invoking the fifth.
20    Q.    Have you discussed the allegations in the New
21 York complaint with anybody other than your Attorney?
22    A.    I'm invoking the fifth.
23    Q.    Have you discussed the allegations of the
24 complaint that we're here on with anybody other than
25 your Attorney?

Page 88

01    A.    I'm invoking the fifth.
02         MR. MORLAN, III:  All right.  I'm going to
03 take a quick break for about five minutes to go
04 through my notes.
05         THE WITNESS:  Okay.
06         THE COURT REPORTER:  I think he froze.  We're
07 going off the record.  The time is 12:03  P.M.
08         MR. MORLAN, III:  I think we froze there for a
09 second.  I don't know if you guys heard my
10 question.  I said I want to just take a five-
11 minute break, review my notes, and then, we'll --
12 I'll either have relatively little or I may be
13 finished.  Does anybody else have anything?  Jim?
14         MR. BOLAND:  Not at the moment, no.
15         MR. MORLAN, III:  Okay.  All right.  Let's go
16 off the record and, hopefully, wrap this up here in
17 a minute.
18         THE COURT REPORTER:  We're off the record.
19         (Thereupon, a short discussion was held off
20 record.)
21         (Deposition resumed.)
22         THE COURT REPORTER:  We are back on the
23 record.  The time is 12:07  P.M.
24 BY MR. MORLAN, III:
25    Q.    Do you know whether any documents contained

Page 89

01 within Steve Pasko's e-mail correspondence, could be
02 potentially useful to Leadenhall in New York litigation?
03         MR. BOLAND:  Object to form.
04    A.    I'm invoking the fifth.
05 BY MR. MORLAN, III:
06    Q.    Have you been asked to assist with collecting
07 any documents for purposes of discovery in this case
08 that we're here on today?
09    A.    I believe it was noted in the complaint, can't
10 recall.
11         MR. MURRAY:  I can't answer for you.  Got it.
12         MR. DONOVAN:  Yeah.
13    A.    I believe it was noted in the -- in the notice
14 to appear here, but I can't recall specifically.
15 BY MR. MORLAN, III:
16    Q.    Well, have you collected any documents to
17 provide to 777 or anyone else in connection with this
18 particular lawsuit that we're here on today?
19         MR. BOLAND:  Object to form.
20    A.    I'm going to invoke the fifth.
21 BY MR. MORLAN, III:
22    Q.    Were you asked to preserve any documents in
23 connection with the litigation that we're here on today?
24    A.    I'm going to invoke the fifth.
25    Q.    Were you instructed to delete any documents



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 90

01 related to any of the subject matter that we've
02 discussed in this deposition, including Mr. Donovan's
03 questions?
04        MR. BOLAND: Objection.
05     A.  I'm going to invoke the fifth.
06 BY MR. MORLAN, III:
07     Q.  Are you familiar with the results of the
08 collateral audit that is at issue with this litigation?
09     A.  I'm going to invoke the fifth.
10     Q.  Wouldn't the information pertaining to
11 Leaden--
12     A.  I think you cut off.
13     Q.  -- to support the results of the audit that
14 was performed, the collateral audit that's at issue in
15 this litigation?
16        MR. DONOVAN: Mr. Morlan, your audio just cut
17        out in the middle of that question.  So, could you
18        try that question again?
19        MR. MORLAN, III: Sure.  Is it your
20        understanding --
21        THE COURT REPORTER: Oh, he got kicked off.
22        MR. BOLAND: And he's gone.
23        THE COURT REPORTER: He's back on.
24        MR. DONOVAN: All right.  So, Mr. Morlan just
25        got kicked out of the Zoom, it looks like and so --

Page 91

01        MR. MORLAN, III: I think I'm back now.
02        MR. DONOVAN: Oh, you're back now.  Okay.
03        All right.
04        MR. MORLAN, III: That was --
05        MR. BOLAND: Last question didn't come in,
06        though.
07        MR. MORLAN, III: Okay.
08 BY MR. MORLAN, III:
09     Q.  There's been some allegations in this
10 litigation of a conspiracy to obtain improperly
11 information that might be useful to Leadenhall in the
12 New York litigation.
13        Are you familiar with any information that was
14 improperly obtained by Mr. Kosinski during the time of
15 the collateral audit at issue?
16        MR. BOLAND: Objection.
17     A.  I'm going to invoke the fifth.
18 BY MR. MORLAN, III:
19     Q.  And is it your understanding that Leadenhall
20 would be entitled to review the records in MP FIN as
21 would pertain to any collateral that was pledged to
22 Leadenhall?
23        MR. BOLAND: Objection.
24     A.  I'm going to invoke the fifth.
25 BY MR. MORLAN, III:

Page 92

01     Q.  And is it your understanding that the
02 information contained within MP FIN as the Leadenhall,
03 along with any other documents that Leadenhall was
04 previously provided by 777, would be sufficient to
05 support the findings of the audit that Saiph performed
06 related to this action?
07     A.  I'm invoking the fifth.
08     Q.  Did -- wander -- about any issues with respect
09 to the double pledging of collateral?
10        MR. BOLAND: Did it just be that Mr., Morlan's
11        question cut out?
12        THE COURT REPORTER: It cut out.
13        MR. DONOVAN: Cut out a little.
14        MR. BOLAND: Yeah, we got only the last part
15        of it.
16        MR. MORLAN, III: Okay.
17 BY MR. MORLAN, III:
18     Q.  Have you spoken with Mr. -- let me start over.
19        MR. MORLAN, III: Are you hearing me now?  Am
20        I clear or am I breaking up?
21        THE COURT REPORTER: You're clear.
22        MR. DONOVAN: Yeah.
23 BY MR. MORLAN, III:
24     Q.  Have you spoken with Josh Wander regarding any
25 of the issues with respect to the double pledging of

Page 93

01 collateral?
02        MR. BOLAND: Object to form.
03     A.  I'm invoking the fifth.
04 BY MR. MORLAN, III:
05     Q.  Have you spoke with Mr. Pasko with respect to
06 any allegations regarding the double pledging of
07 collateral pledged to Leadenhall?
08        MR. BOLAND: Object to form.
09     A.  I'm invoking the fifth.
10 BY MR. MORLAN, III:
11     Q.  Have you spoken with Mr. Wander or Mr. Pasko
12 with respect to any of the allegations of the complaint
13 in this action?
14        MR. BOLAND: Object to form.
15     A.  I'm invoking the fifth.
16 BY MR. MORLAN, III:
17     Q.  Have you spoken with either Mr. Pasko or
18 Mr. Wander with respect to the allegations of the New
19 York complaint?
20     A.  I'm invoking the fifth.
21     Q.  Have you spoken with Mr. Wander regarding any
22 of the allegations against Paul Kosinski and Saiph
23 Consulting in this matter?
24        MR. BOLAND: Object to form.
25     A.  I'm invoking the fifth.



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 94

01  BY MR. MORLAN, III:
02      Q.   Have you ever heard anybody discussing Paul
03  Kosinski for any purpose since his departure from
04  SuttonPark in late 2020?
05          MR. BOLAND:  Object to form.
06      A.   I'm invoking the fifth.
07  BY MR. MORLAN, III:
08      Q.   Have you ever had any discussions with Josh
09  Wander regarding anything to do with Saiph Consulting
10  LLC?
11      A.   I'm invoking the fifth.
12      Q.   Have you ever had any conversations with Josh
13  Wander regarding Paul Kosinski?
14      A.   I'm invoking the fifth.
15      Q.   Have you ever had any conversations with Steve
16  Pasko regarding Paul Kosinski?
17          MR. BOLAND:  Object to form.
18      A.   Invoking the fifth.
19  BY MR. MORLAN, III:
20      Q.   Have you ever had any conversations with Steve
21  Pasko regarding the reasons this lawsuit was brought?
22          MR. BOLAND:  Object to form.
23      A.   Invoking the fifth.
24  BY MR. MORLAN, III:
25      Q.   Have you ever had any discussions with Josh

Page 95

01  Wander regarding the reason this lawsuit was brought?
02          MR. BOLAND:  Object to form.
03      A.   Invoking the fifth.
04  BY MR. MORLAN, III:
05      Q.   Have you ever had any discussions with anyone
06  from B. Riley as to why this lawsuit has been brought?
07      A.   Invoking the fifth.
08      Q.   Have you ever had any discussions with anybody
09  else at 777 Partners regarding why this lawsuit was
10  brought?
11          MR. BOLAND:  Object to form.
12      A.   Invoking the fifth.
13  BY MR. MORLAN, III:
14      Q.   Have you ever had any discussions with anyone
15  from 777 Partners or SuttonPark Capital regarding the
16  damages alleged in this lawsuit?
17          MR. BOLAND:  Object to form.
18      A.   I'm invoking the fifth.
19          MR. MORLAN, III:  I have nothing further.
20          MR. BOLAND:  I have no question.
21          MR. DONOVAN:  Nothing further from me.
22          THE VIDEOGRAPHER:  This concludes today's
23  deposition.  We're going off the record.  The time
24  is 12:18  P.M.
25          THE COURT REPORTER:  All right.  Can someone

Page 96

01  explain read or waive to him or do you just want to
02  do it for him?
03          MR. DONOVAN:  Yeah.  You can explain.
04          THE COURT REPORTER:  So, if this is ordered,
05  the transcript of everything I wrote down, you have
06  the choice of getting a copy that you can read or
07  you can waive that right and just assume that I've
08  typed everything correctly.
09          If not, if you do read, I do send you an e-
10  mail, with the transcript and you get to go over
11  it.  And in the event that there's something that
12  was misunderstood or misspoken and there's an
13  error, you would fill out an errata sheet at the
14  Court reporting office, and you can correct any
15  errors on it.  Would you like to read or waive?
16          THE WITNESS:  I think we'll read.
17          THE COURT REPORTER:  Read?
18          THE WITNESS:  Yeah.
19          (Deposition concluded at 12:30 P.M.)
20          (Reading and signing of the deposition by the
21  witness has been reserved.)
22
23
24
25

Page 97

01              CERTIFICATE OF REPORTER
02  STATE OF FLORIDA
03  COUNTY OF MIAMI-DADE
04
05      I, MICHELLE VILLALOBOS, Court Reporter and Notary
06  Public for the State of Florida, do hereby certify that
07  I was authorized to and did digitally report and
08  transcribe the foregoing proceedings, and that the
09  transcript is a true and complete record of my notes.
10
11      I further certify that I am not a relative,
12  employee, attorney or counsel of any of the parties,
13  nor am I a relative or employee of any of the parties'
14  attorneys or counsel connected with the action, nor am
15  I financially interested in the action.
16
17      Witness my hand this 26th day of March, 2025.
18
19
20  _____
21  MICHELLE VILLALOBOS, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
22
23
24
25



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

```
                                                      Page 98
01              CERTIFICATE OF OATH
02  STATE OF FLORIDA
03  COUNTY OF MIAMI-DADE
04
05      I, MICHELLE VILLALOBOS, the undersigned
06  authority, certify that ALEXANDER ADNANI, personally
07  appeared before me and was duly sworn on the 24th day
08  of March, 2025.
09      Witness my hand this 26th day of March, 2025.
10
11
12
13
    _____
14  MICHELLE VILLALOBOS, COURT REPORTER
    NOTARY PUBLIC, STATE OF FLORIDA
15  Commission No.:  HH 373556
    Commission Exp:  MARCH 15, 2027
16
17
18
19
20
21
22
23
24
25
```

```
                                                     Page 100
1   Errata Sheet
2
3   NAME OF CASE: 777 Partners LLC & Suttonpark Capital vs Leadenhall Capital
4   DATE OF DEPOSITION: 03/24/2025
5   NAME OF WITNESS: Alexander Adnani
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25              _____
```

```
                                                      Page 99
01  DATE:     03/26/2025
    TO:       ALEXANDER ADNANI
02  C/O       Francis D. Murray, Esquire
              Stumphauzer Kolaya Nadler & Sloman, PLLC
03            2 SOUTH BISCAYNE BOULEVARD SUITE 1600
              MIAMI, FLORIDA 33131-1824
04
    IN RE:    777 Partners LLC & Suttonpark Capital v.
05  Leadenhall Capital
06  CASE NO:  24-81143-CIV-DMM
07  Dear Mr. Adnani,
08      Please take notice that on 03/24/2025, you gave
    your deposition in the above-referenced matter.  At
09  that time, you did not waive signature.  It is now
    necessary that you sign your deposition.  You may do so
10  by contacting your own attorney or the attorney who
    took your deposition and make an appointment to do so
11  at their office.  You may also contact our office at
    the below number, Monday -
12  Friday, 9:00 AM - 5:00 PM, for further information and
    assistance.
13
        If you do not read and sign your deposition within
14  thirty (30) days, the original, which has already been
    forwarded to the ordering attorney, may be filed with
15  the Clerk of the Court.
16      If you wish to waive your signature, sign your
    name in the blank at the bottom of this letter and
17  promptly return it to us.
18  Very truly yours,
19  Michelle Villalobos, Court Reporter
    Universal Court Reporting
20  (954)712-2600
21
    I do hereby waive my signature.
22
23  _____
    Alexander Adnani
24  Cc: via transcript:        Brian Donovan, Esquire
                               Francis Murray, Esquire
25
```



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com