# Exhibit Z

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION


777 PARTNERS LLC and
SUTTONPARK CAPITAL LLC,

       Plaintiffs,

                             CASE NO.
      vs.                     24-81143-CIV-DMM

LEADENHALL CAPITAL
PARTNERS LLP, LEADENHALL
LIFE INSURANCE LINKED
INVESTMENTS FUND PLC, NOAH
DAVIS, SAIPH CONSULTING LLC
and PAUL KOSINSKI,

       Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~

     VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

              IAN RATNER


             March 6, 2025

             8:11 a.m.


        1800 Peachtree Street NE

            Suite 1700

          Atlanta, Georgia


   Nicole Limoncelli, RPR, CCR-5799-5142-5014-9888


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 2..5

## Page 2

```
 1          APPEARANCES OF COUNSEL:
 2  On behalf of the Plaintiffs:
 3      DAVID A. PELLEGRINO, Esquire
        Smith Gambrell & Russell, LLP
 4      1301 Avenue of the Americas
        21st Floor
 5      New York, New York 10019
        (212) 907-9700
 6      (646) 887-8165 - (facsimile)
        dpellegrino@sgrlaw.com
 7
        SHELLY A. DEROUSSE, Esquire - via Zoom
 8      Smith Gambrell & Russell, LLP
        311 South Wacker Drive
 9      Suite 3000
        Chicago, Illinois 60606
10      (312) 360-6000
        (312) 360-6520 - (facsimile)
11      sderousse@sgrlaw.com
12
13  On behalf of the Defendants Leadenhall Capital
    Partners LLP and Leadenhall Life Insurance Linked
14  Investments Fund PLC:
15      PETER STARR, Esquire
        King & Spalding, LLP
16      1180 Peachtree Street NE
        Suite 1600
17      Atlanta, Georgia 30309
        (404) 572-4600
18      pstarr@kslaw.com
19      LEIGH M. NATHANSON, Esquire - via Zoom
        King & Spalding, LLP
20      1185 Avenue of the Americas
        34th Floor
21      New York, New York 10036
        (212) 556-2100
22      lnathanson@kslaw.com
23
24
25
```

## Page 3

```
 1      APPEARANCES OF COUNSEL (continued):
 2  On behalf of the Defendant Noah Davis:
 3      LEONARD S. FEUER, Esquire - via Zoom
        Leonard Feuer, P.A.
 4      500 South Australian Avenue
        Suite 500
 5      West Palm Beach, Florida 33401
        (561) 659-1360
 6      (561) 249-4100 - (facsimile)
        lfeuer@feuerlawfirm.com
 7
 8
 9  On behalf of the Defendants Saiph Consulting LLC and
    Paul Kosinski:
10
        HAROLD E. MORLAN, III, Esquire - via Zoom
11      Shutts & Bowen, LLP
        300 South Orange Avenue
12      Suite 1600
        Orlando, Florida 32801
13      (407) 423-3200
        (407) 425-8316 - (facsimile)
14      hmorlan@shutts.com
15
16  Also Present:
17      Brian Stephens - Videographer
18      Mark Shapiro - via Zoom
19      Paul Kosinski - via Zoom
20
21              -  -  -  -  -
22
23
24
25
```

## Page 4

```
 1              INDEX OF EXAMINATION
 2  WITNESS:  IAN RATNER
 3
 4  CROSS-EXAMINATION                        PAGE
 5      By Mr. Starr                          7
 6
 7  CROSS-EXAMINATION
 8      By Mr. Morlan                        177
 9
10
11              -  -  -  -  -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1              INDEX OF EXHIBITS
 2
    RATNER
 3  EXHIBITS        DESCRIPTION              PAGE
 4  Exhibit 1       Declaration of Ian Ratner in   29
 5                  Opposition to the Application
 6                  For Temporary Restraints and
 7                  the Appointment of a Receiver
 8  Exhibit 2       Atlanta Journal-Constitution   96
 9                  article
10  Exhibit 3       Declaration of Ian Ratner in   118
11                  Support of Plaintiffs' Motion
12                  For a Preliminary Injunction
13                  dated September 27, 2024
14  Exhibit 4       Declaration of Paul Kosinski,  157
15                  President of SAIPH Consulting
16                  LLC ("Saiph")
17  Exhibit B       Production Log                 179
18  Exhibit C       Composite Exhibit             185
19
20
21
22  (Original Exhibits 1 through 4 and B and C have been
23  attached to the original transcript.)
24
25              -  -  -  -  -
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 6..9

Page 6

1   Videotaped Videoconference Deposition of Ian Ratner
2           March 6, 2025
3       THE VIDEOGRAPHER:  Okay.  We are on the
4   record.
5       Today's date is March 6th, 2025, and the
6   time is approximately 8:11 a.m.
7       This will be the videotaped deposition of
8   Ian Ratner in the matter of 777 Partners LLC, et
9   al. versus Leadenhall Capital Partners LLP, et al.
10      Will the attorneys present please state
11  their names and whom they -- whom they represent,
12  starting with those online.
13      MR. MORLAN:  Harold E. Morlan, III with
14  Shutts & Bowen, representing Saiph Consulting LLC
15  and Paul Kosinksi.
16      MS. NATHANSON:  Leigh Nathanson from King &
17  Spalding, representing the Leadenhall defendants.
18  Good morning.
19      MR. PELLEGRINO:  David Pellegrino,
20  representing the plaintiffs 777 and Suttonpark.
21      MR. STARR:  Peter Starr, King & Spalding,
22  LLP on behalf the Leadenhall defendants.
23      THE VIDEOGRAPHER:  Thank you.
24      Will the court reporter please swear in the
25  witness.

Page 7

1           IAN RATNER,
2   having been first duly sworn, was examined and
3   testified as follows:
4           CROSS-EXAMINATION
5   BY MR. STARR:
6   Q.  Okay.  Good morning, Mr. Ratner.
7   A.  Good morning.
8   Q.  How are you doing today?
9   A.  Good.  Thank you.
10  Q.  So you have another engagement this
11  afternoon?
12  A.  Yes.
13  Q.  And your counsel has said you needed -- you
14  need to end by 2:00 p.m.; is that right?
15  A.  Yes, sir.
16  Q.  Okay.  What is that engagement?
17  A.  I have a flight that I have to be in New
18  York for a family matters.
19  Q.  Okay.  So I'm hopeful we can get through as
20  much as possible in the time that we have, but there
21  are other defendants and defendants' counsel in this
22  case.  So to the extent we still have further
23  questions, you know, before we've used up the full
24  7 hours, I wanted to ask whether there's another date
25  between now and March 20th that works for you to come

Page 8

1   back and continue the deposition?
2   A.  Yes, sir.
3   Q.  Which date would work?
4   A.  I don't have my...
5   Q.  Okay.
6   A.  -- day-timer in front of me, but I have some
7   flexibility.  Next week I'll be traveling so I can do
8   it remote.  I do have some time next week easily.  And
9   the after -- I -- I -- I think on March 17th, which is
10  a Monday, I'm in Atlanta.  And other than one meeting,
11  I think I have the whole day available.
12  Q.  All right.  Nice.
13  A.  So if I confirm meet -- I'll probably have
14  that meeting confirmed up by Friday afternoon, and
15  then I'll, you know.
16  Q.  Okay.  Thank you.  Yeah, we'll -- we'll be
17  in touch about that to the extent we need more time.
18      And, Mr. Ratner, you've been deposed
19  numerous times?
20  A.  Yes, sir.
21  Q.  Hundreds of times would you say?
22  A.  Yes, sir.
23  Q.  Okay.  I will not go over the ground rules
24  with you today.
25      So what did you do to prepare for today's

Page 9

1   deposition, Mr. Ratner?
2   A.  The -- last night I met with Mr. Pellegrino
3   and Mr. Shapiro for a couple of hours.  And on the
4   afternoon of the -- today is Thursday.  On the
5   afternoon of Tuesday, middle of the day on Tuesday, I
6   reviewed some of the pleadings around this case; the
7   complaint, the summary judgment motions, the
8   declarations.  I also reviewed the Mazur reports.  I
9   also reviewed the -- I forget it -- the name of the
10  other forensic expert -- technology expert.  I
11  reviewed his -- his smaller report.
12  Q.  Mr. Rohr?
13  A.  I don't recall.  His name was Horner or
14  Homer or Horner with an H.  The -- yeah, I think
15  Mr. Rohr.
16  Q.  Robert Rohr?
17      (King & Spalding IT entered into the room.)
18      MR. PELLEGRINO:  Excuse me, could we get a
19  pad?
20      THE WITNESS:  No, no.  It's fine.
21      (King & Spalding IT exited into the room.)
22      THE WITNESS:  Distractions.
23      So the -- so I -- so in the afternoon of the
24  Tuesday, I spent a little time looking at those
25  pleadings and refreshing myself on the matter a



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                        Pages 10..13

Page 10

1  little bit and -- and looking at the forensic
2  reports and that's about it.
3  BY MR. STARR:
4      **Q.   Did you look at any pleadings from the New**
5  **York case?  Do you know what I'm referring to when I**
6  **say "the New York case"?**
7      A.  Sure.
8      **Q.   Did you look at any pleadings from the New**
9  **York case?**
10     A.  I have not gone back and read the -- reread
11 the pleadings. You know, I generally remember, you
12 know -- I -- I did look at the timing of amended --
13 the amended -- the amended complaint or the corrected
14 complaint in the New York matter, but I -- I did not
15 go back and read the entire complaint.
16     **Q.   It's quite long, right?**
17     A.  Yes.
18     **Q.   Yeah.**
19     A.  I had it in my stack of things to do, but I
20 didn't get there.
21     **Q.   Understood.**
22         **Did you -- and you met with Mr. Shapiro last**
23 **night?**
24     A.  Yes.
25     **Q.   Was that after his deposition concluded?**

Page 11

1  A.  Yes, sir.
2      **Q.   And what did you discuss with Mr. Shapiro?**
3         MR. PELLEGRINO:  Objection.
4         I'm just going to warn you to the extent
5  there were conversations with Mr. Shapiro without
6  counsel present, you can testify to that. But if
7  there's conversations with counsel, I'm directing
8  you not to answer.
9         THE WITNESS:  I mean, first of all,
10 Mr. Pellegrino was with us in the conference room
11 at our office in Atlanta. And, you know, we just
12 discussed the deposition a little bit. I -- I --
13 I -- I didn't hear the whole thing. I was --
14 my -- I was on for a good part of the day, but I
15 had some calls and other meeting in the office, so
16 I -- I did listen to a good bit of it. Maybe
17 halfish.
18         I just gave him some feedback. I thought he
19 did -- he was -- his demeanor was professional. I
20 thought he did a fine job. I was not aware of --
21 we discussed the September 2022. I was not aware
22 of that whole second copy.
23         But it was more of a short conversation. It
24 was late, as you know. And -- until they got back
25 to Buckhead, you know -- you know, the fellows

Page 12

1  were -- were tired and we spent a little bit of
2  time on it.
3  BY MR. STARR:
4      **Q.   What did Mr. Shapiro tell you about the**
5  **September 2022 MPFin file?**
6      A.  Just that he had direct conversations with
7  Mr. Mazur about it.
8      **Q.   And what did Mr. Mazur tell him about that**
9  **file?**
10     A.  I mean, we didn't get into it that detailed
11 because I -- I mean, it was something that -- you
12 know, I just don't remember ever hearing anything
13 about it until it was question/answer.
14     **Q.   So that was the first you had heard of it**
15 **was yesterday during the deposition?**
16     A.  Yes.
17     **Q.   And you attended Mr. Shapiro's deposition**
18 **yesterday?**
19     A.  Parts of it.
20     **Q.   And why did you do that?**
21     A.  I -- I -- I don't -- to me, it would be a
22 normal thing to do. We're being deposed on -- on a
23 case, in a far-reaching case. And to the extent that
24 was -- I had some time yesterday, I decided to listen
25 in to part of the deposition. Nothing unusual. If --

Page 13

1  if I'm in case with somebody else in my firm and
2  there's two experts or two parts -- participates in
3  the same case, you know, I like to hear -- you know,
4  hear what the content of the deposition is. Also to
5  get a sense of the demeanor of the -- demeanor of the
6  deposition and such and such.
7      **Q.   What did you think of the demeanor of the**
8  **deposition?**
9      A.  I thought it was very professional and
10 appropriate.
11     **Q.   Did you discuss with Mr. Shapiro your**
12 **deposition or his deposition prior to yesterday?**
13     A.  Well, the scheduling of it and the fact that
14 he was going to come into Atlanta. We had another
15 client thing together, and he came in on Monday so
16 that he would be able to meet that client here in
17 Atlanta. So it was more about scheduling. But not
18 much really because as a fact witness, so to speak,
19 I -- I'm just going to tell you whatever I know. It's
20 not like we're preparing -- going all through kind of
21 documents in the -- in the case or financial analysis
22 and that type of matter.
23     **Q.   During Mr. Shapiro's deposition, were there**
24 **any answers that he gave that you disagreed with or**
25 **thought were untrue?**

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 14..17

Page 14

1    A.    Nothing that -- clearly nothing that was
2  untrue.
3    Q.    Or -- or inaccurate I -- I could say.
4    A.    Nothing that was inaccurate or untrue.  Just
5  a little bit more of a -- an opinion about the
6  obligation to investigate as a CRO in this matter.
7  You had asked -- either you or Mr. Morlan, I don't
8  recall.  Somebody had asked him about the work plan
9  that we had or that we have.  And he's really leading
10  the work plan.
11        And there was a conversation about, oh, have
12  you gone back and investigated the 2022 or 2023
13  activities at Suttonpark.  And -- and he said -- and
14  he described, you know, that we've done a lot of
15  investigations and reconciliations on the collateral
16  accounts, but, you know, we haven't necessarily gone
17  back to, you know -- you know, collect some of the
18  documents that are referred to in the complaint and
19  things like that in the New York litigation.
20    Q.    And what did you disagree with on that
21  score?
22    A.    What -- in -- in -- in -- not a
23  disagreement.  Every case is different.  And in a case
24  like this, when we got on the ground, one of the
25  priorities was securing the infrastructure at

Page 15

1  Suttonpark.  And one of the first things we did was
2  build a team around Suttonpark led by Jim Howard,
3  who's a very skilled former banker, in servicing.  And
4  we assessed that as more important than going back and
5  validating what's in the complaint.  I mean,
6  there's -- you know, Leadenhall will have a forensic
7  account.  They'll testify to what they think happen
8  and it's not -- he said we didn't -- we didn't do
9  that -- because I think he said it -- it wasn't a
10  financial -- we didn't have the funds.
11        I mean, it's -- that's part of the reason,
12  but it's just not a priority right now.  There --
13  there was an event.  There was allegations of double
14  banking, et cetera.  Our mission as fiduciaries is to
15  kind of, you know, put a wall around everything and
16  make sure that -- from the day we get in there, we
17  have full access.
18        So it was more of a discussion, not really a
19  disagreement.  But, you know, we just discussed that
20  topic a little bit from, my experience.
21    Q.    So is it view -- your view that B. Riley's
22  top priority when you -- when you came in was
23  stabilizing operations rather than investigating
24  allegations made in litigation?
25    A.    Yes.  At that time, when we -- at the time

Page 16

1  that we entered the scene, it was a highly unstable
2  environment.  The employees were unstable.  There --
3  the lawsuit had been filed.  There was enormous cash
4  needs and it was really kind of a very unstable
5  environment in terms of operations.  And -- and also,
6  because of the allegations, we needed to get control
7  of the -- of -- the largest enterprise was -- is
8  certainly Suttonpark in terms of day-to-day activity.
9  So that was really a priority.  Obviously we had to
10  learn what was going on at Flair and Bonzah (phonetic)
11  and all these different things.  But, you know, you've
12  got to put a gate around the enterprise that --
13  that -- where the allegations occurred.
14    Q.    But the company has now chosen to file
15  litigation of its own and become a plaintiff in this
16  case, right?
17    A.    Yes.
18    Q.    And you investigated the allegations in this
19  case before the complaint was filed?
20    A.    Yes.  This is happening under our watch.
21  If -- if -- if we had not pursued this, it's -- it's
22  highly...
23        (King & Spalding IT entered and exited the
24    room.)
25  BY MR. STARR:

Page 17

1    Q.    Sorry.  Go ahead.
2        Sorry for the interruption.
3    A.    No, no, it's fine.
4    Q.    I didn't mean to interrupt your train of
5  thought.
6    A.    It's fine.
7        It's -- I -- I realize there's a dispute
8  about what's going on here and -- and the -- and the
9  filing of the case and all that.  But as a fiduciary,
10  if -- and I'm not trying to be flippant, but if --
11  if -- if this had occurred.  And we said, oh, you
12  know, it's -- we don't really -- you know, no big
13  deal, no harm, no foul.  I mean, you should object.
14        In other words, you should be -- I'm not
15  telling you what to do, but as stakeholder you say,
16  well, hold on a second.  If -- if -- if A-CAP had
17  hired a contractor and had perpetrated -- you
18  know, and there was a data intrusion.  I mean, you
19  would be yelling.  So under our watch, this is
20  something we felt that we had to investigate and deal
21  with.
22    Q.    And in this case, I believe Mr. Shapiro
23  testified something like 600,000, $700,000 are at
24  stake; is that right?
25        MR. PELLEGRINO:  Objection to form.

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                        Pages 18..21

Page 18

1        THE WITNESS:  Well, I don't know if he said
2   that's at stake.  I think he was saying that would
3   be the -- the hard cost that's incurred.  I don't
4   know if we know the full extent and -- of the --
5   of the risk around the -- around the data
6   intrusion.
7   BY MR. STARR:
8        Q.   Well, how would you value the claims that
9   plaintiffs are pursuing in this case?
10       A.   I mean, that's a good question.  I think
11  part of the -- so -- so, I mean, part of the claims
12  would be the hard cost.  Okay?  Some of the claims --
13  well, first of all, it would be difficult to fully
14  evaluate all the claims until discovery's finished.
15  Okay?  You got to -- you got to get through discovery
16  and assess the total universe of information that you
17  can glean from discovery and from the process.  And --
18       Q.   Well, we have 2 weeks of discovery yet --
19  left, so we'll -- we'll be there soon.
20       A.   Okay.
21       Q.   Sorry.  Sorry, didn't mean to -- continue.
22       A.   That's -- fair enough.
23            And then you would assess the -- the impact,
24  not only from the hard costs.  I don't know, I haven't
25  looked at it, is it possible the database has been

Page 19

1   damaged and there's a loss in value to the database.
2   In the future, that database has a substantial amount
3   of records.  There's -- you know, I can't remember the
4   current balance, but it's more than a billion or
5   billions of structured settlement transactions in it.
6   Has the database been damaged?  Is the integrity of
7   the database in question?  I don't know the answer to
8   those questions today.  And what's the impact of that.
9        Q.   Well, would you agree that the claims at
10  issue in this case are worth somewhere south of
11  $600 million?
12       A.   Well, that's highly likely.
13       Q.   And the claims at issue in the Leadenhall
14  case are -- or Leadenhall claims entitlement to
15  600 million or more in damages, right?
16       A.   Yes.  I think the -- the -- at the time,
17  I -- I was a lot more involved in the beginning of the
18  case.  At the time that we had some mediation
19  activity, the 600 million is a full advancing of the
20  loan and it does not include the netting of the
21  current collateral value.  So I -- I don't know the
22  number today, but it's not 600 million.  And during
23  our mediation in New York, we -- we had some tighter
24  numbers around the difference between the collateral
25  and the loan balances.  I don't remember the numbers

Page 20

1   now.
2            And some of those differences may relate to
3   collateral.  Some of them may -- may relate to the
4   valuation of the collateral vis- -vis interest rate
5   movements.  So it's not -- and Mr. Gillespie
6   (phonetic) himself commented on that in our own
7   meeting.  So, I mean, I -- I don't know the number,
8   but it's not 600 million.
9        Q.   There's also trebling -- trebling of damages
10  possibly in the New York case, right?
11       A.   I think that's part of the RICO claim.
12       Q.   Correct.
13            So I guess I'm just trying -- what I'm
14  trying to -- what I'm getting at, what I'm trying to
15  understand is why it was not a priority to investigate
16  the merits of the allegations in New York where, at
17  least in the complaint, Leadenhall claims over
18  600 million in damages, whereas it was a priority to
19  investigate the claims at issue in Florida, which
20  Mr. Shapiro testified were worth something like 6 or
21  $700,000.
22       MR. PELLEGRINO:  Objection to form.
23       THE WITNESS:  It's totally apples and
24  oranges.  So let's back up.  I'll try to explain
25  it again.

Page 21

1        This is something that occurred under our
2   watch, right?  So under our watch -- and I'm using
3   "watch" as not -- not a technical term, so maybe
4   that's not a good -- a good term, but it's under
5   our -- under our administration of the
6   enterprises.  Okay?
7        So as a fiduciary, whether receiver or -- or
8   a CRO, fiduciary, you know, this is under our
9   watch and it's something that we decided that
10  required an investigation.  All of the allegations
11  in the New York litigation happened before we're
12  there.
13       The parties are going to litigate that and
14  the -- there has been discovery.  There will be
15  discovery.  They will get the documents.  And --
16  and that -- those disputes will -- will play out
17  in court.  That's different than something that's
18  happening operationally under our fiduciary-ship,
19  if that's a good term.  And -- and in consultation
20  with counsel this was -- this is the type of
21  matter that we would pursue.
22       So they're two different -- they're --
23  they're -- they're kind of tote -- totally two
24  different things.
25  BY MR. STARR:

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 22..25

Page 22

1    Q.   So if your view, because the alleged
2 intrusions in this case occurred after B. Riley was in
3 control of operations, you felt you had an obligation
4 to -- a fiduciary obligation to do something about it?
5    A.   Yes, sir.
6    Q.   Did you explore options -- responses short
7 of filing a federal lawsuit?
8    A.   Well, we had discussions internally about
9 what we ought to do, and that's why we hired Eric
10 Mazur and, you know, discussed it with counsel and,
11 you know, tried to look into this.
12    Q.   What other options did you consider, if any?
13    A.   Well --
14    Q.   Other than filing a federal lawsuit.
15    A.   I mean, the options -- and I don't recall
16 the -- the -- I -- it's not like there's a slideshow
17 that had these are the nine options that we're
18 thinking of.  It's all the fluid process.  There's
19 options from do nothing, do noth- -- literally do
20 nothing, to file a -- file a lawsuit and investigate
21 and try to, you know, find out and -- and try to
22 pursue a claim that we thought we had.  And -- and
23 those options were discussed amongst the group.
24    Q.   Did you file the lawsuit before or after you
25 investigated what had happened?

Page 23

1    A.   If I recall the timeline, pretty -- pretty
2 closely after the discovery of the intrusion, we
3 retained Mr. Mazur to do some work with Shawn and did
4 that work leading up to the filing of the suit.  So
5 the -- the suit, I think, was filed in September.  And
6 I believe that the investigative work was done in
7 August, August and September.  And then there was some
8 amendments and things like that.  And, again, I'm not
9 day-to-day in -- in the case.
10    Q.   Okay.  Did you rely primarily on Mr. Mazur's
11 analysis in deciding whether to file a lawsuit?
12    A.   No.  I think we -- I think Mr. Shapiro and I
13 consulted with -- with David -- with Mr. Pellegrino,
14 Mr. McCarthy, Mr. O'Reilly, Mr. Walder, you know,
15 Mollie Wander, the legal team, Shawn Taheri.  I think
16 it was -- there was a lot of conversation around it.
17 It was not a -- you know, it was not a, oh, let's just
18 do this.  I mean, there was -- there was some thought
19 around doing this or not.
20    Q.   And did you distinguish between the decision
21 whether to file a lawsuit at all and the decision of
22 which parties to name as defendants?
23    A.   Could you repeat that?  I'm not sure --
24    Q.   Yes.
25    A.   -- I understand the exact question.

Page 24

1    Q.   Sure.  Yeah, let me -- I guess I'll break it
2 down.
3         So on August 9, which I believe is when you
4 learned of the intrusions; is that right?
5    A.   Yes.  I -- I don't know the exact date.
6 I -- I want to be careful not to be, you know...
7    Q.   Sure.
8         I'll just represent that August 9 is when
9 the alerts were generated by the intrusions that are
10 specified in Mr. Mazur's report.
11    A.   Okay.
12    Q.   And those alerts pointed clearly to the
13 credentials of Noah Davis.  Are you aware of that?
14    A.   Yes, sir.
15    Q.   Okay.  So at that point -- well, so I guess
16 what I'm asking is:  When did you -- at what point in
17 time did you decide which defendants to name in this
18 case?
19    A.   Okay.  So -- and, again, it's I can't -- I
20 can't define an exact time or date where we exactly
21 decided as a -- as a group who's the defendants.  But
22 my understanding it's -- it's like a chain.  If
23 Leadenhall is A, Saiph is an agent for Leadenhall, and
24 then Noah Davis is an agent, a contractor to Saiph.
25 So it's -- it -- to me, it -- it's the chain of

Page 25

1 command, you know.  I mean, I -- I almost wouldn't see
2 it any other way.  When -- when an employee at B.
3 Riley does something that someone doesn't like, they
4 sue the employ- -- they sue B. Riley.  So -- so to
5 me -- I don't know.  I just didn't see it any other
6 way.  And maybe there is another way to see it, but I
7 didn't see it any other way.
8    Q.   So you have several professional
9 certifications, right?
10    A.   Yes, sir.
11    Q.   You are a CPA; is that right?
12    A.   Yes, sir.
13    Q.   Active?
14    A.   Yes.  Licensed in Georgia.
15    Q.   Okay.  And an ASA?
16    A.   Yes.
17    Q.   What is an ASA?
18    A.   I'm an accredited senior appraiser in the
19 American Society of Appraisers, business valuation
20 section.
21    Q.   Have you performed a business valuation for
22 777 Partners and 600 Partners?
23    A.   I have not.
24    Q.   Have you performed a valuation of
25 Suttonpark?

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                Pages 26..29

Page 26

1    A.  I have not.
2    Q.  Has anyone on your team?
3    A.  No.
4    Q.  You're also a certified fraud examiner?
5    A.  Yes, I am.
6    Q.  What does that mean?  What does it mean to
7  be a certified fraud examiner?
8    A.  Well, I mean, I've -- I've -- there's an
9  association called the National Association of
10 Certified Fraud Examiners, and they promulgate
11 standards for fraud investigation and tests, exams,
12 professional CPE, continuing professional education.
13 And in the '90s, early '90s, I became certified as a
14 certified fraud examiner with the National Association
15 of Certified Fraud Examiners.
16       And at that time did, you know, the course
17 of study and the exams and then I've maintained that
18 ever since.  It's a professional body dedicated to
19 the -- delegate -- dedicated to promulgating standards
20 and -- and professional practice and training and
21 things like that.
22   Q.  So your -- your B. Riley bio says that
23 you're best known as an expert witness in complex
24 commercial cases, fraud investigations, and solvency
25 related valuation disputes.  Is that -- I am quoting

Page 27

1  from it.  But do you agree with that characterization?
2    A.  Yeah.  I mean, regrettably I've been doing
3  this a long time and -- and I've done a lot of big
4  cases in that description.
5    Q.  About --
6    A.  A lot people know me in that -- in the vein.
7    Q.  About what percentage of your work relates
8  to fraud investigations?
9    A.  Today, not much at all because our pract- --
10 our practice -- well, first of all, my practice
11 changes over time, right?  2007 and '8 through about
12 2013, '14, it's 100 percent bankruptcy restructure,
13 turnaround management.
14       And then in the more recent years, it's more
15 litigation support, expert witness, trade secrets,
16 loss profits, solvency disputes.  So it changes over
17 time.
18       Our practice is not doing that much fraud
19 investigation work.  As in the old days, when I was
20 with Kroll, that was a big part of our practice.
21 Today there's just less investigative work being done
22 by consulting firms.  Believe it or not, the law firms
23 are doing a lot of that work.
24   Q.  Oh, I do believe it.
25   A.  Yeah.

Page 28

1    Q.  Yeah.
2    A.  So it's changed a little bit.
3    Q.  Yeah.
4    A.  The entire practice.
5    Q.  Gotcha.
6       Have you assessed the ownership structure of
7  777 Partners and 600 Partners?
8    A.  Yes.
9       THE COURT REPORTER:  I'm sorry, I missed the
10 question.
11 BY MR. STARR:
12   Q.  Have you assessed the ownership structure of
13 777 Partners and 600 Partners?
14   A.  When you say "assessed," I haven't formed
15 any opinions on it.  I have a -- I have a workbook
16 that has 64 pages, slideshow.  And I often refer to
17 it.  Not -- not anymore, but in the beginning of the
18 case I'd often refer to that deck to remind me where a
19 certain enterprise would sit in the entity, in the
20 overall corporate structure.
21   Q.  Has the ownership structure of 777 Partners
22 changed since you got involved as manager of the 777
23 entities?
24   A.  No.
25   Q.  So who owns 777 Partners today?

Page 29

1    A.  I mean, I -- I think ultimately the -- the
2  two top -- top tier HoldCos are HoldCos controlled by
3  Steve Pasko and -- and Josh Wander.  The ultimate
4  equity ownership hasn't changed.  Maybe there's one --
5  one ownership structure change at Sutton National that
6  I was involved with.
7       MR. STARR:  Can we mark that as Ratner
8  Exhibit 1, please.
9       (Ratner Exhibit 1 was marked for
10 identification.)
11 BY MR. STARR:
12   Q.  Mr. Ratner, you've been handed a document
13 marked as Exhibit 1.  Can you please identify that
14 document?
15   A.  (Perusing.)
16       Yeah.  This is a declaration that I -- that
17 I prepared in May 2024 associated with the New York
18 litigation.
19   Q.  And if you go to Paragraph 5.
20   A.  (Complying.)
21   Q.  In that paragraph, you say that the
22 HoldCos -- and in this context, that refers to 777
23 Partners and 600 Partners; is that correct?
24   A.  Yes, sir.
25   Q.  Okay.  So you say that (as read) "The

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 30..33

Page 30

1 HoldCos have retained B. Riley to serve as independent
2 fiduciaries to oversee operations, evaluate financial
3 performance, and resolve outstanding
4 disputes...including the instant dispute with
5 plaintiffs Leadenhall Capital Partners and Leadenhall
6 Life."
7        Do you see that?
8    A. Yes, sir (perusing).
9    Q. Okay. So what have you done to attempt to
10 resolve the dispute between Leadenhall and the
11 HoldCos?
12    A. So a lot in the earlier part of the case.
13 The -- the matter -- Mr. Starr, the matter, I -- I
14 believe, has, in my mind, certain phases, you know, in
15 terms of activity of the team, of the B. Riley team.
16        And in the early part of the matter, there
17 was a lot of effort around trying to come up with a
18 resolution, which I am hopeful we can get back to.
19 There -- there's not been much in -- from my
20 understanding. Again, I'm not -- since Septemberish,
21 Octoberish, I have not been that involved day-to-day.
22 But at -- you know, I'm hoping that we can come back
23 to and attempt to resolve the dispute.
24        In the early part of the case, number one,
25 there was, I think, a court-mandated mediation at --

Page 31

1 in New York where we were -- we had a very positive
2 sit down. And, in fact, designed a structure, a bit
3 of a liquidating trust structure. And there were
4 certain correspondence between us and A-CAP and
5 Leadenhall to develop that kind of liquidating
6 structure. So there was a lot of activity around
7 that.
8        There's been other fits and starts of
9 conversations, primarily driven through Mark,
10 Mr. Jordi Guso, and Roger Schwartz. There was also an
11 attempt at a phone call to try to get things back on
12 track, where I had a call with Leadenhall to, again,
13 try to get us back on track, to try to come up with
14 some kind of waterfall structure. And that call did
15 not result in any positive move forward. So there's
16 been a lot of attempts. Less so more recently, I
17 believe.
18    Q. So how could you resolve the --
19        MR. STARR: Well, withdraw that question.
20 BY MR. STARR:
21    Q. Is it the case that you have not assessed
22 the merits of Leadenhall's claims, investigated the
23 merits of Leadenhall claims in the New York case?
24        MR. PELLEGRINO: Objection to form.
25        THE WITNESS: Well, I'm not sure what you

Page 32

1 mean by "the merits." I mean, the allegation is
2 that there are certain securities that are, so to
3 speak, double banked and the collateral is -- is
4 not -- is -- is not there for all of the loan
5 draws.
6 BY MR. STARR:
7    Q. Well, let me clarify.
8        So I think earlier you testified -- correct
9 me if I'm wrong, but earlier you testified that it
10 wasn't a priority to investigate the allegations of
11 fraud made by Leadenhall when B. Riley came in?
12        MR. PELLEGRINO: Objection to form.
13 BY MR. STARR:
14    Q. Is that...?
15    A. Well, it's not that it wasn't a priority.
16 It's that it's already documented, so to speak, in the
17 complaint. And some of that -- some of what's
18 documented -- you know, you're going -- you're going
19 to have a forensic accountant that's going to prepare
20 a report and he's going to reconcile the -- he's going
21 to reconcile the draws.
22        And -- and the word investigation also, in
23 my mind, you know, includes things like, you know,
24 interviewing people and having conversations and
25 getting text messages and do -- you know, putting the

Page 33

1 story together. A lot of that you've done in your
2 complaint, so to speak. Whether it's all accurate or
3 not, it'll come out in discovery.
4        We have a reconciliation of the accounts.
5 We know the loan balances. We know the collateral
6 pools. Mr. Howard has really -- and Mrs. Licamora
7 have really taken control of Suttonpark. So there has
8 been investigations at Suttonpark in the -- in the
9 reconciliation of the draws and the underlying
10 collateral. No question.
11    Q. So you -- you have done the forensic
12 accounting and reconciliation process that you
13 referred to?
14    A. Yeah. I mean, I -- on -- on -- to me,
15 that's more -- not math, but it's more dealing with
16 the accounts as opposed to -- as opposed to the why
17 and the how, you know, that you might drive from an
18 investigation. Do you see how I'm differentiating a
19 little bit?
20    Q. I do. Yes, I do.
21        Are you familiar with the condition of the
22 collateral portfolio?
23    A. Yes. I mean, I don't know all.
24        MR. PELLEGRINO: Objection to form.
25 BY MR. STARR:

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 34

1    Q.  With Leadenhall's collateral portfolio.
2        MR. STARR:  Objection to form.
3        THE WITNESS:  I mean, I don't have the
4    reconciliations on hand at the moment, but I know
5    that we have the data and we know which accounts
6    are theirs and the loan balances and, you know,
7    which -- how much cash they've gotten since we've
8    been on board.  And, you know, it's all -- we have
9    a very tight control on the Suttonpark
10   recordkeeping.
11 BY MR. STARR:
12   Q.  Okay.  How much collateral --
13       MR. MORLAN:  Mr. Pellegrino, would you state
14   the basis for your objection, please?
15       MR. STARR:  Hold on, Hal.  Let me just
16   continue this.
17 BY MR. STARR:
18   Q.  How much collateral is there left?
19   A.  I don't recall.
20   Q.  Could you ballpark it?
21   A.  I can't.
22       MR. STARR:  Okay.
23       MR. PELLEGRINO:  Yeah.  The question was
24   vague and ambiguous.  There's multiple Leadenhall
25   portfolios, and I'm not sure the questioner and

Page 35

1    the testifier or witness were understanding which
2    portfolio was at issue.  So I -- I objected to
3    form.
4        MR. STARR:  Can we actually go off the
5    record for just one moment?  I've got a tech issue
6    with my little realtime transcription.
7        MR. PELLEGRINO:  Sure.
8        THE VIDEOGRAPHER:  Going off the record.
9    The time is 8:52.
10       (A recess was taken.)
11       MR. STARR:  Okay.  We're back on the record,
12   and the time is now 8:59.
13 BY MR. STARR:
14   Q.  Okay.  Mr. Shap- -- I almost said
15 Mr. Shapiro.  Mr. Ratner.
16       So the declaration says that one of your
17 duties or one of your charges is to resolve
18 outstanding disputes, right?
19   A.  (Perusing.)
20       Yes, sir.
21   Q.  What I was going to ask is -- before the
22 break is, how can you attempt to resolve the dispute
23 with Leadenhall if you have not assessed the merits of
24 their claims of fraud?
25   A.  I mean, the -- I mean, again, I've -- I've

Page 36

1    been doing this a long time.  In the end, when you say
2    the merits of their claim, are you saying the
3    merits of the RICO claim or the merits of the
4    reconciliation or the merits of the potential loss?
5    Q.  What I mean is the merits of the legal
6    claims asserted and the allegations underlying them.
7    The reason I ask is that, you know, in my profession,
8    when we advise a client about potentially settling a
9    case --
10   A.  Right.
11   Q.  -- we typically do so with an eye toward,
12   well, how much exposure do we face here?  How
13   meritorious are the claim?  What is the likelihood
14   that you are held liable on these claims and pay
15   100 percent of what's claimed as recovery?  So it
16   sounds like to me that that assessment has not been
17   done, but correct me if I'm wrong.
18   A.  Well, I'm --
19       MR. PELLEGRINO:  Objection to form.
20       THE WITNESS:  I don't -- I don't -- I --
21   I -- I don't -- I think there's a multi- -- I
22   mean, the question you just asked me had like nine
23   subquestions in it.  So I think we have to unpack
24   it a little bit to get to the essence of what
25   we're able to do and what a lawyer does, right?

Page 37

1    So it would be foolhardy for anybody on my team to
2    assess the merits of a RICO claim.  I mean, we're
3    not attorneys.  We wouldn't have -- we don't have
4    the -- that's not our mission, right?
5        So in terms of assessing the -- the -- let's
6    call it the underlying New York litigation.  In --
7    in the terms of assessing the claims and the
8    litigation, that is done in consultation with --
9    in consultation with counsel.  So that's number
10   one.  Okay?
11 BY MR. STARR:
12   Q.  Mm-hmm.
13   A.  So in assessing an exposure, there's
14   financial exposure, legal exposure, merits of the
15   case, the likelihood of success in litigation.  Many
16   of those matters are -- many of those matters would
17   fall under the legal consulting -- you know, the legal
18   expertise, right?  We're not lawyers.
19       In terms of the -- in terms of the financial
20   side, absolutely.  We would assess the shortfall and
21   the differential between the collateral value and the
22   loan amounts.  So in -- in -- in an assessment it's,
23   okay, the difference between the collateral and the
24   loan amount is $200 million.  Of that $200 million,
25   25 million or 30 million is interest rate fluctuation.


UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 38..41

Page 38

1 It has nothing to do with, you know, collateral,
2 missing collateral.
3        You know, so -- and then it's what's the
4 likelihood of success or failure on the case, right?
5 Which you're getting feedback from a lawyer.  And then
6 it's, oh, so it's a 50/50, so it's -- oh, so the value
7 is such and such.  So there's a whole process of
8 figuring out what the value of a claim is, which
9 includes both accounting expertise and legal
10 expertise.
11        And then the last layer is that the -- from
12 a solvency, you know, waterfall perspective, you know,
13 judgment would be, you know, unsecured claim against
14 the enterprise, right?  And there's a lot of secured
15 claims.  So -- you know, so it's a whole -- has -- has
16 all that work been done?  Yeah, it's been done.  It's
17 been discussed.  It's been analyzed.  It's been
18 considered.  It's a living, breathing -- certainly in
19 the beginning there was a lot of activity around this
20 very topic you raised.
21        Q.  Would you agree that a through line for all
22 that analysis is the underlying factual allegations,
23 the facts?
24        A.  Yes.
25        Q.  Okay.  And have you or your team

Page 39

1 investigated factually what happened in relation to
2 the allegations made in the Leadenhall case in New
3 York?
4        A.  I'm not sure which facts you're referring
5 to.  Certainly we are focused on the dollars and the
6 loans and the collateral.  Was somebody -- did
7 somebody alter a document and things like that,
8 vis- -vis this.  I -- I mean, you have a lot of facts
9 that you list out in the complaint.  I don't
10 believe -- I could be wrong.  I don't believe that our
11 team has gone back and verified this or that or text
12 message or things around the investigative issues.  I
13 don't believe we've done that.
14        Q.  Turning back to your declaration,
15 Mr. Ratner.  If you could flip ahead to Paragraph 12.
16        A.  (Complying.)
17        Q.  And in Paragraph 12, you're discussing
18 Mr. Pasko and Mr. Wander, right?
19        A.  Okay.  I just want to --
20        Q.  Yeah.
21        A.  -- read a little bit before that.
22        Q.  Sure.  Go ahead.
23        A.  (Perusing.)
24           Yes, sir.  Paragraph 12?
25        Q.  Yes.

Page 40

1        A.  Yes, sir.
2        Q.  Paragraph 12.
3           You see in the middle of the paragraph there
4 where you say with respect to Mr. Pasko and Wander
5 that "they remain employed be the 777 Entities"?
6        A.  Yes, sir (perusing).
7        Q.  And was that accurate in May 2024?
8        A.  Yes, sir.
9        Q.  Is it accurate today?
10        A.  They are no longer employees.  Where -- show
11 me which line -- I -- I know -- I read it and it says
12 they're employed, but they are employed at that time.
13        Q.  It's six lines down.  And I understand this
14 was written almost a year ago.
15        A.  Yeah, they -- they -- absolutely they were
16 employed at that time.
17        Q.  And now they are not?
18        A.  They are not.
19        Q.  And what is their role now?
20        A.  They have a consulting agreement.
21        Q.  Do you know who the parties to that or those
22 consulting agreements are?
23        A.  Well, for certain 777 and 600 Partners.  I
24 don't know if they did it through themselves
25 personally or through some other entity, but I think

Page 41

1 it's just personally.
2        Q.  Do you know whether they're paid for their
3 consulting services, Mr. Wander and Pasko?
4        A.  They may -- they may have been paid a little
5 bit.  They have -- they -- they have quite a
6 bit of outstandings that are going to be -- obviously
7 we're not -- there will be a settlement on that.  I
8 mean, they -- they continue to spend time on the
9 matter.
10        Q.  Do you know which entity pays them?
11        A.  I'm -- I am not in the -- I don't know.
12        Q.  Okay.
13        A.  They've not been paid much.
14        Q.  And I think you testified earlier that your
15 involvement on this engagement and 777 Partners has
16 diminished?
17        A.  Yes, sir.
18        Q.  Could you just sort of walk me through at a
19 high level, you know, when you came in and -- and the
20 level of your engagement up through the present?
21        A.  Yeah, sure.  The -- the -- Mr. Starr, I -- I
22 look at this case and we -- and I know yesterday there
23 was some confusion about case and case.  When we refer
24 to the case, we're referring to the 777, 600 Partners
25 matter.

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                        Pages 42..45

Page 42

1   **Q.  Yes.**
2   A.  Not the Florida case.
3   **Q.  The engagement from B. Riley's perspective?**
4   A.  The case.
5   **Q.  Is that fair?**
6   A.  Yes, sir.
7   **Q.  Yeah.**
8   A.  And I -- I was listening yesterday to parts
9   of it yesterday and I was like wow.
10      The -- May -- we -- we -- we really get on
11  site in early May.  I think we're retained on May --
12  in the beginning of May (perusing).
13      Here, May 3rd.  Right.
14      So, you know, I have a meeting out there in
15  the -- the -- I have a meeting out there the week
16  before we're retained on May 3rd.  From May, we --
17  literally on site every day.  Mark, myself,
18  Michael Thatcher (phonetic), Jim Howard.  We
19  established -- immediately we established a separate
20  team around Suttonpark.  Okay?  There's a lot of
21  activity there.
22      So the -- the beginning of the case was
23  extremely active in terms of, you know, there was
24  many, many different businesses, there was, you know,
25  things coming out of the woodwork.  And in the

Page 43

1   beginning, we had a -- a larger team and more focused.
2   Okay?  So Mark and I were essentially full-time in
3   this deal for the first several months.
4   **Q.  At what point did you -- sorry, continue.**
5   A.  Dividing -- we were doing different things.
6   My involvement in the case, as we start settling
7   things, resolving, terminating, people shrinking the
8   enterprise.  When we got there, we were in a massive,
9   you know, 25,000-square foot or more office.  We're
10  now in a, you know, executive suite, which is
11  something that I worked.
12      And so there's -- there's this -- there's
13  this process and I become less involved as the case
14  starts to get organized, number one.
15      Number two, I had some other client
16  commitments and some corporate commitments.  So my
17  involvement in the case really shrinks
18  in Septemberish, later September.
19      Since -- since -- since mid September, I
20  have a very low amount of hours involved in the case.
21  I mean, I still get a call from Mark at, you know --
22  you know, two, three times a week to update me.  I may
23  still speak to Mr. McCarthy from time to time.  But
24  really since middle of September, later September
25  I'm -- I have a very small number of hours dedicated

Page 44

1   to the case.  So that would be October, November,
2   December, January, February.
3   **Q.  Yeah.  Okay.**
4       And during the period when you were more
5   involved, did you confer with Mr. Josh Wander about
6   business decision for the company?
7   A.  Certainly in the beginning.  I mean, we get
8   there in May and it's all about collecting
9   information, investigating.  You know, we're -- we're
10  meeting with the liquidator of Bonzah.  We're trying
11  to understand Flair.  We're trying to understand --
12  and I can't even remember the name now.  It's -- there
13  was a company involved in plastics and cups and all
14  that.  Massive cash needs.
15      So in the beginning we're certainly relying
16  on Mr. Wander, Mr. Pasko, Mr. O'Reilly, Brett Kaufman,
17  the entire team to collect information and -- to
18  educate us and to -- and what I'd say is we're forming
19  our own assessment of what they're telling us.  In the
20  beginning you don't know enough to form an assessment,
21  right.
22      So in the beginning I wouldn't say they're
23  involved in business decisions, that we really kind
24  of turned off right away.
25  **Q.  Mm-hmm.**

Page 45

1   A.  You know, they're really not involved in
2   decisions, but they know everything and we were
3   getting a lot of information.
4   **Q.  And what is your assessment of what they**
5   **were telling you?**
6   A.  Mr. Pasko is more of an operator.  And, you
7   know, the HR committee, you know, oh, we -- the 401(k)
8   bonus, you know, oh, this was the bonus plan we had
9   or, you know, like -- you know, very much into the
10  operations.
11      And Mr. Wander is more involved in the
12  businesses.  And -- and he has, in my view, an
13  optimistic view of most items.
14  **Q.  So you disagree with Mr. Wander's assessment**
15  **of business outlook?**
16  A.  Who does?
17  **Q.  Do you?**
18  A.  I mean, we're dealing -- I -- I wouldn't
19  even say I agree or disagree.  We're dealing with the
20  facts on the ground.  Is that fair?  It -- it's --
21  it's a different kind of role.
22  **Q.  Did A-CAP ask Mr. Pasko and Mr. Wander to**
23  **resign as managers?**
24      MR. PELLEGRINO:  Objection to form.
25      THE WITNESS:  I'm trying to remember the --

**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**Page 46**

1 how -- you know, those -- I was very involved in
2 the beginning conversations. I don't know if they
3 decided on their own it would be better. I -- I
4 don't know if Mr. Pasko or Mr. Wander decided on
5 their own if they were going to do it or somebody
6 suggested. When I -- when I got onto the scene,
7 that was already on the -- that was already kind
8 of on the plate, that that kind transaction would
9 happen.
10 BY MR. STARR:
11    **Q.   Did you -- and you agreed with the decision**
12 **for them to resign?**
13    A.   Sure. I mean, based on the allegations in
14 the complaint and based on the confusion that we then
15 saw on the ground, certainly. Yeah, that conversation
16 was definitely in place when we -- when I showed up.
17    **Q.   So if -- one second.**
18       **So after B. Riley was retained, Mr. Wander**
19 **made a statement to the press in which he said, you**
20 **know, Steve Pasko and I maintain our active roles at**
21 **777 Partners. Is -- is that an accurate statement or**
22 **an inaccurate statement?**
23       MR. PELLEGRINO: Objection to form.
24       THE WITNESS: The fact that it was said?
25 BY MR. STARR:

**Page 47**

1    **Q.   No, the substance of his statement.**
2    A.   I mean, the -- the fact that it was said in
3 a press release or in an e-mail to the staff, I think
4 is accurate. You might have the e-mail. I don't -- I
5 haven't seen it in a long time. The -- can you
6 repeat -- can you repeat the question?
7    **Q.   Yeah.**
8       **So the question is:  Was the substance of**
9 **Mr. Wander's statement "Steve Pasko and I maintain our**
10 **active roles at trip- -- 777 Partners" true?**
11    A.   Well, the -- at the time, I think the
12 substance of that was they were active. They were
13 still employees. They were -- they were helping
14 advise us on what the heck was going on until we
15 really captured an understanding of it. So at the
16 time, you know, they were not making decisions. They
17 did not have decision making power. It is a massive
18 sea change.
19       Having done fiduciary work, you know, I've
20 been a CRO before. I've been a receiver before. I --
21 I've liquidated companies. I -- you know, it's a sea
22 change. One minute they're running everything and the
23 next minute you've got, you know, two guys from B.
24 Riley that no one knows. It -- it takes time. It
25 took time for them even to recognize what was -- you

**Page 48**

1 know, to really absorb the changes. So, in substance,
2 they were still helping us and they were still active.
3 I think the word that they used in that press release
4 is active or something like that.
5    **Q.   Right, yep.**
6    A.   They were active. It was very busy. People
7 worked, you know, 20 hours a day there. It was -- it
8 was very active. There was a lot of media -- inbound
9 media at that time. And, you know, part of our job
10 was to quiet things down a little bit and, you know,
11 try to figure out what was happening. So I wouldn't
12 say it was inaccurate and I wouldn't say it was -- you
13 know, I would say, in substance, it's fine. You know,
14 it's -- it's -- it's -- it's -- it's very nuance.
15 Because, in substance, they were very active, but they
16 weren't making -- you know, it didn't say they were
17 making decisions, did it?
18    **Q.   So in Paragraph 8 of your declaration,**
19 **you're discussing Mr. Pasko and Mr. Wander's**
20 **resignation.  And you say (as read) "That same day,"**
21 **that is May 6th, "the representative members of those**
22 **entities," meaning 777 and 600, "accepted the**
23 **resignations and appointed you and Mr. Glass as**
24 **managers."**
25       **Do you see that?**

**Page 49**

1    A.   Yeah. Which Paragraph? You're on 8?
2    **Q.   Paragraph 8, yes.**
3    A.   "The same day that" (perusing)...
4       Yes, sir.
5    **Q.   Do you know who the members of 777 Partners**
6 **and 600 Partners are?**
7    A.   Now or then?
8    **Q.   Then.**
9    A.   Sure.
10    **Q.   Who are they?**
11    A.   It's the -- again, I -- I didn't -- I didn't
12 go back and look at all my slide deck, but they
13 were -- the -- the the -- ultimately the members were
14 their holding companies.
15    **Q.   So is it -- is it true that in essence**
16 **Mr. Wander -- Mr. Wander and Mr. Pasko caused entities**
17 **that they control to accept their own resignations?**
18 **Is that what this paragraph is describing, in essence?**
19    A.   Yes.
20    **Q.   Okay.**
21    A.   The -- just for full answer, our corporate
22 governance and counsel advisor on -- on these
23 transaction was Shelly DeRousse who's with Smith
24 Gambrell. So, you know, Shelly's involved in this, so
25 we're relying on Shelly's advice as we're --

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 50

1  Mrs. DeRousse's advice as we're doing that.
2        The idea was that they hired Mark and then
3  they resigned.
4     Q.  Looking ahead to Paragraph 10 -- well, go
5  ahead and review Paragraph 10 of your declaration --
6     A.  Sure.  Thank you --
7     Q.  -- please.
8        Yeah.
9     A.  -- Mr. Starr (perusing).
10       Yes, sure.  I was involved in this.
11    Q.  So that paragraph says that Wander and Pasko
12  executed resolutions waiving their authority to remove
13  managers through December 31st, right?
14    A.  Yes, sir.  They -- Mr. Schwartz was
15  concerned that we wouldn't be able to do our job and
16  that he -- I don't remember how he -- he may have
17  communicated this directly to us, but that they would
18  still -- that Mr. Wander and Mr. Pasko would still
19  have the right to terminate us, modify and -- and I
20  forget.  I mean, we went through all these documents
21  with Smith Gambrell.
22       So I believe I came up with the view that we
23  would contractually -- and then I think the resolution
24  might have been Smith Gambrell's idea, but I came up
25  with the view that why don't we just agree that

Page 51

1  there'll be a time period where they would -- they
2  would give up their control to modify.  And then --
3  and then we went through this process of a resolution,
4  which I don't recall exactly, but there was a
5  resolution around that.
6     Q.  The idea is that you're tying yourself to
7  the mast, right?
8     A.  Yeah.
9     Q.  Can't undo the decision --
10    A.  Yeah.
11    Q.  -- or they couldn't undo the decision.
12       Were those waivers extended at any point?
13  Do you know?
14    A.  I do not believe they were.
15    Q.  Okay.  So do the members of 777 and 600
16  Partners currently have the power to remove B. Riley
17  at any time?
18    A.  I do not believe they can.
19    Q.  Why not?
20    A.  Because -- and, again, I'm less -- this --
21  this is all more recent.  I believe that leading --
22  leading into -- at some point prior to December 31,
23  2024, I believe that A-CAP either enforced certain
24  provisions of their credit agreements, proxies or
25  whatever, that -- that would -- that would affect.

Page 52

1  And I -- I don't remember the specifics.  That would
2  affect the ability of the members to act -- of the
3  owners to act.  The members to act.  I believe that
4  they -- they executed certain powers that they have
5  under their agreements.
6     Q.  So A-CAP has the power to restrict the
7  members' rights in that way?
8     A.  I believe under certain of the loan
9  documents.  I think -- I don't -- I don't remember
10  what Mr. Shapiro said, but I think he may have had
11  more specificity than I did, than I recall.
12    Q.  You see in Paragraph 5 you're describing the
13  professionals from B. Riley as independent
14  fiduciaries?
15    A.  Yes (perusing).
16    Q.  Okay.  So you consider yourself an
17  independent fiduciary in this matter?
18    A.  Yes.
19    Q.  To whom do you owe fiduciary duties?
20    A.  To the stakeholders, which would be -- I
21  mean, you know, technically is it to the lenders and
22  the creditors.  But I think typically we -- we look at
23  it as to all the different stakeholders, which are,
24  you know, equity holders, debt holders, creditors,
25  employees.  I mean, you know.

Page 53

1     Q.  So you do consider yourself --
2     A.  We're doing the best we can.  Yeah, we --
3  we're -- we're -- we're trying to do the best we can
4  in an independent fashion, which sometimes puts us at
5  odds with the owners, the lenders, the creditors, the
6  employees.
7     Q.  So you do consider yourself a fiduciary to
8  creditors of 777?
9     A.  Yes.
10       MR. PELLEGRINO:  Objection to form.
11       THE WITNESS:  Yeah.
12  BY MR. STARR:
13    Q.  And in Paragraph 17 of your declaration, you
14  say that you've (as read) "determined it will take
15  several million dollars a month to cover the payroll
16  and overhead of the HoldCos without regard to
17  operating cash required at the various portfolio
18  companies."
19       Do you see that?
20    A.  Yes, sir (perusing).
21    Q.  And, again, the HoldCos are 777 and 600
22  Partners?
23    A.  Yes, sir.
24    Q.  Have the HoldCos been able to raise several
25  million dollars a month to pay their overhead and

## UNIVERSAL
### COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025        Pages 54..57

Page 54

1 payroll costs?
2     A.  Well, those numbers have come down fast.
3 You, know when we came in there -- I don't remember
4 the numbers, but we did in the first -- this was --
5 this was drafted, I guess, in May.  So the first 2,
6 3 weeks we were working with Brett Kaufman, who is the
7 CFO and DC Mendoza [sic], who's no longer there who
8 was like an operations guy, and we were developing
9 cash flow models.
10       You know, the rent, just getting out of the
11 lease.  You know, we had massive leases.  We had
12 leases in California and in -- and there was a lot
13 of over -- a lot of overhead and a lot of employees at
14 the HoldCo level that were actually portfolio level
15 employees that were being paid.  So we pushed all that
16 down to the portfolios and said, well, if you don't
17 need this guy, then you need to get rid of him because
18 we can't -- you know, so there was a lot of expenses
19 being paid at the top co.  So those numbers came down
20 rapidly.  And -- yeah, and we've been able to maintain
21 it.
22     Q.  Does A-CAP provide funding for 777 Partners
23 to remain in operation?
24     A.  Partially.  I mean, I think Mark -- there's
25 a funding agreement.  I mean, Mark prepares cash flows

Page 55

1 and requirements.  And also there's been other sources
2 of cash and, you know, he's -- he's been managing that
3 since Day 1.  I'm not managing that day-to-day at all.
4     Q.  Okay.  Mr. Ratner, how did B. Riley come to
5 be hired on this engagement?  Could you walk me
6 through that process?
7     A.  Yes.  There is an attorney in Chicago area
8 named Matt McClintock with a law firm called Goldstein
9 McClintock, a firm that we've worked with for years.
10 Matt may have seen some -- another B. Riley person in
11 our real estate group and said, oh, I have something
12 for Ian, I'm going to call him or something like that.
13 And then I -- I spoke with Matt about the matter.  And
14 then he arranged a video interview with me and -- and
15 I don't know exact -- I think Matt was -- is -- was
16 retained by A-CAP in some fashion.  But he did arrange
17 an interview first.  The first person I spoke to from
18 all the different parties was I had a video inter- --
19 a video meeting with Mr. Kenny King or maybe first was
20 a phone call and then a video.  But Mr. King and
21 Mrs. -- and Mrs. Jill Gettman.  Those were my first
22 interactions with this matter.  We either spoke by
23 video -- we definitely had one video interview.
24     Q.  Mm-hmm.
25     A.  And probably -- and maybe one or two phone

Page 56

1 calls.  So there was a couple -- like less than three
2 touch points where -- it's just who are you?  What do
3 you do?  How do you do this?  That kind of stuff.
4     Q.  And how did they explain to you what they
5 were looking for at that point in time?
6     A.  I'm not even sure they knew.  They --
7 they -- they were trying to understand what is a CRO,
8 what is a -- how could we help get involved in -- in
9 the -- in the situation and get a handle on -- on the
10 costs and the situation.  And -- and, you know, what
11 are the different -- I -- I don't think they said, oh,
12 we want you to be the CEO.
13       Like it was more of like tell us more what
14 you guys do, you're -- and -- and I might have used
15 the word chief restructuring officer in those
16 conversations with them.  And it was more like tell us
17 what your practice, how you do what you do, who does
18 it, what are the different possibilities.  You know,
19 very, very base level type stuff.
20     Q.  At some point did you interview with anyone
21 from 777 Partners before getting the job?
22     A.  Yeah, sure, of course.  Because you're --
23 you're working -- it's the debtor's side.  So I -- so
24 the first interaction is with -- with A-CAP.  I know
25 through Mr. McClintock they were talking to other

Page 57

1 people.  I just happen to know that.  Matt mentioned
2 that.
3       And then somebody gave -- either -- either
4 Mr. McClintock or somebody at A-CAP gave me the phone
5 numbers and contact information for Mr. Wander and
6 Pasko.  And literally the next week I was going to be
7 in Florida on another matter and I said, oh, I'm going
8 to be in Miami, maybe I'll come by and meet you.  So
9 we didn't even really do a -- we may have had a short
10 telephonic conversation about who are we and what do
11 we do.
12       And then I went to the 777 office on
13 Brickell myself.  And I met with them for a little
14 while and talked about it.  And, of course, it's --
15 you know, it can be overwhelming.  There's -- it's --
16 there's a lot of stuff going on.  I mean, there's --
17 you know, it's a big enterprise.  So we -- we -- we
18 talked a little while and learned more about the
19 situation and talked about how we would structure the
20 deal.  You know, the fees and sometimes we do this on
21 a fixed monthly fee.  I mean, we would never be able
22 to do that here because we didn't know, you know, how
23 big it was.  But we've done other matters like this on
24 a fixed monthly fee.
25     We talked a little bit about the costs.


UNIVERSAL
COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                    Pages 58..61

Page 58

1 Obviously they were concerned about our rates. You --
2 you -- you'll notice we had a discount in our
3 engagement letter. And -- and then we -- that was
4 one week.
5         And then the next week, on a Wednesday of
6 the next week, Mark, myself, Ron, and I even think
7 then the next day Michael Thatcher came on the
8 Thursday. Michael Thatcher has been on site since the
9 beginning. And then eventually -- I think even the
10 first week Jim Howard might have come over for an hour
11 or -- it -- it took about a week to get Jim involved,
12 to figure out what was going on at Suttonpark. You
13 know, like to get that team -- to realize we needed a
14 team. So it was I -- I met them one week and like the
15 next Wednesday we started.
16    Q.  I don't think I've actually seen the
17 engagement letter. Who are the counterparties to that
18 letter? Who are the parties to that agreement?
19    A.  It's -- it's not a complicated letter. It
20 has a scope in it. The counterparties are 777, 600,
21 and B. Riley Advisory Services, d/b/a GlassRatner
22 Advisory & Capital Group. And Mark signed it. And
23 our general counsel, Rebecca Hollander, was involved
24 in -- you know, in the engagement letter.
25         And there's one amendment to the letter,

Page 59

1 just to ensure that the efforts of the managers are
2 incorporated into the fee.
3    Q.  What does that amendment say?
4    A.  Just that. To the extent that I'm a manager
5 and I'm billing time, it's going to be covered under
6 that engagement letter.
7    Q.  Mm-hmm.
8         Has A-CAP ever paid any of B. Riley's fees
9 for that matter?
10    A.  I mean, not directly. 777, all our bills go
11 to 777 and 600 Partners.
12    Q.  Are they reimbursed by A-CAP for those fees?
13    A.  I mean, I think it's just part of the cash
14 flow.
15    Q.  Just generally A-CAP is providing funding?
16    A.  Well, some funding. I mean, Mark has a more
17 detailed source and use of funds.
18    Q.  Okay. And have you discussed -- you
19 mentioned you discussed potentially being retained for
20 this matter with -- with Mr. King and Ms. Gettman at
21 the -- at the outset. Have you discussed the
22 engagement with them over time since then? Since
23 being retained, I should say.
24    A.  I mean, I haven't spoken to them in months.
25 But -- but in the beginning, certainly they were --

Page 60

1 they wanted to make sure that we got -- once --
2 once -- once there was a -- we got down to Florida and
3 met with them, they were -- you know, they were
4 certainly wanting us to get hired. So they were --
5 I -- they were -- I don't know if they were concerned
6 we weren't going to get hired or somebody wasn't going
7 to get hired. I'm not saying me, I'm saying somebody.
8 I think they were -- they were very concerned about
9 the state of the -- the state of affairs at the
10 company.
11    Q.  Did they have any input on the scope of work
12 for B. Riley?
13    A.  No.
14    Q.  Okay. And why were they so adamant that
15 somebody -- some restructuring firm be installed?
16    A.  Well, I don't know about adamant, but they
17 were the first people I spoke to.
18    Q.  So why did they want you to be hired?
19    A.  Well, I mean, I think it's a -- you know,
20 they have a quite a large exposure there, significant
21 exposure. There was a lot of loans that they made to
22 both 777, 600, and other enterprises in the business.
23 They also recaptured through the recapture arrangement
24 at 777 Re, some of the loans that 777 Re had made to
25 these related party entities, right?

Page 61

1         777 Re had been making loans and investments
2 in the affiliate companies and those were ultimately
3 recaptured in the various recapture agreements. So
4 they had a -- they have a large exposure to this
5 enterprise.
6    Q.  Yeah.
7         How much exposure do they have to this
8 enterprise, A-CAP that is?
9    A.  Yeah. I can't recall the exact numbers, but
10 I've -- I -- I -- at some point I knew the numbers,
11 you know, on the top of my tongue.
12    Q.  Could you ballpark it?
13    A.  Well, certainly more than a billion. I
14 don't know where it is today. A lot of it has come
15 down, but significant.
16    Q.  More than 2 billion?
17    A.  I don't -- I don't know if it -- I don't
18 know if it got up to 2 billion.
19    Q.  Okay. You think between 1 and 2 billion
20 seems -- I'm not going to hold you to this, but does
21 that sound about right?
22    A.  I -- I -- I'm -- I'm just remembering that
23 I -- I'm pretty sure it was -- there was -- it was
24 over a billion.
25    Q.  I understand. Yeah, I'm -- it's not a

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 62

1  memory quiz.
2      A.  Yeah.
3      Q.  I'm just trying to get a sense.
4          Have you discussed this lawsuit that was
5  filed in Florida with Mr. King or anyone from A-CAP?
6      A.  I have not.
7      Q.  So you did -- so you -- you mentioned that
8  you had spoken with Mr. King more frequently at the
9  beginning of your engagement here, right?
10     A.  Yes, sir.
11     Q.  And what were his, you know, primary
12  concerns at that time?
13         MR. PELLEGRINO:  Objection to form.
14         THE WITNESS:  I'm just trying to think of
15     the -- some of the early conversations and -- and
16     all that.
17         It was, I think, just more about, you know,
18     control -- you know, like are you guys getting
19     control of the situation, like that type of --
20     more about that, you know.  And the -- and some of
21     the underlying businesses.  You know, the funding
22     of some of these businesses.  Some of the loans
23     that they recaptured.
24  BY MR. STARR:
25     Q.  What does it mean to recapture a loan?  How

Page 63

1  does that --
2      A.  Excuse --
3      Q.  -- work?
4      A.  Excuse me if I'm -- the -- the -- so 777 Re
5  was a reinsurance business.  And when insurance
6  company is writing premiums, the amount of premiums
7  they could write is related to their capital base.  So
8  a lot of insurance companies use reinsurance
9  businesses so that they can write more premiums.  So
10  in a very simple way -- and I'm telling you what
11  reinsurance is before I tell you what a recapture is
12  because you can't understand B without A.
13         So some of the premiums that are collected
14  are -- the risk of that premium, the -- the parts --
15  parts or all of the premium are transferred to a
16  reinsurance enterprise.  And so is the ultimate risk
17  related to that premium.  And I happened to have done
18  a lot of work in this area, so I'm -- I'll probably
19  give you more than you care to know.
20         So then the reinsurance enterprise has to
21  manage their business in a way that they have
22  liquidity to their risks because now they've taken on
23  some of the risks.  And -- so reinsurance business
24  will manage the funds in the same way.  They'll have
25  some funds investigated in, you know, liquid

Page 64

1  securities and they'll have some in longer term
2  assets, depending on the type of insurance that it
3  relates to.  If it's life insurance or property
4  casualty or whatever, you have to match.
5          Anyway, so the reinsurance business has
6  certain assets.  Those assets are loans that it made
7  or other assets.  And I -- I have not studied all the
8  reinsurance arrangement between A-CAP and Heymarket
9  and 777 Re.  But at some point Heymarket and A-CAP and
10  their insurance-related entities recapture the assets
11  and liabilities associated with the original
12  reinsurance.  And the recapture is a very complex
13  transaction and, you know, so I -- I don't want to
14  get -- I don't know the details of all the recapture
15  transactions.  But some of the assets that were at 777
16  were recaptured.  And those assets are primarily loans
17  and investments.
18     Q.  With respect to your initial communications
19  around your engagement, whether with Mr. McClintock or
20  A-CAP or 777, are those memorialized in writing?  Were
21  there e-mails?
22     A.  I -- I don't know if I ever communicated in
23  e-mail with Mr. McClintock because it was more like an
24  introduction, right?
25     Q.  Mm-hmm.

Page 65

1      A.  Like he wasn't -- I wasn't working with him
2  at all.
3      Q.  How about Mr. King and Ms. Gettman?
4      A.  There may be -- there may be e-mails with
5  Mrs. -- Mr. King and Mrs. Gettman, I don't know.  I
6  mean...
7      Q.  In the course of being retained, did you
8  speak with any lawyers from Cadwalader, Wickersham &
9  Taft?
10     A.  I don't believe we spoke with them until we
11  were actually retained.  It was a very quick...
12     Q.  So you did speak with lawyers from
13  Cadwalader after you were retained?
14     A.  Yes.
15     Q.  With whom?
16     A.  You know, anybody that was at the -- there
17  was a lot of Cadwalader lawyers at the courthouse,
18  that was the group in the -- in the -- there was
19  medi- -- a court imposed -- a court sanctioned
20  mediation and the primary lawyers from Cadwalader are
21  Ira Schacter and Jonathan Watkins and -- I mean, those
22  are the two that I -- that I -- there were some other
23  fellows.  I can't -- I can't remember everyone's name.
24     Q.  Did you discuss strategy with respect to the
25  litigation, the New York litigation, with those



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 66..69

Page 66

1 lawyers?
2      MR. PELLEGRINO: I'm going object, based on
3 a common interest privilege.
4      And I'm going to ask you not to disclose the
5 subject of conversations with Cadwalader regarding
6 strategy in the New York litigation.
7      MR. STARR: Okay. What's the common
8 interest?
9      MR. PELLEGRINO: The common interest, we're
10 both defendants in the New York litigation.
11     MR. STARR: Okay. Do you have a common
12 interest agreement?
13     MR. PELLEGRINO: I do believe we do.
14     MR. STARR: Okay. Did you instruct him not
15 to answer or he can answer, right?
16     MR. PELLEGRINO: I'm directing you not to
17 answer.
18 BY MR. STARR:
19     Q.  The question was: Have you discussed
20 strategy with respect to the New York litigation with
21 any lawyers from Cadwalader?
22     MR. PELLEGRINO: I'm going to direct you not
23 to answer that.
24     MR. STARR: That's --
25     MR. PELLEGRINO: Oh.

Page 67

1      MR. STARR: He's allowed to answer yes or
2 no. I'm not asking "what did you say?"
3      MR. PELLEGRINO: I thought he already said
4 yes.
5      THE WITNESS: Well, I don't -- I don't --
6 and I don't think it's a yes. I think it's --
7 it's -- it's -- so I won't say what any of the
8 conversation. I don't believe it's anything about
9 the strategy of the litigation. We've had
10 conversations about settlement, about the
11 waterfall, liquidating trust, but I -- they
12 wouldn't -- I'm not a lawyer. I would not -- I
13 don't know what their strategy is.
14     MR. PELLEGRINO: Just -- just to be clear, I
15 believe -- and correct me if I'm mischaracterizing
16 here, but I think the question concerned the time
17 period during the engagement.
18     MR. STARR: No.
19     MR. PELLEGRINO: Oh, okay. You're asking at
20 any time?
21     MR. STARR: Well, we're -- we're talking --
22 well, first we were talking about the time period
23 during -- at retention. And now we're talking --
24 now we're just talking about at any point after
25 that.

Page 68

1      THE WITNESS: Yeah, prior to -- prior to
2 retention, I don't think so.
3 BY MR. STARR:
4      Q.  And so -- and you testified that it did not
5 involve legal strategy. So what did you discuss?
6      A.  Our discussions have been around the --
7      THE WITNESS: I mean, I can answer? I mean,
8 I'm not -- I'm not talking about strategy. I
9 mean, I don't want to go against my counsel, but
10 what -- what am I supposed to do here?
11     MR. PELLEGRINO: I think we should have a
12 conference regarding privilege.
13     MR. STARR: Off the record.
14     THE VIDEOGRAPHER: Okay. Off the record at
15 9:50.
16     (A recess was taken.)
17     THE VIDEOGRAPHER: We are back on the
18 record, and the time is now 10 o'clock.
19     MR. STARR: Okay.
20     MR. PELLEGRINO: We have not -- we have had
21 an opportunity to discuss the issue of privilege,
22 and I'm going to direct Mr. Ratner not to discuss
23 the sum or substance of any conversations with
24 Cadwalader due to the common interest agreement.
25     MR. STARR: I'm just going to ask a couple

Page 69

1 of questions to test that assertion.
2 BY MR. STARR:
3      Q.  Mr. Ratner, in the New York litigation,
4 A-CAP and 777 Partners are both defendants in that
5 litigation, correct?
6      A.  Yes, sir.
7      Q.  Are their interests in that litigation
8 aligned?
9      A.  Partially.
10     Q.  Can you elaborate?
11     A.  I mean, the --
12     MR. PELLEGRINO I'm going to object to form.
13     MR. STARR: That's fine.
14 BY MR. STARR:
15     Q.  You can answer.
16     A.  It would create the -- and, again, I'm
17 just -- I mean, this is free flow. I'm thinking. I
18 mean, you've asked me a question and I'm thinking
19 about it.
20     MR. PELLEGRINO: It's also a legal analysis.
21     MR. STARR: Enough with the speaking
22 objections.
23 BY MR. STARR:
24     Q.  You can answer.
25     A.  The -- you know, would -- it would create --



UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                        Pages 70..73

Page 70

1  to the extent that the case is successful, would
2  create further claims against the company, right?
3  And -- and although -- although A-CAP, again, may be a
4  senior lender, those claims, you know, could affect
5  their collateral, right?  So I think that would be one
6  part of it.  There's no question that the lawsuit has,
7  from a common perspective, caused a decline in the
8  value of the underlying businesses.  I mean, some of
9  those -- some of that is happening realtime, right?
10 So at the time there's no question that the lawsuit
11 affected the value of the businesses and the
12 underlying collateral for everybody.  So that's
13 common.
14         So I -- I think there's pieces of it.
15 Again, I -- as I said to you, I did not go back and
16 read the complaint prior to the deposition, but I -- I
17 think there's some commonality.
18    Q.  So is the common interest that both A-CAP
19 and 777 would lose money if they lose the lawsuit; is
20 that -- is that what you said?
21    A.  No, the collateral would be damaged.  The --
22 the underlying businesses damaged.  The businesses --
23 the businesses that -- they've already been damaged.
24 I mean, the bus-- the businesses that are owned by
25 777 and 600 Partners have deteriorated because of

Page 71

1  the -- a lot of that is coming to pass, as Mark
2  Shapiro talked about in terms of the depletion in the
3  value of the businesses.  And that affects both the
4  company, obviously the company is the value, and it
5  also affects the value of the collateral to the
6  lenders.
7    Q.  Are the businesses of A-CAP and 777 Partners
8  intertwined?
9    A.  I don't think so.
10   Q.  So then why would --
11   A.  Well, the collateral.  They're -- they're --
12 they're -- they -- they are a lender.  So they --
13 the -- certainly from a -- from an outside
14 perspective, to the extent that the -- ultimately to
15 the extent that 777 and 600 Partners are damaged
16 and -- and the underlying businesses are damaged, that
17 would affect the collateral and affect the value of
18 the loans.
19   Q.  So your counsel has asserted a common
20 interest privilege and the interest that you've
21 identified, depletion of -- or, you know, diminution
22 in value of collateral, that would -- that would apply
23 to every single creditor of 777 Partners, would it
24 not?
25   A.  I think so.

Page 72

1    Q.  Okay.
2    A.  You were asking me about these two.  You're
3  asking me the company.
4    Q.  Right.
5         Well, because he's instructing you not to
6  answer my question based on a common interest and --
7  and the one you just identified sounds, well, common
8  in -- in the usual sense of that word, but common to
9  every creditor.
10   A.  Well, it's certainly common to them.
11   Q.  And every single other creditor, correct?
12   A.  I think so.
13   Q.  Okay.  You said --
14   A.  Stakeholder.  Every -- every stakeholder.
15   Q.  Leadenhall included?
16   A.  Yes.
17   Q.  Okay.
18       MR. STARR:  Well, I assume you wouldn't
19   assert a common interest privilege objection as to
20   Leadenhall.
21 BY MR. STARR:
22   Q.  You said that the -- the lawsuit could lead
23 to further claims.  Did you -- did you mean further
24 claims against A-CAP?
25   A.  No, against the company.

Page 73

1    Q.  Further claims by whom?
2    A.  Well, the -- you would have a -- you --
3  you -- right now you have a litigation claim.  But
4  if -- if they win the case or if there's a judgment,
5  that would be a litigation -- that would be a -- an
6  unsecured claim against the company.
7    Q.  I see.
8         So you're saying an additional -- I
9  understand.  I thought you meant further litigation
10 claims.
11   A.  No.
12   Q.  You mean an unsecured claim?
13   A.  Yeah, it would -- it would -- it would -- it
14 would create another claim on the company.
15   Q.  Okay.  Any other way in which their
16 interests are aligned?
17   A.  Oh, I'm -- I'm -- I'm -- a claim on the
18 company wasn't necessarily -- going back to the
19 original question.  I mean, again, I haven't looked at
20 the complaint.  Some of this sounds like it's -- it's
21 a little bit more legal in -- in -- in content.  But
22 they are both defendants, the company and A-CAP.
23   Q.  Is there any other way that the interests of
24 A-CAP and 777 Partners are aligned in this matter?
25   A.  Well, I think I've -- I've -- I think I've



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 74

1 said them.
2    **Q.  Yeah.  I was asking:  Is that all?**
3    A.  For now, yeah, I guess.
4    **Q.  Okay.  Does Smith Gambrell represent you in**
5 **this case?**
6    A.  Me personally, no.  They represent 777 and
7 600 Partners.
8    **Q.  Okay.  Does BakerHostetler rep- -- represent**
9 **you in this case?**
10    A.  I think BakerHostetler is representing B.
11 Riley.
12    **Q.  Okay.**
13    A.  Not me personally.  I don't -- I don't have
14 counsel personally.  But, yes, B. Riley --
15 BakerHostetler is representing B. Riley.
16    **Q.  Did -- did BakerHostetler handle the**
17 **document collection in review for B. Riley in this**
18 **case?**
19       MR. PELLEGRINO:  Objection to form.
20       THE WITNESS:  I -- I believe either
21    partially or all.  BakerHostetler represented us
22    in another case where we were named as defendant.
23    And then when this discovery -- document discovery
24    and e-mail discovery started, our general counsel
25    Rebecca Hollander wanted to bring in counsel for

Page 75

1    B. Riley.  And that's how Baker got involved in
2    the document discovery and the e-mail discovery
3    and I've -- a lot of traffic I've seen on that
4    topic.
5 BY MR. STARR:
6    **Q.  Why did she want to bring in separate**
7 **counsel for B. Riley?**
8       MR. PELLEGRINO:  I'm going to warn you not
9    to discuss the sum and substance of those
10    communications with your counsel.
11       THE WITNESS:  I -- I -- I -- I did not speak
12    to Rebecca directly on that topic.
13 BY MR. STARR:
14    **Q.  Okay.  Do you have a view?  Would you allow**
15 **Smith Gambrell to collect and review your e-mails in**
16 **this case?**
17       MR. PELLEGRINO:  Objection to form.
18       THE WITNESS:  Again, I'm following
19    counsel's -- Rebecca is general counsel of the
20    company and -- and -- and she's involved in this
21    document discovery.
22 BY MR. STARR:
23    **Q.  Do you yourself, setting aside**
24 **Ms. Hostetler -- sorry, what was her name?**
25    A.  Hollander.

Page 76

1    **Q.  Hollander.  Hostetler is the law firm,**
2 **excuse me.**
3    A.  BakerHostetler, sorry.
4    **Q.  So setting aside Ms. Hollander's views, do**
5 **you personally have any concerns that -- about B.**
6 **Riley's potential exposure in litigation relating to**
7 **either of those Leadenhall matters?**
8       MR. PELLEGRINO:  I'm going to object to
9    form.
10       THE WITNESS:  Now I can answer?
11 BY MR. STARR:
12    **Q.  Yes, you can answer.**
13    A.  I -- I -- I don't -- I don't believe -- when
14 you say "these matters," you're --
15    **Q.  The New York litigation filed by Leadenhall**
16 **and the Florida litigation filed by 777.**
17    A.  No.
18    **Q.  Okay.  Did you not allow Smith Gambrell to**
19 **review your documents due to confidentiality concerns?**
20       MR. PELLEGRINO:  Objection to form.
21       THE WITNESS:  Okay.  So Mark is -- is is
22    running the day-to-day on this.  I -- what I
23    believe has happened is the query -- the -- the
24    concern, I think, from B. Riley's perspective was
25    that other client information was going to get

Page 77

1    captured in the search from the search terms or
2    something like that.  And I think that was
3    concern.
4       But, again, I -- I have not been -- I know
5    there's a lot of activity going on and -- and I've
6    produced some e-mails that I had on my -- that I
7    just, hey, I have a couple things.  But I know
8    there's a lot of activity on it, so I don't...
9       Too many lawyers for me to get involved and
10    push them around.
11 BY MR. STARR:
12    **Q.  Understood.**
13       And do you know whether -- so I
14    understood -- I understand that you self-selected
15    certain e-mails to be produced in this case; is that
16    correct?
17    A.  Yes, sir.
18    **Q.  Do you know whether counsel BakerHostetler**
19 **or other counsel collected your entire mailbox to**
20 **search?**
21    A.  So I had a folder called "data intrusion."
22    **Q.  Mm-hmm.**
23    A.  And I -- and there were 60 or something
24 e-mails in there.  And I -- I don't know if -- if --
25 if I told Rebecca Hollander or Jonathan Lee, there's a


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 78

1 fellow internally.
2  Q.  Mm-hmm.
3  A.  Somehow those were captured and given to
4 somebody earlier this week.  And I -- and certainly my
5 entire -- the system is -- B. Riley has all my e-mails
6 and they have my mailbox, so they absolutely have
7 access to everything.
8  Q.  Okay.
9  A.  And I think they're doing that for me and
10 Mark.
11  Q.  If a company for which you're serving as a
12 restructuring officer suffers a loss at the hands of
13 its former management, do you think you'd have a duty
14 to pursue recovery on that claim?
15  A.  Possibly.
16  Q.  Well, would you pursue such a claim?
17 Setting aside whether or not you have a duty, would
18 you?
19     MR. PELLEGRINO:  Objection to form.
20     THE WITNESS:  Say it again.  If a former?
21 BY MR. STARR:
22  Q.  If a company for which you're serving as a
23 restructuring officer or independent manager suffered
24 a loss at the hands of its former management, would
25 you pursue recovery of that loss?

Page 79

1  A.  Yeah.  Sometimes you do that through
2 insurance.
3  Q.  Sometimes you do that through what?
4  A.  Through insurance.
5  Q.  How so?
6  A.  Well, if -- if there was D&O coverage or
7 other types of fraud fidelity coverage, you would try
8 to make claims on -- on those -- on those basis.
9  Q.  Has 777 Partners or 600 Partners made any
10 complains on any applicable D&O insurance policies
11 relating to the allegations in these cases?
12  A.  Mark is in a better position to comment on
13 that.  I mean, the -- the insurance companies are on
14 notice of everything going on and there's a -- Marsh
15 McLennan is the -- we brought in Marsh as the broker.
16 Like there's a lot going on, I'm not managing that
17 process.
18  Q.  Have you considered whether 777 Partners or
19 600 Partners has valid claims against its former
20 management, Mr. Pasko and Josh Wander?
21  A.  I mean, I think at a very high level, yes.
22  Q.  And what are your thoughts on the matter?
23  A.  That's such an open-ended question.
24     At a very high level, any of the businesses
25 that have produced losses, in many cases, Mr. Wander

Page 80

1 and Mr. Pasko have a lot of detail about why that
2 happened.  What -- this didn't happened according to
3 plan, that didn't happen according to plan.  This was
4 an issue here, that was an issue there.  In other
5 words, not -- it's -- you know, it's -- it's not as --
6 it's not a -- you know, there's a lot to it.  So
7 that's -- that's what I would say.  So you've
8 thought -- we've thought about it.  We've considered
9 it.  But, you know, there's a lot of pieces of the
10 puzzle to unwind.
11  Q.  And in terms of whether to pursue such a
12 claim against Wander or Pasko, would you draw a
13 distinction between just mismanagement and fraud?
14  A.  I believe so.
15  Q.  Would that affect, you know, your view on
16 whether to actually pursue such a claim?
17  A.  Yes, sir.
18  Q.  Okay.  Do you have a view on that issue,
19 whether either of them has committed mismanagement or
20 fraud?
21  A.  I don't have a formal view, no.
22  Q.  Do you have an informal view on that matter
23 or any view?
24  A.  Yeah.  It's -- it's not really my job.  Like
25 it's not what -- I'm not charged with that.  I'm not

Page 81

1 forming an expert opinion on something like that.  I
2 mean, we -- we know the allegations in the complaint.
3 We've put a box around Suttonpark.  We're doing all
4 the reconciliations necessary.  And -- and we're
5 dealing with the problems that we have in front of us
6 with the different businesses.
7  Q.  And you -- you have not yourself
8 investigated or directed that an investigation be done
9 into whether Mr. Pasko or Mr. Wander committed fraud;
10 is that correct?
11  A.  Well, are you separating Suttonpark from the
12 rest of the enterprises or are you just -- is that a
13 blanket statement?
14  Q.  No, I -- I'm not attempting to separate
15 Suttonpark.  So...
16  A.  Well...
17  Q.  Does that affect your answer?
18  A.  Yeah, I think it does.
19  Q.  Okay.  Can you explain?
20  A.  As Mark -- Mark used the word
21 "investigation" a little more freely than me, but
22 there has been a lot of work and investigative work,
23 forensic investigative work at Suttonpark around the
24 collateral base, the loans, which -- which pieces of
25 collateral are there and assigned to which loans.  And


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 82

1  there's a number of portfolios where that type of work
2  has occurred.
3       I differentiate that a little bit, as I said
4  before, fraud in-- in-- -- in-- -- involves, you know,
5  the intent, the benefit, you know, the e-mails, the in-
6  you know, who said what to who and why, how was it
7  covered up. And, you know, that's -- it's different
8  than investigating the financial attributes of the
9  collateral and the portfolios.
10  **Q.  Can I interject there?**
11  A.  Sure.
12  **Q.  So have you ever overseen a fraud**
13  **investigation into former management at a company, you**
14  **know, that -- that -- that's been -- that has retained**
15  **you?**
16  A.  Sure.
17  **Q.  And what do you typically do to investigate**
18  **fraud in that situation?**
19  A.  Well, you are -- maybe I should finish my --
20  the first question.
21  **Q.  Sure. Go ahead. Yeah, yeah.**
22  A.  I wasn't finish.
23  **Q.  I don't mean to --**
24  A.  Yeah.
25  **Q.  Yeah, yeah. Go ahead.**

Page 83

1  A.  So -- so with regard to the rest of the
2  enterprises, I mean, you know, we've been running
3  those businesses and managing the cash flows in those
4  businesses. And as Mark said, FFI went into a
5  bankruptcy, you know, this business is being -- you
6  know, there's all -- all these different businesses
7  have different stories to them. But we haven't done a
8  broad sweeping investigation into any of those
9  businesses. That's not our mandate.
10       So that's a -- more of a complete answer
11  where I've separated --
12  **Q.  Mm-hmm.**
13  A.  -- the reconciliation of the accounts --
14  **Q.  I understand.**
15  A.  -- to the front of us.
16  MR. PELLEGRINO:  Peter --
17  Sorry, are you finish?
18  THE WITNESS:  Yes, sir.
19  MR. PELLEGRINO:  Peter, I just -- I just
20  want to -- what?
21  MR. STARR:  What? I'm just in the middle of
22  a line of questioning here. What?
23  MR. PELLEGRINO:  Well, I think he's -- he's
24  done with his answer.
25       I'm just wondering whether you're going to

Page 84

1  get to some of the stuff that's relevant in the
2  case. I've -- I've let him --
3  MR. STARR:  All right.
4  MR. PELLEGRINO:  I let him answer for
5  collateral stuff.
6  MR. STARR:  I got you. Okay. I'm -- I'm --
7  this is relevant.
8  BY MR. STARR:
9  **Q.  So -- so if I understood your testimony,**
10  **you're saying that, you know, there has been some**
11  **forensic accounting investigation done, but that to**
12  **investigate fraud you need to look more broadly**
13  **because there's elements like intent and you need to**
14  **look at e-mails and you, know, interview employees, et**
15  **cetera; is that fair?**
16  A.  Yes, sir.
17  **Q.  And that that is not --**
18  A.  In my view.
19  **Q.  Yeah. Yes. All of this is your -- yes.**
20  **Just trying to summarize your testimony.**
21  A.  And -- and Jim Howard may have done some of
22  that, vis- -vis his reconciliations and -- and his
23  work at Suttonpark. But I just don't remember what he
24  did there. I don't -- I don't have that at my
25  fingertips.

Page 85

1  **Q.  And you have done that before?**
2  A.  Yes, sir.
3  **Q.  In fraud investigations?**
4  A.  Yes.
5  **Q.  But that's not -- why is that not your**
6  **mandate here but it has been before?**
7  A.  Well, because -- so, I mean, one, I'm
8  just -- I mean, there's so many cases in 35 years.
9  But it's what you're retained to do. I mean, you --
10  you use specifically prior management. So I've had
11  cases where new management comes in and they're
12  saying, Ian, we think prior management brought 12
13  companies and overpaid those -- overpaid for those
14  companies because they have a relationship with
15  somebody in those companies and they got a kickback.
16  Can you go and investigate those 12 acquisitions, get
17  all the papers. So what do you do? So you have --
18  it's a very specific mandate. You've got to go get
19  all the acquisition paperwork. You got to do a
20  valuation. Go -- go look at the offers. Look at the
21  purchase price. Look at the relationships between the
22  executives and the transactions. Maybe do some public
23  record searchs. Maybe some Kroll type investigative
24  work. Maybe people. Completely different mandate.
25  **Q.  So who set the mandate for your engagement**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                   Pages 86..89

Page 86

1 here?
2     A.  We set the mandate in the agreement letter
3 with 777 Partners and 600 Partners.  The scope --
4     Q.  So just --
5     A.  Generally -- generally we've been in that
6 scope.
7     Q.  So Mr. Wander and Mr. Pasko set the mandate?
8     A.  No.  We set the mandate in the engagement
9 letter that we issued to them.
10    Q.  So B. Riley set its own mandate?
11    A.  Well, we discussed what -- what -- yes.
12 We're coming -- we're coming in -- we were coming in
13 to really take over the day-to-day operations of the
14 business going forward and to secure the assets and
15 to -- to make sure that budgets were prepared and, you
16 know, the -- the -- overseeing of the business.  We
17 weren't retained to -- to -- to be an examiner and go
18 back and -- and do a fraud investigation.  You have --
19 as I said before, I've already said it five times.
20 You have a very detailed complaint.  You're going to
21 hire forensic accountant.  He's going put it all
22 together if he can and he's going to testify that this
23 is what he thinks happened.
24    Q.  But you said you're an independent fiduciary
25 in this case, right?

Page 87

1     A.  We're -- yeah.  We're running the business
2 under our watch.  What happened going forward, trying
3 to marshall the assets, protect the creditors today,
4 reduce the expenses, ensure that nothing further on
5 our -- why did we put a wall around Suttonpark?
6 That's where there was a lot of allegations.
7         So guess what, nothing is going to happen
8 there without Jim Howard involved or Teresa Licamora,
9 et cetera.  We're going to put a new team there and --
10 and Michael Spectra (phonetic) and the team there.
11 And, you know, we're -- we're coming in at -- at a
12 point in time -- like I'm going to give you the
13 classic example.  Okay?  And you can research it.
14        If you're a receiver for a business and
15 there was a fraud a couple years ago in the business,
16 is the receiver obligated to investigate the fraud
17 from 3 years ago?  You can research it and you can
18 tell me what you find.  It depends what the receiver
19 order says.  Okay?  And I think Mark even testified to
20 another case that he's been involved with that there
21 was a fraud, there was a DOJ investigation.  Okay, it
22 happened.  They're running the business going forward.
23    Q.  So was it your decision not to investigate
24 fraud by former -- former management?  I understand
25 you're saying you -- you're only viewing your

Page 88

1 responsibility prospectively.  But was it your
2 decision not to touch that?
3     A.  I -- I think Mark's testimony on this point
4 was good.  There's a million things going on and we
5 assessed the importance of dealing with the budgets,
6 cash flow, cutting expenses, and moving down the path
7 and locking down any opportunity for further potential
8 losses due to alleged fraud.
9     Q.  What I'm --
10    A.  Going back and investigating what happened
11 in 2022 or 2023, we assess that -- that -- again, from
12 a financial perspective, we want to know what the
13 collateral is and analyze the collateral portfolio.
14 But our mandate wasn't -- our mandate as established
15 by us.
16    Q.  So that's what I'm -- that -- that's what
17 I'm trying to ask.
18    A.  I mean, it's just not -- it's just not.
19    Q.  So it was your -- so that's what I'm trying
20 to ask.  I'm trying -- and Mr. Shapiro said, you know,
21 we had to -- it wasn't one of your priorities.
22    A.  It wasn't.
23    Q.  So I'm trying to understand who sets the
24 priorities.  Is that B. Riley?  Who sets the mandate
25 in your words?  Is that B. Riley?

Page 89

1     A.  We're absolutely independent.  We set the
2 priorities of what -- what we're doing in consultation
3 with our counsel.  We -- we are the ones that decide
4 what happens.  And -- and we consult with our counsel,
5 the Smith Gambrell firm, the Berger Singerman firm,
6 Jordi Guso, and we establish what is critical to be
7 working on.
8     Q.  So it was B. Riley's decision, okay, we will
9 not investigate fraud by former management; is that
10 fair?
11    A.  I mean, you -- you could say it a million
12 times.  There is a lot of detail in your complaint.
13 Okay?  More than maybe typically.  And you have a lot
14 of information there.  Have we gone and verified all
15 of the statements that you -- that the allegations
16 is -- were altered?  Jim may have done some of that,
17 but it -- it hasn't been our priority.  We've been
18 making sure that we know where the collateral is,
19 what's the value of the collateral.  Checking e-mails
20 and texts and what Bennett did and all.  We were not
21 retained to verify your complaint.
22    Q.  I understand that you haven't done that.
23    A.  Yeah.
24    Q.  I'm trying to ask:  Why not?
25    A.  It's just not -- it's just not necessary.

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 90

1 For what we're doing, our mission is to maximize
2 recoveries and run the operation and lock down the
3 business. Verifying your complaint, we just -- it's
4 just not -- it's just not -- it's just not critical to
5 what we're doing today.
6    **Q.  And those are priorities that B. Riley sets?**
7    A.  Yes, in consultation with our counsel.
8    **Q.  When you met with Mr. King and Ms. Gettman,**
9 **did they discuss your man- -- what your mandate would**
10 **be?**
11    A.  No.  It was stabilize.  It's, you know,
12 explaining to them what a CRO does.  It was not, oh,
13 we want you to -- you know, they didn't bring it and
14 it wasn't even on the table.
15    **Q.  And why wasn't that on the table?**
16    MR. PELLEGRINO:  Objection to form.
17    THE WITNESS:  It's just -- it -- it -- it
18 happened already.  It's not -- what -- what's more
19 important is to -- to lock down that it's not
20 continuing to happen and that there's -- there's a
21 handle on the collateral and the documents and
22 there's no -- no potential loss of documents and
23 that there's -- there's a system to make sure that
24 we have all the evidence secured.
25    We see this in many bankruptcy cases where

Page 91

1    there's a bankruptcy or a restructuring event and
2    you're dealing with what happened now.  There --
3    there could have been a fraud years ago, but it's
4    not -- the debtor's advisor is not, oh -- you
5    know, we've got to deal with the payroll, but
6    let's put all that on hold because we want to put
7    25 people going to investigate what happened
8    7 years ago.
9       In the Enron bankruptcy, that -- there
10    was -- there was a team running the company.  You
11    know, at some point there will be an investigation
12    or they'll be a review or, you know, there's an
13    examiner, whatever.  But it's not -- I mean, this
14    is just how it's done in our business.  It's a
15    very -- we're in a very typical role as a CRO or a
16    restructuring advisor.
17 BY MR. STARR:
18    **Q.  And -- and I'll tell you why I'm struggling**
19 **a little bit with this is because --**
20    A.  You could -- you could struggle.
21    **Q.  And -- and this is --**
22    A.  -- as much as you want.
23    **Q.  You know, and --**
24    MR. STARR:  And this is also to your
25    relevance objection, David.

Page 92

1 BY MR. STARR:
2    **Q.  Because you-all allege in this Florida case**
3 **that we're here on today, that all this was done so**
4 **that Leadenhall could get useful information in -- in**
5 **New York, right?**
6    A.  Yes, that's part of the allegation.  And
7 guess what?
8    **Q.  Yeah, that's part of the allegation.  So --**
9    A.  If we get into the details, you'll -- you'll
10 identify that during the summer of 2024, there was a
11 lot of work going on around discovery.  We had an
12 attorney named Chris Jarvinen at Berger Singerman
13 working directly with -- with Leadenhall about what
14 documents -- we were the ones trying to get documents
15 to -- to Leadenhall.  But only those documents that
16 were relevant to the collateral.  And guess what?  The
17 data intrusions happens right at the same time as all
18 that's going on.  That is suspicious, so...
19    **Q.  And -- and you were giving Leadenhall access**
20 **to the documents relevant to its collateral, correct?**
21    A.  Yes, we were.
22    **Q.  So --**
23    A.  And look what happened.
24    **Q.  And so -- and -- and -- and, yes, the**
25 **allegation is that the entire MPFin system was copied;**

Page 93

1 is that right?
2    A.  That's -- I think that's one of the
3 allegations.
4    **Q.  If Leadenhall already had access to its own**
5 **collateral portfolio files, why would it need the**
6 **entire MPFin system?**
7    A.  I don't know why.  I don't know why it would
8 need that.  I don't -- I'm not -- I'm not getting into
9 their intent.  I don't know why they would need the
10 Pasko e-mails or Jen Logee or whatever.  What --
11 you're comparing something that happened years before
12 we were on site as fiduciaries to something that
13 occurred while we were there.
14    As fiduciaries, there was an intrusions
15 under our watch and we decided to pursue it.  It's
16 just a different -- it's -- it's apples and oranges.
17 And maybe -- maybe in your mind it's the same and you
18 could convince somebody that it is.  That's fine.
19 Terrific.  We -- we decided that this is something
20 that happened under our watch and -- and by the way,
21 if A-CAP had an advisor and -- and -- and they were
22 the ultimate -- anyways, enough said.
23    **Q.  Doesn't Leadenhall allege in its complaint**
24 **in New York that the fraud is ongoing?**
25    A.  I -- I -- I can't recall.  I mean, I don't

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                            Pages 94..97

Page 94

1 know what fraud is ongoing. We're there. I don't
2 know what fraud is ongoing now.
3    Q.  Well, and have you investigated whether
4 fraud is ongoing now?
5    A.  I -- I don't -- I -- we're there working
6 every day. I don't believe there's a fraud going on
7 around us.
8    Q.  Okay. How many lawsuits asserting fraud
9 have been filed against 777 Partners or its
10 affiliates? Do you know?
11    A.  More than one.
12    Q.  More than ten?
13    A.  Probably.
14    Q.  Mm-hmm.
15        Do you know whether any of those has merit?
16 Have you investigated whether any of those have merit?
17    A.  I am involved in some of the litigation
18 cases. There's -- you know, there's -- again, some
19 are less active. I mean, some of them are ultimately
20 collection cases covered up with a lot of noise about
21 fraud. But there's -- there's other cases in --
22 the -- there are other litigation cases going on.
23    Q.  And isn't it true that there's a DOJ
24 investigation focused on the company?
25    A.  Yes, sir.

Page 95

1        MR. PELLEGRINO: Objection to form.
2 BY MR. STARR:
3    Q.  Have you been in contact with the DOJ at all
4 on that investigation?
5    A.  I have not personally been in touch with the
6 DOJ on that investigation.
7    Q.  Have your lawyers been in touch with the DOJ
8 on that investigation?
9    A.  We have counsel working for the company that
10 is in touch with the DOJ.
11    Q.  Which counsel is that?
12    A.  Nelson -- the Nelson Mullins law firm.
13    Q.  Okay. And how about an SEC investigation,
14 are you aware of an SEC investigation into the
15 company?
16    A.  I don't know if there's an active
17 investigation, but I know that -- that we -- we have
18 interacted with the SEC.
19    Q.  Was that -- was that also through the Nelson
20 Mullins firm?
21    A.  Yes, sir.
22    Q.  Do you know whether Mr. Pasko and Mr. Wander
23 are targets of either of those investigations?
24        MR. PELLEGRINO: Objection to form.
25        THE WITNESS: I believe in the DOJ

Page 96

1    investigation they are targets.
2 BY MR. STARR:
3    Q.  Did you tell the AJC that your world view is
4 that everything is one big Ponzi scheme?
5    A.  20-year-old article.
6    Q.  I Google.
7    A.  Yeah. The internet is a wonderful thing.
8 I -- I'd like to see the article, but literally it's
9 probably a 20-year-old -- 20-year-old media piece.
10        MR. STARR: Here you go. Let's introduce
11    that. That'll be Ratner Exhibit 2.
12        (Ratner Exhibit 2 was marked for
13    identification.)
14 BY MR. STARR:
15    Q.  It's not actually dated.
16    A.  (Perusing.)
17    Q.  Mr. Ratner, could you please identify this
18 document?
19    A.  Yeah. That is a "GlassRatner Sees Dark Side
20 of Business World." This is easily a 20 -- this is
21 a -- at -- at least a 20-year-old interview
22 (perusing).
23    Q.  I'll represent it's 2010. I just pulled it
24 up.
25    A.  So that's 14 years, maybe 15. And we see a

Page 97

1 lot of fraud. We do see a lot of fraud cases in our
2 business. And we have worked on a number of Ponzi
3 schemes, which I do not -- I don't believe this is a
4 Ponzi scheme. There's an underlying business here.
5    Q.  And Mr. Glass, your partner, says "Ian
6 thinks everybody is a criminal," right?
7    A.  I'm skeptical. Maybe not as skeptical as I
8 used to be. As you get older, you -- you maybe -- you
9 lose that sharp edge. But, yeah, I know we -- in
10 the -- in the early -- as I said to you earlier today
11 that when I was with Kroll, I did a lot of fraud work.
12    Q.  Yeah.
13        So I just -- just to -- just to lay it out,
14 you know, you've got --
15    A.  You just want to have some fun today.
16 That's fine. I don't -- it's -- it's your deposition.
17 I -- this does not bother me.
18    Q.  You've got DOJ and SEC investigations.
19 You've got numerous lawsuits alleging fraud. You have
20 the Leadenhall lawsuit asserting fraud. But B. Riley
21 has determined it's not important to investigate those
22 allegations of fraud against former management?
23    A.  Absolutely not. What you're saying is --
24 all of the allegations that you're talking about are
25 related to the Suttonpark Capital business. Why do

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 98..101

Page 98

1 you think one of our first missions -- let's assume
2 that everything that happened in your complaint is
3 true.  What -- what do you need me for?  You're going
4 to have your own forensic accountant.  You're going to
5 have your own expert.  You're going to -- you're going
6 to put together a fraud review.  What you need me, as
7 a restructure advisor, to do is to lock down Sutton
8 Capital and ensure that there's a fence around it, and
9 that's what we did.
10        As a restructuring advisor, that's what we
11 care about is making sure that under our watch we lock
12 down that business.  We get a handle on the
13 collateral.  We get a handle on the bookkeeping.  We
14 apply the cash collections properly.  We try to catch
15 up on the reporting, which we've done as best we can
16 with Leadenhall on this portfolio and others, right?
17 Insurity, other -- you know, we -- we were the ones
18 saying hey, CBIZ you're coming in to audit Insure,
19 we -- come in.
20        So you have to separate what's going on.
21 Like we're -- we're -- we're trying to ensure that you
22 actually get a recovery.  And -- and by doing that,
23 we're actually working on the business going forward.
24 And that's just a separate mission.
25    Q.  I understand what you're saying.

Page 99

1        I just -- you are an independent manager
2 with fiduciary duties, you've said?
3    A.  Yes.
4    Q.  That B. Riley has assumed the management as
5 an independent manager?
6    A.  Yeah.
7    Q.  I'm just curious why -- I'm asking why B.
8 Riley hasn't assessed the validity of any liens and
9 claims that A-CAP is currently exercising remedies on?
10    A.  That -- that's the first time you asked that
11 question.
12    Q.  Okay.  Well, have you --
13    A.  Yes, we have.
14    Q.  A-CAP is an alleged co-conspirator in --
15    A.  But -- but --
16    Q.  -- in the Leadenhall case, correct?
17    A.  See, this is the first time you've asked
18 that question.
19    Q.  Okay.
20    A.  You've been asking me about why didn't we do
21 an investigation into the -- you know, and I've
22 explained that 12 times.  Now you're asking me about
23 did we look into the A-CAP liens and -- and -- and --
24 and, you know, that's a different question.
25    Q.  Okay.  So A-CAP is an alleged

Page 100

1 co-conspirator?
2    A.  Yes.
3    Q.  In the New York case?
4    A.  Yes.
5    Q.  And so as an independent manager with
6 fiduciary duties --
7    A.  Yes.
8    Q.  -- I would think you would have a duty to
9 look into the truthfulness of those allegations, to
10 investigate them factually to determine whether to
11 continue doing business with A-CAP.
12    A.  Yes.  We -- so we did a -- we did a debt --
13 they -- they have a lot of debt in this structure.
14 Okay?  And we retained Smith Gambrell to perform a
15 thorough review of all of the debt documents and the
16 debt -- the underlying agreements and ensure that the
17 collateral that they say they have, they have.  The
18 rights that they say they have, they have.
19        And we then took all of those loan documents
20 and we matched them up against the internal accounting
21 records to ensure that there was funds advanced
22 against those documents and the funds came into the
23 company.  And, you know, so we did a loan debt
24 collateral review for all of the -- for -- for the
25 work focused on A-CAP.

Page 101

1    Q.  Is that the extent of your analysis with
2 respect to A-CAP?
3    A.  That -- yeah.  Yes, to the -- to the extent
4 that we -- to the extent that we're validating their
5 position in the capital structure and all the debt
6 documents and the liens and the claims, we analyzed
7 all that.
8    Q.  All right.  Let's -- let's move on.
9        So what is Saiph Consulting?  When did you
10 first learn of Saiph, I guess I should ask?  Start
11 there.
12    A.  During the -- and this is a little more at
13 the Jim Howard/Mark Shapiro level.  But there was a
14 collateral audits that we were trying to facilitate.
15 As a restructuring advisor, that's something you would
16 do.  You would facilitate collateral audits.  We saw
17 that as our role.
18        And at some point, I guess, we learned that
19 Leadenhall was going to use Saiph Consulting.  And I
20 don't know if that was during the summer of 2024.  At
21 the same time, we were engaged in a very detailed
22 review of the information requests that were coming in
23 from -- I think primarily through Roger.  I don't know
24 if -- Roger Schwartz.  I don't know if he had -- was
25 still with King & Spalding or moved on.  But he was

UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 102..105

Page 102

1 the point on the information requests. Some we felt
2 related more to the litigation and some related to the
3 collateral audit. And Roger was working with a lawyer
4 named Christopher Jarvinen to facilitate the
5 collateral audit. And -- and Jim Howard and Mark
6 would have been trying to facilitate that as well.
7    Q. Do you have any understanding or are you
8 aware of whether Leadenhall sought to begin that
9 collateral -- collateral audit long before the summer
10 of 2024?
11    A. I -- they may have done that before we were
12 there. I don't know.
13    Q. It was before you were there.
14       Are you aware of any efforts by 777 --
15 legacy 777 employees to frustrate or delay the
16 collateral audit that Leadenhall sought to commence?
17    A. Only through my readings. I mean, I
18 don't -- I don't have any firsthand knowledge of that.
19    Q. Okay. Are you familiar with Saiph's
20 principal, Paul Kosinksi?
21    A. Only by name.
22    Q. Never met him?
23    A. Never.
24    Q. Never met Lauren Boersig?
25    A. Never.

Page 103

1    Q. Do you know who that is?
2    A. I think she was also a former employee. I
3 don't know.
4    Q. You read about her?
5    A. Yeah, yeah.
6    Q. Okay. Have you ever met Noah Davis?
7    A. I have not.
8    Q. And he resigned from 777 Partners before you
9 were retained, right?
10    A. Yes, sir.
11    Q. Have you ever communicated with Noah Davis?
12    A. I have not.
13    Q. Have you educated yourself about the
14 circumstances of Mr. Davis's departure?
15    A. Not really. I mean, I think he left before
16 we got there. That's all I know.
17    Q. He did. That -- that's why I asked if you
18 educated yourself about it.
19    A. Well, I knew he wasn't there when I --
20 when -- I knew Shawn Taheri was our guy. I don't -- I
21 mean, you know, we came there in May and we met a lot
22 of people. But I -- I don't think he worked there at
23 the time.
24    Q. It's correct he didn't work there at the
25 time. I -- I -- I hear you on that.

Page 104

1       Have you done anything to inform yourself
2 about the circumstances of his departure?
3    A. I have not.
4    Q. Okay. You said that you viewed facilitating
5 the collateral audit as part of your role; is that
6 right?
7    A. Yes, sir.
8    Q. Were you personally involved in determining
9 whether to grant access to Saiph for the collateral
10 audit?
11    A. I may have participated in a couple of
12 conversations around the -- there was a lot of noise
13 about letting a former employee in, a lot of noise
14 about it. And I may have participated in conversation
15 with -- with Jim Howard or -- or Mark Shapiro, for
16 sure Chris O'Reilly. Although I'm -- I'm becoming
17 less involved in, but I'm still on site a little bit.
18    Q. And to B. Riley's credit, you-all said, yes,
19 Leadenhall has this contractual right to inspect the
20 collateral, right?
21    A. Yeah. I mean, look, there was a lot of
22 concern about letting a former employee in. I mean,
23 in hindsight, it would have been better to use CBIZ.
24 They were -- or someone like that. They were
25 already -- you know what I'm saying? There's a lot of

Page 105

1 people that could do this. So in -- in hindsight,
2 the -- they -- there -- you know, but there was a lot
3 of concern about letting in a former employee.
4       And -- and I think by that time they
5 probably knew the contractor was also former employee
6 or the ITs. So there was a lot of concern about
7 letting in a former employee, a competitor in to do
8 the audit. But at some point -- at some point Mark
9 and I decided that -- we overruled the objections and
10 said let's go.
11    Q. Did you think that Saiph was a competitor?
12 Is it your view that Saiph was a competitor?
13    A. And I might be mixing up Paul Kosinksi
14 with -- with Fred Love. I think Fred was -- was going
15 to try to do servicing of portfolios, so maybe that
16 was a mix up. But there was -- so maybe it was more
17 about that. And I don't know exactly what all their
18 business angles at Saiph is. I did look on the
19 internet and see their website.
20    Q. Are you familiar with the MPFin system?
21    A. Just in passing. And I may have seen one
22 export from MPFin for myself. Not in prep. Just at
23 the time I may have been looking at a loan or
24 something.
25    Q. Did you actually look -- review what record

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 106..109

Page 106

1 information, receivable information looks like in
2 MPFin?
3    A.  Yeah, one time.  I think I was on the phone
4 with Jim and I said -- or maybe Teresa Licamora, you
5 know.  And I wanted to see an output.
6    Q.  Mm-hmm.
7        Was it easy to understand for you?
8    A.  I can't even remember to be honest.  It was
9 so long ago.
10       MR. STARR:  Do y'all want to take a quick
11 break?
12       Go off.
13       THE VIDEOGRAPHER:  Okay.  Going off the
14 record.  The time is now 10:53.
15       (A recess was taken.)
16       THE VIDEOGRAPHER:  We're back on the record.
17 The time is now 11:13.
18 BY MR. STARR:
19    Q.  So, Mr. Ratner, before the break we were
20 talking about Saiph Consulting, right?
21    A.  Yes, sir.
22    Q.  Leadenhall is not the only creditor of 777
23 that retained Saiph Consulting to perform a collateral
24 audit; is that right?
25    A.  Yes, sir.  I -- I only learned that in

Page 107

1 prepping for the deposition.
2    Q.  So you're aware of Northwestern Mutual's
3 audit?
4    A.  Yes, sir.
5    Q.  Do you know what the purpose of that audit
6 was?
7    A.  I think similar collateral audit.
8    Q.  Was there a collateral shortfall in
9 Northwestern Mutual's portfolio that you're aware of?
10    A.  I can't recall.
11    Q.  Was Northwestern Mutual looking for evidence
12 of fraud on the part of Suttonpark?
13    A.  I don't know.
14       MR. PELLEGRINO:  Objection to form.
15 BY MR. STARR:
16    Q.  Did anyone at 777 Partners or B. Riley
17 object to Northwestern Mutual's retention of Saiph to
18 perform the audit?
19    A.  I -- I don't think so.
20    Q.  I think you testified earlier that you first
21 learned of the intrusions in August -- Noah Davis, his
22 alleged intrusions in August of 2024?
23    A.  Yeah, I don't recall that exactly -- exactly
24 when I learned it.  It would have been probably after
25 Mark.

Page 108

1    Q.  Okay.
2    A.  And Chris O'Reilly, maybe Chris.
3    Q.  This lawsuit was filed in September of last
4 year, right?
5    A.  Yeah, late September.
6    Q.  Sometime between August and September you
7 learned of the intrusions?
8    A.  (No verbal response given.)
9        THE COURT REPORTER:  Verbally.
10       THE WITNESS:  Yes, ma'am.
11 BY MR. STARR:
12    Q.  Could you just walk me through what happened
13 from the time that you first learned of the
14 intrusions --
15       MR. MORLAN:  I'm sorry, are we on the
16       record?
17       MR. STARR:  Yes.
18       MR. MORLAN:  Okay.  I -- I was not in the
19       room.  Can we check and make sure everybody is
20       here after a break before we start?
21       MR. STARR:  Yes.  Sorry, Hal.
22       MR. MORLAN:  Thank you.
23       MR. STARR:  You didn't miss much.
24 BY MR. STARR:
25    Q.  Could you explain -- just walk me through

Page 109

1 what happened from the time that you first learned of
2 the intrusions to the time plaintiffs filed this
3 lawsuit that led you to believe that Leadenhall was
4 responsible for the intrusions.
5    A.  Well, I think that once the -- once the
6 intrusion was -- became known in August, there was
7 probably a conversation that -- about investigating
8 it.  And I think Mark was working with Shawn.  My --
9 my participation in that process would have been
10 connecting everybody with Eric Mazur because, of
11 course, Eric works for me.  I know him well.  He's
12 highly qualified.  So I would -- when I learned about
13 this, I said, oh, we -- we've got to get Eric
14 involved, this is what he does.  And then I would have
15 connected either Chris O'Reilly or Mark with Eric
16 Mazur.
17    Q.  Did you participate in any of the
18 discussions about investigating it, aside from your
19 recommendation to involve Mr. Mazur?
20    A.  Probably not.
21    Q.  So once Mr. Mazur was on board, he began
22 investigating; is that right?
23    A.  Working with Shawn and Jim Howard and Mark,
24 Chris O'Reilly, Mollie.
25    Q.  Was there, at some point, another meeting to

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 110..113

Page 110

1  discuss his findings?
2        A.  I don't know if it was a group meeting.  It
3  was very fluid.  It was a short time period.  I
4  remember asking somebody in an e-mail to send me his
5  findings, and they sent me a draft or an earlier
6  version of his findings.  And I don't think I talked
7  to Eric about it.  I think I talked to Mark and Jim
8  Howard about it.  So I -- I know at some point I asked
9  to get a draft of what he was working on.  Somebody
10  sent that to me internally.
11       Q.  You authorized the filing of this lawsuit;
12  is that right?
13       A.  Yes, sir.
14       Q.  Was it your intention --
15       A.  Well, with -- with Mark.
16       Q.  Sure.
17           Was it your intention to be guided in your
18  decisions about the litigation by whatever Mr. Mazur
19  found?
20       A.  I think it's part of it.  I mean, working
21  with Mark and Mr. Mazur and counsel, you know, we
22  wouldn't file a lawsuit without consulting with
23  counsel and working with counsel around the table.
24  That's not -- I wouldn't do that.
25       Q.  Mr. Mazur himself did not find any evidence

Page 111

1  linking Leadenhall to the alleged intrusions, right?
2           MR. PELLEGRINO:  Objection to form.
3           THE WITNESS:  Well, you asked me this a
4  little bit before.  I mean, to me, it's -- you
5  know, Leadenhall/has an agent, that agent is
6  Saiph, and then Saiph has a contractor and that's
7  Noah Davis.  Like to me it's -- that's their --
8  their arm.  Their -- like the employer is
9  responsible for the employee.
10  BY MR. STARR:
11       Q.  Did you investigate or rule out any other
12  possibilities, any other possible explanations?
13       A.  I -- I don't think anyone questioned -- I
14  think -- and I could be wrong.  I think my
15  understanding from reading the documents and nobody
16  questions that there was a data intrusion and
17  unauthorized access to various categories of
18  information.
19       Q.  My understanding is that plaintiffs only
20  contend that Noah Davis himself, as far as the person
21  who made -- who actually made the intrusions,
22  plaintiffs contend that was Noah Davis; is that your
23  understanding?
24       A.  Yes, sir.
25       Q.  And Mr. Davis had an independent connection

Page 112

1  and history with 777 Partners, right?
2        A.  Yes, sir.
3        Q.  Mr. Taheri was Mr. Davis's direct report,
4  right?
5        A.  Yes, sir.
6        Q.  And Mr. Taheri testified in this litigation
7  that Mr. Davis was extremely disgruntled.  Are you
8  aware of that?
9           MR. PELLEGRINO:  Objection.  Objection to
10  form.
11          THE WITNESS:  I don't know what he said.
12  I -- I -- I -- I don't know exactly what he said.
13  I think I read that in one of your pleadings.
14  When I say "your," I mean a Leadenhall pleading,
15  sorry.
16  BY MR. STARR:
17       Q.  But is it the case that you didn't
18  investigate whether Mr. Davis had his own personal
19  motives to commit the intrusions?
20       A.  I mean, we didn't interview -- we did not
21  interview Noah Davis.
22       Q.  Who came up with the idea of --
23       A.  I mean, actually, it's the inverse.  I mean,
24  maybe Leadenhall should have done an internal
25  investigation and given us the results of their

Page 113

1  internal investigation about their contractors.  So, I
2  mean...
3        Q.  Did you reach out to Leadenhall before
4  filing the suit?
5        A.  I did not.  I just thought of that now.
6  It's a good idea.
7        Q.  Did anyone?
8        A.  Did you -- did you do an investigation?
9        Q.  I don't -- I don't think I'm answering your
10  questions today, Mr. Ratner.
11       A.  Yeah.  You can.
12       Q.  You've done this a couple hundred times.
13       A.  Yeah.  I mean, you can.
14       Q.  We're not going to do that.
15       A.  I don't know.  I don't know.
16       Q.  No, thanks.
17       A.  I didn't reach out to anybody.  I wasn't --
18  again, at this point I'm not running the day-to-day
19  case at -- at -- at the -- at 777, so...
20       Q.  Do you know whether anyone at B. Riley or
21  777 reached out to Leadenhall to ask about these
22  intrusions before filing suit?
23       A.  I don't know.
24       Q.  And -- and who came up with the idea that it
25  was Leadenhall behind these intrusions?

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**UNIVERSAL**
**COURT REPORTING**

Page 114

1    A.  Well, I think we lay out the -- the
2  groundwork for that in the interrogatories.  But
3  it's -- it's not that they're behind it.  It's their
4  agents.  So their agents are working for them.  And
5  then when you start looking at the fact that it's
6  complex litigation and the discovery that was going on
7  at the time and access to Pasko, why would -- I mean,
8  again, I don't want to get into hypothesizing, but
9  like why is Noah Davis on Pasko's computer.  I mean,
10  so there's just a lot of noise in there.
11    Also, right about that time there's an
12  amendment to the original New York complaint.  A lot
13  of updates in there.  I remember this from a
14  conversation with Mr. McCarthy.
15    MR. PELLEGRINO:  I'm going to warn you not
16  to disclose the substance of conversations with
17  counsel.
18    THE WITNESS:  Okay.
19  BY MR. STARR:
20    Q.  If -- if -- if --
21    MR. PELLEGRINO:  Are you done answering?
22    THE WITNESS:  Well, I was going to refer to
23  a conversation, so I'm not going to.
24    MR. PELLEGRINO:  Okay.  Other than that
25  conversation, I don't know if you're complete --

Page 115

1  completed your answer.
2    THE WITNESS:  Yeah.  I mean, I think
3  there's -- there's -- we lay out as best we can in
4  the interrogatories and the other documents about
5  the -- the -- about the connection to Leadenhall,
6  and that's why we filed suit.
7  BY MR. STARR:
8    Q.  I understand.  We're going to go through
9  though those.
10    I want to ask:  So did you independently
11  arrive at the conclusion that Leadenhall must be
12  responsible or behind the intrusions?
13    A.  When you say -- I don't know what you mean.
14  When you say "independently arrived," did I -- did I
15  personally come up to that view?
16    Q.  That's my question.
17    A.  Yeah, I didn't even think it was that
18  contentious to be honest because -- of -- of including
19  them in the case because they were their contractors.
20  If -- if somebody at B. Riley does something bad, B.
21  Riley gets sued.  And they were the agents for
22  Leadenhall.  Did Leadenhall use the information?  I
23  don't know.  We're going to find that out in
24  discovery.
25    Q.  If Mr. Davis were found not to be

Page 116

1  Leadenhall's agent, would you say there's no basis to
2  name Leadenhall as a defendant in this lawsuit?
3    A.  I mean, Saiph's agent and then Saiph is --
4  is -- and Saiph is a Leadenhall agent.  And also
5  there's all these other suspicious connections that we
6  lay out.  But ultimately those to me seem like
7  legal -- like to me, that's like a legal analysis.
8    Q.  You must have a good faith basis to fill a
9  federal lawsuit, right?
10    A.  Oh, I think -- I think we have a very good
11  faith basis.  It's your agent.  It's a complicated
12  situation.  There's a lot of litigation.  And there's
13  an un- -- unquestioned data breach where sensitive
14  information that could impact the litigation was
15  collected or may have been collected.  I guess, I -- I
16  understand from reading your answer -- or partial --
17  from reading some of your answers.  I don't think I've
18  studied all of the answers in the case, but I
19  understand that there's a dispute.
20    Q.  So I want to get to the -- to the heart of
21  the basis.
22    So you mentioned that the amended complaint
23  filed in New York has more references to Mr. Pasko,
24  right?
25    A.  Yes, sir.

Page 117

1    Q.  More detail?
2    A.  Yes.
3    Q.  Can you identify any new allegation in that
4  complaint that would have been derived from any
5  information Mr. Davis obtained?
6    A.  I cannot.  I -- I didn't do that analysis.
7  So when I say I can't, it's not because I don't know
8  if it exists or not.  I didn't do that analysis.
9    Q.  Okay.
10    A.  Also, I don't know what was -- how could I
11  do that analysis if I don't know what was in the
12  materials that they may have gotten from Pasko's
13  computer.
14    Q.  I think that's a very good question.
15    What kind of information would be useful to
16  Leadenhall in the New York case?
17    A.  Anything that they're going to get in
18  discovery or before discovery is available or
19  privileged information or anything.  Like I --
20  anything about what's -- what Pasko knew, didn't know,
21  what he did, what he supervised.  I don't know.
22    Q.  And the New York case has proceeded to
23  document discovery, right?
24    A.  It is, yeah.
25    Q.  And can you identify any piece of



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 118..121

Page 118

1 information that would be helpful to Leadenhall in the
2 New York case?
3       MR. PELLEGRINO:  Objection to form.
4       THE WITNESS:  Well, anything -- well --
5 well, sure.  I'm not going to make up things.  But
6 they -- they're trying to prove their case, and I
7 imagine that the same reason why you have
8 discovery, that you hope that in discovery you're
9 going to -- or you believe in discovery -- and,
10 again, I'm not a lawyer.  But I believe that you
11 believe in discovery you're going to find
12 additional information to support your allegations
13 and to -- you know, I think that's the same point.
14 I'm sure that counsel for Leadenhall believe that
15 there's going to be useful discovery.
16      MR. STARR:  Can you please mark this as
17 Ratner Exhibit 3.
18      (Ratner Exhibit 3 was marked for
19 identification.)
20      MR. STARR:  Hal, and anyone on Zoom, we're
21 marking as Exhibit 3 the declaration that
22 Mr. Ratner submitted in support of the preliminary
23 injunction.  It's at Docket 11-2.
24      THE WITNESS:  (Perusing.)
25 BY MR. STARR:

Page 119

1       Q.  Mr. Ratner, do you recognize that document?
2       A.  Yes, sir (perusing).
3       Q.  That is the declaration you submitted in
4 this case?
5       A.  Yes, sir.
6       Q.  And you signed it on September 27, 2024?
7       A.  Yes, sir (perusing).
8       Q.  Okay.  Do you stand by the statements made
9 in your declaration?
10      A.  I do.
11      Q.  Okay.  And you articulate several factors
12 that you say make it clear Leadenhall was aware of and
13 directed Davis's actions, correct?
14      A.  (Perusing.)
15          Yes.
16      Q.  Let's go to Paragraph 21.
17      A.  Okay (complying).
18      Q.  In here you say that "Plaintiffs' systems
19 and information that Davis accessed (some of which
20 appears to have been altered) would clearly be
21 considered by Leadenhall as potentially useful in
22 prosecuting the Leadenhall Litigation against
23 Plaintiffs."
24          Do you see that?
25      A.  Yes (perusing).

Page 120

1       Q.  Do you stand by that statement?
2       A.  Yes.
3       Q.  Didn't you just testify just moments ago
4 that you don't know what information was accessed?
5       A.  Well, no.  I know they got access to the
6 MPFin system.  We know that there was access to Jen
7 Log- -- Logee's computer.  I may be pronouncing it
8 wrong.  And she had a lot of information about BIH,
9 which is also another area where Leadenhall may have a
10 loss.  Okay?  And we also -- I'm also aware that they
11 had access to Mr. Steven Pasko's Outlook.  And all of
12 that could be considered potentially useful, the word
13 potentially useful to prosecuting Leadenhall's
14 litigation against the plaintiff.  Sure, for sure.
15      Q.  So -- so Ms. Logee's laptop, can you
16 identify with specificity any -- any file or any
17 document that Mr. Davis accessed on her laptop,
18 allegedly accessed?
19      A.  No.  But that's not the point.  The point is
20 that the -- the -- the target of those items would
21 potentially have useful information in prosecuting the
22 Leadenhall litigation against the plaintiffs.
23      Q.  You mentioned BIH?
24      A.  Yes.
25      Q.  What information about BIH would be on

Page 121

1 Ms. Logee's laptop?  Do you know?
2       A.  Well, she -- I don't know, but she was the
3 general counsel or the lawyer or the paralegal -- not
4 paralegal.  The -- the lawyer assigned to Brickell
5 Insurance Holdings, which is the enterprise that owns
6 777 Re and is also subject to a potential loss for
7 Leadenhall.  There's a loan, I can't remember the
8 exact entity, but BIH has a -- there's a loan at the
9 BIH level or a sub of BIH.
10      Q.  Is -- is BIH relevant to -- is it -- are
11 there claims in New York based on BIH?
12      A.  I can't remember, but I know that when we --
13 when we were in discussion about settlement -- you
14 asked me earlier toady about settlement discussions.
15 I know that in the Leadenhall -- we -- we had tried to
16 leave BIH out, and in the -- Leadenhall put BIH in.
17 Because originally we were talking about Suttonpark
18 and we were talking about the Insurity portfolio.  And
19 then I think in one of the drafts back and forth, a --
20 the BIH loan was included in it.
21      Q.  There's a separate credit facility relating
22 to BIH, right?
23      A.  Or one of the subs.  If I had my chart here,
24 I'd tell you exactly where it is.  But within the
25 BAI -- BIH world, I think there's some other debt.

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                    Pages 122..125

Page 122

1    Q.  You don't know whether there's any claim
2 asserted in the New York case based on BIH?
3    A.  I -- I can't recall.
4    Q.  Okay.  And you don't know what information
5 about BIH was on Ms. Logee's laptop?
6    A.  No.
7    Q.  But your testimony is that it would clearly
8 be considered by Leadenhall as useful in the
9 litigation?
10   A.  No.  You're missing a key word there.
11 Potentially useful.
12   Q.  So you're just saying there's a possibility
13 it might be useful?
14   A.  Yes.
15   Q.  Okay.  You mentioned --
16   A.  Well, they're certainly going to ask for
17 those things in discovery.  I guarantee you that when
18 the Leadenhall discovery requests come up, they're
19 going to have correspondence around BIH and, you know,
20 loan summaries and debt.  I mean, they're going to
21 have all that.
22   Q.  That -- that sounds fine.  We'll see what's
23 in discovery.
24        So you mentioned the MPFin system?
25   A.  Yes, sir.

Page 123

1    Q.  And the MPFin system houses data pertaining
2 to aspects and collateral across all of Suttonpark's
3 business, right?
4    A.  Yes, sir.
5    Q.  Does not just have information about the
6 collateral relevant to Leadenhall, right?
7    A.  That's correct.
8    Q.  Okay.  In fact, we know that it contains
9 data related to Northwestern Mutual, right?
10   A.  Yes, sir.
11   Q.  Northwestern Mutual hired Saiph, correct?
12   A.  Correct.
13   Q.  And your testimony is that Noah Davis was
14 working for Saiph, right?
15   A.  Well, I -- I don't even know when that audit
16 occurred.  I mean, so I don't -- I don't know if he
17 was there at the time.
18   Q.  We'll get there.
19        If -- if those two audits occurred a similar
20 timeline, in the summer of 2024, would it be just as
21 plausible that Northwestern Mutual was behind the
22 intrusions?
23   A.  I mean, I don't -- we're not in litigation
24 with Northwestern Mutual.
25   Q.  That's what I'm asking, yeah.

Page 124

1        Why did you decide to name Leadenhall rather
2 than Northwestern Mutual if it's -- if it's based on
3 an agency relationship?
4    A.  Because the -- my understanding is that
5 the -- well, first of all, we're not in a current
6 litigation with Northwestern Mutual.  Part of the
7 allegation is that the data intrusion was driven to
8 get additional information related to -- you know,
9 that could be used or benefit in the New York
10 litigation, number one.
11       Number two is my understanding is that the
12 intrusions occurred during the Leadenhall collateral
13 audit.  I -- I don't have any information to say that
14 on August 9 it was Northwestern Mutual.  I don't know
15 that.
16   Q.  And you didn't consider that at the time you
17 decided to file suit?
18   A.  Yeah, I don't -- I don't think that was part
19 of our consideration.  I mean, maybe -- maybe the
20 team -- I'm only talking about myself.  I don't recall
21 that.
22   Q.  If I represent to you that the Northwestern
23 Mutual audit was ongoing on August 9th, would that
24 change your view?
25   A.  I don't think so.

Page 125

1    Q.  Why not?
2    A.  Because I don't think -- because North --
3 there's other factors here, and I don't think that
4 Northwestern Mutual was looking for Mr. Pasko's
5 e-mails.  Like I just -- from sitting here today, I
6 don't think that would change my opinion.  I mean, I
7 got to think about it.  But sitting here today, I
8 don't think it would change my opinion.
9    Q.  And -- and one factor is because
10 Northwestern Mutual had not sued 777 Partners, whereas
11 Leadenhall had?
12   A.  Yes.
13   Q.  So did 777 sue Leadenhall because Leadenhall
14 had sued it?
15   A.  No.
16   Q.  And you said Leadenhall would want
17 Mr. Pasko's e-mails?
18   A.  They might.  We just discussed that.
19   Q.  Wasn't -- couldn't Leadenhall get
20 Mr. Pasko's e-mails through discovery in the New York
21 action which is underway?
22   A.  They might.  Some of them might be
23 privileged.  Some might.  I mean, they're -- they're
24 going to have discovery.
25   Q.  You think Leadenhall wanted to risk federal

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 126..129

Page 126

1 criminal liability to get a handful of privileged
2 e-mails?
3    A. I don't know.
4    Q. Are you aware of any e-mails that would be
5 particularly helpful to Leadenhall in its New York
6 case?
7    A. I don't know.
8    Q. You're not aware of any?
9    A. I just said I don't know.
10    Q. Okay. Leadenhall alleges fraud in the New
11 York case, right?
12    A. Yes, sir.
13    Q. A fraudulent conspiracy?
14    A. Yes, sir.
15    Q. Okay. Would you agree that the type of
16 information that would potentially be useful to
17 Leadenhall in New York is evidence of fraud?
18    A. Say that again.
19    Q. Would you agree that the type of information
20 that would be useful to Leadenhall in the New York
21 case is evidence of fraud since Leadenhall is pursuing
22 a fraud claim?
23    A. Yes, sir.
24    Q. Okay. Are you aware of any evidence of the
25 existence at fraud that exists in any of the

Page 127

1 repositories of information you've identified here?
2 Mr. Pasko e-mails, Ms. Logee's laptop, or the MPFin?
3    A. I don't know.
4        And you said "existence at fraud," what does
5 that mean?
6    Q. Existence of --
7    A. Existence of fraud.
8    Q. Of fraud.
9    A. Okay. You said at fraud.
10    Q. Okay. Well, then I misspoke. Existence --
11 existence of fraud.
12    A. I don't know.
13    Q. Do you believe there are e-mails within
14 Mr. Pasko's mailbox that evidence fraud at 777?
15    A. I don't know.
16    Q. Okay. Did you ever ask Mr. Pasko that?
17    A. No.
18    Q. Did you ever ask Mr. Pasko why he thought
19 Davis targeted his e-mails?
20    A. I personally did not. I -- I think there
21 may have been some conversation around that.
22    Q. And he said had to be Leadenhall?
23    A. No, no. I don't -- I don't know what he
24 said.
25    Q. Okay. Why are you the declarant here for

Page 128

1 this preliminary injunction application?
2    A. I mean, it could have been Mark Shapiro.
3 He's the CEO. He's the acting COO of the company. I
4 think Mark also filed a declaration, if I'm...
5    Q. Well, you testified that you didn't
6 personally investigate the allegations made in the
7 complaint, right?
8    A. Well, I mean, I know the allegations in the
9 complaint because we had an investigation done. I
10 think the complaint is pretty factual. And we went
11 through the complaint and I worked with counsel on it.
12 And I'm -- I'm not sure who's supposed to be
13 declarant.
14    Q. Are you the person most knowledgeable about
15 the matters discussed in your declaration?
16    A. Yeah. I mean, I -- I know about these
17 matters in the declaration.
18    Q. Are you the person most knowledgeable about
19 the information that Mr. Davis accessed during the
20 alleged intrusions?
21        MR. PELLEGRINO: Objection to form.
22        THE WITNESS: No, that would be the
23    technical experts. And I think they also filed
24    declarations in this case.
25 BY MR. STARR:

Page 129

1    Q. Did any of their --
2    A. Mr. -- Mr. Mazur. I think Mr. Shawn Taheri
3 filed a declaration. And I'm pretty sure that Mark
4 Shapiro filed a declaration.
5    Q. Did any of their declarations link the
6 intrusions to Leadenhall?
7    A. I don't know.
8    Q. With respect to MPFin, can you identify any
9 information in MPFin, other than the information about
10 Leadenhall's collateral, that would be useful to
11 Leadenhall in New York?
12    A. Say that again, sorry.
13    Q. Can you identify any information in the
14 MPFin system, other than the collateral in
15 Leadenhall's portfolio, that would be useful to
16 Leadenhall in the New York case?
17    A. I mean, I don't know if they're looking at
18 other accounts. You know, there's -- there's some
19 allegations, I believe, that -- that some of the
20 collateral might have been moved between -- between
21 different loan pools, so maybe that's what they're
22 looking at. I don't know. I'm sure it could be
23 helpful.
24    Q. You're sure it could be, but you don't know
25 why?

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025    Pages 130..133

Page 130

1    A.  I mean, because --
2    Q.  Is that right?
3    A.  -- it's a -- well, let me finish.
4        It's a pretty -- it's a pretty expansive
5    allegation and there is a lot of allegation of double
6    banking securities.  And if you're going to do that,
7    you'd want to look at all the different participants,
8    I think.
9    Q.  Would you need to be able to do that to
10    audit the collateral adequately?
11    A.  Possibly.
12    Q.  Didn't 777 Partners at B. Riley's direction
13    grant access --
14    A.  Mm-hmm.
15    Q.  -- to Leadenhall -- excuse me, to Saiph,
16    access to the collateral relevant to Leadenhall?
17    A.  Yes.
18    Q.  Okay.
19        MR. PELLEGRINO:  Objection to form.
20    BY MR. STARR:
21    Q.  All right.  Mr. -- Mr. Pasko's -- with
22    respect to Mr. Pasko's e-mails, it's the case that
23    plaintiffs allege Davis targeted Pasko's entire
24    mailbox, right?
25    A.  I think so.

Page 131

1    Q.  Meaning all of his e-mails, right?
2    A.  I believe so.
3    Q.  Okay.  Mr. Pasko was the former managing
4    partner of the 777 Partners?
5    A.  Yes.
6    Q.  So he had a broad range of management
7    responsibilities; is that right?
8    A.  Yes.
9    Q.  777 Partners has dozens of portfolio
10    companies, right?
11    A.  Yes.  He also has a -- he was also a -- he
12    was obviously involved in Suttonpark as well.
13    Q.  And all of the portfolio companies 777
14    Partners that Mr. Pasko was responsible for, they had
15    a number of business partners other than Leadenhall,
16    correct?
17    A.  Correct.
18    Q.  777 Partners has been sued by other
19    creditors other than Leadenhall, correct?
20    A.  Some.
21    Q.  777 Partners has been sued by investors --
22    A.  Well, I --
23    Q.  -- in other lawsuits?
24    A.  From other creditors, I'm just thinking.  I
25    mean, I don't know if they're all creditors, but

Page 132

1    there -- there are some other lawsuits from investors
2    and there is -- I mean, Orba (phonetic) is a
3    deficiency creditor, you know...
4    Q.  Obra?
5    A.  Yeah.
6    Q.  Okay.
7    A.  So I -- and it's not like there's -- there's
8    not a line of banks suing.  I mean, it's -- it's --
9    there's a -- there's a lot of -- as you identified
10    yesterday, there -- there's a lot of smaller
11    litigation.  Although those -- the two New York state
12    cases are not insignificant.
13    Q.  Let me just make it easier then.
14        777 Partners has been made a defendant by
15    parties in other lawsuits, right?
16    A.  Yes, sir.
17    Q.  Lawsuits that do not involve Leadenhall?
18    A.  Correct.
19    Q.  Mr. Pasko himself has been named as a
20    defendant in lawsuits not involving Leadenhall,
21    correct?
22    A.  Correct.
23    Q.  It's fair to assume that not all of the
24    e-mails in Mr. Pasko's mailbox relate to Leadenhall,
25    right?

Page 133

1    A.  Correct.
2    Q.  And you cannot identify any specific e-mails
3    Mr. Davis targeted, right?
4    A.  That is correct.
5    Q.  Okay.  So why is Pasko's entire mailbox
6    particularly relevant to Leadenhall more so than any
7    other counterparty in another lawsuit?
8    A.  Well, certainly the dispute with Leadenhall
9    dwarfs anything else the company is dealing with at
10    the moment, number one.
11        And number two is I don't know -- I mean, I
12    wasn't aware that any other litigant was using Saiph
13    or Noah Davis to access information.
14    Q.  Do you know anything about Mr. Pasko's
15    relationship with Mr. Davis?
16    A.  I do not.
17    Q.  Do you know whether they had any bad blood?
18    A.  I do not.
19    Q.  Mr. Pasko is the target of a DOJ
20    investigation, right?
21    A.  Yes, sir.
22    Q.  Someone with his e-mails might be able to
23    use them to harm Mr. Davis -- Mr. -- excuse me,
24    Mr. Pasko in connection with the DOJ investigation,
25    hypothetically?

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 134..137

Page 134

1          MR. PELLEGRINO: Objection to form.
2          THE WITNESS: Yeah, that's a reasonable
3    hypothetical.
4    BY MR. STARR:
5     Q.   Okay. You also -- back to your declaration,
6    Mr. Ratner.
7          You mentioned there in Paragraph 22, "the
8    timing of at least one incursion in occurring just
9    prior to an important hearing in the Leadenhall
10   litigation."
11         Do you see that?
12    A.   Yes (perusing).
13    Q.   What are you talking about there?
14    A.   (Perusing.)
15         I remember the hearing, but I can't -- I
16   can't remember what it was about sitting here today.
17   This is -- I wrote this in September. I -- I can't
18   remember. There was a hearing. I know Mr. McCarthy
19   was at the hearing. I know I was on the phone with
20   him. And I cannot remember what the hearing was
21   about.
22    Q.   If you look at Paragraph 16 of your
23   declaration and you see you're discussing a TRO that
24   was set to expire on Monday, July 8th.
25    A.   Oh, maybe that was the hearing. Okay

Page 135

1    (perusing).
2     Q.   Does that refresh your recollection as to
3    which hearing?
4     A.   It does.
5     Q.   Okay. So what are you saying here with
6    this, "the timing of at least one incursion in
7    occurring just prior to an important hearing," that
8    July 8th hearing?
9     A.   I guess it's part of the same comment I made
10   before. There was a -- during that summer time
11   period, there was an intense -- intense effort to
12   collect all types of documents and records in the
13   summer, July, around that time period. And at the
14   same time as -- I mean, literally there's letters and
15   documents and we -- Chris Jarvinen is working
16   full-time on parsing out all those requests. It's all
17   happening at the same time.
18         There's this intense effort to get documents
19   from Mark and myself and the general counsel -- and
20   the counsel and all that. Some of it we're like this
21   doesn't relate to the collateral whatever.
22         And the suspicion is that the effort to get
23   those documents. Again, it -- we're going to have a
24   lawsuit. There's discovery. But all of that is
25   happening at the same time as the data incursion. At

Page 136

1    the same time that there's this intense push by
2    Leadenhall to get all these records, that's when the
3    data incursion occurs. My recollection is maybe 16 is
4    what -- Paragraph 16 is what's referred to in
5    Paragraph 22.
6     Q.   King & Spalding represented Leadenhall at
7    that hearing, correct, the July 8th hearing?
8     A.   I believe so.
9     Q.   I just want to be clear, are you suggesting
10   that King & Spalding directed Mr. Davis to commit
11   federal crimes to have a better showing at that
12   hearing?
13    A.   Absolutely not.
14    Q.   Okay. What are you suggesting?
15    A.   Well, someone at Leadenhall is trying to get
16   all these records and -- and, again, I don't know how
17   involved Leadenhall is or not. But they're trying to
18   get all these records and -- and maybe that's part of
19   the discovery. I don't know what Leadenhall is
20   telling Saiph and -- and Davis. I don't think anyone
21   is saying that King & Spalding -- you know, we're not
22   suing King & Spalding. I have the utmost respect for
23   King & Spalding.
24    Q.   Thank you.
25         Do you know what was discussed at that

Page 137

1    hearing?
2     A.   I did. I don't.
3     Q.   Okay. Well, it -- it says here "the TRO was
4    set to expire" and the hearing was "to decide whether
5    to convert the TRO into a preliminary injunction."
6         Do you see that --
7     A.   Yeah, sure, sure (perusing).
8     Q.   -- in Paragraph 16?
9     A.   Yeah.
10    Q.   Okay.
11    A.   But you asked me if I knew what was
12   discussed. At the time I was on the phone with --
13   with John. I mean, I -- I was trying to be more
14   specific than that. I don't know what happened at the
15   hearing. I can't remember what happened at the
16   hearing.
17    Q.   Okay. There was no new evidence presented
18   at that hearing, correct?
19         MR. PELLEGRINO: Objection to form.
20         THE WITNESS: I don't know.
21   BY MR. STARR:
22    Q.   You don't know. Okay.
23         Do you know what data or system was targeted
24   by Mr. Davis on the eve of that hearing?
25    A.   I do not.

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                          Pages 138..141

Page 138

1    Q.  Can you draw any connection between whatever
2  Mr. Davis targeted right before the hearing and
3  anything that was said at the hearing?
4    A.  I -- I -- I don't.  I mean, I know that the
5  data incursions happened before August.  It happened
6  around the time of those -- in June and all that.  I
7  don't know what -- and -- and I don't know if he was
8  successful.  So I -- I don't know what happened.
9    Q.  Okay.  Well, you -- you're pointing to the
10  timing of at least one incursion -- incursion in
11  occurring just prior to an important hearing in the
12  Leadenhall litigation.  And I'm trying to ask you what
13  connection you can draw between those two things.
14    A.  And I think I've told you what connection
15  I've drawn, several times.
16    Q.  That there were information requests?
17    A.  Well, that we were -- more than information
18  requests.  There was an intense discovery information
19  request.  And -- and going back and forth and a lot of
20  the things that were -- that the company -- that the
21  Leadenhall company was seeking, we felt were outside
22  of the collateral audit requirements.
23        And it was a very intense process.  So much
24  so that we had to assign one attorney to go -- to like
25  cull through it and, you know, explain why this

Page 139

1  document is or isn't appropriate.  And -- and we were
2  trying to walk -- to cooperate.  So it's not like we
3  were doing that as a -- we were like we need to let
4  them in, but we need to make sure that we also don't
5  just -- you know, there's -- there's a lawsuit going
6  on.  You can't just say, okay, guys, come on, it's
7  free discovery.  I mean, that would be against our
8  fiduciary role.
9    Q.  I -- I --
10    A.  To do that.
11    Q.  I hear you on that.
12        What I'm trying -- and I'm -- we're going to
13  come back to the information request.
14        What I'm trying to ask you about though is
15  the hearing.
16    A.  It's all -- to me, it's the same time
17  period.  I -- I don't -- I can't -- I can't separate
18  the time period of July 8th and June and I don't know.
19    Q.  Okay.  But you're talking about a period
20  where there were information requests, intense
21  discovery requests as you say.  And I -- I understand
22  what you're saying.  But this factor that you cite
23  here says an incursion occurred just prior to an
24  important hearing.  And so I'm asking you what the
25  relevance of the connection is to that hearing.  And

Page 140

1  I -- I haven't heard you articulate that point.
2    A.  I think I answered that question.  If there
3  was an incursion in June and it's -- and we know
4  there's an important hearing coming up.  And -- and
5  I'm not saying King & Spalding did anything.  But if
6  Leadenhall says, oh, if we could find this type of
7  document, that'll make -- that'll be great and we'll
8  find a way to, you know, get it to lawyers.  Like I
9  don't know.  I mean, it's -- what you're trying to do
10  here is you're saying -- there was a lot of -- a lot
11  of things going on at the time that would make this
12  incursion strategically helpful.
13    Q.  So -- so you don't know whether any evidence
14  was presented at that hearing.  You don't know whether
15  any evidence was even contemplated or permitted to be
16  presented at that hearing.
17    A.  Mm-hmm.
18    Q.  You don't know what information Davis
19  targeted right before the hearing.  And yet you
20  contend there's a connection between an incursion and
21  the hearing?
22    A.  Yeah, well, how would I know what the --
23  the -- we don't know what he got from those
24  incursions, right?  There was an incursion into the
25  e-mails and into Logee's computer.  I don't know what

Page 141

1  they got, right?  That's -- I mean, I think you've
2  asked me that and I said I don't know what he pulled
3  off or you were going to get there.  So I wouldn't be
4  able to know how it would have helped or not.
5    Q.  You don't know what he got and you don't
6  know if what he got was presented as evidence right
7  before this hearing that you're referring to?
8    A.  Mm-hmm, yes.
9    Q.  Okay.  You mentioned the -- the requests for
10  information that you felt were beyond the collateral
11  audit rights of Leadenhall?
12    A.  Yes.
13    Q.  Okay.  What did Leadenhall ask for that it
14  was not contractually entitled to?  Can you give me an
15  example?
16    A.  I mean, sitting here today it was -- the
17  list was -- there was letters and there was, you know,
18  multi, multi e-mails and we culled through all of
19  those and tried to discern what was relevant to the
20  collateral audit and what isn't.  Some of the things
21  we dis- -- we determined, based on counsel's advice,
22  were not responsive.  And this is not something that
23  Mark or I did on our own.  We had counsel involved.
24  In fact, counsel is running it.
25    Q.  Mm-hmm.

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                               Pages 142..145

Page 142

1    A.  So...
2    Q.  And Mr. Roger Schwartz from Paul Hastings
3  was sending some of those requests?
4    A.  Some.  Some were actually coming direct.  I
5  think there was interaction directly -- not with
6  Mr. Gillespie, but somebody else at Leadenhall had
7  interacted directly with Jim Howard on certain
8  requests as well.  And we combined those -- combined
9  or aggregated those requests and -- and had an actual
10  process to go through them.
11    Q.  Let me ask the same question that I asked
12  earlier about King & Spalding about Paul Hastings.
13      Are -- are you suggesting that Paul Hastings
14  directed Mr. Davis to commit intrusions when its
15  information requests were rebuffed?
16    A.  I -- I'm not.
17    Q.  Okay.
18    A.  I mean, that's -- this is an agency
19  relationship.  Leadenhall -- Leadenhall hires Saiph,
20  Saiph hires Davis.  I don't know what's going on
21  between the three of them.  That's why there's
22  discovery.
23    Q.  Doesn't Leadenhall have information rights
24  beyond the scope of the collateral audit in connection
25  with other credit facilities?

Page 143

1    A.  Yes, they do.
2    Q.  Okay.  Did any of those information --
3    A.  And all -- I mean, it -- it doesn't say
4  anything here about it, but I was on a call with --
5  with Leadenhall and -- and I'm blanking on his name.
6  I mean, the guy was yelling at me at the top of his
7  lungs.  I mean, there's a lot of animus.  I don't know
8  what they would do.  I don't know what Leadenhall
9  would do.  That's why we're -- that's why we're here.
10    Q.  Okay.  And -- and what information did
11  Leadenhall have a right to, generally speaking?
12  Talking books and records?  Financial statements?
13      MR. PELLEGRINO:  Objection to form.
14      THE WITNESS:  I mean, I'm not -- I'm not in
15    a position now to give you the whole list.  Every
16    credit agreement lays out what their right of
17    audit is.
18  BY MR. STARR:
19    Q.  Mm-hmm.  Okay.
20    A.  They definitely had a right to certain
21  documents and we wanted to comply and get them
22  those -- those documents.
23    Q.  Is it unusual in your experience that a
24  creditor ask for information that the debtor doesn't
25  want to give?  Is that unusual for there to be a

Page 144

1  disagreement about the scope of a contractual
2  information right?
3    A.  No.  Happens often.
4    Q.  Were you ever instructed not to provide
5  information by A-CAP or anyone acting on A-CAP's
6  behalf?
7    A.  No.  We were -- we -- we wanted to give
8  information.  We were working on that.
9    Q.  But you didn't want to give them all the
10  information they requested, right?
11    A.  That would be inappropriate.  That would be
12  like, okay, it's -- guys, there's a lot -- remember,
13  it's a major lawsuit.  There's other parties involved.
14  And, okay, it's free discovery, come in, do whatever
15  you want.  I mean, it's just -- there's a process and
16  we're trying to follow the process.  The same way you
17  would if you were representing us.
18    Q.  It's not free discovery if there's a
19  contractual right to the information, right?
20    A.  Right, but that's why you have to go through
21  a process to figure out what -- what are they allowed
22  to get and try to, you know, get it in the right
23  buckets.
24    Q.  Okay.  Turning back to Paragraph 22,
25  romanette iv refers to (as read) "Leadenhall's

Page 145

1  instance on retaining Saiph specifically...in spite of
2  Plaintiffs' objections."
3      Do you see that?
4    A.  Absolutely (perusing).
5    Q.  Okay.  Mr. Kosinksi was previously the COO
6  of Suttonpark, right?
7    A.  Yes, sir.
8    Q.  Presumably he would have a good
9  understanding of how Suttonpark tracks receivables and
10  assets in MPFin?
11    A.  Yes, sir.
12    Q.  Okay.  Wouldn't it be logical for Leadenhall
13  to hire someone with an understanding of MPFin works?
14    A.  Yes, it is logical for Leadenhall to want to
15  use a former employee that may have familiarity with
16  the system.
17    Q.  And Leadenhall is not the only creditor to
18  do that, right?  Northwestern Mutual did that too?
19    A.  Yes, sir.  But, again, we're not in a -- we
20  as debtor -- not bankruptcy debtor, but just as
21  company, we're not in a litigation with Northwestern
22  Mutual.  And, I mean, the more I think about it -- I
23  mean, Kosinksi may end up being a witness in the New
24  York litigation because he was there.  I know he left
25  before the time of those events, but there's going to

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 146

1 be information about the system. It -- it was a bad
2 idea. And -- and people were -- you know, the -- the
3 team -- you know, everybody was concerned about it.
4  **Q.  Do you have a view as to whether the outcome**
5 **of the collateral audit would have been unfavorable to**
6 **Suttonpark?**
7  A.  Yeah. I mean, I don't know.
8  **Q.  Mr. Shapiro testified yesterday that there's**
9 **at least $100 million collateral shortfall at**
10 **Suttonpark alone. Did you hear that testimony?**
11  A.  Yeah, yeah, sure.
12  **Q.  Do you agree with that?**
13  A.  Yeah. I mean, I -- I -- I had the -- when
14 we were in mediation meetings in New York, we had the
15 loan balance and the collateral numbers at that time.
16 And I don't remember if it was 100 million, but there
17 was definitely a shortfall.
18  **Q.  Significant shortfall, right?**
19  A.  Yeah, absolutely.
20  **Q.  And -- and prior to B. Riley's involvement,**
21 **the plaintiff entities here had refused to let the**
22 **collateral audit occur, correct?**
23    MR. PELLEGRINO:  Objection to form.
24    THE WITNESS:  I mean, I'm -- I'm going to
25 accept what you say. I don't -- I didn't -- I

Page 147

1 didn't go back and review when they asked to get
2 in and they weren't -- I mean, I think there's
3 some allegations in the complaint about it, but I
4 know there was -- there was -- they were
5 frustrated.
6 BY MR. STARR:
7  **Q.  So if the collateral audit were allowed to**
8 **proceed, then the extent of the shortfall would be**
9 **revealed, right? I mean, that's -- that was the**
10 **purpose of the collateral audit, right?**
11    MR. PELLEGRINO:  Objection to form.
12    THE WITNESS:  Yeah. And I think Mr. -- I
13 think Mr. Howard actually has -- had
14 communications with Leadenhall with -- with the --
15 about the portfolio.
16 BY MR. STARR:
17  **Q.  So the fact that Leadenhall wanted to use**
18 **Saiph and Kosinksi, who was familiar with the MPFin**
19 **system, is logical, correct?**
20  A.  Well, I -- I'm not sure it's logical. I --
21 I like what I said before is it -- it's understandable
22 that Leadenhall would want to use somebody
23 knowledgeable about the system. I mean, in fact,
24 because there's -- because there's litigation, maybe
25 it would be -- it -- it -- you're creating more

Page 148

1 possibility for conflicts, so. But that wouldn't
2 be -- I mean, they're not -- Leadenhall is not a law
3 firm, so they wouldn't've -- you know, it -- it's -- I
4 understand why they wanted to do it. Let's just leave
5 it at that.
6  **Q.  Okay.**
7  A.  I don't like the word logic because it's --
8 who knows.
9  **Q.  And plaintiffs objected to that, objected to**
10 **Saiph's retention, correct?**
11  A.  Plaintiff -- yeah. Well, ultimately, no.
12 But there was a lot of consternation internally and I
13 think there's another difference that I -- I -- that
14 you asked me about that I -- I don't think has been
15 lasered in on it. The -- my recollection is the New
16 York lawsuit was filed around the time we got involved
17 in the case in 2024. The prior work that they -- that
18 they were trying to do was prior to that. So like
19 once there's a lawsuit, I think things change in -- in
20 hindsight.
21  **Q.  Well, the objections to using Saiph were**
22 **made prior to the filing of the lawsuit, right?**
23  A.  Not by us.
24  **Q.  No, by legacy employees, right?**
25  A.  Yeah.

Page 149

1  **Q.  And then post lawsuit, B. Riley comes in and**
2 **says, no, you have to let them --**
3  A.  Well --
4  **Q.  -- have access, right?**
5  A.  But in -- in hindsight, what I'm saying is
6 that it -- maybe the heightened level -- because of
7 the lawsuit, maybe the objection to Saiph should have
8 been heightened. Not -- again, we were trying to
9 collaborate in particular, you know, with
10 Mr. Schwartz. We wanted to move on and get this
11 moving. So -- so -- so I understand. Yeah, I -- I
12 know what happened.
13  **Q.  Okay. So -- so why does Leadenhall's**
14 **insistence on retaining Saiph lend support to the idea**
15 **that Leadenhall directed all this?**
16  A.  Well, because it's like they have -- and I
17 don't know who's advising Leadenhall. Like I don't
18 think they have a financial advisor advising them
19 every day. But like -- it's like, hey, these guys are
20 pushing back on Saiph. You know what? You guys pick.
21 You can have CBIZ, Ernst & Young, or Deloitte. You
22 pick. We'll -- you know, you pick which one you'll
23 let in. It -- it's a -- it's a -- it's a -- strategy
24 that -- the fact that they were so adamant that these
25 guys had to come in. If they wanted to get in, they

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 150..153

Page 150

1 should say, oh, we understand that your -- your --
2 your team is concerned about he's a former employee
3 and this guy's a -- this guy was a former tech guy
4 there. Maybe, you know, there's some bad blood. You
5 know what? CBIZ, RSM, Grant Thornton. They all have
6 people that know these systems. Okay? Or similar
7 systems. The fact that they insisted on them, I
8 think, is a factor to be considered.
9    Q.  Leadenhall at this point alleges its owed
10 $600 million, right?
11    A.  Well, as we discussed, that includes the --
12 that gives no credit to the actual collateral.
13    Q.  Okay.  But Leadenhall is alleging a
14 fraudulent conspiracy pursuant to which they would
15 seek to recover $1.8 billion, right?  And this is
16 after maybe a year of noncooperation between --
17 noncooperation with respect to the collateral audit on
18 the part of 777, right?
19    A.  Yes, sir.  And with us, it's, you know, 7,
20 8 weeks in we're...
21        A better strategy on their part would have
22 been, hey, you know what?  You guys -- here's three
23 names.  Let's agree.  This is a good list.  Go.  But
24 that didn't happen.  We could have suggested that.  We
25 just didn't want to fight about it anymore.

Page 151

1    Q.  Plaintiffs did not object to Leadenhall
2 using Saiph on the basis that Saiph would steal
3 information for Leadenhall, right?
4    A.  We did not.  Well, I don't think anyone
5 thought that would happen, but...
6    Q.  The objections were based on the claim that
7 Saiph was a competitor, correct?
8    A.  And also former employee and -- and they
9 worked there and there's a lawsuit going on and, you
10 know, I think it's all those things.  I mean, again, I
11 don't remember all the conversations.  Mark would have
12 been -- Mark and Jim Howard would have been around the
13 table more often at that time because of my role.
14    Q.  So you refer here in your declaration to
15 "the agency relationship between Leadenhall and Saiph,
16 Kosinksi, and Davis."
17        Do you see that?
18    A.  Yes, sir (perusing).
19    Q.  Could you explain that to me?
20    A.  I think I've referred to that a couple times
21 today.  It's Leadenhall is at the top of the hill.
22 Then Saiph, then Saiph is Kosinksi or Kosinksi works
23 for Saiph, and then Davis.  I mean, they're all
24 working for Leadenhall.  Leadenhall is -- is the one
25 that controls their contractors.

Page 152

1    Q.  Have you reviewed a contract between
2 Leadenhall and Saiph?
3    A.  I have not.  I think it's attached to one of
4 the motions.
5    Q.  You haven't reviewed it though?
6    A.  No.
7    Q.  Okay.  Do you have an understanding of the
8 scope of any agency relationship between Leadenhall
9 and Saiph?
10    A.  No.  I'm using the word "agency," small A.
11    Q.  Have you reviewed a contract between Saiph
12 and Davis's company?
13    A.  I have not.  I also -- I think -- I think
14 I -- that's also included in one of papers.  I -- I
15 may have -- I may have looked at that one.  I mean, I
16 just don't remember it.
17    Q.  Would you agree that the scope of work and
18 scope of a contract is important in determining the
19 scope of the agency relationship?
20    A.  That might be a legal question.
21    Q.  Are you aware of any direct communication
22 whatsoever between Leadenhall and Davis?
23    A.  No.
24    Q.  Are you aware of any evidence whatsoever
25 that Leadenhall authorized Mr. Davis to act on its

Page 153

1 behalf at all?
2    A.  Well, I'm assuming that Davis -- not -- not
3 on the intrusion, but I'm assuming that Davis acted on
4 behalf of Leadenhall in the audit.  Because Davis --
5 just the way -- because -- I mean, just the way Saiph
6 and Kosinksi did.
7    Q.  What is the basis for that assumption
8 that -- that Davis worked for Leadenhall on the audit?
9    A.  Well, Davis worked for Saiph and Saiph
10 worked for Leadenhall.
11    Q.  How many employees does B. Riley have?
12    A.  1,200.
13    Q.  There are some who do not work on this
14 matter, right?
15    A.  Most.
16    Q.  Would you agree that then they're not agents
17 of 777?
18    A.  I agree with that.
19    Q.  Okay.  So do you know what work Davis --
20    A.  Say that question again.  Because maybe I
21 answered the wrong -- say -- you -- I thought you
22 asked me -- say the question -- the original question
23 again because I thought it was straightforward, but
24 maybe it's not.
25    Q.  The question about B. Riley or the question

**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                          Pages 154..157

Page 154

1 about --
2     A.  No.  Before that you asked me did Davis work
3 for Leadenhall and I said yes.
4     Q.  I asked you whether you had any evidence
5 that Leadenhall authorized Mr. Davis to act on its
6 behalf at all.  And I think --
7     A.  Through -- through Saiph, I believe I said
8 yes.
9     Q.  I -- I think your testimony -- we could read
10 it back.  But I think what you -- tell me if I'm
11 wrong, but I think what you said is that you assumed
12 that, you know, through Saiph Davis was working on the
13 Leadenhall collateral audit?
14     A.  Yes, sir.
15     Q.  Okay.  And then I asked:  Why do you assume?
16 What's the basis for your assumption that Davis worked
17 on the Leadenhall collateral audit?
18     A.  Okay.  It's not exactly how I understand it.
19 That's helpful.
20     Q.  Well, just to -- just to play it out a
21 little bit more.
22         So the reason I asked you about B. Riley
23 employees who don't work on this engagement, you --
24 you get the point is that --
25     A.  Yeah, sure.

Page 155

1     Q.  -- if there's an employee or a subcontractor
2 who has -- works on another matter, not the matter
3 that's at issue --
4     A.  Right.
5     Q.  -- then that -- what I'm asking is:  Do you
6 still consider that person to be an agent with respect
7 to the particular principal at issue?
8     A.  No.
9     Q.  Okay.
10     A.  But I don't -- I don't think that's
11 analogous to this situation.  So the way I saw it is
12 that Leadenhall hires Saiph.  Saiph hires Davis on the
13 Leadenhall collateral audit.  I think it's referred to
14 on some of the correspondence.  Look, I don't think
15 there's a -- I didn't realize that there's a dispute
16 as to whether Davis was working on the Leadenhall
17 collateral audit.  It sounds like maybe there is.
18     Q.  Precisely what I'm trying to ask you is
19 whether you have -- I'm asking for your basis that
20 Saiph hired Davis for the purpose of working on the
21 Leadenhall collateral audit.
22     A.  Oh.  I mean, we can get his contractor
23 agreement out, but I assume that the -- that -- I
24 mean, it just -- it -- maybe it's so obvious that I
25 shouldn't be assuming it.  But I know that Saiph was

Page 156

1 retained by -- Saiph was retained by Leadenhall and I
2 know Davis was working for Saiph as a contractor and
3 he was -- they were doing the collateral audit of the
4 Leadenhall collateral, so Davis was working on that
5 project.
6     Q.  Do you know how many clients Saiph
7 Consulting has?
8     A.  No.  We know that there's only one other
9 client here, which was Northwestern Mutual.
10     Q.  Well, you're only aware of one client -- one
11 other client, right?
12     A.  That they're working on here.  If -- if
13 Saiph was working on other audits at Suttonpark, we
14 would know that.  And by the way, he was there.
15 There's pictures of Davis at Suttonpark.  People know
16 he was there.  So of course he was working on the --
17 on these audits.  It's not analogous to the B. Riley
18 example.
19     Q.  Are you referring to the break in?
20     A.  Yeah.  I mean, he was working on it.  He was
21 there.
22     Q.  He was -- you're referring to the break in?
23     A.  Which is everything.  I mean, Jim Howard,
24 everybody.  Davis was involved in this -- in the
25 audit.  Maybe I'm misunderstanding you, but my

Page 157

1 understanding from all the people that I connected to
2 in this case, that there's no question that Noah Davis
3 was working on -- he was a contractor for Saiph
4 working on the collateral audit.  I -- I -- I thought
5 that was -- that's my understanding.
6     Q.  Have you reviewed Mr. Kosinksi's declaration
7 in this matter?
8     A.  I perused it.
9     Q.  Okay.  I can print this out for you, but...
10     A.  Please.
11     Q.  Why don't I just -- should I print it out?
12     A.  Yeah, sure.
13     Q.  Okay.
14         MR. STARR:  Let's go off the record.
15         THE VIDEOGRAPHER:  Sure.  Going off the
16 record.  The time is now 12:21.
17         (A recess was taken.)
18         (Ratner Exhibit 4 was marked for
19 identification.)
20         THE VIDEOGRAPHER:  Okay.  We're back on the
21 record.  The time is 12:36.
22 BY MR. STARR:
23     Q.  Okay.  Mr. Shapiro [sic], you've been handed
24 a document marked as Shapiro -- excuse me, Ratner.  I
25 keep doing this.

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 158

1       Mr. Ratner, this is Ratner Exhibit 4.
2    A.  (Perusing.)
3    Q.  This is the declaration of Paul Kosinski
4  submitted in this case.
5       Have you seen this document before?
6    A.  Yes.
7    Q.  Did you review it to prepare for today's
8  deposition?
9    A.  I did not.  I perused it.  I did not read it
10  the way I usually read everything.  I just -- I...
11    Q.  Okay.
12    A.  I just -- I definitely recognize it.
13    Q.  So the portion of this declaration that I
14  wanted to direct you to is -- begins at Paragraph 24.
15    A.  Just give me -- I'll go very quickly.  Just
16  give me 2 minutes to -- to just absorb where -- you
17  know, what's in it.
18    Q.  Sure.  Do you want --
19       MR. STARR:  Let's go back off.
20       THE VIDEOGRAPHER:  Sure.
21       THE WITNESS:  Well, I -- okay.
22       THE VIDEOGRAPHER:  Going off the record.
23       The time is 12:37.
24       (There was a brief pause in the
25       proceedings.)

Page 159

1       THE VIDEOGRAPHER:  We're back on the record
2    at 12:40.
3  BY MR. STARR:
4    Q.  Mr. -- Mr. Ratner, are you looking at
5  Paragraph 26 of the Kosinksi declaration?
6    A.  I am now (perusing).
7    Q.  Okay.  And there he says that (as read)
8  "Mr. Davis's sole role with respect to any and all 777
9  collateral audits was to troubleshoot the access that
10  777 provided for the NML," that's Northwestern Mutual
11  Life "audit, and to begin targeting" -- excuse me,
12  "the targeted data extraction tool for Saiph's use in
13  obtaining the Northwestern Mutual records."
14       Do you see that?
15    A.  Yes (perusing).
16    Q.  Okay.  According to Mr. Kosinski, his sworn
17  testimony, Mr. Davis did not perform work on the
18  Leadenhall collateral audit, correct?
19    A.  That's what he says.
20    Q.  Okay.  Are you aware of any facts that
21  contradict Mr. Kosinksi's sworn statement?
22    A.  Yeah, I don't -- I don't know.
23    Q.  Okay.  I think earlier you testified that
24  your understanding from people you spoke to about this
25  case was that Mr. Davis was working on the Leadenhall

Page 160

1  collateral audit?
2    A.  That he was the tech guy that -- I mean, he
3  was -- he came to the company and that he was going to
4  work on the audits.  I mean, that -- that was my
5  understanding.
6    Q.  And who told you that?
7    A.  I can't recall.
8    Q.  Okay.  If, as Mr. Kosinksi says, Mr. Davis
9  did not work on the Leadenhall collateral audit at
10  all --
11    A.  Mm-hmm.
12    Q.  -- would that alter your conclusion about
13  Leadenhall's responsibility for the intrusions?
14    A.  I don't think so.
15    Q.  Why not?
16    A.  Well, because they hired Saiph and Saiph
17  hired -- I mean, he -- he -- I -- I don't -- I mean, I
18  don't know -- first of all, I don't know if -- if
19  this -- I -- I -- I mean, this is what he knows.
20  But -- but Leadenhall hired Saiph and Saiph hired Noah
21  Davis and Noah Davis was involved in the data
22  intrusion.  So it's -- it -- I guess -- I -- I don't
23  know that it matters that he was not active or maybe
24  he was active.  The data intrusion occurred.  And I
25  don't think there's any question that Davis did the

Page 161

1  data incru- -- data intrusion.  And -- and -- yeah.  I
2  mean, I -- I -- he's still working for -- he's working
3  for Saiph and Saiph is working for Leadenhall.  We --
4  that's part of the reason that you have discovery
5  because you've got to find out what was -- what was
6  going on between the parties.
7    Q.  I understand.  My question was if what
8  Mr. Kosinski says is true, then would that alter your
9  conclusion?
10    A.  No, not today.
11    Q.  Okay.  So we have 14 days left in discovery,
12  so I am trying to ascertain -- this is what discovery
13  is for, is to ascertain the basis of your belief for
14  naming Leadenhall in this lawsuit.  So you say it
15  won't alter your conclusion if he were not acting --
16  if he were not working on the collateral audit?
17    A.  But what...
18       MR. STARR:  I'll withdraw that.
19  BY MR. STARR:
20    Q.  Is your testimony that it would not alter
21  your conclusion that Davis is Leadenhall's agent, if,
22  in fact, Davis is not -- was not working on
23  Leadenhall's collateral audit?
24    A.  Well, if he -- if -- if there's other
25  information that shows that there was a data intrusion

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 162..165

Page 162

1 and Leadenhall got access to the data, it wouldn't
2 matter.
3      **Q.  Is there -- is there evidence that**
4 **Leadenhall got access to the data?**
5      A.  Well, that's exactly to your point.  That's
6 why there's discovery.  You're asking me to make an
7 opinion based on a hypothetical and I'm like I don't
8 know.  Which is what I said before, I don't know.
9      **Q.  777 Partners hired B. Riley, correct?**
10     A.  Yes.
11     **Q.  Okay.  Is there a B. Riley IT guy sitting in**
12 **Dallas an agent of 777 Partners now?**
13     A.  No.
14     **Q.  Well, 777 Partners hired B. Riley, B. Riley**
15 **hired the IT guy, right?**
16     A.  Yeah, but if he had an intrusion in the data
17 that -- in your example that was related to what we're
18 working on, then he -- then he'd have some
19 responsibility.  We'd have -- we'd have -- we'd
20 have -- we would have responsibility.  Whether I asked
21 him to do it or not, I'd have some responsibility.
22 I -- I -- I don't know.
23     **Q.  And why is that, like a negligent hiring**
24 **theory?**
25     A.  No.  It's he's your agent.  He's on your

Page 163

1 behalf.  He -- he -- I mean, he -- he...
2      **Q.  Okay.  If he -- if he -- if he killed his**
3 **wife, would you have responsibility for that?**
4      A.  Well, no, because that's not part of the --
5 that's outside of the day-to-day.  But if he was
6 working for us and along the way blew up King &
7 Spalding's computers, King & -- King & Spalding is
8 going to look to B. Riley and say this was your
9 contractor.  You've got to fix this.
10     **Q.  Mm-hmm.**
11     A.  Again, this is legal.  Like I -- I don't
12 want to waste all your time with all this.  But
13 this -- the agency concept, to me, is a small A and --
14 and I -- I believe that -- again, I'm not saying that
15 Mr. Kosinksi is not being fully accurate, but he was
16 involved in the audit, Mr. Davis, and he did have a --
17 there was a data incursion.  And we don't know what --
18     **Q.  Which audit was he involved in?**
19     A.  He was for sure -- for sure involved in
20 Northwestern Mutual.
21     **Q.  Yes.**
22     A.  But he was working on other things there.
23 What did they say?  Data extraction, soft- -- data
24 extraction -- what did they say here (perusing)?
25       Yeah, of course.  He's saying he did not use

Page 164

1 or review or know.  He didn't know.  He's saying he
2 didn't know about any 77 [sic] records that were
3 obtained unlawfully or otherwise by Noah Davis.
4 That's fine.  He didn't know that.  But if it
5 happened -- if it happened, whether he knew or not,
6 may not matter.  Whether Saiph knew or not, didn't --
7 I mean --
8      **Q.  No.**
9      A.  This doesn't tell me it didn't happen.
10     **Q.  Are you aware --**
11     A.  He just says whether he knew -- whether --
12 he -- he's just saying he doesn't know.  That's all
13 he's saying.  He doesn't know.
14     **Q.  I'm not asking about the intrusions.  I'm**
15 **asking your basis -- I'm asking for the basis for your**
16 **statement that Noah Davis is Leadenhall's agent.**
17     A.  That's -- I've given you my understanding of
18 that.
19     **Q.  It's that Leadenhall hired Saiph and Saiph**
20 **contracted with Mr. Davis?**
21     A.  Yes.
22     **Q.  Okay.  Turning back to your declaration,**
23 **Mr. Ratner, Paragraph 22.**
24     A.  (Complying.)
25       MR. PELLEGRINO:  Exhibit 3?

Page 165

1      MR. STARR:  Yes.
2 BY MR. STARR:
3      **Q.  The final factor cited there, romanette vi,**
4 **is "Saiph's inadvertent acknowledgement of**
5 **Leadenhall's relationship to these incursions."**
6       **Do you see that?**
7      A.  Yes (perusing).
8      **Q.  What does that mean?**
9      A.  I think that that is referring to some
10 correspondence where Leadenhall was in the -- in the
11 re line about correspondence relating to these data
12 incursion.  And then whether that was significant or
13 not and a correction was made.  I mean, that's my
14 understanding of it.
15     **Q.  Well, you're the one citing it as a factor.**
16 **Was it significant in your analysis?**
17     A.  Well, yes.
18     **Q.  Why?**
19     A.  Because why -- why did you have to correct
20 it?  I mean, if it -- if it was no big deal, it was
21 just, oh, well, it -- it's about the Leadenhall,
22 we're -- we're in the Leadenhall audit, right?  So
23 that's my recollection.  I mean, this was a long time
24 ago, but that's my recollection about it.  There
25 was -- like I -- I didn't -- that's my recollection.

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 166..169

Page 166

1    Q.  And you say you -- you (as read) "believe
2  that it is clear based on these factors that the
3  actions of Davis were known to and directed by
4  Leadenhall for its benefit," right?
5    A.  Based on all these factors and I think also
6  the -- you know, the -- it's been flushed out a little
7  more in the answers to the interrogatories.  But these
8  are the things that at the time, at the time, based on
9  what I knew at the time, this is what I wrote.
10    Q.  And you think a -- the inclusion of the word
11  Leadenhall in a re line makes it clear that the
12  actions of Davis were directed by Leadenhall?
13    A.  That's not for the -- the last sentence is a
14  summary for everything above that.  Saiph's
15  inadvertent -- that's just one factor.  I believe that
16  it's clear that -- that's based on everything above
17  that.
18    Q.  Are you aware that Leadenhall asked Saiph to
19  notify 777 when it found out about the alleged
20  physical intrusion, break in?
21    A.  I -- yes, I believe I read that.
22    Q.  Would that explain why Leadenhall was
23  referenced in the subject line initially?
24    A.  Possibly.
25    Q.  It could, right?

Page 167

1    A.  Possibly.
2    Q.  Okay.  Is there anything else, other than
3  these factors, that you rely on to point the finger at
4  Leadenhall?
5    A.  I think it's these and I -- you know, I -- I
6  refer to the interrogatory a couple times.  It may be
7  a little further flushed out there.  The modifications
8  to the complaint are not referred to here.  The
9  discovery that was going on at the time is not
10  referred to here.  And, I mean, there may be some
11  other things identified in the interrog- --
12  interrogatory, but, I mean...
13    Q.  Did you provide input to that interrogatory?
14    A.  I did not.
15    Q.  Okay.  If an -- if an employer failed to pay
16  an employee a bonus that the employee felt entitled
17  to, would you describe that as a payment dispute?
18    A.  Yes.
19    Q.  Did you know that Mr. Davis was not paid a
20  bonus in the spring of 2024?
21    A.  I didn't know that, but the company had lost
22  a ton of money.  When we got there, there were a lot
23  of people that were expecting bonuses and we -- we
24  were -- like the company's losing money.  So I guess
25  he left -- he left before we got there.  Because when

Page 168

1  he got there, that -- the bonus issue was floating
2  around.  We did not pay bonuses.
3    Q.  What about if a -- if an employee asked for
4  a raise and had their raised refused, would that
5  qualify as an employ -- as a -- as a payment dispute?
6    A.  Probably not.
7    Q.  Why not?
8    A.  Well, pay- -- a payment dispute is, hey, I
9  think I earned that bonus, here's the amount that I
10  should get, and you didn't pay it to me.  The not
11  getting a raise, I would call that not a payment
12  dispute, that might be an employment dispute.  That
13  might be, hey, I don't like how you're treating me.  I
14  think I'm due for a raise.  Payment dispute is, hey, I
15  think you owe me money and you're not paying me.
16    Q.  Okay.  I'm sorry, Mr. Ratner, I left one
17  out.
18    A.  Oh, that's fine.  There's no rush.  I'm here
19  for you.
20    Q.  Thank you.
21    A.  There's no rush.
22    Q.  The -- I left one of the factors in --
23  mentioned in Paragraph 22 out of our discussion and
24  then I started trying to make you articulate every
25  factor that we had discussed.

Page 169

1    So could you go back to your declaration in
2  Florida, Exhibit 3, and back to Paragraph 22?
3    A.  Yes, sir (complying).
4    Q.  So you cite -- the first -- the very first
5  factor you cite is "Leadenhall's aggressive actions
6  and litigation tactics against Plaintiffs," right?
7    A.  Yes (perusing).
8    Q.  Okay.  What about Leadenhall's litigation
9  tactics have been aggressive in your view?
10    A.  I mean, I could point to a couple of things
11  that are my opinion.  When -- when we were
12  negotiating -- again, there's a lot of -- there's a
13  lot of terrific -- there's a lot of terrific
14  litigators around the table and that sometimes could
15  be perceived as aggressive.  They're doing their job,
16  right?
17    But when we were -- when we were negotiating
18  and we put together this kind of liquidating plan
19  idea, you know, some of the comebacks were outrageous.
20  It was like, okay, so you have an unsecured litigation
21  claim that you might get a judgment for.  But when we
22  were putting together this liquidating model, they
23  wanted to get all of their money first before anybody
24  else that had it -- may have had a secured claim.
25  That was -- I mean, that's that's so aggressive.

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                              Pages 170..173

Page 170

1    The other was when we went through this, we
2 put together the -- this little model, even though when
3 the edit come back, even though BIH is not referred to
4 specifically in the complaint, they put in like the
5 100 percent repayment of BIH in there, which is not
6 even -- you know, there -- there may be no fraud
7 associated with the BIH loss. That's just bad
8 business. You know, the -- the -- the reinsurance
9 didn't work out.
10    So it was very aggressive because, from my
11 perspective, I was involved in that. And there was a
12 real desire to find a middle ground.
13    The second thing is we -- we had a call to
14 try to get back to the table directly with the
15 principals. And, I mean, we get hired in May. We
16 have a good reputation of solving -- you know, getting
17 people -- you know, you're not getting -- you can't
18 get it all, they can't get it all. Let's, you know.
19 I mean, we get on the call. I mean, this guy just
20 tears my head off. And I'm like that's -- that's not
21 going to -- we're not going to get to a carving up the
22 assets through that type of approach.
23    But -- and I think also there was a view
24 that Mark described yesterday that was very much held
25 by the principals of 777, that at the time there was a

Page 171

1 lot going on in the football assets and Everton and
2 different -- different things going on and the -- the
3 litigation -- filing the litigation at that time was
4 extremely aggressive because it did have a chilling
5 affect on, you know, a lot of assets. But, I mean, I
6 understand that. I mean, that -- that's a view. That
7 would be a factor that I might point to as being
8 aggressive. And I think Mark did a nice job
9 describing that. So I think those are kind of like
10 things I was referring to.
11    **Q. Okay. Sorry, anything else?**
12    A. Just kind of generally.
13    **Q. Okay.**
14    A. You know.
15    **Q. So generally, you know, you articulated**
16 **tough negotiating tactics at settlement table; is that**
17 **right, the first one?**
18    A. I think naive a little bit.
19    **Q. Okay.**
20    A. Like, I mean, even if you win. So you got
21 an unsecured litigation claim. We file bankruptcy.
22 It's going to be terrible. The recovery is going to
23 be terrible. So it's like -- it's just not realistic.
24 Like we want to -- you got to get -- you got to get a
25 little more realistic and -- and -- and that was

Page 172

1 something that I -- that I took away from that.
2    **Q. Well, do you think taking an unrealistic, to**
3 **use your term, position in settlement talks is**
4 **suggestive of a heightened propensity to commit**
5 **criminal activity --**
6    A. No, but --
7    **Q. -- to obtain information?**
8    A. -- there's a lot of animus. I mean, this
9 is -- there's a lot of animus. And I'm not saying
10 it's not warranted. I'm just saying there's a --
11 there's -- there may be the more higher level of
12 animus than you might find between two corporate
13 litigants. I mean, from what I could tell, remember
14 I -- I -- I'm not as plugged in today. But at the
15 time in the -- in the first couple of months, that was
16 my sense.
17    **Q. Is the level of animus such that 777**
18 **Partners might file a retaliatory lawsuit against**
19 **Leadenhall without any factual basis?**
20    A. Not from our perspective.
21    **Q. Okay.**
22    A. I mean, this is is -- we -- we have an
23 obligation. It -- it -- if -- if this is happened in
24 a different direction and we didn't file this suit,
25 you guys would -- Leadenhall would be yelling "what

Page 173

1 are you guys doing?", in my opinion.
2    **Q. What about if 777 Partners was owed over**
3 **$600 million from Leadenhall and hadn't received even**
4 **a fraction of that amount despite repeated promises,**
5 **would -- would it be reasonable for 777 Partners to**
6 **file suit?**
7    A. Yes.
8    **Q. Okay.**
9    A. Oh, I don't -- I don't -- as I discussed
10 with you, I don't -- I'm -- you -- you have a -- you
11 have claims, you filed a lawsuit. I mean, I don't
12 think it's 600 million. That number is exaggerated
13 because it ignores the payments that have come in
14 since then and the -- the collateral base. So by
15 throwing around that number, you also create a sense
16 of -- of -- it's going to be harder to get to the real
17 number.
18    **Q. And you mentioned earlier the timing of the**
19 **filing of the lawsuit as potentially aggressive; is**
20 **that right?**
21    A. I mean, I think Mark described it. He's a
22 little more tuned into the value of the businesses and
23 he's -- he was -- there was a big decline in value
24 around that. It created a whole snowball effect. All
25 the counterparties wouldn't finish what they were

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                          Pages 174..177

Page 174

1 doing and, you know, made it harder to sell assets and
2 analyze businesses and counter -- you know, and the
3 counterparties transacting with the company.
4    Q.  How long should a creditor who's owed
5 hundreds of millions of dollars to wait, in your view,
6 to file suit?
7    A.  I'm not an expert in that.
8    Q.  Are you aware that Leadenhall tried to
9 negotiate a forbearance agreement with 777 for
10 18 months or so?
11    A.  I'm -- I don't know about 18 months, but I'm
12 aware there'd been some negotiations.
13    Q.  Are you aware that Josh Wander told
14 Leadenhall 777 couldn't even pay 15 misdemeanor of the
15 debt it owed?
16    A.  I've seen that testimony or I've seen that
17 quote.
18    Q.  Yeah.
19       I'm just -- I guess what I'm trying to ask
20 is:  At what point is it reasonable and not aggressive
21 to file a lawsuit on your legitimate claims?
22    A.  I don't know.
23    Q.  Okay.  Mr. Ratner, do you have any factual
24 basis to conclude that Leadenhall has benefitted in
25 any way from Mr. Davis's alleged intrusions?

Page 175

1    A.  I -- I don't know.
2    Q.  So you don't have any factual basis to
3 conclude that Leadenhall has derived a benefit?
4    A.  Well, we -- I don't know what they -- they
5 got from the intrusion.
6    Q.  And you don't know if they got anything,
7 correct?
8    A.  Well, I know they -- they got something and
9 then there was some deletions and erase -- and
10 erasing, but I -- I don't know if they got any
11 information.
12    Q.  I'm sorry, you know that Leadenhall got
13 something?
14    A.  No, I said I don't know.
15    Q.  You said "they got something" --
16    A.  No, I mean, they, the intrusion, downloaded.
17    Q.  Oh, okay.
18    A.  But I don't know -- I said twice, I don't
19 know what Leadenhall got.
20    Q.  I -- I -- I'm sorry.  I thought you were --
21 I thought the "they" was referring to Leadenhall.
22    A.  The "they" was the intruders.
23    Q.  I see.
24       Or intruder singular?
25    A.  Intruder singular.

Page 176

1    Q.  Okay.  Plaintiffs also allege there was a
2 physical break-in at the Suttonpark offices.  Are you
3 familiar with that?
4    A.  Yes, sir.
5    Q.  Have you seen the police report filed in
6 that case?
7    A.  Yes, sir.
8    Q.  Are you aware that the police report says
9 Mr. Davis accessed the building using an old key fob
10 of his?
11    A.  Yes, sir.
12    Q.  You don't contend, do you, that Leadenhall
13 facilitated Mr. Davis's break-in?
14    A.  I -- I don't think that's an allegation.
15    Q.  Plaintiffs allege that Mr. Davis stole
16 several laptops while he was inside the office
17 building, right?
18    A.  Yes, sir.
19    Q.  Do you know whose laptops those were, which
20 individual employees?
21    A.  I do not.
22    Q.  Do you know anything about what information
23 was on those information?
24    A.  I do not.
25    Q.  You're not aware of any evidence that

Page 177

1 Leadenhall has or ever had possession of the laptops
2 that Davis took, are you?
3    A.  I'm not.
4    Q.  Okay.
5       MR. STARR:  I may still have a couple more
6    questions, but I do want to give Mr. Morlan a
7    chance to pose some questions before we lose you,
8    so why don't I suspend the examination for now.
9       And, Mr. Morlan, do you want to -- do you
10    have questions you'd like to pose?
11       MR. MORLAN:  Sure.
12       MR. STARR:  Thank you, Mr. Ratner.
13       THE WITNESS:  Thank you.
14          CROSS-EXAMINATION
15 BY MR. MORLAN:
16    Q.  Mr. Ratner, my name's Hal Morlan.  I
17 represent Saiph Consulting LLC and Paul Kosinksi.
18       It's about 1 o'clock right now.  We have a
19 limited amount of time.  I understand that you need to
20 leave at 2 o'clock to catch a flight; is that right?
21    A.  Yes, sir.
22    Q.  Okay.  Well, I'm going to try to get as much
23 done as I can right now.  I -- I don't want to rehash
24 too much of what we've gone through, but there are
25 some things that you, you know, I -- I want to confirm and

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 178

1  just clarify and make sure that I understand your
2  testimony and your position accurately; is that fair
3  enough?
4      A.  Yes, sir.
5      Q.  Okay.  And it -- it's important to you that
6  I, and whoever the fact finder is, ultimately (Zoom
7  interference) your testimony, correct?  You agree with
8  that?
9          THE COURT REPORTER:  I'm sorry, I missed
10     part of that question.
11 BY MR. MORLAN:
12     Q.  I said it's also important to you that both
13 I, the one questioning you, as well as the fact finder
14 understands your testimony that you're giving today;
15 is that right?
16     A.  Yes, sir.
17         Mr. Morlan, I'm going to look at the --
18 not -- I'm not -- I'm going to look at you on my --
19 you're coming in in two places.  I'm going to look at
20 you on my screen instead of up here because
21 it's making me dizzy.  It's making me dizzy.
22     Q.  Okay.  Whatever -- whatever works for you.
23         THE WITNESS:  Does he see me?
24         MR. MORLAN:  I'll move my screen over here
25     too so I'm -- it looks more like I'm looking at

Page 179

1  you.
2          THE WITNESS:  He sees me?
3          MR. STARR:  He sees that.
4          MR. PELLEGRINO:  He sees -- Do you see
5      yourself on the left?
6          THE WITNESS:  Oh, okay.  I'm looking at you.
7      Okay.
8  BY MR. MORLAN:
9      Q.  Okay.  Have you had a chance to try to open
10 up the documents over here in the chat?
11     A.  No.  I will right now if you tell me which
12 one to open first.
13     Q.  Okay.
14         MR. MORLAN:  Let's go off the record real
15     quick while we get these exhibit things worked
16     out.
17         THE VIDEOGRAPHER:  Okay.  Going off the
18     record.  The time is 1:08.
19         (A recess was taken.)
20         (Ratner Exhibit B was marked for
21     identification.)
22         THE VIDEOGRAPHER:  Okay.  We're back on the
23     record.  The time is 1:12.
24 BY MR. MORLAN:
25     Q.  Okay.  Mr. Ratner, I believe you're viewing

Page 180

1  a document I shared and that we're going to designate
2  Exhibit B for purposes of this deposition; is that
3  right?
4      A.  Yes, sir (perusing).
5      Q.  Okay.  And I will represent to you that this
6  is a production log of documents that were produced in
7  connection with this litigation.  Does that look like
8  what it is to you?
9      A.  Yes, sir (perusing).
10     Q.  Okay.  You've seen production logs before,
11 correct?
12     A.  Yes, sir.
13     Q.  Okay.  And the controlled number column on
14 the left, you recognize those as Bates labels?
15     A.  Yes, sir (perusing).
16     Q.  Okay.  So I believe earlier you testified
17 that you had a folder that you had some documents
18 related to this litigation in; is that right?
19     A.  Yes, sir.
20     Q.  Okay.  And that folder was on your computer?
21     A.  Yes, sir.
22     Q.  Okay.  Was it in Outlook?
23     A.  Yes, sir.
24     Q.  Okay.  And the documents that you referred
25 to as being in that folder, are they all contained on

Page 181

1  this list?
2      A.  Oh, I -- I -- I wouldn't know that
3  because --
4      Q.  Okay.
5      A.  -- I -- I -- no one's given me the -- there
6  was -- I -- I didn't even look in the folder.  I gave
7  them the folder and there was 50, 60 documents and
8  then the -- the legal team did what they did.  And I
9  don't have a copy of those documents.  And I don't
10 know what Bates number they are or anything like that.
11     Q.  Okay.  So you just gave them that entire
12 folder, you didn't look at the documents that were
13 inside of it?
14     A.  No.  Whatever -- I gave it to them.
15     Q.  Okay.  But you were the one who put the
16 documents in the folder, correct?
17     A.  Yes, sir.
18     Q.  And you have some familiarity with what you
19 put in that folder, correct?
20     A.  Well, at the time.  I haven't -- I haven't
21 looked at it since -- it would have been -- during the
22 month of September, around then, whatever I would've
23 got related to the intrusion, I would have just
24 dragged it into that folder at the time.
25     Q.  Okay.  So that -- you haven't added any

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                Pages 182..185

Page 182

1 documents to that folder since September?
2    A.  Well, I -- I -- I might have, if something
3 came in and I thought it related to that.
4    Q.  Okay.
5    A.  Again, I gave them the folder because I want
6 to comply with the discovery, whatever.
7    Q.  Okay.  And other than the folder, did you
8 provide any other documents?
9    A.  Just to Mr. Lei (phonetic) -- Jonathan Lee
10 in our firm.  I was on a call with -- or an e-mail
11 with him and Rebecca Hollander.
12      MR. PELLEGRINO:  I'm just going to warn you
13    not to disclose the sum and substance of
14    conversations with counsel, your counsel Rebecca
15    Hollander.
16      THE WITNESS:  Okay.
17 BY MR. MORLAN:
18    Q.  Well, let -- let me ask you, Mr. Ratner, I
19 want to go back to that question but since there's
20 been an invocation of privilege, were you speaking
21 with Ms. Hollander for the purpose of seeking legal
22 advice?
23    A.  No.
24    Q.  Okay.  Then you can go ahead and answer the
25 question.

Page 183

1    A.  I was just telling Mr. Lei or Lee, Jonathan,
2 how my e-mails were arranged and I showed them that
3 intrusion folder and I showed them that structure.
4 And then -- and I might have told it to him because I
5 know they had -- at B. Riley there's no desktop.
6 Everything in my e-mail is in the B. Riley system.
7 It's not like the old style where you have Outlook,
8 some on your -- you know, some in the -- separate from
9 the database.  Whatever's on my -- that I don't
10 delete, it's in the database that they have.
11    Q.  But you have -- B. Riley uses a document
12 management system?
13    A.  No.  It's Outlook.  They could see my
14 Outlook every -- like if I send an e-mail or the way I
15 organize my files, they -- they have full visibility
16 to all that.  It's all in the -- in the database
17 somewhere.
18    Q.  Okay.
19    A.  The old -- old Outlook that -- that I used
20 to use was different.  If you -- if you had something
21 on our desktop that you saved in your Outlook, it may
22 not be in the database.  We don't -- now it's -- it's
23 one database.
24    Q.  Okay.  But you don't consider that database
25 a document management system?

Page 184

1    A.  Yeah.  I mean, Outlook -- Outlook is a -- I
2 guess Outlook is a -- could be viewed as a document
3 management.  For me it is because I keep track of what
4 I'm doing.
5    Q.  Okay.  But is -- is it your understanding
6 that -- that you just have regular Outlook or is it
7 that you might have a document management software
8 that integrates with Outlook?
9    A.  Oh, I don't know that.  I -- I don't know
10 what B. Riley has.  I think it's -- I'm only aware
11 that we use Outlook.  I don't know what they're do --
12 I don't know what they're using to pull e-mails and
13 things like that.
14    Q.  Okay.  Well, is there anything that you're
15 aware of that would have been produced in connection
16 with your deposition, other than the documents that
17 we're talking about that you pulled from the intrusion
18 folder?
19    A.  The only thing I'm aware at -- aware of,
20 Mr. Morlan, is that there's a lot of work going on to
21 comply with the discovery because earlier in the week
22 there was e-mail traffic between counsel and Mark
23 Smith -- Mark Shapiro and BakerHostetler.  You know,
24 they're trying to do the documents.
25    Q.  And who is Jonathan Lee again?  That's

Page 185

1 somebody you just mentioned a little while ago.
2    A.  He -- he's one of the technologists at B.
3 Riley that I think is assisting general counsel with
4 the document discovery production.
5    Q.  Okay.  And -- and general counsel would be
6 Ms. Hollander?
7    A.  Yes, sir.
8      (Ratner Exhibit C was marked for
9    identification.)
10 BY MR. MORLAN:
11    Q.  Okay.  Let's take a look, please, if you
12 would, at Composite Exhibit C.
13    A.  (Complying.)
14      I have it open.
15    Q.  OKAY.  Is that open in a browser window or
16 is that opened in a PDF viewer?  It looks like a PDF
17 viewer.
18    A.  It's a PDF.
19    Q.  Okay.  Can you bring up the bookmark tab?
20 Do you know how to do that?  It should be -- looks
21 like it's to the right.
22    A.  (Complying.)
23    Q.  On the screen.  The -- the right bar on your
24 right side.  Maybe scroll up a little bit.
25    A.  I...

UNIVERSAL COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 186

1    Q.  One -- one above what you just clicked.
2       MR. PELLEGRINO:  What color is it?
3 BY MR. MORLAN:
4    Q.  There you go.
5    A.  Thank you.
6       MR. PELLEGRINO:  What color is it, Hal?
7       MR. MORLAN:  I mean, it's black and white.
8    You can see it now on -- on his screen.  If you
9    want -- you have access to the same view of the
10   screen.
11      MR. PELLEGRINO:  The red one.
12 BY MR. MORLAN:
13   Q.  Okay.  So I'm showing you what's been marked
14 as Composite Exhibit C for purposes of this
15 deposition.  Do you see that Composite Exhibit C has
16 some bookmarks to the right there on your screen?
17   A.  Yes, sir (perusing).
18   Q.  Okay.  Click on the very first one.
19   A.  (Complying.)
20   Q.  Okay.  And...
21   A.  Can you see my screen?
22   Q.  Yes, I can.
23   A.  Okay.  Okay.
24   Q.  So for purposes of this exhibit, Composite
25 Exhibit C, each sub or composite exhibit is going to

Page 187

1 be Composite Exhibit C and then whatever number leads
2 off here.  So the one you're looking at right now is
3 Composite Exhibit C-1.  Does that make sense?
4    A.  Yes, sir.
5    Q.  Okay.  And if you went down to the one that
6 starts with 4.  That's Composite Exhibit C-4.
7       All right.  I'm going to represent to you
8 that this Composite Exhibit C is comprised of every
9 document on that list that we just looked at, the
10 production log, Exhibit B.
11   A.  Okay.
12   Q.  Do you have any reason to doubt that?  Does
13 it -- do you need a second to look at the production
14 log?
15   A.  Absolutely not.  I'm -- I have no reason to
16 doubt you at all.
17   Q.  Okay.  And I'm also going to represent these
18 were all of the exhibits that we received in
19 connection with your deposition.  Any reason to doubt
20 that?
21   A.  No.
22      MR. MORLAN:  And, David, if I'm mistaken on
23   that, just let me know.  But I -- I believe that's
24   what was represented earlier.
25 BY MR. MORLAN:

Page 188

1    Q.  So I just want to go through -- we're not
2 going to go through every single sub exhibit
3 necessarily.  But I just wanted to confirm, maybe give
4 you a second to look at this.  If this looks like the
5 materials that you were referring to earlier from the
6 Outlook folders that you provided as part of the
7 document collection.
8       MR. PELLEGRINO:  Hal, I just want to clarify
9    that -- you said these are all documents that were
10   provided in connection with the deposition.  I --
11   I believe there's last seven productions, right,
12   or are you just limiting it to the last
13   production.
14      MR. MORLAN:  We can clarify if you want.
15   I -- I think this is the one that was specifically
16   B. Riley's documents, was it not?
17      MR. PELLEGRINO:  No.  I just wanted to make
18   sure we're -- we were talking about the same
19   thing.
20      MR. MORLAN:  I mean, part of the reason
21   I'm -- I'm doing this is -- is to ask him.  I
22   mean, it's possible this may not be the stuff in
23   the final.  I just want to nail down what we're
24   looking at here.
25      THE WITNESS:  I mean, I recognize some of

Page 189

1    the e-mails and the names.  But, I mean, I'm not
2    on a lot of these e-mails.  I don't know if these
3    are the ones from my file or these are other
4    production, but...
5 BY MR. MORLAN:
6    Q.  Okay.
7    A.  I mean, the ones that I have in my mailbox
8 that I gave to counsel, either they would be addressed
9 to me or they would have been forwarded to me by Mark
10 Shapiro or somebody, John McCarthy.  But I see these a
11 lot correspondence with the Jim Howard and Teresa
12 Licamora, Leadenhall, Saiph, you know, about the
13 audits.
14   Q.  Okay.  So it may be that Production Number 7
15 is maybe Mr. Shapiro's documents and yours might be a
16 different batch.
17   A.  (No verbal response given.)
18   Q.  We can revisit that if necessary.
19      You understand that we just got these
20 documents in the middle of the night on -- I believe
21 it was Monday night, Tuesday morning.  So I'm just
22 trying to clarify what we have.
23   A.  Yeah, it -- I -- I -- that's fair.  I see
24 the correspondence, again, with Mr. Howard,
25 Mr. Jarvinen, Paul Kosinksi.  I mean, there was --

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                    Pages 190..193

Page 190

1 there was activity around the audits.
2    **Q.   Okay.  So let's go back to the paper exhibit**
3 **that Mr. Starr introduced earlier, your exhibit -- I**
4 **mean, your declaration in this case.**
5       THE WITNESS:  Can you close this?
6       MR. PELLEGRINO:  Ratner Exhibit 3?
7       THE WITNESS:  Mr. Starr?
8       Okay.  I just closed that.  Okay?
9       MR. STARR:  Fine by me.  No objection.
10      THE WITNESS:  I'm -- I -- I don't want to
11   mess it up here.
12      Okay (complying).
13      Yep.
14 BY MR. MORLAN:
15   **Q.   Okay.  And am I correct that this**
16 **declaration was given in support of a motion for**
17 **temporary injunction?**
18      MR. PELLEGRINO:  Objection to form.
19      THE WITNESS:  Motion for a preliminary
20   injunction, I believe.
21 BY MR. MORLAN:
22   **Q.   Okay.  So are -- are you making a**
23 **distinction preliminary and temporary?**
24    A.  Yeah, I -- I just -- I want to say exactly
25 what it says.

Page 191

1    **Q.   Okay.  So then you would agree that this is**
2 **your declaration in support of plaintiffs' motion for**
3 **a preliminary injunction; is that right?**
4    A.  Yes, sir.
5    **Q.   Okay.  And the purpose of this document is**
6 **for you to provide sworn information to the court**
7 **about why the court should issue a preliminary**
8 **injunction in favor of 777 Partners and Suttonpark; is**
9 **that right?**
10      MR. PELLEGRINO:  Objection to form.
11 BY MR. MORLAN:
12   **Q.   You can answer.**
13    A.  Yes, sir.
14   **Q.   Okay.  Did you not hear my question?**
15    A.  I -- I said "yes, sir."
16   **Q.   Oh, oh.  Yes, okay.  Got it.**
17      And I want to zero in real quick on
18 Paragraph 22.  I know that this has been talked about,
19 but I want to make sure that -- we may go into some of
20 these, but -- but first I just want to confirm that
21 I've got the right list because I think there was some
22 additional things that are added to this list.
23      So I think Paragraph 22 is a list of the
24 reasons that you believe that the action of Davis were
25 known to and directed by Leadenhall for its benefit in

Page 192

1 the Leadenhall litigation; is that right?
2    A.  Can you say that again.
3    **Q.   That the purpose of this paragraph is for**
4 **you to state the reasons why you believe that Davis's**
5 **actions were known to and directed by Leadenhall for**
6 **its benefit in the Leadenhall litigation; is that**
7 **right?**
8    A.  Yes, sir.
9    **Q.   Okay.  And did you draft this declaration?**
10    A.  I would have drafted parts of it.
11   **Q.   But did you review this declaration?**
12    A.  Yes, sir.
13   **Q.   And did you sign this declaration?**
14    A.  Yes.
15   **Q.   Okay.  And everything in this declaration,**
16 do you still stand by that?
17    A.  Yes, sir.
18   **Q.   Okay.  And I -- I believe earlier that there**
19 was some talk about whether or not Davis was the agent
20 of Leadenhall; is that right?
21    A.  Yes, sir.
22   **Q.   Why was it important for you to testify that**
23 the actions of Davis were known to and directed by
24 Leadenhall for its benefit?
25    A.  Well, I guess that would be a factor that

Page 193

1 the court would consider.  I may not understand the
2 question, but I think the answer to the question is
3 that this is the type of information that a court
4 would consider when making a -- a ruling.
5    **Q.   When making what kind of ruling?**
6    A.  Well, any ruling.  I mean, they -- I --
7 there's argument in the motion for summary judgment.
8 There's argument in the -- in the temporary
9 restraining order.  There's argument in appointment of
10 a receiver or -- you know, whatever.  There's always
11 some information that the court wants to consider at
12 the time.
13   **Q.   Okay.  But this is your declaration, right?**
14    A.  Yes, sir.
15   **Q.   And you are responsible for the truth and**
16 accuracy of this declaration, correct?
17    A.  Yes, sir.
18   **Q.   Okay.  And you're responsible -- you've made**
19 the ultimate final decision as to what content would
20 be in this report, right -- I mean, in this
21 declaration, right?
22    A.  Yes, sir.
23   **Q.   Okay.  So why did you think it was important**
24 to state that it was clear that Davis's actions were
25 known to and directed by Leadenhall?

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 194..197

Page 194

1    A.  Well, maybe it's not important.  I don't
2  know.  I thought that because Leadenhall is the one
3  that's pursuing the audit and that they're using Saiph
4  and Saiph is using Mr. Davis, that they knew who was
5  on their account and that they're also in litigation
6  with us and that the intrusions could potentially
7  benefit them as described in Paragraph 21.  So, again,
8  it's possible they -- they didn't know, as that's what
9  the questions that Mr. Starr asked me, but I guess
10  that'll come out in discovery.
11    Q.  Okay.  So as you sit here today, you're not
12  sure whether or not Mr. Davis's actions were known to
13  and directed by Leadenhall for its benefit in the
14  Leadenhall litigation, do you?
15    A.  That was my belief at the time.
16    Q.  Well, I'm asking you -- well, in fairness to
17  you, this declaration is as of the date that this
18  declaration was made.  But I'm asking you:  As of
19  today, do you believe that the actions of Davis were
20  known to and directed by Leadenhall for its benefit in
21  the Leadenhall litigation?
22        Now having 6 months past in this litigation
23  and discovery and various other investigations, do you
24  have a firm conviction that the actions of Davis were
25  known to and directed by Leadenhall for its benefit in

Page 195

1  the Leadenhall litigation currently as you sit here
2  today?
3    A.  I mean, there's still -- yes.  I mean, I
4  haven't seen anything to tell me that they didn't
5  know.  We haven't had that discovery yet, so I
6  guess --
7    Q.  Have you seen anything to tell you that they
8  did know?
9    A.  Just the things that we've identified still
10  in the record, like what I said already today and
11  what's in the interrogatory.  We -- we haven't had the
12  discovery to tell me anything otherwise.
13    Q.  Okay.  So other than the items listed in
14  Number 22, has there been any other evidence or -- has
15  there been anything that you've come across since you
16  made this declaration that has demonstrated that
17  Davis's actions were known to and directed by
18  Leadenhall for its benefit in the Leadenhall
19  litigation?
20    MR. PELLEGRINO:  Objection to form.
21    THE WITNESS:  Just as I mentioned, there's
22  some other items that are identified in the
23  interrogatories that obviously I know about them.
24  But I think the combination of those items and
25  what Mr. Shapiro testified to and myself,

Page 196

1  that's -- that's what we know.
2  BY MR. MORLAN:
3    Q.  Okay.  So as you sit here today, is it your
4  testimony that you know that the actions of Davis were
5  known to and directed by Leadenhall for its benefit in
6  the Leadenhall litigation?
7    MR. PELLEGRINO:  Objection to form.
8    THE WITNESS:  Well, I mean, I -- what I'm
9  saying is if you read the last sentence, it says I
10  believe.  Based on the things that we have seen in
11  the case and it's -- I still believe that.  I
12  haven't -- I -- that belief hasn't changed based
13  on --
14  BY MR. MORLAN:
15    Q.  Okay.  That's your belief.
16    A.  Well, that's what it says.
17    Q.  Do you know that?  That's my question.
18    A.  Well, no.  That's why --
19    MR. PELLEGRINO:  Objection to form.
20    THE WITNESS:  Sorry.
21    I don't know because that's -- that -- that
22  would be -- that's why discovery and there's facts
23  and this is what I believe based on the -- based
24  on the different pieces of evidence that exist,
25  this is what I believe is the case.

Page 197

1  BY MR. MORLAN:
2    Q.  Have you seen any evidence of communications
3  between Davis and Leadenhall regarding the intrusions?
4    A.  I have not.
5    Q.  Have you seen any other direct evidence that
6  demonstrates that the actions of Davis were known to
7  and directed by Leadenhall?
8    MR. PELLEGRINO:  Objection to form.
9    THE WITNESS:  I mean, I don't know what you
10  mean by direct.  But, again, I've answered this.
11  I think it's the -- the same -- the same items
12  that I've identified.  I haven't seen anything
13  different.
14  BY MR. MORLAN:
15    Q.  Well, I think one of the distinctions that
16  Mr. Shapiro made he was described it as -- as
17  circumstantial.  Essentially things that might raise a
18  suspicion.  Do you understand the difference between
19  direct and indirect evidence?
20    MR. PELLEGRINO:  Objection to form.
21    THE WITNESS:  Yes.
22  BY MR. MORLAN:
23    Q.  Okay.  Do you disagree with Mr. Shapiro's
24  characterization of the evidence that is currently
25  available to you with respect to Leadenhall's

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

Page 198

1 knowledge about Davis's actions, would you disagree
2 with Mr. Shapiro that that's circumstantial?
3        MR. PELLEGRINO:  Objection to form.
4        THE WITNESS:  I mean, that's the way he
5 described it.  I would describe it as these are
6 factors that I considered.  This is what's known.
7 I don't know if I would label it as -- I don't
8 know if I'd label it direct, indirect.  What's the
9 word again that you just used?  Circumstantial.  I
10 mean, it is what is it.  This is what I know
11 and -- and this is how I form my view.
12 BY MR. MORLAN:
13    Q.  Well, I -- I guess, I -- I -- we were making
14 a distinction earlier between what you know and what
15 you believe.  And I think you said that you believe
16 that it's clear that the actions of Davis were known
17 and directed by Leadenhall, right?
18    A.  That's -- that's what I believe.
19    Q.  Okay.
20    A.  But --
21    Q.  But you don't know that the actions of Davis
22 were known to and directed by Leadenhall at this
23 juncture; is that correct?
24        MR. PELLEGRINO:  Objection to form.
25        THE WITNESS:  I think that's fair.

Page 199

1 BY MR. MORLAN:
2    Q.  Okay.  And in fairness to you, that's
3 because while you may have seen some suggestive
4 evidence that may warrant some investigation, you
5 haven't actually seen any direct evidence that
6 Leadenhall knew about and directed Davis's alleged
7 intrusions; is that right?
8    A.  I think that's fair.
9    Q.  Okay.  You said earlier that the case in New
10 York and the case that we're here on today are apples
11 and oranges, right?
12    A.  Yes, sir.
13    Q.  And one of the reasons is because the
14 case -- most of the facts of the New York case didn't
15 happen under your watch, correct?
16    A.  I mean, that's one of the 50 differences, I
17 suppose, yes.
18    Q.  Okay.  But is that a saline difference in
19 your mind?
20    A.  Yeah, they're totally different -- totally
21 different situation, yes.
22    Q.  Right.
23        So you would be expected to have different
24 duties and different responsibility for stuff that
25 happened under your watch as opposed to stuff that

Page 200

1 happened before you were even involved, right?
2    A.  As I described it before, depending on what
3 the issue is, I think that is a fair distinction.
4    Q.  And while you might have some responsibility
5 to investigate or address things that happened before
6 you were there, you certainly can't be said to have
7 responsibility for the actions of the company prior to
8 your involvement or control, right?
9    A.  That's true.
10    Q.  Okay.  And -- and you weren't involved in
11 the activities of -- of 777 and Suttonpark prior to
12 your retention that we talked about earlier, right?
13    A.  Right.  I mean, prior to April 2024, maybe
14 mid -- whenever I was first contacted in -- in April
15 some time, I never heard of these companies.
16    Q.  Okay.
17    A.  At all.  Any of them.
18    Q.  Never heard of Saiph?
19    A.  Never heard of Saiph.  Never heard of A-CAP.
20 Never heard of 777 Partners.  I'm not even a football
21 fan.  I never heard of the Premier League.
22    Q.  When you say "football," is that the sport
23 that a lot of people on this side of the pond call
24 soccer?
25    A.  Yes, sir.

Page 201

1    Q.  Okay.  So you said there were a lot of
2 objections, I think, to Saiph performing the
3 collateral audit; is that right?
4    A.  Yes.
5    Q.  Can you just give me kind of a quick simple
6 explanation of one that might help the jury -- what a
7 collateral audit is and -- and why it was being done
8 in this particular context?
9    A.  Sure.  In a collateral -- the -- the term
10 collateral -- I'm going to give you a nonlegal
11 definition.  The term collateral is used to describe
12 an asset that supports a loan or a debt instrument.
13 And a collateral could be anything.  Collateral could
14 be a table, chairs.  It could be any form of asset.
15 So somebody makes a loan and -- to a person or an
16 enterprise.  And then in -- in many cases that loan is
17 supported by a piece of collateral below the loan to
18 protect the amount of the loan or a part of the loan,
19 et cetera.
20        And in this case, Leadenhall made certain
21 loans to Suttonpark.  And in return for those loans,
22 they got certain collateral to support that loan.
23    Q.  Okay.  And when you say "support," do you
24 mean like if the loan wasn't paid back, then
25 Leadenhall would have first dibs on those



Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                              Pages 202..205

Page 202

1 assets?
2    A.  Yes, sir.
3    Q.  Okay.  And the assets that were collateral
4 for Leadenhall's loans, were those some form of
5 receivables?
6    A.  Yes, sir.  They're -- typically in this case
7 we've been referring them -- referring to them as
8 structured settlement payment streams.
9    Q.  Okay.  So the assets were structured
10 settlement payment streams; is that correct?
11   A.  Yes.  It's a -- Suttonpark would have a
12 receivable from a personal injury award or a lottery
13 award or something like that.  And that would be --
14 the asset would be the collection of those payment
15 stream on that receivable.
16   Q.  Sounds complicated.
17   A.  It is.  It's a com- -- it's a complex
18 business.
19   Q.  Okay.  Have you ever dealt with -- I know
20 you valued a lot of assets before.  Is -- is -- you --
21 you've dealt with receivables as assets before and
22 valued those, right?
23   A.  Yes, I have.
24   Q.  Okay.  And these structured settlements, is
25 this new, old hat, in the middle?  How familiar are

Page 203

1 you with -- with those types of things?
2    A.  Very familiar with the valuation of
3 different receivable packages.
4    Q.  What about structured settlements in
5 particular?
6    A.  We have valued structured settlements before
7 and in -- certainly Jim Howard, who was running the
8 day-to-day operations, had a lot of experience with
9 portfolios of structured settlements.
10   Q.  Okay.
11   A.  And ABS, asset back securities, all that
12 type of stuff.
13   Q.  Are they sometimes referred to as esoteric
14 assets?  Have you ever heard that term?
15   A.  I -- I have.
16   Q.  Okay.  Would you say that structured
17 settlement receivables are sometimes referred to as
18 esoteric assets?
19   A.  I don't -- I don't think I would categorize
20 them as esoteric assets, in my opinion.
21   Q.  Okay.  What would you classify as an
22 esoteric asset?
23   A.  Esoteric assets are -- are in some cases
24 that -- where the value is derived from yet another
25 asset where you might have receivables or some asset

Page 204

1 tied to the -- you know, movement and energy prices
2 would affect the value of some kind of other pool that
3 somebody's investing in.  It -- you know, there's more
4 derivative type values flowing into the underlying
5 security.  I mean, here it's a little before direct.
6    Q.  Does the term esoteric imply that the value
7 is derivative?
8    A.  I don't know.  Depends what -- there --
9 there's a lot of finance textbooks and I'm not -- I
10 don't have one handy.  But there's different ways to
11 classify them.
12   Q.  Okay.  But you've written a finance
13 textbook, haven't you?
14   A.  Well, thank you very much.  I'll take that
15 royalty.
16      Yeah, in -- in 2009 I published a Wiley
17 book.  It's not really a finance book.  It's a
18 business valuation and bankruptcy book.  So it's not
19 dealing with, you know, the definition of different
20 kind of assets, asset -- ABS, asset back securities or
21 receivable assets.  But it -- it's not -- I wouldn't
22 classify it as a finance book.  Not that that --
23   Q.  Okay.  But it's in the --
24   A.  Not that that matters.
25   Q.  -- wheelhouse of what we're talking about

Page 205

1 here, right?
2    A.  I -- I don't -- I don't think it's exactly
3 germane to the valuation of receivable portfolios, but
4 the valuation of the receivable portfolios is based on
5 the projected future cash flows from the underlying
6 receivables.
7    Q.  And are those pretty easy to value?
8      MR. PELLEGRINO:  Objection to form.
9      THE WITNESS:  There are certain nuances to
10   it.  You know, it's -- you know, for example, the
11   valuation of a -- the remainder of a lottery
12   winning receivable is less at risk than different
13   types of receivables because the payor is a
14   better -- is -- is a higher credit payor.  Others,
15   you know, are -- are different.
16      You know, the -- payments from insurance
17   companies in insurance settlements are less risky
18   than other types of assets because you have a more
19   secure payor.  Sometimes these things go out over
20   a longer term period, which makes them a little
21   more difficult to value.  So it -- it's just
22   another asset.
23 BY MR. MORLAN:
24   Q.  So was the purpose of the collateral audit
25 to determine what collateral was still securing

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                                    Pages 206..209

Page 206

1 Leadenhall's loans or credit facilities that were
2 extended to the plaintiffs?
3    A.  Yes.
4       MR. PELLEGRINO:  Objection to form.
5       THE WITNESS:  Yes, sir.
6 BY MR. MORLAN:
7    Q.  And what was the outcome of that collateral
8 audit?
9    A.  I don't know.
10   Q.  Okay.  Have you had a chance to review
11 Mr. Kosinksi's report?
12   A.  I don't think we have Mr. Kosinksi's
13 collateral report.
14   Q.  Okay.  Do you think that would be helpful to
15 you if you had it?
16   A.  Yeah, I -- I just don't -- I don't think
17 we -- I don't think we have his collateral report.
18 Mr. Howard may know and Mrs. Licamora may know the --
19 the same information, but I don't think they issued
20 a -- I don't think Mr. Kosinksi issued a collateral
21 report that we got a copy of.
22   Q.  Okay.  Did Ms. Licamora and Mr. Howard do a
23 collateral audit themselves?
24   A.  Well, they're analyzing the collateral that
25 is associated with the different loans and there's

Page 207

1 different -- typically in-house we've been using the
2 term portfolio.  So there's different portfolios.  And
3 those portfolios include 300 assets, 400 assets, 700
4 assets.  And then that's a portfolio that is supported
5 by a loan.  So they -- they --
6    Q.  Okay.
7    A.  We -- we have the data that they're working
8 with on a regular basis with the system.
9    Q.  But you're not aware of any report by anyone
10 from B. Riley that specifically pertains to
11 Leadenhall's collateral and any potential shortfall,
12 are you?
13   A.  Well, I think -- I mean, it's a real
14 process.  Jim Howard is working with people at the
15 company.  I -- I think we have our view as to what the
16 shortfall is and I think we've communicated back and
17 forth with Leadenhall.  In fact, I remember when I was
18 at the mediation myself, we -- we had information
19 around the loan balance and the collateral pool.  I
20 just don't remember the numbers, but we had some
21 spreadsheets around it.  So I don't think it's a -- I
22 don't think it's anything that we're not aware of.
23   Q.  Well, I think you said that -- that the
24 shortfall's at least $100 million; is that right?
25   A.  I -- I didn't say that.  Mr. Shapiro said

Page 208

1 that.
2    Q.  So you disagree with Mr. Shapiro on that?
3    A.  No.  I don't disagree.  I don't know.  He's
4 closer to the -- remember, what we -- I -- I mean, I'm
5 not involved day-to-day.  I don't know what the -- the
6 number is.  I'm not going to question him.  I'm not
7 saying he's right or wrong.  I just -- I'm giving you
8 my testimony.  I don't know.
9    Q.  Fair enough.
10      But Leadenhall's alleged a shortfall of
11 600 million, correct?
12   A.  Well, that I know is incorrect.  Because
13 when we were in the mediation, it was clear that the
14 600 million at the time -- remember, that number's
15 been paid down.  They -- they are -- been getting
16 cash.  The -- that number was the full amount of the
17 loans without regard to what the collateral values
18 were at the time.  I'm -- I'm pretty certain about
19 that.
20   Q.  Okay.  I appreciate that information.
21      Just to clarify my question and we can go
22 back to the point that you made, but before we do
23 that, I'm just asking you if Leadenhall's claim was
24 that there was a $600 million deficiency, not whether
25 you agreed with it.

Page 209

1    A.  Yes, sir, that's correct.
2    Q.  Okay.  And to your recollection, how much --
3 you just said some of the -- what's owed to Leadenhall
4 has been paid down.  Do you have any idea the
5 magnitude of that amount?
6    A.  I do not.  But since we've been at the
7 company, money that's been coming in on their -- on
8 their collateral is being paid down to them.  I know
9 that because when we first got there, we -- there was
10 a question about payments and we looked into that,
11 that there was ongoing payments going to Leadenhall.
12 I mean, it's an up and running --
13   Q.  -- ongoing payments that were supposed to go
14 into Leadenhall as of the date that you guys took
15 over?  Again, this is -- would be based on things that
16 happened not on your watch.  I'm just asking what you
17 determined once you came in.
18   A.  So I -- I don't -- I didn't understand your
19 question and then you -- you moved behind -- can you
20 repeat the question?  I -- it -- there was a lot in
21 there and I didn't follow what you were asking.
22   Q.  Okay.  You said that you looked into what
23 ongoing payments were going to Leadenhall; is that
24 right?
25   A.  Yes, sir.

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                    Pages 210..213

Page 210

1    Q.   Okay.  And under the terms of the loan
2  agreements at issue, as payments came in on the
3  collateral that was pledged to Leadenhall, those
4  payments were supposed to be passed through to
5  Leadenhall; is that right?
6    A.   Yes, sir.
7    Q.   Okay.  And -- and, again, I'm not saying
8  that this happened on your watch, but I'm saying part
9  of what you evaluated when you came in was whether and
10  to what extent those payments that Leadenhall was
11  entitled to from the collateral were actually going to
12  Leadenhall; is that right?
13       MR. PELLEGRINO:  Objection to form.
14       THE WITNESS:  And -- and I believe that
15    there's been payments to Leadenhall associated
16    with the existing collateral associated with their
17    loans.
18  BY MR. MORLAN:
19    Q.   But did you evaluate whether or not all the
20  collateral that was initially pledged to Leadenhall,
21  all of those payments were getting to Leadenhall?  Is
22  that one of things you looked into?
23    A.   I think we did a reconciliation.  And I'm
24  aware that there was a shortage -- a shortfall in the
25  collateral in the specific loans that -- receivables

Page 211

1  that are assigned to their portfolio.
2    Q.   Okay.  But that happened before B. Riley was
3  involved, correct?
4    A.   Yes, sir.
5    Q.   And did -- did B. Riley fix that?
6    A.   Fix what?
7    Q.   That Leadenhall wasn't receiving payments
8  for all of the --
9    A.   No.
10    Q.   -- that were coming in from all the
11  collateral?
12    A.   No.  Whatever was identified -- I think what
13  I was saying is whatever is identified as -- that we
14  have today that's their collateral, the -- that --
15  those payments are going.  I don't think we went back
16  and said, oh, that -- that piece of collateral that's
17  over here should be over here.  We did not do that.
18  Somebody else's collateral.
19    Q.   Well, I -- I've heard an issue about a
20  shortfall in collateral.  Can you explain to me
21  what -- what that issue is?
22    A.   There -- my understanding is there was
23  certain advances made and there was no underlying
24  collateral for those advances.  That's what the
25  allegations are in the complaint.

Page 212

1    Q.   Okay.  But was there also an issue that
2  needed to be reconciled with respect to whether the
3  payments for the collateral that was there were
4  actually being made to Leadenhall?
5    A.   I -- I -- sitting here today, I think
6  that -- since we've been in there, the payments that
7  were supposed to go to Leadenhall are going there
8  because Jim Howard and our team are interacting with
9  the Leadenhall team, right?  There's cor- -- like I --
10  so I -- I believe that from the portfolio -- I could
11  be wrong, but I believe that we are -- over the time
12  that we've been there, that there is payments going to
13  Leadenhall on the specific collateral that has been
14  identified as their collateral.
15    Q.   Right.  I think -- I think we agree on that.
16        I -- I guess what I'm asking is:  Part of
17  what B. Riley did when they came in was to reconcile
18  the collateral and figure out what payments were
19  supposed to go to Leadenhall from that collateral and
20  make sure that they were paid, right?
21    A.   Yes.  The term that we would use would be
22  the servicing.  I -- my understanding is that since
23  we've been there, the servicing has been -- has -- has
24  occurred properly.
25    Q.   But that's thanks to the work of B. Riley,

Page 213

1  right?
2    A.   It -- to the team that -- the -- the -- the
3  team that we put down to put a gate around the
4  Suttonpark, yes, sir.
5    Q.   And there was an issue prior to B. Riley's
6  involvement as to whether or not all of those payments
7  from the collateral were making their way to
8  Leadenhall or not; is that right?
9    A.   I -- I --
10       MR. PELLEGRINO:  Objection to form.
11       THE WITNESS:  I don't know that.  I can't
12    recall that.
13  BY MR. MORLAN:
14    Q.   Okay.
15       MR. PELLEGRINO:  Hal --
16  BY MR. MORLAN:
17    Q.   So going -- going back to Number 22 and
18  the -- the factors that we talked about, I believe
19  there are six factors on Number 22 in your declaration
20  that have to do with your belief about Leadenhall's
21  knowledge as to Davis, right?
22    A.   Yes, sir.
23    Q.   Okay.  And I just want to make sure, other
24  than those six, I think you said some others.  And
25  that was that some -- one of them was ongoing document

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 214

1 exchange or I think you called it discovery, but it
2 was a back and forth between Leadenhall and B. Riley
3 on behalf of Suttonpark and 777 as to the exchange of
4 certain information --
5      MR. PELLEGRINO:  Objection -- objection to
6 form.
7      THE WITNESS:  Yeah, I think there were other
8 factors that I tried to delineate.  Some of them
9 are mentioned in the interrogatories.  They are
10 items like the specificity or adjustments to the
11 complaint.  They are the attempts to get detailed
12 discovery that might be beyond the terms of the
13 collateral audit and there's a lot of
14 correspondence around that.  Those are at least
15 two that I could recall sitting here now.
16 BY MR. MORLAN:
17     Q.  What was asked for that was outside of the
18 terms of the audit?
19     A.  Oh, it's -- it's -- it's huge.  I mean,
20 there's five different requests that we were dealing
21 with.  Some directly from the company of Leadenhall
22 and some from the counsel.  And then we went through
23 detail process of vetting out each one of those --
24 each one of those items.  So I couldn't sit here and
25 give you an example, I wouldn't want to try to.  But

Page 215

1 we outlined all the requests and then we outlined all
2 the governing documents and we were trying to marry up
3 what was appropriate and what wasn't.
4      Q.  Is it your understanding that one of the
5 reasons that 777 was initially opposed to Saiph
6 performing the collateral audit with the participation
7 of Noah Davis?
8      A.  I don't know.  I can't remember if he --
9      Q.  Do you know -- I'm sorry?
10     A.  I don't remember if he was -- I think so.  I
11 think he might have been known or he was a participant
12 in the prior audit -- or, no, he wasn't because he was
13 still an employee.  But I don't know if they knew that
14 he was working for them or not.  I can't recall.
15     MR. PELLEGRINO:  Hal, we have to -- we have
16 to go.  I -- I apologize.
17 BY MR. MORLAN:
18     Q.  Well, Mr. Davis --
19     MR. PELLEGRINO:  I apologize.
20     MR. MORLAN:  I'm going to finish this line
21 of questioning.
22     MR. PELLEGRINO:  Well, we -- we -- we're
23 going to miss a flight.
24 BY MR. MORLAN:
25     Q.  Mr. Davis was a 777 employee until

Page 216

1 approximately April of 2024, correct?
2      A.  Yes.
3      Q.  Okay.  And the discussions about the
4 collateral audit started some time in mid 2023 or so;
5 is that correct?
6      A.  Well, no.  The -- with -- with us it's in
7 the 2024.
8      Q.  Well, prior to your involvement, you
9 understand and -- and you've specifically talked about
10 Saiph's insistence on -- on -- or Leadenhall's
11 insistence on using Saiph and Davis; is that right?
12     A.  Yes, sir.
13     Q.  Okay.  But at the time that these
14 discussions first began, Davis was actually an
15 employee of 777; is that right?
16     A.  Yes.  And I think I've testified about this
17 in terms of the -- the timing of the requests in 2024
18 and the different environment, vis- -vis the
19 litigation.  But -- but, I mean, this is -- we've
20 covered this.
21     I mean, but -- but I -- I want to respect
22 the time that the flights are.  Again, I'm willing to
23 continue and you'll have, you know, 6 hours and
24 59 minutes and 59 seconds.  But it can't -- but I -- I
25 was very clear about the 2 o'clock time.  If you have

Page 217

1 one or two more questions on this line, I -- I suppose
2 we can do them now.  If not, we're going to have to do
3 it later.
4      Q.  Okay.  I'll just do one or two based on --
5 on -- on that.  And I appreciate your time and I
6 appreciate you doing that and I appreciate those
7 representations.  We'll take you up on that.
8      I just want to ask:  I think you said that
9 it was reasonable for Leadenhall to want to have
10 somebody audit the collateral who was very familiar
11 with the particular systems and assets at issue,
12 correct?
13     A.  Yes.
14     Q.  Do you know anybody who is as familiar or
15 more familiar with that than Paul Kosinksi?
16     A.  I'm sure there -- this is not the most
17 unique thing in the world, but you have to balance off
18 the familiarity with the risk of exactly what
19 happened.  The former employee, a lawsuit going on
20 where he might be a witness in that suit.  So, yes,
21 he's familiar with it, but I don't think it's unique
22 enough that that's the only person that could've
23 performed this task.  I know that.
24     Q.  Well, I'm not asking you if he's the only
25 person.  But I'm just asking if you -- if you know of

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                    Pages 218..221

Page 218

1 anybody that would be more suited in terms of -- of
2 expertise and familiarity with the underlying assets
3 and systems than Paul Kosinksi. Can you name
4 anybody --
5        MR. PELLEGRINO: Objection.
6 BY MR. MORLAN:
7    Q. -- that would be?
8        MR. PELLEGRINO: Objection to form.
9        THE WITNESS: I mean, I -- I haven't
10    undertaken a market survey, but there's many other
11    people that can do this. And the same way that
12    CBIZ was doing Insurity, there's other people that
13    do collateral audits. B. Riley does collateral
14    audits. I mean, there's a lot of people that
15    could do this.
16 BY MR. MORLAN:
17    Q. Okay. Did -- did B. Riley or 777 or
18 Suttonpark ever suggest any auditor alternatives to
19 Leadenhall?
20    A. No. But in hindsight we should have said,
21 here, pick one of these three and we'll get it done.
22 We -- Mark and I were trying to be collaborative,
23 notwithstanding the company's adamant objection to it.
24 Chris Rei- -- Chris O'Reilly and -- and Jonathan
25 Walder and the team. Mark and I eventually acquiesced

Page 219

1 and -- and allowed them to come in.
2    Q. But I think that's certainly to your credit.
3    A. Right.
4        THE WITNESS: Peter.
5 BY MR. MORLAN:
6    Q. I think I just have one more question and
7 then I want to get out of here so you make your flight
8 and aren't cursing my name when they close the gate on
9 you.
10    A. I'm not. You're -- you're a fine fella.
11    Q. Oh, I know what -- what I was going to say.
12       You're not actually alleging that in this
13 case that Mr. Kosinksi knew about and directed
14 Mr. Davis's actions, are you?
15    A. I -- I don't think that's one of the
16 allegations.
17    Q. Okay. And you don't have any information,
18 belief, or knowledge as -- as to whether or not
19 Mr. Kosinksi directed or knew about any of the
20 intrusions that were alleged to have been comitted by
21 Davis, correct?
22    A. I don't know.
23    Q. Meaning correct, you -- you don't have any
24 information to that affect?
25    A. No.

Page 220

1    Q. Okay.
2       MR. PELLEGRINO: The answer --
3       MR. MORLAN: That said --
4       MR. PELLEGRINO: The answer was you don't
5    know.
6       MR. MORLAN: -- I appreciate your time
7    today. You've been very patient and accommodating
8    and I want you to get on that flight. And we
9    will -- we're not ending the deposition, we're
10    going to leave it open in case we need to come
11    back. And I wish you luck and hope you make your
12    flight.
13       MR. STARR: Can we put the time on the
14    record, please.
15       THE VIDEOGRAPHER: Yeah, going -- going --
16    we are at 4 hours and 57 minutes.
17       MR. STARR: Thank you.
18       Okay. Thank you, Mr. Ratner.
19       THE VIDEOGRAPHER: Going off the record.
20    The time is 2:06.
21       THE COURT REPORTER: Mr. Starr, are you
22    ordering this transcript?
23       MR. STARR: Yes.
24       MR. PELLEGRINO: My office is going to
25    contact you.

Page 221

1       THE COURT REPORTER: Mr. Morlan, are you
2    ordering the transcript?
3       MR. MORLAN: I'll get back to you.
4       THE COURT REPORTER: Mr. Feuer, are you
5    ordering the transcript?
6       MR. FEUER: Not at this time. Thank you for
7    asking through.
8       (Pursuant to Rule 30(e) of the Federal Rules
9    of Civil Procedure and/or O.C.G.A. 9-11-30(e),
10    signature of the witness has been reserved.)
11       (Deposition adjourned at 2:07 p.m.)



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

Page 222

```
 1                CERTIFICATE
 2    STATE OF GEORGIA:
 3    COUNTY OF DeKALB:
 4
 5         I hereby certify that the foregoing
 6    transcript was reported, as stated in the caption,
 7    and the questions and answers thereto were reduced
 8    to typewriting under my direction; that the
 9    foregoing pages represent a true, complete and
10    correct transcript of the evidence given upon said
11    hearing, and I further certify that I am not of
12    kin or counsel to the parties in the case; am not
13    in the employ of counsel for any of said parties;
14    nor am I in any way interested in the result of
15    said case.
16
17
18
19
20    Nicole Limoncelli, RPR, CCR-5799-5142-5014-9888
21
22
23
24
25
```

Page 223

```
 1          DISCLOSURE OF NO CONTRACT
 2
 3         I, Nicole Limoncelli, do hereby disclose
      pursuant to Article 10.B of the Rules and
 4    Regulations of the Board of Court Reporting of the
      Judicial Council of Georgia that Gallo Legal
 5    Services was contacted by the party taking the
      deposition to provide court reporting services for
 6    this deposition and there is no contract that is
      prohibited by O.C.G.A. 15-14-37(a) and (b) or
 7    Article 7.C of the Rules and Regulations of the
      Board for the taking of this deposition.
 8
 9         There is no contract to provide court
      reporting services between Gallo Legal Services or
10    any person with whom Gallo Legal Services has a
      principal and agency relationship nor any attorney
11    at law in this action, party to this action, party
      having a financial interest in this action, or
12    agent for an attorney at law in this action, party
      to this action, or party having a financial
13    interest in this action.  Any and all financial
      arrangements beyond our usual and customary rates
14    have been disclosed and offered to all parties.
15    This 6th day of March, 2025.
16
17
18
19    Nicole Limoncelli, RPR, CCR-5799-5142-5014-9888
      Gallo Legal Services
20
21
22
23
24
25
```

Page 224

```
 1    CASE:           777 Partners LLC, et al. v.
 2                    Leadenhall Capital Partners LLP,
 3                    et al.
 4    NAME OF WITNESS:  Ian Ratner
 5
 6         The preceding deposition was taken in the
 7    matter, on the date and at the time and place set
 8    out on the title page hereof.
 9
10         It was requested that the deposition be
11    taken by the reporter and that same be reduced to
12    typewritten form.
13
14         It was agreed by and between counsel and the
15    parties that the deponent will read and sign the
16    transcript of said deposition.
17
18         Said jurat is to be returned within 30 days
19    following receipt of the transcript to the
20    following address:
21
22         Gallo Legal Services
23         2900 Chamblee Tucker Road
24         Building 13
25         Atlanta, Georgia 30341.
```

Page 225

```
 1    NAME OF CASE:    777 Partners LLC, et al. v.
 2                    Leadenhall Capital Partners LLP,
 3                    et al.
 4    DATE OF DEPOSITION:  03/06/2025
 5    NAME OF WITNESS:  Ian Ratner
 6    GLS Job No.:     121599
 7                CERTIFICATE
 8         Before me this day personally appeared IAN
      RATNER, who, being duly sworn, states that the
 9    foregoing transcript of his/her deposition, taken
      in the matter, on the date and at the time and
10    place set out on the title page hereof,
      constitutes a true and accurate transcript of said
11    deposition.
12    _____
13              IAN RATNER
14         SUBSCRIBED and SWORN to before me
15    this _____ day of _____ 20____
16    in the jurisdiction aforesaid.
17
18    _____    _____
      My Commission Expires      Notary Public
19    STATE OF _____
20    COUNTY/CITY OF _____
21    []   No changes made to the Errata Sheet;
22    therefore, I am returning only this signed,
23    notarized certificate.
24    []   I am returning this signed, notarized
25    certificate and Errata Sheet with changes noted.
```



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025                    Pages 226..227

Page 226

```
1                    ERRATA SHEET
2  NAME OF CASE:     777 Partners LLC, et al. v.
3                    Leadenhall Capital Partners LLP,
4                    et al.
5  DATE OF DEPOSITION: 03/06/2025
6  NAME OF WITNESS:    Ian Ratner
7  Reason Codes:  1.  To clarify the record
8                 2.  To correct transcription errors
9                 3.  Other

10 _____
11 Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
14 From _____ to _____
15 Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
20 From _____ to _____
21 Page _____ Line _____ Reason _____
22 From _____ to _____
23
24 SIGNATURE:_____DATE:_____
25       Ian Ratner
```

Page 227

```
1                    ERRATA SHEET
2  NAME OF CASE:     777 Partners LLC, et al. v.
3                    Leadenhall Capital Partners LLP,
4                    et al.
5  DATE OF DEPOSITION: 03/06/2025
6  NAME OF WITNESS:    Ian Ratner
7  Reason Codes:  1.  To clarify the record
8                 2.  To correct transcription errors
9                 3.  Other

10 _____
11 Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
14 From _____ to _____
15 Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
20 From _____ to _____
21 Page _____ Line _____ Reason _____
22 From _____ to _____
23
24 SIGNATURE:_____DATE:_____
25       Ian Ratner
```



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**$**

**$1.8**
150:15

**$100**
146:9 207:24

**$200**
37:24

**$600**
19:11 150:10
173:3 208:24

**$700,000**
17:23 20:21

**-**

**-vis**
20:4 39:8 84:22
216:18

**1**

**1**
29:8,9,13 55:3
61:19 177:18

**1,200**
153:12

**10**
50:4,5 68:18

**100**
27:12 36:15
146:16 170:5

**10:53**
106:14

**11-2**
118:23

**11:13**
106:17

**12**
39:15,17,24 40:2
85:12,16 99:22

**12:21**
157:16

**12:36**
157:21

**12:37**
158:23

**12:40**
159:2

**14**
27:12 96:25
161:11

**15**
96:25 174:14

**16**
134:22 136:3,4
137:8

**17**
53:13

**17th**
8:9

**18**
174:10,11

**1:08**
179:18

**1:12**
179:23

**2**

**2**
18:18 54:5 61:16,
18,19 96:11,12
158:16 177:20
216:25

**20**
48:7 96:20

**20-year-old**
96:5,9,21

**2007**
27:11

**2009**
204:16

**2010**
96:23

**2013**
27:12

**2022**
11:21 12:5 14:12
88:11

**2023**
14:12 88:11 216:4

**2024**
29:17 40:7 51:23
92:10 101:20
102:10 107:22
119:6 123:20
148:17 167:20
200:13 216:1,7,17

**2025**
6:2,5

**20th**
7:25

**21**
119:16 194:7

**22**
134:7 136:5
144:24 164:23
168:23 169:2
191:18,23 195:14
213:17,19

**24**
158:14

**25**
37:25 91:7

**25,000-square**
43:9

**26**
159:5

**27**
119:6

**2:00**
7:14

**2:06**
220:20

**2:07**
221:11

**3**

**3**
54:6 87:17 118:17,
18,21 164:25
169:2 190:6

**30**
37:25

**30(e)**
221:8

**300**
207:3

**31**
51:22

**31st**
50:13

**35**
85:8

**3rd**
42:13,16

**4**

**4**
157:18 158:1
187:6 220:16

**400**
207:3



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**401(k)**
45:7

**5**

**5**
29:19 52:12

**50**
181:7 199:16

**50/50**
38:6

**57**
220:16

**59**
216:24

**6**

**6**
6:2 20:20 194:22
216:23

**60**
77:23 181:7

**600**
19:15,19,22 20:8,
18 25:22 28:7,13
29:23 40:23 41:24
48:22 49:6 51:15
53:21 58:20 59:11
60:22 70:25 71:15
74:7 79:9,19 86:3
173:12 208:11,14

**600,000**
17:23

**64**
28:16

**6th**
6:5 48:21

**7**

**7**
7:24 91:8 150:19
189:14

**700**
207:3

**77**
164:2

**777**
6:8,20 25:22 28:7,
13,21,22,25 29:22
40:5,23 41:15,24
46:21 47:10 48:22
49:5 51:15 53:8,21
54:22 56:21 57:12
58:20 59:10,11
60:22,24 61:1 63:4
64:9,15,20 69:4
70:19,25 71:7,15,
23 73:24 74:6
76:16 79:9,18 86:3
94:9 102:14,15
103:8 106:22
107:16 112:1
113:19,21 121:6
125:10,13 127:14
130:12 131:4,9,13,
18,21 132:14
150:18 153:17
159:8,10 162:9,12,
14 166:19 170:25
172:17 173:2,5
174:9,14 191:8
200:11,20 214:3
215:5,25 216:15
218:17

**8**

**8**
27:11 48:18 49:1,2
150:20

**8:11**
6:6

**8:52**
35:9

**8:59**
35:12

**8th**
134:24 135:8
136:7 139:18

**9**

**9**
24:3,8 124:14

**9-11-30(e)**
221:9

**90s**
26:13

**9:50**
68:15

**9th**
124:23

**A**

**A-CAP**
17:16 31:4 45:22
51:23 52:6 54:22
55:16 56:24 57:4
59:8,12,15 61:8
62:5 64:8,9,20
69:4 70:3,18 71:7
72:24 73:22,24
93:21 99:9,14,23,
25 100:11,25
101:2 144:5
200:19

**A-CAP's**
144:5

**a.m.**
6:6

**ability**
52:2

**able**
13:16 36:25 50:15
53:24 54:20 57:21
130:9 133:22
141:4

**about**
8:17 10:2 12:4,7,8,
13 13:17 14:5,8,11
17:8 22:4,8 27:5,7,
11 36:8 41:23
44:5,8 55:13
57:10,14,18,19,25
58:1,11 60:8,16
61:21 62:17,20
65:3 67:8,10,22,24
68:8 69:19 71:2
72:2 76:5 80:1,8
92:13 94:20 95:13
97:24 98:11 99:20,
22 103:4,13,18
104:2,13,14,22
105:3,6,17 106:20
109:7,12,18 110:7,
8,18 113:1,21
114:11 115:4,5
117:20 120:8,25
121:13,14,17,18
122:5 123:5
124:20 125:7
128:14,16,18
129:9 133:14
134:13,16,21
139:14,19 142:12
143:4 144:1
145:22 146:1,3
147:3,15,23
148:14 150:2,25
153:25 154:1,22
159:24 160:12
164:2,14 165:11,
21,24 166:19
168:3 169:8 173:2
174:11 176:22


**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

177:18 184:17
188:18 189:12
191:7,18 192:19
195:23 198:1
199:6 200:12
203:4 204:25
208:18 209:10
211:19 213:18,20
216:3,9,16,25
219:13,19

**above**
166:14,16 186:1

**ABS**
203:11 204:20

**absolutely**
37:20 40:15 78:6
89:1 97:23 136:13
145:4 146:19
187:15

**absorb**
48:1 158:16

**accept**
49:17 146:25

**accepted**
48:22

**access**
15:17 78:7 92:19
93:4 104:9 111:17
114:7 120:5,6,11
130:13,16 133:13
149:4 159:9 162:1,
4 186:9

**accessed**
119:19 120:4,17,
18 128:19 176:9

**accommodating**
220:7

**according**
80:2,3 159:16

**account**
15:7 194:5

**accountant**
32:19 86:21 98:4

**accounting**
33:12 38:9 84:11
100:20

**accounts**
14:16 33:4,16 34:5
83:13 129:18

**accredited**
25:18

**accuracy**
193:16

**accurate**
33:2 40:7,9 46:21
47:4 163:15

**accurately**
178:2

**acknowledgemen
t**
165:4

**acquiesced**
218:25

**acquisition**
85:19

**acquisitions**
85:16

**across**
123:2 195:15

**act**
52:2,3 152:25
154:5

**acted**
153:3

**acting**
128:3 144:5
161:15

**action**
125:21 191:24

**actions**
119:13 166:3,12
169:5 192:5,23
193:24 194:12,19,
24 195:17 196:4
197:6 198:1,16,21
200:7 219:14

**active**
25:13 42:23 46:20
47:10,12 48:2,4,6,
8,15 94:19 95:16
160:23,24

**activities**
14:13 200:11

**activity**
16:8 19:19 30:15
31:6 38:19 42:21
77:5,8 172:5 190:1

**actual**
142:9 150:12

**actually**
35:4 54:14 58:16
65:11 80:16 96:15
98:22,23 105:25
111:21 112:23
142:4 147:13
199:5 210:11
212:4 216:14
219:12

**adamant**
60:14,16 149:24
218:23

**added**
181:25 191:22

**additional**
73:8 118:12 124:8
191:22

**address**
200:5

**addressed**
189:8

**adequately**
130:10

**adjourned**
221:11

**adjustments**
214:10

**administration**
21:5

**advanced**
100:21

**advances**
211:23,24

**advancing**
19:19

**advice**
49:25 50:1 141:21
182:22

**advise**
36:8 47:14

**advising**
149:17,18

**advisor**
49:22 91:4,16
93:21 98:7,10
101:15 149:18

**Advisory**
58:21,22

**affairs**
60:9

**affect**
51:25 52:2 70:4
71:17 80:15 81:17
171:5 204:2
219:24

**affected**
70:11

**affects**
71:3,5

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**affiliate**
61:2

**affiliates**
94:10

**after**
8:9 10:25 22:2,24
23:2 46:18 65:13
67:24 107:24
108:20 150:16

**afternoon**
7:11 8:14 9:4,5,23

**again**
20:25 23:8 24:19
30:20 31:12 35:25
49:11 51:20 53:21
69:16 70:3,15
73:19 75:18 77:4
78:20 88:11 94:18
113:18 114:8
118:10 126:18
129:12 135:23
136:16 145:19
149:8 151:10
153:20,23 163:11,
14 169:12 182:5
184:25 189:24
192:2 194:7
197:10 198:9
209:15 210:7
216:22

**against**
38:13 68:9 70:2
72:24,25 73:6
79:19 80:12 94:9
97:22 100:20,22
119:22 120:14,22
139:7 169:6
172:18

**agency**
124:3 142:18
151:15 152:8,10,
19 163:13

**agent**
24:23,24 111:5
116:1,3,4,11 155:6
161:21 162:12,25
164:16 192:19

**agents**
114:4 115:21
153:16

**aggregated**
142:9

**aggressive**
169:5,9,15,25
170:10 171:4,8
173:19 174:20

**ago**
40:14 87:15,17
91:3,8 106:9 120:3
165:24 185:1

**agree**
19:9 27:1 38:21
45:19 50:25
126:15,19 146:12
150:23 152:17
153:16,18 178:7
191:1 212:15

**agreed**
46:11 208:25

**agreement**
40:20 54:25 58:18
66:12 68:24 86:2
143:16 155:23
174:9

**agreements**
40:22 51:24 52:5
61:3 100:16 210:2

**ahead**
17:1 39:15,22
50:4,5 82:21,25
182:24

**AJC**
96:3

**al**
6:9

**alerts**
24:9,12

**aligned**
69:8 73:16,24

**all**
8:12 11:9 13:20
16:11 17:9 18:13,
14 21:10 22:18
23:21 27:9,10 32:4
33:2,23 34:8
38:16,21 44:8,13
49:12 50:20 51:21
52:23 54:15 55:3,
18 59:10 62:16
63:15 64:7,14 65:2
74:2,21 78:5 81:3
83:6 84:3,19
85:17,19 86:21
89:14,20 90:24
91:6 92:3,17 95:3
97:24 100:15,19,
24 101:5,7,8
103:16 105:17
116:5,18 120:11
122:21 123:2
124:5 130:7,21
131:1,13,25
132:23 135:12,16,
20,24 136:16
138:6 139:16
141:18 143:3
144:9 149:15
150:5 151:10,11,
23 153:1 154:6
157:1 159:8
160:10,18 163:12
164:12 166:5
170:18 173:24
180:25 183:16
187:7,16,18 188:9
200:17 203:11
210:19,21 211:8,
10 213:6 215:1

**allegation**
32:1 92:6,8,25
117:3 124:7 130:5
176:14

**allegations**
15:13,24 16:6,13,
18 20:16 21:10
32:10 36:6 38:2
39:2 46:13 79:11
81:2 87:6 89:15
93:3 97:22,24
100:9 118:12
128:6,8 129:19
147:3 211:25
219:16

**allege**
92:2 93:23 130:23
176:1,15

**alleged**
22:1 88:8 99:14,25
107:22 111:1
128:20 166:19
174:25 199:6
208:10 219:20

**allegedly**
120:18

**alleges**
126:10 150:9

**alleging**
97:19 150:13
219:12

**allow**
75:14 76:18

**allowed**
67:1 144:21 147:7
219:1

**almost**
25:1 35:14 40:14

**alone**
146:10



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**along**
163:6

**already**
32:16 46:7 67:3
70:23 86:19 90:18
93:4 104:25
195:10

**also**
9:8,9 13:4 16:5
20:9 26:4 31:10
32:22 55:1 60:23
69:20 71:5 91:24
95:19 103:2 105:5
114:11 116:4
117:10 120:9,10
121:6 128:4,23
131:11 134:5
139:4 151:8
152:13,14 166:5
170:23 173:15
176:1 178:12
187:17 194:5
212:1

**alter**
39:7 160:12 161:8,
15,20

**altered**
89:16 119:20

**alternatives**
218:18

**although**
70:3 104:16
132:11

**always**
193:10

**am**
26:5,25 30:18
41:11 68:10 94:17
159:6 161:12
190:15

**ambiguous**
34:24

**amended**
10:12,13 116:22

**amendment**
58:25 59:3 114:12

**amendments**
23:8

**American**
25:19

**amongst**
22:23

**amount**
19:2 37:24 43:20
63:6 168:9 173:4
177:19 201:18
208:16 209:5

**amounts**
37:22

**analogous**
155:11 156:17

**analysis**
13:21 23:11 38:22
69:20 101:1 116:7
117:6,8,11 165:16

**analyze**
88:13 174:2

**analyzed**
38:17 101:6

**analyzing**
206:24

**and/or**
221:9

**angles**
105:18

**animus**
143:7 172:8,9,12,
17

**another**
7:10,24 13:14 25:6
55:10 57:7 73:14

**74:22 87:20**
109:25 120:9
133:7 148:13
155:2 203:24
205:22

**answer**
11:8 19:7 49:21
66:15,17,23 67:1
68:7 69:15,24 72:6
76:10,12 81:17
83:10,24 84:4
115:1 116:16
182:24 191:12
193:2 220:2,4

**answered**
140:2 153:21
197:10

**answering**
113:9 114:21

**answers**
13:24 116:17,18
166:7

**any**
10:4,8 13:24 22:12
25:2,5,7 28:15
31:15 51:12,17
59:8 60:11 65:8
66:21 67:7,20,24
68:23 73:15,23
76:5 79:9,10,24
80:23 83:8 88:7
94:15,16 99:8
102:7,14,18
109:17 110:25
111:11,12 117:3,4,
25 120:16 122:1
124:13 126:4,8,24,
25 129:1,5,8,13
133:2,6,12,17
138:1 140:13,15
143:2 152:8,21,24
154:4 159:8,20
160:25 164:2
172:19 174:23,25

175:2,10 176:25
181:25 182:8
187:12,19 193:6
195:14 197:2,5
199:5 200:17
201:14 207:9,11
209:4 218:18
219:17,19,23

**anybody**
37:1 65:16 113:17
169:23 217:14
218:1,4

**anymore**
28:17 150:25

**anyone**
26:2 56:20 62:5
107:16 111:13
113:7,20 118:20
136:20 144:5
151:4 207:9

**anything**
12:12 67:8 104:1
117:17,19,20
118:4 133:9,14
138:3 140:5 143:4
167:2 171:11
175:6 176:22
181:10 184:14
195:4,7,12,15
197:12 201:13
207:22

**Anyway**
64:5

**anyways**
93:22

**apologize**
215:16,19

**appears**
119:20

**apples**
20:23 93:16
199:10

**UNIVERSAL COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

**applicable**
79:10

**application**
128:1

**apply**
71:22 98:14

**appointed**
48:23

**appointment**
193:9

**appraiser**
25:18

**Appraisers**
25:19

**appreciate**
208:20 217:5,6
220:6

**approach**
170:22

**appropriate**
13:10 139:1 215:3

**approximately**
6:6 216:1

**April**
200:13,14 216:1

**area**
55:7 63:18 120:9

**aren't**
219:8

**argument**
193:7,8,9

**arm**
111:8

**around**
9:6 15:2,15 16:12
18:5 19:24 23:16,
19 30:17 31:6
38:19 39:12 42:20
51:5 64:19 68:6

77:10 81:3,23 87:5
92:11 94:7 98:8
104:12 110:23
122:19 127:21
135:13 138:6
148:16 151:12
168:2 169:14
173:15,24 181:22
190:1 207:19,21
213:3 214:14

**arrange**
55:16

**arranged**
55:14 183:2

**arrangement**
60:23 64:8

**arrive**
115:11

**arrived**
115:14

**article**
96:5,8

**articulate**
119:11 140:1
168:24

**articulated**
171:15

**ASA**
25:15,17

**ascertain**
161:12,13

**aside**
75:23 76:4 78:17
109:18

**ask**
7:24 35:21 36:7
45:22 66:4 68:25
88:17,20 89:24
101:10 113:21
115:10 122:16
127:16,18 138:12

139:14 141:13
142:11 143:24
155:18 174:19
182:18 188:21
217:8

**asked**
14:7,8 36:22 69:18
99:10,17 103:17
110:8 111:3
121:14 137:11
141:2 142:11
147:1 148:14
153:22 154:2,4,15,
22 162:20 166:18
168:3 194:9
214:17

**asking**
24:16 67:2,19
72:2,3 74:2 99:7,
20,22 110:4
123:25 139:24
155:5,19 162:6
164:14,15 194:16,
18 208:23 209:16,
21 212:16 217:24,
25 221:7

**aspects**
123:2

**assert**
72:19

**asserted**
36:6 71:19 122:2

**asserting**
94:8 97:20

**assertion**
69:1

**assess**
18:16,23 37:2,20
88:11

**assessed**
15:4 28:6,12,14
31:21 35:23 88:5

99:8

**assessing**
37:5,7,13

**assessment**
36:16 37:22 44:19,
20 45:4,14

**asset**
201:12,14 202:14
203:11,22,25
204:20 205:22

**assets**
64:2,6,7,10,15,16
86:14 87:3 145:10
170:22 171:1,5
174:1 202:1,3,9,
20,21 203:14,18,
20,23 204:20,21
205:18 207:3,4
217:11 218:2

**assign**
138:24

**assigned**
81:25 121:4 211:1

**assisting**
185:3

**associated**
29:17 64:11 170:7
206:25 210:15,16

**association**
26:9,14

**assume**
72:18 98:1 132:23
154:15 155:23

**assumed**
99:4 154:11

**assuming**
153:2,3 155:25

**assumption**
153:7 154:16

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**Atlanta**
8:10 11:11 13:14,
17

**attached**
152:3

**attempt**
30:9,23 31:11
35:22

**attempting**
81:14

**attempts**
31:16 214:11

**attended**
12:17

**attorney**
55:7 92:12 138:24

**attorneys**
6:10 37:3

**attributes**
82:8

**audit**
98:18 102:3,5,9,16
104:5,10 105:8
106:24 107:3,5,7,
18 123:15 124:13,
23 130:10 138:22
141:11,20 142:24
143:17 146:5,22
147:7,10 150:17
153:4,8 154:13,17
155:13,17,21
156:3,25 157:4
159:11,18 160:1,9
161:16,23 163:16,
18 165:22 194:3
201:3,7 205:24
206:8,23 214:13,
18 215:6,12 216:4
217:10

**auditor**
218:18

**audits**
101:14,16 123:19
156:13,17 159:9
160:4 189:13
190:1 218:13,14

**August**
23:7 24:3,8
107:21,22 108:6
109:6 124:14,23
138:5

**authority**
50:12

**authorized**
110:11 152:25
154:5

**available**
8:11 117:18
197:25

**award**
202:12,13

**aware**
11:20,21 24:13
95:14 102:8,14
107:2,9 112:8
119:12 120:10
126:4,8,24 133:12
152:21,24 156:10
159:20 164:10
166:18 174:8,12,
13 176:8,25
184:10,15,19
207:9,22 210:24

**away**
44:24 172:1

---

**B**

---

**back**
8:1 10:10,15 11:24
14:12,17 15:4
20:24 30:18,22
31:11,13 35:11

39:11,14 49:12
68:17 70:15 73:18
86:18 88:10
106:16 121:19
134:5 138:19
139:13 144:24
147:1 149:20
154:10 157:20
158:19 159:1
164:22 169:1,2
170:3,14 179:22
182:19 190:2
201:24 203:11
204:20 207:16
208:22 211:15
213:17 214:2
220:11 221:3

**bad**
115:20 133:17
146:1 150:4 170:7

**BAI**
121:25

**Baker**
75:1

**Bakerhostetler**
74:8,10,15,16,21
76:3 77:18 184:23

**balance**
19:4 146:15
207:19 217:17

**balances**
19:25 33:5 34:6

**ballpark**
34:20 61:12

**banked**
32:3

**banker**
15:3

**banking**
15:14 130:6

**bankruptcy**
27:12 83:5 90:25
91:1,9 145:20
171:21 204:18

**banks**
132:8

**bar**
185:23

**base**
56:19 63:7 81:24
173:14

**based**
46:13,14 66:2 72:6
121:11 122:2
124:2 141:21
151:6 162:7 166:2,
5,8,16 196:10,12,
23 205:4 209:15
217:4

**basis**
34:14 79:8 116:1,
8,11,21 151:2
153:7 154:16
155:19 161:13
164:15 172:19
174:24 175:2
207:8

**batch**
189:16

**Bates**
180:14 181:10

**became**
26:13 109:6

**because**
12:11 13:18 15:9
16:6 22:1 27:9
48:15 51:20 54:17
56:22 57:22 63:12,
22 64:23 70:25
72:5 84:13 85:7,14
91:6,19 92:2
109:10 115:18,19

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

117:7 121:17
124:4 125:2,9,13
128:9 130:1
145:24 147:24
148:7 149:6,16
151:13 153:4,5,20,
23 160:16 161:5
163:4 165:19
167:25 170:10
171:4 173:13
178:20 181:3
182:5 183:4 184:3,
21 191:21 194:2
196:21 199:3,13
205:13,18 208:12
209:9 212:8
215:12

**become**
16:15 43:13

**becoming**
104:16

**before**
7:23 16:19 21:11
22:24 35:21 39:21
42:16 47:20 56:21
63:11 82:4 85:1,6
86:19 93:11 102:9,
11,13 103:8,15
106:19 108:20
111:4 113:3,22
117:18 135:10
138:2,5 140:19
141:7 145:25
147:21 154:2
158:5 162:8
167:25 169:23
177:7 180:10
200:1,2,5 202:20,
21 203:6 204:5
208:22 211:2

**began**
109:21 216:14

**begin**
102:8 159:11

**beginning**
19:17 28:17 38:19
42:12,22 43:1
44:7,15,20,22 46:2
58:9 59:25 62:9

**begins**
158:14

**behalf**
6:22 144:6 153:1,4
154:6 163:1 214:3

**behind**
113:25 114:3
115:12 123:21
209:19

**belief**
161:13 194:15
196:12,15 213:20
219:18

**believe**
17:22 23:6 24:3
27:22,24 30:14
31:17 39:10,13
50:22 51:14,18,21,
23 52:3,8 65:10
66:13 67:8,15
74:20 76:13,23
80:14 94:6 95:25
97:3 109:3 118:9,
10,11,14 127:13
129:19 131:2
136:8 154:7
163:14 166:1,15,
21 179:25 180:16
187:23 188:11
189:20 190:20
191:24 192:4,18
194:19 196:10,11,
23,25 198:15,18
210:14 212:10,11
213:18

**below**
201:17

**benefit**
82:5 124:9 166:4
175:3 191:25
192:6,24 194:7,13,
20,25 195:18
196:5

**benefitted**
174:24

**Bennett**
89:20

**Berger**
89:5 92:12

**best**
26:23 53:2,3 98:15
115:3

**better**
46:3 79:12 104:23
136:11 150:21
205:14

**between**
7:25 19:24 23:20
30:10 31:4 37:21,
23 61:19 64:8
80:13 85:21 108:6
129:20 138:1,13
140:20 142:21
150:16 151:15
152:1,8,11,22
161:6 172:12
184:22 197:3,18
198:14 214:2

**beyond**
141:10 142:24
214:12

**big**
17:12 27:3,20
57:17,23 96:4
165:20 173:23

**BIH**
120:8,23,25 121:8,
9,10,11,16,20,22,
25 122:2,5,19

170:3,5,7

**billing**
59:5

**billion**
19:4 61:13,16,18,
19,24 150:15

**billions**
19:5

**bills**
59:10

**bio**
26:22

**bit**
10:1 11:12,16 12:1
14:5 15:20 28:2
31:2 33:19 36:24
39:21 41:5,6 48:10
57:25 73:21 82:3
91:19 104:17
111:4 154:21
171:18 185:24

**black**
186:7

**blanket**
81:13

**blanking**
143:5

**blew**
163:6

**blood**
133:17 150:4

**board**
34:8 109:21

**body**
26:18

**Boersig**
102:24

**bonus**
45:8 167:16,20

**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

168:1,9

**bonuses**
167:23 168:2

**Bonzah**
16:10 44:10

**book**
204:17,18,22

**bookkeeping**
98:13

**bookmark**
185:19

**bookmarks**
186:16

**books**
143:12

**both**
38:9 60:22 66:10
69:4 70:18 71:3
73:22 178:12

**bother**
97:17

**Bowen**
6:14

**box**
81:3

**breach**
116:13

**break**
24:1 35:22 106:11,
19 108:20 156:19,
22 166:20

**break-in**
176:2,13

**breathing**
38:18

**Brett**
44:16 54:6

**Brickell**

57:13 121:4

**brief**
158:24

**bring**
74:25 75:6 90:13
185:19

**broad**
83:8 131:6

**broadly**
84:12

**broker**
79:15

**brought**
79:15 85:12

**browser**
185:15

**buckets**
144:23

**Buckhead**
11:25

**budgets**
86:15 88:5

**build**
15:2

**building**
176:9,17

**bus-**
70:24

**business**
25:19,21 44:6,23
45:15 60:22 63:5,
21,23 64:5 83:5
86:14,16 87:1,14,
15,22 90:3 91:14
96:20 97:2,4,25
98:12,23 100:11
105:18 123:3
131:15 170:8
202:18 204:18

**businesses**
42:24 45:12 62:21,
22 63:9 70:8,11,
22,23,24 71:3,7,16
79:24 81:6 83:3,4,
6,9 173:22 174:2

**busy**
48:6

---

**C**

**C-1**
187:3

**C-4**
187:6

**Cadwalader**
65:8,13,17,20
66:5,21 68:24

**California**
54:12

**call**
31:11,12,14 37:6
43:21 55:12,20
143:4 168:11
170:13,19 182:10
200:23

**called**
26:9 55:8 77:21
214:1

**calls**
11:15 56:1

**came**
13:15 15:22 32:11
41:19 50:22,24
54:3,19 58:7
100:22 103:21
112:22 113:24
160:3 182:3
209:17 210:2,9
212:17

**can**

7:19 8:7 11:6
18:17 29:7,13
30:18,22 35:4,22
47:5,6 51:18 53:2,
3 57:15 63:9 66:15
68:7 69:10,15,24
76:10,12 81:19
82:10 85:16 86:22
87:13,17 98:15
108:19 113:11,13
115:3 117:3,25
118:16 120:15
129:8,13 138:1,13
141:14 149:21
155:22 157:9
177:23 182:24
185:19 186:8,21,
22 188:14 189:18
190:5 191:12
192:2 201:5
208:21 209:19
211:20 217:2
218:3,11 220:13

**can't**
19:3 24:19,20
34:21 44:12 51:9
54:18 61:9 63:12
65:23 93:25 106:8
107:10 117:7
121:7,12 122:3
134:15,16,17
137:15 139:6,17
160:7 170:17,18
200:6 213:11
215:8,14 216:24

**cannot**
117:6 133:2
134:20

**capital**
6:9 30:5 58:22
63:7 97:25 98:8
101:5

**captured**
47:15 77:1 78:3

**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**care**
63:19 98:11

**careful**
24:6

**carving**
170:21

**case**
7:22 9:6 10:5,6,9
12:23 13:1,3,21
14:23 16:16,19
17:9,22 18:9
19:10,14,18 20:10
22:2 23:9 24:18
28:18 30:12,24
31:21,23 36:9
37:15 38:4 39:2
41:22,23,24 42:2,
4,22 43:6,13,17,20
44:1 70:1 73:4
74:5,9,18,22 75:16
77:15 84:2 86:25
87:20 92:2 99:16
100:3 112:17
113:19 115:19
116:18 117:16,22
118:2,6 119:4
122:2 126:6,11,21
128:24 129:16
130:22 148:17
157:2 158:4
159:25 176:6
190:4 196:11,25
199:9,10,14
201:20 202:6
219:13 220:10

**cases**
26:24 27:4 79:11,
25 85:8,11 90:25
94:18,20,21,22
97:1 132:12
201:16 203:23

**cash**
16:3 34:7 44:14
53:17 54:9,25 55:2

59:13 83:3 88:6
98:14 205:5
208:16

**casualty**
64:4

**catch**
98:14 177:20

**categories**
111:17

**categorize**
203:19

**caused**
49:16 70:7

**CBIZ**
98:18 104:23
149:21 150:5
218:12

**CEO**
56:12 128:3

**certain**
28:19 30:14 31:4
32:4 40:23 51:23
52:4,8 64:6 77:15
142:7 143:20
201:20,22 205:9
208:18 211:23
214:4

**certainly**
16:8 38:18 39:5
44:7,15 46:15
59:25 60:4 61:13
71:13 72:10 78:4
122:16 133:8
200:6 203:7 219:2

**certifications**
25:9

**certified**
26:4,7,10,13,14,15

**cetera**
15:14 84:15 87:9
201:19

**CFO**
54:7

**chain**
24:22,25

**chairs**
201:14

**chance**
177:7 179:9
206:10

**change**
29:5 47:18,22
124:24 125:6,8
148:19

**changed**
28:2,22 29:4
196:12

**changes**
27:11,16 48:1

**characterization**
27:1 197:24

**charged**
80:25

**charges**
35:17

**chart**
121:23

**chat**
179:10

**check**
108:19

**Checking**
89:19

**Chicago**
55:7

**chief**
56:15

**chilling**
171:4

**chosen**
16:14

**Chris**
92:12 104:16
108:2 109:15,24
135:15 218:24

**Christopher**
102:4

**circumstances**
103:14 104:2

**circumstantial**
197:17 198:2,9

**cite**
139:22 169:4,5

**cited**
165:3

**citing**
165:15

**Civil**
221:9

**claim**
20:11 22:22 36:2,
3,13 37:2 38:8,13
73:3,6,12,14,17
78:14,16 80:12,16
122:1 126:22
151:6 169:21,24
171:21 208:23

**claimed**
36:15

**claims**
18:8,11,12,14
19:9,13,14 20:17,
19 31:22,23 35:24
36:6,14 37:7 38:15
70:2,4 72:23,24
73:1,10 79:8,19
99:9 101:6 121:11
173:11 174:21

**clarify**
32:7 178:1 188:8,

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

14 189:22 208:21

**classic**
87:13

**classify**
203:21 204:11,22

**clear**
67:14 119:12
136:9 166:2,11,16
193:24 198:16
208:13 216:25

**clearly**
14:1 24:12 119:20
122:7

**Click**
186:18

**clicked**
186:1

**client**
13:15,16 36:8
43:15 76:25 156:9,
10,11

**clients**
156:6

**close**
190:5 219:8

**closed**
190:8

**closely**
23:2

**closer**
208:4

**co**
54:19

**co-conspirator**
99:14 100:1

**collaborate**
149:9

**collaborative**
218:22

**collateral**
14:15 19:21,24
20:3,4 32:3 33:5,
10,22 34:1,12,18
37:21,23 38:1,2
39:6 70:5,12,21
71:5,11,17,22
81:24,25 82:9 84:5
88:13 89:18,19
90:21 92:16,20
93:5 98:13 100:17,
24 101:14,16
102:3,5,9,16
104:5,9,20 106:23
107:7,8 123:2,6
124:12 129:10,14,
20 130:10,16
135:21 138:22
141:10,20 142:24
146:5,9,15,22
147:7,10 150:12,
17 154:13,17
155:13,17,21
156:3,4 157:4
159:9,18 160:1,9
161:16,23 173:14
201:3,7,9,10,11,
13,17,22 202:3
205:24,25 206:7,
13,17,20,23,24
207:11,19 208:17
209:8 210:3,11,16,
20,25 211:11,14,
16,18,20,24 212:3,
13,14,18,19 213:7
214:13 215:6
216:4 217:10
218:13

**collect**
14:17 44:17 75:15
135:12

**collected**
63:13 77:19
116:15

**collecting**
44:8

**collection**
74:17 94:20 188:7
202:14

**collections**
98:14

**color**
186:2,6

**column**
180:13

**com-**
202:17

**combination**
195:24

**combined**
142:8

**come**
7:25 13:14 30:17,
22 31:13 33:3 54:2
55:4 57:8 58:10
61:14 98:19
115:15 122:18
139:6,13 144:14
149:25 170:3
173:13 194:10
195:15 219:1
220:10

**comebacks**
169:19

**comes**
85:11 149:1

**coming**
42:25 71:1 86:12
87:11 98:18
101:22 140:4
142:4 178:19
209:7 211:10

**comitted**
219:20

**command**
25:1

**commence**
102:16

**comment**
79:12 135:9

**commented**
20:6

**commercial**
26:24

**commit**
112:19 136:10
142:14 172:4

**commitments**
43:16

**committed**
80:19 81:9

**committee**
45:7

**common**
66:3,7,9,11 68:24
70:7,13,18 71:19
72:6,7,8,10,19

**commonality**
70:17

**communicated**
50:17 64:22
103:11 207:16

**communication**
152:21

**communications**
64:18 75:10
147:14 197:2

**companies**
47:21 49:14 53:18
61:2 63:8 79:13
85:13,14,15
131:10,13 200:15
205:17

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**company**
16:14 44:6,13
60:10 63:6 70:2
71:4 72:3,25 73:6,
14,18,22 75:20
78:11,22 82:13
91:10 94:24 95:9,
15 100:23 128:3
133:9 138:20,21
145:21 152:12
160:3 167:21
174:3 200:7
207:15 209:7
214:21

**company's**
167:24 218:23

**comparing**
93:11

**competitor**
105:7,11,12 151:7

**complains**
79:10

**complaint**
9:7 10:13,14,15
14:18 15:5 16:19
20:17 32:17 33:2
39:9 46:14 70:16
73:20 81:2 86:20
89:12,21 90:3
93:23 98:2 114:12
116:22 117:4
128:7,9,10,11
147:3 167:8 170:4
211:25 214:11

**complete**
83:10 114:25

**completed**
115:1

**Completely**
85:24

**complex**
26:23 64:12 114:6

202:17

**complicated**
58:19 116:11
202:16

**comply**
143:21 182:6
184:21

**complying**
29:20 39:16
119:17 164:24
169:3 185:13,22
186:19 190:12

**composite**
185:12 186:14,15,
24,25 187:1,3,6,8

**comprised**
187:8

**computer**
114:9 117:13
120:7 140:25
180:20

**computers**
163:7

**concept**
163:13

**concern**
76:24 77:3 104:22
105:3,6

**concerned**
50:15 58:1 60:5,8
67:16 146:3 150:2

**concerns**
62:12 76:5,19

**conclude**
174:24 175:3

**concluded**
10:25

**conclusion**
115:11 160:12
161:9,15,21

**condition**
33:21

**confer**
44:5

**conference**
11:10 68:12

**confidentiality**
76:19

**confirm**
8:13 177:25 188:3
191:20

**confirmed**
8:14

**conflicts**
148:1

**confusion**
41:23 46:14

**connected**
109:15 157:1

**connecting**
109:10

**connection**
111:25 115:5
133:24 138:1,13,
14 139:25 140:20
142:24 180:7
184:15 187:19
188:10

**connections**
116:5

**consider**
22:12 52:16 53:1,7
124:16 155:6
183:24 193:1,4,11

**consideration**
124:19

**considered**
38:18 79:18 80:8
119:21 120:12
122:8 150:8 198:6

**conspiracy**
126:13 150:14

**consternation**
148:12

**consult**
89:4

**consultation**
21:19 37:8,9 89:2
90:7

**consulted**
23:13

**consulting**
6:14 27:22 37:17
40:20,22 41:3
101:9,19 106:20,
23 110:22 156:7
177:17

**contact**
57:5 95:3 220:25

**contacted**
200:14

**contained**
180:25

**contains**
123:8

**contemplated**
140:15

**contend**
111:20,22 140:20
176:12

**content**
13:4 73:21 193:19

**contentious**
115:18

**context**
29:22 201:8

**continue**
8:1 18:21 34:16
41:8 43:4 100:11

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

216:23

**continuing**
26:12 90:20

**contract**
152:1,11,18

**contracted**
164:20

**contractor**
17:17 24:24 105:5
111:6 155:22
156:2 157:3 163:9

**contractors**
113:1 115:19
151:25

**contractual**
104:19 144:1,19

**contractually**
50:23 141:14

**contradict**
159:21

**control**
16:6 22:3 33:7
34:9 49:17 51:2
62:18,19 200:8

**controlled**
29:2 180:13

**controls**
151:25

**conversation**
11:23 14:11 23:16
46:15 57:10 67:8
104:14 109:7
114:14,23,25
127:21

**conversations**
11:5,7 12:6 31:9
32:24 46:2 56:16
62:15 66:5 67:10
68:23 104:12
114:16 151:11

**182:14**

**convert**
137:5

**conviction**
194:24

**convince**
93:18

**COO**
128:3 145:5

**cooperate**
139:2

**copied**
92:25

**copy**
11:22 181:9
206:21

**cor-**
212:9

**corporate**
28:20 43:16 49:21
172:12

**correct**
20:12 29:23 32:8
36:17 67:15 69:5
72:11 77:16 81:10
92:20 99:16
103:24 119:13
123:7,11,12
131:16,17,19
132:18,21,22
133:1,4 136:7
137:18 146:22
147:19 148:10
151:7 159:18
162:9 165:19
175:7 178:7
180:11 181:16,19
190:15 193:16
198:23 199:15
202:10 208:11
209:1 211:3 216:1,

**5** 217:12 219:21,
23

**corrected**
10:13

**correction**
165:13

**correspondence**
31:4 122:19
155:14 165:10,11
189:11,24 214:14

**cost**
18:3,12

**costs**
18:24 54:1 56:10
57:25

**could**
9:18 14:3 23:23
31:18 34:20 39:10,
15 41:18 55:5 56:8
61:12 63:7 70:4
72:22 89:11 91:3,
20 92:4 93:18
96:17 105:1
108:12,25 111:14
116:14 117:10
120:12 124:9
128:2 129:22,24
140:6 150:24
151:19 154:9
166:25 169:1,10,
14 172:13 183:13
184:2 194:6
201:13,14 212:10
214:15 218:15

**could've**
217:22

**couldn't**
51:11 125:19
174:14 214:24

**counsel**
7:13,21 11:6,7
21:20 22:10 37:9

**49:22 58:23 68:9**
71:19 74:14,24,25
75:7,10,19 77:18,
19 89:3,4 90:7
95:9,11 110:21,23
114:17 118:14
121:3 128:11
135:19,20 141:23,
24 182:14 184:22
185:3,5 189:8
214:22

**counsel's**
75:19 141:21

**counter**
174:2

**counterparties**
58:17,20 173:25
174:3

**counterparty**
133:7

**couple**
9:3 56:1 68:25
77:7 87:15 104:11
113:12 151:20
167:6 169:10
172:15 177:5

**course**
26:16 56:22 57:14
65:7 109:11
156:16 163:25

**court**
6:24 21:17 28:9
65:19 108:9 178:9
191:6,7 193:1,3,11
220:21 221:1,4

**court-mandated**
30:25

**courthouse**
65:17

**cover**
53:15

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

**coverage**
79:6,7

**covered**
59:5 82:7 94:20
216:20

**CPA**
25:11

**CPE**
26:12

**create**
69:16,25 70:2
73:14 173:15

**created**
173:24

**creating**
147:25

**credentials**
24:13

**credit**
51:24 104:18
121:21 142:25
143:16 150:12
205:14 206:1
219:2

**creditor**
71:23 72:9,11
106:22 132:3
143:24 145:17
174:4

**creditors**
52:22,24 53:5,8
87:3 131:19,24,25

**crimes**
136:11

**criminal**
97:6 126:1 172:5

**critical**
89:6 90:4

**CRO**
14:6 21:8 47:20

56:7 90:12 91:15

**CROSS-
EXAMINATION**
7:4 177:14

**cull**
138:25

**culled**
141:18

**cups**
44:13

**curious**
99:7

**current**
19:4,21 124:5

**currently**
51:16 99:9 195:1
197:24

**cursing**
219:8

**cutting**
88:6

---

**D**

**D&o**
79:6,10

**d/b/a**
58:21

**Dallas**
162:12

**damaged**
19:1,6 70:21,22,23
71:15,16

**damages**
19:15 20:9,18

**Dark**
96:19

**data**
17:18 18:5 34:5

77:21 92:17
111:16 116:13
123:1,9 124:7
135:25 136:3
137:23 138:5
159:12 160:21,24
161:1,25 162:1,4,
16 163:17,23
165:11 207:7

**database**
18:25 19:1,2,6,7
183:9,10,16,22,23,
24

**date**
6:5 7:24 8:3 24:5,
20 194:17 209:14

**dated**
96:15

**David**
6:19 23:13 91:25
187:22

**Davis**
24:13,24 103:6,11
107:21 111:7,20,
22,25 112:7,18,21
114:9 115:25
117:5 119:19
120:17 123:13
127:19 128:19
130:23 133:3,13,
15,23 136:10,20
137:24 138:2
140:18 142:14,20
151:16,23 152:22,
25 153:2,3,4,8,9,
19 154:2,5,12,16
155:12,16,20
156:2,4,15,24
157:2 159:17,25
160:8,21,25
161:21,22 163:16
164:3,16,20 166:3,
12 167:19 176:9,
15 177:2 191:24

192:19,23 194:4,
19,24 196:4 197:3,
6 198:16,21
213:21 215:7,18,
25 216:11,14
219:21

**Davis's**
103:14 112:3
119:13 152:12
159:8 174:25
176:13 192:4
193:24 194:12
195:17 198:1
199:6 219:14

**day**
8:11 9:5 11:14
15:16 42:17 48:7,
20 49:3 55:3 58:7
94:6 149:19

**day-timer**
8:6

**day-to-day**
16:8 23:9 30:21
55:3 76:22 86:13
113:18 163:5
203:8 208:5

**days**
27:19 161:11

**DC**
54:7

**deal**
17:13,20 43:3
57:20 91:5 165:20

**dealing**
33:15 45:18,19
81:5 88:5 91:2
133:9 204:19
214:20

**dealt**
202:19,21

**debt**

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

52:24 100:12,13,
15,16,23 101:5
121:25 122:20
174:15 201:12

**debtor**
143:24 145:20

**debtor's**
56:23 91:4

**December**
44:2 50:13 51:22

**decide**
24:17 89:3 124:1
137:4

**decided**
12:24 21:9 24:21
46:3,4 93:15,19
105:9 124:17

**deciding**
23:11

**decision**
23:20,21 44:6
46:11 47:17 51:9,
11 87:23 88:2 89:8
193:19

**decisions**
44:23 45:2 47:16
48:17 110:18

**deck**
28:18 49:12

**declarant**
127:25 128:13

**declaration**
29:16 35:16 39:14
48:18 50:5 53:13
118:21 119:3,9
128:4,15,17 129:3,
4 134:5,23 151:14
157:6 158:3,13
159:5 164:22
169:1 190:4,16
191:2 192:9,11,13,

15 193:13,16,21
194:17,18 195:16
213:19

**declarations**
9:8 128:24 129:5

**decline**
70:7 173:23

**dedicated**
26:18,19 43:25

**defendant**
74:22 116:2
132:14,20

**defendants**
6:17,22 7:21 23:22
24:17,21 66:10
69:4 73:22

**defendants'**
7:21

**deficiency**
132:3 208:24

**define**
24:20

**definitely**
46:16 55:23
143:20 146:17
158:12

**definition**
201:11 204:19

**delay**
102:15

**delegate**
26:19

**delete**
183:10

**deletions**
175:9

**delineate**
214:8

**Deloitte**
149:21

**demeanor**
11:19 13:5,7

**demonstrated**
195:16

**demonstrates**
197:6

**departure**
103:14 104:2

**depending**
64:2 200:2

**depends**
87:18 204:8

**depletion**
71:2,21

**deposed**
8:18 12:22

**deposition**
6:1,7 8:1 9:1 10:25
11:12 12:15,17,25
13:4,6,8,12,23
70:16 97:16 107:1
158:8 180:2
184:16 186:15
187:19 188:10
220:9 221:11

**derivative**
204:4,7

**derived**
117:4 175:3
203:24

**Derousse**
49:23

**Derousse's**
50:1

**describe**
167:17 198:5
201:11

**described**
14:14 170:24
173:21 194:7
197:16 198:5
200:2

**describing**
49:18 52:12 171:9

**description**
27:4

**designate**
180:1

**designed**
31:2

**desire**
170:12

**desktop**
183:5,21

**despite**
173:4

**detail**
80:1 89:12 117:1
214:23

**detailed**
12:10 59:17 86:20
101:21 214:11

**details**
64:14 92:9

**deteriorated**
70:25

**determine**
100:10 205:25

**determined**
53:14 97:21
141:21 209:17

**determining**
104:8 152:18

**develop**
31:5

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**developing**
54:8

**dibs**
201:25

**didn't**
10:20 11:13 12:10
15:8,10 17:4 18:21
25:5,7 48:16 49:11
57:9,22 80:2,3
90:13 99:20
103:24 108:23
112:17,20 113:17
115:17 117:6,8,20
120:3 124:16
128:5 130:12
144:9 146:25
147:1 150:24,25
155:15 164:1,2,4,
6,9 165:25 167:21
168:10 170:9
172:24 181:6,12
194:8 195:4
199:14 207:25
209:18,21

**difference**
19:24 37:23
148:13 197:18
199:18

**differences**
20:2 199:16

**different**
14:23 16:11 21:17,
22,24 42:24 43:5
45:21 52:23 55:18
56:11,18 81:6 82:7
83:6,7 85:24 93:16
99:24 129:21
130:7 171:2
172:24 183:20
189:16 196:24
197:13 199:20,21,
23,24 203:3
204:10,19 205:12,
15 206:25 207:1,2

214:20 216:18

**differential**
37:21

**differentiate**
82:3

**differentiating**
33:18

**difficult**
18:13 205:21

**diminished**
41:16

**diminution**
71:21

**direct**
12:6 66:22 68:22
112:3 142:4
152:21 158:14
197:5,10,19 198:8
199:5 204:5

**directed**
81:8 119:13
136:10 142:14
149:15 166:3,12
191:25 192:5,23
193:25 194:13,20,
25 195:17 196:5
197:7 198:17,22
199:6 219:13,19

**directing**
11:7 66:16

**direction**
130:12 172:24

**directly**
50:17 59:10 75:12
92:13 142:5,7
170:14 214:21

**dis-**
141:21

**disagree**
14:20 45:14,19

197:23 198:1
208:2,3

**disagreed**
13:24

**disagreement**
14:23 15:19 144:1

**discern**
141:19

**disclose**
66:4 114:16
182:13

**discount**
58:2

**discovery**
18:15,17,18 21:14,
15 23:2 33:3
74:23,24 75:2,21
92:11 114:6
115:24 117:18,23
118:8,9,11,15
122:17,18,23
125:20,24 135:24
136:19 138:18
139:7,21 142:22
144:14,18 161:4,
11,12 162:6 167:9
182:6 184:21
185:4 194:10,23
195:5,12 196:22
214:1,12

**discovery's**
18:14

**discuss**
11:2 13:11 65:24
68:5,21,22 75:9
90:9 110:1

**discussed**
11:12,21 15:19
22:10,23 38:17
59:18,19,21 62:4
66:19 86:11
125:18 128:15

136:25 137:12
150:11 168:25
173:9

**discussing**
39:17 48:19
134:23

**discussion**
15:18 121:13
168:23

**discussions**
22:8 68:6 109:18
121:14 216:3,14

**disgruntled**
112:7

**dispute**
17:7 30:4,10,23
35:22 116:19
133:8 155:15
167:17 168:5,8,12,
14

**disputes**
21:16 26:25 27:16
35:18

**disputes...**
**including**
30:4

**distinction**
80:13 190:23
198:14 200:3

**distinctions**
197:15

**distinguish**
23:20

**Distractions**
9:22

**Dividing**
43:5

**dizzy**
178:21


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**Docket**
118:23

**document**
29:12,14 39:7
74:17,23 75:2,21
96:18 117:23
119:1 120:17
139:1 140:7
157:24 158:5
180:1 183:11,25
184:2,7 185:4
187:9 188:7 191:5
213:25

**documented**
32:16,18

**documents**
13:21 14:18 21:15
50:20 52:9 76:19
90:21,22 92:14,15,
20 100:15,19,22
101:6 111:15
115:4 135:12,15,
18,23 143:21,22
179:10 180:6,17,
24 181:7,9,12,16
182:1,8 184:16,24
188:9,16 189:15,
20 215:2

**doesn't**
25:3 93:23 135:21
142:23 143:3,24
164:9,12,13

**DOJ**
87:21 94:23 95:3,
6,7,10,25 97:18
133:19,24

**dollars**
39:5 53:15,25
174:5

**don't**
8:4 9:13 12:12,21
14:7 17:12 18:1,3,
24 19:7,21,25 20:7

22:15 24:5 25:5
33:23 34:3,19
36:20,21 37:3
39:9,10,13 40:24
41:11 44:20 46:2,4
47:4 50:16,25 51:4
52:1,9 54:3,16
55:15 56:11 58:16
60:5,16 61:14,17
64:13,14,22 65:5,
10 67:5,6,8,13
68:2,9 71:9 74:13
76:13 77:8,24
80:21 82:23 84:23,
24 93:7,8,9,25
94:1,5,6 95:16
97:3,16 101:20,23,
24 102:12,18
103:3,20,22
105:17 107:13,19,
23 110:2,6 111:13
112:11,12 113:9,
15,23 114:8,25
115:13,23 116:17
117:7,10,11,21
120:4 121:2 122:1,
4 123:15,16,23
124:13,14,18,20,
25 125:2,3,6,8
126:3,7,9 127:3,
12,15,23 129:7,17,
22,24 131:25
133:11 136:16,19,
20 137:2,14,20,22
138:4,7,8 139:4,
17,18 140:9,13,14,
18,23,25 141:2,5
142:20 143:7,8
146:7,16,25 148:7,
14 149:17 151:4,
11 152:16 154:23
155:10,14 157:11
159:22 160:14,17,
18,22,25 162:7,8,
22 163:11,17
168:13 173:9,10,

11 174:11,22
175:1,2,4,6,10,14,
18 176:12,14
177:8,23 181:9
183:9,22,24 184:9,
11,12 189:2
190:10 194:1
196:21 197:9
198:7,21 203:19
204:8,10 205:2
206:9,12,16,17,19,
20 207:20,21,22
208:3,5,8 209:18
211:15 213:11
215:8,10,13
217:21 219:15,17,
22,23 220:4

**done**
14:14 23:6 27:3,21
30:9 33:1,11 36:17
37:8 38:16 39:13
47:19 57:23 63:17
81:8 83:7,24
84:11,21 85:1
89:16,22 91:14
92:3 98:15 102:11
104:1 112:24
113:12 114:21
128:9 177:23
201:7 218:21

**double**
15:13 32:3 130:5

**doubt**
187:12,16,19

**down**
24:2 31:2 40:13
48:10 54:2,16,19
60:2 61:15 88:6,7
90:2,19 98:7,12
187:5 188:23
208:15 209:4,8
213:3

**downloaded**
175:16

**dozens**
131:9

**draft**
110:5,9 192:9

**drafted**
54:5 192:10

**drafts**
121:19

**dragged**
181:24

**draw**
80:12 138:1,13

**drawn**
138:15

**draws**
32:5,21 33:9

**drive**
33:17

**driven**
31:9 124:7

**due**
68:24 76:19 88:8
168:14

**duly**
7:2

**during**
12:15 13:23 19:22
44:4 67:17,23
92:10 101:12,20
124:12 128:19
135:10 181:21

**duties**
35:17 52:19 99:2
100:6 199:24

**duty**
78:13,17 100:8

**dwarfs**
133:9

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

## E

**e-mail**
47:3,4 64:23 74:24
75:2 110:4 182:10
183:6,14 184:22

**e-mails**
64:21 65:4 75:15
77:6,15,24 78:5
82:5 84:14 89:19
93:10 125:5,17,20
126:2,4 127:2,13,
19 130:22 131:1
132:24 133:2,22
140:25 141:18
183:2 184:12
189:1,2

**each**
186:25 214:23,24

**earlier**
30:12 32:8,9 41:14
78:4 97:10 107:20
110:5 121:14
142:12 159:23
173:18 180:16
184:21 187:24
188:5 190:3
192:18 198:14
199:9 200:12

**early**
26:13 30:16,24
42:11 62:15 97:10

**earned**
168:9

**easier**
132:13

**easily**
8:8 96:20

**easy**
106:7 205:7

**edge**
97:9

**edit**
170:3

**educate**
44:18

**educated**
103:13,18

**education**
26:12

**effect**
173:24

**effort**
30:17 135:11,18,
22

**efforts**
59:1 102:14

**either**
14:7 51:23 55:22
57:3 74:20 76:7
80:19 95:23
109:15 189:8

**elaborate**
69:10

**elements**
84:13

**else**
13:1 133:9 142:6
167:2 169:24
171:11

**else's**
211:18

**employ**
168:5

**employ-**
25:4

**employed**
40:5,12,16

**employee**
25:2 103:2 104:13,
22 105:3,5,7 111:9
145:15 150:2
151:8 155:1
167:16 168:3
215:13,25 216:15
217:19

**employees**
16:2 40:10 47:13
52:25 53:6 54:13,
15 84:14 102:15
148:24 153:11
154:23 176:20

**employer**
111:8 167:15

**employment**
168:12

**end**
7:14 36:1 145:23

**ending**
220:9

**energy**
204:1

**enforced**
51:23

**engaged**
101:21

**engagement**
7:10,16 41:15,20
42:3 55:5 58:3,17,
24 59:6,22 62:9
64:19 67:17 85:25
86:8 154:23

**enormous**
16:3

**enough**
18:22 44:20 69:21
93:22 178:3 208:9
217:22

**Enron**
91:9

**ensure**
59:1 87:4 98:8,21
100:16,21

**entered**
9:17 16:1,23

**enterprise**
16:7,12 28:19
38:14 43:8 57:17
61:5,8 63:16,20
121:5 201:16

**enterprises**
21:6 60:22 81:12
83:2

**entire**
10:15 28:4 44:17
77:19 78:5 92:25
93:6 130:23 133:5
181:11

**entities**
28:23 40:5 48:22
49:16 60:25 64:10
146:21

**entitled**
141:14 167:16
210:11

**entitlement**
19:14

**entity**
28:19 40:25 41:10
121:8

**environment**
16:2,5 216:18

**equity**
29:4 52:24

**erase**
175:9

**erasing**
175:10



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**Eric**
22:9 109:10,11,13,
15 110:7

**Ernst**
149:21

**esoteric**
203:13,18,20,22,
23 204:2

**essence**
36:24 49:15,18

**essentially**
43:2 197:17
201:25

**establish**
89:6

**established**
42:19 88:14

**estate**
55:11

**et**
6:8 15:14 84:14
87:9 201:19

**et al**
6:9

**evaluate**
18:14 30:2 210:19

**evaluated**
210:9

**eve**
137:24

**event**
15:13 91:1

**events**
145:25

**eventually**
58:9 218:25

**Everton**
171:1

**every**
14:23 42:17 71:23
72:9,11,14 94:6
143:15 149:19
168:24 183:14
187:8 188:2

**everybody**
70:12 97:6 108:19
109:10 146:3
156:24

**everyone's**
65:23

**everything**
15:15 45:2 47:22
78:7 79:14 96:4
98:2 156:23
158:10 166:14,16
183:6 192:15

**evidence**
90:24 107:11
110:25 126:17,21,
24 127:14 137:17
140:13,15 141:6
152:24 154:4
162:3 176:25
195:14 196:24
197:2,5,19,24
199:4,5

**exact**
23:25 24:5,20
55:15 61:9 121:8

**exactly**
24:20 51:4 105:17
107:23 112:12
121:24 154:18
162:5 190:24
205:2 217:18

**exaggerated**
173:12

**examination**
177:8

**examined**
7:2

**examiner**
26:4,7,14 86:17
91:13

**Examiners**
26:10,15

**example**
87:13 141:15
156:18 162:17
205:10 214:25

**exams**
26:11,17

**exchange**
214:1,3

**excuse**
9:18 63:2,4 76:2
130:15 133:23
157:24 159:11

**executed**
50:12 52:4

**executive**
43:10

**executives**
85:22

**exercising**
99:9

**exhibit**
29:8,9,13 96:11,12
118:17,18,21
157:18 158:1
164:25 169:2
179:15,20 180:2
185:8,12 186:14,
15,24,25 187:1,3,
6,8,10 188:2
190:2,3,6

**exhibits**
187:18

**exist**

196:24

**existence**
126:25 127:4,6,7,
10,11

**existing**
210:16

**exists**
117:8 126:25

**exited**
9:21 16:23

**expansive**
130:4

**expected**
199:23

**expecting**
167:23

**expenses**
54:18 87:4 88:6

**experience**
15:20 143:23
203:8

**expert**
9:10 26:23 27:15
81:1 98:5 174:7

**expertise**
37:18 38:9,10
218:2

**experts**
13:2 128:23

**expire**
134:24 137:4

**explain**
20:24 56:4 81:19
108:25 138:25
151:19 166:22
211:20

**explained**
99:22

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**explaining**
90:12

**explanation**
201:6

**explanations**
111:12

**explore**
22:6

**export**
105:22

**exposure**
36:12 37:13,14
60:20,21 61:4,7
76:6

**extended**
51:12 206:2

**extent**
7:22 8:17 11:4
12:23 18:4 59:4
70:1 71:14,15
101:1,3,4 147:8
210:10

**extraction**
159:12 163:23,24

**extremely**
42:23 112:7 171:4

**eye**
36:11

―――――――― **F** ――――――――

**face**
36:12

**facilitate**
101:14,16 102:4,6

**facilitated**
176:13

**facilitating**
104:4

**facilities**
142:25 206:1

**facility**
121:21

**fact**
13:13,18 31:2
46:24 47:2 114:5
123:8 141:24
147:17,23 149:24
150:7 161:22
178:6,13 207:17

**factor**
125:9 139:22
150:8 165:3,15
166:15 168:25
169:5 171:7
192:25

**factors**
119:11 125:3
166:2,5 167:3
168:22 198:6
213:18,19 214:8

**facts**
38:23 39:4,8 45:20
159:20 196:22
199:14

**factual**
38:22 128:10
172:19 174:23
175:2

**factually**
39:1 100:10

**failed**
167:15

**failure**
38:4

**fair**
18:22 42:5 45:20
84:15 89:10
132:23 178:2
189:23 198:25

**facilities**
199:8 200:3 208:9

**fairness**
194:16 199:2

**faith**
116:8,11

**fall**
37:17

**familiar**
33:21 102:19
105:20 147:18
176:3 202:25
203:2 217:10,14,
15,21

**familiarity**
145:15 181:18
217:18 218:2

**family**
7:18

**fan**
200:21

**far**
111:20

**far-reaching**
12:23

**fashion**
53:4 55:16

**fast**
54:2

**favor**
191:8

**February**
44:2

**federal**
22:7,14 116:9
125:25 136:11
221:8

**fee**
57:21,24 59:2

**feedback**
11:18 38:5

**fees**
57:20 59:8,12

**fella**
219:10

**fellow**
78:1

**fellows**
11:25 65:23

**felt**
17:20 22:3 102:1
138:21 141:10
167:16

**fence**
98:8

**Feuer**
221:4,6

**FFI**
83:4

**fidelity**
79:7

**fiduciaries**
15:14 30:2 52:14
93:12,14

**fiduciary**
17:9 21:7,8 22:4
47:19 52:17,19
53:7 86:24 99:2
100:6 139:8

**fiduciary-ship**
21:18

**fight**
150:25

**figure**
48:11 58:12
144:21 212:18

**figuring**
38:8



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**file**
12:5,9 16:14
22:20,24 23:11,21
110:22 120:16
124:17 171:21
172:18,24 173:6
174:6,21 189:3

**filed**
16:3,19 23:5 62:5
76:15,16 94:9
108:3 109:2 115:6
116:23 128:4,23
129:3,4 148:16
173:11 176:5

**files**
93:5 183:15

**filing**
17:9 22:7,14 23:4
110:11 113:4,22
148:22 171:3
173:19

**fill**
116:8

**final**
165:3 188:23
193:19

**finance**
204:9,12,17,22

**financial**
13:21 15:10 30:2
37:14,19 82:8
88:12 143:12
149:18

**find**
22:21 87:18
110:25 115:23
118:11 140:6,8
161:5 170:12
172:12

**finder**
178:6,13

**findings**
110:1,5,6

**fine**
9:20 11:20 17:3,6
48:13 69:13 93:18
97:16 122:22
164:4 168:18
190:9 219:10

**finger**
167:3

**fingertips**
84:25

**finish**
82:19,22 83:17
130:3 173:25
215:20

**finished**
18:14

**firm**
13:1 55:8,9 60:15
76:1 89:5 95:12,20
148:3 182:10
194:24

**firms**
27:22

**first**
7:2 11:9 12:14
15:1 18:13 27:10
43:3 54:4,5 55:17,
19,21 56:24 58:10
60:17 67:22 82:20
98:1 99:10,17
101:10 107:20
108:13 109:1
124:5 160:18
169:4,23 171:17
172:15 179:12
186:18 191:20
200:14 201:25
209:9 216:14

**firsthand**
102:18

**fits**
31:8

**five**
86:19 214:20

**fix**
163:9 211:5,6

**fixed**
57:21,24

**Flair**
16:10 44:11

**flexibility**
8:7

**flight**
7:17 177:20
215:23 219:7
220:8,12

**flights**
216:22

**flip**
39:15

**flippant**
17:10

**floating**
168:1

**Florida**
20:19 42:2 57:7
60:2 62:5 76:16
92:2 169:2

**flow**
54:9 59:14 69:17
88:6

**flowing**
204:4

**flows**
54:25 83:3 205:5

**fluctuation**
37:25

**fluid**
22:18 110:3

**flushed**
166:6 167:7

**fob**
176:9

**focused**
39:5 43:1 94:24
100:25

**folder**
77:21 180:17,20,
25 181:6,7,12,16,
19,24 182:1,5,7
183:3 184:18

**folders**
188:6

**follow**
144:16 209:21

**following**
75:18

**follows**
7:3

**foolhardy**
37:1

**foot**
43:9

**football**
171:1 200:20,22

**forbearance**
174:9

**forensic**
9:10 10:1 15:6
32:19 33:11 81:23
84:11 86:21 98:4

**forget**
9:9 50:20

**form**
17:25 20:22 31:24
32:12 33:24 34:2
35:3 36:19 44:20
45:24 46:23 53:10
62:13 69:12 74:19


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

75:17 76:9,20
78:19 90:16 95:1,
24 107:14 111:2
112:10 118:3
128:21 130:19
134:1 137:19
143:13 146:23
147:11 190:18
191:10 195:20
196:7,19 197:8,20
198:3,11,24
201:14 202:4
205:8 206:4
210:13 213:10
214:6 218:8

**formal**
80:21

**formed**
28:14

**former**
15:3 78:13,20,24
79:19 82:13 87:24
89:9 97:22 103:2
104:13,22 105:3,5,
7 131:3 145:15
150:2,3 151:8
217:19

**forming**
44:18 81:1

**forth**
121:19 138:19
207:17 214:2

**forward**
31:15 86:14 87:2,
22 98:23

**forwarded**
189:9

**foul**
17:13

**found**
110:19 115:25
166:19

**fraction**
173:4

**fraud**
26:4,7,10,11,14,
15,24 27:8,18
32:11 35:24 79:7
80:13,20 81:9
82:4,12,18 84:12
85:3 86:18 87:15,
16,21,24 88:8 89:9
91:3 93:24 94:1,2,
4,6,8,21 97:1,11,
19,20,22 98:6
107:12 126:10,17,
21,22,25 127:4,7,
8,9,11,14 170:6

**fraudulent**
126:13 150:14

**Fred**
105:14

**free**
69:17 139:7
144:14,18

**freely**
81:21

**frequently**
62:8

**Friday**
8:14

**from**
6:16 10:4,8 15:16,
20 18:17,24 22:19
27:1 30:19 33:17
38:5,11 42:3,16
43:21,23 47:23
52:13 55:17 56:21
62:5 65:8,12,20
66:21 70:7 71:13
76:24 77:1 81:11
87:17 88:11
101:23 103:8
105:22 108:13

109:1,18 111:15
114:13 116:16,17
117:4,12 125:5
131:24 132:1
135:19 140:23
142:2 157:1
159:24 170:10
172:1,13,20 173:3
174:25 175:5
183:8 184:17
188:5 189:3
202:12 203:24
205:5,16 207:10
210:11 211:10
212:10,19 213:7
214:21,22

**front**
8:6 81:5 83:15

**frustrate**
102:15

**frustrated**
147:5

**full**
7:23 15:17 18:4
19:19 49:21
183:15 208:16

**full-time**
43:2 135:16

**fully**
18:13 163:15

**fun**
97:15

**funding**
54:22,25 59:15,16
62:21

**funds**
15:10 59:17 63:24,
25 100:21,22

**further**
7:22 70:2 72:23
73:1,9 87:4 88:7

167:7

**future**
19:2 205:5

---

**G**

**Gambrell**
49:24 50:21 74:4
75:15 76:18 89:5
100:14

**Gambrell's**
50:24

**gate**
16:12 213:3 219:8

**gave**
11:18 13:24 57:3,4
181:6,11,14 182:5
189:8

**general**
58:23 74:24 75:19
121:3 135:19
185:3,5

**generally**
10:11 59:15 86:5
143:11 171:12,15

**generated**
24:9

**Georgia**
25:14

**germane**
205:3

**get**
7:19 9:18 10:20
12:10 13:5 15:16
16:6 18:15 21:15
30:18 31:11,13
36:24 42:10 43:14,
21 44:7 54:17
56:8,9 58:11,13
60:4,6,7 62:3
64:14 76:25 77:9

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

84:1 85:16,18
92:4,9,14 97:8
98:12,13,22
109:13 110:9
114:8 116:20
117:17 123:18
124:8 125:19
126:1 135:18,22
136:15 140:8
141:3 143:21
144:22 147:1
149:10,25 154:24
155:22 168:10
169:21 170:14,15,
18,19,21 171:24
173:16 177:22
179:15 214:11
218:21 219:7
220:8 221:3

**get all**
136:2,18 169:23

**gets**
115:21

**getting**
20:14 32:25 38:5
45:3 54:10 56:21
62:18 93:8 168:11
170:16,17 208:15
210:21

**Gettman**
55:21 59:20 65:3,5
90:8

**Gillespie**
20:5 142:6

**give**
51:2 63:19 87:12
141:14 143:15,25
144:7,9 158:15,16
177:6 188:3 201:5,
10 214:25

**given**
78:3 108:8 112:25
164:17 181:5

189:17 190:16

**gives**
150:12

**giving**
92:19 178:14
208:7

**Glass**
48:23 97:5

**Glassratner**
58:21 96:19

**glean**
18:17

**go**
8:23 10:15 17:1
29:19 35:4 39:22
49:12 50:4 59:10
68:9 70:15 82:21,
25 85:16,18,20
86:17 96:10
105:10 106:12
115:8 119:16
138:24 142:10
144:20 147:1
150:23 157:14
158:15,19 169:1
179:14 182:19,24
186:4 188:1,2
190:2 191:19
205:19 208:21
209:13 212:7,19
215:16

**going**
11:4 13:14,19,20
15:4 16:10 17:8
21:13 32:18,19,20
35:8,21 41:6 46:5
47:14 55:12 57:6,
7,16 58:12 59:5
60:6 61:20 66:2,4,
22 68:22,25 69:12
73:18 75:8 76:8,25
77:5 79:14,16
83:25 86:14,20,21,

22 87:2,7,9,12,22
88:4,10 91:7
92:11,18 94:6,22
98:3,4,5,20,23
101:19 105:14
106:13 113:14
114:6,15,22,23
115:8,23 117:17
118:5,9,11,15
122:16,19,20
125:24 130:6
135:23 138:19
139:5,12 140:11
141:3 142:20
145:25 146:24
151:9 157:15
158:22 160:3
161:6 163:8 167:9
170:21 171:1,2,22
173:16 177:22
178:17,18,19
179:17 180:1
182:12 184:20
186:25 187:7,17
188:2 201:10
208:6 209:11,23
210:11 211:15
212:7,12 213:17
215:20,23 217:2,
19 219:11 220:10,
15,19,24

**Goldstein**
55:8

**gone**
10:10 14:12,16
39:11 89:14
177:24

**good**
6:18 7:6,7,9 11:14,
16 18:10 21:4,19
88:4 113:6 116:8,
10 117:14 145:8
150:23 170:16

**Google**

96:6

**Gotcha**
28:5

**gotten**
34:7 117:12

**governance**
49:22

**governing**
215:2

**grant**
104:9 130:13
150:5

**great**
140:7

**ground**
8:23 14:24 45:20
46:15 170:12

**groundwork**
114:2

**group**
22:23 24:21 55:11
58:22 65:18 110:2

**guarantee**
122:17

**guess**
20:13 24:1,15 54:5
74:3 87:7 92:7,16
101:10,18 116:15
135:9 160:22
167:24 174:19
184:2 192:25
194:9 195:6
198:13 212:16

**guided**
110:17

**Guso**
31:10 89:6

**guy**
54:8,17 103:20
143:6 150:3 160:2

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

162:11,15 170:19

**guy's**
150:3

**guys**
47:23 56:14 62:18
139:6 144:12
149:19,20,25
150:22 172:25
173:1 209:14

---

## H

**had**
10:19 11:15 12:6,
14,24 13:14 14:7,
8,9 16:3,9,21
17:11,16,17,20
19:18,23 22:3,8,
17,22,25 31:1,12
36:22 43:1,15 45:8
52:10 54:11 55:18,
23 57:9 58:2 60:24
61:1,4 62:8 67:9
68:20 77:6,21
85:10 88:21 92:11
93:4,21 101:24
111:25 112:18
120:8,11 121:15,
23 125:10,11,14
127:22 128:9
131:6,14 133:17
138:24 141:23
142:6,9 143:20
146:13,14,21
147:13 149:25
154:4 162:16
167:21 168:4,25
169:24 170:13
177:1 179:9
180:17 183:5,20
195:5,11 203:8
206:10,15 207:18,
20

**hadn't**
173:3

**Hal**
34:15 108:21
118:20 177:16
186:6 188:8
213:15 215:15

**halfish**
11:17

**hand**
34:4

**handed**
29:12 157:23

**handful**
126:1

**handle**
56:9 74:16 90:21
98:12,13

**hands**
78:12,24

**handy**
204:10

**happen**
15:7 46:9 57:1
80:3 87:7 90:20
150:24 151:5
164:9 199:15

**happened**
21:11 22:25 39:1
63:17 76:23 80:2
86:23 87:2,22
88:10 90:18 91:2,7
92:23 93:11,20
98:2 108:12 109:1
137:14,15 138:5,8
149:12 164:5
172:23 199:25
200:1,5 209:16
210:8 211:2
217:19

**happening**
16:20 21:18 48:11
70:9 135:17,25

**happens**
89:4 92:17 144:3

**hard**
18:3,12,24

**harder**
173:16 174:1

**harm**
17:13 133:23

**Harold**
6:13

**has**
7:13 16:14 18:25
19:2,6 21:14 26:2
28:16,21 30:14
33:6,7 36:16 38:1,
15 39:11 41:15
45:12 52:6 58:8,20
59:8,16 61:14
63:20 64:5 70:6
71:19 76:23 78:5
79:9,19 80:19
81:22 82:2,14
84:10 85:6 94:15
97:21 99:4 104:19
111:6 116:23
117:22 121:8
131:9,11,18,21
132:14,19 147:13
148:14 155:2
156:7 174:24
175:3 177:1
184:10 186:15
191:18 195:14,16
209:4 212:13,23
221:10

**hasn't**
29:4 89:17 99:8
196:12

**Hastings**

142:2,12,13

**hat**
202:25

**have**
7:10,17,20,22 8:4,
6,8,11,13 10:10
14:9,11 15:6,10,17
18:18 25:8,21,23,
24 26:1 28:6,12,15
30:1,9,21 31:21
32:19 33:4,7,11
34:3,5,8 35:23
36:23 37:3 38:25
39:8 40:20 41:4,5
42:14,15 43:20,25
47:4,17 50:16,19,
24 51:16 52:4,10
53:24 54:2 55:10,
11 56:14 57:9
58:10 59:18,21
60:11,20 61:4,7
62:4,6 63:17,21,24
64:1,4,7 66:11,19
68:6,11,20 70:25
73:2,3 74:13 75:14
76:5 77:4,7 78:6,
13,17 79:18,25
80:1,18,21,22
81:5,7 82:12 83:7
84:21,24 85:1,14,
17 86:18,20 89:13,
14,16 90:24 91:3
94:3,9,16 95:3,5,7,
9,17 97:2,15,19
98:4,5,20 99:12,13
100:8,13,17,18
102:6,7,11,18
103:6,7,11,12,13
104:1,3,11,14,23
105:21,23 107:24
109:9,14 112:24
116:8,10,15 117:4,
12 118:7 119:20
120:9,21 122:19,
21 123:5 124:13



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

125:24 127:21
128:2 129:20
135:23 136:11,22
141:4 142:23
143:11 144:20
145:8,15 146:4,5
149:2,4,7,16,18,21
150:5,21,24
151:11,12 152:1,3,
7,11,13,15 153:11
155:19 157:6
158:5 161:4,11
162:18,19,20,21
163:3,16 165:19
169:9,20,24
170:16 171:4
172:22 173:10,11,
13 174:23 175:2
176:5 177:5,10,18
179:9 181:9,18,21,
23 182:2 183:4,7,
10,11,15 184:6,7,
15 185:14 186:9
187:12,15 189:7,9,
22 192:10 194:24
195:7 196:10
197:2,4,5 199:3,23
200:4,6 201:25
202:11,19,23
203:6,14,15,25
204:10 205:18
206:10,12,17
207:7,15 209:4
211:14 213:20
215:11,15 216:23,
25 217:2,9,17
218:20 219:6,17,
20,23

**haven't**
14:16 18:24 28:14
47:5 59:24 73:19
83:7 89:22 140:1
152:5 181:20,25
195:4,5,11 196:12
197:12 199:5

204:13 218:9

**having**
7:2 32:24 47:19
194:22

**he**
11:18,19,20 12:6
13:14,15,16,24
14:13,14 15:8,9
18:1,2 45:12 46:19
50:16 52:10 55:14,
16 65:1 66:15 67:3
84:23 86:22,23
101:24,25 103:8,
15,17,19,22,24
109:14,21 110:9
112:11,12 117:21
123:16 127:18,22,
23 131:6,11 138:7
140:23 141:2,5,6
145:8,24 156:3,14,
16,20,22 157:3
159:7,19 160:2,3,
17,19,23,24
161:15,16,24
162:16,18 163:1,2,
5,15,16,18,19,22,
25 164:1,4,5,11,
12,13 167:25
168:1 173:23
176:16 178:23
179:2,3,4 185:2
197:16 198:4
215:8,10,11,12,14
217:20

**he'd**
162:18

**he's**
14:9 32:20 55:2
67:1 72:5 83:23
86:21,22 87:20
109:11 128:3
150:2 161:2
162:25 163:25
164:1,12,13

173:21,23 185:2
208:3,7 217:21,24

**head**
170:20

**hear**
11:13 13:3,4
103:25 139:11
146:10 191:14

**heard**
12:14 140:1
200:15,18,19,20,
21 203:14 211:19

**hearing**
12:12 134:9,15,18,
19,20,25 135:3,7,8
136:7,12 137:1,4,
15,16,18,24 138:2,
3,11 139:15,24,25
140:4,14,16,19,21
141:7

**heart**
116:20

**heck**
47:14

**heightened**
149:6,8 172:4

**held**
36:14 170:24

**help**
56:8 201:6

**helped**
141:4

**helpful**
118:1 126:5
129:23 140:12
154:19 206:14

**helping**
47:13 48:2

**her**
75:24 103:4

120:17

**here**
13:16 17:8 36:12
42:13 57:22 62:9
67:16 68:10 80:4
83:22 85:6 86:1
92:3 96:10 97:4
108:20 119:18
121:23 125:3,5,7
127:1,25 134:16
135:5 137:3
139:23 140:10
141:16 143:4,9
146:21 151:14
156:9,12 163:24
167:8,10 168:18
178:20,24 179:10
187:2 188:24
190:11 194:11
195:1 196:3
199:10 204:5
205:1 211:17
212:5 214:15,24
218:21 219:7

**here's**
150:22 168:9

**hey**
77:7 98:18 149:19
150:22 168:8,13,
14

**Heymarket**
64:8,9

**high**
41:19 79:21,24

**higher**
172:11 205:14

**highly**
16:1,22 19:12
109:12

**hill**
151:21

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**him**
11:18 12:8 14:8
54:17 55:12 65:1
66:14 84:2,4
102:22 109:11
134:20 162:21
182:11 183:4
188:21 208:6

**himself**
20:6 110:25
111:20 132:19

**hindsight**
104:23 105:1
148:20 149:5
218:20

**hire**
86:21 145:13

**hired**
17:17 22:9 50:2
55:5 60:4,6,7,18
123:11 155:20
160:16,17,20
162:9,14,15
164:19 170:15

**hires**
142:19,20 155:12

**hiring**
162:23

**his**
9:11,13 10:25
11:19 13:12 47:1
62:11 83:24 84:22
104:2 107:21
110:1,4,6 112:18
127:19 131:1
133:22 143:5,6
155:22 159:16
163:2 176:10
186:8 206:17

**history**
112:1

**hold**
17:16 34:15 61:20
91:6

**Holdco**
54:14

**Holdcos**
29:2,22 30:1,11
53:16,21,24

**holders**
52:24

**holding**
49:14

**Holdings**
121:5

**Hollander**
58:23 74:25 75:25
76:1 77:25 182:11,
15,21 185:6

**Hollander's**
76:4

**Homer**
9:14

**honest**
106:8 115:18

**hope**
118:8 220:11

**hopeful**
7:19 30:18

**hoping**
30:22

**Horner**
9:13,14

**Hostetler**
75:24 76:1

**hour**
58:10

**hours**
7:24 9:3 43:20,25
48:7 216:23

220:16

**houses**
123:1

**Howard**
15:2 33:6 42:18
58:10 84:21 87:8
102:5 104:15
109:23 110:8
142:7 147:13
151:12 156:23
189:11,24 203:7
206:18,22 207:14
212:8

**Howard/mark**
101:13

**HR**
45:7

**huge**
214:19

**hundred**
113:12

**hundreds**
8:21 174:5

**hypothesizing**
114:8

**hypothetical**
134:3 162:7

**hypothetically**
133:25

———————————

**I**

**I'D**
28:18 44:18 96:8
121:24 162:21
198:8

**I'LL**
8:7,13,15 20:24
24:1,8 57:8 63:18
91:18 96:23

158:15 161:18
178:24 204:14
217:4 221:3

**I'M**
7:19 8:10 10:5
11:4,7 13:1,19
17:10,14 20:13,14
21:2 23:8,23 24:16
25:18 28:9 30:20,
22 31:25 32:9
33:18 34:25 36:17,
18 39:4 41:11
43:25 45:25 51:20
55:3,12 56:6 57:7
59:4,5 60:7 61:20,
22,23,25 62:3,14,
16,22 67:2,12,15
68:8,22,25 69:12,
16,17,18 73:17
75:8,18 76:8 79:16
80:25 81:14 83:21,
25 84:6 85:7 87:12
88:9,16,17,19,20,
23 89:24 91:18
93:8 97:7 99:7
104:16,17,25
108:15 113:9,18
114:15,23 118:5,
10,14 120:10
123:25 124:20
128:4,12 129:3,22
131:24 138:12
139:12,14,24
140:5 142:16
143:5,14 146:24
147:20 149:5
152:10 153:2,3
154:10 155:5,18,
19 156:25 162:7
163:14 164:14,15
168:14,16,18
170:20 172:9,10,
14 173:10 174:7,
11,19 175:12,20

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

177:3,22 178:9,17,
18,19,25 179:6
182:12 184:4,10,
19 186:13 187:7,
15,17,22 188:21
189:1,21 190:10
194:16,18 196:8
200:20 201:10
204:9 208:4,6,7,
18,23 209:16
210:7,8,23 212:16
215:9,20 216:22
217:16,24,25
219:10

**I'VE**
26:8,17 27:2,3
35:5,25 47:19,20,
21 58:16 61:10
73:25 75:3 77:5
83:11 84:2 85:10
86:19 99:21
116:17 138:14,15
151:20 164:17
174:16 191:21
197:10,12 211:19
216:16

**Ian**
6:1,8 7:1 55:12
85:12 97:5

**idea**
50:2,24 51:6
112:22 113:6,24
146:2 149:14
169:19 209:4

**identification**
29:10 96:13
118:19 157:19
179:21 185:9

**identified**
71:21 72:7 127:1
132:9 167:11
195:9,22 197:12
211:12,13 212:14

**identify**
29:13 92:10 96:17
117:3,25 120:16
129:8,13 133:2

**ignores**
173:13

**III**
6:13

**imagine**
118:7

**immediately**
42:19

**impact**
18:23 19:8 116:14

**imply**
204:6

**importance**
88:5

**important**
15:4 90:19 97:21
134:9 135:7
138:11 139:24
140:4 152:18
178:5,12 192:22
193:23 194:1

**imposed**
65:19

**in**
6:8,24 7:17,20,21
8:6,10,17 9:23
10:14,19 11:10,11,
15 12:23,25 13:1,
2,15,16,21 14:6,
18,19,22,23 15:3,
5,16,22,24 16:5,8,
15,18 17:14,22
18:9 19:1,2,5,7,10,
13,15,17,23 20:6,
10,16,17,18,19
21:11,17,19 22:2
23:5,6,9,11 24:10,

16,17 25:14,18
26:13,23 27:4,6,
14,19 28:17,19
29:17,21,22 30:12,
14,16,19,24 31:1,
2,15,23 32:11,16,
22 33:1,3,8 36:1,7,
23 37:5,6,7,8,9,13,
15,19,22 38:18
39:1,2,9,17 40:3,7
41:11,19 42:11,12,
14,23,25 43:2,6,8,
10,17,18,20 44:7,
8,13,15,19,22,23
45:1,11,12 46:1,
13,16,19 47:2,3,5
48:1,3,13,15,18
49:15,18,24 50:10
52:7,12,17 53:4,13
54:3,4,5,12,23
55:7,10,16 56:5,8,
9,15 57:7,8 58:2,
20,24 59:24,25
60:22 61:2,3 62:5
63:10,18,21,24,25
64:1,20,22 65:7,18
66:6,10 69:3,4,7
70:7 71:2,22 72:8
73:15,21,24 74:4,
9,17,22,25 75:1,6,
15,20 76:6 77:1,
15,24 79:11,12,15,
25 80:4,11 81:2,5
82:18 83:3,21
84:1,18 85:3,8,11,
15 86:2,5,8,12,25
87:11,12,15 88:11,
25 89:2,12 90:7,25
91:9,14,15 92:2,4
93:17,23,24 94:17,
21 95:3,5,7,10,25
97:1,9,10 98:2,18,
19 99:14,16 100:3,
13 101:5,21,22
103:21 104:8,11,
13,14,17,22,23

105:1,3,7,21,22
106:1,25 107:8,21,
22 108:3,18 109:6,
9,17 110:4,17
112:6,13 114:2,10,
13 115:3,19,23
116:2,18,23 117:3,
11,16,17 118:1,8,
9,11,22 119:3,9,
18,21 120:21
121:11,13,15,16,
19,20,24 122:2,8,
17,23 123:8,20,23
124:5,9 125:20
126:5,10,17,20,25
128:6,8,15,17,24
129:9,11,13,14,16
131:12,23 132:15,
20,24 133:7,24
134:7,8,9,17
135:6,12 136:4
137:8 138:6,10,11
139:4 140:3
141:24 142:24
143:14,23 144:14,
22 145:10,19,21,
23 146:14 147:2,3,
23 148:15,17,19
149:1,5,9,23,25
150:20 151:14
152:14,18 153:4
156:19,22,24
157:2,7 158:4,17,
24 159:12 160:21
161:11,14,22
162:11,16,17
163:16,18,19
165:10,16,22
166:7,11,20,23
167:11,20 168:22,
23 169:1,9 170:4,
5,11,15 171:1
172:3,14,15,23
173:1,13,23 174:5,
7,24 176:5 178:19
179:10 180:6,18,

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

22,25 181:6,16,19
182:3,10 183:6,8,
10,16,21,22
184:15,21 185:15,
16 187:18 188:10,
22 189:7,20 190:4,
16 191:2,8,17,25
192:6,15 193:7,8,
9,20 194:5,7,10,
13,16,20,22,25
195:10,11,13,18,
22 196:5,10 199:2,
9,18 200:10,14
201:8,9,16,20,21
202:6,25 203:4,7,
20,23 204:3,16,23
205:17 207:17
208:13 209:7,17,
20 210:2,9,24,25
211:10,20,25
212:6,17 213:19
214:9 215:12
216:4,6,17 217:17,
20 218:1,20 219:1,
12 220:10

**in-**
82:4

**in-house**
207:1

**inaccurate**
14:3,4 46:22 48:12

**inadvertent**
165:4 166:15

**inappropriate**
144:11

**inbound**
48:8

**include**
19:20 207:3

**included**
72:15 121:20
152:14

**includes**
32:23 38:9 150:11

**including**
115:18

**inclusion**
166:10

**incorporated**
59:2

**incorrect**
208:12

**incru-**
161:1

**incurred**
18:3

**incursion**
134:8 135:6,25
136:3 138:10
139:23 140:3,12,
20,24 163:17
165:12

**incursions**
138:5 140:24
165:5

**independent**
30:1 52:13,17 53:4
78:23 86:24 89:1
99:1,5 100:5
111:25

**independently**
115:10,14

**indirect**
197:19 198:8

**individual**
176:20

**inform**
104:1

**informal**
80:22

**information**

18:16 44:9,17 45:3
57:5 76:25 89:14
92:4 101:22 102:1
106:1 111:18
115:22 116:14
117:5,15,19 118:1,
12 119:19 120:4,8,
21,25 122:4 123:5
124:8,13 126:16,
19 127:1 128:19
129:9,13 133:13
138:16,17,18
139:13,20 140:18
141:10 142:15,23
143:2,10,24 144:2,
5,8,10,19 146:1
151:3 161:25
172:7 175:11
176:22,23 191:6
193:3,11 206:19
207:18 208:20
214:4 219:17,24

**infrastructure**
14:25

**initial**
64:18

**initially**
166:23 210:20
215:5

**injunction**
118:23 128:1
137:5 190:17,20
191:3,8

**injury**
202:12

**input**
60:11 167:13

**inside**
176:16 181:13

**insignificant**
132:12

**insisted**
150:7

**insistence**
149:14 216:10,11

**inspect**
104:19

**installed**
60:15

**instance**
145:1

**instant**
30:4

**instead**
178:20

**instruct**
66:14

**instructed**
144:4

**instructing**
72:5

**instrument**
201:12

**insurance**
63:5,8 64:2,3 79:2,
4,10,13 121:5
205:16,17

**insurance-related**
64:10

**Insure**
98:18

**Insurity**
98:17 121:18
218:12

**integrates**
184:8

**integrity**
19:6

**intense**



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

135:11,18 136:1
138:18,23 139:20

**intent**
82:5 84:13 93:9

**intention**
110:14,17

**inter-**
55:18

**interacted**
95:18 142:7

**interacting**
212:8

**interaction**
56:24 142:5

**interactions**
55:22

**interest**
20:4 37:25 66:3,8,
9,12 68:24 70:18
71:20 72:6,19

**interests**
69:7 73:16,23

**interference**
178:7

**interject**
82:10

**internal**
100:20 112:24
113:1

**internally**
22:8 78:1 110:10
148:12

**internet**
96:7 105:19

**interrog-**
167:11

**interrogatories**
114:2 115:4 166:7
195:23 214:9

**interrogatory**
167:6,12,13
195:11

**interrupt**
17:4

**interruption**
17:2

**intertwined**
71:8

**interview**
55:14,17,23 56:20
84:14 96:21
112:20,21

**interviewing**
32:24

**into**
9:17,21 12:10
13:14 22:11 45:9
51:22 59:2 81:9
82:13 83:4,8 92:9
93:8 95:14 99:21,
23 100:9,22 114:8
137:5 140:24,25
173:22 181:24
191:19 204:4
209:10,14,22
210:22

**introduce**
96:10

**introduced**
190:3

**introduction**
64:24

**intruder**
175:24,25

**intruders**
175:22

**intrusion**
17:18 18:6 23:2
77:21 109:6
111:16 124:7

153:3 160:22,24
161:1,25 162:16
166:20 175:5,16
181:23 183:3
184:17

**intrusions**
22:2 24:4,9 92:17
93:14 107:21,22
108:7,14 109:2,4
111:1,21 112:19
113:22,25 115:12
123:22 124:12
128:20 129:6
142:14 160:13
164:14 174:25
194:6 197:3 199:7
219:20

**inverse**
112:23

**investigate**
14:6 17:20 20:15,
19 22:20 32:10
82:17 84:12 85:16
87:16,23 89:9 91:7
97:21 100:10
111:11 112:18
128:6 200:5

**investigated**
14:12 16:18 22:25
31:22 39:1 63:25
81:8 94:3,16

**investigating**
15:23 44:9 82:8
88:10 109:7,18,22

**investigation**
21:10 26:11 27:19
32:22 33:18 81:8,
21 82:13 83:8
84:11 86:18 87:21
91:11 94:24 95:4,
6,8,13,14,17 96:1
99:21 112:25
113:1,8 128:9

133:20,24 199:4

**investigations**
14:15 26:24 27:8
33:8 85:3 95:23
97:18 194:23

**investigative**
23:6 27:21 39:12
81:22,23 85:23

**investing**
204:3

**investments**
61:1 64:17

**investors**
131:21 132:1

**invocation**
182:20

**involve**
68:5 109:19
132:17

**involved**
19:17 28:22 29:6
30:21 43:13,20
44:5,13,23 45:1,11
46:1 49:24 50:10
56:8 58:11,23
75:1,20 77:9 87:8,
20 94:17 104:8,17
109:14 131:12
136:17 141:23
144:13 148:16
156:24 160:21
163:16,18,19
170:11 200:1,10
208:5 211:3

**involvement**
41:15 43:6,17
146:20 200:8
213:6 216:8

**involves**
82:4

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**involving**
132:20

**Ira**
65:21

**isn't**
94:23 139:1
141:20

**issue**
19:10,13 20:19
35:2,5 68:21 80:4,
18 155:3,7 168:1
191:7 200:3 210:2
211:19,21 212:1
213:5 217:11

**issued**
86:9 206:19,20

**issues**
39:12

**it'll**
33:3

**it's**
9:20 10:16 13:19
15:8,11,12 16:21
17:3,6,7,12 19:4,
22 20:5,8,23 21:4,
9 22:16,18 24:19,
22,25 26:18 27:12,
14 28:2 32:15,16
33:2,15 34:8 37:22
38:3,6,15,16,17,18
40:13 41:1 44:8,12
45:20,21 47:21
48:13,14 49:11
56:2,23 57:14,15,
17 58:19 59:5,13
60:19 61:25 64:3
67:6,7,8 69:20
72:10 73:20 80:5,
6,24,25 82:7 85:9,
18 88:18 89:25
90:3,4,11,17,18,19
91:3,13,14 93:15,
16,17 96:8,15,23

97:16,21 99:24
103:24 110:20
111:4,7 112:23
113:6 114:3,5
116:11 117:7
118:23 124:2
130:3,4,22 132:7,
8,23 135:9,16
139:2,6,16 140:3,9
144:12,13,14,15,
18 147:20,21
148:3,7 149:16,19,
23 150:19 151:10,
21 152:3 153:24
154:18 155:13,24
156:17 160:22
162:25 164:19
165:21 166:6,16
167:5 171:22,23
172:10 173:12,16
177:18 178:5,12,
21 183:7,10,13,16,
22 184:10 185:18,
21 186:7 188:22
194:1,8 196:11
197:11 198:16
202:11,17 204:5,
17,18,21,23 205:2,
10,21 207:13,21,
22 209:12 214:19
216:6 217:21

**items**
45:13 120:20
195:13,22,24
197:11 214:10,24

**its**
16:15 78:13,24
79:19 86:10 92:20
93:4,23 94:9 105:6
126:5 142:14
150:9 152:25
154:5 166:4
191:25 192:6,24
194:13,20,25
195:18 196:5

**iv**
144:25

---

**J**

**January**
44:2

**Jarvinen**
92:12 102:4
135:15 189:25

**Jen**
93:10 120:6

**Jill**
55:21

**Jim**
15:2 42:18 58:10,
11 84:21 87:8
89:16 101:13
102:5 104:15
106:4 109:23
110:7 142:7
151:12 156:23
189:11 203:7
207:14 212:8

**job**
11:20 48:9 50:15
56:21 80:24
169:15 171:8

**John**
137:13 189:10

**Jonathan**
65:21 77:25 182:9
183:1 184:25
218:24

**Jordi**
31:10 89:6

**Josh**
29:3 44:5 79:20
174:13

**judgment**
9:7 38:13 73:4

169:21 193:7

**July**
134:24 135:8,13
136:7 139:18

**juncture**
198:23

**June**
138:6 139:18
140:3

**jury**
201:6

**just**
11:4,11,18 12:6,12
13:19 14:4 15:12,
19 20:13 23:17
24:8 25:5 27:21
34:15 35:5 36:22
39:19 41:1,18
49:21 50:25 54:10
56:2 57:1 59:1,4,
13,15 61:22 62:3,
14,17 67:14,24
68:25 69:17 72:7
77:7 80:13 81:12
83:19,21,25 84:20,
23 85:8 86:4 88:18
89:25 90:3,4,17
91:14 93:16 96:23
97:13,15 98:24
99:1,7 105:21,22
108:12,25 113:5
114:10 120:3
122:12 123:5,20
125:5,18 126:9
131:24 132:13
134:8 135:7 136:9
138:11 139:5,6,23
144:15 145:20
148:4 150:25
152:16 153:5
154:20 155:24
157:11 158:10,12,
15,16 164:11,12
165:21 166:15



**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

170:7,19 171:12,
23 172:10 174:19
178:1 181:11,23
182:9,12 183:1
184:6 185:1 186:1
187:9,23 188:1,3,
8,12,17,23 189:19,
21 190:8,24
191:20 195:9,21
198:9 201:5
205:21 206:16
207:20 208:7,21,
23 209:3,16
213:23 217:4,8,25
219:6

**K**

**Kaufman**
44:16 54:6

**keep**
157:25 184:3

**Kenny**
55:19

**key**
122:10 176:9

**kickback**
85:15

**killed**
163:2

**kind**
13:20 15:15 16:4
21:23 31:5,14
44:23 45:21 46:7,8
56:3 117:15
169:18 171:9,12
193:5 201:5 204:2,
20

**king**
6:16,21 9:17,21
16:23 55:19,20
59:20 62:5,8 65:3,

5 90:8 101:25
136:6,10,21,22,23
140:5 142:12
163:6,7

**knew**
56:6 61:10 103:19,
20 105:5 117:20
137:11 164:5,6,11
166:9 194:4 199:6
215:13 219:13,19

**know**
7:23 8:15 10:5,11,
12 11:11,24,25
12:12 13:3,19
14:14,16,17 15:6,
15,19 16:11 17:12,
18 18:1,4,24 19:3,
7,21 20:7 21:8
22:10,11,21 23:14,
17 24:5,6 25:1,5
26:16 27:6 30:14,
22 32:18,23,25
33:5,17,23 34:4,5,
6,8 36:7 37:17
38:1,3,12,13,15
40:11,21,24 41:2,
10,11,19,22 42:14,
23,24 43:9,10,21,
22 44:9,20 45:1,2,
7,8,9 46:1,2,4,20
47:16,19,21,23
48:1,7,9,10,13,16
49:5,24 51:13
52:21,24,25 54:3,
10,11,18 55:2,15
56:10,18,24 57:1,
15,17,20,22 58:13,
24 60:3,5,16,19
61:11,14,17,18
62:11,17,18,20,21
63:19,25 64:13,14,
22 65:5,16 67:13
69:25 70:4 71:21
77:4,7,13,18,24
80:5,6,9,15 81:2

82:4,5,6,7,14 83:2,
5,6 84:10,14 86:16
87:11 88:12,20
89:18 90:11,13
91:5,11,12,23
93:7,9 94:1,2,10,
15,18 95:16,17,22
97:9,14 98:17
99:21,24 100:23
101:20,23,24
102:12 103:1,3,16,
21 104:25 105:2,
17 106:5 107:5,13
109:11 110:2,8,21
111:5 112:11,12
113:15,20,23
114:25 115:13,23
117:7,10,11,20,21
118:13 120:4,5,6
121:1,2,12,15
122:1,4,19 123:8,
15,16 124:8,14
126:3,7,9 127:3,
12,15,23 128:8,16
129:7,17,18,22,24
131:25 132:3
133:11,14,17
134:18,19 136:16,
19,21,25 137:14,
20,22,23 138:4,7,
8,25 139:5,18
140:3,8,9,13,14,
18,22,23,25 141:2,
4,5,6,17 142:20
143:7,8 144:22
145:24 146:2,3,7
147:4 148:3 149:9,
12,17,20,22 150:4,
5,6,19,22 151:10
153:19 154:12
155:25 156:2,6,8,
14,15 158:17
159:22 160:18,23
162:8,22 163:17
164:1,2,4,12,13
166:6 167:5,19,21

169:19 170:6,8,16,
17,18 171:5,14,15
174:1,2,11,22
175:1,4,6,8,10,12,
14,18,19 176:19,
22 177:25 181:2,
10 183:5,8 184:9,
11,12,23 185:20
187:23 189:2,12
191:18 193:10
194:2,8 195:5,8,23
196:1,4,17,21
197:9 198:7,8,10,
14,21 202:19
204:1,3,8,19
205:10,15,16
206:9,18 208:3,5,
8,12 209:8 213:11
215:8,9,13 216:23
217:14,23,25
219:11,22 220:5

**knowledge**
102:18 198:1
213:21 219:18

**knowledgeable**
128:14,18 147:23

**known**
26:23 109:6 166:3
191:25 192:5,23
193:25 194:12,20,
25 195:17 196:5
197:6 198:6,16,22
215:11

**knows**
47:24 148:8
160:19

**Kosinksi**
6:15 102:20
105:13 145:5,23
147:18 151:16,22
153:6 158:3 159:5,
16 160:8 161:8
163:15 177:17
189:25 206:20

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

217:15 218:3
219:13,19

**Kosinksi's**
157:6 159:21
206:11,12

**Kroll**
27:20 85:23 97:11

---

**L**

**label**
198:7,8

**labels**
180:14

**laptop**
120:15,17 121:1
122:5 127:2

**laptops**
176:16,19 177:1

**large**
60:20 61:4

**larger**
43:1

**largest**
16:7

**lasered**
148:15

**last**
9:2 10:22 38:11
108:3 166:13
188:12 196:9

**late**
11:24 108:5

**later**
43:18,24 217:3

**Lauren**
102:24

**law**
27:22 55:8 76:1

95:12 148:2

**lawsuit**
16:3 22:7,14,20,24
23:11,21 62:4
70:6,10,19 72:22
97:20 108:3 109:3
110:11,22 116:2,9
133:7 135:24
139:5 144:13
148:16,19,22
149:1,7 151:9
161:14 172:18
173:11,19 174:21
217:19

**lawsuits**
94:8 97:19 131:23
132:1,15,17,20

**lawyer**
36:25 38:5 67:12
102:3 118:10
121:3,4

**lawyers**
37:18 65:8,12,17,
20 66:1,21 77:9
95:7 140:8

**lay**
97:13 114:1 115:3
116:6

**layer**
38:11

**lays**
143:16

**lead**
72:22

**Leadenhall**
6:9,17,22 15:6
19:13,14 20:17
24:23 30:5,10
31:5,12,23 32:11
34:24 35:23 39:2
72:15,20 76:7,15
92:4,13,15,19

93:4,23 97:20
98:16 99:16
101:19 102:8,16
104:19 106:22
109:3 111:1
112:14,24 113:3,
21,25 115:5,11,22
116:2,4 117:16
118:1,14 119:12,
21,22 120:9,22
121:7,15,16 122:8,
18 123:6 124:1,12
125:11,13,16,19,
25 126:5,10,17,20,
21 127:22 129:6,
11,16 130:15,16
131:15,19 132:17,
20,24 133:6,8
134:9 136:2,6,15,
17,19 138:12,21
140:6 141:11,13
142:6,19,23 143:5,
8,11 145:12,14,17
147:14,17,22
148:2 149:15,17
150:9,13 151:1,3,
15,21,24 152:2,8,
22,25 153:4,8,10
154:3,5,13,17
155:12,13,16,21
156:1,4 159:18,25
160:9,20 161:3,14
162:1,4 164:19
165:10,21,22
166:4,11,12,18,22
167:4 172:19,25
173:3 174:8,14,24
175:3,12,19,21
176:12 177:1
189:12 191:25
192:1,5,6,20,24
193:25 194:2,13,
14,20,21,25 195:1,
18 196:5,6 197:3,7
198:17,22 199:6
201:20,25 207:17

209:3,11,14,23
210:3,5,10,12,15,
20,21 211:7 212:4,
7,9,13,19 213:8
214:2,21 217:9
218:19

**Leadenhall's**
31:22 34:1 116:1
120:13 129:10,15
144:25 149:13
160:13 161:21,23
164:16 165:5
169:5,8 197:25
202:4 206:1
207:11 208:10,23
213:20 216:10

**Leadenhall/has**
111:5

**leading**
14:9 23:4 51:21,22

**leads**
187:1

**League**
200:21

**learn**
16:10 101:10

**learned**
24:4 57:18 101:18
106:25 107:21,24
108:7,13 109:1,12

**lease**
54:11

**leases**
54:11,12

**least**
20:17 96:21 134:8
135:6 138:10
146:9 207:24
214:14

**leave**
121:16 148:4

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

177:20 220:10

**led**
15:2 109:3

**Lee**
77:25 182:9 183:1
184:25

**left**
18:19 34:18
103:15 145:24
161:11 167:25
168:16,22 179:5
180:14

**legacy**
102:15 148:24

**legal**
23:15 36:5 37:14,
17 38:9 68:5 69:20
73:21 116:7
152:20 163:11
181:8 182:21

**legitimate**
174:21

**Lei**
182:9 183:1

**Leigh**
6:16

**lend**
149:14

**lender**
70:4 71:12

**lenders**
52:21 53:5 71:6

**less**
27:21 31:16 43:13
51:20 56:1 94:19
104:17 205:12,17

**let's**
20:24 23:17 37:5
91:6 96:10 98:1
101:8 105:10

119:16 148:4
150:23 157:14
158:19 170:18
179:14 185:11
190:2

**letter**
58:3,17,18,19,24,
25 59:6 86:2,9

**letters**
135:14 141:17

**letting**
104:13,22 105:3,7

**level**
41:19,20 54:14
56:19 79:21,24
101:13 121:9
149:6 172:11,17

**liabilities**
64:11

**liability**
126:1

**liable**
36:14

**Licamora**
33:6 87:8 106:4
189:12 206:18,22

**Licensed**
25:14

**liens**
99:8,23 101:6

**life**
30:6 64:3 159:11

**likelihood**
36:13 37:15 38:4

**likely**
19:12

**limited**
177:19

**limiting**

188:12

**line**
38:21 40:11 83:22
132:8 165:11
166:11,23 215:20
217:1

**lines**
40:13

**link**
129:5

**linking**
111:1

**liquid**
63:25

**liquidated**
47:21

**liquidating**
31:3,5 67:11
169:18,22

**liquidator**
44:10

**liquidity**
63:22

**list**
39:9 141:17
143:15 150:23
181:1 187:9
191:21,22,23

**listed**
195:13

**listen**
11:16 12:24

**listening**
42:8

**literally**
22:19 42:17 57:6
96:8 135:14

**litigant**
133:12

**litigants**
172:13

**litigate**
21:13

**litigation**
14:19 15:24 16:15
21:11 27:15 29:18
37:6,8,15 65:25
66:6,10,20 67:9
69:3,5,7 73:3,5,9
76:6,15,16 94:17,
22 102:2 110:18
112:6 114:6
116:12,14 119:22
120:14,22 122:9
123:23 124:6,10
132:11 134:10
138:12 145:21,24
147:24 169:6,8,20
171:3,21 180:7,18
192:1,6 194:5,14,
21,22 195:1,19
196:6 216:19

**litigators**
169:14

**little**
9:24 10:1 11:12
12:1 14:5 15:20
28:2 33:19 35:6
36:24 39:21 41:4
48:10 57:13,18,25
73:21 81:21 82:3
91:19 101:12
104:17 111:4
154:21 166:6
167:7 170:2
171:18,25 173:22
185:1,24 204:5
205:20

**living**
38:18

**LLC**
6:8,14 177:17



**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**LLP**
6:9,22

**loan**
19:20,25 32:4 33:5
34:6 37:22,24 52:8
62:25 100:19,23
105:23 121:7,8,20
122:20 129:21
146:15 201:12,15,
16,17,18,22,24
207:5,19 210:1

**loans**
39:6 60:21,24 61:1
62:22 64:6,16
71:18 81:24,25
201:21 202:4
206:1,25 208:17
210:17,25

**lock**
90:2,19 98:7,11

**locking**
88:7

**log**
180:6 187:10,14

**Log-**
120:7

**Logee**
93:10

**Logee's**
120:7,15 121:1
122:5 127:2
140:25

**logic**
148:7

**logical**
145:12,14 147:19,
20

**logs**
180:10

**long**
10:16 27:3 36:1

47:5 102:9 106:9
165:23 174:4

**longer**
40:10 54:7 64:1
205:20

**look**
10:4,8,12 22:11
41:22 49:12 52:22
84:12,14 85:20,21
92:23 99:23 100:9
104:21 105:18,25
130:7 134:22
155:14 163:8
178:17,18,19
180:7 181:6,12
185:11 187:13
188:4

**looked**
18:25 73:19
152:15 181:21
187:9 209:10,22
210:22

**looking**
9:24 10:1 50:4
56:5 105:23
107:11 114:5
125:4 129:17,22
159:4 178:25
179:6 187:2
188:24

**looks**
106:1 178:25
185:16,20 188:4

**lose**
70:19 97:9 177:7

**losing**
167:24

**loss**
19:1 27:16 36:4
78:12,24,25 90:22
120:10 121:6
170:7

**losses**
79:25 88:8

**lost**
167:21

**lot**
14:14 19:17 23:16
27:3,6,23 30:12,17
31:6,16 33:1
38:14,19 39:8
42:20 45:3 48:8
54:12,13,18 57:16
60:21 61:14 63:8,
18 65:17 71:1 75:3
77:5,8 79:16 80:1,
6,9 81:22 87:6
89:12,13 92:11
94:20 97:1,11
100:13 103:21
104:12,13,21,25
105:2,6 114:10,12
116:12 120:8
130:5 132:9,10
138:19 140:10
143:7 144:12
148:12 167:22
169:12,13 171:1,5
172:8,9 184:20
189:2,11 200:23
201:1 202:20
203:8 204:9
209:20 214:13
218:14

**lottery**
202:12 205:11

**Love**
105:14

**low**
43:20

**luck**
220:11

**lungs**
143:7

## M

**ma'am**
108:10

**made**
15:24 32:11 39:2
46:19 60:21,24
64:6 79:9 111:21
119:8 128:6
132:14 135:9
148:22 165:13
174:1 193:18
194:18 195:16
197:16 201:20
208:22 211:23
212:4

**magnitude**
209:5

**mailbox**
77:19 78:6 127:14
130:24 132:24
133:5 189:7

**maintain**
46:20 47:9 54:20

**maintained**
26:17

**major**
144:13

**make**
15:16 60:1 79:8
86:15 90:23
108:19 118:5
119:12 132:13
139:4 140:7,11
162:6 168:24
178:1 187:3
188:17 191:19
212:20 213:23
219:7 220:11

**makes**
166:11 201:15

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

205:20

**making**
47:16,17 48:16,17
61:1 89:18 98:11
178:21 190:22
193:4,5 198:13
213:7

**man-**
90:9

**manage**
63:21,24

**management**
27:13 78:13,24
79:20 82:13 85:10,
11,12 87:24 89:9
97:22 99:4 131:6
183:12,25 184:3,7

**manager**
28:22 59:4 78:23
99:1,5 100:5

**managers**
45:23 48:24 50:13
59:1

**managing**
55:2,3 79:16 83:3
131:3

**mandate**
83:9 85:6,18,24,25
86:2,7,8,10 88:14,
24 90:9

**many**
37:15,16 42:24
77:9 79:25 85:8
90:25 94:8 153:11
156:6 201:16
218:10

**March**
6:2,5 7:25 8:9

**mark**
29:7 31:9 42:17
43:2,21 50:2

54:24,25 58:6,22
59:16 71:1 76:21
78:10 79:12 81:20
83:4 87:19 102:5
104:15 105:8
107:25 109:8,15,
23 110:7,15,21
118:16 128:2,4
129:3 135:19
141:23 151:11,12
170:24 171:8
173:21 184:22,23
189:9 218:22,25

**Mark's**
88:3

**marked**
29:9,13 96:12
118:18 157:18,24
179:20 185:8
186:13

**market**
218:10

**marking**
118:21

**marry**
215:2

**Marsh**
79:14,15

**marshall**
87:3

**massive**
43:8 44:14 47:17
54:11

**mast**
51:7

**match**
64:4

**matched**
100:20

**materials**
117:12 188:5

**math**
33:15

**Matt**
55:8,10,13,15 57:1

**matter**
6:8 9:25 10:14
13:22 14:6 21:21
30:13,16 41:9,25
52:17 55:13,22
57:7 59:9,20 73:24
79:22 80:22
153:14 155:2
157:7 162:2 164:6

**matters**
7:18 37:16 57:23
76:7,14 128:15,17
160:23 204:24

**maximize**
90:1

**may**
20:2,3 29:17 40:7
41:4 42:10,11,12,
13,16 43:22 44:8
48:21 50:16 52:10
54:5 55:10 57:9
65:4 70:3 84:21
89:16 102:11
103:21 104:11,14
105:21,23 116:15
117:12 120:7,9
127:21 145:15,23
152:15 164:6
167:6,10 169:24
170:6,15 172:11
177:5 183:21
188:22 189:14
191:19 193:1
199:3,4 206:18

**maybe**
11:16 21:3 25:6
29:4 55:19,25 57:8
82:19 85:22,23,24
89:13 93:17 96:25

97:7,8 105:15,16
106:4 108:2
112:24 124:19
129:21 134:25
136:3,18 147:24
149:6,7 150:4,16
153:20,24 155:17,
24 156:25 160:23
185:24 188:3
189:15 194:1
200:13

**Mazur**
9:8 12:7,8 22:10
23:3 109:10,16,19,
21 110:18,21,25
129:2

**Mazur's**
23:10 24:10

**Mccarthy**
23:14 43:23
114:14 134:18
189:10

**Mcclintock**
55:8,9 56:25 57:4
64:19,23

**Mclennan**
79:15

**me**
8:6 9:18 12:21
24:1,25 25:5 27:6
28:18 32:7,9 33:14
34:15 36:16,17,22
40:11 41:18 43:22
55:5,14 57:4 60:7
63:4 67:15 69:18
72:2,3 74:6,13
76:2 77:9 78:9
81:21 87:18 97:17
98:3,6 99:20,22
108:12,25 109:11
110:4,5,10 111:3,
4,7 116:6,7 121:14
130:3,15 132:13



**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

133:23 137:11
139:16 141:2,14
142:11 143:6
148:14 151:19
153:22 154:2,10
157:24 158:15,16
159:11 162:6
163:13 164:9
168:10,13,15
178:21,23 179:2,
11 181:5 182:18
184:3 187:23
189:9 190:9 194:9
195:4,12 201:5
211:20

**mean**
11:9 12:10,11
15:5,11 17:4,13,18
18:10,11,21 20:7
22:15 23:18 25:1
26:6,8 27:2 29:1
32:1 33:14,23 34:3
35:25 36:5,22 37:2
39:8 41:8 43:21
44:7 45:18 46:13
47:2 50:20 52:21,
25 54:24,25 57:16,
21 59:10,13,16,24
60:19 62:25 65:6,
21 68:7,9 69:11,
17,18 70:8,24
72:23 73:12,19
79:13,21 81:2
82:23 83:2 85:7,8,
9 88:18 89:11
91:13 93:25 94:19
102:17 103:15,21
104:21,22 110:20
111:4 112:14,20,
23 113:2,13 114:7,
9 115:2,13 116:3
122:20 123:16,23
124:19 125:6,23
127:5 128:2,8,16
129:17 130:1

131:25 132:2,8
133:11 135:14
137:13 138:4
139:7 140:9 141:1,
16 142:18 143:3,6,
7,14 144:15
145:22,23 146:7,
13,24 147:2,9,23
148:2 151:10,23
152:15 153:5
155:22,24 156:20,
23 160:2,4,17,19
161:2 163:1 164:7
165:8,13,20,23
167:10,12 169:10,
25 170:15,19
171:5,6,20 172:8,
13,22 173:11,21
175:16 184:1
186:7 188:20,22,
25 189:1,7,25
190:4 193:6,20
195:3 196:8 197:9,
10 198:4,10
199:16 200:13
201:24 204:5
207:13 208:4
209:12 214:19
216:19,21 218:9,
14

**meaning**
48:22 131:1
219:23

**meant**
73:9

**medi-**
65:19

**media**
48:8,9 96:9

**mediation**
19:18,23 30:25
65:20 146:14
207:18 208:13

**meet**
8:13 13:16 57:8

**meeting**
8:10,14 11:15 20:7
42:14,15 44:10
55:19 109:25
110:2

**meetings**
146:14

**members**
48:21 49:5,13
51:15 52:2,3

**members'**
52:7

**memorialized**
64:20

**memory**
62:1

**Mendoza**
54:7

**mentioned**
57:1 59:19 62:7
116:22 120:23
122:15,24 134:7
141:9 168:23
173:18 185:1
195:21 214:9

**merit**
94:15,16

**meritorious**
36:13

**merits**
20:16 31:22,23
32:1 35:23 36:2,3,
4,5 37:2,14

**mess**
190:11

**message**
39:12

**messages**
32:25

**met**
9:2 10:22 57:13
58:14 60:3 90:8
102:22,24 103:6,
21

**Miami**
57:8

**Michael**
42:18 58:7,8 87:10

**mid**
43:19 200:14
216:4

**middle**
9:5 40:3 43:24
83:21 170:12
189:20 202:25

**might**
33:17 47:4 50:24
56:14 58:10
105:13 122:13
125:18,22,23
129:20 133:22
152:20 168:12,13
169:21 171:7
172:12,18 182:2
183:4 184:7
189:15 197:17
200:4 201:6
203:25 214:12
215:11 217:20

**million**
19:11,15,19,22
20:8,18 37:24,25
53:15,25 88:4
89:11 146:9,16
150:10 173:3,12
207:24 208:11,14,
24

**millions**
174:5

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**mind**
30:14 32:23 93:17
199:19

**minute**
47:22,23

**minutes**
158:16 216:24
220:16

**mischaracterizing**
67:15

**misdemeanor**
174:14

**mismanagement**
80:13,19

**miss**
108:23 215:23

**missed**
28:9 178:9

**missing**
38:2 122:10

**mission**
15:14 37:4 90:1
98:24

**missions**
98:1

**misspoke**
127:10

**mistaken**
187:22

**misunderstanding**
156:25

**mix**
105:16

**mixing**
105:13

**Mm-hmm**
37:12 44:25 55:24

59:7 64:25 77:22
78:2 83:12 94:14
106:6 130:14
140:17 141:8,25
143:19 160:11
163:10

**model**
169:22 170:2

**models**
54:9

**modifications**
167:7

**modify**
50:19 51:2

**Mollie**
23:15 109:24

**moment**
34:4 35:5 133:10

**moments**
120:3

**Monday**
8:10 13:15 134:24
189:21

**money**
70:19 167:22,24
168:15 169:23
209:7

**month**
53:15,25 181:22

**monthly**
57:21,24

**months**
43:3 59:24 172:15
174:10,11 194:22

**more**
8:17 11:23 13:17
14:5 15:4,18 19:4,
15,17 27:14 31:16
33:15 43:1,9 44:4
45:6,11 51:21

52:11 56:13,16
57:18 59:16 61:13,
16 62:8,17,20
63:9,19 64:23
73:21 81:21 83:10
84:12 89:13 90:18
94:11,12 101:12
102:2 105:16
116:23 117:1
133:6 137:13
138:17 145:22
147:25 151:13
154:21 166:7
171:25 172:11
173:22 177:5
178:25 204:3
205:18,21 217:1,
15 218:1 219:6

**Morlan**
6:13 14:7 34:13
108:15,18,22
177:6,9,11,15,16
178:11,17,24
179:8,14,24
182:17 184:20
185:10 186:3,7,12
187:22,25 188:14,
20 189:5 190:14,
21 191:11 196:2,
14 197:1,14,22
198:12 199:1
205:23 206:6
210:18 213:13,16
214:16 215:17,20,
24 218:6,16 219:5
220:3,6 221:1,3

**morning**
6:18 7:6,7 189:21

**most**
45:13 128:14,18
153:15 199:14
217:16

**motion**
190:16,19 191:2

193:7

**motions**
9:7 152:4

**motives**
112:19

**move**
31:15 101:8
149:10 178:24

**moved**
101:25 129:20
209:19

**movement**
204:1

**movements**
20:5

**moving**
88:6 149:11

**MPFIN**
12:5 92:25 93:6
105:20,22 106:2
120:6 122:24
123:1 127:2 129:8,
9,14 145:10,13
147:18

**Mrs**
33:6 50:1 55:21
65:5 206:18

**much**
7:20 13:18 27:9,18
30:19 34:7,12,18
36:12 41:13 45:9
61:7 91:22 108:23
138:23 170:24
177:22,24 204:14
209:2

**Mullins**
95:12,20

**multi**
141:18

**multi-**

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

36:21

**multiple**
34:24

**must**
115:11 116:8

**Mutual**
107:11 123:9,11,
21,24 124:2,6,14,
23 125:4,10
145:18,22 156:9
159:10,13 163:20

**Mutual's**
107:2,9,17

**my**
8:4 10:19 11:14
13:1 15:20 24:22
27:10 30:14,19
32:23 35:6 36:7
37:1 43:6,16 45:12
49:12 55:21 61:11
68:9 72:6 77:6
78:4,5,6 80:24
82:19 84:18,24
102:17 109:8,9
111:14,19 115:16
121:23 124:4,11
125:6,8 136:3
148:15 151:13
156:25 157:5
160:4 161:7
164:17 165:13,23,
24,25 169:11
170:10,20 172:16
173:1 177:16
178:18,20,24
183:2,6,9,13,15
186:21 189:3,7
191:14 194:15
196:17 198:11
203:20 208:8,21
211:22 212:22
219:8 220:24

**myself**

9:25 42:17 57:13
58:6 105:22
124:20 135:19
195:25 207:18

---

## N

**nail**
188:23

**naive**
171:18

**name**
9:9,13 23:22 24:17
44:12 65:23 75:24
102:21 116:2
124:1 143:5 218:3
219:8

**name's**
177:16

**named**
55:8 74:22 92:12
102:4 132:19

**names**
6:11 150:23 189:1

**naming**
161:14

**Nathanson**
6:16

**National**
26:9,14 29:5

**necessarily**
14:16 73:18 188:3

**necessary**
81:4 89:25 189:18

**need**
7:14 8:17 54:17
84:12,13 93:5,8,9
98:3,6 130:9
139:3,4 177:19
187:13 220:10

**needed**
7:13 16:6 58:13
212:2

**needs**
16:4 44:14

**negligent**
162:23

**negotiate**
174:9

**negotiating**
169:12,17 171:16

**negotiations**
174:12

**Nelson**
95:12,19

**netting**
19:20

**never**
57:21 102:22,23,
24,25 200:15,18,
19,20,21

**new**
7:17 10:4,6,8,14
14:19 19:23 20:10,
16 21:11 29:17
31:1,23 37:6 39:2
65:25 66:6,10,20
69:3 76:15 85:11
87:9 92:5 93:24
100:3 114:12
116:23 117:3,16,
22 118:2 121:11
122:2 124:9
125:20 126:5,10,
17,20 129:11,16
132:11 137:17
145:23 146:14
148:15 199:9,14
202:25

**next**
8:7,8 47:23 57:6

58:5,6,7,15

**nice**
8:12 171:8

**night**
9:2 10:23 189:20,
21

**nine**
22:17 36:22

**NML**
159:10

**no**
9:20 17:3,12,13
23:12 26:3 28:24
33:10 40:10 47:1,
24 54:7 60:13
67:2,18 70:6,10,21
72:25 73:11 74:6
76:17 80:21 81:14
86:8 90:11,22
108:8 113:16
116:1 120:5,19
122:6,10 125:15
127:17,23 128:22
137:17 144:3,7
148:11,24 149:2
150:12 152:6,10,
23 154:2 155:8
156:8 157:2
161:10 162:13,25
163:4 164:8
165:20 168:18,21
170:6 172:6
175:14,16 179:11
181:5,14 182:23
183:5,13 187:15,
21 188:17 189:17
190:9 196:18
208:3 211:9,12,23
215:12 216:6
218:20 219:25

**Noah**
24:13,24 103:6,11
107:21 111:7,20,



UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

22 112:21 114:9
123:13 133:13
157:2 160:20,21
164:3,16 215:7

**nobody**
111:15

**noise**
94:20 104:12,13
114:10

**noncooperation**
150:16,17

**nonlegal**
201:10

**normal**
12:22

**North**
125:2

**Northwestern**
107:2,9,11,17
123:9,11,21,24
124:2,6,14,22
125:4,10 145:18,
21 156:9 159:10,
13 163:20

**not**
8:23 10:10,14
11:8,20,21 13:17,
20 14:22 15:8,12,
18 16:21 17:10,14
18:24 19:20,22
20:5,8,15 21:3,4
22:16 23:8,17,19,
23 24:6 25:23 26:1
27:9,18,22 28:17
30:19,20,21 31:15,
21,25 32:4,15
33:3,15 34:25
35:23 36:16 37:3,
4,18 39:4 40:17,18
41:7,11,13 42:2
45:1 47:16,17
51:14,18,19 55:3

56:6 58:19 59:10
60:7 61:20,25 62:6
64:7 66:4,14,16,22
67:2,12 68:4,8,20,
22 70:15 71:24
72:5 74:13 75:8,11
76:18 77:4 78:17
79:16 80:5,6,24,25
81:7,14 83:9 84:17
85:5 87:23 88:2,18
89:9,20,24,25
90:4,12,18,19
91:4,13 93:8 95:5
96:15 97:3,7,17,
21,23 103:7,12,15
104:3 105:22
106:22 108:18
109:20 110:24,25
112:20 113:5,14,
18 114:3,15,23
115:25 117:7,8
118:5,10 120:19
121:3 123:5,23
124:5 125:1,10
126:8 127:20
128:12 132:7,8,12,
17,20,23 133:16,
18 136:13,17,21
137:25 139:2
140:5 141:4,14,22
142:5,16 143:14
144:4,18 145:17,
19,20,21 147:20
148:2,23 149:8
151:1,4 152:3,13
153:2,13,16,24
154:18 155:2
156:17 158:9
159:17 160:9,15,
23 161:10,15,16,
20,22 162:21
163:4,14,15,25
164:5,6,14 165:13
166:13 167:8,9,14,
19 168:2,6,7,10,
11,15 170:3,5,17,

20,21 171:23
172:9,10,14,20
174:7,20 176:21,
24,25 177:3
178:18 182:13
183:7,22 187:15
188:1,16,22 189:1
191:14 192:19
193:1 194:1,11,12
197:4 200:20
204:9,17,18,21,22,
24 207:9,22 208:5,
6,24 209:6,16
210:7,19 211:17
213:6,8 215:14
217:2,16,24
219:10,12,18
220:9 221:6

**noth-**
22:19

**nothing**
12:25 14:1,4
22:19,20 38:1
87:4,7

**notice**
58:2 79:14

**notify**
166:19

**notwithstanding**
218:23

**November**
44:1

**now**
7:25 15:12 16:14
20:1 35:12 40:17,
19 43:10 44:12
49:7 63:22 67:23,
24 68:18 73:3 74:3
76:10 91:2 94:2,4
99:22 106:14,17
113:5 143:15
157:16 159:6
162:12 177:8,18,

23 179:11 183:22
186:8 187:2
194:22 214:15
217:2

**nuance**
48:14

**nuances**
205:9

**number**
19:22 20:7 30:24
37:9 43:14,15,25
82:1 97:2 124:10,
11 131:15 133:10,
11 173:12,15,17
180:13 181:10
187:1 189:14
195:14 208:6,16
213:17,19

**number's**
208:14

**numbers**
19:24,25 54:2,4,19
57:5 61:9,10
146:15 207:20

**numerous**
8:19 97:19

---

**O**

**o'clock**
68:18 177:18,20
216:25

**O'REILLY**
23:14 44:16
104:16 108:2
109:15,24 218:24

**O.C.G.A.**
221:9

**object**
17:13 66:2 69:12
76:8 107:17 151:1

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**objected**
35:2 148:9

**objection**
11:3 17:25 20:22
31:24 32:12 33:24
34:2,14 36:19
45:24 46:23 53:10
62:13 72:19 74:19
75:17 76:20 78:19
90:16 91:25 95:1,
24 107:14 111:2
112:9 118:3
128:21 130:19
134:1 137:19
143:13 146:23
147:11 149:7
190:9,18 191:10
195:20 196:7,19
197:8,20 198:3,24
205:8 206:4
210:13 213:10
214:5 218:5,8,23

**objections**
69:22 105:9 145:2
148:21 151:6
201:2

**obligated**
87:16

**obligation**
14:6 22:3,4 172:23

**Obra**
132:4

**obtain**
172:7

**obtained**
117:5 164:3

**obtaining**
159:13

**obvious**
155:24

**obviously**

16:9 41:6 58:1
71:4 131:12
195:23

**occur**
146:22

**occurred**
16:13 17:11 21:1
22:2 82:2 93:13
123:16,19 124:12
139:23 160:24
212:24

**occurring**
134:8 135:7
138:11

**occurs**
136:3

**October**
44:1

**Octoberish**
30:21

**odds**
53:5

**off**
35:4,8 44:24
68:13,14 106:12,
13 141:3 157:14,
15 158:19,22
170:20 179:14,17
187:2 217:17
220:19

**offers**
85:20

**office**
11:11,15 43:9
57:12 176:16
220:24

**officer**
56:15 78:12,23

**offices**
176:2

**often**
28:16,18 144:3
151:13

**oh**
14:11 17:11 23:17
27:24 38:6 45:7,8
55:11 56:11 57:7
66:25 67:19 73:17
90:12 91:4 109:13
116:10 134:25
140:6 150:1
155:22 165:21
168:18 173:9
175:17 179:6
181:2 184:9
191:16 211:16
214:19 219:11

**okay**
6:3 7:6,16,19 8:5,
16,23 18:12,15,20
21:6 23:10 24:11,
15,19 25:15 29:25
30:9 34:12,22
35:11,14 37:10,23
38:25 39:19 41:12
42:20 43:2 44:3
49:20 51:15 52:16
55:4 59:18 60:14
61:19 66:7,11,14
67:19 68:14,19
72:1,13,17 73:15
74:4,8,12 75:14
76:18,21 78:8
80:18 81:19 84:6
87:13,19,21 89:8,
13 94:8 95:13
99:12,19,25
100:14 102:19
103:6 104:4
106:13 108:1,18
114:18,24 117:9
119:8,11,17
120:10 122:4,15
123:8 126:10,15,
24 127:9,10,16,25

130:18 131:3
132:6 133:5 134:5,
25 135:5 136:14
137:3,10,17,22
138:9 139:6,19
141:9,13 142:17
143:2,10,19
144:12,14,24
145:5,12 148:6
149:13 150:6,13
152:7 153:19
154:15,18 155:9
157:9,13,20,23
158:11,21 159:7,
16,20,23 160:8
161:11 162:11
163:2 164:22
167:2,15 168:16
169:8,20 171:11,
13,19 172:21
173:8 174:23
175:17 176:1
177:4,22 178:5,22
179:6,7,9,13,17,
22,25 180:5,10,13,
16,20,22,24 181:4,
11,15,25 182:4,7,
16,24 183:18,24
184:5,14 185:5,11,
15,19 186:13,18,
20,23 187:5,11,17
189:6,14 190:2,8,
12,15,22 191:1,5,
14,16 192:9,15,18
193:13,18,23
194:11 195:13
196:3,15 197:23
198:19 199:2,9,18
200:10,16 201:1,
23 202:3,9,19,24
203:10,16,21
204:12,23 206:10,
14,22 207:6
208:20 209:2,22
210:1,7 211:2
212:1 213:14,23

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

216:3,13 217:4
218:17 219:17
220:1,18

**old**
27:19 176:9 183:7,
19 202:25

**older**
97:8

**on**
6:3,22 8:9 9:3,4,5,
25 11:14 12:2,22
13:15 14:15,20,24
16:10 17:8,16 20:6
23:10 24:3 26:2
28:15 31:11,13
33:14 34:4,8,9,15
35:11 36:14 37:1
38:4 39:5 41:7,8,
15 42:10,11,16,17
44:16 45:20 46:3,
4,7,8,13,14,15
47:14 49:1,22,25
56:9 57:7,12,16,
20,23 58:5,7,8,12
60:11 61:11 63:22
64:2 66:2 68:17
72:6 73:14,17
75:3,12 76:22
77:5,6,8 78:14
79:8,10,12,13,14,
16,22 80:15,18,22
81:1 87:4 88:3,4
89:7 90:14,15,21
91:6 92:3,11,18
93:12 94:6,22,24
95:4,6,8 97:2
98:12,13,15,16,20,
23 99:9 100:25
101:8,25 102:1
103:25 104:17
105:18 106:3,16
107:12 108:15
109:21 110:9
114:6,9 118:20
119:6 120:17,25

121:11 122:2,5
124:2,14,23
128:11 134:19,24
135:16 137:12,24
139:6,11 140:11
141:21,23 142:7,
20 143:4,5 144:5,8
145:1 148:15
149:10,14,20
150:7,17,21 151:2,
6,9 152:25 153:3,
8,13 154:5,12,17,
23 155:2,12,14,16,
20 156:4,12,13,16,
17,20 157:3,4,20
159:1,17,25 160:4,
9 161:6,16,22
162:7,18,25
163:22 166:2,5,8,
16 167:3,9 170:19
171:1,2,5 174:21
176:23 178:18,20
179:5,22 180:13,
20,25 182:10
183:8,9,21 184:20
185:23 186:8,16,
18 187:9,22 189:2,
20 191:17 194:5
196:10,13,23,24
199:10 200:2,23
201:25 202:15
205:4 207:8 208:2
209:7,15,16 210:2,
8 212:13,15
213:19 214:3
216:10,11 217:1,4,
5,7,19 219:8
220:8,13

**once**
60:1,2 109:5,21
148:19 209:17

**one**
8:10 14:24 15:1
29:4,5 30:24 35:5,
16,17 37:10 43:14

46:17 47:22,24
55:23,25 58:4,14,
25 70:5 72:7 85:7
88:21 93:2 94:11
96:4 98:1 105:21
106:3 112:13
121:19,23 124:10
125:9 133:10
134:8 135:6
138:10,24 149:22
151:24 152:3,14,
15 156:8,10
165:15 166:15
168:16,22 171:17
178:13 179:12
181:15 183:23
185:2 186:1,11,18
187:2,5 188:15
194:2 197:15
199:13,16 201:6
204:10 210:22
213:25 214:23,24
215:4 217:1,4
218:21 219:6,15

**one's**
181:5

**ones**
89:3 92:14 98:17
189:3,7

**ongoing**
93:24 94:1,2,4
124:23 209:11,13,
23 213:25

**online**
6:12

**only**
18:24 87:25 92:15
102:17,21 106:22,
25 111:19 124:20
145:17 156:8,10
184:10,19 217:22,
24

**onto**

46:6

**open**
179:9,12 185:14,
15 220:10

**open-ended**
79:23

**opened**
185:16

**operating**
53:17

**operation**
54:23 90:2

**operationally**
21:18

**operations**
15:23 16:5 22:3
30:2 45:10 54:8
86:13 203:8

**operator**
45:6

**opinion**
14:5 81:1 125:6,8
162:7 169:11
173:1 203:20

**opinions**
28:15

**opportunity**
68:21 88:7

**opposed**
33:16 199:25
215:5

**optimistic**
45:13

**options**
22:6,12,15,17,19,
23

**oranges**
20:24 93:16
199:11


**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

**Orba**
132:2

**order**
87:19 193:9

**ordering**
220:22 221:2,5

**organize**
183:15

**organized**
43:14

**original**
64:11 73:19
114:12 153:22

**originally**
121:17

**other**
7:21 8:10 9:10
11:15 17:14 22:12,
14 25:2,5,7 31:8
40:25 43:15 55:1
56:25 57:23 60:22
64:7 65:22 72:11
73:15,23 76:25
77:19 79:7 80:4
94:21,22 98:17
111:11,12 114:24
115:4 116:5
121:25 125:3
129:9,14,18
131:15,18,19,23,
24 132:1,15 133:7,
12 142:25 144:13
156:8,11,13
161:24 163:22
167:2,11 170:1
182:7,8 184:16
189:3 194:23
195:13,14,22
197:5 204:2
205:18 213:23
214:7 218:10,12

**others**
151:1

**outcome**
146:4 206:7

98:16 205:14
213:24

**otherwise**
164:3 195:12

**ought**
22:9

**our**
11:11 15:14 16:20
17:19 19:23 20:6
21:1,2,5,8,18 27:9,
10,18,20 37:4
39:10 44:19 46:20
47:9 48:9 49:21
50:15 55:11 58:1,
2,23 59:10 68:6
74:24 83:9 87:2,5
88:14 89:3,4,17
90:1,7 91:14
93:15,20 97:1
98:1,11 101:17
103:20 124:19
139:7 141:23
168:23 172:20
182:10 183:21
207:15 212:8

**out**
21:16 22:21 33:3
38:8 39:9 42:14,
15,25 48:11 54:10
58:12 97:13
111:11 113:3,17,
21 114:1 115:3,23
116:6 121:16
135:16 143:16
144:21 154:20
155:23 157:9,11
161:5 166:6,19
167:7 168:17,23
170:9 179:16
194:10 205:19
212:18 214:23
219:7

**outcome**
146:4 206:7

**outlined**
215:1

**outlook**
45:15 120:11
180:22 183:7,13,
14,19,21 184:1,2,
6,8,11 188:6

**output**
106:5

**outrageous**
169:19

**outset**
59:21

**outside**
71:13 138:21
163:5 214:17

**outstanding**
30:3 35:18

**outstandings**
41:6

**over**
8:23 20:17 27:11,
16 54:13 58:10
59:22 61:24 86:13
173:2 178:24
179:10 205:19
209:15 211:17
212:11

**overall**
28:20

**overhead**
53:16,25 54:13

**overpaid**
85:13

**overruled**
105:9

**oversee**
30:2

**overseeing**
86:16

**overseen**
82:12

**overwhelming**
57:15

**owe**
52:19 168:15

**owed**
150:9 173:2 174:4,
15 209:3

**own**
16:15 20:6 44:19
46:3,5 49:17 86:10
93:4 98:4,5 112:18
141:23

**owned**
70:24

**owners**
52:3 53:5

**ownership**
28:6,12,21 29:4,5

**owns**
28:25 121:5

———————

**P**

———————

**p.m.**
7:14 221:11

**packages**
203:3

**pad**
9:19

**pages**
28:16

**paid**
41:2,4,13 54:15,19
59:8 167:19
201:24 208:15
209:4,8 212:20

**paper**
190:2


**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**papers**
85:17 152:14

**paperwork**
85:19

**paragraph**
29:19,21 39:15,17,
24 40:2,3 48:18
49:1,2,18 50:4,5,
11 52:12 53:13
119:16 134:7,22
136:4,5 137:8
144:24 158:14
159:5 164:23
168:23 169:2
191:18,23 192:3
194:7

**paralegal**
121:3,4

**parsing**
135:16

**part**
11:14 12:25 15:11
18:11 20:11 27:20
30:12,16,24 48:9
59:13 70:6 92:6,8
104:5 107:12
110:20 124:6,18
135:9 136:18
150:18,21 161:4
163:4 178:10
188:6,20 201:18
210:8 212:16

**partial**
116:16

**partially**
54:24 69:9 74:21

**participant**
215:11

**participants**
130:7

**participate**

109:17

**participated**
104:11,14

**participates**
13:2

**participation**
109:9 215:6

**particular**
149:9 155:7 201:8
203:5 217:11

**particularly**
126:5 133:6

**parties**
21:13 23:22 40:21
55:18 58:18
132:15 144:13
161:6

**partner**
97:5 131:4

**partners**
6:8,9 25:22 28:7,
13,21,25 29:23
30:5 40:23 41:15,
24 46:21 47:10
49:5,6 51:16 53:22
54:22 56:21 59:11
69:4 70:25 71:7,
15,23 73:24 74:7
79:9,18,19 86:3
94:9 103:8 107:16
112:1 125:10
130:12 131:4,9,14,
15,18,21 132:14
162:9,12,14
172:18 173:2,5
191:8 200:20

**parts**
12:19 13:2 42:8
63:14,15 192:10

**party**
60:25

**Pasko**
29:3 39:18 40:4
41:3 44:16 45:6,22
46:4,20 47:9 48:19
49:16 50:11,18
57:6 79:20 80:1,12
81:9 86:7 93:10
95:22 114:7
116:23 117:20
127:2,16,18 131:3,
14 132:19 133:19,
24

**Pasko's**
114:9 117:12
120:11 125:4,17,
20 127:14 130:21,
22,23 132:24
133:5,14

**pass**
71:1

**passed**
210:4

**passing**
105:21

**past**
194:22

**path**
88:6

**patient**
220:7

**Paul**
6:15 102:20
105:13 142:2,12,
13 158:3 177:17
189:25 217:15
218:3

**pause**
158:24

**pay**
36:14 53:25
167:15 168:2,10

174:14

**pay-**
168:8

**paying**
168:15

**payment**
167:17 168:5,8,11,
14 202:8,10,14

**payments**
173:13 205:16
209:10,11,13,23
210:2,4,10,15,21
211:7,15 212:3,6,
12,18 213:6

**payor**
205:13,14,19

**payroll**
53:15 54:1 91:5

**pays**
41:10

**PDF**
185:16,18

**Pellegrino**
6:19 9:2,18 11:3,
10 17:25 20:22
23:13 31:24 32:12
33:24 34:13,23
35:7 36:19 45:24
46:23 53:10 62:13
66:2,9,13,16,22,25
67:3,14,19 68:11,
20 69:12,20 74:19
75:8,17 76:8,20
78:19 83:16,19,23
84:4 90:16 95:1,24
107:14 111:2
112:9 114:15,21,
24 118:3 128:21
130:19 134:1
137:19 143:13
146:23 147:11
164:25 179:4

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

182:12 186:2,6,11
188:8,17 190:6,18
191:10 195:20
196:7,19 197:8,20
198:3,24 205:8
206:4 210:13
213:10,15 214:5
215:15,19,22
218:5,8 220:2,4,24

**people**
27:6 32:24 43:7
48:6 57:1 60:17
85:24 91:7 103:22
105:1 146:2 150:6
156:15 157:1
159:24 167:23
170:17 200:23
207:14 218:11,12,
14

**perceived**
169:15

**percent**
27:12 36:15 170:5

**percentage**
27:7

**perform**
100:14 106:23
107:18 159:17

**performance**
30:3

**performed**
25:21,24 217:23

**performing**
201:2 215:6

**period**
44:4 51:1 67:17,22
110:3 135:11,13
139:17,18,19
205:20

**permitted**
140:15

**perpetrated**
17:17

**person**
55:10,17 111:20
128:14,18 155:6
201:15 217:22,25

**personal**
112:18 202:12

**personally**
40:25 41:1 74:6,
13,14 76:5 95:5
104:8 115:15
127:20 128:6

**perspective**
38:12 42:3 70:7
71:14 76:24 88:12
170:11 172:20

**pertaining**
123:1

**pertains**
207:10

**perused**
157:8 158:9

**perusing**
29:15 30:8 35:19
39:23 40:6 42:12
49:3 50:9 52:15
53:20 96:16,22
118:24 119:2,7,14,
25 134:12,14
135:1 137:7 145:4
151:18 158:2
159:6,15 163:24
165:7 169:7 180:4,
9,15 186:17

**Peter**
6:21 83:16,19
219:4

**phases**
30:14

**phone**
31:11 55:20,25
57:4 106:3 134:19
137:12

**phonetic**
16:10 20:6 42:18
87:10 132:2 182:9

**physical**
166:20 176:2

**pick**
149:20,22 218:21

**pictures**
156:15

**piece**
96:9 117:25
201:17 211:16

**pieces**
70:14 80:9 81:24
196:24

**place**
46:16

**places**
178:19

**plaintiff**
16:15 120:14
146:21 148:11

**plaintiffs**
6:20 18:9 30:5
109:2 111:19,22
119:23 120:22
130:23 148:9
151:1 169:6 176:1,
15 206:2

**plaintiffs'**
119:18 145:2
191:2

**plan**
14:8,10 45:8 80:3
169:18

**plastics**

44:13

**plate**
46:8

**plausible**
123:21

**play**
21:16 154:20

**pleading**
112:14

**pleadings**
9:6,25 10:4,8,11
112:13

**please**
6:10,24 29:8,13
34:14 50:7 96:17
118:16 157:10
185:11 220:14

**pledged**
210:3,20

**plugged**
172:14

**point**
24:15,16 43:4
51:12,22 56:5,20
61:10 64:9 67:24
87:12 88:3 91:11
101:18 102:1
105:8 109:25
110:8 113:18
118:13 120:19
140:1 150:9
154:24 162:5
167:3 169:10
171:7 174:20
208:22

**pointed**
24:12

**pointing**
138:9

**points**
56:2

**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

police
176:5,8

policies
79:10

pond
200:23

Ponzi
96:4 97:2,4

pool
204:2 207:19

pools
33:6 129:21

portfolio
33:22 34:1 35:2
53:17 54:14 88:13
93:5 98:16 107:9
121:18 129:15
131:9,13 147:15
207:2,4 211:1
212:10

portfolios
34:25 54:16 82:1,9
105:15 203:9
205:3,4 207:2,3

portion
158:13

pose
177:7,10

position
79:12 101:5
143:15 172:3
178:2

positive
31:1,15

possession
177:1

possibilities
56:18 111:12

possibility
122:12 148:1

possible
7:20 18:25 111:12
188:22 194:8

possibly
20:10 78:15
130:11 166:24
167:1

post
149:1

potential
36:4 76:6 88:7
90:22 121:6
207:11

potentially
36:8 59:19 119:21
120:12,13,21
122:11 126:16
173:19 194:6

power
47:17 51:16 52:6

powers
52:4

pract-
27:9

practice
26:20 27:10,18,20
28:4 56:17

Precisely
155:18

preliminary
118:22 128:1
137:5 190:19,23
191:3,7

Premier
200:21

premium
63:14,15,17

premiums
63:6,9,13

prep
105:22

prepare
8:25 32:19 158:7

prepared
29:17 86:15

prepares
54:25

preparing
13:20

prepping
107:1

present
6:10 11:6 41:20

presented
137:17 140:14,16
141:6

press
46:19 47:3 48:3

Presumably
145:8

pretty
23:1 61:23 128:10
129:3 130:4 205:7
208:18

previously
145:5

price
85:21

prices
204:1

primarily
23:10 31:9 64:16
101:23

primary
62:11 65:20

principal
102:20 155:7

principals
170:15,25

print
157:9,11

prior
13:12 51:22 68:1
70:16 85:10,12
134:9 135:7
138:11 139:23
146:20 148:17,18,
22 200:7,11,13
213:5 215:12
216:8

priorities
14:25 88:21,24
89:2 90:6

priority
15:12,22 16:9
20:15,18 32:10,15
89:17

privilege
66:3 68:12,21
71:20 72:19
182:20

privileged
117:19 125:23
126:1

probably
8:13 55:25 63:18
94:13 96:9 105:5
107:24 109:7,20
168:6

problems
81:5

Procedure
221:9

proceed
147:8

proceeded
117:22



UNIVERSAL
COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**proceedings**
158:25

**process**
18:17 22:18 33:12
38:7 43:13 51:3
55:6 79:17 109:9
138:23 142:10
144:15,16,21
207:14 214:23

**produced**
77:6,15 79:25
180:6 184:15

**production**
180:6,10 185:4
187:10,13 188:13
189:4,14

**productions**
188:11

**profession**
36:7

**professional**
11:19 13:9 25:8
26:12,18,20

**professionals**
52:13

**profits**
27:16

**project**
156:5

**projected**
205:5

**promises**
173:4

**promulgate**
26:10

**promulgating**
26:19

**pronouncing**
120:7

**propensity**
172:4

**properly**
98:14 212:24

**property**
64:3

**prosecuting**
119:22 120:13,21

**prospectively**
88:1

**protect**
87:3 201:18

**prove**
118:6

**provide**
54:22 144:4
167:13 182:8
191:6

**provided**
159:10 188:6,10

**providing**
59:15

**provisions**
51:24

**proxies**
51:24

**public**
85:22

**published**
204:16

**pull**
184:12

**pulled**
96:23 141:2
184:17

**purchase**
85:21

**purpose**

107:5 147:10
155:20 182:21
191:5 192:3
205:24

**purposes**
180:2 186:14,24

**pursuant**
150:14 221:8

**pursue**
21:21 22:22 78:14,
16,25 80:11,16
93:15

**pursued**
16:21

**pursuing**
18:9 126:21 194:3

**push**
77:10 136:1

**pushed**
54:15

**pushing**
149:20

**put**
15:15 16:12 81:3
86:21 87:5,9 91:6
98:6 121:16
169:18 170:2,4
181:15,19 213:3
220:13

**puts**
53:4

**putting**
32:25 169:22

**puzzle**
80:10

---

**Q**

**qualified**
109:12

**qualify**
168:5

**query**
76:23

**question**
18:10 19:7 23:25
28:10 31:19 33:10
34:23 36:22 47:6,8
66:19 67:16 69:18
70:6,10 72:6 73:19
79:23 82:20 99:11,
18,24 115:16
117:14 140:2
142:11 152:20
153:20,22,25
157:2 160:25
161:7 178:10
182:19,25 191:14
193:2 196:17
208:6,21 209:10,
19,20 219:6

**question/answer**
12:13

**questioned**
111:13

**questioner**
34:25

**questioning**
83:22 178:13
215:21

**questions**
7:23 19:8 69:1
111:16 113:10
177:6,7,10 194:9
217:1

**quick**
65:11 106:10
179:15 191:17
201:5

**quickly**
158:15

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

**quiet**
48:10

**quite**
10:16 41:5 60:20

**quiz**
62:1

**quote**
174:17

**quoting**
26:25

---

### R

**raise**
53:24 168:4,11,14
197:17

**raised**
38:20 168:4

**range**
131:6

**rapidly**
54:20

**rate**
20:4 37:25

**rates**
58:1

**rather**
15:23 124:1

**ratner**
6:1,8 7:1,6 8:18
9:1 29:7,9,12
35:15 39:15 55:4
68:22 69:3 96:11,
12,17 106:19
113:10 118:17,18,
22 119:1 134:6
157:18,24 158:1
159:4 164:23
168:16 174:23
177:12,16 179:20,

25 182:18 185:8
190:6 220:18

**re**
60:24 61:1 63:4
64:9 121:6 165:11
166:11

**reach**
113:3,17

**reached**
113:21

**read**
10:10,15 29:25
39:21 40:11 48:20
53:14 70:16 103:4
112:13 144:25
154:9 158:9,10
159:7 166:1,21
196:9

**reading**
111:15 116:16,17

**readings**
102:17

**real**
55:11 170:12
173:16 179:14
191:17 207:13

**realistic**
171:23,25

**realize**
17:7 58:13 155:15

**really**
13:18 14:9 15:18
16:4,9 17:12 33:6,
7 42:10 43:17,24
44:23 45:1 47:15
48:1 57:9 80:24
86:13 103:15
204:17

**realtime**
35:6 70:9

**reason**
15:11 36:7 118:7
154:22 161:4
187:12,15,19
188:20

**reasonable**
134:2 173:5
174:20 217:9

**reasons**
191:24 192:4
199:13 215:5

**Rebecca**
58:23 74:25 75:12,
19 77:25 182:11,
14

**rebuffed**
142:15

**recall**
9:13 14:8 22:15
23:1 34:19 51:4
52:11 61:9 93:25
107:10,23 122:3
124:20 160:7
213:12 214:15
215:14

**recapture**
60:23 61:3 62:25
63:11 64:10,12,14

**recaptured**
60:23 61:3 62:23
64:16

**receivable**
106:1 202:12,15
203:3 204:21
205:3,4,12

**receivables**
145:9 202:5,21
203:17,25 205:6,
13 210:25

**received**
173:3 187:18

**receiver**
21:7 47:20 87:14,
16,18 193:10

**receiving**
211:7

**recent**
27:14 51:21

**recently**
31:16

**recess**
35:10 68:16
106:15 157:17
179:19

**recognize**
47:25 119:1
158:12 180:14
188:25

**recollection**
135:2 136:3
148:15 165:23,24,
25 209:2

**recommendation**
109:19

**reconcile**
32:20,21 212:17

**reconciled**
212:2

**reconciliation**
33:4,9,12 36:4
83:13 210:23

**reconciliations**
14:15 34:4 81:4
84:22

**record**
6:4 35:5,8,11
68:13,14,18 85:23
105:25 106:14,16
108:16 157:14,16,
21 158:22 159:1
179:14,18,23
195:10 220:14,19

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

recordkeeping
34:10

records
19:3 100:21
135:12 136:2,16,
18 143:12 159:13
164:2

recover
150:15

recoveries
90:2

recovery
36:15 78:14,25
98:22 171:22

red
186:11

reduce
87:4

refer
28:16,18 41:23
114:22 151:14
167:6

referenced
166:23

references
116:23

referred
14:18 33:13 136:4
151:20 155:13
167:8,10 170:3
180:24 203:13,17

referring
10:5 39:4 41:24
141:7 156:19,22
165:9 171:10
175:21 188:5
202:7

refers
29:22 144:25

refresh

135:2

refreshing
9:25

refused
146:21 168:4

regard
53:16 83:1 208:17

regarding
66:5 68:12 197:3

regrettably
27:2

regular
184:6 207:8

rehash
177:23

Rei-
218:24

reimbursed
59:12

reinsurance
63:5,8,11,16,20,23
64:5,8,12 170:8

relate
20:2,3 132:24
135:21

related
26:25 60:25 63:7,
17 97:25 102:2
123:9 124:8
162:17 180:18
181:23 182:3

relates
27:7 64:3

relating
76:6 79:11 121:21
165:11

relation
39:1

relationship
85:14 124:3
133:15 142:19
151:15 152:8,19
165:5

relationships
85:21

release
47:3 48:3

relevance
91:25 139:25

relevant
84:1,7 92:16,20
121:10 123:6
130:16 133:6
141:19

rely
23:10 167:3

relying
44:15 49:25

remain
40:5 54:23

remainder
205:11

remedies
99:9

remember
10:11 12:12 19:3,
25 44:12 45:25
50:16 52:1,9 54:3
65:23 84:23 106:8
110:4 114:13
121:7,12 134:15,
16,18,20 137:15
144:12 146:16
151:11 152:16
172:13 207:17,20
208:4,14 215:8,10

remembering
61:22

remind
28:18

remote
8:8

remove
50:12 51:16

rent
54:10

rep-
74:8

repayment
170:5

repeat
23:23 47:6 209:20

repeated
173:4

report
9:11 24:10 32:20
112:3 176:5,8
193:20 206:11,13,
17,21 207:9

reporter
6:24 28:9 108:9
178:9 220:21
221:1,4

reporting
98:15

reports
9:8 10:2

repositories
127:1

represent
6:11 24:8 74:4,6,8
96:23 124:22
177:17 180:5
187:7,17

representations
217:7

representative

UNIVERSAL
COURT REPORTING

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

48:21

**represented**
74:21 136:6
187:24

**representing**
6:14,17,20 74:10,
15 144:17

**reputation**
170:16

**request**
138:19 139:13

**requested**
144:10

**requests**
101:22 102:1
122:18 135:16
138:16,18 139:20,
21 141:9 142:3,8,
9,15 214:20 215:1
216:17

**required**
21:10 53:17

**requirements**
55:1 138:22

**reread**
10:10

**research**
87:13,17

**reserved**
221:10

**resign**
45:23 46:12

**resignation**
48:20

**resignations**
48:23 49:17

**resigned**
50:3 103:8

**resolution**
30:18 50:23 51:3,5

**resolutions**
50:12

**resolve**
30:3,10,23 31:18
35:17,22

**resolving**
43:7

**respect**
40:4 64:18 65:24
66:20 101:2 129:8
130:22 136:22
150:17 155:6
159:8 197:25
212:2 216:21

**response**
108:8 189:17

**responses**
22:6

**responsibilities**
131:7

**responsibility**
88:1 160:13
162:19,20,21
163:3 199:24
200:4,7

**responsible**
109:4 111:9
115:12 131:14
193:15,18

**responsive**
141:22

**rest**
81:12 83:1

**restraining**
193:9

**restrict**
52:6

**restructure**
27:12 98:7

**restructuring**
56:15 60:15 78:12,
23 91:1,16 98:10
101:15

**result**
31:15

**results**
112:25

**retained**
23:3 30:1 42:11,16
46:18 55:16 59:19,
23 65:7,11,13
82:14 85:9 86:17
89:21 100:14
103:9 106:23
156:1

**retaining**
145:1 149:14

**retaliatory**
172:18

**retention**
67:23 68:2 107:17
148:10 200:12

**return**
201:21

**revealed**
147:9

**review**
50:5 74:17 75:15
76:19 91:12 98:6
100:15,24 101:22
105:25 147:1
158:7 164:1
192:11 206:10

**reviewed**
9:6,8,9,11 152:1,5,
11 157:6

**revisit**
189:18

**RICO**
20:11 36:3 37:2

**rid**
54:17

**right**
7:14 8:12 10:16
15:12 16:16 17:24
19:15 20:10 21:2
24:4 25:9,11 27:11
35:18 36:10,25
37:4,18 38:4,14
39:18 42:13 44:21,
24 48:5 50:13,19
51:7 60:25 61:21
62:9 64:24 66:15
70:2,5,9 72:4 73:3
84:3 86:25 92:5,17
93:1 97:6 98:16
101:8 103:9 104:6,
19,20 106:20,24
108:4 109:22
110:12 111:1
112:1,4 114:11
116:9,24 117:23
121:22 123:3,6,9,
14 126:11 128:7
130:2,21,24 131:1,
7,10 132:15,25
133:3,20 138:2
140:19,24 141:1,6
143:11,16,20
144:2,10,19,20,22
145:6,18 146:18
147:9,10 148:22,
24 149:4 150:10,
15,18 151:3
153:14 155:4
156:11 162:15
165:22 166:4,25
169:6,16 171:17
173:20 176:17
177:18,20,23
178:15 179:11
180:3,18 185:21,
23,24 186:16

**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

187:2,7 188:11
191:3,9,21 192:1,
7,20 193:13,20,21
198:17 199:7,11,
22 200:1,8,12,13
201:3 202:22
205:1 207:24
208:7 209:24
210:5,12 212:9,15,
20 213:1,8,21
216:11,15 219:3

**rights**
52:7 100:18
141:11 142:23

**Riley**
22:2 25:3,4 26:22
30:1,15 32:11
46:18 47:24 51:16
52:13 55:4,10
58:21 60:12 74:11,
14,15,17 75:1,7
78:5 86:10 88:24,
25 90:6 97:20
99:4,8 107:16
113:20 115:20,21
149:1 153:11,25
154:22 156:17
162:9,11,14 163:8
183:5,6,11 184:10
185:3 207:10
211:2,5 212:17,25
214:2 218:13,17

**Riley's**
15:21 42:3 59:8
76:6,24 89:8
104:18 130:12
146:20 188:16
213:5

**risk**
18:5 63:14,16
125:25 205:12
217:18

**risks**
63:22,23

**risky**
205:17

**Robert**
9:16

**Roger**
31:10 101:23,24
102:3 142:2

**Rohr**
9:12,15,16

**role**
40:19 45:21 91:15
101:17 104:5
139:8 151:13
159:8

**roles**
46:20 47:10

**romanette**
144:25 165:3

**Ron**
58:6

**room**
9:17,21 11:10
16:24 108:19

**royalty**
204:15

**RSM**
150:5

**rule**
111:11 221:8

**rules**
8:23 221:8

**ruling**
193:4,5,6

**run**
90:2

**running**
47:22 76:22 83:2
87:1,22 91:10
113:18 141:24

203:7 209:12

**rush**
168:18,21

---

**S**

**said**
7:13 14:13 15:8,9
17:11 18:1 35:14
46:19,24 47:2
52:10 54:16 55:11
56:11 57:7 67:3
70:15,20 72:13,22
74:1 82:3,6 83:4
86:19,24 88:20
93:22 97:10 99:2
104:4,18 105:10
106:4 109:13
112:11,12 125:16
126:9 127:4,9,22,
24 138:3 141:2
147:21 154:3,7,11
162:8 175:14,15,
18 178:12 188:9
191:15 195:10
198:15 199:9
200:6 201:1
207:23,25 209:3,
22 211:16 213:24
217:8 218:20
220:3

**Saiph**
6:14 24:23,24
101:9,10,19 104:9
105:11,12,18
106:20,23 107:17
111:6 116:3,4
123:11,14 130:15
133:12 136:20
142:19,20 145:1
147:18 148:21
149:7,14,20 151:2,
7,15,22,23 152:2,
9,11 153:5,9

154:7,12 155:12,
20,25 156:1,2,6,13
157:3 160:16,20
161:3 164:6,19
166:18 177:17
189:12 194:3,4
200:18,19 201:2
215:5 216:11

**Saiph's**
102:19 116:3
148:10 159:12
165:4 166:14
216:10

**saline**
199:18

**same**
13:3 48:20 49:3
63:24 92:17 93:17
101:21 118:7,13
135:9,14,17,25
136:1 139:16
142:11 144:16
186:9 188:18
197:11 206:19
218:11

**sanctioned**
65:19

**saved**
183:21

**saw**
46:15 101:16
155:11

**say**
8:21 10:6 14:3
17:15 28:14 29:21,
25 36:1 40:4
44:18,22 45:19
48:12,13,16,20
53:14 59:3,23
67:2,7 76:14 78:20
80:7 89:11 100:17,
18 112:14 115:13,
14 116:1 117:7

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

119:12,18 124:13
126:18 129:12
139:6,21 143:3
146:25 150:1
153:20,21,22
161:14 163:8,23,
24 166:1 190:24
192:2 200:22
201:23 203:16
207:25 219:11

**saying**
18:2 36:2 60:7
73:8 84:10 85:12
87:25 97:23 98:18,
25 104:25 122:12
135:5 136:21
139:22 140:5,10
149:5 163:14,25
164:1,12,13 172:9,
10 196:9 208:7
210:7,8 211:13

**says**
26:22 35:16 40:11
50:11 87:19 97:5
137:3 139:23
140:6 149:2 159:7,
19 160:8 161:8
164:11 176:8
190:25 196:9,16

**scene**
16:1 46:6

**Schacter**
65:21

**scheduling**
13:13,17

**scheme**
96:4 97:4

**schemes**
97:3

**Schwartz**
31:10 50:14
101:24 142:2

149:10

**scope**
58:20 60:11 86:3,6
142:24 144:1
152:8,17,18,19

**score**
14:21

**screen**
178:20,24 185:23
186:8,10,16,21

**scroll**
185:24

**sea**
47:18,21

**search**
77:1,20

**searchs**
85:23

**SEC**
95:13,14,18 97:18

**second**
11:22 17:16 46:17
170:13 187:13
188:4

**seconds**
216:24

**secrets**
27:15

**section**
25:20

**secure**
86:14 205:19

**secured**
38:14 90:24
169:24

**securing**
14:25 205:25

**securities**
32:2 64:1 130:6

203:11 204:20

**security**
204:5

**see**
25:1,5,6,7 30:7
33:18 40:3 48:25
52:12 53:19 73:7
90:25 96:8,25 97:1
99:17 105:19
106:5 119:24
122:22 134:11,23
137:6 145:3
151:17 159:14
165:6 175:23
178:23 179:4
183:13 186:8,15,
21 189:10,23

**seek**
150:15

**seeking**
138:21 182:21

**seem**
116:6

**seems**
61:20

**seen**
47:5 55:10 58:16
75:3 105:21 158:5
174:16 176:5
180:10 195:4,7
196:10 197:2,5,12
199:3,5

**sees**
96:19 179:2,3,4

**self-selected**
77:14

**sell**
174:1

**send**
110:4 183:14

**sending**
142:3

**senior**
25:18 70:4

**sense**
13:5 62:3 72:8
172:16 173:15
187:3

**sensitive**
116:13

**sent**
110:5,10

**sentence**
166:13 196:9

**separate**
42:19 75:6 81:14
98:20,24 121:21
139:17 183:8

**separated**
83:11

**separating**
81:11

**September**
11:21 12:5 23:5,7
43:18,19,24 108:3,
5,6 119:6 134:17
181:22 182:1

**Septemberish**
30:20 43:18

**serve**
30:1

**services**
41:3 58:21

**servicing**
15:3 105:15
212:22,23

**serving**
78:11,22

**set**

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

85:25 86:2,7,8,10
89:1 134:24 137:4

**sets**
88:23,24 90:6

**setting**
75:23 76:4 78:17

**settlement**
19:5 41:7 67:10
121:13,14 171:16
172:3 202:8,10
203:17

**settlements**
202:24 203:4,6,9
205:17

**settling**
36:8 43:6

**seven**
188:11

**several**
25:8 43:3 53:15,24
119:11 138:15
176:16

**Shap-**
35:14

**Shapiro**
9:3 10:22 11:2,5
12:4 13:11 17:22
20:20 23:12 35:15
52:10 71:2 88:20
101:13 104:15
128:2 129:4 146:8
157:23,24 184:23
189:10 195:25
197:16 198:2
207:25 208:2

**Shapiro's**
12:17 13:23
189:15 197:23

**shared**
180:1

**sharp**
97:9

**Shawn**
23:3,15 103:20
109:8,23 129:2

**she**
75:6 103:2 120:8
121:2

**she's**
75:20

**Shelly**
49:23

**Shelly's**
49:24,25

**short**
11:23 22:6 57:9
110:3

**shortage**
210:24

**shortfall**
37:20 107:8 146:9,
17,18 147:8
207:11,16 208:10
210:24 211:20

**shortfall's**
207:24

**should**
17:13,14 59:23
68:11 82:19
101:10 112:24
149:7 150:1
157:11 168:10
174:4 185:20
191:7 211:17
218:20

**shouldn't**
155:25

**show**
40:10

**showed**

46:16 183:2,3

**showing**
136:11 186:13

**shows**
161:25

**shrinking**
43:7

**shrinks**
43:17

**Shutts**
6:14

**sic**
54:7 157:23 164:2

**side**
37:20 56:23 96:19
185:24 200:23

**sign**
192:13

**signature**
221:10

**signed**
58:22 119:6

**significant**
60:20 61:15
146:18 165:12,16

**similar**
107:7 123:19
150:6

**simple**
63:10 201:5

**since**
26:18 28:22 30:20
34:7 43:19,24 55:3
58:8 59:22 126:21
173:14 181:21
182:1,19 195:15
209:6 212:6,22

**Singerman**
89:5 92:12

**single**
71:23 72:11 188:2

**singular**
175:24,25

**sir**
7:15 8:2,20,22
11:1 22:5 24:14
25:10,12 29:24
30:8 35:20 39:24
40:1,6,8 41:17
42:6 49:4 50:14
53:20,23 62:10
69:6 77:17 80:17
83:18 84:16 85:2
94:25 95:21
103:10 104:7
106:21,25 107:4
110:13 111:24
112:2,5 116:25
119:2,5,7 122:25
123:4,10 126:12,
14,23 132:16
133:21 145:7,11,
19 150:19 151:18
154:14 169:3
176:4,7,11,18
177:21 178:4,16
180:4,9,12,15,19,
21,23 181:17
185:7 186:17
187:4 191:4,13,15
192:8,12,17,21
193:14,17,22
199:12 200:25
202:2,6 206:5
209:1,25 210:6
211:4 213:4,22
216:12

**sit**
28:19 31:2 194:11
195:1 196:3
214:24

**site**
42:11,17 58:8

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

93:12 104:17

**sitting**
125:5,7 134:16
141:16 162:11
212:5 214:15

**situation**
56:9,10 57:19
62:19 82:18
116:12 155:11
199:21

**six**
40:13 213:19,24

**skeptical**
97:7

**skilled**
15:3

**slide**
49:12

**slideshow**
22:16 28:16

**small**
43:25 152:10
163:13

**smaller**
9:11 132:10

**Smith**
49:23 50:21,24
74:4 75:15 76:18
89:5 100:14
184:23

**snowball**
173:24

**soccer**
200:24

**Society**
25:19

**soft-**
163:23

**software**

184:7

**sole**
159:8

**solvency**
26:24 27:16 38:12

**solving**
170:16

**some**
8:6,8 9:6 11:15,18
12:24 14:17 18:12
19:18,23 20:2,3
23:3,7,18 31:14
32:17 40:25 41:23
43:15,16 51:22
55:10,16 56:20
59:16 60:15,24
61:10 62:15,20,22
63:13,23,25 64:1,
9,15 65:22 70:8,9,
17 73:20 77:6
84:1,10,21 85:22,
23 89:16 91:11
94:17,18,19 97:15
101:18 102:1,2
105:8 109:25
110:8 116:17
119:19 121:25
125:22,23 127:21
129:18,19 131:20
132:1 135:20
141:20 142:3,4
147:3 150:4
153:13 155:14
162:18,21 165:9
167:10 169:19
174:12 175:9
177:7,25 180:17
181:18 183:8
186:16 188:25
191:19,21 192:19
193:11 195:22
199:3,4 200:4,15
202:4 203:23,25
204:2 207:20

209:3 213:24,25
214:8,21,22 216:4

**somebody**
13:1 14:8 39:6,7
46:5 57:3,4 60:6,7,
15 78:4 85:15
93:18 110:4,9
115:20 142:6
147:22 185:1
189:10 201:15
211:18 217:10

**somebody's**
204:3

**Somehow**
78:3

**someone**
25:3 104:24
133:22 136:15
145:13

**something**
12:11 17:20,23
20:20 21:1,9,17
22:4 25:3 43:11
48:4 55:11,12
77:2,23 81:1
93:11,12,19
101:15 105:24
115:20 141:22
172:1 175:8,13,15
182:2 183:20
202:13

**Sometime**
108:6

**sometimes**
53:4 57:20 79:1,3
169:14 203:13,17
205:19

**somewhere**
19:10 183:17

**soon**
18:19

**sorry**
17:1,2 18:21 28:9
43:4 75:24 76:3
83:17 108:15,21
112:15 129:12
168:16 171:11
175:12,20 178:9
196:20 215:9

**sort**
41:18

**sought**
102:8,16

**sound**
61:21

**sounds**
36:16 72:7 73:20
122:22 155:17
202:16

**source**
59:17

**sources**
55:1

**south**
19:10

**Spalding**
6:17,21 9:17,21
16:23 101:25
136:6,10,21,22,23
140:5 142:12
163:7

**Spalding's**
163:7

**speak**
13:18 32:3,16 33:2
43:23 65:8,12
75:11

**speaking**
69:21 143:11
182:20

**specific**
85:18 133:2



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

137:14 210:25
212:13

**specifically**
85:10 170:4
188:15 207:10
216:9

**specifically...in**
145:1

**specificity**
52:11 120:16
214:10

**specifics**
52:1

**specified**
24:10

**Spectra**
87:10

**spend**
41:8

**spent**
9:24 12:1

**spite**
145:1

**spoke**
55:13,17,22 60:17
65:10 159:24

**spoken**
59:24 62:8

**sport**
200:22

**spreadsheets**
207:21

**spring**
167:20

**stabilize**
90:11

**stabilizing**
15:23

**stack**
10:19

**staff**
47:3

**stake**
17:24 18:2

**stakeholder**
17:15 72:14

**stakeholders**
52:20,23

**stand**
119:8 120:1
192:16

**standards**
26:11,19

**Starr**
6:21 7:5 10:3 12:3
16:25 18:7 21:25
28:11 29:7,11
30:13 31:19,20
32:6,13 33:25
34:2,11,15,17,22
35:4,11,13 37:11
41:21 46:10,25
50:9 53:12 62:24
66:7,11,14,18,24
67:1,18,21 68:3,
13,19,25 69:2,13,
14,21,23 72:18,21
75:5,13,22 76:11
77:11 78:21 83:21
84:3,6,8 91:17,24
92:1 95:2 96:2,10,
14 106:10,18
107:15 108:11,17,
21,23,24 111:10
112:16 114:19
115:7 118:16,20,
25 128:25 130:20
134:4 137:21
143:18 147:6,16
157:14,22 158:19
159:3 161:18,19

165:1,2 177:5,12
179:3 190:3,7,9
194:9 220:13,17,
21,23

**start**
43:6 101:10
108:20 114:5

**started**
58:15 74:24
168:24 216:4

**starting**
6:12

**starts**
31:8 43:14 187:6

**state**
6:10 34:13 60:9
132:11 192:4
193:24

**statement**
46:19,21,22 47:1,9
81:13 120:1
159:21 164:16

**statements**
89:15 119:8
143:12

**steal**
151:2

**Steve**
29:3 46:20 47:9

**Steven**
120:11

**still**
7:22 43:21,23
47:13 48:2 50:18
101:25 104:17
155:6 161:2 177:5
192:16 195:3,9
196:11 205:25
215:13

**stole**
176:15

**stories**
83:7

**story**
33:1

**straightforward**
153:23

**strategically**
140:12

**strategy**
65:24 66:6,20
67:9,13 68:5,8
149:23 150:21

**stream**
202:15

**streams**
202:8,10

**structure**
28:6,12,20,21 29:5
31:2,3,6,14 57:19
100:13 101:5
183:3

**structured**
19:5 202:8,9,24
203:4,6,9,16

**struggle**
91:20

**struggling**
91:18

**studied**
64:7 116:18

**study**
26:17

**stuff**
56:3,19 57:16
84:1,5 188:22
199:24,25 203:12

**style**
183:7

**sub**



**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

121:9 186:25
188:2

**subcontractor**
155:1

**subject**
66:5 121:6 166:23

**submitted**
118:22 119:3
158:4

**subquestions**
36:23

**subs**
121:23

**substance**
47:1,8,12 48:1,13,
15 68:23 75:9
114:16 182:13

**substantial**
19:2

**success**
37:15 38:4

**successful**
70:1 138:8

**sue**
25:4 125:13

**sued**
115:21 125:10,14
131:18,21

**suffered**
78:23

**suffers**
78:12

**suggest**
218:18

**suggested**
46:6 150:24

**suggesting**
136:9,14 142:13

**suggestive**
172:4 199:3

**suing**
132:8 136:22

**suit**
23:4,5 113:4,22
115:6 124:17
172:24 173:6
174:6 217:20

**suite**
43:10

**suited**
218:1

**sum**
68:23 75:9 182:13

**summaries**
122:20

**summarize**
84:20

**summary**
9:7 166:14 193:7

**summer**
92:10 101:20
102:9 123:20
135:10,13

**supervised**
117:21

**support**
27:15 118:12,22
149:14 190:16
191:2 201:22,23

**supported**
201:17 207:4

**supports**
201:12

**suppose**
199:17 217:1

**supposed**
68:10 128:12

209:13 210:4
212:7,19

**sure**
10:7 15:16 23:23
24:1,7 31:25 34:25
35:7 39:4,22 41:21
46:13 49:9 50:6,10
56:6,22 60:1 61:23
82:11,16,21 86:15
89:18 90:23 98:11
104:16 108:19
110:16 118:5,14
120:14 128:12
129:3,22,24 137:7
139:4 146:11
147:20 154:25
157:12,15 158:18,
20 163:19 177:11
178:1 188:18
191:19 194:12
201:9 212:20
213:23 217:16

**survey**
218:10

**suspend**
177:8

**suspicion**
135:22 197:18

**suspicious**
92:18 116:5

**Sutton**
29:5 98:7

**Suttonpark**
6:20 14:13 15:1,2
16:8 25:25 33:7,8
34:9 42:20 58:12
81:3,11,15,23
84:23 87:5 97:25
107:12 121:17
131:12 145:6,9
146:6,10 156:13,
15 176:2 191:8
200:11 201:21

202:11 213:4
214:3 218:18

**Suttonpark's**
123:2

**swear**
6:24

**sweeping**
83:8

**sworn**
7:2 159:16,21
191:6

**system**
78:5 90:23 92:25
93:6 105:20 120:6
122:24 123:1
129:14 137:23
145:16 146:1
147:19,23 183:6,
12,25 207:8

**systems**
119:18 150:6,7
217:11 218:3

———————

T

**tab**
185:19

**table**
90:14,15 110:23
151:13 169:14
170:14 171:16
201:14

**tactics**
169:6,9 171:16

**Taft**
65:9

**Taheri**
23:15 103:20
112:3,6 129:2

**take**

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

53:14 86:13
106:10 185:11
204:14 217:7

**taken**
33:7 35:10 63:22
68:16 106:15
157:17 179:19

**takes**
47:24

**taking**
172:2

**talk**
192:19

**talked**
57:14,18,19,25
71:2 110:6,7
191:18 200:12
213:18 216:9

**talking**
56:25 67:21,22,23,
24 68:8 97:24
106:20 121:17,18
124:20 134:13
139:19 143:12
184:17 188:18
204:25

**talks**
172:3

**target**
120:20 133:19

**targeted**
127:19 130:23
133:3 137:23
138:2 140:19
159:12

**targeting**
159:11

**targets**
95:23 96:1

**task**
217:23

**team**
15:2 23:15 26:2
30:15 37:1 38:25
39:11 42:20 43:1
44:17 58:13,14
87:9,10 91:10
124:20 146:3
150:2 181:8 212:8,
9 213:2,3 218:25

**tears**
170:20

**tech**
35:5 150:3 160:2

**technical**
21:3 128:23

**technically**
52:21

**technologists**
185:2

**technology**
9:10

**telephonic**
57:10

**tell**
12:4,8 13:19
56:13,16 63:11
87:18 91:18 96:3
121:24 154:10
164:9 172:13
179:11 195:4,7,12

**telling**
17:15 44:19 45:5
63:10 136:20
183:1

**temporary**
190:17,23 193:8

**ten**
94:12

**Teresa**
87:8 106:4 189:11

**term**
21:3,4,19 64:1
172:3 201:9,11
203:14 204:6
205:20 207:2
212:21

**terminate**
50:19

**terminating**
43:7

**terms**
16:5,8 30:15 37:5,
7,19 42:23 71:2
77:1 80:11 210:1
214:12,18 216:17
218:1

**terrible**
171:22,23

**terrific**
93:19 169:13

**test**
69:1

**testified**
7:3 17:23 20:20
32:8,9 41:14 68:4
87:19 107:20
112:6 128:5 146:8
159:23 180:16
195:25 216:16

**testifier**
35:1

**testify**
11:6 15:7 86:22
120:3 192:22

**testimony**
84:9,20 88:3 122:7
123:13 146:10
154:9 159:17
161:20 174:16
178:2,7,14 196:4
208:8

**tests**
26:11

**text**
32:25 39:11

**textbook**
204:13

**textbooks**
204:9

**texts**
89:20

**than**
8:10 15:4,23 19:4
21:17 22:14 52:11
56:1 61:13,16
63:19 81:21 82:8
89:13 94:11,12
114:24 124:2
129:9,14 131:15,
19 133:6 137:14
138:17 167:2
172:12 182:7
184:16 195:13
205:12,18 213:24
217:15 218:3

**thank**
6:23 7:9 8:16 50:6
108:22 136:24
168:20 177:12,13
186:5 204:14
220:17,18 221:6

**thanks**
113:16 212:25

**that**
7:14,16,17,20,25
8:14,17 10:25
11:6,22 12:6,8,10,
11,14,20,23 13:13,
16,22,24 14:1,4,9,
14,18,19,20 15:4,
9,16,19,21,25
16:1,9,12,13 17:9,
20,24 18:2,8,16

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

19:2,8,9,18 20:6
21:1,9,13,16,21
22:17,22 23:4,6,8,
23 24:4,8,9,13,15
25:3,11 26:6,16,
17,21,22,25 27:1,
4,6,18,20,23
28:16,18 29:5,7,
13,16,21,22,23,25
30:7,21,22 31:5,7,
14,19,21 32:2,9,
14,15,16,17 33:1,
12,17 34:5 35:16
36:7,14,16 37:8,24
38:11,16,21,22
39:7,9,10,11,13,21
40:5,7,12,16,21
41:6,7,14 42:5
43:11 44:1,14,23
45:20 46:7,8,14,
15,21,24 47:2,12,
24 48:3,4,9,20,21,
25 49:3,15,17,18
50:1,2,11,15,16,
17,18,22,25 51:5,
6,21,23,25 52:1,3,
4,7 53:14,19
54:14,15 55:2,3,6,
9,12 56:3,5 57:1,2,
22 58:3,13,17,18
59:1,3,4,6,9 60:1,
14,21,24 61:8,21,
22 62:4,7,12,16,
19,20,23 63:1,9,
13,14,17,21 64:2,
6,15 65:16,18,22
66:23 67:25 68:4
69:1,4,7 70:1,5,6,
9,10,18,20,23,24
71:1,3,14,15,16,
20,22 72:8,22
73:5,23 74:2 75:3,
12 76:5,25 77:2,6,
14,15 78:9,14,25
79:1,3,13,16,25
80:1,3,4,15,18,22,

25 81:1,5,8,10,12,
17 82:1,3,14,18
84:10,11,15,17,22,
24 85:1,5 86:5,9,
15,22 87:4,20
88:2,11,16,24,25
89:3,9,15,16,18,22
90:6,15,19,20,23
91:6,9 92:3,4,10,
15,18,25 93:1,8,
11,12,18,19,20,24
94:23 95:4,6,8,9,
11,17,19 96:3,4,
11,19 97:9,11,24
98:2,8,11,12,21,22
99:4,9,10,18,22
100:16,17,18,21
101:1,3,4,7,14,17,
18,20,22 102:6,8,
11,16,18 103:1,17,
25 104:4,5,24
105:1,4,9,11,12,
15,17 106:23,24,
25 107:5,9,20,23
108:13 109:1,3,5,
7,9,22 110:10,12,
24 111:5,16,19,20,
22 112:7,8,13,17
113:5,14,24 114:2,
3,5,6,11,24
115:11,15,17,23
116:5,14,19,22
117:3,4,6,8,11,12,
17 118:1,7,8,10,
14,21 119:1,3,12,
18,19,24 120:1,4,
6,10,12,17,20
121:5,12,15 122:7,
17,21,22 123:8,13,
15,21 124:4,7,9,
11,13,15,16,18,21,
22,23 125:3,6,18
126:4,15,16,18,19,
20,25 127:5,14,16,
21 128:5,19,22
129:3,10,12,15,19

130:2,6,9,22
131:7,14 132:17,
23 133:4,12
134:11,23,25
135:2,7,10,13,20,
22,24 136:1,7,10,
11,21,25 137:6,14,
18,24 138:3,4,6,
16,17,20,24 139:3,
4,7,10,11,22,25
140:1,2,11,14,16
141:2,7,10,13,22
142:11,13 143:23,
24,25 144:8,11
145:3,15,18 146:8,
10,12,15 147:9,17,
22 148:1,5,9,13,
14,17,18 149:6,15,
24 150:1,6,7,11,
12,24 151:2,5,6,
13,17,19,20,25
152:15,17,20,25
153:2,3,7,8,16,18,
20 154:2,5,11,12,
16,24 155:5,6,12,
15,19,23,24,25
156:4,8,12,14
157:1,2,5 158:13
159:7,9,14,20,23,
25 160:2,3,4,6,12,
23,25 161:4,8,18,
20,21,25 162:3,17,
23 163:3,14 164:2,
4,16,18,19 165:6,
8,9,12 166:2,8,11,
14,15,16,17,18,21,
22 167:3,9,13,16,
17,19,21,23 168:1,
4,9,11,12,25
169:11,14,21,24,
25 170:11,22,24,
25 171:3,6,7,9,16,
25 172:1,15,17
173:4,12,13,15,20,
24 174:7,8,13,16,
24 175:3,12 176:3,

6,8,12,15,25
177:2,19,20,25
178:1,2,5,8,10,12,
14,15 179:3 180:1,
2,5,6,7,17,18,20,
24,25 181:2,10,11,
12,19,24,25 182:1,
3,19 183:2,3,9,10,
16,19,21,24 184:6,
7,8,9,11,13,14,15,
16,17,20 185:3,15,
16,20 186:15
187:3,5,8,9,12,18,
20,23 188:5,6,9,15
189:7,8,14,18,19
190:3,8,15 191:1,
3,9,18,19,20,22,24
192:1,2,3,4,6,16,
18,20,22,25 193:3,
11,24 194:2,3,4,5,
6,9,15,17,19,24
195:4,5,7,9,15,16,
22,23 196:4,10,11,
12,17,21,24 197:5,
6,12,15,17,24
198:2,6,9,15,16,
21,23 199:4,5,7,9,
10,18,24,25 200:3,
5,12,22,23 201:3,
6,12,16,22 202:3,
10,13,15 203:11,
14,16,24 204:2,6,
14,22,24 206:1,7,
14,21,24 207:4,7,
10,22,23,24,25
208:1,2,12,13,14,
16,19,20,22,23,24
209:5,9,10,11,13,
14,15,22,23 210:3,
5,8,10,12,14,20,
22,24,25 211:1,2,
5,7,10,13,14,16,
17,21 212:1,3,6,
10,11,12,13,15,19,
20,21,22 213:2,3,
8,11,12,18,20,25



UNIVERSAL
COURT REPORTING

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

214:8,12,14,15,17,
20 215:4,5,13
216:5,11,13,15,22
217:5,6,7,8,15,20,
22,23 218:1,7,11,
12,14 219:12,13,
20,24 220:3,8

**that'll**
96:11 140:7
194:10

**that's**
10:2 15:11 18:2,3,
10,22 19:12 20:11
21:4,17,19 22:9
32:19 33:15 37:4,9
66:24 69:13 70:12
75:1 79:23 80:7
82:7,14 83:9,10
84:1 85:5 87:6
88:16,19 92:6,8,18
93:2,18 96:25
97:16 98:9,10,24
99:10 101:15
103:16,17 110:24
111:6,7 115:6,16
116:7 117:14
118:13 120:19
123:7,25 129:21
134:2 136:2,18
141:1 142:18,21
143:9 144:20
147:9 152:14
154:19 155:3,10
157:5 159:10,19
161:4 162:5 163:4,
5 164:4,12,17
165:13,23,24,25
166:13,15,16
168:18 169:25
170:7,20 171:6
176:14 184:25
187:6,23 189:23
194:3,8 196:1,15,
16,17,18,21,22
198:2,4,18,25

199:2,8,16 200:9
207:4 209:1,7
211:14,16,24
212:25 217:22
219:2,15

**Thatcher**
42:18 58:7,8

**their**
6:11 35:24 36:2
40:19 41:2 46:3,5
49:14,17 50:12
51:2,24 52:5 53:25
63:7,21,22 64:10
67:13 69:7 70:5
73:15 93:9 101:4
105:17,19 111:7,8
112:25 113:1
114:3,4 115:19
118:6 129:1,5
143:16 150:21
151:25 168:4
169:15,23 194:5
209:7,8 210:16
211:1,14 212:14
213:7

**theirs**
34:6

**them**
20:3 36:6 41:10
46:12 47:25 56:16
57:13 58:14 59:22,
24 60:3 65:10
72:10 74:1 77:10
80:19 83:7 86:9
90:12 94:19
100:10,20 114:4
115:19 125:22
133:23 139:4
142:10,21 143:21
144:9 149:2,18
150:7 181:7,11,14
182:5 183:2,3
194:7 195:23
200:17 202:7

203:20 204:11
205:20 209:8
213:25 214:8
215:14 217:2
219:1

**themselves**
40:24 206:23

**then**
8:15 18:23 23:7
24:24 26:17 27:14
38:3,5,11 46:14
49:7,8 50:2,23
51:2,3 54:17
55:13,14,20 57:3,
12 58:3,5,7,9
59:22 63:20 71:10
74:23 100:19
109:14 111:6
114:5 116:3
121:19 127:10
132:13 147:8
149:1 151:22,23
153:16 154:15
155:5 161:8
162:18 165:12
168:24 170:2
173:14 175:9
181:8,22 182:24
183:4 187:1 191:1
201:16,24 207:4
209:19 214:22
215:1 219:7

**theory**
162:24

**there**
7:20 10:20 11:5
13:23 14:11 15:12,
13,16 16:2,3 17:18
18:19 21:12,14
23:7,16,18 25:6
30:16,19,25 31:3,
6,10 32:2,4 33:7
34:18 38:19 40:3
41:7,22 42:14,15,

21,23,24 43:8
44:8,12 48:7,8
51:4 54:3,7,12,18
55:7 56:1 60:2,20,
21 61:23 64:21
65:4,16,18,22
73:23 77:23,24
79:6 80:4 81:22,25
82:10 84:10,24
87:6,8,9,10,15,20,
21 89:12,14 91:2,
3,9,10,11 92:10
93:13,14 94:1,5,22
100:21 101:11,13
102:12,13 103:16,
19,21,22,24
104:12,21 105:2,6,
16 107:8 109:6,25
111:16 114:10,13
120:6 121:11
122:10 123:17,18
127:13,20 130:5
132:1,2,10 134:7,
13,18 135:10,11
137:17 138:16,18
139:20 140:2,10,
24 141:3,17 142:5
143:25 145:24
146:16 147:4
148:12 150:4
151:9 153:13
155:17 156:14,16,
21 158:24 159:7
161:25 162:3
163:17,22 165:3,
24 167:2,7,10,22,
25 168:1 170:5,6,
11,23,25 172:11
173:23 175:9
176:1 177:24
181:5,7 184:14,22
186:4,16 189:25
190:1 191:21
192:18 195:14,15
200:6 201:1 204:8
205:9 208:24



**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

209:9,11,20,21
210:24 211:22,23
212:1,3,6,7,12,23
213:5,19 214:7
217:16

**there'd**
174:12

**there'll**
51:1

**there's**
7:24 11:7 13:2
15:6 17:7 19:1,3
20:9 22:16,18 26:8
27:21 29:4 30:19
31:8,15 34:24
36:21 37:13 38:7,
14 42:20 43:12
54:24 55:1 57:15,
16 58:25 70:6,10,
14,17 73:4 77:5,8,
25 79:14,16 80:6,9
82:1 83:6 84:13
85:8 88:4 90:20,
22,23 91:1,12
94:6,18,21,23
95:16 97:4 98:8
104:25 114:10,11
115:3 116:1,5,12,
19 118:15 121:7,8,
21,25 122:1,12
125:3 129:18
132:7,9,10 135:14,
18,24 136:1 139:5
140:4,20 142:21
143:7 144:12,13,
15,18 145:25
146:8 147:2,24
148:13,19 150:4
151:9 155:1,15
156:8,15 157:2
160:25 161:24
162:6 168:18,21
169:12,13 172:8,9,
10,11 182:19
183:5 184:20

188:11 193:7,8,9,
10 195:3,21
196:22 204:3,9,10
206:25 207:2
210:15 212:9
214:13,20 218:10,
12,14

**these**
16:11 22:17 36:14
49:22 50:20 60:25
62:22 72:2 76:14
79:11 83:6 113:21,
25 116:5 128:16
136:2,16,18
149:19,24 150:6
156:17 165:5,11
166:2,5,7 167:3,5
179:15 187:17
188:9 189:2,3,10,
19 191:20 198:5
200:15 202:24
205:19 216:13
218:21

**they**
6:11 11:24 15:7
17:17 21:15 25:3,4
26:10 40:5,10,12,
15,17,18,20,24
41:4,5,8 45:2,4
46:2,5 47:12,13,16
48:2,3,6,15,16
49:10,12,17 50:2,
3,14,17 51:1,11,
14,18 52:4 56:4,6,
7,11,25 58:1
59:12,25 60:1,3,4,
5,8,11,14,16,18,
20,21,23 61:4,7
62:23 63:7,9,21
67:11 70:19 71:12
73:4,22 74:6 78:6
85:14,15 90:9,13
93:9,21 96:1
100:13,17,18
102:11 104:24

105:2,4 110:5
115:19,21 117:12
118:6 120:5,10
125:18,22 128:23
131:14 133:17
141:1 143:1,8,20
144:10,21 147:1,2,
4 148:3,4,17,18
149:16,18,24,25
150:5,7,14 151:8
156:3 160:16
163:23,24 169:22
170:4,18 173:25
175:4,6,8,10,15,
16,21,22 180:25
181:8,10 183:5,10,
13,15 189:8,9
193:6 194:4,8
195:4,7 201:22
203:13 206:19
207:5 208:15
212:17,20 214:9,
11 215:13 219:8

**they'll**
15:7 63:24 64:1
91:12

**they're**
21:22,23 40:12
41:2 44:19,22 45:1
47:22 71:11,12
78:9 85:11 87:22
114:3 117:17
118:6 122:16,18,
20 125:23 129:17,
21 131:25 136:17
148:2 151:23
153:16 156:12
169:15 184:11,12,
24 194:3,5 199:20
202:6 206:24
207:7

**they've**
34:7 41:13 63:22
70:23

**thing**
11:13 12:22 13:15
96:7 170:13
184:19 188:19
217:17

**things**
10:19 14:19 15:1
16:11 21:24 23:8
26:21 31:11 32:23
39:7,12 42:25
43:5,7 48:10 77:7
88:4 118:5 122:17
138:13,20 140:11
141:20 148:19
151:10 163:22
166:8 167:11
169:10 171:2,10
177:25 179:15
184:13 191:22
195:9 196:10
197:17 200:5
203:1 205:19
209:15 210:22

**think**
8:9,11 9:14 13:7
15:7,9 18:2,10
19:16 20:11 23:5,
12,15 29:1 30:25
32:8 36:21,23
40:25 41:14 42:11
47:3,11 48:3 50:23
52:9,10,22 54:24
55:15 56:11 58:6,
9,16 59:13 60:8,19
61:19 62:14,17
67:6,16 68:2,11
70:5,14,17 71:9,25
72:12 73:25 74:10
76:24 77:2 78:9,13
79:21 81:18 83:23
85:12 87:19 88:3
93:2 98:1 100:8
101:23 103:2,15,
22 105:4,11,14
106:3 107:7,19,20



**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

109:5,8 110:6,7,20
111:13,14 112:13
113:9 114:1 115:2,
17 116:10,17
117:14 118:13
121:19,25 124:18,
25 125:2,3,6,7,8,
25 127:20 128:4,
10,23 129:2 130:8,
25 136:20 138:14
140:2 141:1 142:5
145:22 147:2,12,
13 148:13,14,19
149:18 150:8
151:4,10,20 152:3,
13 154:6,9,10,11
155:10,13,14
159:23 160:14,25
165:9 166:5,10
167:5 168:9,14,15
170:23 171:8,9,18
172:2 173:12,21
176:14 184:10
185:3 188:15
191:21,23 193:2,
23 195:24 197:11,
15 198:15,25
199:8 200:3 201:2
203:19 205:2
206:12,14,16,17,
19,20 207:13,15,
16,21,22,23
210:23 211:12,15
212:5,15 213:24
214:1,7 215:10,11
216:16 217:8,21
219:2,6,15

**thinking**
22:18 69:17,18
131:24

**thinks**
86:23 97:6

**this**
6:7 7:10,21 9:6
14:6,24 16:15,18,

20,21 17:11,19,22
18:9 19:10 21:1,8,
20 22:2,11 23:18,
19 24:17 27:3
29:16,22 34:16
36:1 38:19 39:8,11
40:13 41:15,22
43:3,12,13 45:8
49:18,24 50:10,17
51:3,20,21 52:17
54:4,5,17 55:5,22
56:3 57:20,23
59:20 61:4,7,20
62:4 63:18 69:17
73:20,24 74:5,9,
17,23 75:16,20
76:22 77:15 78:4
80:2,3 83:5 84:7,
19 86:22,25 88:3
90:25 91:13,19,21,
24 92:2,3 93:19
96:17,20 97:3,17
98:16 99:17
100:13 101:12
104:19 105:1
108:3 109:2,13,14
110:11 111:3
112:6 113:12,18
114:13 116:2
118:16 119:4
128:1,24 134:17
135:6,18,20 136:1
138:25 139:22
140:6,11 141:7,22
142:18 149:10,15
150:3,9,15,23
153:13 154:23
155:11 156:24
157:2,7,9,25
158:1,3,4,5,13
159:24 160:19
161:12,14 163:8,9,
11,12,13 164:9
165:23 166:9
169:18,22 170:1,2,
19 172:8,22,23,24

180:2,5,7,18 181:1
186:14,24 187:8
188:4,15,21,22
190:4,5,15 191:1,
5,18,22 192:3,9,
11,13,15 193:3,13,
16,20 194:17,22
195:16 196:23,25
197:10 198:6,10,
11,22 200:23
201:8,20 202:6,25
209:15 210:8
215:20 216:16,19,
20 217:1,16,23
218:11,15 219:12
220:22 221:6

**Thornton**
150:5

**thorough**
100:15

**those**
6:12 9:24 19:8
20:2 21:16 22:23
24:12 37:16 40:21
46:1 48:21 51:12
54:2,19 55:21
56:15 59:12 61:2
64:6,16,20 65:21,
25 70:4,9 75:9
76:7 78:3 79:8
83:3,8 85:13,15,16
90:6 92:15 94:15,
16 95:23 97:21
100:9,19,22 115:9
116:6 120:20
122:17 123:19
132:11 135:16,23
138:6,13 140:23
141:19 142:3,8,9
143:2,22 145:25
151:10 171:9
176:19,23 180:14
181:9 195:24
201:21,25 202:4,
14,22 203:1 205:7

207:3 210:3,10,21
211:15,24 213:6,
24 214:14,23,24
217:6

**though**
115:9 139:14
152:5 170:3

**thought**
11:18,20 13:9,25
17:5 22:22 23:18
67:3 73:9 80:8
113:5 127:18
151:5 153:21,23
157:4 175:20,21
182:3 194:2

**thoughts**
79:22

**three**
43:22 56:1 142:21
150:22 218:21

**through**
7:19 13:20 18:15
27:11 31:9 38:21
40:24,25 41:18,20
50:13,20 51:3 55:6
56:25 60:23 79:1,
3,4 95:19 101:23
102:17 108:12,25
115:8 125:20
128:11 138:25
141:18 142:10
144:20 154:7,12
170:1,22 177:24
188:1,2 210:4
214:22 221:7

**throwing**
173:15

**Thursday**
9:4 58:8

**tied**
204:1

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

tier
  29:2

tight
  34:9

tighter
  19:23

time
  6:6 7:20 8:8,17
  9:24 12:2,24 15:25
  19:16,18 24:17,20
  26:16 27:3,11,17
  35:9,12 36:1
  40:12,16 41:8
  43:23 47:5,11,16,
  24,25 48:9 51:1,17
  56:5 59:5,22 62:12
  67:16,20,22 68:18
  70:10 87:12 92:17
  99:10,17 101:21
  103:23,25 105:4,
  23 106:3,14,17
  108:13 109:1,2
  110:3 114:7,11
  123:17 124:16
  135:10,13,14,17,
  25 136:1 137:12
  138:6 139:16,18
  140:11 145:25
  146:15 148:16
  151:13 157:16,21
  158:23 163:12
  165:23 166:8,9
  167:9 170:25
  171:3 172:15
  177:19 179:18,23
  181:20,24 193:12
  194:15 200:15
  208:14,18 212:11
  216:4,13,22,25
  217:5 220:6,13,20
  221:6

timeline
  23:1 123:20

times
  8:19,21 43:22
  86:19 89:12 99:22
  113:12 138:15
  151:20 167:6

timing
  10:12 134:8 135:6
  138:10 173:18
  216:17

tired
  12:1

toady
  121:14

today
  7:8 8:24 9:4 19:8,
  22 27:9,21 28:25
  40:9 61:14 87:3
  90:5 92:3 97:10,15
  113:10 125:5,7
  134:16 141:16
  151:21 161:10
  172:14 178:14
  194:11,19 195:2,
  10 196:3 199:10
  211:14 212:5
  220:7

today's
  6:5 8:25 158:7

together
  13:15 33:1 86:22
  98:6 169:18,22
  170:2

told
  77:25 138:14
  160:6 174:13
  183:4

ton
  167:22

tongue
  61:11

took

47:25 58:11
  100:19 172:1
  177:2 209:14

tool
  159:12

top
  15:22 29:2 54:19
  61:11 143:6
  151:21

topic
  15:20 38:20 75:4,
  12

total
  18:16

totally
  20:23 21:23
  199:20

tote
  21:23

touch
  8:17 56:2 88:2
  95:5,7,10

tough
  171:16

toward
  36:11

track
  31:12,13 184:3

tracks
  145:9

trade
  27:15

traffic
  75:3 184:22

train
  17:4

training
  26:20

transacting
  174:3

transaction
  46:8 49:23 64:13

transactions
  19:5 64:15 85:22

transcript
  220:22 221:2,5

transcription
  35:6

transferred
  63:15

traveling
  8:7

treating
  168:13

trebling
  20:9

tried
  22:11 121:15
  141:19 174:8
  214:8

trip-
  47:10

TRO
  134:23 137:3,5

troubleshoot
  159:9

true
  47:10 49:15 94:23
  98:3 161:8 200:9

trust
  31:3 67:11

truth
  193:15

truthfulness
  100:9

try

**UNIVERSAL COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

20:24 22:21 31:11,
13 48:11 79:7
98:14 105:15
144:22 170:14
177:22 179:9
214:25

**trying**
17:10 20:13,14
30:17 44:10,11
45:25 53:3 56:7
62:3,14 84:20 87:2
88:17,19,20,23
89:24 92:14 98:21
101:14 102:6
118:6 136:15,17
137:13 138:12
139:2,12,14 140:9
144:16 148:18
149:8 155:18
161:12 168:24
174:19 184:24
189:22 215:2
218:22

**Tuesday**
9:5,24 189:21

**tuned**
173:22

**turnaround**
27:13

**turned**
44:24

**Turning**
39:14 144:24
164:22

**twice**
175:18

**two**
13:2 21:22,23 29:2
43:15,22 47:23
55:25 65:22 72:2
123:19 124:11
132:11 133:11

138:13 172:12
178:19 214:15
217:1,4

**tying**
51:6

**type**
13:22 21:20 56:19
62:19 64:2 82:1
85:23 126:15,19
140:6 170:22
193:3 203:12
204:4

**types**
79:7 135:12 203:1
205:13,18

**typical**
91:15

**typically**
36:11 52:22 82:17
89:13 202:6 207:1

———————

**U**

———————

**ultimate**
29:3 63:16 93:22
193:19

**ultimately**
29:1 49:13 61:2
71:14 94:19 116:6
148:11 178:6

**un-**
116:13

**unauthorized**
111:17

**under**
16:20 17:19 21:1,
2,4,5,8,18 37:17
52:5,8 59:5 87:2
93:15,20 98:11
199:15,25 210:1

**underlying**
33:9 36:6 37:6
38:22 62:21 70:8,
12,22 71:16 97:4
100:16 204:4
205:5 211:23
218:2

**understand**
20:15 23:25 40:13
44:11 56:7 61:25
63:12 73:9 77:14
83:14 87:24 88:23
89:22 98:25 106:7
115:8 116:16,19
139:21 148:4
149:11 150:1
154:18 161:7
171:6 177:19
178:1 189:19
193:1 197:18
209:18 216:9

**understandable**
147:21

**understanding**
24:22 30:20 35:1
47:15 102:7
111:15,19,23
124:4,11 145:9,13
152:7 157:1,5
159:24 160:5
164:17 165:14
184:5 211:22
212:22 215:4

**understands**
178:14

**understood**
10:21 77:12,14
84:9

**undertaken**
218:10

**underway**
125:21

**undo**
51:9,11

**unfavorable**
146:5

**unique**
217:17,21

**universe**
18:16

**unlawfully**
164:3

**unpack**
36:23

**unquestioned**
116:13

**unrealistic**
172:2

**unsecured**
38:13 73:6,12
169:20 171:21

**unstable**
16:1,2,4

**until**
11:24 12:13 18:14
47:14 65:10
215:25

**untrue**
13:25 14:2,4

**unusual**
12:25 143:23,25

**unwind**
80:10

**up**
7:23 8:14 20:24
23:4 30:17 31:13
41:20 46:16 50:22,
24 51:2 61:18 82:7
94:20 96:24 98:15
100:20 105:13,16
112:22 113:24
115:15 118:5

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

122:18 140:4
145:23 163:6
170:21 178:20
179:10 185:19,24
190:11 209:12
215:2 217:7

**update**
43:22

**updates**
114:13

**us**
11:10 31:4,13
44:18,19 47:14
48:2 50:17,19 53:4
56:13,16 60:4
74:21 81:5 83:15
88:15 94:7 112:25
144:17 148:23
150:19 163:6
194:6 216:6

**use**
59:17 63:8 85:10
101:19 104:23
115:22 133:23
145:15 147:17,22
159:12 163:25
172:3 183:20
184:11 212:21

**used**
7:23 48:3 56:14
81:20 97:8 124:9
183:19 198:9
201:11

**useful**
92:4 117:15
118:15 119:21
120:12,13,21
122:8,11,13
126:16,20 129:10,
15

**uses**
183:11

**using**
21:2 133:12
148:21 151:2
152:10 176:9
184:12 194:3,4
207:1 216:11

**usual**
72:8

**usually**
158:10

**utmost**
136:22

---

**V**

**vague**
34:24

**valid**
79:19

**validating**
15:5 101:4

**validity**
99:8

**valuation**
20:4 25:19,21,24
26:25 85:20 203:2
204:18 205:3,4,11

**value**
18:8 19:1,21 37:21
38:6,8 70:8,11
71:3,4,5,17,22
89:19 173:22,23
203:24 204:2,6
205:7,21

**valued**
202:20,22 203:6

**values**
204:4 208:17

**various**
53:17 61:3 111:17

194:23

**vein**
27:6

**verbal**
108:8 189:17

**Verbally**
108:9

**verified**
39:11 89:14

**verify**
89:21

**Verifying**
90:3

**version**
110:6

**versus**
6:9

**vetting**
214:23

**vi**
165:3

**video**
55:14,18,19,20,23

**Videoconference**
6:1

**VIDEOGRAPHER**
6:3,23 35:8 68:14,
17 106:13,16
157:15,20 158:20,
22 159:1 179:17,
22 220:15,19

**videotaped**
6:1,7

**view**
15:21 22:1 45:12,
13 50:22,25 75:14
80:15,18,21,22,23
84:18 96:3 105:12
115:15 124:24

146:4 169:9
170:23 171:6
174:5 186:9
198:11 207:15

**viewed**
104:4 184:2

**viewer**
185:16,17

**viewing**
87:25 179:25

**views**
76:4

**vis-**
20:4 39:8 84:22
216:18

**visibility**
183:15

---

**W**

**wait**
174:5

**waivers**
51:12

**waiving**
50:12

**Walder**
23:14 218:25

**walk**
41:18 55:5 108:12,
25 139:2

**wall**
15:15 87:5

**Wander**
23:15 29:3 39:18
40:4 41:3 44:5,16
45:11,22 46:4,18
49:16 50:11,18
57:5 79:20,25
80:12 81:9 86:7

**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

95:22 174:13

**Wander's**
45:14 47:9 48:19

**want**
24:6 39:19 56:12
60:18 64:13 68:9
75:6 83:20 88:12
90:13 91:6,22
97:15 106:10
114:8 115:10
116:20 125:16
130:7 136:9
143:25 144:9,15
145:14 147:22
150:25 158:18
163:12 171:24
177:6,9,23,25
182:5,19 186:9
188:1,8,14,23
190:10,24 191:17,
19,20 213:23
214:25 216:21
217:8,9 219:7
220:8

**wanted**
7:24 60:1 74:25
106:5 125:25
143:21 144:7
147:17 148:4
149:10,25 158:14
169:23 188:3,17

**wanting**
60:4

**wants**
193:11

**warn**
11:4 75:8 114:15
182:12

**warrant**
199:4

**warranted**
172:10

**wasn't**
15:9 32:10,15 60:6
65:1 73:18 82:22
88:14,21,22 90:14,
15 103:19 113:17
125:19 133:12
201:24 211:7
215:3,12

**waste**
163:12

**watch**
16:20 17:19 21:2,
3,9 87:2 93:15,20
98:11 199:15,25
209:16 210:8

**waterfall**
31:14 38:12 67:11

**Watkins**
65:21

**way**
25:2,6,7 52:7
63:10,21,24 73:15,
23 93:20 140:8
144:16 153:5
155:11 156:14
158:10 163:6
174:25 183:14
198:4 213:7
218:11

**ways**
204:10

**we**
6:3 7:19,20,22
8:17 9:18 11:11,21
12:1,10 13:14
14:9,16,24 15:1,4,
8,10,16,19,25
16:1,6,9,21 17:11,
12,20 18:4,18
19:18,23 21:9,21
22:8,9,22 23:2,12
24:20 29:7 30:18,
22 31:1 33:4,5

34:5,8 35:4 36:8,
11,12,23 37:3,20
39:5 41:22,23
42:10,16,18,19
43:1,5,6,8 44:7,23
45:2,7,8 46:14,16
47:14 50:15,20,22,
25 51:3 52:22
53:2,3 54:3,4,6,8,
11,15,18 55:22,23
56:8,12 57:9,10,
11,17,19,20,21,22,
25 58:2,3,13,15
60:1,2,6 65:10
66:13 67:22 68:11,
17,20 74:22 79:15
81:2,5 83:7 85:12
86:2,8,9,11,12,16
87:5 88:4,11,12,21
89:1,3,4,6,8,14,18,
20 90:3,13,24,25
91:6 92:9,11,14,21
93:12,13,15,19
95:9,17 96:25
97:1,2,9 98:9,10,
11,12,13,14,15,17,
19 99:13,20,23
100:12,14,19,20,
23 101:4,6,14,16,
18,21 102:1,11
103:16,21 105:9
106:19 108:15,19,
20 109:13 110:21
112:20 114:1
115:3,6 116:5,10
120:6,10 121:12,
13,15,17,18 123:8
125:18 128:9,10
135:15 138:17,21,
24 139:1,2,3,4
140:3,6,23 141:18,
21,23 142:8
143:21 144:7,8
145:19 146:14
148:16 149:8,10
150:1,11,24 151:4

154:9 155:22
156:8,13 161:3,11
162:20 163:17
167:22,23,25
168:2,25 169:11,
17,18,21 170:1,13,
15,19 171:21,24
172:22,24 175:4
177:7,18 179:15
183:22 184:11
187:9,18 188:14,
18 189:18,19,22
191:19 195:5,11
196:1,10 198:13
200:12 203:6
206:12,17,21
207:7,15,18,20
208:4,13,21,22
209:9,10 210:23
211:13,15,17
212:11,15,21
213:3,18 214:20,
22 215:1,2,15,22
217:2 218:20,22
220:8,10,13,16

**we'd**
162:19

**we'll**
8:16 18:19 122:22
123:18 140:7
149:22 217:7
218:21

**we're**
12:22 13:20 21:11
22:17 35:11 36:25
37:2,18 41:7,24
42:11,16,17 43:9
44:9,10,11,15,18
45:18,19 49:25
50:1 53:2,3 66:9
67:21,23,24 81:3,4
86:12 87:1,9,11
89:1,2 90:1,5
91:15 92:3 94:1,5
98:21,23 101:4

**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

106:16 113:14
115:8,23 118:20
123:23 124:5
135:20,23 136:21
139:12 143:9
144:16 145:19,21
150:20 157:20
159:1 162:17
165:22 170:21
179:22 180:1
184:17 188:1,18,
23 199:10 204:25
207:22 215:22
217:2 220:9

**we've**
7:23 14:14 34:7
39:13 54:20 55:9
57:23 67:9 80:8
81:3 83:2 86:5
89:17 91:5 98:15
109:13 177:24
195:9 202:7 207:1,
16 209:6 212:6,12,
23 216:19

**website**
105:19

**Wednesday**
58:5,15

**week**
8:7,8 42:15 43:22
57:6 58:4,5,6,10,
11,14 78:4 184:21

**weeks**
18:18 54:6 150:20

**went**
50:20 51:3 57:12
83:4 128:10 170:1
187:5 211:15
214:22

**were**
11:5 12:1 13:23,25
16:2 20:20 22:23
24:9 31:1,3 35:1

40:15 43:2,5,8
44:4 45:2,5 46:5
47:12,13,16 48:2,
6,15,16 49:13
51:12,14 54:6,8,
14,15 55:21 56:5,
7,25 58:1 59:25
60:3,4,5,8,14,17
61:2 62:11 64:15,
16,20 65:11,13,22
67:22 72:2 74:22
77:23 78:3 86:12,
15 89:16,20 92:14,
16,19,21 93:12,13,
21 98:17 101:14,
21,22 102:11,13
103:9 104:8,24
106:19 115:19,21,
25 121:13,17,18
138:16,17,20,21
139:1,3,20 141:3,
10,22 142:4,15
144:4,7,8,17
146:2,14 147:4,7
148:18,21 149:8,
24 151:6 156:3
161:15,16 164:2
166:3,12 167:22,
23,24 169:11,17,
19,22 173:25
175:20 176:19
180:6 181:12,15
182:20 183:2
187:18 188:5,9,18
191:24 192:5,23
193:24 194:12,19,
24 195:17 196:4
197:6 198:13,16,
22 200:1,6 201:1
202:3,4,9 206:1
208:13,18 209:13,
21,23 210:4,11,21
211:10 212:3,7,18,
20 213:7 214:7,20
215:2 218:22
219:20

**weren't**
48:16 60:6 86:17
147:2 200:10

**what**
7:16 8:25 10:5
11:2 12:4,8 13:4,7
14:20,22 15:7
16:10 17:15 20:13,
14 22:9,12,25
24:16 25:17 26:6
27:7 30:9 31:25
35:21 36:5,13,24,
25 38:8 39:1 40:19
43:4 44:18,19 45:4
47:14,25 48:11
49:18 52:10 56:2,
4,7,8,10,13,17,18
57:10 58:12 59:3
62:11,25 63:10,11
67:2,7,13 68:5,10
70:20 75:24 76:22
79:3,22 80:2,7,25
82:6,17 83:20,21,
22 84:23 85:9,17
86:11,23 87:2,7,18
88:9,10,12,16,19
89:2,4,6,20 90:1,5,
9,12,18 91:2,7
92:7,13,16,23
93:10 94:1,2 97:23
98:3,6,9,10,25
101:9 104:25
105:17,25 107:5
108:12 109:1,14
110:9 112:11,12
115:13 117:10,11,
15,20,21 120:4,25
122:4 123:25
127:4,23 129:21
134:13,16,20
135:5 136:4,14,19,
25 137:11,14,15,
23 138:7,8,12,14
139:12,14,22,24
140:9,18,22,23,25

141:2,5,6,13,19,20
143:8,10,16
144:21 146:25
147:21 149:5,12,
20 150:5,22 153:7,
19 154:10,11
155:5,18 159:19
160:19 161:5,7,12,
17 162:8,17
163:17,23,24
165:8 166:9 168:3
169:8 172:13,25
173:2,25 174:19,
20 175:4,19
176:22 177:24
180:8 181:8,10,18
184:3,10,11,12
186:1,2,6 187:24
188:23 189:22
190:25 193:5,19
194:8 195:10,25
196:1,8,16,23,25
197:9 198:10,14,
18 200:2 201:6
203:4,21 204:8,25
205:25 206:7
207:15 208:4,5,17
209:16,21,22
210:9,10 211:6,12,
21,24 212:16,17,
18 214:17 215:3
217:18 219:11

**what's**
15:5 17:8 19:8
32:17 36:15 38:3
66:7 89:19 90:18
98:20 117:20
122:22 136:4
142:20 154:16
158:17 186:13
195:11 198:6,8
209:3

**whatever**
13:19 51:25 64:4
91:13 93:10

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

110:18 135:21
138:1 144:14
178:22 181:14,22
182:6 187:1
193:10 211:12,13

**Whatever's**
183:9

**whatsoever**
152:22,24

**wheelhouse**
204:25

**when**
10:5 14:24 15:22,
25 24:3,8,16 25:2
27:19 28:14 32:11
36:1,8 41:19,23
43:8 44:4 46:6,16
54:3 63:5 74:23
76:13 90:8 97:11
101:9 103:19,20
107:24 109:12
112:14 114:5
115:13,14 117:7
121:12,13 122:17
123:15 136:2
142:14 146:13
147:1 166:19
167:22,25 169:11,
17,21 170:1,2
193:4,5 200:22
201:23 207:17
208:13 209:9
210:9 212:17
219:8

**whenever**
200:14

**where**
16:13 20:16 24:20
28:18 31:1,12
40:4,10 51:1 56:2
61:14 74:22 82:1
83:11 85:11 87:6
89:18 90:25

116:13 120:9
121:24 139:20
158:16 165:10
183:7 203:24,25
217:20

**whereas**
20:18 125:10

**whether**
7:24 21:7 23:11,21
33:2 41:2 64:19
77:13,18 78:17
79:18 80:11,16,19
81:9 83:25 94:3,
15,16 95:22
100:10 102:8
104:9 112:18
113:20 122:1
133:17 137:4
140:13,14 146:4
154:4 155:16,19
162:20 164:5,6,11
165:12 192:19
194:12 208:24
210:9,19 212:2
213:6 219:18

**which**
8:3,9 20:19 23:22
24:3,17 30:18
34:5,7 35:1 38:5,8
39:4 40:11 41:10
43:10 46:19 49:1
51:4 52:20,23 53:4
73:15 78:11,22
81:24,25 95:11
97:3 98:15 119:19
120:9 121:5
125:21 135:3
149:22 150:14
156:9,23 162:8
163:18 170:5
176:19 179:11
205:20

**while**
57:14,18 93:13

176:16 179:15
185:1 199:3 200:4

**white**
186:7

**who**
28:25 40:21 45:16
49:5,10 54:6,7
56:2,17 57:10
58:17,18 82:6
85:25 88:23,24
103:1 111:21
112:22 113:24
147:18 148:8
153:13 154:23
155:2 160:6
181:15 184:25
194:4 203:7
217:10,14

**who's**
15:3 24:21 49:23
54:7 128:12
149:17 174:4

**whoever**
178:6

**whole**
8:11 11:13,22
38:7,15 143:15
173:24

**whom**
6:11 52:19 65:15
73:1

**whose**
176:19

**why**
12:20 20:15 22:9
33:16 50:25 51:19
60:14,18 71:10
75:6 80:1 82:6
85:5 87:5 89:24
90:15 91:18 93:5,
7,9 97:25 99:7,20
103:17 114:7,9

115:6 118:7 124:1
125:1 127:18,25
129:25 133:5
138:25 142:21
143:9 144:20
148:4 149:13
154:15 157:11
160:15 162:6,23
165:18,19 166:22
168:7 177:8 191:7
192:4,22 193:23
196:18,22 201:7

**Wickersham**
65:8

**wife**
163:3

**Wiley**
204:16

**will**
6:7,10,24 8:23
15:6 21:14,15,16
41:7 53:14 63:24
89:8 91:11 179:11
180:5 220:9

**willing**
216:22

**win**
73:4 171:20

**window**
185:15

**winning**
205:12

**wish**
220:11

**with**
6:12,13 8:24 9:2,
14 10:22 11:2,5,7,
10 12:6 13:1,11,24
14:20 17:21 21:20
22:10 23:3,13
26:14 27:1,20

**UNIVERSAL**
**COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

29:6,17 30:4,17
31:12,13 33:15,21
34:1 35:6,23 36:11
37:8,9 38:1 40:4
44:5,10 45:14,19
46:11 49:23 50:21,
22,25 53:5 54:6
55:8,9,13,14,19,22
56:16,20,24 57:13
59:20,22 60:3
62:5,8 64:11,18,
19,23 65:1,4,8,10,
12,15,24,25 66:5,
20 68:23 69:21
75:10 80:25 81:5,6
83:1,24 85:14 86:3
87:20 88:5 89:3,4
90:7,8 91:2,5,19
92:13 94:20 95:3,
5,7,10,18 97:11
98:16 99:2 100:5,
11 101:1,25 102:3,
19 103:11 104:15
105:14,20 106:4
109:8,10,15,23
110:15,21,22,23
112:1,22 113:24
114:14,16 120:16
123:24 124:6
128:11 129:8
130:21 133:8,9,15,
22,24 134:19
135:5 137:12,13
142:5,7,25 143:4,5
145:13,15,21
146:12 147:14,18
149:9 150:17,19
153:18 155:6
159:8 163:12
164:20 170:7,14
173:10 174:3,9
176:3 178:7 180:7
181:18 182:6,10,
11,14,21 184:8,16,
21 185:3 187:6,19
188:10 189:11,24

194:6 197:23,25
198:2 202:19,21
203:1,2,8 204:19
206:25 207:8,14,
17 208:2,25
210:16 212:2,8
213:20 214:21
215:6 216:6
217:11,15,18,21
218:2

**withdraw**
31:19 161:18

**within**
121:24 127:13

**without**
11:5 53:16 63:12
87:8 110:22
172:19 208:17

**witness**
6:25 9:20,22 11:9
13:18 18:1 20:23
26:23 27:15 31:25
34:3 35:1 36:20
45:25 46:24 53:11
62:14 67:5 68:1,7
74:20 75:11,18
76:10,21 78:20
83:18 90:17 95:25
108:10 111:3
112:11 114:18,22
115:2 118:4,24
128:22 134:2
137:20 143:14
145:23 146:24
147:12 158:21
177:13 178:23
179:2,6 182:16
188:25 190:5,7,10,
19 195:21 196:8,
20 197:9,21 198:4,
25 205:9 206:5
210:14 213:11
214:7 217:20
218:9 219:4

221:10

**won't**
67:7 161:15

**wonderful**
96:7

**wondering**
83:25

**woodwork**
42:25

**word**
32:22 48:3 56:15
72:8 81:20 120:12
122:10 148:7
152:10 166:10
198:9

**words**
17:14 80:5 88:25

**work**
8:3 14:8,10 23:3,4,
6 27:7,19,21,23
38:16 47:19 60:11
63:3,18 81:22,23
82:1 84:23 85:24
92:11 97:11
100:25 103:24
148:17 152:17
153:13,19 154:2,
23 159:17 160:4,9
170:9 184:20
212:25

**workbook**
28:15

**worked**
43:11 48:7 55:9
97:2 103:22
128:11 151:9
153:8,9,10 154:16
179:15

**working**
54:6 56:23 65:1
89:7 92:13 94:5

95:9 98:23 102:3
109:8,23 110:9,20,
23 114:4 123:14
135:15 144:8
151:24 154:12
155:16,20 156:2,4,
12,13,16,20 157:3,
4 159:25 161:2,3,
16,22 162:18
163:6,22 207:7,14
215:14

**works**
7:25 109:11
145:13 151:22
155:2 178:22

**world**
96:3,20 121:25
217:17

**worth**
19:10 20:20

**would**
8:3,21 12:21 13:16
17:19 18:2,8,12,
13,23 19:9 21:21
28:19 34:13 37:1,
16,20 38:13,21
44:1 46:3,8 48:13
50:17,18,23 51:1,
2,25 52:1,20
57:19,21 67:12
69:16,25 70:1,5,
19,21 71:10,17,22,
23 73:2,5,13,14
75:14 78:16,17,24
79:7 80:7,12,15
90:9 93:5,7,9
100:8 101:15,16
102:6 104:23
107:24 109:9,12,
14 114:7 116:1
117:4,15 118:1
119:20 120:20,25
122:7 123:20
124:23 125:6,8,16

**UNIVERSAL
COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

126:4,15,16,19,20
128:22 129:10,15
130:9 139:7
140:11,22 141:4
143:8,9 144:11,17
145:8 146:5 147:8,
22,25 150:14,21
151:2,5,11,12
152:17 153:16
156:14 160:12
161:8,20 162:20
163:3 166:22
167:17 168:4,11
171:7 172:25
173:5 181:21,23
184:15 185:5,12
189:8,9 191:1
192:10,25 193:1,4,
19 196:22 198:1,5,
7 199:23 201:25
202:11,13,14
203:16,19,21
204:2 206:14
209:15 212:21
218:1,7

**would've**
181:22

**wouldn't**
25:1 37:3 44:22
45:18 48:11,12
50:15 67:12 72:18
110:22,24 141:3
145:12 148:1
162:1 173:25
181:2 204:21
214:25

**wouldn't've**
148:3

**wow**
42:9

**write**
63:7,9

**writing**

63:6 64:20

**written**
40:14 204:12

**wrong**
32:9 36:17 39:10
111:14 120:8
153:21 154:11
208:7 212:11

**wrote**
134:17 166:9

––––––––––

### Y

**y'all**
106:10

**yeah**
8:16 9:14 10:18
24:1 27:2,25 28:1,
3 29:16 33:14
34:23 38:16 39:20
40:15 41:21 42:7
44:3 46:15 47:7
49:1 50:8 51:8,10
53:2,11 54:20
56:22 61:6,9,25
62:2 68:1 73:13
74:2,3 79:1 80:24
81:18 82:21,24,25
84:19 87:1 89:23
92:8 96:7,19 97:9,
12 99:6 101:3
103:5 104:21
106:3 107:23
108:5 113:11,13
115:2,17 117:24
123:25 124:18
128:16 132:5
134:2 137:7,9
140:22 146:7,11,
13,19 147:12
148:11,25 149:11
154:25 156:20
157:12 159:22
161:1 162:16

163:25 174:18
184:1 189:23
190:24 199:20
204:16 206:16
214:7 220:15

**year**
40:14 108:4
150:16

**years**
27:14 55:9 85:8
87:15,17 91:3,8
93:11 96:25

**yelling**
17:19 143:6
172:25

**yep**
48:5 190:13

**yes**
7:12,15 8:2,20,22
10:17,24 11:1
12:16 15:25 16:17,
20 19:16 22:5
23:24 24:5,14
25:10,12,14,16
26:5 28:8 29:24
30:8 33:20,23
35:20 38:24 39:24,
25 40:1,6,8 41:17
42:1,6 49:2,4,19
50:10,14 52:15,18
53:9,20,23 55:7
62:10 65:14 67:1,
4,6 69:6 72:16
74:14 76:12 77:17
79:21 80:17 83:18
84:16,19 85:2,4
86:11 90:7 92:6,
21,24 94:25 95:21
99:3,13 100:2,4,7,
12 101:3 103:10
104:7,18 106:21,
25 107:4 108:10,
17,21 110:13
111:24 112:2,5

116:25 117:2
119:2,5,7,15,25
120:2,24 122:14,
25 123:4,10
125:12 126:12,14,
23 130:17 131:5,8,
11 132:16 133:21
134:12 141:8,12
143:1 145:7,11,14,
19 150:19 151:18
154:3,8,14 158:6
159:15 162:10
163:21 164:21
165:1,7,17 166:21
167:18 169:3,7
173:7 176:4,7,11,
18 177:21 178:4,
16 180:4,9,12,15,
19,21,23 181:17
185:7 186:17,22
187:4 191:4,13,15,
16 192:8,12,14,17,
21 193:14,17,22
195:3 197:21
199:12,17,21
200:25 201:4
202:2,6,11,23
206:3,5 209:1,25
210:6 211:4
212:21 213:4,22
216:2,12,16
217:13,20 220:23

**yesterday**
12:15,18,24 13:12
41:22 42:8,9
132:10 146:8
170:24

**yet**
18:18 140:19
195:5 203:24

**York**
7:18 10:5,6,9,14
14:19 19:23 20:10,
16 21:11 29:17
31:1,23 37:6 39:3

**UNIVERSAL**
**COURT REPORTING**

Office Phone: 954-712-2600
Email: info@ucrinc.com
Website: ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

65:25 66:6,10,20
69:3 76:15 92:5
93:24 100:3
114:12 116:23
117:16,22 118:2
121:11 122:2
124:9 125:20
126:5,11,17,20
129:11,16 132:11
145:24 146:14
148:16 199:10,14

**you**
6:23 7:8,9,10,13,
23,25 8:15,16,21,
24,25 10:4,5,8,11,
22 11:2,4,6,8,11,
24,25 12:4,11,14,
17,20 13:3,7,11,
19,24 14:7,12,14,
16,17,20 15:6,15,
19,22 16:11,18
17:11,12,13,14,15,
17,18 18:8,15,16,
23 19:3,9 21:8
22:3,6,10,11,12,
21,24 23:10,14,17,
20,23 24:3,6,13,
16,17 25:1,8,11,
21,24 26:16 27:1
28:6,12,14,22
29:13,19,21,25
30:7,9,14,22
31:18,21,25 32:8,
9,18,23,25 33:11,
12,17,18,21 34:6,
8,13,20 35:22,23
36:1,2,7,14,22
37:17 38:1,3,12,
13,15,20,21,25
39:8,9,15 40:3,4,
21 41:2,10,14,18,
19 42:14,23,24
43:4,9,10,21,22
44:4,5,9,20 45:1,5,
6,7,8,9,14,17 46:1,

11,19 47:4,5,6,16,
19,21,23,25 48:7,
9,10,12,13,16,20,
23,25 49:5,24 50:6
51:13 52:12,16,19,
21,24,25 53:1,7,
13,19 54:3,10,11,
16,17,18 55:2,5
56:2,3,4,10,12,14,
17,18,20 57:8,15,
17,20,22 58:1,2,
12,24 59:18,19,21
60:3,18,19 61:11,
12,19,20 62:4,7,8,
11,17,18,20,21
63:10,11,12,19,25
64:4,13 65:7,12,
13,16,24 66:4,11,
14,16,19,22 67:2
68:4,5 69:10,15,
24,25 70:4,15,20
71:21 72:2,5,7,13,
18,22,23 73:2,3,9,
12 74:4,9 75:8,14,
23 76:5,12,14,18
77:13,14,18 78:13,
16,17,18,25 79:1,
3,7,18 80:5,6,9,12,
15,18,22 81:7,11,
12,19 82:4,5,6,7,
12,13,15,17,19
83:2,5,17 84:6,10,
12,13,14 85:1,9,
10,16,17,19 86:15,
18,20,24 87:11,12,
13,17,18,25 88:20
89:11,13,15,22
90:8,11,13 91:4,
10,12,18,20,22,23
92:19 93:17 94:3,
10,15,16,18 95:3,
14,22 96:3,10,17
97:8,10,14,15,19
98:1,3,6,17,20,21
99:1,10,12,21,24
100:8,23 101:9,15,

16 102:7,13,14,19
103:1,4,6,8,11,13,
17,21,25 104:1,4,
8,25 105:2,11,20,
25 106:4,7 107:5,
20 108:6,12,13,22,
23,25 109:1,3,17
110:11,21 111:3,4,
11 112:7,17 113:3,
8,11,13,20 114:5,
15,21 115:10,13,
14 116:1,8,22
117:3,25 118:7,8,
9,10,13,16 119:1,
3,6,8,11,12,18,24
120:1,3,4,15,23
121:1,13,24 122:1,
4,15,17,19,24
124:1,8,16,22
125:16,25 126:4,
15,19,24 127:4,9,
13,16,18,25 128:5,
14,18 129:8,13,18,
24 130:9 132:3,9
133:2,14,17 134:5,
7,11,13,22,23
135:5 136:9,14,21,
24,25 137:6,11,22,
23 138:1,9,12,13,
14,25 139:5,6,11,
14,21,22,24 140:1,
8,13,14,18,19
141:3,5,9,10,14,17
142:13 143:15
144:4,9,15,16,17,
20,22 145:3 146:2,
3,4,10,12,25
148:3,14 149:2,9,
20,21,22 150:4,19,
22 151:9,14,17,19
152:1,5,7,11,17,
21,24 153:16,19,
21 154:2,4,10,11,
12,15,22,23,24
155:5,18,19 156:6,
19,25 157:6,9

158:5,7,14,16,18
159:4,14,20,23,24
160:6 161:4,14
163:3 164:10,17
165:6,19 166:1,6,
10,18 167:3,5,13,
17,19 168:10,15,
19,20,24 169:1,4,
5,19,20,21 170:6,
8,16,17,18 171:5,
14,15,20,24 172:2,
12,25 173:1,10,11,
15,18 174:1,2,8,
13,23 175:2,6,12,
15,20 176:2,5,8,
12,19,22 177:2,7,
9,12,13,19,25
178:5,7,12,13,18,
20,22 179:1,4,6,9,
11 180:5,8,14,16,
17,24 181:11,12,
15,18,25 182:7,12,
18,20,24 183:7,8,
11,20,21,24 184:6,
7,17,23 185:1,11,
19,20 186:1,4,5,8,
9,13,15,21 187:5,
7,12,13,16 188:4,
5,6,9,12,14
189:12,19 190:5,
22 191:1,6,12,14,
24 192:2,4,9,11,
13,16,22 193:10,
15,23 194:11,14,
16,17,18,19,23
195:1,7,15 196:3,
4,9,17 197:2,5,9,
18,23,25 198:1,9,
14,15,21 199:2,3,
4,9,23 200:1,4,6,
10,22 201:1,5,10,
23 202:19,20
203:1,14,16,21,25
204:1,3,13,14,19
205:10,15,16,18
206:10,14,15

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC vs LEADENHALL CAPITAL
Ratner, Ian on 03/06/2025

207:12,23 208:2,7,
22,23,25 209:3,4,
14,16,17,19,21,22
210:9,19,22
211:20 213:24
214:1,25 215:9
216:8,23,25 217:6,
7,8,14,17,24,25
218:3 219:7,9,14,
17,23 220:4,8,11,
17,18,21,25 221:1,
3,4,6

**you'd**
78:13 130:7
177:10

**you'll**
58:2 92:9 149:22
216:23

**you're**
26:4,23 32:18 38:5
39:4,17 48:19 49:1
51:6 52:12 56:14,
22,23 67:19 72:2
73:8 76:14 78:11,
22 83:25 84:10
85:9 86:20,24
87:14,25 91:2
93:11 97:23,24
98:3,4,5,18,25
99:22 107:2,9
114:25 118:8,11
122:10,12 126:8
129:24 130:6
134:23 138:9
139:19,22 140:9,
10 141:7 147:25
156:10,22 162:6
165:15 168:13,15
170:17 176:25
178:14,19 179:25
184:14 187:2
193:18 194:11
207:9 219:10,12

**you've**

8:18 16:11 29:12
33:1 47:23 53:14
69:18 71:20 80:7
85:18 97:14,18,19
99:2,17,20 113:12
127:1 141:1
157:23 161:5
163:9 180:10
193:18 195:15
202:21 204:12
216:9 220:7

**you-all**
92:2 104:18

**Young**
149:21

**your**
7:13 13:11 15:21
17:4 22:1 26:2,22
27:7 33:1 34:14
35:16,17 38:25
39:14 41:14,20
45:4 48:18 50:5
53:13 56:17 62:9
64:18,19 71:19
75:10,15 76:19
77:19 79:22 80:15
81:17 84:9,19,20
85:5,25 87:23,25
88:1,19,21,25
89:12,21 90:3,9
91:24 93:17 95:7
96:3 97:5,16 98:2,
4,5 101:1 104:5
105:12 109:18
110:14,17 111:22
112:13,14 113:9
115:1 116:11,16,
17 118:12 119:9
122:7 123:13
124:24 128:15
134:5,22 135:2
143:23 150:1,2
151:14 154:9,16
155:19 159:24
160:12 161:8,13,

15,20,21 162:5,17,
25 163:8,12
164:15,22 165:16
169:1,9 172:3
174:5,21 178:1,2,
7,14 180:20
182:14 183:8,21
184:5,16 185:23
186:16 187:19
190:3,4 191:2
193:13 196:3,15
199:15,19,25
200:8,12 209:2,16,
18 210:8 213:19,
20 215:4 216:8
217:5 219:2,7
220:6,11

**yours**
189:15

**yourself**
51:6 52:16 53:1,7
75:23 81:7 103:13,
18 104:1 179:5

---

## Z

**zero**
191:17

**zoom**
118:20 178:6



**UNIVERSAL**
○ **COURT REPORTING**

**Office Phone:** 954-712-2600
**Email:** info@ucrinc.com
**Website:** ucrinc.com