# CADWALADER

Cadwalader, Wickersham & Taft LLP
200 Liberty Street, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

May 5, 2025

**VIA ECF**

**APPLICATION GRANTED**
**SO ORDERED**

The Hon. John G. Koeltl
Daniel Patrick Moynihan Courthouse
United States Courthouse
500 Pearl St
New York, New York 10007

John G. Koeltl, U.S.D.J.

5/6/25

Re:   **A-CAP Defendants' Letter Motion to Seal** – *Leadenhall Capital Partners LLP, et al. v. Wander, et al.***, No. 24-cv-3453-JGK (S.D.N.Y.)**

Dear Judge Koeltl:

   We write on behalf of Advantage Capital Holdings LLC and Kenneth King (together, "the A-CAP Defendants"), under Practice VI(A)(2), to request that the sealing of certain documents filed by Plaintiffs ("Leadenhall") in support of its Motion for Contempt, Dkts. 281, 282. When sealing documents, courts consider: (1) whether the documents are judicial documents; (2) the weight of the public's presumptive right of access; and (3) balancing competing considerations. *Mercantile Glob. Holdings, Inc. v. Hamilton M&A Fund, SP*, 2024 WL 1974276, at *1 (S.D.N.Y. May 3, 2024) (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006)) (sealing "business plans, detailed financial information, and financial projections" that would "unfairly aid its competitors").

## 1.   Leadenhall's Citations and Exhibits from Parallel Proceedings Must be Sealed.

   Leadenhall filed with its motion sealed documents from proceedings in Utah and South Carolina—documents ruled to be "Protected," "PRIVATE," or "confidential."[1]  *See Atlantic Coast Life Ins. Co., et al. v. S. Carolina Dept. of Ins.*, No. 24-ALJ-09-0427-CC, slip op. at 1, 23 (S.C Admin. L. Ct. Feb. 13, 2025) (attached as **Exhibit A**); *In re: Sentinel Security Life Ins. Co., et al.*, No. 2509902339 (Utah Dist. Ct. Apr. 24, 2025) (classifying as "protected" and marking "**** PRIVATE ****" documents filed here as Dkts. 282-13, 282-15, 282-16, 282-17, 282-18). Those documents are now provisionally sealed before this Court. They should be sealed here

---

[1] Leadenhall's brief refers to and attaches several such documents. Dkts. 281 at 5, 12, 13, 18, 19, 21, 22; 282-13; 282-14; 282-15; 282-16.

**Jonathan M. Watkins**  Tel +1 (212) 504-6229   Fax +1 212 504 6666   jonathan.watkins@cwt.com

**C A D W A L A D E R**

The Hon. John G. Koeltl
May 5, 2025

permanently both as a matter of comity[2] and to prevent further undue harm to A-CAP and its companies' policyholders.

The risk of undue harm here is pronounced: Leadenhall has selectively publicized only certain sealed documents, and has done so to support arguments based on several false representations, which threatens to make this court's docket a "reservoir[] of libelous statements for press consumption." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978). Take Leadenhall's filing and treatment of selected "orders" in Utah and South Carolina. Leadenhall represents that those "emergency orders cover all A-CAP's operating businesses." Dkt. 281 at 12. That is not true. As widely reported—including to Leadenhall—in industry press, every one of those orders (or their effects) was subsequently reversed, stayed, or permanently enjoined.

For instance, in "a scathing 24-page decision" issued after a full evidentiary hearing, South Carolina's Chief Administrative Law Judge "rebuked the department's process,"[3] found that its "unsupported by the evidence in the record," Ex. A at 2, and permanently enjoined the enforcement of the December 2024 order of the South Carolina DOI:

- Chief ALJ Anderson "concluded that Petitioners met their burden of proof to show that the Director's December 11, 2024 Order is unsupported by the facts and contrary to the law." Ex. A at 2. In so ruling, the tribunal found Mr. King's "testimony to be highly credible and convincing." *Id.* at 11 n.20.

- Contrary to Leadenhall's assertions, Chief ALJ Anderson found that "A-CAP has . . . taken steps in good faith to reduce its exposure to 777. . . . A-CAP has also exercised its rights as a lender in an effort to . . . take control and sell the 777 assets that serve as protective collateral on its loans. . . . Notably, A-CAP has not simply liquidated all of its assets but is rather methodically liquidating them to sensibly preserve the value of 777 assets." *Id.* at 11.

- Contrary to Leadenhall's false representation of what "[s]tate regulators have found," Dkt. 281 (quoting Dkt. 282-16), Chief ALJ Anderson found, over an "unsuccessful[] attempt[] to impeach Mr. King's testimony," that A-CAP has not "t[aken] control of

---

[2] *See, e.g.*, *Doe v. Lerner*, 688 F. App'x 49, 50–51 (2d Cir. 2017) (per curiam) (holding "that sealing was appropriate for . . . documents sealed in related proceedings").

[3] John Hilton, *SC judge rules Atlantic Coast can stay in business; rips regulators*, Ins. News Net (Feb. 13, 2025), https://insurancenewsnet.com/innarticle/sc-judge-rules-atlantic-coast-can-stay-in-business-rips-regulators.

# CADWALADER

The Hon. John G. Koeltl
May 5, 2025

777 . . . is not affiliated with 777 and, as explained by Mr. King, A-CAP has merely take control of asserts which secure their loans." *Id.* at 11 n. 22.

That order also spelled out the harm that had been caused by previous publicization of the department's December order: it "tarnished [A-CAP's] credibility in the market," caused financial harm to A-CAP, and "financial loss to the public." *Id.* at 15.

Leadenhall's reference to the Utah proceedings is similarly misleading—it also omits that the Utah Insurance Department announced that it paused any further litigation against A-CAP's affiliates to participate in mediation.[4] Consequently, these documents—Dkts. 281 at 5, 12, 13, 18, 19, 21, 22; 282-13; 282-14; 282-15; 282-16; 282-17, 282-18—currently provisionally sealed, should be formally sealed both as a matter of comity and to prevent that harm.

## 2.  A-CAP's Commercially Sensitive Information Outweighs the Presumption of Public Access.

In addition to the foregoing, Leadenhall also filed publicly entire deposition transcripts, only portions of which are relevant to A-CAP, as well as other confidential documents that disclose A-CAP's current confidential commercial information. For these documents, the "possibility of competitive harm to an enterprise if confidential business information is disclosed" is a "countervailing consideration[] that may overcome even strong presumptions of public access." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2023 WL 1966134, at *3 (S.D.N.Y. Jan. 17, 2023).

As discussed below, each of the following documents discloses specific information about A-CAP's business, including its current financial information, its business strategy, and the terms of confidential transactions. Consequently, A-CAP seeks an order formally sealing the following documents (as indicated) to protect its confidential information, the disclosure of which would harm A-CAP in conducting its business, and in turn, harm A-CAP's policyholders:

| Dkt. | Document | Pages to Seal | Reasons for Sealing |
|---|---|---|---|
| 281 | Leadenhall Mem. of Law | Portions of 4, 8, 9, 10, 11, 16, 17, 18, 20. 22 | Discusses the terms of A-CAP's loan agreements and its TAMI and Everton negotiations, disclosing A-CAP's strategy and impairing pending deals. |

---

[4] *Sentinel Security Life Insurance, Haymarket Insurance, and Jazz Reinsurance Companies*, Utah Insurance Department (Apr. 30, 2025), https://insurance.utah.gov/sentinel-security-haymarket-jazz-reinsurance/.

C A D W A L A D E R

The Hon. John G. Koeltl
May 5, 2025

| 282-1 | Exhibit A | Entire Document | Discusses the pending TAMI valuation negotiations, which disclosure harms the TAMI negotiations and valuation of other assets. |
|-------|-----------|-----------------|-------------------------------------------------------------------------------------------------------------------------------|
| 282-8 | Exhibit H | Entire Document | Discusses A-CAP's business strategy and senior lender funding priorities, as well as current contractual rights A-CAP possesses, the disclosure of which harms A-CAP's ability to negotiate with counterparties and maximize asset value. Further discloses certain confidential terms of the Everton deal, which the Court previously sealed (Dkt. 222). |
| 282-10 | Exhibit J | Entire Document | Same as 282-8 concerning Everton. |
| 282-17 | Exhibit Q | Entire Document | Confidential statement concerning A-CAP's current financial position and strategy, which disclosure will harm A-CAP's ability to negotiate with third parties over assets. Sealed by court order. |
| 282-18 | Exhibit R | Entire Document | Same as 282-17. |
| 282-25 | Exhibit Y | Entire Document | Same as 282-8. |

\*      \*      \*

For the foregoing reasons, A-CAP respectfully moves the Court to order the foregoing documents to be formally sealed.

Respectfully submitted,

*J. W. T*

Jonathan M. Watkins

JMW

cc:    All Counsel of Record via ECF

# EXHIBIT A

## STATE OF SOUTH CAROLINA
## ADMINISTRATIVE LAW COURT

Atlantic Coast Life Insurance Company )    Docket No. 24-ALJ-09-0427-CC[1]
and Southern Atlantic Re, Inc. )

Petitioners, )

v. )    **ORDER**

South Carolina Department of Insurance, )

Respondent. )

**APPEARANCES**:   For the Petitioners:   Brandon Gottschall, Esq.
                                 Carl Micarelli, Esq.
                                 Robert Fettman, Esq.
                                 Eric Dinallo, Esq.

           For the Respondent:   Anthony Ibarra, Esq.

### STATEMENT OF THE CASE

This matter comes before the South Carolina Administrative Law Court (Court or ALC) pursuant to a request filed by Atlantic Coast Life Insurance Company (ACL) and Southern Atlantic Re, Inc., (SAR) (collectively, Petitioners) to enjoin Respondent South Carolina Department of Insurance (DOI or Department) from enforcing its December 11, 2024 order in which the Director of DOI ordered that: 1) Petitioners remain under the administrative supervision of Michael J. FitzGibbons, 2) Petitioners notify all producers who sell Petitioners' products that it is prohibited from writing any new business effective December 31, 2024 and, 3) Petitioners cancel all new policies and new annuities after December 31, 2024, returning to the purchaser of a policy or annuity described above, within five (5) business days, all money received from the purchaser in connection with the transaction. Additionally, the Director also ordered a partial lift of the confidentiality of the administrative supervision proceedings to permit the disclosure of certain

---

[1]   The Department's Agency Information Sheet reflects that a final written decision has not been issued in this matter. Thus, although captioned as a contested case, this matter is injunctive in nature.



specified information based on its determination that it was in the best interest of the public or in the best interest of each insurer, its insureds, its creditors or the general public.

Along with its request, Petitioners filed a Motion for Temporary Restraining Order and/or Immediate Stay, a Motion to Seal and a Motion for Expedited Hearing. On December 30, 2024, the Court issued a temporary order staying the matter pending a hearing on the merits and denying Petitioners' Motion to Seal.[2] A hearing on the merits was then held on January 15, 2025, during which time the Court orally extended its temporary stay of the December 11, 2024 Order until the Final Order on the matter is issued. The parties filed proposed orders on January 27, 2025.[3] Based upon my review of the testimony and the parties' arguments, I conclude that the Petitioners met their burden of proof to show that the Director's December 11, 2024 Order is unsupported by the facts and contrary to the law.

## MOTION TO DISMISS

On December 30, 2024, the Department filed a Motion to Dismiss, arguing (1) that this Court lacks the authority to stay the Director's Order and (2) that Petitioners are barred from challenge the Director's December 11, 2024 Order because they failed to exhaust their administrative remedies.

### Authority to Order a Stay

The Department argues the Court is prohibited from issuing a stay because the Court lacks the authority to order a stay of enforcement of an order of the director or his designee to make good an impairment or capital or surplus or a deficiency in the amount of admitted assets. The Department maintains that orders to stop writing new business act as a temporary stop to prevent an insurer from assuming new risk while it refills its capital reserves. While this may indeed be a collateral effect of an order to stop writing new business, section 38-3-210 of the South Carolina Code (2015) only prohibits this Court from staying enforcement of orders **"to make good an**

---

[2]    On January 17, 2025, the Court issued an Amended Order to correct an error arising from an omission in the record and to amend its ruling on Petitioner's Motion to Seal because the Court did not receive a copy of the Department's December 20th Order until the hearing on January 15, 2025. *See* SCALC Rule 67 ("Clerical mistakes in orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the administrative law judge at any time of his own initiative or on the motion of any party and after such notice, if any, as the administrative law judge orders. "). In the Department's December 20th Order, its Director made public "proceedings, hearings, notices, correspondence, reports, records, and other information in the possession of the director, his designee, or the Department of Insurance relating to [Petitioner's] supervision."

[3]    The Department submitted its proposed order via email and did not copy Petitioners.

**impairment of capital or surplus or a deficiency in the amount of admitted assets**." S.C. Code Ann. § 38-3-210. Unequivocally, the Director's December Order did not order Petitioners to make good an impairment of capital or surplus or a deficiency in the amount of admitted assets. Rather the Director's Order required that Petitioners a) **notify its producers** that it is prohibited from writing any new business, b) **cancel all new policies and new annuities** issued after December 31, 2024 and, c) **return to the purchaser** of a new policy or annuity with an effective date after December 31, 2024, all money received for the transaction. Thus, I find section 38-3-210 of the South Carolina Code does not apply because the Director did not order Petitioners to make good an impairment of capital or surplus or a deficiency in the amount of admitted assets. Further, as discussed in detail below, this Court has jurisdiction to review and enforce an administrative process issued by the Department and, the Court generally has authority "[t]o issue those remedial writs as are necessary to give effect to its jurisdiction." S.C. Code Ann. §§ 1-23-600(G) (Supp. 2024) & -630(A) (2005); *see also* S.C. Code Ann. § 1-30-10(10) (Supp. 2024). Accordingly, I conclude that the Department has failed to show that the Court is prohibited from staying the Director's Order.

### Timeliness of Petitioners

The Department also argues that the appeal should be dismissed because Petitioners failed to exhaust their administrative remedies. More specifically, the Department contends that since Petitioners failed to challenge either the April 10th Order imposing administrative supervision or seek a motion for reconsideration of Mr. Fitzgibbons' October 21, 2024 or November 14, 2024 directives,[4] as required under section 38-26-70 of the South Carolina Code (2015),[5] they are now precluded from challenging the Director's December 11th Order. Petitioners, however, assert that the Department has misconstrued what has been appealed and that they have properly sought review of the Director's December 11, 2024 Order, not the emailed directives of Mr. Fitzgibbons.

---

[4]    As will be discussed further below, on April 10, 2024, the Director appointed Mr. Fitzgibbons to serve as Petitioners' administrative supervisor.

[5]    Section 38-26-70 provides that "[d]uring supervision the insurer may contest an action taken or proposed to be taken by the supervisor specifying the manner in which the action being complained of would not result in improving the condition of the insurer. Denial of the insurer's request upon reconsideration entitles the insurer to review under related regulation and the Administrative Procedures Act."

Certainly, there is no dispute that a notice of appeal of an agency's final decision must be served and filed and served within thirty days of the decision.[6] However, the Department ignores that the challenged administrative process is the Director's December 11, 2024 Order, not Mr. Fitzgibbons' November 14th directive. Accordingly, the procedures set forth under section 38-26-70 do not apply. S.C. Code Ann. § 38-26-70 (sets forth the procedure for contesting supervisor action). Further, even if the Director's December 11th Order incorporated Mr. Fitzgibbons' directive, the issuance of the Director's December 11th Order created a new order from which Petitioners possess a right to administrative review. *See* § 1-23-600(G) (Supp. 2024) (providing jurisdiction to ALC to review administrative processes such as cease and desist); *see also* S.C. Code Ann. § 1-30-10(10).

Moreover, the Department argument is premised upon the presumed authority of Mr. Fitzgbbons and the *res judicata* effects of his directives.[7] However, Mr. Fitzgbbons' October 21st and November 14th directives cannot be construed as an order or decision as contemplated under section 38-3-210 of the South Carolina Code. First, section 38-26-70 does not describe supervisor actions as orders having preemptive effect. S.C. Code Ann. § 38-26-70 (providing "insurer may contest an **action** taken or proposed to be taken by the supervisor ....") (emphasis added), *cf.* S.C. Code Ann. 38-3-210 ("Any **order or decision** made, issued, or executed by the director or his designee is subject to judicial review in accordance with the appellate procedures of the South Carolina Administrative Law Court, as provided by law.") (emphasis added). Indeed, Mr. Fitzgibbons recognized the non-preemptive effect of his directive when he stated that the regulators "may issue . . . Cease and Desist Orders." Certainly, if Mr. Fitzgibbons had the authority to issue an order to cease and desist, his comment and the Director's December 11th Order would

---

[6]    In its proposed Order the Department incorrectly cites to subsection 1-23-380(1) of the South Carolina Code (Supp. 2024) and Rule 33 of the Rules of Procedure for the South Carolina Administrative Law Court (SCALC Rules). S.C. Code Ann. § 1-23-380(1) (providing that notice of appeal must be filed within thirty days after final decision of agency); (SCALC Rule 33 (providing "notice of appeal from the final decision of an agency shall be filed with the Court and a copy served on each party and the agency whose final decision is the subject of the appeal within thirty (30) days of receipt of the decision from which the appeal is taken."). As discussed herein, this matter is not being heard under subsection 1-23-600(D) of the South Carolina Code (Supp. 2024).

[7]    Res Judicata is "[a]n affirmative defense barring the same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions ...." *RES JUDICATA*, Black's Law Dictionary (12th ed. 2024). "The three essential elements are (1) an earlier decision on the issue, (2) a final judgment on the merits, and (3) the involvement of the same parties, or parties in privity with the original parties." *Id.*

be superfluous.    Moreover, the Director also did not describe the November 14, 2024, communication as an order or decision but rather a "directive."

The October 21st and November 14th emails also lack the substance and formality of an administrative order. *See also* S.C. Code § 1-23-350 (2005) (providing that "[a] final decision or order adverse to a party in a contested case shall be in writing or stated in the record. A final decision shall include findings of fact and conclusions of law, separately stated. …").

Furthermore, Mr. Fitzgibbons lacked the authority to issue a cease-and-desist order. Here, the imposition of supervision was based upon the Director's finding that "the continuance of [Petitioners'] business without intervention [sic] hazardous to the public and their insureds, warranting supervision pursuant to S.C. Code Ann. § 38-26-40(A)(1)." The findings of fact supporting the Director's determination was the occurrence of a Mandatory Control Level Event. A Mandatory Control Level Event includes any one of the following events:

(1)    filing of an RBC Report which indicates that the licensee's Total Adjusted Capital is less than its Mandatory Control Level RBC;

(2)    notification of an Adjusted RBC Report pursuant to Section 38-9-360(A)(1), provided the licensee does not challenge that Adjusted RBC Report pursuant to Section 38-9-370. **If the licensee challenges an Adjusted RBC Report notification, then the Mandatory Control Event Level occurs upon notification that an administrative law judge has rejected the challenge.**

S.C. Code Ann. § 38-9-360 (Supp. 2024) (emphasis added). However, on April 15, 2024, Petitioners notified the Department of its request for a confidential hearing before the Director on the matter of the Adjusted RBC Report. Notably, a hearing on this matter has not occurred nor have Petitioners been notified by an administrative law judge that their challenge to the Adjusted RBC Report has been rejected. As such, the record does not support the occurrence of a Mandatory Control Level Event. S.C. Code Ann. § 38-9-360(A)(2). Thus, since the factual basis for the Director's imposition of supervision is flawed and unsupported by the evidence before me, I am left to conclude that the imposition of supervision is null and void.[8] Consequently, any subsequent

---

[8]    I acknowledge that Petitioners did not seek review under subsection 38-26-40(B)(3) of the South Carolina Code (2015). *Compare* S.C. Code Ann. § 38-9-370(A)(1) (Supp. 2024) (establishing right to challenge notification of an Adjusted RBC Report), *with* S.C. Code Ann. § 38-26-40(B)(3) (2015) (providing for judicial review of action taken by the Director under Administrative Supervision of Insurers Act); *see also* § 38-26-40 (2015) (authorizing Director to place insurers on administrative supervision). While administrative remedies must generally be exhausted, the Director's imposition of administrative supervision prior to a determination on Petitioners' appeal to the Adjusted RBC suggests that the Department had taken a hard and fast position on the issue of the validity of the Adjusted RBC Report. *Brown v. James*, 389 S.C. 41, 54, 697 S.E.2d 604, 611 (Ct. App. 2010); *see Law v. S.C. Dep't of Corr.,* 368 S.C. 424, 438, 629 S.E.2d 642, 650 (2006) (citing *Thetford Props. IV Ltd. P'ship v. U.S. Dep't of Hous. & Urban*

actions of Mr. Fitzgibbons are null and void as he never possessed the authority to exercise powers enumerated under section 38-26-60 of the South Carolina Code (2015).

But even presupposing the April 10th Supervision Order was valid, section 38-26-40 of the South Carolina Code (2015) provides, in pertinent part:

> (C) If placed under administrative supervision, the insurer has sixty days or another period of time designated by the director or his designee to comply with the requirements of the department subject to the provisions of this chapter.
>
> (D) If it is determined after notice and hearing that the conditions giving rise to the supervision still exist at the end of the supervision period, the director or his designee may extend the period or may initiate proceedings under Chapter 27 of this title.

S.C. Code Ann. § 38-26-40(C) & (D). In this case, the Director imposed another period of time, rather than the sixty-day timeframe, specifically that "ACL will remain under the administrative supervision of this Department for at least six months or until it demonstrates to the Department's satisfaction that the conditions which have made this action necessary have been abated." Therefore, pursuant to the Director's April 10th Order, unless Petitioners produced satisfactory evidence to the Department that the conditions had been abated, the imposition of administrative supervision would presumably extend beyond October 10th. Incontrovertibly, the administrative order failed to designate a **period of time** as envisioned by the General Assembly. Moreover, the indefinite imposition of administrative supervision is further exacerbated by the fact that the Department never provided notice or held a hearing regarding whether the conditions that gave rise to supervision still exist as contemplated by subsection 38-2-40(D) of the South Carolina Code. Thus, I am left to conclude that the period of supervision ended six months after the issuance of the April 10th Order as it is the only reasonable period of time which the Director designated.

Nevertheless, the Department argues that Petitioners are still under administrative supervision because they did not request to be released from supervision as the law allows.

---

*Dev.,* 907 F.2d 445, 450 (4th Cir.1990)) ("A general exception to the requirement of exhaustion of administrative remedies exists when a party demonstrates that a pursuit of them would be a vain or futile act. Futility, however, must be demonstrated by a showing comparable to the administrative agency taking "a hard and fast position that makes an adverse ruling a certainty.") (internal citations removed).

Moreover, the Department is statutorily required to set a date for a hearing on an Adjusted RBC Report "no less than ten days nor more than thirty days after the date of the licensee's request." S.C. Code Ann. § 38-9-370(B) (Supp. 2024). Significantly, the Department failed to adhere to its statutory duty and, in doing so, curtailed Petitioners due process right to separately challenge the Order Imposing Administrative Supervision. For these reasons, I conclude that Petitioners failure to separately challenge the Order of Supervision is excused.

However, the Department did not cite to any law or case to support its proposition, nor did the Court find any legal basis to support the Department's argument. Indeed, such a conclusion is illogical as it would render meaningless the requirement that the Director or his designee designates a period of time, if other than sixty days, that an insurer shall remain under administrative supervision. *See State ex rel. McLeod v. Montgomery*, 244 S.C. 308, 314, 136 S.E.2d 778, 782 (1964) (holding that courts must presume that legislature intended by its action to accomplish something and not to do a futile thing).

Finally, the Department failed to establish that a supervisor has the authority to preemptively require Petitioners to stop approving new premiums. The Administrative Supervision of Insurers Act only empowers a designated supervisor to provide, after notice to the insurer, that the insurer may not do designated actions **without prior approval**.[9] S.C. Code Ann. § 38-26-60(6). Notably, the supervisor's powers are limited, however, to requiring an insured to obtain prior approval before taking one of the enumerated actions. This limitation is in keeping with the role of supervising. However, in this case, the record is devoid of evidence that the supervisor reviewed any new premiums to determine the financial effect of their issuance or that Petitioners even sought to issue any new premiums. Accordingly, I find that even if Mr. Fitzgibbons was appropriately designated as supervisor, he improperly exercised his authority under section 38-26-60 of the South Carolina Code when he issued a blanket directive to Petitioners to "shut down all new premium writing."

For the aforementioned reasons, the Department's Motion to Dismiss is denied. Now, the Court turns to the merits of the case.

## FINDINGS OF FACT

Having observed the witnesses and exhibits presented at the hearing and closely passed upon their credibility, and taking into consideration the burden of proof upon the parties, I make the following Findings of Fact by a preponderance of the evidence:

---

[9] Section 38-26-60 of the South Carolina Code (2015) lists the following actions: (1) dispose of, convey, or encumber its assets or its business in force; (2) withdraw its bank accounts; (3) lend its funds; (4) invest its funds; (5) transfer its property; (6) incur debt, obligation, or liability; (7) merge or consolidate with another company; (8) approve new premiums or renew policies; (9) enter into a new reinsurance contract or treaty; (10) terminate, surrender, forfeit, convert, or lapse an insurance policy, a certificate, or a contract, except for nonpayment of premiums due; (11) release, pay, or refund premium deposits, accrued cash or loan values, unearned premiums, or other reserves on an insurance policy, certificate, or contract; (12) make a material change in management; (13) increase salaries and benefits of officers or directors or the preferential payment of bonuses, dividends, or other preferential payments.

### Atlantic Coast Life Insurance Company and
### Southern Atlantic Re, Inc. Business Model

Atlantic Coast Life Insurance Company (ACL) has been a provider of insurance for nearly 100 years. At inception, ACL offered small life insurance policies and later expanded its portfolio to include pre-need policies.[10]  Today, the pre-need product is at the heart of ACL's business. Additionally, ACL sells a fixed accumulation annuity product.

Reinsurance also plays a predominant role in ACL's business structure.  ACL uses reinsurance to balance its risk-based capital (RBC)[11] and profitability.[12]  At the time of the hearing, ACL was actively engaging with eight reinsurers, with approximately 80 percent of its underlying business sent to reinsurers.[13]  Southern Atlantic Re, Inc., (SAR) is wholly owned by ACL and is a captive reinsurer of ACL,[14] reinsuring 13% of ACL's assets.  Haymarket Insurance Company (Haymarket) is also a reinsurer of ACL's assets.  Haymarket is wholly owned and controlled by Advantage Capital Holdings, LLC (A-CAP), it reinsures 18% of ACL's business.

Since its inception, ACL's pre-need and annuity businesses have steadily grown.  ACL is a profitable business.  During 2024, it had $63 million in pre-need and $1,028 billion in annuity sales and a total adjusted capital of $100.7 Million.  Currently, ACL maintains positive cash flow, it has not had difficulty paying amounts owed to either its policy holders or creditors and, as of February 23, 2024, carries an AM Best credit rating of B++.[15]

---

[10]   Pre-need policies are small life insurance policies for payment of future funeral expenses. ACL employees work closely with local funeral homes to ensure that its pre-need products appropriately align with their policy holders' funeral expenses.

[11]   S.C. Code Ann. § 38-9-310(16) (Supp. 2024) (defining RBC).

[12]   Reinsurance structures are common in the insurance industry.  The structure enables an insurance company to ensure risks in excess of the business they maintain.

[13]   As of the date of the hearing, ACL retained 16% of its business.  As will be discussed hereinafter, these assets are representative of business which ACL recaptured from 777 Re., a Bermuda-based reinsurer whom previously reinsured Southern Atlantic Re., Inc. assets. 777 Re. is wholly owned by 777 Partners. 777 Partners is a Miami-based private equity firm with a diverse portfolio including assets such as insurance, airlines, and sports teams.

[14]   Captive insurers are wholly owned by the insured.

[15]   A.M. Best is an American credit rating agency that focuses on the insurance industry. Both the Securities and Exchange Commission and the National Association of Insurance Commissioners have designated A.M. Best as a Nationally Recognized Statistical Rating Organization (NRSRO) in the United States. A.M. Best credit rating services assess the creditworthiness of and/or reports on over 16,000 insurance companies worldwide. It warrants that its credit ratings are independent, indicative and interactive, and summarize their expert professional opinions on an insurance company's ability to pay claims, debts and other financial obligations in a timely manner.

Advantage Capital Holdings

During June 2015, A-CAP acquired ACL. A-CAP is a holding company. In addition to ACL, A-CAP has invested in Sentinel Security Life Insurance Company (Sentinel), Haymarket and Jazz Reinsurance Company (Jazz Re), each Utah-based insurers. A-CAP has also invested in several of 777 Partner's businesses and holds a minority preferred security investment in 777. Nevertheless, A-CAP is not affiliated with 777 nor does anyone at A-CAP hold a position in any 777 entity.

**DOI's Initial Examination of Petitioners**

In 2022, the Department began examining Petitioners solvency. The examination continued into 2023 but was subsequently suspended upon the start of the Department's examination of Petitioners' 2023 regulatory filings. On January 25, 2024, the Department joined the Utah Insurance Department in an examination of A-CAP's financial status. Scott Eady was designated as the Examiner in Charge (EIC).

Petitioners' Risk Based Capital Reports

In accordance with statutory requirements, ACL and SAR individually filed Risk Based Capital (RBC) Reports for 2023. *See* S.C. Code Ann. § 38-9-320 (Supp. 2024) (describing form and content of the RBC Report). The RBC Report is used as a regulatory tool to assess an insurer's solvency. Generally, an RBC Ratio between 300 and 350 is a strong indicator and anything over 500 is extremely strong. For the 2023 Reporting year, ACL reported a total adjusted capital of approximately $124 Million, an Authorized Control Level RBC of $20 Million, and an RBC Ratio of 600. SAR reported a total adjusted capital of $13 Million, an Authorized Control Level RBC of 978,000, and an RBC Ratio of 1300.

Department's Notification of an Adjusted RBC Report

On April 10, 2024, the Department notified Petitioners of its issuance of an Adjusted RBC Report based upon its determination that the submitted RBC Reports were inaccurate.[16] Specifically, the Department determined that Petitioners violated the single issuer limitation set forth under subsection 38-12-220(A)(1) of the South Carolina Code (2015) because more than 3% of its assets were either invested or reinsured with one of its affiliates.[17] As a result of this

---

[16] "'Adjusted RBC Report' means a risk-based capital report which has been adjusted by the director in accordance with Section 38-9-320(F)." S.C. Code Ann. § 38-9-310 (2015).

[17] Subsection 38-12-220(A)(1) restricts an insurer from "acquir[ing], directly or indirectly through an investment

determination, the Department concluded that $200.2 million of ACL's investment assets and $460.3 million of SAR's investment assets could not be treated as admitted assets. The cumulative effect of that determination resulted in a reduction of $4.5 billion in ACL's capital and surplus, an RBC of negative 19,734.85%, and an adjusted surplus of negative $4.0 billion, adjustments which placed Petitioners at a Mandatory Control Level.[18]  Finally, the Department also concluded that ACL, SAR, and Haymarket (a reinsurer of ACL) would each be insolvent by 2023 year-end.

Petitioners timely requested a confidential hearing regarding those determinations.  The Department designated Honorable Justice Kaye Hearn (Ret.) to conduct a hearing on behalf of the Director.  Notably, the Director is statutorily required to set a date for the hearing which "must be no less than ten days nor more than thirty days after the date of the licensee's request." S.C. Code Ann. § 38-9-370(B) (Supp. 2024).  Nonetheless, a hearing has yet to occur.[19]

### Department's Order of Supervision

In tandem with its notification of an Adjusted RBC Report, the Department's Director, Michael Wise, issued a confidential order imposing administrative supervision and the appointment of Michael J. FitzGibbons as supervisor of ACL and SAR.  The Director found that although ACL had a good credit rating, "management of A-CAP's risks [were] primarily through a heavy reliance on reinsurance counterparties, resulting in a heavyweight of reinsurance leverage and an uncertainty of the quality of assets backing the reserves backing the reserves." The Director further found that one of Petitioners' reinsurers, 777 Re, Inc., had a weak credit rating and a very weak balance sheet and that Petitioners' extensive investments in 777 Partners was the primary cause of its violation of subsection 38-12-220(A)(1) of the South Carolina Code.  Based upon these concerns the Director concluded that it was appropriate to place Petitioners under supervision. Since such time, both A-CAP and Petitioners have cooperated with the Department and willingly worked Mr. Fitzgibbons.

---

affiliate, an investment pursuant to this chapter if as a result of and after giving effect to the investment the insurer holds more than three percent of its admitted assets in investments of all kinds issued, assumed, accepted, insured, or guaranteed by a single person."

[18]   As mentioned previously in this Order, "if the licensee challenges an Adjusted RBC Report notification, then the Mandatory Control Event Level occurs upon notification that an administrative law judge has rejected the challenge." S.C. Code Ann. § 38-9-360.

[19]   While the Department alleged that the hearing has been delayed upon the request of Petitioners, the Department presented no evidence to show that the hearing was originally scheduled to occur within the statutory timeline or that it has since scheduled the hearing as requested by Petitioners.

### Events Following Issuance of the April 10th Orders

Following the issuance of the Department's April 10th orders, ACL has worked to reduce its premiums to become less and less competitive without creating concerns in the market and amongst policy holders.[20] In fact, it has reduced its premium sales by 90%. ACL has also modified its reinsurance structure, recapturing assets previously held by 777. Additionally, one of ACL's existing reinsurers is also poised to buy $800 million of assets previously reinsured by Haymarket.[21]

A-CAP has also taken steps in good faith to reduce its exposure to 777. A-CAP also exercised its rights as a lender in an effort to take control of 777 assets.[22] Additionally, A-CAP has initiated action to take control and sell the 777 assets that serve as protective collateral on its loans. Importantly, A-CAP has reduced its investment exposure to 777 from $2.3 billion to $2.4 billion to approximately $1.2 billion. More specifically, A-CAP has stabilized the "Flair asset" by arranging for third-party funding and started the process of liquidating football assets that are held as collateral for the "Nutmeg asset." Notably, A-CAP has not simply liquidated all of its assets but is rather methodically liquidating them to sensibly preserve the value of the 777 assets. Nevertheless, although A-CAP has roughly 3.9 billion dollars of liquid assets which it could orderly sell to meet any liquidity requirements, Mr. King projected that all 777 assets will likely be liquidated this year.[23]

---

[20]   This Court's findings regarding operation and financial soundness of the business of ACL and A-CAP are based upon the testimony of Mr. Cathcart, ACL's Chief Executive Officer and Mr. Kenneth King, President and principal owner of A-CAP. Mr. Cathcart has been in the insurance business for approximately thirty-five years. He is an Associate of the Society of Actuaries and is a licensed insurance agent. Mr. King holds a business associate degree in business management and has forty years of experience in the finance industry. Over the course of his forty years of experience, Mr. King has worked for large banking institutions, assisted with the establishment of financial product divisions for reinsurers, and founded specialty line insurance companies. Mr. Cathcart and Mr. King each demonstrated a heightened degree of understanding of current conditions at ACL and A-CAP and I found their testimony to be highly credible and convincing.

[21]   On December 30, 2024, Mr. Fitzgibbons denied Petitioners' proposal to recapture $800 million of business from Haymarket. While that denial may have been beneficial to the citizens of Utah, it was not for the citizens of South Carolina as it directly impeded ACL from reducing its exposure to an insolvent reinsurer.

[22]   The Department unsuccessfully attempted to impeach Mr. King's testimony by suggesting that A-CAP took control of 777. However, A-CAP is not affiliated with 777 and, as explained by Mr. King, A-CAP has merely taken control of assets which secure their loans.

[23]   Mr. King stated that over the course of just the next three to four months he anticipates further reducing A-CAP's exposure by an additionally $7-8 million dollars.

Based on the evidence presented at the hearing, the companies' actions appear prudent and demonstrate that Petitioners took the regulators' concerns seriously and taking actions which are in furtherance of the public's interest. In point of fact, Petitioners have reduced their exposure to their reinsurance counterparties and also nearly recaptured all of their investments in 777 and the Department did not present any evidence or testimony to dispute these facts. Indeed, the evidence shows that Petitioners have significantly abated the conditions which gave rise to the Director's Imposition of Administrative Supervision.

### Triennial Examination of A-CAP

As part of the triennial examination of A-CAP, Mr. Eady retained Harvest to conduct an independent pricing of three of A-CAP's assets—Pac Wagon, Flair Airlines, and the JARM loan. Although the Department **did not** offer the Harvest report into evidence to support its claims, Mr. King nonetheless explained that the Harvest report was "frankly, nonsensical."[24] Indeed, the Harvest valuation was diametrically different from the valuation computed by its advisors, Houlihan Lokey and Dundon Advisors. Specifically, the Harvest valuation disregarded the value of the collateral that secured the loans, including valuable commodities such as Boeing Jets, a premier league football club, and other aviation assets.[25] In addition, according to Mr. King, the Harvest report also disregarded observable market data on the valuation of the assets. Based upon the preponderance of the evidence before me, I find that the Harvest report is not conclusive of the valuation of A-CAP's assets. Further, I find it significant that the examination of A-CAP is ongoing, and Mr. Eady has yet to issue an examination report.

### Utah Cease and Desist Order

On December 2, 2024, the Utah Department of Insurance issued an order for A-CAP's Utah affiliates to cease-and-desist writing premiums. Importantly, the Order was based upon Utah's concerns regarding the valuation of the Pac Wagon, Flair Airlines, and the JARM loan

---

[24]   The Department did not present witnesses from Harvest or otherwise introduce testimony to support the conclusions drawn in the report or contradict the opinions offered by Mr. King.

[25]   The Department attempted to impeach Mr. King's testimony by suggesting that the decline in Boeing stock is indicative of the devaluation of aircrafts. The Department's argument is unconvincing. An aircraft, such as a Boeing Jet, is a commodity which carries value independent from the Boeing Company. Indeed, as asserted by Mr. King, the value of the aircraft is driven by market demands.

valuations, assets which were valued in the Harvest Report.[26]  A-CAP's Utah affiliates have challenged this Order, and a hearing is scheduled for mid-March.  As such, I find that the Utah Order does not provide probative evidence of Petitioners' financial conditions since that order is pending administrative review and because the Harvest report is not conclusive of the valuation of A-CAP's assets.

### Communications from Mr. Fitzgibbons

On October 21, 2024, Mr. Fitzgibbons emailed Mr. King that all A-CAP affiliates needed to promptly shut down all new premium writings.  Thereafter, on November 14, 2024, Mr. Fitzgibbons notified Petitioners by email that "[b]ased on our November 5 discussion, I'm amending the October 21 directive to cease writing new business.  ACAP now has until December 31, 2024."  Mr. Fitzgibbons further stated that "all the companies' **RBC's reflect mandatory control level** and each of the **insurers exhibit negative surplus**."  (Emphasis added).  Finally, Mr. Fitzgibbons advised Mr. King that both Departments "**may** issue Cease-and-Desist Orders." (Emphasis added).

It is notable that Mr. Fitzgibbons' directive was issued despite ACL's efforts to reduce premium sales.  Indeed, as recently as December 2, 2024, ACL provided notice to Mr. Fitzgibbons of its continued success in lowering its premiums without causing panic amongst its policy holders. The Department did not explain the need for Mr. Fitzgibbons' directive in light of the ongoing efforts by ACL nor present any evidence to support Mr. Fitzgibbons' finding that Petitioners' RBC's reflect mandatory control level and that the insurers exhibit negative surplus.  Rather, the evidence before me reflects the inverse.

As stated above, a Mandatory Control Level Event includes any one of the following events:

(1) filing of an RBC Report which indicates that the licensee's Total Adjusted Capital is less than its Mandatory Control Level RBC;

(2) notification of an Adjusted RBC Report pursuant to Section 38-9-360(A)(1), provided the licensee does not challenge that Adjusted RBC Report pursuant to Section 38-9-370. If the licensee challenges an Adjusted RBC Report notification,

---

[26]    According to Mr. King, the Harvest report is the only valuation report being offered by the Utah Department of Insurance. Significantly, the Department did not dispute his testimony.

> then the Mandatory Control Event Level occurs upon notification that an
> administrative law judge has rejected the challenge.

S.C. Code Ann. § 38-9-360. Here, Petitioners have challenged the Department's notification of
an Adjusted RBC Report, and the record is devoid of any evidence of the disposition of their
challenge.   Thus, pursuant to subsection 38-9-360(2) of the South Carolina Code, , the
Department's notification of an Adjusted RBC Report has not yet given rise to a Mandatory
Control Level Event.

Additionally, the 2023 RBC Reports of ACL and SAR each reflect that the companies'
total adjusted capital are more than their reported Mandatory Control Level RBC.[27]   ACL reported
total Adjusted Capitals and Authorized Control Level RBCs of $124 million and $20,518,094,
SAR $13 million and $987,030.   The product of the Authorized Control Level and .70 is $14
million for ACL and $690,921 for SAR.  Unequivocally, Petitioners' respective RBC Reports
indicate that the licensee's Total Adjusted Capital is greater than its Mandatory Control Level
RBC.

Accordingly, I find that the evidence does not support Mr. Fitzgibbons' statement that all
the companies' RBC's reflect mandatory control level and negative surplus.  Rather the evidence
shows that ACL maintains a positive cash flow and has not experienced any difficulty paying
amounts owed to either its policy holders or creditors

### December 11, 2024 Order

On December 11, 2024, the Department's Director issued an "Order Amending
Confidentiality of Certain Provisions of Confidential Order Imposing Administrative Supervision
and Appointing Supervisor."  The Director concluded that the conditions giving rise to the need
for administrative supervision persisted and thus Petitioners were to remain under the
Department's supervision.   The Director further determined that in order to ensure timely
compliance with the Supervisor's November 14, 2024 directive, 1) Petitioners remain under the
administrative supervision of Michael J. FitzGibbons, 2) Petitioners notify all producers who sell
Petitioners' products that it is prohibited from writing any new business effective December 31,
2024 and, 3) Petitioners cancel all new policies and new annuities after December 31, 2024,

---

[27]   The Mandatory Control level RBC is "the product of .70 and the Authorized Control Level RBC."  § 38-9-
310(18)(d) (Supp. 2024); see also S.C. Code Ann. § 38-9-310(18)(d) (Supp. 2024) (defining Authorized Control Level
RBC as the number determined by the RBC formula in accordance with the RBC Instructions.).

returning to the purchaser of a policy or annuity described above, within five (5) business days, all money received from the purchaser in connection with the transaction.

Additionally, the Director also ordered a partial lift of the confidentiality of the administrative supervision proceedings to permit the disclosure of certain specified information based on its determination that it was in the best interest of the public or in the best interest of each insurer, its insureds, its creditors or the general public.[28]

The December 11th Order has tarnished Petitioners' credibility in the market, resulting in a loss of employees, and damaged relations with its brokerage distribution and amongst local funeral homes. More specifically, Mr. Cathcart indicated that the "noise" has led to a dip in the Company's capital,[29] precluded the Company from fully divesting itself from 777-affiliated assets and impeded Petitioners' attempt to recapture Haymarket assets. Moreover, policyholders have sought recoupment of premiums, resulting in financial loss to the public.

## CONCLUSIONS OF LAW

Based upon the above Findings of Fact, I conclude the following as a matter of law:

### Jurisdiction

Subsection 1-23-600(G) of the South Carolina Code (Supp. 2024) provides that,

[n]otwithstanding another provision of law, the Administrative Law Court has jurisdiction to review and enforce an administrative process issued by an agency or by a department of the executive branch of government, as defined in Section 1-30-10, such as a subpoena, administrative search warrant, cease and desist order, or other similar administrative order or process. A department or agency of the executive branch of government authorized by law to seek an administrative process may apply to the Administrative Law Court to issue or enforce an administrative process. A party aggrieved by an administrative process issued by a department or agency of the executive branch of government **may apply to the Administrative Law Court for relief from the process as provided in the Rules of the Administrative Law Court**.

---

[28]  Mr. Wise testified that lifting confidentiality was in the best interest of the public because "the more policies they write, the more people that would be negatively impacted by a potential insolvency." However, Petitioners were actively reducing their premiums and there is an absence of evidence before me to suggest that Petitioners were trending towards insolvency. In fact, the preponderance of the evidence shows that Petitioners had a total adjusted capital of $100.7 million. Accordingly, I do not find Mr. Wise's testimony to be persuasive or supported by the evidence.

[29]  Nevertheless, the evidence reflects that Petitioners have a positive capital.

(Emphasis added); *see also* S.C. Code Ann. § 1-30-10(10). The Department of Insurance is within the executive branch of the state government. Accordingly, this Court has jurisdiction to review the Department's December 11th Order.

**Standard of Review**

In its proposed order, the Department argues that pursuant to section 38-3-210 of the South Carolina Code (2015),[30] this Court has appellate jurisdiction to review orders or decisions of the Department and that the Court should therefore apply the standard of review set forth under subsection 1-23-380(5) of the South Carolina Code (2015). Undisputably, this Court has subject matter jurisdiction over Department decisions and orders. S.C. Code Ann. § 38-3-210. However, the decision before me did not arise from a final decision in a contested case. *See* S.C. Code Ann. § 1-23-310(3) (2005) (defining contested case as a proceeding in which the legal rights, duties, or privileges of a party are required by law or by Article I, Section 22, Constitution of the State of South Carolina, 1895, to be determined by an agency or the Administrative Law Court after an opportunity for hearing.). In fact, in its Agency Information Sheet, the Department acknowledged that a final written decision has not been issued. Therefore, review of this matter is not under subsection 1-23-600(D) of the South Carolina Code. Rather, as stated above, this matter is heard under subsection 1-23-600(G) of the South Carolina Code. Since this matter does not pertain to a final decision in a contested case, the standard of review for this case is not governed by section 1-23-380. *See* S.C. Code Ann. 1-23-600(E) (Supp. 2024) (providing that review of final decision in a contested case must be in the same manner as prescribed in section 1-23-380).

Generally, the party asserting the affirmative issue has the burden of proof. *DIRECTV, Inc. & Subsidiaries v. S.C. Dep't of Revenue*, 421 S.C. 59, 78, 804 S.E.2d 633, 643 (Ct. App. 2017). Therefore, it is Petitioners' burden to establish a right to relief from the administrative process. The burden of proof to be applied is a preponderance of the evidence. S.C. Code Ann. § 1-23-600(A)(5) (Supp. 2024). A "preponderance of the evidence is evidence which convinces the fact finder as to its truth." *Pascoe v. Wilson*, 416 S.C. 628, 788 S.E.2d 686 (2016). Said differently, Petitioners are only entitled to relief if the preponderance of the evidence shows that the Director's December 11th Order is unsupported by the facts and contrary to the law.

---

[30]    S.C. Code Ann. § 38-3-210 (2015) ("Any order or decision made, issued, or executed by the director or his designee is subject to judicial review in accordance with the appellate procedures of the South Carolina Administrative Law Court, as provided by law.").

**Subject Matter Jurisdiction**

Quizzically, the Department argues this Court lacks subject matter jurisdiction over this matter because 1) the underlying challenge does not meet the definition of a contested case, 2) Petitioners failed to comply with the requirements set forth under subsection 1-23-600(B) of the South Carolina Code (Supp. 2024) as well as this Court's Rules of Procedure and, 3) subsection 38-3-210 of the South Carolina Code prohibits this Court from staying enforcement of the December 11 Order. I disagree.

"The word 'jurisdiction' does not in every context connote subject matter jurisdiction, but rather, is 'a word of many, too many, meanings.'" *Limehouse v. Hulsey*, 404 S.C. 93, 104, 744 S.E.2d 566, 572 (2013) (citations omitted) "Jurisdiction is generally defined as the authority to decide a given case one way or the other." *Id.* (citing 32A Am.Jur.2d Federal Courts § 581 (2007)). "Jurisdiction is composed of three elements: (1) personal jurisdiction; (2) subject matter jurisdiction; and (3) the court's power to render the particular judgment requested." *Id.* (citing *Indep. Sch. Dist. No. 1 of Okla. Cty. v. Scott*, 15 P.3d 1244, 1248 (Okla. Civ. App. 2000)). "Subject matter jurisdiction is the power of a court to hear and determine cases of the general class to which the proceedings in question belong." *Pierce v. State*, 338 S.C. 139, 150, 526 S.E.2d 222, 227 (2000).

Here, subsection 1-23-600(G) of the South Carolina Code provides that a party, such as Petitioners, who are aggrieved by an administrative process issued by the executive branch of government, "may apply to the Administrative Law Court for relief from the process." The Department does not, and cannot, contend that it is not an executive branch of government as defined by section 1-30-10 of the South Carolina Code. As such, the Court clearly has subject matter jurisdiction to hear this type of case.

Moreover, section 38-3-210 of the South Carolina Code provides that this Court has appellate jurisdiction over the general class to which the proceeding in question belongs. In fact, the Department acknowledges this fact in its Proposed Order. Further, subsection 1-23-630(A) of the South Carolina Code (2005) provides that the ALC specifically has authority "[t]o issue those remedial writs as are necessary to give effect to its jurisdiction," as well as the authority that emanates from being a Court of Record. *See* S.C. Code Ann. §§ 1-23-600(G) & -630(A); S.C. Const. art. V, § 20 (all "courts of record shall have the same power at chambers to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and interlocutory writs or orders

of injunction as when in open court."). Accordingly, I conclude that this Court has subject matter jurisdiction over this case because the Court has the power to hear and determine the general class of cases involving the review of an administrative process issued by the Department and this Court has the authority to enforce its appellate jurisdiction. *Id.*; *see also* S.C. Code Ann. § 38-3-210.

Notwithstanding this law, the Department adamantly insists that this Court lacks subject matter jurisdiction to hear this matter because the underlying challenge is not a contested case nor do Petitioners allege that they have been deprived of an opportunity to pursue agency review. Nonetheless, the fact that this appeal does not arise from a final decision of a contested case does not preclude this Court from having subject matter jurisdiction. As discussed above, this Court has the authority to review administrative processes taken by departments of the executive branch of government. As such, I find the Department's argument meritless.

Finally, the Department argues that the Court lacks subject matter jurisdiction because Petitioners failed to timely seek judicial review. However, the question of compliance with rules, regulations, and statutes governing an appeal is a matter of appellate jurisdiction, not subject matter jurisdiction.[31] *Allison v. W.L. Gore & Assocs.*, 394 S.C. 185, 188, 714 S.E.2d 547, 549 (2011). Irrespectively, as discussed in detail above, Petitioners appeal was timely and therefore this Court has appellate jurisdiction over the matter.

### Does the Evidence Support the Director's Decision?

Petitioners argue the Director's December 11th Order is contrary to law and unsupported by the facts. Conversely, the Department argues Petitioners have failed to show that the Department's actions are unsupported by the evidence. The Department asserts that since it joined the Triennial examination, "there is sufficient evidence to conclude that the Director learned of information which indicated that the Petitioners were in hazardous condition." More specifically, the Department asserts that the following findings from the December 11th Order support the Director's actions:

---

[31]  During the hearing, the Department's attorney, Mr. Ibarra, vehemently disagreed with the Court arguing that untimely filing divests the Court of subject matter jurisdiction. In support of his argument, he cited to a December 30th Order of the Honorable Crystal M. Rookard, claiming that "it has binding authority within it that shows the reason why she held that an untimely filing divests this Court of subject matter jurisdiction." The Court takes notice that on December 30, 2024, Judge Rookard issued an Order in re: Docket No: 24-ALJ-21-0370-AP. Indubitably, the Order does not stand for the proposition that untimely service divests this Court of subject matter jurisdiction. In fact, the Order does not even mention the phrase "subject matter jurisdiction."

8.    ACL and SAR remain in administrative supervision. The conditions giving rise to the need for administrative supervision persist.

9.    On November 14, 2024, the Supervisor directed management of ACL and SAR "to cease writing new business," effective "December 31, 2024."

10.   In his correspondence of November 14, 2024, the Supervisor explained that ACL and SAR's risk-based capital (RBC) "reflect[ed] mandatory control level" and that "each of the insurers exhibit negative surplus. This cessation of writings [directive] is in accordance with [paragraphs 6 and 8 of the South Carolina Supervision Order], among other authorities." In an earlier communication dated October 21, 2024, the Supervisor had written, "As Supervisor, I am unwilling to continue to permit the insurers to incur new liabilities, particularly policyholder liabilities when all companies['] RBC are at a mandatory control level and each of the insurers exhibit negative surplus."

11.   On December 2, 2024, the Utah Insurance Commissioner issued an emergency order directing the three Utah-domiciled affiliates of ACL and SAR to, *inter alia:*

      a.    Cease writing all new business by December 31, 2024;

      b.    Cancel any new policies and new annuities issued after December 31, 2024.

As explained in detail below, I find that Petitioners have shown by a preponderance of the evidence that the Department's Order is contrary to the law and unsupported by the facts.

<u>Evidence Does Not Support that Petitioners Remain under Administrative Supervision</u>

The evidence does not support that Petitioners were under administrative supervision at the time the Director issued his Order. The basis for the Director's imposition of administrative supervision was the occurrence of a Mandatory Control Level Event. A Mandatory Control Level Event includes any one of the following events:

(1) filing of an RBC Report which indicates that the licensee's Total Adjusted Capital is less than its Mandatory Control Level RBC;

(2) notification of an Adjusted RBC Report pursuant to Section 38-9-360(A)(1), provided the licensee does not challenge that Adjusted RBC Report pursuant to Section 38-9-370. If the licensee challenges an Adjusted RBC Report notification, then the Mandatory Control Event Level occurs upon notification that an administrative law judge has rejected the challenge.

S.C. Code Ann. § 38-9-360. Yet, the evidence does not reflect that either of these events has occurred. Indeed, Petitioners challenged the Department's notification of an Adjusted RBC Report, and the record is devoid of any evidence of the disposition of their challenge. Thus,

pursuant to subsection 38-9-360(A)(2) of the South Carolina Code, a Mandatory Control Event Level has not yet occurred. Additionally, Petitioners' 2023 Filings respectively reflect that their Total Adjusted Capital is more than their reported Mandatory Control Level RBC.

There is also no evidence that the underlying conditions which originally gave rise to the Department's adjustment to Petitioners' admitted assets remain the same. Rather, the evidence shows that Petitioners have reduced their exposure to their reinsurance counterparties, and they have also recaptured assets previously held by 777 Re. Similarly, A-CAP has reduced its investment exposure to 777 by nearly $1 billion and anticipates liquidating all remaining 777 assets by year's end.

Moreover, pursuant to the terms of the April 10th Order, ACL was to remain under the administrative supervision for "at least six months or until it demonstrates to the Department's satisfaction that the conditions which have made this action necessary have been abated." Subsection 38-26-40 of the South Carolina Code provides, in pertinent part:

> (C) If placed under administrative supervision, the insurer has sixty days or another period of time designated by the director or his designee to comply with the requirements of the department subject to the provisions of this chapter.
>
> (D) If it is determined after notice and hearing that the conditions giving rise to the supervision still exist at the end of the supervision period, the director or his designee may extend the period or may initiate proceedings under Chapter 27 of this title.

S.C. Code Ann. § 38-26-40(C) & (D). The record lacks any evidence that the Department provided notice and hearing regarding the state of Petitioners' conditions. But even if Mr. Fitzgibbons' November 14th email could be construed as notice that the Department believed that the companies' RBC's remained at mandatory control level, the Department presented no evidence to corroborate this fact. Rather, the evidence before me shows the opposite. Irrespectively, the Department did not provide Petitioners an opportunity for a hearing on the matter. Thus, even presupposing the April 10, 2024 Order was legally sound, the imposition of Supervision ended on October 10, 2024. For these reasons, I conclude that the evidence does not support the Director's finding that Petitioners remain under administrative supervision.

<u>The Supervisor Lacked the Authority to Direct Petitioners to Cease Writing New Business</u>

Assuming *arguendo* that the Director's imposition of administrative supervision was valid, Mr. Fitzgibbons lacked the authority to direct Petitioners to cease writing business. Subsection

38-26-60 of the South Carolina Code grants a supervisor the authority to require an insured to seek prior approval before taking certain enumerated actions, one of which being to approve new premiums or renew policies. However, in this case, the evidence does not reflect that the supervisor reviewed any new premiums to determine the financial effect of their issuance or that Petitioners even sought to issue any new premiums. Rather, the evidence shows that Petitioners are actively reducing premiums. In fact, as of December, Petitioners had reduced their premiums by 90%. Accordingly, I conclude that Mr. Fitzgibbons improperly exercised his authority under section 38-26-60 when he issued a blanket directive to Petitioners' to "shut down all new premium writing." As such, the Director's reliance on the November 14, 2024 directive is misplaced.

<u>Evidence Does Not Reflect that Petitioners have a Negative Surplus</u>

The evidence does not support the fact that Petitioners exhibit a negative surplus. Conversely, Mr. Cathcart testified that Petitioners are in good and stable financial health and that they have a positive cash flow. In fact, Petitioners' 2024 financial statements reflect a capital and surplus of $100.7 Million. Additionally, Petitioners' parent company, A-CAP, also has 3.9 billion dollars of liquid assets which could be sold to meet any liquidity requirements. Importantly, the Department has introduced no evidence to refute these facts.

Nonetheless, the Department argues that the Director's determination is supported by the evidence because Petitioners never contested Mr. Eady's September 2024 examination finding. In other words, the Department seems to take the position that Mr. Eady's examination findings are sufficient to establish a *prima facie* case. However, Mr. Eady did not issue an order or decision. In fact, Mr. Eady's examination is still ongoing. Thus, even if Mr. Eady's examination had been introduced for the truth of the matter asserted, there has been no conclusive finding to support the Department's assertions. As such, I find the Department's argument unconvincing.

Accordingly, I conclude that the preponderance of the evidence does not show that Petitioners have a negative surplus.

<u>Utah Order</u>

In his December 11th Order, the Director concluded that in light of the public Utah Order, it was in the best interest of each insurer, its insureds, its creditors, and the general public to make public the directive to not write any new business. Generally, "[p]roceedings, hearings, notices, correspondence, reports, records, and other information in the possession of the director, his designee, or the Department of Insurance relating to the supervision of an insurer are confidential."

S.C. Code Ann. § 38-26-50(A) (2015). While the confidentiality of supervision proceedings may be lifted, the evidence in this case does not show that doing so was in the best interest of the public. *See* S.C. Code § 38-26-50(D) (2015) ("The director or his designee may open the proceedings or hearings or make public notices, correspondence, reports, records, or other information if the director or his designee determines that it is in the best interest of the public or in the best interest of the insurer, its insureds, its creditors, or the general public."). In fact, the probative evidence before the Court reflects that publication of information regarding this matter has resulted in direct harm to the public. Policy holders and Petitioners have both been financially harmed and, Petitioners have been impeded from taking actions that are in the best interest of the public. Accordingly, I conclude that the Director's findings are unsupported by the evidence.

Conclusion

I conclude that the evidence, as a whole, does not support the Director's actions. As I have discussed, the Director's reliance on Mr. Fitzgibbons' November 14th directive was misplaced. As I determined above, the imposition of administrative supervision was premised upon the occurrence of a Mandatory Control Level Event. Yet, the evidence in the record does not support that a Mandatory Control Level Event has occurred. Therefore, because there was not a ground upon which the Director could impose administrative supervision, Mr. Fitzgibbons' directives are null and void *in totem*. Furthermore, a supervisor lacks the statutory power to preemptively direct an insurer from approving new premiums or renewals. Additionally, the Triennial examination of A-Cap's financial status is still ongoing, and an examination report has yet to be issued. Overall, the evidence relied upon by the Director was unreliable, unsupported, and contrary to the law.

Conversely, Mr. Cathcart and Mr. King each sufficiently explained that substantial changes have taken place among the A-CAP affiliates that have significantly abated conditions that existed in April. Specifically, Petitioners have reduced their exposure to their reinsurance counterparties and recaptured assets previously held by 777. Additionally, Petitioners are financially stable. ACL carries a B++ credit rating, maintains positive cash flow, and pays amounts owed to its policy holders and creditors. Notably, the Department presented **no** evidence to dispute these facts.

Accordingly, based upon the preponderance of the evidence, I conclude that the Director's December 11th Order is unsupported by the evidence in the record. In reaching this conclusion, I further find that the Department shall be enjoined from enforcing or giving effect to the Director's December 11th Order until such time as the Department issues a final decision on the matter.

Page **22** of **24**

## ORDER

**IT IS THEREFORE ORDERED** that the Department's Motion to Dismiss is **DENIED.**

**IT IS FURTHER ORDERED** that the Department, and all persons acting in concert with the Department, are permanently enjoined from enforcing or giving effect to the Director's December 11th Order until a final decision is issued by the Department in this matter.

**AND IT IS SO ORDERED.**

Ralph King Anderson, III
Chief Administrative Law Judge

February 13, 2025
Columbia, South Carolina

Page **23** of **24**

## CERTIFICATE OF SERVICE

I, Stephanie Perez, hereby certify that I have this date served this Order upon all parties to this cause by depositing a copy hereof in the United States mail, postage paid, or by electronic mail, to the address provided by the party(ies) and/or their attorney(s).

Stephanie Perez
Judicial Law Clerk

February 13, 2025
Columbia, South Carolina