# Exhibit B



1(212) 318-6358
rogerschwartz@paulhastings.com

April 16, 2025

**VIA EMAIL**

David Pellegrino
Smith Gambrell Russell
1301 Avenue of the Americas 15th Floor
New York, New York 10019
dpellegrino@sgrlaw.com

Re:   Equity Foreclosure Notice and Related Correspondence

Dear David:

This letter is in response to your letter to Paul Hastings dated April 15, 2025, regarding the Notices of Foreclosure dated as of April 4, 2025. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Loan and Security Agreement, dated as of May 7, 2021 (as amended, restated, amended and restated, extended, supplemented or otherwise modified in writing from time to time, the "Loan Agreement"), among the Borrowers party thereto, the Lenders from time to time party thereto (the "Lenders"), Leadenhall Capital Partners LLP, as the administrative agent, Leadenhall Life Insurance Linked Investments Fund PLC, as collateral agent (in such capacity, the "Collateral Agent"), the Servicers from time to time party thereto and the Sellers from time to time party thereto.

As you are well aware, certain Events of Default have occurred and are ongoing under the Loan Agreement, and all outstanding Obligations have been accelerated for well over one year as a result of the continuing Events of Default. As you are also aware, Leadenhall has attempted repeatedly to work constructively with the Borrowers and the Guarantors (together, the "Loan Parties") during that same time period in order to address issues regarding safeguarding and preserving the value of the Collateral.
To date, these efforts have included, without limitation, the following:

- Leadenhall, Leadenhall's counsel, the Loan Parties, and the Loan Parties' counsel have had numerous discussions over the past year regarding outstanding information requests. Consistent with the Loan Parties' past practices, notwithstanding the numerous information requests from Leadenhall and its counsel following the appointment of a supposed independent fiduciary, Leadenhall continues to lack basic, material information relating to the Collateral and whether it is being preserved a manner that maximizes value. This includes a call on July 8, 2024, whereby Paul Hastings identified the specific provisions of the LSA that entitled Leadenhall to the information that had already been withheld for months. Thereafter, counsel to the Loan Parties responded on July 17, 2024, acknowledging that Leadenhall "may have a right to some of the information requested." While 777/B. Riley agreed to provide requested information relating to the Collateral (while claiming additional information would need to be provided in the context of settlement negotiations and execution of a non-disclosure agreement despite the existing confidentiality provisions in the Loan Agreement), no material information was ever provided by the Loan Parties nor their advisors regarding the Collateral despite numerous follow-up requests. Leadenhall still awaits a response to those requests.



_____

April 16, 2025
Page 2

- On June 18, 2024, B. Riley informed Craig Gillespie at Leadenhall that cash at the Signal entities was being pooled on an unallocated basis and then remitted to Leadenhall and MedSett Funding, another Signal creditor. In response, Leadenhall requested that a DACA and intercreditor be put in place over that account. Leadenhall followed up with Kevin Cronin of 777 Partners on August 7, 2024, with several questions related to implementing such an intercreditor agreement. Leadenhall is still waiting on a response to those items. Nevertheless, Paul Hastings sent a draft intercreditor agreement to Smith Gambrell and Berger Singerman on November 27, 2024, for review and comment. Similarly, Paul Hastings is still waiting on a response.

- In another instance, given Leadenhall's concern and surprise over the Signal Loan Parties' refusal to engage with its sole secured creditor, Leadenhall requested that an independent fiduciary step in to oversee administration and protection of the Signal Collateral. In furtherance of those efforts, on December 19, 2024, Leadenhall sent counsel to the Loan Parties a draft consent to permit an independent director to be appointed to oversee the Signal collateral, similar to what the Loan Parties eventually agreed to with respect to the Insurety Borrower. However, consistent with their past practice, the Loan Parties and their advisors simply never responded to a proposal, consistent with the Insurety approach, that would not have (i) required the Borrowers or the Guarantors to provide the Borrowers with any additional liquidity, (ii) required immediate cure of any existing Events of Default, or (iii) provided the Independent Director with any exclusive decision-making authority over a bankruptcy petition or third-party transaction. We remain perplexed as to how perpetual silence in response to such a proposal could constitute a reasonable decision by a purportedly independent fiduciary in the context of a defaulted, accelerated loan.

- Even in the one instance where Leadenhall and the Loan Parties were able to consensually agree to a remedy in connection with the appointment of an independent director at the parent of the Insurety Borrower, the executed consent came after protracted negotiations that resulted in Insurety brazenly and without prior notice utilizing Leadenhall's loan proceeds to make payroll and discovery by Leadenhall, in contrast to disclosure by the Borrowers or their fiduciaries and advisors, that the Loan Parties had improperly transferred title to certain Collateral to a non-Obligor under the Credit Agreement.

- Prior to serving the foreclosure notices, Paul Hastings reached out to 777's counsel one last time to propose a consensual foreclosure pursuant to Section 9-620 of the Uniform Commercial Code. The Loan Parties and their fiduciaries, per usual, opted not to respond to this proposal.

Given this history, Leadenhall ultimately determined that it had no choice but to foreclose on its Collateral in order to preserve and protect its value. Nevertheless, your letter indicates surprise over the actions taken despite the Loan Parties and their fiduciaries continuously ignoring Leadenhall and refusing to act in the best interests of their stakeholders. Consistent with the Loan Parties' past behavior, this position, among other things, ignores their contractual responsibilities and the rights of their secured lenders as if they simply do not exist. It is particularly concerning that page 2 of your letter indicates that there are other creditors that may hold an interest in the Collateral. As you know, this is explicitly prohibited under Section 5.01(d) the Loan Agreement.

Your letter also contains numerous questions regarding the foreclosure process to date. Unlike your client, Leadenhall is under no contractual obligation to provide the information requested. However, your questions indicate that you believe that the Borrowers may possess equity value at this time. With that in mind, we



April 16, 2025
Page 3

will postpone , for the time being and in our sole discretion, the pending foreclosure auction to give you the opportunity to provide further information as to, among other things, (1) valuation of the Collateral performed by B. Riley to date, (2) marketing efforts performed by B. Riley that indicate such equity value exists, and (3) further information (which is already contractually required under the Loan Agreement) regarding specific Collateral that you believe possesses sufficient value that may provide a recovery to stakeholders besides Leadenhall.  Assuming that B. Riley has actually fulfilled its fiduciary obligations to maximize and preserve value for all (as opposed to only certain) stakeholders since its engagement nearly one year ago, providing this information should not be too difficult or time-consuming.

Your provision of the requested information should address any "concerns"—expressed for the first time in your letter—about ensuring that the pending foreclosure satisfies a "commercially reasonable" standard.  As you know, Leadenhall has repeatedly raised *its* concerns about the manner in which certain of 777's creditors have exercised rights and remedies against 777 assets to the detriment of Leadenhall and other creditors.  Specifically, during the course of B. Riley's engagement, A-CAP and its affiliates have repeatedly exercised purported secured creditor remedies against, and to the detriment of, 777 Partners assets and interests with what appears to be the eager cooperation and facilitation, or at the very least acquiescence, of B. Riley and its advisors.  This has occurred notwithstanding B. Riley's and its advisors' repeated admissions, including under oath, that they have undertaken no investigation as to (i) the facts, circumstances and fairness of the various transactions that gave rise to A-CAP's alleged secured status, (ii) any defenses that 777 Partners and its affiliates may have with respect to A-CAP's purported claims or secured status, or (iii) any claims or causes of action that 777 Partners and its affiliates may possess against A-CAP and its affiliates.  The apparent failure of 777 Partners and its fiduciaries and advisors to pose any of the questions contained in your letter to A-CAP in connection with its numerous exercises of remedies suggests that your "concerns" about commercial reasonableness turn exclusively on which creditor is exercising remedies.

Please let us know no later than April 18, 2025, if you intend to provide the information requested above.  Leadenhall reserves all rights.

Sincerely,

*Roger G. Schwartz*

Roger G. Schwartz
of PAUL HASTINGS LLP