UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>Plaintiffs,<br><br>vs.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>Defendants. | Civil Action No. 1:24-cv-03453-JGK |

**REPLY IN SUPPORT OF LEADENHALL'S MOTION FOR
<u>CONTEMPT AGAINST THE GUARANTORS, A-CAP, AND KENNETH KING</u>**

## TABLE OF REFERENCES

| Abbreviation | Definition |
|---|---|
| "600 Partners" | 600 Partners LLC |
| "777 Entity Defendants" | 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Signal SML 4 LLC, SuttonPark Capital LLC, Signal Medical Receivables LLC, Insurety Capital LLC, SuttonPark Servicing LLC |
| "777 Partners" or "777" | 777 Partners LLC |
| "A-CAP" | Advantage Capital Holdings LLC, inclusive of affiliates Haymarket and ACM Delegate |
| "ACM Delegate" | ACM Delegate LLC |
| "Atlantic Coast" | Atlantic Coast Life Insurance Company |
| "B. Riley" | B. Riley Advisory Services |
| "Borrowers" | SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, Signal SML 4 LLC |
| "Everton" | Everton Football Club |
| "Friedkin" | The Friedkin Group |
| "Guarantors" | 777 Partners LLC and 600 Partners LLC |
| "Haymarket" | Haymarket Insurance Company |
| "Jazz Re" | Jazz Reinsurance Company |
| "Leadenhall" | Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC |
| "Nutmeg" | Nutmeg Acquisition LLC |
| "Sentinel Life" | Sentinel Security Life Insurance Company |
| "Southern Re" | Southern Atlantic Re, Inc. |
| "SuttonPark" | SuttonPark Capital LLC |
| "TAMI" | Trans Atlantic Lifetime Mortgages Limited |

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Lowry v. OppenheimerFunds, Inc.*,
  2022 WL 976823 (S.D.N.Y. Mar. 31, 2022) ............................................................................. 7

*John T. ex rel. Paul T. v. Delaware Cnty. Intermediate Unit*,
  318 F.3d 545 (3d. Cir. 2003) .................................................................................................... 9

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000) ..................................................................................................... 6

*In re Sledziejowski*,
  533 B.R. 408 (S.D.N.Y. Bankr. 2015) ..................................................................................... 5

*Telecom Bus. Sol., LLC v. Terra Towers Corp.*,
  2025 WL 1194375 (S.D.N.Y. Apr. 22, 2025) .......................................................................... 5

## **TABLE OF CONTENTS**

                                                                                                                                                                        **Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ...................................................................................................................................1

I.      DEFENDANTS CONCEDE THE PRELIMINARY INJUNCTION IS CLEAR AND UNAMBIGUOUS. ..................................................................................................1

II.     DEFENDANTS DO NOT DISPUTE THAT A-CAP REALIZED A PROFIT ON THE TAMI AND EVERTON TRANSACTIONS AND DID NOT PASS THAT VALUE TO THE GUARANTORS. ...........................................................................2

        A.    The Everton Transaction Violates the PI by Diminishing the Equity Value of 600 Partners' Asset, Nutmeg. ................................................................4

        B.    The TAMI Transaction Violates the PI Because 600 Partners Received Virtually No Value for a $200-300 Million Asset. ...................................6

III.    DEFENDANTS FAIL TO DEMONSTRATE ANY ATTEMPTS TO COMPLY WITH THE PRELIMINARY INJUNCTION. ................................................................10

CONCLUSION ..............................................................................................................................11

CERTIFICATE OF COMPLIANCE ............................................................................................13

**PRELIMINARY STATEMENT**

Defendants do not dispute the key dispositive fact: the fair value of two assets A-CAP took from the Guarantors exceeded the consideration A-CAP gave the Guarantors for those assets.



Nothing in Defendants' opposition briefs—from protestations that A-CAP needed to save the Guarantors from financial troubles of their own making to non-sequiturs about the Florida lawsuit that the 777 Entity Defendants dismissed with prejudice—changes the fact that A-CAP's campaign of ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌" violated the PI. A-CAP's opposition is loud and clear: It does not want the Court scrutinizing these transactions because it has every intention of continuing to strip assets from the Guarantors to save itself from insolvency.

**ARGUMENT**

**I. DEFENDANTS CONCEDE THE PRELIMINARY INJUNCTION IS CLEAR AND UNAMBIGUOUS.**

No Defendant argues the PI is anything but clear and unambiguous, conceding that the first element for finding contempt is satisfied. As the Court stated, "the preliminary injunction is clear. No one has suggested that it's not." ECF 238 11:9-11.

1

## II. DEFENDANTS DO NOT DISPUTE THAT A-CAP REALIZED A PROFIT ON THE TAMI AND EVERTON TRANSACTIONS AND DID NOT PASS THAT VALUE TO THE GUARANTORS.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ To avoid the PI's clear prohibition on these transfers for less than fair value, Defendants contend the TAMI transaction was permissible because it ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ ECF 313 at 15-16, 18-20. Neither argument holds water.

Given that A-CAP exercised a proxy in December 2024 to formally control the Guarantors, the 777 Entity Defendants evidently do as they are told by A-CAP and do not attempt to defend either transaction, deferring entirely to A-CAP.[1] ECF 282-7 at 1, 3-4. Even apart from the proxy exercise, that B. Riley—the Guarantors' nominal managers—abdicated all responsibility for complying with the PI is unsurprising; B. Riley was installed by A-CAP, ECF 86-11 ¶ 6; ECF 87 ¶¶ 18, 22; ████████████ ECF 282-8 54:2-4; ████████████████████ ████████████████████████████████████████████████ ECF 282-25 64:16-19; ECF 282-26 99:7-101:7. ████████████████████████

████████████████████████████████████████████████████████████

---

[1] The 777 Entity Defendants dedicate their entire opposition to "set[ting] the record straight" on the Florida litigation—a case they voluntarily dismissed with prejudice *without a settlement agreement*. ECF 309 at 2. They cannot rewrite (or relitigate) history; across the tens of thousands of documents in that record, not a shred of evidence supports any link between Leadenhall and 777's former employee Noah Davis beyond the 777 Entity Defendants' unfounded "independent contractor once-removed" theory.

2

███████████████████████████████████████████ ECF 282-1 at 2, or the "particulars" of the Everton transaction, ECF 282-7 at 1-2.

A-CAP, in a transparent effort to distract from its own wrongdoing, faults Leadenhall for its "belated" motion but conspicuously ignores its own role in concealing the misconduct giving rise to Leadenhall's motion—which emerged only through recent depositions and regulatory proceedings against A-CAP. ECF 313 at 1. As the Court made clear when declining to issue an advisory opinion preemptively blessing the Everton transaction, ECF 233 11:2-22, A-CAP could discuss contemplated transactions with Leadenhall or proceed at its own risk. *Id.* 11:15-20. A-CAP chose the latter.

Heeding the exhortation that a PI challenge should follow "an adversary process in which, if necessary, evidence was taken, expert opinions were offered, and the like," *id.* 10:18-20, Leadenhall conducted its due diligence before turning to the Court. Defendants resisted Leadenhall's efforts to obtain relevant information; the 777 Entity Defendants disclaimed any responsibility to provide information, ECF 282-7 at 1-2, and A-CAP conditioned providing information about the Everton transaction on ███████████████████████████████████ ███████████████████████████ ECF 306-2 at 2. It was not until late 2024 and early 2025—when Leadenhall deposed B. Riley's COO, ECF 282-8, and the Utah Insurance Commission publicly revealed ████████████████████████████████████ that Leadenhall finally obtained evidence confirming its suspicion that A-CAP structured these transactions to *circumvent* the PI, usurping value the Guarantors should be preserving for its creditors. Defendants cite no authority where a court faulted a party for waiting to move for contempt while it marshaled evidence to support the request.

3

### A. The Everton Transaction Violates the PI by Diminishing the Equity Value of 600 Partners' Asset, Nutmeg.

A-CAP spills much ink trying to evade the Court's scrutiny by arguing that "[n]o right or asset of any enjoined party was a subject of the Everton transaction." ECF 313 at 15. But Defendants concede that the Everton transaction *did* involve the asset of an enjoined party. As B. Riley's COO testified, the equity value of Nutmeg—undisputedly 600 Partners' asset—was ▮▮▮▮▮—something of value that the PI requires 600 Partners to preserve. Just as transferring the equity of Nutmeg to A-CAP would violate the PI, diminishing the value of Nutmeg by draining *its* assets without fair compensation *also* violates the PI. The fact that Defendants have not calculated *how much less* Nutmeg is worth after the Everton transaction does not insulate them; Defendants cannot bury their heads in the sand to avoid knowing whether Nutmeg's assets were dissipated in violation of the PI. In any event, Defendants are no longer pretending to abide by their PI obligations—last night, A-CAP's counsel notified Leadenhall that it *does* intend to foreclose upon and sell all of 600 Partners' equity interests in Nutmeg on June 6, 2025. *See* Ex. AA. Leadenhall reserves the right to seek a contempt order with respect to this transaction, including the Guarantors' apparent abdication of their obligation to even notify Leadenhall of A-CAP's exercise of remedies, to the extent 600 Partners receives less than fair value for the (diminished) equity of Nutmeg.

The Court should reject A-CAP's insistence that it did not (and does not) act in concert with the Guarantors given that A-CAP *formally took over* proxy control of Nutmeg and then the Guarantors to facilitate the transaction, ▮▮▮▮▮

4

ECF 282-10; ECF 282-7 at 3-4.  A-CAP not only acted *in concert* with the Guarantors; it acted *for* the Guarantors.  A-CAP does not seriously contest that, by virtue of ACM Delegate's exercise of proxy rights to control the Guarantors' actions, it is now an enjoined party.  Courts have found "active concert" between third parties and enjoined parties on far less.  *In re Sledziejowski*, 533 B.R. 408, 424 (S.D.N.Y. Bankr. 2015) (active concert can involve "considerable control by the enjoined party over the non-party's operations"); *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, 2025 WL 1194375, at *15 (S.D.N.Y. Apr. 22, 2025) (finding non-party to injunction in contempt for violating injunction where non-party exercised "sole control over [the enjoined party's] representatives").[2]

      A-CAP next insists no asset was dissipated because "[i]t is elementary that when debt (a liability) is reduced, equity value (assets minus liabilities) ***increases***."  ECF 313 at 16 (emphasis original).  This ignores the Everton transaction as a whole and zooms in on the second half in isolation.  First, in April 2024, Haymarket stripped the Everton loan from Nutmeg for no consideration (or illusory consideration in the form of the retention of the fanciful and ultimately failed attempt to buy Everton), and second, in a belated attempt to actually pay for the loan, Haymarket wrote down debt to Nutmeg in December 2024.  A-CAP's myopic review of the single transaction, whereby the taking is ignored but the payment is credited, would mean that A-CAP acted above board so long as it provided a single dollar of debt reduction in December 2024.  What Leadenhall does know, because A-CAP has touted it to regulators, is that the ▮▮▮▮▮▮

---

[2] A-CAP's suggestion that it lacked "explicit notice" of the PI's limitations, ECF 313 at 15, is risible given A-CAP's leading role in efforts to oppose, modify, and then appeal the PI.

5

██████████████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████████████████

████████████████████ That is the value of the loan. *See Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("[A] recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value."). It dictates precisely how much A-CAP should have compensated Nutmeg—in cash, debt reduction (assuming the debt itself resulted from a valid transaction), or other consideration. The Guarantors have refused to determine whether the debt reduction provided to Nutmeg was fair in light of the consideration A-CAP received from Friedkin ████████████████████████████████ and how much Nutmeg's equity value was affected because of that transaction. A-CAP's admission that *it* realized a gain—as opposed to broke even or took a loss—means that it made more than it gave back to Nutmeg. That is a dissipation.

### B. The TAMI Transaction Violates the PI Because 600 Partners Received Virtually No Value for a $200-300 Million Asset.

The Guarantors have not received fair market value for TAMI. ECF 146; ECF 282-1 at 2. Nor have they received *any* value for TAMI, ████████████████████████ ████████████████████████████████████████████ ████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████

The following facts are undisputed: ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

6

[REDACTED]

A-CAP is right that it papered the TAMI transaction, including its provision for [REDACTED]," to give the appearance of legitimacy to an objectively bad deal for the Guarantors. *See* ECF 313 at 1, 9-10. [REDACTED] A-CAP's generic assertion that post-closing [REDACTED] adds nothing to the analysis, particularly since the case it relies on involved an arm's-length transaction in which only a portion of the cash payment was deferred to later earn-out payments—not an insider transaction between alleged co-conspirators with one exercising a proxy to control the other. *Lowry v. OppenheimerFunds, Inc.*, 2022 WL 976823, at *2 (S.D.N.Y. Mar. 31, 2022).

[REDACTED] ECF 313 at 11—A-CAP studiously avoids disclosing what those reports conclude about TAMI's value. Defendants' estimates of TAMI's value vary wildly depending on whether a high or low value is convenient. For example, B. Riley's COO Mark Shapiro testified under oath that TAMI [REDACTED] Contemporaneous with the transfer of TAMI to Haymarket, A-CAP represented to regulators that [REDACTED]

[REDACTED] Starkly contradicting these representations, A-CAP now tells this Court that, in July

7



2024, ███████████████████████████████████████

███████  ECF 313 at 20 (quotations omitted).

These oscillations about TAMI's value make sense when viewed through A-CAP's prism of interests. When A-CAP wants regulators to believe it has sufficient assets backing policyholder claims, ████████████████████████████████████████ ECF 282-17 at 7. But here, where A-CAP wishes to conceal its stripping of valuable assets from the Guarantors, TAMI is worth ████████████████████████ A-CAP has no incentive to reach a final valuation—████████████████████████████████████████████████

████████████████████████████████████████████████

A-CAP also contends the TAMI transaction is not contumacious because ██ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ there has been no analysis of the validity or enforceability of that debt (or whether the terms of that loan agreement were commercially reasonable), and in fact

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

8

███████████████████████████████████████████████████████

████████████████████ ██████████ . ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ██

████████████████████ █████████

  A-CAP's assurances that the Guarantors will receive fair market value for TAMI are further undercut by the language in the SPA's ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ The upshot of the provision is that A-CAP has carte blanche to ███████████████████ however it wishes given a mountain of evidence that Wander and Pasko committed a slew of bad acts, including sworn deposition testimony from SuttonPark's Accounting Controller that they "████████████████████████████████." ECF No. 282-19 113:23-114:2.

  Finally, A-CAP argues that the ███████████████████████████████

████████████████████████████████████████████████ ECF 313 at 19. That argument is disingenuous because, in December 2024, A-CAP exercised irrevocable proxy rights "to make resolutions" on behalf of the Guarantors, taking formal control of 777. ECF 282-7 at 4-5.  Accordingly, any delay A-CAP ascribes to the Guarantors is entirely attributable to A-CAP.  It is also irrelevant.  Under the terms of the PI, it does not matter which party caused the delay—the Guarantors must receive fair compensation for transferring this asset to A-CAP or they are in contempt.  *See John T. ex rel. Paul T. v. Delaware Cnty. Intermediate Unit*, 318 F.3d 545,

552 (3d. Cir. 2003) ("[E]vidence regarding good faith does not bar the conclusion that the defendant acted in contempt." (alterations adopted)).  The Guarantors transferred a ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  This transaction violates the PI.

### III. DEFENDANTS FAIL TO DEMONSTRATE ANY ATTEMPTS TO COMPLY WITH THE PRELIMINARY INJUNCTION.

A-CAP gives short shrift to its efforts to comply with the PI; its entire defense hinges on its paternalistic insistence that it knows what is best for the Guarantors.  But the details of the Everton transaction and the TAMI transfer demonstrate that A-CAP is doing what is best for A-CAP: exploiting its control of the Guarantors to strip profits and save face with regulators.  Defendants' briefing only underscores that A-CAP is calling the shots.  While the 777 Entity Defendants appear content to quibble about their unproven allegations in the Florida action that they dismissed with prejudice, A-CAP takes the pen opposing the contempt motion.  And A-CAP's contention that the 777 Entity Defendants are dependent on A-CAP to play the savior is a problem of Defendants' own (deliberate) creation.  Regardless—indeed, *because*—of the precarious situation in which the 777 Entity Defendants find themselves, the PI prohibits them and A-CAP from harming other creditors to save themselves.

Rather than open the books to defend the transactions or explain their efforts to comply with the PI, A-CAP again reverts to accusing Leadenhall of misconduct, taking issue with Leadenhall's public filing of court documents from the Utah proceedings—the substance of which speaks for itself.  ECF 313 at 12-13.  But Leadenhall (like any other member of the public) accessed all filings submitted from the court docket where they were publicly available for weeks before, unbeknownst to Leadenhall, the Utah court retroactively sealed the docket at A-CAP's request.  ECF 288 at 1-2.  Those filings have now been sealed again here at A-CAP's request, serving its

real goal of operating in the shadows so that it can continue making one representation to insurance regulators and another to this Court. A-CAP's blatant disregard for the judicial process makes this a paradigmatic case for finding contempt and sanctions.

A-CAP is also wrong that sanctions are not appropriate. A-CAP cites *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, which explains that civil contempt sanctions "may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged"—the latter requiring some "proof of loss." 369 F.3d 645, 657-58 (2d Cir. 2004). A sanction can "be both coercive and compensatory" so long as "[t]he coercive component of the fine levied . . . does not predominate over the compensatory." *Id.* at 658 (citations omitted). Such is the case here. Leadenhall seeks a sanction with coercive and compensatory components, and the coercive components do not predominate. Leadenhall requests approximately $11.8 million in compensatory sanctions—a drop in the bucket compared to the profits A-CAP has siphoned from the Guarantors and, by extension, their creditors—and prospective sanctions to coerce compliance with the PI. There is nothing improper about that.

## CONCLUSION

The Court should grant Leadenhall's motion.

Dated: New York, New York
May 27, 2025

KING AND SPALDING LLP

*Leigh M. Nathanson*
Craig Carpenito
Leigh M. Nathanson
Brian Donovan
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
ccarpenito@kslaw.com
lnathanson@kslaw.com

11

bdonovan@kslaw.com

*Attorneys for Plaintiffs*

12

## **CERTIFICATE OF COMPLIANCE**

I hereby state that the foregoing Reply was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Memorandum of Law, excluding the caption, table of contents, table of authorities, signature block, and this certification is 3,496 words. The foregoing Reply complies with the formatting rules set forth in the § III.D of the Court's Individual Practices.

Dated: New York, New York

May 27, 2025

                                                 KING AND SPALDING LLP

                                                 *Leigh M. Nathanson*
                                                 Leigh M. Nathanson

                                                 *Attorney for Plaintiffs*