# C A D W A L A D E R

Cadwalader, Wickersham & Taft LLP
200 Liberty Street, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

June 18, 2025

**VIA ECF**

The Hon. John G. Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     ***Leadenhall Capital Partners LLP, et al. v. Wander, et al.,***
        **No. 1:24-cv-03453 (JGK)**

Dear Judge Koeltl:

        We submit this letter (1) to inform the Court of the voluntary dismissal of Utah litigation that Leadenhall featured in its motion for contempt, and (2) in response to Leadenhall's June 11 letter regarding A-CAP-affiliate ACM Delegate's exercise of a foreclosure remedy with respect to Nutmeg's equity. Unlike Leadenhall's $3.00 purchase of Borrowers' assets after cursory "marketing," ECF 327 at 3, ACM Delegate's thorough process resulted in a commercially reasonable disposition of collateral that complies with both the UCC and the PI.

## Dismissal of the Utah Litigation

        As outlined in A-CAP's opposition brief, the Utah and South Carolina orders relied on by Leadenhall were issued months after the accused transactions; are sealed in the issuing tribunal; and have been reversed, permanently enjoined, or stayed. *See* ECF 304; *see also* ECF 303. And now, the last remaining regulatory matter on which Leadenhall relies, the Utah state court case filed in March, *see* ECF 281 at 5, 12–13, has been voluntarily dismissed. *See* Ex. 2 at Dkt. Nos. 247, 250, 251; *see also* Ex. 1 (press report). Neither that short-lived matter nor any other regulatory proceeding has any bearing on the Court's analysis of the transactions at issue here.

## The Public Disposition of Nutmeg's Equity

        Leadenhall asserts that "it is *more than reasonable to presume* that" ACM Delegate's exercise of its UCC remedy is "an additional violation of the PI." ECF 326 at 2.[1] But contempt

---

[1] All emphasis is added.

**Jonathan M. Watkins**  Tel +1 212 504-6229   Fax +1 212 504-6666   jonathan.watkins@cwt.com

**CADWALADER**

The Hon. John G. Koeltl
June 18, 2025

cannot be presumed, and Leadenhall does not claim clear and convincing proof. If Leadenhall files another baseless motion for contempt, A-CAP will respond in full (not in a three-page letter), and fee-shifting may be appropriate. For now, A-CAP outlines why the public disposition of Nutmeg comports with the PI.

**Background.** A-CAP (and affiliates) loaned 600 Partners (and affiliates) hundreds of millions of dollars. ECF 220 ¶ 8. To secure 600 Partners' obligation to repay that debt, 600 Partners pledged collateral, including its equity interests in Nutmeg. ECF 141-3 at 3. With the debt unpaid, collateral agent ACM Delegate provided notice that it would auction those interests under Article 9 of the UCC. ECF 326-1. The process prescribed by the UCC played out, and, on June 6, A-CAP purchased Nutmeg's equity. ECF 326-3.

**The PI required only notice.** The PI does not enjoin A-CAP or actions to "foreclose on, repossess, or exercise remedial actions." ECF 146 § E. The PI "***doesn't prevent any such actions****; it just provides* [for] *notice.*" 6/7/24 Tr. 43:17–20. And here, Leadenhall received prompt notice—in the interest of immediate transparency, ACM Delegate sent the Notice of Public Disposition of Collateral to Leadenhall and 600 Partners in a single email. ECF 326-1. Because A-CAP is not enjoined and did not work in active concert or participation with an enjoined entity,[2] it has not violated the PI.

**Transmitting the Notice does not suggest control.** A-CAP transmitted the Notice to Leadenhall "as a courtesy" among litigants, "not pursuant to any obligation of any entity under the preliminary injunction . . . ." *Id*. Leadenhall's argument that the communication "reflect[s]" that "Guarantors are now fully controlled by A-CAP," ECF 326 at 1, is baseless. Leadenhall cites a memo from private examiner Scott Eady, ECF 282-16, but neglects to mention that, days later, Judge Anderson ruled that A-CAP had not "t[aken] control of 777," "is not affiliated with 777," ECF 288 Ex. A at 11 n.22, and that "[o]verall, the evidence relied on by the [South Carolina] Director," including findings from Mr. Eady's ongoing examination, *id.* at 21, 22, "was unreliable, unsupported, and contrary to the law," *id.* at 22. Leadenhall also cites a letter from Mr. McCarthy; but that letter only reinforces that B. Riley, not A-CAP, controls the Guarantors. *See* ECF 282-7 at 2, 3-4. Indeed, A-CAP exercised its (customary) proxy rights only to insulate the controlling independent professionals from any attempt by an individual defendant to reclaim control at year end. *Id.* at 2, 3-4 (noting B. Riley's indefinite control and the revocation of Wander's and Pasko's rights); *see also* Ex. 3 (Notice of Exercise of Irrevocable Proxy).

---

[2] A-CAP is not alleged to have prevented 600 Partners from providing duplicative notice (it did not).

# C A D W A L A D E R

The Hon. John G. Koeltl
June 18, 2025

*The public disposition delivered fair value.* The Article 9 sale was, in any case, commercially reasonable and for fair value. Moelis & Company widely and publicly marketed Nutmeg and its assets for thirteen months. ECF 326-3. When the time came to exercise a UCC remedy, A-CAP retained an experienced specialist to lead and market the public disposition. *Id.* at 1. Despite the robust process, ACM Delegate was "the only active bidder," and it submitted a credit bid for its collateral. *Id.* at 2. While Leadenhall elected to make a trio of $1 credit bids[3] for its collateral (Borrowers' assets) after a sham "marketing" process, *see* ECF 327, A-CAP took the opposite approach—one that yielded a disposition for fair value, and at a price reflecting the sentiment of a fully informed market.

*There is no basis to "presume" otherwise.* Leadenhall's only proffered basis to "presume that a dissipation did occur" is that A-CAP has not provided Leadenhall all the information it requested—information to which Leadenhall has no right and which, for the reasons above, has nothing to do with PI compliance. *See* ECF 326 at 1-2. A-CAP's willingness to volunteer superfluous information is shaped by Leadenhall's record. On the Everton transaction, for instance, A-CAP was exceptionally forthcoming—*see, e.g.*, ECF 219; ECF 220; 10/24/24 Tr. 21:19–22; ECF 304 at 2, 6-8—yet Leadenhall nevertheless conjured a baseless, belated, and seemingly pretextual contempt motion. While A-CAP remains committed to providing information as reasonably appropriate, it disfavors needless motion practice, inflated litigation expense, and defamatory dockets.

Very truly yours,

*J. W. T.*

Jonathan M. Watkins

JMW

cc:    All Counsel of Record via ECF

---

[3] Leadenhall has indicated that Borrowers' debt (which Guarantors' guarantee) will be paid down as its receivables generate cash flow. ECF 327-2 at 13:5-10. That cannot be squared with Leadenhall's critique of the cash component of the TAMI transaction—which similarly hinges on *future cash flows* generated by the sold asset. ECF 304 at 18. Moreover, it seems that Leadenhall's claimed contract damages will remain a moving target for years to come. *Cf.* ECF 215 at 14-16.