# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222

Leigh M. Nathanson
Direct Dial: +1 212 790 5359
lnathanson@kslaw.com

August 5, 2025

The Honorable Barbara Moses
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 20A
New York, NY 10007

Re: Leadenhall *Capital Partners LLP et al v. Wander et al*, 24-cv-03453-JGK-BCM

Dear Judge Moses,

Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall") respectfully request a conference regarding discovery disputes with Advantage Capital Holdings ("A-CAP") and the 777 Entity Defendants ("777").

## I. A-CAP Corporate Secretary Jill Gettman Is an Appropriate Document Custodian Because She Holds Relevant Business Roles in Addition to Her Legal Role.

A-CAP objects to producing the documents of Jill Gettman, A-CAP's Corporate Secretary and Chief Legal Officer, even though Ms. Gettman held non-legal roles through which she assisted A-CAP in controlling 777. As set forth in Leadenhall's Complaint (ECF 187, the "CAC"), Ms. Gettman was directly involved in A-CAP's control of 777, including having the final say on whether 777 could even enter into a contract to delay the filing of this suit. *See* CAC ¶¶ 178, 181. Ms. Gettman also serves as a director on the boards of A-CAP affiliates referenced in the CAC for the proposition that A-CAP and 777 worked together to serve A-CAP's interests at the expense of 777's creditors; these affiliates include Phoenix Aviation Capital, which seized airplanes from a 777-owned airline in April 2024, *see id.* ¶ 302, and Trans-Atlantic Lifetime Mortgages Limited, an asset A-CAP stripped from 777 in 2024 which is the subject of Leadenhall's recent Motion for Contempt (ECF 281). She also signed quarterly regulatory filings for A-CAP's insurance companies, making her knowledgeable about the assets held (and transferred) by those insurers. Ms. Gettman therefore possesses information about the control rights A-CAP obtained and exercised as to 777—and whether its control over 777's operations exposes A-CAP to liability under a lender liability, fraud, racketeering, and/or aiding and abetting theory.

A-CAP does not dispute Ms. Gettman's relevance. Instead, A-CAP contends that her role as in-house counsel renders *all* of her documents privileged. The law belies this argument because Ms. Gettman holds non-legal roles at A-CAP and executes transactions for A-CAP as directed by Mr. King. *See, e.g.*, CAC ¶ 181. The attorney-client privilege does not apply to communications rendered "solely, or even largely, [for] business advice." *United States v. Int'l Bus. Mach. Corp.*, 66 F.R.D. 206, 212 (S.D.N.Y. 1974); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006) (documents reflecting "the performance by the attorney of non-legal

functions are not protected"). The presence of an attorney does not automatically render a communication privileged; it is the "motive for the communication" that matters. *U.S.P.S. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 160 (E.D.N.Y. 1994). Given Ms. Gettman's business roles, "[i]t follows that [she] would have generated emails or other documents that related principally to [her] role as business advisor, rather than her role as counsel." *Swift Spindrift, Ltd. v. Alvada Ins., Inc.*, 2013 WL 3815970, at *8 (S.D.N.Y. July 24, 2013). A-CAP cannot rely on a blanket assertion of privilege to avoid producing Ms. Gettman's documents.

A-CAP's second objection—that Ms. Gettman's documents will be cumulative—is equally infirm. Ms. Gettman's positions differ from those of A-CAP's other custodians: Kenneth King, A-CAP's chairman and CEO; Michael Saliba, COO; and Carson McGuffin, its portfolio manager. That there might be some overlap between Ms. Gettman's documents and those of other custodians is not a sufficient basis for rejecting Ms. Gettman as a custodian altogether.

Leadenhall has attempted to resolve this issue with A-CAP through meet-and-confer calls and in written correspondence.[1] To try to get Leadenhall to stand down on requesting Ms. Gettman as a custodian, A-CAP refuses to compromise unless Leadenhall agrees to produce the documents of its general counsel, Peter Clark. But Mr. Clark did not wear multiple hats. Because Mr. Clark's only role at Leadenhall is legal, he is unlikely to possess responsive, non-privileged information—and A-CAP has identified none. A-CAP's insistence on a mismatched horse trade ignores the facts and the law. The Court should direct A-CAP to produce Ms. Gettman's non-privileged documents.

**II. 777 Has Failed to Fulfill its Discovery Obligations.**

In the Court's November 26, 2024 ruling on Defendants' motions to stay discovery, Judge Koeltl recognized, "discovery promises to be time-consuming," so "it is appropriate for the parties to begin the process of locating and producing documents." ECF No. 252 at 4. Since then, 777 has engaged in what appears to be calculated delay to avoid responding to Leadenhall's discovery requests by (1) refusing to engage in meaningful negotiations over search parameters, as required by the parties' ESI Protocol (ECF 295), and (2) declining to provide proper responses to Leadenhall's Requests for Admission ("RFAs"), which seek an answer to the central question of which assets 777 improperly pledged as collateral to Leadenhall.

Leadenhall respectfully requests that the Court require 777 to apply Leadenhall's search terms, which have been modified to avoid overbreadth, so that 777 can begin producing custodial documents. Leadenhall further requests an order requiring 777 to cooperate in producing discovery relating to the viability of Leadenhall's collateral—the relevance of which is not disputed—whether through amended answers to the RFAs or through the production of documents.

---

[1] Good-faith conferences between A-CAP and Leadenhall took place on May 28, June 16, July 9, and August 1, 2025. The first call lasted 50 minutes and involved Leigh Nathanson, Peter Starr, Brian Donovan, and Lilian Klatskin for Leadenhall and Andrew Huynh and Jessica Talar for A-CAP. The second call lasted approximately 30 minutes and involved Leigh Nathanson, Brian Donovan, and Zoe Beiner for Leadenhall; Rachel Skene for A-CAP; Max Auerbach for Pasko; and John McCarthy, David Pellegrino, and Ryan Solfaro for 777. The third call lasted one hour and involved Brian Donovan, Lilian Klatskin, and Jenni Weaver for Leadenhall; Andrew Huynh, Jessica Talar, and Rachel Skene for A-CAP; Emily Drake for Wander; and Maximilian Auerbach for Pasko.  The final call, between Brian Donovan and Andrew Huynh, lasted 30 minutes.

### A. 777 Should Apply Leadenhall's Revised Search Terms Given Its Refusal to Provide a Counterproposal Consistent with the Parties' ESI Protocol.

Leadenhall served document requests in September 2024. The Court denied 777's subsequent motion to stay discovery in November 2024 and ordered 777 to "begin the process of locating and producing documents." ECF 252 at 4. In the eight months since, 777 has produced only 27 non-custodial documents. Leadenhall proposed search parameters to 777 on February 11, 2025. 777 ignored that proposal for nearly four months. When 777 responded on June 12, 2025, it did not address Leadenhall's proposal and instead offered an entirely new proposal. *See* Ex. A. 777's proposal was inconsistent with the parties' ESI protocol, which requires a party objecting to a requesting party's proposed search terms to "disclose the basis for its objection and provide the hit count of documents." *See* ECF 295 at 3. The proposal also did not purport to address, as Leadenhall's did, all of the issues on which 777 had agreed to produce responsive documents. *See id.* at 19, 21 (refusing to provide parameters for RFPs 19 and 21). 777's proposal reduced the overall number of proposed search terms from 92 to 22; altered various date ranges; rejected more than half of Leadenhall's proposed custodians; and limited search terms with the connector of "NEAR/8." *See id.*

Leadenhall sent a revised proposal on July 2, 2025, which 777's counsel later claimed they "did not see," and to which 777 waited another three weeks to respond. On July 22, 777 provided a hit report for Leadenhall's revised search terms. 777 claimed the terms were "vastly overbroad" but did not propose revisions. On July 25, Leadenhall again revised its proposal to narrow certain terms. *See* Ex. B. 777 has not responded to that proposal.

777 has also refused to meet and confer, failing to attend teleconferences on May 27 and July 9, which all other parties attended.[2] Given 777's failure to provide a viable counterproposal that comports with the ESI protocol and Leadenhall's efforts to narrow its proposal, Leadenhall respectfully requests that the Court compel 777 to apply Leadenhall's July 25, 2025 search parameters (Ex. B) and begin custodial productions. *See Aviles v. S&P Glob., Inc.*, 583 F. Supp. 3d 507 (S.D.N.Y. 2022) (granting motion to compel where plaintiffs delayed responding and produced a suspiciously low number of documents).

### B. 777's Responses to Leadenhall's RFAs Are Improper.

On May 20, 2025, Leadenhall served 777 with RFAs seeking admissions that certain assets 777 had pledged as collateral to Leadenhall were not in fact free and clear of adverse claims. Ex. C. 777 has admitted that some portion of Leadenhall's purported collateral was, in fact, double-pledged or not otherwise eligible,[3] and the RFAs sought to identify which of the thousands of assets comprising the collateral, listed in an attachment, had been improperly pledged—a fact undisputedly relevant to Leadenhall's case. On June 17, 2025, 777 moved for an extension to respond or a ruling that the RFAs "are premature." ECF 328. In that motion, 777 objected to the RFAs as "unreasonabl[y] burden[some]" because answering them would require reviewing records to "determine whether any of the 3,449 deals was ever subject to an adverse claim while serving

---

[2] 777's counsel attended conferences on June 16 and July 1, 2025, which lasted for approximately 30 minutes. John McCarthy and David Pellegrino attended the June 16 conference on behalf of 777 while Brian Donovan and Leigh Nathanson attended for Leadenhall. Mr. McCarthy and Ms. Nathanson attended the July 1, 2025 conference.

[3] *See, e.g.*, ECF No. 282-8 at 52:3–18 (777's COO testifying to a collateral "shortfall of $320 million" in Leadenhall's credit facility); ECF 128 at 54-55 (Judge Koeltl observing that "defendants do not dispute any of Leadenhall's allegations of breaches" of the parties' agreement).

as collateral for Leadenhall's loan"—a process that, in 777's words, "would be incredibly time-consuming." *Id.* at 2. These objections are misguided; the need for 777 to examine thousands of assets arises from the scope of its own misconduct—the scale of discovery is proportional to the scale of the fraud. *SEC v. Rayat*, 2022 WL 1606953, at *2 (S.D.N.Y. May 19, 2022) (the "sheer number of RFAs" does not render them objectionable, particularly in a "complex" case); *Napolitano v. Synthes USA, LLC*, 297 F.R.D. 194, 198 (D. Conn. 2014) (noting the "strong disincentive to finding an undue burden" in responding to RFAs). Still, during the parties' June 16 conference, Leadenhall proposed alternatives, including deferring the RFAs pending 777's production of documents (including "compliance reports") demonstrating which assets were pledged to each of 777's creditors during the relevant period. 777 has not produced such documents.

On July 25, 2025, 777 Partners denied both RFAs without providing any asset-by-asset response. *See* Ex. C. The denial was surprising given (1) 777's prior representation that it would have to review each individual piece of collateral to determine its eligibility and (2) the substantial evidence that 777 failed to own sufficient collateral as required by the parties' contracts. *See supra* n. 3. Leadenhall therefore requested to confer regarding the basis for 777's denial and to confirm that 777 had conducted the process required to accurately answer the RFAs. *See* Ex. D. Counsel for 777 refused, stating, "[W]e see no need for the attorneys to meet and confer about our clients' responses" and "are not aware of any . . . authority that would suggest that we are somehow required to meet and confer concerning those responses." *Id.* 777's refusal to confer contravenes Section 2(b) of this Court's Individual Practices and deprives Leadenhall of a full understanding of the nature of the dispute. Because 777's denials do not appear to be responsive to Leadenhall's RFAs with respect to particular assets, and because 777 has refused to provide any legal or factual support for the propriety of its responses, Leadenhall asks the court to compel 777 to (1) specify which assets caused it to issue a denial, and (2) produce all of the records it claimed it would have had to review to sufficiently answer the RFAs—including compliance reports pertaining to other credit facilities, *see* ECF 328 at 2—so that Leadenhall can ascertain the truth.

                                      Respectfully submitted,

                                      */s/ Leigh M. Nathanson*
                                      Leigh M. Nathanson

Enclosure
cc: Counsel of record (via ECF)