# CADWALADER

Cadwalader, Wickersham & Taft LLP
200 Liberty Street, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

August 12, 2025

**VIA ECF**

The Hon. Barbara Moses
Daniel Patrick Moynihan Courthouse
United States Courthouse
500 Pearl St
New York, New York 10007

Re:   *Leadenhall Capital Partners LLP v. Wander et al.*, No. 1:24-cv-03453-JGK-BCM

Dear Judge Moses:

We write on behalf of A-CAP and Kenneth King to oppose Leadenhall's August 5 request, ECF 334, to compel A-CAP's Chief Legal Officer to be a custodian.  *See infra* Part I.  Leadenhall seeks to bootstrap a baseless accusation (that refusing to waive contractual rights is a federal crime) into a means to target a Chief Legal Officer and her communications—communications that are privileged, in other custodians' files, or both.  Because Leadenhall cannot (and makes no serious attempt to) show that Ms. Gettman is likely to possess unique relevant documents, she is not an appropriate custodian.

We also address a dispute over Leadenhall's refusal to search the files of its CFO and COO.[1]  *See infra* Part II.

**I.     JILL GETTMAN IS NOT AN APPROPRIATE CUSTODIAN.**

Ms. Gettman is the longtime Managing Partner of litigation boutique Gettman & Mills, LLP and, since 2021, A-CAP's Chief Legal Officer.  As CLO, Ms. Gettman's job is to provide legal advice to A-CAP—advice typically delivered (and sought) through communications directly between Ms. Gettman and A-CAP's principal, Mr. King.  Mr. King is an agreed custodian.

Ms. Gettman, however, is not an appropriate custodian.  Pronounced burdens come with lawyers being custodians—document-by-document privilege review, privilege logs, the risk of inadvertent production, and seemingly inevitable motion practice.  Doing so is inappropriate unless movants show that the lawyer's files include "unique relevant information not already" available

---

[1] A-CAP and Leadenhall met and conferred regarding the appropriate scope of discovery, as laid out in Leadenhall's letter.  ECF 334 2 n.1

The Hon. Barbara Moses
August 12, 2025

from other custodians.² *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013).³ Leadenhall fails to make that showing.

***Background.*** This lawsuit centers on 777 (not A-CAP) allegedly overstating its "Borrowing Base" under a Loan and Security Agreement between 777 affiliates (the Borrowers) and Leadenhall. *See* ECF 187 ¶ 160. Leadenhall alleges that before it was tipped off to the overstatements in September 2022, it approved draws under the credit facility in reliance on Borrowers' overstated Borrowing Bases. *Id.* ¶¶ 2, 8, 105. The final draws on the facility were made by June 2021. *Id.* ¶¶ 55, 102; *see* ECF 215 at 7.

Leadenhall declared an Event of Default and accelerated Borrowers' debt in March 2024. ECF 187 ¶¶ 176, 177. Neither Borrowers nor Guarantors satisfied that debt, and Leadenhall sued for contract damages in the amount of the Accelerated Debt. ECF 1 ¶¶ 212-18, 230-36. It seeks the same in fraud claims against Borrowers, Guarantors, and their principals, Messrs. Wander and Pasko, whom it accuses of perpetrating the allegedly fraudulent overstatements. ECF 187 ¶ 384-88.

Leadenhall asserts that Borrowers, Guarantors, and their principals are near insolvency, so it also sued A-CAP, seeking the same Accelerated Debt as damages. A-CAP is 777's senior secured (and largest) creditor; it is not a party to the LSA or any other contract with Leadenhall. *See id.* ¶ 49; ECF 215 at 3. Leadenhall thus formulated a nominal RICO conspiracy claim against A-CAP, ECF 187 ¶¶ 277-310, and later amended to attempt to plead, in the alternative, a "lender-liability" claim, alleging that A-CAP eventually came to control 777 and should be held responsible for 777's alleged contractual liability to Leadenhall. *Id.* ¶¶ 322, 332, 345. A-CAP and Mr. King have moved to dismiss all claims against them. *See generally* ECF 215, 263.

***Leadenhall identifies no responsive, unique, non-privileged documents regarding forbearance negotiations.*** Contrary to Leadenhall's lead assertion, ECF 334 at 1, Ms. Gettman's involvement in pre-suit forbearance negotiations do not make her a proper custodian.

According to Leadenhall, in March 2024—almost three years after the object of the alleged fraud was achieved, *e.g.*, ECF 215 at 7, ECF 263 at 1—"in a last-ditch attempt to stave off this

---

² To satisfy their burden, movants must show more than a *de minimis* volume of unique relevant documents. *See, e.g.*, *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 1:14-cv-04394-AJN-BCM, ECF 337 Hr'g Tr. at 12:10-15 (Mar. 3, 2017) (Moses, M.J.) (denying motion to add in-house legal counsel as custodians, explaining that if there are "100,000 documents [from a legal custodian] of which three might potentially be relevant and non-privileged ... I would have to think long and hard before I ordered a party to go down that path").

³ *See also Assured Guar. Mun. Corp. v. UBS Real Est. Sec. Inc.*, 2013 WL 1195545, at *4 (S.D.N.Y. Mar. 25, 2013); *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 2020 WL 7383940, at *7 (S.D.N.Y. Dec. 16, 2020); *Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2016 WL 6779901, at *3-4 (S.D.N.Y. Nov. 16, 2016).

The Hon. Barbara Moses
August 12, 2025

lawsuit, Leadenhall entered into negotiations concerning a 'Forbearance Agreement'" with "777 Partners." ECF 187 ¶ 178. Leadenhall alleges that while progress was made, in the end, 777's principal, Josh Wander, told Leadenhall that no deal was possible because **A-CAP "h[as] the power of the purse right now,"** *id.* ¶ 178, and **"[A-CAP] told us they're going to default our Holdco loan if we sign the [forbearance] document without them agreeing to it"** *Id.* ¶ 180. This is Leadenhall's theory: by indicating to Wander that it would exercise its contractual rights, and thus allegedly causing 777 not to enter a forbearance agreement with Leadenhall, A-CAP and Mr. King—but not Ms. Gettman—committed wire fraud (and a RICO predicate) that harmed Leadenhall by causing it to delay this lawsuit (for about a month) while its negotiations with 777 played out. *Id.* ¶ 363(h); *but see, e.g.*, ¶ 363(g)(h) (alleging that A-CAP and Mr. King improperly participated in the negotiations so that it might prevent the disclosure, via public litigation, of 777's alleged fraud); ECF 215 at 21.[4]

That theory, the merits of which are being evaluated by Judge Koeltl, does not make Ms. Gettman a proper custodian. *First*, Ms. Gettman's internal communications on the matter are overwhelmingly privileged.[5] Her role was one of legal advisor, not, as Leadenhall nakedly asserts, decisionmaker with "final say." That assertion is both untrue and unalleged. With the benefit of her legal advice, Ms. Gettman's client made the decision. Leadenhall's unsupported representation to the contrary not only defies common sense, it clashes with its own allegation that Mr. King, A-CAP's principal and alleged "puppeteer," controlled those negotiations. *See, e.g.,* ECF 187 ¶¶ 180-192, n.8.[6] Indeed, if Ms. Gettman's role were to make her a proper custodian, the same would hold for the lawyers who led those negotiations for Leadenhall: its General Counsel, Mr. Clark, and current litigation counsel, Ms. Nathanson.

*Second*, Leadenhall identifies no document (or type of document) that is likely to exist *only* in Ms. Gettman's files. A-CAP expects the opposite. Ms. Gettman provides advice to A-CAP, which acts through its principal, Mr. King. He is a custodian, and his two purported "deputies," ECF 187 ¶¶ 202-03, 209, are too. It is hard to conceive of responsive communications in Ms. Gettman's files to which none of those three was also a party. In any case, Leadenhall does not carry its burden of showing that such unique responsive documents exist.

As for Leadenhall's allegation that Ms. Gettman "possesses information about the control rights A-CAP obtained and exercised as to 777," ECF 334 at 1, any such rights come from the contracts themselves. The contracts and any written exercises of rights under them will be in the files of other A-CAP custodians, 777 custodians, or both. The same is true of any forbearance-

---

[4] To put it mildly, this is no well-pleaded RICO predicate. *See, e.g.*, ECF 215 at 20-22.

[5] Moreover, the power of the work product protection is at its apex when, as here, threatened litigation looms. *E.g., J.A. Apparel Corp. v. Abboud*, 2008 WL 111006, at *3 (S.D.N.Y. Jan. 10, 2008).

[6] The cases cited by Leadenhall stand for the unremarkable proposition that business advice is not privileged. *See* ECF 334 at 2. But the proposition is inapt here: Leadenhall identifies no "business advice" from Ms. Gettman.

Page 3

The Hon. Barbara Moses
August 12, 2025

related communications with 777. And those custodians—or Leadenhall itself, *see* ECF 187 ¶ 190 n.9—will also have in their files any such communications involving Ms. Gettman and Leadenhall.

Contrary to Leadenhall's representation, A-CAP has never asserted that all of Ms. Gettman's documents are privileged; that is a straw man. But the burden of reviewing a CLO's files is unwarranted when, as here, any non-privileged communications are reasonably expected to be collected from non-lawyer custodians.

***Ms. Gettman's post-complaint roles at Phoenix and TAMI are a red herring.*** Ms. Gettman's alleged roles on certain "boards"[7] of A-CAP affiliates are irrelevant. They began even *after* Leadenhall filed this lawsuit and, in any case, Leadenhall does not allege how they have anything to do with its claims. ECF 334 at 1. In fact, Leadenhall cites only its own contempt *motion*, ECF 281, which involves only post-suit (baseless) allegations that the preliminary injunction was violated—matters on which Leadenhall sought no discovery and brings no claims. Leadenhall's tactics underscore the irrelevance. If Leadenhall truly sought board-related documents, it would have requested board minutes and materials. Seeking such (irrelevant) documents by targeting A-CAP's sitting CLO smacks of ulterior motive—and Leadenhall is no stranger to misusing this litigation to harass, malign, and otherwise inflict *in terrorem* burdens.

Similarly, Leadenhall alleges that Ms. Gettman's service as Corporate Secretary of non-party insurance-company affiliates of A-CAP and her signing of their "quarterly regulatory filings . . . mak[es] her knowledgeable about the assets held (and transferred) by those insurers." ECF 334 at 1. But Leadenhall does not explain why that is so; why alleged knowledge should make her a document custodian; or how assets held and transferred by A-CAP insurers have anything to do with its claims. And if signing quarterly filings or serving as Corporate Secretary (of non-party affiliates, no less) were enough to be a proper custodian, CEOs, CFOs, and GCs would be constant targets of vexatious discovery.

***Leadenhall misconstrues A-CAP's stance on Leadenhall's General Counsel, Mr. Clark***. A-CAP does not "insist" that both senior lawyers should be custodians. We have instead made the point that Mr. Clark is a far more appropriate custodian than Ms. Gettman. Mr. Clark also participated in the forbearance negotiations on which Leadenhall focuses—and about which it elected to make accusations of federal crimes. And unlike Ms. Gettman, Mr. Clark *does* "wear multiple hats": he is Leadenhall's Chief Compliance Officer, a non-legal role that makes Mr. Clark likely to possess much ESI that sheds light on whether, when, and how Leadenhall conducted diligence and learned (or should have learned) of 777's alleged misconduct. Moreover, Mr. Clark's alleged involvement in business meetings with 777's Josh Wander (in which Wander purportedly confessed to double-pledging collateral) is central to Leadenhall's claims. ECF 187 ¶¶ 123, 131.

---

[7] The affiliates are LLCs, not corporations.

The Hon. Barbara Moses
August 12, 2025

## II.    CHRIS LEARMONTH SHOULD BE A CUSTODIAN.

Chris Learmonth, Leadenhall's CFO and COO, possesses relevant and unique documents; he is an essential custodian.  Leadenhall admits that Learmonth played a role in investigating deficiencies in Leadenhall's collateral (and thus the stated Borrowing Base), the foundation of Leadenhall's claims.  ECF 187 ¶¶ 99–162; *cf. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *9 (S.D.N.Y. Apr. 10, 2023) (granting motions for custodians "directly involved" in core allegations).

Leadenhall has not alleged any undue burden with making Learmonth a custodian—instead, it attempted to use him as a bargaining chip, offering to make him a custodian if A-CAP would do the same for Ms. Gettman.  But the two are not similarly situated.  Unlike with Ms. Gettman, Learmonth's involvement with core matters makes him a proper custodian.

Respectfully submitted,

*/s/ Jonathan M. Watkins*

Jonathan M. Watkins

cc:    All Counsel of Record via ECF