# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222

Leigh M. Nathanson
Direct Dial: +1 212 790 5359
lnathanson@kslaw.com

August 15, 2025

The Honorable Barbara Moses
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 20A
New York, NY 10007

Re: *Leadenhall Capital Partners LLP et al v. Wander et al*, 24-cv-03453-JGK-BCM

Dear Judge Moses,

Defendants' attempt to blame Leadenhall for their delay in producing documents—in the past eight months, 777 has produced just 27 (non-custodial) documents, and A-CAP has produced none—is disingenuous. For the reasons below, this Court should grant the relief requested by Leadenhall and direct 777 and A-CAP to begin producing custodial documents.

I.     **Leadenhall's July 25 Search Terms Yield a Review Universe Proportional to this Case, and 777 Has Offered No Workable Counterproposal.**

777 opposes producing documents using Leadenhall's July 25 search terms based on the contention they are overbroad but has failed to (1) substantiate this contention based on either the volume of documents returned or the percentage of hits over the universe of documents collected or (2) suggest any revisions to those terms to allow the parties to reach a compromise.

On August 12, 2025, over two weeks after Leadenhall narrowed its proposed search terms for the second time—and only after Leadenhall filed this motion—777 provided a hit report indicating that Leadenhall's search terms returned 378,693 documents. ECF 336-1 at 4. A review universe of this size is proportional to this case, which alleges a multi-year fraud perpetrated by multiple defendants giving rise to nearly $2 billion in damages. *See Bank of Am. Corp. v. Lemgruber*, 2007 WL 4510329, at *2 (S.D.N.Y. Dec. 20, 2007) (discussing "review of hundreds of thousands of documents" in a case involving a fraud of only $27 million); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.,* 297 F.R.D. 99, 103 (S.D.N.Y. 2013) (search terms yielded "875,000 document hits"). 777 has not disclosed either (1) the total number of documents against which Leadenhall's search terms were run or (2) the scope of documents collected by custodian, time period, and communication medium (*e.g.*, e-mail, text messages, etc.), so it has not shown that it conducted a fulsome search or that Leadenhall's terms return a disproportionately large percentage of the documents collected. *See Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, 2012 WL 5927379, at *2 (S.D.N.Y. Nov. 21, 2012) (noting the "total number of documents 'harvested' is not a particularly compelling statistic by itself").

777 avers that it reviewed the "top ten 'unique hit' terms" from Leadenhall's July 25 search term proposal and that, in its counsel's opinion, those ten terms yielded "swaths of irrelevant

1

material." ECF 336 at 2, 4. What is not clear is (1) the quantitative basis for this opinion; (2) whether a human reviewer made this assessment; or (3) whether 777 merely ran a search for the words "Leadenhall," "LCP," and "Gillespie" in those documents and represented that the hits were irrelevant based on the absence of those terms. *See id.* at 4 (stating initially that 777 "undertook the additional step of reviewing the underlying documents" but then suggesting that this "manual review" involved only a "search for 'Leadenhall,' 'LCP,' or 'Gillespie'" among the hits). If 777 performed an actual review, then it has already reviewed 75,446 documents—a sizable percentage of the entire review set, of which it is obligated to produce any responsive materials. If 777 merely searched for the words "Leadenhall," "LCP," or "Gillespie," then its methodology is unsound given the scope of the case and the fact that many relevant documents are unlikely to mention Leadenhall expressly.

For example, one of Leadenhall's proposed search terms includes words like "('free and clear' OR 'adverse claim' OR encumber*) . . . AND (asset* OR collateral)." This term is designed to identify documents discussing whether assets pledged as collateral were eligible or were already encumbered—*e.g.*, because they had been pledged to lenders other than Leadenhall. And documents discussing Leadenhall's loan portfolios may have referenced not the lender's name but portfolio names like "SPLCSS III" or "Dorchester"—among other permutations. *See* CAC ¶¶ 110, 114. Accordingly, a lack of hits for the limiter "Leadenhall" is not probative. 777 contends that Leadenhall's proposed search term "(Month* OR Compl*) w/5 Report*" is overbroad for the same reason. ECF 336 at 2; ECF 336-1 at 2. But this term is intended to identify the monthly compliance reports that 777 issued to Leadenhall (and other lenders), many of which were fraudulent. CAC ¶¶ 99-174. If 777 is correct that these documents do not expressly reference "Leadenhall" or "LCP," that only confirms that 777's search methodology will exclude responsive materials.

In critiquing Leadenhall's proposal, 777 misleadingly cites only fragments of Leadenhall's search terms, omitting limiters designed to exclude irrelevant documents. For example, 777 takes issue with the term "book* OR record* OR account*," ECF 336 at 2, but omits that this term will generate hits only when those more generic words appear within 25 words like "cook* OR fals* OR fake* OR manipulat*," ECF 336-1 at 3. Documents relating to falsifying records are central to this case—in which Leadenhall alleges 777 altered compliance reports, bank statements, and other financial records in furtherance of its fraudulent scheme. CAC ¶¶ 163-74.

Leadenhall notes that 777 has objected to only ten of the search terms proposed by Leadenhall. *See* ECF 336-1 (highlighting in yellow the terms to which 777 raised objections). Leadenhall remains amenable to tailoring those search terms—for example, the "Riley OR Reilly" term that coincidentally captures all emails involving 777 General Counsel Christopher O'Reilly. *See* ECF 336 at 2. But 777 has refused to engage with the proposed terms at all, forcing Leadenhall to resort to motion practice. Having declined to comply with the parties' ESI protocol and caused months of delay, 777 should be compelled to produce the responsive hits on Leadenhall's July 25 search terms. At a minimum, the Court should order 777 to apply the more than 70 search terms 777 does not challenge and begin producing documents while the parties meet and confer promptly to refine and reach agreement on the remaining terms.

## II.    777 Should Be Compelled to Provide Discovery Sufficient to Show Which Assets Were Improperly Pledged to Leadenhall.

777 agrees that the purpose of RFAs is to "allow for the narrowing or elimination of issues" and to "obtain[] admissions for the record of facts already known.'" ECF 336 at 3 (citing *Khurana*

*v. Wahed Inv., LLC*, 2020 WL 6729124 (S.D.N.Y. Nov. 16, 2020)).  Leadenhall's RFAs were intended to do just that: they asked 777 to admit, as to each of 3,449 specific assets, (1) whether the asset was referenced in (and subsequently removed from) a Compliance Report and (2) whether the asset was not free and clear of adverse claims while it was pledged to Leadenhall.  ECF 334-3 at 4-5.

The list of assets attached to Leadenhall's RFAs was derived from Compliance Reports that 777 itself issued.  After Leadenhall learned that much of the collateral pledged by 777 was double-pledged or fictitious (*i.e.*, not "free and clear"), it raised the deficiency to 777, prompting 777 to reissue corrected Compliance Reports that retroactively *removed* ineligible assets.  CAC ¶¶ 145-49.  Leadenhall then compared the restated Compliance Reports to the originals to generate a list of 3,449 assets that were removed.  That list was attached as Exhibit A to Leadenhall's RFAs so that 777 could confirm that these assets were removed from Compliance Reports on which they had previously been listed because they were not "free and clear."  Accordingly, Leadenhall's RFAs serve Rule 36's purpose: "to narrow the issues for discovery and for trial," thereby "avoiding time, trouble and expense which otherwise would be required to prove" whether each individual asset was eligible to be pledged as collateral.  *S.E.C. v. Rayat*, 2022 WL 1606953, at *2 (S.D.N.Y. May 19, 2022).  Instead of serving 3,449 separate RFAs, Leadenhall sought to streamline the process by serving one set of RFAs seeking admissions as to each of the 3,449 assets listed.

Although 777 still refuses to explain the basis for its denial, it appears to have interpreted Leadenhall's RFAs as asking for one blanket answer for all 3,449 assets.  *See* ECF 336 at 3 (arguing that 777 was "asked to 'admit *each* asset' on Exhibit A was either referenced in a compliance report and subsequently removed, or double-pledged").[1]  If 777 denied the RFAs in their entirety because it contends that *some* small subset of the 3,449 assets was properly pledged, such semantic gamesmanship should not be condoned.  *See Szafrankowska v. AHRC Home Care Servs., Inc.*, 2008 WL 186206, at *1 (S.D.N.Y. Jan. 22, 2008) (criticizing counsel's "semantic" denial of request for admission based on a distinction between "developmentally disabled" and "developmental disabilities").  Leadenhall does not know whether 777 denied the RFAs for that reason, however, because 777 refused to meet and confer on the issue.  ECF 334-4; *cf.* Individual Practices § 2(b) ("Counsel must respond promptly and in good faith to a request from another party to meet and confer.").

Unable to justify its responses, 777 cites an out-of-circuit decision to argue that "a reviewing court may not second guess or dissect each factual issue presented by the request for admission."  ECF 336 at 3.  This principle is irrelevant here.  Leadenhall does not ask this Court to "dissect each factual issue" or second-guess the accuracy of 777's responses; Leadenhall asks the Court to compel 777 to respond to the RFAs as phrased—for each asset—or, alternatively, to specify the assets that caused it to issue a denial or produce the "thousands of records associated with the 3,449 deals."  ECF 336 at 2.  That is clearly within the Court's power.  *See Iron Workers Loc. No. 60 Annuity Pension Fund v. Solvay Iron Works, Inc.*, 2017 WL 1458772, at *8, *8 n.11 (N.D.N.Y. Apr. 24, 2017) (requiring defendants to provide amended responses to RFAs that were "incomplete, inadequate, or improper"); Fed. R. Civ. P. 36(a)(6) ("The requesting party may move to determine the sufficiency of an answer or objection.").

---

[1] To be clear, the RFAs did not pose the narrower question of whether each asset was "double-pledged."  They asked whether each asset was at all times "Free and Clear of Any Adverse Claim," as the Compliance Reports represented.

### III.    Leadenhall Seeks Documents from Jill Gettman in Her Capacity as Officer and/or Manager of Entities That Leadenhall Alleges Exerted Control Over 777 in Orchestrating a Fraud on Leadenhall.

A-CAP does not dispute that Gettman's documents are relevant to this litigation, which, "for the purposes of discovery, is an extremely broad concept." *A.I.A. Holdings S.A. v. Lehman Bros.*, 2000 WL 763848, at \*2 (S.D.N.Y. June 12, 2000).  As the complaint alleges, this action arises from a years-long, carefully orchestrated pattern of fraud to induce Leadenhall to lend hundreds of millions of dollars for 777 and A-CAP to use on *joint* pursuits.  The crux of this case is A-CAP's control of 777, and its knowledge of and participation in 777's fraud on Leadenhall. Gettman was essential to facilitating, and is likely to possess unique documents evidencing, that control in many ways, including:

- Serving as a board member of A-CAP affiliates involved in stripping assets subject to this Court's preliminary injunction.  ECF 334 at 1.

- Signing A-CAP's regulatory filings reflecting, *inter alia*, A-CAP's exposure to 777.  *Id.*

- Serving as manager (a non-legal role) of ACM Delegate, an A-CAP entity created to act as the collateral agent vested with various rights under the 777/A-CAP loan agreements, including an all-asset lien on 777 and many of its affiliates.  CAC ¶¶ 134, 243; ECF 220-4.

- Causing ACM Delegate to exercise its control rights, including via direct proxy, to act for the 777 Entities, including in December 2024 when A-CAP, via ACM Delegate, granted itself the irrevocable right "to make resolutions" on behalf of the Guarantor defendants. ECF 282-7 at 3-4.

- Exercising ACM Delegate's proxy rights as to Nutmeg Acquisition LLC—the 777 entity that invests in professional soccer teams—pursuant to which ACM Delegate became Nutmeg's sole manager.  *See* ECF 281 at 11; ECF 220 ¶ 19.

- Installing restructuring professionals from B. Riley to manage 777 in response to this lawsuit and then extending their retention.  ECF 282-7 at 3-4.

A-CAP's use of affiliates including ACM Delegate—for which no other A-CAP custodian appears to hold a managerial role—to exert control over 777 is central to Leadenhall's claim that A-CAP's participation in 777's business (and fraud) transcended the role of an arm's-length lender.[2]

---

[2] For example, ACM Delegate facilitated the transfer of an asset worth hundreds of millions of dollars from the 777 Entities to A-CAP, for which 777 received little or nothing in return.  Nutmeg, an asset owned by 600 Partners, loaned Everton approximately $201 million in 2023-24.  ECF 219 at 3-5.  According to A-CAP, to fund the Everton loan, Nutmeg borrowed $193 million from Haymarket; the proposed transaction contemplated that Haymarket would monetize the Everton loan for itself by discharging Everton's obligation to repay the loan in exchange for $66.5 million from Everton's new owner plus the right to purchase, equity in Everton.  *Id.* at 6.  When Friedkin purchased Everton in December 2024, A-CAP, seven of its affiliates, and Nutmeg executed an "Acknowledgement and Agreement" whereby Haymarket wrote down approximately $201 million in debt, plus interest, owed by Nutmeg to Haymarket.  ECF 282-10.  Gettman signed on behalf of *all eight parties*.  *Id.*

Gettman is likely to possess unique information about the A-CAP/777 relationship by virtue of her role in managing this and other A-CAP affiliate entities.  The fact that Gettman plays a legal role for a *different* A-CAP entity is irrelevant because A-CAP has advanced no argument that Gettman's communications with or about 777 in her role as manager of A-CAP entities managing the 777 lending relationship are legal in nature—and certainly her communications *with* 777 representatives are not privileged, as a true lender and borrower are adversaries.  *Galayda v. Wachovia Mortg., FSB*, 2010 WL 5392743, at *16 (D.N.J. Dec. 22, 2010).

A-CAP's suggestion that Leadenhall can obtain the information it seeks from other custodians is frustrated by the fact that A-CAP has not produced a single document; unlike the movants in many of A-CAP's cases, Leadenhall has not had any document discovery to assess A-CAP's uniqueness defense.[3] *Cf. Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) (denying plaintiffs' discovery requests "since Plaintiffs have received millions of pages of documents").  In a RICO case, "it is not always reasonable to expect a plaintiff to have available sufficient factual information regarding the inner workings of a RICO enterprise," and "where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question." *Superb Motors Inc. v. Deo*, 776 F. Supp. 3d 21, 70 (E.D.N.Y. 2025).  Even without the benefit of discovery, Leadenhall has shown that a search of Gettman's documents will likely yield non-privileged and unique communications because, at the very least, Gettman is the only A-CAP custodian holding a business role with ACM Delegate.

Given the discrete categories of unique, non-privileged documents that Gettman is likely to possess, ECF 337 at 2, A-CAP now bears the burden to demonstrate that discovery of Gettman's documents "is not reasonably accessible because of undue burden or cost." *Precision Med. Grp., LLC v. Blue Matter, LLC*, 2020 WL 7352509, at *1 (S.D.N.Y. Dec. 15, 2020).  Aside from assailing Leadenhall's general litigation strategy as an "*in terrorem*" tactic, ECF 337 at 4, A-CAP makes no effort to quantify the burden of collecting and reviewing Gettman's documents—much less demonstrate that they are not "reasonably accessible," Fed. R. Civ. P. 26(b)(1)(B).  "[G]eneral and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information." *Precision Med. Grp., LLC*, 2020 WL 7352509, at *1.[4]

A-CAP's insistence that reviewing Gettman's internal communications will cause undue burden is also undercut by its inability to substantiate its claim that Gettman's documents are "overwhelmingly privileged."  ECF 337 at 3.  As discussed in Leadenhall's opening letter, Gettman held various positions across A-CAP and its affiliates in addition to her role as in-house counsel.  ECF 334 at 1.  The parties agree that "[w]here the lawyer in question is a corporate officer

---

[3] If A-CAP's counsel is correct that another A-CAP custodian is copied on Gettman's communications, those documents will need to be reviewed anyway, including for privilege.  The likelihood that Gettman will have unique documents, given her unique roles, outweighs any incremental burden created by the review of some number of duplicates, which is inherent in every document review (including Leadenhall's).

[4] *See also Black Love Resists In the Rust by & through Soto v. City of Buffalo, N.Y.*, 334 F.R.D. 23, 29 (W.D.N.Y. 2019) (compelling production despite claims of undue burden because defendants had "not quantified that burden in terms of the number of documents" to be collected and reviewed "or the amount of time and manpower" required) (citation omitted); *Oakley v. MSG Networks, Inc.*, 2024 WL 4134903, at *4 (S.D.N.Y. Sept. 10, 2024) (similar).

with business as well as legal responsibilities, the court must ascertain which hat the attorney was wearing during the allegedly privileged communication." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 2020 WL 757840, at *4 (S.D.N.Y. Feb. 14, 2020) (quotations omitted).  This standard already applies with a thumb on the scale for admissibility and is more exacting here, where Gettman serves as corporate, not trial, counsel for A-CAP. *See Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 491 (S.D.N.Y. 2019) ("[T]he need to apply [privilege] cautiously and narrowly is heightened in the case of corporate staff counsel."); *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 2000 WL 1253262, at *2 (S.D.N.Y. Sept. 1, 2000) (subjecting general counsel to discovery would "not be disruptive of the litigation, or raise significant privilege issues, as would be more likely if they were they acting as trial counsel.").  A-CAP cannot baldly assert undue burden based on a claim of a privilege that, as applied to Gettman, is narrowly construed.

Because A-CAP fails to demonstrate the requisite undue burden or cost, there is no basis to deny Leadenhall's request to make Gettman a custodian as to her non-legal roles at A-CAP.

Respectfully submitted,

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

Enclosure

cc: Counsel of record (via ECF)

6