

King & Spalding LLP
1290 Avenue of the Americas
New York, New York 10104

**Leigh M. Nathanson**
Partner
T: 212-790-5359
lnathanson@kslaw.com

October 28, 2025

**VIA ECF**

Hon. Barbara Moses
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

      Re: *Leadenhall Capital Partners LLP et al. v. Wander et al.*, 24-cv-03453-JGK

Dear Judge Moses,

      Pursuant to this Court's October 21 Order, the parties submit this joint status update regarding the discovery disputes raised in letter briefs to the Court, ECF Nos. 334, 336, 337, 340.

      As of today, Leadenhall has produced 2,342 documents including noncustodial documents, custodial documents hitting on agreed-upon search terms, and documents previously produced in the Florida litigation; 777 has produced 3,696 documents consisting of non-custodial documents and documents previously produced in the Florida litigation or related to the Florida litigation;[1] and A-CAP has produced 501 documents consisting mainly of communications between A-CAP and Leadenhall.

**I.    Leadenhall and A-CAP Remain at an Impasse as to Jill Gettman as a Custodian.**

      The parties remain at an impasse on whether to include Jill Gettman, in her capacity as a businessperson, as a document custodian for A-CAP.

      ***Leadenhall's Position.***  Leadenhall contends that Gettman is likely to possess unique responsive discovery about A-CAP's relationship with and control over 777, including A-CAP's knowledge and oversight of 777's dealings with Leadenhall. Separate and apart from her role as General Counsel, Gettman executed Kenneth King's business directives as to 777, including (1) acting as board member or sole manager of vehicles created by A-CAP to appropriate or take control of 777 companies and assets; (2) signing A-CAP's regulatory filings reflecting, *inter alia*, A-CAP's exposure to 777; (3) executing, on behalf of both A-CAP and 777 entities, contractual agreements granting and exercising control rights of A-CAP over 777 companies or assets; and (4) installing and overseeing restructuring professionals from B. Riley to manage 777 in response to this lawsuit.

---

[1] 2,792 of the documents produced by 777 are stamped with Florida bates numbers. As 777 confirmed during a meet and confer with Leadenhall on October 20, 2025, none of the documents 777 has produced were identified using Leadenhall's proposed search terms.

On the parties' meet-and-confer on October 27, 2025, A-CAP's new counsel at Foley & Lardner LLP requested for the first time that Leadenhall consent to a two-week adjournment of the upcoming discovery conference regarding this single issue. Leadenhall is concerned, given the slow pace of A-CAP's productions thus far in a RICO case in which 777 and A-CAP's conduct and relationship is principally at issue,[2] that an adjournment would only cause further delay. This dispute has been pending before the Court since August 5, 2025. Leadenhall has met and conferred with A-CAP's counsel at least three times between May 28, 2025 and October 27, 2025 regarding this dispute, including after Foley entered appearances on September 4, 2025. Based on the representations of Cadwalader, Leadenhall understands that A-CAP is unlikely to entertain any compromise whatsoever on disclosing Gettman's documents. In any event, Leadenhall has communicated to Foley that it remains open to a compromise and is available between now and the November 4 conference to discuss any new compromise proposal Foley may be able to offer.

In its position statement below, A-CAP contends that Leadenhall has asked "A-CAP to search Ms. Gettman's files using more than 1,500 search terms." That is inaccurate. Leadenhall proposes 106 search terms, and A-CAP's prior counsel had, after negotiations, agreed to all but six of those terms. Other than that unexpected assertion, A-CAP merely reiterates the same points made in its prior letter-brief, confirming that the parties are at an impasse.

***A-CAP's Position.*** Leadenhall's demand to add A-CAP's General Counsel, Jill Gettman, as a document custodian at this early stage of discovery is both premature and unduly burdensome. Foley & Lardner LLP ("Foley") has only recently assumed representation of A-CAP. Based on conversations with Cadwalader, it is anticipated that they will request the Court's permission to withdraw as counsel shortly. As a result, counsel for A-CAP asked if Leadenhall would consent to requesting a one or two-week adjournment of the discovery conference from the Court as files are expected to be transferred; they declined. That request was neither dilatory nor tactical; it was a practical step to permit meaningful discussion of the issues.

Leadenhall's representation to the Court regarding the status of A-CAP's document production is disingenuous and underscores that seeking intervention from the Court is premature and inappropriate at this stage. As Foley understands the status of negotiations, there are still disputes about a significant number of search terms. Although Leadenhall asks A-CAP to search Ms. Gettman's email files using more than 1,500 search terms, A-CAP and Leadenhall are, in fact, still negotiating those search terms. Leadenhall is correct that Foley is unaware of the search parameters used to create A-CAP's October 22, 2025 production or what that production contains, as Foley was not responsible for conducting that document search or review. As represented at the meet and confer, this is why A-CAP believes a short adjournment of the discovery conference is appropriate, as it will allow more productive discussions between current counsel prior to requesting assistance from the Court.

Substantively, Leadenhall's position is entirely speculative. Its request would require that every one of the over one thousand proposed search terms be applied across Ms. Gettman's email files, based solely on the fact that she signed certain documents and allegedly participated in some communications with Kenneth King. This approach would impose an enormous and unjustified

---

[2] A-CAP had not produced any documents until its initial production October 22, after this Court directed the parties to report by today how many documents had been produced. On the October 27 meet-and-confer, Foley finally agreed to begin rolling productions based on the vast majority of search terms on which Leadenhall and A-CAP are agreed, but they were not aware of the search parameters used for the October 22 production or what that production contained.

2

burden on A-CAP at this time. The overwhelming majority of Ms. Gettman's communications are subject to attorney-client privilege or otherwise relate to the provision of legal advice. As discussed more fully in the motion papers (ECF No. 377), Leadenhall has not and cannot demonstrate that Ms. Gettman's files include any unique, relevant information that cannot be obtained from other custodians.

Accordingly, no agreement can reasonably be reached on this issue before the November 4 conference. A-CAP respectfully submits that the issue should be deferred until Foley has completed its review and the parties are in a position to engage in a fully informed, proportional discussion consistent with the Federal Rules and this Court's guidance.

## II.  Leadenhall and 777 Remain at an Impasse as to 777's Custodial Search Parameters and 777's Responses to Leadenhall's RFAs.

### a.  Search Parameters for 777's Documents

The parties remain at an impasse regarding search parameters for 777's documents. On October 24, 2025, 777 provided a hit report for the search terms Leadenhall proposed (but excluding 16 of the 23 custodians Leadenhall had proposed in February 2025), indicating that those terms returned 643,884 hits (and 799,823 documents including families). 777 counter-proposed a narrower set of terms, excluding approximately two-thirds of the Leadenhall-proposed terms and proposing limiters for the remaining terms. 777's proposed terms would result in a total of 58,553 search hits (123,384 documents including families).

*Leadenhall's Position.* Leadenhall notes that the hit report provided by 777 (attached as Ex. A) still fails to comply with the parties' ESI protocol because it does not include documents from 70% of the custodians that Leadenhall proposed; 777 has declined to provide any explanation for why it refuses to include these custodians beyond the blanket statement that they are "not relevant." Even though incomplete, however, the hit report demonstrates that Leadenhall's proposed search terms are reasonable. A review universe of approximately 643,884 hits is easily proportional to a case of this magnitude, alleging a multi-party conspiracy to defraud over the course of years. *See* ECF No. 340 at 1 (citing case law discussing the number of search term hits in comparably complex cases).

777's October 24 counterproposal strikes two-thirds of Leadenhall's terms (including unquestionably relevant terms, like "A-CAP" and "fraud*") and adds the modifier "Leadenhall" or "LCP [Leadenhall Capital Partners]" to the majority of the remaining terms.[3] When asked to explain how it determined which terms to strike, 777's counsel responded that it struck terms with a high hit count that, in 777's view, would return high numbers of non-responsive documents— but counsel refused to disclose what methodology was used to determine whether the hits were responsive or not beyond representing that somebody reviewed some undisclosed number of hits. When pressed on its responsiveness criteria—including the fact that 777's proposed modifiers would exclude most documents if they do not reference "Leadenhall" or "LCP" by name—777 refused to take a position as to whether a document containing the words "collateral" and "fraud" is responsive even if it didn't contain "Leadenhall" or "LCP." Because Leadenhall contends that 777 fraudulently pledged the same assets to both Leadenhall *and* to other lenders, custodial

---

[3] Although 777 identifies below two terms it "tailored" that do not involve the addition of "Leadenhall" or "LCP," that was the approach it took for over half of its proposed revisions.

searches cannot be limited to documents that expressly reference "Leadenhall." The fact that 777's proposal returns only 58,553 hits (123,384 documents, including families)—a very small number for a case of this size—underscores that the terms and custodians it proposes to use are artificially narrow and will exclude responsive documents.

In its position statement below, 777 contends that it has made "repeated requests over months" for Leadenhall to "work with us" and "reasonably tailor" its proposed search terms. That statement is inaccurate, and it ignores the inordinate delays 777 has interposed between each round of search term proposals and hit reports. For example, 777 waited four months to respond to Leadenhall's initial, February 2025 search term proposal; three weeks passed between Leadenhall's revised July 2 proposal and 777's provision of a hit report on July 25; and it was not until October 24—and the Court's request for a status update—that 777 provided an updated hit report (based on Leadenhall's July 25 proposal) encompassing additional custodial collections. 777 has also repeatedly failed to attend lengthy meet and confers scheduled and attended by all other parties (even Wander and Pasko, to which discovery is stayed) in which Leadenhall explained the relevance of its proposed custodians and search terms.

Further mitigating 777's burden is the fact that it has already produced documents involving the issues in this case to the Department of Justice in connection with the recent indictment of Defendant Josh Wander—indeed, the DOJ disclosed that it has received approximately 600,000 documents from 777 and other entities and individuals. *United States v. Joshua Wander*, 25-CR-473 (S.D.N.Y., filed Oct. 16, 2025), Oct. 21, 2025 Hr'g Tr. 5:13-14. On the October 27 meet-and-confer, Leadenhall asked if 777 would produce the documents it has already produced to the government, and 777 would not commit to doing so. Leadenhall also asked if 777 would share the search parameters used for those productions in order to leverage the work 777 has already done. 777's counsel disclaimed any knowledge of or involvement with those productions and would not disclose what counsel had knowledge of those productions.[4]

***777's Position.*** The dispute is about scope and proportionality, not whether the 777 Entity Defendants are committed to producing responsive documents.

Leadenhall has named 23 proposed custodians but has not explained why each of those 23 is relevant to a claim or defense in this case. Several of Leadenhall's proposed custodians are in-house counsel (including Ms. Wander and Messrs. Walder and O'Reilly). Those individuals' mailboxes are presumptively privileged, and Leadenhall has offered no basis to treat them as business custodians whose day-to-day communications should be swept into discovery. Other proposed custodians worked in lines of business having no involvement with the receivables investment business at issue here. For many of the remaining names, Leadenhall is stacking duplicative custodians on top of the senior custodians we already offered (for example, adding a former IT manager whose only supposed relevance is a Florida-side data dispute that has already been addressed in produced material). The Federal Rules and the ESI Protocol do not permit a party to declare "here are two dozen names" and, without any showing of need, force the other side to collect, ingest, host, and review full email, chat, text, OneDrive, and device data for all 23

---

[4] On October 27, Leadenhall also asked A-CAP's counsel if A-CAP would produce to Leadenhall any documents it has produced to the government regarding the claims in this action. A-CAP's counsel would not disclose whether A-CAP has produced any documents to the DOJ or SEC and stated that A-CAP would object to any request from Leadenhall for such documents on confidentiality grounds.

4

across a five-year period. Rule 26(b)(1) and the ESI Protocol require proportionality and reasonableness, not "collect everyone because we said so."

Leadenhall's volume argument does not fix that problem. Even limiting to seven of Leadenhall's proposed custodians, running Leadenhall's own 90 search strings across those seven, generated roughly 900,000 documents with family members. That number is driven by the breadth of Leadenhall's terms, not by relevance.

The spreadsheet reflecting the "hit counts" as applied to proposed search terms and the 777 Entity Defendants efforts to address those terms is annexed hereto. As it shows, Leadenhall insisted on terms like "fraud*," bare entity names such as "Dorchester" or "SPLCSS," and proximity strings such as "(get* OR too OR in) w/5 clos*," which alone generated 118,942 hits with families; "(make OR made OR give OR "as if" OR like) w/5 (appear* OR seem* OR look* OR act* OR illus*)", which generated 104,084 hits with families; "GlassRatner OR Glass OR Ratner," which pulled 20,009 hits with families; or "(just OR really OR so OR fuck* OR complete* OR total* OR this OR that*) w/5 (crazy OR nuts OR stupid* OR ridiculous OR insan* OR dumb OR wrong OR allow* OR *legal OR legit* OR permi* OR messed OR fuck* OR bad OR "not right" OR "not good" OR real)," which pulled 180,215 hits with families.

Despite our repeated requests over months, including but not limited to our requests on August 12, 2025, September 22, 2025, and October 24, 2025[5], asking that Leadenhall agree to work with us on more targeted search terms, Leadenhall has refused to reasonably tailor its roughly 90 terms and, in most instances, failed to engage at all.

None of those terms is anchored to Leadenhall, to the facility, or even to collateral. Instead, they indiscriminately sweep generic internal chatter. Leadenhall then compounds their overbreadth by demanding collection from every possible source (iMessage, WhatsApp, Teams, device images, custodian OneDrives, etc.), even though the 777 Entity Defendants did not issue corporate phones, do not control former employees' personal devices, and have already described what sources actually exist and have been collected. The fact that Leadenhall can generate a six-figure (or seven-figure) hit count does not make the requests reasonable; it shows how untailored the requests are.

By contrast, the 777 Entity Defendants have proposed, and are executing, a phased and proportional approach. We identified an initial custodian set (Nick Bennett; Alex Adnani; Steven Pasko; Karen Gorde; Fred Love; Josh Wander; and Damien Alfalla) and ran Leadenhall's July 25, 2025 terms across those custodians. We did not simply reject Leadenhall's terms, we accepted many of them, and for others we narrowed them to target what matters in this case.

For example, Leadenhall proposed "(manipulat* OR modif* OR chang* OR fals* OR fake* OR sham* OR show* OR temporar* OR "for now" OR placeholder OR report* OR record*) w/5 (portfolio* OR lender* OR facilit*)," we tailored that to "(manipulat* OR fals* OR fake* OR sham* OR placeholder) w/5 (portfolio* OR lender* OR facilit*)." Leadenhall proposed "(Wells OR bank OR statement* OR reserve* OR collection*) w/20 (forge* OR fals* OR photoshop* OR

---

[5] Notably, in response to our October 24, 2025 request, when the parties met and conferred on October 27, 2025, Leadenhall explicitly refused to engage with the 777 Entity Defendants' proposal that, if it objected to using "Leadenhall" connectors, the 777 Entity Defendants would expand those connectors to include other lender names as well. Leadenhall refused to expand the proposed connectors even though it appeared to address their concerns and, again, refused to engage.

edit* OR fake*),"  we tailored that to "(Wells OR "bank statement" OR "reserve account" OR "collection account") w/10 (forgery OR forge OR forged OR photoshop* OR edit* OR fake*)."

Those refinements keep the core fraud and falsification concepts Leadenhall says it cares about, but remove generic words that indiscriminately blow up hit counts with routine traffic. After that tailoring, the resulting universe is about 123,000 documents (including families). We have already begun reviewing that set for responsiveness and privilege, and we have told Leadenhall we will produce responsive, non-privileged material from that review and then meet and confer on any specific gaps. We believe that this approach is reasonable and consistent with how proportional discovery is supposed to proceed, not by demanding 'collect everything from everyone' and calling the raw hit count proof of reasonableness.

Indeed, in its position statement above, Leadenhall claims that the 777 Entity Defendants "failed to attend" meet and confers. This is misleading. The 777 Entity Defendants have repeatedly engaged in writing and by call on search terms, produced detailed hit reports, and offered concrete counterproposals, while Leadenhall has often sent short notice invites (including calls focused on A-CAP and issues unrelated to the 777 Entity Defendants) and then tried to use our unavailability on those calls as leverage. The present impasse is not from any refusal to confer on our side, but from Leadenhall's decision to abandon the iterative narrowing process and instead demand its full 23 custodian / 90 term sweep as a take it or leave it position.

The 777 Entity Defendants have already produced more than 33,647 pages of documents. Most of those documents were provided in connection with the Florida litigation where Plaintiffs insisted that the same issues in this case were relevant to that matter. The parties have agreed that discovery from that action can be used in this action, and it is anticipated that much of the forthcoming discovery will indeed be duplicative.

### b. Leadenhall's RFAs Regarding "Free and Clear" Collateral

The parties are at an impasse regarding Leadenhall's RFAs to 777 concerning double-pledged and fictitiously pledged assets.

***Leadenhall's Position.*** As Leadenhall explained in its pending letter motion, Leadenhall issued RFAs seeking evidence substantiating which of the thousands of receivables pledged to Leadenhall as collateral were actually "free and clear" of adverse security interests and which were double-pledged or fictitiously pledged. Leadenhall's objective in issuing the RFAs was to streamline discovery on issues for trial that are undisputed. After 777 issued a blanket denial to the RFAs, the parties met and conferred three times, during which Leadenhall sought to (1) understand the basis for 777's blanket denial and (2) determine the most efficient discovery device to address the information sought. 777 has refused to explain the basis for its denial; refused to respond to an interrogatory seeking the basis for the denial; and refused to respond to another interrogatory seeking information about the extent of the Borrowing Base deficiency (*i.e.*, the extent to which Leadenhall was undercollateralized).

Leadenhall has also suggested that 777 could produce at least some of the information sought (*i.e.*, information about double-pledged assets specifically) by producing a complete set of compliance reports sent by 777 to all of its lenders over the relevant period; 777 has not yet produced any compliance reports. Similarly, Leadenhall has suggested that 777 could produce

6

information about the receivables by producing records from its proprietary "MPFin" receivables database, but 777 has not done so.

One way or another, 777 is obligated to provide discovery about *all* of the collateral pledged to Leadenhall that is the subject of this action. Leadenhall asks that the Court order 777 to do so and continues to believe that RFAs are an efficient means of doing so.

***777's Position.*** The 777 Entity Defendants disagree that an impasse exists as to their responses to the two Requests for Admission that Plaintiffs served upon them. The 777 Entity Defendants properly denied both requests as written, not as Plaintiffs now claim they intended them to read. (Plaintiffs' current contention is that they intended for the 777 Entity Defendants to make more than 3,400 admissions or denials, one for each deal listed in Appendix A, which is not what the Requests for Admission actually request.) For the reasons set forth in their letter (Dkt. 336), the 777 Entity Defendants contend that Plaintiffs request is legally improper. Nevertheless, the 777 Entity Defendants are in the process of determining whether there are any restrictions or prohibitions against producing copies of reports issued to other lenders during the applicable timeframe that could possibly have identified as collateral the same receivables that were identified on compliance reports issued to Plaintiffs for the Dorchester and SPLCSS III portfolios. The 777 Entity Defendants are prepared to produce such reports. To date we have confirmed that producing the reports sent to two of the other lenders would be allowed under the terms of the applicable agreements. We expect to know later this week if the same is true for the remaining lenders.

Respectfully submitted,

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

Cc: All counsel of record (via ECF)