# Exhibit A

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE I REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY



```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF FLORIDA        ORIGINAL

 3   WEST PALM BEACH DIVISION

 4   CASE NO. CASE NO. 9:24-CV-81143-DMM

 5

 6   777 PARTNERS LLC AND

 7   SUTTONPARK CAPITAL LLC,

 8   Plaintiffs,

 9

10   V.

11

12   LEADENHALL CAPITAL PARTNERS

13   LLP, LEADENHALL LIFE

14   INSURANCE LINKED INVESTMENT

15   FUND PLC, NOAH DAVIS, SAIPH

16   CONSULTING LLC AND PAUL

17   KOSINSKI,

18   Defendants.

19

20   DEPONENT:  KAREN GORDE

21   DATE:      MARCH 17, 2025

22   REPORTER:  KATELYN TATTOLI MCFARLAND

23

24

25
```

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

```
 1                    APPEARANCES

 2  ON BEHALF OF THE: PLAINTIFFS, 777 PARTNERS LLC AND
    SUTTONPARK CAPITAL LLC:
 3  James J. Boland, Esquire
    Smith Gambrell & Russell
 4  311 South Wacker Drive
    Suite 3000
 5  Chicago, Illinois 60606
    Telephone No.: (312) 360-6548
 6  E-mail: jboland@sgrlaw.com
    (Appeared via videoconference)
 7
    ON BEHALF OF THE DEFENDANTS, SAIPH CONSULTING LLC & PAUL
 8  KOSINSKI:
    Harold E. Morlan III, Esquire
 9  Noah Rust, Esquire
    Shutts & Bowen, LLP
10  300 South Orange Avenue
    Suite 1600
11  Orlando, Florida 32801
    Telephone No.: (407) 423-3200
12  E-mail: hmorlan@shutts.com
    (Appeared via videoconference)
13
    ON BEHALF OF THE DEFENDANTS, LEDENHALL CAPITAL PARTNERS
14  LLP, LEADENHALL LIFE INSURANCE LINKE INVESTMENT FUND
    PLC:
15  Brian Donovan, Esquire
    Leigh Nathanson, Esquire
16  King & Spalding, LLP
    1185 Avenue of the Americas
17  34th Floor
    New York, New York 10036
18  Telephone No.: (212) 556-2100
    E-mail: bdonovan@kslaw.com
19  (Appeared via videoconference)

20  ON BEHALF OF THE DEFENDANT, NOAH DAVIS:
    Leonard Feuer, Esquire
21  The Feuer Law Firm
    500 South Australian Avenue
22  Suite 500
    West Palm Beach, Florida 33401
23  Telephone No.: (561) 659- 1360
    E-mail: lfeuer@feuerlawfirm.com
24  (Appeared via videoconference)

25  Also Present: Paul Kosinski, Defendant
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 3

```
1                     INDEX
2                                    Page
3   PROCEEDINGS                        5
4   DIRECT EXAMINATION BY MR. MORLAN   7
5   EXAMINATION BY MR. DONOVAN        108
6   EXAMINATION BY MR. FEUER          156
7   CROSS-EXAMINATION BY MR. BOLAND   158
8   REDIRECT EXAMINATION BY MR. MORLAN 162
9   RECROSS-EXAMINATION BY MR. BOLAND 172
10
11                    EXHIBITS
12  Exhibit                          Page
13     1     Letter about Data Access  21
14     2     Saiph 5.30.24             31
15     3     Saiph 6.5.24              32
16     4     Saiph 2.10.23 E-mail Bellissimo 36
17           to N. Bennett, K Gorde
18     5     Saiph 6.20.24             68
19     6     Saiph E-mail Ref top off  73
20     7     E-mail Re Interest Payment 82
21     8     Saiph Top off Collection  90
22     9     Structured Settlement Matrix 27
23    10     Matrices                  62
24    11     E-mail Re Dorchester Facility 97
25
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                       STIPULATION

 2

 3  The deposition of KAREN GORDE was taken at MILESTONE

 4  REPORTING, 315 EAST ROBINSON STREET, SUITE 510, ORLANDO,

 5  FLORIDA 32801, via videoconference in which all

 6  participants attended remotely, on MONDAY the 17th  day

 7  of MARCH 2025 at 9:04 A.M. (ET); said deposition was

 8  taken pursuant to the FLORIDA Rules of Civil Procedure.

 9

10  It is agreed that KATELYN TATTOLI MCFARLAND, being a

11  Notary Public and Court Reporter for the State of

12  FLORIDA, may swear the witness and that the reading and

13  signing of the completed transcript by the witness is

14  not waived.

15

16

17

18

19

20

21

22

23

24

25
```


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                    PROCEEDINGS
 2         THE REPORTER:  Okay, everyone.  My name's Kate
 3     McFarland, I'm the online video technician as well
 4     as the court reporter today.  Excuse me.  We
 5     represent Milestone Reporting Company, located at
 6     315 East Robinson Street, Suite 510, Orlando,
 7     Florida 32801. Today's the 17th day of March 2025.
 8     The time now is 9:04 a.m., Eastern.
 9         We are convened by video conference to take the
10     deposition of Ms. Karen Gorde in the matter of 777
11     Partners, LLC, and SuttonPark Capital, LLC, v.
12     Leadenhall Capital Partners LLP, Leadenhall Life
13     Insurance Linked Investment Fund PLC, Noah Davis,
14     Saiph Consulting, LLC, and Paul Kosinski pending in
15     the United States District Court Southern District
16     of Florida West Palm Beach Division, case number
17     9:24-CV-81143-DMM.
18         Will everyone, except the witness, please state
19     your appearance, how you are attending, and the
20     location that you're attending from, starting with
21     the plaintiff's counsel, please?
22         MR. BOLAND:  Oh, Jim Boland, Smith, Gambrell &
23     Russell, on behalf of the plaintiffs.  I'm attending
24     from Chicago.
25         THE REPORTER:  Thank you.
```



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
1          MR. MORLAN:  Harold E. Morlan III with Shutts &

2     Bowen on behalf of Defendants, Saiph Consulting,

3     LLC, and Paul Kosinski.  I'm attending from Orlando.

4          THE REPORTER:  Thank you.

5          MR. DONOVAN:  Brian Donovan from King &

6     Spalding on behalf of the Leadenhall defendants.  I

7     am attending from New York.

8          THE REPORTER:  Thank you.  Ms. Gorde, will you

9     please state and spell your last name for the

10    record?

11         THE WITNESS:  My name is Karen.  Last name is

12    Gorde, G-O-R-D-E.

13         THE REPORTER:  Thank you.  Let the record

14    reflect that I did have Ms. Gorde show us her

15    driver's license off the video record.  Counselors,

16    can we all stipulate on the record that we are in

17    agreement she is who she says she is based on that

18    driver's license provided?

19         MR. BOLAND:  Yes.

20         MR. MORLAN:  So stipulated.

21         MR. DONOVAN:  Yep.  Confirmed.

22         THE REPORTER:  Thank you.  All right, Ms.

23    Gorde, will you please raise your right hand?  Do

24    you solemnly swear or affirm that the testimony

25    you're about to give will be the truth, the whole
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1    truth, and nothing but the truth so help you God?

 2         THE WITNESS:  Yes, I do.

 3         THE REPORTER:  Thank you.  Counsel, you may

 4    begin.

 5         MR. MORLAN:  Thank you.

 6              DIRECT EXAMINATION

 7         BY MR. MORLAN:

 8    Q.   Good morning, Ms. Gorde.  Thank you for being

 9    here.  I know it's not always the first choice of folks

10    to have to testify in something that they're not a party

11    to, but we sure appreciate you taking this time and --

12    out of your busy schedule to accommodate us.

13              And we're going to do our best -- continue to

14    try to do our best to accommodate you and make this

15    deposition go as smoothly and as quickly as possible. To

16    that end, I want to go over just a few things that'll,

17    kind of, help us do that.  Have you ever had your

18    deposition taken before?

19    A.   No, I have not.

20    Q.   Okay.  So this is a little bit, you know,

21    different than a typical one because we're doing this

22    remotely, but we still have a court reporter, and part

23    of what we're trying to do today is get a clear record

24    so that we can use it for other purposes.  Does that

25    make sense?
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1        A.   Yes, it does.

 2        Q.   Okay.  And in order to do that, we need you to

 3   answer -- provide your answers audibly.  Speak.

 4   Sometimes there's a tendency to, you know, shake your

 5   head or nod your head, but it will help the court

 6   reporter if you could make sure that your answers are

 7   audible.  Sound good?

 8        A.   Sounds good.

 9        Q.   Okay.  And we need to also make sure that we

10   don't talk over each other, and I'll try to do my best

11   to let you finish.  And if you'll try to do your best to

12   let me finish.  That way, there won't be two of us

13   talking at once, and she'll be able to get a clear

14   record.  Does that sound good?

15        A.   Sounds great.

16        Q.   Great.  Also, you are in charge here in a --

17   several different ways.  You're the master of your own

18   testimony, and we're here also to accommodate you.  So

19   anytime you want to take a break, just let us know, and

20   we'll take a break.

21             The only thing that I ask is if we're in the

22   middle of a question or a short line of questions that

23   we just finish that before we take a break, and then we

24   can take a break whenever you need.  Does that sound

25   fair enough?
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    It sounds fair.

2      Q.    Great.  Also, if any -- I'm going to try my

3  best to make my questions clear, but if anything is

4  unclear, you're welcome to ask me to rephrase it or

5  break it down further so that you make sure that it's

6  clear that you understand what I'm asking, all right?

7      A.    Okay.  Sounds great.

8      Q.    But if you do answer, then -- if you're able

9  to answer, then we will all assume that you understood

10  the question.  Does that make sense?

11      A.    That does make sense.

12      Q.    Okay.  Is there any reason that you can think

13  of that you wouldn't be able to provide true and

14  accurate testimony today?

15      A.    Nope.

16      Q.    Okay.  Where do you presently work, Ms. Gorde?

17      A.    I presently work at a company called Fine Art

18  Handcrafted Lighting.

19      Q.    And how long have you worked there?

20      A.    About -- probably about eight months now.

21      Q.    And prior to that, who was your employer?

22      A.    It was SuttonPark slash -- SuttonPark

23  Capital/777 Partners.

24      Q.    Okay.  And for our purposes today, I'm going

25  to refer to the plaintiffs as 777 or Triple 7.  And

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  that's going to mean SuttonPark or 777 Partners, kind

2  of, collectively.  Does that make sense?

3      A.    Yes.

4      Q.    Okay.  But if there is a particular question

5  where there's some sort of difference that you think is

6  significant between SuttonPark and 777 Partners with

7  respect to the particular question, if you could just

8  let us know or help clarify for us.  I'm not sure there

9  will be, but if you could do that to the extent you can,

10 that would be helpful.  Sound good?

11     A.    Sounds good.

12     Q.    Great.  And how long did you work for 777?

13     A.    I worked there -- well, okay.  Let's --

14 originally, it was SuttonPark that I was hired for back

15 in 2019.

16     Q.    Okay.

17     A.    And then 777 took over SuttonPark and I left

18 last year in 2024.

19     Q.    What year did 777 take over SuttonPark?

20     A.    That I am not exactly sure on the exact year.

21     Q.    Okay.

22     A.    Probably more -- I would say more like 2020

23 during COVID, maybe.  It could have been a little

24 earlier.

25     Q.    And when you say takeover, what do you mean?

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     A.    Well, what I mean by that is 777 Partners was

2   the parent company, and SuttonPark was the subsidiary of

3   -- of 777.

4     Q.    Okay.  So when you say that 777 took over, do

5   you mean that they stepped in to -- sorry, I was getting

6   a little feedback there.  Do you mean that they stepped

7   in to take over management of day-to-day operations or

8   something else?

9     A.    I -- to tell you the truth, I'm not exactly

10  sure exactly what their role was.  All I know is that

11  SuttonPark was a subsidiary of 777 Partners.  They

12  probably had a majority stake in the company.  But other

13  than that, I -- they didn't -- at that time when they

14  started taking over, they didn't do the everyday

15  management operations.  That was later on.

16    Q.    And when you say that was later on, when are

17  you -- what approximate date are you referring to?

18    A.    I would say probably more like 2023.

19    Q.    Okay.  Do you remember was that around the

20  summertime?  Later in the year?  Do you recall when in

21  2023 it was?

22    A.    I don't recall.

23    Q.    Okay.  When you started at SuttonPark in 2019,

24  what was your position?

25    A.    I was the assistant controller.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 12

1     Q.    And is that the position that you had

2  throughout your tenure at -- this position even as it --

3  there were some changes of management and control that

4  we just talked about?

5     A.    I was the assistant controller up until

6  October of 2024.

7     Q.    And October of 2024, was that was when you

8  were no longer employed by 777 as of October 2024?

9     A.    No.   October 2024 is when they moved me up to

10  the controller position because the controller at that

11  time left the company.

12     Q.    Okay.  And who was that controller?

13     A.    That was Josh Klein.

14     Q.    And how long had Mr. Klein been the

15  controller?

16     A.    He was probably the controller for about two

17  years.

18     Q.    And when was your last day of employment with

19  777?

20     A.    July 12, 2024.

21     Q.    Okay.  So just to clarify, I think earlier you

22  might have said 2024 when you were talking about when

23  you moved from assistant controller to a controller. Did

24  you mean October of 2023?

25     A.    Yes, sorry.  It was October of 2023.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 13

1      Q.    That's okay.  And did you do anything to

2  prepare for this deposition today?

3      A.    No, I did not.

4      Q.    Okay.  And have you spoken with anyone about

5  this case other than to schedule your deposition at all?

6      A.    No, I did not.

7      Q.    Okay.  And what, if anything, do you know

8  about the particular case that we're here on today?

9      A.    Well, I --

10     Q.    Just generally speaking.

11     A.    If you can refer about exactly this case with

12 Paul Kosinski and Saiph --

13     Q.    Okay.

14     A.    -- or the entire case in general?

15     Q.    So there is -- by the way, just so that we're

16 clear, you may have heard before I represent Paul

17 Kosinski and Saiph Consulting in this matter.  Saiph and

18 Kosinski are defendants, two Leadenhall entities are

19 also defendants, and then the plaintiffs are SuttonPark

20 and 777 in this particular case.  It sounds like from

21 what you were saying earlier that you might be familiar

22 with some litigation between Leadenhall, the plaintiffs

23 and a whole bunch of other folks up in New York.  Is

24 that fair to say?

25     A.    That is fair to say.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  So Saiph and Kosinski are not part of

2  that New York case.  We're on a -- this is a separate

3  case.  We're -- it -- it's in the Southern District of

4  Florida, and it concerns -- the primary sort of subject

5  matter of this case concerns a collateral audit that Mr.

6  Kosinski and Saiph performed for Leadenhall.  When I say

7  collateral audit, are you familiar with what I'm talking

8  about?

9    A.   Yes.  I am familiar with what you're talking

10  about.

11    Q.   Okay.  And are you familiar with the specific

12  collateral audit that I'm talking about with respect to

13  Saiph and Mr. Kosinski on behalf of Leadenhall?

14    A.   The only thing I know about that is that

15  Leadenhall had hired Paul Kosinski and Saiph Consulting

16  to do some audits of their records with SuttonPark/77

17  Partners.

18    Q.   Okay.  And in connection with that, did

19  management designate or assign you any particular role

20  with respect to that collateral audit?

21    A.   No, they did not.

22    Q.   Did they designate you as someone that would

23  -- that -- provide information and answer Mr. Kosinski's

24  questions as part of the collateral audit?

25    A.   The only thing they said was they sent a

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  general e-mail that they were doing an audit of their

2  files.  That was it.

3      Q.   Okay.  When you say a general e-mail, they

4  sent it to everybody, or they sent it to some --

5      A.   Yes, everybody.  I'm sorry.

6      Q.   Okay.

7      A.   Yes, everybody.

8      Q.   Okay.  So was it your understanding that part

9  of the purpose of that e-mail was to let everybody know

10  that the audit was occurring?

11     A.   I -- I'm -- I don't understand what you mean

12  by that.

13     Q.   Fair enough.  Was it your understanding that

14  if Mr. Kosinski had questions or needed information with

15  respect to the audit, that -- to the extent that you had

16  that information, management was directing you to

17  provide that to Mr. Kosinski?

18     A.   Was my understanding.

19     Q.   Okay.  And how long -- or do you know Paul

20  Kosinski?

21     A.   I do.

22     Q.   Okay.  And how long have you known Mr.

23  Kosinski?

24     A.   Since I started working at SuttonPark.

25     Q.   And while you were at SuttonPark, did you have

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   occasion to have much interaction with Mr. Kosinski?

2       A.   Yes, every day.

3       Q.   And do you recall when Mr. Kosinski left his

4   employment with 777?

5       A.   I do.

6       Q.   Do you recall when that was?

7       A.   I am pretty sure it was in December of 2020,

8   because I know it was during COVID, and we were all at

9   home.

10      Q.   Okay.  And shifting focus back to the audit,

11  did you and Mr. Kosinski communicate at all about the

12  audit?

13      A.   The only thing is -- is I met him at the

14  SuttonPark office on a day that I was also doing other

15  work for B. Riley, who is also there at the SuttonPark

16  offices.  And that's the only one I communicated any,

17  you know, work or documents that he -- he might've --

18  was questioning.

19      Q.   And when you say SuttonPark's offices, were

20  those the offices in Boca?

21      A.   Yes.  Those were the offices in Boca.

22      Q.   And was that where you were normally located

23  or did you come up --

24      A.   I was actually -- oh, sorry.  I was actually,

25  normally, working from home.  I had not really been set



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1   foot in SuttonPark offices for over four years.

2       Q.   Okay.  And that -- did that kind of start with

3   COVID?

4       A.   Yes, it did.

5       Q.   And so was one of the specific purposes you

6   came into the office was to help facilitate Mr. Kosinski

7   and Saiph's audit?

8       A.   It was -- it was a combination of Mr. Kosinski

9   audit plus also with -- at the time B. Riley was there,

10  too.

11      Q.   And what did B. Riley ask you to do?

12      A.   Did some questions about the -- the accounting

13  books in general of, you know, SuttonPark.  They wanted

14  to look at -- at the records in total.  Showed them how

15  to have -- show them exactly where those records were,

16  where they could find it.  They had access to that.

17      Q.   What type of records are you referring to?

18      A.   Accounting records, Excel spreadsheets, maybe

19  PF documentation, our -- you know, our accounting

20  software.

21      Q.   And would these be -- I'm getting a little

22  feedback here, so I apologize.  Let me start over. Would

23  those records that you just referred to, would that

24  include anything that would be in MpFin or are those

25  separate from what you're talking about?





**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.    Yeah, those were separate -- separate from

2  what I was talking to -- about.  MpFin was a totally

3  different software system, which housed all the client

4  information, customer and client information in there.

5     Q.    Can you sort of give us a brief sort of

6  overview of the difference between the -- it -- to the

7  extent there is one, between the MpFin records and the

8  accounting records and those types of records that you

9  were just talking about?

10     A.    So -- so the accounting records are mainly

11  like, you know, your cash accounts, your balance, you

12  know, your bank accounts on there, your receivables in -

13  - in total.  Where MpFin housed all the documentations,

14  all the checks, all the backup for all the insurance

15  annuities that we would get in and then have to send

16  out.

17     Q.    Okay.  And from time to time, were there

18  differences or inconsistencies between the MpFin system

19  and the accounting records?

20     A.    I cannot be -- can't tell you on that.  I was

21  never in MpFin.  I never dealt with MpFin.

22     Q.    Okay.  Did you assist with reconciling certain

23  accounting records and documentation that you had with

24  records from other systems or records used for other?

25     A.    I did reconcile with a spreadsheet to a report



**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that we would send over to our investors.

2       Q.   Okay.  And which records would you be

3  reconciling with the accounting records?

4       A.   So we would -- I didn't have access to MpFin,

5  but we would get what we called work deals, which were

6  stuff that we would buy, you know, insurance annuities

7  and stuff that we would buy.  We would get that.  I

8  would have a record of those.  I would put it on a -- a

9  spreadsheet.  And then once a month, our -- another

10 apartment would repair a report, and we would -- I would

11 match what I was given and what -- what we sold and

12 purchased to what they were stating -- stating.

13      Q.   Okay.  I'm going to go ahead and rather than

14 just do these bit by bit, I'm going to upload some

15 additional exhibits to kind of make sure that you are

16 able to open all of those and just ask you to just spend

17 a few minutes taking a look at them.  We will talk about

18 them more, but I want to give you a chance to just

19 familiarize yourself with them if you haven't seen them

20 before or haven't seen them recently, is more like it.

21 Most of them, I believe, have your -- or communications

22 that you were involved in.  But I'm going to go ahead

23 and do that.  And while we're getting that squared away

24 and giving you some time to kind of go through those,

25 however long you need, there's not that many.  We will

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  go off the record.  Does that sound workable?

2      A.   Yes.

3      Q.   Okay.  So I'm going to go ahead and just start

4  uploading these.  And if you need any help accessing it,

5  the court reporter may be able to help, and I'll do

6  anything I can to assist as well.

7      A.   Okay.

8          MR. MORLAN:  So I'm going to start doing that

9      right now and we will go off the record.  Also,

10     Counsel, let me know if you have any problems

11     accessing this.  I don't mind sending an e-mail with

12     this stuff.  I think most of it is probably small

13     enough that will work.  So with that, we'll go off

14     the record.

15         THE REPORTER:  The time now is 9:28, Eastern.

16     We are going off the record.

17         (A recess was taken.)

18         THE REPORTER:  Time now is 9:48 a.m., Eastern.

19     We are back on the record.

20         BY MR. MORLAN:

21     Q.   Okay.  Ms. Gorde, I understand you were able

22  to download the exhibits that I shared to the chat.

23     A.   Yes.  All eight of them.

24     Q.   Great.  Don't worry.  I'm not necessarily

25  going to ask you tons and tons of questions in detail

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  about each one.  Some of these are going to be just to

2  see if you're familiar with or if you can identify them

3  for us. Let's start with, if you would, please take a

4  look at what we've marked for purposes of this

5  deposition as Exhibit 1.

6             (Exhibit 1 was marked for identification.)

7       A.   Okay.  I have it open.

8             BY MR. MORLAN:

9       Q.   Okay.  And is the right bottom corner, do you

10  see a number in the right bottom corner of that

11  Exhibit 1?

12      A.   Yeah.  On the first page?

13      Q.   First page.  Yes.

14      A.   Yes.

15      Q.   Can you tell me what that number is?

16      A.   I have -- it says 77(PL-FL_3 -- 00008909).

17      Q.   Okay.  And we're going to refer to that as a

18  Bates label, and we will call this one Bates 8909, for

19  example, just for clarification and to keep the record

20  straight, but we'll also refer to it by its Exhibit

21  number.

22      A.   Okay.

23      Q.   Do you recognize this document here?

24      A.   I do not because I don't think I've ever seen

25  it.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1     Q.    Okay.  Have you had a chance to look at it

2  briefly?

3     A.    Yes.  I was able to look at it briefly.

4     Q.    Okay.  And do you see that the -- according to

5  the subject line and in looking at this, do you

6  understand that this letter to be discussing access to

7  data and information for purposes of the audit that

8  we're talking about?

9     A.    Yes.

10    Q.    Okay.  And do you see that the letter is

11  directed to B. Riley, attention: Jim Howard?

12    A.    Yes.

13    Q.    Do you know who Jim Howard is?

14    A.    I do.  I know he worked for B. Riley, and I

15  know he was, I guess, the lead on anything relating to

16  the 777 Partners and looking at records.

17    Q.    Okay.  And did you have much interaction with

18  Jim Howard while he was at 777 SuttonPark?

19    A.    Not much.  I mainly had interactions with

20  Teresa, and I don't know her last name.  With Teresa --

21    Q.    Do you think it was Teresa Licamara?

22    A.    It might have been.  All I -- all I know is

23  she worked with him on 777 Partners, and I was dealing

24  mainly with her.  Occasionally I would get an e-mail

25  from Jim, but Jim usually did not respond to me.  It

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  went always through Teresa.

2      Q.   And did you and Jim Howard or you and Teresa

3  have any discussions at all about the collateral audit?

4      A.   Nope.  Just -- just -- the only thing we had

5  in -- in communications was just to meet up with Paul

6  Kosinski.  That was it.

7      Q.   Okay.  And when you say communications

8  regarding meetup with Paul Kosinski, was that Mr. Howard

9  or Teresa directing you to meet up with Paul Kosinski

10  for purposes of the audit?

11     A.   Yes.

12     Q.   Okay.  And did you in fact meet up with Mr.

13  Kosinski for purposes of the audit?

14     A.   Yes, I did.

15     Q.   Okay.  And I just want to direct your

16  attention to the last page of this Exhibit 1.  Do you

17  see in the third to last paragraph where it lists some

18  names of some folks that are being requested to have --

19  to be able to have permission to speak with Paul

20  Kosinski directly?

21     A.   Yes.

22     Q.   Okay.  And do you know who the signatory,

23  Roger Schwartz, is on this letter?

24     A.   No, I do not.

25     Q.   Okay.  And do you know who the law firm of

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  King and Spalding is?

2      A.   No, I do not.

3      Q.   Okay.  But do you understand from this letter

4  overall that King and Spalding and Mr. Schwartz were

5  stating that they represented Leadenhall in connection

6  with the audit at issue?

7      A.   That's the way it appears to be, yes.

8      Q.   And so with respect to that, just to clarify,

9  because I think my question before was a little awkward.

10 So did you -- do you understand based on what happened

11 with the audit, your conversations with the B. Riley

12 folks and in this letter that this letter was requesting

13 permission for Mr. Kosinski to have direct conversations

14 with you and some other 777 folks in the context of the

15 collateral audit?

16     A.   Yes.

17     Q.   Okay.  Can you tell me -- if you would just

18 take a look at this list real quick.  Can you tell me

19 who Sue Melchiori is?

20     A.   She was a legal counsel.  She wasn't like, you

21 know, top legal, but she was -- she worked under Fred

22 Love.

23     Q.   And did you have any communications with Sue

24 about the collateral audit?

25     A.   No, I did not.



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1       Q.   Okay.  Did you have any communications with

2   anyone besides Jim Howard and -- yeah.  Strike that. Let

3   me start over.  As far as other 777 employees, or B.

4   Riley acting on behalf of 777, was there anybody that

5   you had any communications with about the collateral

6   audit besides Jim Howard and Teresa?

7       A.   Nope.

8       Q.   Okay.  All right.  Percy Ford.  Can you tell

9   me -- do you know who Percy Ford is?

10      A.   I do.

11      Q.   And who is Percy Ford?

12      A.   Percy Ford is the servicing manager.  So he

13  would deal with MpFin.  He also dealt with a lot of the

14  money coming in with the insurance companies and money

15  going directly out.

16      Q.   And did you ever have occasion to need to

17  access any of the documentation in MpFin?

18      A.   If I did -- if I did, it would be, you know --

19  I would ask Percy Ford to get documentation for me

20  because I didn't have access to it.

21      Q.   But were some of the documents that you might

22  have looked at in the context of reconciliations, were

23  some of those reports that you were referring to -- were

24  those reports that would be based on information in

25  MpFin or something else?

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1       A.    They would be based on information from MpFin,

2  but Percy -- Percy Ford would have the information in

3  there.  But somebody else would access that information

4  to do the report and then give it to me.

5       Q.    Okay.  Do you know who that person would be,

6  who would access the information other than Percy Ford?

7       A.    Well -- oh, well, and not in SuttonPark area,

8  it was Alex Adnani -- Adani [sic].  I think that's how

9  he says his last name.

10      Q.    Okay.  And who is Alex Adnani?

11      A.    He worked at 777.  He would do all the

12 reporting and monthly requirements, monthly compliance

13 for all investors.  He would compile all the data and

14 send the reports out to the investors.

15      Q.    And as part of Mr. Adnani's compilation --

16 compiling of the data, as you said, would he need to

17 consult with you sometimes?

18      A.    Sometimes he would.  He would, you know -- so

19 I can compare to what I have on -- what we call as a

20 matrix, which is an Excel documentation that lists all

21 the deals between the different investors.  And we would

22 compare it saying, why -- you know, what he has on his

23 report and what I have on mine.

24      Q.    Okay.  And I want to come back to the -- these

25 matrixes a little bit more.  And I may show some of them

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    to you.  But I want to ask, can you explain a little bit

2    more what the matrixes are that you're talking about?

3         A.   The matrixes is -- it's a very large document.

4    It had several -- it had about four or five different

5    tabs on it.  It would list a summary listing of all

6    deals that we have, that we have on our record, and then

7    what the interest and principal and payments would be

8    for those each deals that would be sent over to either,

9    you know, the different investors.

10        Q.   Okay.  I'm actually -- since it just came up,

11   I'm going to show you something.  And we will call this

12   -- let me know when you are able to open the document I

13   just shared.

14            THE REPORTER:  And what did you want to call

15       this one?

16            MR. MORLAN:  We'll call that one Exhibit 9.

17            (Exhibit 9 was marked for identification.)

18            THE REPORTER:  Okay.  Great.

19            THE WITNESS:  It -- it's going.  I know it's a

20       very large document.  Okay.  I have it open.

21            BY MR. MORLAN:

22        Q.   Oh, you weren't kidding.  Okay.  I'm going to

23   definitely --

24        A.   Yes.

25        Q.   -- try not to - problems with all these


**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 28

```
 1  exhibits.
 2       Q.   Would this Exhibit 9 that you're looking at
 3  right now, would that be an example of one of the
 4  matrices you just described?
 5       A.   Yes.  This is the matrice [sic].
 6       Q.   Okay.  And hang on.  It's taking a minute to
 7  open up on my screen as well.
 8       A.   Yeah.  It's a large document.  I could have
 9  told you that right away.
10       Q.   Okay.  And so did Mr. Kosinski request access
11  or request copies of settlement matrices like this one
12  for purposes of the audit?
13       A.   Yes.  Yes, he did.
14       Q.   Okay.  And did that seem to you to be an odd
15  or inappropriate request?
16       A.   No, I did not.
17       Q.   Why would this document be useful to someone
18  who was trying to perform a collateral audit?
19       A.   This document would be useful because it lists
20  all the deals that we have on record on when they were
21  purchased, what investor they belong to and -- and that.
22  So that's what I would see very -- very helpful.
23       Q.   Okay.  And what is the significance of the --
24  for the title of this document?  The beginning part is a
25  Bates label identification number.  But it's got
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    appended there, too.  It's something that says,

2    Structured Settlement Matrix 1-31-21 XLSX.  Do you see

3    that?

4        A.    Yes.

5        Q.    And is that how -- disregarding the beginning

6    part, identifying it, but starting with Structured

7    Settlement Matrix, is that how the files were typically

8    named?

9        A.    Yes, because we kept it up to date for every

10   month.  This would also help me reconcile my records on

11   a monthly basis, because we did have deals that we would

12   buy and sell throughout the month.  And at the end of

13   the month, we would have these listing of deals --

14       Q.    Okay.

15       A.    -- that were technically, you know, settled on

16   the different investors.

17       Q.    Okay.  So this particular one that we're

18   looking at, am I correct that it was dated January 31,

19   2021?  Is that what that means in the name -- file name?

20       A.    Correct.  Correct.

21       Q.    Okay.  And so that was the information that

22   was current as to the particular deals, as you described

23   it, as of January 31, 2021?

24       A.    Correct.

25       Q.    Okay.  And so that date doesn't necessarily

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  refer to when the deals were acquired.  It just refers

2  to the status of the deals as of that particular date;

3  is that right?

4      A.   That is correct.

5      Q.   Okay.  All right.  We'll come back to this.  I

6  think what I'm going to do is show you a spreadsheet

7  with a list of names of some other settlement matrixes.

8  So we don't necessarily have to upload them all because

9  you're right.  They're quite large.

10     A.   Yes.

11     Q.   Do you recall approximately how many

12 Structured Settlement Matrices Mr. Kosinski requested

13 and that you provided?

14     A.   I -- I am not exactly sure the amount -- the

15 number of them.  I think it was maybe at least one --

16 couple of them, like, one every month because we did

17 this every month.  I would save it every month.  So I'm

18 pretty sure he has every month for a year maybe.  I am

19 not exactly sure exactly the amount.

20     Q.   Okay.  And these files are pretty large.  How

21 were you able to transfer these to Mr. Kosinski?

22     A.   I had -- he -- I had a -- what we call -- I

23 call as a jump drive, a portable, you know, little flash

24 drive.  Be able to put it on there to give to him.

25     Q.   Okay.  And was that because of the files were



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1   too large to e-mail?

2        A.   Correct.

3        Q.   Okay.  And were there any other files that you

4   provided to Mr. Kosinski on the -- what you described as

5   a jump drive besides Structured Settlement Matrices?

6        A.   Nope.  It was just the Structured Settlement

7   Matrices.

8        Q.   Okay.  All right.  Let's take a look now at

9   Exhibit 2, if you would, please.

10            (Exhibit 2 was marked for identification.)

11       A.   Okay.  Got it open.

12            BY MR. MORLAN:

13       Q.   Okay.  And I don't see your name in the e-

14  mails on this.  The e-mail addresses.  Have you ever

15  seen this document before?

16       A.   This document, I don't recall.  I did -- might

17  have been on another e-mail maybe with this, requesting

18  me to be able to meet with Paul from Jim.

19       Q.   Okay.  And if you look at the top of this e-

20  mail, it CCs someone named Teresa Licamara.  Do you

21  think that was the Teresa from -- we were talking about

22  earlier?

23       A.   Yes.  That was the Teresa we were talking

24  about earlier.

25       Q.   Okay.  And looking at this e-mail and

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   recognizing that you received a similar e-mail, as you
 2   said, does it appear that this involves a request by
 3   Paul Kosinski to Jim to meet with you for purposes of
 4   the audit?
 5       A.   Yes.
 6       Q.   All right.  And if you would, please take a
 7   look at Exhibit 3.
 8            (Exhibit 3 was marked for identification.)
 9       A.   Okay.  I have Exhibit 3 open.
10            BY MR. MORLAN:
11       Q.   Okay.  Now, is this an e-mail you've ever seen
12   before?
13       A.   Yes, this is.
14       Q.   Okay.  And is this the e-mail that you may
15   have been referring to earlier when you said that you
16   thought you received some additional communication about
17   meeting with Paul?
18       A.   Yes.
19       Q.   Okay.  And does this appear to be a true and
20   accurate copy of an e-mail exchange between you and
21   Paul, Teresa Licamara, and Jim Howard?
22       A.   Yes.  It appears to be correct.
23       Q.   Okay.  And is this the type of e-mail document
24   that you would routinely rely on during the course and
25   scope of your -- of performing your duties for 777?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yes.

2      Q.    Okay.  And were these types of e-mails saved

3 and preserved and relied upon overall in the ordinary

4 course of business of 777 Partners?

5      A.    Yes.  On my triple -- on my SuttonPark e-mail

6 address.

7      Q.    Okay.  And when you were doing work for 777

8 and SuttonPark, did you use any other e-mail addresses

9 besides the one on here, kgorde@suttonpark.com?

10     A.    Nope, I did not.

11     Q.    Okay.  Didn't have, like, a 777 Partner's

12 e-mail address or anything like that?

13     A.    I think they might have set me up with one,

14 but I never used it.  Never got e-mails from that.  I --

15 mine was always SuttonPark.

16     Q.    Okay.

17           MR. BOLAND:  Mr. Morlan?

18           BY MR. MORLAN:

19     Q.    And --

20           MR. BOLAND:  Mr. Morlan, can I just ask you a

21     question?

22           MR. MORLAN:  Yes, sir.

23           MR. BOLAND:  I noticed that the document that

24     you showed didn't have a Bates number on it.  It

25     doesn't look like it has one on the stamp.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1        MR. MORLAN:  I'm going to fix that or either

2    substitute that or just give you the Bates number.

3    That should only be a couple of these, but these are

4    documents that were produced, and they do have a

5    Bates number that we just got some wires crossed.

6    And some of them right now are -- they may be

7    referred to by a control number.  But we will

8    clarify that for you, but I wanted to get something

9    for everybody to be able to see.

10       MR. BOLAND:  That -- that's fine.  Is it fair

11   then that in the title of the document, it says,

12   Exhibit 3, and that it's got a Saiph number.  That

13   this is going to be a Saiph-produced document?

14       MR. MORLAN:  Yes.

15       MR. BOLAND:  Okay.  That's what I wanted to

16   know.  Thank you.

17       MR. MORLAN:  I think so.  Okay.  And again, we

18   will -- actually, I may have that now.  Let me

19   check. Yes, we will get that ironed out.  But yes,

20   all of these with the control numbers where -- if it

21   says safe, it's just a control number.  If it says

22   safe PROD, that should be the production ones, and

23   we will fix that after the depo.  Or at least make

24   clear with the -- which Bates number these

25   correspond to.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1            BY MR. MORLAN:
 2       Q.   Okay.  And this e-mail that we're looking at,
 3  Exhibit 3, the most recent date on that at the top is
 4  Wednesday, June 5, 2024; is that right?
 5       A.   Yes.
 6       Q.   Okay.  And do you know -- do you recall when
 7  you actually met with Mr. Kosinski?
 8       A.   It -- it was the Thursday the day after.
 9  Thursday, June 6, 2024.
10       Q.   Okay.  And if you would please take a look at
11  Composite Exhibit 4.
12            (Exhibit 4 was marked for identification.)
13       A.   Okay.
14            BY MR. MORLAN:
15       Q.   And are you able to open the bookmark tab?
16  Are you able to see that?
17       A.   The bookmark tab?  Not exactly sure.
18       Q.   Actually, will you share your -- will you
19  share your screen with us real quick and let me just see
20  if --
21       A.   You need me to share my screen?
22       Q.   Yes.
23       A.   Okay.  Sorry.
24       Q.   I just want to see what you're looking at to
25  make sure you're looking at the right thing and see if I
```

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  can -- okay.

 2      A.   Can you see my screen?

 3      Q.   I can.  If you would go to the far left corner

 4  and go to the bottom ribbon.  Up a little bit.  Next to

 5  the highlighter.  That little tab.  Yes.

 6      A.   Yeah.  This one?

 7      Q.   If you would click on -- yes.  There you go.

 8      A.   Okay.  And then click on these.

 9      Q.   Okay.  Correct.  So I'm showing you what's

10  been marked as Composite Exhibit 4.

11           Do you recognize --

12      A.   Okay.  Okay.

13      Q.   -- this document?

14      A.   This one?  Yes.

15      Q.   Okay.  And do you see on Page 1 of Composite

16  Exhibit 4, the Bates number is Safe Prod 443611?

17      A.   Yes.

18      Q.   Okay.  And then Composite Exhibit 4 has four

19  parts that I'm going to ask you about just briefly, 4A,

20  4B, 4C, 4D.  And --

21      A.   Okay.

22      Q.   Do you see that?

23      A.   Yeah.  Do you want me to go to 4A?

24      Q.   Well, let's start with four for just a second.

25  And I believe you said you do recognize this document,
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  Page 1 of this Composite Exhibit 4?

2      A.   Yes.

3      Q.   Okay.  And does this appear to be a true and

4  accurate copy of an e-mail that you sent to Mr. Kosinski

5  on June 7, 2024?

6      A.   Yes.

7      Q.   Okay.  And was that the day that -- or around

8  the time that you met with Mr. Kosinski, as we just

9  discussed?

10     A.   Yes.

11     Q.   Okay.  And was this e-mail that you sent that

12  we're looking at right now, was this provided to Mr.

13  Kosinski for purposes of the audit?

14     A.   Yes.

15     Q.   Okay.  And does this e-mail reference four

16  different attachments?

17     A.   Yes.

18     Q.   Okay.  And we're going to go through them

19  briefly, but does it appear that Attachments 4A, 4B, 4C,

20  and 4D -- or Composite Exhibit 4A, 4B, 4C, and 4D, that

21  those correspond with the attachments to this e-mail

22  that are listed on Page 1?

23     A.   I'm not exactly sure.

24     Q.   Okay.  All right.  Well, we can go through

25  those.  What did you mean when you said, "See attached

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  backup for the different matrices"?

2      A.   Off the top of my head, the only thing I can

3  think of is regarding some deals that were supposed to

4  be on the books that we were going to purchase.  Then we

5  had to take them off, I think.  Because they weren't

6  purchased.  That's the only thing I can think of with

7  this.

8      Q.   Okay.  I -- I'm a little --

9          MR. MORLAN:  Did somebody say something?  Must

10     be the feedback again.

11         BY MR. MORLAN:

12     Q.   So I -- I'm a little confused.  So you said

13  these deals were on the books and then off the books.

14  Can you help us understand what that means a little

15  more?

16     A.   Well, they were deals that we were going to be

17  purchasing at one point in time.  And then it turned out

18  some of those deals we did not -- we did not purchase.

19  So we had to take them off the matrices.

20     Q.   And so was it typical for there to be deals

21  included on the matrix that had not been purchased?

22         MR. BOLAND:  Object to the form.

23         THE WITNESS:  Not -- not typically.  Sometimes

24     because they were in the process of getting all the

25     information together, they knew which deals they

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   were. Most of the time we would put them on because

2   we knew we were going to buy them in the next week,

3   or two, or three weeks.  But typically this was not

4   typical of them putting them on and then taking them

5   off.

6        MR. MORLAN:  Mr. Boland, what was your

7   objection to form so that I can fix it and make sure

8   we get this clear for Ms. Gorde?

9        MR. BOLAND:  Well, I think she answered it, but

10  it was the use of the word typical.  I thought it

11  was vague.  But she answered it.

12       MR. MORLAN:  Okay.  Okay.  So is your objection

13  withdrawn?

14       MR. BOLAND:  No.  I put the objection in. She's

15  answered the question.  And we're there.

16       MR. MORLAN:  Okay.

17       BY MR. MORLAN:

18  Q.   Ms. Gorde, I'm going to ask the question

19  slightly differently, because -- in order to keep a nice

20  clear record on this.  How often was it the situation

21  that deals would go on and off the books as you

22  described with respect to the settlement matrices?

23  A.   Not often at all.

24  Q.   And so let's look at Composite Exhibit 4A.  If

25  you would just take a moment to review that and let me

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  know when you've had a chance to look at that.  It's two

2  pages long.

3      A.    I'm assuming it's the one with Richard

4  Bellissimo --

5      Q.    Yes.

6      A.    -- and Damien -- okay.

7      Q.    And there's a Bates number at the bottom,

8  443612?

9      A.    Yes.

10      Q.    Okay.  And is the subject line for this WMS

11  and JGW deals?

12      A.    Yes, it is.

13      Q.    Okay.  And is this one of the attachments that

14  you sent in the previous e-mail that we just looked at

15  that's also part of this composite exhibit?

16      A.    I can't say that it is.

17      Q.    Okay.  Well, let -- let's go up to Page 1.  Do

18  you see where it says attachments?

19      A.    Here?

20      Q.    Yes.

21      A.    Yes.

22      Q.    And you see where it says WMS and JGW deals?

23      A.    Yes.

24      Q.    Okay.  Now let's go down to -- back down to

25  the next page.  Does the subject line of this Composite

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Exhibit 4A on Page 2, does that match the name of the

2  first attachment that we just looked at on Page 1?

3      A.   It looks like it.  It appears to -- to be.

4      Q.   Okay.  And does Composite Exhibit 4A that

5  we're looking at right now on Page 2, does this appear

6  to be a document that you attached to the e-mail that we

7  just looked at --

8      A.   I can't verify that --

9      Q.   -- on Page 1?

10     A.   -- that was the attachment that -- in that e-

11 mail.

12     Q.   Okay.  Well, are you familiar with this

13 document that we've marked as -- it doesn't --

14     A.   I'm familiar with this e-mail.  I'm -- I am

15 familiar with this e-mail.

16     Q.   Okay.  And do you believe that -- do you have

17 any reason to believe that you did not send this e-mail

18 to Mr. Kosinski?

19     A.   I can't tell you what exactly those

20 attachments were.

21     Q.   Okay.  And can you tell me what the

22 significance of this e-mail that we're looking at is?

23     A.   The only thing I can say -- say on this was

24 that these were the deals that they were going to put on

25 the books and then they took them off.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   And if you go down to the highlighted portion
 2  of Page 2 of Composite Exhibit 4, do you see the bold
 3  and underlined part that says, "Do not put those
 4  contracts on the books and records"?
 5      A.   Correct.  Yes, I do see it.
 6      Q.   Okay.  Had something like that ever happened
 7  before?  Were those routine instructions?
 8      A.   Those were not routine instructions because we
 9  would always only put deals that we purchased on the
10  books.
11      Q.   And who is Damien Alfalla?
12      A.   He was the CFO of 777 Partners.
13      Q.   So would this -- would -- was this e-mail part
14  of the backup for certain versions of the settlement
15  matrices that we described -- that you described
16  earlier?
17      A.   Yes.
18      Q.   Okay.  And when you say that it's backup for
19  that, is this a document that was retained to confirm
20  and memorialize changes to the settlement matrices based
21  on instructions from Damien Alfalla?
22      A.   I can say it probably was because it was
23  actually directed toward the controller at the time,
24  Josh Klein.
25      Q.   And did you report to Mr. Klein?
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    I did.

2      Q.    And do you remember anything about this

3  particular issue in terms of whether or not to put these

4  contracts on the books and records as of the approximate

5  time of this e-mail in February 2023?

6      A.    You mean to put them on, or take them off?

7      Q.    Well, whatever you would have used this as

8  backup for.  If this was to take them off, then -- let

9  me start over.  Was this -- the purpose of this e-mail,

10 was it to provide backup for taking certain deals, as

11 you described it, off of the settlement matrices?

12     A.    Yes.

13     Q.    Okay.  And were those deals in fact taken off

14 the settlement matrices?

15     A.    They were.

16     Q.    Okay.  And when Mr. Alfalla is saying, "Do not

17 put those contracts on the books and records" would that

18 refer to the settlement matrices?  More than that?

19 Something else?  Do you know?

20     A.    It would be the settlement matrices, as well

21 as the accounting records.  Because our matrices would

22 be tying into our accounting records.  We couldn't have

23 a matrices with deals on the books that didn't match to

24 our accounting records.

25     Q.    And when you say your accounting records, were

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  those contained within a particular system?

2      A.   Yes, that would be SAP.

3      Q.   So did the settlement matrices, did they start

4  out as a report or an output from SAP?

5      A.   No.  Those matrices were just a manual

6  documentation that we kept for anything that would come

7  through as an e-mail say -- stating that we're buying

8  these deals.  Here's the deal, here's the -- the

9  information, and we would manually put it on an Excel

10 spreadsheet, and then we would enter it into SAP as a --

11 you know, as an entry.

12     Q.   Okay.  So first, the deals would be put within

13 the settlement matrices, and then the settlement

14 matrices would be used to have the deals input into SAP?

15     A.   Yes, they would.

16     Q.   Okay.

17     A.   It would be almost simultaneously.  It would

18 be on the matrix and in SAP at the same time.

19     Q.   At the point that Mr. Alfalla sent this e-

20 mail, the deals that are being referenced were those

21 already part of a settlement matrice as you understand

22 it?

23     A.   Yes.

24     Q.   Okay.  Were these deals already in SAP?

25     A.   Yes.  At that point in time, yes, they were.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    Q.    Okay.  So given that the deals were already in

2  SAP and Mr. Alfalla's instructions, what were the next

3  steps that needed to be taken?

4    A.    We would take them off the matrices and then

5  take them -- like, write them off in SAP.  What we call

6  as a write-off.

7    Q.    And what -- can you give me a little bit more

8  information about what a write-off in SAP is?

9    A.    It's just taking the actual deal off the books

10  that was put on.  So pretty much just reversing what we

11  originally booked.

12    Q.    And with respect to the deals described in

13  this e-mail, do you have any idea how long these

14  particular deals were in SAP before they were written

15  off?

16    A.    I wouldn't -- I'm actually not exactly sure if

17  it was on for a year or two years.

18    Q.    Okay.  But are you fairly sure that it was

19  sometime within the one-to-two-year time frame that

20  these deals were in SAP before they were written off?

21    A.    Yes.

22    Q.    Okay.  And was this something that had ever

23  happened before like this?  Had you needed to do

24  something like this before?

25    A.    No.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And the last sentence of Mr. Alfalla's

2  e-mail, you see where it says, "This will be a trade

3  break until we generate the cash to complete the

4  transaction"?

5    A.   Yes.

6    Q.   What does the trade break refer to?  Do you

7  know what that means?

8    A.   No, I do not.

9    Q.   Okay.  And can you tell me anything else about

10 the rest of the sentence in terms of generating the cash

11 to complete the transaction?

12    A.   That I do not know either.

13    Q.   Okay.  Who is Richard Bellissimo?

14    A.   He was the controller for 77 Partners [sic].

15    Q.   And the person in the CC, Josh Klein, that I

16 think you said is the -- he was the controller for

17 SuttonPark?

18    A.   Correct.

19    Q.   Okay.  And did you report to Mr. Bellissimo as

20 well as Mr. Klein?

21    A.   Yes, I -- I would report to both of them.

22    Q.   And would there be anything odd to you about

23 this particular document that we're looking at, Page 2

24 and Page 3 of Composite Exhibit 4?  Do you believe that

25 the --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    No, I --

2      Q.    Go ahead.

3      A.    I was going to say, no, I don't believe

4    anything to be odd about it.

5      Q.    I -- strike that question.  I -- my question

6    -- what I meant to ask was there anything odd about this

7    document being requested by or provided to Ms. Kosinski

8    in the context of the collateral audit?

9      A.    Not that I'm aware of.

10      Q.    As you understood it, this would've been one

11    of the -- a document that you would have been authorized

12    to provide to Mr. Kosinski for the collateral audit; is

13    that right?

14      A.    That is right.  The thing with this document

15    could -- the only reason why, if it was sent to him, was

16    because of the different matrices and the different

17    timelines.

18      Q.    Okay.  And if you would, let's go to Composite

19    Exhibit 4B starting on Page 4.

20      A.    Okay.

21      Q.    Have you ever seen -- starting on Page 4 of

22    Composite Exhibit 4, is -- does this appear to be an e-

23    mail dated September 7, 2022?

24      A.    Yes.

25      Q.    Okay.  And do you know -- have you ever seen

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  this e-mail before?

2       A.   Yes.

3       Q.   Okay.  And I see that from the header that it

4  appears that this e-mail was directed to you; is that

5  right?

6       A.   It was to me and Anthony.

7       Q.   And is this another e-mail that would've

8  provided backup for changes or revisions to the

9  settlement matrices that we were discussing earlier?

10      A.   Yes.

11      Q.   Okay.  And was the purpose of providing --

12 strike that.  And did you provide Mr. Kosinski with

13 settlement matrices that were current as of different

14 dates that showed sort of the progression of the -- and

15 changes to the settlement matrices over time?

16      A.   Yes.

17      Q.   Do you recall what the WMS portfolio refers

18 to?

19      A.   It's -- I recall that the WMS portfolio was a

20 listing of deals that we were going to purchase from

21 WMS.

22      Q.   And what is WMS?

23      A.   That I do not know.

24      Q.   But does this Composite Exhibit 4B, Page 4, 5,

25 and 6, does that appear to be one of the attachments

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1   referenced on the first page of Composite Exhibit 4?

 2        A.   Yes, it appears.

 3        Q.   Okay.  And does this appear to be a true and

 4   correct copy of an e-mail that you received and also

 5   sent to Mr. Kosinski?

 6        A.   It appears to be an e-mail I received and

 7   appears to be maybe something that I did send to Paul

 8   Kosinski.  I can't verify that from the first -- first

 9   e-mail with the attachments.

10        Q.   Okay.  But you would agree that the subject

11   line of Composite Exhibit 4B where it says WMS portfolio

12   6-30-2021, is that something that's also listed in the

13   attachments on Page 1 of Composite Exhibit 4?

14        A.   I can't -- it looks like it might be one of

15   the attachments, but I can't verify that.

16        Q.   Okay.  But do you have any reason to believe

17   that this is not one of the attachments that was sent

18   along with and referenced on Page 1 of Composite

19   Exhibit 4?

20        A.   All I -- I -- it looks like it is, but I can't

21   verify that.

22        Q.   And was there anything unusual about this

23   particular e-mail exchange on Page 4 through 6 of

24   Composite Exhibit 4?

25        A.   I do not see anything strange about it.
```


**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       Q.   All right.  If you would take a look at Page
 2   5. Do you see an e-mail on Page 5 from Abascheck
 3   Lasaria?
 4       A.   Yes.
 5       Q.   Okay.  And was it common to receive -- or can
 6   you tell me what these first two sentences, what you
 7   understood them to mean when you receive this e-mail?
 8   The two sentences after "Hi, Karen"?
 9       A.   "That these files will be removed from the WMS
10   portfolio"?  And the one --
11       Q.   Yes.
12       A.   -- underneath it?
13       Q.   Yes.
14       A.   It -- to mean that these deals were not being
15   purchased from the -- on the WMS portfolio.
16       Q.   Okay.
17       A.   They originally were on the WMS portfolio, but
18   then they said they won't be -- we won't be funding
19   these, or they won't be funding those.
20       Q.   Okay.  And was that something that had
21   happened before?
22       A.   It has.  Sometimes with these portfolios, they
23   would give a list of deals as they're trying to work
24   them all out, saying we're going to give you a list of
25   these deals.  Turned out these deals weren't right, and
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  they would substitute these deals for something else.

2      Q.   Okay.  And what does the statement "they're

3  not pledged anywhere" mean?

4      A.   What it means is that according -- at this

5  time and on this time that these deals for this WMS

6  portfolio was not pledged to any investor, meaning that

7  we did not borrow against any of our investors for these

8  deals.

9      Q.   And did you know or were you asked to verify

10  whether or not these deals were pledged or not?

11     A.   The only way I was able to verify if these

12  deals were not if they were on my matrices and if they

13  were put on as that they were pledged to a -- a

14  different investor or if they were just put on bought

15  through -- and put on just SuttonPark's listing of

16  deals.

17     Q.   Were you the only person who input data into

18  the settlement matrices?

19     A.   I would put it in there.  We would have -- I

20  -- I took care of it mostly myself.  If I wasn't around,

21  Josh Klein would do it.  If he wasn't available, we used

22  to have another guy called Reuben Mitchell would work on

23  these.  Another person, Mary Thomas, would work on

24  these.  These matrices, you know, for -- these matrices

25  were mostly mine.  But if I was out on a vacation or



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  something, some -- we would have a backup.

2      Q.   Okay.  And where would you get the information

3  from in order to put the deal information into the

4  settlement matrice?

5      A.   That would come through e-mails from our

6  funding department.  They would say, okay, we're funding

7  this deal.  Here's the information on the deal.  And

8  Alex Adnani and Nick -- Nick's last name I don't

9  remember off the top of my head -- would actually say,

10  okay, we're going to, what we call, pledge these deals

11  to whatever investor that we can.

12      Q.   So if a deal made it onto your settlement

13  matrice, does that mean that it had already been pledged

14  to an investor?

15      A.   Not necessarily.  It would first go on the

16  matrice, maybe as just a -- a deal we purchased, and

17  until we could see where we could pledge it to.  So

18  maybe on, you know, I'm just using an example, January

19  9th, we would put it on because that's when we're paying

20  -- you know, we're buying the deal.  And then maybe

21  February 1st is when we would pledge it to a facility

22  because we have the capacity to pledge it to a certain

23  facility -- you know, investor.

24      Q.   What would need to happen from your

25  perspective and from an accounting perspective from the


**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  time that the deal was purchased or supposed to have

2  been purchased to the time that it was pledged to an

3  investor?

4      A.   As far as I know, all I would deal with was

5  purchases of the deals.  Whether they were pledged to an

6  investor, that would've been with Alex or Nick.  They

7  would be the ones that would contact the investors and

8  send them a list of deals.  Hey, we have these deals. We

9  would like to put them on this facility -- on this

10 facility with you guys.

11     Q.   So are you saying (audio cuts out) -- would

12 provide the investors with different information about

13 the deals that you (audio cuts out) --

14         THE REPORTER:  I'm sorry.  Mr. Morlan, I'm

15     having audio issues for you.  Can you try to restate

16     that question for me?

17         MR. MORLAN:  Sure.

18         THE REPORTER:  You're still coming through

19     garbled even with the "sure".  I'm so sorry.

20         MR. MORLAN:  How do I sound?  Still garbled?

21         THE REPORTER:  You're cutting in and out.  I'm

22     going to pull us off record.  One moment.  The time

23     now is 10:41 a.m., Eastern.  We're going off the

24     record.

25         (A recess was taken.)

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          THE REPORTER:  Time now is 10:49 a.m., Eastern,

2     and we are back on the record.

3          BY MR. MORLAN:

4     Q.   Okay.  Ms. Gorde, when we went off the record,

5     we were still looking at Composite Exhibit 4.  I'd like

6     to direct your attention to Page 7 of Composite Exhibit

7     4, what we're referring to as Composite Exhibit 4C.  If

8     you would, please take a look at that document?

9     A.   Yes, I have it up.

10    Q.   Okay.  And is this WMS portfolio 6-30-2021?

11    Is that the subject line of the e-mail that you're

12    looking at right now?

13    A.   Yes.

14    Q.   Okay.  And does that appear to match the --

15    one of the references to the attachments on Page 1 of

16    Composite Exhibit 4?

17    A.   It appears to be, yes.

18    Q.   Okay.  And have you ever seen this e-mail

19    starting at Page 7 of Composite Exhibit 4?

20    A.   Yes.

21    Q.   Okay.  And is the -- at the very top, is this

22    is an e-mail from you to Anthony Lockwa (phonetic) and

23    Josh Klein; is that right?

24    A.   Correct.

25    Q.   Okay.  And if we go down to the e-mail

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  directly below that, is that a copy of the e-mail that

 2  we just looked at a couple pages up from Abascheck

 3  (phonetic) Lasaria (phonetic)?

 4      A.   Yes, it is.

 5      Q.   Okay.  And can you just sort of tell me in

 6  layman's terms what the purpose of your e-mail to

 7  Anthony and Josh is?

 8      A.   This is just to inform Anthony, who is on 777

 9  Partners side, to -- that -- you know, he deals with the

10  777 accounting, that these are the deals that are being

11  taken off for the WMS deals that we were not purchasing.

12      Q.   Okay.  And what is Anthony Lockwa's title at

13  this time?  Do you know?

14      A.   I -- I want to say his title maybe was an

15  assistant controller over at 777 Partners.

16      Q.   And -- oh, I did want to clarify something

17  earlier.  When you were describing two employees who

18  communicated with the investors, I believe one of them

19  was Alex Adani, correct?

20      A.   Correct.

21      Q.   And the other one that you said his first name

22  was Nick, but you couldn't remember his last name; is

23  that right?

24      A.   His -- his last name was, I think, Nick

25  Bennett.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    Okay.  That was my understanding as well.  I

2  was just going to confirm that.  And when you say

3  investors, what do you mean?

4    A.    What I mean by investors?  It's the -- and

5  well, investors are the people that we would, you know,

6  borrow the money to buy these deals.

7    Q.    Okay.  And so would Leadenhall be considered

8  an investor, as you're using the term here?

9    A.    Yes.

10    Q.    Okay.  And besides Leadenhall, who are some of

11  the other investors that would loan money to purchase

12  these deals?

13    A.    Credigy, ING -- ING Capital.  Those are the

14  ones I am aware of, and Leadenhall.  Those are the three

15  main ones that I'm aware of off the top of my head.

16    Q.    Was Northwestern Mutual Life an investor?

17    A.    It was, but that was years and years prior to

18  -- that was when I first started out at SuttonPark

19  Capital.

20    Q.    And were you involved at all in any audits for

21  Northwestern Mutual Life's collateral?

22    A.    I was not.  I know a lot of the -- the audits

23  came with Percy Ford.  Percy Ford did a lot of that part

24  of the audits.

25    Q.    Okay.  Were you involved in any audits for

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1  Credigy?
 2      A.   I was not.  Mary Thomas was the one that was
 3  dealing with Credigy.
 4      Q.   And were you involved in any audits for ING
 5  Capital?
 6      A.   I couldn't say that I was.  The main audits
 7  that I dealt with was mainly the overall audit with our
 8  auditors doing our financial statements.
 9      Q.   And when you say the overall audit, was that
10  like a regular annual audit?
11      A.   That -- yes, that was a regular annual audit.
12      Q.   And who were your auditors for the regular
13  annual audits?
14      A.   We had -- who did we have?  Off the top of my
15  head, I don't remember who they were at this point --
16  moment in time.
17      Q.   Okay.  But you were also involved with those
18  audits as well?
19      A.   Correct.
20      Q.   What was your role with respect to those
21  overall audits as you described them?
22      A.   Anything they would -- you know, I would be
23  the ones to give them, like, the trial balances.  And
24  when they questioned and they want to see backup was it
25  given the backup to the auditors, you know, and answered
```

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  any questions that they might have had, like any changes

2  in the company and stuff like that.

3      Q.    Okay.  And at the time of -- this e-mail that

4  we're looking at is dated September 6, 2022; is that

5  right?

6      A.    Yes.

7      Q.    Okay.  And when would you typically be

8  communicating?  Like, what months, what time frame of

9  the year would you typically be communicating with the

10  auditors for the overall audit?

11      A.    I would say anywhere from, like, April to

12  June.

13      Q.    And what fiscal year did 777 and SuttonPark

14  use

15      A.    What -- okay.  It -- it's always a December

16  31st year-end.

17      Q.    Okay.  And so these audits, the -- these

18  overall audit that you would assist with, those would be

19  for a calendar year?

20      A.    Correct.

21      Q.    So if I said calendar year 2022, that would

22  end on December 31, 2022?

23      A.    That is correct.

24      Q.    And do you recall whether there was anything

25  abnormal with respect to the 2022 audit overall?

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   The only thing I can think of is -- has to do

2  with these -- the portfolio deals.

3      Q.   And when you say the portfolio deals, are you

4  talking about the ones specifically that we've been

5  discussing and that are discussed in these e-mails we're

6  looking at?

7      A.   Yes, the WMS deals and the JGW deals.

8      Q.   And what was abnormal about those particular

9  deals?

10     A.   The only thing I can think of abnormally is

11 that they were either not on the books or they were on

12 the books.

13     Q.   And by that, do you mean that they were on the

14 books for a time and then needed to be taken off the

15 books?

16     A.   Correct.

17     Q.   All right.  And if you would, please scroll

18 down to Page 9.  What I'm -- as part of Composite

19 Exhibit 4, Page 9 starts Composite Exhibit 4D.

20     A.   Okay.

21     Q.   Do you recognize this document on Page 9 and

22 Page 10?

23     A.   Yes, I do.

24     Q.   Okay.  And is this an e-mail exchange that

25 you're a part of?

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yes, I am.

2      Q.    Okay.  And the other folks on there, I believe

3 we identified all of them.  Anthony, Josh, and Richard;

4 is that right?

5      A.    Yes.  Yes.

6      Q.    Okay.  And those are other accounting folks,

7 correct?

8      A.    Correct.

9      Q.    Okay.  And is this additional backup with

10 respect to why the JGW and WMS deals were taken off the

11 books?

12      A.    Correct.

13      Q.    Okay.  And scrolling down to the bottom, do

14 you see an e-mail at the bottom of Page 10 of Composite

15 Exhibit 4 from Anthony Lockwa to Josh Richard and you,

16 dated January 3rd at 12:10 p.m.?

17      A.    Yes.

18      Q.    Okay.  Can you tell me -- can you explain to

19 me what this e-mail is asking about and describing?

20      A.    This e-mail, that it looks like is that they

21 were actually taking the WMS and the J.G. deals off the

22 books and that the entry is through -- with SuttonPark

23 and 777 Partners.

24      Q.    Okay.  And does this appear to be, on Page 9

25 and 10, a true and accurate copy of an e-mail exchange

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   that you were a participant in on about the date stated?

 2        A.   Yes.

 3            MR. MORLAN:  All right.  I'm going to add

 4   another exhibit that will hopefully allow us to not

 5   have to upload all of those other matrices that we

 6   talked about.  Let me just put that in the chat

 7   here.  That's interesting.  I logged in and logged

 8   out and the sound got better, but now it's not

 9   letting me drop anything into the chat.

10            THE REPORTER:  Do you want to --

11            MR. MORLAN:  Why don't you put your e-mail

12   address in the chat, if you don't mind, and I'll e-

13   mail it to you, Madam Court Reporter Kate.  And if

14   you would then put it in the chat so everybody can

15   see it.

16            THE REPORTER:  Do you want to go off record for

17   this?

18            MR. MORLAN:  Sure.

19            THE REPORTER:  Okay.  One moment.  Time now is

20   11:02 a.m., Eastern.  We're going off the record.

21            (A recess was taken.)

22            THE REPORTER:  Time now is 11:11 a.m., Eastern.

23   We are back on the record.

24            BY MR. MORLAN:

25        Q.   Okay.  Ms. Gorde, if you would please open up
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  what's been marked for purposes of this deposition as

2  Exhibit 10.  It should be shared in the chat.

3          (Exhibit 10 was marked for identification.)

4      A.   Yes, I have it open.

5          BY MR. MORLAN:

6      Q.   Okay.  And I'm going to represent to you that

7  this is a list of the settlement matrices that we were

8  describing earlier that I think were provided, but

9  rather than go through each one, if we can avoid it,

10 given their size, I thought this might be a shortcut.  So

11 I'm going to ask you a few questions about this Exhibit

12 10, okay?

13     A.   Okay.

14     Q.   Okay.  Do you see the first line of Exhibit

15 10, under "unified title"?  Does that appear to be a

16 file name?

17     A.   Yes, it appears to be a file name.

18     Q.   Okay.  And does that describe -- is that a

19 file name for one of the structured settlement matrices

20 that we were discussing?

21     A.   Yes.

22     Q.   And does the very first one, dated 1.31.21, is

23 that in fact the specific Settlement Matrice that we

24 looked at previously?

25     A.   Yes.



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.    Okay.  And looking at this list, do you see

2   that there's some additional settlement matrice file

3   names on here?

4     A.    Yes.

5     Q.    Okay.  Does -- do you recognize these

6   particular file names?

7     A.    Yes.

8     Q.    Okay.  Does this appear to be a list of the

9   settlement matrices that you provided to Mr. Kosinski

10  that we talked about earlier?

11    A.    Yes.

12    Q.    And with respect to the settlement matrices,

13  the last few items on the bottom, what does it -- what

14  do the dates mean?  These are the only ones that I --

15  I've seen that have a date and then they say they're

16  updated.  Can you explain what that means?

17    A.    Well, that -- those are the ones that -- the

18  original December 31, 2021 matrices, the dates after

19  that are the dates that they were updated for whatever

20  reason, either a deal was taken off or a deal was put

21  on.  And those were the back-and-forths of all those

22  different timeframes and -- at the, you know -- on

23  updating all that stuff.

24    Q.    Okay.  And are these updates -- were those --

25  what were the reasons for these updates; do you recall?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    Those updates could have been for the WMS and

2  JGW deals that were either taken on or put off.  There

3  were different back-and-forths of what -- these deals

4  were either going to be bought, not bought, and those

5  were the dates that I had to update those -- the

6  December matrices for whatever change that was

7  communicated to me.

8    Q.    Okay.  And just to clarify in case I didn't

9  say this before when we were talking about this lawsuit,

10  to my knowledge, nobody in this lawsuit is claiming that

11  you did anything wrong.  We're just asking you to help

12  us authenticate some documents and kind of describe what

13  was happening.  My clients certainly aren't claiming

14  that you did anything wrong, but I just wanted to let

15  you know that if I didn't make that clear earlier,

16  because I know that, you know, depositions, if you

17  haven't done them before, can be not the most pleasant

18  experiences, but I thought that might help.

19    A.    Yes, it does.

20    Q.    Okay.  So going up to the very first one that

21  says "updated."  At 12 -- if you look to the left, it

22  says "Saiph Prod 331514".  That's just a Bates reference

23  label like we talked about earlier.  That doesn't really

24  have anything to do with you, but I'm asking about the

25  file name.



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          Would that have -- if I understand correctly

2    from your testimony, that would reflect that the

3    original Structured Settlement Matrice dated December

4    31, 2021, was updated as of December 19, 2022; is that

5    right?

6          A.    Correct.

7          Q.    Okay.  And what does the "-JP" mean?

8          A.    The one -- the "-JP," I'm not exactly sure

9    what that one represents.

10         Q.    Okay.  And was it typical to need to update a

11   structured settlement matrice, it looks like, almost a

12   year later.

13         A.    Usually, no.  This -- normally, we would just

14   -- it would be the 12-31 would be done on 12-31 with all

15   updates and everything else, not make changes a year

16   later.

17         Q.    Okay.  And am I looking at this correctly that

18   these last few entries reflect that there were updates

19   to the December 31, 2021?  That was updated several

20   times; is that right?

21         A.    Correct.

22         Q.    Okay.  And it looks like, in addition to

23   December 19th of 2022 that we just discussed, there was

24   also an update on -- a prior update on February 3, 2022?

25         A.    Correct.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    Okay.  And another one on September 7, 2022?

2    A.    Correct.

3    Q.    Okay.  And the update for September 7th also

4  has that JP suffix at the end; is that right?

5    A.    Yes.

6    Q.    Okay.  And as to any of these other updates,

7  do you recall the purpose or the reason for the update?

8    A.    The updates were -- on all of these were

9  either dealing with the -- like I said, the JG and WMS

10 deals.  One -- at one point, they were told to put on the

11 matrix, then they were told to put off the matrix, then

12 they were told to put on the matrix, then they were told

13 to put off.  That's why you have all these back-and-

14 forth.  Originally, if they were changed, I wanted to

15 make sure I had a record of what I changed from what to

16 what time frame.

17   Q.    Okay.  And the very last one on this list, the

18 12.31.21-1, does that mean that that was the initial

19 Settlement Matrice for December 31st of '21?

20   A.    I'm not sure if that was the initial one.  It

21 could be -- it could be the initial one and that the

22 original one maybe had some file errors when opening it

23 up because these are big files, and that when we tried

24 to save it, it wouldn't let me save, so we had to put a

25 -1 on there.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 67

1      Q.    Okay.  And all of these documents listed on

2   Composite Exhibit -- or sorry.  Just Exhibit 10, these

3   were documents that you provided to Mr. Kosinski for

4   purposes of the collateral audit; is that right?

5      A.    That is correct.

6      Q.    Okay.  And did you -- could -- would you

7   consider, based on your experience at SuttonPark and

8   your accounting experience, to be records that would be

9   germane to the collateral audit?

10     A.    Yes.

11         MR. MORLAN:  And Madam Court Reporter, did we

12     already mark -- I apologize.  I'm going to have to

13     ask a little bit about where we're at just to

14     clarify in some of these exhibits because my chat

15     window got erased.

16         THE REPORTER:  That's okay.

17         MR. MORLAN:  Did you already mark Exhibit 3?

18         THE REPORTER:  Yes.

19         MR. MORLAN:  Okay.

20         THE REPORTER:  And Composite 4 and Exhibit 10.

21     That was the --

22         MR. MORLAN:  Okay.  And we also did one and --

23     one, two, three, four, and --

24         THE REPORTER:  I did one, nine, two, three,

25     four, and then ten.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
1              BY MR. MORLAN:
2        Q.   So if you would, please, Ms. Gorde, take a
3   look at Exhibit 5.
4              (Exhibit 5 was marked for identification.)
5        A.   Okay.  I have it open.
6              BY MR. MORLAN:
7        Q.   Okay.  And does this appear to be an e-mail
8   exchange between you and Mr. Kosinski in the context of
9   the collateral audit?
10       A.   Yes.
11       Q.   Okay.  And have you seen this e-mail exchange
12  before, do you believe?
13       A.   Yes.
14       Q.   Okay.  And the subject line is "M&T Bank."  Do
15  you see that?
16       A.   Yes, I do.
17       Q.   Do you recall, just generally speaking, what
18  the subject matter of this e-mail exchange in Exhibit 5
19  is?
20       A.    In this exhibit, it's just trying to get a
21  contact at M&T Bank due to our Wells Fargo account.  We
22  had a couple lockboxes at M&T, and we had a couple
23  accounts at Wells, and this was just to try to get a
24  contact person from M&T so that we could move some of
25  our lockboxes that were at Wells over to M&T.
```

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    And why did you need to move the lockboxes

2  from Wells to M&T?

3    A.    Wells Fargo was threatening to close our

4  accounts.

5    Q.    And do you know why Wells Fargo was

6  threatening to close the accounts?

7    A.    Due to some of our accounts having -- going in

8  a negative balance.

9    Q.    And these were lockbox accounts that were

10  going into a negative balance?

11    A.    Not the lockboxes, some of our main operating

12  accounts.

13    Q.    And was that an issue that was occurring as of

14  the date of these e-mails?

15    A.    Yes.

16    Q.    And do you know approximately when Wells Fargo

17  first started threatening to close 777's accounts?

18    A.    I want to say probably in -- starting in May

19  of 2024.

20    Q.    And was there anything that happened in May of

21  2024 that's significant or would otherwise relate to why

22  Wells Fargo might be threatening to shut down accounts

23  for 777?

24    A.    Not that I was aware of.

25    Q.    Okay.  Earlier, we briefly discussed a lawsuit

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  between Leadenhall and 777, SuttonPark, and some other

2  folks that's pending in New York, and I believe you said

3  that you had heard of that before; is that right?

4      A.    That is correct.

5      Q.    Okay.  As of -- and I'll represent to you that

6  that lawsuit was filed in May of 2024.  At the time of

7  these e-mails in June of 2024, do you think you were

8  aware of the existence of that lawsuit?

9      A.    Yes, I was.

10      Q.    Okay.  And is that something that most people

11  at 777 and SuttonPark knew about and talked about

12  shortly after it was filed?

13      A.    I can't say that everybody knew.  I can't say

14  most people knew.  I do know it was talked about.  I

15  think pretty much the most people that were still at

16  SuttonPark knew about it, and I don't know who at 777

17  knew about it or didn't know.

18      Q.    Okay.  And why was Paul Kosinski involved in

19  this lockbox account issue with Wells and M&T?  Do you

20  know?

21      A.    I do not.  I mean, his name -- because we used

22  to -- the M&T account we had at M&T, Paul Kosinski was

23  on that account way back when he used to work for

24  SuttonPark.  It's a SuttonPark account, and that is, I

25  think, where it came from.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.    Okay.  So was this e-mail exchange -- would

2  you say that this was part of the audit or was this

3  something ancillary that Mr. Kosinski was assisting

4  with?

5    A.    This was ancillary to Paul Kosinski was

6  helping with because, since his name was still on the

7  account, you know, we were trying to get a contact

8  person over at M&T to be able to move those Wells

9  accounts over.

10    Q.    Okay.  So was it your understanding that 777

11  and SuttonPark were requesting Mr. Kosinski to help

12  address this lockbox account issue?

13    A.    It was my understanding, yes.

14    Q.    Okay.  And was that based in part on these e-

15  mails?

16    A.    Yes.

17    Q.    Okay.  And did you ever have any conversations

18  with Jim Howard and Teresa Licamara about this issue?

19    A.    We were told about I have talked to those two

20  about Wells Fargo being closed, and I got no response.

21    Q.    Meaning that you sent Jim Howard and Teresa

22  Licamara some e-mails with questions about that?

23    A.    Correct.  I asked them what's going -- what

24  were they planning on doing to help with the Wells Fargo

25  closing, helping them to not close the account, because

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  we did get letters from Wells Fargo stating that we had
2  60 days before they would close the accounts.
3      Q.   And what would happen if they closed these
4  accounts?
5      A.   Some of those funds, I -- my understanding
6  would've been locked, and it would be hard to get a lot
7  of our insurance companies that send our checks over to
8  our lockboxes for the individual deals to try to get
9  them to send it over to another lockbox.
10     Q.   Okay.  Can you just give us sort of a nutshell
11 version of what a lockbox account is?
12     A.    It -- a lockbox account is mainly a bank
13 account that, you know, you can send -- it's like a PO
14 box to send checks to, and the bank will process those
15 checks instead of sending them directly to SuttonPark's
16 office and having us go to a bank to deposit that.
17     Q.   Okay.  And was it your understanding,
18 particularly in light of them being copied on this e-
19 mail, that Jim Howard and Teresa Licamara were aware of
20 and requested Mr. Kosinski's assistance with respect to
21 the lockbox issue?
22     A.   As far as I know, it looks -- appears to be
23 that.
24     Q.   Okay.  Other than this e-mail, did you have
25 any other understanding about Mr. Kosinski's involvement



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   in the -- in this particular issue?

 2        A.    No.

 3        Q.    But I think you said you were aware that Mr.

 4   Kosinski was a person who was on existing M&T Bank

 5   accounts; is that right?

 6        A.    Yes.

 7        Q.    Okay.  And you must have known that

 8   independent of this particular e-mail string at Exhibit

 9   5; is that right?

10        A.    It would -- it would've been -- if I would've

11   known, I think we -- Kevin Burgos, who's a 777 Partner

12   treasury analyst, had a listing of all -- who was on

13   everybody's bank accounts within the entire company.

14        Q.    Okay.

15        A.    And I think he was the one that was -- told me

16   that's Paul is still on there.

17        Q.    Okay.  All right.  I'd like to now direct your

18   attention, please -- oh, and let me just ask before we

19   go.  Does -- this Exhibit 5, does this appear to be a

20   true and accurate copy of an e-mail exchange that you

21   participated in on or about the date specified?

22        A.    Yes.

23        Q.    Okay.  And now, if you would please take a

24   look at composite -- I'm sorry, just Exhibit 6.

25              (Exhibit 6 was marked for identification.)
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1      A.    Okay.  I have it open.

2            BY MR. MORLAN:

3      Q.    Okay.  Now, there are a fair number of e-mails

4   that are kind of similar to some of the exhibits that

5   I'm going to show you.  What I'm going to try to do is

6   just sort of get a -- an overview of the significance of

7   these particular e-mails as kind of examples and see if

8   we can get enough information from the examples so that

9   I don't have to -- we don't have to go through every one

10  of them.  So I'm going to kind of ask you maybe some

11  specific questions and maybe some more, you know,

12  general questions to try to streamline things.  So with

13  that, do you recognize this document, Exhibit 6, this e-

14  mail exchange?

15     A.    Yes, I do.

16     Q.    Okay.  And can you generally sort of describe

17  the subject matter and purpose of this e-mail exchange?

18     A.    Well, this -- this purpose of this e-mail is

19  between Alex and, like, myself and Josh regarding one of

20  our investor facilities, Dorchester.  This is a monthly

21  report that we usually send out, and this was him

22  telling us the -- how much we need to top off the

23  facility to be -- so that we could be in compliant with

24  the report.

25     Q.    Thank you for that succinct summary.  Just I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  -- I'm going to ask you to break that down a little more

2  and kind of ask you what Dorchester facility top off and

3  compliant in which report, but we'll take that kind of

4  one by one.  First of all, what is Dorchester?

5       A.   Dorchester is a -- I guess a facility.  It's

6  through Leadenhall.  We set up a whole separate company

7  called Dorchester so that we could just segregate all

8  the -- those deals relating to that facility.  And, you

9  know, we would -- we would have borrowing on them to

10 purchase deals, and the deals will be pledged to the

11 facility.

12      Q.   And when you say the word "facility" here,

13 what does that mean?  That doesn't mean, like, a

14 physical building like some people would use it in other

15 contexts, right?

16      A.   Correct.  It's more of a, I guess you can say,

17 electronic facility, a digital facility.

18      Q.   Okay.  But the Dorchester facility that

19 related specifically to Leadenhall; is that right?

20      A.   Correct.

21      Q.   Okay.  And when you -- what is -- what does

22 the term "top off" mean here?

23      A.   Meaning based on the value of the deals that

24 are on the facility and the report that they generated,

25 it was below the required calculation.  So because of



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    our -- maybe our deals were worth a little bit less than

2    originally thought, we would have to put additional

3    funds back into the facility to top it off to make it in

4    compliance.

5         Q.    And when you say in compliance, do you mean to

6    make it comply with the terms of the agreement between

7    777 and Leadenhall with respect to the facility?

8         A.    Correct.

9         Q.    And so I see in the bottom e-mail that started

10   this chain, that's an e-mail from Mr. Adnani, who I

11   believe you described previously; is that correct?

12        A.    Yes.

13        Q.    Okay.  And it looks like he's pointing out a

14   -- both a borrowing base deficiency and an interest

15   payment deficiency; is that right?

16        A.    Correct.

17        Q.    Okay.  What's a borrowing base deficiency?

18        A.    Meaning to based on how, you know, our receive

19   -- the money that we owe we're not -- we haven't

20   received that money yet from the insurance companies. So

21   let's just say we had $100,000 worth of deals that we

22   were supposed to get in from the insurance company.  We

23   only got 50.  So we were short that 50 that we owed

24   Dorchester to -- for those deals.

25        Q.    Okay.  So when it says borrowing base

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    deficiency, $720,964 and change, that's what you were

2    referring to as being short in terms of what you

3    would've -- should have received?

4         A.   Correct.

5         Q.   Okay.  And what is the parenthetical there,

6    "not associated with defaulted open receivables"? What's

7    the significance of that?

8         A.   That, I am not exactly sure.

9         Q.   Okay.  And then "interest payment deficiency,"

10   what does that mean?

11        A.   That is based on if we borrowed a certain

12   amount of money on -- on the deals, we owe a certain

13   amount of interest.  The interest on there, we were

14   short probably prior month or something like that, so we

15   owed 120,000 for -- for shorting an interest payment.

16        Q.   So that would be an interest payment due to

17   Leadenhall based on the amount of 777 borrowing under

18   the terms of the facility?

19        A.   Correct.

20        Q.   Thank you.  And what was the purpose of Mr.

21   Adnani sending this e-mail to you and Mr. Klein as you

22   understood it?

23        A.   Was that he was letting us aware that we had

24   to pay these back to Dorchester on this report.  And we

25   were going to do another borrowing on another facility,

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   and we were including this amount so that we could pay

 2   Dorchester the amount of money that was owed for

 3   Leadenhall.

 4       Q.   Okay.  So are you saying that these -- the

 5   additional money that was going to be added to

 6   Dorchester, was that $841,104 and change?

 7       A.   Correct.

 8       Q.   Okay.  And that's the sum of the borrowing

 9   base deficiency and the interest payment deficiency; is

10   that right?

11       A.   Correct.

12       Q.   Okay.  And I believe I understood you to say

13   that we're -- and I don't mean you, Karen, but 777 was

14   going to need to borrow that $841,104 from another

15   facility in order to make these payments to Leadenhall?

16       A.   Correct.

17       Q.   Okay.  And with respect to the borrowing base

18   deficiency, would -- was that a payment that would be

19   paid to Leadenhall and retained by Leadenhall or was

20   that something that would just be allocated to the

21   facility?

22       A.   My understanding it would be allocated to the

23   facility.  I'm -- because I'm not the one that do -- did

24   those reports.  That was Alex.

25       Q.   Okay.
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    I just made the payments into the correct --

2   where there -- where they were supposed to go.

3    Q.    Okay.  So essentially, the purpose of this is

4   Alex is sending information about directing what

5   payments need to be made to accounting, so that

6   accounting can make the payments and book them within

7   the accounting record; is that right?

8    A.    Correct.  Correct.

9    Q.    Okay.  And then with respect to the interest

10  payment deficiency component, is that something that

11  Leadenhall would retain?  I mean, is that, like, normal

12  interest payment on a loan that the bank or the lender

13  would keep?

14   A.    Yes.

15   Q.    Okay.  But the borrowing base deficiency,

16  that's just money that's allocated to the particular

17  facility in order to keep it in compliance with the loan

18  terms of the facility?

19   A.    That is my understanding; that is correct.

20   Q.    Okay.  And is this type of top off e-mail

21  communication from Mr. Adnani, is that something -- is

22  this the only one or is this something that would happen

23  fairly regularly?

24   A.    I mean, different communications based on, you

25  know, the different reports and how they come out.  But

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  he would always be sending us, oh, we need to make this

2  payment or stuff like that every month after the report

3  is been run.

4       Q.   Okay.  And after, for example, in this one

5  that borrowing base deficiency was allocated to the

6  Dorchester facility, would that amount be subject to

7  being reallocated to a different facility later?

8       A.   Not that I was aware of, no.

9       Q.   Okay.  Is that something that you would've

10 been involved in if it -- if it -- if it did happen?

11      A.   If it did?  Yes, for the accounting records.

12 The only thing I know what they would do on -- on --

13 between the different facilities, different investors is

14 they would, you know, sell some of the deals off

15 Dorchester and put them on -- and, you know, put them on

16 Volins.  And that's the things -- the only things that I

17 know that would happen.

18      Q.   And is Volins the name of a different

19 facility?

20      A.   It is.

21      Q.   Okay.  And who is the investor for Volins?

22      A.   Credigy.

23      Q.   And when you say that they would sell off a

24 deal from a facility, what does that mean?

25      A.   They would -- say, for example, whatever the



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  reason being, they would take off -- they would sell --

2  you know, take off the deals on Dorchester.  Obviously,

3  pay the money for those deals being taken off so that

4  they can clear off the borrowing -- the -- the

5  outstanding loan for that part.  And then they would put

6  it on to a different facility.  Sell off one, put it on

7  another.

8      Q.   Okay.  So when you say sell off, do you mean

9  that they would replace the particular receivable within

10 the facility with cash representing the value of that

11 receivable?

12     A.   Yes.

13     Q.   And then once that cash payment was made, that

14 -- your understanding was then that the deal could be

15 reallocated or repledged to a different facility?

16     A.   Correct.

17     Q.   And scrolling up to the very top of this e-

18 mail, it looks like within about three minutes or so of

19 you receiving this, you forwarded this e-mail to Reuben

20 Mitchell; is that right?

21     A.   That is correct.

22     Q.   Okay.  Do you recall why you did that?

23     A.   I did that because he was the one that would

24 keep track of what cash needs we -- we needed for, you

25 know, or maybe the week, the day, the month.  And so he



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  just needed to put on his cash flow of, hey, I needed
 2  this amount of money to go here.
 3       Q.   Okay.  If you would please take a look at
 4  Exhibit 7.
 5            (Exhibit 7 was marked for identification.)
 6       A.   Okay.  I got it open.
 7            BY MR. MORLAN:
 8       Q.   Okay.  Actually, let me go back to Exhibit 6
 9  real quick, just in case I didn't ask this.  Does this
10  appear to be a true and accurate copy of an e-mail
11  exchange in which you were a participant?
12       A.   Yes, it does.
13       Q.   Okay.  All right.  And now, if you'll take a
14  look at Exhibit 7.
15       A.   Got it open.
16       Q.   Okay.  Have you had a chance to look at this
17  exhibit?
18       A.   Yes, I have.
19       Q.   Okay.  Does this appear to be a true and
20  accurate copy of an e-mail exchange that you were a part
21  of with Mr. Adnani, and Mr. Bennett, and others?
22       A.   Yes, it does.  Yes.
23       Q.   Okay.  All right.  And this is -- it appears
24  to be a little bit longer and more complicated e-mail
25  exchange than the last one; is that right?
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

376108 Gorde Karen 03-17-2025          Page 83

1       A.    Correct.

2       Q.    Okay.  And I believe the last one we looked at

3   related to a Dorchester monthly report from November of

4   2021, Exhibit 6; is that right?

5       A.    Correct.

6       Q.    Okay.  And then this one, Exhibit 7, that

7   we're looking at, appears to relate to a Dorchester

8   monthly report dated 9-30-21?

9       A.    Correct.

10      Q.    Okay.  And that monthly report that's

11   referenced in the subject line, were those the monthly

12   reports that you were referring to previously when you

13   said Mr. Adnani and Mr. Bennett would be responsible for

14   sending those to the investors?

15      A.    Yes.

16      Q.    Okay.  And were those reports typically done

17   by facility?

18      A.    Yes.  It would be done by facility.

19      Q.    Okay.  And besides Dorchester, are you

20   familiar with, or do you recall any other Leadenhall-

21   specific facilities?

22      A.    SPLCSS 2, SPLCSS 3.  It was those two.  And

23   then -- they -- they had a Dorchester 1 and

24   Dorchester 2.

25      Q.    So I'm guessing that since this just says,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  "Dorchester," is this Dorchester 1?

2      A.   Yes.

3      Q.   Okay.  And SPLCSS -- was there a SPLCSS 1, or

4  otherwise, an original SPLCSS that proceeded 2 and 3?

5      A.   There might have been an SPLCSS, I think it

6  was 2016.  And then they amended it to SPLCSS 2, and

7  then they amended again to SPLCSS 3.

8      Q.   Okay.  So those weren't necessarily completely

9  different facilities, they were just an amended

10 facility?

11     A.   Correct.  They would close one facility and

12 reopen it up as a new facility with new agreements on

13 it.

14     Q.   Okay.  But the new facilities, would they have

15 some of the same assets as part of them, as the old

16 facility?

17     A.   Correct.  They would just move them over from

18 one to another.

19     Q.   Okay.  And is there a typical range of how

20 long the particular assets would stay on the books of a

21 particular facility?

22     A.   I wouldn't know, exactly, the range.  I mean,

23 they could be years, or they could be months, and it --

24 there is no particular range.

25     Q.   Okay.  It would be specific to the specific

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  asset?

2      A.   Yes.

3      Q.   Depending on its -- the length of the payment

4  stream left, and whether or not it was bought, or sold,

5  or reallocated to different facilities; is that correct?

6      A.   Correct.  That's correct.

7      Q.   Okay.  So if you can, just to kind of

8  streamline this, can you give me sort of an overview of

9  the purpose of this particular e-mail exchange that

10  we've marked as Exhibit 7 for purposes of this

11  deposition?

12      A.   Well, the below e-mails were relating to Alex

13  and Leadenhall, submitting the report as a draft, have

14  them review it, have them make any comments on it.  And

15  the last e-mail from Alex to me and Nick was that the

16  report was approved by Leadenhall, and that we should

17  process the interest payment at that time.

18      Q.   Okay.  But you and accounting weren't involved

19  in getting these reports approved by the investor; is

20  that right?

21      A.   No.  We were not in involved in that.

22      Q.   Okay.  So that would be something that Mr.

23  Adnani or Mr. Bennett took care of, and then informed

24  you about so you could make the necessary accounting

25  adjustments?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    Correct.

2    Q.    And are you familiar with the particular

3  issues that are discussed in this e-mail in terms of

4  what needed to be modified, with respect to the report?

5    A.    I am not, no.

6    Q.    But this is -- this sort of exchange of

7  information regarding monthly reports being sent to an

8  investor, and then there being comments, and ultimately

9  approved, is that something that you would normally be

10  involved in in the capacity that we just spoke about?

11    A.    Yes.

12    Q.    So just going down to -- if you look on Page 3

13  of this exhibit, did you see an e-mail from

14  tomfoot@leadenhall to Alex Adnani?

15    A.    Yes.

16    Q.    Okay.  And do you know what Mr. Foot is

17  referring to in his first comment that starts with the

18  reconciliation?

19    A.    The only thing is -- is based on the report,

20  is that he was seeing that every payment was -- that we

21  had not received every -- any payment, is pretty much

22  what he's asking about.

23    Q.    Okay.  Do you know why you wouldn't have

24  received any payments?

25    A.    I don't know why that was the case on this

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  one, no.

2     Q.   Is that something that you were used to seeing

3  that there would be a report, and every payment would be

4  past due, or do you know?

5     A.   No.  That doesn't seem -- to me, it doesn't

6  seem that appears to be right at all.

7     Q.   When you say it doesn't appear to be right,

8  you mean -- do you mean that Tom's evaluation is

9  incorrect, or that it's, you know, abnormal for a report

10 to have all the payments being past due, or something

11 else?

12    A.   It's abnormal for a report to have all

13 payments past due.  There always are going to be some

14 payments that are past due, but not all of them.

15    Q.   Okay.  And it also refers to, if I'm correct,

16 something about whether or not the borrowing base was

17 reduced for defaulted receivables.  What does that mean?

18    A.   That, I guess there -- the -- my understanding

19 would be -- is that due to the fact that we had -- we

20 had a borrowing base, which means we could borrow up to

21 a certain amount.  Since we were defaulted, we couldn't

22 borrow as much on the facility because of those

23 defaulted deals.

24    Q.   Okay.  And is a defaulted receivable just one

25 that an interest payment wasn't received on, or did it



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  have to be more than that to be considered a defaulted

2  receivable?

3      A.   A defaulted receivable would be that we didn't

4  receive, yeah, the interest, or any payments on that --

5  that asset.

6      Q.   Okay.  So where Tom says, "Every payment is

7  showing being past due," just being past due, wouldn't

8  necessarily be enough to render something a defaulted

9  receivable, would it?

10     A.   Well, it's past -- it would be in default

11 because we were supposed to expect the payment on, let's

12 say, January 1st, and we haven't received it as -- at

13 the end of January 31st, as an example.  And it's in

14 default, meaning we haven't paid on that -- that deal.

15     Q.   Okay.  I'm a little confused, but I think we

16 saw this earlier.  Can you just go back to Exhibit 6 for

17 a second?

18     A.   Yes.

19     Q.   And if you look at the e-mail from Mr. Adnani,

20 where he's describing the borrowing base deficiency, do

21 you see that, the parenthetical not associated with

22 defaulted open receivables?

23     A.   Yes.

24     Q.   Okay.  So what does that mean?  Is he

25 describing what the deficiency is, but that number



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  doesn't include the -- any deficiency created by a

2  defaulted open receivable?

3       A.    That I can't answer.

4       Q.    Okay.  And is one of the reasons that you

5  can't answer that because you didn't often see

6  situations where there were borrowing base deficiencies

7  not associated with defaulted open receivables?

8       A.    It's just that I don't know what he meant in

9  this particular e-mail.  All I -- all this particular e-

10  mail tells me is that we owe Dorchester $841,000.  And

11  that's really what we did on this that's based on his

12  report.

13      Q.    Okay.  Anything else of significance, going

14  back to Exhibit 7, from your perspective, and in terms

15  of what you and the accounting department needed to know

16  from the exchange -- the e-mail exchange at Exhibit 7?

17      A.    Nope.  Other than the fact that the report was

18  approved and that we can go ahead and make the payment

19  that we -- the interest payment that we owed on the

20  facility.

21      Q.    And does this appear to be a document that

22  would be germane to Leadenhall's collateral audit?

23      A.    Yes.

24      Q.    Okay.  And does this appear to be a document

25  that you would've provided to Mr. Kosinski, in


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  connection with the Leadenhall collateral audit?

2      A.   I am not exactly sure.

3      Q.   Do you have any reason to believe that this is

4  not an e-mail that you provided to Mr. Kosinski?

5      A.   On -- from your exhibit that you gave me on

6  Exhibit 4, based on the attachments, that's the -- one

7  of them is not in there.  So I do not know if this was

8  an e-mail that I provided to Paul Kosinski.

9      Q.   Okay.  Were there e-mails included on that

10 thumb drive with the settlement matrices?

11     A.   The settlement matrices, the only thing I put

12 on there were the matrices.

13     Q.   Okay.  All right.  Let's take a look at

14 Exhibit

15 8.

16          (Exhibit 8 was marked for identification.)

17     A.   Okay.  I have it open.

18          BY MR. MORLAN:

19     Q.   All right.  And does this appear to be a true

20 and accurate copy of an e-mail -- appear to be a true

21 and accurate copy of an e-mail exchange that you were

22 on, with the date of December 29, 2021 at the very top?

23     A.   Yes, it appears.

24     Q.   Okay.  And the subject line is Dorchester

25 collection top off, right?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.    Correct.

2    Q.    Okay.  And is that top off, as it's being used

3  here, it's being used in the same way that we discussed

4  earlier when you were describing what topping off the

5  accounts meant?

6    A.    Yes.

7    Q.    Okay.  And what is the particular significance

8  of this particular e-mail exchange from your

9  perspective?

10    A.    From my perspective, this e-mail exchange was

11  to top off the collection account to remain in compliant

12  with the facility.  And that's just us getting the

13  approvals to top it off.

14    Q.    So accounting would be seeking the approvals

15  to make the top off payments; is that right?

16    A.    Correct.  From management.

17    Q.    Okay.  And typically, who would need to

18  approve these types of top offs?

19    A.    Damien Alfalla, Steve Pasko, Fred Love.  So we

20  would need all three of them to approve it.

21    Q.    Would all three of those people, Damien

22  Alfalla, Steve Pasko, and Fred Love need to approve all

23  top offs, or is this a special one or does it have to do

24  with the amount or something?

25    A.    Nope.  All of them.

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   And does the first e-mail in the string from

2    Damien Alfalla, 12-29-2021, is it your understanding

3    that -- did this e-mail mean to you that Mr. Alfalla

4    approved the top off?

5    A.   Yes.

6    Q.   Okay.  And in the e-mail below that, is your

7    understanding of that e-mail that Mr. Pasko was

8    approving the top off?

9    A.   Yes.

10   Q.   And I don't see an e-mail from Mr. Love, but

11   would he also need to approve this top off payment?

12   A.   Yes.

13   Q.   And if we look starting at the bottom -- well,

14   let me ask you about this bottom e-mail.  Does this

15   appear to be an e-mail from Mr. Adnani to Clarence Err?

16   A.   It appears to be.

17   Q.   Okay.  And Mr. Err, along with Mr. Foot, and

18   Mr. Mason, and Mr. Gillespie, those are representatives

19   of Leadenhall?

20   A.   Yes, they are.

21   Q.   Okay.  And is this one of those communications

22   that you were describing earlier where Mr. Adnani and/or

23   Mr. Bennett would be communicating about monthly status

24   and compliance reports with the investors with respect

25   to particular facilities?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Yeah, that is correct.

2    Q.   Okay.  And this particular e-mail exchange

3  that we're looking at, Exhibit 8, that deals with the

4  Leadenhall Dorchester facility that we've been

5  discussing, correct?

6    A.   Correct.

7    Q.   Okay.  And do you know what the significance

8  is of the black text versus the red text in the very

9  first e-mail?  In other words, who is -- I think is --

10 does the red text reflect somebody's comment or do you

11 know?

12   A.   I do not know.

13   Q.   Okay.  How about with respect to the next e-

14 mail?  Do you understand what they're talking about

15 there when they say -- when they're talking about the

16 shortfall there, is that the shortfall that we talked

17 about before, about -- as to the borrowing base?

18   A.   It appears to be.

19   Q.   And what would Clarence be referring to, if

20 you know, when he's asking Alex, would you be able to

21 update the report to cure the shortfall, please, do you

22 know what that means?

23   A.   No, I do not.

24   Q.   All right.  Well, let -- let's scroll up to

25 the e-mail from Mr. Adnani to you, Josh Klein, and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   Reuben Mitchell.  Do you see that?

2       A.   Yes, I do.

3       Q.   Okay.  And in this, does this reflect that Mr.

4   Adnani is essentially seeking -- I guess, asking

5   accounting to make a payment of $64,000 into the

6   Dorchester facility?

7       A.   Correct.

8       Q.   Okay.  And so he would direct accounting to

9   make the payment and then before accounting made that

10  payment, they would make sure that Mr. Pasko, Mr. Love,

11  and Mr. Alfalla approved of the payment; is that right?

12      A.    Correct.

13      Q.   Okay.  And do you know what Mr. Adnani is

14  referring to when he says, "This is a small ask given

15  they're waiving the 11 million in defaulted receivables

16  as of 11-30"?

17      A.   No, I do not.

18      Q.   And do you know whether the $64,000 payment

19  was ultimately approved by Fred Love or not?

20      A.   I do not know if it was.  He could have done

21  it a different e-mail.

22      Q.   Okay.  And who is Fred Love?

23      A.   Fred Love was -- let's see.  He was legal

24  counsel and then he was overseeing SuttonPark after I --

25  Paul Kosinski left.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    When you say Paul Kosinski left, do you know

2 anything besides the approximate time frame regarding

3 Paul Kosinski's departure from SuttonPark?

4    A.    No.  I wasn't really involved in that.

5    Q.    Okay.

6    A.    I just know he left, and I know, you know,

7 that he went on his own.

8    Q.    Okay.  Was that something that was discussed

9 at all around the office?

10    A.    That I do not know.  I wasn't in the office.

11 I work from home.

12    Q.    Okay.  Were you privy to any, you know, office

13 gossip or grapevine at all, even though you were working

14 from home?

15    A.    Nope.

16    Q.    Did you like it better that way?

17    A.    Sometimes, yeah.

18    Q.    Have you ever heard any disparaging remarks

19 about Paul Kosinski made by anyone affiliated with

20 SuttonPark, B. Riley, or 777?

21    A.    No, I'm not.  I'm not aware of any.

22    Q.    Okay.  And in -- I believe you said you worked

23 with Mr. Kosinski quite a bit --

24    A.    Yes.

25    Q.    -- during the time you overlapped?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 96

1      A.   Yes.

2      Q.   Okay.  And did you ever know Mr. Kosinski to

3  do anything unethical or questionable during that time?

4      A.   No, not at all.

5      Q.    And would you consider Mr. Kosinski someone

6  who was knowledgeable regarding the accounting and

7  reporting issues with respect to these structured

8  settlement loan facilities like Dorchester?

9      A.   Yes.  He was very knowledgeable when he worked

10 there.

11     Q.   Okay.  And in your view, based on your

12 interaction with him with respect to the audit, as well

13 as your experience in working with him, do you believe

14 that he was somebody who would be particularly qualified

15 to perform a collateral audit on behalf of Leadenhall?

16     A.   Oh yes, definitely.

17     Q.   As you sit here today, are you aware of

18 anybody who would be more qualified than Mr. Kosinski to

19 perform a audit of structured settlement collateral

20 facilities than Paul Kosinski?

21     A.   No.

22          MR. MORLAN:  All right.  I am going to now

23      direct you to -- did I -- was I able to share

24      Exhibit 9 yet?  I don't believe so.

25          THE REPORTER:  You did.  That was the second

MILESTONE ｜ REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      one that you shared.
 2          MR. MORLAN:  Oh, that's right.  Okay.  So --
 3          MR. BOLAND:  Sorry, I don't see Exhibit 9 in
 4      the chat.  Am I missing it?
 5          THE REPORTER:  It's not marked as nine.  It's
 6      the Saiph --
 7          MR. DONOVAN:  The Excel.  Is it the Excel?
 8          MR. BOLAND:  Oh, it's the Excel.  Yeah, I get
 9      it.
10          MR. DONOVAN:  I think it's the Excel.
11          MR. MORLAN:  Okay.  And we did Exhibit 10.  All
12      right.  I'm going to -- still can't share it to the
13      chat.  I'm going to send Exhibit 11 to the court
14      reporter.  I apologize everybody for the delay on
15      this.  I don't know how that happened that I can't --
16      that I could share in the beginning and now I can't
17      but doing the exact same thing.  So I'm going to
18      share that and ask Kate to put that in the chat so
19      that everyone will be able to see it.
20          THE REPORTER:  All right.  It's now in the
21      chat.
22          MR. MORLAN:  Okay.  Does everybody have access
23      to that?
24          MR. BOLAND:  Yes.  Thank you.
25          THE WITNESS:  Yes.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MR. BOLAND:  Give me one second.  Thanks.  Yeah.

2          BY MR. MORLAN:

3     Q.    So Ms. Gorde, when these top off payments were

4  approved and made, would that then result in the monthly

5  reports to the investor as of that time not showing any

6  borrowing-based deficiencies?

7     A.    Correct.

8     Q.    And that was the purpose of the top-off?

9     A.    Yes.

10    Q.    Okay.  And do you have what we've marked as

11  Exhibit 11?

12          (Exhibit 11 was marked for identification.)

13    A.    Yes, I have it open here.

14          BY MR. MORLAN:

15    Q.    Okay.  And does Exhibit 11 appear to be a true

16  and accurate exchange between you, Fred Love, and others

17  regarding the Dorchester facility that we've been

18  discussing?

19    A.    Yes.  Yes.

20    Q.    And do you see where the subject line says,

21  the Dorchester July distribution due today?

22    A.    Correct.

23    Q.    What is the -- what is a distribution as it's

24  used here in this e-mail?

25    A.    It is payments made regarding all the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  collections based on the reports.

2      Q.   Okay.  So in addition to making interest

3  payments on the facility, there would need to be

4  payments made based on the receivable payments that came

5  into the lockbox?

6      A.   Correct.

7      Q.   Okay.  And those -- so those -- that

8  shortfall, that's a different -- is that a different

9  shortfall than we were talking about before in terms of

10  the -- I think we talked about the -- there being

11  interest payments due and we talked about the borrowing-

12  based deficiency, but this particular e-mail is talking

13  about a distribution deficiency?

14      A.   Yes.

15      Q.   Okay.  And with respect to the distribution

16  deficiency, is that deficiency -- does that represent

17  the difference between the payments that were received

18  by 777 and the payments that were made to Leadenhall?

19      A.   Yes.  It's the difference between the payments

20  that were collected into the account versus what is

21  actually due.

22      Q.   Okay.  And this particular e-mail is talking

23  about $270,000 -- a shortfall of $270,000 in the

24  distribution amount that was due to Leadenhall as of the

25  -- as of August 25, 2021; is that right?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     A.   Based on the July distribution report --

2   report.  So July distribution report, they -- it goes

3   out in August, obviously when July closes, and it was

4   due on August 25th for the July amount.

5     Q.   And so was the July amount that was in the

6   report, was that based on actual collections or

7   predicted collections?

8     A.   On the report I would say it's -- well, it's a

9   combination, I think, of both.  It's predicted

10  distribute -- it's predicted collections, but it also

11  compares it to what actually was collected.

12    Q.   Okay.  So does this mean that $270,000 was not

13  collected or just that there was a shortfall in the

14  amount of the lockbox for whatever reason of $270,000?

15    A.   Well, that 270,000 hadn't been collected from

16  the insurance companies.

17    Q.   Okay.  And the first e-mail in the string at

18  the bottom, August 25, 2021, at 11:40 a.m., this is you

19  seeking approval again, from Damien Alfalla, Steve

20  Pasko, and Fred Love to make the July distribution?

21    A.   Correct.

22    Q.   Okay.  And so if the July distribution was

23  supposed to be a particular amount, but the funds didn't

24  come in, was the typical practice to add funds so that

25  that payment could be made to the lender as of the date

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    that it was due?

2         A.    Correct.

3         Q.    Is that something that -- how often were there

4    shortfalls like that?

5         A.    I do not know off the top of my head.

6         Q.    Okay.  I mean, does this look like something

7    that was typical, abnormal?  Do you have any feel for

8    the frequency of this?

9         A.    No, I do not.

10        Q.    Okay.  How about the magnitude?  A $270,000

11   shortfall in the collection account.  Is that -- does

12   that get your attention or is that within, you know, a

13   range that you recall typically seeing?

14        A.    That I don't remember.  No.

15        Q.    And do you know the -- what would be some of

16   the reasons for shortfalls in the collection account?

17        A.    It would be the fact that we didn't get the

18   funds from the insurance companies because they didn't

19   send the checks for whatever reason.  Maybe they, you

20   know, got it late and then they sent it to us late.

21   Could have been that.  Mainly would be the reason why.

22        Q.    Can you think of any other reason?

23        A.    Not that I can think of.  No.

24        Q.    But you wouldn't necessarily be in a position

25   to know all of those reasons, because that wasn't within



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  your area necessarily, was it?

2      A.   Correct.

3      Q.   All right.  All right.  I'm just going to take

4  a two-minute break, check my notes and then I think I am

5  done.  So if we'll just go off the record here real

6  quick and I will be right back.

7          THE REPORTER:  Sure.  The time now is 12:19

8      p.m., Eastern.  We're going off the record.

9          (A recess was taken.)

10          THE REPORTER:  Time now is 12:29 p.m., and we

11      are back on the record.

12          BY MR. MORLAN:

13      Q.   Ms. Gorde, do you know who Noah Davis is?

14      A.   Yes, I do.

15      Q.   Okay.  And how long have you known Mr. Davis?

16      A.   Since I started at SuttonPark.

17      Q.   Okay.  And did you have much interaction with

18  Mr. Davis while you were at SuttonPark?

19      A.   IT-related issues.

20      Q.   What types of IT-related issues?

21      A.   If -- if I couldn't get into a drive, you

22  know, he would fix it.  If, you know, we used to have an

23  old QuickBooks file, we use.  If I couldn't get in

24  there, he would be able to get me -- fix it to be able

25  to get me into it, where he would have to shut down the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  server and put it back up, but just little things like

2  that.

3       Q.   Okay.  How well would you say you think, you

4  know, Mr. Davis?

5       A.   Just I guess I know him well, but not too

6  well.  I mean, we were, you know, just, you know,

7  employee -- you know, colleagues.

8       Q.   Okay.  Were you aware of any allegations

9  against Mr. Davis with respect to hacking into or

10 otherwise accessing 777 SuttonPark's computer systems

11 without authorization following his employment?

12      A.   The only thing I've heard was what was ever --

13 was in the news.

14      Q.   Okay.  And what was it that you heard from the

15 news and what was the news source, if you recall?

16      A.    I don't recall the exact news source, but it

17 was just that supposedly he -- he had broke into

18 SuttonPark and took some -- some IT equipment or some

19 data.  And I don't know if that's the case or not.

20      Q.   Okay.  So you -- you're talking about an

21 actual physical break in; is that right?

22      A.   Yes.

23      Q.   Okay.  Have you seen any news reports about

24 any allegations made by SuttonPark or 777 against Paul

25 Kosinski or Saiph?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Not that I was aware of, no.

2      Q.    Okay.  Are you -- have you seen any

3  allegations in news reports regarding Leadenhall or --

4  yeah.  Well, yes.  Just regarding Leadenhall with

5  respect to any unauthorized intrusions by Mr. Davis?

6      A.    Nope, I have not.

7      Q.    Would it surprise you to learn that SuttonPark

8  and 777 are alleging in this lawsuit that Paul Kosinski

9  and Saiph encouraged or otherwise caused Mr. Davis to

10 illegally make unauthorized intrusions to SuttonPark's

11 offices and computer systems?

12     A.    I couldn't see Paul having him do that.  No.

13     Q.    So based on having worked with Paul and known

14 Paul for a considerable period of time, are you saying

15 that those allegations don't ring true to you?

16     A.    I don't see them ringing true at all.  Only

17 just by his, you know, knowing him, knowing that he

18 wouldn't send out anybody to go steal something.  That's

19 just how I only know him.

20     Q.    Okay.  And I know earlier you said you were

21 somewhat out of the loop, but have you -- did you hear

22 anybody say anything negative about Paul leading into

23 the time of the audit or during the collateral audit?

24     A.    Nope.

25     Q.    And prior to that, did you hear anybody say

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  anything negative about Paul?

2      A.   Nope.

3      Q.   And just going back to, sort of, look at the

4  big picture, we, kind of, got into the detail, but on a

5  more big picture view, trying to understand the process

6  by which reports go to the investors and then the

7  reports are compared with certain accounting records and

8  there's some reconciliation.  That's that whole process

9  that we've been discussing here?

10     A.   Yes.

11     Q.   Okay.  And ideally, would there be -- would

12 there be as many discrepancies as were apparent between

13 those records over time?

14     A.   I'm -- I'm not exactly sure I understand the

15 question.

16     Q.   Okay.  That's fair.  Did you understand there

17 to be frequent discrepancies requiring reconciliation

18 between the accounting records and other records or

19 reports or systems regarding information about the

20 credit facilities?

21     A.   No.  I mean, we would always reconcile the

22 reports to what I have on the Matrices to the accounting

23 records.  It was always a reconciliation.

24     Q.   Okay.  In terms of some of the allegations

25 that were made in the New York litigation regarding



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

376108 Gorde Karen 03-17-2025          Page 106

1  inaccuracies and reports and collateral being double

2  pledged, things like that, are you familiar with --

3  well, first of all, do you know what I mean when I say

4  that collateral was double pledged?

5      A.   Yes, I do.

6      Q.   Okay.  Understanding that it wouldn't

7  necessarily be in your direct area to decide what was

8  and was not pledged, are you familiar with any instances

9  of any receivables or assets being double pledged to

10 different creditors or different facilities?

11     A.   I have been aware of some of them, yes.

12     Q.   Okay.  And was management of 777 and

13 SuttonPark also aware of those?

14     A.   As far as I know, yes, they were.

15     Q.   Okay.  And to the extent that you discovered

16 irregularities like that or performed reconciliations,

17 you would bring that type of information to the

18 attention of management, correct?

19     A.   Correct.

20     Q.   Okay.  And would that include Mr. Pasko?

21     A.   Yes.

22     Q.   Okay.  And would that include Mr. Alfalla?

23     A.   Yes, that would.

24     Q.   Okay.  And would that include Fred Love?

25     A.   Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1      Q.   Would that include Josh Wander?

 2      A.   Josh Wander, I didn't -- I mean, he was

 3 included on it, yes, because I would send it to

 4 everyone.  I didn't deal too much with Josh Wander.  I

 5 did mainly with, you know, Steve Pasko and Fred Love and

 6 Damien.

 7      Q.   Okay.  Other than the double pledging

 8 discrepancies that we talked about, were there other

 9 types of suspicious or other potentially problematic or

10 fraudulent discrepancies that you're aware of besides

11 the double pledging?

12           MR. BOLAND:  Objection.  Form.

13           THE WITNESS:  No.

14           BY MR. MORLAN:

15      Q.   And while you were at -- what -- when was your

16 -- when did you leave 777 and SuttonPark?

17      A.   July -- was it July 15th or July 12th?  I

18 think it was July 12th of 2024.

19      Q.   2024.  Okay.  And do you recall ever hearing

20 anything about any problems with the MpFin system?

21      A.   I know it was an outdated system.  It was very

22 not friendly to use.  Other than that, not -- not much

23 on that.

24      Q.   Okay.  Were you aware of any allegations of

25 any records being improperly altered within the MpFin
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    system?

2        A.    No, I was not.

3        Q.    Okay.  But you were aware of usability types

4    of issues with respect to MpFin?

5        A.    It -- I have seen it, that it wasn't very

6    friendly.  I would actually, you know, have somebody do

7    it for me and it always wasn't easy to find certain

8    things in there.  It's what my, you know, recollection

9    of it was, but I never really used it.  So --

10        Q.    Okay.  But in terms of the system being down

11    or things like that, or other people who routinely used

12    it not being able to -- or you not being able to get the

13    data that you wanted, any issues like that of which you

14    were aware?

15        A.    No.

16        MR. MORLAN:  Okay.  All right.  I will tender

17    this witness to whoever's next.

18        MR. DONOVAN:  All right.  I think that's me,

19    right?  Okay.  Thanks, Hal.

20                    EXAMINATION

21        BY MR. DONOVAN:

22        Q.    Hi, Ms. Gorde.

23        A.    Hi.

24        Q.    My name is -- my name is Brian Donovan.  I'm

25    Counsel for the Leadenhall defendants.  I know this is



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 not, probably, your favorite thing to do.  I want to get

2 you out of here on time.  We really appreciate your time

3 today.  Mr. Morlan said before that no one is saying you

4 did anything wrong.  I want to reiterate that both for

5 purposes of this Florida litigation and also the New

6 York litigation.  Have you read the complaint in this

7 litigation, the Florida litigation?

8     A.   In this -- the Florida litigation, no, I have

9 not.  The New York one, I have

10     Q.   All right.  What are your reactions to the

11 allegations in the New York litigation?

12         MR. BOLAND:  Object to the form.

13         THE WITNESS:  I prefer not to answer.  Yeah, I

14     have my own opinions on it.  That's all I got to

15     say.

16         BY MR. DONOVAN:

17     Q.   Sure.  Can I get those opinions, if you don't

18 mind?

19     A.   I prefer not to do it because I do know for a

20 fact that it is true.  They stole the money.

21     Q.   Can you explain what you mean by that?

22     A.   I saw the money come into our bank accounts

23 from Leadenhall.  And in turn, 777 asked for a

24 distribution from SuttonPark, directing all that money

25 to them, not paying for deals.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS**

```
 1        Q.    How much money did SuttonPark and 777 Partners
 2   steal from Leadenhall?
 3             MR. BOLAND:   Object to the form.
 4             THE WITNESS:   The one I know of is the 350
 5       million.
 6             BY MR. DONOVAN:
 7        Q.    Okay.  So do you know -- strike that.  How did
 8   777 Partners and SuttonPark steal at least $350 million
 9   from Leadenhall?
10             MR. BOLAND:   Object to the form.
11             THE WITNESS:   From my knowledge, they went and
12       borrowed the money from Leadenhall to purchase the
13       JGW deals and the WMS deals.  In turn, that money
14       never went to those portfolios to purchase.  It went
15       straight from SuttonPark to 777.
16             BY MR. DONOVAN:
17        Q.    All right.  It went straight to SuttonPark and
18   777.  What did 777 and SuttonPark do with the money it
19   stole from Leadenhall?
20             MR. BOLAND:   Object to the form.
21             THE WITNESS:   That I do not know.  I can't tell
22       you what -- when it left SuttonPark's bank accounts
23       and it went to 777 Partners' bank accounts, what 777
24       Partner did with that money.  All I do know that
25       those deals that they said that it was going to be
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1    for, it did not.

2         BY MR. DONOVAN:

3    Q.   Okay.  So you understand that SuttonPark was

4  supposed to be using debt from Leadenhall to purchase

5  receivables, right?

6    A.   Correct.

7    Q.   And you're saying that instead of using at

8  least 350 million from Leadenhall to purchase

9  receivables, SuttonPark instead transferred those funds

10  to 777 Partners, right?

11    A.   Correct.

12    Q.   Do you know what bank account SuttonPark

13  transferred $350 million to?

14    A.   Not on the -- it was a 777 bank account.  I

15  want to say maybe it was Bank of America, but I'm not

16  100 percent sure.

17    Q.   Who gave the direction at 777 Partners to

18  steal $350 million from Leadenhall at least?

19         MR. BOLAND:  Object to the form.

20         THE WITNESS:  I --

21         MR. BOLAND:  You can answer.

22         THE WITNESS:  -- I -- I would -- go ahead.

23         MR. BOLAND:  No, you can answer.  I just made

24    the objection.  You can answer.

25         THE WITNESS:  Okay.  No problem.  I would say

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      -- I mean, it came from -- I would say probably

2      Steve and Josh went to Damien and had Damien then

3      send it to -- down to myself and/or Josh Klein, who

4      Josh Klein was, at the time, the controller.

5          BY MR. DONOVAN:

6      Q.   All right.  So I just want to make sure I

7  understand your testimony.  Your testimony is that Josh

8  Wander and Steven Pasko directed Damien Alfalla to steal

9  money from Leadenhall, right?

10         MR. BOLAND:  Object to the form.

11         THE WITNESS:  I wouldn't say necessarily steal,

12     but transfer money from SuttonPark to them for their

13     operations, as far as I know.

14         BY MR. DONOVAN:

15     Q.   Okay.

16         THE WITNESS:  What they did with that money?  I

17     do not know.

18         BY MR. DONOVAN:

19     Q.   Okay.  So is it your testimony that Josh

20  Wander and Steven Pasko directed Damien Alfalla to

21  transfer at least $350 million of Leadenhall's money

22  from SuttonPark to 777 Partners?

23     A.   That is my understanding, yes.

24     Q.   And you testified that you don't know what 777

25  Partners then did with that money, right?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Correct, because I was not on 777's bank

2  accounts.  I was not on 777's accounting records.  I was

3  only on SuttonPark's accounting records.

4      Q.    Did you ever hear from anyone what 777

5  Partners might have done with that money?

6      A.    I do not know.

7      Q.    Do you know what I mean by the word knowingly

8  or intentionally?

9      A.    Yes.

10     Q.    Is there any doubt in your mind that Josh

11 Wander and Steven Pasko knowingly stole money from

12 Leadenhall?

13         MR. BOLAND:  Object to the form.

14         THE WITNESS:  Yes.

15         BY MR. DONOVAN:

16     Q.    Sorry.  There is doubt in your mind or is

17 there is not doubt?

18     A.    No, there's no -- there's -- that they

19 knowingly did it?  Yes.

20     Q.    All right.  So I just want to make sure the

21 record is clear.

22     A.    Yes.

23     Q.    Is there any doubt in your mind that Steven

24 Pasko and Josh Wander stole at least $350 million from

25 Leadenhall?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MR. BOLAND:  Objection to the form.

2          THE WITNESS:  There's no doubt in my mind.

3          BY MR. DONOVAN:

4     Q.   And is it your testimony that Josh Wander and

5   Steven Pasko knowingly stole hundreds of million dollar

6   -- hundreds of millions of dollars from Leadenhall?

7          MR. BOLAND:  Object to the form.

8          THE WITNESS:  Yeah.  From the -- at least 350,

9     yes.

10         BY MR. DONOVAN:

11    Q.   Who else at 777 Partners or SuttonPark do you

12  think knows that Josh Wander and Steven Pasko stole

13  hundreds of millions of dollars from Leadenhall?

14         MR. BOLAND:  Objection to the form.

15         THE WITNESS:  I would say Josh Klein, who was

16    the controller at the time.  I know Rich Bellissimo

17    might have known about it.  Not that he did

18    anything, or Josh Klein.  We were just doing what we

19    were told, you know, where to send that money.

20    Other than that, I'm not exactly sure who else might

21    know.  I don't know if Alex or anybody else that

22    we've been talking about on this call knows anything

23    about that.  But the other people I've mentioned,

24    they might have some -- some -- some knowledge on

25    it.  They had -- they would have more knowledge than

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 115

1      I would.

2           BY MR. DONOVAN:

3      Q.   All right.  Did you raise concerns directly

4  with Steven Pasko or Josh Wander that they were stealing

5  money from Leadenhall?

6      A.   I did not.  I -- because at the time, like I

7  said, I -- we were supposedly going to buy these deals.

8  I -- I brought it up to Damien saying that we shouldn't

9  put anything on the books if we're not buying these

10  deals.  But other than that -- other than those

11  conversations, nothing else.

12     Q.   All right.  When you refer to these deals,

13  you're referring to the J.G. Wentworth and WMS deals,

14  right?

15     A.   Correct.

16     Q.   All right.  In or around -- sorry, strike

17  that. In 2021, did SuttonPark Capital consider

18  purchasing a portfolio of assets valued at approximately

19  $250 million --

20     A.   Yeah.  Yes, it was -- my understanding, it was

21  the WMS and the J.G. Wentworth deals.

22     Q.   Did SuttonPark pledge assets from that deal

23  before they were purchased?

24     A.   I do not know.

25     Q.   All right.  So why don't you just explain to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  me what the problem was with the J.G. Wentworth deal

2  vis-a- vis pledging assets to Leadenhall?

3      A.   They -- well, my -- my problem was, is that

4  they borrowed the money.  They hadn't purchased the

5  deals yet.  They borrowed the money to purchase those

6  deals.  Then they were in the process of working with

7  the JGW and -- J.G. Wentworth -- J.G. and WMS to

8  purchase the portfolio of deals.  But they were going

9  through to figure out if these deals are correct or if

10 they still have those deals, they didn't purchase --

11 they didn't sell them to somebody else and stuff like

12 that.  When in turn, they didn't end up buying that many

13 deals at all.  Maybe $1 million worth of them.

14     Q.   Okay.  So is it fair to say that SuttonPark

15 pledged assets to Leadenhall as collateral that it never

16 purchased in the first place?

17         MR. BOLAND:  Object to the form.

18         THE WITNESS:  I would say yes.

19         BY MR. DONOVAN:

20     Q.   And what is the dollar amount of assets,

21 approximately, that SuttonPark pledged to Leadenhall

22 that it never purchased in the first place?

23     A.   Probably be about 300 million.

24     Q.   Did Josh Wander knowingly pledge assets to

25 Leadenhall as collateral that SuttonPark never purchased



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   in the first place?
 2           MR. BOLAND:  Object to the form.
 3           THE WITNESS:  Personally, with Josh Wander, I'm
 4      not exactly sure if Josh Wander directly did it
 5      himself.
 6           BY MR. DONOVAN:
 7      Q.   Fair enough.  So leaving aside whether he
 8   directly did it himself, is it your view that Josh
 9   Wander knowingly pledged assets to Leadenhall that
10   SuttonPark had never purchased in the first place?
11           MR. BOLAND:  Object to the form.
12           THE WITNESS:  Yes.
13           BY MR. DONOVAN:
14      Q.   Did Steven Pasko pledge or direct the pledging
15   of assets to Leadenhall that SuttonPark never purchased
16   in the first place?
17           MR. BOLAND:  Object to the form.
18           THE WITNESS:  I would say yes.
19           BY MR. DONOVAN:
20      Q.   And the dollar amount of assets that
21   SuttonPark pledged to Leadenhall, which it never
22   purchased in the first place, was around $350 million,
23   right?
24      A.   Correct.
25      Q.   We talked before about the term, "double
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  pledge," do you remember that?

2      A.    Yes.

3      Q.    How would you define the term, "double

4  pledge"?

5      A.    Double pledging, meaning pledging it to

6            Leadenhall and then pledging it also to ING:

7  same deal, same amount, both -- two different

8  facilities.

9      Q.    Did SuttonPark double pledge assets to

10 Leadenhall?

11           MR. BOLAND:  Object to the form.

12           THE WITNESS:  That, I'm not exactly sure if

13     they double pledged all -- any assets to Leadenhall.

14     I'm aware that some of them were, and when they did,

15     they -- you know, when we found them out, we -- I

16     mentioned it and we took them off the books.  That's

17     all the ones I know.

18           BY MR. DONOVAN:

19     Q.    Got it.  That's helpful.  Do you know the

20 approximate dollar amount of assets that were pledged as

21 collateral to Leadenhall that were also pledged to

22 another lender?

23     A.    Not -- not exactly, no

24     Q.    Leaving aside exactly, do you know generally

25 how much, in terms of dollars, SuttonPark pledged in



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  assets to Leadenhall that it also pledged to another

2  lender?

3      A.    Maybe 5 million.

4      Q.    And was that 5 million associated with the

5  Dorchester borrowing base, or the SPLCSS 3 borrowing

6  base?

7      A.    That, I don't know.  I do not remember.

8      Q.    Can you explain to me the concerns that the

9  accounting department raised to management as to assets

10 being pledged to Leadenhall that were not actually

11 purchased?

12      MR. BOLAND:  Object to the form.

13      THE WITNESS:  All -- all I know is that they

14  were, you know, just brought in concern saying we

15  shouldn't put these deals on the books until we

16  purchase them.  That's -- we brought it up to -- I

17  know I've brought it up to both Rich, who also --

18  Richard Bellissimo, who also brought it up to Damien

19  Alfalla.

20      From there, I don't know where it went off on

21  the books.  Eventually, I know they were, I think,

22  taken off the matrices.

23      BY MR. DONOVAN:

24      Q.    Do you know whether 777 Partners or SuttonPark

25  Capital ever forged or photoshopped bank statements to

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  make it appear as though money was in accounts when it

2  was not in those accounts?

3      A.   I am not aware that they did anything like

4  that.

5      Q.   Did those allegations surprise you when you

6  read them in the Leadenhall, New York, complaint?

7      A.   No, not really.

8      Q.   Why didn't they surprise you?

9      A.   They didn't surprise me because the fact they

10 were trying to hide that they stole the 350 million.

11     Q.   Can you explain for me all of the ways in

12 which Josh Wander, Steven Pasko, or others at 777

13 Partners tried to conceal the fact that they stole $350

14 million from Leadenhall?

15         MR. BOLAND:  Object to the form.

16         THE WITNESS:  The only thing I can say is --

17     from what I know, is that they made the reports look

18     like they bought them and then eventually took them

19     off, saying they didn't.

20         BY MR. DONOVAN:

21     Q.   When you're referring to reports, you're

22 referring to the monthly compliance reports issued to

23 Leadenhall, right?

24     A.   Correct.

25     Q.   And is it your understanding that those



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  compliance reports listed assets which were purportedly

 2  pledged exclusively to Leadenhall?

 3      A.   Correct.

 4      Q.   Is it your understanding that the compliance

 5  reports then added up those receivable values to come up

 6  with a borrowing base?

 7      A.   Correct.

 8      Q.   And you understand the borrowing base to be a

 9  credit limit?

10      A.   Correct.

11      Q.   Do you know approximately how many compliance

12  reports 777 Partners issued to Leadenhall over the

13  course of Leadenhall's credit facility?

14      A.   Oh, I don't remember.  I mean, it's one every

15  month for -- you know, since at least 2016 so, I mean,

16  you're talking about, you know, maybe hundreds.  I -- I

17  don't know how many.

18      Q.   Would you agree with me that those monthly

19  compliance reports issued by 777 Partners to Leadenhall

20  contained false statements?

21          MR. BOLAND:  Object to the form.

22          THE WITNESS:  Yes.

23          BY MR. DONOVAN:

24      Q.   What were those false statements?

25      A.   The fact that some of them had -- some of

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1  those monthly compliance reports had those deals that

 2  were never purchased.

 3      Q.   Right.  In other words, the way in which the

 4  compliance reports were false was that they listed

 5  approximately $350 million in assets that were never

 6  actually purchased by 777 Partners, right?

 7      A.   Correct.

 8      Q.   In your view, did Josh Wander knowingly issue,

 9  or direct to be issued, compliance reports, which

10  contain false statements, to Leadenhall?

11          MR. BOLAND:  Object to the form.

12          THE WITNESS:  Yes.

13          BY MR. DONOVAN:

14      Q.   In your view, did Steven Pasko knowingly issue

15  compliance reports to Leadenhall which contained false

16  statements?

17          MR. BOLAND:  Same objection.

18          THE WITNESS:  Yes.

19          MR. BOLAND:  Yeah.

20          BY MR. DONOVAN:

21      Q.   Who are all of the people at 777 Partners who

22  knowingly issued false compliance reports to Leadenhall?

23          MR. BOLAND:  Object to the form.

24          THE WITNESS:  It would be Alex Adnani and Nick

25  Bennett who actually prepared the reports.  I do
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    know they had questionable concerns about those

2    reports, but they followed their direction of what

3    they were told to issue those reports.

4           BY MR. DONOVAN:

5       Q.   What were the concerns that Nick Bennett and

6    Alex Adnani had about the compliance reports containing

7    false statements?

8           MR. BOLAND:  Object to the form.

9           THE WITNESS:  The fact that the deals that --

10      that were on their statements on the compliance

11      reports were not deals we actually purchased.

12          BY MR. DONOVAN:

13      Q.   Did Alex Adnani know that the monthly

14   compliance reports issued to Leadenhall contained false

15   statements?

16          MR. BOLAND:  Object to the form.

17          THE WITNESS:  Yes.

18          BY MR. DONOVAN:

19      Q.   Did Nick Bennett know that the monthly

20   compliance reports issued to Leadenhall contain false

21   statements?

22          MR. BOLAND:  Object to the form.

23          THE WITNESS:  Yes.

24          BY MR. DONOVAN:

25      Q.   Is there anyone other than Josh Wander, Steven



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Pasko, Nick Bennett, and Alex Adnani who, in your view,

2    knew that 777 Partners was knowingly issuing false

3    compliance reports to Leadenhall?

4              MR. BOLAND:  Object to the form.

5              THE WITNESS:  I would say Damien Alfalla.

6              BY MR. DONOVAN:

7         Q.    Would you agree with me that Josh Wander,

8    Steven Pasko, Damien Alfalla, Nick Bennett, and Alex

9    Adnani knowingly stole hundreds of millions of dollars

10   from Leadenhall?

11             MR. BOLAND:  Object to the form.

12             THE WITNESS:  I don't know if they specifically

13        stole, but following the reports that they filed,

14        yes.

15             BY MR. DONOVAN:

16        Q.    Sorry, can you explain what you mean by that?

17        A.    So I -- they knowingly didn't do it themselves

18   by -- but they did know those reports were false by

19   adding those deals on those reports.

20        Q.    Right.  So when I use the term "knowingly,"

21   what I mean by that is they knew that an asset was not

22   actually purchased, but it was being listed on the

23   compliance reports to Leadenhall anyway.  Does that make

24   sense?

25        A.    Yes.  Yes.  That makes sense, and that is

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    correct.

2        Q.    Okay.  So let me just make -- ask my question

3    one more time.  Did Josh Wander, Steven Pasko, Damien

4    Alfalla, Nick Bennett, and Alex Adnani issue compliance

5    reports to Leadenhall that they knew were false?

6              MR. BOLAND:  Object to the form.

7              THE WITNESS:  Correct.  Yes.

8              BY MR. DONOVAN:

9        Q.    Do you believe a fraud was perpetrated on

10   Leadenhall?

11             MR. BOLAND:  Object to the form.

12             THE WITNESS:  I do.

13             BY MR. DONOVAN:

14       Q.    Can you explain to me why you think that?

15       A.    Why I think that?  Because they borrowed money

16   that they didn't use the intended purpose on.

17       Q.    Do you think Josh Wander is trustworthy?

18             MR. BOLAND:  Object to the form.

19             THE WITNESS:  That, I don't know because I do

20       not know him that well.

21             BY MR. DONOVAN:

22       Q.    Do you think Steven Pasko is trustworthy?

23             MR. BOLAND:  Same objection.

24             THE WITNESS:  I thought I did.

25             BY MR. DONOVAN:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.    You thought you did?  What do you mean by

2    that?

3    A.    Because I thought he was trustworthy in the

4    beginning, you know, when I -- since I've been at

5    SuttonPark, and then with all the -- the stealing of

6    these deals, I do not.

7    Q.    Can you explain to me what you mean by

8    "stealing of these deals"?

9    A.    By stealing the money from Leadenhall and

10   falsifying, saying they're purchasing deals that they

11   never did.

12   Q.    So outside of the monthly compliance reports,

13   did 777 Partners falsify any other records that were

14   issued to Leadenhall?

15        MR. BOLAND:  Object to the form.

16        THE WITNESS:  As far as I know, no, but I do

17     not know.

18        BY MR. DONOVAN:

19   Q.    Do you know that in the New York complaint,

20   Leadenhall -- we allege -- Leadenhall alleges that it

21   received an anonymous tip in September 2022, concerning

22   assets that had been double pledged or fictitiously

23   pledged?

24   A.    I didn't know that they received that, no.

25   Q.    Do you have any understanding of who may have

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   sent Leadenhall a tip, in September 2022, that assets it
 2   was lending against were double pledged or fictitiously
 3   pledged?
 4       A.   I do not know who would've told Paul that.
 5       Q.   Sorry, did you say Paul, or did you say
 6   Leadenhall?
 7            MR. FEUER:  I think --
 8            THE WITNESS:  No, I didn't --
 9            MR. FEUER:  -- you got cut off.
10            MR. BOLAND:  Yeah.  Sorry.  You may want to ask
11       the question again.
12            MR. DONOVAN:  Sorry.  Ms. Gorde, I -- can I --
13            THE WITNESS:  Yeah, go --
14            MR. DONOVAN:  Let me just ask it again because
15       I don't think I --
16            THE WITNESS:  Sure.
17            BY MR. DONOVAN:
18       Q.   So do you know who may have sent Leadenhall an
19   anonymous tip, in September 2022, that assets had been
20   double pledged or fictitiously pledged?
21       A.   No.  I do not.
22       Q.   Before you testified about topping up or
23   topping off accounts, right?
24       A.   Correct.
25       Q.   Can you explain to me exactly what that means?
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      A.    From my perspective, that means that --

 2 topping off the account would be, for example, our

 3 collection account.  We topped it off because we did not

 4 expect the -- we did not receive the interest -- the

 5 insurance payments for the deals in a -- in a timely

 6 manner, so to make a payment on the -- the distribution

 7 for those deals, we had to top it off to make the full

 8 distribution based on the report.

 9      Q.    Got it.  So you testified that one of the

10 reasons for topping off a deal or a receivable is that

11 the money wasn't coming in from the insurance company,

12 right?

13      A.    Correct.

14      Q.    Is another reason why 777 Partners or

15 SuttonPark might top off a deal or receivable that the

16 receivable was never purchased in the first place?

17      A.    That -- that probably was toward the end, yes.

18      Q.    And so in part, was the purpose of topping off

19 or topping up receivables to conceal the fact from

20 Leadenhall that it had been pledged receivables which

21 were never purchased in the first place?

22      A.    Back in 2001, I would say yes.

23      Q.    Sorry, did you say 2001 there?

24      A.    I'm sorry, 2021.

25      Q.    Okay.  So let me just try my question again.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        A.    Okay.

2        Q.    Is one of the reasons why 777 Partners or

3    SuttonPark topped up accounts because it had pledged

4    assets to lenders that it never purchased in the first

5    place?

6        A.    Yes, in 2021.

7        Q.    And was the purpose of that, quote, "topping

8    up of accounts," to conceal the fact from lenders that

9    lenders had been pledged assets which 777 Partners had

10   never purchased in the first place?

11       A.    I would say yes.

12           THE REPORTER:  Sorry, Mr. Donovan.  I have a --

13       I had somebody in the waiting room.  It was Leigh

14       something.

15           MR. DONOVAN:  Leigh Nathanson?  She can come

16       in.

17           THE REPORTER:  Okay.  It looks like she dropped

18       off, but if she adds again, I will admit her.  Thank

19       you.

20           BY MR. DONOVAN:

21       Q.    Do you know -- what do you know about the

22   MpFin system?

23       A.    I don't know much about the MpFin system.  I

24   never dealt with that system.

25       Q.    Do you know anything about 777 Partners

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 130

```
 1  offering programming in the MpFin system to make it

 2  appear as though assets were pledged to different

 3  lenders historically?

 4      A.   No.  I was never aware of that.

 5      Q.   Do you think Nick Bennett is trustworthy?

 6      A.   I do.

 7      Q.   Do you think Alex Adnani is trustworthy?

 8      A.   I do.

 9      Q.   So why then do you think they participated in

10  defrauding Leadenhall out of hundreds of millions of

11  dollars?

12      A.   The only thing I'm -- I know I think they did

13  it was to do what their bosses told them to do.  Nothing

14  other than that.

15      Q.   Got it.  Their bosses being Josh Wander and

16  Steven Pasko?

17      A.   Yes.

18      Q.   Anyone else?

19      A.   And I think Damien Alfalla might have told him

20  also to do it, but I think he was also being directed by

21  Josh Wander and Steven.

22      Q.   Do you know what ACAP is?

23      A.   ACAP?  Yes.

24      Q.   And do you know who Kenneth King is?

25      A.   I've heard of him, but I do not know who he
```


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  was.
 2       Q.   Can you describe for me your understanding of
 3  the 777 Partners and ACAP relationship?
 4       A.   My -- from my understanding of it, it was
 5  another business partner with them that they borrowed
 6  money from to do their operations.
 7       Q.   Do you know whether in April or May 2023, ACAP
 8  employees moved into 777 Partner's offices in Miami?
 9       A.   I have no recollection.  No knowledge of that
10  at all.
11       Q.   Do you know whether ACAP controlled 777
12  Partners' ability to make payments such as payroll?
13       A.   I would say yes, they did.
14       Q.   Can you tell me more about that?
15       A.   As far as I know, they would borrow money from
16  ACAP and then use it to pay their payroll.
17       Q.   What other expenses did 777 Partners borrow
18  money from?
19       A.   I would say probably rent because I do know,
20  you know, SuttonParks rent in Boca.  They were having
21  problems paying it.  And I think they also used it for
22  some of the other subsidiaries.
23       Q.   Do you know whether ACAP knew that 777
24  Partners was issuing false compliance reports to
25  Leadenhall?
```

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 132

1          MR. BOLAND:  Object to the form.

2          THE WITNESS:  I do not know.

3          BY MR. DONOVAN:

4      Q.   So, just so I'm clear, and this will cut off

5  some other questions, you don't have any understanding

6  of what ACAP knew about compliance reports issued to

7  Leadenhall, right?

8      A.   Correct.

9      Q.   Okay.  Would you were the -- can you remind me

10  what your job title was when you left SuttonPark?

11      A.   My job title when I left SuttonPark was

12  controller.

13      Q.   And you testified that 777 Partners took over

14  SuttonPark in 2023; is that right?

15          MR. BOLAND:  Object to the form.

16          THE WITNESS:  I would say so.  Yes.

17          BY MR. DONOVAN:

18      Q.   Are 777 Partners and SuttonPark Capital now

19  the same thing?

20          MR. BOLAND:  Object to the form.

21          THE WITNESS:  I would -- I could say yes.

22          BY MR. DONOVAN:

23      Q.   All right.  Let me try it again.  Are 777

24  Partners and SuttonPark Capital, as far as you know, the

25  same entity right now?

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1        MR. BOLAND:  Object to the form.

2        THE WITNESS:  As far as I know, yes, but I'm

3     not exactly sure.  I mean, when I left, they were

4     just a subsidiary of -- of 777 Partner, but to tell

5     you the truth, SuttonPark only had a handful of

6     employees left when I left.

7        BY MR. DONOVAN:

8     Q.    And you left in what month of 2024?

9     A.    July.

10    Q.    Why did you leave?

11    A.    I've been trying to leave because of all this

12  -- the mess that we -- we saw, the not making -- you

13  know, not having the funds to pay anything.  You know,

14  the stealing of the 350 million and not doing with the

15  deals.  I didn't want to be a part of that.

16    Q.    Why did you feel uncomfortable about that?

17    A.    Because it was wrong.  I mean, the fact that

18  you're stealing money to not purchase deals, and not

19  even make -- try to make payroll, and not do anything on

20  that, it's -- to me, it was just wrong.

21    Q.    Like it was morally wrong, you mean?

22        MR. BOLAND:  Object to the form.

23        THE WITNESS:  Morally and ethically wrong.

24        BY MR. DONOVAN:

25    Q.    Did others at 777 Partners have similar

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1   concerns about 777 Partners and SuttonPark Capital
 2   stealing approximately $350 million from Leadenhall?
 3             MR. BOLAND:  Object to the form.
 4             THE WITNESS:  I can say Rich Bellissimo, Josh
 5        Klein, they both left because of all of it.  I don't
 6        know about anybody else.
 7             BY MR. DONOVAN:
 8        Q.   Well, how many people in the accounting
 9   department resigned or left as a result of concerns over
10   Josh Wander and Steven Pasko stealing $350 million from
11   Leadenhall?
12             MR. BOLAND:  Object to the form.
13             THE WITNESS:  I do not know off the top of my
14        head.  I mean, we originally had a department of
15        eight people, and it was down to me when I left in
16        July.
17             BY MR. DONOVAN:
18        Q.   So do you know -- do you know that Leadenhall
19   filed this complaint in New York around the time,
20   May 2024?
21        A.   I did hear that they -- something that they
22   filed some -- some complaint about it.
23        Q.   Can you describe for me -- strike that.  You
24   testified that you weren't surprised by the complaint,
25   right?
```



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1     A.    No, I was not.

2     Q.    And can you remind me why you weren't

3  surprised about the complaint?

4     A.    Because the fact of the matter is we saw that

5  what -- what they did back in 2021 and 2022.

6     Q.    And what was it that they did?

7     A.    That they took the money and did not purchase

8  the deals that they say they were going to purchase.

9  What they did with that money, I do not know.

10     Q.    Right.  In other words, they issued false

11  compliance reports to Leadenhall, causing Leadenhall to

12  provide them with $350 million, right?

13          MR. BOLAND:  Object to the form.

14          THE WITNESS:  Correct.

15          BY MR. DONOVAN:

16     Q.    And 777 Partners then did not use that $350

17  million to purchase receivables, right?

18     A.    Correct.

19     Q.    And Josh Wander and Steven Pasko knowingly

20  issued false compliance reports to Leadenhall, right?

21          MR. BOLAND:  Object to the form.

22          THE WITNESS:  Correct.

23          BY MR. DONOVAN:

24     Q.    Do you know approximately when 777 Partners

25  started issuing false compliance reports to Leadenhall?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          MR. BOLAND:  Object to the form.

2          THE WITNESS:  No, I do not.

3             BY MR. DONOVAN:

4      Q.   Do you know generally when 777 Partners and

5  SuttonPark Capital started issuing false compliance

6  reports to Leadenhall?

7          MR. BOLAND:  Same objection.

8          THE WITNESS:  No, I do not.  Because my

9      understanding of those compliance reports that they

10     were issuing for December of 2021 and forward, that

11     they were intending to purchase these assets.

12          BY MR. DONOVAN:

13     Q.   Right.  However, your testimony is that while

14  Josh Wander and Steven Pasko may have intended to

15  purchase EG&G, Wentworth, and WMS portfolio of assets,

16  they did not ultimately purchase that portfolio of

17  assets, right?

18     A.   Correct.

19     Q.   And yet, despite not purchasing those

20  portfolios of assets, 777 Partners pledge those assets

21  to Leadenhall, right?

22          MR. BOLAND:  Object to the form.

23          THE WITNESS:  Correct.

24          BY MR. DONOVAN:

25     Q.   And those assets were used as collateral to

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  convince Leadenhall to provide 777 Partners with at

2  least $350 million in funding, right?

3          MR. BOLAND:  Object to the form.

4          THE WITNESS:  Correct.

5          BY MR. DONOVAN:

6      Q.   How would you define -- sorry.  You have an

7  accounting background, right?

8      A.   Correct.  I do.

9      Q.   All right.  And how long have you been an

10  accountant or in the accounting world?

11     A.   Oh, I've been in there since let's see, 20 --

12  20 -- 2025.  No, not 2025.  Sorry.  Sorry.  2005.

13     Q.   All right.  Do you have an -- do you have a --

14  an accounting degree?

15     A.   I do.  I have a -- a bachelor's of accounting

16  and a master's also.

17     Q.   How would you define the word insolvent?

18     A.   That you can't -- when you're insolvent, that

19  you don't have the money to, you know, to purchase

20  anything, pay for expenses, anything like that, that you

21  are -- you just don't have anything.

22     Q.   Would you characterize 777 Partners and

23  SuttonPark Capital as insolvent at any point in time

24  while you worked there?

25          MR. BOLAND:  Object to the form.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          THE WITNESS:  Probably I would say -- well at

2     -- at least with SuttonPark, because we did not have

3     very much funds at all from 777 because that's where

4     we got all our funding from.  Probably I would say

5     in 2024.

6          BY MR. DONOVAN:

7     Q.   So when you say SuttonPark got all of its

8  funding from 777 Partners, what do you mean by that?

9     A.   Well, because we weren't able to borrow on

10  facilities because we weren't buying deals and stuff

11  like that.  So to pay our operating expenses, we

12  actually had to reach out to 777 Partners, who then

13  reached out to whomever, to borrow funds to so that we

14  could pay our -- just our operating expenses of keeping

15  our -- our -- the lights on in our offices.

16     Q.   Is your understanding -- is your understanding

17  that 777 Partners was borrowing hundreds of millions or

18  billions of dollars from ACAP to stay afloat?

19          MR. BOLAND:  Objection.

20          THE WITNESS:  Toward the -- toward the end,

21     yes.  I did note -- I did hear that they were

22     borrowing, you know, millions of dollars to stay

23     afloat.

24          BY MR. DONOVAN:

25     Q.   And how did the transactions work between 777

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1   Partners and SuttonPark Capital whereby 777 Partners was

2   providing SuttonPark Capital with funds?

3           MR. BOLAND:  Object to the form.

4           THE WITNESS:  We would tell -- we would, like,

5       let them know, hey, we need, you know, $100,000 for

6       payroll.  They would then borrow it and then say,

7       okay, well I have $100,000 for you to use.  We'll --

8       they'll move the money from their bank account to

9       ours.

10          BY MR. DONOVAN:

11      Q.   Okay.  And would that transaction be

12  memorialized in a contract?

13      A.   It was -- I think it's based on an agreement

14  between 777 Partners and SuttonPark.  But I have never

15  seen that agreement, so I don't know exactly what it

16  says.

17      Q.   All right.  Another way to ask my question is,

18  were 777 Partners and SuttonPark Capital just drawing

19  funds from the same bank account?

20          MR. BOLAND:  Object to the form.

21          THE WITNESS:  Not that I'm aware of.  No.

22          BY MR. DONOVAN:

23      Q.   Do you know whether Josh Wander and Steven

24  Pasko ever used corporate funds for personal use?

25      A.   I do not know that.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 140

1    Q.   So you don't know whether they ever used 777

2  Partners or SuttonPark Capital's funds to, like, buy

3  apartments or go on vacations, right?

4    A.   I do not -- I do not know, because if any --

5  if they did, it would all come through 777, and I was

6  never part of 777's accounting department.

7    Q.   Would you say that Josh Wander and Steven

8  Pasko exercise complete control over 777 Partners?

9         MR. BOLAND:  Object to the form.

10        THE WITNESS:  I would say yes.

11        BY MR. DONOVAN:

12   Q.   How would you define a Ponzi scheme?

13   A.   How would I define a Ponzi scheme, saying you

14  pretty much you would have a -- an item or an

15  investment, let's just -- just say investment, that, you

16  know, John Smith would say, hey, I have this investment.

17  Invest in me.  Instead of using it to buy that

18  investment, they used it to purchase whatever personal

19  stuff they wanted to and never put the monies in the

20  funds that they -- the investments that they borrowed,

21  you know, from an individual.

22   Q.   Do you think that Josh Wander and Steven Pasko

23  were, in part, running a Ponzi scheme or a shell game?

24        MR. BOLAND:  Object to the form.

25        THE WITNESS:  That I don't know.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          BY MR. DONOVAN:

2      Q.   Who do you think knows the most about this

3  fraud?

4          MR. BOLAND:  Object to the form.

5          THE WITNESS:  Who do I think knows the most

6      about this fraud?  I would have to say the

7      accounting department that was in -- at 777.

8          BY MR. DONOVAN:

9      Q.   And can you remind me who you're referring to

10 when you refer to the accounting department?

11     A.   And like I said -- like I would say, Rich

12 Bellissimo.  I would even say Kevin Burgos might know

13 something about it.  Damien Alfalla.  Other than those

14 few people, that's the only one I would know who -- who

15 might know the most.

16     Q.   Do you think that Josh Wander and Steven Pasko

17 tried to get the accounting department to cook the books

18 so to speak?

19         MR. BOLAND:  Object to the form.

20         THE WITNESS:  On -- on 777's side, I'm not

21     sure.  I don't know.

22         BY MR. DONOVAN:

23     Q.   What about on SuttonPark Capital side?

24     A.   I would say no.

25     Q.   So is it -- I'm just trying to understand your

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1  -- how you think of it.  Is it --

2      A.    Yep.

3      Q.    Well, let me start here.  Are Nick Bennett and

4  Alex Adnani in the Capital Markets Group?

5      A.    Yes, they are.

6      Q.    Is it your view that the Capital Markets Group

7  perpetrated a fraud on Leadenhall that the accounting

8  department tried to raise concerns over?

9          MR. BOLAND:  Object to the form.

10         THE WITNESS:  I would say yes.

11         BY MR. DONOVAN:

12     Q.    Can you explain to me why you say yes to that

13 question?

14     A.    Well, by doing those reports, those monthly

15 compliance reports, I mean, they knew exactly those

16 deals weren't on the books.  But they were only doing

17 what they were told to do and then turning it over to

18 the accounting, where we actually had to book the -- the

19 information on our -- on the SuttonPark books.

20     Q.    All right.  So I think when you're referring

21 to "they" in that sentence, you're referring to Nick

22 Bennett and Alex Adnani, right?

23     A.    Yes, I am.

24     Q.    And what you're saying is, while Nick Bennett

25 and Alex Adnani knowingly issued false compliance

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 143

```
 1  reports to Leadenhall, you don't hold them responsible
 2  because they were just following orders, right?
 3          MR. BOLAND:  Object to the form.
 4          THE WITNESS:  Correct.
 5          BY MR. DONOVAN:
 6      Q.   And those orders were from Josh Wander and
 7  Steven Pasko, right?
 8          MR. BOLAND:  Object to the form.
 9          THE WITNESS:  Correct.
10          BY MR. DONOVAN:
11      Q.   So I checked out your LinkedIn before this,
12  and I'm not going to introduce it as an exhibit.  I just
13  have a question on what one of the lines means, if you
14  don't mind.  You referenced preparing monthly financial
15  statements for over 20 subsidiaries with respect to
16  SuttonPark Capital.
17      A.   Correct.
18      Q.   Can you tell me what financial statements
19  you're referring to there?
20      A.   So under SuttonPark, there's multiple
21  subsidiary companies that we had set up -- that were set
22  up.  ING for the ING, you know, borrowing, Dorchester
23  for the Dorchester borrowing, SPLCSS2 for their
24  borrowing, you know, and on those.  And each one of
25  those had a set of books that we -- I would properly do
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    and prepare 20 plus financial statements for on a

2    monthly basis.

3         Q.   All right.  And so when you -- when you're

4    referring to financial statements, are you referring to

5    like balance sheets and cash flow statements?

6         A.   Yes.  Balance sheets and cash flow statements.

7    I would only do those for the major accounts.  Like ING

8    Dorchester, SPLCSS, some -- some of our smaller ones

9    just rolled up into SuttonPark's main account.

10        Q.   Okay.  So you're not -- when you refer to

11   monthly financial statements, you're not referring to

12   the compliance reports issued to Leadenhall, right?

13        A.   No.  No.

14        Q.   Got it.  Do you know those reports were

15   generated from MpFin?

16        A.   My understanding is that MP -- they ran

17   reports -- my understanding is that they ran reports

18   from MpFin on the deals that were associated when they

19   were entered into MpFin.  And they used MpFin as the

20   listing of all deals on the compliance report.

21        Q.   So was it your understanding that the

22   compliance reports were generated from the MpFin system?

23        A.   On a portion.  Just for the listing of deals

24   that applied to that.  The actual entire report was not.

25        Q.   I see.  So the portion of the compliance

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  reports that lists receivables is generated from MpFin,

2  right?

3      A.   Correct.

4      Q.   So then understanding that -- strike that.

5  You didn't prepare these monthly compliance reports to

6  Leadenhall, right?

7      A.   Correct.

8      Q.   Is it fair to say that if assets were listed

9  on compliance reports issued to Leadenhall, that 777

10 Partners had never actually purchased, MpFin showed

11 those assets as being purchased?

12          MR. BOLAND:  Object to the form.

13          THE WITNESS:  As far as I am aware, yes.  I --

14     but I don't know.  Like I said, I don't know MpFin,

15     so I don't know what records were on there.

16          BY MR. DONOVAN:

17     Q.   I guess what I'm asking is, do you know how

18 Nick Bennett or Alex Adnani were listing assets on

19 compliance reports issued to Leadenhall that 777

20 Partners had never purchased in the first place?

21     A.   I do not.  No, I do not.

22     Q.   Who would know the answer to that?  Other than

23 Nick Bennett and Alex Adnani.

24          MR. BOLAND:  Object to form.

25          THE WITNESS:  That's as far as I know, would be

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900        www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

1    those two.

2          BY MR. DONOVAN:

3      Q.   Do you think Josh Wander and Steven Pasko know

4    how the compliance reports are prepared?

5          MR. BOLAND:  Object to the form.

6          THE WITNESS:  I do not know.

7          BY MR. DONOVAN:

8      Q.   But you do believe that Josh Wander and Steven

9    Pasko directed Alex Adnani and Nick Bennett to list

10   assets on compliance reports issued to Leadenhall that

11   had not actually been purchased by 777 Partners, right?

12         MR. BOLAND:  Object to the form.

13         THE WITNESS:  Do believe, yes.

14         BY MR. DONOVAN:

15     Q.   And the value of those assets that were listed

16   on Leadenhall's compliance reports that were never

17   purchased in the first place was approximately $350

18   million, right?

19     A.   That is my understanding, yes.

20     Q.   Can you explain to me the basis for your

21   understanding?

22     A.   The basis of my understanding was because I

23   knew the -- you know, I knew they borrowed $350 million.

24   I saw the money because I had to book the -- the ins and

25   outs of those funds coming in.  But -- and then I knew

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  there was supposedly a list of deals that they were

2  supposedly going to purchase.

3      Q.    All right.  So is the basis not the, using

4  your terms, reconciliations that you were conducting?

5  Or do you is your basis for knowing -- for this

6  knowledge, something other than the reconciliations?

7      A.    The basis of my knowledge on this was from the

8  -- actually the compliance reports because I would do my

9  reconciliation of what was on my books, what was on the

10 compliance report.  And I would compare them and say,

11 hey, these aren't -- deals aren't here.  Where'd you get

12 them from?

13     Q.    Okay.  That clears it up.  So I just want to

14 make sure I understand how 777 Partners and you use the

15 term reconciliation.  Is it accurate to say that a

16 reconciliation is comparing accounting statements with

17 compliance reports issued to lenders?

18         MR. BOLAND:  Object to the form.

19         THE WITNESS:  Yes.

20         BY MR. DONOVAN:

21     Q.    And is the purpose of the reconciliation to

22 determine whether assets that exist on the compliance

23 reports also exist in the accounting department's books

24 and records?

25     A.    Correct.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.    And did you make the determination that there

2    were hundreds of millions of dollars in assets which

3    existed on Leadenhall's compliance reports, which were

4    not in the accounting department's books and records?

5    A.    Yes, I did.  And I also brought it up to -- I

6    brought it into Alex because she -- he's the one that

7    was doing these reports.  Like, where did you get these

8    deals?

9    Q.    And what did he say in response to that

10   concern that you raised?

11   A.    His concern is that these are deals we were in

12   the process of purchasing and that was about it.

13   Q.    Do you know when you raised that concern to

14   Alex Adnani?

15   A.    Probably in January of 2022, when we were

16   doing the December of 2021s accounting.

17   Q.    Did you -- did -- strike that.  Do you

18   remember saying to Alex Adnani something along the lines

19   of, hey, we shouldn't be pledging these assets given

20   that --

21   A.    I have.

22   Q.    -- we never purchased them in the first place.

23   A.    Correct.  I have

24   Q.    And his response was just, we are in the

25   process of purchasing these deals and so it's fine?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1     A.   His -- his response was we're in the process
 2  of purchasing these deals.  He told me that Josh wants
 3  them on their -- on the report.  That was what I was
 4  told.
 5     Q.   Is your understanding that Josh wanted assets
 6  that 777 Partners had never actually purchased on
 7  Leadenhall's compliance reports because that would allow
 8  SuttonPark to borrow even more money from Leadenhall?
 9          MR. BOLAND:  Object to the form.
10          THE WITNESS:  Not that I'm aware of.  No.
11          BY MR. DONOVAN:
12     Q.   Well -- so what's the purpose of pledging
13  assets to Leadenhall that 777 Partners would (audio cuts
14  out) --
15          MR. BOLAND:  Object to the form.
16          THE WITNESS:  Well, if 777 Partners purchased
17      assets that they never actually purchased and they
18      borrowed that money that be brings down their
19      borrowing base, which means they couldn't borrow
20      anymore because they have all these deals unless
21      they sold them.
22          BY MR. DONOVAN:
23     Q.   Right.  And so the purpose of pledging assets
24  to Leadenhall that SuttonPark had never actually
25  purchased in the first place, is that it allowed Josh
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

1  Wander and Steven Pasko to take out even more money from

2  Leadenhall than they otherwise be able to do, right?

3          MR. BOLAND:  Object to the form.

4          THE WITNESS:  Correct.

5          BY MR. DONOVAN:

6      Q.  I know you have childcare and kid

7  responsibilities.

8      A.  Yes.

9      Q.  I'm almost done here.  So you had testified

10 before that topping up of receivable accounts was a way

11 to conceal from lenders that assets they were lending

12 against were not actually purchased, right?

13          MR. BOLAND:  Object to the form.

14          THE WITNESS:  Yes.

15          BY MR. DONOVAN:

16     Q.  Are you aware of any other ways, whether

17 through forging documents or otherwise, that 777

18 Partners concealed from lenders, such as Leadenhall,

19 that the lenders were lending against assets that were

20 double pledged or did not exist?

21     A.  No.

22     Q.  Where do you think evidence would exist that

23 777 Partners pledged assets to Leadenhall that it never

24 purchased in the first place?

25     A.  The only thing I can see is I know from the

III  MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 151

1  different matrices that I had, that can be -- that's the

2  only thing I have.  I know they have had documents

3  stating that they were going to purchase $350 million of

4  assets, which I've seen those agreements.  But other

5  than them not purchasing it, I don't have any record

6  other than my matrices showing them coming on and going

7  off.

8      Q.   All right.  So you're saying that in the 2021

9  period, there would be documents showing that SuttonPark

10 was considering purchasing a J.G. Wentworth and WMS

11 portfolio of assets, right?

12     A.   Yes.

13     Q.   And where would those documents be?  Like,

14 would they be in someone's inbox?

15         MR. BOLAND:  Object to the form.

16         THE WITNESS:  I don't know if there would be in

17     somebody's inbox.  I do know I've seen a copy of it,

18     and I've seen it sitting on our -- the network

19     there.  The, you know, SuttonPark Network.

20         BY MR. DONOVAN:

21     Q.   And when you say the SuttonPark Network, what

22 do you mean?

23     A.   The shared drive that everybody could have

24 access to.

25     Q.   Does that have a name?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   I don't know what the name of it is.

2      Q.   Is it -- well, can you just describe to me

3  what the shared drive is like?  Is it like a folder that

4  everyone at 777 Partners can save documents in and then

5  access?

6      A.   This drive would -- I don't know what people

7  have access to and what people don't.  So the drive I'm

8  talking about has mainly SuttonPark's information in it,

9  different folders of different accounting reports, like

10 the different monthly compliance reports that I would

11 save myself to make sure here is what my information

12 that came from and has also a folder of different

13 agreements that are in there.  But I do not know who has

14 access to those at SuttonPark side.  And I do not know

15 if they had one, a folder like that on the 777 side,

16 since I did not have access to 777's records.

17          THE REPORTER:  Excuse me, Mister (audio cuts

18     out) -- we have a Noah Rust joining?

19          MR. DONOVAN:  Sorry.  Say it again.

20          THE REPORTER:  Noah Rust.

21          MR. BOLAND:  That -- that's fine.  He's -- he

22     is an attorney with Shutts --

23          MR. DONOVAN:  Oh.

24          THE REPORTER:  Okay.  Thank you.

25          MR. BOLAND:  -- working on the case.


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          BY MR. DONOVAN:

2      Q.    If you were trying to find documents showing

3  that Josh Wander and Steven Pasko knowingly stole

4  approximately $350 million from Leadenhall, where would

5  you look?

6      A.    I would try those drives, but also I think

7  there might be some e-mail communication could also be

8  the case, too.

9      Q.    Is that how e-mail communication -- sorry,

10  strike that.  Are you referring to e-mail communication

11  with, and to and from Josh Wander and Steven Pasko?

12      A.    Those, I don't know.  I don't know if there is

13  any e-mail communication between them.  I know there was

14  e-mail communication between, you know, the accounting

15  department saying these -- these numbers don't -- aren't

16  -- shouldn't be on the books.  Should we take them off?

17  Should we keep them on?  That's the only thing I know of

18  on that e-mail communication.  But with -- between Josh

19  Wander and Steven, I don't know.

20      Q.    Were you ever directed to delete documents or

21  not leave a paper trail of your concerns?

22      A.    No.

23      Q.    To your knowledge, would the e-mails you're

24  referring to where you raised concerns to management

25  concerning the pledging of assets that were not actually



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    purchased still live in your SuttonPark e-mail inbox?

2        A.    I don't know if it does or doesn't.  I don't

3    know what -- since I haven't worked there, I don't know

4    what they've done.

5        Q.    Do you have any like texts or personal e-mails

6    which would reflect the pledging of assets which were

7    not actually purchased or the double pledging of assets?

8        A.    No, I do not.

9        Q.    Outside of individuals in the accounting

10   department, who do you think knows the most about the

11   fraud perpetrated on Leadenhall?

12       A.    Outside the accounting department?  I know

13   Percy Ford is pretty much aware of it.

14       MR. DONOVAN:  Why don't we go off the record

15       for three minutes and then I think that I'll review

16       my materials and that might be it.

17       THE REPORTER:  All right.  The time --

18       MR. DONOVAN:  Thank you, Ms. Gorde.  I really

19       appreciate your time.

20       THE WITNESS:  No problem.

21       THE REPORTER:  The (audio cuts out) -- p.m.,

22       Eastern.  We're going off the record.

23           (A recess was taken.)

24       THE REPORTER:  Time now is 1:46 p.m., Eastern,

25       and we are back on the record.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          BY MR. DONOVAN:

2          Q.   Okay.  Ms. Gorde, did anyone at 777 Partners

3    ever try to prevent you from disclosing what you knew

4    about the fraud perpetrated on Leadenhall?

5          A.   No, no one prevented me.

6          Q.   Well, I'm asking, did anyone ever try to

7    prevent you from disclosing what you saw at SuttonPark?

8          A.   No.

9          Q.   In 777 Partners?

10         A.   No.

11         Q.   Did 777 Partners or SuttonPark Capital ever

12   offer you severance?

13         A.   No.

14         Q.   All right.  You said before that when you

15   reviewed the complaint filed by Leadenhall in the New

16   York action, you weren't surprised at all, right?

17         A.   Correct.

18         Q.   Is there anything that I haven't asked you

19   today that would be helpful for us to know or that you

20   think we should know?

21         MR. BOLAND:  Object to the form.

22         THE WITNESS:  Nope, I've -- I think you've

23    pretty much asked everything.

24         BY MR. DONOVAN:

25         Q.   Okay.  So there's nothing that -- there's no



**MILESTONE │ REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  other reaction to the complaint filed by Leadenhall or

2  the allegations in Leadenhall's complaint against 777

3  Partners that we haven't covered today?

4       A.   No.

5            MR. DONOVAN:  That's all the questions I have.

6       I really appreciate it, Ms. Gorde.

7            THE WITNESS:  No problem.

8                    EXAMINATION

9            BY MR. FEUER:

10      Q.   Good afternoon, Ms. Gorde.  How are you?

11      A.   Good.  How are you?

12      Q.   Good.  This is Leonard Feuer.  I represent

13  Noah Davis.  I've just got a few questions for you,

14  okay?

15      A.   Sure.

16      Q.   Had -- did anyone at 777 Partners ever try to

17  get you to sign a non-disclosure agreement?

18      A.   Nope.  Nope.

19      Q.   You think they were aware that you knew or

20  know what you -- you've testified to as far as the $350

21  million version?

22      A.   I don't know if they know that I testified for

23  it, but they knew I knew.

24      Q.   Did you ever have a conversation with any of

25  the upper echelon at 777 Partners about that?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    No.

2      Q.    Were there false compliance reports issued

3  after the diversion of the $315 million?

4      A.    It -- I think they were after -- after it, but

5  I think it was finally rectified like a year later.

6      Q.    When you say rectified?

7      A.    Meaning they -- as far as I know, my

8  understanding was that they were taken off the

9  compliance reports.

10     Q.    I see.  Do you know what the catalyst for that

11 was?

12     A.    No, I don't.

13     Q.    Okay.  Are you aware of any attempts to

14 disguise the transfer of the $350 million besides false

15 compliance reports?

16     A.    Nope.

17     Q.    Had you been -- have you received any

18 subpoenas for a federal grand jury?

19     A.    Nope.

20     Q.    When was the last time you spoke or had any

21 contact with Noah Davis?

22     A.    I didn't even know he had left 777, if that is

23 any kind of indication of that, you know, so it's been

24 few years.

25     Q.    Did you have any bad interactions with him?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

376108 Gorde Karen 03-17-2025          Page 158

1      A.    No.

2      Q.    When he was still employed there?

3      A.    No.

4      Q.    Okay.  And you had no interaction or contact

5   with him after he left the employment of 777 Partners;

6   is that right?

7      A.    No, I haven't had any contact with him.

8          MR. FEUER:  Okay.  I've got no further

9      questions.  Thank you, ma'am.

10          THE WITNESS:  You're welcome.

11                CROSS-EXAMINATION

12          BY MR. BOLAND:

13      Q.    I do have a few if just not very many, Ms.

14   Gorde.

15      A.    Okay.

16      Q.    Nice to see you.  My name is Jim Boland.  I

17   represent the plaintiffs in the case.  I just want to

18   make sure I had some facts clear in my mind.

19      A.    Sure.

20      Q.    Did you testify earlier that Mr. Kosinski left

21   in 12 -- in December of 2020?

22      A.    That's my -- yes.  That's my understanding,

23   yes.

24      Q.    And again -- and then he -- you were contacted

25   again by him in roughly June of 2024 in connection with

**MILESTONE** | **REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  the collateral audit; is that accurate?

2      A.    That is accurate, yes.

3      Q.    Had you had communications or contact with him

4  from the time he left until the time he came back?

5      A.    No.

6      Q.    So it'd been several years before you had

7  experience with him -- since the last time you had spent

8  some time working with him as a colleague; is that

9  accurate?

10          MR. MORLAN:   Object to form.

11          THE WITNESS:   That is accurate, yes.

12          BY MR. BOLAND:

13      Q.    Okay.   You testified --

14          THE REPORTER:   I'm sorry.   Who is that

15      objection from?

16          MR. MORLAN:   Oh, that was from me.

17          THE REPORTER:   Thank you.   Sorry, Mr. Boland.

18          BY MR. BOLAND:

19      Q.    You testified that you had read something

20  about Mr. Davis.   And I don't want to -- I don't want to

21  put words in your mouth, having an issue --

22      A.    Sure.

23      Q.    -- with having possibly been alleged to have

24  breaking -- broken into SuttonPark offices?

25      A.    Correct.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.    Did that surprise you?

 2        A.    It did actually.  I didn't think Noah Davis

 3   would actually do anything like that.

 4        Q.    Yeah.  The only reason I said that is because

 5   you testified earlier that you didn't think Mr. Kosinski

 6   would direct anything to be taken from like SuttonPark

 7   systems as well.  You remember testifying to that?

 8        A.    Yes, I do.  And I don't think he would direct

 9   anybody to take anything from that -- from that office.

10        Q.    And you didn't think Mr. Davis would've broken

11   into SuttonPark's offices either, right?

12        A.    No, I don't.

13        Q.    Okay.  I did not look at your LinkedIn

14   portfolio.  I apologize.  I should have.  You have an

15   accounting degree?

16        A.    Yes, I do.

17        Q.    Yeah.  And a master's.  Are you a CPA?

18        A.    No, I'm not.

19        Q.    Okay.  I think you testified earlier, and I

20   don't want to use the term you used, that there was sort

21   of an overall audit of 777 Partners that was done.  Do

22   you remember using that word?

23        A.    Overall audit?  Yes, I do remember using that.

24        Q.    Do you mean like an audit of the companies by

25   an independent outside accounting firm?
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.    Yes.

2      Q.    And I --

3      A.    Yes.

4      Q.    Do you recall who the independent outside

5 accounting firm was?

6      A.    No, I do not recall.

7      Q.    Did you interact with any of those outside

8 accountants at all during the course of any of their

9 audits from 2021, 2022, and 2023?

10     A.    The only thing, I think it was for 2021, just,

11 you know, them asking, you know, for documentation when

12 they were doing the 2020 audit.  But 2022 and 2023, as

13 far as I know, they hadn't even done any audits.

14     Q.    You know there were no audits being done?

15     A.    As far as I'm -- I was aware of that they told

16 me.

17     Q.    And when you testified a little bit before

18 about the assets that were never purchased, but money

19 was --

20     A.    Correct.

21     Q.    -- promised, I just -- I'm just getting you

22 back to the subject.

23     A.    No, that's fine.

24     Q.    2021, 2022 time period is what we were talking

25 about, right?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    Yes.

2      Q.    And you were aware of these events

3  contemporaneously, were you not?

4      A.    Yes.

5      Q.    To whom, other than internally, did you report

6  those facts?

7      A.    Just internally.

8      Q.    You didn't report them to Leadenhall, did you?

9      A.    No, I did not.

10     Q.    You did not report them to any of the outside

11 auditors, did you?

12     A.    No, I did not.

13     Q.    You didn't report them to any state or federal

14 authority, did you?

15     A.    No, I did not.

16          MR. BOLAND:  Okay.  I have nothing further.

17     Thank you.

18          THE WITNESS:  You're welcome.

19          THE REPORTER:  Okay.

20               REDIRECT EXAMINATION

21          BY MR. MORLAN:

22     Q.    I just have a couple quick follow-ups.

23     A.    Okay.

24     Q.    With respect to the overall audits that we

25 talked about, did you play any role with respect to the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
1   2021 audit?
2        A.   Just by giving documentation that they
3   requested, you know, their -- their standard audit list
4   that -- that I was able to give.  I know Josh Klein was
5   the main contact person and I would funnel everything
6   from -- from him -- to him after he funneled it down
7   from them.
8        Q.   Okay.  So you weren't a direct point of
9   contact in the overall audit for 2021; is that correct?
10       A.   Correct.
11       Q.   Okay.  And did anyone seek any information
12  from you in the context of the 2021 audit regarding any
13  of the double pledging or other irregularities that
14  we've discussed today?
15       A.   No.
16       Q.   Okay.  And I believe you said you were not
17  aware of any overall audit that was conducted as to
18  2022, 2023?
19       A.   Correct.
20       Q.   And I guess you -- okay.  And so it's safe to
21  say that nobody contacted you for purposes of getting
22  information about an audit for the 2022 or 2023 books of
23  SuttonPark or 777; is that correct?
24       A.   That is correct.
25       Q.   And when you did report this information
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  regarding the fraud, did you -- who did -- to whom did

2  you report that information to?

3       A.   Well, I told, you know, Josh Klein, who was

4  the controller at the time, Rich Bellissimo.  I know I

5  -- Fred Love was in -- was told about it.  And I know,

6  you know, my documentation was told to them.  What they

7  did with it, I don't know.

8       Q.   And was that documentation provided to them

9  via e-mail?

10      A.   Some of it, I think, was e-mail and then also

11 some was maybe on Teams.

12      Q.   Okay.  So if we wanted to look for

13 communications regarding those issues that we just

14 talked about, a good place to start then would be the e-

15 mails and Teams messages of Josh Klein, Rich Bellissimo,

16 and Fred Love?

17      A.   I would say yes.

18      Q.   Okay.  And would those e-mails be with you?

19      A.   I -- it -- I would assume they would be.  I

20 don't know if there's any other between other people

21 between them.

22      Q.   Okay.  If you were trying to figure out

23 whether there were other communications by and amongst

24 Josh Klein, Rich Bellissimo, and Fred Love regarding the

25 issues that you reported to them, is there anyone else

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   who you -- whose e-mail you suspect -- who might have

 2   some of those e-mails?

 3       A.   I don't know.

 4       Q.   And when you said earlier that eventually your

 5   understanding was that the -- from a reporting and

 6   compliance standpoint, the $350 million fraud was

 7   ultimately taken off the compliance reports; is that

 8   right?

 9       A.   That's my understanding.

10       Q.   Okay.

11       A.   Yes.

12       Q.   Okay.  And approximately when was that when

13   you say a year later?  Would you say that was around

14   mid-2023 or when was that?

15       A.   I -- I am not exactly sure, to tell you the

16   truth.

17       Q.   Okay.  Do you remember whether there -- any

18   particular salient event or catalyst that may have led

19   to that being rectified?

20       A.   No, I -- I don't know.

21       Q.   Okay.  How did you learn that that was

22   rectified?

23       A.   Only by looking at my matrix and the deals and

24   the compliance reports that I do, the -- the

25   reconciliation.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   Okay.  So if we were to look at the settlement

2  matrices over a period of time and revisions there too,

3  would that give us a pretty good indication as to

4  whether and when those issues were rectified?

5          MR. BOLAND:  Object to the form.

6          THE WITNESS:  Yes, I would say so.

7          BY MR. MORLAN:

8     Q.   Okay.  And who else were those settlement

9  matrices shared with?

10     A.   What do you -- I -- you know, anyone had

11  access to it who -- in the accounting department who had

12  the drive.

13     Q.   And with respect to the -- some of the

14  representations contained in compliance reports that you

15  described about assets that had not yet been purchased,

16  were there specific people who directed you or the

17  accounting department, that it was okay for those assets

18  to remain on the compliance reports?

19          MR. BOLAND:  Object to the form.

20          THE WITNESS:  No one -- no one directed -- no

21      one told me anything on that about the compliance

22      reports.

23          BY MR. MORLAN:

24     Q.   Okay.  Did anyone say anything to you with

25  respect to -- strike that.  Was there anyone that told

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  you that the irregularities that you were noticing or

2  the concerns that you raised were not a problem?

3      A.   No.

4      Q.   And was there anyone else with whom -- or was

5  there anyone with whom you had any spoken or oral

6  communications with about the issues that we're -- we've

7  been discussing with respect to the double pledging and

8  the non-existent assets?

9      A.   No, no one else other than the people that

10  I've mentioned.

11      Q.   Okay.  And that would be the folks in the

12  accounting department that you mentioned?

13      A.   Yes, correct.

14      Q.   Any -- anyone else beyond those accounting

15  folks?

16      A.   Nope.

17      Q.   Okay.  All right, anyone else in management

18  outside the accounting department who approved of these

19  things or directed that they weren't concerns?

20          MR. BOLAND:  Object to the form.

21          THE WITNESS:  Nope.

22          MR. MORLAN:  All right, I have nothing further

23      at this time.

24          THE REPORTER:  All right, this --

25          MR. MORLAN:  Oh, wait, I did have one more



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    question actually.

2        BY MR. MORLAN:

3        Q.    You were asked some questions about your

4    thoughts as to whether or not you expected Mr. Davis --

5    whether you were surprised by some of the allegations

6    against him; is that right?

7        A.    Yes.

8        Q.    Okay.  How much interaction and time did you

9    spend with Mr. Davis compared to the amount of time that

10   you spent with Mr. Kosinski while both you and Mr.

11   Kosinski were at SuttonPark?

12       A.    I had more interactions with Mr. Kosinski than

13   with Mr. Davis, because only -- Mr. Davis was only

14   anything with IT related.  So if I had an IT issue, I

15   only -- I went to him.  The accounting stuff, I would

16   always go to -- you know, obviously deal with Paul

17   Kosinski.

18       Q.    And just relatively speaking, is there any way

19   you could quantify the amount of communication or

20   interaction that you had with Mr. Kosinski compared to

21   the amount of communication, interaction you had with

22   Mr. Davis?

23       A.    I would say I probably spent about -- you

24   know, probably 30 to 40 percent with, you know, Davis,

25   and then, like, more 80, 90 percent with Mr. Kosinski.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay, you mean, like, 30 to 40 percent of the

2    days you were in the office you spoke with them, with

3    Davis?  Or I guess I don't quite understand what you

4    mean by the percentages.

5    A.   Well, I mean, I interacted with Davis, you

6    know, said hello and stuff like that, but mainly I would

7    deal with him when I had an IT issue.

8    Q.   Okay.

9    A.   If an IT issue was -- you know, if you had one

10   every day, maybe it was 10 percent.  You know, 10

11   percent of the day I was in the office, maybe I dealt

12   with him.  I did -- you know, did speak with him, say,

13   hi.  You know, other than that -- but not much after

14   that.  With Mr. Kosinski, I would spend a lot more

15   interaction with him because of the accounting and our

16   roles together.

17   Q.   Okay.  So you're not saying that on average,

18   you spent 10 percent of your day dealing with Mr. Davis,

19   right?

20   A.   Correct.

21   Q.   Okay.  So your interactions with Mr. Davis

22   were episodic and they just dealt with IT problems that

23   you were having; is that right?

24   A.   Correct.

25   Q.   Okay.  And when you say IT problems, do you

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  mean things like your e-mail wasn't working, something

2  like that?

3       A.   Yes.

4       Q.   Okay.  And would these interactions typically

5  take place over e-mail, in person, on the phone?

6       A.   All different, depends.  You know, it was in

7  person when we -- when -- when I was in the office, but

8  when we had COVID it was through e-mails and Teams

9  messages.

10      Q.   And other than what I said in terms of

11 problems with e-mails, do any other particular kinds of

12 IT issues that you had come to mind, like a broken

13 mouse, a problematic monitor, something like that?

14      A.   Nothing that I could think of.  No.

15      Q.   Okay.  And in order to resolve those types of

16 issues, typically the total sort of interaction time

17 that you would spend, whether it was on Teams, or

18 sending e-mails, or on the phone with Mr. Davis, would

19 that typically be under ten minutes total?

20      A.   It would -- I mean, it depends on what the

21 problem was.  If there was a major issue, maybe 30

22 minutes, maybe, you know, ten minutes, it all depends.

23      Q.   Okay.  On average, how many of those types of

24 interactions would you have with Mr. Davis in a given

25 month?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1          MR. BOLAND:  Object to the form.

 2          THE WITNESS:  Oh, then I don't know.  Probably,

 3      if anything, maybe once a month, if that.

 4          BY MR. MORLAN:

 5      Q.    So is it your testimony that you would have IT

 6  issues that required contact with Mr. Davis

 7  approximately once a month or less?

 8      A.    Yes.

 9      Q.    Okay.  And approximately how many times per

10  month would you interact with Mr. Kosinski?

11      A.    Oh, I would be, you know, interacting with

12  him, like, almost on a daily basis, because of the

13  accounting -- the accounting things that we would do.

14      Q.    So would it be safe to say that you know Mr.

15  Kosinski much better than you know Mr. Davis?

16          MR. BOLAND:  Objection to the form.

17          THE WITNESS:  That is correct, yes.

18          BY MR. MORLAN:

19      Q.    Okay.  And would it be safe to say that you're

20  much more familiar based on your observations and

21  interactions of Mr. Kosinski, that you're much more

22  familiar with Mr. Kosinski's character than you are Mr.

23  Davis'?

24          MR. BOLAND:  Object to the form.

25          THE WITNESS:  I would say yes, yes.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1        MR. MORLAN:  Okay.  I have nothing further at

2    this time.

3                  RECROSS-EXAMINATION

4        BY MR. BOLAND:

5        Q.    I just have one quick follow up, if I could.

6  Ms. Gorde, you started in 2019; is that accurate?

7        A.    In my -- I -- it could be -- I think it might

8  have been 2016, I'm not exactly sure on the date.  I

9  would have to go back into my records.

10       Q.    Oh, you -- no, when you started working?

11       A.    When I started --

12       Q.    Yeah.

13       A.    -- working for SuttonPark?

14       Q.    Yeah.

15       A.    It could have been I think maybe -- I thought

16  it was 2019, but I was looking up something and I think

17  it's 2016.

18       Q.    Oh, you think it's 2016?

19       A.    Yes.

20       Q.    Okay, got it.  And in 2020, you were working

21  -- from the time COVID hit, you were working from home?

22       A.    Correct.

23       Q.    So you were not in the office

24  (audio cuts out) --

25       A.    Nope.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.    Okay.   And Mr. Kosinski left in December of

2  that year?

3      A.    Yes.

4      Q.    And Mr. Davis continued on through April

5  of 2024?

6      A.    I don't know when he left, I couldn't tell you

7  that when he left, because I wasn't even informed that

8  he left.

9      Q.    Okay.   But in terms of IT issues and whatnot,

10  you still continued to work with him until the time he

11  left; is that fair?

12      A.    Yes, yes.

13      Q.    That's all I had, thank you.

14      A.    You're welcome.

15          THE REPORTER:  All right, can someone explain

16     read or waive to Ms. Gorde?

17          MR. BOLAND:  Oh, are we allowed to do that?

18          MR. MORLAN:  Sorry, what was the question?

19          THE REPORTER:  It's, can we explain read or

20     waive?  Yeah, because she doesn't have --

21          MR. MORLAN:  Sorry, I still can't hear what you

22     said.

23          THE REPORTER:  Read or waive for Ms. Gorde, can

24     someone elaborate on that for her?

25          MR. BOLAND:  Yeah.  Ms. Gorde, you have the

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1    ability to read your transcript and then sign it and
 2    make any corrections that you think need to be made,
 3    the court reporter can send them to you.  Or you
 4    could waive your right to do that and just stand on
 5    it as it is right now, it's totally up to you.
 6         THE WITNESS:  Okay, so I would give you guys --
 7    let you know if I wanted to read it to make sure it
 8    seems accurate from my words, and then -- or I would
 9    just say, it is what it is.
10         THE REPORTER:  So I can e-mail what's called an
11    errata sheet to you, you can't change anything, but
12    you can make notes --
13         THE WITNESS:  Okay.
14         THE REPORTER:  -- like for example, your 2019
15    start date versus your 2016 start date.  You can
16    make a note of it, but you can't actually change it
17    per se.
18         THE WITNESS:  Got you.
19         THE REPORTER:  So if you --
20         THE WITNESS:  So could -- I would like you to
21    send that to me, please.
22         THE REPORTER:  What's your e-mail address?
23         THE WITNESS:  T as in Tom, A as in apple, Z as
24    in zebra, F as in Frank, E as in Edward, R as in
25    Robert, at MSN.com.
```


**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

```
 1          THE REPORTER:  Okay, thank you.  And any orders
 2     today, gentlemen?
 3          MR. DONOVAN:  Orders of the transcript you
 4     asked?
 5          THE REPORTER:  Yes.
 6          MR. DONOVAN:  Yeah.  Could we get the rough
 7     whenever you've got it available, and maybe an
 8     expedited --
 9          THE REPORTER:  How soon?
10          MR. DONOVAN:  -- final, if you can.
11          THE REPORTER:  What's the date that you need it
12     in your hands by?
13          MR. DONOVAN:  It's kind of just as soon as you
14     can, like, can you do the rough maybe today or
15     tomorrow? And then the final in, like, three days?
16     I don't know. What is reasonable for you?
17          THE REPORTER:  Yeah.  I mean, we can do same
18     day.  Of course, there are fees that apply to any
19     kind of rush day, our standard is seven business
20     day.  But I can definitely have production reach out
21     to you to let you know exactly how much --
22          MR. DONOVAN:  Okay, that'd be good.
23          THE REPORTER:  Okay.
24          MR. DONOVAN:  Thank you.
25          MR. BOLAND:  We will definitely take the rough,
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
1    and I'll have somebody get in touch with you about

2    the order, that's above my pay grade.

3          THE REPORTER:  Okay, understood.  And Mr.

4    Morlan?

5          MR. MORLAN:  I'll follow up with you if we need

6    it, I got to run to another deposition we have

7    scheduled for right now.

8          THE REPORTER:  All right, one moment.  The time

9    now is 2:11 p.m., Eastern, and this concludes the

10   deposition of Karen --

11          (Deposition concluded at 2:11 p.m. ET)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1                         CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF ORANGE

 5

 6        I, the undersigned, certify that the witness in the

 7   foregoing transcript personally appeared before me and

 8   was duly sworn.

 9

10   Identification:  Produced Identification

11

12

13

14

15        _____

16             KATE MCFARLAND

17             Court Reporter, Notary Public

18             State of Florida

19             Commission Expires: 02/06/2028

20             Commission Number:  HH 489646

21

22

23

24

25
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1                C E R T I F I C A T E

 2

 3  STATE OF FLORIDA)

 4  COUNTY OF ORANGE)

 5

 6       I, KATE MCFARLAND, Court Reporter and Notary Public

 7  for the State of Florida at Large, do hereby certify

 8  that I was authorized to and did report the foregoing

 9  proceeding, and that said transcript is a true record of

10  the said proceeding.

11

12       I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: March 19, 2025.

18

19

20

21

22

23            KATE MCFARLAND

24            Court Reporter, Notary Public

25
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1                        ERRATA

 2

 3  PAGE     LINE                CHANGE     REASON

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16  I have read the entire transcript of my deposition taken

17  in the captioned matter or the same has been read to

18  me.I request that the following changes be entered upon

19  the record for the reasons indicated. I have signed my

20  name to the Errata Sheet and authorize you to attach the

21  changes to the original transcript.

22

23

24  _____     _____

25  Date                         NAME
```



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

**March 19, 2025**

**Karen Gorde**
tasfer@msn.com

RE:     Deposition of **Karen Gorde** taken on 3/17/2025
         **777 Partners LLC et al v Leadenhall Capital Partners LLP et al**

Dear Ms. Gorde,

**IMPORTANT NOTICE FOR DEPOSITION TRANSCRIPT READ AND SIGN**

It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*.

\_\_\_     **Attorney - Copy of Transcript Enclosed:**  Signature of the Deponent is required.  Please have the deponent make any corrections/changes necessary on the Errata Sheet ONLY, sign name on the form where indicated.  Please return ONLY the original signed Errata Sheet to our offices within 30 days from the date of this memorandum.  If you have any questions, please call our offices.

\_\_\_     **Attorney - No Copy Ordered:**  Since you did not request a copy of the transcript, it will be necessary for the Deponent to call our offices to arrange for an appointment to read and sign the transcript of the Deposition within 30 days of this memorandum.

\_x\_     **Deponent:**  At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, attached please find a copy of the transcript and Errata Sheet.  Please read the transcript, make any corrections necessary on the Errata Sheet ONLY, sign the bottom of the Errata Sheet, and return it within 30 days from the date of this memorandum.  Please call our offices if you have any questions.

\_\_\_     **Deponent:**  At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, it is necessary for you to come to our offices to read and sign same.  Please call Milestone Reporting Company to arrange for an appointment at your earliest convenience.

\_\_\_     The attached executed copies of the Errata Sheet(s) are sent to you for your files.  If you have any questions, please call our offices.

Thank you for your attention to this matter.

No. 376108

cc: Harold Morlan, Esquire
James Boland, Esquire
Brian Donovan, Esquire
Leonard Feuer, Esquire

Waiver:
I, Karen Gorde, hereby waive the reading and signing of my deposition transcript.

_____          \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_
Deponent Signature                                                     Date

*Federal Civil Procedure Rule 30 (e) / Florida Civil Procedure Role 1.310 (e)

400 North Ashley Drive, Suite 2600
**TAMPA, FL 33602**

315 East Robinson Street , Suite 510
**ORLANDO, FL 32801**
CORPORATE
WWW.MILESTONEREPORTINGCOMPANY.COM

4651 Salisbury Road, 4th Floor
JACKSONVILLE, FL 32256