

King & Spalding LLP
1290 Avenue of the Americas
New York, NY 10104
Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

**Leigh M. Nathanson**
Direct Dial: +1 212 790 5359
lnathanson@kslaw.com

November 20, 2025

**VIA ECF**

Hon. Barbara Moses
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *Leadenhall Capital Partners LLP et al v. Wander et al*, 24-cv-03453-JGK

Dear Judge Moses,

This status report is submitted jointly by counsel for Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall") and counsel for Advantage Capital Holdings LLC ("A-CAP") in order to update the Court on recent developments bearing on the parties' dispute as to whether Jill Gettman, in her capacity as a businessperson, is a proper document custodian for A-CAP, as raised in prior letter briefs to the Court. ECF Nos. 334, 336-340.

## I.      Leadenhall's Position

This case turns on A-CAP's control of 777 and its knowledge of and participation in 777's efforts to perpetuate and conceal a massive years-long fraud on Leadenhall. Gettman was (and is) one of the central decisionmakers on A-CAP's relationship with 777 and is likely to possess unique information about A-CAP's involvement in and knowledge of 777's financial operations, including its dealings with creditors like Leadenhall. Since Leadenhall sought to compel A-CAP to search and produce Gettman's documents, additional discovery has come to light confirming Gettman's critical role.

In response to Leadenhall's third-party subpoena, 777's former Head of Insurance, Jorge Beruff, produced a text exchange with Damien Alfalla, 777's former Chief Financial Officer, discussing the need for 777 to pay A-CAP $33 million in December 2020—with Alfalla implying that 777 is obtaining the money through illegal means:

- Alfalla: "Paying A-CAP $33 million. Ttyl"
- Beruff: "ha where is the $33m coming from?"
- Alfalla: "I won't even say to protect the innocent. Just save some bail money for me."

- Beruff: "yikes"
- Alfalla: "Yup.  It sucks.  Hopefully cured next week but still the wrong thing to do."
- Beruff: "geez man, be careful"

*See* Ex. A, JAJB000610 at 2-3.  Alfalla's reference to "curing" the issue echoes contractual language, suggesting that 777 took money from another contractual counterparty to pay A-CAP.

In a June 2021 text exchange between Beruff and A-CAP Chief Operating Officer Mike Saliba, the pair discussed weekly operational calls between "777 AM," which is 777 Partners' asset management affiliate, and A-CAP, highlighting Gettman's critical role in the relationship:

- Saliba: "Let's invite Jill to that call."
- Saliba: **"Really comes down to her.  You can develop the most elegant plan and if she's not on board then it's moot."**
- Beruff: "yes"
- Beruff: "Didn't realize how influential she was in all of this."
- Beruff: "let's definitely get on the next 777 AM / ACAP ops call and we can address up front"
- […]
- Saliba: **"Most important person at A-CAP"**
- Beruff: "the salibas and kings are just playing for 2nd"
- Saliba: "Truth"
- […]

Ex. B, JAJB000911 at 4-6 (emphases added).

This third-party discovery confirms (1) A-CAP's longtime involvement in, and direct benefits from, 777's misconduct and (2) Gettman's personal oversight and approval—or veto—of aspects of 777's business operations.

In an effort to narrow this dispute before the upcoming conference, Leadenhall shared these documents with A-CAP and proposed that A-CAP could limit its initial review and production of Gettman's documents to (1) external communications between Gettman and any 777 personnel that will not be produced by any other A-CAP custodian and (2) any of Gettman's custodial documents referencing Leadenhall or "LCP" that will not be produced by any other A-CAP custodian.  This narrow proposal reasonably targeted documents that are centrally relevant to the case (*i.e.*, communications evidencing the extent of A-CAP's control over 777 or communications directly referencing Leadenhall) and are unlikely to be privileged because they would be mostly external communications.  This proposal would also yield unique documents; for example, documents that only Ms. Gettman has by virtue of her role as a director of certain A-CAP affiliates created to exercise remedies or control of 777 entities and assets, including at the expense of 777's creditors.  ECF 187 ¶ 302.

A-CAP initially rejected this proposal, instead asking Leadenhall to withdraw its request for Gettman's custodial documents until A-CAP completed its review of other custodians' documents, which will ostensibly contain communications with Gettman.  Ex. C (11/13/25 email

from P. Guberman to L. Nathanson). Then, this week, counsel for A-CAP asserted that Gettman possesses no documents responsive to the criteria in Leadenhall's compromise proposal. *Id.* (11/17/25 email from P. Guberman to L. Nathanson). Contrary to A-CAP's prior counsel's representation that A-CAP had collected documents from only three custodians (Kenneth King, Michael Saliba, and Carson McGuffin, A-CAP's new counsel represented for the first time on Tuesday that A-CAP has collected Microsoft 365 files (including email and Teams chats) for all A-CAP employees, including Gettman.[1] A-CAP's new counsel further advised that it determined Gettman had no documents responsive to Leadenhall's compromise proposal by having A-CAP's discovery vendor run searches over Gettman's Microsoft 365 file for (1) "custodial emails or Teams chats responsive to any agreed-to search term WITH any 777 domain email address . . . AND NOT any agreed-to A-CAP custodian" and (2) "custodial emails or Teams chats responsive to the 'Leadenhall' or 'LCP' search terms AND NOT any agreed-to A-CAP custodian." *Id.* (11/18/25 email from P. Guberman to L. Nathanson). These searches were apparently run using raw data—without any processing or indexing of Gettman's Microsoft 365 files—which casts serious doubt on their reliability.

The fact that A-CAP has already collected and run searches over Gettman's files obviates the need for Leadenhall's compromise proposal, which was designed to minimize the burden of collection.[2] There is no question that Gettman is a relevant custodian. Now that her files have been collected, the burden of reviewing the hits on a set of agreed-upon search terms will be incremental; to the extent there is significant overlap between her documents and the documents of other agreed-upon custodians (as A-CAP's counsel represents there is), those documents will need to be reviewed (including for privilege) in any event. Nor has A-CAP made any showing of undue burden. *See* ECF 386, Nov. 4 Hr'g Tr. at 55:4-16 (noting that with respect to any future "burden" argument, the Court "will expect a more granular presentation as to what that burden is and why you think it would cost this many dollars or take this many people [and] that many hours"). In its position statement below, A-CAP emphasizes that "[m]ore than 90,000 documents already in the review pool hit on Ms. Gettman's name." But those documents must be reviewed anyway. *See infra* ("[T]he privilege burden is real . . . and [is] *already being shouldered* through agreed custodians.") (emphasis added). In other words, A-CAP has not shown that it would incur any *incremental* burden in searching Gettman's files separately to identify responsive documents (including internal communications) that she may have. And even if such a burden exists, it is justified by her important role in the conduct alleged in this action.

Leadenhall therefore reaffirms its request that the Court direct A-CAP to produce Gettman's non-privileged, responsive documents, including Microsoft 365 files and text or instant messages.

---

[1] A-CAP had also refused to answer Leadenhall's interrogatories seeking information about how and where A-CAP stored and preserved responsive documents and whether any such documents have been deleted by some or all custodians. A-CAP's counsel recently represented that they would be amending their interrogatory responses.

[2] A-CAP argues below that the absence of documents in Gettman's Microsoft 365 file meeting the narrow criteria of Leadenhall's compromise proposal means that Gettman has *no* unique communications with "central relevance to the case." That argument is based on the incorrect premise that the two narrow categories of communications identified by Leadenhall represent the extent of Gettman's relevance, which is plainly not the case.

## II.    A-CAP's Position.

Following the adjournment of the initial Conference, A-CAP has sought to reach a compromise with Leadenhall regarding Ms. Gettman's documents. Although Leadenhall originally signaled a willingness to compromise, it has repeatedly moved the goal posts, making it impossible for the parties to come to a resolution on Ms. Gettman's documents. Leadenhall's original request was extremely broad, extending beyond Ms. Gettman's time as in-house counsel and reaching back to her role originally as outside counsel to A-CAP (*i.e.*, the same role that King & Spalding LLP now holds with Leadenhall), and seeking the application of more than 1,000 different search terms (considering all of the disjunctive components in Leadenhall's requested "~100 search terms").

As part of the meet-and-confer communications between the parties, counsel for Leadenhall provided two documents for A-CAP's review, which it represented would show that Ms. Gettman acted in a non-legal role; they did not. Indeed, both documents that Leadenhall has relied upon (attached hereto as Exhibits A and B) predate Ms. Gettman's position as Chief Legal Officer (which began in September 2021) and refer entirely to her legal role as outside counsel to A-CAP. *See, e.g.*, Ex. B, JAJB000911 (distinguishing between, on the one hand, the "business side" in a proposed transaction and, on the other hand, "legal" and "Jill"). Leadenhall has never identified a single document showing that Ms. Gettman performed any unique non-legal business function.

The focus has always been on the burden of the *review* of Ms. Gettman's documents, not the collection itself. A review of in-house counsel's communications requires attorney-level review, privilege calls, and logging (that necessarily includes forced disclosure of privileged timing patterns of when legal advice was sought and internal legal workflows), all with waiver risk. This is not merely an inconvenience but the type of prejudice that Rule 26(b)(1) specifically exists to prevent. Nor is the burden hypothetical. More than 90,000 documents already in the review pool hit on Ms. Gettman's name, confirming that the privilege-review burden is real, significant, and already being shouldered through agreed custodians.

Recognizing this breadth and burden, Leadenhall offered to narrow the scope of its request, seeking only documents with "central relevance to the case (i.e., communications evidencing the extent of A-CAP's control over 777 or communications directly referencing Leadenhall)," acknowledging that those were "unlikely to be privileged because they [would] be mostly external communications." Ex. C (11/14/25 email from L. Nathanson to P. Guberman). Leadenhall hence asked A-CAP to review (1) "external communications between Ms. Gettman and any 777 personnel that will not be produced by any other A-CAP custodian" and (2) "any of Ms. Gettman's custodial documents referencing Leadenhall or 'LCP' that will not be produced by any other A-CAP custodian." *See id*. A-CAP objected to the basis of this purported compromise. *First*, any of Ms. Gettman's external communications with 777 personnel would be produced by 777 without necessitating a privilege review, rendering A-CAP's review of her custodial documents superfluous. *Second*, Ms. Gettman's role in the relationship between A-CAP and Leadenhall was exclusively legal, and Leadenhall does not suggest otherwise; her role as to the relationship between A-CAP and 777 was similarly exclusively legal – that was her role as Chief Legal Officer. Leadenhall cannot recast attorney communications as "business" communications simply by asserting that they must be so.

Without waiver of its objections, however, A-CAP tested this compromise by conducting these two searches within Ms. Gettman's Office 365 file, which includes her A-CAP custodial emails and Teams chats for the duration of her employment as Chief Legal Officer at A-CAP, which was collected as part of A-CAP's document preservation efforts but never processed or elevated to a review platform.[3]

Each search took one to two hours to run and was executed using terms and search parameters suggested by Leadenhall:

1. Ms. Gettman's A-CAP custodial emails or Teams chats responsive to any agreed-to search term WITH any 777 domain email address (@777part.com, @777.com, @777assetmngt.com, @777partners.com, or @777) AND NOT any agreed-to A-CAP custodian; and

2. Ms. Gettman's A-CAP custodial emails or Teams chats responsive to the "Leadenhall" or "LCP" search terms AND NOT any agreed-to A-CAP custodian AND NOT @kslaw.com AND NOT @cwt.com

A-CAP already informed Leadenhall that more than 90,000 documents in the current review pool (documents being reviewed from agreed-to A-CAP custodians) include Ms. Gettman. Hence, the goal was to understand what documents that Leadenhall represented are of "central relevance to the case" – using Leadenhall's own view – were not already part of our search pool. We were able to confirm that **no such unique documents exist**. This is precisely the scenario Leadenhall's "narrow" proposal was meant to test, and it yielded zero unique documents and no incremental relevance exactly as A-CAP predicted.

In A-CAP's view, these results have rendered the issue as to Ms. Gettman's email review no longer ripe. Using Leadenhall's own language, Ms. Gettman does not have any unique emails or chats that have "central relevance to the case." Instead of conceding that A-CAP did what was asked of it, Leadenhall backtracked. Leadenhall first attempted to reach into Ms. Gettman's text messages (inquiring about a review that no party, including Leadenhall, has undertaken for any custodian at this juncture). It has now pivoted to argue, with no support, that the burden associated with reviewing Ms. Gettman's files is somehow obviated because her files have been collected. That position disregards the actual source of burden (*i.e.*, attorney review, privilege determinations, and logging) and ignores that Leadenhall itself acknowledged this when it offered the compromise. Further, Leadenhall entirely misconstrues and misses the point of A-CAP's position, which is that the burden of *reviewing* (not collecting) Ms. Gettman's files, given her status as Chief Legal Officer and outside counsel to A-CAP, is undue at this stage of litigation. A-CAP acted in good faith in responding to Leadenhall's compromise proposal. Rather than act similarly, Leadenhall reneged on its position.

At bottom, A-CAP is currently reviewing hundreds of thousands of documents pursuant to agreed-upon search parameters and custodians, including more than 90,000 that include Ms. Gettman. Every non-privileged, responsive document that includes Ms. Gettman will be produced from that pool. Nothing is being withheld. Leadenhall will have the opportunity to review these

---

[3] Leadenhall raises questions about the reliability of these searches for this first time in this letter. The searches were conducted by Leadenhall's outside IT vendor using Microsoft Office 365's Purview eDiscovery search feature, a secure and reliable method for which A-CAP can provide additional details via expert affidavit at the Court's request.

documents, and, if it believes necessary, can move in the future to compel a full review of Ms. Gettman's custodial files. Without waiver of either party's future rights, the Court should moot this issue at this time.

Respectfully submitted,

*/s/ Leigh M. Nathanson*
Leigh M. Nathanson

cc: All counsel of record (via ECF)