UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>　　　　　　Plaintiffs,<br><br>　　-against-<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>　　　　　　Defendants. | Case No. 1:24-cv-03453-JGK<br><br>**ORAL ARGUMENT REQUESTED** |

**ADVANTAGE CAPITAL HOLDINGS LLC AND KENNETH KING'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE, FOR CONTEMPT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY .......................................... 3

      A.    A-CAP Holds a Perfected, First-Priority Security Interests in All HoldCo
            Assets. ............................................................................................................. 3

      B.    Leadenhall's 2021 Facility Left It Structurally Inferior and Unsecured as
            to the HoldCos. ............................................................................................... 3

      C.    After Receiving a Tip About Potential Criminal Conduct, Leadenhall
            Continues Business as Usual. .......................................................................... 4

      D.    The April 2023 Call with Wander Reveals Leadenhall Was Seeking to
            Reach A-CAP's Collateral, Not Investigating Fraud. ..................................... 5

      E.    After the April Call, Leadenhall Turns to A-CAP to Improve Its Position. ............ 6

      F.    Leadenhall Turns to Litigation and Alleges "Fraud" Only After Its
            Business Strategy Fails. ................................................................................ 10

      G.    Leadenhall Eliminates the Very Collateral Whose Preservation Justified
            Injunctive Relief ............................................................................................ 11

III.  LEGAL STANDARD .............................................................................................. 13

IV.   THE PRELIMINARY INJUNCTION MUST BE DISSOLVED. ................................... 14

      A.    Leadenhall Eliminated the Factual Predicate for the Preliminary
            Injunction. ..................................................................................................... 14

      B.    With the Collateral Gone, a Legal Bar Now Controls ......................................... 15

      C.    With Leadenhall's Collateral Gone, Irreparable Harm Is Legally
            Impossible. .................................................................................................... 17

      D.    The Balance of Hardships Overwhelmingly Favors Dissolution. ........................ 18

V.    IN THE ALTERNATIVE, LEADENHALL SHOULD BE HELD IN CONTEMPT
      FOR ITS SHADOWY FORECLOSURE ON THE COLLATERAL AT ISSUE IN
      THIS ACTION. ..................................................................................................... 20

      A.    The Preliminary Injunction Is Clear and Unambiguous as to the Collateral. ....... 20

      B.    Leadenhall Transferred the Collateral in Violation of the Preliminary
            Injunction. ..................................................................................................... 21

      C.     Leadenhall Did Not Attempt to Comply in a Reasonable Manner. ...................... 22

VI.    CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
  2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002) ......................................................... 19

*Allstate Ins. Co. v. Harvey Fam. Chiropractic*,
  677 F. App'x 716 (2d Cir. Jan. 27, 2017).............................................................. 16

*Am. Optical Co. v. Rayex Corp.*,
  291 F. Supp. 502 (1967)......................................................................................... 13

*Baliga v. Link Motion Inc.*,
  2022 WL 2531535 (S.D.N.Y. Mar. 9, 2022) ............................................... 13, 14, 16

*Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*,
  2014 WL 4054240 (S.D.N.Y. Aug. 15, 2014)....................................................... 17

*Bilalov v. Gref*,
  2022 WL 19560947 (S.D.N.Y. Mar. 18, 2022) ..................................................... 17

*Cent. Budget Corp. v. Garrett*,
  48 A.D.2d 825 (2d Dep't 1975) ............................................................................ 22

*DLJ Mortg. Cap., Inc. v. Kontogiannis*,
  594 F. Supp. 2d 308 (E.D.N.Y. 2009) ............................................................. 15, 16

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999).............................................................................................. 15

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
  427 F. Supp. 2d 491 (S.D.N.Y. 2006) ................................................................... 13

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
  295 F. Supp. 2d 366 (S.D.N.Y. 2003) ................................................................... 15

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
  917 F.2d 75 (2d Cir. 1990) ................................................................................... 17

*Levy v. Young Adult Inst., Inc.*,
  2015 WL 170442 (S.D.N.Y. Jan. 13, 2015) .......................................................... 17

*Life Ins. Fund Elite LLC v. Hamburg Com. Bank AG*,
  545 F. Supp. 3d 86 (S.D.N.Y. 2021) ..................................................................... 21

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
  75 F. Supp. 3d 592 (S.D.N.Y. 2014) ............................................................... 18

*Museum Boutique Intercontinental, Ltd. v. Picasso*,
  880 F. Supp. 153 (S.D.N.Y. 1995) ................................................................. 13

*Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*,
  2006 WL 2337186 (S.D.N.Y. Aug. 11, 2006) ................................................ 15

*Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*,
  289 F. Supp. 2d 373 (S.D.N.Y. 2003) ........................................................... 19

*NML Cap., Ltd. v. Republic of Argentina*,
  2016 WL 836773 (S.D.N.Y. Mar. 2, 2016) ..................................................... 12

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004) ........................................................................... 19

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  732 F.2d 253 (2d Cir. 1984) ........................................................................... 13

*Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*,
  149 F. Supp. 3d 376 (E.D.N.Y. 2016) ................................................. 17, 18, 19

**Other Authorities**

U.C.C. § 9-610(b) ................................................................................................. 21

Defendants Advantage Capital Holdings LLC ("A-CAP") and Kenneth King, by and through their attorneys, submit this memorandum of law in support of their Motion to Dissolve the Preliminary Injunction, or, in the Alternative, for Contempt Against Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (collectively, "Leadenhall").

## I.    PRELIMINARY STATEMENT

A party cannot wield a preliminary injunction as a shield to disrupt the rights of other creditors while simultaneously disregarding that injunction to seize collateral that the order was meant to preserve. Yet that is precisely what Leadenhall has done.

Having convinced the Court in June 2024 that extraordinary equitable relief was needed to safeguard its collateral, Leadenhall then quietly ran a closed UCC sale in May 2025—unadvertised, held at counsel's office, and yielding a nominal three-dollar credit bid for assets it had previously valued in the hundreds of millions. With that sale, Leadenhall *admitted* it "exhaust[ed] its contractual remedies as to [the] collateral," thus extinguishing the factual predicate for the injunction. (*See* ECF 361 at 3.) The injunction now functions not as an asset-preservation tool but as a weapon Leadenhall deploys against A-CAP, an undisputed senior secured creditor whose collateral does not overlap with Leadenhall's. The law does not tolerate this asymmetric use of equitable relief.

The facts leading up to the filing of this lawsuit underscore why the injunction should no longer stand. For over a year before seeking injunctive relief, Leadenhall repeatedly communicated to A-CAP that its collateral deficits were related to valuations issues tied to interest rates. Leadenhall never mentioned the possibility that its collateral deficits were the result of fraud by 777. But Leadenhall knew differently. In fact, in recorded phone calls with Joshua Wander ("Wander") in March and April 2023, Wander revealed to Leadenhall that 777 Partners LLC ("777

1

Partners") had double pledged Leadenhall's collateral. That admission confirmed a Credigy report Leadenhall also received in March that uncovered double pledging. None of this came as a complete surprise to Leadenhall because, in September 2022, Leadenhall received an anonymous tip that 777 Partners was engaged in fraud. Keeping all that to itself, Leadenhall contacted A-CAP seeking junior-lien enhancements on A-CAP's collateral, and urged A-CAP to inject fresh capital into 777 Partners from its own loan facility. Leadenhall eventually mentioned the possibility of double-pledging in November 2023, but at no point in its discussions with A-CAP did Leadenhall ever disclose the anonymous tip it received in 2022, Credigy's report of double-pledging, or the admissions of Wander.

Only after business negotiations with A-CAP failed did Leadenhall pivot to its current fraud theory against A-CAP and King. Against this backdrop of tortious concealment, the Preliminary Injunction should be dissolved for three reasons: *First*, the sole equitable predicate for the injunction—the need to preserve collateral—no longer exists. *Second*, once Leadenhall foreclosed on the remaining collateral, it became an unsecured creditor, and unsecured creditors may not obtain or maintain asset restraints to secure potential money judgments. *Third*, were the Court to reach the equitable factors, Leadenhall cannot demonstrate irreparable harm, and the balance of hardships strongly favors dissolution.

In the alternative, if the Court does not dissolve the Preliminary Injunction, it should hold Leadenhall in civil contempt. The order unambiguously prohibits any disposition of the pledged collateral and Leadenhall's private UCC sale of the assets to itself for a nominal amount is clear and convincing evidence of noncompliance. Ultimately, Leadenhall made no reasonable effort to comply with the very injunction it invoked against A-CAP.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    A-CAP Holds a Perfected, First-Priority Security Interests in All HoldCo Assets.

A-CAP, through affiliates including Haymarket Insurance Company ("Haymarket"), holds a perfected, "first-priority" security interest in substantially all the assets of the 777 Partners and 600 Partners LLC ("600 Partners") (collectively, "HoldCos"). (*See* ECF 187 ("Corrected Amended Complaint" or "Compl.") ¶¶ 13–14, 134, 211.) Under the HoldCo Loan Agreement, Haymarket loaned hundreds of millions of dollars to HoldCos *and* perfected its security interests. (Compl. ¶ 180; *see also* ECF 141-1, 141-2, 141-3 (UCC filing statements).)

### B.    Leadenhall's 2021 Facility Left It Structurally Inferior and Unsecured as to the HoldCos.

In May 2021, SPLCSS II LLC ("Sutton Park"), Signal SML 4 LLC ("Signal"), Insurety Agency Services LLC ("Insurety"), and Dorchester Receivable II LLC's ("Dorchester") (collectively, "Borrowers") "entered into a new credit facility with Leadenhall," memorialized in a Loan and Security Agreement ("Leadenhall LSA"). (Compl. ¶¶ 4, 49.) Borrowers are four special-purpose entities that purchased and owned structured-settlement receivables. (*Id.* ¶¶ 49–50.) Under the Leadenhall LSA, Leadenhall's only security interest was in the equity and assets of the Borrowers, which mainly comprise receivables—cash flows from structured settlements and lottery winnings. (*See id.* ¶¶ 46, 56.)

Separately, Leadenhall obtained a guaranty from the HoldCos for the benefit of Borrowers ("Leadenhall Unsecured Guaranty"). (*Id.* ¶¶ 51, 84.) However, the HoldCos did not pledge any assets to support it (and Leadenhall has never alleged otherwise). (ECF 58-2 (Guaranty Agreement, dated May 7, 2021); *cf.* Compl. ¶ 87 (alleging, with no reference to assets, a generic "equitable interest" predicated solely on the Leadenhall LSA).) As a result, Leadenhall's overall credit position, particularly as to the Holdcos, was structurally subordinated to A-CAP's perfected, first-

priority liens under the HoldCo Loan Agreement. (*See infra* Section II.E (describing Leadenhall's awareness of its subordinated loan).)

### C.    After Receiving a Tip About Potential Criminal Conduct, Leadenhall Continues Business as Usual.

By August 2022, material weaknesses in Leadenhall's lending structure were already emerging. On August 8, 2022, Leadenhall warned that the Sutton Park and Dorchester were out of compliance with their hedging obligations, that delinquent receivables remained unresolved despite multiple prior requests, and that the increased advance rates and expanded facility capacity Leadenhall had authorized in early 2022 were expiring without a plan to revert to contractual levels. (Decl. of Phara Guberman ("Guberman Decl.") ¶ 3, Ex. A.) Leadenhall's Head of Portfolio Management, Craig Gillespie ("Gillespie"), emphasized that Leadenhall ███████████ ████████████████████ without response and that continued non-compliance would require Leadenhall to "████████████████████████████████████████████████████" (*Id.*)

On September 19, 2022, Gillespie received an anonymous tip revealing that Mr. Wander had already allegedly consummated "criminal activity" involving the reported Borrowing Base of Sutton Park: "*The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender . . . . What he is doing is criminal.*" (Compl. ¶ 105 (emphasis added); ECF 187-01 (copy of the anonymous tip).) Regardless, Leadenhall continued to rely on Compliance Reports it received through at least January 2023. (Compl. ¶ 118.)

Leadenhall also continued to pursue new financing opportunities and investment opportunities with 777 Partners, 600 Partners, and their affiliates (collectively, "777"). For example, on September 27, eight days after receiving the anonymous tip, Leadenhall's Director,



Clarence Er, ███████████████████████████████████

████████████████████████████████ (Guberman Decl. ¶ 4, Ex. B.) His request

referenced ████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ (*See id.*)

Between October 4 and 7, Sutton Park delivered a ████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████—inconsistencies that would have caused any reasonable lender to stop any

work that would increase risk and inject new capital until resolved. (Guberman Decl. ¶ 5, Ex. C.)

Nevertheless, Leadenhall approved the ████████████████████████

█████████████████████████████████████████. (*Id.*)

That same week, Leadenhall further explored an investment in the ████████████

████████ with 777, █████████████████████████████████

████████████████████ (Guberman Decl. ¶ 6, Ex. D.) Leadenhall ultimately

consummated ████████████████████████████████████████

███████████████████ (*Id.*)

### D.    The April 2023 Call with Wander Reveals Leadenhall Was Seeking to Reach A-CAP's Collateral, Not Investigating Fraud.

In March 2023, Leadenhall allegedly received a second tip from another lender, Credigy,

demonstrating that approximately $185 million in receivables were allocated to another lender,

Credigy—not A-CAP. (Compl. ¶¶ 119–20.) In a call that same month, Leadenhall claims Mr.

Wander told them that any deficit in Leadenhall's collateral could be cured through "replacement

deals," including cash generated from selling minority equity interests in 777 Partners' football assets. (*See id.* ¶¶ 124–25.)

In April 2023, senior executives and board members of Leadenhall conducted a second recorded call with Wander. (*Id.* ¶¶ 131–34.) During that call, Wander acknowledged that "some of the collateral may have ended up actually getting funded," and that in some cases, one of the Borrowers "bought a subset of the collateral and didn't intend to buy the rest of it." (Guberman Decl. ¶ 7, Ex. E at 27:34–58) ("Wander Tr").) He also explained that A-CAP held a perfected, senior all-asset lien at the HoldCos level. (Compl. ¶ 134; Wander Tr. at 20:39–21:20, 29:53–30:06.) Leadenhall Chairman, John Wells, immediately sought to leverage A-CAP's collateral to improve Leadenhall's own position, asking: "████████████████████████████████████████" (Wander Tr. at 30:08–11.) When Wander explained that any such action would depend on A-CAP's rights, Wells pressed further, asking for the A-CAP facility's covenants and terms so that Leadenhall could make its "████████████████████████████████████████" (Wander Tr. at 40:30–38.)

Wells also suggested that 777 use A-CAP's facility to repay Leadenhall, noting ████████ ████████████████████████████████████████████████████████████████████████████████ (Wander Tr. at 35:22–35:24.) When Wander attempted to re-focus on repaying the facility, Wells further explained his strategy: "████████████████████████████████████████" (Wander Tr. at 43:14–18.)

### E.    After the April Call, Leadenhall Turns to A-CAP to Improve Its Position.

Following the April 3, 2023 call with Wander, Leadenhall immediately turned to A-CAP to mitigate the losses it understood it was facing. (*Cf.* Compl. ¶ 198 (alleging A-CAP "began to rear its head" in spring 2023).)

On June 16, 2023, 777's in-house counsel suggested to Gillespie that "because of the way the various pieces of the ACAP loan are structured, the simplest way to [] accomplish the ask is for 777 to grant Leadenhall a 'springing lien' on all assets of 777 that takes effect once all ACAP obligations are retired." (Decl. of Michael Saliba ("Saliba Decl.") ¶ 2, Ex. A; *cf.* Compl. ¶ 211.) Gillespie responded within minutes that Leadenhall was "aware of many other parental guarantees that exist and a key objective here is to put the Leadenhall claim ahead of those." (Saliba Decl. ¶ 2, Ex. A.)

Days later, Leadenhall again acknowledged A-CAP's senior secured position on separate collateral when it asked A-CAP to convene meetings to discuss "2nd/3rd lien and intercreditor documents," noting that Leadenhall was under investor pressure to finalize an agreement before June 30. (*Id*. ¶ 3, Ex. B.) A-CAP cooperated, confirmed it was "willing to consider the 4th lien," and authorized Leadenhall to review its loan agreements. (*Id*. ¶ 4, Ex. C.)

That cooperation continued through the fall. By September 2023, Leadenhall was reaching out to A-CAP to discuss 777's liquidity needs and writing that ███████████████████ █████████████████████████████████████████ (*Id*. ¶ 5, Ex. D.)

The negotiations then shifted. In October 2023, for reasons A-CAP did not then understand, Leadenhall's demands changed. Apparently facing significant pressure from its own investors due to substantial losses in its other structured settlement exposures, Leadenhall ███████████ █████████████████████████████████████████████████████████████████[1]

---

[1] On November 30, 2022, Reverse Mortgage Investment Trust Inc. and Reverse Mortgage Funding LLC filed for bankruptcy protection. *See* Case No. 22-11225-MFW (Bankr. D. Del.). There, **Leadenhall filed proofs of claim exceeding $230 million** on a purportedly secured credit facility where the debtors reported very limited remaining assets and virtually no liquidity. *See* ECF Nos. 456, 1021. On August 30, 2023, Hi.Q, Inc. likewise filed for bankruptcy after a failed runoff transaction in which Leadenhall, which is described as the financing party behind a receivables

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████. (Saliba Decl. ¶ 6, Ex. E.) ████████████████

███████████████████████████████████████

████████████ even though Leadenhall's most senior executives (including Wells) already knew

receivables were missing, double pledged, and materially impaired. (*Id.*; *see also* Compl. ¶¶ 131–

32.)

Rather than disclose those facts, █████████████████████████

███████████████████████████████████████

█████████████████ (*See* Saliba Decl. ¶ 6, Ex. E.) █████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████ (*Id.* ¶ 6; *see also* ECF 153 ¶¶ 1–12).

Throughout this period, Leadenhall continued refining its borrowing-base calculations and

repeatedly shared information with A-CAP reflecting what it euphemistically called "shortfall

amounts" or "deficits." ██████████████████████

███████████████████████████████████████

████████████████████████████████ (Saliba Decl. ¶ 7, Ex. F.) ████████

███████████████████████████████████████

facility secured by Medicare Advantage commission streams. *See* Case No. 23-11361-MFW
(Bankr. D. Del.).

8

██████████████████████████████████████████████████████████

████████████████████████████ [2] (*Id.*)

Leadenhall's concealment continued into November. ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ Importantly, despite having received the anonymous September 2022 fraud tip eighteen months earlier, despite having obtained incriminating information from Credigy, and despite Wander admitting double-pledging on the recorded calls seven months prior, Leadenhall never once raised concerns to A-CAP about fraud, "double-pledged" assets of Borrowers or HoldCos, or collateral disappearance. (*See* Saliba Decl. ¶ 11.) Instead, Leadenhall repeatedly and deceptively presented its exposure as a commercial shortfall caused by interest-rate sensitivity and asset valuation volatility. (*Id.* ¶ 10.)

That changed suddenly on November 21, 2023 when Gillespie emailed 777 requesting "full evidence of existence and eligibility" of receivables and demanded that "materials be put together and shared via Dropbox without further delay." (*Id.* ¶ 10, Ex. I.) When 777 promptly uploaded a pro-forma borrowing-base report to a Dropbox link that Leadenhall provided, Gillespie immediately responded with a list of accusatory "[b]asic questions," challenging whether certain receivables were "good or eligible," questioning why some were marked "[r]eleased," and explicitly suggesting that others had been "[d]ouble pledged," "[n]ever purchased," or sold without proceeds being applied to pay down Leadenhall's facilities. (*Id.*) Leadenhall's mock showing of surprise was completely inconsistent with Wander's admissions months earlier. And those inquiries

---

[2] For months, Leadenhall had been characterizing the issue to A-CAP as a market-driven gap in collateral coverage requiring commercial solutions, not any form of fraud or misconduct. (Saliba Decl. ¶ 10.)

stood in stark contrast to Leadenhall's prior eight months of communications with A-CAP, in which it never mentioned fraud, double-pledging, or collateral misconduct.

Over the course of several months, A-CAP and Leadenhall remained engaged in active workout discussions. During that entire time, Leadenhall concealed the September 2022 tip, the report provided by Credigy, and Wander's recorded admissions in March and April. A-CAP did not learn about those until this lawsuit was filed. (Saliba Decl. ¶ 11.)

### F.    Leadenhall Turns to Litigation and Alleges "Fraud" Only After Its Business Strategy Fails.

On May 3, 2024, Leadenhall filed this lawsuit, (ECF 1), alleging A-CAP "crossed the line" by (i) "strategically injecting capital into the 777 businesses" to "induc[e] Leadenhall to continue lending money," and (ii) "perpetuating and concealing 777's lies" to "avoid the discovery and collapse of the fraudulent enterprise," (*see* Compl. ¶ 3). Just days later, Leadenhall moved for a temporary restraining order ("TRO"), (ECF 57), which the Court granted on June 7, 2024, (ECF 128 at 55:20–22).

The purpose of the injunction was to prevent the parties from dissipating their assets to frustrate the collection of a final judgment. (*See generally id.*) This Court, therefore, issued a TRO that restrained not just Leadenhall's collateral, but also "cash or cash equivalents owned by the Borrowers and [HoldCos] sufficient to cover the full amount of the Accelerated Debt" and *all* "assets" of both "the Borrowers and [HoldCos]"—despite that the injunction was not issued against A-CAP. (*See* ECF 114; *see also* ECF 128 at 28:12–13.) The TRO was granted under the condition "that there is an exception for transactions in the normal and ordinary course of business." (ECF 128 at 59:8–12.)

The Court subsequently converted the TRO to a preliminary injunction. (ECF 146; ECF 148.) The Court, however, made clear that the preliminary injunction was not permanent. Indeed,

the Court remained "open to modifying the preliminary injunction if necessary on the application of either side or by agreement if the preliminary injunction doesn't adequately serve the ends for which it is constructed." (ECF 148 at 22:13–24.) Where any issue arose as to the ramifications of the preliminary injunction, the Court "invite[d] the parties to come up with a better preliminary injunction" or dissolve it altogether. (*Id.* at 26:22–24.) As the Court noted, "if there are reasons to change [the preliminary injunction], make an appropriate application," and "[i]f it's an urgent application, ask for it to be decided urgently." (*Id.* at 29:25–30:14.)

A-CAP accepted the Court's invitation on July 31, 2024, moving to modify the preliminary injunction's scope to exclude restraints on assets in which Leadenhall indisputably had no lien or equitable interest. (*See generally* ECF 155.) The Court denied A-CAP's motion from the bench on October 2, 2024, reasoning that "Leadenhall has a security interest in the assets of the borrowers" and "also has an interest in the assets of the [HoldCos] who guaranteed 'performance when due.'" (ECF 201 at 52:17–23; *see also* ECF 199.) A-CAP timely filed an appeal with the Second Circuit Court of Appeals on October 3, 2024, which remains pending after oral argument on April 1, 2025. (*See* ECF 200.)

### G.    Leadenhall Eliminates the Very Collateral Whose Preservation Justified Injunctive Relief.

On May 1, 2025, just one month after defending the necessity of its injunction before the Second Circuit and the ***same day*** it filed a motion for contempt against Defendants for allegedly violating the preliminary injunction, (ECF 280), Leadenhall noticed a foreclosure proceeding as to its Collateral, (Decl. of Sean Horner ("Horner Decl.") ¶ 3, Exs. A–C). The collateral listed as part of the sale was that "defined under the Loan and Security Agreement, dated as of May 7, 2021," described simply as "all assets of the Borrower constituting Collateral" for each of Signal, Sutton Park, and Dorchester. (*Id.*)

11

On May 15, 2025, Leadenhall orchestrated a closed door UCC auction at Leadenhall's attorneys' office. (*See id.* ¶ 4.) The sale began over fifty minutes late and, apart from the attorneys for Leadenhall and a representative for the Borrowers, no bidders attended. (*Id.* ¶ 10.) No one arrived to commence the sale, and the only participants were the attorneys and a court reporter. (*Id.* ¶ 12.) No sign-in sheets or written materials were available to attendees. (*Id.* ¶ 8.) At no point during the auction did Leadenhall's attorneys provide any written descriptions of the collateral or the governing terms of the sale. (*Id.* ¶ 14.)

Leadenhall then informed this Court that it had "foreclosed on the remaining collateral," (ECF 361 at 3), *i.e.*, the receivables of Signal, Sutton Park, and Dorchester, and that it had "exercised other remedies" related to the collateral held by Insurety, (*see id.* at 3 n.1).[3] This, it acknowledged, "exhaust[ed] its contractual remedies" with respect to all remaining collateral. (*Id.* at 3.)

Leadenhall's single-bidder "auction" enabled it to purchase assets that Leadenhall itself valued at over $200 million for just $3. (*See* Saliba Decl. ¶ 7, Ex. F; *see also* ECF 58-5 (present value of Dorchester Receivables $38.97 million as of 12/31/23); ECF 58-6 (valuation amount of all receivables in Sutton Park $86.76 million as of 3/31/23); ECF 58-10 at 23 (principal amount of $73.79 million for Signal); Horner Decl., ¶ 21, Ex. D at 12:7–16, 13:1–12). This at the same time that Leadenhall was reiterating its need for the injunction (and even pursuing contempt) against A-CAP, insisting the disputed collateral was highly valuable and required the Court's protection to prevent dissipation. (*See* ECF 280; ECF 281.)

---

[3] A-CAP filed a Motion to Strike Leadenhall's Improper Sur-Reply, which remains pending. (*See* ECF 363.)

### III.    LEGAL STANDARD

A federal court has "wide discretion" to vacate or modify injunctions. *NML Cap., Ltd. v. Republic of Argentina*, 2016 WL 836773, at *6 (S.D.N.Y. Mar. 2, 2016), *aff'd sub nom., Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 644 F. App'x 98 (2d Cir. Apr. 15, 2016) (collecting cases). "When modifying or vacating a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place." *Museum Boutique Intercontinental, Ltd. v. Picasso*, 880 F. Supp. 153, 161 (S.D.N.Y. 1995) (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984)). In the case of a preliminary injunction, "a material change in circumstances justifies the [dissolution or] alteration." *Baliga v. Link Motion Inc.*, 2022 WL 2531535, at *15 (S.D.N.Y. Mar. 9, 2022) (alteration in original) (quoting *Int'l Equity Invs., Inc. v. Opportunity Equity Partners*, *Ltd.*, 427 F. Supp. 2d 491, 501 (S.D.N.Y. 2006)), *report and recommendation adopted*, 2022 WL 3699339 (S.D.N.Y. Aug. 25, 2022). Where changed circumstances demonstrate that "continuance of the injunction is no longer justified and/or will work oppressively against the enjoined parties," vacatur is appropriate. *Id.* (quoting *Am. Optical Co. v. Rayex Corp.*, 291 F. Supp. 502, 510 (1967)).

"In order to determine whether a preliminary injunction … should be terminated, [the] Court first reviews the circumstances in which such an order would be justified in the first instance – and then considers whether that justification no longer exists." *Id.*, at *16. And when issuing this current preliminary injunction, this Court stated it was "open to modifying the preliminary injunction if necessary on the application of either side or by agreement if the preliminary injunction doesn't adequately serve the ends for which it is constructed." (ECF 148 at 22:13–24.)

## IV.    THE PRELIMINARY INJUNCTION MUST BE DISSOLVED.

### A.    Leadenhall Eliminated the Factual Predicate for the Preliminary Injunction.

This Court granted the Preliminary Injunction based on a foundational assumption: that Leadenhall held a secured interest in specific Borrower collateral at risk of dissipation. (*See* ECF 128 at 4:23–5:6, 55:7–9; ECF 148 at 8:5–12.) Leadenhall represented that, absent injunctive relief, A-CAP might abscond with that collateral, leaving Leadenhall unable to recover the Accelerated Debt. (ECF 128 at 12:21–25, 32:19–20; ECF 148 at 14:21–25.)

That factual predicate (false though it was) no longer exists. After obtaining the injunction, Leadenhall itself removed the collateral from the Borrowers' asset base, "exhausting its contractual remedies as to whatever collateral Defendants did not double-pledge or fabricate." (ECF 361 at 3.) Through a closed, single-bidder UCC sale, Leadenhall acquired the Signal, Dorchester, and Sutton Park portfolios—assets it had previously valued at over $180 million—for just **three dollars**. (*See supra* Section II.F.) The Court previously recognized that a creditor taking assets "for less than fair value" is *not* ordinary-course and would fundamentally undermine the purpose of the injunction. (ECF 128 at 33:1–4, 62:16–19.) Leadenhall did exactly that.

What remains is a classic "material change in circumstances." The collateral that justified the injunction has been extinguished, Leadenhall has exhausted its contractual remedies, and the Preliminary Injunction now restrains only assets—primarily HoldCo assets—in which Leadenhall never had any lien or equitable claim.[4] Instead of preserving the status quo, the injunction now distorts it, and works oppressively against A-CAP and other creditors with actual and senior

---

[4] To the extent that Insurety collateral remains at issue, Leadenhall has explained that those assets were not included in the "remaining collateral" and were subject to other remedies. (ECF 361 at 3 n.1.)

secured interests. Because Leadenhall erased the very property interest the injunction was designed to preserve, the factual foundation for injunctive relief has disappeared.

### B. With the Collateral Gone, a Legal Bar Now Controls

With the collateral extinguished by Leadenhall's own foreclosure, Leadenhall now stands as an unsecured creditor seeking to restrain all remaining assets to secure a potential money judgment. Federal courts lack authority to issue such injunctions.[5]

The Supreme Court's rule is unequivocal: "District court[s] ha[ve] no authority to issue a preliminary injunction preventing [a defendant] from disposing of their assets pending adjudication of … [a] claim for money damages." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). Courts in this district have faithfully followed that rule. *See, e.g., JSC Foreign Econ. Ass'n Technostroyexpert v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003) (Koeltl, J.) (rejecting freeze where creditor lacked an equitable lien); *Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, 2006 WL 2337186, at *7 (S.D.N.Y. Aug. 11, 2006) (Koeltl, J.) (holding "[t]he Court has no power to grant a preliminary injunction" because plaintiff "stands in the position of an unsecured creditor" and cannot restrain assets).

The decision in *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308 (E.D.N.Y. 2009), reinforces the point. There, the plaintiff sought an extensive asset freeze to prevent defendants from moving funds allegedly derived from a racketeering scheme, which the court described as "a wide-ranging and complex mortgage fraud scheme that spanned several years and cost the company upwards of $50 million." *Id.* at 314. "Many of DLJ's allegations against the

---

[5] A-CAP recognizes that this Court has issued its opinion regarding the applicability of *Grupo Mexicano* to this case, and that the Second Circuit appeal thereof remains pending. A different question is now before the Court: the significantly changed circumstances related to Leadenhall's dissipation of its Collateral require a review of "the circumstances in which such an order would be justified in the first instance" and a consideration of "whether that justification no longer exists." *Baliga*, 2022 WL 2531535, at *16.

RICO defendants are drawn from admissions made by [two of the individual defendants], or from documents filed, during the course of these criminal prosecutions" where those two individual defendants pled guilty. *Id*. at 316.

Although the allegations were serious (which the court viewed as plaintiff's "shock and awe litigation strategy," *id*. at 318), the court in *DLJ* held that it could not expand the scope of its equitable jurisdiction. *Id.* at 328–29. It emphasized that "district courts lack the authority" to freeze a defendant's assets in order to preserve them for a potential future judgment, and the requested wide-reaching asset freeze, "in order to satisfy a subsequent judgment," "must be seen as largely in service of [plaintiff's] claims at law." *Id.* Consequently, the court swiftly denied "DLJ's broad motion to enjoin the RICO defendants from disposing of their property in order to protect any money judgment." *Id.* at 328–29

Leadenhall now finds itself in the same posture as the plaintiff in DLJ. Whatever equitable interest it once claimed in the Sutton Park, Dorchester, and Signal portfolios was extinguished by its own foreclosure, leaving it with no identifiable security interest in the assets of HoldCos. Nothing about Leadenhall's allegations alters that legal reality. As *DLJ* explains, conclusory racketeering allegations or even claims that defendants have acted to "thwart a judgment," cannot substitute for a present equitable interest. *See id.* at 314, 330. The principle applies with particular force here, where Leadenhall's own self-help foreclosure eliminated the only collateral interest that could have supported injunctive relief.

In the absence of a present equitable interest in specific property, the Preliminary Injunction cannot be sustained under *Grupo Mexicano* or *DLJ*. The legal bar is absolute, and it compels dissolution.

C.       **With Leadenhall's Collateral Gone, Irreparable Harm Is Legally Impossible.**

Even if the categorical bar did not apply (it does), Leadenhall cannot establish irreparable harm. *See Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716, 718 (2d Cir. Jan. 27, 2017) (declining to consider whether the court could issue a preliminary injunction where the record was clear that plaintiffs faced no irreparable harm, given they could be fully compensated "should they prevail on their RICO claim[s]"). A plaintiff cannot show irreparable harm when its alleged injury is fully compensable by money damages or, as here, when it has already monetized the collateral it sought to protect.

Courts may dissolve injunctions when the party seeking equitable relief eliminates the equitable predicate for irreparable harm. In *Baliga v. Link Motion Inc.*, the court vacated a receivership and preliminary injunction after the plaintiff's own actions converted the case from one involving equitable claims into one seeking only legal damages. 2022 WL 2531535, at *18–19. Similarly, in *Lead Creation Inc. v. Hangzhou Yueji E-Com. Co.*, the court vacated a preliminary injunction where new evidence undercut both the likelihood of success and the claim of irreparable harm, holding that the injunction no longer served any equitable purpose, particularly where "new evidence casts significant doubt on the validity of the patent-in-suit and, thus, on Plaintiff's likelihood of success on the merits" and "there is some basis to believe that Plaintiff violated its 'duty of candor and good faith' in dealing with the United States Patent and Trademark Office." 2023 WL 2403678, at *1 (S.D.N.Y. Mar. 8, 2023).

The same logic applies here. The Court's finding of irreparable harm rested on two premises: (i) the potential dissipation or devaluation of the pledged collateral, and (ii) the Borrowers' inability to pay. (*See* ECF 128 at 56:13–57:16.) But Leadenhall has now seized and monetized that collateral, valued by Leadenhall itself at over $180 million, thereby eliminating

17

any threat of irreparable loss. Leadenhall cannot claim irreparable harm from the risk that assets might vanish when it has already removed those assets and converted them into cash.

All that remains is a claim for monetary damages. And it is well-settled law that damages do not constitute irreparable harm. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990); *see also Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, 2014 WL 4054240, at *7 (S.D.N.Y. Aug. 15, 2014) ("Because BHT has quantified its alleged injury, it cannot also claim to have suffered an irreparable injury."); *Levy v. Young Adult Inst., Inc.*, 2015 WL 170442, at *7 (S.D.N.Y. Jan. 13, 2015) (finding no irreparable harm where damage amount was both "monetary" and "countable"); *Bilalov v. Gref*, 2022 WL 19560947, at *2–3 (S.D.N.Y. Mar. 18, 2022) (holding one billion in alleged RICO damages and other equitable claims insufficient to establish irreparable harm); *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 391–94 (E.D.N.Y. 2016) (finding that, even where plaintiffs allege claims rooted in equity and fraud, such claims were "made primarily to protect the Defendants' assets in the event it succeeds on its [alleged] claims for monetary damages" and were "entirely duplicative of the Plaintiff's breach of contract claims"). Because "courts cannot issue preliminary injunctions based solely on the insolvency of debtors where the plaintiffs' underlying claims primarily seek monetary damages[,]" as true here, Leadenhall "has not demonstrated irreparable harm sufficient to justify a preliminary injunction." *Vis Vires Grp., Inc.*, 149 F. Supp. 3d at 393, 397.

## D.    The Balance of Hardships Overwhelmingly Favors Dissolution.

Finally, the balance of hardships weighs overwhelmingly in favor of dissolution of the injunction. Whatever the circumstances existed at the time the TRO and Preliminary Injunction were entered, the present record reflects a dramatic shift: Leadenhall has acted unilaterally with respect to the Collateral pool, extracting value for itself through the foreclosure sale, while no other creditor, including those with senior secured interests, received any comparable protection or

opportunity. The effect of those actions, irrespective of their propriety, is that Leadenhall has already availed itself of legal remedies unavailable to others without Court approval.

Meanwhile, the injunction now imposes significant and ongoing burdens on entities who have security interests in assets that were never pledged to Leadenhall, including A-CAP. The orders impose practical burdens on routine transactions, constrains normal business activity, and freezes assets that have no connection to any Collateral of Leadenhall's. (*See, e.g.*, ECF 196 (Leadenhall letter to the Court complaining about the Everton transaction); ECF 281 (filing motion for contempt based in part on the Everton transaction). Moreover, the "ordinary course" exception has proven unworkable, as Leadenhall has used the Court's orders as a basis to object to or delay transactions that fall well outside the scope of any alleged security interest—even while its own conduct with respect to the Collateral proceeded outside any ordinary-course parameters and remains subject to dispute. *Cf. Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 609 (S.D.N.Y. 2014) ("Plaintiffs face the potential loss of ability to recover interest and principle on Notes worth, nominally, just over $20 million . . . . Defendants and their creditors at a minimum risk the imperilment of a painstakingly negotiated $1.5 billion debt restructuring … [and] a serious risk of insolvency[.]")

An injunction that no longer preserves any identifiable secured property, provides no present equitable benefit to the movant, and imposes direct harm on parties holding superior interests cannot be justified. .*See, e.g.*, *Vis Vires Grp.,* 149 F. Supp. 3d at 397 ("[T]he Court finds that the Plaintiff has not demonstrated irreparable harm sufficient to justify a preliminary injunction. Thus, although the contractual language in the SPA providing for preliminary relief is relevant to the question of irreparable harm, it is not dispositive of the Court's analysis."). At this stage, the Preliminary Injunction operates as a one-sided restraint that distorts, rather than protects,

property rights and imposes hardships disproportionate to any legitimate equitable purpose. Under these circumstances, the balance of hardships decisively favors dissolution without conceding—and expressly preserving—the parties' ability to challenge the validity, fairness, or legal effect of Leadenhall's foreclosure sale.

## V.    IN THE ALTERNATIVE, LEADENHALL SHOULD BE HELD IN CONTEMPT FOR ITS SHADOWY FORECLOSURE ON THE COLLATERAL AT ISSUE IN THIS ACTION.

A party may be held in civil contempt if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (citation omitted). "Sanctions for contempt are meant to coerce compliance or compensate loss." *Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 378 (S.D.N.Y. 2003). Willfulness is not required to impose civil sanctions; however, a finding of willfulness strongly supports a grant of attorneys' fees and costs. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 2002 WL 2012618, at *7–11 (S.D.N.Y. Sept. 3, 2002) (granting motion for contempt and motion to modify preliminary injunction).

Leadenhall's foreclosure satisfies all three elements.

### A.    The Preliminary Injunction Is Clear and Unambiguous as to the Collateral.

Paragraph A of the Preliminary Injunction "prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021." (ECF 146.) This provision was never disputed. It identifies the protected property by reference to the Leadenhall LSA, prohibits any disposition of that property, and applies without limitation as to who may not dispose of it.

Unlike the other provisions, which were and are the subject of dispute (*E.g.*, ECF 128 at 20, 43, 61–62; ECF 281 at 3 (accusing A-CAP and the HoldCos of violating Paragraphs B and D), Paragraph A leaves no ambiguity. It bars any action that alters the status, value, possession, or condition of the pledged Collateral as it existed on the date of entry. The order is as clear and specific, as Rule 65(d) requires.

### B.    Leadenhall Transferred the Collateral in Violation of the Preliminary Injunction.

The second element is met by clear and convincing evidence. The record shows that:

- On May 15, 2025, Leadenhall conducted a UCC foreclosure involving pledged Collateral under the May 7, 2021 LSA.

- The Collateral sold included portfolios of assets that Leadenhall had previously valued in excess of $180 million.

- The foreclosure was conducted privately at Leadenhall's counsel's office, began late, lacked sign-in sheets or written collateral descriptions, and attracted no outside bidders.

- Leadenhall submitted—and accepted—its own winning credit bid of $3.

The Court already determined that "a transaction which is for less than fair value would not be in the normal and ordinary course of business." (ECF 128 at 62:16–19.) A foreclosure yielding a $3 bid for collateral previously valued at $180 million dollars cannot qualify as in the ordinary course. Nor could it satisfy the UCC's mandate that "every aspect of a disposition of collateral . . . must be commercially reasonable." U.C.C. § 9-610(b).

Courts in this district have treated similar disparities and procedural defects as sufficient to support analogous claims of commercially unreasonable disposition. *E.g., Life Ins. Fund Elite LLC v. Hamburg Com. Bank AG*, 545 F. Supp. 3d 86, 91 (S.D.N.Y. 2021) (finding plausible claim where sale price deviated sharply from collateral value and notice to interested parties was lacking). Here,

the undisputed facts are stronger: Leadenhall disposed of collateral covered by Paragraph A while the injunction remained in effect.

### C.    Leadenhall Did Not Attempt to Comply in a Reasonable Manner.

The third requirement is also satisfied. Leadenhall drafted the Preliminary Injunction and has invoked it to restrict the conduct of senior secured creditors like A-CAP. Leadenhall cannot credibly claim confusion about what it prohibited.

Its own counsel defined the order's purpose this way: "What is part of the TRO is an obligation on 777 to avoid that asset stripping on terms that are not commercial and whereby 777, and thereby, by extension, its creditors, are not getting consideration for those transactions." (ECF 128 at 12:25–13:4.) Yet Leadenhall proceeded with a foreclosure process that bears none of the hallmarks of fair value or commercial reasonableness and stands in conflict with both its statements to the Court and the obligations imposed by the injunction.

Leadenhall did not seek clarification, modification, or leave before taking actions that altered the status of the Collateral. Instead, it acted unilaterally, without attempting to comply with Paragraph A's plain directive or the standard of "mutual best advantage" long recognized in commercial-reasonableness jurisprudence. *See Cent. Budget Corp. v. Garrett*, 48 A.D.2d 825, 825 (2d Dep't 1975).

The record demonstrates a failure to comply, not a diligent effort to do so. That is sufficient for contempt.

## VI.    CONCLUSION

For the foregoing reasons, and in light of the profound changes in circumstance since the preliminary injunction was entered, A-CAP respectfully submits that continued enforcement of the injunction cannot be justified under any equitable standard. The injunction no longer preserves any identifiable collateral, no longer protects any interest Leadenhall still holds, and now operates

22

solely as a one-sided restraint that distorts the parties' rights and inflicts concrete harm on creditors with superior interests. Under governing law, dissolution is the only outcome consistent with the Court's equitable authority. Accordingly, A-CAP respectfully requests that the Court dissolve the preliminary injunction in its entirety.

In the alternative, if the Court declines to lift the injunction, the facts show that Leadenhall's May 2025 foreclosure was undertaken in contravention of Paragraph A of the Preliminary Injunction. That conduct satisfies every element of civil contempt under Second Circuit law. The Court should make a finding of contempt and impose appropriate sanctions to remedy the violation and prevent further abuse of the Court's order.

Dated: December 5th, 2025
     New York, New York

             **FOLEY & LARDNER LLP**

             */s/ Phara A. Guberman*
             Phara A. Guberman
             David Jordan
             Phillip F. Hosp
             Alexandra R. Jernigan
             90 Park Avenue
             New York, NY 10016
             (212) 338-3514
             phara.guberman@foley.com
             djordan@foley.com
             phosp@foley.com
             alexandra.jernigan@foley.com

             *Attorneys for Advantage Capital Holdings LLC and Kenneth King*

## CERTIFICATE OF COMPLIANCE

I hereby certify, under Section II.D of Judge Koeltl's individual practices, that this memorandum contains 6,837 words, exclusive of the caption, table of contents, table of authorities, and this certification.

*/s/ Phara A. Guberman*
Phara A. Guberman