UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>                    Plaintiffs,<br><br>          -against-<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>                    Defendants. | Case No. 1:24-cv-03453-JGK<br><br>**ORAL ARGUMENT REQUESTED** |

**ADVANTAGE CAPITAL HOLDINGS LLC AND KENNETH KING'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR CONTEMPT**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT .................................................................................. 1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY .......................................... 2

       A.    A-CAP Holds a Perfected, First-Priority Security Interest in All HoldCo
             Assets. ........................................................................................................ 2

       B.    Leadenhall's 2021 Facility Left It Structurally Inferior and Unsecured as
             to the HoldCos. .......................................................................................... 3

       C.    After Receiving a Tip About Potential Criminal Conduct, Leadenhall
             Continues Business as Usual. ..................................................................... 3

       D.    The April 2023 Call with Wander Reveals Leadenhall Was Seeking to
             Reach A-CAP's Collateral, Not Investigate Fraud. .................................. 5

       E.    After the April Call, Leadenhall Turns to A-CAP to Improve Its Position. ............ 6

       F.    Leadenhall Turns to Litigation and Alleges "Fraud" Only After Its
             Business Strategy Fails. ........................................................................... 10

       G.    Leadenhall Eliminates the Very Collateral Whose Preservation Justified
             Injunctive Relief........................................................................................11

       H.    Procedural History ................................................................................... 12

III.   LEGAL STANDARD ......................................................................................... 13

IV.    ARGUMENT .................................................................................................... 13

       A.    The Court Has Jurisdiction to Enforce Its Preliminary Injunction Pending
             the Appeal. ............................................................................................... 13

       B.    Leadenhall Should Be Held in Contempt for Its Shadowy Foreclosure on
             the Collateral at Issue in This Action. .................................................... 14

             1.    The Preliminary Injunction Is Clear and Unambiguous as to the
                   Collateral. ....................................................................................... 14

             2.    Leadenhall Transferred the Collateral in Violation of the
                   Preliminary Injunction. ................................................................... 15

             3.    Leadenhall Did Not Attempt to Comply in a Reasonable Manner. .......... 16

V.     CONCLUSION .................................................................................................. 18

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
  2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002) .......................................................... 13

*Cent. Budget Corp. v. Garrett*,
  48 A.D.2d 825 (2d Dep't 1975) ............................................................................. 17

*Life Ins. Fund Elite LLC v. Hamburg Com. Bank AG*,
  545 F. Supp. 3d 86 (S.D.N.Y. 2021) ...................................................................... 15

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
  470 U.S. 373 (1985).............................................................................................. 13

*Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*,
  289 F. Supp. 2d 373 (S.D.N.Y. 2003) .................................................................... 13

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004) .................................................................................. 13

*Red Ball Interior Demolition Corp. v. Palmadessa*,
  947 F. Supp. 116 (S.D.N.Y. 1996) ......................................................................... 13

**Statutes**

N.Y. U.C.C. § 9-610(b) .............................................................................................. 15

**Rules**

Fed. R. Civ. P. 65(d) .................................................................................................. 14

Defendants Advantage Capital Holdings LLC ("A-CAP") and Kenneth King ("King"), by and through their attorneys, respectfully submit this memorandum of law in support of their Motion for Contempt ("Motion") Against Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (collectively, "Leadenhall").

## I.    PRELIMINARY STATEMENT

A party cannot wield a preliminary injunction as a shield to disrupt the rights of other creditors while simultaneously disregarding that injunction to seize collateral that the order was meant to preserve. Yet that is precisely what Leadenhall has done.

Having convinced the Court in June 2024 that extraordinary equitable relief was needed to safeguard its collateral, Leadenhall then quietly ran a closed UCC sale in May 2025—unadvertised, held at counsel's office, and yielding a nominal $3 credit bid for assets it had previously valued in the hundreds of millions of dollars. With that sale, Leadenhall *admitted* it "exhaust[ed] its contractual remedies as to [the] collateral," thus extinguishing the factual predicate for the injunction. (*See* ECF 361 at 3.) The injunction now functions not as an asset-preservation tool but as a weapon Leadenhall deploys against A-CAP, an undisputed senior secured creditor whose collateral does not overlap with Leadenhall's. The law does not tolerate this asymmetric use of equitable relief.

The facts leading up to the filing of this lawsuit underscore why Leadenhall should be held in contempt for violation of the preliminary injunction (the "Preliminary Injunction"). (*See* ECF 146; ECF 148.) For over a year before seeking injunctive relief, Leadenhall repeatedly communicated to A-CAP that its collateral deficits were related to valuations issues tied to interest rates. Leadenhall never mentioned the possibility that its collateral deficits were the result of fraud by 777. But Leadenhall knew differently. In fact, in recorded phone calls with Joshua Wander ("Wander") in March and April 2023, Wander revealed to Leadenhall that 777 Partners LLC ("777

Partners") had double pledged Leadenhall's collateral. That admission confirmed a Credigy report Leadenhall also received in March that uncovered double pledging. None of this came as a surprise to Leadenhall because, in September 2022, Leadenhall received an anonymous tip that 777 Partners was engaged in fraud. Keeping all that to itself, Leadenhall contacted A-CAP seeking junior-lien enhancements on A-CAP's collateral, and urged A-CAP to inject fresh capital into 777 Partners from its own loan facility. Leadenhall eventually mentioned the possibility of double-pledging in November 2023, but at no point in its discussions with A-CAP did Leadenhall ever disclose the anonymous tip it received in 2022, Credigy's report of double-pledging, or the admissions of Wander.

Only after business negotiations with A-CAP failed did Leadenhall pivot to its current fraud theory against A-CAP and King, weaponizing the public nature of this action with unsubstantiated allegations against them to obtain the Preliminary Injunction. Leadenhall represented to this Court that the Preliminary Injunction was necessary to protect its purported collateral and to preserve the status quo of this litigation. Months later, Leadenhall disobeyed the very order it sought, using the Preliminary Injunction to preserve assets it intended to swipe from A-CAP while surreptitiously transferring ownership of that same collateral to itself. The Court should hold Leadenhall in contempt for blatantly violating the very injunction it invoked against A-CAP.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    A-CAP Holds a Perfected, First-Priority Security Interest in All HoldCo Assets.

A-CAP, through affiliates, including Haymarket Insurance Company ("Haymarket"), holds a perfected, "first-priority" security interest in substantially all the assets of the 777 Partners and 600 Partners LLC ("600 Partners") (collectively, "HoldCos"). (*See* ECF 187 ("Corrected Amended Complaint" or "Compl.") ¶¶ 13–14, 134, 211.) Under the HoldCo Loan Agreement, Haymarket

loaned hundreds of millions of dollars to HoldCos *and* perfected its security interests. (Compl. ¶ 180; *see also* ECF 141-1, 141-2, 141-3 (UCC filing statements).)

### B.    Leadenhall's 2021 Facility Left It Structurally Inferior and Unsecured as to the HoldCos.

In May 2021, SPLCSS II LLC ("Sutton Park"), Signal SML 4 LLC ("Signal"), Insurety Agency Services LLC ("Insurety"), and Dorchester Receivable II LLC's ("Dorchester") (collectively, "Borrowers") "entered into a new credit facility with Leadenhall," memorialized in a Loan and Security Agreement (the "Leadenhall LSA"). (Compl. ¶¶ 4, 49.) Borrowers are four special-purpose entities that purchased and owned structured-settlement receivables. (*Id.* ¶¶ 49–50.) Under the Leadenhall LSA, Leadenhall's only security interest was in the equity and assets of the Borrowers, which mainly comprise receivables—cash flows from structured settlements and lottery winnings. (*See id.* ¶¶ 46, 56.)

Separately, Leadenhall obtained a guaranty from the HoldCos for the benefit of Borrowers ("Leadenhall Unsecured Guaranty"). (*Id.* ¶¶ 51, 84.) However, the HoldCos did not pledge any assets to support it (and Leadenhall has never alleged otherwise). (ECF 58-2 (Guaranty Agreement, dated May 7, 2021); *cf.* Compl. ¶ 87 (alleging, with no reference to assets, a generic "equitable interest" predicated solely on the Leadenhall LSA).) As a result, Leadenhall's overall credit position, particularly as to the Holdcos, was structurally subordinated to A-CAP's perfected, first-priority liens under the HoldCo Loan Agreement. (*See infra* Section II.E (describing Leadenhall's awareness of its subordinated loan).)

### C.    After Receiving a Tip About Potential Criminal Conduct, Leadenhall Continues Business as Usual.

By August 2022, material weaknesses in Leadenhall's lending structure were already emerging. On August 8, 2022, Leadenhall warned that Sutton Park and Dorchester were out of compliance with their hedging obligations, that delinquent receivables remained unresolved

despite multiple prior requests, and that the increased advance rates and expanded facility capacity Leadenhall had authorized in early 2022 were expiring without a plan to revert to contractual levels. (Decl. of Phara Guberman ("Guberman Decl.") ¶ 3, Ex. A.) Leadenhall's Head of Portfolio Management, Craig Gillespie ("Gillespie"), emphasized that Leadenhall "identified and flagged this issue several times" without response and that continued non-compliance would require Leadenhall to "look[] at the remedies available to [Leadenhall] under the terms of each facility." (*Id.*)

On September 19, 2022, Gillespie received an anonymous tip revealing that Mr. Wander had already allegedly consummated "criminal activity" involving the reported Borrowing Base of Sutton Park: "*The assets you are lending against at SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender . . . . What he is doing is criminal.*" (Compl. ¶ 105 (emphasis added); ECF 187-01 (copy of the anonymous tip).) Regardless, Leadenhall continued to rely on Compliance Reports it received through at least January 2023. (Compl. ¶ 118.)

Leadenhall also continued to pursue new financing opportunities and investment opportunities with 777 Partners, 600 Partners, and their affiliates (collectively, "777"). For example, on September 27, eight days after receiving the anonymous tip, Leadenhall's Director, Clarence Er, requested securitization-spread data for a new ERM financing facility in order to continue negotiating updated term-sheet versions. (Guberman Decl. ¶ 4, Ex. B.) His request referenced updated term-sheet iterations, waterfall modeling, and Leadenhall's anticipated share of securitization proceeds, confirming that Leadenhall was still actively negotiating advance rates, return economics, and the scope of future lending. (*See id.*)

Between October 4 and 7, Sutton Park delivered a refinancing package for its facility. Leadenhall recalculated borrowing-base metrics, identified unresolved issues in cash reconciliations, and noted that all receivables were hard-coded as not defaulted, which did not match prior cash data—inconsistencies that would have caused any reasonable lender to stop any work that would increase risk and inject new capital until resolved. (Guberman Decl. ¶ 5, Ex. C.) Nevertheless, Leadenhall approved the release and re-assignment documentation and moved forward with the refinancing before Sutton Park completed its updated cash reconciliation. (*Id*.)

That same week, Leadenhall further explored an investment in the European equity-release initiative with 777, exchanged product materials, and executed a fresh non-disclosure agreement to facilitate transfer of actuarial data. (Guberman Decl. ¶ 6, Ex. D.) Leadenhall ultimately consummated this facility, increasing the exposure to an organization that Leadenhall had been tipped to have defrauded them. (*Id*.)

**D.    The April 2023 Call with Wander Reveals Leadenhall Was Seeking to Reach A-CAP's Collateral, Not Investigate Fraud.**

In March 2023, Leadenhall allegedly received a second tip from another lender, Credigy, demonstrating that approximately $185 million in receivables were allocated to Credigy—not A-CAP. (Compl. ¶¶ 119–20.) In a call that same month, Leadenhall claims Mr. Wander told them that any deficit in Leadenhall's collateral could be cured through "replacement deals," including cash generated from selling minority equity interests in 777 Partners' football assets. (*See id.* ¶¶ 124–25.)

In April 2023, senior executives and board members of Leadenhall conducted a second recorded call with Wander. (*Id.* ¶¶ 131–34.) During that call, Wander acknowledged that "some of the collateral may have ended up actually getting funded," and that in some cases, one of the Borrowers "bought a subset of the collateral and didn't intend to buy the rest of it." (Guberman

Decl. ¶ 7, Ex. E ("Wander Tr") at 27:34–58.) He also explained that A-CAP held a perfected, senior all-asset lien at the HoldCos level. (Compl. ¶ 134; Wander Tr. at 20:39–21:20, 29:53–30:06.) Leadenhall's Chairman, John Wells, immediately sought to leverage A-CAP's collateral to improve Leadenhall's own position, asking: "Will you give us a second lien on all of those assets?" (Wander Tr. at 30:08–11.) When Wander explained that any such action would depend on A-CAP's rights, Wells pressed further, asking for the A-CAP facility's covenants and terms so that Leadenhall could make its "own judgment on how likely any of that cash is to come to us." (*Id.* at 40:30–38.)

Wells also suggested that 777 use A-CAP's facility to repay Leadenhall, noting that A-CAP's interest rate was "cheaper than the ticking fee" (i.e., default-interest) on Borrowers' debt. (*Id.* at 35:22–35:24.) When Wander attempted to re-focus on repaying the facility, Wells further explained his strategy: "Yeah, but squeaky wheels are the ones that get oiled." (*Id.* at 43:14–18.)

### E.    After the April Call, Leadenhall Turns to A-CAP to Improve Its Position.

Following the April 3, 2023 call with Wander, Leadenhall immediately turned to A-CAP to mitigate the losses it understood it was facing. (*Cf.* Compl. ¶ 198 (alleging A-CAP "began to rear its head" in spring 2023).)

On June 16, 2023, 777's in-house counsel suggested to Gillespie that "because of the way the various pieces of the ACAP loan are structured, the simplest way to [] accomplish the ask is for 777 to grant Leadenhall a 'springing lien' on all assets of 777 that takes effect once all ACAP obligations are retired." (Decl. of Michael Saliba ("Saliba Decl.") ¶ 2, Ex. A; *cf.* Compl. ¶ 211.) Gillespie responded within minutes that Leadenhall was "aware of many other parental guarantees that exist and a key objective here is to put the Leadenhall claim ahead of those." (Saliba Decl. ¶ 2, Ex. A.)

Days later, Leadenhall again acknowledged A-CAP's senior secured position on separate collateral when it asked A-CAP to convene meetings to discuss "2nd/3rd lien and intercreditor documents," noting that Leadenhall was under investor pressure to finalize an agreement before June 30. (*Id*. ¶ 3, Ex. B.) A-CAP cooperated, confirmed it was "willing to consider the 4th lien," and authorized Leadenhall to review its loan agreements. (*Id*. ¶ 4, Ex. C.)

That cooperation continued through the fall. By September 2023, Leadenhall was reaching out to A-CAP to discuss 777's liquidity needs and writing that resolving "[t]he situation we are facing with our mutual client" required coordinated lender dialogue. (*Id*. ¶ 5, Ex. D.)

The negotiations then shifted. In October 2023, for reasons A-CAP did not then understand, Leadenhall's demands changed. Apparently facing significant pressure from its own investors due to substantial losses in its other structured settlement exposures, Leadenhall abruptly advanced an proposal that sought to push its non-existent and double pledged collateral losses onto A-CAP.[1] On October 12, Leadenhall urged A-CAP to supply new capital through a Cayman fund structure managed by Leadenhall to be funded by A-CAP, which would then be used to purchase or refinance Leadenhall's Sutton Park-related notes. (*Id*. ¶ 6, Ex. E.) Leadenhall assured A-CAP that these notes were "for all intents and purposes structured to be fully backed by structured settlement receivables," even though Leadenhall's most senior executives (including Wells) already knew receivables were missing, double pledged, and materially impaired. (*Id.*; *see also* Compl. ¶¶ 131–32.)

---

[1] On November 30, 2022, Reverse Mortgage Investment Trust Inc. and Reverse Mortgage Funding LLC filed for bankruptcy protection. *See* Case No. 22-11225-MFW (Bankr. D. Del.). There, **Leadenhall filed proofs of claim exceeding $230 million** on a purportedly secured credit facility where the debtors reported very limited remaining assets and virtually no liquidity. *See* ECF Nos. 456, 1021. On August 30, 2023, Hi.Q, Inc. likewise filed for bankruptcy after a failed runoff transaction where Leadenhall was described as the financing party behind a receivables facility secured by Medicare Advantage commission streams. *See* Case No. 23-11361-MFW (Bankr. D. Del.).

Rather than disclose those facts, Leadenhall proposed to repackage the notes into senior and junior tiers so that A-CAP would take on the non-collateralized exposure while Leadenhall preserved its fees and control. (*See* Saliba Decl. ¶ 6, Ex. E.) This was not an honest restructuring effort. It was an attempt to offload a known shortfall and effectively make A-CAP the victim of the same fraud by 777 that Leadenhall has alleged in this lawsuit. A-CAP did not yet know the full extent of the collateral problems Leadenhall was concealing, but the proposal still made no commercial sense. A-CAP rejected it. (*Id.* ¶ 6; *see also* ECF 153 ¶¶ 1–12.)

Throughout this period, Leadenhall continued refining its borrowing-base calculations and repeatedly shared information with A-CAP reflecting what it euphemistically called "shortfall amounts" or "deficits." One of the clearest examples came on October 18, 2023, when Gillespie emailed A-CAP a detailed table calculating "collateral shortfall amounts" across the Dorchester, Sutton Park, and Insurety structures as of September 2023. (Saliba Decl. ¶ 7, Ex. F.) Gillespie reported a combined $204,429,611.83 shortfall and represented to A-CAP that the collateral still had a collective value of $295.6 million—between Dorchester ($66,314,000.22), Sutton Park ($186,489,258.62), and Insurety ($42,833,947.72).[2] (*Id.*)

Leadenhall's concealment continued into November. Leadenhall was still coordinating with A-CAP on documentation tied to the borrowing base deficit and repeatedly thanking A-CAP for its assistance in discussing potential solutions to Leadenhall's deficit. (*See, e.g.,* Saliba Decl. ¶ 8, Ex. G ("Thanks appreciate the help here").) Importantly, despite having received the anonymous September 2022 fraud tip eighteen months earlier, despite having obtained incriminating information from Credigy, and despite Wander admitting double-pledging on the recorded calls seven months prior, Leadenhall never once raised concerns to A-CAP about fraud,

---

[2] For months, Leadenhall characterized the issue to A-CAP as a market-driven gap in collateral coverage requiring commercial solutions, not any form of fraud or misconduct. (Saliba Decl. ¶ 10.)

"double-pledged" assets of Borrowers or HoldCos, or collateral disappearance. (*See* Saliba Decl. ¶ 11.) Instead, Leadenhall repeatedly thanked A-CAP for exploring "solutions" and attributed the deficit to interest-rate sensitivity and market volatility, which obscured the known collapse of collateral integrity and preserved the false impression that the facilities remained fundamentally sound. (*Id.* ¶ 10.)

On November 8, 2023, while Leadenhall continued to characterize the situation to A-CAP as a market-driven "shortfall," employees of 777 exchanged internal text messages reflecting that Leadenhall was already aware of pervasive collateral failures, including double pledging. One employee stated, "**Yea it's bad. I've told Leadenhall all**." (*See* Guberman Decl. ¶ 8, Ex. F.) Another responded, "**All of what? The double pledging? I thought they knew already.**" (*Id.*) The reply confirmed that Leadenhall personnel had discussed the issue openly: "**yeah they made jokes about double pledging at lunch today.**" (*Id.*) When asked, "**How can they joke about that. Don't people go to jail for doing that?**", the response was blunt: "**they're [expletive]. so many losses in their portfolio. 777 probably next.**" (*Id.*)

While Leadenhall was apparently joking about the double pledging in offline communications with 777, it continued to string A-CAP along and did not disclose anything. That changed suddenly on November 21, 2023, when Gillespie emailed 777 requesting "full evidence of existence and eligibility" of receivables and demanded that "materials be put together and shared via Dropbox without further delay." (*See* Saliba Decl. ¶ 10, Ex. I.) When 777 promptly uploaded a pro-forma borrowing-base report to a Dropbox link that Leadenhall provided, Gillespie immediately responded with a list of accusatory "[b]asic questions," challenging whether certain receivables were "good or eligible," questioning why some were marked "[r]eleased," and explicitly suggesting that others had been "[d]ouble pledged," "[n]ever purchased," or sold without

proceeds being applied to pay down Leadenhall's facilities. (*Id.*) Leadenhall's mock showing of surprise was completely inconsistent with Wander's admissions months earlier. And those inquiries stood in stark contrast to Leadenhall's prior eight months of communications with A-CAP, in which it never mentioned fraud, double-pledging, or collateral misconduct.

Over the course of several months, A-CAP and Leadenhall remained engaged in active intercreditor discussions. During that entire time, Leadenhall concealed the September 2022 tip, the report provided by Credigy, and Wander's recorded admissions in March and April. A-CAP did not learn about those until this lawsuit was filed. (Saliba Decl. ¶ 11.)

### F.    Leadenhall Turns to Litigation and Alleges "Fraud" Only After Its Business Strategy Fails.

Having failed to force A-CAP into concessions through intercreditor proposals, selective disclosure, and media pressure, Leadenhall pivoted to litigation. On May 3, 2024, Leadenhall filed this lawsuit, (ECF 1), alleging A-CAP "crossed the line" by (i) "strategically injecting capital into the 777 businesses" to "induc[e] Leadenhall to continue lending money," and (ii) "perpetuating and concealing 777's lies" to "avoid the discovery and collapse of the fraudulent enterprise," (*see* Compl. ¶ 3). Just days later, Leadenhall moved for a receiver or a temporary restraining order ("TRO"), (ECF 57), which the Court granted on June 7, 2024, (ECF 128 at 55:20–22).

The purpose of the injunction was to prevent the parties from dissipating their assets to frustrate the collection of a final judgment. (*See generally* ECF 128.) This Court, therefore, issued a TRO that restrained not just Leadenhall's collateral, but also "cash or cash equivalents owned by the Borrowers and [HoldCos] sufficient to cover the full amount of the Accelerated Debt" and *all* "assets" of both "the Borrowers and [HoldCos]"—despite the fact that the injunction was not issued against A-CAP. (*See* ECF 114; *see also* ECF 128 at 28:12–13.) The TRO was granted under the condition "that there is an exception for transactions in the normal and ordinary course of

business." (ECF 128 at 59:8–12.) The Court subsequently converted the TRO to a preliminary injunction. (ECF 146; ECF 148.)

> **G.    Leadenhall Eliminates the Very Collateral Whose Preservation Justified Injunctive Relief.**

On September 6, 2024, Leadenhall filed the Corrected Amended Complaint in which it expressly admitted that the Sutton Park and Dorchester collateral had substantial, quantifiable value in the tens of millions of dollars, which far exceeded the nominal price it later paid at the UCC sale. Specifically, Leadenhall alleged that the most recent Compliance Reports for Sutton Park reflected a Borrowing Base of approximately $64 million, even after removing assets Leadenhall contended were double-pledged or not owned. (ECF 187 ¶¶ 145–47.) Likewise, the revised Dorchester Compliance Report reflected a Borrowing Base of approximately $42 million under Leadenhall's own methodology. (*Id.* ¶¶ 148–49.) Leadenhall further alleged no borrowing-base deficiency specific to Signal, and its own acceleration notice reflects that Signal's assets supported outstanding principal borrowings of $73,790,592. (*See* ECF 187-10; *see also* ECF 327 at 3 and 327-3 (audit report reflecting Leadenhall's own values of Sutton Park and Dorchester).)

On May 1, 2025, just one month after defending the necessity of its injunction before the Second Circuit and the ***same day*** it filed a motion for contempt against Defendants for allegedly violating the Preliminary Injunction, (ECF 280), Leadenhall noticed a foreclosure proceeding as to its Collateral, (*see* ECF 426 ¶ 3, Exs. A–C). The collateral listed as part of the sale was that "defined under the Loan and Security Agreement, dated as of May 7, 2021," described simply as "all assets of the Borrower constituting Collateral" for each of Signal, Sutton Park, and Dorchester. (*Id*.)

On May 15, 2025, Leadenhall orchestrated a closed door UCC auction at Leadenhall's attorneys' office. (*See id.* ¶ 4.) The sale began over fifty minutes late and, apart from the attorneys

for Leadenhall and a representative for the Borrowers, no bidders attended. (*Id.* ¶ 10.) No one arrived to commence the sale, and the only participants were the attorneys and a court reporter. (*Id.* ¶ 12.) No sign-in sheets or written materials were available to attendees. (*Id.* ¶ 8.) At no point during the auction did Leadenhall's attorneys provide any written descriptions of the collateral or the governing terms of the sale. (*Id.* ¶ 14.)

Leadenhall then informed this Court that it had "foreclosed on the remaining collateral," (ECF 361 at 3), *i.e.*, the receivables of Signal, Sutton Park, and Dorchester, and that it had "exercised other remedies" related to the collateral held by Insurety, (*see id.* at 3 n.1).[3] This, it acknowledged, "exhaust[ed] its contractual remedies" with respect to all remaining collateral. (*Id.* at 3.)

Leadenhall's single-bidder "auction" enabled it to purchase assets that Leadenhall itself valued at over $200 million **for just $3**. (*See* Saliba Decl. ¶ 7, Ex. F; *see also* ECF 58-5 (present value of Dorchester Receivables $38.97 million as of 12/31/23); ECF 58-6 (valuation amount of all receivables in Sutton Park $86.76 million as of 3/31/23); ECF 58-10 at 23 (principal amount of $73.79 million for Signal); ECF 426 ¶ 21, Ex. D at 12:7–16, 13:1–12). This was at the same time that Leadenhall was reiterating its need for the injunction (and even pursuing contempt) against A-CAP, insisting the disputed collateral was highly valuable and required the Court's protection to prevent dissipation. (*See* ECF 280; ECF 281.)

## H.  Procedural History

In response to Leadenhall's egregious violation of the Preliminary Injunction, A-CAP initially filed a Motion to Dissolve the Preliminary Injunction Or, In the Alternative, for Contempt, on December 5, 2025. (ECF 422.) On December 17, 2025, the Court held a conference where it

---

[3] A-CAP filed a Motion to Strike Leadenhall's Improper Sur-Reply, which remains pending. (*See* ECF 363.)

questioned whether it had jurisdiction to rule on a motion to dissolve during the pendency of the Second Circuit appeal, (ECF 437), and advised the parties to confer regarding the status of the motion. (ECF 447.) The parties proposed an Order dismissing the motion to dissolve on jurisdictional grounds (ECF 449), which the Court entered on Dec. 22, 2025. (ECF 451.) The Order expressly reserved A-CAP's right to refile the motion for contempt, because a dismissal without prejudice did not implicate A-CAP's right to refile while the Second Circuit appeal was pending.[4] (ECF 449.) This motion followed.

## III.    LEGAL STANDARD

A party may be held in civil contempt if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (citation omitted). "Sanctions for contempt are meant to coerce compliance or compensate loss." *Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 378 (S.D.N.Y. 2003). Willfulness is not required to impose civil sanctions; however, a finding of willfulness strongly supports a grant of attorneys' fees and costs. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 2002 WL 2012618, at *7–11 (S.D.N.Y. Sept. 3, 2002).

## IV.    ARGUMENT

### A.    The Court Has Jurisdiction to Enforce Its Preliminary Injunction Pending the Appeal.

The Court dismissed the prior Motion to Dissolve the Preliminary Injunction, or, in the Alternative, for Contempt, (ECF 449), "without prejudice to renewal on jurisdictional grounds"

---

[4] Leadenhall objected to A-CAP refiling the motion for contempt, claiming it "implicates issues on appeal." (*See* ECF 449.) Given their own pending motion for contempt (ECF 280)—which has not been withdrawn—their position is unsupportable and hypocritical.

and stated that the dismissal was "without prejudice to … refile the motion for contempt in the District Court should the District Court determine that it has jurisdiction over such motion." (*Id.*) Second Circuit authorities are clear that the Court has jurisdiction to adjudicate the Motion because enforcement of an existing injunction remains within a district court's authority even while the order granting the injunction is on appeal. *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 378 (1985) (noting that an appeal divests the district court only of matters involved in the appeal's merits); *see also Red Ball Interior Demolition Corp. v. Palmadessa*, 947 F. Supp. 116, 120 (S.D.N.Y. 1996) (holding that a district court may enforce compliance with its orders during an appeal).

### B. Leadenhall Should Be Held in Contempt for Its Shadowy Foreclosure on the Collateral at Issue in This Action.

Leadenhall's foreclosure satisfies all three elements for civil contempt: (1) the Preliminary Injunction issued by this Court was clear and unambiguous; (2) Leadenhall's failure to comply with this Court's order is irrefutable and publicly documented; and (3) Leadenhall not only failed to diligently attempt compliance—it intentionally disobeyed the very Preliminary Injunction it sought to obtain.

#### 1. The Preliminary Injunction Is Clear and Unambiguous as to the Collateral.

Paragraph A of the Preliminary Injunction "prohibits selling, transferring, converting, pledging, or encumbering the assets pledged as collateral by the Borrowers to Leadenhall under the Loan and Security Agreement dated May 7, 2021." (ECF 146.) This provision was never disputed. It identifies the protected property by reference to the Leadenhall LSA, prohibits any disposition of that property, and applies without limitation as to who may not dispose of it.

Unlike the other provisions, which were and are the subject of dispute, (*see e.g.*, ECF 128 at 20, 43, 61–62; ECF 281 at 3 (accusing A-CAP and the HoldCos of violating Paragraphs B and

D)), Paragraph A leaves no ambiguity. It bars any action that alters the status, value, possession, or condition of the pledged Collateral as it existed on the date of entry. The order is as clear and specific, as Rule 65(d) requires. *See* Fed. R. Civ. P. 65(d).

### 2. Leadenhall Transferred the Collateral in Violation of the Preliminary Injunction.

The second element is met by clear and convincing evidence. The record shows that:

- On May 15, 2025, Leadenhall conducted a UCC foreclosure involving pledged Collateral under the May 7, 2021 LSA.

- The Collateral sold included portfolios of assets that Leadenhall had previously valued in excess of $180 million.

- The foreclosure was conducted privately at Leadenhall's counsel's office, began late, lacked sign-in sheets or written collateral descriptions, and attracted no outside bidders.

- Leadenhall submitted—and accepted—its own winning credit bid of a mere $3.

The Court already determined that "a transaction which is for less than fair value would not be in the normal and ordinary course of business." (ECF 128 at 62:16–19.) A foreclosure yielding a $3 bid for collateral previously valued at $180 million dollars cannot qualify as in the ordinary course.

Leadenhall seems to agree. Indeed, in its own motion for contempt, Leadenhall asserts that "receiv[ing] approximately 1% of its value in return" is evidence of a commercially unreasonable transfer. (ECF 283 at 10.) But here, Leadenhall's $3 purchase is not just "1% of its value"—it is a fraction of that (approximately 0.000000017%). (*See id.*) In other words, Leadenhall's transaction drastically oversteps the very same conduct it deems worthy of contempt.

Nor could this transaction satisfy the UCC's mandate that "every aspect of a disposition of collateral . . . must be commercially reasonable." U.C.C. § 9-610(b). Courts in this district have

15

treated similar disparities and procedural defects as sufficient to support analogous claims of commercially unreasonable disposition. For example, in *Life Ins. Fund Elite LLC v. Hamburg Com. Bank AG*, 545 F. Supp. 3d 86 (S.D.N.Y. 2021), the court held that a borrower plausibly stated a claim under UCC Article 9 for breach of the duty of commercial reasonableness where it alleged that the lender disposed of collateral at a price far below its asserted value and failed to meaningfully market the assets or provide adequate notice to interested parties. Applying N.Y. U.C.C. § 9-610(b), the court emphasized that "every aspect" of a collateral disposition must be commercially reasonable and that such determinations are "necessarily fact intensive," making dismissal inappropriate at the pleading stage. *Id*. at 91. The court found it sufficient that the plaintiff alleged a sharp disparity between the collateral's value and the sale price, coupled with procedural defects in the sale process, even though the lender disputed those facts. *Id*. While dismissing duplicative implied-covenant and negligence claims, the court squarely allowed the commercial reasonableness claim to proceed, confirming that allegations of undervaluation and flawed disposition procedures alone can support a plausible UCC violation in this District. Here, the undisputed facts are stronger: Leadenhall disposed of collateral covered by Paragraph A while the injunction—indeed, the one Leadenhall requested be issued—remained in effect. And this transfer was blatantly not for fair value (to say nothing of the serious procedural problems with the transfer), rendering the transaction completely outside of the normal and ordinary course of business. (*See* ECF 128 at 62:16–19.)

### 3. *Leadenhall Did Not Attempt to Comply in a Reasonable Manner.*

The third requirement is also satisfied. Leadenhall drafted the Preliminary Injunction and has invoked it to restrict the conduct of senior secured creditors like A-CAP. Leadenhall cannot credibly claim confusion about what it prohibited.

Its own counsel defined the order's purpose this way: "What is part of the TRO is an obligation on 777 to avoid that asset stripping on terms that are not commercial and whereby 777, and thereby, by extension, its creditors, are not getting consideration for those transactions." (ECF 128 at 12:25–13:4.) Yet Leadenhall proceeded with a foreclosure process that bears none of the hallmarks of fair value or commercial reasonableness and stands in conflict with both its statements to the Court and the obligations imposed by the injunction.

Foreclosures generally were considered in issuing the Preliminary Injunction: in addition to a blanket prohibition on transferring any part of the collateral as defined by paragraph A, the Preliminary Injunction further was designed to (i) require Borrowers and Guarantors to provide notice of any foreclosure and/or (ii) "prevent any Defendant from foreclosing on, repossessing, or exercising remedial actions against the assets of the Borrowers and Guarantors." (*See* ECF 146, Paragraph E.). While this section did not serve as a blanket ban on foreclosures, (ECF 128 43:17–20), the Paragraph indicates the high likelihood that any other foreclosure would have been construed to violate the Preliminary Injunction, given Leadenhall's actions to date establishing its broad reading of the Preliminary Injunction. (*E.g.*, ECF 280) and its use thereof to attempt to stifle legitimate business transactions. (*Id.*) It is abundantly clear that no other creditor—even senior creditors like A-CAP—could have engaged in contractually authorized remedies like foreclosure without Leadenhall's interference. But Leadenhall has shown no qualms about resorting to egregious self-help, disregarding the blanket proscription in the Preliminary Injunction in transferring the collateral as defined in the Leadenhall LSA.

Leadenhall did not seek clarification, modification, or leave before taking actions that altered the status of the Collateral. Instead, it acted unilaterally, without attempting to comply with Paragraph A's plain directive or the standard of "mutual best advantage" long recognized in

commercial-reasonableness jurisprudence. *See Cent. Budget Corp. v. Garrett*, 48 A.D.2d 825, 825 (2d Dep't 1975).

The record demonstrates a failure to comply, not a diligent effort to do so. An order of contempt is warranted in these circumstances.

## V.    CONCLUSION

The facts show that Leadenhall's May 2025 foreclosure was undertaken in contravention of Paragraph A of the Preliminary Injunction. That conduct satisfies every element of civil contempt under Second Circuit law. The Court should make a finding of contempt and impose appropriate sanctions to remedy the violation and prevent further abuse of the Court's order.

Dated: February 2, 2026          Respectfully submitted,
      New York, New York

                        **FOLEY & LARDNER LLP**

                    By:    */s/ Phara A. Guberman*
                        Phara A. Guberman, Esq.
                        David Jordan, Esq. (admitted *pro hac vice*)
                        Phillip F. Hosp, Esq. (admitted *pro hac vice*)
                        Alexandra R. Jernigan, Esq. (admitted *pro hac vice*)
                        90 Park Avenue
                        New York, NY 10016
                        Telephone: (212) 338-3514
                        Email: phara.guberman@foley.com
                                  djordan@foley.com
                                  phosp@foley.com
                                  alexandra.jernigan@foley.com

                        *Attorneys for Advantage Capital Holdings LLC and Kenneth King*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, under Section II.D of Judge Koeltl's individual practices, that this memorandum contains 5,347 words, exclusive of the caption, table of contents, table of authorities, and this certification.

/s/ Phara A. Guberman
Phara A. Guberman