# EXHIBIT E

Case 1:24-cv-03453-JGK-BCM    Document 485-5    Filed 03/06/26    Page 2 of 17

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SIGNAL SML 4 LLC, SPLCSS III LLC,  :
DORCHESTER RECEIVABLES II LLC,
777 PARTNERS LLC and 600 PARTNERS LLC,     Index No. _____/2025

:

Plaintiffs,

:   **VERIFIED COMPLAINT**

- against -

:

LEADENHALL LIFE INSURANCE LINKED
INVESTMENTS FUND PLC,    :

Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiffs Signal SML 4 LLC, SPLCSS III LLC, Dorchester Receivables II LLC, 777

Partners LLC and 600 Partners LLC (collectively, "Plaintiffs"), by their undersigned counsel, as

and for their Verified Complaint against defendant Leadenhall Life Insurance Linked Investments

Fund PLC ("Leadenhall" or "Defendant"), alleges as follows:

## NATURE OF THIS ACTION

1. This is an action to stop three (3) commercially unreasonable, believed to be non-

judicial U.C.C. foreclosure sales (the "UCC Sales") scheduled for May 15, 2025, at 10:00 a.m. by

Defendant, an opportunistic, predatory lender seeking to reap a windfall by virtue of improperly

foreclosing on collateral ("Collateral") which is believed to be thousands of receivables owned by

Plaintiffs Signal SML 4 LLC, SPLCSS III LLC, Dorchester Receivables II LLC ("Borrowers").

Incredibly, Defendant failed and refused to abide by the most basic and unequivocal of

requirements of a sale under the U.C.C. – its notices are defective, and the proposed disposition of

assets is commercially unreasonable because it seeks to preclude the Borrowers' ability to

participate in the UCC Sales as well as their ability to assess their commercial reasonableness. In

fact, after Borrowers sought information on the marketing under a prior notice seeking to sell

Case 1:24-cv-03453-JGK-BCM Document 485-5 Filed 03/06/26 Page 3 of 17

equity interests in Borrowers, Defendant refused to provide any information on how the Collateral was being marketed. When Defendant shifted gears and noticed sales again for the assets of Borrowers, rather than the equity, Defendant would only reveal that the sales would be deemed commercially reasonable. Notably, Defendant would not disclose how the sales had been published, how they were directed to entities that would likely be most interested in assets of this kind, whether a broker or banker specialized in the specific type of collateral was directing the sale process, how and what due diligence was being provided to potential bidders or even the proposed "terms of the sale," which would provide essential bidding requirements, like who could be a "qualified" bidder, what type of deposit and closing timing was being required. Here, Defendant seeks to take, not only what it is due, but also potential surplus proceeds for themselves, by proceeding with the UCC Sales against Borrowers' assets and then attempt to reap millions of dollars by either keeping the assets or selling to third parties at real market rates. Such unreasonable conduct also adversely affects a pivotal right that all Borrowers possess - the equitable right of redemption of the loan.

2. Further, the Defendant's notices of disposition are materially defective. They do not assert the existence of any default, they do not provide the relevant legal context, such as Article 9 of the Uniform Commercial Code, and do not detail the collateral to be sold other than a vague reference to a loan agreement definition that makes no reference to specific assets that comprise the Collateral. Although notice was purportedly sent to interested parties, the revised notice for exercise of Defendant's rights under the applicable security agreement was not sent to Borrowers.

3. The purported UCC disposition notices unreasonably exclude Plaintiffs' participation in the anticipated sales. No details are provided to Borrowers as to how the sales were

2

SGR/80335613.4

Case 1:24-cv-03453-JGK-BCM     Document 485-5     Filed 03/06/26     Page 4 of 17

marketed or the terms of disposition, such as Defendant's right to reject any bids, cash needed and various registration requirements – the absence of which all make the noticed UCC Sales *per se* unreasonable.

4.      The loans at issue originated when Borrowers financed their three (3) valuable portfolios of assets in 2021with Defendant.

5.      Although the loan documents are consolidated, each Borrower independently owns assets that may constitute the Collateral seeking to be sold by the Defendant.

6.      Defendant's proposed UCC Sales are also improper because they are plainly commercially unreasonable in that, among other things, they require knowledge of insider information only privy to the Defendant and their cohorts (such as going through a vetting process that is left entirely up to the Defendant to decide how a bidder can become qualified) and disincentivize third-party bidders from participating due to other unfair terms (such as permitting Defendant to postpone or cancel the UCC Sales at any time without notice to potential bidders) and other terms which Defendant refuses to provide to Plaintiffs.  In addition, the proposed UCC Sales will likely result in a windfall to Defendant or will artificially increase any deficiency because the Collateral is not being marketed in a commercially reasonable manner.

7.      Additionally, Defendant has refused to provide the form of the advertisement for the UCC Sales, and the formal "terms of sale" which apparently will not be provided until the sale. In a world where most asset portfolios with aggregate values exceeding $100 million are financed, especially at the size of these assets, a sale without a fair opportunity to obtain financing is clearly unreasonable and meant to preclude any real bidding at the UCC Sales.

8.      Accordingly, Plaintiffs had no choice but to commence this action seeking declaratory and injunctive relief restraining Defendant from conducting the UCC Sales until the

3

SGR/80335613.4

procedures are provided to Plaintiffs and it is ensured that all aspects of the sales will be commercially reasonable.

## THE PARTIES, CHOICE OF LAW, JURISDICTION, AND VENUE

9.     Borrowers Signal SML 4 LLC, SPLCSS III LLC, and Dorchester Receivables II LLC are Delaware limited liability companies with their principal places of business at 100 SE 2nd Street, Suite 2000, Miami, Florida 33131.

10.    Plaintiffs 777 Partners LLC and 600 Partners LLC (collectively "Guarantors" and with the Borrowers, "Plaintiffs") are Delaware limited liability companies and indirect equity owners of the Borrowers. The Guarantors executed a Guaranty Agreement in favor of Leadenhall, under which they jointly and severally guaranteed certain obligations of the Borrowers under the Loan and Security Agreement. 777 Partners and 600 Partners have a direct legal and financial interest in the Collateral and in preventing its unlawful disposition.

11.    Upon information and belief, Defendant Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall") is an investment company organized as a public limited company under the laws of Ireland, with its principal place of business in Dublin, Ireland. Leadenhall acts as Collateral Agent on behalf of a group of lenders under a secured credit facility extended to the Borrowers.

12.    This Court has jurisdiction over Defendant pursuant to CPLR § 302 in that it is present in New York by virtue of conducting the UCC Sales in the state.

13.    Venue is proper in New York County pursuant to CPLR § 501 and N.Y. Gen Oblig. Law § 5-1402 in that the operative credit facility entered into by the parties designates any New York State Court sitting in New York City as a proper forum.

SGR/80335613.4

14.     Defendant has noticed the UCC Sales for May 15, 2025 at 10:00 a.m. at its counsel's offices at 200 Park Avenue, New York, NY 10166. There is also a case pending in the United States District Court, Southern District of New York brought by Defendant and an affiliate involving the underlying loan agreement, which includes RICO claims (the "SDNY Action"). The SDNY Action is currently the subject of motions to dismiss by inter alia the Plaintiffs herein. Upon information and belief, the SDNY does not possess jurisdiction over this dispute. The dispute between Plaintiffs and Defendant has a substantial nexus to New York County.

15.     New York law governs this dispute pursuant to N.Y. Gen. Oblig. Law§ 5-1401 in that the operative credit facility entered into by the parties designates New York law as governing matters of construction, validity and performance thereunder.

## FACTS RELEVANT TO ALL CLAIMS

### A.      The Loan and Security Agreement and SDNY Action

16.     On May 7, 2021, Borrowers entered into a structured credit facility governed by the Loan and Security Agreement (the "LSA") with non-party Leadenhall Capital Partners LLP as Administrative Agent and Defendant Leadenhall Life Insurance Linked Investments Fund PLC as Collateral Agent. The LSA is structured as a secured credit facility whereby the Borrowers were permitted to draw funds through September 30, 2024, subject to compliance with "Borrowing Base" limitations calculated using a formula specific to the Borrower with reference to the value of pledged receivables.

17.     As security for the loans, each Borrower granted the Collateral Agent a first-priority lien over substantially all of its assets, including cash, receivables, accounts, equity interests in affiliated entities, and rights under related agreements (the "Collateral").

5

SGR/80335613.4

Case 1:24-cv-03453-JGK-BCM    Document 485-5    Filed 03/06/26    Page 7 of 17

18. The LSA requires that the Collateral be owned "free and clear" of adverse claims and that each borrowing be supported by pro forma compliance certifications verifying that the Borrowing Base exceeds outstanding loan principal. In the SDNY Action, Defendant alleges that some receivables of Dorchester Receivables II LLC and SPLCSS III LLC were double-pledged.

19. The Collateral consists of highly illiquid cash flow assets, including:

    a. Structured settlement receivables, derived from court-approved payment streams issued by insurance companies to personal injury claimants;

    b. Assignable annuities;

    c. Lottery receivables, payable over time from government lottery systems; and

    d. Medical lien receivables, tied to litigation-related medical services with repayment contingent on personal injury claim resolutions.

20. The above-referenced receivables are acquired through negotiated transactions at discounted present values, and are individually underwritten based on actuarial models, obligor solvency, court approval records, and enforceability under statutory and contractual terms.

21. The sale, transfer, or valuation of these receivables require specialized diligence and documentation, including judicial transfer orders (in the case of structured settlements), obligor consents, servicing records, and compliance with state-specific consumer protection laws. In particular, because the assets are interest-rate sensitive, potential bidders will factor into their calculations the likelihood that interest rates will decrease and thereby increase the Collateral's value.

22. The Borrowers' operations depend on ongoing performance by affiliated Servicers and Sellers under detailed Servicing Agreements and Sale Agreements, which set forth

6

duties related to receivable collection, legal monitoring, and compliance.

23.     These assets are not traded on any exchange or public platform, and no established secondary market exists for bulk sales of this type. Marketing or monetizing the assets requires asset-by-asset diligence, making any "foreclosure" process inherently complex and ill-suited to compressed timeframes.

24.     On March 15, 2024, Leadenhall issued a formal notice purporting to accelerate all amounts due under the facility, citing alleged Events of Default. Leadenhall demanded immediate payment of $609,529,966.82, including amounts attributable to SPLCSS II LLC ($395.9 million), Dorchester Receivables II LLC ($88.5 million), and Signal SML 4 LLC ($74.3 million).

25.     On May 3, 2024, Defendant and Leadenhall Capital Partners LLP commenced an action in the United States District Court for the Southern District of New York ("NY Action") under docket number 24 Civ. 3453 (JGK)(BCM), asserting claims against Plaintiffs Signal SML 4 LLC, SPLCSS III LLC, and Dorchester Receivables II LLC, among others. That same month, on or about May 13, 2024, Leadenhall moved by order to show cause for a temporary restraining order ("NY TRO") and preliminary injunction. On July 8, 2024, the District Court entered a Preliminary Injunction (ECF No. 146) restraining and enjoining, inter alia, the transfer, dissipation, or disposal by Borrowers of the same assets that are the subject of Leadenhall's May 15, 2025 U.C.C. sale notices.

26.     To date, the Collateral continues to produce income to Defendant and Defendant's lien position remains intact by virtue of the above-referenced preliminary injunction against the Borrowers.

7

SGR/80335613.4

Case 1:24-cv-03453-JGK-BCM    Document 485-5    Filed 03/06/26    Page 9 of 17

**B.**      **Defendant Served Defective Foreclosure Notices**

27.      On or about May 1, 2025, Leadenhall issued Article 9 foreclosure notices scheduling sales of all Collateral for May 15, 2025 at 10:00 AM EST, at the New York offices of its counsel, Paul Hastings LLP. True and correct copies of the notices are annexed hereto as **Exhibits 1-3**.

28.      Section 10.02 of the LSA requires that all notices and communications under the agreement be in writing and delivered by hand, overnight courier, certified or registered mail, telecopy, or email, and sent to the recipient's address "set forth on Schedule III" or to such other address as may be designated "in a written notice to the other parties." A true and correct copy of the relevant excerpt of the LSA is annexed hereto as **Exhibit 4**.

29.      Schedule III of the LSA identifies the designated notice recipients and email addresses for each of the Borrowers as follows:

  a.   For SPLCSS III LLC: Steve Pasko, steve@suttonparkcapital.com
  b.   For Dorchester Receivables II LLC: Steve Pasko, steve@suttonparkcapital.com
  c.   For Signal SML 4 LLC: David Hough, dhough@signalfunds.com

30.      The designated physical address for all three Borrowers is 600 Brickell Avenue, 19th Floor, Miami, Florida 33131.

31.      The UCC Notices were mailed to a different physical address, 100 SE 2nd Street, Suite 2000, Miami, Florida 33131, where Plaintiffs currently maintain offices. Though, Plaintiffs did not receive the UCC Notices until May 5.

32.      Additionally, Leadenhall failed to direct email notice to the contractually designated recipients listed in Schedule III. Upon information and belief, no notice was sent to dhough@signalfunds.com or steve@suttonparkcapital.com.

SGR/80335613.4

33. Instead, Leadenhall apparently sent the foreclosure notices via email to:

   a. Steven Pasko at a different address (spasko@777part.com), and even though Leadenhall knew he no longer managed or controlled the Guarantors;
   b. Jim Howard, who no longer works with Plaintiffs;
   c. Teresa Licamara, where her name and email address were misspelled as tlicamari@brileyfin.com; and
   d. Jordi Guso, outside counsel, who is not a designated notice recipient under the LSA.

34. Upon information and belief, Leadenhall did not direct the notices to the Borrowers' designated legal contact, legalnotices@777part.com, and has provided no indication that any of the actual recipients had authority to receive contractual notice on behalf of the Borrowers.

35. Upon information and belief, Leadenhall also failed to send the required notice of disposition to Plaintiffs 777 Partners LLC and 600 Partners LLC, who executed a Guaranty Agreement and qualify as "secondary obligors" under Article 9. The foreclosure notices' Schedule 1 lists only the Borrowers and omits any reference to the Guarantors, despite their statutory right to receive notice.

36. As a result, Leadenhall failed to comply with the LSA's contractual notice requirements and also failed to satisfy N.Y. U.C.C. § 9-611, which requires that foreclosure notices be sent to the debtor at the address specified in the security agreement or the last known address.

37. In addition to the procedural deficiencies of the notices, there are substantive deficiencies regarding their contents.

38. Notwithstanding the complexity of the asset classes that comprise the Collateral, Leadenhall only provided 14 days' notice of the impending sales and scheduled all three UCC Sales to take place at the same time.

9

SGR/80335613.4

39. Further, contrary to N.Y. U.C.C. §§ 9-610, 9-611, and 9-613, the Collateral is described only by reference to the LSA's general definition, without any itemized schedule, valuation, or receivable-level disclosure.

## C. Defendant's Proposed UCC Sales are Not Commercially Reasonable

40. Although we are now one day away from the proposed sale, it is not known how Leadenhall has marketed the UCC Sales and whether this aspect has been executed in a commercially reasonable manner.

41. Here, the Collateral at issue in the UCC Sales includes structured settlement receivables, lottery receivables, annuities and medical lien receivables. These are illiquid financial instruments that do not trade on public markets and they are not readily understood or valued by generalist investors. Their valuation depends on factors such as payment stream duration, obligor creditworthiness, court approval histories, servicing arrangements and statutory enforceability. These features make them distinct from conventional assets like inventory or accounts receivables. Marketing such assets require specialized expertise and customized sale procedures. Standard practice involves engaging experienced brokers, financial advisors or bankers to identify institutional buyers and facilitate diligence and risk-adjusted pricing. Upon information and belief, Leadenhall did not take any of these steps.

42. The Collateral owned by Plaintiff Dorchester Receivables II LLC ("Dorchester") includes more than 300 receivables in various asset classes. According to Defendant's allegations in the SDNY Action, Dorchester's Collateral is valued at least $40 million dollars.

43. The Collateral owned by Plaintiff SPLCSS III LLC ("SPLCSS") includes approximately 700 receivables and, according to Defendant's allegations in the SDNY Action,

10

SGR/80335613.4

Case 1:24-cv-03453-JGK-BCM   Document 485-5   Filed 03/06/26   Page 12 of 17

is valued in excess of $60 million dollars.

44.     Upon information and belief, if marketed properly, the true value of the Collateral owned by Plaintiff Signal SML 4 LLC ("Signal") could be worth in excess of the outstanding debt.

45.     The notice provides that the Collateral will be sold to the "highest qualified bidder" but no information is provided as to how to become a "qualified" by Leadenhall and Leadenhall has refused to provide such information.

46.     Leadenhall has also refused to provide "Terms of Sale" that may contain additional requirements that Plaintiffs have not been permitted to review.

47.     Remarkably, Leadenhall also reserves the right to "postpone or cancel" the UCC Sales.  Therefore, any prospective (non-colluding) purchaser who is otherwise inclined to bid is faced with the possibility that it will expend the considerable time and resources necessary to formulate a proper bid only to show up at the UCC Sales and be told that it has been cancelled or rescheduled.

48.     Further, upon information and belief, Defendant has failed to make readily available to prospective bidders any standard due diligence materials.  As a matter of fact, it appears that the Defendant is not providing prospective bidders with asset specific information such as asset performance, underlying documentation and other information that would typically be used and evaluated by a prospective bidder in deciding whether to participate in a UCC sale of receivables.

49.     Upon information and belief, Leadenhall has made no efforts to advertise the UCC Sales to the public, and definitely not in any publication directed to investors in receivables.

50.     Moreover, the sales are scheduled to occur at a private law firm office with no

11

SGR/80335613.4

public access or advertisement and Defendant has apparently reserved unilateral discretion to accept or reject bidders, impose undisclosed bidding terms, and credit bid against the debt balance.

51. Plaintiffs have received no instructions, procedures, or disclosures enabling them, or any third party, to qualify as a bidder, conduct diligence, or exercise their rights of redemption under U.C.C. § 9-623.

52. Under no circumstances is the fourteen-day notice set for the UCC Sales a commercially reasonable period for a prospective purchaser to obtain and review all necessary due diligence materials, and formulate an appropriate bid or bids for the assets, which consist of hundreds of different underlying transactions that have varying income streams. Defendant's intentionally compressed period was intended to discourage the vast majority of prospective purchasers from attending the UCC Sales and presenting competing bids for the Collateral.

53. The design and execution of the sale process reflect a calculated effort to suppress price discovery, eliminate competition, and permit Defendant to obtain the Collateral at a distressed internal valuation without market validation.

54. Because the UCC Sales fail, by far, to satisfy the standard for commercial reasonableness under New York law, they are manifestly and commercially unreasonable.

55. As a result of the commercially unreasonable terms of the UCC Sales, Defendant has not taken the necessary and crucial steps to ensure that Borrowers receive fair value for the Collateral. Given the unique and complicated nature of the receivables constituting the Collateral and the fact that the UCC Sales are currently scheduled to take place on May 15, 2025, Defendant's actions pose an imminent threat of irreparable harm to Plaintiffs.

**AS AND FOR A FIRST CAUSE OF ACTION**

12

SGR/80335613.4

Case 1:24-cv-03453-JGK-BCM    Document 485-5    Filed 03/06/26    Page 14 of 17

**(Declaratory Judgment that Proper Notice has Not Been Provided and the UCC Sales are Not Commercially Reasonable)**

56.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

57.    As detailed above, Defendant is intentionally and willfully failing and refusing to conduct the UCC Sales in a commercially reasonable manner in violation of UCC §§ 9-610(b) and/or 9-611 (b).

58.    Under New York law, Defendant bears the burden of proving that its UCC Sales are commercially reasonable in all respects.

59.    An actual, ripe and justiciable controversy exists between Plaintiffs, on the one hand, and Defendant, on the other, as to whether Leadenhall is intentionally and purposefully failing to conduct the UCC Sales in a commercially reasonable manner and as to whether proper notice of the UCC Sales has been provided to Borrowers.

60.    Plaintiffs have no adequate remedy at law other than this form of action to have their rights determined as to the matters set forth herein.

61.    Plaintiffs are therefore entitled to a declaration under CPLR 3001 and UCC § 9-625(a) that Borrowers  have not been provided with proper notice of the UCC Sales and that the UCC Sales are not commercially reasonable and, in consequence, may not go forward.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Injunctive Relief Enjoining Improper, Improperly Noticed and Commercially Unreasonable UCC Sales)**

62.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

63.    Plaintiffs have no adequate remedy at law other than this form of action to have

13

SGR/80335613.4

Case 1:24-cv-03453-JGK-BCM    Document 485-5    Filed 03/06/26    Page 15 of 17

their rights determined as to the matters set forth herein.

64. Plaintiffs will succeed on the merits of their claims herein, namely that Defendant has failed to properly notify Borrowers and Guarantors of the UCC Sales and are intentionally and purposefully failing and refusing to conduct the UCC Sales in a commercially reasonable manner in violation of U.C.C. §§ 9-610(b) and/or 9-611(b).

65. Unless Defendant is restrained and enjoined from conducting the UCC Sales of the Collateral, Plaintiffs will suffer substantial and irreparable injury, including the loss of their valuable and irreplaceable interests in the receivables.

66. By contrast, Defendant will suffer no prejudice if the requested injunction is granted, in that Plaintiffs seek only a required commercially reasonable sale. The equities therefore tip sharply in Plaintiffs' favor.

67. Because Defendant is not conducting the UCC Sales in accordance with the applicable loan documents or U.C.C. §§ 9-610(b) and/or 9-611(b), this Court is authorized under U.C.C. § 9-625(a) to restrain the disposition of the Collateral on appropriate terms and conditions.

68. Plaintiffs are entitled to a permanent injunction restraining and enjoining Defendant from conducting commercially unreasonable UCC Sales of the Collateral and, pending the Court's determination of this action, a preliminary injunction to the same effect.

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

(a) On the First Cause of Action, a declaration under CPLR 3001 that Defendant has failed to notify Borrowers and Guarantors of the UCC Sales in accordance with the requirements of the UCC and are not conducting the UCC Sales in a commercially reasonable manner and, in consequence, it may not go forward;

(b) On the Second Cause of Action, a permanent injunction restraining and enjoining Defendant from conducting improper and commercially unreasonable UCC Sales of the Collateral

14

SGR/80335613.4

and, pending the Court's determination of this action, a preliminary injunction to the same effect;

(c)    Awarding Plaintiffs reimbursement for the costs and expenses incurred in commencing and prosecuting this action; including reasonable attorneys' fees, and

(d)    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 14, 2025

                          **SMITH, GAMBRELL & RUSSELL, LLP**
                          By: */s/ David A. Pellegrino*
                              John G. McCarthy
                              David A. Pellegrino
                              1301 Avenue of the Americas, 15th Floor
                              New York, NY 10019
                              (212) 907-9700
                              jmccarthy@sgrlaw.com
                              dpellegrino@sgrlaw.com
                              *Attorneys for Plaintiffs*

15

SGR/80335613.4

## VERIFICATION

I am the Interim Chief Operating Officer of Plaintiff 777 Partners LLC. In that position, I have oversight responsibilities for 777 Partners and its affiliates including Signal SM4 LLC, SPLCSS III LLC, Dorchester Receivables II LLC and 600 Partners LLC ("Plaintiffs"). I have read the annexed complaint, and its factual contents are true to my personal knowledge, except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

I affirm this 13th day of May, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand this document may be filed in an action or proceeding in a court of law.

Dated: Dallas, Texas

May 13, 2025

_____
Mark Shapiro

SGR/80335613.4

16 of 16