# EXHIBIT I



1(212) 318-6434
danfliman@paulhastings.com


May 14, 2025


**VIA NYSCEF AND E-MAIL**

Hon. Jennifer G. Schecter
Supreme Court, New York County
60 Centre Street, Room 626
New York, NY 10007

**Re:    Signal SML 4 LLC, et al. v. Leadenhall Life Insurance Linked Investments Fund PLC, Index No. 652929/2025**

Dear Justice Schecter:

We represent Defendant Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall") and write, at this Court's direction, in opposition to the Motion for Preliminary Injunction, NYSCEF No. 8 (the "TRO Motion"), filed by Plaintiffs Signal SML 4 LLC ("Signal"), SPLCSS III LLC ("SPLCSS"), Dorchester Receivables II LLC ("Dorchester" and, together with Signal and SPLCSS, the "Borrowers"), 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners" and, together with 777 Partners, the "Guarantors") (collectively "Plaintiffs").

This action is Plaintiffs' latest attempt to frustrate Leadenhall's ability to recover over $600 million in loans Plaintiffs stole through a fraudulent scheme that they perpetrated and concealed for years, which is the subject of a pending action in the Southern District of New York in which Leadenhall won a temporary restraining order and preliminary injunction freezing Plaintiffs' assets, including the collateral at issue here. *See generally Leadenhall Capital Partners LLP et al v. Wander et al*, No. 24-cv-03453 (S.D.N.Y., filed May 3, 2024).[1] Despite the fact that Plaintiffs concede that Leadenhall has the right to foreclose on the assets, they attempt to contrive a dispute to prevent or delay—yet again—Leadenhall's exercise of a contractual remedy. Leadenhall has repeatedly made clear its willingness to work with Plaintiffs and their advisors to ensure that the foreclosure process maximizes the value of the relevant assets. Leadenhall has already postponed the foreclosure sale once at Plaintiffs' request so that Plaintiffs could provide information they claimed was necessary to facilitate the process—which they promised to Leadenhall on April 21 and now, more than three weeks later, have still declined to provide. Plaintiffs have no good-faith basis to ask this Court to further delay the foreclosure process for the reasons described below.

Plaintiffs do not and cannot dispute any of the following: (i) they are in default under that certain Loan and Security Agreement, dated May 7, 2021 ("the LSA"), pursuant to which Plaintiffs are obligated to repay Leadenhall managed funds (the "Secured Parties") in excess of $600 million; (ii) Leadenhall accelerated Plaintiffs' outstanding debt obligations in accordance with the LSA on March 15, 2024, making the full measure of the outstanding debt immediately due and payable to Leadenhall; (iii) Leadenhall, in its capacity as Collateral Agent, is authorized to foreclose on collateral securing the outstanding debt pursuant to the express terms of the LSA, *see* LSA, Section 7.02 ("[T]he Administrative Agent and the Collateral Agent, on behalf of the Secured Parties, shall have, in addition to the rights and remedies which they may have under this Agreement, all other rights and remedies provided after default under the UCC and under other

---

[1]    Leadenhall is evaluating and does not hereby waive its rights to remove this action to federal court.



Hon. Jennifer G. Schecter
May 14, 2025
Page 2

applicable law, which rights and remedies shall be cumulative."); (iv) Plaintiffs know exactly what the collateral is because, in monthly reports issued to Leadenhall over the term of the LSA, they (or their affiliates) identified each asset by asset number to Leadenhall; and (v) none of the notice recipients listed in section 10.02 of the LSA for the collateral being foreclosed upon (Steven Pasko and David Hough) remain employed by Plaintiffs, and Leadenhall served foreclosure notices on April 4, 2025 on the current managers of Plaintiffs.

Having conceded both their own default and Leadenhall's resulting rights to pursue remedies under Article 9 of the Uniform Commercial Code (the "UCC"), Plaintiffs are left only to contest Leadenhall's planned foreclosure sale of collateral on the baseless grounds that it may not be conducted on commercially reasonable terms.  As a threshold matter, however, Plaintiffs' assertions in this regard are entirely without merit.  Plaintiffs were on notice of the planned foreclosure as early as April 1, 2025, at which time they raised complaints similar to those set forth in the TRO Motion.  But, when given an opportunity to participate in the process by which the collateral would be disposed, Plaintiffs declined to work consensually with Leadenhall regarding the terms of any Article 9 foreclosure.  Specifically, Plaintiffs ignored Leadenhall's proposal for a consensual foreclosure process, and separately refused to provide Leadenhall with information that Plaintiffs claim to possess regarding the value of the collateral itself.[2] In light of Plaintiffs' refusal to work cooperatively with Leadenhall on a commercially reasonable process to auction the assets, Leadenhall independently set the terms for this foreclosure, which in all respects comply with applicable UCC requirements.

While these facts should alone defeat Plaintiffs' instant request for extraordinary relief, the Court need not consider the substance of this factual dispute because Plaintiffs clearly cannot demonstrate that they would be irreparably harmed if the foreclosure sale were to proceed as noticed.[3]  As Plaintiffs concede, the collateral subject to foreclosure consists of receivables derived from structured settlements, assignable annuities, lotteries and medical liens—*i.e.*, future revenue streams that, as Plaintiffs concede, are properly due and owing to the lenders under the LSA.  Thus, even assuming, contrary to fact and law, that Plaintiffs have alleged valid concerns regarding the manner in which this foreclosure sale will be conducted, their remedy consists of money damages that (if warranted, which they are not) may be measured by the difference between value realized through the foreclosure and value that Plaintiffs believe should have been realized by the foreclosure had it been conducted on the terms they propose.  *See Shelbourne BRF*

---

[2]    *See* Exhibit A, April 16, 2025 Letter from R. Schwartz to D. Pellegrino ("Prior to serving the foreclosure notices, Paul Hastings reached out to 777's counsel one last time to propose a consensual foreclosure pursuant to Section 9-620 of the Uniform Commercial Code.  The Loan Parties and their fiduciaries, per usual, opted not to respond to this proposal.").

[3]    Although Section 9-625 authorizes injunctive relief, it does not mandate injunctive relief, let alone modify the irreparable harm standard required under New York law.  In fact, the First Department has expressly upheld denials of borrower requests to enjoin UCC dispositions of equity interests in real property where the borrower cannot establish irreparable harm.  *See Broadway 500 W. Monroe Mezz II LLC v. Transwestern Mezzanine Realty Partners II, LLC*, 80 A.D.3d 483, 484 (1st Dep't 2011) (Where a party's "interest in the real estate is commercial, and the harm they fear is the loss of their investment … they can be compensated by damages and therefore cannot demonstrate irreparable harm.") (alterations and citation omitted); *see also Lombard v. Station Square Inn Apartments Corp.*, 94 A.D.3d 717, 721 (2d Dep't 2012) (vacating preliminary injunction of UCC disposition of stock and proprietary leases in co-op units for lack of irreparable harm since plaintiff did not reside in any of the apartments, "his interest in the apartments [was] commercial," and his harm could be fully compensated by monetary damages).



Hon. Jennifer G. Schecter
May 14, 2025
Page 3

*LLC v. SR 677 Bway LLC*, 192 A.D.3d 444, 444 (1st Dep't 2021) (plaintiffs, which sought injunctive relief to block scheduled UCC foreclosure sale, as here, could not show irreparable harm because "feared loss of an investment can be compensated in money damages"); *Broadway 500 W. Monroe Mezz II LLC v. Transwestern Mezzanine Realty Partners II, LLC*, 80 A.D.3d 483, 484 (1st Dep't 2011) ("Since plaintiffs' interest in the real estate is commercial, and the harm they fear is the loss of their investment, as opposed to loss of their home or a unique piece of property . . . they can be compensated by damages and therefore cannot demonstrate irreparable harm."); *Lombard v. Station Sq. Inn Apartments Corp.*, 94 A.D.3d 717, 721-22 (2d Dep't 2012) (plaintiff seeking to block sale of shares could not show irreparable harm "where [] plaintiff [could] be fully compensated by a monetary award").[4]

Plaintiffs also cannot demonstrate that the equities tip in their favor. As a threshold matter, Plaintiffs' refusal to participate in a consensual foreclosure process should alone defeat any argument that equity favors their application. This conclusion is underscored by the broader context of this action against the S.D.N.Y. litigation, where Judge Koeltl has already found that Plaintiffs "do not refute" Leadenhall's assertion that they breached the LSA and that "[t]he balance of hardships weighs in favor of [Leadenhall] even where … preventing the [plaintiffs] from interfering with [Leadenhall's] security interest in the collateral may be destructive for the [plaintiffs'] floundering business." *Leadenhall v. Wander*, No. 24-cv-03453, ECF No. 128 (June 7, 2024 TRO Hr'g Tr.) at 53, 57-58. Indeed, when taking into account the contentious history between these parties, it is clear that Plaintiffs' instant request for injunctive relief amounts to no more than their latest attempt to frustrate Leadenhall's ability to recover over $600 million in loans that Plaintiffs stole through a fraudulent scheme they perpetrated and concealed for years.

For these reasons, the TRO Motion should be denied. To the extent the Court has any further questions regarding the issues in dispute or the circumstances precipitating the planned foreclosure, Leadenhall requests an opportunity to be heard before the TRO Motion is adjudicated.

Respectfully submitted,

Daniel A. Fliman

---

[4]    Indeed, Plaintiffs appear to concede this point as well in that they point to no authority whatsoever for the proposition that a potential loss in perceived value of a future revenue stream could constitute irreparable harm, and otherwise purport to rely primarily on a decision in which parties had stipulated to irreparable harm in the first place. *See* TRO Motion at 8-9, citing *D2 Mark LLC v. OREI VI Invs., LLC*, 2020 WL 3432950, at *6 (Sup. Ct. N.Y. Cty. Jan. 21, 2020) ("The parties agreed to limit plaintiffs remedies to injunctive relief; money damages are not available to plaintiff here. (NYSCEF 8, Mezzanine Loan Agreement at § 10.12.) Such a provision is enough to establish irreparable harm.").