1:24-cv-03453-JGK-BCM

24-2647 (L)
Leadenhall Capital Partners LLP v. Advantage Capital Holdings, LLC

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 23 2026

# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term 2024
Argued:  April 1, 2025
Decided: March 23, 2026

Nos. 24-2647 (L), 24-2867 (Con)

---

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED
INVESTMENTS FUND PLC,
*Plaintiffs-Appellees*,

ING CAPITAL LLC, HAYMARKET INSURANCE COMPANY, ACM DELEGATE LLC,
NATIONAL FOUNDERS LP,
*Intervenors*,

v.

ADVANTAGE CAPITAL HOLDINGS LLC, KENNETH KING, 777 PARTNERS LLC, 600
PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES
LLC, DORCHESTER RECEIVABLES II LLC,
*Defendants-Appellants*,

JOSH WANDER, STEVEN PASKO, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL
RECEIVABLES LLC, INSURETY CAPITAL LLP, SUTTONPARK SERVICING LLC, SIGNAL
SERVICING LLC, INSURETY SERVICING LLC,
*Defendants*.

---

Appeal from the United States District Court
for the Southern District of New York
Docket No. 1:24-cv-3453, John G. Koeltl, *District Judge*.

---

CERTIFIED COPY ISSUED ON 03/23/2026

Before:  SACK, PÉREZ, and MERRIAM, *Circuit Judges.*

This appeal is about whether the District Court had the equitable power in this case to freeze the guarantors' assets upon the borrowers' default.  Defendants-Appellants are guarantors, who assert that the District Court (Hon. John G. Koeltl, *J.*) abused its discretion in granting a preliminary injunction freezing their assets based on the District Court's conclusion that Plaintiffs had sufficient contractual and equitable interests in those assets.  Plaintiffs are a pair of lenders who sued debtor Defendants for breach of contract to collect on their debt.  In the same action, Plaintiffs also sued the entities that guaranteed the debt—the guarantor Defendants-Appellants.  Worried that guarantor Defendants would dispose of their assets before Plaintiffs could secure a final judgment, Plaintiffs moved for a preliminary injunction freezing both debtor and guarantor Defendants' assets. The District Court granted the preliminary injunction, and Defendants appealed.

On appeal, Defendants argue that freezing the guarantor Defendants' assets was in contravention of the Supreme Court's decision in *Grupo Mexicano De Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which held that a court cannot issue a preliminary injunction freezing assets in which no lien or equitable interest is claimed.  We agree.  Plaintiffs have not demonstrated a lien or equitable interest in guarantor Defendants' assets: they point to no current legal interest in guarantor Defendants' property, and they do not seek ultimate relief that gives rise to an equitable interest.  Accordingly, we VACATE the portion of the District Court's preliminary injunction order restraining guarantor Defendants' assets and REMAND for further proceedings consistent with this opinion.

---

> JONATHAN M. WATKINS, (Michael E. Petrella, Matthew M. Karlan, *on the brief*), Cadwalader, Wickersham & Taft LLP, New York, NY, *for Defendants-Appellants Advantage Capital Holdings LLC and Kenneth King*
>
> JOHN G. MCCARTHY, Smith, Gambrell & Russell, LLP, New York, NY, *for Defendants-Appellants 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Signal SML 4 LLC,*

2

*Insurety Agency Services LLC, and Dorchester Receivables II LLC*

LEIGH M. NATHANSON, (Craig Carpenito, King & Spalding LLP, New York, NY, Paul Alessio Mezzina, Zoe M. Beiner, King & Spalding LLP, Washington, DC, *on the brief*), King & Spalding LLP, New York, NY, *for Plaintiffs-Appellees*.

MYRNA PÉREZ, *Circuit Judge*:

This appeal is about whether the District Court had the equitable power in this case to freeze the guarantors' assets upon the borrowers' default. Defendants-Appellants[1] are guarantors, who assert that the District Court (Hon. John G. Koeltl, *J.*) abused its discretion in granting a preliminary injunction freezing their assets based on the District Court's conclusion that Plaintiffs had sufficient contractual and equitable interests in those assets. Plaintiffs are a pair of lenders, Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC, who sued debtor Defendants for breach of contract to collect on their debt. In the same action, Plaintiffs also sued the entities that guaranteed the debt—the guarantor Defendants-Appellants. Worried that guarantor Defendants would

---

[1] Defendants-Appellants are: Advantage Capital Holdings LLC, Kenneth King, 777 Partners LLC, 600 Partners LLC, SPLCSS III LLC, Signal SML 4 LLC, Insurety Agency Services LLC, and Dorchester Receivables II LLC.

3

dispose of their assets before Plaintiffs could secure a final judgment, Plaintiffs moved for a preliminary injunction freezing both debtor and guarantor Defendants' assets. The District Court granted the preliminary injunction, and Defendants appealed.

On appeal, Defendants argue that freezing the guarantor Defendants' assets was in contravention of the Supreme Court's decision in *Grupo Mexicano De Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which held that a court cannot issue a preliminary injunction freezing assets in which no lien or equitable interest is claimed. We agree. Plaintiffs have not demonstrated a lien or equitable interest in guarantor Defendants' assets: they point to no current legal interest in guarantor Defendants' property, and they do not seek ultimate relief that gives rise to an equitable interest. Accordingly, we VACATE the portion of the District Court's preliminary injunction order restraining guarantor Defendants' assets and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

In May 2021, Plaintiffs-Appellees Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (together, "Leadenhall") entered into a Loan and Security Agreement ("LSA") with four special purpose investment entities, Defendants-Appellants SPLCSS III LLC, Dorchester Receivables II LLC, Insurety Agency Services LLC, and Signal SML 4 LLC (each a "Borrower," and together, "Borrowers"). Under the terms of the LSA, Leadenhall lent capital to Borrowers to finance their purchase of investment instruments. This debt was secured under the LSA by Borrowers' grant to Leadenhall of a first-priority interest in the entirety of Borrowers' assets and equity as collateral. Leadenhall also executed agreements with Borrowers' ultimate parents, Defendants-Appellants 777 Partners LLC and 600 Partners LLC ("Guarantors"), who agreed to guarantee those loans. Under that agreement, "[e]ach Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably guarantees to [Leadenhall], . . . the full and punctual payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations." App'x at 254. "Guaranteed Obligations" is defined, in

part, as including all obligations under the LSA. App'x at 252. Relevant here, Guarantors did not pledge any collateral as part of their agreements with Leadenhall.

In September 2022, Leadenhall received an anonymous tip that the collateral pledged to secure Leadenhall's loans to Borrowers was either also pledged to secure other debts, or not in fact owned by Borrowers at all, either of which would breach Borrowers' LSA obligations. App'x at 1110. By November 2023, Leadenhall believed it had confirmed the tip, and sent formal notice to Borrowers of their alleged breaches. App'x at 1110–31. Leadenhall believed it was being defrauded, and in March 2024, Leadenhall exercised its contractual option to demand immediate payment of the entire outstanding debt of $609,529,966.82 (the "Accelerated Debt"). App'x at 1131–32.

It soon became clear that neither Borrowers nor Guarantors were able to pay the Accelerated Debt. App'x at 1132–35. In addition, Leadenhall learned that Defendant-Appellant Advantage Capital Holdings ("A-CAP") was a secured lender to Guarantor 777 Partners LLC and had been in control of 777 Partners's operations.[2] App'x at 1131–37. Because 777 Partners was also having trouble

---

[2]    Defendant-Appellant Kenneth King is A-CAP's Chief Executive Officer.

6

servicing A-CAP's debt, A-CAP was seeking to foreclose on 777 Partners's assets. Rather than foreclosing on Borrowers' assets, Leadenhall instead sought to collect the Accelerated Debt via a lawsuit alleging claims for breach of contract, fraud, and RICO violations, against Borrowers, Guarantors, A-CAP, and related entities and individuals.

## II.    Procedural History

Leadenhall filed suit on May 3, 2024, in the Southern District of New York. Ten days later, Leadenhall moved for a temporary restraining order ("TRO") on the basis of its contract claims,[3] alleging that Borrowers and Guarantors were unable to pay the Accelerated Debt, and that they were in the process of liquidating and dissipating remaining assets. The requested TRO was therefore to freeze Borrowers' and Guarantors' assets up to the amount of the full Accelerated

---

[3]    Leadenhall's original Complaint and Amended Complaint both asserted claims of fraud, conspiracy to defraud, and unjust enrichment. *See* App'x at 109–17, 1204–28. While the District Court referenced these claims when denying modification of the preliminary injunction, *see* App'x at 1346–47, its original grant of a TRO was premised on "Leadenhall focus[ing] its analysis on the contract claims, which provide, on their own, a sufficient basis for the Court to order the relief requested," *see* App'x at 816, and it "issue[d] the preliminary injunction for the reasons stated that [it] issued the TRO," *see* App'x at 1340. The parties acknowledge that the preliminary injunction at issue is premised on Leadenhall's contract claims. *See* A-CAP Br. at 16 ("When Leadenhall applied for a temporary restraining order, it did so based only on its contract claims . . . ."); Appellees' Br. at 12 ("The TRO application was based on Leadenhall's breach-of-contract claims against the Borrowers and Guarantors . . . ."); Appellees' Suppl. Letter Br. at 23 (conceding that "allegations of fraud" were "not the basis for the injunction"). While "the Supreme Court has made clear that the equitable label applied to a claim is not determinative," *see Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 155 (2d Cir. 2014), we do, however, limit our review to the basis of the District Court's injunction, which is Leadenhall's contract claims, *see Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996).

7

Debt.  The District Court held a TRO hearing and issued a TRO the same day.  *See* App'x at 831–34.  It subsequently converted the TRO into a preliminary injunction. *See* App'x at 923, 933.

Throughout their opposition to the TRO and the preliminary injunction, Borrowers, Guarantors, and A-CAP focused primarily on the Supreme Court's decision in *Grupo Mexicano De Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).  They argued that the District Court lacked power to freeze Guarantors' assets because, although Leadenhall has an equitable interest in *Borrowers'* assets which were pledged as collateral, it has no such interest in *Guarantors'* assets.  The District Court disagreed, concluding that *Grupo Mexicano* was distinguishable: "In *Grupo Mexicano*, as opposed to this case, the notes issued by the borrower and guaranteed by the guarantors were explicitly unsecured," whereas here, "the guarantors guaranteed performance of all the borrowers' obligations to Leadenhall."  App'x at 819.

A-CAP moved to reconsider and modify the preliminary injunction to unfreeze assets not specifically pledged.  The District Court held a hearing on the motion to reconsider on October 2, 2024, where it denied the motion from the bench, allowing the injunction against Guarantors to stand.

8

A-CAP appealed the preliminary injunction and subsequent denial to reconsider and modify the injunction insofar as it freezes Guarantors' assets.[4] A-CAP does not appeal the freezing of Borrowers' assets. *See* A-CAP Br. at 3 ("Because Leadenhall has no lien or equitable interest in Guarantors' assets, the portion of the preliminary injunction restraining those assets should be vacated."). Borrowers and Guarantors separately noticed their appeal of the preliminary injunction, but largely adopt A-CAP's positions on appeal. *See* Borrowers' & Guarantors' Br. at 2 ("Pursuant to Federal Rule of Appellate Procedure 28(i), the 777 Appellants adopt by reference the argument set forth in the A-CAP Appellants' brief.").

## STANDARD OF REVIEW

We review a district court's grant, denial, or modification of a preliminary injunction for abuse of discretion. *See JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 99 (2d Cir. 2024). Relevant here, we find an abuse of discretion if a district court "based its ruling on an erroneous view of the law" or "made a clearly erroneous assessment of the evidence." *Id.* (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)).

---

[4]     A-CAP claims "a perfected, first-priority security interest in substantially all of Guarantors' now-frozen assets." A-CAP Br. at 12.

9

## DISCUSSION

This appeal concerns whether *Grupo Mexicano* precludes the freezing of Guarantors' assets, so we first address *Grupo Mexicano* and its holding. We then assess whether Leadenhall properly claims an interest in Guarantors' assets, which in turn allows us to determine whether *Grupo Mexicano*'s holding applies to the case at bar. Finally, we consider whether the preliminary injunction may be affirmed on an alternate basis as an attachment under New York law.

We conclude that Leadenhall has neither a lien nor an equitable interest in Guarantors' assets. Leadenhall has not shown that it is a secured creditor as to Guarantors, nor has it shown that it is seeking ultimate equitable relief that would give rise to an equitable interest in Guarantor's property. As a result, under *Grupo Mexicano*, the District Court did not have the authority to issue a preliminary injunction freezing those assets, and the District Court's contrary ruling amounted to an abuse of discretion. Because *Grupo Mexicano* precludes freezing Guarantors' assets in this case, and because we cannot affirm under the alternate basis of attachment on this record, the portion of the District Court's preliminary injunction restraining Guarantors' assets is therefore vacated.[5]

---

[5]   The injunction also restrains Borrowers' assets, which is not challenged here.

## I.    *Grupo Mexicano*

*Grupo Mexicano* considered "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed."   527 U.S. 308, 310 (1999).   To answer that question, the Supreme Court explained that a district court's equitable authority to issue preliminary injunctions—pursuant to Rule 65 of the Federal Rules of Civil Procedure—is circumscribed by "traditional principles of equity jurisdiction."   *Id.* at 319 (quoting 11A Wright & Miller's Federal Practice & Procedure § 2941 (2d ed. 1995)).   And those traditional principles, according to *Grupo Mexicano*, consist of "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789."   *Id.* at 318 (quoting Armistead M. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)).   The Supreme Court ultimately denied the preliminary injunction that sought the asset freeze:   "Because such a remedy was historically unavailable from a court of equity, we hold that the District Court had no authority to issue a preliminary injunction preventing petitioners from

11

disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 333.

As *Grupo Mexicano* explained, determining the equitable power of the courts in this context is to determine "the time and manner in which the property of a debtor ceases to be subject to his disposition, and becomes subject to the rights of his creditor." *Id.* at 323 n.6 (quoting *Adler v. Fenton*, 65 U.S. 407, 411 (1861)). And where a creditor claims no preexisting lien or equitable interest in the assets sought to be enjoined:

> A creditor acquires a lien upon the lands of his debtor by a judgment; and upon the personal goods of the debtor, by the delivery of an execution to the sheriff. It is only by these liens that a creditor has any vested or specific right in the property of his debtor. Before these liens are acquired, the debtor has full dominion over his property; he may convert one species of property into another, and he may alienate to a purchaser.

*Id.* (quoting *Adler*, 65 U.S. at 411).

The crux of the dispute in *Grupo Mexicano* was not the validity of those baseline principles, but rather if and when a district court's equitable power may extend *beyond* that baseline. The Supreme Court was faced with a situation in which the plaintiff "had satisfied all conditions precedent to its breach of contract claim," the defendant "had no plausible defense on the merits," and "unchallenged evidence indicated that [defendant] was so rapidly disbursing its

12

sole remaining asset that, absent provisional action by the District Court, [plaintiff] would have been unable to collect on the money judgment for which it qualified." *Id.* at 333–34 (Ginsburg, J., dissenting).  As such, were it "possible for the District Judge to set up 'a pie-powder court . . . on the instant and on the spot,' the judge could have moved without pause from evidence taking to entry of final judgment for [plaintiff], including an order prohibiting [defendant] from transferring assets necessary to satisfy the judgment."  *Id.* (Ginsburg, J., dissenting) (quoting *Parks v. City of Boston*, 32 Mass. (15 Pick.) 198, 208 (1834) (Shaw, C. J.)).  Even so, and while acknowledging that "equity is flexible," the majority in *Grupo Mexicano* held that "in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief."  *Id.* at 322.  While hewing tightly to the "well-established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property," the Supreme Court acknowledged that general creditors nevertheless have an "arsenal" of options available to them, including "bankruptcy, fraudulent conveyances, and preferences."  *Id.* at 321, 331.

Grupo Mexicano thus stands for the rather unremarkable observation that in a claim for contractual money damages, "before judgment (or its equivalent) an

unsecured creditor has no rights at law or in equity in the property of his debtor."

*Id.* at 330. To be clear, while *Grupo Mexicano* referred to an "unsecured creditor,"

what mattered at bottom was that the creditor claimed "no lien or equitable

interest" precisely *because* the creditor in that case presented only a "contract claim

for money damages." *Id.* at 310, 333. That is, whether a creditor is secured goes to

whether it has a lien, and does not determine whether it may nevertheless have an

equitable interest, which depends on the nature of the claim.

Indeed, in distinguishing precedent that purportedly held otherwise, *Grupo*

*Mexicano* explained that cases where the complaint "state[d] a cause [of action] for

equitable relief" are "not on point here," and that where "the creditor (the

Government) asserted an equitable lien on the property," such a situation

"presents a different case from that of the unsecured general creditor." *Id.* at 325–

26 (alteration in original).

In that sense, the admittedly imprecise language referencing whether a

creditor is "secured" or "unsecured" under *Grupo Mexicano* is relevant to—but not

dispositive of—the substantive inquiry, which is whether a creditor has a lien or

equitable interest. *See Gucci America, Inc. v. Bank of China*, 768 F.3d 122, 130 (2d Cir.

2014) ("The [Supreme] Court's holding [in *Grupo Mexicano*] was limited to actions

for money damages in which plaintiffs seek a preliminary injunction to prevent the defendant 'from transferring assets in which no lien or equitable interest is claimed.'" (quoting *Grupo Mexicano*, 527 U.S. at 310)).  The point is simply that where a creditor claims no rights in a debtor's assets, neither law nor equity shall operate to grant such rights pre-judgment.

## II.   Whether a Lien or Equitable Interest Is Claimed

Whether *Grupo Mexicano* permits a pre-judgment restraint on Guarantors' assets thus depends on whether Leadenhall properly claims a "lien or equitable interest" in those assets.  527 U.S. at 310.  We conclude that, on this record, Leadenhall has failed to establish that it possesses either.  Therefore, under *Grupo Mexicano*, the District Court abused its discretion in restraining Guarantors' assets based on a finding that plaintiffs were likely to succeed on the contract claims against them.

### 1.  No Lien at Issue

Leadenhall has failed to establish that it has a lien on Guarantors' assets.  A lien is a "legal right or interest that a creditor has in another's property."  *Lien*,

Black's Law Dictionary (12th ed. 2024).[6]  Leadenhall asserts that Guarantors "guaranteed all of the Borrowers' obligations—including not just the obligation to *repay* the debt, but also the obligation to *secure* the debt."  Appellees' Br. at 33.  In essence, Leadenhall asserts that Guarantors have a contractual "obligation to provide sufficient collateral to secure the Borrowers' loans" that provides Leadenhall with a current legal interest in Guarantors' property.  Appellees' Suppl. Letter Br. at 21.  We thus examine the specific nature of that obligation.

The contracts in question define the parties' obligations.  Guarantors agreed to "the full and punctual payment and performance when due" of all of Borrowers' obligations under the LSA.  App'x at 254; *see also* App'x at 252.  And "'Obligations' is defined in the LSA to include 'the performance of *all of the terms, covenants and agreements on the part of such Borrower* (whether as Borrower or otherwise) to be performed under this Agreement or any document delivered in connection with this Agreement.'"  Appellees' Br. at 43–44 (quoting App'x at 60).  As for the collateral pledged by Borrowers, those specific assets were pledged when the LSA became effective:  "Section 2.15 Security Interest. (a) To secure the

---

[6]      Indeed, the entry for "lien" in Black's Law Dictionary cross-references the entry for "pledge," the relevant part of which says: "A bailment or other deposit of personal property to a creditor as security for a debt or obligation." *Pledge*, Black's Law Dictionary (12th ed. 2024).  As this section explains, a lien in this context most directly means any extent to which assets are pledged as collateral.

16

performance by the Borrowers of all of the Obligations, each Borrower *hereby*

*grants* to the Collateral Agent for the benefit of the Secured Parties in the Related

Lender Group with respect to such Borrower, a first-priority security interest in

the Collateral." App'x at 214 (emphasis added). It is undisputed that Guarantors

do not hold any of the pledged collateral that Leadenhall could foreclose on, and

also that Guarantors did not pledge any assets themselves.

So, the obligated performance in question has nothing to do with *existing*

collateral, but rather the obligation to provide and perfect *additional* collateral,

precisely because it turned out that the existing collateral was insufficient.[7] *See*

Appellees' Br. at 37 ("Leadenhall is seeking injunctive relief to compel the

Borrowers and Guarantors to fulfill their contractual obligation *to acquire and pledge*

sufficient collateral to secure Leadenhall's debt." (emphasis added)). Even with

this characterization of the relevant obligations, Leadenhall does not—because it

---

[7] The parties dispute the actual contractual obligations at issue. For example, Leadenhall asserts that "the Borrowers were contractually required to ensure they owned the appropriate amount of collateral on an ongoing basis" under the LSA. Appellees' Suppl. Letter Br. at 5–8. Guarantors (via A-CAP) in contrast assert that the LSA contains no affirmative obligation to extend collateral at all, but rather triggers protections for Leadenhall in the event of a collateral deficiency, such as relieving lending obligations and accelerating debt repayment obligations. *See* A-CAP Suppl. Letter Br. at 30–36. Determining the actual obligations under the LSA goes to the ultimate merits of the contractual claims; for purposes of resolving this preliminary injunction on appeal, we take Leadenhall's allegations of those rights to determine whether a lien or an equitable interest is sufficiently asserted in the first instance. *See Deckert v. Indep. Shares Corp.,* 311 U.S. 282, 289 (1940) ("It is enough at this time to determine that the bill contains allegations which, if proved, entitle petitioners to some equitable relief. Whether or not they sufficiently allege or prove their right to all of the relief prayed in the bill we do not decide because the question is not before us.").

cannot—assert that it has a current legal right to, or interest in, Guarantors' assets. Leadenhall does not point to any contractual language pledging Guarantors' assets as additional collateral, nor any contractual specifications at all for what any additional collateral would be.  To wit, Leadenhall only asserts that "[t]he Guarantors' assets must be preserved (up to the amount of the Accelerated Debt) so they can ultimately fulfill their own obligation to protect Leadenhall's rights as a secured creditor."  Appellees' Br. at 33.  And because it asserts no legal right to foreclose upon or otherwise control Guarantors' assets, Leadenhall is not a secured creditor as to Guarantors.  *See Secured*, Black's Law Dictionary (12th ed. 2024) ("(Of a creditor) protected by a pledge, mortgage, or other encumbrance of property that helps ensure financial soundness and confidence.").  Leadenhall cannot claim a lien on Guarantors' assets, and thus, under *Grupo Mexicano*, Leadenhall cannot obtain a pre-judgment restraint on Guarantors' assets on that basis.

### 2.  No Equitable Interest at Issue

On its contract claims at issue, Leadenhall has failed to show that the ultimate relief it seeks gives rise to an equitable interest.  As a general principle, a "claim for money due and owing under a contract is 'quintessentially an action at law,'" *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002)

(quoting *Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000)), because "[m]oney damages are, of course, the classic form of *legal* relief," *id.* (alteration in original) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)).  Nevertheless, claims for money can still implicate equitable interests: "a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.* at 213.  Such money claims are distinguishable from the general principle because an equitable interest in property is an interest in *particular* property, as opposed to a general interest in receiving compensation.  *See Coan v. Kaufman*, 457 F.3d 250, 262–64 (2d Cir. 2006) (drawing the same distinction between equitable and legal "restitutionary monetary relief" in the ERISA context, and holding that the remedy sought was not equitable because plaintiff "seeks monetary relief; she does not attempt to recover a specifically identified fund from the defendants").

Leadenhall identifies no particular property of Guarantors' that it is entitled to; the nature of the alleged obligation at issue is simply that Guarantors owe funds to meet Borrowers' collateral deficiency.  And that additional collateral is

19

fungible—there is no claim that any specific assets of Guarantors must be provided as collateral or applied to service outstanding debts, nor that Guarantors must obtain any specific assets to do so.  In other words, the contractual obligation in question is for Guarantors to pay money.   "Typically, however, specific performance of a contract to pay money was not available in equity."  *Knudson*, 534 U.S. at 211.  So too here.  That the District Court found "Leadenhall has demonstrated that the borrowers and guarantors would be unable to satisfy a substantial damage award and intend to frustrate any judgment on the merits by making an award uncollectible" does not alter the *nature* of the obligation sought to be enforced here, which is a *legal* interest in money due and owing under a contractual obligation.  App'x at 820.  The obligation sought to be enforced thus does not give rise to an equitable interest.

To be sure, a preliminary injunction may restrain fungible assets like money without identifying particular property, but only "where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief."  *Gucci America, Inc. v. Bank of China*, 768 F.3d 122, 131 (2d Cir. 2014) (citation omitted).  But Leadenhall identifies no final equitable relief to which the asset freeze could be "ancillary," and thus fails to claim an equitable interest.

20

*Gucci America* for example involved an asset freeze that Leadenhall claims is "directly analogous." Appellees' Suppl. Letter Br. at 34. But *Gucci America* made clear that plaintiffs there were "seeking an *accounting* of the defendants' profits, in addition to injunctive relief and monetary damages, under the Lanham Act," and that "the common law action of 'account' is one of the earliest examples of a restitutionary action in equity, imposing on a defendant the obligation to disclose and return profits from the use of the plaintiff's property." 768 F.3d at 131–33; *see Knudson*, 534 U.S. at 214 n.2 (describing the general rule that equitable restitution requires particular funds or property, and that "[t]here is a limited exception for an accounting for profits"). It was thus not improper to freeze assets without identifying particular funds because doing so was ancillary to the equitable final relief pursuant to statutory authority, *see Gucci America*, 768 F.3d at 131–33, and "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945). This aligns with our reading of *Grupo Mexicano*: The propriety of a preliminary injunction in relation to a court's equitable powers is determined by the nature of the *final* relief sought.

21

Granted, when it comes to monetary relief, construing the character of that final relief as either legal or equitable can sometimes require a "fine distinction." *Cf. Knudson*, 534 U.S. at 214–15; *see also De Beers Consol. Mines, Ltd.*, 325 U.S. at 219 ("Preliminary to a discussion of the course of decision in chancery it will be well to note exactly what is the substance of the injunction, since the name given to the process is not determinative."); *Gucci America*, 768 F.3d at 131 (observing "that recovery of profits 'is not easily characterized as legal or equitable'" (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 668 n.1 (2014))); *cf. SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978) (determining the right to a jury trial by "analyz[ing] the nature of the claim for a money judgment" because "[t]he name which the complaint affixes to the money claim is not controlling"). Take, for example, "the well-settled principle that restitution is 'not an *exclusively* equitable remedy,'" such that "whether it is legal or equitable in a particular case . . . remains dependent on the nature of the relief sought." *Knudson*, 534 U.S. at 215 (quoting *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)). *Knudson* distinguished between "cases in which the plaintiff 'could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the

22

defendant had received from him,'" and cases "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession," as actions for restitution in law and in equity, respectively. *Id.* at 212–14 (quoting 1 Dan B. Dobbs, Law of Remedies § 4.2(1), at 571 (2d ed. 1993)). Both are actions for a payment of a sum of money, but the underlying basis of that relief is different.

In sum, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214. Or, put another way, "[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." *Grupo Mexicano*, 527 U.S. at 325 (distinguishing *Deckert v. Independence Shares Corporation*, 311 U.S. 282 (1940), which permitted a pre-judgment asset freeze because the creditor's bill "stated a cause of action for the equitable remedies of rescission of the contracts and restitution of the consideration paid"); *see also Gucci America*, 768 F.3d at 130–31.

The contract claims at issue seek no other final relief beyond monetary damages in the form of the Accelerated Debt plus interest—that is, full and due

23

payment of the "secured debt obligation."  App'x at 1190–228; *see also* App'x at 1017.  The "specific performance" being sought is therefore "equitable assistance in the collection of a legal debt," a recourse precisely foreclosed by *Grupo Mexicano*. 527 U.S. at 325.  While Leadenhall recognizes that "contracts—and particularly breaches of contracts—often give rise to equitable rights, including but not limited to rights of specific performance, rescission, restitution, disgorgement, and the like," Leadenhall does *not* assert such a claim.  Appellees' Br. at 41.  Indeed, as Leadenhall itself states, the allegations of fraud are "not the basis for the injunction" in question.  Appellees' Suppl. Letter Br. at 23–24.  Leadenhall asserts that it seeks specific performance "in forcing the Borrowers—and Guarantors—to perform their obligations to hold sufficient collateral to satisfy the secured debt obligation."  Appellees' Br. at 36.  But that is nothing more than saying the specific performance desired is ensuring the legal debt can be paid.

Inescapably, "[h]ere, petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity."  *Knudson*, 534 U.S. at 210; *cf. De Beers Consol. Mines, Ltd.*, 325 U.S. at 222–23 (rejecting monetary injunction under Sherman Act as unauthorized by statute or equity, because otherwise "it is difficult to see why a

plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action," and "[n]o relief of this character has been thought justified in the long history of equity jurisprudence"). Without a cognizable equitable interest at issue, *Grupo Mexicano* controls, and the District Court lacked authority to freeze Guarantors' assets. 527 U.S. at 322 (explaining that "there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others," and that "[t]he law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not").

## III.   State-Law Attachment

Finally, Leadenhall offers an alternative basis by which it asserts this Court could affirm the injunction against Guarantors' assets: "a prejudgment attachment under state law pursuant to [Federal Rule of Civil Procedure] 64." Appellee's Br. at 21. But an attachment is a distinct order applying state law, not an alternative basis for a preliminary injunction under federal law. An attachment order also requires factual findings—including with respect to whether Guarantors have

acted with intent to frustrate enforcement of a future judgment against them. *See*

*Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218–19 (2d Cir. 2006)

(quoting N.Y. C.P.L.R. § 6201(3) (Consol. 2025)).

Those factual findings were not made by the District Court and are not

evident from the record. *See* App'x at 823 ("If Leadenhall seeks an attachment, it

should move separately for an attachment, and the Court would afford the other

parties an opportunity to respond, and Leadenhall an opportunity to reply."). The

District Court can decide on remand whether to issue such an order.

## CONCLUSION

For the foregoing reasons, we VACATE the portion of the District Court's

preliminary injunction order restraining Guarantors' assets and REMAND for

further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit