**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEADENHALL CAPITAL PARTNERS LLP AND LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSH WANDER, STEVEN PASKO, KENNETH KING, 777 PARTNERS LLC, 600 PARTNERS LLC, SPLCSS III LLC, SIGNAL SML 4 LLC, INSURETY AGENCY SERVICES LLC, DORCHESTER RECEIVABLES II LLC, SUTTONPARK CAPITAL LLC, SIGNAL MEDICAL RECEIVABLES LLC, INSURETY CAPITAL LLC, SUTTONPARK SERVICING LLC, and ADVANTAGE CAPITAL HOLDINGS LLC,<br><br>*Defendants*. | Civil Action No. 1:24-cv-03453 (JGK) |

# ADVANTAGE CAPITAL HOLDINGS LLC AND KENNETH KING'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO STAY PROCEEDINGS

FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016
(212) 338-3514
*Attorneys for Advantage Capital Holdings LLC and Kenneth King*

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 1

II. RELEVANT BACKGROUND AND PROCEDURAL HISTORY .......... 2

A. This Litigation .......... 2

B. The Involuntary Petition and Voluntary Chapter 11 Filings .......... 3

C. Leadenhall's Stipulation to Stay the Non-Debtor 777 Entity Defendants. .......... 4

D. Wander's Separate Criminal Prosecution. .......... 4

E. Live Bankruptcy Issues that Overlap with This Action. .......... 5

F. A-CAP and King Sought a Consensual Stay, which Leadenhall Declined. .......... 8

III. LEGAL STANDARD .......... 8

IV. ARGUMENT .......... 9

A. The Chapter 11 Cases Have Fundamentally Changed the Procedural Posture of This Action .......... 9

B. The Discretionary Stay Factors Favor a Stay .......... 10

1. Leadenhall Will Suffer No Cognizable Prejudice From a Time-Limited Stay .......... 10

2. Proceeding Against A-CAP and King Alone Would Create an Asymmetric and Fragmented Litigation. .......... 10

3. A Stay Will Promote Judicial Economy and Avoid Duplicative or Inconsistent Proceedings .......... 12

4. The Interests of Non-Parties Favor a Stay. .......... 13

5. The Public Interest Supports Fair, Efficient, and Non-Duplicative Adjudication. .......... 14

V. CONCLUSION .......... 14

# TABLE OF AUTHORITIES

Page(s)

Cases

*Fagan v. Republic of Austria*,
No. 08Civ 6715, 2009 WL 1423338 (S.D.N.Y. May 19, 2009) ... 9

*Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*,
No. 11 Civ. 4141 (BSJ), 2012 WL 252139 (S.D.N.Y. Jan. 25, 2012) ... 9

*Futch v. Starboard With Cheese, LLC*,
830 F. Supp. 3d 736 (S.D. Ill. 2025) ... 12, 13, 14

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) ... 14

*In re Ionosphere Clubs, Inc.*,
124 B.R. 635 (S.D.N.Y. 1991) ... 12, 14

*In re Pirraglia*,
No. 26-10274 (JPM), 2026 WL 1683573 (Bankr. S.D.N.Y. June 10, 2026) ... 14

*In re The 1031 Tax Grp., LLC*,
397 B.R. 670 (Bankr. S.D.N.Y. 2008) ... 9

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ... 8

*LaSala v. Needham & Co.*,
399 F. Supp. 2d 421 (S.D.N.Y. 2005) ... 9

*Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*,
No. 22 Civ. 4094 (KPF), 2023 WL 3506142 (S.D.N.Y. Apr. 18, 2023) ... 8, 9, 11

*Ritchie Capital Management, L.L.C. v. Jeffries*,
849 F. Supp. 2d 881 (D. Minn. 2012) ... 13

*Schweitzer v. Nevels*,
No. 23-1556, 2026 WL 625090 (E.D. Pa. Mar. 5, 2026) ... 10, 13

Statutes

11 U.S.C. § 362 ... 9

# I. PRELIMINARY STATEMENT

Defendants Advantage Capital Holdings LLC ("A-CAP") and Kenneth King ("King") respectfully move for a six-month discretionary stay of this proceeding.

On July 16, 2026, Vida Longevity Fund LP, Vida Insurance Credit Opportunity Fund II, LP, and Vida Insurance Credit Opportunity Fund III, LP (collectively, "Vida")—entities with no relationship to A-CAP or King—filed an involuntary chapter 7 petition in their capacity as alleged creditors against co-defendant 777 Partners LLC ("777 Partners") in the United States Bankruptcy Court for the Southern District of Florida. The next day, 777 Partners filed a suggestion of bankruptcy in this Court. ECF 575. That filing prompted this Court's July 27, 2026 status hearing, at which the Court invited A-CAP and King to brief their position on the stay and observed that "[i]t would be odd if the case was stayed against the 777 entity defendants and proceed against the remaining defendants." Declaration of Phara A. Guberman ("Guberman Dec.") ¶ 3, Ex. A (ECF 583, "7/27/26 Hr'g Tr.") at 4:23–25. Since that observation, the oddity the Court anticipated has become reality.

On August 9, 2026, four co-defendants in this action—777 Partners, 600 Partners LLC ("600 Partners"), SuttonPark Capital LLC ("SuttonPark Capital"), and SuttonPark Servicing LLC ("SuttonPark Servicing")—filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Texas, commencing jointly administered cases under *In re Signal National LLC*, Case No. 26-90190 (ELM) (the "Chapter 11 Cases"). On August 13, 2026, Plaintiffs Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (collectively, "Leadenhall") themselves stipulated to stay the remaining non-debtor 777 entity defendants. ECF 589. And Josh Wander ("Wander")—the individual Leadenhall identifies as the central architect of the alleged fraud—remains separately stayed in this action while facing

criminal prosecution for conduct that includes alleged fraud against A-CAP itself. Guberman Dec. ¶ 4, Ex. B (Case 1:25-cr-00473-JPO, ECF 50 ("Wander Superseding Indictment")).

This action is now stayed as to every defendant other than A-CAP and King. Leadenhall chose to plead claims whose factual predicates depend overwhelmingly on conduct, communications, transactions, and intent involving Wander, 777 Partners, and its affiliated entities. Now that the 777 parties are stayed, there is no sensible reason to litigate a carved-out fragment of that case against A-CAP and King alone.

The case for a stay is reinforced by the Chapter 11 Cases themselves. The bankruptcy court will necessarily address issues that directly overlap with threshold liability and damages questions in this action—including the amount and validity of Leadenhall's approximately $609 million guaranty claim, the commercial reasonableness and legal effect of Leadenhall's Article 9 foreclosures, the credit to be given for collateral Leadenhall acquired at $1 credit bids, and estate claims, defenses, and offsets arising from those foreclosures. ***Those determinations may narrow, resolve, or materially reshape what remains to be litigated here***. Where, as here, the claims against the debtor and non-debtor defendants share the same factual foundation and are closely interrelated (including as an alleged enterprise scheme), a discretionary stay is particularly appropriate because permitting the action to proceed would risk piecemeal adjudication of issues intertwined with the claims against the debtors—creating duplication, a fragmented record, and a risk of inconsistent rulings.

For these reasons, the Court should stay this case as to A-CAP and King.

## II. RELEVANT BACKGROUND AND PROCEDURAL HISTORY

### A. This Litigation.

On May 3, 2024, Leadenhall filed its complaint, and on September 6, 2024 filed its corrected amended complaint (ECF 187, the "Complaint"), asserting RICO claims, fraudulent-

inducement claims, contract claims, unjust enrichment, and fraudulent transfer claims. The Complaint alleges, among other things, that Wander and a collection of 777-affiliated entities defrauded Leadenhall through double-pledging and other misconduct involving collateral securing Leadenhall's special-purpose-entity-level facilities.

The Complaint does not treat A-CAP and King as peripheral actors. Rather, Leadenhall alleges that A-CAP and King participated in the alleged fraud, that A-CAP controlled the 777 entities, that A-CAP acted not as an arm's-length lender but as an insider, and that A-CAP and King conspired with and aided and abetted the 777 entities and their principals. *See, e.g.*, Am. Compl. ¶¶ 3, 13–21, 198–245, 356–383.

Leadenhall's own pleading theory makes the 777 parties and their principals indispensable to any fair defense. The alleged enterprise is not A-CAP and King alone. The alleged conspiracy is not A-CAP and King alone. The alleged underlying fraud is alleged to have been carried out by Wander, Steven Pasko ("Pasko"), 777 Partners, 600 Partners, and multiple 777-affiliated borrower, seller, and servicer entities. *See id.* Counts V–IX. That matters for stay purposes because A-CAP and King cannot reasonably defend those claims if the alleged principal conspirators and core enterprise actors are absent from active litigation due to the automatic stay or agreed stay.

### B. The Involuntary Petition and Voluntary Chapter 11 Filings.

On July 16, 2026, Vida filed an involuntary chapter 7 petition against 777 Partners in the United States Bankruptcy Court for the Southern District of Florida. On July 17, 2026, 777 Partners filed a suggestion of bankruptcy in this Court. ECF 575.

On July 27, 2026, this Court held a status hearing and observed that "[i]t would be odd if the case was stayed against the 777 entity defendants and proceed against the remaining

defendants." ECF 583, 7/27/26 Hr'g Tr. at 4:23–25. At the conclusion of that conference, the Court invited all defendants to brief their position on the stay.

On August 9, 2026, 777 Partners, 600 Partners, SuttonPark Capital, and SuttonPark Servicing—together with additional affiliated debtors—filed voluntary chapter 11 petitions in the Northern District of Texas.

### C. Leadenhall's Stipulation to Stay the Non-Debtor 777 Entity Defendants.

On August 13, 2026, Leadenhall and the 777 entity defendants stipulated in this action to a temporary stay as to the remaining non-debtor 777 entity defendants (Defendants Insurety Capital LLC, Insurety Agency Services LLC, Signal Medical Receivables LLC, SPLCSS III LLC, Dorchester Receivables II LLC, and Signal SML 4 LLC), without prejudice to later applications based on developments in the bankruptcy proceedings or otherwise. ECF 589. The parties agreed to submit joint status reports every 45 days regarding the bankruptcy proceedings. *Id.* The stipulation expressly provides that "this stay does not apply to any other defendants." *Id.*

As a result of the automatic stay and the stipulation, every defendant in this action other than A-CAP and King is stayed.

### D. Wander's Separate Criminal Prosecution.

Josh Wander—whom Leadenhall identifies as the primary architect of the alleged fraud—is separately facing criminal prosecution in this District. On October 16, 2025, the U.S. Attorney's Office unsealed an indictment charging Wander with conspiracy to commit wire fraud, wire fraud, conspiracy to commit securities fraud, and securities fraud, arising from a scheme to defraud 777's lenders and investors—including through the double-pledging of collateral. A superseding indictment was filed on June 30, 2026, and trial is set for October 19, 2026. Guberman Dec. ¶ 4, Ex. B (Wander Superseding Indictment). The Wander prosecution alleges conduct that includes

alleged fraud against A-CAP. Civil discovery as to Wander has been stayed in a separate SEC enforcement action since May 11, 2026. Wander is effectively unavailable in this action.

### E. Live Bankruptcy Issues that Overlap with This Action.

The Chapter 11 Cases will require the bankruptcy court to address issues that directly overlap with threshold liability and damages questions in this action. The debtors' stated chapter 11 objective is to establish "an orderly, centralized, Court-supervised process for creditors to file and, where necessary, adjudicate claims by and against the debtors' estates," and the First Day Declaration of Mark Shapiro submitted therein ("First Day Dec.") identifies Leadenhall's asserted guaranty claim and the related collateral disputes as among the principal matters to be resolved in that forum. Guberman Dec. ¶ 5, Ex. C (First Day Dec. ¶¶ 15, 43, 73).

As set forth in the First Day Declaration, the following overlapping issues are now before the bankruptcy court:

1. **Amount and allowance of Leadenhall's approximately $609 million guaranty claim.** Leadenhall asserts a claim of approximately $609 million "including default interest, fees, and other charges," and "[t]he Debtors dispute the validity and amount of Leadenhall's claims." *Id*. ¶ 43.

2. **Nature of Leadenhall's claim against 777 Partners and 600 Partners.** The First Day Declaration states that the Leadenhall facility is an obligation of special-purpose borrower entities and that 777 Partners and 600 Partners are "unsecured guarantors only, not secured borrowers," and that "Leadenhall holds no lien on their assets"—a point the Second Circuit confirmed when it vacated the preliminary injunction restraining guarantor assets. *Id*. ¶¶ 41, 60.

3. **Commercial reasonableness and legal effect of Leadenhall's Article 9 foreclosures.** In May 2025, Leadenhall conducted Article 9 foreclosure auctions of the assets of three borrower entities. The debtors contend those sales "were not conducted in a commercially reasonable manner," "stripped hundreds of millions of dollars of value from the estates at a fire-sale price," and "were engineered to inflate Leadenhall's guaranty claims against 777 Partners and 600 Partners." *Id*. ¶ 61.

4. **The effect of Leadenhall's $1 credit bids on any asserted deficiency.** Leadenhall allegedly acquired portfolios it had valued at more than $170 million for nominal $1 credit bids. The extent to which the collateral was worth substantially more than those bids—and the resulting credit against any claimed deficiency—will necessarily bear on the amount, if any, of Leadenhall's allowable claim. *Id*. ¶¶ 61, 73.

5. **Valuation of the collateral Leadenhall foreclosed upon.** The foreclosed assets consisted of structured-settlement and receivables portfolios "whose value depends on specialized knowledge of the underlying payment streams." The debtors further state that their remaining value is concentrated in "self-liquidating structured-receivables portfolios" requiring continuity of knowledgeable management and servicing to realize value over time. *Id*. ¶¶ 14, 61, 68, 74–75. Valuation disputes concerning those assets overlap directly with Leadenhall's damages theories here.

6. **Ownership, eligibility, priority, and allocation of receivables supporting the Leadenhall facility and related specialty-finance facilities.** The First Day Declaration explains that "issues emerged by 2022 concerning the ownership,

eligibility, valuation, and allocation of receivables supporting certain specialty-finance facilities," including "instances in which assets were reported as collateral under more than one facility or were not available to the borrower in the manner reflected in lender reporting." *Id.* ¶ 50. Those are the same collateral-allocation and double-pledging issues that form the backbone of Leadenhall's claims in this action.

7. **Estate claims, defenses, offsets, recoupment, and related litigation arising from Leadenhall's foreclosures and collateral assertions.** The debtors have challenged the Article 9 sales and filed a verified amended complaint seeking, among other things, a declaration that Leadenhall bears no deficiency claim because the sales were not commercially reasonable. *Id.* ¶ 61. The First Day Declaration also identifies a post-foreclosure dispute over Leadenhall's assertion that receivables had been transferred to DASIR 2 LLC and its direction to third-party obligors to remit collections without producing sufficient documentation establishing ownership or authority. *Id.* ¶ 62. These estate claims and defenses may reduce, offset, or eliminate any recovery Leadenhall seeks here.

8. **The debtors' claim against Leadenhall's $1 million injunction bond.** Following the Second Circuit's vacatur of the preliminary injunction restraining guarantor assets, 777 Partners and 600 Partners intend to pursue the injunction bond to recover damages caused by the vacated injunction. *Id.* ¶ 60.

These are live, active bankruptcy issues that will be adjudicated through the claims-allowance process and related contested matters. Their resolution may materially narrow, reshape, or eliminate significant components of what Leadenhall seeks to recover in this action.

### F. A-CAP and King Sought a Consensual Stay, which Leadenhall Declined.

A-CAP and King attempted to avoid motion practice by seeking Leadenhall's agreement to a stipulated stay on terms paralleling the existing stay as to the 777 entity defendants. On August 16, 2026, counsel for A-CAP and King wrote to Leadenhall's counsel explaining that A-CAP and King intended to file a motion for a discretionary stay but first wished to determine whether Leadenhall would stipulate to a stay in light of the Chapter 11 Cases and overlapping issues. Guberman Dec. ¶ 6. For fairness, counsel for A-CAP and King also offered to stipulate to a stay of the related litigation, *Haymarket Insurance Company v. Leadenhall Capital Partners LLP, et al.*, Case No. 25-cv-10687 (JGK), on the same terms and during the same period. *Id*. Counsel for Leadenhall declined to agree to that proposal by an email dated August 17, 2026. *Id*.

Accordingly, A-CAP and King file this motion.

## III. LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

Courts in this District generally consider five factors: "[i] the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; [ii] the private interests of and burden on the defendants; [iii] the interests of the courts; [iv] the interests of persons not parties to the civil litigation; and [v] the public interest." *Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*, No. 22 Civ. 4094 (KPF), 2023 WL 3506142, at *2 (S.D.N.Y. Apr. 18, 2023) (citing *Fagan v. Republic of Austria*, No. 08 Civ. 6715 (LTS) (JCF), 2009 WL 1423338, at *4 (S.D.N.Y. May 19, 2009)). "This analysis must accommodate the nuances of each lawsuit and the ultimate decision lies firmly in the discretion of the Court." *Fried v. Lehman Bros. Real Est. Assocs. III, L.P.*, No. 11 Civ. 4141 (BSJ), 2012 WL

252139, at *5 (S.D.N.Y. Jan. 25, 2012) (citing *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005)).

That discretionary authority is particularly important where, as here, only some defendants have filed bankruptcy and the automatic stay under 11 U.S.C. § 362 does not by its own force extend to the remaining defendants. In that setting, courts have recognized that a stay may nevertheless be appropriate where the claims against the non-debtor defendants and "the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding" *Plaintiff Funding Holding*, 2023 WL 3506142, at *2 (quoting *In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008)).

## IV. ARGUMENT

### A. The Chapter 11 Cases Have Fundamentally Changed the Procedural Posture of This Action.

When this Court observed on July 27 that it would be "odd" to stay the 777 entity defendants while proceeding against the remaining defendants, that observation rested on a sound practical judgment: Leadenhall's claims against all defendants arise from the same alleged scheme, the same transactions, and the same communications at 777. Since that hearing, the procedural landscape has shifted decisively. The Chapter 11 Cases have been filed. The automatic stay is in effect as to the debtor defendants. Leadenhall itself has stipulated to stay the remaining non-debtor 777 entity defendants. And Wander remains separately stayed.

The result is precisely the fragmentation this Court anticipated would be "odd." Proceeding solely against A-CAP and King—while every alleged co-participant is stayed—would require this Court to adjudicate claims that depend overwhelmingly on conduct at 777, using a partial factual record, without the participation of the entities and individuals Leadenhall alleges were the primary actors.

## B. The Discretionary Stay Factors Favor a Stay.

### *1. Leadenhall Will Suffer No Cognizable Prejudice From a Time-Limited Stay.*

Leadenhall's claims are fully preserved. It agreed to stay its claims against the 777 entity defendants. ECF 589. It can protect its substantial creditor interests in the bankruptcy, where it has already actively participated. And the proposed six-month stay is defined and time-limited, with a status report to the Court before expiration and a mechanism for earlier modification if circumstances warrant.

The interest in expedition, while legitimate, must be weighed against the practical reality that Leadenhall's claims against A-CAP and King cannot be efficiently adjudicated in isolation. Leadenhall's own pleading theory ties those claims to the same alleged scheme involving the stayed defendants. A brief, defined stay does not deprive Leadenhall of a forum—it ensures that when adjudication resumes, it can proceed on a complete and coherent factual record. *See Schweitzer v. Nevels*, 2026 WL 625090, at *3–5 (E.D. Pa. Mar. 5, 2026) (granting discretionary stay where the bankruptcy proceeding could narrow or resolve dispositive issues, and allowing the district-court case to proceed risked duplicative litigation and inconsistent judgments).

Nor can Leadenhall claim that the stay would indefinitely shield A-CAP and King from liability. The stay requested by A-CAP and King is a time-limited discretionary stay tied to identifiable milestones in the bankruptcy and consistent with the stay against the Debtors.

### *2. Proceeding Against A-CAP and King Alone Would Create an Asymmetric and Fragmented Litigation.*

Leadenhall's claims against A-CAP and King are premised on conspiracy, aiding-and-abetting, and civil RICO enterprise theories that by their nature depend on the conduct of multiple actors. *See, e.g.*, Am. Compl. ¶¶ 198–245, 356–383, Counts V–IX. Although A-CAP and King dispute Leadenhall's bases for asserting such claims, particularly in light of the Wander

Superseding Indictment, those claims require development of facts about what occurred inside 777: its lending relationships, its collateral arrangements, its internal communications, its personnel's actions and knowledge, and its governance decisions.

In *Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC*, No. 22 Civ. 4094 (KPF), 2023 WL 3506142 (S.D.N.Y. Apr. 18, 2023), Judge Failla granted a discretionary stay of claims against a non-debtor defendant after his co-defendants filed for bankruptcy. Although the court declined to hold that the automatic stay itself extended to the non-debtor, it nevertheless found a stay warranted because there was "a colorable risk that this proceeding will later be enjoined by the bankruptcy court," and because the claims against the debtor and non-debtor defendants "share a similar factual nexus and are closely related in several respects." *Id.* at *2. The court also emphasized that the plaintiff had not meaningfully differentiated the claims, observing that the plaintiff's filings "hardly seek[] to differentiate between both parties, one of whom is a debtor and one of whom is not," and that resolving the matter "dangerously approaches claims that are inextricably intertwined with those brought against the debtors." *Id.*

That is precisely the situation here. Proceeding now would create an asymmetric and fragmented discovery process. The central entity defendants are stayed. Wander, whom Leadenhall identifies as the primary actor, is unavailable. The parties and courts would be required to develop overlapping factual issues in piecemeal fashion—potentially requiring the same factual questions to be revisited once the bankruptcy concludes or the stayed defendants become available.

This is not a case in which the claims against A-CAP and King are "discrete and easily separable" from those against the 777 parties. *See Futch v. Starboard With Cheese, LLC*, 830 F. Supp. 3d 736, 741–43 (S.D. Ill. 2025) (granting stay where the claims against the non-debtor and bankrupt co-defendant were not "discrete and easily separable," and where trying the case without

the bankrupt co-defendant would require litigation of management-and-control issues in its absence). For example, Leadenhall's RICO claims against A-CAP and King are codependent on Leadenhall's RICO claims against the debtor-entity defendants: they arise from the same predicate acts and necessarily require analysis of whether the acts of A-CAP, King, and the debtor-entity defendants were coordinated. As in *Ionosphere Clubs*, where claims, including civil RICO, against non-debtor defendants were "inextricably interwoven" with those against the debtor—"presenting common questions of law and fact, which can be resolved in one proceeding"—a stay is warranted. *In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 641–42 (S.D.N.Y. 1991).

Furthermore, because most, if not all, of Leadenhall's claims against A-CAP and King are predicated on the acts or omission of the debtor-entity defendants, much of the information necessary to defend the claims against A-CAP and King is in the debtor-entity defendants' possession. Continuing this case against A-CAP and King necessarily requires getting discovery from the debtor-entity defendants, for whom the matter is now stayed.

### *3. A Stay Will Promote Judicial Economy and Avoid Duplicative or Inconsistent Proceedings.*

The bankruptcy court's claims-allowance process will necessarily address many of the same factual and legal issues this Court would otherwise need to resolve—including what Leadenhall is actually owed, what credit it must receive for collateral it foreclosed upon, and what claims, defenses, or offsets the estates may have against Leadenhall. Those determinations may narrow, resolve, or materially reshape the claims asserted here, thus reducing the burden and cost of litigating this case for the parties and the Court.

Proceeding in parallel would create precisely the risk of "needlessly exhaust[ing] resources re-litigating issues and repeating discovery" while risking "inconsistent rulings and judgments" that courts routinely stay to avoid. *Schweitzer*, 2026 WL 625090, at *3. *See also Futch*, 830 F.

Supp. 3d at 742 (stay promoted judicial economy because "it is conceivable that [plaintiffs'] claims could proceed through discovery and trial two separate times").

The same concern with duplicative federal litigation drove the court's decision in *Ritchie Capital Management, L.L.C. v. Jeffries*, 849 F. Supp. 2d 881 (D. Minn. 2012). There, plaintiffs brought a civil RICO action in district court while related bankruptcy adversary proceedings were already litigating overlapping issues concerning the plaintiffs' asserted security interests, collateral, and alleged injury. The court held the litigation was duplicative because the plaintiff was attempting to litigate "the same issue at the same time in more than one federal court," *id.* at 890, and explained that even though the claims were framed differently, the proceedings arose from a "common nucleus of operative fact" and sought effectively the same relief, *id.* at 889–90. On that basis, and considering equitable factors such as conservation of judicial resources, comprehensive disposition of litigation, the risk of inconsistent results, and the relative progress of the bankruptcy proceedings, the court dismissed the RICO action without prejudice pending resolution of the bankruptcy matters. *Id.* at 890–93.

The logic is the same here. The bankruptcy court will address questions that go to the heart of what Leadenhall can recover, including the allowance of its $609 million claim, the credit for its $1 foreclosures, and estate defenses and offsets. This Court should not require the parties and the judiciary to develop the same factual record in parallel.

#### ***4. The Interests of Non-Parties Favor a Stay.***

The Chapter 11 Cases involve not only the defendant debtors but also other affiliated debtors, creditor constituencies, proposed DIP lenders, and other parties in interest. Proceeding with this action in parallel would create a risk of rulings or factual findings here that could bear on issues being litigated in the Chapter 11 Cases by parties not before this Court. Conversely, a stay

would allow overlapping issues to be addressed in the centralized bankruptcy forum where all affected parties are present. *See Ionosphere*, 124 B.R. 635, 642; *Futch*, 830 F. Supp. 3d at 742 (stay helps ensure issues are litigated with "full participation of all interested parties").

#### ***5. The Public Interest Supports Fair, Efficient, and Non-Duplicative Adjudication.***

The public has an interest in the efficient administration of bankruptcy cases, the avoidance of duplicative litigation across federal courts, and fair adjudication. *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 367–68 (S.D.N.Y. 2007) ("there is also a strong public interest in the swift and efficient resolution of bankruptcy proceedings"); *In re Pirraglia*, No. 26-10274 (JPM), 2026 WL 1683573, at *12 (Bankr. S.D.N.Y. June 10, 2026) (the public interest factor favored a stay because extending it would promote orderly administration of the estate and protect the integrity of the bankruptcy process). A defined stay promotes all three interests.

## V. CONCLUSION

For the foregoing reasons, A-CAP and King respectfully request that the Court grant this Motion and stay this action as to them, including discovery directed to them, for a period of six months, subject to earlier modification upon application of any party and with a joint status report to be submitted thirty days before the stay's expiration, together with such other and further relief as the Court deems just and proper.

Dated: August 17, 2026
New York, New York

Respectfully submitted,

**FOLEY & LARDNER LLP**

By: */s/ Phara A. Guberman*

Phara A. Guberman, Esq.
David Jordan, Esq. (admitted *pro hac vice*)
F. Phillip Hosp, Esq. (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016-1314
Telephone: (212) 338-3514

Facsimile: (212) 687-2329
Email: phara.guberman@foley.com
djordan@foley.com
phosp@foley.com

*Attorneys for Defendants Advantage Capital Holdings LLC and Kenneth King*

## CERTIFICATE OF WORD COUNT COMPLIANCE

I hereby state that the foregoing Memorandum of Law in Support of the Motion to Stay Proceedings was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Memorandum of Points and Authorities, excluding the caption, table of contents, table of authorities, signature block, and this certification, is 4,033. The foregoing Memorandum of Law complies with the formatting rules set forth in Section III.D of Judge Koeltl's Individual Practices.

*/s/ Phara A. Guberman*
Phara A. Guberman