**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**LEADENHALL CAPITAL PARTNERS LLP, ET ANO.,**

**Plaintiffs,**

**- against -**

**JOSH WANDER, ET AL.,**

**Defendants.**

**24-cv-3453 (JGK)**

**Memorandum Opinion and Order**

**John G. Koeltl, District Judge:**

The plaintiffs, Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life"), (collectively, "Leadenhall") brought this action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, along with various state law claims for breach of contract and fraud, against the defendants, Josh Wander ("Wander"), Steven Pasko ("Pasko"), various entities owned and controlled by Wander and Pasko (the "777 Entities"), Advantage Capital Holdings LLC ("A-CAP") and Kenneth King ("King").

The alleged scheme is as follows: Leadenhall and certain of the 777 Entities entered into a credit facility which allowed the 777 Entities to borrow money from Leadenhall on an ongoing basis. The 777 Entities' debt was to be secured by collateral—in this case, future cash flows from structured settlements and lottery winnings. Unbeknownst to Leadenhall, the 777 Entities double pledged and fictitiously pledged collateral to Leadenhall—rendering

the credit facility substantially undercollateralized—while investing the money obtained from the credit facility in various vanity projects and personal pursuits, including luxury condominiums, soccer teams, and budget airlines. A-CAP and its chairman and chief executive officer ("CEO"), King, are alleged to have directed the actions of Wander, Pasko, and the 777 Entities from an early stage by virtue of an all-asset lien A-CAP held on the 777 Entities' assets, and to have benefited from the control of a family of companies not subject to the same regulatory oversight as A-CAP-an insurance company

The defendants originally moved to dismiss the Corrected Amended Complaint ("Amended Complaint" or "Am. Compl.") in four motions: one filed by Wander, one by Pasko, one by the 777 Entities, and one by A-CAP and King. The defendants advance distinct arguments for dismissal of the Amended Complaint but generally move pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). See ECF Nos. 203, 209, 211, 214. Following a suggestion of bankruptcy and a subsequent stipulation among the parties, this action was stayed as to the 777 Entities. See ECF Nos. 588–89. Each claim in the Amended Complaint brought against one of the 777 Entities was also brought against at least one other defendant. Additionally, defendants Wander and Pasko join the memorandum of law filed by the 777 Entities in support of their motion to dismiss. Therefore, this Memorandum Opinion and Order does not resolve the 777 Entities' motion, because that motion is stayed, but it discusses claims brought against those entities and

arguments raised by those entities in their moving papers as they relate to the remaining defendants.

For the reasons that follow, the motions to dismiss by the defendants (other than the 777 Entities whose motion is stayed) are **denied**, except that the motions to dismiss the actual and constructive fraudulent transfer claims—Counts Eleven and Twelve of the Amended Complaint—are **granted** as to Wander, and Pasko, and the motion to dismiss by the 777 Entities is **stayed.**

## I.

Unless otherwise indicated, the following facts are taken from the complaint and are accepted as true for the purpose of deciding these motions.[1]

In May 2021, Leadenhall entered into a secured credit facility with four special-purpose borrowers: SPLCSS III LLC (the "SuttonPark Borrower"), Dorchester Receivables II LLC (the "Dorchester Borrower"), Signal SML 4 LLC (the "Signal Borrower"), and Insurety Agency Services LLC (the "Insurety Borrower," and collectively the "Borrowers"), whose ultimate parents are the defendants 777 Partners LLC ("777 Partners") and 600 Partners LLC ("600 Partners"). Am. Compl. ¶¶ 33–36, 49–87. The facility was embodied in a Loan and Security Agreement (the "LSA") executed on May 7, 2021. Id. ¶ 49. The lenders, represented by Leadenhall, provided secured debt to the Borrowers, which used the proceeds to purchase assets such as structured

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

settlements and lottery receivables from affiliated entities (the "Sellers"). Id. ¶¶ 53, 75–78. Each Borrower pledged to Leadenhall, as collateral, a first-priority security interest in all of its assets. Id. ¶¶ 53–68. The Borrowers were permitted to draw only up to credit limits, called "Borrowing Bases," that corresponded to the value of the pledged collateral. Id. ¶¶ 55–57.

Because the Borrowers' assets corresponded to the collateral securing the debt, the facility required that the Borrowers own all collateral "free and clear" of any other claims. Id. ¶¶ 7, 88–98. Each Borrower represented that its assets were owned free and clear upon executing the LSA, and reaffirmed that representation each time it borrowed and in monthly Compliance Reports prepared and transmitted to Leadenhall by the "Servicers," affiliates of 777 Partners responsible for identifying and valuing the assets pledged as collateral and for calculating the Borrowing Bases. Id. ¶¶ 79–83, 88–98. The Compliance Reports were the monthly certifications at the center of the facility. Each month, the Servicers prepared and transmitted to Leadenhall a Compliance Report that identified and valued the specific assets pledged as collateral and calculated each Borrower's Borrowing Base—the credit limit against which it could draw. Id. ¶¶ 57, 99, 144. By certifying the assets backing each Borrower's loans, the Reports were the means by which Leadenhall confirmed, throughout the term of the LSA, that its loans remained secured as the agreement required. Am. Compl. ¶¶ 62–64, 162. Leadenhall received more than sixty such Reports between May 2021 and November 2023. Am. Compl. ¶¶ 99–174.

777 Partners and 600 Partners (together, the "Guarantors") also guaranteed the Borrowers' obligations under the LSA. Id. ¶¶ 84–87. The Guaranty defined a "Trigger Event" giving Leadenhall recourse against the Guarantors to include, among others, any act of fraud or willful misconduct by a Guarantor or by any entity in a Borrower group, any willful misrepresentation of a material nature by a Guarantor, and any failure of a Borrower to own the pledged collateral free and clear of all liens, security interests, or encumbrances. Id. ¶ 86.

In September 2022, approximately 18 months into the facility and after the Borrowers had drawn hundreds of millions of dollars, a managing partner of Leadenhall received an anonymous email stating that the defendant Josh Wander had either never purchased the assets pledged to Leadenhall as collateral or had already pledged them to another lender, and asserting that "What he is doing is criminal." Id. ¶¶ 99–105.

Leadenhall began an investigation. Id. ¶ 106. In November 2022, Leadenhall personnel visited 777 Partners' offices in Miami, Florida, to review the "MP Fin" computer system used to allocate assets to lenders and to meet with Wander and members of 777 Partners' Capital Markets Group responsible for preparing the monthly Compliance Reports, including Nicholas Bennett and Alexander Adnani. Id. ¶¶ 100, 107–13. Leadenhall learned that the Dorchester Borrower had drawn approximately $7 million in excess of its credit limit, but Wander and others represented that the problem was limited to the Dorchester Borrower and was contained. Id. ¶¶ 114–15.

In March 2023, another lender to 777 Partners, Credigy, sent Leadenhall a list of assets that 777 Partners had represented were pledged exclusively to Credigy. Id. ¶ 119. From that list, Leadenhall identified more than 1,600 assets, worth approximately $185 million, that the SuttonPark Borrower had pledged to both Credigy and Leadenhall. Id. ¶¶ 119–21. Those assets had been assigned to the SuttonPark Borrower by a "Form of Assignment" executed by the defendant Steven Pasko on September 30, 2022. Id. ¶ 121.

Leadenhall requested confirmation that the assets were owned free and clear and, on March 28, 2023, raised the issue with Wander on a recorded conference call. Id. ¶¶ 122–24. Wander acknowledged that the SuttonPark Borrower had pledged assets to both Leadenhall and another lender. Id. ¶¶ 124–29. On a second call on April 3, 2023, Wander stated that approximately $100 million in assets had been double-pledged, attributed the double-pledging to the MP Fin system, and said that he intended to sell businesses and to borrow from 777 Partners' holding-company lender to address the shortfall. Id. ¶¶ 131–33.

The holding-company lender was the defendant Advantage Capital Holdings LLC ("A-CAP"), an insurance holding company controlled by its chairman and chief executive officer, the defendant Kenneth King. Id. ¶¶ 37–38, 134, 198. The Amended Complaint alleges that, since February 2020, A-CAP had lent 777 Partners and its affiliates more than $2 billion, including approximately $500 million to 777 Partners and approximately $1 billion to

777 Partners' football clubs and airlines. Id. ¶¶ 241–42. Through a reinsurance affiliate, 777 Re Ltd. ("777 Re"), A-CAP also provided 777 Partners with approximately $2.2 billion in reinsurance reserves. Id. ¶¶ 231–38. In connection with that financing, A-CAP obtained all-asset liens on 777 Partners, 600 Partners, and approximately forty affiliated entities, including JARM Capital LLC ("JARM"), the majority owner of 777 Partners. Id. ¶ 243. King also held personal interests in certain assets purchased by 777 Partners, including a ten-percent stake in a Canadian airline, Flair, and an $11 million condominium in Miami acquired with the proceeds of a $10 million loan from 777 Partners. Id. ¶¶ 244–46.

The Amended Complaint alleges that, around March 2023, A-CAP memorialized its control of 777 Partners' operations in an internal communication, established a "Steering Committee" through which King approved 777 Partners' investment decisions, and moved A-CAP personnel into 777 Partners' Miami offices. Id. ¶¶ 198–210. A-CAP's chief operating officer was placed near Wander's and Pasko's offices, and an A-CAP portfolio manager was placed in the office shared by Bennett and Adnani. Id. After A-CAP's personnel moved in, the entity SuttonPark Capital, rather than Adnani, began transmitting the Compliance Reports to Leadenhall. Id. ¶ 208. King also attended Wander's telephone calls, and A-CAP assumed 777 Partners' payroll obligations. Id. ¶¶ 205–06, 210, 257. In June and July 2023, A-CAP offered Leadenhall a fourth-priority position in 777 Partners' assets—

behind A-CAP's first-priority position—to replace the double-pledged collateral, and Leadenhall declined. Id. ¶¶ 211–12.

The Amended Complaint alleges that 777 Partners sought to move its business focus from structured settlements and lottery receivables to aviation and professional sports. Id. ¶¶ 260–61. In addition to a private jet, 777 Partners acquired airlines, including Flair and an Australian airline, Bonza. Id. ¶¶ 243, 301–02. In September 2023, 777 Partners announced an agreement to purchase Everton Football Club, a club in the English Premier League. Id. ¶¶ 269–70. That acquisition followed earlier purchases of other clubs, including Hertha BSC, Genoa CFC, Standard Liège, and Vasco da Gama. Id. ¶¶ 257–76. According to the Amended Complaint, 777 Partners acquired clubs for nominal sums, assumed their debts, and used the clubs' valuations as collateral to obtain additional financing. Id. ¶¶ 48, 265.

A-CAP financed 777 Partners' aviation investments and the Everton transaction. Id. ¶¶ 242, 270–72. The Amended Complaint alleges that an "Investment Overview" prepared by A-CAP stated that A-CAP was the ultimate source of the initial loan made by 777 Partners to Everton, and that 777 Partners required Everton as an asset on its books to attract additional investors and lenders. Id. ¶¶ 271, 275. During this period, Wander continued to represent to Leadenhall that proceeds from forthcoming transactions would be used to address the collateral shortfall. Id. ¶ 140.

Leadenhall continued to meet with 777 Partners' personnel through the summer and fall of 2023. Id. A-CAP and Pasko allegedly prevented

Leadenhall from engaging a former SuttonPark Capital employee to conduct a review of the receivables pledged as collateral. Id. ¶¶ 216–18. In November 2023, Leadenhall discovered that the SuttonPark and Dorchester Borrowers had borrowed against assets they had never purchased and therefore could not pledge as collateral. Id. ¶¶ 140–41.

Leadenhall served a formal notice of material breach in November 2023. Id. ¶ 143. In December 2023, the parties executed an amendment to the LSA under which the Borrowers agreed to pay additional interest on the "Un-collateralized Portion" of the outstanding debt, retroactive to March 2023. Id. ¶ 150. In January 2024, at Leadenhall's direction, the SuttonPark Servicer issued revised Compliance Reports for the SuttonPark and Dorchester Borrowers that removed double-pledged and fictitiously pledged assets from the Borrowing Bases; those revised reports, which reached back to March 2023, disclosed that the two Borrowers had double-pledged or fictitiously pledged more than $350 million in assets. Id. ¶¶ 144–49.

In early 2024, an individual within 777 Partners informed Leadenhall that financial statements submitted to Leadenhall had been altered and that, before the November 2022 on-site meetings, records in the MP Fin system had been changed to conceal the double-pledging. Id. ¶ 163. Leadenhall's re-examination of the materials delivered around November 2022 revealed that the SuttonPark Borrower had altered Wells Fargo bank statements so that accounts appeared to hold funds they did not. Id. ¶¶ 163–64. The Amended Complaint further alleges that, in 2022 or 2023, the MP Fin system was

reprogrammed to permit users to change retroactively the lender to which an asset had been allocated, and that 777 Partners personnel used that capability to make assets appear to have been pledged only to Leadenhall. Id. ¶¶ 159, 171–74. Notes in the MP Fin system acknowledged, as early as 2021, that assets had been double-pledged or fictitiously pledged. Id. ¶ 156.

The Amended Complaint alleges that, beginning in 2021, 777 Partners considered purchasing a portfolio of receivables from JG Wentworth and received a "data tape" identifying and valuing the portfolio's assets. Id. ¶¶ 151–52. Before SuttonPark Capital acquired the portfolio, Wander directed Bennett, Adnani, and the Capital Markets Group to use the data tape to allocate the JG Wentworth assets as collateral to lenders. Id. ¶ 153. To conceal that SuttonPark Capital did not own those receivables, the Capital Markets Group added other funds to Leadenhall's collection account to simulate cash flows on the pledged assets. Id. ¶¶ 154–58.

On March 12, 2024, Leadenhall served the Borrowers and the Guarantors with notice that Events of Default had occurred under the LSA, and on March 15, 2024, Leadenhall accelerated the outstanding debt, making the balance of $609,529,966.82 immediately due and payable. Id. ¶¶ 175–77.

The parties attempted to negotiate a restructuring. Id. ¶¶ 178–92. The Amended Complaint alleges that Wander traveled to New York and at times worked from A-CAP's offices during the negotiations. Id. ¶¶ 181, 191. When asked whether A-CAP controlled what 777 Partners could agree to, Wander stated that A-CAP controlled what 777 Partners signed because A-CAP held

"the power of the purse." Id. ¶ 182. Between March and April 2024, Leadenhall sought to determine whether 777 Partners could pay approximately $15 million, roughly 2.5 percent of the outstanding debt, and was told, through Wander, that it could not. Id. ¶¶ 178–92. Wander stated that 777 Partners was unable to pay Leadenhall. Id. ¶ 191.

In February 2024, AM Best, a credit-rating agency, downgraded 777 Re and assessed its balance sheet as very weak, and approximately one week later downgraded A-CAP because of its exposure to 777 Partners. Id. ¶¶ 277–81. King sought to unwind the 777 Re relationship but stated on an investor call that terminating it immediately would cut off liquidity to 777 Re and create additional risk for A-CAP. Id. ¶ 283.

A-CAP also transferred debt obligations to 777 Partners and took steps to strengthen A-CAP's existing liens. Id. ¶¶ 225–28. Since December 2020, A-CAP had extended a $170 million loan to JARM—the entity through which Wander held his majority interest in 777 Partners—to enable Wander to acquire a portion of Pasko's interest; the loan was secured by JARM's equity in 777 Partners and personally guaranteed by Wander and Pasko. Id. ¶¶ 221–23. In March 2024, King notified Leadenhall that the JARM loan would be "consolidated into the HoldCo facility," transferring the $170 million obligation from JARM to 777 Partners and securing it with A-CAP's asserted first-priority lien on 777 Partners' assets, ahead of 777 Partners' other secured creditors, including Leadenhall. Id. ¶¶ 225–26.

In April 2024, an A-CAP affiliate took possession of a fleet of Australian aircraft shortly before the portfolio company that owned them entered receivership. Id. ¶ 302. The Amended Complaint alleges that 777 Partners and A-CAP were sufficiently intertwined that other lenders could not reach agreement with the company concerning its debts. Id. ¶¶ 302–03. In May 2024, A-CAP took control of 777 Partners' football-club assets and offered them for sale. Id. ¶¶ 289–90.

The Amended Complaint alleges that, while Wander represented in March and April 2024 that 777 Partners could not produce $15 million, 777 Partners continued to direct funds to its football clubs, including an additional $80 million to Hertha BSC in early April 2024 and an additional $20 million loan to Everton in late April 2024, which Wander characterized as "protective advances" by A-CAP. Id. ¶¶ 285–87.

Leadenhall commenced this action on May 3, 2024, asserting claims under RICO and for fraud and breach of contract against the Borrowers, the Guarantors, A-CAP, Wander, Pasko, and King. See Compl., ECF No. 1; Am. Compl. ¶ 309. The Amended Complaint alleges that, as of that date, 777 Partners and its affiliates had been named in seventeen lawsuits for unpaid debts and that collectively those lawsuits sought more than $130 million. Am. Compl. ¶ 309. After this action was filed, A-CAP caused Wander and Pasko to resign as managers of 777 Partners and 600 Partners and appointed B. Riley Advisory Services to assume control of the 777 entities, although 777 Partners publicly maintained that Wander and Pasko remained the owners of 777

Partners and continued to direct its strategy. Id. ¶¶ 194, 252, 254–55. On May 10, 2024, 777 Partners invested an additional $10 million in Everton. Id. ¶ 291.

On May 13, 2024, Leadenhall applied for a temporary restraining order to restrain the Borrowers and the Guarantors from dissipating their remaining assets. See Appl. for TRO, ECF No. 57. At a hearing on June 7, 2024, counsel for the 777 entity defendants represented that those defendants had little remaining in their accounts, and on July 8, 2024, the temporary restraining order was converted to a preliminary injunction.[2] Am. Compl. ¶ 311; see also ECF No. 146. In June 2024, A-CAP made its own bid to acquire Everton. Am. Compl. ¶¶ 293–97. Leadenhall thereafter filed the Amended Complaint, and these motions to dismiss followed.

**III.**

The defendants first move to dismiss this case for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). However, as discussed below, Leadenhall has adequately pleaded its RICO claims such that there is federal question jurisdiction pursuant to 28 U.S.C. § 1332. The

[2] On March 23, 2026, the Court of Appeals for the Second Circuit vacated the portion of the preliminary injunction restraining the Guarantors' assets. See Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC, 171 F.4th 155, 166 (2d Cir. 2026). The Court of Appeals held that Leadenhall had failed to establish that it had a lien on the Guarantors' assets that could support a pre-judgment restraint on the Guarantors' assets. Id. at 162. Because the Court of Appeals's opinion addressed the scope of the preliminary injunction, rather than Leadenhall's likelihood of success on the merits of its claims, the opinion does not affect these motions to dismiss.

Court therefore has supplemental jurisdiction over Leadenhall's state-law claims pursuant to 28 U.S.C.§ 1367. The motion to dismiss for lack of subject matter jurisdiction is therefore **denied**.

## IV.

The defendants next move to dismiss the Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In the Amended Complaint, Leadenhall asserts 12 claims against 14 defendants: Wander, Pasko, and King; 777 Partners and 600 Partners; the four Borrowers; SuttonPark Capital, Signal Medical Receivables LLC ("Signal Medical"), Insurety Capital LLC ("Insurety Capital"), and the SuttonPark Servicer; and A-CAP. Am. Compl. ¶¶ 25–38.

The first four claims allege breach of contract. Count One asserts a claim for breach of the LSA against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, the SuttonPark Servicer, Signal Medical, Insurety Capital, and the SuttonPark, Dorchester, Signal, and Insurety Borrowers. Id. ¶¶ 313–23. Count Two asserts a claim for breach of the Sale Agreement against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, Signal Medical, Insurety Capital, and the Signal and Insurety Borrowers. Id. ¶¶ 324–32. Count Three asserts a claim for breach of the Servicing Agreement and the LSA against Wander, Pasko, King, A-CAP, 600 Partners, SuttonPark Capital, and the SuttonPark Servicer. Id. ¶¶ 333–45.

Count Four asserts a claim for breach of the Guaranty Agreement against Wander, Pasko, 777 Partners, and 600 Partners. Id. ¶¶ 346–55.

Counts Five and Six arise under RICO. Count Five asserts a substantive RICO violation pursuant to 18 U.S.C. § 1962(c) against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, SuttonPark Capital, the SuttonPark Servicer, the SuttonPark Borrower, and the Dorchester Borrower, whom the Amended Complaint defines as the "RICO Defendants." Id. ¶¶ 356–71. Count Six asserts a RICO conspiracy claim against all of the defendants, pursuant to 18 U.S.C. § 1962(d). Id. ¶¶ 372–83.

Counts Seven, Eight, and Nine sound in fraud. Count Seven asserts a claim for fraudulent misrepresentation against the RICO Defendants. Id. ¶¶ 384–88. Count Eight asserts a claim for civil conspiracy to commit fraud against all of the defendants. Id. ¶¶ 389–93. Count Nine asserts a claim for aiding and abetting fraud against Wander, Pasko, King, A-CAP, 777 Partners, 600 Partners, and SuttonPark Capital. Id. ¶¶ 394–98. Count Ten asserts a claim for unjust enrichment against all of the defendants. Id. ¶¶ 399–402.

Counts Eleven and Twelve assert claims brought pursuant to New York's Debtor and Creditor Law. Count Eleven alleges an actual fraudulent transfer under N.Y. Debtor & Creditor Law § 273(a)(1) against 777 Partners, Wander, Pasko, and A-CAP. Id. ¶¶ 403–08. Count Twelve alleges a constructive fraudulent transfer under N.Y. Debtor & Creditor Law §§ 273(a)(2) and 274 against 777 Partners, Wander, Pasko, and A-CAP. Id. ¶¶ 409–16.

The defendants move to dismiss the various causes of action asserted against them for failure to state a claim.

**A.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2008). The Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court should construe the facts alleged in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

**B.**

The RICO Defendants move to dismiss the substantive RICO claim (Count Five), brought pursuant to 18 U.S.C. § 1962(c), for failure to state a claim. Section 1962(c) provides that:

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to state a claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) though a pattern (4) of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir.2001). "Racketeering activity" encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include, for purposes relevant to the present case, acts of wire fraud (18 U.S.C. § 1343). See 18 U.S.C. § 1961(1)(B). To establish a "pattern" of racketeering activity, a plaintiff must plead "at least two predicate acts, [and] show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." Schlaifer Nance & Co. v. Est. of Warhol, 119 F.3d 91, 97 (2d Cir.1997). "Predicate acts are related for RICO purposes when they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id.

A RICO plaintiff must also plead a clear and definite injury that was proximately caused by the alleged RICO violation. See Elsevier Inc. v. W.H.P.R., Inc., 692 F. Supp. 2d 297, 309 (S.D.N.Y. 2010). The defendants argue that the Amended Complaint fails to allege a distinct enterprise, the commission of predicate acts by each defendant, a pattern of racketeering activity, and the requisite injury and causation. Each of these arguments fails.

**1.**

A RICO enterprise includes any legal entity and any group of individuals associated in fact. 18 U.S.C. § 1961(4). An association-in-fact enterprise is a continuing unit that functions with a common purpose, United States v. Arrington, 941 F.3d 24, 37 (2d Cir. 2019), and has three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose. United States v. Gershman, 31 F.4th 80, 96 (2d Cir. 2022). The Amended Complaint alleges an association-in-fact enterprise comprising three individuals—Wander, Pasko, and King—and the two corporate families they control, namely, A-CAP, 777 Partners, 600 Partners, and their affiliated entities; a common purpose of fraudulently inducing lenders to fund the enterprise's members and their investments; ongoing relationships formalized in a steering committee; and a course of conduct spanning years. Am. Compl. ¶¶ 357–67. That is sufficient. The RICO Defendants make various arguments as to why the Amended Complaint fails to allege certain structural attributes of a RICO enterprise, but the Supreme Court rejected any such requirement of a hierarchy, role differentiation, or chain of command in Boyle v. United States, 556 U.S. 938, 948 (2009).

The RICO Defendants also argue that the RICO claim fails because Leadenhall has not pleaded a distinct enterprise. The RICO Defendants are correct that a corporate entity cannot be both the RICO person and the RICO enterprise, and an enterprise consisting only of a corporate defendant

together with its own subsidiaries, employees, or agents is not distinct from that defendant. U1it4less, Inc. v. FedEx Corp., 871 F.3d 199, 205–06 (2d Cir. 2017). But the distinctness requirement does not foreclose liability where a corporate entity associates with others to form an enterprise sufficiently distinct from itself. Id. at 206. In this case, the Amended Complaint alleges an association of three individuals and two separately controlled corporate families that operate in different industries and are alleged to use their separateness to further the enterprise's aims. Am. Compl. ¶¶ 357–60. The Court of Appeals has held that such an enterprise satisfies the distinctness requirement. U1it4less, 871 F.3d at 206-07.

Contrary to the RICO defendants' assertions, the enterprise is also adequately alleged to exist apart from the pattern of racketeering activity. The Amended Complaint alleges that the 777 entities are a family of businesses that predate the conduct at issue and carry on operations in addition to the alleged fraud, and that A-CAP and King's role as funders and controllers preceded and extended beyond that conduct. Am. Compl. ¶ 361. Whether the enterprise in fact conducted legitimate business separate from the alleged scheme is a factual question that cannot be resolved on a motion to dismiss.

**2.**

The RICO Defendants next argue that the Amended Complaint does not allege the commission of predicate acts by each defendant and improperly groups the defendants together. To conduct or participate in an enterprise's

affairs, a defendant need not hold a formal position or bear primary responsibility, but must take some part in directing those affairs; lower-rung participants acting under the direction of others may be liable. Reves v. Ernst & Young, 507 U.S. 170, 179 (1993); United States v. Allen, 155 F.3d 35, 41 (2d Cir. 1998). The predicate acts alleged are mail and wire fraud, which constitute racketeering activity. 18 U.S.C. § 1961(1)(B). The Amended Complaint identifies, for each RICO defendant, that defendant's role in the issuance of more than sixty false monthly Compliance Reports and related communications, together with facts giving rise to a strong inference of fraudulent intent. Am. Compl. ¶¶ 357–67; see Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006); Novak v. Kasaks, 216 F.3d 300, 311–12 (2d Cir. 2000). Because the Amended Complaint distinguishes the conduct of each defendant, the defendants' arguments to the contrary fail.

**3.**

The RICO Defendants next argue that Leadenhall has failed to plead a pattern of racketeering activity. A pattern of racketeering activity requires at least two related predicate acts that amount to, or pose a threat of, continued criminal activity. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). Continuity is closed-ended where the related acts span a substantial period, and open-ended where a shorter period of conduct threatens repetition or reflects the regular way the enterprise conducts its business. Id. at 241-42; DeFalco, 244 F.3d at 321–23; Williams v. Equitable Acceptance Corp., 443 F.

Supp. 3d 480, 493 (S.D.N.Y. 2020). The Amended Complaint alleges more than sixty false Compliance Reports of the same form, function, and authorship, transmitted at monthly intervals from May 2021 through November 2023. Am. Compl. ¶¶ 160–61. Those allegations describe a closed-ended pattern spanning more than two years, which is sufficient to allege closed-end continuity. See Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 319 (S.D.N.Y. 2009) (allegations of a scheme involving "numerous predicate acts and multiple participants, including both corporate and individual defendants" over a period of more than two years are sufficient to plead closed-end continuity). These allegations also support open-ended continuity, because the double-pledging and fictitious pledging of collateral are alleged to have been the enterprise's regular method of operation, employed against multiple lenders. Am. Compl. ¶¶ 48, 162, 309; see Bolivar v. FIT Int'l Grp., No. 12-cv-781, 2017 WL 11473766, at *19 (S.D.N.Y. Mar. 16, 2017) (finding open-ended continuity where the complaint alleged that predicate acts of mail and wire fraud were how the defendants regularly conducted business), report and recommendation adopted, 2019 WL 4565067 (S.D.N.Y. Sept. 20, 2019). The Amended Complaint therefore adequately alleges a pattern of racketeering activity.

**4.**

The RICO Defendants also argue that the RICO claim fails because the Amended Complaint does not allege clear and definite damages; the

defendants' principal contention on this point is that a secured lender must foreclose on its collateral before bringing a RICO claim.

A RICO plaintiff may recover only when its actual loss has become clear and definite. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767–68 (2d Cir. 1994). In this case, the plaintiffs allege a definite loss—the accelerated balance of $609,529,966.82, immediately due and payable. Am. Compl. ¶¶ 175–77, 417. While the defendants argue to the contrary, First Nationwide did not require foreclosure in particular; it recognized that fraud losses may become clear and definite in other ways, and the claim in that case was unripe only because the lender had not exercised any remedy to reduce its loss to a sum certain.[3] 27 F.3d at 767–68. In this case, the plaintiffs exercised their contractual right to accelerate the debt and allege that they have been unable to collect it.[4] Am. Compl. ¶¶ 67, 175–77. Thus, the plaintiffs allege clear and definite damages.

* * *

[3] The other cases the defendants cite are to the same effect, involving plaintiffs that had not pursued available remedies or were pursuing parallel proceedings to recover the same funds. See Motorola Credit Corp. v. Uzan, 322 F.3d 130, 136 (2d Cir. 2003); Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 398 (S.D.N.Y. 2000); Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc., 2012 WL 3542196, at *14 (S.D.N.Y. Aug. 15, 2012).

[4] Leadenhall did, in fact, foreclose on the collateral after the motion to dismiss was filed, as reflected in the Court's opinion denying A-CAP and King's motion to hold Leadenhall in contempt. See generally Leadenhall Cap. Partners LLP v. Wander, No. 24-cv-3453, 2026 WL 1804113 (S.D.N.Y. June 23, 2026).

Because Leadenhall has adequately alleged a substantive RICO claim, the defendants' motions to dismiss Count Five of the Amended Complaint are **denied**.

## C.

The RICO Defendants also argue that Leadenhall has failed to plead a RICO conspiracy. A RICO conspiracy claim under 18 U.S.C. § 1962(d) requires an agreement to join a racketeering scheme, knowing engagement in the scheme with intent that its goals be effectuated, and that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts. United States v. Zemlyansky, 908 F.3d 1, 11 (2d Cir. 2018). Because Leadenhall has adequately pleaded a substantive RICO claim, and because the Amended Complaint alleges an agreement among the RICO defendants and their knowing participation in the scheme, see Am. Compl. ¶¶ 372–83, the conspiracy claim survives as well. The motions to dismiss Count Six of the Amended Complaint are therefore **denied**.

## D.

The various defendants move to dismiss the breach-of-contract claims, Counts One through Four, as applicable to them, for failure to state a claim. To state a claim for breach of contract under New York law, a plaintiff must allege the existence of a contract, the plaintiff's performance, the defendant's breach, and resulting damages. Nat'l Gear & Piston, Inc. v. Cummins Power

Sys., LLC, 861 F. Supp. 2d 344, 355 (S.D.N.Y. 2012). The 777 Defendants do not dispute that the agreements at issue—the LSA, the Sale Agreements, the Servicing Agreements, and the Guaranty Agreement—are valid and enforceable contracts. They argue that Leadenhall has not identified which provisions the defendants breached, has named defendants that did not sign the agreements, and has not alleged a condition precedent to recovery under the Guaranty. Each argument fails.

**1.**

The defendants first argue that Count Four, for breach of the Guaranty Agreement, fails because Leadenhall has not alleged a "Trigger Event," which they characterize as a condition precedent to the Guarantors' obligations. In fact, the Amended Complaint alleges ten distinct Trigger Events. Am. Compl. ¶ 351; see id. ¶¶ 84–174. The defendants dispute only one of them—the failure to own collateral free and clear "solely as a result of the action or inaction" of a Borrower or Guarantor—and do not address the other nine. Because the Amended Complaint alleges that each Trigger Event independently gives rise to the Guarantors' obligations, the nine undisputed Trigger Events are sufficient to state a claim, and the defendants may not raise a challenge to them for the first time on reply. See Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993). As to the one Trigger Event the defendants do dispute, they identify no allegation that anyone other than a Borrower or Guarantor caused the failure to own the collateral free and clear, and any competing

theory of causation would raise a factual dispute that cannot be resolved on a motion to dismiss.

**2.**

The defendants next argue that Counts One through Three, for breach of the LSA, the Sale Agreements, and the Servicing Agreements, fail because Leadenhall does not identify which provisions each defendant breached. But that is not the case. The Amended Complaint alleges that the Borrowers breached their representations and covenants to hold the collateral free and clear of any Adverse Claim and to refrain from creating any such claim, their obligation to pay the accelerated amount, and their duty to indemnify Leadenhall, citing the specific sections of the LSA. See Am. Compl. ¶¶ 316–23. It also alleges that SuttonPark Capital breached its representations and covenants regarding ownership of the receivables it sold, and that the Sellers breached their indemnification obligations, under identified sections of the Sale Agreements. See Am. Compl. ¶¶ 326–32. And the Amended Complaint alleges that the SuttonPark Servicer breached its obligations to deliver accurate Compliance Reports, to give notice of Servicer Defaults, and to indemnify Leadenhall, under identified sections of the LSA and the applicable Servicing Agreement. See Am. Compl. ¶¶ 336–45.

**3.**

The defendants also argue that Leadenhall has named defendants that did not sign the agreements and that its allegations of alter-ego liability are

conclusory. Under New York law, a plaintiff may pierce the corporate veil and sue a non-signatory for breach of contract when the non-signatory is an alter ego of a signatory. Javier v. Beck, No. 13-cv-2926, 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014). A court may pierce the veil where the owner exercised such control that the corporation became a mere instrumentality of the owner, the owner used that control to commit a wrong, and the wrong caused injury to the plaintiff. Wm. Passalacqua Builders, Inc. v. Resnick Devs. South, Inc., 933 F.2d 131, 138 (2d Cir. 1991). The Amended Complaint alleges that the 777 entities are alter egos of one another and of Wander and Pasko, who dominated and controlled them and disregarded corporate formalities, moving assets among the entities at will. See Am. Compl. ¶¶ 247–56. Those allegations state a basis for alter-ego liability, and whether the corporate veil should in fact be pierced is a factual question that cannot be resolved on this motion to dismiss. See Citibank, N.A. v. Aralpa Holdings Ltd. P'ship, 714 F. Supp. 3d 416, 439-41 (S.D.N.Y. 2024), aff'd, No. 24-423, 2025 WL 289499 (2d Cir. Jan. 24, 2025).

**4.**

Finally, the defendants argue that Count Two must be dismissed because Leadenhall has not adequately alleged that it is an intended third-party beneficiary of the Sale Agreements. The Amended Complaint alleges that Leadenhall has the right to enforce the Sellers' obligations under an identified provision of the Sale Agreements. Am. Compl. ¶¶ 325–26. That

allegation is sufficient at the pleading stage, and the defendants' contrary contention raises a question of contract interpretation that cannot be resolved on this motion.

* * *

Because Leadenhall has adequately alleged its breach-of-contract claims, the motions to dismiss Counts One through Four of the Amended Complaint are denied.

**E.**

The defendants move to dismiss the unjust enrichment claim, Count Ten, as duplicative of the contract claims. Under New York law, an unjust enrichment claim will not lie where a valid and enforceable contract governs the same subject matter. Goldberg v. Pace Univ., 535 F. Supp. 3d 180, 198 (S.D.N.Y. 2021). But a plaintiff may plead unjust enrichment in the alternative where the enforceability of the contract is in dispute. Flatscher v. Manhattan Sch. of Music, 551 F. Supp. 3d 273, 287 (S.D.N.Y. 2021). The 777 Entity Defendants concede that the agreements at issue are valid and enforceable contracts, but the other defendants do not clearly make the same concession. Because the enforceability of the contracts against every defendant is not conceded, the unjust enrichment claim is not necessarily duplicative, and Leadenhall may pursue it in the alternative at this stage. See Protex Indus. (H.K.) Ltd. v. Vince Holding Corp., 748 F.Supp.3d 234, 255–56 (S.D.N.Y. 2024). The motion to dismiss Count Ten is therefore denied.

**F.**

The defendants move to dismiss the fraud claims—Count Seven, for fraudulent misrepresentation; Count Eight, for civil conspiracy to commit fraud; and Count Nine, for aiding and abetting fraud. As a threshold matter, A-CAP and King argue that the fraud claims are not ripe because Leadenhall has not first exhausted its contractual remedies. That argument fails for the reasons already given in connection with the RICO claims: Leadenhall accelerated the debt and alleges a definite, uncollected loss, and it need not foreclose before suing, although Leadenhall has now foreclosed on the collateral.

**1.**

Under New York law, a claim for fraud requires a material misrepresentation or omission of fact, made with knowledge of its falsity and an intent to defraud, reasonable reliance, and resulting damage. Childers v. N.Y. & Presbyterian Hosp., 36 F. Supp. 3d 292, 309 (S.D.N.Y. 2014). The moving defendants—the 777 Entity Defendants, Wander, and Pasko—principally rest on their RICO arguments that the misrepresentations and fraudulent intent are insufficiently pleaded. Those arguments fail for the reasons already stated. The Amended Complaint alleges the misrepresentations with particularity: more than sixty false monthly Compliance Reports issued from May 2021 through November 2023, each identifying the period covered, the sender, and the date and manner of transmission, that misstated that the Borrowers owned the pledged collateral free and clear. Am. Compl. ¶ 160, see

also id. ¶¶ 99–174. It alleges knowledge and intent through, among other things, the magnitude of the double-pledging and fictitious pledging, contemporaneous records reflecting awareness that pledged assets were never acquired or had already been sold, forged bank statements, and the alteration of the MP Fin system. See id. ¶¶ 151–74. The Amended Complaint also alleges that Leadenhall relied on the reports to confirm that its loans were secured, and the Amended Complaint alleges that Leadenhall lost more than $600 million as a result. Am. Compl. ¶¶ 162, 177. At the pleading stage, the alleged fraud need only be plausible. Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 174 (2d Cir. 2015). Pasko separately argues that he lacked scienter, but knowledge and intent may be alleged generally, Fed. R. Civ. P. 9(b), and the Amended Complaint alleges that Pasko signed multiple false Compliance Reports, the Borrowing Requests, and the assignment of receivables already pledged to another lender. See Am. Compl. ¶¶ 55, 60–64, 120–21, 161. Count Seven is adequately pleaded.

**2.**

The elements of aiding and abetting fraud are an underlying fraud, the defendant's actual knowledge of the fraud, and the defendant's substantial assistance. Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 482 (S.D.N.Y. 2018). Actual knowledge may be shown by circumstantial evidence and need not rest on an explicit acknowledgment of the fraud. Nathel v. Siegal, 592 F. Supp. 2d 452, 468-69 (S.D.N.Y. 2008); Oster v. Kirschner,

905 N.Y.S.2d 69, 72 (App. Div. 2010). A defendant substantially assists where it affirmatively assists, helps conceal, or, being under a duty to act, enables the fraud to proceed. JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005). A-CAP and King argue that they became involved only after the fraud had achieved its object, and that Leadenhall could not have relied on any report transmitted after it learned of the double-pledging. The argument rests on the premise that A-CAP and King first learned of the fraud in the spring of 2023, but the Amended Complaint alleges that A-CAP controlled the 777 organization through a lending relationship dating to 2020 and knew of the fraud before it moved into the offices of 777 Partners. Am. Compl. ¶¶ 194, 198–212. Thus, the Amended Complaint adequately alleges that A-CAP and King had actual knowledge of the fraud and substantially assisted it—by controlling the entity that transmitted the false reports, prohibiting Leadenhall from auditing the collateral, and financing the enterprise to preserve the appearance of solvency. See Am. Compl. ¶¶ 202–42. Whether A-CAP and King in fact knew of the fraud when they acted is a factual question that cannot be resolved on this motion to dismiss. The 777 Entity Defendants and Pasko argue only that their own conduct and knowledge are insufficiently pleaded, but the Amended Complaint amply alleges each defendant's knowing participation. See Am. Compl. ¶¶ 151–74, 216–17. Count Nine is adequately pleaded.

**3.**

The defendants argue that New York does not recognize a standalone claim for civil conspiracy. That is correct, but Leadenhall does not assert a standalone conspiracy claim; it alleges a conspiracy to commit fraud, which serves to connect the defendants to the underlying tort. See AM Cosms., Inc. v. Solomon, 67 F. Supp. 2d 312, 322 (S.D.N.Y. 1999). To state such a claim, a plaintiff must allege the underlying fraud together with an agreement, a common objective, acts in furtherance of that objective, and knowledge. Winnick, 406 F. Supp. 2d at 259. The Amended Complaint alleges the underlying fraud; an agreement between A-CAP and King and the 777 Defendants, formalized around March 2023; a common objective of obtaining fraudulent financing to fund the enterprise's investments and enrich its principals; and acts in furtherance by each defendant. See Am. Compl. ¶¶ 201, 230–46, 372–83, 389–93. Count Eight is adequately pleaded.

* * *

Because Leadenhall has adequately alleged its fraud claims, the motions to dismiss Counts Seven, Eight, and Nine of the Amended Complaint are **denied**.

**G.**

Leadenhall asserts claims for both actual and constructive fraudulent transfer against A-CAP, 777 Partners, Wander, and Pasko pursuant to the DCL. The basis of Leadenhall's claim is a transaction wherein A-CAP allegedly caused 777 Partners to assume $170 million in debt owed to A-CAP by

JARM—Wander's personal shareholding vehicle—for no consideration. See Am. Compl. ¶¶ 221–29. Leadenhall alleges that A-CAP directed the transfer to increase A-CAP's likelihood of being repaid and that because of A-CAP's first priority security interest in 777 Partners, this placed the JARM debt obligation ahead of the debt owed to Leadenhall, to Leadenhall's detriment.

The DCL provides that a fraudulent transfer claim "is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred." DCL § 279(b). In this case 777 Partners is the debtor and is located "at its chief executive office," in Florida. See DCL § 279(a)(3). Accordingly, the substantive law of Florida governs Leadenhall's fraudulent transfer claims.

Under Florida's Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. § 726.101, et seq, plaintiffs may proceed under two theories: actual fraudulent transfer pursuant to § 726.105(1)(a) or constructive fraudulent transfer pursuant to §§ 726.105(1)(b), 726.106. See Philip von Kahle v. Cargill, Inc., No. 21-cv-8532, 2024 WL 5508232, at *6 (S.D.N.Y. Dec. 19, 2024), report and recommendation adopted, 2025 WL 733252 (S.D.N.Y. Mar. 7, 2025). Leadenhall alleges that A-CAP, 777 Partners, Wander and Pasko are liable for both actual and constructive fraudulent transfer.

**1.**

Section 726.105(1)(a) governs actual fraudulent transfer and provides that:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (a) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

An actual fraudulent transfer requires that "(1) there was a creditor to be defrauded, (2) a debtor intending fraud, and (3) a conveyance—i.e., a transfer—of property which could have been applicable to the payment of the debt due." Isaiah v. JPMorgan Chase Bank, 960 F.3d 1296, 1302 (11th Cir. 2020). Courts within the Eleventh Circuit are divided on the question whether fraudulent transfer claims are subject to the Rule 9(b) heightened pleading standard. See Oginsky v. Paragon Props. of Costa Rica LLC, 784 F. Supp. 2d 1353, 1369 (S.D. Fla. 2011). It is unnecessary to decide the issue because Leadenhall has satisfied the higher pleading standard.

To plead a claim for actual fraudulent transfer, the plaintiff must allege that the defendant acted with actual intent. However, "section 726.105(2) provides that fraudulent intent may be presumed from evidence of badges of fraud." Beal Bank SSB v. Almand & Assocs., 780 So.2d 45, 60 (Fla. 2001). Section 726.105(2)(a)–(k) provides a non-exhaustive list of factors that may suggest fraudulent intent, including whether:

> (a) The transfer or obligation was to an insider.
> (b) The debtor retained possession or control of the property transferred after the transfer.
> (c) The transfer or obligation was disclosed or concealed.
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (e) The transfer was of substantially all the debtor's assets.
> (f) The debtor absconded.
> (g) The debtor removed or concealed assets.

> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Alternatively, "under FUFTA's actual fraud provision, proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under § 726.105(1)(a) without the need to consider the badges of fraud." Wiand v. Lee ("Lee"), 753 F.3d 1194, 1201 (11th Cir. 2014). To plead the existence of a Ponzi scheme, a plaintiff must adequately allege: "(1) deposits made by investors; (2) the [debtor] conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the [debtor] produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors." Wiand v. Morgan, 919 F. Supp. 2d 1342, 1355 (M.D. Fla. 2013)

In this case, 777 Partners—the debtor—is alleged to have incurred a debt obligation, and the transfer of that obligation from JARM to 777 Partners is alleged to have been fraudulent as to Leadenhall—777 Partners' creditor. See § 726.105(1) (governing whether "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor" (emphasis added)).

The defendants contend that "[a] fraudulent conveyance claim seeking to recover money damages can only be maintained against a person who

participates in the fraudulent transfer as either the transferee of the assets or the beneficiary of the conveyance," and that 777 Partners, Wander, and Pasko do not fall into either category. See Amusement Indus., Inc. v. Midland Ave. Assocs., LLC, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2011).[5] Because this case involves an assumption of a debt obligation rather than a transfer of assets, there is no "transferee of the assets." See id. However there is a "beneficiary of the conveyance." See id. That alleged beneficiary is A-CAP—which allegedly was able to transfer a loan from an entity unlikely to repay the debt to an entity with more assets, over which A-CAP held a purported first-priority, all-asset lien. Accordingly, Leadenhall may maintain its actual fraudulent transfer claim as to A-CAP but not as to Wander or Pasko—who are neither recipients of fraudulently transferred assets nor beneficiaries of the alleged fraudulent transfer.

Leadenhall adequately alleges "actual intent" as required by FUFTA. See § 726.105(1)(a). Leadenhall provide two bases for actual intent: (1) the Ponzi scheme presumption; and (2) "badges of fraud." It is unnecessary to determine whether the Ponzi scheme presumption applies because Leadenhall has alleged numerous badges of fraud and thus has adequately pleaded the element of actual intent. For example, Leadenhall alleges that before 777 Partners assumed the debt obligation, 777 Partners had been sued by

[5] Leadenhall briefly responds that 777 Partners, Wander, and Pasko were all beneficiaries of the conveyance, but the facts alleged in the Amended Complaint do not make clear how 777 Partners' assumption of a debt obligation benefits any of these parties.

creditors other than Leadenhall, see § 726.105(2)(d); Am. Compl. ¶ 309, and that 777 Partners was either insolvent or became insolvent shortly after incurring the obligation, see § 726.105(2)(i); Am. Compl. ¶¶ 175–92, 257–302.

Leadenhall also argues that the debt obligation assumed by 777 Partners was an obligation to an insider. See § 726.105(2)(a). FUFTA provides a non-exhaustive list of "insiders," including directors of the debtor, officers of the debtor, and persons in control of the debtor. § 726.102(8)(b). Moreover, "[a] close relationship between a transferor debtor and a transferee is a factor equivalent to a badge of fraud which should be considered in determining fraudulent intent." Gen. Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1499 (11th Cir. 1997); see also Mane FL Corp. v. Beckman, 355 So.3d 418, 426–27 (Fla. Dist. Ct. App. 2023). Leadenhall has adequately alleged both "a close relationship between" A-CAP and 777 Partners, see Gen. Trading, 119 F.3d at 1499, and that by early 2024, A-CAP was a "person in control of the debtor," § 726.102(8)(b)(3); see also Am. Compl. ¶¶ 175–92, 219–29.

Although "a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance[,] several of them when considered together may afford a basis to infer fraud," and Leadenhall has alleged several additional badges of fraud. See Lee, 753 F.3d at 1200. Moreover, "[c]ourts may take into account the circumstances surrounding the conveyance," not captured in the enumerated list of badges of fraud. See Gen. Elec. Co. v. Chuly Int'l, LLC, 118 So.3d 325, 327 (Fla. Dist.

Ct. App. 2013). In this case, both the enumerated badges and the overall circumstances of 777 Partners' assumption of the JARM debt obligation are suggestive of actual intent to commit fraud. Accordingly, Leadenhall has adequately alleged a claim for actual fraudulent conveyance against A-CAP—although not against Wander or Pasko because those parties are neither transferees nor beneficiaries of the debt assumption.

A-CAP contends that Leadenhall has not adequately alleged that the debtor—777 Partners—incurred the obligation with actual intent, as required by FUFTA. See § 726.105(1)(a) (asking whether "the debtor made the transfer or incurred the obligation: (a) [w]ith actual intent" (emphasis added)); see also In re Nanobeak Biotech, 656 B.R. 350, 365–66 (Bankr. S.D.N.Y. 2024) (analyzing an identically phrased statute and concluding that a plaintiff "must plead the fraudulent intent of the transferor, not the transferee, to defraud creditors"). A-CAP argues that the Amended Complaint only alleges that A-CAP possessed "actual intent"—not 777 Partners. However, the facts alleged support the conclusion that 777 Partners, and its alleged alter egos Wander and Pasko, assumed JARM's debt obligation with actual knowledge that such a transfer would increase A-CAP's chances of repayment at the expense of 777 Partners' other creditors like Leadenhall. That 777 Partners was not the intended beneficiary of the alleged fraudulent transfer does not mean that it acted without actual intent to defraud.

**2.**

FUFTA's constructive fraudulent transfer provision provides:

> a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Fla. Stat. § 726.106(1).[6] In other words, a transfer is constructively fraudulent where: "(1) the creditor's claim arose before the transfer; (2) the debtor was insolvent at the time of the transfer or became insolvent because of the transfer; and (3) the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer." Pasternack v. Klein, No. 16-cv-482, 2019 WL 330593, at *8 (M.D. Fla. Jan. 25, 2019). Unlike claims for actual fraudulent transfer, constructive fraudulent transfer does not require proof of fraudulent intent. See Gen. Trading, 119 F.3d at 1499.

Pursuant to FUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." § 726.103(1). "A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." § 726.103(2). To assess whether a debtor received reasonably equivalent value in exchange for the assumption

[6] Leadenhall appears to rely on both § 726.105(1)(b)—constructive transfer as to present and future creditors—and § 726.106(1)—constructive transfer as to present creditors—in its Amended Complaint. See Am. Compl. ¶¶ 409–16 (citing DCL §§ 273(a)(2), 274—the New York analogues of Fla. Stat. §§ 726.105(1)(b), 726.106). However, because the briefing only addresses constructive fraudulent transfer as to present creditors—the Court will focus its analysis on that provision.

of a debt obligation, courts consider "the totality of the circumstances . . . including the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee." Wiand v. Waxenberg, 611 F. Supp. 2d 1299, 1320–21 (M.D. Fla. 2009).

In this case, Leadenhall was a present creditor with a claim that arose before 777 Partners' assumption of the debt obligation. Leadenhall has also adequately alleged that 777 Partners was insolvent at the time it assumed the debt obligation in March 2024. See Am. Compl. ¶¶ 175–92 (describing 777 Partners' inability to make even $15 million repayments to Leadenhall); id. ¶¶ 257–302 (describing 777 Partners' inability to make payroll or pay other creditors).[7] Although Leadenhall has not specifically alleged that the sum of all 777 Partners' debts is greater than its assets, the fact that 777 Partners has—with the exception of protective advances funded by A-CAP—not been paying its debts as they become due creates a presumption of insolvency. See, e.g., id. ¶ 20 (alleging that the 777 Entities are "propped up" by "the patronage of A-CAP, which pays off the enterprise's last-minute obligations—including 777 Partners' own payroll").

---

[7] Leadenhall relies on its assertion that the defendants operated a Ponzi scheme to satisfy the insolvency element. See In re Pearlman, 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014) ("[A] company run as a Ponzi scheme is insolvent as a matter of law."). However, the Court need not reach this issue to determine that Leadenhall has adequately alleged that 777 Partners failed to pay its debts as they become due—thereby entitling it to a presumption of insolvency.

Finally, Leadenhall adequately alleges that 777 Partners assumed the debt without receiving assets of reasonably equivalent value in exchange. See Am. Compl. ¶ 411; id. ¶ 225 (observing that King only told Leadenhall that the loan to JARM would be "consolidated into the HoldCo facility" without reference to any exchange or consideration). A-CAP contends that these allegations are conclusory and speculates that A-CAP's continued decision not to foreclose on its loans to 777 Partners served as consideration for the transfer. See In re Wade Park Land Holdings, LLC, No. 23-591, 2024 WL 3024648, at *6 (2d Cir. June 17, 2024) (summary order) ("[C]ourts in this circuit have held that forbearance of foreclosure on a defaulted loan can constitute reasonably equivalent value by itself or in addition to other consideration."). However, unlike in In re Wade Park Holdings, in this case, A-CAP has not entered into a formal forbearance agreement with 777 Partners in connection with the transfer of the JARM loan. Cf. In re Silverman Laces, Inc., No. 01-cv-6209, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (holding that a debtor received reasonably equivalent value when the creditor formally agreed to waive its rights to pursue legal remedies for default). Moreover, the totality of the circumstances surrounding the JARM transaction, including the arms-length nature of the transaction and the good faith of the beneficiary, are in doubt, as evidenced by the badges of fraud alleged by Leadenhall. Thus, Leadenhall has adequately pleaded the elements of a constructive fraudulent transfer claim.

The defendants argue that Leadenhall's constructive fraudulent transfer claim—much like its actual fraudulent transfer claim—fails because 777 Partners was neither a transferee of any assets nor a beneficiary of the transfer and thus, is not a proper defendant. As the Court concluded above with respect to the actual fraudulent transfer claim, Leadenhall may assert its constructive fraudulent transfer claim against A-CAP as a beneficiary of the alleged fraudulent transfer but not against Pasko or Wander.

* * *

The motions to dismiss the actual and constructive fraudulent transfer claims (Counts Eleven and Twelve) are **denied** as to A-CAP and **granted** as to Pasko and Wander.

**V.**

Finally, Wander and Pasko move to dismiss the claims against them for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). On a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003). To survive a motion to dismiss where no evidentiary hearing is held, the plaintiff need only make a prima facie case that the defendant is subject to the Court's personal jurisdiction. See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of

jurisdiction."). "In determining whether a plaintiff has met this burden, [the Court] will not draw argumentative inferences in the plaintiff's favor" but will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994); see also Mende, 269 F. Supp. 2d at 251. Nevertheless, "although pleadings and affidavits are construed in the light most favorable to the plaintiff, conclusory non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a prima facie showing of jurisdiction." DeLorenzo v. Ricketts & Assocs., Ltd., No. 15-cv-2506, 2017 WL 4277177, at *5 (S.D.N.Y. Sept. 25, 2017)

To determine whether jurisdiction exists over a non-domiciliary, the Court must determine whether New York law allows the exercise of personal jurisdiction and, if so, whether doing so comports with constitutional due process guarantees. See Edwardo v. Roman Catholic Bishop of Providence, 66 F.4th 69, 73 (2d. Cir. 2023); Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d. Cir. 2013).

**A.**

The Court has personal jurisdiction over Wander and Pasko because they consented to such jurisdiction in New York through the forum-selection clauses in the LSA and the related agreements. The 777 entities that are parties to those agreements consented to the jurisdiction of the courts in New York, Am. Compl. ¶ 41; see LSA § 10.09, ECF No. 213-1, and a court that has

personal jurisdiction over a party to such an agreement may also exercise jurisdiction over that party's alter ego, CesFin Ventures LLC v. Al Ghaith Holding Co. PJSC, No. 21-cv-1395, 2022 WL 18859076, at *3 (S.D.N.Y. Dec. 10, 2022). The showing required to exercise jurisdiction over an alleged alter ego is less onerous than the showing required to pierce the corporate veil for purposes of liability. Id. at *4. As explained above in connection with the breach-of-contract claims, the Amended Complaint adequately alleges that Wander and Pasko are alter egos of the 777 entities. Because the standard governing alter-ego jurisdiction is less demanding than the standard governing the piercing of the corporate veil for liability, those allegations are more than sufficient to bind Wander and Pasko to the forum-selection clauses to which the 777 entities consented.[8] See Id.

Wander and Pasko argue that a non-party to a contract may not be bound by a forum-selection clause unless the exercise of jurisdiction independently satisfies the minimum-contacts test for specific jurisdiction. But that is not the law: consent to personal jurisdiction through a valid forum-selection clause comports with due process. Burger King Corp. v. Rudzewicz,

[8] Wander separately argues that he cannot be an alter ego of the 777 entities because the Amended Complaint alleges that A-CAP and King controlled those entities. But a plaintiff may plead in the alternative, and the allegation that A-CAP and King exercised control does not negate the allegation that Wander and Pasko also dominated the 777 entities and used them to further the alleged scheme. And, as explained in the text, whether the corporate veil should ultimately be pierced is a factual question that cannot be resolved on a motion to dismiss.

471 U.S. 462, 472 n.14 (1985). Because the Amended Complaint adequately alleges that Wander and Pasko are alter egos of the entities that consented to jurisdiction, the exercise of jurisdiction over them rests on their consent and comports with due process, without any separate showing of minimum contacts.

Moreover, Wander and Pasko are bound by the forum-selection clauses because both Wander and Pasko are closely related to the signatories to both the relevant agreements and to this dispute. A party to a contract containing a forum-selection clause may invoke the clause against a non-signatory that is closely related to a signatory or to the dispute, where the relationship is such that it was foreseeable the non-signatory would be bound. Fasano v. Li, 47 F.4th 91, 103 (2d Cir. 2022); Saidnia v. Nimbus Mining LLC, No. 21-cv-7792, 2023 WL 7005037, at *6-7 (S.D.N.Y. Oct. 24, 2023). Courts in this District have applied that principle to bind non-signatory officers and owners who played an active role in the transaction or the dispute governed by the agreement. See, e.g., Diamond v. Calaway, No. 18-cv-3238, 2018 WL 4906256, at *4-5 (S.D.N.Y. Oct. 9, 2018); Transient Path, LLC v. Stones S. Bay Corp., No. 23-cv-5628, 2024 WL 3730113, at *8 (S.D.N.Y. Aug. 8, 2024); Long Side Ventures LLC v. Hempacco Co., No. 22-cv-8152, 2023 WL 6386888, at *6 (S.D.N.Y. Sept. 29, 2023). The Amended Complaint alleges that Wander and Pasko were the co-founders and owners of the 777 entities, Am. Compl. ¶¶ 31–32, and were closely involved in the conduct at the center of this dispute. Wander led the communications and negotiations with Leadenhall and

directed the preparation of the false Compliance Reports, and Pasko signed the LSA, numerous Compliance Reports, the Borrowing Requests, and the assignment of receivables that had already been pledged to another lender, obstructed Leadenhall's review of the collateral, and was a beneficiary of the challenged $170 million transfer. See Am. Compl. ¶¶ 43, 55, 60–64, 107, 120–34, 150–58, 161, 216–17, 219–27. Those allegations describe involvement well beyond that of an officer who merely signs an agreement on a corporation's behalf.

**B.**

Personal jurisdiction over Wander and Pasko also exists pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1). The long-arm statute permits the exercise of jurisdiction over a non-domiciliary who transacts any business within the state, provided the plaintiff's claim arises from that transaction. N.Y. C.P.L.R. § 302(a)(1). A defendant transacts business in New York when he purposefully avails himself of the privilege of conducting activities within the state, and the inquiry considers the totality of the defendant's contacts, no single one of which need be shown. Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir. 2005).

The Amended Complaint alleges that Wander transacted business in New York in the course of the restructuring negotiations with Leadenhall. Wander is alleged to have traveled to New York on several occasions in March and April 2024 and to have worked from A-CAP's New York offices,

where he met with King and negotiated a forbearance agreement that would have restructured the 777 entities' debt to Leadenhall. Am. Compl. ¶¶ 181, 191. Wander argues that those contacts cannot support jurisdiction because they occurred toward the end of the alleged scheme and postdate the conduct underlying Leadenhall's claims. But the Amended Complaint alleges that the restructuring negotiations were themselves part of the conduct on which the claims are based: while Wander represented that he was working to reach agreement with Leadenhall, the negotiations are alleged to have served to forestall litigation and to allow A-CAP to continue removing assets from the 777 entities, including through the challenged transfer of the $170 million JARM obligation to 777 Partners in March 2024. See Am. Compl. ¶¶ 178–92, 219–29. At a minimum, Leadenhall's claims are arguably connected to Wander's transaction of business in New York, which is all the long-arm statute requires. See SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co., 578 F. Supp. 3d 511, 531 (S.D.N.Y. 2022).

The Amended Complaint likewise alleges sufficient facts showing that Pasko transacted business in New York. It alleges that Pasko resided in New York; that his New York residence served as the business address of MTCP LLC, the entity through which he held his interests in 777 Partners and 600 Partners; and that Pasko signed numerous false Compliance Reports on behalf of the SuttonPark Servicer, which had its principal place of business in New York. Am. Compl. ¶¶ 42–43. It further alleges that 777 Partners maintained an office in New York during the relevant period and that Wander and

Pasko conducted the business of 777 Partners at least in part from New York. Id.

* * *

Because Leadenhall has established a basis for the exercise of personal jurisdiction over Wander and Pasko, the motions to dismiss for lack of personal jurisdiction are **denied**.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motions to dismiss the Amended Complaint are **denied**, except that the motions to dismiss the actual and constructive fraudulent transfer claims—Counts Eleven and Twelve—are **granted** as to Wander and Pasko.

The Clerk is respectfully requested to close ECF Nos. 209, 211, and 214. ECF No. 203, the motion brought by the 777 Entities, is stayed.

**SO ORDERED.**

**Dated: New York, New York**
**September 21, 2026**

**John G. Koeltl**
**United States District Judge**