# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 26-90190-elm-11** |
| | ) | *Jointly Administered* |
| SIGNAL NATIONAL, LLC, | ) | |
| et al., | ) | Fort Worth, Texas |
| | ) | November 4, 2026 |
| Debtors. | ) | 1:30 p.m. Docket |
| | ) | |
| | ) | ADVANTAGE CAPITAL HOLDINGS, |
| | ) | LLC'S MOTION FOR RELIEF FROM |
| | ) | THE AUTOMATIC STAY TO ISSUE |
| | ) | WRITTEN DISCOVERY IN THE SDNY |
| | ) | ACTION [367] |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Micheal Bishop<br>Amber M. Carson<br>Blake M. Bryan<br>GRAY REED<br>1845 Woodall Rodgers Freeway, Suite 1300<br>Dallas, TX 75201<br>(469) 320-6132 |
| For the A-CAP Parties: | Mark C. Moore<br>Nora J. McGuffey<br>FOLEY & LARDNER, LLP<br>321 North Clark Street, Suite 3000<br>Chicago, IL 60654<br>(312) 832-4700 |
| For Leadenhall Capital Partners, LLP: | Roger G. Schwartz<br>Geoffrey M. King<br>Amber John<br>PAUL HASTINGS, LLP<br>71 South Wacker Drive, Suite 4500<br>Chicago, IL 60606<br>(312) 499-6000 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Leadenhall Capital Partners, LLP: | Leigh M. Nathanson<br>KING & SPALDING, LLP<br>1290 Avenue of the Americas, 14th Floor<br>New York, NY 10104<br>(212) 790-5359 |
| For the Official Committee of Unsecured Creditors: | JaKayla DaBera<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>401 Congress Avenue, Suite 2100<br>Austin, TX 78701<br>(512) 487-6560 |
| For the Official Committee of Unsecured Creditors: | Sharon I. Dwoskin<br>BROWN RUDNICK, LLP<br>One Financial Center<br>Boston, MA 02111<br>(617) 856-8464 |
| Recorded by: | Shelley Warren<br>UNITED STATES BANKRUPTCY COURT<br>501 W. 10th Street<br>Fort Worth, TX 76102<br>(817) 333-6005 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORT WORTH, TEXAS - NOVEMBER 4, 2026 - 1:29 P.M.

THE CLERK: All rise.

THE COURT: All right. Please be seated.

Okay. Good afternoon, everybody. We are on the November 4th, 2026 -- hard to believe, November already -- 1:30 p.m. docket. We have the Signal National, LLC and Affiliated Debtors cases, jointly administered under Case 26-90190.

Let me go ahead and start by taking appearances of counsel, and I'll start by noting that we have electronic appearances that have been made by the following folks, in no particular order:

For the Committee, we have Ms. Dwoskin.

For the Leadenhall Parties, we have Mr. Schwartz, Mr. King, Ms. Nathanson, and Ms. John.

And I think those are the electronic appearances of which I'm aware. So let's go ahead and take up additional appearances, and we'll start in the courtroom. Mr. Bishop?

MR. BISHOP: Good afternoon, Your Honor. It's been a while in your court. Mike Bishop, Blake Bryan, and Amber Carson from Gray Reed on behalf of the Debtors.

THE COURT: Okay. Good afternoon to you all.

MS. MCGUFFEY: Good afternoon, Judge. Nora McGuffey and Mark Moore here on behalf of A-CAP.

THE COURT: Okay. Good afternoon to both of you.

MS. DABERA: Good afternoon, Your Honor. JaKayla

DaBera on behalf of the Committee.

THE COURT: Okay. Good afternoon.

All right. On WebEx, do we have anyone else wishing to make a formal appearance?

Okay. Then who's taking the lead for A-CAP today?

MS. MCGUFFEY: That's me.

THE COURT: Okay. All right.

MS. MCGUFFEY: Again, Nora McGuffey from Foley & Lardner on behalf of A-CAP.

Your Honor, we filed -- we have a lift stay motion here. It's filed at Docket 367. And then our witness and exhibit list was at Docket 428.

And I defer to Your Honor, but just as a housekeeping matter, we conferred with the Debtors beforehand and we'd like to move our exhibits in. And as Counsel noted, we're not admitting the exhibits for the truth of the matter asserted except for Exhibit 4.

THE COURT: Okay.

MS. MCGUFFEY: And I believe the Debtor was okay with that.

THE COURT: All right. So let's start with everything other than Exhibit 4.

MS. MCGUFFEY: Okay.

THE COURT: Any objections to the admission of A-CAP Exhibits 1 through 3 and 5 through 7, solely for the purpose

of the assertions -- I assume we're talking about probably the pleadings in the other litigation -- the assertions that have been made but not for the truth of the matter?

MR. BISHOP: Your Honor, with that understanding, yes on the pleadings. As long as they're not being offered for the truth, that's fine, I have no objection to admission.

Also, in Exhibit 1, which is the declaration of Mr. Moore, I think I have an understanding with Mr. Moore that Paragraph 3 of that declaration basically says all of the items contained in the motion are true and correct. I object to that paragraph because in the motion, obviously, are legal arguments, positions, theories. That shouldn't be the subject of testimony. If lawyers want to make argument about those things, that's perfectly fine, but it shouldn't be in the testimony of a lawyer about legal positions and case cites and those types of things.

THE COURT: Okay. So I think what I heard previously was Exhibit 1 was among the exhibits --

MS. MCGUFFEY: Oh.

THE COURT: -- that wasn't being offered for all purposes. It sounds like you want to reverse course on that. Correct?

MS. MCGUFFEY: I think -- I think so. I mean, I agree with that understanding that's what we had. Apologies for misspeaking. I meant it -- I'm fine striking that sentence

completely from the declaration. So that was not my intention, to go back on what we talked about.

THE COURT: Okay. All right. So let's try again. Let's just start with Exhibit 1.

MS. MCGUFFEY: Okay.

THE COURT: Any objection to the admission of A-CAP Exhibit 1 for all purposes other than the last sentence of Paragraph 3, which I think is really the issue?

MR. BISHOP: I'm fine with that, Your Honor. It's the last sentence of Paragraph 3.

THE COURT: Okay. I don't need any more. I'm trying to get this done.

MR. BISHOP: Okay.

THE COURT: All right. Any objection? (No response.) All right. Then Exhibit 1 will be admitted with the exception of the second sentence of Paragraph 3.

(A-CAP Parties' Exhibit 1 is admitted into evidence as specified.)

THE COURT: Okay. And then with respect to Exhibits -- let's just jump to A-CAP Exhibit 4. We also have an offer of A-CAP Exhibit 4 for all purposes. Any objection?

MR. BISHOP: No. No, Your Honor.

THE COURT: Okay. Without objection, A-CAP Exhibit 4 is admitted for all purposes.

(A-CAP Parties' Exhibit 4 is admitted into evidence.)

THE COURT: And then we have A-CAP Exhibits 2, 3, 5, 6, and 7 are being offered for the purpose of reflecting what has been asserted but not for the truth of the matter. Any objection to the admission with that limitation?

MR. BISHOP: No, Your Honor.

THE COURT: Okay. And just for people, I'm looking at the screen because I know the Committee is a party to this, too. That's why, if anybody's wondering, why does he keep looking at the screen? Just making sure we're not having objections on that front as well.

So, without objection, A-CAP Exhibits 2 through 3 and 5 through 7 will be admitted for purposes other than for the truth of the matters asserted therein.

(A-CAP Parties' Exhibits 2 through 3 and 5 through 7 are admitted into evidence as specified.)

THE COURT: Okay. Very good.

OPENING STATEMENT ON BEHALF OF THE A-CAP PARTIES

MS. MCGUFFEY: Okay. Yes. So, Your Honor, we're here on a motion to modify the stay, and I think it's for a very narrow purpose, which is to issue written discovery to the Debtors in connection with the Southern District of New York litigation with Leadenhall.

The written discoveries are Exhibit 2. And I'm sure Your Honor is well aware of this, but what we refer to as the SDNY Action or Litigation is that case that Leadenhall has brought

against the Debtor and various nondebtor 777 entities and then their principals, and alleging basically that they defrauded Leadenhall through double-pledging of collateral and other misconduct. And then as to A-CAP and Mr. King, Leadenhall falsely accuses them of participating in the alleged fraud and/or conspiring and aiding and abetting them.

A-CAP and the other Defendants filed motions to dismiss back when it was filed, which were under advisement with the District Court for nearly two years. And just recently, this past September, on the 21st, the District Court denied those motions, and so we filed our answers and defenses back on October 20th.

And just about the bankruptcy, after the bankruptcy cases were filed, the SDNY Action was obviously stayed as to the Debtor entities. And then, by agreement with Leadenhall, was stayed as to the nondebtor 777 entities. But it was not stayed as to A-CAP.

We asked Leadenhall to stay the action, and they said no. This correspondence is our Exhibit 4, an email from -- between counsel. And it's also my understanding that the Debtors have recently asked Leadenhall to stay the action as to A-CAP and were again told no.

So then A-CAP moved the District Court for a temporary stay for about six months to let the Bankruptcy Court run its course. And Leadenhall is opposed, and that briefing is at

Exhibits 5 and 6.

But ultimately, the District Court denied our request, for, among other reasons, that it just didn't see that the bankruptcy proceedings would interfere with that pending litigation.

The District Court also noted that if there's any overlap or conflict with this ruling, we could seek appropriate relief either before the District Court or here. And that decision denying our motion is Exhibit 7.

And so, Your Honor, that's why we're here now. A-CAP needs discovery from the Debtors in order to build our case in the SDNY action, and we believe that there is ample cause to modify the stay for that reason, for three general reasons, three main reasons.

First, A-CAP is seeking pretty narrow relief. We just want to issue written discovery, and we're not seeking to litigate any claims or assert any cross-claims against the Debtor at this time. We really just need the information.

Second, it's A-CAP's position that, without this information, it would be severely prejudiced in the SDNY Action. The information sought in the discovery requests we believe is vital to build our case and defense.

For instance, one of our defenses, among the myriad that we filed, is that we believe Leadenhall knew about the fraud and double-pledging before A-CAP did. And we also believe

that Leadenhall and allege that Leadenhall concealed such fraud and diverted funds from other secured creditors, which includes A-CAP.

It's also our position that the Debtors fraudulently misused A-CAP loan funds to pay other creditors, like Leadenhall, and that Leadenhall was in on this whole thing.

And so that's why we're asking for documents that trace payments made by 777 entities to Leadenhall and others. That's also why we're asking for documents that show what collateral was pledged and to whom, and then the related correspondence amongst the 777 entities and their employees.

Third, we believe that the prejudice of A-CAP not being able to get this information far outweighs the alleged harm to the Debtors and other creditors. Again, without it, A-CAP can't build its defense. We need this information.

And we understand that the Debtors and Committee are concerned that responding to the discovery may detract from the Chapter 11 process and could be a burden on the estate resources. But this notion that A-CAP is trying to derail this process, the Chapter 11 cases, is just simply not true. A-CAP has been and remains fully supportive and committed to the success of this bankruptcy for the benefit of all creditors.

And it should not be lost on anyone that the original plan was for A-CAP, along with the other bridge lenders, to fund

this entire process from the outset, as we have been doing for nearly the past two years, funding over $25 million to the Debtors so they could run their out-of-court restructuring process.

But, unfortunately, our hands are tied and we couldn't get a stay in the SDNY Action. Leadenhall would not agree to it, and the District Court denied our request. And so we have to continue with the litigation, and that necessarily requires seeking discovery from the Debtors.

Moreover, the Chapter 11 milestones that the Debtors and Committee raise they have to meet, those are created by Leadenhall. And as a DIP Lender, Leadenhall can agree to extend or modify those deadlines. Leadenhall, as the Plaintiff in the SDNY Litigation, could also agree to stay its own litigation against A-CAP and give more time to confirm a plan without any distractions from anyone and give the Debtors and Committee the time to investigate which of Leadenhall's claims, if not all, are really estate claims. But, again, that just hasn't happened.

And so what we think this problem really comes down to is if Leadenhall just agreed to a temporary stay of the SDNY Action against all defendants, this problem could go away. But they just haven't.

So our hands are tied. If the SDNY Action is going to go forward against A-CAP, then we need to issue discovery

requests to the Debtor so we can start building our defense. And for those reasons and the ones stated in our motion, we believe there is ample cause to modify the automatic stay to allow A-CAP to issue its written discovery.

THE COURT: Okay. Thank you.

Any introductory comments, Mr. Bishop?

MR. BISHOP: Yes, Your Honor.

(Indistinct noise.)

MR. BISHOP: If it's acceptable to the Court, I thought I would make introductory comments and then --

THE COURT: Was there something funny? Or was that just a sneeze or something?

Okay. All right. Go ahead.

OPENING STATEMENT ON BEHALF OF THE DEBTORS

MR. BISHOP: If it's acceptable to the Court, I thought I would make introductory comments and then offer the evidence.

THE COURT: Sure.

MR. BISHOP: And Mr. Shapiro is certainly here, and if --

THE COURT: Okay. Not a problem. However you want to --

MR. BISHOP: Okay.

THE COURT: -- approach the exhibits is fine.

MR. BISHOP: Okay. Your Honor, the Debtors' objection

is at Docket No. 429. Granting the motion at this point, early in the case, if my math is right, four of the Debtors have only been in Chapter 11 87 days, and one, Sutton Park Medical Receivables, 55 days. So we're really early in the case.

As Counsel mentioned, we do have this final DIP order with milestones. The plan is due November 21st, with a disclosure statement and a motion to approve disclosure statement processes. There's a deadline of January 22nd of 2027 to confirm the plan, and then February 5th of 2027 to have an effective date on the plan. So this case is moving extremely quickly.

As I think the evidence will show through Mr. Shapiro's declaration, the Debtor only has 14 employees, and they are fully allocated to gathering information for the plan and disclosure statement process, gathering information at the request of DIP Lender and the Committee relating to assets of the estate.

Mr. Shapiro will testify that, frankly, there's just not enough man-hours in the day, at least between now and the effective date of the plan, to produce, even if the Court ordered us to do it, produce the documents that will be -- that are being requested. And I'll go over those in a bit, but they are extremely broad.

The scope of the discovery I'll talk about in a minute,

but I think you could read those document requests to require the production of virtually every piece of paper these Debtors have. And these are Debtors that had billions of dollars of assets and liabilities. And most of the requests don't even have a time limitation. Some, there's a limitation of 2016 forward. Others, there's no time limitation at all.

In the New York Litigation, Leadenhall commenced that litigation by filing a complaint on May 3rd of 2024, so it's been a while. May 3rd of 2024. The Defendants filed motions to dismiss. But there was no automatic stay on discovery in that litigation. So early on, the Defendants filed a motion for stay. And that motion was denied. And that's in the Debtors' Exhibits 431-6 that I'll be offering into evidence later.

So, in effect, A-CAP has had over two years to serve discovery. Again, the complaint was filed May 3rd of 2024. The order denying the stay was November 26th of 2024. Again, that's at our Exhibit 6.

So maybe from the filing of the complaint, maybe from the order denying stay, but it's been over two years, almost two years, that A-CAP could have been serving discovery but didn't, with the exception of one RFP that was sent in April of 2025. That's our Exhibit 11. And it asked for three things. And those three things were things relating to a separate Florida lawsuit. No RFPs at all served by A-CAP

relating to this Leadenhall litigation.

Counsel mentioned the order that the District Court entered -- let me back up. On November 26th, the order that I just mentioned, I wanted to point out a couple of things the Court found: "There is no assurance that the motions can be decided quickly. Meanwhile, discovery promises to be time-consuming, and it is appropriate for the parties to begin the process of locating and producing documents." That's the end of the quote. So the Court was talking about the pending motions to dismiss. So the Court was saying, guys, start doing discovery if you want to. And, again, that was two years ago.

So A-CAP's -- maybe that was their strategy. I get it. But their strategy of not serving AFPs in the lawsuit shouldn't automatically be some emergency by the Debtor where the Debtor has to spend tons of money, tons of time, at this critical stage in the bankruptcy case, to respond to this discovery.

In contrast, during this two-year period I mentioned, Leadenhall, the Plaintiff, served extremely broad discovery on the Debtors and the other defendants. And as the docket sheet will indicate, which is our Exhibit 3, there were multiple discovery disputes, discovery hearings, over that two-year period.

Leadenhall served RFPs that were at our Exhibit 12 and 13,

and they, you know, they're voluminous. In response to those, the Debtor produced approximately 127,000 documents to Leadenhall and the other parties in that litigation, including A-CAP. So it's not like A-CAP has no information. They have at least 127,000 documents that have already been produced.

Additionally, the evidence will show that, and as mentioned by Counsel, A-CAP was providing funding to the Debtors prepetition. So as you can probably imagine, A-CAP on occasion was making informal information and document requests to the Debtors, and for the most part, those documents were produced informally by the Debtors to A-CAP during that period of time prepetition.

So the Court knows the factors, what I've always called for 30 years the *Curtis* Factors, and I won't go through all of those, but I wanted to just highlight two or three items. Each of those factors are walked through in our objection, and I don't want to just repeat what that says.

First off, again, it's the manpower issue in this --

THE COURT: So, rather than -- I feel like we're starting to tread into closing arguments, and I almost gave the same lecture previously. I don't want to hear it twice. Opening statements are designed to preview the evidence. So rather than talk to me about what the factor test is, if there's something you want to highlight that you think the evidence is going to show, I'm happy to hear it, but just know

that I don't want to hear two closing arguments.

MR. BISHOP: Your Honor, I was planning on making this kind of my closing, and my closing being like one minute. Or I can stop now and --

THE COURT: That's fine.

MR. BISHOP: Your Honor, with respect to the factors, the first one I'd like to briefly talk about is the balancing of the harm factor. And again we have the manpower issue, which is the Debtors' problem in the near-term between now and the effective date.

Also, prepetition, through the fairly extensive discovery in the Leadenhall litigation, literally the Debtors spent hundreds of thousands of dollars on discovery, producing documents. And the Debtor is concerned that exact same thing is going to happen again: There will be discovery disputes, we'll have to hire New York counsel to deal with those discovery disputes, and then produce a voluminous amount of documents, at the cost of probably hundreds of thousands of dollars, distracting the employees. And we think granting the motion benefits maybe A-CAP, but it certainly harms the Debtor, the bankruptcy estate, and creditors.

With respect to the factor of whether it will be a partial or complete resolution of the issues, as outlined in the objection, I don't think granting the motion really solves any of the issues in this case. It's not going to solve the

causes of action, who owns the causes of action, are they Debtor claims, are they not Debtor claims? All those issues will still be out there.

The next factor, interference with the bankruptcy case. I think I've outlined those. There's just, frankly, no manpower available to produce all of the requested documents.

The next factor is, does the action primarily involve third parties? Well, in this case, Your Honor, all of the parties in the Leadenhall litigation are involved in this bankruptcy case, either as a creditor, the Debtors, DIP Lender, Interim DIP Lender, so forth. The real concern is granting the motion, basically, we're back in pretrial discovery in the New York Litigation, at great expense and to the harm of the estate.

The New York -- one other factor. The New York Litigation is not set for trial yet.

One thing I wanted to point out, and we briefly discussed in the objection, is causes of action and allegations are made in the Leadenhall complaint that the Debtors and certain of the nondebtor parties are alter egos of each other. And then there are two counts of fraudulent conveyance in the New York suit, under New York state law. There's an actual fraudulent conveyance count and a constructive fraudulent conveyance count.

We think there's real issues whether those are property of

the estate or not. Those issues need to be fleshed out and the appropriate Court determine who owns the causes of action and can pursue them.

Counsel mentioned the recent order denying the stay that the District Court entered on September 21st of 2026. It's at the Debtors' Exhibit 431-10. And I just wanted to highlight a couple of the District Court's findings: "The Plaintiffs have a strong interest in proceeding against A-CAP and King, whom they allege are independently responsible for millions of dollars of damages against them, irrespective of the liability of the bankrupt parties. That liability will be determined, in part, by discovery between Leadenhall and A-CAP and King, and all could proceed irrespective of the bankruptcy proceeding."

I think someone could read that to think the District Court didn't really anticipate the bankruptcy -- the bankrupt debtors being drug back into discovery, that it would be discovery on what the District Court considered independent claims would be between Leadenhall and A-CAP, they can have discovery, but it doesn't seem like he was contemplating the Bankruptcy Court -- the bankruptcy debtor being drug into it.

As Counsel mentioned, the Court did also say, hey, if there are conflicts between what maybe the Bankruptcy Court does and what we're doing up here, --

THE COURT: There may be statutory conflicts. I'm

just floored, honestly. I don't understand what's going on in New York. I mean, am I going to see a pleading where the Debtors have been either nonsuited or severed out of this case?

MR. BISHOP: No --

THE COURT: I'm asking you.

MR. BISHOP: No one --

THE COURT: Has the District Court severed the Debtors out of this case?

MR. BISHOP: No. Not to my knowledge, Your Honor.

MR. MOORE: Not today, Your Honor.

THE COURT: Okay. All right.

MR. BISHOP: No. I understand, Your Honor.

With respect to the discovery, I don't want to belabor it. But, you know, we do say that the discovery, if the Court were to grant the stay motion, the discovery is so broad that I think we're immediately going to be in discovery disputes, and it will be tremendously expensive and time-consuming to produce any appropriate documents.

I can do it either of two ways. I was going to highlight just three or four of the RFPs, just to give you a sense of how broad they are. But the Court can read those, and I can do it either way to save time.

THE COURT: Well, they're not in evidence right now, so if we're going to do that, you probably need to put them

into evidence.

MR. BISHOP: Okay.

THE COURT: Oh, unless you're -- what you're talking about is the A-CAP exhibits?

MR. BISHOP: Yes. It would be --

THE COURT: Okay.

MR. BISHOP: -- in the A-CAP exhibits.

THE COURT: All right. Fair enough. Then they are in evidence. All right.

MR. BISHOP: So, we probably need to put this on the screen so I guess the people online can watch it. If the Court could give Mr. Bryan access to the screen, he can pull up these documents I was going to walk through.

THE COURT: Are you wired into WebEx? I'm looking at you and I'm looking at my colleague, because I don't know. It looks like you've got it up. Because that's beyond my technological capabilities.

MR. BISHOP: Okay, Your Honor. I'm at Docket No. 428, which is A-CAP's exhibits. Exhibit 2, which I could not read the printing at the top, so I think the easier way to do it is, at the bottom right, in red print, there are numbers. If you could go to A-CAP Exhibit 2, Page 21 of 85.

THE COURT: Okay.

MR. BISHOP: First off, Your Honor, on the next page, at Page 22, Paragraph 1, I just note the very broad definition

of 777 Partners, which basically includes all of those entities and all of those folks listed at the bottom. So it would be a document where we would have to go and look through all those people and those entities.

Then if the Court could move to Page 28 of 85 in that same exhibit. The first one, the first RFP: Documents between you and Leadenhall from 2016 to present. So ten years' worth.

RFP #6: Source, date, amount, and purpose of payments of your operations, including payroll, rent. Your Honor, I submit that could be tens of thousands of documents, as broad as that is.

Paragraph 10, RFP 10, talking about transactions utilizing funding from A-CAP, Leadenhall, or any other creditor. Creditor is defined as basically anyone the Debtor has ever owed money to at any point in time, which is probably thousands of folks.

15, RFP 15 on Page 29: Compliance, functions, personnel. Does that mean we have to produce every personnel file of any employee?

16: Governance functions. Again, no time limit. Committee's minutes.

20, on Page 30. RFP 20: Use, intended disposition, and ultimate disposition of any funds you receive from any creditor. Well, I think that means every dollar the Debtors have ever spent.

21: Funds received from any lender. Well, that's probably many lenders and many billions of dollars of transactions.

Those are the examples I wanted to walk through, Your Honor.

THE COURT: Okay.

MR. BISHOP: For now.

THE COURT: All right.

MR. BISHOP: Your Honor, at this point, we believe -- and I'll get to my evidence after this -- but we don't believe that A-CAP has met the cause standard to modify the stay at this point in time, at this stage of the bankruptcy case. It's a critical stage for the benefit of all the creditors in this case, and the Debtor and the estate.

We're not saying that A-CAP isn't entitled to the production of documents that's within the Rules at some point in time down the road. But just not today, when we're in the middle of this Chapter 11 process.

With that, Your Honor, I wanted to go through the Debtors' exhibits. I think there's largely agreement on the admissibility of the Debtors' exhibits. I'll start with Debtors' Exhibits 1, 2, and 3, which is at Docket No. 431. Mr. Shapiro is here to be cross-examined, and I understand Mr. Moore may want to cross him.

THE COURT: So are you offering those?

MR. BISHOP: Yes, Your Honor.

THE COURT: All right. Any --

MR. BISHOP: I offer Exhibits 1, 2, and 3.

THE COURT: All right. Any objection to the admission of Debtors' Exhibits 1 through 3 from Docket 431?

MR. MOORE: No objection, Your Honor, subject to cross.

THE COURT: Okay. All right. Without objection, Debtors' Exhibits 1 through 3 are admitted, noting that Mr. Shapiro is here. Okay.

(Debtors' Exhibits 1 through 3 are admitted into evidence.)

MR. BISHOP: Okay. Your Honor, Exhibit 5 is the amended complaint. I understand we have the same agreement. It's not being offered for the truth of the matter asserted, but just that it's filed and those are the allegations. And I would offer Exhibit 5 for that purpose.

THE COURT: All right. Any objection?

MR. MOORE: No objection to any pleadings coming in with that proviso, Your Honor.

THE COURT: All right.

MR. BISHOP: Okay.

THE COURT: Then, without objection, Debtors' Exhibit 5 is admitted for evidence of what it reflects but not for the truth of the matters asserted therein.

(Debtors' Exhibit 5 is admitted into evidence.)

MR. BISHOP: Okay. Your Honor, next, I'll offer Exhibits 6 through 15. And those are primarily either orders entered in the District Court suit or discovery that the parties served in the District Court suit.

THE COURT: All right. So 6 through 15?

MR. BISHOP: Yes, Your Honor.

THE COURT: All right. Any objection to the admission of Debtors' Exhibits 6 through 15?

MR. MOORE: No objection, Your Honor.

THE COURT: All right. Without objection, Debtors' Exhibits 6 through 15 from Docket 431 are admitted.

(Debtors' Exhibits 6 through 15 are admitted into evidence.)

MR. BISHOP: Your Honor, with that, I'll cede the podium for the moment. Mr. Shapiro is available for cross.

THE COURT: Your colleague is coming up to whisper in your ear.

(Pause.)

MR. BISHOP: Your Honor, I was told maybe I didn't offer Exhibit 4, Debtors' Exhibit 4. If I didn't, I --

THE COURT: It's a good thing you have a colleague, because this is true.

MR. BISHOP: That's why I have him. I told him specifically before the hearing, make sure I get my exhibits

in.

THE COURT: All right. So are you offering --

MR. BISHOP: I offer Exhibit 4, please.

THE COURT: All right. Any objection?

MR. MOORE: No, Your Honor.

THE COURT: All right. Without objection, Debtors' Exhibit 4 is admitted.

(Debtors' Exhibit 4 is admitted into evidence.)

THE COURT: All right. Ms. DaBera or Ms. Dwoskin, any opening comments from the Committee?

OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

MS. DWOSKIN: Very briefly, Your Honor. Good afternoon. For the record, Sharon Dwoskin of Brown Rudnick for the Committee. Can you hear me okay?

THE COURT: I can. Thank you.

MS. DWOSKIN: Perfect. Thanks for letting me appear remotely. I heard Your Honor's directive, and really don't have any evidence to offer, but I would ask, as Your Honor listens to the evidence, you bear in mind what A-CAP's counsel said at the outset as to why they're looking for the discovery they're looking for.

They told you that they're looking for evidence that Leadenhall knew and concealed -- knew of the Debtors' fraud and concealed it. That's discovery, of course, that A-CAP can

get and has gotten, we believe, from Leadenhall.

And second, and most tellingly, is what the Debtors did with A-CAP's money. I mean, that, Your Honor, implicates A-CAP's claims against the Debtors, and that's precisely why we should have an automatic stay, so that some creditors don't get the benefit of a race to the courthouse.

And with that, Your Honor, I'll reserve the rest of my remarks for closing. We did file a joinder at Docket No. 432, and that is the sum and substance of our comments here today. Thank you.

THE COURT: All right. Thank you.

Okay. Mr. Bishop, let me -- or, I'm sorry, I'm getting a little mixed up on the order here. Let's start with Ms. McGuffey. Any other evidence that you wish to introduce today?

MS. MCGUFFEY: No, Your Honor.

THE COURT: Okay. All right. Mr. Bishop, any other evidence that you wish to introduce today?

MR. BISHOP: No other evidence I want to offer, but I think maybe when cross --

THE COURT: Understood. I'm just trying to make sure that I know where we are on evidence.

All right. So do we have any cross-examination of Mr. Shapiro?

MR. MOORE: Very limited, Your Honor.

THE COURT: Okay. All right. Mr. Shapiro, if you'll come on up. And before you sit down, I'll swear you in real quick. If you could please raise your right hand.

MARK SHAPIRO, DEBTORS' PARTIES' WITNESS, SWORN

THE COURT: All right. Please be seated.

CROSS-EXAMINATION

BY MR. MOORE:

Q Mr. Shapiro, I believe you have one of the Debtors' books in front of you.

A I do.

Q Can you turn to Exhibit 2?

A I'm here.

Q And it should have Docket No. 430 at the top of it, and be your declaration in support --

A It is.

Q -- of the Debtors' objection.

A It is.

Q Okay. I just have a few questions for you. If you could turn to Page 3.

A I'm there.

Q Paragraph 8 starts with the statement: The Debtors Currently have 14 employees. Do you see that?

A Yes.

Q And if we go to the last sentence, --

THE COURT: So, I'm so sorry. Hang on. You said Page

3, --

MR. MOORE: Oh, I apologize, Your Honor.

THE COURT: -- Paragraph 8? I mean, I guess if it's front and back. So is that how we -- I'm just -- which paragraph are you on?

MR. MOORE: I'm on Paragraph 8 of Docket Number --

THE COURT: That's probably better. So we're on Debtors' Exhibit 1, Paragraph 8. Correct?

MR. MOORE: Debtors' Exhibit 2.

THE COURT: I'm sorry. That's my fault.

MR. MOORE: Not the first day declaration, but the declaration in support of their objection.

THE COURT: Okay. So we're at Debtors' Exhibit 2, Paragraph 8?

MR. MOORE: Yes, Your Honor.

THE COURT: Okay. I'm with you now.

MR. MOORE: All right.

THE COURT: Thank you.

BY MR. MOORE:

Q And you see the paragraph starts: The Debtors currently have 14 employees?

A Yes.

Q And then I think that the next -- the rest of the paragraph, I think, is one entire sentence. And I just want to direct your attention to the last part that starts with

"assisting with the investigation of estate claims and causes of action and gathering and analyzing the information necessary to respond to numerous information and document requests from the Committee and creditors."

Is that right?

A Correct.

Q When you say "numerous information and document requests," how many do you mean?

A I mean, it's -- it's constant. It's not a formal document request. Basically, we're constantly working with document requests and providing documents back to the Committee and creditors.

Q And when you -- okay. So let's take that apart. Do you -- have you seen these document requests?

A Typically, yes. Typically, they're in email form, yes.

Q And approximately how many have you received? If you were to put them into a number of requests?

A Five to ten.

Q Five to ten emails with requests, or five to ten requests?

A Five to ten emails with requests.

Q And if you broke it into subparts, how many do you think that you've received?

A Me personally?

Q The Debtors. I apologize.

A Well, that's what the Debtors received.

Q But I'm saying, if you were to number the requests that you receive in a given email and then put them all together, is it 50, 75, 100?
A No. I'd say 50.
Q Okay. And that's from the Committee. What about creditors?
A I'm just guessing at numbers here. A lot of what the Committee is requesting is also what the creditors are looking for.
Q And which creditors have sent you information requests?
A Leadenhall.
Q Okay. And is that in their capacity as a DIP Lender or as their capacity as a creditor, to your understanding?
A I can't say.
Q Okay. And so have you -- are you familiar with the requests that A-CAP wants to send and is seeking permission to be able to promulgate?
A I've seen the requests, yes.
Q Have you compared those to the requests that the Committee has sent to you informally?
A I mean, I'm aware of both. I haven't made a conscious -- I mean, I haven't made a physical comparison, no.
Q Okay. And have the Debtors produced documents to the Committee?
A Yes.

Q Are those Bates-labeled?
A No.
Q Okay. Do you have an idea of approximately how many documents you've produced to the Committee?
A No. I'd just be guessing.
Q Okay. But you don't have an idea of how many pages it is?
A No.
Q All right. So, but part of what the Debtor is asserting is that it would cost too much money to go and seek out documents to respond to A-CAP's discovery, correct?
A Correct.
Q But there are documents that you've already pulled for the Committee's discovery?
A Correct.
Q And so you wouldn't have to go pull those documents again, would you?
A No.
Q So if there was documents that A-CAP wanted that you've already produced to the Committee, you could just re-produce them. Fair?
A Fair.
Q Okay. But you haven't gone to look to see if that's -- if there's any overlap?
A I've seen requests. There's not much overlap --
Q Okay.

A -- in what they're looking for.
Q So you said you've looked at A-CAP's requests, right?
A Correct.
Q And you understand that part of what we're looking for is bank records of the Debtor?
A Yes.
Q Debtors. I apologize.
A Correct.
Q Would you -- would the Debtors agree that if we could receive that from another party, like the banks themselves, that you would authorize us to be able to go and do that?
A I'd have to check with counsel first.
Q Okay. But that wouldn't cost you any money if we, for example, had authority to submit third-party subpoenas to banks?
A No.
Q Okay. Let's go to Paragraph 10, which is on the next page. The paragraph starts: The Debtors' remaining employees and GlassRatner are fully committed in their time and resources to managing these Chapter 11 cases.
Do you see that?
A Yes.
Q Okay. And it goes on to say: Responding to the voluminous information requests relating thereto.
And I think that's relating to the plan and disclosure

statement in that sentence. Is that right?
A Correct.
Q Okay. And who sent those voluminous information requests?
A The Committee and Leadenhall.
Q Okay. And as we stand here today, are you willing to share with A-CAP the requests that you've received from the Committee and Leadenhall so that we could compare the two things together?
A I -- again, I'd have to check with counsel. I wouldn't have any problem with it.
Q You wouldn't have any problem with that?
A No.
Q Okay. And then if there was documents that you've produced to other parties that did overlap with documents that we're seeking, you wouldn't have any objection to producing those to A-CAP, would you?
A No.
Q Okay. Now, if we go to Paragraph 14, I want to go to the last sentence. It starts with: Based upon my experience with the Leadenhall discovery against the NY Litigation Defendants in the NY Litigation ...
Do you see that?
A Yes.
Q (continues) ... if the Debtors were required to respond to the A-CAP proposed discovery, the estate would once again

spend many hundreds of thousands of dollars, or more, in hiring New York counsel, having likely discovery disputes in court, and attempting to gather the voluminous documents requested.

Did I read that correctly?

A Yes.

Q So you state that you would have to hire New York counsel; is that right?

A Yes.

Q Isn't it true that Smith, Gambrell & Ross [sic] has represented the Debtors in the New York action?

A Yes.

Q And isn't it true that they -- their retention here was actually approved, I think, by order entered yesterday?

A Yes.

Q And they were approved to assist with that action to the extent that it was necessary?

A Yes.

Q So you wouldn't have to hire new counsel?

A Not new counsel, no.

Q And it's also that their retention was approved to allow them to assist with document requests?

A Correct.

Q Okay. So you have counsel that could do it?

A Correct. They cost money, but we have counsel.

Q And so it's not just the 14 people that you would need?
A Correct.
Q Okay. And then I want to go to the last part, Paragraph 18. You state: It's my understanding that Leadenhall asserts various causes of action in the New York Litigation that may be property of the Debtors' estates, including fraudulent conveyance claims under New York law.
Is that right?
A Yes.
Q And is that your understanding?
A That's my understanding.
Q Okay. (continues) The Debtors and the estates' professionals need additional time to analyze those issues and make sure those claims and causes of action are preserved for the benefit of the estates and their creditors.
Is that right?
A Correct.
Q And is it your understanding that, at this time, Leadenhall is seeking to pursue those claims?
A Can you say that again?
Q Is it your understanding that, at this time, because the case is not stayed as to A-CAP and various other parties, that Leadenhall as Plaintiff is trying to pursue those claims?
A I know they're pursuing claims. I think it remains to be seen what the estate owns and what Leadenhall owns, but

they're pursuing claims.
Q But, and you agree, though, if there are estate claims that Leadenhall has asserted, right now Leadenhall is attempting to continue to assert them, fair?
A Fair.
Q Okay. And those are estate claims, potentially?
A Correct.
Q Okay. And so would you agree with me, then, that the best thing to do to preserve those estate claims would be to just stay that case?
A Yes.
Q Okay.

MR. MOORE: No further questions, Your Honor.

THE COURT: All right. Any redirect?

MR. BISHOP: Very short.

REDIRECT EXAMINATION

BY MR. BISHOP:
Q Mr. Shapiro, you're not a lawyer, are you?
A No.
Q And you're not testifying about what legally may be property of the estate or not as far as causes of action go?
A No. I am not.

MR. BISHOP: Nothing further.

THE COURT: All right. You may step down.

(The witness steps down.)

THE COURT: Okay. I think, Mr. Bishop, you had indicated that no additional evidence, outside of just making sure that we provided an opportunity for cross-examination, correct?

MR. BISHOP: Correct.

THE COURT: Okay. Just to make sure, I'm just dotting I's and crossing T's, from the Committee's perspective, any evidence today?

MS. DWOSKIN: No, Your Honor.

THE COURT: Okay. Any rebuttal evidence?

MS. MCGUFFEY: No, Your Honor.

THE COURT: Okay. Well, then the evidence will be deemed closed at this point in time, and I will take up closing arguments in one moment. I simply want to take a look at the declarations.

(Pause.)

THE COURT: Okay. Ms. McGuffey? Or Mr. Moore? Whomever. Closing? Any closing arguments?

MS. MCGUFFEY: Is it okay if we go after everyone else? I thought --

THE COURT: Well, you're the Movant, right?

MS. MCGUFFEY: Yes. So we --

THE COURT: You can go after everybody if you want to, but it's going to be rebuttal.

MS. MCGUFFEY: Okay. We'll go now.

THE COURT: Okay.

CLOSING ARGUMENT ON BEHALF OF THE A-CAP PARTIES

MS. MCGUFFEY: I will try not to be repetitive for Your Honor.

THE COURT: That's fine, because I'm probably going to ask a lot of questions along the way.

MS. MCGUFFEY: Okay.

THE COURT: I'm just going to start off with one right off the bat.

MS. MCGUFFEY: Perfect.

THE COURT: I'm looking at A-CAP Exhibit 2, I think. I'm sorry, no, A-CAP Exhibit 3. Actually, why does this have Exhibit 2?

MS. MCGUFFEY: I don't -- oh, I just -- yeah.

THE COURT: Was that just a whiff?

MR. MOORE: Your Honor, the exhibit labels that are on the front are related to my declaration. The tabs are right.

MS. MCGUFFEY: Yes.

MR. MOORE: So if you will go by the tabs in your binder, they should be correct.

THE COURT: Okay.

MR. MOORE: I apologize for that.

MS. MCGUFFEY: Apologies.

THE COURT: All right. So let's look at Exhibit 3. Exhibit 3 is the corrected amended complaint. Right?

MS. MCGUFFEY: Yes.

THE COURT: And it appears to be the same thing as Debtors' Exhibit 5. If I look at the last page, it reflects a date of September 6th -- okay, 2024. That's where I was getting mixed up. All right. So I just want to make sure that I again understand. Is this the live complaint in the case?

MS. MCGUFFEY: Yes, Your Honor.

THE COURT: All right. And nothing has been done, to your understanding, to sever any of the Debtors out of this case?

MS. MCGUFFEY: Correct, Your Honor.

THE COURT: I guess I'm confused as to, honestly, I'm just kind of, I'm befuddled as to why nobody is arguing to me that this case is obviously stayed by the automatic stay. Why are people running around asking a New York judge to stay things? Tell me, what is your understanding as to why any of this activity is going on at all, based upon the existence of the automatic stay?

MS. MCGUFFEY: So, my understanding is it's -- the automatic stay applies to the Debtor entities, and that's -- it has been stayed as to Debtor entities. And there are non -- basically, non-affiliated Debtor entities, 777 ones, and by agreement, Leadenhall agreed to stay the litigation as to them.

As to A-CAP, Mr. King, and then I think Steve Wander and Josh Pasko -- maybe I -- Wander and Pasko, the litigation is still live and going against them. And we have asked Leadenhall to stay it. Leadenhall said no. We filed a motion with the District Court requesting a discretionary stay for at least six months so the bankruptcy could play out. The District Court denied that request. And so that's why we're here.

THE COURT: And the order that denied that, I have that in evidence, correct?

MS. MCGUFFEY: Yes.

THE COURT: Is that a reasoned order, or is it just ordered, denied?

MS. MCGUFFEY: There is a -- yes, it is, I think, three pages. It's under Tab 7.

THE COURT: All right. Let me just take a look at that real quick.

(Pause.)

THE COURT: Okay. All right. You've answered my question for the moment. Go ahead.

MS. MCGUFFEY: Okay. Again, I won't try to repeat myself, but, generally, we are where we are because of the procedural posture in the SDNY Litigation, and that requires us to put up our defense, which means we need the information we've asked for.

I understand that the requests, they're a lot, but so is the SDNY Litigation. The complaint is, I think, I don't know, 416 paragraphs, and there's --

THE COURT: So tell me, what do I have in evidence that tells me that all this stuff has to happen prior to roughly February 5th, 2027?

MS. MCGUFFEY: I believe the Debtors have admitted the Joint Rule 26(f) Report. That's at their Exhibit 4.

THE COURT: Okay.

MS. MCGUFFEY: And my understanding is there is a deadline in here for, I think, that fact discovery should be concluded by June -- or, July 2027.

THE COURT: So, a Rule 26(f) Report would not constitute an order. Do I have an order that sets a discovery cutoff?

MS. MCGUFFEY: No. You do not.

THE COURT: Is there a discovery cutoff?

MS. MCGUFFEY: I believe, right now, in the SDNY Litigation, there is -- we are working on getting an updated -- I think another Rule 26(f) Report, so not an order, from my understanding, but I see Ms. Nathanson is on, and she will probably correct me if I'm wrong.

THE COURT: Okay. Well, they haven't engaged in this fight, so I'm talking to you.

MS. MCGUFFEY: Okay.

THE COURT: Is there, to your understanding -- well, I think you've answered my question, which is you're not aware of an existing order and, to your understanding -- and correct me if I'm wrong.

MS. MCGUFFEY: Uh-huh.

THE COURT: To your understanding, where the parties are is they need to submit a supplemental, basically, which is really bizarre, by the way, because, once again, I'm not sure who's submitting a Rule 26(f) Statement, but it sure as heck isn't going to be the Debtors because the Debtors are protected by the stay.

MS. MCGUFFEY: Yes.

THE COURT: So this would appear to be some bizarre partial Rule 26(f) Statement, which is not a creation that Rule 26 recognizes, and your belief that somehow the Court is then going to impose some deadlines that purport to bind the parties, which includes the Debtors, to some deadlines that nobody knows what they're going to as we sit here today?

MS. MCGUFFEY: I think -- I believe that's correct, except I'm not sure if it binds the Debtors, the Rule -- this new upcoming Rule 26(f) Report. Candidly, I am not involved in the drafting. But I have looked at it, and I believe there is some reservation of rights for the Debtor entities, and I think the nondebtor entities are agreed to be stayed by.

So, and my understanding is they're working on an

agreement whereby Leadenhall would agree to extend certain discovery deadlines because of the stay that's imposed. And -- but we don't know what that extension looks like at this time. That's my understanding.

THE COURT: So, right now -- and I'm going to ask this in two ways.

MS. MCGUFFEY: Uh-huh.

THE COURT: I'm going to ask for a representation, but what would be even better is if I have evidence. Is there discovery ongoing in this litigation right now?

MS. MCGUFFEY: Yes. There is discovery that is ongoing right now. I --

THE COURT: And does that include things like depositions? Or are we still in the document phase?

MS. MCGUFFEY: We are still in the document phase.

THE COURT: Okay. All right.

MS. MCGUFFEY: Yes. My understanding is the document productions are still going on between Leadenhall and A-CAP, are exchanging -- are still producing documents -- making productions.

THE COURT: Okay.

MS. MCGUFFEY: Okay. So, --

THE COURT: I mean, if you're wondering why I'm perplexed, I just, this is so highly prejudicial to the Debtors. I'm probably just going to tell you all out loud, it

is very likely I'm going to issue a Show Cause Order to Leadenhall as to why they should not be found in contempt and sanctioned for violation of the automatic stay. I think this is a patent violation of 11 U.S.C. Section 362(a)(1). So I'm hearing you. I get it.

MS. MCGUFFEY: Uh-huh.

THE COURT: I understand why A-CAP is freaking out. But I am really frustrated right now. I am really frustrated that the approved DIP Lender in this case is monkeying around in ways that appears to be about as black letter law violation of the automatic stay as you can get. And I realize I'm venting to the wrong crowd, so bear with me, because I have to resolve this motion. But I'm just really troubled by what I'm hearing.

MS. MCGUFFEY: And Your Honor, yes, we understand. And I -- we -- A-CAP agrees. But we have done everything we can do as A-CAP to try to get it stayed as to us. It is stayed as to the Debtors and the 777 entity, other 777 entities, but it's not stayed as to us. And we've asked, the Debtors have asked, and we're told no, and the District Court told us no. So that's where we are today and that's why we have this motion. And I think that's all that needs to be said for now. Unless the Court, of course, has more questions.

THE COURT: I don't at the moment.

MS. MCGUFFEY: Okay.

THE COURT: We're going to have a lot to talk about at some point, but we'll move on to let me hear if Mr. Bishop has any nonrepetitive comments he wants to make. I'm kind of giving you a little bit of a hard time, Mr. Bishop. I'm not really trying to contain you. I'm just used to hearing closing arguments in closing.

MR. BISHOP: I promise, I will not be repetitive.

CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

MR. BISHOP: As an officer of the Court, I wanted to point you to some things that I think maybe are a little off in your discussion. So, first off, you were talking about Exhibit 4, the Joint Status Report. Let's see. It was Debtors' Exhibit 4.

THE COURT: Ah.

MR. BISHOP: And you were -- you said -- I think you made the comment, that's just a report, that's not a court order.

THE COURT: Yes, I see the last page.

MR. BISHOP: But the very last page, the judge signed it.

THE COURT: So the judge signed off on it?

MR. BISHOP: Yes.

THE COURT: Okay. So is there a discovery cutoff in this document?

MR. BISHOP: I'm trying to find it, Your Honor, but I know in one of the orders the District Court ordered fact discovery to end nine months after resolution of the motions to dismiss. It's in one of these orders. If I had some time, I can find it.

THE COURT: Okay. And when were the -- the motions to dismiss were resolved --?

MR. BISHOP: September 21st, I believe it was, of this year.

THE COURT: And I'm sorry, tell me again, how many months for discovery?

MR. BISHOP: Nine. Nine months from resolution of the motions to dismiss.

THE COURT: Okay.

MR. BISHOP: So, by my math, it's like early June 2027.

But there's another order that says once the motions to dismiss are ruled upon, you should contact chambers and get a, you know, get a status report so we can see where things stand. And it's my understanding --

THE COURT: Were the motions to dismiss denied postpetition?

MR. BISHOP: Yes. It was September 21st, I think it was, 2026. So a month and a half ago.

But the ruling on the motion to dismiss says we're not

discussing, the Court's not discussing anything about the Debtor. Those are stayed. I'm only ruling on the nondebtor pending motions to dismiss.

THE COURT: I got you. Okay. So we still have pending motions to dismiss?

MR. BISHOP: The Debtors' pending motion to dismiss.

THE COURT: Right. So if --

MR. BISHOP: I think that's still pending.

THE COURT: If the key was nine months after the disposition of the motions to dismiss, has the clock actually started?

MR. BISHOP: As to the Debtor, I don't think so. But as to the other folks, I think arguably it has, yes. In the District Court. You know, --

THE COURT: Okay. All right.

MR. BISHOP: So, Your Honor, I can see A-CAP's thinking, oh, we need to defend. I get it, in the big picture. But with them not doing discovery for two years and now it's all of a sudden an emergency for the Debtor, --

THE COURT: Yes. But you know, Mr. Bishop, you and I have both, when I was back in practice, been involved with litigation for years and years. It's not uncommon to hold off on cranking up the discovery machinery until you know whether or not the motion -- what's going to happen to the motions to dismiss.

MR. BISHOP: I got you.

THE COURT: So I am certainly not going to fault A-CAP on that front.

MR. BISHOP: I don't disagree. Lots of folks do that. And, you know, it's very expensive to do the discovery.

So, Your Honor, I still don't think, on this record, cause has been shown to lift the stay today, at this stage of the case, with these issues of ownership of claims and the stay and all of that. Not to say they're not entitled to discovery somewhere down the road, in a different context, but just not today.

Unless the Court has any other questions.

THE COURT: Let me ask one thing. I am assuming, probably knowing the sophistication at the parties and all this, that there was a spoliation-type letter that went out at the very beginning of the case that says preserve everything, basically?

MR. BISHOP: Mr. Shapiro says yes. I have no knowledge one way or the other.

THE COURT: Okay.

MR. BISHOP: But I've read almost all the pleadings in the case. I don't remember seeing a pleading or attachment, but --

THE COURT: No, no. I know. But usually it's a letter. It's a counsel letter that just says, hey, we're

putting you on notice. You know.

MR. BISHOP: Right.

THE COURT: Whatever typical document destruction type policies you have in place, don't do anything that would result in the spoliation of anything that might be relevant to the proceeding.

What I'm really getting at is I'm -- and I'm looking at the A-CAP team. There was, I saw in one of the orders, probably an order that denied a request for stay by A-CAP, that there was some suggestion of concern about documents not being preserved or that sort of thing. And what I'm trying to do is get a sense of, in some sense, because we're in bankruptcy, that would be the most reckless thing that a debtor in bankruptcy would do, would be destroying documents, right? Particularly if there is pending litigation. So I doubt that that would be occurring. But either way, it's standard to send out a spoliation-type letter, which also puts parties on notice so that -- what I'm trying to do is mitigate against is there really any risk here of stuff disappearing without, you know, under some pre-existing policy of document destruction or whatever, without some kind of notice process to the Court.

And I see Mr. Shapiro stepping up. He's probably, like, wanting to whisper in your ear: We can guarantee we're not going to do that. And I'm certainly happy for him to do that.

Because, again, I'm trying to assess all of the risks here as to what's going on, and that's one of the risks, is making sure, because it was highlighted by the Court. And I can understand why the District Court would say that, given kind of the history of where the Debtors are currently, and certainly some of the principals. Not suggesting that anybody would do anything untoward, but when we have a -- using probably a little too-loose language -- a meltdown situation, a lot of times people don't preserve stuff. So I get it. The District Court says, this has been floating around for a while, it's not going to age better like wine, and we have a risk of stuff potentially not being preserved, so let's get it going, basically.

I'm looking at specifically the Debtors' piece of this. I'm not really paying attention to the nondebtors right now. I'm paying attention to the Debtors and just making sure that we don't have any risk of that sort of thing, at least now that we're in bankruptcy.

MR. BISHOP: I would think Mr. Shapiro would be better to answer that question, because it certainly wouldn't be me. I'm not digging through the Debtors' records on a daily basis.

THE COURT: Frankly, I will welcome, if Mr. Shapiro wants to come up and just tell me, frankly, I think it would be helpful for the parties to hear it. Because everybody knows this case is, in many respects, going to result in a

conclusion that is preserving causes of action. We've already had that discussion in connection with the DIP financing motions and all that.

MR. SHAPIRO: Your Honor, we've been under a litigation hold, because of the DOJ, the SEC, the SDNY Litigation, forever. And we all understand everything has to be preserved, and that's one of the concerns that we've been dealing with with the Committee, to make sure that everything's preserved for the causes of action.

THE COURT: Okay. All right. That's helpful. Thank you.

Okay.

MR. BISHOP: Thank you.

THE COURT: All right. Thank you.

Ms. Dwoskin?

MS. DWOSKIN: Thank you, Your Honor.

THE COURT: Lend us your guidance in this foray of interesting developments.

MS. DWOSKIN: I will do my best. I will do my best, Your Honor.

CLOSING ARGUMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

MS. DWOSKIN: The Committee, obviously, is a stranger to the litigation between Leadenhall and A-CAP and the Debtors in SDNY. It's my understanding that that litigation was

primarily in direct claims among and between Leadenhall, for now, Leadenhall and A-CAP, and there are claims against the Debtors, and those are stayed.

There are also claims that the Committee believes, by operation of bankruptcy law, are estate claims. It's my understanding that Leadenhall is not seeking to pursue and recover on those claims, and I expect, and we've discussed with both Leadenhall and the Debtors, there will be the appropriate papers filed in the District Court to ensure that those claims are now being prosecuted by the Debtors and not by Leadenhall.

But none of that is what's on your docket today, Your Honor. The question before you is, what does A-CAP need, why do they need it, and what is the balance of harms here between the harm to A-CAP of not receiving those documents before this plan goes effective -- in what we hope is a few short months, if that -- against the burden that you heard from Mr. Shapiro and Mr. Bishop on the Debtors' estate of producing these documents?

Now, Mr. Moore and A-CAP certainly could have served the Debtors with discovery requests in the bankruptcy case. They didn't do that. It doesn't sound like they've done that. But instead they're seeking to serve these document requests in SDNY.

And their answer, Your Honor, to a hardship objection is,

well, there are DIP deadlines, but those are Leadenhall's deadlines and they can be extended, and there's a DIP budget, but that's Leadenhall's budget and that can be extended. And Your Honor, Leadenhall is -- Leadenhall and A-CAP are both creditors of the estate, and therefore, I believe, in our constituency. But the Debtors have lots of creditors here. And the DIP argument, I think, is a red herring. It's not good for anyone for this case to stay in bankruptcy longer than it needs to and for the Debtors to spend more time than they need to to review documents for the purposes of A-CAP's and Leadenhall's disputes against one another.

The question in this court, Your Honor, should be, how do the Debtors get out of this bankruptcy case, and as you said, put causes of action into a trust so that actions against the Debtors, those -- those will be resolved by claims in this case, but actions by the Debtors can be resolved?

So, Your Honor, I think that burden on the estate is quite high. Chapter 11 is expensive. It's not good for anybody for the Debtors to be in longer than they need to. And we believe that the Debtors' paperwork will be preserved for a trust after the bankruptcy case. If there's any discovery that A-CAP needs to pursue its claims against Leadenhall, it can do that on the trust. It's got, by my calculation, about seven months from now. So ideally five months after confirmation, assuming all goes according to plan. If they haven't been

able to do the work they need to do by then, they have a pretty good argument for an extension of those deadlines. And I don't see a fire drill here, Your Honor. But I do think that if Mr. Shapiro and the other employees of the Debtors are required to spend the estates' time and the estates' money to allow A-CAP to pursue its claims against Leadenhall and defend against Leadenhall's claims against it, then these Chapter 11 cases are going to get derailed. And that's not the Committee's goal, Your Honor.

So, with that, those are my comments. I hope that that provides sufficient guidance.

THE COURT: All right. Thank you. No, I appreciate it.

MS. DWOSKIN: That's all I've got.

THE COURT: All right. Very good. Thank you.

All right. Ms. McGuffey, you get the final word. Is there any last parting blows here?

MS. MCGUFFEY: Yes. Just a few, Your Honor.

So, first off, we found the exhibit that points to when discovery should end.

THE COURT: Okay.

MS. MCGUFFEY: It's Debtors' Exhibit 7. And then the, I guess, second paragraph right after the heading "Discovery," that says it.

THE COURT: All right. Let me just take a quick look.

(Pause.)

THE COURT: All right. So this is partially helpful. And tell me if I'm not reading it correctly. But it seems to be saying, let's get the production discovery going, but deposition discovery is going to remain stayed until the motions to dismiss are disposed of. Right?

MS. MCGUFFEY: Correct.

THE COURT: Okay. And the motions to dismiss, plural, have not all been disposed of. True?

MS. MCGUFFEY: Correct.

THE COURT: Okay. So is there any disagreement, to your understanding, between your client and Leadenhall, the Leadenhall Parties who are the plaintiff parties, as to whether or not that clock has started?

MS. MCGUFFEY: It's my understanding I think we are proceeding as to A-CAP and the other non-stayed defendants as to the discovery timeline.

THE COURT: So let me ask this. Have the parties reached out to the Court to set a case management conference?

MS. MCGUFFEY: I think so, yes.

THE COURT: Okay. All right.

MS. MCGUFFEY: And so the last thing I'll say is the Committee raised that A-CAP could just issue discovery in the bankruptcy case, I guess, to get discovery we need in SDNY. But I believe that would be inappropriate. So I'm not sure

how we would --

THE COURT: I don't disagree with you.

MS. MCGUFFEY: Yeah. So that's my only point, and I understand Your Honor gets it, so that's all I have.

THE COURT: Okay.

MS. MCGUFFEY: Thank you.

MR. MOORE: Your Honor, if I may answer your question.

THE COURT: Sure.

MR. MOORE: On October 21st, the SDNY Court entered an order requiring a Rule 26(f) Report by November 5th, which is tomorrow.

THE COURT: And where is that?

MR. MOORE: I apologize. It's not an exhibit, Your Honor. I'm looking at the actual docket, which I think is maybe in the Debtors' book, if I may.

THE COURT: Okay.

MR. MOORE: Yes, Your Honor. It is in the Debtors' exhibits. It's Exhibit 3. And it's Page 92 of 92. It's Docket No. 637. The docket entry states: The parties as to whom this action is not stayed are directed to submit a Rule 26(f) Report by November 5th, 2026.

THE COURT: Okay.

MR. MOORE: And it's in that Rule (f) report process as between the parties that are not stayed and Leadenhall that the parties are discussing potential document discovery

deadlines and things of that nature.

THE COURT: Okay. All right. Thank you.

All right. I'm going to step down for a few minutes, gather my thoughts, and then I'll come back out and give you all a ruling.

The Court will be in recess.

THE CLERK: All rise.

(A recess ensued from 2:48 p.m. until 3:19 p.m.)

THE CLERK: All rise.

THE COURT: All right. Please be seated.

Okay. Let's go back on the record in Case 26-90190.

Before the Court for determination today is Advantage Capital Holdings, LLC's Motion for Relief from the Automatic Stay to Issue Written Discovery in the SDNY Action, filed at Docket No. 367. We have the Debtors' objection thereto, filed at Docket No. 429, and the Committee's joinder in support of the Debtors' objection at Docket No. 432.

The proceeding initiated by the motion of Advantage Capital Holdings, LLC, which I'll just refer to as "A-CAP" for short, but the proceeding initiated by the motion is a proceeding as to which the Court has jurisdiction pursuant to 28 U.S.C. Sections 1334 and 157, and Miscellaneous Order No. 33 of the District Court for the Northern District of Texas.

The venue of the proceeding in this district is proper pursuant to 28 U.S.C. Section 1409, and the proceeding is core

in nature pursuant to 28 U.S.C. Section 157(b)(2)(G).

With respect to the nature of the relief, the Court notes that we had two waves of Debtor filings. The first wave of filings, which involved a very large number of Debtors, was on August 9th, 2026, and included, among other Debtors, 600 Partners, LLC and 777 Partners, LLC. So those Debtors have been a party to this bankruptcy case since August 9th, 2026.

The Court notes that there was actually also an involuntary proceeding that had been filed even prior to that in the Florida Bankruptcy Court. So, in essence, we had, using common lingo, a petition date that even preceded the August 9th, 2026 date. But just for the sake of making things simple, I'm just going to focus on the August 9th, 2026 date as the petition date, at least in this Court, vis-á-vis the first wave of Debtors.

We had that second wave of Debtors on September 10th, 2026. But again, just to try to keep things simple, I'm just going to focus on the 777 Partners and 600 Partners entities because those have been around in this Court since at least August 9th, 2026.

I make that reference because referring to that date as the petition date, as I know all Counsel are fully aware, but noting it for purposes of our record, the initiation of a bankruptcy case automatically imposes the provisions of 11 U.S.C. Section 362(a), which we commonly refer to as the

automatic stay. And 362(a) expressly provides that a petition filed as a voluntary petition for relief, under Chapter 11 or any other chapter, but here, for purposes of this case, Chapter 11, operates as a stay applicable to all entities, and "Entities" is separately defined in the Bankruptcy Code very expansively to include virtually any type of individual or entity or organization. But it operates as a stay of, among other things, the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the Debtor that arose before the commencement of a case under this title.

With that in mind, as of August 9th, 2026, that provision of the automatic stay was in full force and effect. The request before the Court today is a request recognizing that. A-CAP at least recognizes that we have a stay that is in place. So we have a request that's been made under 11 U.S.C. Section 362(d)(1) for relief from that automatic stay to allow the A-CAP Parties, either party or parties, whichever is a defendant, codefendant in litigation that I'm going to talk about in a minute, to issue written discovery to the Debtors.

So, with that in mind, to provide some context into how did we get here, prepetition, we had litigation initiated by

Leadenhall Capital Partners, LLP and certain of its affiliates, it would appear, against certain parties. And I'm just going to refer to the parties that I'm aware of now. There may have been parties that were added from time to time or whatever. But we had prepetition litigation initiated by Leadenhall, for short, against, among others, 777 Partners, 600 Partners, and various other Debtors, as well as a number of parties affiliated with the Debtors and A-CAP. And that was initiated back in 2024.

The case is pending in the United States District Court for the Southern District of Texas under Civil Action No. 1:24-cv-03453. And I'll just use the same nomenclature that A-CAP has been using -- I think, frankly, both the parties have been using -- which we'll just call it the "SDNY Litigation", even though it's a little bit of a tongue twister.

The live complaint in the SDNY Litigation has been introduced into evidence. It's A-CAP Exhibit 3 and Debtor Exhibit 5. It's the same thing. It's styled as a Corrected Amended Complaint. It is 156 pages long, excluding the possibility of any exhibits. I don't know if there are exhibits, but that's just the body of the complaint. There are multiple Debtors that are named as Defendants in the case, including, without limitation, 777 Partners and 600 Partners. A-CAP is also named as a Defendant in the action. And one or

more of the Debtors and A-CAP are jointly sued on 11 different causes of action.

So, to reiterate that, I'm not saying that there are 11 causes of actions, and as between the parties A-CAP and the Debtors are named as to various of those. We have 11 separate pled causes of action as to which the cause of action is asserted jointly against the Debtors, either a Debtor or multiple Debtors, and A-CAP. I'll come back to that in a minute.

To date, the Debtors have not been severed from the case. To date, the Debtors, who are named as Defendants, have not been dismissed from the case. And again, in this 156-page complaint, to provide additional color with respect to what are we talking about in terms of the nature of these claims, the claims that have been asserted against one or more Debtors and A-CAP jointly, among other parties, by the way, are breach to a sale agreement, breach of a servicing agreement and LSA, civil RICO, civil RICO conspiracy, fraudulent misrepresentation, civil conspiracy to commit fraud, aiding and abetting fraud, unjust enrichment, actual fraudulent transfer under relevant New York laws, constructive fraudulent transfer under relevant New York law. And those are the 11 overlapping causes of action.

Notwithstanding the purported recognition that there is a stay against the prosecution of those causes of action against

the Debtors, there is ongoing discovery as we speak that may, and possibly even is, presenting prejudice, or at least possible prejudice, to the Debtors, if for no other reason because of the necessity to keep up with what is going on by the Debtors to ensure there will be no prejudice to the Debtors and the estates because of the fact that they are still parties to the case.

Some of the causes of action -- namely, the fraudulent transfer causes of action -- very well may be subject to the control of the Debtors' estates by and through the Debtors as Debtor-in-Possession because of the nature of those claims, with discovery ongoing, as we speak, possibly in relation thereto.

So, why are we here? As evidenced by Debtors' Exhibit 7, there was a magistrate order entered at one point in time that was designed to control general pretrial management. On Page 1, there's a Discovery section that noted that once the motions to dismiss, which had been asserted by many if not all of the Defendants, including, without limitation, the Debtors and A-CAP separately, but once those motions to dismiss were disposed of -- actually, let me get to this.

So, it recognized that there would be a discovery cutoff that would be nine months after the date on which the Court resolves Defendants', plural, pending motions to dismiss. And it also recognized that the Court had previously directed that

document production could proceed against all parties except for Defendants Josh Wander and Steven Pasko, but that the deposition discovery were to remain stayed pending a decision on the motions to dismiss, and that it recognized or imposed upon the parties an obligation to inform the Court within two weeks of the resolution of the pending motions to dismiss so that the magistrate judge could schedule a case management conference.

This order I'm talking about at Debtors' Exhibit 7 was obviously entered by the magistrate judge, which is, of course, common in complex litigation, to have the magistrate judge involved in coordinating pretrial matters.

It appears that all of the motions to dismiss have been disposed of except with respect to the Debtors, and that, as evidenced by Debtors' Exhibit 3, an order was entered on October 21st, 2026 directing the parties "to whom the action is not stayed" to submit a new Rule 26(f) Report by November 5th, 2026 -- *i.e.*, tomorrow.

So, it would appear that where A-CAP's angst is coming from is that there is this indicator of a possible nine-month clock that has started based upon the date of the denial of A-CAP's motion to dismiss. And hence they wish to conduct discovery against the Debtors. I say that because it's not, frankly, entirely clear to the Court where all this may go with respect to discovery issues because we don't have, it

would appear to the Court, a denial of the Debtors' motions because those are stayed, and hence I question whether or not the nine-month clock would involve or relate to the Debtors at all.

But I certainly understand the knee-jerk reaction by A-CAP to want to not get caught in the wind here and find out that its belief with respect to whether or not the nine-month clock is ticking didn't affect it whenever the Court may say it did or what have you.

That said, it's not clear to this Court that that clock has started ticking, frankly, at all, given the fact that we don't have all of the motions to dismiss disposed of. And it's not entirely clear to the Court what may transpire in connection with the Rule 26(f) Report that's submitted, apparently at the direction of the District Court by no later than tomorrow, by the parties other than the Debtors and what those parties may report to the District Court with respect to what should happen as to the discovery cutoff, given the fact that the Debtors are still parties to this lawsuit.

I'll come back to this in a minute.

In relation to all of this, we have the proposed discovery, which I do appreciate the fact that A-CAP has specifically set out, here's what we are wanting to do, by actually presenting the draft discovery, and that is A-CAP Exhibit 2, which spans greater than 80 pages' worth of written

discovery.

Now, I can only imagine that probably the discovery it got might have been even more than 80 pages, knowing how these parties love each other, but I'm highlighting the number of pages involved because part of the Debtors' response in relation to this, and the Committee echoing it to some degree, is we have at Debtors' Exhibit 15 a copy of the final Debtor-in-Possession financing order, which includes at Paragraph 8 -- noting, by the way, that the DIP Lender under the DIP financing order is the Plaintiff in the SDNY Litigation, which makes this even more intriguing -- but we have in Paragraph 8 of the DIP financing order a number of case milestones, which includes that, by no later than November 21st, 2026, *i.e.*, like two and a half weeks from now, or thereabouts, a deadline for the filing of a plan, a disclosure statement, and what we commonly refer to as a solicitation procedures-type motion. And of course, I'm sure that there's language that says, that is consistent with the plan term sheet that was previously worked up in connection with the DIP financing and is reasonably acceptable to the DIP Lender and all this.

We have a deadline of January 22nd, 2027, *i.e.*, a little over two months from now, to get to confirmation. And we have a deadline of February 5th, 2027 for that confirmed order and the plan to go effective.

Now, of course, there is flexibility built into the DIP

financing order that the DIP Lender can agree, potentially, to a modification of some of those deadlines, but none of us has a crystal ball. I certainly don't. And so the fact that there is flexibility to do that doesn't really mean anything today.

So, lastly, in terms of evidence, we have the Debtors' Exhibit 2, which is the declaration of Mr. Shapiro, in which he highlights, among other things, in Paragraph 8 that there are currently 14 employees on board at the Debtors. And inasmuch as the Debtors are in wind-down mode, I accept Mr. Shapiro's representations to the Court and to the parties here that all documents are -- we're basically in a litigation freeze because of SEC investigations; the pending SDNY Litigation; obviously, we've got this bankruptcy case, which is not the least of the laundry list of things to note, with the Committee heavily involved.

So we have a lot of processes effectively in place to ensure that there's not going to be any spoliation of evidence.

But going back to the declaration testimony of Mr. Shapiro, he notes in Paragraph 13, I'm just going to read his testimony: "Responding to the requests," which is referring to the proposed discovery, "would require the Debtors to, among other things, (a) identify custodians, many of whom are former employees; (b) locate, preserve and collect emails,

shared drives, accounting systems, servicing databases, and bank records, some maintained by third parties or legacy systems; (c) process and host the collected data with an e-discovery vendor; (d) review the documents for responsiveness, privileges, and confidentiality, including potential estate claims and causes of action; (e) prepare written responses, objections, and interrogatory answers; and (f) participate in the meet-and-confer process and discovery disputes that I expect will follow."

That's all from Paragraph 13. And then he goes on in Paragraph 14 to indicate: "The Debtors' approximately 14 employees do not have the time, training, or capacity to perform this work while also meeting the final DIP order milestones."

So those are the background contextual facts. Turning to the analysis that's at issue here, again, the relief that's being sought is under 11 U.S.C. Section 362(d)(1), which allows for modification of the automatic stay for cause. "For cause" is not defined within the Bankruptcy Code, and so most cases tend to, at a very high level, describe it as the Court is to look at the totality of the circumstances involved and assess whether or not sufficient cause has been presented to provide relief from the automatic stay.

Here, the cause that has been presented to the Court is the concern by A-CAP that the clock is ticking in the SDNY

Litigation with respect to it, and a potential discovery deadline, which, while may be out in June of 2027 if we count out the nine months, is nevertheless, given the complexity of the litigation, not super-long from now, frankly, in the scheme of things, given the degree of potentially-responsive items there might be. And the fact that we're going to have 30 days, even if the stay is lifted, there's going to be a 30-day responsive deadline before anything is even starting to get pushed out. So that is the proposed cause.

The Debtors have responded by noting, among other things, that, when we're dealing with litigation-related stay relief requests, that we have the benefit of, whether we look to *Curtis* or we look to *Sonnax* or whatever, we have some cases out there that have identified a variety of factors that ought to be looked at to consider whether or not relief should be granted. And I'm just going to roll through some of these. Frankly, I think that the factors that have been identified and are laid out on the Debtors' response on Page 12 of the objection are illustrative. They're clearly not exhaustive. They do help facilitate discussion. So, again, I'll kind of use them as a guide to talk about some of these things, but they are highly relevant to the Court's consideration of where we're at.

One of them is, if relief is provided from the stay, will that result in a partial or complete resolution of the issues

that are wound up in the litigation? Here, vis-á-vis from the Debtors' perspective, the answer would be clearly no, because the action, if I provide full benefit to what I think the District Court is trying to do, has recognized that any prosecution of the case against the Debtors is stayed, and therefore none of this is going to inure, in some respects, to the benefit of the Debtors. Maybe somebody could argue that having to marshal evidence would inure indirectly to the Debtors because it helps them also start to garner the war chest of potentially-relevant information to defend, ultimately, on claims that would be asserted presumably in the bankruptcy case against the Debtors. But it certainly isn't going to lead to the "complete resolution" of the issues.

And I just want to use this as a launching point to talk about why I expressed frustration during the course of the proceedings about all of this stuff going on. I think it is, with all due respect to what has been going on up in New York, a little misguided and slightly too simplistic to believe that allowing discovery to take place among other parties to litigation, with a recognition that the stay precludes the continuation of the litigation against the Debtors, somehow escapes the grasp of the automatic stay.

It is certainly prejudicial to the Debtors because the Debtors are party to the litigation. There is no way that the Debtors can get the breathing spell from the litigation and

sit on the sidelines completely and focus on the bankruptcy case, which is exactly what early Supreme Court case law talked about in the context of automatic stay issues, while collateral activity is going on among other parties to the action, including, without limitation, codefendants on causes of action as to which the Debtors and another party are named as co-parties.

It would be different, for example, if there was an independent fraud cause of action asserted against A-CAP for something that A-CAP allegedly misrepresented to Leadenhall, as to which the Debtors aren't a party to. I would a hundred percent be in agreement that there is little to probably no or very nominal risk to the Debtors of any prejudice of discovery ongoing with respect to that. But here, when we have breach claims going on with respect to the Debtors and A-CAP relating to the same agreements; when we have civil RICO claims being asserted against the Debtors and A-CAP; when we have conspiracy and aiding and abetting claims going on that involve fraud against the Debtors and A-CAP; it is naïve to believe that allowing discovery to be ongoing among the other parties is non-prejudicial to the Debtors. It is absolutely one hundred percent prejudicial to the Debtors, and it's going to require, to the extent that it's allowed to continue, the Debtors, through their retained counsel -- and now I understand why we needed retained counsel in relation to the

SDNY Litigation. I sort of figured it was a backstop in case the stay ever gets lifted and we needed counsel up there, or alternatively, it was to be consulting counsel. I had no idea that we were authorizing counsel because we need somebody to be basically reading all the discovery that's flying back and forth to make sure that the Debtors aren't being prejudiced. But that's where we're at. Now I've got the estate incurring expense and I've got people having to pay attention to it, and anytime Counsel needs the input of individuals who might have been involved in all that, now we're distracting those individuals from being focused on the plan process to have to deal with monitoring what's going on in connection with ongoing discovery. And that's a problem.

And I know I suggested that I might issue a Show Cause Order. I'm here to tell you I'm not going to do it. But if somebody else wants to do it, I'll understand why.

Another factor for consideration is interference with the bankruptcy case. Well, I think I made the point as to that with what I just said. Absolutely, if we open the door now to discovery involving the Debtors, that is going to interfere with what needs to be going on in the bankruptcy case.

The third factor: Other proceeding involves the Debtor as a fiduciary. I don't really know what the Court was thinking with respect to that factor, but clearly that's sort of the case in the SDNY Litigation, because I don't know if it's so

much as the Debtor is a fiduciary really matters as much as we certainly have all kinds of fraud-based claims going on, which, again, that's why I say, in a fraud-based case, the Debtors can't sit on the sidelines. Even if we pretend that the case isn't proceeding against the Debtors, they're a party. They haven't been severed. They haven't been dismissed. They're a party to litigation. So it's clearly going to involve the Debtor one way or the other.

Do we have a specialized tribunal? No. Although I say that with all due respect to the Southern District District Court. That's not to suggest that the Southern District District Court is not a highly-sophisticated court. Of course, it absolutely is, but it's not a specially-created tribunal for these types of cases, and it's not like an MDL proceeding or something like that.

Whether or not the Debtors' insurer has assumed full responsibility for defending. I don't have any evidence on that one way or the other.

Whether the action primarily involves third parties. It does not. The Debtors are still in the mix.

Whether the litigation in another forum would prejudice the interests of other creditors. Well, I think the Committee has made its view on that. Absolutely. If the Debtors have to focus the attention right now on dealing with this, it puts potentially some risk on being able to complete the plan

process that's in place under the DIP financing order because of the distraction, and it certainly drains resources that have been modeled financially, just because the Court knows this from the DIP financing hearings, on the fact that we are not having extracurricular litigation through at least the end of this plan process, which is only a matter of months from now. So it would be prejudicial to other creditors, being unsecured creditors in the case.

Whether the judgment claim -- this doesn't even relate. There is no judgment claim. This is pre-judgment litigation. So, Factor 8 is irrelevant.

Whether the success by A-CAP in the other proceeding would result in a judicial lien. That's irrelevant. It has nothing to do with any of this.

Interests of judicial economy and the expeditious and economical resolution of the litigation. I think from the standpoint of Leadenhall, who obviously is not a movant, but they would think, absolutely, this is helpful -- to their litigation. With respect to A-CAP, A-CAP probably thinks, yes, it would be helpful to their ability to defend. I am here to tell you that I think that this will create judicial un-economy and non-expeditious resolution for the following reasons. And I'm going to say this as delicately but as directly as I possibly can: The proposed discovery at A-CAP Exhibit 2 is absolutely super-overbroad and objectionable. I

don't think it was formulated in good faith. I certainly don't think it was formulated in a good-faith attempt to recognize where we are in this bankruptcy case, and that is illustrated by some of the requests that were identified by Mr. Bishop during the course of our discussion in relation to A-CAP Exhibit 2, where we have expansive definitions; we have no time limits on certain requests; we have extraordinarily broad requests with respect to the use of funds. I mean, documents and communications concerning the use, intended disposition, and ultimate disposition of any funds you -- "you" being expansively defined to include the Debtors and the Debtors' affiliates, like, individuals that had any control over the Debtors, and certain affiliates, and whatever -- but any funds you received from any creditor or lender pursuant to the transactions. And "transactions," obviously, is about our only limited governor. But we've got no time limit on that. Maybe there inherently is a time limit because "transactions" is defined in a way that cabins it.

But we've got the suggestion that the Debtors have counsel, counsel can deal with this. As Mr. Shapiro noted in his declaration testimony, there's no way that -- the lawyers don't control everybody's email accounts and iPhones and boxes of documents. You're talking about individuals have to be involved with that, and we've got 14 people, 14 people on the ground who have longer-term institutional knowledge of what

was going on.

That's just unreasonable. It's patently unreasonable. And so my concern here is, when we talk about judicial economy, here's the fear that I would have: We would end up having dual discovery hearings, which I absolutely one hundred percent do not want to do. I don't want to be having hearing after hearing here to talk about how can we scale back these discovery requests so that it's something that's manageable by the Debtors and then have objections that have to be lodged up in New York, and you've got the New York district judge making decisions as to Rule 26 and discovery scope issues, and then we have the possibility of conflicting rulings.

There is nothing about this process that is -- and, again, I'm trying to say this very directly. I get where A-CAP is. I think A-CAP turned around and started launching discovery that it was as wildly expansive as what they were receiving. This is just knowing from when I was in practice. This is how it works. Everybody starts launching this insanely over-expansive discovery that's not -- sort of, some might argue, intended to cost a lot, so that people will soften and try to realize, we need to resolve these matters.

I just don't think that this is reasonably calculated, under the facts and circumstances of where the Debtors are, to be reasonable, to be something that wouldn't be subject to a protective order. I don't want to have protective order

proceedings here, because it gets awkward because I'm doing it in the context of a lift stay proceeding. I'm sure that the District Court up in New York doesn't want to have discovery hearings on protective order issues, because then that gets really weird. This kind of goes back to sort of this odd approach, which is so the District Court is going to agree that the case is stayed as to the Debtors, but yet the Debtors are forced to file a motion for protective order in the stayed litigation. That makes no sense to me.

In any event, the point is that that factor is not supportive of providing relief from the stay.

The next factor, whether the parties are ready for trial. Obviously not. A long ways from that.

And then the impact of the stay on parties and the balance of harms. Well, I do agree with A-CAP that they are ostensibly exposed here by what's going on up in New York, which is why I'm continuing to scratch my head, why are we doing this? I don't understand why our DIP Lender is forcing the issue up in New York in a way that necessarily is causing A-CAP to run down here to try to get relief from the stay so that we can cause the estate to expend a bunch of resources, which is being funded by Leadenhall. This is a circular, very bizarre, nonsensical exercise that is going on for a period of time that Leadenhall itself has cabined as February 5th, 2027, a mere, what, three months from now, right? Yes, I guess it

would be right at three months from now.

I do not understand why everybody is not going up to the District Court in New York and singing *Kumbaya* and saying, Judge, we agree. We know this case has been on your docket a long time, and we apologize for that. We, the Plaintiff, have cabined the Debtor to a tight timeline on when things have to happen in the bankruptcy case. We kind of tend to agree they need to focus on that. So if you will just ride with all of us with a short additional three-month window, because that's part of the order in the Bankruptcy Court, please do that for us so that we don't have to have these crazy hearings in front of the bankruptcy judge down in Fort Worth, because he's getting frustrated with us.

I bet the judge would be like, okay; if all we're talking about is three months, okay.

But I can't force the parties to do what they're going to do. All I can do is I can assess whether or not sufficient cause has been presented to provide relief from the stay.

With respect to this matter, I do need to note, just to try to be complete, that with respect to this type of issue, the burden of proof is on the Debtors, pursuant to 11 U.S.C. Section 362(g)(2), and I find that the Debtors have satisfied the burden of proving that cause has not been established to provide any relief from the automatic stay at this juncture. So the motion will be denied in all respects.

Now, I'm going to drop a few footnotes to all of this. The denial is without prejudice. I fully expect A-CAP to include in that Rule 26(f) report to the District Court what has happened here and the impact that that ought to have with respect to a discovery cutoff. I think that Leadenhall ought to reassess exactly what they're doing up in New York with respect to the litigation and whether or not they are being very careful to ensure that we're not tripping a wire under 362(a)(1), or, frankly, (a)(6), vis-à-vis claims that may be fraudulent transfer-based claims that may be subject to the control of the estates. I'm sorry. It's not (a)(6). It's (a)(3).

But in any event, if the District Court says, nope, here's the discovery cutoff, sorry, A-CAP, you've got to figure it out, then I will certainly reconsider a renewed motion.

What I would tell the A-CAP folks, though, is you all need to throttle back, and even if we need to do things in swaths, we could try to do this in waves so that it is manageable. Right now, if I were to allow all this to be issued, there is no way that they would be able to deal with it. It's so expansive. So you all need to get your litigation team to stage it and throttle back and come up with a game plan that's manageable. If, in fact, if things are going to plow forward, I'm not going to allow A-CAP to be exposed because something's going on up north that prejudices them unless they can't get

discovery. But we do have to protect against the prejudice to the Debtors.

So that's sort of a longwinded way of saying I do sort of view this as potentially premature, depending upon what happens after this Rule 26(f) Report process. But if we need to get back and regroup on it, please just be conferring with the Debtors. They know where I'm going now. You know where I'm going now.

In the midst of all this, also, there's no reason, given the bankruptcy case, why there can't be some sharing of productions. And if we need -- I think we already might have some sort of protective order, kind of a global protective order in place so that stuff isn't going somewhere where it shouldn't go. But I would just encourage the Debtors to voluntarily share information that's being shared with others, subject, of course, if there's privilege issues or whatever else.

I'm just trying to -- let's eliminate as much of the clutter as we can or barriers that we can to deal with the fact that there is this litigation that's going on, and at some point it is going to continue, it appears.

So just see what you can do to manage that process and kind of collaboratively produce what can be produced as things go along, just from a -- but keep track of it, and then don't ask for it again if you get it, obviously.

But that's all I've got for you all. Any questions?

All right. Well, then -- yes, sir?

MR. MOORE: Would the Court like us to prepare a form of order, or are you going to prepare your own?

THE COURT: I was going to actually look over at Mr. Bryan and put that burden on his plate. But it will be a really light burden, because, frankly, all it should say is just incorporate by reference the Court's oral ruling, and for those reasons, that the motion is denied. But, again, I'm just noting for the record that it's denied without prejudice for the reasons that I've talked through. Okay?

All right. Well, very good. It's good to see you all, even if under these circumstances. I'd much rather be talking about a consensual confirmed plan, but there's still time, we can still get there. But it is good to see you all.

And that will take care of what we had on the docket this afternoon at 1:30. The Court will be in recess.

THE CLERK: All rise.

(Conclusion of proceedings at 4:06 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*/s/ Kathy Rehling* *11/05/2026*

______________________________ ______________

Kathy Rehling, CETD-444 Date

Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 3

OPENING STATEMENTS

By Ms. McGuffey 7
By Mr. Bishop 12
By Ms. Dwoskin 26

WITNESSES

Debtors' Witnesses

Mark Shapiro
- Direct Testimony by Declaration 28
- Cross-Examination by Mr. Moore 28
- Redirect Examination by Mr. Bishop 37

EXHIBITS

A-CAP Parties' Exhibits

Exhibit 1 Admitted 6
Exhibits 2-3 Admitted 7
Exhibit 4 Admitted 6
Exhibits 5-7 Admitted 7

Debtors' Exhibits

Exhibits 1-3 Admitted 24
Exhibit 4 Admitted 26
Exhibit 5 Admitted 24
Exhibits 6-15 Admitted 25

CLOSING ARGUMENTS

By Ms. McGuffey 39
By Mr. Bishop 46
By Ms. Dwoskin 52

RULINGS 58

END OF PROCEEDINGS 81

INDEX 82